UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICOLE HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| CITY OF CHICAGO; Chicago Police | ) |
| Officers ROBERT BARTIK, #3078; | ) |
| DEMOSTHENES BALODIMAS, #21204; | ) |
| ROBERT CORDARO, #20689; | ) Case No. 14-cv-4391 |
| JOHN J. DAY, # 20926, | ) |
| JAMES M. KELLY, #22121; | ) Judge John W. Darrah |
| MICHAL LANDANDO, #20417; | ) |
| ANTHONY NORADIN, #21252; and | ) |
| RANDALL WO, #20232; | ) |
| Assistant Cook County State's Attorneys | ) |
| ANDREA GROGAN and | ) |
| LAWRENCE O'REILLY; and | ) |
| THE COUNTY OF COOK, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Nicole Harris, filed an eight count Complaint, alleging various claims stemming from her arrest, subsequent conviction, and later acquittal for the murder of her son. Defendants Robert Bartik, Demosthenes Balodimas, Robert Cordaro, John J Day, James M Kelly, Michael Landando, Anthony Noradin, and Randall Wo (collectively, "Defendant Officers") filed a Motion to Dismiss on September 15, 2014, which was joined by Defendant City of Chicago. Defendant Assistant Cook County State's Attorneys Andrea Grogan and Lawrence O'Reilly (collectively, "Defendant ASAs") and Defendant Cook County filed their own Motion to Dismiss on November 10, 2014.

## BACKGROUND

The following is taken from the Complaint, which is assumed to be true for the purposes of a motion to dismiss. *Reger Dev., LLC v. Nat'l City Bank,* 592 F.3d 759, 763 (7th Cir. 2010). Defendants D Demosthenes Balodimas, Robert Cordaro, John J Day, James M Kelly, Michael Landando, Anthony Noradin, and Randall Wo were Chicago Police Department Officers assigned to the Detective Division of the Area 5 Violent Crimes Unit. (Compl. ¶ 7.) Defendant Robert Bartik was a Chicago Police Department Officer assigned to the polygraph unit. (*Id.* at ¶ 6.) Defendant ASA's were Assistant State's Attorneys with the Cook County State's Attorney's Office. (*Id.* at ¶ 8.)

In May 2005, Plaintiff lived with her two sons, Diante and Jaquari, and the boys' father, Sta-Von Dancy. (*Id.* at ¶ 12.) On May 14, 2005, Plaintiff and Dancy were at the laundromat while the children were in the boys' room, which contained a set of bunk beds. (*Id.* at ¶¶ 13-15.) Jaquari wrapped an elastic band from a fitted sheet belonging to the top bunk around his neck. (*Id.* at ¶ 17.) Upon their return, Dancy went to check on the children and saw that Jaquari was lying flat on his stomach on the floor, a bubble was coming out of his nose, and his face was purple. (*Id.* at ¶ 18-19.) The elastic band was wrapped around Jaquari's neck. (*Id.* at ¶ 20.) Dancy attempted to perform CPR and carried Jaquari outside. (*Id.*)

Plaintiff and Dancy borrowed a phone and dialed 9-1-1. (*Id.* at ¶ 22.) An ambulance arrived and took Jaquari to the hospital. (*Id.*) Plaintiff and Dancy retrieved Diante and headed to the hospital. (*Id.* at ¶ 24.) When they arrived at the hospital, Plaintiff was informed that Jaquari was dead. (*Id.* at ¶ 26.) Less than an hour later, detectives and officers from the Chicago Police Department, including Defendants Wo and Day, approached Plaintiff and Dancy. (*Id.* at ¶ 28.)

Defendants Wo and Day asked Plaintiff and Dancy to go to the police station so detectives could ask them some questions. (*Id.* at ¶ 29.) Plaintiff and Dancy were taken to Area 5 Police Headquarters in separate marked police cars. (*Id.* at ¶ 30.) Diante was in the car with Plaintiff. (*Id.*)

When they arrived at the station, Plaintiff and Dancy were placed in separate rooms. (*Id.* at ¶ 32.) At approximately 9:00 p.m., Plaintiff was placed in an interrogation room, known as the "butterfly room," and questioned by several detectives, including Defendants Noradin and Kelly. (*Id.* at ¶ 33-34.) During the questioning, Plaintiff told the detectives about an attempt to fix the phone cord in their apartment. (*Id.* at ¶ 35.) At some point during the questioning, Plaintiff and Diante tried to leave the room, but a detective told them to stay in the room. (*Id.* at ¶ 36.) Defendants Day and Wo questioned Dancy in another room. (*Id.* at ¶ 37.)

During Plaintiff's and Dancy's questioning, at approximately 10:30 p.m., Defendants Balodimas and Landando went to the apartment and took the phone cord as evidence. (*Id.* at ¶ 38-39). Upon their return to the station, Balodimas and Landando shared their theory with Noradin, Kelly, Day, and Wo that Plaintiff had used the phone cord to strangle Jaquari. (*Id.* at ¶40.) Plaintiff alleges that, shortly thereafter, Balodimas, Landando, and Noradin falsely claimed that Plaintiff spontaneously confessed to killing Jaquari. (*Id.* at ¶ 41.) She alleges that Noradin, Kelly, Day, and Wo wrote her false confession into police reports. (*Id.*) Plaintiff further alleges Noradin and Kelly fabricated a police report claiming that Plaintiff recanted her incriminating statement after being informed that State's Attorneys were coming to talk to her. (*Id.* at ¶ 43.)

At approximately 11:00 p.m., Defendant Kelly contacted the Special Investigation Unit of the Children's Advocacy Center to arrange for a "Victim Sensitive Interview" of Diante. (*Id.* at ¶ 44.) Diante was questioned by Ale Levy of the Children's Advocacy Center. (*Id.* at ¶ 48.) Defendant Wo observed this interview. (*Id.* at ¶ 49.) Diante said that he saw Jaquari wrap the elastic band from the blue sheet on the top bunk around his neck but that he could not help Jaquari. (*Id.*) Plaintiff alleges that Wo, in agreement with Noradin, Kelly, and Day, deliberately omitted Diante's exculpatory statements from the Official Cleared and Closed Supplementary Report. (*Id.* at ¶ 50.)

Noradin took Plaintiff into a different interrogation room, where she was questioned by Noradin, Balomidas, and Landando. (*Id.* at ¶ 51.) Noradin pushed Plaintiff onto a bench and handcuffed her arm to a bar over the bench. (*Id.* at ¶ 53.) Noradin, Landando, and Balodimas questioned, badgered, and yelled at Plaintiff. (*Id.* at ¶ 54.) At some point, Plaintiff asked for an attorney, but Defendants refused to allow her to contact one. (*Id.* at ¶ 57.) Defendants continued to accuse Plaintiff of lying, mocked her, and accused her of not crying real tears. (*Id.* at ¶ 56.) At some point, Defendants uncuffed Plaintiff and left her in the locked room. (*Id.* at ¶ 58.) Plaintiff was without anything to eat or drink for hours. (*Id.* at ¶ 62.) Plaintiff needed to use the bathroom and knocked on the door for approximately an hour before someone took her to the bathroom. (*Id.* at ¶ 63.) Defendants Noradin and/or Kelly asked Plaintiff to take a lie detector test, and Plaintiff agreed. (*Id.* at ¶ 64.) Because a lie detector would not be available until the next day, Plaintiff was left in the room the entire night and was not able to sleep. (*Id.* at ¶ 65.) Plaintiff had not been advised of her *Miranda* rights. (*Id.* at ¶ 66.)

Dr. John Scott Denton, a Cook County Medical Examiner, conducted an autopsy on Jaquari on May 15, 2004, at approximately 9:00 a.m. (*Id.* at ¶ 68.) Noradin and Kelly were present for the autopsy. (*Id.*) Denton concluded that the elastic band from the bed sheet was the cause of Jaquari's death, not the phone cord. (*Id.* at ¶ 69.) Noradin and Kelly relayed this information to Wo and another Defendant. (*Id.*)

Defendant Bartik administered the polygraph exam. (*Id.* at ¶ 72.) Prior to the polygraph examination, Noradin, Kelly and Day met with Defendant Bartik and told him about the investigation and their theories of the cause of Jaquari's death. (*Id.* at ¶ 71.) Defendant Bartik berated Plaintiff after administering the exam and told Plaintiff that the results indicated she was lying, which was not true. (*Id.* at ¶ 74.) Plaintiff requested an attorney but Bartik replied that she did not need an attorney and that having one would be detrimental to her. (*Id.* at ¶ 76.) Bartik told Plaintiff that she needed to cooperate by telling them what they wanted her to say. (*Id.* at ¶ 78.) At some point, Kelly, Noradin, and Day came into the room and aggressively questioned Plaintiff and told her that she would be in jail for life if she did not cooperate. (*Id.* at ¶¶ 80, 83.)

Plaintiff was transported back to Area 5, where she was interrogated by Noradin, Balodimas, and Cordaro. (*Id.* at ¶ 85.) Cordaro told Plaintiff that she was going to speak with an Assistant State's Attorney. (*Id.* at ¶ 86.) Plaintiff alleges that Cordaro told her to give Defendant Officers' fabricated story to the Assistant State's Attorney. (*Id.*) Cordaro allegedly repeated the story several times to make sure that she could remember it for the interview. (*Id.* at ¶ 87.) Defendant O'Reilly met with Plaintiff in the presence of Noradin and Balomidas. (*Id.* at

5

¶ 92.) Plaintiff recited to O'Reilly the false and fabricated confession, as instructed by the detectives. (*Id.*) Plaintiff told O'Reilly that she had been mistreated by the officers, and O'Reilly asked the officers to leave the room. (*Id.* at ¶¶ 93-94.) O'Reilly noted Plaintiff's complaints but did not cease the interrogation, investigate the misconduct, or give Plaintiff the opportunity to speak to an attorney. (*Id.* at ¶ 94.)

Plaintiff later met with Defendant Grogan at Area 5. (*Id.* at ¶ 95.) Plaintiff repeated the same false and fabricated confession to Grogan. (*Id.* at ¶ 96.) Plaintiff also told Grogan that she had been mistreated by the detectives, including that she had been physically and psychologically coerced. (*Id.* at ¶ 97.) Grogan left the room but did not give the Plaintiff an opportunity to speak to an attorney. (*Id.* at ¶ 98.) On May 15, 2005, shortly after 1:00 a.m., Plaintiff gave a videotaped statement, in which she gave the allegedly false confession to killing Jaquari. (*Id.* at ¶ 100.) The Defendant Officers memorialized the false and fabricated confession in official reports but omitted that it was the product of coercion and fabrication. (*Id.* at ¶ 101.)

Plaintiff was charged with murder and moved to suppress her confession. (*Id.* at ¶ 102.) Defendants Bartik and Noradin testified at the suppression hearing. (*Id.*) Noradin and Bartik allegedly falsely testified that Plaintiff had spontaneously and voluntarily admitted to the murder and that no one had physically or psychologically coerced Plaintiff into giving a false and fabricated statement. (*Id.* at ¶ 104.) The trial judge denied Plaintiff's suppression motion. (*Id.* at ¶ 109.) Defendants Bartik, Cordaro, Landando, Noradin, Grogan, and O'Reilly testified against Plaintiff during her trial. (*Id.* at ¶ 105.) Plaintiff was convicted and sentenced to thirty years' imprisonment. (*Id.* at ¶ 110.) In October 2012, the Seventh Circuit Court of Appeals overturned Plaintiff's conviction. (*Id.* at ¶ 114.) Plaintiff was released on bond on February 25, 2013. (*Id.*

at ¶ 115.)  On June 17, 2013, the Cook County State's Attorney dismissed all charges against Plaintiff.  (*Id.* at ¶ 116.)  Plaintiff was granted a Certificate of Innocence, pursuant to 735 ILL. COMP. STAT. 5/2-702.  (*Id.* at ¶ 118.)

## LEGAL STANDARD

Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  A complaint must allege enough facts to support a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility exists when the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  All well-pleaded allegations are presumed to be true, and all inferences are read in the light most favorable to the plaintiff.  *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013).  This presumption is not extended to 'legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'  *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).  The complaint must provide a defendant "with 'fair notice' of the claim and its basis."  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, 550 U.S. at 555).

## ANALYSIS

*Count I – Deprivation of Fair Trial and Wrongful Conviction*

In Count I, Plaintiff claims that she was deprived of the right to a fair trial and wrongfully convicted by Defendant Officers and Defendant ASAs.  It is not entirely clear what the basis of

Count I is.[1]  Plaintiff argues that her right to a fair trial was violated when Defendant Officers fabricated her testimony and used it at trial, but that is the essence of her claim in Count II.

Plaintiff argues that Defendant Officers and Defendant ASA's both knew about, and had a duty to disclose under *Brady*, their own pattern of engaging in unconstitutional conduct. "To succeed on a *Brady* claim, a plaintiff must show that: (1) the suppressed evidence is either exculpatory or impeaching and is favorable to the accused; (2) the government, either willfully or inadvertently, suppressed the evidence; and (3) the suppressed evidence resulted in prejudice." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014) (citing *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007)). To establish that evidence was suppressed, a plaintiff must demonstrate that: "(1) the State failed to disclose known evidence before it was too late for [a defendant] to make use of the evidence; and (2) the evidence was not otherwise available to [a defendant] through the exercise of reasonable diligence." *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002).

Plaintiff cannot claim that she was unaware of the officers' conduct regarding her own allegedly forced and fabricated confession. Plaintiff argues that the *Brady* violation stems from Defendants' failure to disclose the pattern and practice of coerced and fabricated confessions. However, the Seventh Circuit has repeatedly held that "*Brady* cannot 'serve as the basis of a cause of action against [police] officers for failing to disclose [the circumstances surrounding a coerced confession] to [a] prosecutor . . . .'" *Saunders-El v. Rohde*, No. 14-1570, 2015 WL 400559, at *5 (7th Cir. Jan. 30, 2015) *reh'g denied* (Feb. 26, 2015) (quoting *Sornberger v.*

---

[1] Plaintiff, in discussing the Defendants' Motion to Dismiss Count I, admits in a footnote in her response to Defendant Officers that there is no recognized federal claim for malicious prosecution, but "she seeks to preserve that claim" for the purposes of appeal. (Dkt. 72-1, p. 9.)

*City of Knoxville* 434 F.3d 1006, 1029 (7th Cir. 2006)). "*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El*, 2015 WL 400559, at *5.

Defendants' Motions to Dismiss are granted without prejudice as to Count I.

*Count II – Coercive Interrogation*

In Count II, Plaintiff alleges that Defendants Officers and ASAs coerced her into making false and fabricated admissions in violation of her Fifth and Fourteenth Amendment due process rights. Plaintiff makes the alternative claim that Defendants Officers and ASAs failed to intervene.

Defendants argue that the existence of a state law malicious prosecution claim disposes of any fabrication of evidence claim. That argument is not persuasive. As the Seventh Circuit has recently held, "fabrication can support a due process claim under § 1983." *Id.* at *2. A due process claim does not arise when criminal proceedings are based on false evidence or testimony because such a claim is one for malicious prosecution. *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir.2009). However, when evidence is manufactured against a criminal defendant and used to deprive her liberty, due process rights are violated. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (" . . . a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way.") This applies equally to evidence manufactured by police officers and/or by prosecutors acting in an investigatory capacity. *Id.*

Plaintiff alleges that Defendant Officers fabricated a confession and coerced her into making the fabricated confession. Defendants argue that Plaintiff's claim is more accurately

9

portrayed as a coerced confession. The Seventh Circuit has drawn a distinction between coerced testimony and fabricated testimony. "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false." *See Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("*Fields II*"). Fabricated testimony is deliberately inaccurate and, therefore, always false. *See Id.* A coerced confession does not lead to a cognizable due process claim, as opposed to a fabricated confession where there is a cognizable claim. *See Petty*, 754 F.3d at 422-23. This is not to say that the two are unrelated, indeed "coercion (which in an extreme case could amount to torture) may be an essential tool in 'persuading' a witness to fabricate testimony." *Fields II*, 740 F.3d at 1112. Here, Plaintiff alleges that her confession was both fabricated and coerced, the very situation contemplated in *Fields II*.

Defendants argue that the situation is more like *Petty*, where the Seventh Circuit held that a witness coerced into falsely identifying a defendant in a lineup was more accurately described as a coercion case and not a fabrication case. *Petty*, 754 F.3d at 419, 423-33. In *Petty*, there was "not one shred of evidence to suggest that CPD officers fabricated evidence." *Id.* at 423. Here Plaintiff alleges that Defendant Officers knew that the confession was false because they knew the results of the autopsy and they knew about Diante's testimony that his mother was not present when Jaquari died. (Compl. ¶¶ 49-50, 68-69.) As the Seventh Circuit has noted, "[a]t trial, by far the most damning evidence against Harris was her videotaped confession, recorded the day after Jaquari's death following 27 hours of intermittent interrogation at a Chicago police station." *Harris v. Thompson*, 698 F.3d 609, 612 (7th Cir. 2012). This videotape was essentially fabricated by Defendant Officers, as they caused Plaintiff to record a confession they knew was

10

false. Plaintiff has plausibly stated a claim by alleging facts that Defendants created a confession that they knew was false and then coerced Plaintiff into adopting it on the video they recorded.

## Statute of Limitations

Defendants also argue that Plaintiff's confession claim is time barred. Federal courts apply personal injury statutes of limitation from the state in which they sit. *Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1187 (N.D. Ill. 2013). In Illinois, the statute of limitations for § 1983 claims is two years. *Id.* Generally, a claim accrues when the Plaintiff has a complete and present cause of action, i.e. when the plaintiff can file suit and obtain relief. *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (Internal citations omitted.) Therefore, under ordinary circumstances, a claim arising from Plaintiff's confession in 2005 would be barred as untimely.

However, under the *Heck* doctrine, "a claim that implies the invalidity of a criminal conviction does not accrue, and the statute of limitations does not begin to run, until the conviction is set aside by the judiciary or the defendant receives a pardon." *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)). "In almost every case [in this district], the courts have concluded that where (as in this case) the plaintiff's conviction rested largely upon the allegedly coerced confession, a coercive interrogation claim necessarily impugns the validity of the conviction." *Tillman v. Burge*, 813 F. Supp. 2d 946, 970 (N.D. Ill. 2011). Defendants argue that *Heck* operates to bar civil claims that *necessarily* imply the invalidity of a conviction. (Dkt. 44, p. 7.) As stated above, the Seventh Circuit recognized that the videotaped confession was "by far the most damning evidence." *Harris*, 698 F.3d at 612. Additionally, if substantive due process violations occur only when fabricated evidence is used at trial, *see Saunders-El*, 2015 WL 400559, at *3-4, then necessarily the claim accrues

11

during the trial and implicates the validity of the conviction. The allegedly coerced and fabricated confession was the largest determining factor of Plaintiff's conviction; therefore, the claim was barred by *Heck* until Plaintiff's conviction was vacated. Plaintiff's claims are not time-barred by the statute of limitations.

## Immunity

Last, Defendant Officers argue that they are immune from Plaintiff's claims due to qualified immunity. An official is entitled to qualified immunity for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). 1110-11 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 275-76 (1993)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The specific act in question does not have to have been held unlawful. *Id*. Defendant Officers claim that the right to not be coerced into a confession has not been established by Seventh Circuit or Supreme Court decisions. However, as discussed above, Plaintiff's claim is a fabricated evidence claim. And "all courts that have directly confronted the question before us agree that the deliberate manufacture of false evidence contravenes the Due Process Clause." *Whitlock*, 682 F.3d at585. The contours of fabricated evidence claims were well established at the time of Plaintiff's claims. Defendant Officers are not protected by qualified immunity.

Defendant ASAs argue that they are absolutely immune from Plaintiff's claims. "[A] prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties." *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976). This

immunity is not just a defense to liability but immunity from suit. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Further, the immunity would extend to Plaintiff's conspiracy allegations because they are related to activities intimately associated with the judicial phase of the criminal process. *Imbler*, 424 U.S. at 431. Defendant ASAs would also be immune to any *Brady* claims that they suppressed exculpatory evidence. *See Fields II*, 672 F.3d at 514 (". . . a prosecutor is entitled to [absolute immunity] with respect to his actions and decisions pertaining to his fulfillment of *Brady*.")

Plaintiff argues that Defendant ASAs are not protected by absolute immunity because they were acting in an investigatory capacity. Prosecutors are not absolutely immune for everything they do: "[o]ften [prosecutor's] employment duties go beyond the strictly prosecutorial to include investigation, and when they do nonprosecutorial work they lose their absolute immunity and have only the immunity, called 'qualified,' that other investigators enjoy when engaged in such work." *Fields II*, 740 F.3d at 1111 (citing *Buckley*, 509 U.S. at 275-76). However, Plaintiff does not allege that O'Reilly or Grogan participated in the investigation. At most, Plaintiff alleges Defendant ASAs listened to and memorialized her confession and noted Plaintiff's complaints that she had been mistreated. (Compl. ¶¶ 92-98.) Plaintiff does not allege Defendant ASAs asked any questions or tried to develop any evidence.

Absolute immunity extends to "the [prosecutor's] professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273. Plaintiff does not allege that Defendant ASAs developed any evidence outside of what Defendant

13

Officers assembled for them. Plaintiff has failed to sufficiently allege that Defendant ASAs were working in an investigatory capacity and, therefore, unprotected by absolute immunity.

### Failure to Intervene

Defendant Officers do not address Plaintiff's failure to intervene claim. Defendant ASAs argue that there is no cognizable claim against them for failure to intervene. A prosecutor's failure to intervene may render her culpable under § 1983. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994). However, failure to intervene claims against prosecutors have only been maintained where the Plaintiff sufficiently alleged that prosecutors were exercising police powers. *See Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013) (citing *Rivera*, 974 F. Supp. 2d at 1191). Several courts have declined to recognize failure to intervene claims. *See Gordon v. Devine*, No. 08–CV–377, 2008 WL 4594354 at *17 (N.D. Ill. October 14, 2008); *Andrews v. Burge*, 660 F.Supp.2d 868, 876 n.6 (N.D.Ill.2009); *Hobbs v. Cappelluti*, 899 F.Supp.2d 738, 773 (N.D. Ill. 2012). As discussed above, Plaintiff has not sufficiently alleged that Defendant ASAs were exercising police powers and had a realistic opportunity to prevent Defendant Officers from violating her rights.

Defendant Officers' Motion to Dismiss Count II is denied. Defendant ASAs' Motion to Dismiss Count II is granted without prejudice.

### *Count III – Monell Claim*

In Count III, Plaintiff alleges that the actions of Defendants Officers and ASAs were done pursuant to *de facto* policies, practices, and/or customs of the City of Chicago.

"While a municipality is not vicariously liable under § 1983 for the acts of its employees, a constitutional deprivation may be attributable to a municipality 'when execution of a

14

government's policy or custom . . . inflicts the injury.'" *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir.2008) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); and *Schlessinger v. Salimes*, 100 F.3d 519, 522 (7th Cir.1996)). "A local government unit's unconstitutional policy or custom can be shown by: (1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir.2008). In order to state a claim, Plaintiff must go beyond a "formulaic recitation of the cause of action" and "give enough detail about the subject-matter of the case to present a story that holds together." *McCauley v. City of Chicago*, 671 F.3d 611, 616, 617 (7th Cir. 2011).

In its response, Chicago merely asserts that there are no underlying constitutional violations, so Plaintiff's *Monell* liability fails. As discussed above, there are underlying, sufficiently pled constitutional violations. Therefore, Defendant Chicago's Motion to Dismiss Count III is denied.

*Counts IV -VI – State Law Claims*

In Count IV, Plaintiff claims that Defendants Officers and ASAs initiated and continued a malicious prosecution against her without probable cause. In Count V, Plaintiff claims that Defendants Officers and ASAs intentionally inflicted emotional distress upon Plaintiff by violating her rights. In Count VI, Plaintiff alleges that Defendant Officers and ASAs conspired to falsely imprison, maliciously prosecute, an intentionally inflict emotional distress upon Plaintiff.

Defendant Officers do not seek to dismiss the state law claims. Defendant Officers challenge the federal claims only and argue that the Court should not exercise supplemental jurisdiction over any remaining state law claims. As the federal claims remain, the state law claims against Defendant Officers will not be dismissed.

Defendant ASAs argue that they are also immune from Plaintiff's state law claims. Illinois appellate courts have confirmed that prosecutors are absolutely immune from civil claims for those activities that are intimately associated with the judicial process. *White v. Chicago*, 861 N.E.2d 1083, 1088-89 (Ill. App. Ct. 2006). Plaintiff cites *Aboufariss v. City of De Kalb*, which held that prosectuors are shielded for acts that were taken without "malicious motives." *Aboufariss v. City of De Kalb*, 713 N.E.2d 804, 812 (Ill. App. Ct. 1999). However, *Aboufariss* has been recognized as being "out of step with all prior and subsequent Illinois and federal case law on this question." *Frank v. Garnati*, 989 N.E.2d 319, 322 (Ill. App. Ct. 2013). The Illinois and federal doctrines of prosecutorial immunity are coterminous. *Id.* As presently pled, Defendant ASAs have absolute immunity from the federal and state claims. Defendant ASAs' Motion to Dismiss Counts IV-VI is granted without prejudice.

*Count VII – Respondeat Superior*

In Count VII, Plaintiff seeks to enter judgment against the City for the actions of Defendant Officers under the theory of *respondeat superior*. Chicago merely asserts that there are no underlying constitutional violations, so liability under *respondeat superior* fails. As discussed above, there are sufficiently stated underlying constitutional violations. Therefore, Defendant Chicago's Motion to Dismiss Count VII is denied.

*Count VIII – Indemnity*

In Count VIII, Plaintiff seeks indemnity from the City and County for the actions of Defendants Officers and ASAs.

By statute, "a local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable." 745 ILL. COMP. STAT. ANN. 10/9-102. The City argues that since none of their employees are liable for an injury, they do not have the duty to indemnify. As discussed above, City employees are potentially liable. Therefore, the City's Motion to Dismiss Count VIII is denied.

"A county is liable for depriving an individual's constitutional rights only if the deprivation was the result of the county's official policy, custom, or practice." *Wilson v. Giesen*, 956 F.2d 738, 744 (7th Cir. 1992) (citing *Monell*, 436 U.S. 658). In Illinois, State's Attorneys and Assistant State's Attorneys are State employees, not County employees. *See McGrath v. Gillis*, 44 F.3d 567, 571 (7th Cir. 1995). As such, the County has no prosecutorial policy and cannot have caused any of plaintiff's alleged injuries. *See Jones v. City of Chicago*, 639 F. Supp. 146, 154 (N.D. Ill. 1986). Defendants ASAs' Motion to Dismiss Count VIII is granted without prejudice.

*Defendant Bartik*

Defendant Officers specifically move to dismiss all claims against Defendant Bartik. Defendants argue that Bartik was not personally involved in alleged harmful conduct and, thus, cannot be held liable. *See Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012). However, Plaintiff sufficiently alleges that Defendant Bartik took part in fabricating her confession and

17

coercing her into adopting it. (Compl. at ¶¶ 70-74, 82.) Defendant Officers' Motion to Dismiss Defendant Bartik is denied.

## CONCLUSION

Defendant Officers' Motion to Dismiss [44] is granted without prejudice as to Count I and denied as to all other counts. Defendant ASAs and Cook County's Motion to Dismiss [69] is granted without prejudice. Plaintiff may file an amended complaint as to Count I and as to Defendant ASAs, if she can do so pursuant to Rule 11, within thirty days of the entry of this Order.

Date:     March 19, 2015

JOHN W. DARRAH
United States District Court Judge