IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-04391 |
| | ) | |
| CITY OF CHICAGO, Chicago Police Officers | ) | John W. Darrah, District Judge |
| ROBERT BARTIK, #3078; DEMOSTHENES | ) | |
| BALODIMAS, #21204; ROBERT CORDARO, | ) | Susan E. Cox, Magistrate Judge |
| #20680; JOHN J. DAY, #20926; JAMES M. | ) | |
| KELLY, #21121; MICHAEL LANDANDO, | ) | |
| #20417; ANTHONY NORADIN, #21252, and | ) | |
| RANDALL WO, #20232; Assistant Cook | ) | |
| County State's Attorneys ANDREA | ) | |
| GROGAN, LAWRENCE O'REILLY; and the | ) | |
| COUNTY OF COOK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANT OFFICERS' ANSWER, AFFIRMATIVE DEFENSES AND JURY DEMAND TO PLAINTIFF'S COMPLAINT

Defendant Chicago Police Officers Robert Bartik, Demosthenes Balodimas, Robert Cordaro, John Day, James Kelly, Michael Landando, Anthony Noradin, and Randall Wo ("Defendant Officers"), hereby submit the following Answer, Affirmative Defenses and Jury Demand to Plaintiff Nicole Harris's ("Plaintiff") Complaint.

## INTRODUCTION

1.      Plaintiff Nicole Harris, by and through her attorneys, files this complaint against individually named Defendants of the Chicago Police Department (CPD") and the Cook County State's Attorney's Office ("CCSAO"), as well as the City of Chicago ("City") and the County of Cook ("County"), seeking compensation for the nearly eight years she spent unjustly in prison after she was wrongfully charged and convicted of

murdering one of her beloved children, Jaquari, aged 4, and for the physical pain, extreme emotional distress and anguish and other injuries she suffered as a result of her prosecution, conviction, incarceration, and deprivation of being able to properly mourn her son's tragic death.

**ANSWER:** Defendant Officers admit that Plaintiff has sued the individuals and entities set forth above. Defendant Officers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1 and, on that basis, deny all allegations in the paragraph.

2.     Ms. Harris was charged with killing her son after Chicago Police Investigator Bartik and several area 5 CPD Detectives, with the assistance of two Cook County Assistant State's attorneys ("ASAs") interrogated Ms. Harris for over 28 hours, and physically and psychologically coerced her into making a false confession, which they fabricated, by having her implicate herself in Jaquari's death.

**ANSWER:** Defendant Officers admits that Ms. Harris was charged with killing her son. Defendant Officers deny all remaining allegations set forth in paragraph 2.

### JURISDICTION AND VENUE

3.     The actions of the Defendants violated the United States Constitution, the Civil Rights Act, 42 U.S.C. §§ 1983, as well as Illinois law. This Court has jurisdiction over Ms. Harris's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and over her state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

**ANSWER:** Defendant Officers admit that the Court has jurisdiction over this civil action. Defendant Officers deny all remaining allegations set forth in paragraph 3.

4.     Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Ms. Harris's claims also occurred in this judicial district.

**ANSWER:** Defendant Officers admit that venue is proper in this Court for the claims asserted in Plaintiff's Complaint. Defendant Officers deny all remaining allegations set forth in paragraph 4.

## PARTIES

5.　　Plaintiff Nicole Harris is an African-American woman and a citizen of the United States.

**ANSWER:**　Defendant Officers admit that Nicole Harris is an African-American woman. Defendant Officers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 5.

6.　　Defendant Robert Bartik was a duly appointed and sworn CPD officer assigned to the polygraph unit at all times relevant to this Complaint.

**ANSWER:**　Defendant Officers admit that Robert Bartik was a duly appointed and sworn CPD officer assigned to the polygraph unit on May 15, 2005.

7.　　Defendants Demosthenes Balodimas, Robert R. Cordaro, John J. Day, James M. Kelly, Michael Landando, Anthony Noradin, and Randall Wo were duly appointed and sworn CPD officers who were assigned to the Detective Division of the Area 5 Violent Crimes Unit at all times relevant to this Complaint.

**ANSWER:**　Defendant Officers admits that Demosthenes Balodimas, Robert R. Cordaro, John J. Day, James M. Kelly, Michael Landando, Anthony Noradin, and Randall Wo were duly appointed and sworn CPD officers who were assigned to the Detective Division of the Area 5 Violent Crimes Unit on May 14, 2005.

8.　　Defendant City is an Illinois municipal corporation.　The City is or was the employer of the Defendant Officers.

**ANSWER:**　Defendant Officers admit that the City of Chicago is an Illinois municipal corporation, and at various times alleged in the Complaint, was the employer of the Defendant Officers.

9.　　Defendants Andrea Grogan and Lawrence O'Reilly were ASAs, who were assigned to the Felony Review Unit of the CCSAO.

**ANSWER:** This allegation is not directed toward the Defendant Officers and therefore the Defendant Officers are not required to respond. To the extent an answer is deemed to be required, Defendant Officers admit that Defendants Andrea Grogan and Lawrence O'Reilly were Assistant States Attorneys on May 15, 2005.

10. Defendant Cook County is a governmental entity within the State of Illinois which consists in part of the CCSAO and the Cook County Board. At all times relevant to this action, Cook County was the employer of Defendants Grogan and O'Reilly, and is a necessary party to this lawsuit.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in this Paragraph 10 and, on that basis, deny the same.

11. At all times relevant to this action, each of the named individual Defendants acted in the scope of his or her employment, and under color of the laws, regulations, and customs of the State of Illinois. Each individual Defendant is sued in his or her individual capacity. The actions of each Defendant, both individual and governmental, constituted "state action" as defined under federal law.

**ANSWER:** Defendant Officers admit the allegations set forth in paragraph 11.

## FACTUAL ALLEGATIONS

### A. The Death of Jaquari Harris on May 14, 2005

12. In May 2005, Ms. Harris graduated from Southern Illinois University in Edwardsville, Illinois with a degree in psychology. Upon graduation, she moved with her five-year-old son Diante, her four-year-old son Jaquari, and the boys' father, Sta-Von Dancy, to Chicago's West Side and began working as a psychiatric rehabilitation service coordinator for the Winston Manor Nursing Home.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 12 and, on that basis, deny the same.

13. On May 14, 2005, Ms. Harris and Mr. Dancy went to the laundromat close to their apartment to wash some clothes. Before leaving for the laundromat, Ms. Harris told the boys to stay in the home and not to go outside for any reason.

**ANSWER:**   Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 13 and, on that basis, deny the same.

14.     Nonetheless, when Ms. Harris returned to the apartment, the boys were playing outside.  Ms. Harris scolded the children and sent them to their room.

**ANSWER:**   Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 14 and, on that basis, deny the same.

15.     Later that day, with the boys in their room, Ms. Harris returned to the laundromat to dry her clothes.

**ANSWER:**   Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 15 and, on that basis, deny the same.

16.     The boys' room contained a pair of bunk beds stacked with one on top of the other.  An elastic band had come free from one end of the fitted sheet on the top bunk and dangled down toward the bottom bunk.

**ANSWER:**   Defendant Officers admit that the boys' room contained a pair of bunk beds stacked with one on top of the other.  Defendant Officers lack sufficient knowledge or information to admit or deny the remaining allegations in paragraph 16 and, on that basis, deny the same.

17.     While Diante and Jaquari were alone in their room, Jaquari, while playing, wrapped the elastic band around his own neck.

**ANSWER:**   Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 17 and, on that basis, deny the same.

18.     While Ms. Harris was parking the car after returning from the laundromat, Mr. Dancy went to check on the children in their room.

**ANSWER:**   Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 18 and, on that basis, deny the same.

19.     Upon entering the room, he could tell something was wrong with Jaquari as he was lying flat on his stomach on the floor, with a bubble coming out of his nose, and his face was purple.

**ANSWER:**     Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 19 and, on that basis, deny the same.

20.     Mr. Dancy saw that the elastic band that had been loose from the fitted sheet on the upper bunk bed was tightly wrapped around Jaquari's neck.   He unwrapped the elastic band from around Jaquari's neck, started to give Jaquari CPR and then picked him up and ran outside to find Ms. Harris and look for help.

**ANSWER:**     Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 20 and, on that basis, deny the same.

21.      Returning from parking the car, Ms. Harris saw Mr. Dancy holding a lifeless Jaquari in his arms and became hysterical.

**ANSWER:**     Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 21 and, on that basis, deny the same.

22.     Ms. Harris and Mr. Dancy rushed to their car hoping to drive to the nearest hospital and they also sought out someone who had a cell phone so that they could use it to call 911.

**ANSWER:**     Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 22 and, on that basis, deny the same.

23.     They eventually found someone who lent them his phone and Ms. Harris called 911 seeking help for her child.   Eventually, an ambulance arrived and took Jaquari to the hospital.

**ANSWER:**     Defendant Officers admit that Jaquari arrived to the hospital in an ambulance. Defendant Officers lack sufficient knowledge or information to admit or deny the remaining allegations in paragraph 23 and, on that basis, deny the same.

24.     While Jaquari was being taken to the hospital in the ambulance, Ms. Harris and Mr. Dancy returned to the apartment to retrieve Diante and then headed to the hospital as well.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 24 and, on that basis, deny the same.

25. When the family arrived at the hospital, Ms. Harris rushed in to check on Jaquari's condition while Mr. Dancy parked the car.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 25 and, on that basis, deny the same.

26. Ms. Harris was told that the doctors were stopping treatment because Jaquari was dead. This news caused Ms. Harris to cry out in anguish, shock, and grief.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 26 and, on that basis, deny the same.

27. Grief-stricken, neither Ms. Harris nor Mr. Dancy were able to stand. They were taken in wheelchairs to the hospital chapel where they met with a grief counselor.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 27 and, on that basis, deny the same.

28. Less than an hour after Ms. Harris and Mr. Dancy learned that they had lost their son, several detectives and officers from the CPD, including Defendants Wo and Day, approached Ms. Harris and Mr. Dancy at the hospital.

**ANSWER:** Defendant Officers admit that detectives and officers from the CPD, including Wo and Day, approached Ms. Harris and Mr. Dancy at the hospital, which is where their son was officially pronounced dead. Defendant Officers lack sufficient knowledge or information as to the remaining allegations set forth in paragraph 28 and, on that basis, deny the same.

29. Defendants Wo and Day asked Ms. Harris and Mr. Dancy about Jaquari's death and indicated they should come to the police station so the detectives could ask them questions, claiming that it was standard procedure for there to be such questioning because Jaquari's death was not natural.

**ANSWER:** Defendant Officers admit that Defendants Wo and/or Day asked Ms. Harris and Mr. Dancy about Jaquari's death and asked them to come to the police station so the detectives could ask them questions. Defendant Officers deny that the allegations in paragraph 29 accurately portray their verbatim conversation with Ms. Harris and Mr. Dancy.

30.     Ms. Harris and Mr. Dancy were then taken to Area 5 Police Headquarters, located at 5555 W. Grand Street, in Chicago, Illinois, in separate marked police cars, with Diante riding in the backseat of the same car as Ms. Harris.

**ANSWER:** Defendant Officers admit that Ms. Harris, Diante, and Mr. Dancy were driven in police vehicles to the Area 5 Police Headquarters, located at 5555 W. Grand Avenue, in Chicago, Illinois on May 14, 2005. Defendant Officers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30.

**B.      Ms. Harris' Twenty-Eight Hour Interrogation**

31.     At Area 5, over the course of more than 28 hours, Ms. Harris was subjected to acts of physical abuse and intimidation; was repeatedly threatened with the loss of her liberty and with the loss of her remaining child; was taunted and called grotesque names and subjected to false accusations; was refused permission to speak with an attorney; and was deprived of food and sleep.  As a result of this severe and continuing abuse and intimidation, Ms. Harris was coerced into making false incriminating statements and giving a false videotaped confession fabricated by the Defendant Officers, which falsely implicated her in intentionally causing Jaquari's death.  The physical abuse, intimidation and psychological coercion of Ms. Harris, as well as the manufacturing of the false confession, included but was not limited to the actions set forth below.

**ANSWER:** Defendant Officers deny the allegations in paragraph 31.

32.     When they arrived at the police station at approximately 9:00 p.m., Ms. Harris and Mr. Dancy were separated and placed in different rooms.

**ANSWER:** Defendant Officers admit that when they arrived at the police station at approximately 9:00 p.m., Ms. Harris and Mr. Dancy were separated and placed in different rooms.

33.   Ms. Harris and Diante were escorted by police officers to an interrogation room, referred to at Ms. Harris's trial as the "quiet room" or the "butterfly room."

**ANSWER:** Defendant Officers deny that the term "interrogation room" is an accurate description of the location within the police department where Ms. Harris and Diante were sitting. Defendant Officers admit that the location identified in paragraph 33 of the Complaint was described in Ms. Harris' trial as the quiet room or butterfly room and that Ms. Harris and Diante were escorted there.

34.   In this room, starting at approximately 9 p.m., Ms. Harris was questioned and confronted by several detectives, including Defendants Noradin and Kelly.

**ANSWER:** Defendant Officers admit that starting at approximately 9 p.m., Ms. Harris was intermittently questioned by several detectives, including Defendants Noradin and Kelly.

35.   Ms. Harris related to Defendants Noradin and Kelly the events of the day, including her trips to the laundromat, catching her boys playing outside without permission, and punishing Jaquari by sending him to his room. She also told them that after punishing the boys but before returning to the laundromat, she had attempted to fix the phone cord in their apartment because it had loose wires.

**ANSWER:** Defendant Officers admit that Plaintiff related to Defendants Noradin and Kelly a recounting of her events of the day, including that she made trips to the laundromat, caught her boys playing outside without permission, and that she punished Jaquari by sending him to his room. Defendant Officers also admit that

Plaintiff told Defendants Noradin and Kelly that she had attempted to fix the phone cord in her apartment between her first and second claimed trips to the Laundromat.

36.     At one point during the interrogation, Ms. Harris and Diante attempted to leave the room, but a detective directed them to stay put.  Ms. Harris did not feel free to leave, nor was she allowed to leave.

**ANSWER:**     Defendant Officers lack sufficient knowledge or information as to Plaintiff's subjective feelings. Defendants admit that, once Plaintiff provided an inculpatory statement, she was arrested and no longer free to leave. (See Defendant Officers' answer to paragraphs 51 and 58). Defendant Officers deny the remaining allegations set forth in paragraph 36.

37.     At approximately 9:45 p.m., Defendants Day and Wo began questioning Mr. Dancy in another interrogation room.  Mr. Dancy also related the events of the day and the information he provided was consistent with the information provided by Ms. Harris.  He also explained that he found Jaquari lying on the floor motionless with bubbles coming out of his nose.  He further related that he picked Jaquari up and had to unwrap the elastic band wrapped around Jaquari's neck to free him.

**ANSWER:**     Defendant Officers admit that at approximately 9:45 p.m., Defendants Day and Wo began questioning Mr. Dancy in an interrogation room where he explained that he found Jaquari lying on the floor motionless with bubbles coming out of his nose and he further related that he picked Jaquari up and had to unwrap the elastic band wrapped around Jaquari's neck to free him. Defendant Officers lack sufficient knowledge or information from which to form a belief as to the truth of the remaining allegations in paragraph 37, and on that basis deny same.

### 1.     The Purported "Phone Cord Confession"

38.     At approximately 10:30 p.m., while Ms. Harris and Mr. Dancy were being interrogated, Defendants Balodimas and Landando traveled to Ms. Harris's home, where they discovered the phone cord Ms. Harris was attempting to repair earlier that

day. They noted that the phone cord could stretch from the phone jack in the kitchen into the boys' bedroom.

**ANSWER:** Defendant Officers admit that at approximately 10:30 p.m., while Ms. Harris and Mr. Dancy were being interviewed, Defendants Balodimas and Landando traveled to Ms. Harris's home, where they discovered a phone cord that could reach the boys' bedroom. Defendant Officers lacks sufficient information to admit or deny the remaining allegations in this paragraph 38, and on that basis deny the same.

39. Defendants Balodimas and Landando removed the phone card, claiming it had evidentiary value, and brought it back with them to Area 5 Police Headquarters.

**ANSWER:** Defendant Officers admit that Defendants Balodimas and Landando elected to have an evidence technician recover and inventory the telephone cord. Defendants deny the remaining allegations set forth in paragraph 39.

40. When Defendants Balodimas and Landando returned to Area 5 with the phone cord, they shared with their fellow co-conspirators Noradin, Kelly, Day and Wo their theory that Ms. Harris had used it to strangle Jaquari.

**ANSWER:** Defendant Officers deny the allegations in paragraph 40.

41. Shortly thereafter, Defendants Balodimas, Landando, and Noradin falsely claimed that Ms. Harris spontaneously confessed to killing Jaquari, using the phone cord to strangle him. Defendants Noradin, Kelly, Day and Wo memorialized this fabricated phone cord confession in official police reports.

**ANSWER:** Defendant Officers deny the allegations in paragraph 41.

42. Defendants Balodimas, Day, Kelly, Landando, Noradin and Wo fabricated this false statement in order to justify Ms. Harris's arrest because they knew they possessed no facts that amounted to probable cause to justify her arrest, prolonged detention, and interrogation.

**ANSWER:** Defendant Officers deny the allegations in paragraph 42.

43. Subsequently, during the course of their interrogation of Ms. Harris, Defendants Noradin and Kelly fabricated another false statement that was memorialized in official police reports, claiming that when they advised Ms. Harris that

State's Attorneys were coming to speak with her she recanted her incriminating statement.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 43.

### 2.    Ignoring Diante's Statement That Exonerated Ms. Harris

44.    At approximately 11 p.m., Defendant Kelly contacted the Special Investigation Unit of the Children's Advocacy Center to arrange for a "Victim Sensitive Interview" of Diante because the Defendant Detectives were aware that Diante was a possible witness to Jaquari's death.

**ANSWER:**    Defendant Officers admit that at approximately 11 p.m., Defendant Kelly contacted the Special Investigation Unit of the Children's Advocacy Center to arrange for a "Victim Sensitive Interview" of Diante because the Defendant Officers were aware that Diante was a possible witness to Jaquari's death.

45.    Around midnight, at the request of the Department of Children and Family Services, Ms. Harris signed a paper releasing Diante to his grandmother's custody.

**ANSWER:**    Defendant Officers admit that around midnight, at the request of the Department of Children and Family Services, Ms. Harris signed a paper releasing Diante to his grandmother's custody.

46.    Both Ms. Harris and Diante were then escorted out of the room by Defendant Noradin and in the hallway Diante was taken away from Ms. Harris, causing her to cry again.

**ANSWER:**    Defendant Officers admit that the Department of Children and Family Services took custody of Diante. Defendant Officers lack sufficient knowledge or information as to the truth of the remaining allegations in paragraph 46.

47.    After Diante was taken away, Ms. Harris was subjected to an increasingly hostile interrogation, as discussed below.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 47.

48.     During the course of Ms. Harris's interrogation, Diante was questioned by Ale Levy of the Children's Advocacy Center (the "Center").

**ANSWER:**     Defendant Officers admit that Diante was questioned by Ale Levy of the Center on May 15, 2005.

49.     During this interview, which was observed by Defendant Wo and Detective O'Shea, Diante reported that (1) he saw Jaquari playing a Spiderman game in their bedroom; (2) he saw Jaquari wrap the elastic band from the blue sheet from the top bunk bed around his neck; (3) he could not help Jaquari; and (4) he later saw Jaquari with a bubble coming from his nose (collectively, "Diante's exculpatory statements").

**ANSWER:**     Defendant Officers admit that during this interview, which was observed by Defendant Wo and Detective O'Shea, Diante reported that (1) he saw Jaquari playing a Spiderman game in their bedroom; (2) he saw Jaquari wrap the elastic band from the blue sheet from the top bunk bed around his neck; (3) he could not help Jaquari; and (4) he later saw Jaquari with a bubble coming from his nose. Defendant Officers deny the remaining allegations in paragraph 49.

50.     Defendant Wo, in agreement with co-conspirator Defendants Noradin, Kelly and Day, deliberately omitted Diante's exculpatory statements from the Official Cleared and Closed Supplementary Report (the "Cleared and Closed Report"). Instead, in an effort to exclude or discredit Diante as a witness to his brother's death, these Detectives wrote in the Cleared and Closed Report only that Diante said he was sleeping when Jaquari died.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 50.

**3.     The Continued Interrogation**

51.     After escorting Ms. Harris out of the "butterfly" room, Defendant Noradin took Ms. Harris to a different interrogation room, where she was interrogated by Defendants Noradin, Balodimas and Landando.

**ANSWER:**     Defendant Officers admit that Plaintiff was placed under arrest and taken from the "butterfly" room to an interrogation room in the presence of Defendants Noradin, Balodimas, and Landando. Defendant Officers deny that paragraph 51

accurately sets forth the sequence and substance of the events described. Defendant

Officers lack sufficient knowledge or information to admit or deny the remaining

allegations in this paragraph 51 and, on that basis, deny the same.

52.    When they arrived at the entryway to the new room, Defendant Noradin shoved Ms. Harris into the room, stated "You're under arrest for murdering your F'g son," pushed her onto a bench and handcuffed her arm to a bar over the bench.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 52.

53.    Defendant Noradin said he was "sick of [her] BS lies," that she was "playing games" and that she could no longer "sit [t]here and say [she] didn't do it" because they already found the phone cord.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 53.

54.    While so restrained, Ms. Harris was continually questioned, badgered, and yelled at by Defendants Noradin, Landando and Balodimas.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 54.

55.    In response, Ms. Harris, in tears, continually told Defendant Noradin and the other Defendant Detectives that she was telling the truth and that she had nothing at all to do with Jaquari's death.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 55.

56.    The Defendant Detectives told Ms. Harris she was lying, and mocked her and accused her of not crying "real tears."

**ANSWER:**    Defendant Officers deny the allegations in paragraph 56.

57.    Ms. Harris asked for an attorney, but the Defendants refused to allow her to contact one, telling her she did not need an attorney, but rather, she needed to cooperate.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 57.

58.    Eventually, the Defendants uncuffed Ms. Harris and left her in the room, locking the door behind them.

**ANSWER:** Defendant Officers admit that, once Plaintiff was arrested following her initial admission of killing Jaquari, she was placed into a locked interview room. Defendant Officers deny that Plaintiff was handcuffed at the time and, as such, also deny that she was "uncuffed."

59. Defendant Detective returned to the room and at one point he said "tell us the truth." When Ms. Harris again responded that she was telling the truth, the Detective told her Mr. Dancy had suggested that Ms. Harris might have killed Jaquari. Ms. Harris responded that this was not possible because she was not in the house when Jaquari suffered his injuries.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 59 and, on that basis, deny the same.

60. The Defendant Detective then asked Ms. Harris if it was possible Mr. Dancy murdered Jaquari, and she responded no.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny the allegations in paragraph 60 and, on that basis, deny the same.

61. Ms. Harris continued to maintain her innocence.

**ANSWER:** Defendant Officers deny the allegations in paragraph 61.

62. Hours passed without Ms. Harris being offered anything to eat or drink.

**ANSWER:** Defendant Officers deny the allegations in paragraph 62.

63. At one point, while still locked in the interrogation room, Ms. Harris had to use the bathroom. She pounded on the locked door for approximately an hour before anyone arrived to take her to use the bathroom. She was then returned to the interrogation room.

**ANSWER:** Defendant Officers deny the allegations in paragraph 63.

64. Eventually, Defendants Noradin and/or Kelly asked Ms. Harris if she would take a lie detector test. She agreed, but because of the unavailability of a polygraph examiner at that late hour, she could not be given the test until later that day.

**ANSWER:** Defendant Officers admit that Defendants Noradin and/or Kelly asked Ms. Harris if she would take a lie detector test. She agreed, but because of the unavailability of a polygraph examiner at that late hour and her need to rest, she could not be given the test until later that day.

65. Ms. Harris was kept in the interrogation room the entire night. She was unable to sleep and was let out of the room only once to use the bathroom.

**ANSWER:** Defendant Officers admit that Plaintiff was detained in an interrogation room and that she was afforded the opportunity to sleep prior to the time that she was transported to another police facility for purposes of taking a polygraph examination on May 15, 2005. Defendant Officers admit that Plaintiff was allowed to use the bathroom facilities as she needed them during the course of the investigation in this case. Defendant Officers lack sufficient knowledge or information as to the number of hours Plaintiff actually slept while she was in an interrogation room and lack sufficient knowledge or information as to the precise number of times she used the bathroom facilities. Defendant Officers deny the remaining allegations set forth in paragraph 65.

66. Prior to these interrogations, Ms. Harris had not been advised of her Miranda rights.

**ANSWER:** Defendant Officers deny the allegations in paragraph 66.

67. Throughout the night of May 14th and 15th, Defendants Wo and Day interviewed Sta-Von Dancy and falsely told him that Ms. Harris admitted that she killed Jaquari.

**ANSWER:** Defendant Officers deny the allegations in paragraph 67.

**4. The Medical Examiner concludes that the Elastic Band, not the Phone Card, strangled Jaquari**

68.     On May 15, 2004, beginning at approximately 9:00 a.m., Cook County Medical Examiner Dr. John Scott Denton conducted an autopsy on Jaquari. Detectives Noradin and Kelly were present for the autopsy and provided Dr. Denton both the phone cord and the elastic band that they had removed from Ms. Harris' home.

**ANSWER:** Defendant Officers admit that on May 15, 2004, beginning at approximately 9:00 a.m., Cook County Medical Examiner Dr. John Scott Denton conducted an autopsy on Jaquari. Defendant Officers further admit that Detectives Noradin and Kelly were present for the autopsy and provided Dr. Denton both the phone cord and the elastic band that they had removed from Ms. Harris' home.

69.     At the conclusion of the autopsy, Dr. Denton ruled out the phone cord as the cause of Jaquari's death and determined that the elastic band from the bed sheet was the actual cause. He informed Defendants Noradin and Kelly of his findings and they communicated them to Defendants Wo and Kelly.

**ANSWER:** Defendant Officers admit that Dr. Denton determined that the ligature marks on the victim's neck, most likely came from the elastic from the bed sheet rather than a telephone cord. Defendant Officers admit that, at some point, this information became known to one or more Defendant Officers and that Detectives Kelly and Noradin advised Detectives Day and Wo of the findings of Dr. Denton. Defendant Officers deny the remaining allegations set forth in paragraph 69.

**5.     The Polygraph Examination**

70.     The next day, after Ms. Harris had been in custody for more than fifteen hours, Defendants Noradin, Kelly and Day transported Ms. Harris and Mr. Dancy to the polygraph examination unit at 1819 West Pershing Road, Chicago, Illinois.

**ANSWER:** Defendant Officers admit that after Ms. Harris had been at the Area 5 Police Station for more than fifteen hours prior to Plaintiff being transported to the polygraph unit at 1819 West Pershing Road in Chicago but deny that Plaintiff was "in custody" for more than fifteen hours prior to her being transported to the polygraph

unit. Defendant Officers admit that Defendant Noradin drove Plaintiff to the Polygraph

unit. Defendant Officers deny the remaining allegations set forth in paragraph 70.

71.     Prior to Ms. Harris's polygraph examination, Defendants Noradin, Kelly
and Day met with Defendant Bartik and informed him of the facts of their investigation
and their theories into Jaquari's death.

**ANSWER:**     Defendant Officers admit that Defendants Day, Kelly, and Noradin

met with Defendant Bartik and informed him of the basic facts relevant to the

investigation prior to the time that he administered any polygraph examinations.

Defendant Officers lack sufficient knowledge or information as to the truth of the

remaining allegations in paragraph 71.

72.     Defendant Bartik then met with Ms. Harris and purported to administer a
polygraph exam.

**ANSWER:**     Defendant Officers admit that Defendant Bartik administered a

polygraph examination on Ms. Harris on May 15, 2005. Defendant Officers deny the

remaining allegation set forth in paragraph 72.

73.     Ms. Harris maintained her innocence throughout the test.

**ANSWER:**     Defendant Officers admit that Plaintiff denied involvement in

Jaquari's death during her polygraph examination with Defendant Bartik.

74.     After administering the exam, Defendant Bartik began to intimidate and
berate Ms. Harris, telling her, "You are pissing me off. I've been very patient with you,
I've been very nice to you, and you are still sitting up here, you are lying to us . . . you
know what, you're acting like a monster." He also falsely informed her that the
polygraph exam results indicated that she was lying.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 74.

75.     Ms. Harris protested that she was telling the truth and again requested an
attorney.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 75.

76.    Defendant Bartik told her that she did not need an attorney because an attorney would tell her not to talk to the police, and that would "force us to give the stuff to the state, and then they're just going to slam you."

**ANSWER:**    Defendant Officers deny the allegations in paragraph 76.

77.    Another Defendant Detective soon joined Defendant Bartik, telling Ms. Harris that he was "sick and tired" of her "lying" and he had been on the case all night long.  He also said that a boss called him and told him to hurry and wrap the case up. At this time, he began to jab Ms. Harris in her the [sic] shoulder.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 77.

78.    Defendant Bartik asked Ms. Harris if she wanted him to turn the case over to the State and spend the rest of her life behind bars.  He continued to berate her by telling her she was acting like a monster and she needed to cooperate with them by telling them what they wanted her to say.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 78.

79.    Ms. Harris, in a state of exhaustion, crying, and fearing for her future and her life, asked Defendant Bartik what was going to happen to her.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 79.

80.    Around that time, Defendants Noradin and Day entered the polygraph examination room and repeated that if she did not cooperate with them she was going to spend the rest of her life behind bars.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 80.

81.    Defendant Bartik, in the presence of Defendants Noradin, Kelly and Day, then outlined the Defendant Police Officers' false and fabricated theory of what happened, telling Ms. Harris that she had gotten angry and "pulled [the band] down [from the bed sheet] and put it around Jaquari's neck" . . . "four or five times."

**ANSWER:**    Defendant Officers deny the allegations in paragraph 81.

82.    Detective Bartik has a long history of falsely claiming that suspects have spontaneously confessed to him during the course of his polygraph examinations. Detective Bartik has been sued in four cases for falsely claiming or obtaining coerced confessions.

**ANSWER:** Defendant Officers admit that Defendant Bartik has previously been sued but deny that paragraph 82 accurately describes those lawsuits and further deny the remaining allegations in paragraph 82.

83. Despite this aggressive questioning, Ms. Harris maintained her innocence for hours, "just crying and crying" and "shaking [her] head."

**ANSWER:** Defendant Officers deny the allegations in paragraph 83.

84. While suffering from the extreme shock and stress of losing her youngest child and after enduring over 20 hours of interrogation and abuse, as set forth herein, Ms. Harris, who was tired, scared, physically and emotionally drained, finally started agreeing to go along with the story of the Defendant Officers.

**ANSWER:** Defendant Officers lack sufficient knowledge or information to admit or deny Plaintiff's subjective feelings, on that basis, deny the same. Defendant Officers deny the remaining allegations in paragraph 84.

**6. The Detectives Fabricate a Confession for Ms. Harris to Recite to the ASAs**

85. Defendant Noradin then transported Ms. Harris back to Area 5 where she was interrogated again by Defendants Noradin, Balodimas, and Cordaro.

**ANSWER:** Defendant Officers admit that Defendant Noradin then transported Ms. Harris back to Area 5 where she was interrogated again by Defendants Noradin, Balodimas, and Cordaro.

86. Defendant Cordaro informed Ms. Harris that he had arranged for her to talk with an ASA and laid out the version of events that Ms. Harris was supposed to tell the ASA.

**ANSWER:** Defendant Officers deny the allegations in paragraph 86.

87. Defendant Cordaro "kept going through the story over and over and over again" with Ms. Harris to ensure she could properly recite it to the ASA. Ms. Harris cried throughout the period in which Cordaro fed her the Defendant Officers' story.

**ANSWER:** Defendant Officers deny the allegations in paragraph 87.

88. Pressing Ms. Harris to include details that the Defendant Officers had just given her, Defendant Cordaro urged her to "remember, [the elastic was wrapped] four or five times" around Jaquari's neck, a crucial fact fabricated by the Defendant Officers.

**ANSWER:** Defendant Officers deny the allegations in paragraph 88.

89. Defendants Noradin and Cordaro also falsely told Ms. Harris that her statement would allow her to secure a low bond which would enable her to get out and fight the charges from the outside, and that her statement would guarantee she would be charged with manslaughter and not first-degree murder.

**ANSWER:** Defendant Officers deny the allegations in paragraph 89.

90. Defendant Cordaro told her that when she confessed in front of the ASA she should do so on videotape because it would convey her emotions.

**ANSWER:** Defendant Officers deny the allegations set forth in paragraph 90.

91. By the time Defendant ASA O'Reilly arrived to take Ms. Harris's statement, Defendants Cordaro and Noradin had rehearsed the version of events with Ms. Harris enough times that she could recite it back to the ASA.

**ANSWER:** Defendant Officers deny the allegations in paragraph 91.

92. Defendant O'Reilly met with Ms. Harris in the presence of Defendants Noradin and Balodimas. Ms. Harris recited the false and fabricated confession she was told to give to Defendant O'Reilly by the Defendant Detectives.

**ANSWER:** Defendant Officers deny the allegations in paragraph 92.

93. At a certain point, however, Ms. Harris told Defendant O'Reilly that she had been mistreated by the Defendant Detectives, and at that point, Defendant O'Reilly asked Defendants Noradin and Balodimas to leave the room.

**ANSWER:** Defendant Officers deny the allegations in paragraph 93.

94. After Defendants Noradin and Cordaro left the room, Ms. Harris told Defendant O'Reilly that she had been mistreated by the Defendant Detectives. Defendant O'Reilly took note of Ms. Harris's complaints and left the room, but he did not take any steps to cease the interrogation, investigate the misconduct or give Ms. Harris the opportunity to speak with an attorney.

**ANSWER:** Defendant Officers deny the allegations in paragraph 94.

### 7. Ms. Harris Repeats on Videotape the Confession Defendant Officers Fabricated and Fed to Her

95.     Later, Defendant ASA Andrea Grogan met with Ms. Harris at Area 5.

**ANSWER:**     Defendant Officers admit that ASA Andrea Grogan met with Ms.

Harris at Area 5 at some point after she had met ASA O'Reilly.

96.     Ms. Harris repeated to Defendant Grogan the same fabricated confession she had gone over with Defendants Noradin and Cordaro and told to Defendant O'Reilly.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 96.

97.     Ms. Harris also told ASA Grogan that she had been mistreated by the Defendant Detectives, including that she was she was [sic] physically and psychologically coerced by them.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 97.

98.     In response to Ms. Harris' complaints, ASA Grogan left the interrogation room but did not take any steps to afford Ms. Harris the opportunity to speak with an attorney, even though Ms. Harris had repeatedly invoked her right to do so.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 98.

99.     Shortly after 1:00 a.m. on May 16, 2005, after nearly twenty-eight hours in police custody Ms. Harris gave a videotaped statement in which she falsely confessed to killing Jaquari by regurgitating the details the Defendant Officers had provided to her.

**ANSWER:**     Defendant Officers deny the allegations in paragraph 99.

100.    Ms. Harris was and is completely innocent of Jaquari's death.  The confession she gave was fabricated by the Defendant Officers in violation of her constitutional rights and the rights guaranteed her under Illinois law.

**ANSWER:**     Defendant Officers lack knowledge or information sufficient to

form a belief as to the question of Plaintiff's actual innocence or guilt. Defendant

Officers deny the remaining allegations in paragraph 100.

### C.    Ms. Harris's Wrongful Conviction

101. The CPD Defendants memorialized Ms. Harris's false and fabricated confession in official reports that omitted any mention of the fact that the confession was the product of the coercion and fabrication described in detail in this Complaint. These false official reports were presented to the attorney who prosecuted Ms. Harris and were relied upon in order to secure Ms. Harris's wrongful charging, prosecution, conviction and imprisonment.

**ANSWER:** Defendant Officers deny the allegations in paragraph 101.

102 After Ms. Harris was charged with murder in the Circuit Court of Cook County, Ms. Harris filed a motion to suppress her coerced confession. Defendants Bartik and Noradin were called as witnesses at the suppression hearing.

**ANSWER:** Defendant Officers deny that Plaintiff's confession was coerced.

Defendant Officers admit the remaining allegations in paragraph 102.

103. Prior to testifying at the motion to suppress hearing, Defendants Bartik and Noradin falsely informed the prosecuting trial attorneys that neither they nor the other named Defendants physically or psychologically coerced Ms. Harris into giving a false and fabricated confession. They also deliberately withheld the fact that they created the fabricated confession Ms. Harris subsequently repeated, and that they have coerced and fabricated false incriminating statements of suspects and witnesses in other cases.

**ANSWER:** Defendant Officers deny the allegations in paragraph 103.

104. In their testimony, Defendants Noradin and Bartik falsely testified that Ms. Harris had spontaneously and voluntarily admitted to the murder, denied that they or anyone else had physically or psychologically coerced Ms. Harris into giving a false and fabricated videotaped statement, and suppressed the true events of Ms. Harris's interrogation and the interrogation of Mr. Dancy.

**ANSWER:** Defendant Officers deny the allegations in paragraph 104.

105 Later, during Ms. Harris's murder trial, Defendants Bartik, Cordaro, Landando, Noradin, Grogan and O'Reilly all testified against Ms. Harris.

**ANSWER:** Defendant Officers admit that Defendants Bartik, Cordaro, Landando, Noradin, Grogan and O'Reilly testified at Ms. Harris's criminal trial.

106. Prior to testifying at the trial, Defendants Bartik, Cordaro, Landando, Noradin, Grogan and O'Reilly falsely informed the prosecuting trial attorneys that neither they nor the other named Defendants physically or psychologically coerced Ms.

Harris into giving a false confession, and they deliberately withheld the fact that they created Ms. Harris's fabricated confession.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 106.

107.    Thus, by their false reports and their perjured testimony, the Police Officer Defendants and Defendants Grogan and O'Reilly suppressed from the prosecutors who prosecuted Ms. Harris, from the judges and juries who heard her case, and from the prosecutors and judges who prosecuted and heard Ms. Harris's appeals, among other things, that the admissions they attributed to Ms. Harris were: (a) false and unreliable; (b) coerced; and (c) constructed and fabricated by them.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 107.

108.    Diante, Ms. Harris's other son, was precluded from testifying at trial about his observations that he saw Jaquari wrap the elastic band around his own neck and other exculpatory statements.

**ANSWER:**    Defendant Officers admit that a judicial ruling prevented Diante,

Ms. Harris's other son, from testifying at trial.  Defendant Officers deny all remaining

allegations not specifically admitted herein.

109.    Prior to Ms. Harris's criminal trial in October of 2005, the trial judge, relying on the Defendant Police Officers' false reports and perjured testimony, denied Ms. Harris's motion to suppress her coerced and fabricated statement.  Ms. Harris's statement was presented as the only evidence against Ms. Harris at her trial and this provided the sole basis for Ms. Harris' conviction for murder.  Without the individual Defendants' coercive interrogation, fabrication of Ms. Harris' confession, and their suppression of exculpatory evidence, Ms. Harris would not have been prosecuted for, or convicted of, the murder of Jaquari.

**ANSWER:**    Defendant Officers admit that Plaintiff's motion to suppress was

denied prior to her October 2005 trial. Defendant Officers deny the remaining

allegations in paragraph 109.

110.    After her trial and conviction, Ms. Harris was sentenced to thirty years imprisonment.

**ANSWER:**    Defendant Officers admit the allegations set forth in paragraph 110.

111.    Ms. Harris's physical and psychological coercion was not an isolated incident of individual police officer brutality and misconduct. Rather, the interrogation of Ms. Harris in pursuit of a confession, which was constructed by the Police Officer Defendants and fed to her after she was physically and mentally exhausted and broken, was part of a long-standing pattern and practice of similar acts of coercive interrogation practices committed by Defendant Bartik and the Area 5 Chicago Police Detectives.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 111.

112.    In addition to their suppression of other evidence as described herein, Police Officer and ASA Defendants also suppressed from Ms. Harris and her counsel; the trial, appellate and habeas counsel; and the jurors and judges in Ms. Harris's criminal proceeding, all of the facts regarding this extensive pattern of coercion.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 112.

**D.    Ms. Harris's Exoneration on the Basis of Innocence**

113.    The fabrication of false inculpatory evidence and the concealment and suppression of exculpatory information, and the continuing failure to investigate or discipline the Chicago Police Defendants who engaged in the illegal interrogation practices described above materially and significantly continued the wrongful prosecution of Ms. Harris, substantially delayed Ms. Harris's exoneration, and caused Ms. Harris to face many additional years of unjust incarceration that she would not have endured if the fabrication, suppression and concealment had not occurred.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 113.

114.    In October 2012, the United States Court of Appeals for the Seventh Circuit overturned Ms. Harris's conviction, holding that the trial judge's exclusion of Diante's exculpatory testimony was "arbitrary and disproportionate to the truth-seeking and reliability concerns advanced by witness competency restrictions." *Harris v. Thompson*, 698 F.3d 609, 612 (7th Cir. 2012).

**ANSWER:**    Defendant Officers admits that the United States Court of Appeals for the Seventh Circuit overturned Ms. Harris' conviction, in part, because it disagreed with the trial court's decision to exclude Diante's testimony.  Defendant Officers further admit that Ms. Harris's conviction was overturned because the Seventh Circuit determined that she had ineffective assistance of counsel.   Except as specifically admitted, Defendant Officers deny all remaining allegations in this paragraph 114.

115.    On February 25, 2013, Ms. Harris was released from Dwight Correctional Center in Illinois but was subjected to the conditions and curtailment of her liberty by her release on bond.

**ANSWER:**    Defendant Officers lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115.

116.    On June 17, 2013, the Cook County State's Attorney dismissed all charges against Ms. Harris.

**ANSWER:**    Defendant Officers admit that on June 17, 2013, the Cook County State's Attorney dismissed all charges against Ms. Harris.

117.    As a result of the actions of the individual Defendants, Ms. Harris was imprisoned and subjected to the curtailment of her liberty for over 8 years.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 117.

118.    On January 25, 2014, the Circuit Court of Cook County found, pursuant to 735 ILCS 5/2-702, that Ms. Harris was innocent of the charges for which she was convicted and granted her a Certificate of Innocence.

**ANSWER:**    Defendant Officers admit that on January 25, 2014, the Circuit Court of Cook County found, pursuant to 735 ILCS 5/2-702, that Ms. Harris was innocent of the charges for which she was convicted and granted her a Certificate of Innocence.

E.    **The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy**

119.    All of the named individual Defendants, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Ms. Harris of her constitutional rights. By the overt acts set forth above, these Defendants deprived and continue to deprive Ms. Harris of those rights, including her right to be free from unreasonable seizure and wrongful confinement and imprisonment; her right to be free from involuntary self-incrimination and from false and fabricated evidence being used against her; her right to access to the courts and to a

fair and impartial trial; and her right to equal protection of the law, all as protected by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

**ANSWER:** Defendant Officers deny the allegations in paragraph 119.

**F. Ms. Harris's Damages**

120. Ms. Harris was subjected to the curtailment of her liberty while in prison or abiding by the restriction of bond. In addition to being physically injurious, this time was emotionally and psychologically grueling, and Ms. Harris has suffered from constant fear and anxiety, deep depression, despair, rage, isolation, boredom, and loneliness.

**ANSWER:** Defendant Officers admit that Plaintiff's liberty was restricted while she was in prison. Defendant Officers lack sufficient knowledge or information from which to form a belief as to the truth of the remaining allegations in paragraph 120 and, on that basis, deny these allegations.

121. Ms. Harris was also denied the ability to fully mourn the loss of her son Jaquari, was denied the opportunity to attend his funeral, and suffered from the loss of sustained contact with her remaining child, Diante, during his formative years.

**ANSWER:** Defendant Officers are without sufficient information to admit or deny the allegations in this paragraph 121, and on that basis denies same.

122. Ms. Harris continues to experience pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and symptoms of post-traumatic stress disorder from her coercive interrogation and her years of wrongful incarceration.

**ANSWER:** Defendant Officers deny the allegations in paragraph 122

**COUNT I.**
**(42 U.S.C. § 1983 Claim for Deprivation of**
**Right to a Fair Trial and for Wrongful Conviction)**

123. Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

**ANSWER:** Defendant Officers incorporates their Answer to each paragraph of the Complaint as if restated fully herein.

124.    Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan and O'Reilly, individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, conviction, and imprisonment of Ms. Harris.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 124.

125.    These Defendants caused and/or continued Ms. Harris's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: coercing, constructing and/or fabricating the false and unreliable confession which formed the basis for Plaintiff's charging, prosecution and conviction; withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements were false, unreliable, coerced and fabricated; suppressing, destroying and preventing the discovery and development of additional exculpatory evidence regarding the coercive interrogation practices used against Ms. Harris and others who were subjected to similar interrogation practices by the individually named Defendants; giving a false and incomplete version of events to prosecutors; writing false reports and giving false statements and testimony; improperly influencing the judges hearing Plaintiff's case, inter alia, obstructing and improperly influencing investigations which would have led to discovery of exculpatory evidence; suppressing and attempting to discredit findings of individual and systematic coercive and fabrication practices; and by the additional wrongdoing that is set forth above in this Complaint.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 125.

126.    In engaging in the conduct described in this Complaint, the Defendants unconstitutionally deprived Ms. Harris of her liberty and violated her right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourth and/or Fourteenth Amendments to the U.S. Constitution.

**ANSWER:**    Defendant Officers deny the allegations in paragraph  126.

127.    Additionally and/or alternatively, the individual Defendants failed to intervene to stop Ms. Harris's coercive interrogation, wrongful prosecution, conviction, and imprisonment despite having the opportunity and duty to do so.

**ANSWER:**    Defendant Officers deny the allegations in paragraph  127.

128.    The actions of the individual Defendants as set forth in this Complaint were a direct and proximate cause of the injuries to Ms. Harris set forth above.

**ANSWER:**    Defendant Officers deny the allegations in paragraph  128.

## COUNT II
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

129.   Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

**ANSWER:**   Defendant Officers incorporate their Answer to each paragraph of

the Complaint as if restated fully herein.

130.   The actions of Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan and O'Reilly individually, jointly, and in conspiracy, in coercively interrogating Ms. Harris and causing her to make false and fabricated admissions, violated Ms. Harris's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

**ANSWER:**   Defendant Officers deny the allegations in paragraph 130.

131.   Additionally and/or alternatively, Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan and O'Reilly failed to intervene to stop Ms. Harris's coercive interrogation, wrongful prosecution, conviction, and resulting imprisonment despite having the opportunity and duty to do so.

**ANSWER:**   Defendant Officers deny the allegations in paragraph 131.

132.   The actions of Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, and Wo in using coercive techniques to interrogate Ms. Harris, and/or, together with Defendants Grogan and O'Reilly, in condoning and permitting the use of said techniques, were the direct and proximate cause of Ms. Harris's injuries and damages as more fully set forth above.

**ANSWER:**   Defendant Officers deny the allegations in paragraph 132.

## COUNT III
### (42 U.S.C. § 1983 *Monell* Policy Claim against City of Chicago)

133.   Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

**ANSWER:**   Defendant Officers incorporate their Answer to each paragraph of

the Complaint as if restated fully herein.

134.   The actions of Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin and Wo, as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

**ANSWER:** Defendant Officers deny the allegations in paragraph 134.

135. At all times material to this complaint, Defendant City of Chicago, by and through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or the Corporation Counsel's Office had the following interrelated *de facto* policies, practices and customs, among others.

   a) conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions;

   b) manufacturing, fabricating, or using improper suggestive tactics to obtain false statements from suspects or witnesses;

   c) filing false reports, and giving false statements and testimony about interrogations and confessions and fabricating or constructing parts of or whole confessions; suppressing exculpatory evidence concerning interrogations and confessions; pursuing wrongful prosecutions and obtaining false imprisonments on the basis of confessions obtained during these interrogations; denying suspects their right to full and fair access to the courts; denying individuals the right to counsel; and otherwise covering up the true nature of these interrogations and confessions;

   d) failing to videotape the interrogation or questioning of suspects, arrestees, and witnesses, from beginning to end, particularly in the circumstances set forth above;

   e) failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of abuse and/or psychological coercion of suspects and witnesses, wrongful imprisonments, malicious prosecutions and wrongful convictions; making false reports and statements attributed to suspects and witnesses, and/or of physically, psychologically or otherwise illegally, improperly or coercively questioning or interrogating witnesses, suspects and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control was Defendant Bartik who was repeatedly accused of psychologically coercing suspects and/or fabricating inculpatory statements;

   f) perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-e above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or

fabricated, suppressed and destroyed evidence of which they were aware of, despite their obligation under the law and police regulations to report. This code of silence also caused police officers either to remain silent or to give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers coercively interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and/or prosecuted a criminal defendant.

**ANSWER:** Defendant Officers admit that, at the relevant time period in 2005, the Police Department had a policy and practice of not videotaping the interrogation or questioning of suspects, arrestees, and witnesses, from beginning to end. Defendant Officers deny the remaining allegations in this paragraph 135.

136. The interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged the coercing of statements from suspects, witnesses and arrestees, by abuse tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the Defendant Officers and their co-conspirators, and the injuries suffered by Ms. Harris.

**ANSWER:** Defendant Officers deny the allegations in paragraph 136.

137. The City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel police officers was done with deliberate indifference and likewise was a direct and proximate cause of the injuries to Ms. Harris.

**ANSWER:** Defendant Officers deny the allegations in paragraph 137.

138. Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above by final Chicago governmental and policy policymakers, establish that the constitutional violations alleged in this complaint were directly and proximately caused by the City of Chicago and its Police Department.

**ANSWER:** Defendant Officers deny the allegations in paragraph 138.

## COUNT IV
### (State Law Claim for Malicious Prosecution)

139. Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

**ANSWER:** Defendant Officers incorporate their Answer to each paragraph of the Complaint as if restated fully herein.

140. Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan, and O'Reilly, individually, jointly, and in conspiracy, initiated and continued a malicious prosecution without probable cause against Ms. Harris.

**ANSWER:** Defendant Officers deny the allegations in paragraph 140.

141. The prosecution of Ms. Harris terminated in her favor.

**ANSWER:** Paragraph 141 is a legal conclusion to which no response is required. To the extent that an answer is required, Defendant Officers admit that Ms. Harris' conviction was overturned by the Seventh Circuit Court of Appeals, and that the Cook County State's Attorney's Office declined to retry the case. Except as specifically admitted herein, the Defendant Officers deny any remaining allegations in this paragraph 141.

142. The Defendants' actions were done in a willful and wanton manner.

**ANSWER:** Defendant Officers deny the allegations in paragraph 142.

143. The Defendants' actions directly and proximately caused the injury and damage to Ms. Harris set forth above.

**ANSWER:** Defendant Officers deny the allegations in paragraph 143.

## COUNT V
### (State Law Claim for Intentional Infliction of Emotional Distress)

144.     Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

__ANSWER:__     Defendant Officers incorporate their Answer to each paragraph of

the Complaint as if restated fully herein.

145.     Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan and O'Reilly individually, jointly, and in conspiracy, engaged in extreme and outrageous conduct by, *inter alia*, coercing a false confession from Ms. Harris and/or by failing to prevent or stop Ms. Harris's coercive interrogation, by constructing and fabricating the details of Ms. Harris's confession, and by procuring her prosecution, conviction, and sentence of imprisonment for a murder she did not commit by means of the false and fabricated confession and evidence.

__ANSWER:__     Defendant Officers deny the allegations in paragraph 145.

146.     The individual Defendants individually, jointly, and in conspiracy, engaged in additional extreme and outrageous conduct by fabricating and coercing inculpatory evidence, suppressing exculpatory evidence, by continuing Ms. Harris's false imprisonment after procuring her wrongful conviction, by refusing to investigate or discipline the interrogators, and by covering up all of their individual and conspiratorial actions as more fully alleged above in this Complaint.

__ANSWER:__     Defendant Officers deny the allegations in paragraph 146.

147.     Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan and O'Reilly intended to inflict severe emotional distress on Ms. Harris, and knew that their conduct would cause Ms. Harris severe emotional distress.

__ANSWER:__     Defendant Officers deny the allegations in paragraph 147.

148.     As a direct and proximate result of Defendants' outrageous conduct, Ms. Harris was injured and has experienced, and continues to experience, severe emotional distress, including fear of spending the majority of her life in prison, nightmares, sleep disruption symptoms of post-traumatic stress disorder, anxiety, depression, and inability to focus or concentrate.

__ANSWER:__     Defendant Officers deny the allegations in paragraph 148.

## COUNT VI
### (State Claim for Conspiracy)

149.    Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

**ANSWER:**    Defendant Officers incorporate their Answer to each paragraph of

the Complaint as if restated fully herein.

150.    Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin, Wo, Grogan and O'Reilly with other unsued co-conspirators, including police and prosecutorial investigative supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison Ms. Harris and/or to continue that imprisonment, to maliciously prosecute Ms. Harris and/or continue that prosecution, and to intentionally inflict severe emotional distress on Ms. Harris.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 150.

151.     In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth above.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 151.

152.    The conspiracy or conspiracies were and are continuing in nature.

**ANSWER:**    Defendant Officers deny the allegations in paragraph 152.

## COUNT VII
### (State Law *Respondeat Superior* Claim)

153.    Ms. Harris re-alleges paragraphs 1 through 22 and 139 through 152 and incorporates them in this count.

**ANSWER:**    Defendant Officers incorporate their Answer to each paragraph of

the Complaint as if restated fully herein.

154.    Defendants Bartik, Balodimas, Cordaro, Day, Kelly, Landando, Noradin and Wo, were, at all times material to this complaint, employees of the Defendant City of Chicago; were acting within the scope of their employment; and their acts, which

violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

**ANSWER:** Defendant Officers deny they violated state law and further deny committing any wrongful conduct. Defendant Officers admit the remaining allegations in paragraph 154.

## COUNT VIII
### (745 ILCS 10/9-102 and Common Law Claims Against the City and County)

155. Ms. Harris re-alleges all of the preceding paragraphs and incorporates them in this count.

**ANSWER:** Defendant Officers incorporate their Answer to each paragraph of the Complaint as if restated fully herein.

156. Defendant City of Chicago was the employer of Bartik, Balodimas, Day, Cordaro, Kelly, Landando, Noradin, and Wo at all times relevant and material to this complaint. These Defendants committed the acts alleged above in the scope of their employment as employees of the City of Chicago.

**ANSWER:** Defendant Officers deny committing any wrongful conduct. Defendant Officers admit the remaining allegations in paragraph 156.

157. Defendant Cook County and its State's Attorneys' Office was at all times material to this complaint the employer of Defendants Grogan and O'Reilly. Cook County is responsible for any judgment entered against Defendants Grogan and O'Reilly making the County a necessary party to this complaint. Defendants Grogan and O'Reilly committed the acts alleged above under color of law and, in the scope of their employment as employees of Cook County and its State's Attorneys' Office.

**ANSWER:** Defendant Officers are without sufficient information to admit or deny the allegations in this paragraph 157, and on that basis deny same.

### AFFIRMATIVE DEFENSES

1. At all times material to the events alleged in Plaintiff's complaint, reasonably competent police officers, objectively viewing the facts and circumstances then

confronting Defendant Officers, would have believed that the actions taken were objectively reasonable and were within clearly established constitutional limits. Defendant Officers are, therefore, entitled to qualified immunity as a matter of law.

2. To the extent any employee or agent of defendant City of Chicago was acting within the scope of his or her employment, that employee or agent is not liable for his or her acts or omissions in the execution or enforcement of the law, unless such act or omission constitutes willful and wanton conduct. 745 ILCS 10/2-202.

3. Under the Illinois Tort Immunity Act, Defendant Officers are not liable under state law for any injury caused by the act or omission of another person. 745 ILCS 10/2-204.

4. Defendant Officers are not liable for the claims alleged under state law because a public employee is not liable for his or her acts or omissions in the execution or enforcement of any law unless such acts or omissions constitute willful and wanton conduct. 745 ILCS 10/2-202.

5. Under the Illinois Tort Immunity Act, a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

6. Defendant Officers are absolutely immune for any testimony they may have given in Plaintiff's underlying criminal case. *See Briscoe v. LaHue*, 460 U.S. 325 (1983).

7.     As argued in Defendant Officers' motion to dismiss, Plaintiff's coercive

interrogation claim is time barred.

**JURY DEMAND**

Defendants hereby request a trial by a jury pursuant to Fed. R. Civ. P. 38(b) for
all issues so triable.


                                        Respectfully submitted,

                                        /s/ Shneur Z. Nathan
                                        Shneur Z. Nathan

Andrew M. Hale
Avi T. Kamionski
Shneur Z. Nathan
Hale Law LLC
53 West Jackson, Suite 330
Chicago, Illinois 60604
(312) 341-9646



**CERTIFICATE OF SERVICE**

I, Shneur Nathan, an attorney, hereby certify that on the date stamped on the top

margin, I electronically filed the attached document with the Court's CM/ECF system

for electronic filing, which sent an email notice to all counsel of record.

                                        Respectfully submitted,

                                        /s/ Shneur Z. Nathan
                                        Shneur Z. Nathan