IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| NICHOLE HARRIS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 14-cv-4391 |
| ) | |
| CITY OF CHICAGO, Chicago Police Officers ) | Judge John W. Darrah |
| ROBERT BARTIK, DEMOSTHENES ) | |
| BALODIMAS, ROBERT CARDARO, ) | Magistrate Judge Susan E. Cox |
| JOHN J. DAY, JAMES M. KELLY, MICHAEL ) | |
| LANDANDO, ANTHONY NORADIN, and ) | |
| RANDALL WO, Assistant Cook County State's ) | |
| Attorneys ANDREA GROGAN and LAWRENCE ) | |
| O'REILLY, and the COUNTY OF COOK, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF NICOLE HARRIS'S MOTION TO COMPEL
DISCOVERY RESPONSES FROM THE CITY OF CHICAGO**

Plaintiff Nicole Harris was convicted of a crime that she did not commit, the strangulation murder of her four- year old son Jaquari. Any proper and honest investigation of Jaquari's death would have established that it was not a crime at all, but a tragic self-inflicted accident, witnessed by Jaquari's then-five-year-old brother Diante. Instead, several Chicago Police Department officers (the "CPD" and the "Defendant Officers") conspired to frame – and succeeded in framing – Ms. Harris for her own son's murder. They did so by conducting a highly corrupt and unconstitutional investigation of Jaquari's death. They took Ms. Harris directly from the hospital chapel where she wept over her lost child, interrogated her with increasing hostility for nearly 28 hours, refused her request for counsel, forced her to take a lie detector test *which the officers then lied about*, fabricated and hid evidence, manipulated witnesses, and ultimately threatened and coerced Ms. Harris into giving a false confession. It was this unconstitutional conduct that led to Ms. Harris's wrongful conviction.

It was only after the Seventh Circuit declared Ms. Harris' conviction unconstitutional (698 F.3d 609 (7th Cir. 2012)) and emphasized that the jury had numerous good reasons to question the reliability of Ms. Harris's confession (*Id.* at 613), and *only after Ms. Harris had already spent eight years in prison*, that the Cook County Criminal Court finally ended Ms. Harris's wrongful imprisonment. On June 17, 2013, the Cook County State's Attorney dismissed all charges against Ms. Harris, and on January 25, 2014, Judge Paul Biebel issued Ms. Harris a long overdue Certificate of Innocence, a judicial declaration that she is innocent as a matter of law of the murder for which she was wrongfully convicted. *See* 735 ILCS 5/2-702.

Ms. Harris now sues the City of Chicago (the "City") and the Defendant Officers (collectively, "Defendants") for the numerous violations of her constitutional rights and the City's pattern and practice of such unconstitutional "investigative" tactics. After this Court denied these Defendants' motion to dismiss in its entirety [Dkt. 87], Ms. Harris pursued certain basic discovery from the City (Exhibits 1 and 2), but she has been met with delay after delay, and frivolous objection on top of frivolous objection (Exhibits 3 and 4). Even after extensive "meet and confer" conferences under Local Rule 37.2 (which are memorialized in Exhibits 5-8, 16) –and just days before depositions are to begin – the City continues to refuse to answer even the most basic discovery. Ms. Harris respectfully requests this Court to compel the City to answer the interrogatories and produce the documents to which she is entitled.

**I.  The Court Should Compel The City To Produce All Reviews, Analyses, Assessments, and Evaluations of the City's Polygraph Unit.**

A central issue in this case involves the City's Polygraph Unit and the conduct of its polygraph examiners, including defendant Bartik, the polygrapher. Ms. Harris' contends that the Polygraph Unit did not act as a polygraph unit at all, but rather, that it was used to obtain false and

2

coerced confessions from her and others under the guise of allowing an innocent person to believe that she is supporting her innocence through a properly-conducted polygraph exam. Ms. Harris alleges in her Complaint that Defendant Bartik and other Defendant Officers lied to her about her polygraph examination, denied her request for counsel, and threatened, badgered and coerced her into giving the false and fabricated story she ultimately gave. [Dkt 1 ¶¶ 70-84.] Accordingly, Ms. Harris seeks the following documents:

> Doc.Req. #3: "All reviews, analyses, assessments, and/or evaluations of the polygraph unit, the work conducted there, or [of] its polygraph examiners from January 1, 2000 to the present." Exhibit 1 at 3.

After mulling this request for 6-1/2 weeks, the City refused to produce any responsive documents to this request *at all*, asserting that the words "analysis, assessment, or evaluation of CPD's polygraph unit" were "vague, ambiguous [and] subject to multiple interpretations . . . rendering response . . . impossible with speculation." Exhibit 3 at 4 (Doc. Req. #3); *see also* Exhibit 4 at 5 (Interog. #4). This objection is ridiculous. The City of Chicago knows perfectly well what it means to conduct a review, analysis, assessment, or evaluation of a department or of a polygraph examiner. The argument is especially disingenuous given that the City has repeatedly been charged in lawsuits and public accusations with having used "*their polygraph unit as a tool to obtain false confessions*," See, e.g., Duaa Eldeib, *Chicago Tribune*, "Chicago Police Accused of Using Exams to Manipulate Suspects," attached as Exhibit 9 (emphasis added), and given that "after decades of relying on controversial polygraph examinations to help solve crimes," the City in November 2013 "drastically scaled back on giving so-called lie detector tests in the course of criminal investigations." *See* Duaa Eldeib, *Chicago Tribune*, "Use of Chicago Police Polygraphs Down in Face of False Confessions," attached as Exhibit 10. Such change in City policy did not come out of thin air. There must have been internal discussions of the corrupt conduct of the

3

Polygraph Unit that led to this change, and Ms. Harris is entitled to see any such document, as well as all of the complaints, allegations, and lawsuits that led to the change.

Defendant has since conceded – during the several meet and confer conferences – that it will produce such reviews, analyses, assessments, or evaluations, but only for the period of 2000-2005. Ms. Harris had requested them for the period of 2000 to the present. The City has never provided a written basis for unilaterally limiting the time frame to 2000-2005, not in their initial response, supplemental response, or second supplemental response. It simply declares unilaterally and without explanation that the scope is too broad and that it will only provide information and documents for the narrower period. The only time the City articulated a more specific objection was during a meet and confer when the City's counsel asserted that the time frame "through the present" left the matter ambiguous and open-ended (to which Harris immediately stated that she would agree to a date certain in 2015 if we could otherwise reach agreement). Shortly after that meet and confer, however, the City reverted back to its initial position: no documents after 2005. This is a frivolous position, especially given that the City used its Polygraph Unit against Ms. Harris in May 2005, and all of the un-doing and disbanding of this corrupt unit occurred between 2005 and 2015. The City's position appears to be that unless the City learned of the Polygraph Unit's corrupt practices, evaluated those practices, and took action in the time period June to December 2005, then Ms. Harris is not entitled to know about it. This position is *beyond frivolous*.

**Ms. Harris requests this Court to compel the City to produce immediately all "reviews, analyses, assessments, and evaluations" of CPD's polygraph unit from 2000 to 2015.**

**II.     The Court Should Compel the City To Produce the Names, Titles, Contact Information, Complaint and Discipline History Related to Employees In The City's Polygraph Unit.**

In addition to asking for the reviews, analyses, assessments, and evaluations, Ms. Harris also requested the City to provide the following information related to the Polygraph Unit.

> Interrog.#5: "Identify by name, title, address and phone number each person who worked in the Chicago Police Department's polygraph unit and each person who directly supervised anyone in the polygraph unit from January 1, 2000 to the present [with an asterisk next to the polygraph examiners]." Exhibit 2 at 3.
>
> Interrog. #6: "Identify . . . each polygraph examiner who has been disciplined, the subject of a complaint, or sued for conduct alleged . . . in connection with any aspect of a polygraph examination." *Id*.

The City's initial response was that this request was oppressive, overly broad, overly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and "infringes upon the privacy rights of third-party non-litigants." The City therefore refused to provide *any information whatsoever about its Polygraph Unit*. Obviously, the City's position is not supported by Federal Rules of Civil Procedure 26, 33, and 34. The notion that the City need only disclose under Rule 26 the names of polygraph examiners whom they wish to call in their case, but does not need to provide the Plaintiff with any information about any other employee of the polygraph unit, really misses the point of discovery all together. And the City's final assertion that the request imposes on privacy rights of third persons misses completely the long-established principle that every citizen is required to provide information relevant to a legal proceeding; it is one of the burdens that comes with living in a democracy, just like jury duty. Nor is there an exception for City of Chicago police officers and other personnel.

After several "meet and confers," the City produced the names of four individuals that the City employed as polygraph examiners from 2000 to 2005. It did not produce the names of the polygraph examiners from 2006 to 2015; it did not produce the names of any other employee or supervisor in the Polygraph Unit; and it did not produce any documents related to (a) complaints

5

lodged against; (b) discipline imposed on; or (c) lawsuits filed against any of the polygraph examiners. Ms. Harris is entitled to all of this evidence because it is critically relevant to her claims, and again, the City does not get to unilaterally dictate the scope of their responses. Defendant Bartik and the use of the Polygraph Unit were central to Defendant Officers' coercion of a false and fabricated confession from Ms. Harris in violation of her Fifth and Fourteenth Amendment rights. They are central to her complaint regarding the City's unconstitutional pattern and practice, and straightforward discovery about them is plainly relevant under Rule 26. [*E.g.*, Dkt 1, ¶¶ 70-84, 135(e).]

Therefore, Ms. Harris requests this Court to compel the City to produce immediately the following specific information:

**(1) The names of all polygraph unit personnel – including polygraph examiners, supervisors, staff – for the time period 2000-2015, as well as last-known contact information for each such person.**

**(2) All complaints lodged against; discipline imposed on; or lawsuits filed against any of the polygraph examiners in the City's polygraph unit from 2000-2015.**

**III. The Court Should Compel The City To Produce The Names of The Witnesses from the City's Own Rule 26(a)(1) List of Persons With Knowledge Who Assert That They Heard A Statement By Ms. Harris or By Jaquari's Brother or Father During the City's Investigation, as well as the Contents of such Purported Statements.**

In her Interrogatory #2, Ms. Harris requested the City to identify – from its own Rule 26(a) Statement – the name of any witness who claims to have heard a statement of or observed the demeanor of Ms. Harris during the 50-hour investigation into Jaquari's death, as well as the contents of that purported statement. Ms. Harris asked for the same information related to any statements made by Jaquari's brother Diante or Jaquari's father Sta-Von during that same period. As with the other requests discussed above, the City initially did not produce any information *at all*. After numerous meet and confers, the City indicated that it would produce such information,

but it really has not done so. All it actually did was refer to its generically written police reports, which had already been produced months prior to the interrogatories propounded. Those documents in turn provide equally generic and equivocal descriptions in narrative form. *It was precisely because the information sought was not found in the documents* that Ms. Harris served the interrogatories in the first place.

Ms. Harris directs this Court to the City's Supplemental Response, Exhibit 11, at pages 7-9. These responses are unacceptable for numerous reasons. First, the City does not identify the witnesses who actually claim to have heard particular statements. Rather, every response is couched as Detective X or Officer Y "may have heard or observed a statement made by Nicole Harris, Sta-Von Dancy, or Diante Dancy during the CPD's investigation of the death of Jaquari." This is a complete non-answer. For the answer to be complete, the City must name the person who actually heard the purported statement (not list 13 people), any one of whom "may" have heard such a thing. Second, not one specific statement or expression of demeanor is referenced; the purpose of the interrogatory is to identify specific witnesses who heard statements and the substance of the statements they heard; none of this has been supplied. Third, for the reasons already stated, the attempt to point to documents under Rule 33(d) fails because the documents do not provide any of the specific information that the interrogatories seek. This entire, now 3-month exercise (these responses were originally due on September 14), has simply been one of stalling and evasion, and respectfully, the Court should not tolerate it.

**Therefore, Ms. Harris requests this Court to compel the City to produce immediately the following specific information:**

> **(1) The specific name of any person who claims to have heard a statement by, or observe the demeanor of, Ms. Harris, during the approximate 2-day investigation into Jaquari's death;**
>
> **(2) A specific description of the statement or demeanor observed;**
>
> **(3) The specific place in which the statement was heard or demeanor observed (not generic responses, such as, at "the police station," but more specific, such as, in "the squad car," "the interrogation room," or "the hospital chapel");**
>
> **(4) The specific time the statement was heard (not "May 15, 1999," but more specifically, "when we removed her from the hospital chapel" or "when she first arrived for the polygraph examination");**
>
> **(5) All of the information in (1)-(4) for statements and demeanor of Jaquari's brother Diante;**
>
> **(6) All of the information in (1)-(4) for statements and demeanor of Jaquari's father Sta-Von.**

**IV.  The City Should Be Required To Produce <u>ALL</u> of Their Orders, Policies, Practice Manuals, and Directives Regarding The Various Topics At Issue In This Case.**

Finally, Ms. Harris asked the City for "All Department General Orders, Special Orders, Directives, Department Manuals, procedural guides, training, rules, policies, practices or directives" (collectively, "Orders and Directives") that refer or relate to an array of relevant topics, which are set forth in Exhibit 1, at 3-4 (Doc. Req. ## 6, 7, & 8).  While the specific categories requested apply to this particular case, the request for such Orders and Directives itself is a standard request in every civil rights case against the City.

8

In response to the request, the City has produced just 33 pages of documents, which are attached as Group Exhibit 15. The City now insists that "it has produced to Plaintiff **all** non-privileged responsive documents in its possession, custody, or control" related to these topics. Exhibit 11, at 5 (emphasis added). Based on documents produced by the City in other cases, counsel for Ms. Harris knows for a fact that this is not true, and know that the City's counsel has not even scratched the surface of CPD's Orders and Directives (as defined above) with respect to these various topics. Rather, "all" does not mean "all;" it means what the City has deigned to give Ms. Harris at this time, reserving the right "to supplement" the production in the future. Depositions begin this week. There is no room for continued delay. Ms. Harris is entitled to discovery relevant to her claims – the full complement of orders, directives, training manuals, memoranda, and similar documents, to use in the upcoming depositions. Ms. Harris requests this Court to direct the City to re-double its efforts in this regard.

**Ms. Harris respectfully requests this Court to compel the City to locate and produce all of the City's Orders and Directives (as that term is defined in the request) related to the topics identified in Document Requests 6-8. In the alternative, Ms. Harris requests the Court to take the City at its word that these are "all" the responsive documents and enter an Order *in limine* that the City may not later assert that such Orders and Directives (as that term is defined above) includes anything other than the documents produced as CITY23-27, 54-64, 260-61, and 1447-1461.**

## CONCLUSION

For all the reasons stated in this Motion, Plaintiff Nicole Harris respectfully requests this Court to order all of the relief identified in this motion, order the City to pay the fees and costs

incurred with respect to this Motion and Ms. Harris's underlying efforts to obtain the discovery set forth in this Motion, and order any other relief that the Court deems just and proper.

**Dated:** November 2, 2015 /s/ Stuart J. Chanen_____
Stuart J. Chanen
Nicole N. Auerbach
Margot Klein
VALOREM LAW GROUP
35 E. Wacker Drive, Ste. 3000
Chicago, IL 60601
Phone: (312) 676-5460
stuart.chanen@valoremlaw.com
nicole.auerbach@valoremlaw.com
margot.klein@valoremlaw.com