**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 14-cv-4391 |
| | ) | |
| | ) | District Judge John W. Darrah |
| CITY OF CHICAGO, et al. | ) | |
| | ) | Magistrate Judge Susan Cox |
| Defendants. | ) | |

**PLAINTIFF NICOLE HARRIS'S OPPOSITION TO CITY OF CHICAGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


Nicole N. Auerbach
Stuart J. Chanen
Margot Klein
Valorem Law Group
35 E. Wacker Dr., Suite 3000
Chicago, IL 60601
(312) 676-5460

Janine L. Hoft
Joey L. Mogul
Jan Susler
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070

J. Samuel Tenenbaum
Bluhm Legal Clinic
Northwestern University
School of Law
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-4808

***Counsel for Plaintiff Nicole Harris***

TABLE OF CONTENTS

BACKGROUND ........................................................ 2

SUMMARY JUDGMENT STANDARD ........................................................ 3

LAW APPLICABLE TO *MONELL* CLAIMS ........................................................ 4

ARGUMENT ........................................................ 6

I. Genuine Disputes of Material Fact Exist as to the Well-Established Pattern and Practice of CPD's Unsupervised Polygraph Unit Using Unconstitutional Tactics to Coerce (and/or Assist In Coercing) False Confessions. ........................................................ 6

II. Genuine Disputes of Material Facts Exist as to the CPD's Pattern and Practice of Using Unconstitutional Tactics to Coerce and Assist in Coercing False Confessions. ........................................................ 11

III. Genuine Disputes Of Material Fact Exist as to the Existence of a Widespread CPD Code Of Silence that Enabled the Defendant Officers to Act with Impunity and Without Fear of Consequences. ........................................................ 14

CONCLUSION ........................................................ 17

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) .......... 3, 4

*Brokaw v. Mercer Cnty*, 235 F.3d 1000 (7th Cir. 2000) .......... 4

*Bunn v. Khoury Enters., Inc*., 753 F.3d 676 (7th Cir. 2014) .......... 3, 4

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .......... 13

*Cannon v. Burge*, No. 05 C 2192, 2006 WL 27354 (N.D. Ill. 2006) .......... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 4

*City of Canton v. Harris*, 489 U.S. 378 (1989) .......... 4

*Craig v. City of Chi*., No. 08 CV 2275, 2011 WL 1196803 (N.D. Ill. Mar. 25, 2011) .......... 16

*Dunn v. City of Elgin*, 347 F.3d 641 (7th Cir. 2003) .......... 4

*Elizarri v. Sheriff of Cook Cty*, 07 CV 2427, 2015 WL 1538150 (N.D. Ill. Mar. 31, 2015) .......... 13

*Fox v. Hayes*, 600 F3d 819 (7th Cir. 2010) .......... 16

*Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012) .......... 2, 3

*McNabola v. Chicago Transit Auth*., 10 F.3d 501 (7th Cir.1993) .......... 5

*Monell v. New York City Dept. of Social Serv*., 436 U.S. 658 (1978) .......... 4

*Monroe v. Pape*, 365 U.S. 167 (1961) .......... 4

*Obrycka v. City of Chicago*, 913 F. Supp. 2d 598 (N.D. Ill. 2012) .......... 14, 15

*Ovadal v. City of Madison*, 416 F.3d 531 (7th Cir. 2005) .......... 4

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir.2006) .......... 5, 13

*Thomas v. Cook Cty Sheriff's Dep't*, 604 F.3d 293 (7th Cir.2009) .......... 13

*Wells v. City of Chi*., No. 09-cv-1198, 2012 WL 116040 (N.D .Ill. Jan. 16, 2012) .......... 13

### Rules

Fed. R. Civ. P. 56(a) .......... 3

The City of Chicago is tilting at windmills in its motion for partial summary judgment on Plaintiff Nicole Harris's *Monell* claims. It has not accurately characterized her claims or her evidence. Even as the City notes it "is not required to guess which documents the plaintiff intends to use to support [her] claim," it does exactly that. It guesses badly, however, omitting virtually all of the material evidence on which Ms. Harris relies and setting up largely irrelevant arguments in order to try to knock them down. Ms. Harris's claims are in fact amply supported by extensive evidence that, at the very least, establishes a genuine dispute of material fact sufficient to defeat this motion. Specifically, she contends, and the evidence supports, that in May 2005:

(1) The Chicago Police Department's ("CPD") Polygraph Unit (the "Unit") had a well-established custom and practice of coercing false confessions (and assisting other officers to do so) by using a variety of improper techniques and tactics related to administering polygraph examinations. CPD failed to train, supervise, control, or discipline its polygraphers, or to adopt reasonable standards for the Unit. CPD polygraphers felt emboldened to engage in this widespread practice because of the complete lack of supervision and because the CPD's code of silence is so deeply embedded in CPD culture that the polygraphers believed they could act illegally with absolute impunity. The CPD custom and practice of using the Unit to improperly obtain confessions was a moving force behind Ms. Harris's injuries.

(2) The CPD Detective Division (the "Division") had a widespread custom and practice of coercing false confessions, using improper interrogation techniques and tactics, which included coercion, fabrication, physical restrictions and deprivations. CPD failed to train, supervise, control, or discipline its detectives with respect to false confessions or enforce reasonable standards within the Division. CPD's failures in this regard and its deeply embedded code of silence led detectives to believe that they could act illegally with impunity. This well-established practice of coercing false confessions was also a moving force behind Ms. Harris's injuries.

(3) CPD had a well-established and widespread code of silence which had two primary components: (a) officers failing to report the misconduct of other officers; and (b) CPD failing to adequately investigate and/or discipline its officers for misconduct. CPD's code of silence created a culture in which officers believed that they could violate citizens' rights with impunity because neither their fellow officers nor the Department would disclose, investigate, or discipline their misconduct. This well-established code of silence was also a moving force behind Ms. Harris's injuries.

For these and the reasons that follow, the City's summary judgment motion should be denied.

**BACKGROUND**

Defendant Officers coerced a false and fabricated confession from Ms. Harris for a crime she did not commit: the murder of her four-year-old son Jaquari. (*See* Harris's LR 56.1(b)(3)(C) Stmt. Add'l Facts ("PSOF"), at 2-12; 3/19/15 Mem. Op. & Order 2-7 (Darrah, J.)[Dkt 87].) They did so by taking Ms. Harris into custody within an hour of Jaquari's accidental death and subjecting her to a highly corrupt and unconstitutional interrogation lasting more than 30 hours. The interrogation included acts of physical abuse and intimidation, threatening her with life in prison and the loss of her other child, then-five-year-old Diante, depriving her of food and sleep, taunting and bullying her, calling her grotesque names, and refusing her requests for counsel. (*Id.* ¶¶2-4, 7-8.) Once Diante left with his grandmother, Defendant Noradin shoved her into a room, handcuffed her to a bench, and told her she was "under arrest for murdering her f**ing son." (*Id.* ¶3.) He demanded she say what Defendant Officers had already decided was true: that she had killed her child, and after she insisted she *had not*, they locked her into an interrogation room for hours. (*Id.* ¶4.) When they were initially unable to get her to confess, they simply fabricated a confession and attributed it to her, but soon learned that the confession they concocted did not match the physical evidence. (*Id.* ¶6; *see also Harris v. Thompson*, 698 F.3d 609, 614 (7th Cir. 2012) ("That first confession was undisputedly false").) So, they attributed a recantation of it to Ms. Harris. (*Id.*)

After more than 15 hours in custody, Ms. Harris was taken to another police station where Robert Bartik was to give her a polygraph examination. Bartik, along with Detectives Noradin, Day, and Kelly, used the polygraph process to break Ms. Harris, pressuring, threatening, and berating her until they got what they wanted: her acquiescence to a confession the Defendant Officers had fabricated. (*Id.* ¶7.) Detective Cordaro assured her she could say what they needed her to say, and "fight it from the outside" – that this was the best way for her to get back home. (*Id.* ¶8.) The

Defendant Officers worked together to coerce the confession they wanted, and closed their eyes to critical, relevant evidence surrounding Jaquari's death.

For example, Defendant Officers knew Ms. Harris was not home when Jaquari accidentally strangled himself while playing with the loose elastic band of his brother's bedsheet. (*Id.* ¶9). They also knew that Diante had witnessed Jaquari put the band around his own neck; Diante had said so multiple times in front of Defendant Wo, who in turn shared that information with the other Defendants. (*Id.* ¶¶10, 11.) Diante's statements, which were contained in Detective Wo's General Progress Report ("GPR"), were intentionally omitted from the "Clear and Closed Supplementary Report" that Defendants Wo, Noradin, Day, and Kelly prepared. Diante was not even listed as a witness on this final CPD report. (*Id.* ¶11.) It was only after the Seventh Circuit declared Ms. Harris' conviction unconstitutional, 698 F.3d 609 (7th Cir. 2012), emphasizing that the jury had good reasons to question the reliability of her confession (*id.* at 613), that the Cook County State's Attorney dismissed all charges against her and the Chief Judge of the Cook County Criminal Court awarded her a Certificate of Innocence. (*Id.* ¶13.) Ms. Harris spent *eight years* in prison before she was fully exonerated on January 25, 2014. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists whenever there is enough evidence that "'a reasonable jury could return a verdict for the nonmoving party.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014). The City's burden is to establish both that that there are no material factual disputes to be resolved by a jury and that the facts to be presented can lead only to a judgment for the City. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). The Court construes all evidence, and all inferences reasonably drawn from the evidence most favorably to the nonmoving party. *Anderson*, 477 U.S. at 255; *Bunn*, 753 F.3d at 682.

## LAW APPLICABLE TO *MONELL* CLAIMS

In *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658 (1978), the Supreme Court overruled *Monroe v. Pape,* 365 U.S. 167 (1961) and held that municipalities and other local governmental units may be liable where an action taken as part of official municipal policy causes a constitutional tort. *Id.* at 691. "Official municipal policy" may generally take three forms: (1) an express municipal policy, (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a usage or custom with the force of law; and (3) a deliberate act by a decision-maker with final policy-making authority affecting the defendant. *Brokaw v. Mercer Cnty*, 235 F.3d 1000, 1013 (7th Cir. 2000). A municipality may also be found liable under *Monell* if the municipality fails to provide adequate training or supervision, and the City's failure to train or supervise amounts to a deliberate indifference to the rights of the persons with whom the police come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003). Here, Ms. Harris establishes each of her *Monell* claims via the second method, that is, through proof of a widespread custom or practice and as a result of the City's deliberate indifference to the constitutional violations that emanated from the custom and practice. To establish these *Monell* claims, Ms. Harris must show that: (1) she suffered a deprivation of a federal right; (2) as a result of a widespread custom or practice; which (3) was the proximate cause of [her] injury. *Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005). The City does not challenge either the first or third elements of Ms. Harris's claims. She therefore addresses only whether in 2005 the City had a

sufficiently widespread custom and practice of using the Unit and Division to coerce false confessions and/or had a well-established code of silence.[1]

Where, as here, plaintiff predicates *Monell* liability on a wide-spread practice instead of a written policy, plaintiff must demonstrate that the City both knew of and acquiesced in a pattern of unconstitutional conduct, that is, that the city was "deliberately indifferent" to the pattern of which it had knowledge. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir.2006); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir.1993). In turn, proof of a City's deliberate indifference may be established through evidence of either (1) a failure to provide adequate training in light of foreseeable consequences, or (2) a failure to act in response to repeated complaints of constitutional violations by its officers. *Id*.

As set forth below, the jury in this case will be able to reasonably conclude that the City knew of, acquiesced in, and was deliberately indifferent to the foreseeable consequences of its failure to train, supervise, control, investigate, and/or discipline officers in CPD's Unit and Division. In her PSOF, Ms. Harris presents extensive and detailed evidence that as of May 2005, the City knew of numerous confessions that had been coerced, falsified, and fabricated, knew of the Unit's extensive role in such confessions, knew of the repeated complaints of (and sustained findings of) constitutional violations by its officers, and nevertheless remained deliberately indifferent.

[1] The City may not challenge the first or third elements of Ms. Harris's *Monell* claims for the first time in its reply brief. *See Cannon v. Burge*, No. 05 C 2192, 2006 WL 27354, at *22 (N.D. Ill. 2006) (arguments not raised in motion and moving memorandum are waived). Nor does the City's passing reference to these elements in its introductory section preserve the claim; rather, a party must fully develop an argument in order to preserve it, *Id.*, which the City has not done in this instance.

## ARGUMENT

### I. Genuine Disputes of Material Fact Exist as to the Well-Established Pattern and Practice of CPD's Unsupervised Polygraph Unit Using Unconstitutional Tactics to Coerce (and/or Assist In Coercing) False Confessions.

Ms. Harris first *Monell* claim asserts that her constitutional rights were violated in part by the City's widespread custom and practice related to its Polygraph Unit. Summary judgment on this claim must be denied based on the abundance of evidence that demonstrates not just the disputed nature of the material facts but also the strength of those facts. The record is plain that from 1989 until at least 2010, the City had next to no written rules about the Unit, and certainly no training, management or supervision as to how the polygraph examination process was to be employed against civilian citizens and/or protecting against false confessions. (PSOF ¶¶ 21, 23, 27-29.) The degree to which Defendant Bartik and other polygraphers were permitted to conduct CPD business in any manner they chose, is astounding. (*Id.*) Since at least 1989, Bartik and other polygraphers have used the polygraph examination process as a tool to coerce individuals to falsely confess to crimes that they did not commit. (*Id.* ¶¶15-48.)

From 1988 through at least 2010 (and thus including 2005 when Ms. Harris was subjected to a polygraph examination), the City failed and refused to establish any policy: to ensure (1) the administration of reliable polygraph examinations; (2) that its polygraphers were properly licensed and educated; (3) that its polygraphers applied standard-of-the-profession scoring to exams; (4) that its polygraphers even knew of, let alone followed, national standards for the administration of polygraph exams; (5) that its polygraphers even knew of, let alone followed, Illinois law regarding the administration of polygraph exams; (6) that there was substantive supervision of its polygraphers; or (7) that the exceedingly high number of purported confessions made to the Unit and especially from Bartik were investigated. (*Id.* ¶16.) By these failures, the City enabled Bartik to falsify and manipulate polygraph results and reports he knew no supervisor would review and,

with other officers who brought him suspects, to coerce false confessions they knew would seal convictions without complaint from CPD colleagues. (*Id.* ¶48.) The City's complete lack of standards and/or supervision, and its knowledge of the many Bartik Complaint Registers ("CRs") and lawsuits demonstrate the City's deliberate indifference to manipulated polygraph results and the exorbitant number of confessions emanating from Bartik and his Unit. (*Id.* ¶¶ 15-48.)

Moreover, in 2005, the CPD encouraged and condoned the use of the polygraph examination process as a false evidence ploy which is commonly found as a contributing factor in verified cases of false confessions, including confessions confirmed false by DNA. (PSOF ¶ 18.) In 2005, the CPD was aware of the risk of false confessions following polygraph tests, and yet the CPD admits that it took no measures to avoid manipulation of the polygraph process to lead to false confessions. (*Id.* ¶19.) From 1998 through at least 2010, no Unit supervisor was trained in polygraphy, and thus none were qualified to review a polygrapher examiner's work. (*Id.* ¶ 27.) Bartik testified he was unaware of any quality control or substantive review of the Unit, and that is because, as the City admits, there was none. (*Id.* ¶33.)

Bartik readily conceded that throughout his CPD polygraph career, he used a subjective global assessment (the "Reid technique") to score polygraph examinations in criminal investigations, although he used numerical scoring in more recent years ***at the CPD's insistence*** for pre-employment polygraph examinations only. (PSOF 31.) By Ms. Harris's 2005 exam, it was well known within the scientific community that global assessment scoring was vastly inferior to numerical scoring, and indeed considered archaic and discredited. (*Id.*) The questions asked of her were also not properly formulated under well-known 2005 scientific standards, and were in fact biased towards a false positive outcome (*i.e.*, "an actually innocent person failing the examination"). Contrary to Bartik's contention, an analysis of Ms. Harris' 2005 polygraph examination data using 2005 scientifically-accepted numerical scoring indicated that she had been truthful. (*Id.* ¶ 23.)

In sworn testimony in another federal action against him, Bartik asserted that in the five years between 1998 and 2003 he had had obtained approximately 111 confessions in the pre-test phase of the polygraph process, the time in which the polygrapher is to be impartial so as to establish a baseline with the subject. (PSOF 40.) Discovery in this case has disclosed that the actual number of Bartik's pre-test confessions in that period is closer to 144. (*Id*.) In other words, although Bartik's sole job was to conduct a non-biased, scientific detection of deception test, Bartik was apparently able to get 144 individuals to confess *before he even administered the polygraph examination* for which the individual had been brought to him. This is a shocking number. In 2013, a past president of the American Polygraphers' Association told the *Tribune* that in his 30 years of administering polygraphs he had obtained less than five confessions *at any stage of the polygraph process*. (*Id.*)

The CPD was not only intimately aware of Bartik's propensity to obtain confessions, it praised him for it! In 2000, Bartik was rated 99 out of 100 for work quality for "achiev[ing] a high number of confessions from polygraph subjects prior to the actual polygraph examination." (*Id.* ¶41.) The CPD had its ostrich-like neck buried deep in the sand when it refused to consider, acknowledge, question, or investigate that Bartik was obtaining these confessions in improper ways, even though many appeared to have been completely fabricated. (*Id*.) This is true even after numerous individuals from whom Bartik had purportedly taken confessions were (1) fully exonerated, (2) sued Bartik and the City for wrongful convictions, and (3) were paid hundreds of thousands of dollars by the City to compensate them for the harm caused them. (*Id.* ¶¶42-44.)

From 1998 to the present, the CPD has had no written policy, practice, or procedure, nor any training, supervision, or discipline regarding the use of the CPD Polygraph Unit as a tool to obtain false or fabricated confessions. (PSOF 37.) Bartik testified that he does not even believe false or fabricated confessions occur. (*Id*. 20.) If a subject gives an inculpatory statement during a polygraph exam, he believes the person is always telling the truth; if the confession occurs pre-test, he is so

confident that the person is telling the truth that he does not then administer the exam. (*Id.* ¶.) Bartik stands on this premise even though it has been proven false and even though the City has paid millions of dollars in response allowing the Polygraph Unit to be conducted on this basis. (This irony – of operating a scientific truth v. falsity unit on the singularly false premise that every confession the unit obtains is truthful – should not be lost on this Court.)

The City does not have any record of any police officer or CPD employee notifying a superior or filing a formal complaint about Bartik's conduct. (*Id.* ¶22.) This supports the existence of a CPD code of silence which further perpetuated the wrongful conduct at issue. Although nobody inside CPD complained about Bartik, he was the subject of numerous complaints and lawsuits from individuals outside CPD, and he was repeatedly accused of coercing confessions. (*Id.* ¶41.) Nevertheless, he received no professional discipline or other consequence as a result. (*Id.* ¶45.) The City admits it has no documentation that any supervisor ever so much as requested Bartik's disciplinary records from the various and scattered sources where they are kept, or that anyone ever reviewed Bartik's disciplinary history as a whole, including to look for patterns or for issues that could be addressed by counseling, increased supervision or training. (*Id.* ¶35.) The CPD likewise has no documents reviewing Bartik's testimony or his role in motions to suppress, appeals, post-conviction, or habeas proceedings alleging wrongdoing with respect to his conduct, nor has it undertaken a review of the numerous successful Section 1983 lawsuits brought against him. (*Id.* ¶35.) The City even admits that it conducted no investigation as to his license. (*Id.* ¶22.) This failure to investigate, coupled with the CPD code of silence, allowed Bartik and his co-defendants to engage in misconduct with little fear of sanction. And they were right: Bartik was recently promoted to the rank of sergeant, with the City admitting that the multiple citizen complaints and civil lawsuits brought against him – including those resulting in jury verdicts or settlements – ***were not considered in any way*** in assessing his qualifications for promotion. (*Id.* ¶53.)

Even in preparation for the City's 30(b)(6) deposition, the City turned a blind eye to Bartik: the City's designee, O'Neill, testified that although he noted a number of lawsuits alleging civil rights violations in relation to Bartik's polygraph examinations, he saw no pattern other than attorneys making allegations and not substantiating them to the Internal Affairs Division. (*Id.* ¶36.)

In March 2013, the *Chicago Tribune* published an exposé on the Polygraph Unit. (*Id.* ¶49.) The article described in detail the Unit's failure to follow national standards when administering exams, failure to require peer review, failure to require continuing education, failure to routinely take pre-test notes or record examinations, and failure to use numerical scoring of examinations until as late as 2012. It also reported at length on six false and coerced confession civil rights cases against the City, five of which involved Defendant Bartik. (*Id.*) The City further admits that even after this *Chicago Tribune* article was published, it *still* did not investigate:

(1) Whether polygraph exams were an appropriate or valuable investigative tool in criminal cases;

(2) Whether use of polygrapher testimony in criminal cases was an asset to criminal prosecutions;

(3) Whether CPD had or needed continuing education requirements for its polygraphers;

(4) Whether CPD polygraphers were required under state law to take notes of pre-test interviews and whether they repeatedly failed to do so;

(5) Whether CPD polygraphers failed to use numerical scoring of polygraph exams prior to 2012;[2]

(6) Whether CPD polygraphers had a custom or rule that no polygraph result was ever reviewed by a second examiner or that no Polygraph result was required to be reviewed by a supervisor.

(7) Whether CPD polygraphers conducted exams other than in the test taker's native tongue.

(8) Whether CPD polygraphers were violating national industry standards by not having: continuing education requirements for polygraphers, exam results reviewed by a second examiner, numerical scoring for exams prior to 2012, and exams in a taker's non-native tongue.

(9) Whether CPD had made a specific decision to ignore national polygrapher standards; if so, who made that decision; and if so, whether that person was authorized to do so.

---

[2] The City denies that (a) it waited until 2012 to apply numerical scoring and (b) its officers had an obligation to take notes during the pre-test interview. These are disputed issues of fact.

(PSOF 50.) When asked if it ever investigated the assertions in the *Tribune* article, the City in a verified interrogatory answer stated that "***the Chicago Police Department does not initiate investigations in response to unfounded, biased and unsubstantiated allegations contained in a newspaper article.***" (*Id.* ¶51 & Exh. 37) (emphasis added). The City's failure to impose any supervision or quality control over the Unit is enough, standing alone, to demonstrate its deliberate indifference to the stream of false confessions emanating from that Unit, but that it summarily dismissed the article detailed allegations and did ***nothing whatsoever to look into it***, perhaps raises deliberate indifference to a heretofore unseen level. The City's motion on this claim must be denied.

## II. Genuine Disputes of Material Facts Exist as to the CPD's Pattern and Practice of Using Unconstitutional Tactics to Coerce and Assist in Coercing False Confessions.

Ms. Harris has also presented sufficient detailed evidence to support her second *Monell* claim, that the CPD Detective Division had a well-established pattern and practice of using improper tactics to coerce false confessions. (PSOF 55-85.) Ms. Harris's evidence details the City's long history of allowing its officers to do whatever it took to obtain confessions, regardless of whether those confessions are genuine and truthful, on the one hand, or are the false and fabricated product of lies, tricks, false and fabricated evidence, physical coercion, mental coercion, lack of sleep, hunger, fear, and for many years, torture. Ms. Harris does not repeat in this memorandum all of the detailed historical evidence sets forth in her PSOF. She also does not repeat here the detailed construct for a pattern and practice *Monell* claim against the City that she sets forth above in Section I. Suffice it to say that Ms. Harris's undisputed and indisputable evidence set forth in PSOF 55-85 is more than sufficient for a jury to reach five main conclusions:

(1) The City has a long history of obtaining false and fabricated confessions through the use of illegal and unconstitutional conduct.

(2) As of 2005, the City remained and was deliberately indifferent to the Detective Division tactics that were being used and which were likely to lead to false confessions. The CPD did not collect evidence of or pay attention to false confessions, educate itself with respect to false confessions, train or supervise its officers to conduct police interrogations in a manner

that would not lead to false confessions, discipline detectives who intentionally obtained fabricated confessions, violated the Constitutional rights of individuals during interrogations, and/or used other improper interrogation and investigation techniques to do so.

(3) Whether the Division's widespread practice of coercing false confessions was so well-settled as to constitute a custom or usage with the force of law is a question for the jury in this case.

(4) Whether CPD's code of silence was so deeply embedded in CPD culture as to be a moving force behind the Defendants' Constitutional violations is also a question to be left to the jury.

(5) Whether, by failing adequately to train, supervise, control, investigate, or discipline its detectives and their Division with respect to unconstitutional interrogation practices, the City was deliberately indifferent to the rights of the persons with whom detectives came into contact, is also a question that must be left to the jury.

The City asserts three reasons why none of these questions should go to a jury. It argues that (1) CR allegations, standing alone, are insufficient to establish a custom and practice; (2) CR and lawsuit allegations, taken together, are insufficient to establish a custom and practice; and (3) statistical evidence of the City's failure to discipline its officers, standing alone, is insufficient to establish an custom or practice. (City's Mem. Supp. Mot. Partial SJ ("Br.") at 7-10.)

To support this argument, the City repeatedly asserts that the only evidence that Ms. Harris has provided to establish a custom or practice are the 61 false confessions she cited in an interrogatory response served almost a year ago – ***before*** any of the Defendant Officers or the City's three Rule 30(b)(6) depositions were taken, and ***before*** the City made numerous admissions in response to discovery. Harris' response was also before the Magistrate Judge compelled the City to produce thousands of pages of relevant evidence, much of which, to the best of her knowledge, had never been produced before. *See* Dkt 118, 119, 126, 156, 161. (*See also* PSOF 54.) Moreover, the list of false confessions the City points to is but one item from a ten-page interrogatory response. (*See* Harris's Resp. Second Set Interrogs. at 1 [Dkt 153-1].)

Further, the Court should reject the City's argument that Ms. Harris's evidence is inadmissible or otherwise insufficient to prove the City's historical knowledge or its deliberate indifference. While some individual courts have rejected proffers of evidence that are limited only

to CRs or perhaps a combination of limited CRs and lawsuits, Ms. Harris presents much more than that here, and more importantly, the City significantly overstates the *ratio decidendi* of those cases. Indeed, the City's own brief concedes that the sole proof that Ms. Harris must present to establish the inference of an actionable custom and practice is: "(1) failure to provide adequate training, supervision or discipline in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." (Br. at 7, citing *Sornberger*, 434 F.3d at 1029-30).) The City does not argue, and *Sornberger* did not hold, that the "repeated complaints of constitutional violations by its officers" must be sustained in whole or in part in order to put a municipality on notice. Therefore, the determination in this case of whether the City had sufficient evidence to perceive "foreseeable consequences" and/or "to act in response" is one that must be made by the jury. This is certainly true here where the plaintiff relies on extensive evidence that goes well beyond CRs – sustained or unsustained – against CPD officers. Courts in this circuit have repeatedly stated that if "the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that . . . cannot support municipal liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *Elizarri v. Sheriff of Cook Cty*, 07 CV 2427, 2015 WL 1538150, at *2-3 (N.D. Ill. Mar. 31, 2015). *See also Thomas v. Cook Cty Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir.2009); *Wells v. City of Chi.*, No. 09-cv-1198, 2012 WL 116040 (N.D .Ill. Jan. 16, 2012) (juxtaposing problem presented to city "many times" against one presented as "random event").

Ms. Harris has presented sufficient evidence in PSOF 55-85 for a jury to reasonably conclude that by 2005 the "same problem [regarding coerced confessions] ha[d] arisen many times and the municipality ha[d] acquiesced in the outcome," and despite the "foreseeable consequence" of continuing constitutional deprivations, the City expressly chose <u>not</u> "to act in response." This is all that Ms. Harris must proffer to defeat the City's motion.

### III. Genuine Disputes Of Material Fact Exist as to the Existence of a Widespread CPD Code Of Silence that Enabled the Defendant Officers to Act with Impunity and Without Fear of Consequences.

In the face of the detailed facts set forth above and in her PSOFs, the City cannot seriously argue that there are no disputed issues of material fact as to the substantial, historic "code of silence" within the CPD, enabling officers to act above the law and with impunity. (PSOF 86-87.) On December 8 and 9, 2015, the Mayor Rahm Emanuel admitted as much, and the City confirmed his admissions in discovery in this case. (*Id.*) On December 8, 2015, he was asked on the WTTW program *Chicago Tonight*: "Is there a code of silence that exists among police officers?" He said, "The short answer is yes." (*Id.*) The next day, in prepared remarks before the Chicago City Council, Mayor Emanuel explained that the code of silence had existed within the CPD for "decades," and that it had enabled officers to commit misconduct with impunity. (*Id.*) Emanuel implored the City Council: "We cannot ask citizens in crime-ravage neighborhoods to break the code of silence if we continue to allow a code of silence to exist within our own Police Department." (*Id.*)

Although the Mayor's admissions alone are sufficient to establish Ms. Harris's *Monell* code of silence claim, she does not rely on them alone. This Court may also take judicial notice of the jury's verdict in *Obrycka v. City of Chi.*, 07-CV-2372, and Judge St. Eve's refusal to vacate that verdict on the City's post-trial motion. *Obrycka*, 913 F. Supp. 2d 598 (N.D. Ill. 2012). In *Obrycka*, off-duty CPD Officer Abbate beat Obrycka in the bar where she was working. When she called 911, she reported that the offender was a CPD officer and that the incident had been videotaped, but neither of those pieces of information were included in the CPD's final report of the incident. *Id.* at 603. In addition, Abbate made several phone calls to fellow CPD officers within hours of the incident and tried to intimidate the bar to give him the videotape. (*Id.*) (The post-attack behavior of CPD officers in the *Obrycka* case is grotesquely similar to the CPD officer behavior after the Laquan McDonald shooting.) Obrycka filed both civil rights claims against Abbate, as well as *Monell* claims

against the City, in which she asserted that the moving force behind the officer's battery against her was the City's widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or the CPD code of silence. The jury found in Obrycka's favor on both. (*Id*.)

After the jury found *Monell* liability against the City, the City moved to vacate the jury's verdict based on both a settlement with Obrycka and an argument that the jury's *Monell* finding was ambiguous. The District Court, however, refused to vacate the jury's finding, holding that:

> The jury had a choice of deciding [1] whether the code of silence was the moving force behind the constitutional violation or [2] if the City's widespread custom or practice of failing to adequately investigate and/or disciple its police officers was the moving force – or both.

*Id.* at 694. The Court held that the "public's interest in the precedential value of the judgment" outweighed any ambiguity caused by the jury's failure to identify specifically under which prong – it had found liability – or both. *Id.* Notwithstanding the City's repeated attempts to get the jury's finding in *Obrycka* vacated, when Ms. Harris asked the City *in this case* about the jury's verdicts in *Obrycka*, the City responded that it had "made reasonable inquiry into this Request [to Admit] and the information known or readily obtainable by the City is insufficient to enable the City to admit or deny" whether the *Obrycka* jury had found that in 2007 there existed a code of silence among Chicago police officers or a widespread custom or practice of failing to investigate or discipline its officers when they engaged in misconduct. (PSOF 89 n.3)

As in *Obrycka*, Ms. Harris demonstrates that the Defendant Officers violated her Constitutional rights because they knew they could do so with impunity given, *among other reasons*, the City's widespread custom or practice of failing to adequately train, investigate and/or discipline its officers, and enabling and allowing the CPD's well-established code of silence to prevent disclosure of misconduct. (PSOF 86-97.) From the moment they met her, the Defendants undertook a biased investigation targeted at Ms. Harris and aimed at coercing a false and fabricated confession. (*Id.* ¶5.) They knew from Diante Dancy's statements that Jaquari had accidentally caused his own

death, and that Ms. Harris was not home at the time this occurred. (*Id.* ¶9.) Defendants Noradin, Kelly, Day and Wo intentionally omitted this evidence (and even the fact that Diante was a witness) from their Cleared and Closed Report (*Id.* ¶12.) Although each of the officers acknowledge writing portions of that final report, none admit to omitting the critical part about Diante's exculpatory statements. (*Id.*) "[P]olice officers may not close their eyes to facts that would clarify the circumstances of an arrest, *particularly where it is not clear whether a crime was committed or who committed the crime.*" *Craig v. City of Chi.*, No. 08 CV 2275, 2011 WL 1196803 *6 (Mar. 25, 2011) (emphasis added); *Fox v. Hayes*, 600 F3d 819 (7th Cir. 2010).

In addition, as discussed above, Defendants Bartik, Noradin, Day, and Kelly used the polygraph process as a false evidence ploy to coerce a confession from Ms. Harris with impunity. (PSOF 48.) The City was well aware of the risk of false confessions in relation to polygraph examinations in 2005, and yet it took no effort whatever to prevent them. The City admits it had no policy, practice, or procedure between 1998 and the present for the Unit regarding false confessions. (*Id.* ¶19.) To the contrary, the City intentionally created an organizational structure that allowed the Unit to operate without guidelines or supervision of any kind. (*Id.*) This structure, along with the City's dispersed, complicated, and inaccessible record keeping (*see Id*. ¶34), made it impossible for any meaningful review of officer misconduct, a fact well known to members of this blatantly rogue Unit. (*Id*. ¶¶27, 32-35.)

Moreover, despite the fact that each Defendant Officer has been with CPD for more than 20 year, and the sheer volume of attention to the CPD's code of silence over the past many years (*e.g.,* PSOF 56, 86-87), Defendants Balodimas, Day, Noradin, Cordaro and Landando each professed ignorance as to the code of silence, while at the same time acknowledging that they had never heard of a fellow officer being disciplined for misconduct, nor volunteered any information regarding misconduct against any fellow officer. (PSOF 92-96.) The officers' positions are consistent with

the City's abysmally low number of *sustained* citizen civil rights complaints and high number of such complaints deemed "unfounded" or not considered at all. (*Id.* ¶90.) Defendant Officers knew they could manipulate the investigation of Ms. Harris, manipulate her polygraph examination, and ultimately coerce a false and fabricated confession because of the lack of supervision in the Unit and the attendant code of silence rampant with the CPD. Ms. Harris's evidence on this claim more than demonstrates a genuine dispute as to the material facts of her *Monell* claim.

**CONCLUSION**

For these reasons, Ms. Harris respectfully requests this Honorable Court to deny the City's motion, allow this case to continue to trial, and order any other just and proper relief.

In the alternative, if and only if this Court does not agree with the arguments set forth here, then for the reasons set forth in the attached Rule 56(d) declaration, Ms. Harris requests the Court to allow her until April 15 to supplement this opposition with discovery obtained after March 15.

Dated: March 15, 2016

Respectfully submitted,

*/s/Margot Klein*
One of Nicole Harris' Attorneys


Nicole N. Auerbach
Stuart J. Chanen
Margot Klein
Valorem Law Group
35 E. Wacker Dr., Suite 3000
Chicago, IL 60601
(312) 676-5460

Janine L. Hoft
Joey L. Mogul
Jan Susler
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070

J. Samuel Tenenbaum
Bluhm Legal Clinic
Northwestern University
School of Law
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-4808

***Counsel for Plaintiff Nicole Harris***

**CERTIFICATE OF SERVICE**

I, Margot Klein, certify that on Tuesday, March 15, 2016, I caused the attached **PLAINTIFF NICOLE HARRIS'S OPPOSITION TO CITY OF CHICAGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT** to be served on all counsel of record in this case through the Court's ECF system.

*/s/ Margot Klein*
Margot Klein