# EXHIBIT 5

To
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,              )
                            )
         Plaintiff,         )
                            )
    vs.                     )    No. 14 CV 4391
                            )
CITY OF CHICAGO, et al.,    )
                            )
         Defendants.        )

The videotaped deposition of JOHN DAY, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Carmella T. Fagan, C.S.R., R.P.R., Notary Public within and for the County of Cook and State of Illinois, at 1180 North Milwaukee Avenue, Third Floor, in the City of Chicago, Cook County, Illinois, commencing at 10:09 a.m. on the 12th day of November, 2015.

BREHON REPORTING   (708) 442-0027

Page 62

1  remember -- I don't know that that's correct. I kind
2  of think that may have happened, but basically it was
3  just some general information thing.
4      Q.    Did you -- do you know who sought that
5  information?
6      A.    I don't -- I don't remember.
7      Q.    Did you ever look through those DCFS
8  records?
9      A.    I don't believe so.
10     Q.    And during this interview with Stavon
11 Dancy and Nicole Harris, were they -- were they both
12 talking, like, an equal amount?
13     A.    I don't -- that's -- I -- I couldn't
14 judge it as far as equality.
15     Q.    Okay. But they were both talking and
16 responding to questions?
17     A.    Yeah. Yes.
18     Q.    And you testified earlier that at some
19 point you made the decision that Nicole Harris and
20 Stavon Dancy should come back to the station?
21     A.    Yes.
22     Q.    And why did you make that decision?
23     A.    Because of the cause of death, the --
24 what I -- what I -- what I would say is the demeanor

BREHON REPORTING (708) 442-0027

1    of Ms. Harris as opposed to the demeanor -- demeanor

2    of Stavon, the fact that their -- their most brief

3    statement just kind of aroused suspicion.

4              And I don't remember much about the

5    other child at that point, but I knew there was

6    another child in the house, in the family, however

7    you want to describe it.  And I -- I -- I wanted to

8    be sure that whatever needed to be done beyond

9    notifying DCFS about the incident would be done.

10        Q.    So I'm clear:  So one of the reasons

11   you said why you believe Nicole Harris and Stavon

12   Dancy had to come back to Area 5 was the cause of

13   death?

14        A.    Right.

15        Q.    What about the cause of death made you

16   believe there was need for further investigation?

17        A.    Well, it's -- it's -- when one -- when

18   one uses the term "accidental" or "violent," they can

19   be interchangeable even though there's no criminal

20   behavior.  Strangulation in and of itself is a

21   violent way to die, even if it's accidental.  I

22   wanted further clarification on that.

23              I also, because you have to be

24   prudent, particularly when children are involved, you

Page 64

1  want to view the crime scene.  Part of the
2  investigation requires you to physically go and look
3  at the scene, you know, look at the room, try to --
4  try -- try -- try to put together what you see versus
5  what people are telling you to determine the
6  possibility or impossibility.
7       Q.   Okay.  And so you're also saying that
8  you -- you wanted to do further investigation because
9  you believed Ms. Harris's demeanor was off in this
10 case?
11      A.   I -- I believed it was unusual.
12      Q.   Okay.  It was suspicious?
13      A.   Suspicious.
14      Q.   And you had a desire to question
15 Ms. Harris further regarding her knowledge
16 regarding --
17      A.   Yes.
18      Q.   -- his death?  But with respect to
19 Mr. Dancy, you believed his demeanor was not unusual?
20      A.   On face value, it didn't appear
21 unusual to me.
22      Q.   You wanted -- you wanted the
23 opportunity to have -- further question Ms. Harris
24 back at Area 5.

BREHON REPORTING  (708) 442-0027

Page 84

1  so.

2  Q. May 16th?

3  A. I don't know. I think I went home and
4  showered and shaved at least once. I'd bet on that.

5         (WHEREUPON, there was laughter.)

6  Q. Okay. Are you currently working
7  today?

8  A. You mean am I on the payroll or do I
9  have a job?

10 Q. Do you have a job?

11 A. No.

12 Q. When did you start at the Chicago
13 Police Department?

14 A. September 8th, 1986.

15 Q. And -- okay. And that's when you went
16 to the academy?

17 A. Yes.

18 Q. And had you worked in law enforcement
19 prior to that?

20 A. No.

21 Q. After September 8th of 1986, you
22 finished the academy, right? And that was how long?

23 A. I think, if I'm not mistaken, at the
24 time it was -- I think it was -- I think it was 18

Page 101

1    A.    It's been referred to as chronic
2 fatigue.  I -- I'm a cancer survivor; I had cancer
3 surgery in 2003.  And the pace of life between
4 Area 3, which at the time was at Belmont and Western,
5 versus Area 5 was significant.
6    Q.    Okay.
7    A.    And your -- your caseload was much
8 lighter.  The level of activity in the whole Area,
9 Area 3, was much less.  It was much less demanding.
10 And without sounding weepy here, I didn't know how
11 much longer I had because I felt pretty bad.  In
12 fact, that's why I gave it up in 2006 and said, you
13 know, "I just can't work anymore."
14    Q.    I'm sorry to hear about your
15 experience.
16    A.    I'm doing better.
17    Q.    Okay.  Are you recovered now --
18    A.    Well --
19    Q.    -- or is it in remission?
20    A.    Well, you know, it's one of these
21 things -- you know, again, I -- I'm neither giving
22 medical advice or a great history, but the original,
23 horrific cancer is gone --
24    Q.    Um-hum.

BREHON REPORTING  (708) 442-0027

Page 244

1      Q.    Okay. What?

2      A.    Yeah, something would.

3      Q.    And what would refresh your memory?

4      A.    A copy of a report, a GPR.

5      Q.    The cleared and closed report
6 indicates that you, Noradin, and Kelly met with
7 Bartik.

8      A.    Yes. I'm sure that's possible. I
9 don't -- wouldn't argue that point.

10     Q.    Does that piece of information refresh
11 your memory?

12     A.    Yes.

13     Q.    Okay. So now you remember meeting
14 with Bartik?

15     A.    Yes.

16     Q.    So what was your conversation with
17 Detective Bartik at that time?

18     A.    I can only tell you what it would have
19 been, and I can't state it word for word, you know,
20 just as -- as it's been done in the past, he would
21 have been apprised of what the case is, why we
22 brought these two particular subjects there for a
23 polygraph examination.

24           It's been my practice not to tell an

BREHON REPORTING (708) 442-0027

Page 245

1  examiner what to ask, just, you know, "Here's what we
2  got.  You know, you ask the questions, and the reason
3  we're bringing this person here is because. . ."
4        Q.    So as you sit here today, you couldn't
5  tell us what you, Detectives Noradin or Kelly
6  conveyed to Bartik?
7        A.    Only the basic facts of the case is
8  what we would have conveyed and why it is our concern
9  to have the subject examined by -- by polygraph.
10       Q.    Okay.
11       A.    In what words, I can't tell you.
12       Q.    How long was this meeting with
13 Officer Bartik?
14       A.    Oh, I don't recall.
15       Q.    And you believe reports were given,
16 but do you know reports were given --
17       A.    Well --
18       Q.    -- to Bartik?
19       A.    -- I don't know if they were reports
20 or GPRs or so much as what I -- what I've done in the
21 past is just a handwritten piece of paper saying this
22 is the subject's name, whatever, and here's the RD
23 number, you know, the stuff he needs.  And usually it
24 was just done on a GPR, and then there was a verbal

Page 246

1  explanation.  I don't remember what we did in -- in
2  this case.
3       Q.    In this case, would you have given
4  him, Mr. Bartik, copies of GPRs of interviews with
5  Nicole Harris or Stavon Dancy?
6       A.    We could have.
7       Q.    Because that would obviously have
8  familiarized him with what they said in the past?
9       A.    Sure.  That would have been one way of
10 doing it, if it was.
11      Q.    I'm sorry.  How long was this meeting
12 with Officer Bartik?
13      A.    I don't recall.
14      Q.    Was it more or less than a half hour?
15      A.    I don't -- I don't believe it would
16 have exceeded a half hour by more than -- too much
17 more than that.
18      Q.    So it was about 30 minutes or more?
19      A.    Yeah, give or take.  Sure.
20      Q.    Okay.  And at that time, did you share
21 with him the suspicions you and other detectives had
22 as to who was responsible in this case for Jaquari
23 Dancy's death?
24      A.    I don't know if we shared that with
                BREHON REPORTING  (708) 442-0027

Page 332

1  Q.  Have you ever observed an officer use
2  excessive force in the Chicago Police Department?
3  A.  No.
4  Q.  Have you ever observed an officer
5  engage in a false arrest in the police department?
6  A.  No.
7  Q.  Have you ever heard of an officer
8  using excessive force in the Chicago Police
9  Department?
10  A.  What do you mean, "heard"?
11  Q.  Has another police officer or someone
12  in the department ever told you that they -- that
13  they observed an officer using excessive force?
14  A.  No.
15  Q.  Has have you ever heard from someone
16  in the Chicago Police Department that they observed
17  an officer falsely arrest someone?
18  A.  No.
19  Q.  Have you ever observed an officer
20  coercing a confession from a suspect?
21  A.  No.
22  Q.  Have you ever heard of an officer who
23  said they observed or witnessed an officer coercing a
24  confession?

BREHON REPORTING  (708) 442-0027

Page 333

1    A.    No.

2    Q.    Have you ever known a member of the
3 Chicago Police Department to report any other member
4 of the Chicago Police Department for using excessive
5 force?

6    A.    Have I heard it directly?

7    Q.    Yeah.

8    A.    No.

9    Q.    Okay. Have you heard it indirectly?

10   A.    Over the years there's been newspaper
11 articles making such allegations, but no one, sworn
12 member or anyone else, has ever come up to me and
13 said, "Let me tell you this story." That's never
14 happened.

15   Q.    Have you ever heard or -- okay. Have
16 you ever learned of a member of the Chicago Police
17 Department reporting another member of the Chicago
18 Police Department for coercing a confession?

19   A.    Not to my knowledge. No.

20   Q.    Have you ever heard of a member of the
21 Chicago Police Department reporting another member of
22 the Chicago Police Department for fabricating
23 evidence?

24   A.    In -- directly? No.

BREHON REPORTING (708) 442-0027

Page 334

1      Q.     Again, indirectly?

2      A.     Newspaper accounts over, you know,
3 something that is alleged to have happened.

4      Q.     But not from a police source?

5      A.     No police officer has ever told me
6 that, and no one has ever officially told me that
7 directly.

8      Q.     And have you ever observed or
9 witnessed any member of the Chicago Police Department
10 fabricating evidence?

11     A.     No.

12     Q.     Have you ever reported a member of the
13 Chicago Police Department for any misconduct?

14     A.     Yes.

15     Q.     What -- under what circumstances?

16     A.     Well, I'll make this as -- as brief as
17 possible.  While -- while working a 17th District
18 Tactical Unit, we stumbled upon a major auto theft
19 ring that was operating between the states of
20 Indiana, Wisconsin, Illinois, and internationally.
21 It was -- it was a very sophisticated operation.

22          During an interview with a -- a
23 primary suspect who happened to have a handful of
24 blank titles from Indiana, during an interview with

BREHON REPORTING  (708) 442-0027

Page 336

1    Q.    Okay.  Other than this instance, have
2 you ever reported a Chicago Police officer for any
3 other form of misconduct or any form of misconduct?
4    A.    No.
5    Q.    Do you know of any cases from a
6 Chicago Police source that said the police department
7 was responsible for a wrongful conviction?
8    A.    No.
9    Q.    Do you know what the code of silence
10 is?
11   A.    I've heard about it.
12   Q.    Where have you heard about it?
13   A.    Seeing a lot of great movies --
14   Q.    Oh, yeah?
15   A.    -- reading a lot of great newspaper
16 stories.
17   Q.    Have you ever heard the code of
18 silence as being discussed in the Chicago Police
19 Department?
20   A.    In a rather sarcastic way.  Yes.
21   Q.    Do you believe there's a code of
22 silence in the Chicago Police Department?
23   A.    No, I don't.
24   Q.    Since May of 2005 and prior to meeting

BREHON REPORTING  (708) 442-0027