# EXHIBIT 10

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS
REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**


**March 15, 2016**


**Case No. 14-CV-4391**

 BEHAVIORAL CRIMINOLOGY *International*

GREGG O. MCCRARY
SUPERVISORY SPECIAL AGENT
F.B.I. (RETIRED)

4121 PLANK ROAD, NUMBER 514
FREDERICKSBURG, VIRGINIA 22407

TELEPHONE 540-972-2835
FAX        540-972-9329
E-MAIL GREGGMCCRARY@GMAIL.COM

JAMES MCNAMARA
SUPERVISORY SPECIAL AGENT
F.B.I. (RETIRED)

325 GARRISONVILLE ROAD
SUITE 106, NUMBER 148
STAFFORD, VIRGINIA 22554

TELEPHONE 540-288-8825
E-MAIL JJMCNAMARA75@GMAIL.COM

February 5, 2016

Ms. Janine I. Hoft
People's Law Office
1180 North Milwaukee Avenue
Chicago, IL 60642

Re:        ***Nicole Harris v. City of Chicago, et al.***
           ***In the United States District Court***
           ***Northern District of Illinois***
           ***Eastern Division***
           ***No: 14 CV 4391***

## Assignment

In this matter I was asked to review relevant materials to: (1) Identify and assess the reasonableness and propriety of the interview and interrogation tactics used in questioning Ms. Harris; (2) Identify and assess the vulnerability factors that may have impacted Ms. Harris's capacity for free self-determination in responding to questioning by authorities; (3) Assess how the combination of those factors impacted and shaped the interrogation process and its results; (4) Discuss the defining characteristics of both true and false confessions, and explain how one may reliably establish the validity or invalidity of a confession; (5) Discuss the propriety of the investigation into the death of Jaquari Harris. This report may be amended upon the review of additional material.

1

## Background and Experience

I have been professionally involved in violent crime investigations for more than 40 years including 25 years as an FBI Agent. In that capacity, I investigated violent crimes as a field agent for approximately 17 years and then was promoted and transferred to the FBI Academy in Quantico, Virginia as a Supervisory Special Agent where I worked in the National Center for the Analysis of Violent Crime (NCAVC). There I was assigned to the operational wing of the Behavioral Science Unit where my primary responsibility was to provide expertise in investigative techniques and crime scene analysis in violent crime investigations both to FBI field agents as well as to any law enforcement agency around the world that requested FBI assistance. My other responsibilities included conducting research into violent and sexually violent crimes and offenders and providing training to law enforcement agencies nationally and internationally.

I have investigated more than 1,000 homicide cases nationally and internationally, including numerous equivocal death cases. I have also been a panel member and presenter at the American Academy of Forensic Sciences regarding suicide and equivocal death investigations. Among the agencies which I have trained and/or worked with on violent crime investigations are the following: The New York City Police Department, The New York State Police, The Texas Rangers, The Boston Police Department, The King County Police in Seattle, The Florida Department of Law Enforcement, the California Attorney General's Office, Georgia Bureau of Investigation, The Massachusetts State Police, The Kansas City Missouri Police and the Maricopa County Sheriff's Office in Arizona. Included among the international agencies with which I have worked cases and/or provided training are the following; Scotland Yard, The Cuerpo Nacional De Policia in Spain, The Policia Judiciare in Portugal, The Hungarian National Police, Budapest Homicide, The French National Police, the Dutch National Police, Oslo Police Homicide, The Seguridad Publica in Costa Rica, The Belize Police Department, The Royal Bahamas Police Force, The Metropolitan Toronto Police, The Ontario Provincial Police, The Royal Canadian Mounted Police, The Austrian Federal Police, the Carabinieri in Italy

and serial murder task forces in Australia and Canada. I have testified before select Senate Committees on Sexual Violence in New York State and Massachusetts. My formal education includes a Bachelor's degree from Ithaca College and a Master of Arts degree in Psychological Services from Marymount University. I currently teach graduate-level courses in forensic psychology and criminal justice at Marymount University in Arlington, Virginia and DeSales University in Pennsylvania. I have co-authored an article on stalking,[1] was a contributing author to the FBI's *Crime Classification Manual*,[2] and contributed a chapter to the book *Criminal Investigative Failures*.[3] I serve on the editorial review board of two professional journals, *The Journal of Aggression and Violence* and *The Journal of Family Violence*.

### Overview of Incident and Police Contact with Ms. Harris

On May 14, 2005, Ms. Nicole Harris and Mr. Sta-von Dancy resided at 2004 North Laporte in Chicago, Illinois with their two sons Jaquari Harris and Diante Dancy, ages 4 and 5 respectively. On that date they went to a nearby Laundromat to wash some clothes. When Ms. Harris and Mr. Dancy returned, Ms. Harris found Jaquari playing outside, and called him indoors, reminding him that he was not supposed to be outside and told both children to go to their room. Ms. Harris did some work on the telephone jack as the phone reportedly was not working at that time. She then returned to the laundromat to launder more clothes and Mr. Dancy stayed home to nap as he had reportedly worked late the day before.

When Ms. Harris next returned from the laundromat she seemed happy and was smiling according to Mr. Dancy, her boyfriend, who had awakened from his nap and was helping her bring a heavy laundry basket into their apartment. He claims to have glanced in the bedroom shared by their two sons and observed Jaquari lying

---

[1] Wright, J.A., Burgess, A.G., Burgess, A.W., Laszlo, A.T., McCrary, G.O., Douglas, J.E., (1966) *A Typology of Interpersonal Stalking;* Journal of Interpersonal Violence, (11), (4) 487-501

[2] Douglas, J., Burgess, A.W., Burgess, A.G, Ressler, R.K. (Eds.). (1992) *Crime Classification Manual; A Standard System for Investigating and Classifying Violent Crimes;* New York: Lexington Books,

[3] Rossmo, K. (Ed); Criminal Investigative Failures: 2009, Taylor and Francis Group Boca Raton, FL

face down on the floor with his head turned to the side. There was a bubble extended from his nose and his face was purple. Mr. Dancy picked Jaquari up and observed an elastic band wrapped around his neck several times. He laid him on the bottom bunk bed and unwrapped the elastic band from around his neck. He then administered mouth-to-mouth resuscitation to Jaquari. When Jaquari failed to respond he carried him outside where Ms. Harris was parking her car. She asked what happened and he told her that he did not know. She asked him what happened a second time and he again responded that he did not know. They got in her car and she drove while Mr. Dancy continued with mouth-to-mouth resuscitation. They found an individual with a cell phone and called for help. An ambulance arrived and transported Jaquari to the hospital. Ms. Harris and Mr. Dancy returned to the apartment and picked up their other son, Diante. They were delayed in arriving at the hospital as they reportedly did not know the way. Upon arriving at the hospital Ms. Harris went in first and when Mr. Dancy was being escorted to the back with Diante, Mr. Dancy stated that he heard Ms. Harris cry out. It was at that time, around 6:15PM, that Jaquari was pronounced dead at the hospital. Detectives Wo and Day reportedly interviewed Ms. Harris at the hospital for approximately 15-20 minutes and explained that she and Mr. Dancy needed to come to the Area 5 Detective Division.[4] They were driven there by police officers and once there, detectives interviewed Mr. Dancy and Ms. Harris separately. Mr. Dancy testified that he answered their questions truthfully and that he saw Ms. Harris there only briefly.[5]

Detectives and Assistant State Attorneys interviewed and/or interrogated Ms. Harris several times over the next 26 hours. During this period detectives also searched the apartment occupied by Ms. Harris, Mr. Dancy and their two boys. They also interviewed some of their neighbors. Eight-year-old Dinajia Arnold allegedly told police that she had been playing with Diante and Jaquari and that she had seen Ms. Harris beat Jaquari and Diante with a belt that day and then observed the boys

---

[4] Deposition transcript of Det. Wo, Pg. 21-27; 58-59; 303
[5] Transcript of Testimony of Sta-Von Dancy 2005-10-21 (P. 136-218)

get into their respective bunk beds in their bedroom.[6]  Detectives also found a telephone cord in the apartment, which they suspected might have been the instrument of death.  Upon returning to the Area 5 Division around 12:45AM on May 15, 2005, Detectives Balodimas, Noradin and Landando reported that when they confronted Ms. Harris with the allegation that she had struck Jaquari and Diante with a belt earlier that Ms. Harris spontaneously confessed to having murdered Jaquari that day.  Ms. Harris denies she made these statements, but according to their report she told them that, " I put phone cord around Jaquari's neck and then the cord from the bed-sheet to make it look like an accident."[7]  Detective Noradin testified that at that point Detective Landando advised Ms. Harris of her rights under Miranda.  She was upset at that time and the interview ceased.  Around 1:40AM Detective Noradin testified that he and Detective Kelly advised Ms. Harris that a State's attorney would be coming to take her statement.  At that point, according to Detective Noradin, Ms. Harris recanted her alleged confession.  At approximately 2:25AM that same morning Detectives Noradin and Kelly spoke with Ms. Harris about taking a polygraph examination and she agreed to do so.[8]

Around 9AM on May 15, 2005 Dr. Denton performed the post mortem exam on Jaquari Dancy and concluded, among other things, that the telephone cord seized from the apartment was not the instrument of death, but the elastic band from the bed sheet was.[9]  According to Detective Noradin, Ms. Harris then changed her alleged confession saying that she wrapped the elastic band from the bed sheet around Jaquari's neck and not the telephone cord.

---

[6] GPR – City0000556 Pg. 10 of 15
[7] GPR of Det. Landando City0000399 and Deposition of Det. Balodimas Pg. 90-91
[8] Motion to Suppress Testimony of Detective Noradin 2005-09-28 Pgs. 10-15
[9] GPR – City0000556 Pg. 12 of 15

At approximately 12:15 PM on May 15, 2005, Ms. Harris arrived at the polygraph unit where Investigator Bartik was going to administer the polygraph examination. Investigator Bartik testified that the results of her polygraph were inconclusive and he notified Detective Noradin and the other detectives involved of this result. He noted that grief, sadness and a lack of sleep are factors that can disrupt an individual's physiological responses, thereby rendering a polygraph inconclusive.[10]

In his motion to suppress testimony Investigator Bartik denied that he or any other officer pushed, poked, shoved or berated Ms. Harris and denied that he or anyone else called her a murderer, a liar or a monster or handcuffed her to a wall. He also denied that anyone threatened to have her surviving child taken away from if she did not give a statement or that she would receive leniency if she did give a statement. He further denied that he or anyone else told her that if she cooperated she would be charged with involuntary manslaughter and would be able to go home.[11] Ms. Harris has alleged that the defendants did all of these things as well as telling her that she failed the polygraph examination to get her to confess, which, after over 26 hours in custody with minimal sleep and food, she did.

At approximately 1:00AM on May 16, 2005, Assistant States Attorney (ASA) Andrea Grogan took a recorded statement from Ms. Harris in the presence of Detective Anthony Noradin. At the opening of this recorded statement ASA Grogan summarizes Ms. Harris's confession, alleging that this is what Ms. Harris told her previously. Ms. Harris then largely fed back to ASA Grogan and Detective Noradin the scenario that ASA Grogan had set forth at the beginning of the taped interview. However, there is no independent evidence that would corroborate what Ms. Harris said to the ASA or the detectives previously. At the very least, ASA Grogan should have simply asked Ms. Harris to tell her what happened, rather than telling Ms. Harris what she believed happened. This interview continued with ASA Grogan asking inappropriate leading questions such as,

---

[10] Deposition transcript of Robert Bartik Pg. 275-278
[11] Testimony of Rober Bartik 2005-09-28 Pg. 77-78

Q:     And after – and – you saw blood coming from his nose, correct?"

A:     Just a little bit....

## Investigative Issues

The first phase of a criminal investigation is to determine whether or not a crime has been committed. The manner of death varies from homicide, suicide, accidents or natural causes and death investigations should remain equivocal, that is, open to interpretation, until the relevant facts have been established, verified and a working classification can be made.

Additionally, all relevant facts, such as the results of the autopsy, forensic testing, all interviews, and other collateral information must first be gathered and assessed before attempting to classify the manner of death in an equivocal case. The investigation into the death of Jaquari Dancy began as a death investigation, i.e. open to interpretation until all the facts were gathered. However, it was prematurely framed as a homicide prior to all of the facts being developed.

Investigative failures are primarily caused by how investigators think. From the first exposure to a crime scene, an investigator begins to construct a story, narrative or hypothesis about the crime. This narrative frames or defines how a crime is perceived and is born from the union of the chaos that is the crime scene as well as the models and mindsets of the investigators. Framing can create a perilous sway, as once investigators have framed the problem and created a narrative, it fundamentally alters how they perceive the crime from that point forward, jeopardizing objectivity. What follows is unconscious psychological pressure to look for that evidence that fits within the frame and to reject evidence that does not. This makes investigators increasingly vulnerable to a host of other cognitive biases. The problem arises most frequently when investigators label or frame a crime prematurely, based on incomplete evidence, inaccurate assumptions, faulty beliefs or untested hypotheses.

The investigation then becomes an exercise in validating the dominant hypothesis rather than a search for truth. Once a hypothesis becomes fixed, it creates organizational momentum, which, like a boulder rolling down a mountain, gains enough force to crush anything in its way.

Cognitive biases such as tunnel vision, confirmation bias, anchor traps, organizational momentum and groupthink are among the subtle hazards and traps that commonly cause investigators to make avoidable mistakes and jeopardize the successful resolution of their investigation. Unlike airplane crashes or building collapses where exhaustive efforts are made to understand what went wrong, criminal investigative failures are rarely examined, and, therefore, these biases often remain undetected.[12] "A growing body of research reveals that our behavior and decision making are influenced by an array of such psychological undercurrents and that they are much more powerful and pervasive than most of us realize. The interesting thing about these forces is that, like streams, they converge to become even more powerful."[13]

Tunnel vision is a narrow focus that unduly limits the range of alternatives. It is insidious and can result in the elimination of other suspects who should be investigated. Events that could lead to other suspects are eliminated from the officers' thinking as well. Getting locked into a mindset is a consistent thread in analytical and investigative failures. Premature closure, which is closely associated with tunnel vision, results when investigators make early judgments about the resolution and then defend those initial judgments tenaciously, limiting the scope of the investigation. Premature closure "can lead an investigator to select subsequent evidence that supports the favored solution and

---

[12] The *Innocence Protection Act of 2001*, a bipartisan bill that failed to make it through Congress, would have required states to investigate reasons for wrongful convictions, publicize them, and find ways to prevent such errors from reoccurring.
[13] Brafman & Brafman (2008); *Sway; The Irresistible Pull of Irrational Behavior;* New York; Crown Publishing p 16

to reject evidence that conflicts with it."[14]  There is a tendency to put more weight on evidence that supports our hypothesis than evidence that weakens it, and we remember those things that support what we believe.  "Arresting the first likely suspect, then closing the investigation off to alternative theories, is a recipe for disaster; tunnel vision has been identified as a leading cause of wrongful convictions."[15]  Belief perseverance, the stubborn embrace of a belief in the face of disconfirming evidence, and tunnel vision are both closely related to *confirmation bias.*

Confirmation bias is a type of selective thinking in which an individual is more likely to notice or search for evidence that confirms his/her hypothesis while ignoring or refusing to search for contradicting evidence.  When police have a "prime suspect," information regarding other suspects tends to become marginalized.  Secondary suspects are often ignored because they did not fit the dominant theory at the time.  Anchor traps occur when "a person does not consider multiple possibilities, but quickly and firmly latches on to a single one, sure that he has thrown his anchor down just where he needs to be.  You look at your map, but your mind plays tricks on you (confirmation bias), because you see only the landmarks you expect to see and neglect those that should tell you that in fact you're still at sea.  Your skewed reading of the map 'confirms' your mistaken assumption that you have reached your destination."[16]

In this case it is clear that some detectives believed that the death of Jaquari Harris was not an accident before any substantive investigation had been completed.  For example, Detective Balodimas testified that from the time he first spoke to Ms. Harris, he did not think Jaquari's death was an accident.[17]  When asked if during his initial interview with Ms. Harris he had, "....any basis whatsoever to have any suspicion that someone had intentionally harmed Jaquari?"  Detective Wo responded, "Yes..... Nicole was very

---

[14] Clark, Robert M. (2007) *Intelligence Analysis: A Target Centric Approach;*  CQ Press; Washington, D.C.

[15] FTP Heads of Prosecutions Committee Working Group (2004) *Report on the Prevention of Miscarriages of Justice*.  Ottawa Department of Justice.

[16] Goopman, J. (2007) *How Doctors Think*.  New York; Houghton Miffling in "

[17] Deposition transcript of Demosthenes Balodimas Pgs. 39-41

stoic."[18]  He further testified that he never saw Ms. Harris cry during the time she was with the Area 5 detectives nor did she appear distraught. Detective Wo further testified that he had never witnessed any parent go into a state of shock over the loss of a loved one. [19]  Because there are myriad reactions possible in response to the death of a loved one, there are none that I know of that can be deemed unequivocally suspicious. Emotionally labile reactions vary from grief, to depression to anger and some individuals may show no visible emotions at all.  Arguably, individuals who show no visible emotions may appear "stoic", but that should not be deemed to be suspicious.

On May 14, 2005, Detectives Landando and Balodimas returned to the apartment where the incident occurred and interviewed eight-year-old Dinajia Arnold and her father, Melvin Arnold, who were neighbors of the deceased.   The detectives reported that Dinajia told them that she had been playing in back of the house with Jaquari and Diante that afternoon when Ms. Harris came home.  She indicated that Ms. Harris was mad at Jaquari and Diante and brought them into the house and "whooped" them and heard them crying.  The police report indicated that Dinajia claimed to have seen the boys go to their bunk beds with Diante getting on the top bunk and Jaquari getting on the bottom bed.[20] However, in her deposition, she denied looking into their room and denied seeing them in their room that day.[21]

There is also some dispute as to when Ms. Arnold's interview with the police took place. In her deposition Ms. Arnold testified that while her father talked to the police on May 14, 2005, she did not.  She testified that it was "..maybe a couple of days later, we went to the police department, all of us, and that's when I talked to them at the police department." She testified that it could have been the next day, but either way, that was the first time she spoke with the police.  She testified that she was sure that she did not speak to the police on the day of the incident, but believes that her father did speak to the police the

---

[18] Deposition transcript of Randall Wo Pg. 28 lines 9-18
[19] Deposition transcript of Randall Wo Pg. 29;  55-56
[20] City0000397-398
[21] Deposition transcript of Dinajia Arnold Pg. 33-34;  52-53; 98-101;

night of the incident.[22] However, her father, Melvin Arnold testified that the police spoke with him and Dinajia the day of the incident and that the detectives told them that the child's death was a homicide.[23] He also testified that he and Dinajia went to the Cook County Courthouse two or three times and were interviewed there. He does not recall if it those interviews were recorded.[24] Of concern is Ms. Arnold's recollection and sworn testimony that she recalled having her statement recorded by the police at a police station.[25] However, her father, Melvin Arnold, testified that he never took Dinajia to a police station for a interview.[26] These recordings, if they exist, have not been produced to my knowledge.

Also of concern is the conflict between Ms. Arnold's deposition and the police report stating that Dinajia Arnold told them that she was able to see Ms. Harris beating the boys with a belt and that she saw the boys go to their bunk beds with Diante on the top bunk and Jaquari on the bottom bunk.[27] In her deposition, Ms. Arnold testified to the opposite, i.e. that she could not see into their room that day.[28] An unresolved question as of the writing of this report regards logistics. That is, where was the window into the boys' bedroom in relation to where eight-year-old Dinajia said she was standing, was it open or closed, did it have curtains or a shade and if so, were they open or closed? If she was able to see through the window into the bedroom, could she have seen what the police reported.[29]

While searching the apartment where the death occurred, detectives found a telephone on the floor of the apartment and noted that the cord was long enough to reach the children's room. The detectives noted that the phone worked. Detective Balodimas testified that at that point he thought it was possible that the telephone cord was the instrument of

---

[22] IBID Pg. 117 lines 10 – Pg. 118 line 8
[23] Deposition transcript of Melvin Arnold Pg. 45-47
[24] Deposition transcript of Melvin Arnold Pg. 41-44
[25] IBId Pg. 38-47; 123-124
[26] Deposition transcript of Melvin Arnold Pg. 76
[27] GPR of Det. Landando City0000397-398
[28] Deposition transcript of Dinajia Arnold Pg. 113 lines 16-18.
[29] GPR of Det. Landando City0000397-398

death.[30]  As noted above, the Detectives Landando, Noradin and Balodimas alleged that

Ms. Harris spontaneously confessed to strangling Jaquari with the telephone cord and

then wrapping the elastic cord from the bed sheet in an attempt to stage the homicide as

an accident.  Detective Landando testified that immediately after Ms. Harris made that

confession he advised her of her rights under Miranda.[31]  However, in her deposition Ms.

Harris denied both making that confession and being advised of her rights under Miranda

at this time.[32]

Only after Dr. Denton concluded that the telephone cord could not have been the murder

weapon did the detectives go back to Ms. Harris, who then allegedly changed her story to

fit this new fact pattern.  It is also clear that Dr. Denton initially ruled Jaquari's death to

be an accidental hanging, but changed the manner of death to a homicide based on the

confession of Ms. Harris.  He also testified that he found no evidence of any belt marks

or pattern of blunt force trauma nor any other signs of abuse or neglect.[33]

While the police had concluded that Jaquari's death was a homicide, they also developed

evidence that presented an alternate hypothesis.  Diante Dancy, the only person known to

be in the room with Jaquari when he died, was interviewed by Ms. Ale Levy at the

Children's Advocacy Center (CAC) on May 15, 2005.  Detective Wo took notes as he

observed that interview through a one-way mirror. Detective Wo testified that during that

interview Diante indicated that, *"....Jacquari was playing, wrapped elastic around neck

from blue sheet playing Spiderman game.  Couldn't help Jaquari get out of his sheet."*[34]

Diante went on to indicate that he was asleep when Jaquari died and although Detective

WO's GPR contained the question, "Did a grown up help Jaquair put sheet around his

neck", there was no notes indicating that Diante answered this directly.  When asked that

same question the next day by Ms. Karen Wilson, a Child Protection Worker with the

---

[30]GPR of Det. Landando City0000397-398 and Deposition Transcript of Det. Balodimas
Pgs. 15; 58-67
[31] Deposition transcript of Michael Landando (Pg. 48- 50)
[32] Deposition transcript of Ms. Harris, Pg. 280
[33] Deposition of Scott Denton, M.D. Pg. 73; 89-90; 97-98; 110-112
[34] City0000406;  Deposition transcript of Detective Wo Pg.

Illinois Department of Children and Family Services, Diante replied, "No."[35] Of concern is the fact that the final Cleared and Closed report in this case does not include these important statements From Detective Wo's notes.

Nonetheless, the defendants framed the incident as a homicide. As such they were compelled to identify a suspect and immediately focused on Ms. Harris as the sole suspect even though Sta-von was admittedly the only adult in the residence when Jaquari's death was discovered. As noted above, problems arise most frequently when investigators label or frame a crime prematurely, based on incomplete evidence, inaccurate assumptions, faulty beliefs or untested hypotheses. This then became a case where an interrogation, based on the unsubstantiated hypotheses (1) that this was a homicide and (2) that Ms. Harris was the perpetrator, became a substitute for a thorough investigation.

As previously discussed, Detective Bartik gave Ms. Harris a polygraph exam during the afternoon of May 15, 2005. He testified that he declined to administer a polygraph exam to Sta-von Dancy that same afternoon due to the close proximity in time to the death of Jaquari, the fact that Mr. Dancy appeared emotionally distraught, had not eaten or slept and was a candidate for having a guilt complex syndrome over the death of his child.[36] Arguably, these same factors applied to Ms. Harris, yet Mr. Bartik believed that she was a suitable candidate for the test.

Detective Bartik advised that the results of that polygraph were inconclusive, but Ms. Harris testified that Detective Bartik told her that she had failed the polygraph and called her a monster, yelled at her and accused her of killing her son. She characterized Detective Bartik as being very nasty, cruel and harsh.[37] Detective Bartik denied these allegations in his motion to suppress testimony.[38]

---

[35] 2005-10-24: testimony of Karen Wilson Pg. 182-189
[36] Deposition Transcript of Robert Bartik, Pg. 320-325
[37] Deposition Transcript of Nicole Harris Pg. 196-202
[38] Testimony of Rober Bartik 2005-09-28 Pg. 77-78

## Factors & Facts Bearing On Voluntariness of Ms. Harris's "Confession"

Based on my law enforcement experience of having conducted and/or reviewed thousands of interviews and interrogations, and a review of the professional peer-reviewed literature involving interview and interrogations, I have found specific factors that need to be assessed when determining the voluntariness/involuntariness (and reliability/unreliability) of confessions.[39] These factors can be organized into four different groups and competent law enforcement officers need to be cognizant of them. They are:

    (1)    Characteristics of the Specific Suspect

    (2)    The Context of and Environment Where Interrogation Occurs

    (3)    The Suspect's Mental, Emotional & Physical State During Interrogation

    (4)    Interrogation Techniques and Examiners

### Factor (1): Characteristics of the Specific Suspect

❖ *Naïveté in dealing with law enforcement:* – Ms. Harris's prior contact with law enforcement dealt with a minor domestic violence issue stemming from a dispute with Sta-von Dancy. It has been my experience that people who are naïve in their dealing with law enforcement tend to go along with and be compliant with law enforcement officers during interviews and interrogations.

### Factor (2): Context Of and Environment Where Interrogation Occurs

---

[39] Marcus, P. (2006) It's Not Just About Miranda: Determining the Voluntariness of Confessions in Criminal Prosecutions. Valparaiso University Law Review Volume 40, No. 3 Pgs. 601-644

❖ *Timing of Interrogation:*  Ms. Harris was interviewed in the immediate aftermath of having seen her son unresponsive and then declared dead by Dr. Donahue at Our Lady of Resurrection Hospital at 18:15 hours[40].  Based on my law enforcement experience, the existing professional literature and customary police training, this is not the best time to interview or interrogate anyone.

❖ *Police Presence & Control:*  Ms. Harris was subjected to a constant police presence beginning at the hospital and continuing at the police department

  o Adversarial contact with the police was initiated by the police, not by Ms. Harris.

  o Police took steps to enhance their power, control and/or authority over Ms. Harris by transporting her to Area 5 of the police department and interrogating her there.

  o The number of police officers who were present during the interrogations differed between one and three and included detectives who had taken breaks or were fresh as tours of duty apparently overlapped during the course of Ms. Harris's numerous interviews and interrogations.

**Factor (3): The Suspect's Mental, Emotional & Physical State**

As noted above, Ms. Harris was subjected to an interview and interrogation in the immediate aftermath of the untimely death of her four-year-old son.  It has been my experience, and that of sound social science research, that the mental and emotional impact of such an event can be destabilizing and make an individual vulnerable to law enforcement interrogation techniques.  This is especially true for those individuals who have had limited adversarial contact with law enforcement.  For example, "Suspects who are accused of murdering someone close to them, such as a spouse, an offspring or a close friend, are often especially vulnerable during interrogation.  This is irrespective of their guilt or innocence and relates to the fact

---

[40] City 0000386 pg. 6-7

15

that loss of a close one results in grief and bereavement. The manipulation of feelings of guilt, particularly in suspects who are accused of murdering loved ones, can markedly increase the likelihood of an unreliable statement."[41] Well-trained police interrogators are aware of these vulnerabilities and use great caution when interviewing or interrogating anyone in this circumstance. Additional relevant circumstances include:

- ❖ *Stress, Anxiety or Overt Emotional Distress:* The totality of the circumstances that befell Ms. Harris from that Saturday afternoon through the following morning were overwhelmingly stressful and clearly created a good deal of anxiety and emotional stress for her.
- ❖ *Recent Bereavement*: Ms. Harris found her youngest son dead only hours before being interrogated.
- ❖ *Deprivation of Food and Sleep:* Ms. Harris was interviewed and interrogated with little sleep and was not fed until approximately 7:45PM on May 15, 2005, more than 24 hours after the traumatic events of the previous day.[42]

**Factor (4): Interrogation Techniques by the Examiners**

Since the detectives did not record their interviews and interrogations with the plaintiff, there is no way to know what interrogation techniques were used. What is clear is that this issue is in dispute, as Ms. Harris' memory of being abused and coerced by the detectives and promised she could go home if she cooperated and gave a statement is in stark contrast to the recollection of the investigating detectives.

**<u>Proper Law Enforcement Approach to Evaluating the Reliability of Statements</u>**

In criminal law, a confession is generally considered to be the most damaging and potent form of evidence produced at a trial.[43] Finding the truth is arguably the most

---

[41] The Psychology of Interrogations, Confessions and Testimony Gudjonsson, G. (1996) Wiley & Sons; New York; (Pg. 67; 232; 259; 301-302; 304)
[42] Deposition transcript of Detective Noradin, Pg. 333, Line 20 Pg. 334 line 22.

important goal of a police interrogation. While some guilty suspects confess, others do not. The assertion by the president of the Reid School -- that the techniques they teach cannot result in false confessions "because we don't interrogate innocent people" as suspects -- is false. In reality, law enforcement officers routinely interrogate innocent suspects, and some of those innocent suspects falsely confess to crimes they did not commit.[44] I know this from over 47 years of experience in dealing with criminal investigations.

## Types of False Confessions

Law enforcement has identified three types of false confessions and they have been buttressed by social science. The three types are; voluntary, coerced-compliant and coerced-internalized, which is sometimes referred to as a persuaded false confession.[45] The false confession in this case may be categorized as the coerce-compliant type.

*Coerced-Compliant False Confessions* occur when suspects confess, knowing that they are innocent. This type of false confession is usually motivated by a desire to achieve some immediate gain such as bringing the interrogation to an end, being allowed to go home, etc. Suspects "may naively believe that somehow the truth will come out later, or that their attorney will be able to rectify their false confession."[46]

A *Voluntary False Confession* is a self-incriminating statement given freely and not police-induced. *Voluntary False Confessions* are often motivated by an exaggerated

---

[43] Wrightsman, L.S. & Kassin, S.M. (1993) Confessions in the courtroom. Newbury Park, CA; Sage

[44] http://www.innocenceproject.org/free-innocent/improve-the-law/fact-sheets/dna-exonerations-nationwide found that 63% homicide cases (71 of 113) among the DNA exonerations involved a false confession or other self incriminating statements.

[45] The Psychology of Evidence and Trial Procedure (1985).Kassin, S. M & Wrightsman, L.S. Beverly Hills: Sage (Pg. 67-94)

[46] The Psychology of Interrogations, Confessions and Testimony Gudjonsson, G. (1996) Wiley & Sons; New York; (Pg. 226-228)

or pathological desire for notoriety or for some perceived secondary gain. There is no information known to me which suggests that this concept applies in this case.

Here, if Ms. Harris's recollections about the conduct of the detectives during their interviews and interrogations are correct, then there were multiple immediate gains, offered by the police and by the circumstances, which could have produced a false confession. The interrogative pressure, especially when being wrongfully accused of murdering one's child combined with the promise that she could go home if she did cooperate, could generate a coercive impulse for Ms. Harris to confess to achieve the immediate end to the stress of the interrogation and to allow her to better grieve for the loss of her son.

*Coerced-Internalized False Confessions*, sometime referred to as *Persuaded False Confessions*, occur when innocent but vulnerable suspects are persuaded that they have committed a crime through interrogative pressure and manipulation. Gudjonsson and MacKeith (1982)[47] say that this kind of false confession results from a memory distrust syndrome, where the suspect distrusts his own memory and begins to rely on external sources of information. They find that one type of memory distrust syndrome relates to suspects who, at the beginning of the police interview, have a clear recollection of not having committed the alleged offense, but, because of subtle manipulative influences by the interrogator, they gradually begin to distrust their own recollections and beliefs.[48] It has been my experience that Richard Ofshe's observation that *Persuaded False Confessions* are typically

---

[47] Gudjonsson, G. H., MacKeith, J.A. (1982) False Confessions, Psychological Effects of Interrogation. A discussion paper in The Psychology of Interrogations, Confessions and Testimony Gudjonnson G. (1996) Wiley & Sons; New York (Pg. 228)

[48] The Psychology of Interrogations, Confessions and Testimony Gudjonsson, G. (1996) Wiley & Sons; New York; (Pg 228-230)

characterized by tentative expressions, such as "I guess I must have", and "I think I did this next" [49] is correct.

The above motivation-categories are consistent with my experience in conducting, monitoring and reviewing thousands of interviews and interrogations. For example, I testified for the prosecution in a homicide case in California in 2004 regarding the murder of 12-year-old Stephanie Crowe. The initial investigators had coerced an internalized-false confession from the victim's older brother and one of his friends. A follow-up investigation by the San Diego County Sheriff's Office identified Richard Tuite, who had the victim's blood on his clothing, as the perpetrator. The boys, who had falsely confessed, had most of the characteristic vulnerabilities known to be associated with individuals who make *coerced-internalized false confessions* and were subjected to coercive interrogation techniques. A judge found their "confessions" to have been coerced, and subsequently the boys were completely exonerated and all charges against them were dismissed.

Another case that I actively investigated was the murder of nine individuals at a Buddhist Temple outside of Phoenix, Arizona. During the course of that investigation, investigators received a call from a man in Tucson who said he could tell them who committed these murders. Officers went to Tucson and interviewed Michael McGraw, who initially denied making the call but eventually admitted to being involved in the murders. He implicated four other men. Police interrogated all four and three of them confessed. They subsequently recanted their confessions claiming to have been deprived of sleep and food, and interrogated for hours. Their initial alibis checked out. They were in Tucson on the night of the murders. One had a videotape of himself at a party in Tucson on the night of the murders. Shortly thereafter, investigators located the true killers, recovered the murder weapon and items stolen from the temple, and matched their boots with boot prints recovered at the crime scene. The Tucson suspects, who had falsely confessed to this mass

---

[49] Ibid Pg. 232

murder, dutifully fed back crime scene information provided by investigators during their interrogation and the investigators took this as proof of guilt.[50]

Interrogations, which are predicated upon the presumption of guilt, and during which the interrogator manifests extreme confidence in the suspect's guilt, are designed to get a suspect to confess. A problem arises when that presumption is incorrect, since interrogation might result in a false confession. Even if no confession is obtained, what is often produced is the appearance of guilt. Based on my experience of having conducted, supervised, monitored and reviewed thousands of interviews and interrogations, the greater the predisposition of, or confidence in, the perceived guilt of the suspect, the more coercive are the techniques that tend to be employed, and the more "guilty" even an innocent suspect appears during questioning. My own experience and opinions are consistent with current research in this area: "Recent research into investigative bias indicates that a predisposition to presume suspects guilty may set into motion a process of confirmatory hypothesis testing in which evidence of deception is perceived and coercive interrogation techniques are applied. Such a bias toward presuming guilt may thereby limit the diagnostic value of an interrogation and increase the likelihood that a false confession is ultimately obtained."[51]

One study found that trained investigators and students performed no better than chance in detecting deception in a controlled experiment, although the investigators were significantly more confident in their judgments. Consistently, the most pressure-filled interrogation sessions, as rated by all participants, were those that paired investigators who *presumed guilt* with suspects who were *actually innocent*. In short, these results suggested that the presumption of guilt, which often underlies a criminal interrogation, sets in motion a process of behavioral confirmation by

---

[50] The Unknown Darkness; Profiling the Predators Among Us McCrary, G. Ramsland, K. (2003) Harper Collins

[51] Interrogations, Confessions and Entrapment (2004) Edited by Daniel Lassiter; Perspectives in Law and Psychology, American Psychological Association; Kluwer Academic Publishers, New York; Pg. 86

which expectations influence an interrogator's behavior, and ultimately the judgments of judges, juries and other neutral observers. Although the empirical results were obtained in a laboratory paradigm, they may well *underestimate* the risks incurred by innocent suspects in criminal justice settings. [52]. While we do not know what techniques were used in interrogating Ms. Harris, we do know that the investigators suspected that this was not an accident and that their investigation focused exclusively on Ms. Harris as being responsible for her son, Jaquari's, death.

Capable law enforcement investigators understand that obtaining a confession is not the end of the investigation -- every confession must be subjected to a vigorous post-confession investigation to determine if it is reliable. There are a number of features which reliable confessions have in common. A true confession typically contains a wealth of specific details. These details must be consistent with the crime scene, autopsy, and other investigative information. These details must be independently verified -- corroborated -- or, at the very least, must be checked to see if they are false. To have real value, the details should include information reflecting the suspect's guilty knowledge -- that is, the confession should contain facts which were not known by the police, and which could not have been learned other than by presence at the commission of the crime or communication with someone who was present.

When corroborated by a thorough post-confession investigation, the validity of such a confession is strengthened. For example, I was involved in a serial murder investigation where the suspect confessed to the eleven murders under investigation. He not only provided a wealth of accurate details for each of the eleven homicides, but also provided other details that were previously unknown, including leading investigators to the location of a missing victim's body. That post-

---

[52] Kassin, S. M. , Meissner, C. & Norwick, R. (2003) July. The post-interrogation safety net: "I'd know a false confession if I saw one." Paper presented at the psychology & Law International, Interdisciplinary Conference, Edinburgh, Scotland

confession investigation served to validate and strengthen the offender's original confession and that became a powerful tool during trial.

In this case however, none of the reliability features is present. According to the police, Ms. Harris spontaneously confessed to strangling her son with a telephone cord at a time when that was the theory held by detectives. This was a demonstrably false confession as previously noted. Also of concern is that Detective Bartik, in spite of a long history of documented false confessions obtained not only in Cook County, but throughout the United States testified that he does not believe in false confessions and cannot think of any circumstance under which a false confession could occur.[53]

Only when the detectives learned that the elastic band from the sheet was the instrument of death and re-interviewed Ms. Harris about this did she change her confession to reflect the revised police theory. The defendants were dismissive of information that disconfirmed their hypothesis concerning Ms. Harris's guilt. As previously noted, Ms. Harris's other son, Diante, told investigators that he had observed Jaquari tie that elastic band around his neck and then observed a bubble presumably from his nose because that was consistent with his father, Sta-von's, testimony, that when he found Jaquari he had a bubble protruding from his nose. He never mentioned seeing anyone, including Ms. Harris, harming Jaquari, or even being in the room with them when Jaquari died. They also apparently disregarded the fact that there was no physical evidence supporting Ms. Harris's statement that she repeatedly whipped Jaquari with a belt just before his death.

---

[53] Deposition transcript of Robert Bartik, Pg. 183, lines 5-10

## Conclusion

*"Circumstantial evidence may be strong and the suspect's story weak. Be careful to make sure."*[54]

In summary, there were a number of serious problems with this investigation:

The first phase of a criminal investigation is to determine whether a crime has been committed. In this case the two alternatives were an accidental death or a homicide. The investigators quickly decided that this was a homicide and focused on Ms. Harris as the perpetrator.

A second problem in this investigation is that the detectives began to interrogate Ms. Harris prior to the investigation being completed. It is a basic rule that investigators investigate before they interrogate. Here, the detectives first tried to make a confession fit their hypothesis that the phone cord they found was the instrument of death. Further complicating many of the interviews in this case, especially those of Ms. Harris, is the lack of thorough documentation. Every suspect interview should be electronically recorded, ideally on video. If not, then one detective should conduct the interview and a second should take meticulous notes simultaneously. A structured process for note-taking is essential to capture the quantity and quality of information received. It also provides a firm basis for the questions that need to be asked to clarify or challenge the interviewee's account. This was not done. In fact, Detective Landando testified that it was his policy and that of his colleagues _not_ to take notes. He testified that, "I can remember what someone said to me. I don't need to write it down...when I'm talking to people, I don't write anything down." He also testified that this was the policy of Detective Balodimas and Detective Noradin stating that, "Nobody's got a notepad when we're talking to someone and writing

---

[54] Police Interrogation Kidd, W.J. (1940) R.V. Basuino Publication, New York, NY pg. 70

their answers down. No."[55]  All notes, particularly those containing exculpatory evidence, must be thoroughly included in final reports.  The investigating detectives also neglected to conduct any investigation at the laundromat to see if Ms. Harris's claims to have been there were true.

The defendants failed to consider Ms. Harris's status as a grieving parent as they held her for over 26 hours with little sleep and virtually no food during that time.  It appears that the first time she was fed after arriving at the Area 5 division late in the afternoon of May 14, 2005 was at approximately 7:45PM the following evening.[56] Clearly the Chicago Police Department understands the stress involved in traumatic situations, as they require at least a 24-hour "cooling off" period for any officer involved in a shooting incident before that officer is required to give a statement or be interviewed.[57]

However, Detective Bartik decided not to polygraph Sta-von Dancy as he was a grieving parent who was emotionally distraught.  They also showed no interest in Sta-von as a viable suspect in what they perceived to be a murder case in spite of the fact that Sta-von, by his own admission, was the only adult in the house when he discovered Jaquari's death. They knew, or had access to, Sta-von's criminal history that included arrests for criminal sexual assault, criminal sexual abuse, battery and domestic battery.[58]

Based on my review of the documents there appears to be an overall lack of training and supervision.  For example, Detective Bartik testified that numerous individuals have accused him of wrongdoing such as fabricating a confession, fabricating polygraph results and on one occasion using a cattle prod on a man in a cell.  He also testified that the City of Chicago has paid approximately $800,000 to plaintiffs

---

[55] Deposition transcript of Michael Landando Pg. 49, lines 4-10; 14-16
[56] City0000403
[57] Chicago PD General Order GO8-01-01 Pg. 3-4
[58] Deposition transcript of Anthony Noradin Pg. 423-424; 436-437

in civil lawsuits as a result of his role as a polygraph examiner, but that he has never been disciplined by the City of Chicago.[59]  The failure to train officers extends to the apparent lack of training in false confessions and investigative failures as well. Although not officially required by the Chicago Police Department at the time, each and every interview and interrogation of Ms. Harris should have been video taped. After all, she was the prime suspect in what the defendants perceived to be a murder case.  By focusing on Ms. Harris as the prime suspect early in the investigation, the defendants moved prematurely from an evidenced-based investigation to a suspect-based investigation.  In so doing they substituted an interrogation for a thorough investigation.

If Ms. Harris's assertions that the defendants physically and psychologically abused her, failed to tell her that she was free to leave during the course of this investigation, but promised her that she could go home if she confessed and then fabricated her alleged spontaneous confession, then this is more than just poor police work.  This is willful, deliberate misconduct and an utter disregard for the truth on the part of the defendants.

Sincerely,

Gregg O. McCrary
Behavioral Criminology International

---

[59] Deposition transcript of Robert Bartik, Pg. 344-358.

**Material Provided to Police Practices Expert Gregg McCrary**

**Nicole Harris v. City of Chicago, et al., No. 14-4391**

Civil Rights Complaint Filed 6/12/2014

Seventh Circuit Decision Granting Writ of Habeas Corpus (698 F. 3d 609)

Answer to Civil Rights Complaint Filed by Defendant City of Chicago

Answer to Civil Rights Complaint Filed by Individual Defendants

Decision by Judge Darrah Denying Defendants' Motion to Dismiss

Videotaped "Confession"

Grand Jury Testimony of Det. Noradin (PL Nicole Harris Bates 9684-9689)

Testimony at Criminal Trial

    9-28-2005

        Det. Noradin (PL Nicole Harris Bates 6911-6982)

        Robert Bartik (PL Nicole Harris Bates6983-7022)

        ASA Grogan (PL Nicole Harris Bates 7313-7365)

        Dr. Denton (PL Nicole Harris Bates 7366-7415)

    10-21-2005

        Sta-Von Dancy (PL Nicole Harris Bates 7448-7530)

        Det. Noradin (PL Nicole Harris Bates 7531-7595)

    10-24-2005

        Det. Balodimas (PL Nicole Harris Bates 7596-7623)

        Karen Wilson (PL Nicole Harris Bates 7650-7657)

        ASA O'Reilly (PL Nicole Harris Bates 7658-7690)

        Det. Wo (PL Nicole Harris Bates 7691-7714)

        Sta-Von Dancy (PL Nicole Harris Bates 7715-7735)

        Diante Dancy (PL Nicole Harris Bates 7736-7762)

        Wanda Harris (PL Nicole Harris Bates 7763-7771)

    10-25-2005

1

ASA Grogan (PL Nicole Harris Bates 7772-7787)

Audrey Harris (PL Nicole Harris Bates 7788-7801)

Nicole Harris (PL Nicole Harris Bates 7802-7923)

Robert Bartik (PL Nicole Harris Bates 7924-7943)

10-26-2005

Det. Landando (PL Nicole Harris Bates 8012-8022)

Det. R. Cordaro (PL Nicole Harris Bates 8023-8030)

ASA O'Reilly (PL Nicole Harris Bates 8061-8065)

GO 87-7, Interrogations: Field and Custodial (effective 31 October 1987) (Bates City 18-21)

GO 87-7A, Interrogations: Field and Custodial (revision 87-7A, effective 22 December 1998)(Bates City 22)

GO 92-1, Abused and neglected child offenses (addendum 7, effective 4 July 1992)(Bates City 23-27)

GO 93-3, Complaint and disciplinary procedure (effective 15January 1993)(Bates City 28)

GO 93-3, Specific responsibilities (addendum 2B, effective 24 May 2001)(Bates City 29-33)

GO 93-3, Conduct of the investigation (addendum 3, effective 15 January 1993)(Bates City 34-38)

GO 93-3, Conduct of the investigation (revision 93-3-3A, effective 13 July 1994)(Bates City 39)

GO 93-3, Conduct of the investigation (revision 3C, effective 27 February 2003)(Bates City 40)

GO 93-3, Reporting and review procedures (addendum 4, effective 15 January 1993)(Bates City 41-46)

GO 93-3, Reporting and review procedures (addendum 4A, effective 26 March 1999)(Bates City 47-49)

GO 93-3, Reporting and review procedures (addendum 4B, effective 7 April 1999(Bates City 50-53)

GO 93-3, Special situations (addendum 5B, effective 1 October 2002)(Bates City 54-64)

GO 93-3, Suspension/options (addendum 6, effective 15 January 1993)(Bates City 65-67)

GO 93-3, Summary punishment (addendum 7, effective 15 January 1993)(Bates City 68-75)

GO 93-3, Summary punishment (addendum 7, effective 1 January 1998)(Bates City 76-77)

GO 93-3, Summary punishment (addendum 7B, effective 18 December 2001)(Bates City 78-79)

GO 93-3, Summary punishment (addendum 7C, effective 29 July 2004)(Bates City 80)

GO 99-03, Felony review by Cook County State's Attorney (effective 31 March 1999)(Bates City 81-83)

GO 99-03, Felony review by Cook County State's Attorney (No. 99-03A, effective 1 December 2001)(Bates City 84-85)

GO 02-05, Crime scene protection and processing (effective 15 June 2002)(Bates City 149-154)

GO 89-13, Audio/visual equipment and reading materials, restricted us of (effective 24 May 1989)(Bates City 156)

GO 01-03, Chicago Children's Advocacy Center (effective 5 August 2001)(Bates City 157-158)

GO 01-03, Chicago Children's Advocacy Center (revision 01-03A, effective 13 August 2002)(Bates City 159)

Detective Division Standard Operating Procedures, copyright 1988 (207 pages)(Bates City 160-366)

Original Case Incident Report, RD # HL 356544 (Jaquari)
RO Hector Lopez (Bates City 367-368)

Investigative File Inventory, RD # HL 356544 (Bates City 369)

Investigative File Control, RD # HL 356544 (Bates City 370)

Case Supplementary Reports, RD # HL 356544
Field Investigation Cleared Closed (Arrest and Prosecution) Report, submitted June 21, 2005
RO Noradin, Kelly, Day and Wo (Bates City 371-385)

Case Supplementary Reports, RD # HL 356544
Field Investigation Progress-Violent (Scene) Report, submitted June 2, 20015
RO Wo, Day (Bates City 386-393)

Field Investigation Report, submitted May 14, 2005
RO Lopez (Bates City 394-395)

Supplementary Report, submitted May 14, 2004 [sic]
RO Curry (Bates City 396)

GPR, submitted May 14, 2005
RO Landando (Bates City 397-398)

GPR, submitted May 15, 2005
RO Landando (Bates City 399)

GPR, submitted May 14, 2005
RO Noradin (Bates City 400-405)

GPR, submitted May 15, 2005
(Deante interview CACC Ale Levy)
RO Wo #2023257 (Bates City 406-407)

GPR, submitted May 15, 2005
(post mortem at ME office)
RO Kelly #21121 (Bates City 408-409)

GPR, submitted May 14, 2005
(nuclear family listed)
RO Kelly #21121 (Bates City 410-411)

GPR, submitted  May 14, 2005
(interview Nicole)
RO Kelly #21121 (Bates City 412-413)

GPR, submitted  May 14, 2005
(no DCFS history)
RO Wo #2023261 (Bates City 414-418)

GPR, submitted  May 14, 2005
(interview Stavon)
RO Wo #20232 (Bates City 419-420)

GPR, submitted May 15, 2005
(Nicole recants, says not guilty)
RO Noradin (Bates City 421)

GPR, submitted May 15, 2005
(Stavon 2nd interview)
RO Wo #20232 (Bates City 422)

GPR, submitted May 15, 2005
(Nicole agrees to polygraph, offered food & drink, re-advised of rights)
RO Noradin (Bates City 423-425)

Arrest report, May 15, 2005
RO Wo, Lopez, Day, Kelly, Balodimas (Bates City 426-430)

Felony minutes for state's attorney's use, May 16, 2005
RO Wo, Lopez Day, Kelly, Balodimas, Landando (Bates City 431)

Complaint for preliminary examination, May 16, 2005 (Bates City 432)

Statement of Stavon Dancy, May 16, 2005
Wo & ASA Grogan (Bates City 433-443)

Report of post-mortem examination, July 8, 2005
J. Scott Denton, MD (Bates City 444-449)

Toxicology report, May 25, 2005 (Bates City 450)

Medical examiner body diagram indicating location of injuries (Bates City 451-452)

Crime scene processing report, May 14, 2005
RO Landando (Bates City 453)

Crime scene processing report, May 14, 2005
RO Lampa (Bates City 454)

Crime scene processing report, May 14, 2005
RO Poradzisz  (Bates City 455)

Crime scene processing report, May 15, 2005
RO Principato (Bates City 456)

Property inventory (kid's computer), May 14, 2005
RO Lampa (Bates City 457)

Property inventory (blanket), May 14, 2005
RO Lampa (Bates City 458)

Property inventory (sheet), May 14, 2005
RO Lampa (Bates City 459)

Property inventory (fitted sheet), May 14, 2005
RO Lampa (Bates City 460)

Property inventory (phone cord) May 15, 2005
RO Counts (Bates City 461)

Property inventory (blood card from ME) May 15, 2005(Bates City 462)

Property inventory (clothing from ME) May 15, 2005 (Bates City 463)

Property inventory (photos of bedroom) June 7, 2005
RO Fuller (Bates City 464)

Stavon rap sheet (Bates City 465)

Stavon LEADS (Bates City 466-469)

Nicole rap sheet (Bates City 470)

Nicole LEADS (Bates City 471-475)

Edwardsville Police Narrative Supplement, May 14, 2005 (Bates City 476)

Edwardsville Police fax cover sheet, May 15, 2005 (Bates City 477)

Edwardsville Police on Nicole traffic ticket (Bates City 478-479)

Edwardsville Police Narrative Supplement, May 14, 2005 (Bates City 480)

Edwardsville Police Narrative Supplement re Nicole Dec 9, 2003 traffic ticket (Bates City 481)

Edwardsville Police fax cover sheet, May 15, 2005 (Bates City 482)

Edwardsville Police Narrative Supplement re Stavon crim damage to property Aug 2, 2004
(Bates City 483-485)

Edwardsville Police Narrative Supplement re Stavon crim damage to property Aug 2, 2004
(cont'd) (Bates City 486)

Edwardsville Police Narrative Supplement re Stavon crim damage to property Aug 2, 2004
(cont'd)(Bates City 487)

Edwardsville Police Narrative Supplement re Stavon crim damage to property Aug 2, 2004
(cont'd)(Bates City 488)

Edwardsville Police Narrative Supplement re Stavon crim damage to property Aug 2, 2004
(cont'd)(Bates City 489)

Edwardsville Police Narrative Supplement re Stavon crim damage to property Aug 2, 2004
(cont'd)(Bates City 490-491)

Edwardsville Police fax cover sheet, May 15, 2005 (Bates City 492)

Edwardsville Police event information re May 11, 2004 arrest Stavon on warrant(Bates City 493-494)

Edwardsville Police printout re: Stavon warrant (Bates City 495)

Edwardsville Police Narrative Supplement re Stavon arrest on warrant (Bates City 496)

SIU Edwardsville Police fax cover sheet, May 15, 2005 (Bates City 497)

SIUE PD contact history on Nicole (Bates City 498)

SIUE PD report of Nicole complaint of telephone harassment on January 1, 2004 re: Stavon friend; and report of March 15, 2003 Stavon complained of domestic battery by Nicole. (Bates City 499-503)

SIUE PD supp report re: March 15, 2003 Stavon complained of domestic battery by Nicole. (Bates City 504-505)

Diante ER, May 15, 2005 (Bates City 506)

Diante ER nurses notes May 15, 2005 (Bates City 507)

Kelly fax cover sheet May 14, 2005 to SIU & Youth Advocacy Center requesting VSI w/Diante (Bates City 508)

CCAC Investigative Intake, May 15, 2005 (Bates City 509)

Consent to videotape statement, May 15, 2005 (Nicole)
Grogan & Det. illegible #21252 (Bates City 510)

Event history table May 14, 2005 (hospital) (Bates City 511-513)

Event history table (Bates City 514-518)

City Office of Emergency Communication, May 15, 2005
Wo requesting 911 recording (Bates City 519)

CPD Event Query for May 14, 2005 (Bates City 520)

CPD Event Query for May 14, 2005 (Bates City 521-522)

CPD Event Query for May 14, 2005 (Bates City 523)

CPD Event Query for May 14, 2005 (Bates City 524)

7

CPD Event Query for May 14, 2005 (Bates City 525-527)

CPD Event Query for May 14, 2005 (Bates City 528)

Tape research log for May 14, 2005 incident (Bates City 529)

Original Case Incident Report RD HL 356544
(listing officers) (Bates City 530-531)

CPD Arrest report for Nicole (Bates City 532-539)

CPD supp report, Field Investigation Polygraph Report, submitted May 17, 2005
RO Bartik (Bates City 540-543)

CPD supp report, Field Investigation Method/CAU Code Report, submitted May 18, 2005
RO Masuda (Bates City 544-545)

CPD supp report, Field Investigation Morgue Report, submitted May 19, 2005
RO Foley (Bates City 546-547)

CPD supp report, Field Investigation Progress -Violent (Scene) Report, submitted June 2, 2005
RO Wo, Day (Bates City 548-555)

CPD supp report, Field Investigation Cleared Closed (Arrest and Prosecution) Report, submitted
June 21, 2005
RO Noradin, Kelly, Day, Wo (Bates City 556-570)

CPD supp report, VC Investigation Polygraph Report, submitted May 17, 2005
RO Bartik (Bates City 571-574)

Polygraph examiner's worksheet, May 15, 2005
RO Bartik (Bates City 575)

Polygraph case review, May 15, 2005 (Bates City 576)

Polygraph subject consent, May 15, 2005
Nicole
RO Bartik (Bates City 577)

Polygraph subject consent, May 15, 2005
Stavon
RO Bartik(Bates City 578)

Polygraph examiner's worksheet, May 15, 2005
Stavon
RO Bartik (Bates City 579)

(untitled) Polygraph graph (Bates City 580-586)

CPD 5 year employee complaint register history, July 23, 2014
Balodimas (Bates City 587)

CPD 5 year employee complaint register history, July 23, 2014
Bartik(Bates City 588)

CPD 5 year employee complaint register history, July 23, 2014
Cordaro (Bates City 589)

CPD 5 year employee complaint register history, July 23, 2014
Day (Bates City 590)

CPD 5 year employee complaint register history, July 23, 2014
Kelly (Bates City 591)

CPD 5 year employee complaint register history, July 23, 2014
Landando (Bates City 592)

CPD 5 year employee complaint register history, July 23, 2014
Noradin (Bates City 593)

CPD 5 year employee complaint register history, July 23, 2014
Wo(Bates City 594)

CPD Complimentary history, July 22, 2014
Balodimas (Bates City 595)

CPD Complimentary history, July 22, 2014
Bartik (Bates City 596)

CPD Complimentary history, July 22, 2014
Cordaro (Bates City 597)

CPD Complimentary history, July 22, 2014
Day (Bates City 598)

CPD Complimentary history, July 22, 2014
Kelly (Bates City 599)

CPD Complimentary history, July 22, 2014
Landando (Bates City 600)

CPD Complimentary history, July 22, 2014
Noradin (Bates City 601)

CPD Complimentary history, July 22, 2014
Wo (Bates City 602)

CPD Criminal history report (Nicole), printed July 22, 2014(Bates City 603-604)

CPD fingerprint card (Nicole), May 16, 2005(Bates City 605-606)

eTrack Inventory Item Inquiry
(blood card, phone cord, sheets, clothing) (Bates City 607)

eTrack Inventory Item Inquiry
(clothing, photo) (Bates City 608)

Search / Edit Tactical Response Report
(no match) (Bates City 609)

Photographs (Nicole's home), May 14, 2005
Lampa (Bates City 610-715)

Arrest Profile (Nicole), July 22, 2014(Bates City 716)

GO 04-03, Preliminary investigations, effective 8 September 2004(Bates City 799-801)

GO 02-03, Detention of warrantless arrestees prior to charging and duty judge procedures,
Addendum 13, effective 10 October 2008(Bates City 802-806)

CPD employee training record, November 3, 2014
Bartik(Bates City 820-830)

CPD employee training record, November 3, 2014
Kelly(Bates City 831-843)

CPD employee training record, November 3, 2014
Balodimas(Bates City 844-854)

CPD employee training record, November 3, 2014
Noradin(Bates City 855-866)

CPD employee training record, November 3, 2014
Wo(Bates City 867-879)

CPD employee training record, November 3, 2014

Cordaro (Bates City 880-891)

CPD employee training record, November 3, 2014
Day (Bates City 892-898)

CPD employee training record, November 3, 2014
Landando(Bates City 899-908)

CPD Employee complaint history from CRMS, January 1, 2000 - October 29, 2014 (Bates City 909-926)
  909: Landando
  910: Noradin
  911: Kelly
  912: Bartik
  913: Balodimas
  914: Cordaro
  915: Wo

Pre 2000 Mainframe complaint register history, January 1, 1967 - December 31, 1999(Bates City 916-923)
  916: Bartik
  917: Kelly
  918: Balodimas
  919: Noradin
  920: Wo
  921: Cordaro
  922: Day
  923: Landano

Williams v. City, 14 C 4391, listing warehouse numbers 1-119(Bates City 924-926)

Log and Event queries, May 14-15, 2005(Bates City 927-946)

Polygraph Unit Standard Operating Procedures (Bates City 1447-1454)

GO Recording Homicide Interrogations (Effective 7/18/05)(Bates City 1455-1461)

Department of Children and Family Services Documents Produced by Subpoena (72 pp)

Deposition Transcripts

  Defendant Balodimas
  Defendant Landando
  Defendant Wo
  Defendant Noradin
  Defendant Bartik

Defendant Cordaro
Plaintiff Nicole Harris
Dr. Denton
Melvin Arnold
Dinajia Arnold
Defendant John Day
James Hickey
Donald O'Neill

Bartik

CITY 588 Bartik 5 year CR history
CITY 596 Bartik complimentary history
CITY 820 Bartik training record
Bartik CRs
CITY 1947, 2017, 2466, 2525, 3598, 3626, 4441, 4721, 5274, 5538, 6089, 6748, 6884, 7142
CITY 7224 Bartik personnel file
Bartik rating cards
CITY 8099, 8100, 8102
Bartik evaluations
CITY 8103, 8105, 8107
Bartik CR history
CITY 912, 916

Exhibit 75, Transcript of Video-Taped Statement of Nicole Harris
Chicago Fire Department Ambulance Records CCSAO 272-275

Exhibits 83A to 88, Photographs Identified at Ms. Arnold's Deposition

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLE HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14-cv-4391** |
| **v.** | ) | |
| | ) | **Judge Darrah** |
| **CITY OF CHICAGO, et al.,** | ) | **Magistrate Cox** |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RULE 26(a)(2) SUPPLEMENTAL DISCLOSURE**
**FOR GREGG McCRARY**

Plaintiff hereby supplements her previously disclosed Rule 26(a)(2) opinion of Gregg McCrary as follows:

1. The compensation to be paid for the study and testimony in the case is $450 per hour.

2. A list of all other cases in which, during the previous 4 years, he testified as an expert at trial or by deposition is attached.

Dated: February 18, 2016
                                     /s/ Jan Susler _____
                                     Jan Susler, one of Plaintiff's Attorneys

| | | |
|---|---|---|
| Nicole N. Auerbach | Janine L. Hoft | J. Samuel Tenenbaum |
| Stuart J. Chanen | Joey L. Mogul | Bluhm Legal Clinic |
| Margot Klein | Jan Susler | Northwestern University |
| Valorem Law Group | People's Law Office | School of Law |
| 35 E. Wacker Drive | 1180 N. Milwaukee | 357 E. Chicago Ave. |
| Suite 3000 | Chicago IL 60642 | Chicago IL 60611 |
| Chicago IL 60601 | 773.235.0070 | 312.503.4808 |
| 312.676.5460 | | |

Attorneys for Plaintiff Nicole Harris

CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2016, I caused a true and correct copy of Plaintiff

1

Nicole Harris' RULE 26(a)(2) SUPPLEMENTAL DISCLOSURE FOR GREGG McCRARY to be served on all counsel of record via email, including but not limited to the following:

Kyle L. Flynn
Tiffany Fordyce
John F. Gibbons
Greenberg Traurig, LLP
77 West Wacker Drive | Suite 3100
Chicago, IL 60601
flynnk@gtlaw.com
fordycet@gtlaw.com
gibbonsj@gtlaw.com

Attorneys for City of Chicago

Andrew Hale
Avi Kamionski
Shneur Nathan
Jennifer Bitoy
Andrew M. Hale & Associates
53 W. Jackson Blvd.
Chicago IL 60604
ahale@ahalelaw.com
akamionski@ahalelaw.com
snathan@ahalelaw.com
jbitoy@ahalelaw.com

Attorneys for Individual Defendants

/s/ Jan Susler_____
Jan Susler
One of Plaintiff's Attorneys

## Gregg O. McCrary - Deposition and Trial Testimony 2012-2015

| Case Name | Client | City, State | Description | Represent | Deposition | Trial |
|---|---|---|---|---|---|---|
| | | | | | | |
| Jimenez v. City of Chicago | Attorney Stuart Chenen | Chicago | Police Practices | P | 6-Dec-11 | 17-Jan-12 |
| Bosworth v. Vornado Realty Tru | Attorney Robert Stoney | Fairfax, VA | Abduction/murder | P | 18-Apr-12 | Settled |
| Lopez v. Yoyitos | Attorney Rand Ackerman | Miami, FL | Abduction/Mass Murder | D | 5-Sep-12 | MSJ |
| Blanton v. ISMG Security | Attorney David Fernandez | Orlando, FL | Stalking Homicide -Wkplace | D | 18-Sept.-12 | Settled |
| Paul v. the Atrium | Attorney Sun Choy | Atlanta, Ga | Abduction/Rape | D | 6-Sep-12 | Settled |
| Bustamante v. Headly Insurand | Attorney john Morrow | Polk County, FL | Robbery/double homcide | D | 19-Oct.-12 | Settled |
| Harvey/Anderson v. Spearmint | attorney Issac Wannos | West palm Beach, FL | Agg Assault/Robbery | D | 22-Oct-12 | Settled |
| Brown v. Conch Heaven | Attorneyh Luis Diz | Miami, FL | Murder in restaurant Parking | D | 24-Oct.12 | Settled |
| Diana C. v. Lodi Unified School | Attorney Kenneth Meleyco | San Francisco, CA | Sex Assault of Minor | P | 6-Nov.-12 | Settled |
| Clark v. Penn Square Mall | Attorneys Tom Wolfe and Per | Oklahoma City, OK | Abduction/Rape | D | 7-Dec.12 | Settled |
| Santos v. Scott Villa | Attoney Bill Baumgaetne | Los Angeles, CA | Homicide - Apt. complex | D | 31-Jan-13 | Settled |
| Betancourt v. Mid City | Attorney Greg Gerjel | Orlando, FL | Shooting at Hotel | D | 21-Sep-12 | 1/18/2013 |
| Flecha v. Avalon | Attorney Robert Swift | Orlando, FL | Homicide - Apt. complex | D | 2-Sep-09 | 2/8/2013 |
| Steward v. Aventerra | Attorney Barry Bradley | San Bernadino, CA | Stabbing at Apartment Compl | D | 18-Mar-13 | 28-Mar-13 |
| Ayers v. City of Cleveland | Attorney Russel Ainsworth | USDC Cleveland, Ohio | Police Practices | P | 26-Mar-13 | 5/21/2013 |
| Raymundo v. Palmer Landing | Attorney Jamie Mahar | Stamford, CT | Murder, condo complex | D | 7-May-13 | Settled |
| Lopez v. Crystal Associates | Attorney Derek Metts | Orlando, FL | Stabbing at Motel | D | 16-May-13 | May 30-31,2013 |
| Livers v. Nebraska | Attorney Locke Bowman | Omaha, NE (FED) | Police Practices - Wrongful P | P | 7-Jun-13 | Settled |
| Cruz v. Senior Living Center | Attorney Deborah Moskowitz | Orlando, FL | Domestic Homicide in Worpla | D | 21-Jun-13 | Settled |
| Mays v. KCM Associates | Attorney Sun Choy | DeKalb County, GA | Rape at Apt. Complex | D | 9-Aug-13 | Settled |
| Montesino v. Gurkin | Attorney Mike Paris | Miami, FL | Robbery/shooting at Apts. | D | 30-Sept.13 | Settled |
| Quijano v. Bill Seidle's Nissan | Attorney Neil Colvin | Miami, FL | Stolen car from Dealership | D | 2-Oct-13 | Settled |
| Jordan v. TGIF | Attorney Tom Gmelich | Riverside, CA | Murder inside Restaurant | D | 14-Oct-13 | Settled |
| Doe 7 v. BSA | Attorney Bryan McElvane | New Jersey | Child Molestation | D | 16-Oct-13 | Settled |
| Fudora v. Pro Tech | Attorney Cris Casal | Miami, FL | Robbery Homicide | D | 13-Nov-13 | Settled |
| Dobrzniecki v. Salisbery | Attorney Stuart Chenen | Chicago, Ill | Police Practices | P | 17-Dec-13 | Settled |
| Williams v. City of Chicago | Attorney Amanda Antholt | Chicago, Ill | Police Practices | P | 4-Mar-14 | Settled |
| Barret v. Fowler Homes | Attorney David Macdonald | Dallas, TX | Homicide at apartment compl | D | 1-Apr-14 | Settled |
| Cartright v. Duluth | Attorney Jim Budd | Atlanta, Ga | Shooting at Apt. Complex | D | 28-Jul-14 | Settled |
| Santos v. Village Laundry | Attorney Chad Lucas | Matiland, FL | Homicide in Laundromat | D | 29-Aug-14 | 28-Jan-16 |
| Hampton v. City of Chicago | Attorney Christopher Smith | Chicaogo, Ill | Police Practices | P | 9-Mar-15 | |
| State v. Jackson | Attorney Rosemarie Peoples | St.Augustine, FL | Police Practices - Criminal Ca | D | 13-Mar-15 | |
| Savory v. State of Illinois | Attorney Josh Tepfer | Peoria, Illinois | Police Practices - double hom | P | | 2-Apr-15 |
| Danial Williams v. Commonwea | Attorney Donald Salzman | USDC Richmond, VA.. | Police Practices - sexual hom | P | | April 16-17,2015 |
| Martinez v. Snadey Springs | Attorney John McKinley | Atlanta, GA | Rape at Apt. Complex | D | 4-Jun-15 | |
| MM v. Signature | Attorney Brian neary | Marietta , GA | Rape at Apt. Complex | D | 16-Jun-15 | |
| Fairbansk 4 v. State of Alaska | Attorney Kate Demerest | Fairbanks, AK | Police Practices - homicide | P | 11-Sep-15 | 21-Oct-15 |
| Beaman v. Normal PD | Attorney Locke Bowman | Chicago, Ill | Police Practices - homicide | P | 25-Sept.-15 | |
| Koh v. Chicago PD | Attorney Elizabeth Mazur | Chicago, Ill | Police Practices - homicide | P | 19-Oct-15 | |
| McDonald v. Briar Oak | Attorney Todd Springer | Clay County FL | Homicide - condo | D | 1--Nov-15 | 10-Dec-15 |