# EXHIBIT 12

To
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

|    |    |    |
|----|----|----|
| 1  | IN THE UNITED STATES DISTRICT COURT | |
| 2  | NORTHERN DISTRICT OF ILLINOIS | |
| 3  | EASTERN DIVISION | |
| 4  | NICOLE HARRIS,                          ) | |
| 5  |     Plaintiff,      ) | |
| 6  | v.                                      ) No. 14-cv-4391 | |
| 7  | CITY OF CHICAGO; Chicago Police         ) | |
| 8  | Officers ROBERT BARTIK,                 ) | |
| 9  | DEMOSTHENES BALODIMAS, ROBERT           ) | |
| 10 | CARDARO, JOHN J. DAY, JAMES M.          ) | |
| 11 | KELLY, ANTHONY NORADIN, and             ) | |
| 12 | RANDALL WO; Assistant Cook County)       | |
| 13 | State's Attorneys ANDREA GROGAN         ) | |
| 14 | and LAWRENCE O'REILLY, and THE          ) | |
| 15 | COUNTY OF COOK,                         ) | |
| 16 |     Defendants.     ) | |
| 17 | | |
| 18 | The video deposition of DEMOSTHENES BALODIMAS, called for examination pursuant to | |
| 19 | the Rules of Civil Procedure for the United States District Courts pertaining to the taking | |
| 20 | of depositions, taken before Tracy Jones, a Certified Shorthand Reporter within and for the | |
| 21 | County of Cook and State of Illinois, at 35 East Wacker Drive, Suite 3000, Chicago, Illinois, on | |
| 22 | November 16, 2015, at the hour of 10:05 o'clock a.m. | |
| 23 | Reported by:    Tracy Jones, CSR, RPR, CLR | |
| 24 | License No.:    084-004553 | |



1  pre-2005 --
2      A.   Yes.
3      Q.   -- were accidental deaths?
4      A.   Yes.
5      Q.   So this was the first homicide -- This
6  was the first case that evolved into a homicide
7  investigation regarding the death of a child
8  that you worked on?
9      A.   Yes.
10     Q.   What was your appointment date to CPD?
11     A.   My appointment date?
12     Q.   Mm-hmm.  Yes.
13     A.   24 April 1981.
14     Q.   And that was your first day at the
15  academy?
16     A.   Yes.
17     Q.   Had you had any prior law enforcement
18  experience?
19     A.   No.
20     Q.   After the -- How long were you at the
21  academy?
22     A.   24 to 26 weeks.
23     Q.   And what happened next?  Where were you
24  assigned?

1  Q. So you talked to Detective Noradin
2  before you interviewed Ms. Harris; is that
3  right?
4  A. Yes.
5  Q. What did he tell you?
6  A. I don't recall exactly what he told me.
7  Q. What led you to believe that it wasn't
8  possible to have been an accident?
9  A. From where the child was found on the
10 floor.
11 Q. Did Detective Noradin tell you that?
12 A. I don't recall who told me.
13 Q. You knew that before you talked to
14 Ms. Harris?
15 A. I don't remember.
16 Q. At the time you first spoke to
17 Ms. Harris, did you believe it could be an
18 accident?
19 A. No. I didn't think it was an accident.
20 Q. Did you believe it could be an
21 accident?
22 A. No.
23 Q. Why not?
24 A. I just don't -- just what I told you.



1    Q.   I'm just --
2    A.   From all the information I gathered.  I
3  don't -- I don't exactly remember what they told
4  me, but the information I learned.
5    Q.   So the time you first talked to
6  Ms. Harris, you did not believe it could have
7  been an accident because of the evidence you had
8  about beating the child and something that
9  Detective Noradin told you, but you don't
10 remember what?
11      MR. KAMIONSKI:  Objection:  Asked and
12 answered.
13      THE WITNESS:  Yes.
14 BY MS. KLEIN:
15   Q.   Did you know anything else before you
16 talked to Ms. Harris about the case?
17   A.   No.
18   Q.   Did you listen to the 911 tapes?
19   A.   You asked me that.  No.
20   Q.   Sorry.
21        Did you have any knowledge of any 911
22 tapes?
23   A.   No.
24   Q.   Actually, I asked you if you listened

1    Q.   Does it refresh your recollection as to
2 anything else you did while you were at 2004
3 North Laporte with Detective Landando?
4    A.   I think I basically said everything
5 that's on these GPRs.
6    Q.   My question is just a little bit
7 different.  Does this help you remember anything
8 else that you did at 2004 North Laporte with
9 Detective Landando?
10   A.   No.
11   Q.   Okay.  Have we discussed everything
12 that you did at 2004 North Laporte with
13 Detective Landando?
14   A.   Yes.
15   Q.   And you've told me everything you
16 recall about that event?
17   A.   Yes.
18   MR. CHANEN:  I'm sorry.  Was there an answer?
19   MS. KLEIN:  Yes.
20 BY MS. KLEIN:
21   Q.   And this GPR, Exhibit 2, accurately
22 reflects everything you did at 2004 North
23 Laporte?
24   A.   Yes.

1    Q.   So you didn't go to the laundromat
2  after you left the apartment?
3    A.   No.
4    Q.   Did you at any time go to the
5  laundromat?
6    A.   No.
7    Q.   Did you at any time go anywhere else to
8  look for witnesses with regard to the Jaquari
9  Dancy death investigation?
10   A.   No.
11   Q.   So what happened after you finished at
12 2004 North Laporte?  What did you do next?
13   A.   Went back to Area 5.
14   Q.   And what did you do there upon
15 returning?
16   A.   Met with Detective Tony Noradin.
17   Q.   Was that the first time you talked to
18 him with regard to this case?
19   A.   I don't remember.
20   Q.   Did you communicate back to Area 5
21 while you were at 2004 North Laporte?
22   A.   I don't recall.
23   Q.   Did you communicate to any of the
24 detectives working on the case from 2004 North

1    A.   Correct.

2    Q.   Were you present during that entire
3 7:10 interview?

4    A.   Yes.

5    Q.   Were all the detectives present during
6 that 7:10 interview?

7    A.   The three of us, yes.

8    Q.   Entered together and left together?

9    A.   Yes.

10   Q.   Were there other detectives working on
11 the case at that point besides the three of you?

12   A.   I don't know.

13   Q.   When you testified earlier that you at
14 some point had read Detective Wo's GPR regarding
15 Diante Dancy's interview --

16   A.   Yes.

17   Q.   -- when did you do that?

18   A.   Sometime during the investigation.  I
19 know I read it here also on the 2nd and 3rd when
20 I got my packets.

21   Q.   Do you believe you read it prior to
22 interviewing Ms. Harris at 7:10 p.m.?

23   A.   I don't know.  I don't know when I read it.

24   Q.   But you do believe reading it at some

1  BY MS. KLEIN:
2      Q.   Have you ever observed an officer use
3  excessive force?
4      A.   No.
5      Q.   Have you ever observed an officer
6  engage in a false arrest?
7      A.   No.
8      Q.   Have you ever heard of an officer using
9  excessive force?
10     A.   Just through the media.
11     Q.   Not through the CPD?
12     A.   No.
13     Q.   Have you ever heard of an officer
14  falsely arrest someone?
15     A.   No.
16     Q.   Have you ever heard of an officer
17  coercing a confession?
18     A.   No.
19     Q.   Have you ever heard of an officer
20  fabricating a confession?
21     A.   No.
22     Q.   Have you ever -- Have you ever reported
23  an officer for misconduct?
24     A.   No.



1    Q.   Have you ever been interviewed with
2  regard to an officer's misconduct?
3    A.   No.
4    Q.   Have you ever testified against an
5  officer?
6    A.   Yes.
7    Q.   In what -- Can you describe the
8  circumstances?
9    A.   There was an officer who stabbed his
10 wife to death.  I forgot what year that would
11 be, 2000- -- 2009, 2010, somewhere around there,
12 during a domestic altercation, I take it.  And
13 he subsequently got sentenced to, I don't know,
14 I want to say 30 years, 25 years, somewhere
15 around there, after trial.
16   Q.   So you testified in your capacity as an
17 investigating detective on that case?
18   A.   Yes.
19   Q.   Have you ever heard of other -- other
20 officers testifying against officers for
21 misconduct?
22   A.   No.
23   Q.   Have you ever heard of an officer being
24 disciplined or terminated for engaging in



1  excessive force?
2      A.   Sure.  Yes.
3      Q.   Describe the context, please.
4      A.   It's just from the media, what I hear
5  in the media.
6      Q.   Media reports with regard to CPD?
7      A.   Sure.
8      Q.   But no discussions within CPD?
9      A.   No.
10     Q.   Have you ever heard of an officer being
11 disciplined for a false arrest or terminated for
12 a false arrest?
13     A.   No.
14     Q.   Have you ever heard of an officer being
15 disciplined for fabricating a statement?
16     A.   No.
17     Q.   Terminated for fabricating a statement?
18     A.   No.
19     Q.   Have you heard of an officer
20 disciplined for coercing a confession?
21     A.   No.
22     Q.   Have you heard of an officer terminated
23 for coercing a confession?
24     A.   No.



1    Q.   Do you know of any cases where a
2    Chicago Police officer was responsible for a
3    wrongful conviction?
4    A.   No.
5    Q.   Have you ever been accused of falsely
6    arresting someone?
7    A.   No.
8    Q.   Have you ever been accused of using
9    excessive force?
10   A.   I don't recall.
11   Q.   Is there anything that would refresh
12   your recollection?
13   A.   I don't know.  Do you have my complaint
14   history?  I don't -- I'm not going to guess.  I
15   don't recall.
16   Q.   Okay.  Have you ever been accused of
17   saying something that wasn't true in an
18   investigation?
19   A.   I don't recall.
20   Q.   Have you ever been accused of coercing
21   a confession?
22   A.   Other than this?
23   Q.   Correct.
24   A.   I don't recall.

1  Q.  Do you write that with regard to every
2 CR?
3  A.  Yes.
4  Q.  What does that mean?
5  A.  That you're doing it because it's a
6 direct order, and you're doing it under duress.
7  Q.  Have you ever given any statement
8 because you were threatened with consequences --
9 with consequences if you didn't?
10  A.  Well, yes.  If you don't, you can get
11 fired for refusing a direct order.
12  Q.  Are you referring to CR statements,
13 then?
14  A.  Yes.
15  Q.  Any other circumstances?
16  A.  Not that I recall.
17  Q.  Are you familiar with the term code of
18 silence as it relates to the Chicago Police
19 Department?
20  A.  Am I familiar with it?
21  Q.  Yes.
22  A.  I don't understand your question, am I
23 familiar with it.
24  Q.  Have you heard that term used with

1  regard to the Chicago Police Department?
2      A.   Yes.
3      Q.   What do you understand it to mean?
4      A.   Officers not telling on each other.
5      Q.   Do you believe that to be true?
6      A.   I don't know.
7      Q.   I'm asking about your belief.
8      A.   No, I don't.
9      Q.   I'm sorry.  I didn't understand.
10     A.   No, I don't believe that to be true.
11     Q.   You don't believe that to be true?
12     A.   No.
13     Q.   Have you ever discussed the code of
14 silence within the police department?
15     A.   No.
16     Q.   Have you ever discussed officers not
17 telling on each other amongst your fellow
18 officers?
19     A.   No.
20     MS. KLEIN:  I have no further questions.
21     MR. KAMIONSKI:  Kyle, questions?
22     MR. FLYNN:  No questions.
23     MR. KAMIONSKI:  I've got a few follow-ups.
24

