# EXHIBIT 13

To
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4   NICOLE HARRIS,                        )

 5          Plaintiff,                     )

 6     v.                                  ) No. 14-cv-4391

 7   CITY OF CHICAGO; Chicago              )

 8   Police Officers ROBERT BARTIK,        )

 9   DEMOSTHENES BALODIMAS, ROBERT         )

10   CARDARO, JOHN J. DAY, JAMES M.        )

11   KELLY, ANTHONY NORADIN, and           )

12   RANDALL WO; Assistant Cook            )

13   County State's Attorneys              )

14   ANDREA GROGAN and LAWRENCE            )

15   O'REILLY, and THE COUNTY OF COOK,)

16          Defendants.                    )

17         The deposition of RANDALL WO, called for
     examination pursuant to the Rules of Civil
18   Procedure for the United States District Courts
     pertaining to the taking of depositions, taken
19   before Tracy Jones, a Certified Shorthand
     Reporter within and for the County of Cook and
20   State of Illinois, at 35 East Wacker Drive,
     Suite 3000, Chicago, Illinois, on the November
21   13, 2015, at the hour of 8:14 o'clock a.m.

22

23   Reported by:    Tracy Jones, CSR, RPR, CLR

24   License No.:    084-004553
```



1  review -- and reviewing the crime scenes that
2  the primary detective assigned had with respect
3  to the case?
4      A.   I'm sorry.  Repeat the question.
5      Q.   Sure.  Other than what you've already
6  told us, is there any other responsibilities
7  that the primary detective assigned had with
8  respect to the case?
9      A.   No.
10     Q.   Okay.  What about the cleared and
11 closed supplemental case report, was that
12 ultimately the responsibility of the primary
13 detective assigned?
14     A.   So which part of the case?
15     Q.   I'm asking you as the primary detective
16 assigned to the case, is it your responsibility
17 to make sure of the accuracy of the cleared and
18 closed case report before it's submitted to a
19 supervisor?
20     A.   No.
21     Q.   So does the primary detective assigned
22 have any responsibility towards the cleared and
23 closed case report?
24     A.   They would -- I don't understand your



1  question.
2          Did -- At that point, I did not type
3  the closer, if that's your question.
4      Q.   Okay.  Did you review it before it went
5  up the chain to the supervisors?
6      A.   No.
7      Q.   Who prepared it in this case?
8      A.   That I don't remember.
9      Q.   Had you -- How did you come to be
10 assigned as the primary detective in this case?
11 And by this case, when I refer to this case
12 throughout the day, I'm referring to the Jaquari
13 Dancy death investigation.  Okay?
14     A.   The office called us.
15     Q.   Okay.  And when you say they called us,
16 did they call your phone or Dave's phone?
17     A.   I don't remember.
18     Q.   Well, how did it come that as between
19 you and Detective Day you became the primary
20 detective assigned?  The office made that
21 decision?
22     A.   No.  Just technically, we were both
23 assigned to it.  It wasn't -- I wasn't the guy.
24 We were both assigned to it.

1  an ambulance, correct?
2     A.   Yes.
3     Q.   Arrived on the scene, correct?
4     A.   Yes.
5     Q.   Does it accurately reflect what Stavon
6  told you?
7     A.   Yes.
8     Q.   At this moment in time in your
9  interview, did you have any basis whatsoever to
10 have any suspicion that someone had
11 intentionally harmed Jaquari?
12    MR. KAMIONSKI:  Objection to the form of the
13 question.
14    THE WITNESS:  Yes.
15 BY MR. CHANEN:
16    Q.   Okay.  And what was the basis of that
17 suspicion?
18    A.   Nicole was very stoic.  He was
19 emotionally distraught, but Nicole was very
20 stoic.
21    Q.   Okay.  And you were well acquainted
22 with Nicole at that point, so you understood her
23 emotions completely?
24    A.   No.



1  Q.  This was the first time you had ever
2 met Nicole Harris?
3  A.  Yes.
4  Q.  Do sometimes when people find out that
5 their 4-year-old child had died or any child, do
6 they sometimes go into a state -- a virtual
7 state of shock?
8  MR. KAMIONSKI:  Objection:  Calls for
9 speculation.
10 BY MR. CHANEN:
11  Q.  From your experience, sir.
12  A.  Not in my experience, no.
13  Q.  No?  You've never seen a parent lose a
14 child and go into a state of shock?
15  MR. KAMIONSKI:  Objection:  Asked and
16 answered.
17  THE WITNESS:  Every time I have seen someone
18 whose child has died, they've always been
19 distraught.
20 BY MR. CHANEN:
21  Q.  And your position is Nicole Harris
22 wasn't at all distraught about this situation?
23  A.  Not to what I saw.
24  Q.  Anything else other than the fact that



1  about one of them marked 1218 and one of them
2  marked 1219?
3      A.   Yes.
4      Q.   And you think of those as two GPRs, or
5  you think of that as one two-page GPR?
6      A.   Each GPR is one.  Two GPRs.
7      Q.   Okay.  So page 1218 is one GPR, and
8  page 1219 is a separate GPR?
9      A.   Same interview, two GPRs.
10     Q.   Got it.
11          Now let's look at 12A.  Is that your
12 handwriting on the word, Draft?
13     A.   No.
14     Q.   Do you know whose handwriting it is?
15     A.   No.
16     Q.   And I'm looking at both page 1220 and
17 1221.  Neither of those are your handwriting?
18     A.   No.
19     Q.   And did you ever -- Have you ever --
20 when was the first time you ever saw this
21 document, 12A?
22     A.   Today.
23     Q.   So this is the first time you ever
24 became aware that someone went ahead on one of