# EXHIBIT 16

To
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
NICOLE HARRIS,                      )
                                    )
            Plaintiff,              )
                                    )
       vs.                          ) No. 14 CV 4391
                                    )
CITY OF CHICAGO, Chicago Police     ) Hon. John W. Darrah
Officers ROBERT BARTIK,             )
DEMOSTHENES BALODIMAS, ROBERT       )
CORDARO, JOHN J. DAY, JAMES M.      )
KELLY, MICHAEL LANDANDO,            )
ANTHONY NORADIN, and RANDALL WO,)
Assistant Cook County State's       )
Attorneys ANDREA GROGAN and         )
LAWRENCE O'REILLY, and the          )
COUNTY OF COOK,                     )
                                    )
            Defendants.             )
```

       The videotaped deposition of ANTHONY NORADIN, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Carmella T. Fagan, C.S.R., R.P.R., Notary Public within and for the County of Cook and State of Illinois, at 1180 North Milwaukee Avenue, Third Floor, in the City of Chicago, Cook County, Illinois, commencing at 10:28 a.m. on the 23rd day of November, 2015.

              BREHON REPORTING  (708) 442-0027

Page 181

1  anything else that was said or done during this?
2       A.      No.
3       Q.      At that time, why didn't you ask her
4  questions about -- further questions about what had
5  happened?  Well, let me ask this:  At that point, she
6  had just confessed to you, right?
7       A.      Correct.
8       Q.      And now she's saying, "I didn't kill
9  my son"?
10      A.      Correct.
11      Q.      Did you ask her, "Why did you just
12 tell us that you did"?
13      A.      I did not ask her that question.
14      Q.      Why not?
15      A.      Because I think at that point in time
16 we were going to -- since she had already made a
17 statement that she did do it and we had a statement
18 that she didn't do it, I thought at that time it
19 would be better for us to set up a polygraph for her.
20      Q.      Okay.  And so did you share those
21 thoughts with Kelly, Wo, and Day?
22      A.      We did have -- the four of us did talk
23 about it after I came out of the room with her.
24      Q.      Okay.  So at -- so at the time when
              BREHON REPORTING  (708) 442-0027

BREHON REPORTING  (708) 442-0027

Page 378

1  Q. And you knew that, because the medical
2  examiner was deferring his -- the cause and manner of
3  death in this case, this is something he would look
4  at?
5  A. Yes.
6  Q. Was this entire cleared and closed,
7  arrest and prosecution, report, it had to be
8  completed before you could provide it to the medical
9  examiner, right?
10  A. It has to be completed and approved
11  before we can provide any reports.
12  Q. So in this case, you wrote up the
13  interview that was conducted of Dinajia Arnold and
14  Alexis Fultis, the witnesses -- the neighbors in this
15  case?
16  A. I did not.
17  Q. Okay. I'm sorry. So I want to be
18  clear: Where -- I thought you said that you had
19  completed that part of the -- the supp report on
20  page 10.
21  A. No. I said I did not.
22  Q. Okay. Oh, I see. You're saying
23  that --
24  A. My part of it was the top.

BREHON REPORTING (708) 442-0027

Page 379

```
 1         Q.      Okay.
 2         A.      The two interviews was not me.
 3         Q.      So I want to turn your page -- you
 4   attention back to page --
 5         A.      Can you stop one second?
 6         Q.      Sure.
 7         A.      Just so we're clear:  The top of
 8   page 10, where it says Our Lady of Rection -- "Our
 9   Lady of Resurrection Hospital, but first returned
10   home to get Diante and bring him along," and then,
11   "The interview with Stavon Dancy was terminated at
12   this time," was not me --
13         Q.      Okay.
14         A.      -- okay?  "On 14 May 05, at
15   approximately 22:30 hours," that's me.
16         Q.      Okay.
17         A.      Okay?  Then the interviews of Alexis
18   Fultis and Arnold are not me.
19         Q.      Okay.  In your experience as a
20   detective in the Chicago Police Department, have you
21   ever written up a cleared and closed report and used
22   other people's GPRs to write it?
23         A.      Have I?
24         Q.      Yeah.
```

Page 380

1   A.   Yes.
2   Q.   And that's something detectives do all
3   the time, isn't it?
4   A.   Sometimes. Yes.
5   Q.   It's not who did the GPR, but someone
6   will take the -- the case file with the GPRs, and you
7   know you have a responsibility to transcribe the GPRs
8   into the case and -- cleared and closed report?
9   A.   Myself, as well as the person who
10  drafted the GPRs also has that responsibility to type
11  what their interview is.
12  Q.   Right. There's a responsibility to
13  transcribe what's in the GPR into a supplementary
14  report.
15  A.   Yes.
16  Q.   Right. And so what I'm asking is: In
17  other investigations, haven't you taken the case file
18  and taken all the GPRs and just written up the case
19  and clear -- the cleared and closed report all on
20  your own?
21  A.   At -- at other times? Yes.
22  Q.   And other detectives have done that as
23  well, right?
24  A.   Yes.

BREHON REPORTING (708) 442-0027

BREHON REPORTING (708) 442-0027

Page 381

1   Q.   They've taken your GPRs and they've
2   written up the entire cleared and closed report
3   themselves?
4   A.   Yes.
5   Q.   Okay.  Why wasn't that done in this
6   case?
7   A.   Because at this point, I mean, the --
8   the people who did the interviews decided to type
9   their own interviews, and we incorporated them in the
10  report.
11  Q.   So there -- was there a discussion
12  amongst the detectives that each person was going to
13  type up their own interviews in terms of the cleared
14  and closed report?
15  A.   Right.  Yeah.  At some point, yes.
16  Q.   When did that -- that occur?
17  A.   Probably during the time that the
18  report was being written.  I don't know -- I can't
19  tell you date and time and where it took place.
20  Q.   Okay.  But before it was submitted,
21  somehow Detectives Wo, Kelly, you, Day, Wo -- did
22  I -- let me strike that.
23  A.   Balodimas, Landando --
24  Q.   Yeah.

BREHON REPORTING  (708) 442-0027

Page 382

1     A.    Yes.

2     Q.    So sometime before this supplemental
3 report was submitted, there was a conversation
4 amongst you and your partner, Kelly; Wo, Day,
5 Balodimas, and Landando, that each of you were going
6 to write up your own interviews in the cleared and
7 closed supp report?

8     A.    It could have been as much as me
9 saying, "Hey, here's your interviews, can you type
10 these up for me."

11    Q.    Okay. And was that your
12 responsibility as the lead detective in this case?

13    A.    Yes.

14    Q.    And so you -- it's your -- as you sit
15 here today, do you believe you went to the various
16 detectives and said, "You've got to write up your own
17 interviews in this"?

18    A.    I don't recall that specifically. No.

19    Q.    But as a lead detective, it was your
20 responsibility to ensure this was accurate before you
21 submitted it, right?

22    A.    Correct.

23    Q.    And that it contained all the
24 pertinent information, right?

BREHON REPORTING (708) 442-0027

Page 383

1  A. Correct.

2  Q. And it included both inculpatory and
3 exculpatory information in this case --

4  A. Correct.

5  Q. -- right? Turning your page to --
6 page 6 and 7.

7  MR. NATHAN: Are you good? You need a break,
8 or do you want to --

9  THE WITNESS: No. I'm okay.

10  MR. NATHAN: -- keep going? Okay.

11  THE WITNESS: So 6 and 7?

12 BY MS. MOGUL:

13  Q. Yes.

14  A. Okay.

15  Q. Okay. This indicates that Alexis
16 Fultis and Dinajia Arnold were witnesses in the case,
17 right?

18  A. Correct.

19  Q. And that was -- and they -- they were
20 circumstantial witnesses, right?

21  A. Correct.

22  Q. And you put this information in,
23 correct?

24  A. Correct.

BREHON REPORTING (708) 442-0027

Page 400

1   Q.   And you've been a police officer for
2   going on how long?
3   A.   Going on twenty -- it will be 22 years
4   in January.
5   Q.   Okay. And you've had opportunities to
6   testify numerous times in court, right?
7   A.   Yes.
8   Q.   Would you say you've testified over a
9   hundred times in --
10  A.   Yes.
11  Q.   -- court? Over 500 times in court?
12  A.   That's a little excessive.
13  Q.   Okay. Over 300 times in court?
14  A.   Over a hundred.
15  Q.   Yeah. Okay. And you've received
16  training from the Chicago Police Department on how to
17  testify in court proceedings?
18  A.   There was some training. Yes.
19  Q.   And you've watched videos about
20  credibility and testifying before a jury, correct?
21  A.   Yes. There's a video on that.
22  Q.   Would you say you feel comfortable
23  testifying in court proceedings?
24  A.   Yes.

BREHON REPORTING  (708) 442-0027

Page 401

1	Q.	It's a routine part of your job?
2	A.	Yes.
3	Q.	Yes. Okay. Can you please look at
4	document -- is there a 12A there?
5	A.	No, there's not.
6	Q.	I'm going to show you what's marked as
7	12A in this case.
8			(WHEREUPON, Exhibit 12A was
9			tendered to witness.)
10	A.	Okay.
11	Q.	Did you ever see -- this is defendant
12	Wo's GPR with respect to the interview of Diante
13	Dancy, right?
14	A.	May I flip the page?
15	Q.	Sure.
16	A.	Yes.
17	Q.	Okay. Can you turn over -- you can
18	look at the back page, too. These are the two GPRs,
19	right?
20	A.	Yes.
21	Q.	Okay. Did you ever see this GPR with
22	the words "Draft" written on it?
23	A.	Not that I recall. No.
24	Q.	Is that your handwriting?

Page 402

1       A.     No, it's not.

2       Q.     Do you know whose handwriting it is?

3       A.     No, I don't.

4       Q.     So you never saw this GPR with the
5 word "Draft" on it?

6       A.     I don't recall seeing it.  No.

7       Q.     At any other time throughout your time
8 in Area 5, did you see any other GPRs with the word
9 "Draft" on it?

10      A.     No.

11      Q.     In your time throughout your history
12 as a Chicago Police Department officer, have you ever
13 seen the word "Draft" written on a GPR?

14      A.     No.

15      Q.     Have you ever seen a word "Draft"
16 written on any police report?

17      A.     No.

18      Q.     Okay. Thanks. Now, as a lead
19 detective, you -- or strike that.

20           Well, as one of the lead detectives in
21 this case, you knew that the Department of Children
22 and Family Services was conducting an investigation
23 into this case?

24      A.     I knew that they were contacted.  I

BREHON REPORTING  (708) 442-0027

Page 440

1  MS. MOGUL: All right. I want to just take a
2  short break to check with anyone else about any other
3  questions they may have. I know. It will be really
4  short because I know --
5  MR. NATHAN: Please.
6  MS. MOGUL: -- you want to get out of here.
7  MR. KOSBERG: Off the record, 7:02.
8  (WHEREUPON, there was a brief
9  recess had in the proceedings.)
10  Back on the record, 7:05.
11  BY MS. MOGUL:
12  Q. Did you ever ask Nicole Harris to
13  remove her blanket so you could examine her clothes?
14  A. No.
15  Q. Do you know if any other detective
16  asked her to do that?
17  A. Not that I'm aware of.
18  Q. Do you know what the code of silence
19  is?
20  A. No, I don't.
21  Q. Okay. Have you ever heard of officers
22  not telling on other officers regarding misconduct
23  they've ever engaged in?
24  A. No.

BREHON REPORTING (708) 442-0027

Page 441

```
 1        Q.    You never -- okay.  You heard of that?
 2        A.    No.
 3        Q.    You never -- so to -- as you sit here
 4   today, you've never heard the words "code of
 5   silence"?
 6        A.    I know it's a movie.  That's all I
 7   know about it.
 8        Q.    Okay.
 9        A.    But as it being in the Chicago Police
10   Department?  No, I don't.
11        Q.    But do you have an understanding of
12   what it means?
13        A.    The "code of silence"?
14        Q.    Yeah.
15        A.    Judging from the movie, yes.
16        Q.    Okay.  So what does -- okay.  What
17   does it mean from the movie?
18        A.    The "code of silence" means basically
19   officers not talking -- telling on other officers.
20        Q.    Okay.  Have you ever reported any
21   other member of the Chicago Police Department for any
22   misconduct?
23        A.    No.
24        Q.    Have you ever heard of a Chicago
```

BREHON REPORTING  (708) 442-0027

Page 442

1  police officer reporting any other officer for
2  misconduct?
3       A.   No.
4       Q.   And absent from watching the movie
5  about the co -- what was the name of this movie?
6       A.   "Code of Silence."
7       Q.   It was called -- was it the "Blue Wall
8  of Silence"?
9       A.   No.  "Code of Silence."
10      Q.   Oh, it was called "Code of Silence"?
11      A.   Um-hum.
12      Q.   Other than watching this movie about
13 the code of silence, you've never heard those words
14 used in the Chicago Police Department?
15      A.   No.
16      Q.   Blue Wall of Silence?
17      A.   No.  Code of silence.
18      Q.   When did you first learn that you were
19 being sued in this case?
20      A.   The exact date, I don't recall.
21      Q.   Okay.  At the time after -- after you
22 learned you were being sued in this case, were you
23 e-mailed a series of -- or a bunch of documents
24 regarding this case?