# EXHIBIT 26

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


**March 15, 2016**


**Case No. 14-CV-4391**

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   NICOLE HARRIS,                    )

5          Plaintiff,                 )

6    v.                               ) No. 14-cv-4391

7   CITY OF CHICAGO; Chicago          )

8   Police Officers ROBERT BARTIK,    )

9   DEMOSTHENES BALODIMAS, ROBERT     )

10  CARDARO, JOHN J. DAY, JAMES M.    )

11  KELLY, ANTHONY NORADIN, and       )

12  RANDALL WO; Assistant Cook        )

13  County State's Attorneys          )

14  ANDREA GROGAN and LAWRENCE        )

15  O'REILLY, and THE COUNTY OF COOK,)

16          Defendants.               )

17

18          The video deposition of JAMES K. HICKEY, called
    for examination pursuant to the Rules of Civil
19  Procedure for the United States District Courts
    pertaining to the taking of depositions, taken
20  before Tracy Jones, a Certified Shorthand Reporter
    within and for the County of Cook and State of
21  Illinois, at 1180 North Milwaukee Avenue,
    4th Floor, Chicago, Illinois, on the 21st day of
22  January, 2016, at the hour of 9:18 o'clock a.m.

23  Reported by:    Tracy Jones, CSR, RPR, CLR

24  License No.:    084-004553



1    when it was located at Pershing Road?

2         A.    I was not.

3         Q.    Do you have any particular expertise

4    with respect to polygraph examination?

5         A.    I do not.

6         Q.    Could you please tell me about any

7    general orders that related to polygraph

8    examination or the Polygraph Unit from 1998 to

9    the present.

10        MS. FORDYCE:  Objection:  Calls for a

11   narrative.

12        THE WITNESS:  There are very few reference to

13   the Polygraph Unit or polygraph examinations in

14   our department directives system.  Mostly, they

15   are in reference to organizational placement,

16   organizational charts, and description of units

17   which have responsibility for conducting

18   polygraph exams.  And there is some incidental

19   reference for job titles, not for polygraph

20   examiners but for police laboratory technician,

21   supervisory titles.  There's some vague

22   reference to a polygraph overview of

23   responsibility.

24             And it's also mentioned in the



 1  Electronic Recorded Interrogations Directive as

 2  well.

 3  BY MS. SUSLER:

 4      Q.  Do you know that -- numbers or titles

 5  of any of the directives that you're referring to?

 6      A.  At this time, I do not.

 7      Q.  Okay.  And is that the sum total of

 8  your knowledge of any special orders or

 9  directives that the Chicago Police Department

10  has with respect to Polygraph Unit or polygraph

11  examination from 1998 to the present?

12      MS. FORDYCE:  Object to the form.

13      THE WITNESS:  There are directives which may

14  not be on point directly on the topic of

15  polygraph examination.  But as members of the

16  police department, everyone has

17  responsibilities.  So, in effect, you could say

18  yeah, it affects polygraph examiners.  But it

19  affects all members of the police department.

20          So I don't know if I could agree that

21  those are the only ones that ...

22  BY MS. SUSLER:

23      Q.  All right.  Other than the fact that

24  every -- every Chicago Police Department general



1  order applies to anybody who works for the

2  Chicago Police Department, are there any other

3  directives or general orders in the Chicago

4  Police Department with respect to the Polygraph

5  Unit or polygraph examination from 1998 through

6  the present?

7      A.   Yes.  There are --

8      MS. FORDYCE:  Objection to the form.

9      THE WITNESS:  There are a couple standard

10  operating procedures manuals.

11  BY MS. SUSLER:

12      Q.   Is it two separate things you're

13  talking about, standard operating procedures and

14  manuals?

15      A.   No.  It was two -- There were two

16  issued during this time period.

17      MS. FORDYCE:  Mr. Hickey, I know it's

18  difficult.  But please let's let Jan finish her

19  question before you answer.  The court reporter

20  will be most appreciative.

21  BY MS. SUSLER:

22      Q.   Any other directives or general orders

23  with respect to Polygraph Unit or polygraph

24  examination from 1998 to the present that you



 1   haven't already told me about?

 2       MS. FORDYCE:  Object to form; asked and

 3   answered.

 4       THE WITNESS:  At this time, I can't think of

 5   any others.

 6   BY MS. SUSLER:

 7       Q.   Is there anything that would refresh

 8   your recollection?

 9       A.   Not at this time.

10       Q.   Let me show you what we will mark as --

11   I don't even know the exhibit numbers.

12                    (Whereupon, a discussion was had

13                     off the record.)

14                    (Whereupon, Hickey Deposition

15                     Exhibit No. 127 was marked for

16                     identification.)

17       MS. SUSLER:  And for the record, and for

18   those of you on the phone, this is City 8551

19   through 8558, titled Addendum to General Order 0301,

20   effective date, March 26, 2003, which was

21   provided last night for the first time.

22   BY MS. SUSLER:

23       Q.   Do you recognize what I've handed you

24   as Exhibit 127, Mr. Hickey?



1        A.    I do.

2        Q.    All right.  Is this one of the

3   directives that you testified about that mostly

4   refers to organizational placement?

5        A.    It is.

6        Q.    And if you look at page City 8555 in the

7   lower right-hand corner, it says, Section (c):

8   Forensics Unit -- Section.  And if you look down

9   to paragraph 1(f), it says:  The polygraph team

10  administers forensic polygraph examinations to

11  assist Department units with their investigative

12  needs.

13          Right?

14       A.    Right.

15       Q.    Is there -- And basically, what this

16  exhibit tells us is that the polygraph team is

17  within the Forensics Section?

18       MS. FORDYCE:  Objection.  The document speaks

19  for itself.

20       THE WITNESS:  In this time period.

21  BY MS. SUSLER:

22       Q.    Yes.  And that is effective date

23  March 26, 2003?

24       A.    Correct.

1      Q.   Okay.  Do you know where the Polygraph

2   Unit was before this?

3      A.   Frankly, I don't know where the

4   Polygraph Unit was even at this moment.  I know

5   they moved a few times.

6      Q.   It was bad question.  I meant

7   organizationally; I didn't mean physically.

8      A.   Before this, yes, I do.

9      Q.   Okay.  Where -- What section or part of

10   the police department was the polygraph team in?

11      MS. FORDYCE:  Objection to the form.

12      THE WITNESS:  The prior organizational chart

13   had the Forensic Services Division called by a

14   different name.  It was called the Crime

15   Laboratory Division.  And instead of reporting

16   to the Detective Division, it reported to the

17   Bureau of Technical Services.

18   BY MS. SUSLER:

19      Q.   Okay.  What we see here as of 2003 is a

20   change from -- from that?

21      A.   It documented the change.  That change

22   actually occurred, I believe, in about 1999.

23      Q.   Okay.  And as far as you can see in

24   Exhibit 127, is there any other reference to

1  Polygraph Unit or the polygraph team or

2  polygraph examination?

3       A.   There --

4       MS. FORDYCE:  Objection:  The document speaks

5  for itself.

6       THE WITNESS:  There is not.

7  BY MS. SUSLER:

8       Q.   Okay.  Let's mark this as Exhibit 128.

9                 (Whereupon, Hickey Deposition

10                 Exhibit No. 128 was marked for

11                 identification.)

12      MS. SUSLER:  And for those of you on the

13  phone and for the record, this is City 8559

14  through 8566, titled Addendum to General Order 0401,

15  effective date 01 January 2004, which we also

16  received for the first time last evening.

17  BY MS. SUSLER:

18      Q.   Do you recognize what I've handed you,

19  Mr. Hickey?

20      A.   I do.

21      Q.   And is this a sequel to Exhibit 127?

22      MS. FORDYCE:  Objection to the form.

23      THE WITNESS:  It is.

24

1   BY MS. SUSLER:

2       Q.   And is this another example of, as you

3   testified earlier, a directive that really

4   refers to organizational placement?

5       A.   It is.

6       Q.   Okay.  And if you look at City 8561,

7   you'll see again in Paragraph (f) there:  The

8   polygraph team administers forensic polygraph

9   examinations to assist Department units with

10  their investigative needs.

11          Did I read that correctly?

12      A.   You did.

13      Q.   All right.  Is there any other

14  reference to anything with respect to polygraph

15  in Exhibit 128?

16      A.   There is not.

17      Q.   How, if at all, is what's represented

18  in Exhibit 128 with respect to the polygraph

19  team different from what is -- appears in

20  Exhibit 127?

21      A.   There is no difference.

22      Q.   Okay.  Let me show you what's already

23  been marked as Exhibit 38.

24          Do you want to move your glasses so I



1    don't bump them.

2         Do you recognize what I've handed you?

3    A.   I do.

4    Q.   What is that?

5    A.   This is a Bureau of Technical Services,

6    Division Forensic Services -- Excuse me.  Bureau

7    of Technical Services, Forensic Services

8    Division Standard Operating Procedure.

9    Q.   Is this one of the two standard

10   operating procedures that you testified about

11   earlier?

12   A.   Right.

13   Q.   And is this one that was in effect

14   since 1999 -- I'm sorry, 1998?

15   A.   Prior to 1999, yes.

16   Q.   Okay.  And if you look at the last

17   page of -- of it, City 1450, it indicates --

18   it says there at the left margin:

19   polygraph 02 November 1998?

20   A.   It does.

21   Q.   Is that the effective date of this SOP?

22   A.   It would presume to be so.

23   Q.   Do you know whether --

24   A.   I -- I do not.



1     Q.   What's the significance of that date on

2   the document?

3     A.   Someone was trying to create a marker

4   in time.

5          The SOP is but one chapter in a larger

6   document, the SOP for Forensic Services, the

7   S -- Polygraph Unit.  So this is but one section

8   of a larger document.

9     Q.   And could you explain what that larger

10  document was?  Was it the Bureau of Technical

11  Services, Forensic Services Division Manual?

12    A.   Forensic Services Division Standard

13  Operating Procedures Manual.

14    Q.   So the manual had other SOPs related to

15  other teams or functions within the Forensic

16  Services Division?

17    A.   Correct.

18    Q.   Was there anything else, if you know,

19  in that manual that applied to or addressed in

20  any way the Polygraph Unit or polygraph

21  examinations?

22    A.   There is not and would not have been.

23    Q.   Do you know who wrote Exhibit 38?

24    A.   I do not.



1      Q.   Do you know whether any polygraph

2   examiner was consulted in the creation of

3   Exhibit 38?

4      A.   I do not personally know.  I cannot

5   imagine it being published without their input.

6      Q.   Do you have any knowledge whether any

7   polygraph examiner was consulted in the creation

8   of Exhibit 38?

9      A.   I do not have personal knowledge of

10   that.

11      Q.   Can you identify anybody in the Chicago

12   Police Department who would have that knowledge?

13      A.   I cannot.

14      Q.   Did you know a Commander Cronin?

15      A.   Thomas Cronin; yes, I did.

16      Q.   Was he a polygraph examiner?

17      A.   He was not.

18      Q.   Let me direct your attention to the

19   second page of Exhibit 38, at the top, where it

20   says:  Subject suitability.

21           Right here.

22      A.   Okay.

23      Q.   Okay?  And it says:  Some subjects may

24   not be suitable candidates for polygraph



1    examination at the time of the request.  The

2    suitability of the subject will be left to the

3    discretion of the examiner.

4           Did I read that right?

5       A.   You did.

6       Q.   What, if any, guidelines existed at the

7    time this SOP was in effect to instruct the

8    polygraph examiner how to exercise his

9    discretion?

10      MS. FORDYCE:  Objection to the form.  When

11   you say guidelines, are you talking specifically

12   CPD guidelines?

13      MS. SUSLER:  Yes.  Thanks for clarifying.

14      THE WITNESS:  The -- This would be it for CPD

15   guidelines.  Of course, there are the -- their

16   own State training.

17   BY MS. SUSLER:

18      Q.   What State training are you referring

19   to?

20      A.   Their certification as polygraph

21   examiners.

22      Q.   Do you know what, if any, training the

23   State provided to any polygraph examiners who

24   ever worked at the Chicago Police Department?



1      A.   It's different schools which are

2  license -- which issue the license for the

3  polygraph examiners.

4      Q.   The schools issue the licenses?

5      A.   No.  The State of Illinois issues

6  licenses for those who have attended accredited

7  polygraph schools.

8      Q.   What, if anything, did the Chicago

9  Police Department do at any time in the history

10 of having polygraph examiners work for the

11 police department to determine whether the

12 polygraph schools attended by those people were

13 accredited?

14     MS. FORDYCE:  Okay.  Objection to the form

15 and objection to the extent you're asking him

16 information beyond the temporal scope of the

17 30(b)(6) notice.

18     MS. SUSLER:  Fine.  I'm happy to limit it to

19 the scope of the notice, which was 1998 to the

20 present.

21 BY MS. SUSLER:

22     Q.   Do you remember the question?

23     A.   Chicago Police Department does not

24 review the accreditations of schools except in

1    one matter.  I think tuition reimbursement, they

2    want schools to be accredited by the various

3    regional accreditations organizations as a

4    criteria for tuition reimbursement.

5        Q.  Other than for purposes of tuition

6    reimbursement, are you aware of what, if

7    anything, the police department does to

8    determine whether the schools attended by

9    polygraph examiners who work for the Chicago

10   Police Department are accredited?

11       A.  I am not aware of anything.

12       Q.  And is what you're saying about the

13   tuition reimbursement, is that documented

14   somewhere?

15       A.  Yes, it is.

16       Q.  Where?

17       A.  We have a directive on the topic of

18   tuition reimbursement.

19       Q.  And that says where it would be

20   documented what the police department did to

21   determine whether the schools to which they

22   provided tuition reimbursement were

23   accredited --

24       MS. FORDYCE:  Objection to the form.



1    were in effect in May of 2005?

2         A.   I am not aware of anything superseding

3    this document.  This is 2005 -- This is 2011.

4    We want to go back --

5         Q.   Exhibit 38, the one before that --

6         A.   38.

7         Q.   -- had the date on the last page of

8    1998.

9         A.   Right.  So this Exhibit 38 would be the

10   governing directive or SOP.

11        Q.   And you're saying that because you're

12   looking at the date on the document?

13        A.   I am.

14        Q.   And not because you have any specific

15   knowledge about it?

16        A.   Correct.

17        Q.   All right.  And other than the -- Let's

18   just exclude all of the general orders and

19   directives and special orders and every other

20   kind of thing that applies to the entire police

21   department.  Let's just focus on polygraph

22   examiners in the Polygraph Unit.  Other than

23   Exhibits 127, 128, 38, and 39, are you aware of

24   any other directives, general orders, that apply



1    to the Polygraph Unit or polygraph examiners in

2    the police department?

3        MS. FORDYCE:  Objection to the form.

4        THE WITNESS:  There is a reference to

5    polygraph examinations in the Complaint and

6    Disciplinary Directive under Special Situations.

7    BY MS. SUSLER:

8        Q.   And is that that police department --

9    police officers are not subject --

10       A.   Right.  But I would think that probably

11   the broader population of police officers may be

12   subjected to a polygraph given certain

13   circumstances.  But it really is not a directive

14   governing or guiding polygraph examiners.

15       Q.   Yeah.  It's really just limiting the

16   circumstances under which a police officer can

17   be subjected to a polygraph exam?

18       A.   Right.

19       MS. FORDYCE:  Objection.  Belated objection:

20   Misstates the evidence in the record, and the

21   document in question speaks for itself.

22                     (Whereupon, Hickey Deposition

23                      Exhibit No. 129 was marked for

24                      identification.)



1    BY MS. SUSLER:

2        Q.   Let me show what you we'll mark as

3    Exhibit 129.

4            I'm showing you, Mr. Hickey, what is

5    Bates stamped in the bottom right-hand corner as

6    City 8053 through 80 -- I'm sorry, 8060.

7            And I will represent to you that these

8    were produced to us as the performance

9    evaluation summaries for Lori Rice, L-O-R-I,

10   Rice, R-I-C-E.

11           Have you ever seen performance

12   evaluation summaries before?

13       A.   I have.

14       Q.   Let me ask you to look at that first

15   page, 8053, right about in the middle where --

16   where it says:  Adaptability, responsiveness:

17   Meets expectations.

18           And I'm going to just read to you.  Do

19   you see where I am?

20       A.   I am.

21       Q.   She adjusts as needed and is

22   consistently reliable and operates within

23   department and polygraph guidelines.

24           Did I read that correctly?



1    A.   You did.

2    Q.   Do you know what, if any, polygraph

3  guidelines are referred to here?

4    A.   It would probably be the SOPs.

5    Q.   You're guessing?

6    A.   Yes.

7    Q.   Do you have any knowledge of whether,

8  in fact, in -- this looks like an August 21st of

9  2013 evaluation, there were any other polygraph

10 guidelines other than what you testified about

11 this morning?

12   A.   Not by the Chicago Police Department,

13 but by the standards under which they operate

14 and keep -- maintain their license.

15   Q.   It indicates here on that same page of

16 Exhibit 129 that Tracey Ladner was the person

17 doing this evaluation.  Do you know whether

18 Tracey Ladner was a polygraph examiner?

19   A.   She was not.

20   Q.   Do you know whether she had any

21 knowledge of what polygraph guidelines were at

22 the time?

23   MS. FORDYCE:  Objection.  This question is

24 outside the scope of the 30(b)(6) notice as to

1    Tracey Ladner's personal knowledge.

2            He's going to have to answer on his

3    personal knowledge.

4        THE WITNESS:  As an attorney, she probably

5    had the skills to look up the license

6    requirements for polygraph examiners.  And as

7    the Director of Human Relations, she should have

8    been aware of SOPs.

9    BY MS. SUSLER:

10       Q.   But do you have any personal knowledge

11   that Ms. Ladner knew -- had any knowledge about

12   what polygraph guidelines were?

13       MS. FORDYCE:  Same objections.

14       THE WITNESS:  I do not.

15   BY MS. SUSLER:

16       Q.   Let me direct your attention to

17   Exhibit 29, the 4th page, which is Bates stamped

18   City 08056.

19           And this is another performance

20   evaluation summary of Lori Rice.  Appears to be

21   done February 2nd, 2012, by Barbara West.  And

22   about the same place in the page as on that

23   first page, looks like Ms. West has written:

24   She is able to adapt to challenges faced and



1   makes adjustments while keeping in compliance

2   with departmental and polygraph standards.

3         Do you see that?

4      A.   I do.

5      Q.   And do you know what polygraph

6   standards are referred to here?

7      MS. FORDYCE:  Objection.  This is outside the

8   scope of the 30(b)(6) notice.

9      MS. SUSLER:  Well, I disagree.  I'm trying to

10  find out what -- what exists in the way of

11  departmental guidelines and general orders.  And

12  if there is a polygraph standard that the police

13  department has generated here that's being

14  addressed here, I would like to know what it is.

15     MS. FORDYCE:  You can ask about that.  But

16  your question specifically was what was Barbara

17  West referring to in this specific evaluation

18  when she referred to departmental and polygraph

19  standards.  That's outside the scope.

20     MS. SUSLER:  That's true.  Okay.

21     MS. FORDYCE:  I'm going to let him answer,

22  but he's not going to be able to answer in his

23  capacity as a 30(b)(6).

24     THE WITNESS:  The SOPs and their professional



1   and answered.

2       THE WITNESS:  I am not aware of any.

3   BY MS. SUSLER:

4       Q.   And can you identify anybody else in

5   the Chicago Police Department who could?

6       A.   No, ma'am.

7       Q.   What national standards with respect to

8   polygraph examination existed in 2005?

9       MS. FORDYCE:  Objection.  This question is

10  outside the scope of the 30(b)(6).  He can only

11  answer in his personal capacity.

12      THE WITNESS:  I'm not aware of any national

13  standards.  I have no personal knowledge.

14  BY MS. SUSLER:

15      Q.   Do you know whether anyone in the

16  Chicago Police Department does within 1998 to

17  the present?

18      MS. FORDYCE:  Same objection.

19      THE WITNESS:  I would not know.

20  BY MS. SUSLER:

21      Q.   In 2005, who, if anyone, in the Chicago

22  Police Department was responsible for being

23  aware of national standards with respect to

24  polygraph examinations?



 1      MS. FORDYCE:  Same objection.

 2      THE WITNESS:  Polygraph examination is

 3  governed by State law, not any federal or

 4  national standard.  So there would be no

 5  obligation to be tracking information on a

 6  national level which pertains to polygraph

 7  examinations.

 8  BY MS. SUSLER:

 9      Q.   Well, you may have already answered

10  this.  But who, if anyone, in the Chicago Police

11  Department -- and my questions will be between

12  1998 and the present -- was responsible for

13  ensuring that the Chicago Police Department

14  Polygraph Unit and polygraph examiners met

15  national standards?

16      MS. FORDYCE:  So objection, because you're

17  asking about the whole Chicago Police

18  Department.  I think your 30(b)(6) was narrowed

19  to the Polygraph Unit.  So I'm going to object

20  as outside of the scope, and he can answer in

21  his personal capacity.  If you change your

22  question to who in the Polygraph Unit was

23  responsible for that, then I think it's an

24  appropriate question within the 30(b)(6) notice.



1      MS. SUSLER:  Well, the way the notice read

2  was -- and I have it here -- it was about the --

3      MS. FORDYCE:  You know what?  I'll withdraw

4  that objection.

5      MS. SUSLER:  Thank you.

6  BY MS. SUSLER:

7      Q.   Do you want the question read back to

8  you?

9      A.   If there was a national mandate on

10  polygraph examinations, it probably would be

11  codified in law or some regulatory act.  And

12  normally, such changes, revisions, or new

13  requirements are communicated to the Chicago

14  Police Department through our Legal Affairs

15  office.

16      Q.   Who in the Chicago Police Department

17  was responsible for determining whether the

18  practice of the Polygraph Unit and its polygraph

19  examiners complied with State law?

20      MS. FORDYCE:  Objection to the form.

21      THE WITNESS:  The individual polygraph

22  examiners had a professional obligation to

23  follow whatever standards are issued by the

24  State law.  If, in fact, it's a new State law



1   which might affect the Polygraph Unit to change

2   something, such as electronic recorded

3   interrogations was a State law intended to

4   videotape the interrogation of those being

5   investigated for murder violations, but it also

6   spilled over into those conducting the

7   investigations through polygraph if, in fact, it

8   was a homicide investigation.

9           So that would be an example where Legal

10  Affairs would inform members -- select members

11  of the police department, there's been a change;

12  there's something you need to know about.

13  BY MS. SUSLER:

14      Q.   What, if anything -- Well, let me ask

15  it this way first:  Who -- Who, if anyone, in

16  the police department was responsible for

17  determining whether the Polygraph Unit and its

18  examiners complied with State law other than

19  leaving it to the individual polygraph examiner

20  to meet his or her professional

21  responsibilities?

22      MS. FORDYCE:  Objection to the form; asked

23  and answered; misstates prior testimony.

24      THE WITNESS:  The supervisors of the



1    Polygraph Unit would have some supervisory

2    responsibility if it was something they had

3    observed that might be a deviation from a State

4    law or department policy.

5    BY MS. SUSLER:

6        Q.   What did the police department do to

7    determine whether the supervisors of the

8    Polygraph Unit had any knowledge about State law

9    with respect to polygraph?

10       A.   Again, if there is a legally mandated

11   change, it is communicated from the Legal

12   Affairs office of the police department.

13       MS. FORDYCE:  I need to take a quick,

14   five-minute break.

15       MS. SUSLER:  All right.

16       THE VIDEOGRAPHER:  Off the record, 10:13.

17                   (Whereupon, a short break was

18                    taken.)

19                   (Whereupon, the record was read

20                    as requested.)

21       THE VIDEOGRAPHER:  Back on the record, 10:21.

22   BY MS. SUSLER:

23       Q.   Mr. Hickey, other than being notified

24   through some sort of general order, as you gave



1    the example, the -- I think it was effective in

2    July of 2005, the electronic recording or

3    digital recording of homicide investigations and

4    interrogations and polygraph examinations

5    related to those investigations, is there

6    anything else that the police department did to

7    ensure that the supervisors of the Polygraph

8    Unit or the individual examiners were aware of

9    State law applicable to polygraph examinations?

10        MS. FORDYCE:  Objection to the form; asked

11   and answered.

12        THE WITNESS:  I am not aware of anything

13   else.

14   BY MS. SUSLER:

15        Q.   Is there anyone else in the police

16   department who would be?

17        A.   No, ma'am.

18        Q.   Is there any documentation that you're

19   aware of that anyone ever reviewed in any way

20   the Polygraph Unit to determine whether the unit

21   and the individual examiners were complying with

22   State law?

23        MS. FORDYCE:  Objection to the form.

24        THE WITNESS:  Reviewing the unit.  What do

1   you mean by that?

2   BY MS. SUSLER:

3       Q.   Taking a look.  Any kind of analysis,

4   examination, quality control, in any way doing

5   anything to determine whether the unit and the

6   individual examiners were operating in

7   compliance with State law.

8       MS. FORDYCE:  Objection to the form.

9       THE WITNESS:  No.

10  BY MS. SUSLER:

11      Q.   Okay.  And the same question with

12  respect to national standards.

13      A.   No.

14      Q.   Was there ever in the -- between '98

15  and the present any kind of written job or post

16  description for polygraph examiner?

17      A.   No.  Polygraph examiners is not a title

18  so much as it is a function.  It's -- You

19  don't -- You can be a police officer or, in

20  theory, a detective or a sergeant, I suppose,

21  and be a licensed polygraph examiner.  It's a

22  skill set and not so much a title.

23      Q.   So the answer is no?

24      A.   No.



1    Q.   Did the department have any written

2  criteria for the polygraph examination function?

3    MS. FORDYCE:  And just so I can not do this

4  objection, you're always talking 1998 to the

5  present unless you specify a different time

6  frame?

7    MS. SUSLER:  Yes.  Yes.  Thank you.

8    THE WITNESS:  I'm not aware of anything.

9  BY MS. SUSLER:

10    Q.   How about criteria for retention as a

11  polygraph examiner?

12    MS. FORDYCE:  Objection to form.

13    THE WITNESS:  The department has an overall

14  general requirement to evaluate personnel.

15  BY MS. SUSLER:

16    Q.   In their capacity as a police officer

17  or sergeant, lieutenant?

18    A.   In their specific assignment, whether

19  it be a police officer or a polygraph examiner.

20    Q.   Could you tell me what those are with

21  respect to polygraph examiner?

22    A.   They are not unique.  It's the general

23  traits.

24    Q.   So nothing that specifically applies to



1   polygraph examination?

2       A.   Correct.

3       Q.   Are there any other functions within

4   the police department that, like polygraph

5   examination, that have no criteria or job

6   description?

7       MS. FORDYCE:  Objection to the form;

8   misstates prior testimony; misstates facts in

9   the record.

10      THE WITNESS:  Lawyers --

11  BY MS. SUSLER:

12      Q.   Any others?

13      A.   -- in Legal Affairs.

14           Firearm -- I'm not --

15      MS. FORDYCE:  Before you continue -- and I'll

16  let him finish -- also object that that's

17  outside of the scope of the 30(b)(6).

18      THE WITNESS:  You're asking me if there is

19  posted what?

20  BY MS. SUSLER:

21      Q.   You said that there was no job

22  description because polygraph examiner isn't a

23  job title, it's a function?

24      A.   Right.

1  BY MS. SUSLER:

2      Q.   Do you know whether any -- anyone who

3  supervised a polygraph examiner was ever a

4  polygraph examiner him or herself?

5      A.   I don't know.

6      Q.   Are you aware of any -- anyone who

7  supervised a polygraph examiner who was a

8  polygraph examiner him or herself?

9      MS. FORDYCE:  Objection to the form.

10      THE WITNESS:  I'm not aware of any.

11  BY MS. SUSLER:

12      Q.   In Exhibits 38 and 39, if you want to

13  turn to those, I don't -- I don't want to make

14  it a pop quiz for you.

15          It looks like in Exhibit 38, that SOP

16  was when the Polygraph Unit was with the Bureau

17  of Technical Services, Forensic Division,

18  correct?

19      A.   Correct.

20      Q.   And if you look at Exhibit 39, it says

21  Bureau of Detectives, Forensic Services

22  Division, correct?

23      A.   Correct.

24      Q.   Do you know what -- why that change was

1    made?

2        A.   Management rights.

3        Q.   I'm not sure what you mean.

4        A.   The superintendent has the authority to

5    organize the subunits of the Chicago Police

6    Department in a manner that he feels

7    appropriate.

8        Q.   And so -- Pardon me.

9             Other than moving from Technical

10   Services to the Bureau of Detectives, do you

11   know what, if any, changes obtained with respect

12   to the Polygraph Unit?

13       MS. FORDYCE:  Did you say obtained?

14       MS. SUSLER:  Yes.

15       MS. FORDYCE:  Objection to the form.

16       THE WITNESS:  I see no difference.  What

17   really changed was the ending of the Bureau of

18   Technical Services.

19   BY MS. SUSLER:

20       Q.   When did that bureau end?

21       MS. FORDYCE:  Objection.  It's outside the

22   scope of the 30(b)(6).

23       THE WITNESS:  To the best of my knowledge, it

24   was about 1999.



1    BY MS. SUSLER:

2        Q.   In 2005, what division or service was

3    the Polygraph Unit under?

4        A.   It was a subunit of the Detective

5    Division, and the Detective Division reported to

6    the Bureau of Investigative Services.

7        Q.   Well, I just need to clarify.

8    Exhibit 38, the last page said November 2nd, 1998.

9        A.   Correct.

10       Q.   And Exhibit 39, the last page said

11   December 1st, 2011?

12       A.   Right.

13            SOPs are not revised at the hour of the

14   organizational change.  They tend to be done

15   when they get around to it.

16       Q.   Okay.  So even if it took ten years?

17       A.   There is no time limit on SOPs, nor is

18   there a requirement for them.

19       Q.   Other than looking at Exhibits 38 and 39,

20   are you aware of any changes when the Polygraph

21   Unit was moved from the Bureau of Technical

22   Services to the Bureau of Detectives?

23       MS. FORDYCE:  Objection to the form.

24       THE WITNESS:  I am not.



1    volume, therefore, more of a need to do

2    background checks on recruits than the volume

3    for criminal investigations.

4    BY MS. SUSLER:

5        Q.   In the time period that we're talking

6    about here, 1998 to the present, were there

7    statistics kept for the Polygraph Unit?

8        A.   No.

9        Q.   None at all?

10       MS. FORDYCE:  Objection:  Asked and answered.

11       THE WITNESS:  No.

12   BY MS. SUSLER:

13       Q.   Okay.  So there were no statistics

14   about the number of polygraph exams that were

15   performed by Chicago Police Department polygraph

16   examiners?

17       A.   There were records for each and every

18   polygraph exam scheduled and performed.

19       Q.   But what I'm trying to find out is in

20   terms of, was anyone monitoring or documenting

21   the numbers of polygraph examinations performed?

22       A.   I would believe that there was some

23   counting.  But it never made it to an annual

24   report.



 1      Q.    And what makes you believe there was
 2   some counting?
 3      A.    I -- I think that's a normal activity
 4   of administrators.
 5      Q.    Did you ever see any documentation with
 6   respect to the number of polygraph examinations
 7   performed?
 8      A.    I have no specific recall.  But I did
 9   do the budget for the crime lab.  So I must have
10   considered each unit's activity.
11      Q.    And we're talking about the period in
12   the '80s?
13      A.    Correct.
14      Q.    And since then, did you have any access
15   to statistics with respect to the Polygraph Unit?
16      A.    No, ma'am.
17      Q.    If those were kept, who in the police
18   department would be likely to have those?
19      A.    I thought they might be in the
20   department annual reports.  I've looked, and I
21   can't find any.  So I don't know.
22      Q.    You looked in anticipation of this
23   deposition?
24      A.    I did.



1    Q.   When were you notified that you were

2  going to be served up today as the 30(b)(6)

3  witness?

4    MS. FORDYCE:  Objection.  I'm going to

5  instruct him not to answer only to the extent

6  you have to reveal discussions with me or with

7  an attorney.  If you can answer without

8  revealing those discussions, you can go ahead.

9    THE WITNESS:  Oh, about a week ago, maybe ten

10  days ago.

11  BY MS. SUSLER:

12    Q.   Is it fair to say that since you

13  haven't seen statistics, that as far as you

14  know, the department didn't keep any statistics

15  in terms of the number of polygraph examinations

16  that resulted in a finding of deception?

17    A.   That is accurate.

18    Q.   And none that reflected the number of

19  polygraph examinations that resulted in a

20  finding of truthful?

21    A.   That's correct.

22    Q.   So we wouldn't know the number of

23  people who were found to be truthful when they

24  denied they were guilty?



1      A.   Correct.

2      Q.   The number of polygraph examinations

3   that resulted in a finding of inconclusive?

4      A.   Also correct.

5      Q.   Or the number of polygraph examinations

6   that resulted in a finding that the subject

7   wasn't suitable to be examined?

8      A.   Correct.

9      Q.   Or the reasons for no suitability?

10     A.   Yes, ma'am.

11     Q.   No statistics on that?

12     A.   Correct.

13     Q.   No statistics on the number of errors

14  in polygraph examinations?

15     MS. FORDYCE:  Objection to the form.

16     THE WITNESS:  I don't know what you mean by

17  errors.

18  BY MS. SUSLER:

19     Q.   Times when polygraph examiners found

20  the person to be truthful, for example, and then

21  that that person later was convicted of an

22  offense?

23     A.   I'm not aware of any such statistic

24  being kept.

1      Q.   All right.  And how about statistics on

2  the number of confessions obtained at the

3  Polygraph Unit?

4      A.   It's -- None.

5      Q.   There are no statistics?

6      A.   No statistics.

7      Q.   And so, then, you wouldn't have

8  statistics on the number of confessions that

9  were obtained in the pretest interview stage of

10  the polygraph examination?

11      A.   We would not.

12      Q.   As far as you know, was there any --

13  any kind of instruction to the individual

14  polygraph examiners that they keep any sort of

15  statistics about their own examinations?

16      A.   No.  I'm not aware of any.

17      Q.   Have you ever seen any documentation of

18  any such statistics?

19      A.   No, ma'am.

20      Q.   I want to just direct your attention to

21  the Polygraph Unit as it existed in May of 2005.

22  As far as you know, other than what you've

23  already told me, were there any other

24  departmental rules or regulations or orders that



1  working to be available.  And that didn't

2  happen.

3      Q.   Was there any rule or guideline

4  prohibiting a detective from requesting a

5  specific examiner?

6      A.   No.  There's nothing on the subject.

7      Q.   As of May of 2005, was there any police

8  department policy, practice, or procedure

9  regarding what school of polygraph examination a

10  Chicago Police officer had to have attended in

11  order to conduct polygraph examinations?

12      A.   There was not.

13      Q.   Was there any policy, practice, or

14  procedure in May of 2005 about what technique a

15  polygraph examiner had to use in performing

16  polygraph examinations?

17      MS. FORDYCE:  Objection to the form.

18      THE WITNESS:  There was not.

19  BY MS. SUSLER:

20      Q.   Or what kind of scoring of a polygraph

21  examination in a criminal investigation the

22  examiner had to use?

23      A.   There was not.

24      Q.   What, if any, peer review was there of



1  polygraph examinations in May of 2005?

2       A.   Nothing formalized.  I do believe on

3  occasion there was informal peer review, review

4  of charts amongst the polygraph examiners.  But

5  there was nothing written on the topic.

6       Q.   So if they wanted to do that, they

7  could; if they didn't want to, they didn't have to?

8       A.   Correct.

9       Q.   And was there any documentation that

10  you're aware of on those occasions when, if

11  there were any, they did consult and do any kind

12  of a consultation, was there any documentation

13  of that that you're aware of?

14       MS. FORDYCE:  Objection to the form.

15       THE WITNESS:  There was no documentation.

16  BY MS. SUSLER:

17       Q.   Was there any policy, practice, or

18  procedure as of May 2005 with respect to

19  requiring continuing education with respect to

20  polygraph examination of the examiners in the

21  department?

22       A.   There is no department requirement, nor

23  is there a license requirement for same.

24       Q.   Was there any monitoring with respect



1    to whether the polygraph examiners maintained

2    their State licenses?

3         A.   That's a good question.

4         Q.   I try.

5         MS. FORDYCE:  I think they've all been good,

6    Jan.

7         MS. SUSLER:  Keep it coming.

8         THE WITNESS:  Nothing in writing.  We do ask

9    police officers to show that they have their

10   driver's license active and see.  So ...

11   BY MS. SUSLER:

12        Q.   Was there any monitoring of the status

13   of the examiner's state licenses in terms of

14   whether there had been any complaints

15   registered, for example, or any discipline from

16   the State?

17        A.   I am not aware of any.

18        Q.   Was there any -- any quality control of

19   the Polygraph Unit in between 1998 and the

20   present?

21        A.   Their professional obligation to

22   themselves.

23        Q.   Is that the only quality control?

24        MS. FORDYCE:  Objection to the form.

1        THE WITNESS:  Are you referring to their

2   showing up to work or the way they perform their

3   duties?

4   BY MS. SUSLER:

5        Q.   All of the above.

6        A.   Well, quality control, shows up on

7   time, that's by a supervisor.  And all those

8   other department-wide obligations also fall upon

9   the polygraph examiners.

10       Q.   How about any quality control with

11  respect to their function as a polygraph

12  examiner versus just any other Chicago Police

13  officer, any quality control with respect to

14  that?

15       A.   No.

16       Q.   So basically, you left it to the

17  individual polygraph examiners to fulfill

18  whatever they determined their professional

19  obligations to be?

20       MS. FORDYCE:  Objection:  Misstates prior

21  testimony; to the form.

22       THE WITNESS:  The polygraph examination is

23  done in a room with just a subject, unless

24  there's a trainee in the room.  It does not lend



1    itself for visual observations of what goes on

2    behind closed door of a polygraph examination.

3    So it's a little bit more unique of a situation

4    for supervisors.

5    BY MS. SUSLER:

6        Q.    Now, as of July of 2005, polygraph

7    examinations in homicide cases were required to

8    be recorded, correct?

9        A.    Yes.

10       Q.    And what, if any, quality control was

11   implemented as of that date which obviates the

12   concern that you just expressed?

13       A.    Any authorized investigative personnel

14   or their supervisors could review these -- these

15   tapes.

16       Q.    What documentation exists as -- in

17   terms of any quality control of the Polygraph

18   Unit that was done subsequent to the general

19   order requiring recording of polygraph

20   examinations in homicide cases?

21       A.    None that I'm aware of.

22       Q.    Let's go back to the -- your answer

23   about the fact that the polygraph examination

24   occurs with just the polygraph examiner and the



1        MS. FORDYCE:  Objection to the form:  Calls

2   for speculation; incomplete hypothetical;

3   foundation.

4        THE WITNESS:  I understand your point here.

5   But I don't think we want to establish as

6   managers a competitive playground where people

7   are comparing their batting averages, whatever

8   the topic might be; how come a certain latent

9   fingerprint examiner can only bring in

10  X percentage of prints which are suitable for

11  comparison?  How come one's are always so messy?

12  I get it.

13  BY MS. SUSLER:

14       Q.   Mm-hmm.

15       A.   But polygraph examiners are recognized

16  as professionally licensed, and we have to

17  respect their opinions.  We have no reason to

18  believe they're acting anything other than in

19  accordance with their profession.

20       Q.   So basically, the quality control was

21  to trust the polygraph examiner to do what

22  they're licensed to do?

23       MS. FORDYCE:  Objection to the form:

24  Misstates prior testimony.



1        THE WITNESS:  Correct.

2        MS. FORDYCE:  Jan, do you anticipate going

3   another two hours at least?

4        MS. SUSLER:  Yes.

5        MS. FORDYCE:  Okay.  Thanks.

6        MS. SUSLER:  I mean, if we get done earlier,

7   that's great.

8        MS. FORDYCE:  I know.  I was just asking for

9   an estimate for parking.

10                    (Whereupon, a discussion was had

11                     off the record.)

12   BY MS. SUSLER:

13       Q.   What, if any, police department policy,

14   practice, or procedure existed between 1998 and

15   the present with respect to false confessions?

16       MS. FORDYCE:  Objection.

17          Can you repeat the question.

18                    (Whereupon, the record was read

19                     as requested.)

20       MS. FORDYCE:  Okay.  Objection.  That's

21   beyond the scope of the 30(b)(6) notice.

22       MS. SUSLER:  I can amend the question to say

23   within the Polygraph Unit.

24       MS. FORDYCE:  Thank you.  Then I'll withdraw.



 1          THE WITNESS:  None.

 2     BY MS. SUSLER:

 3          Q.   Is it fair to say that there was no

 4     policy, practice, or procedure within the

 5     Polygraph Unit to avoid false confessions --

 6          MS. FORDYCE:  Objection to the form.

 7     BY MS. SUSLER:

 8          Q.   -- other than to rely on the individual

 9     polygraph examiner to perform according to his

10     or her licensure?

11          A.   When do you stop beating your wife?  I

12     mean, that's -- I think that question was

13     totally negative.  I'm trying to understand it.

14     Could you do it one more time?

15          Q.   All right.  I'll -- I'll try to

16     rephrase it.

17               What, if any, policy, practice, or

18     procedure has existed between 1998 and the

19     present to ensure that there are no false

20     confessions?  And I'm talking about with respect

21     to the Polygraph Unit.

22          A.   Right.  You answered my question by

23     saying in accordance to their own training as

24     professional licensed polygraph examiners.



1      Q.   But that's it?

2      A.   Yes.

3      Q.   You relied on the individual polygraph

4   examiner to know that he or she should not

5   extract a false confession in the context of a

6   polygraph examination?

7      MS. FORDYCE:  Objection to the form and

8   misstates the prior testimony.

9      THE WITNESS:  Correct.

10  BY MS. SUSLER:

11     Q.   What, if any, review or supervision or

12  quality control existed to ensure that the

13  individual polygraph examiners were practicing

14  within their professional license so as to avoid

15  obtaining false confessions in the polygraph

16  context?

17     MS. FORDYCE:  Objection to the form.

18     THE WITNESS:  On occasion, polygraph

19  examiners would go for continuing training.

20  It's not something required.  Sometimes the

21  Chicago Police Department would finance it, and

22  sometimes the individual polygraph examiners

23  would finance their own continuing education.

24



1  department just assumed that the individual

2  polygraph examiner was going to comport him or

3  herself according to their polygraph license

4  requirements?

5      A.   Correct.  And if there were reasons to

6  believe they were not conforming or actually in

7  violation of some standard or behavior, then we

8  do have procedures in place from informal

9  counseling to formal discipline.

10     Q.   Are you aware of an instance where that

11  ever happened with respect to a polygraph

12  examiner's performance of his or her duty as a

13  polygraph examiner at all?

14     A.   I have no personal knowledge.

15     Q.   So that would be true with respect to

16  false confessions?

17     A.   Yes.

18     Q.   And that would be true with respect to

19  fabricated confessions?

20     A.   Yes.

21     Q.   What, if any, police department policy,

22  practice, or procedure existed in 1998 to the

23  present with respect to police department

24  detectives and officers not using the Polygraph



1  Unit and polygraph examinations as a tool to

2  obtain false or fabricated confessions?

3      MS. FORDYCE:  Objection to the form:

4  Argumentative.

5      THE WITNESS:  There is nothing written on

6  topic.

7  BY MS. SUSLER:

8      Q.   Let's go back to the SOP for a minute,

9  the 39 and 39.  I just want to be sure, and I

10  apologize, but I think you already told me this.

11  The Exhibit 38 was the one that would have been

12  in effect as of May of 2005?

13      A.   Yes, ma'am.

14      Q.   Do you know what, if anything, was done

15  to monitor compliance with the SOP?

16      A.   The guidelines were for the members of

17  the Polygraph Unit.  There was no audit.

18  Case-by-case basis, if the supervisor saw

19  something that was unacceptable, it's the

20  supervisor's responsibility to take action.

21      Q.   Well, as you said earlier, if the

22  polygraph examination was taking place in a

23  private in a room with the polygraph examiner

24  and the subject, how would the supervisor see



1    that?

2        A.   Correct.

3        Q.   And if the supervisor wasn't a

4    polygraph examiner and couldn't examine the

5    charts, how could the polygraph examiner -- or

6    how could the supervisor do that?

7        A.   Right.

8        Q.   And if there weren't any statistics,

9    how could the supervisor do that?

10       A.   I understand.

11       Q.   Was there ever an instance that you are

12   aware of that a supervisor documented a problem

13   with respect to compliance with the SOP?

14       A.   I am not aware of any.

15       Q.   Would it surprise you to know that

16   Polygraph Examiner Bartik testified that he

17   practiced as a polygraph examiner for some three

18   or four years before he even knew about this

19   SOP?

20       A.   Yes, it would.

21       Q.   Would it tell you that nothing was done

22   to monitor compliance with the SOP while he was

23   in his first three or four years of practice?

24       MS. FORDYCE:  Objection:  Form; foundation.



1    BY MS. SUSLER:

2        Q.   But go ahead.

3        A.   I -- I don't know if it means arrived

4    or the time of examination.

5        Q.   And the form doesn't say?

6        A.   No, it does not.

7        Q.   And what kind of quality control was

8    there with respect to polygraph examiners to

9    determine that they were all using this form in

10   the same way?

11       A.   I don't know if it was an issue.

12       Q.   Well, my question is --

13       A.   There's no audit.

14       Q.   That was actually -- You anticipated my

15   next question.

16            What -- Are you aware of any audit from

17   1998 to the present of the Polygraph Unit?

18       A.   I am not.

19       Q.   Are you aware of any kind of -- Well,

20   let's start internal first -- any kind of

21   internal assessment, analysis, evaluation of the

22   Polygraph Unit?

23       MS. FORDYCE:  Objection:  Asked and answered.

24



1   practices, and customs.  It doesn't talk -- I

2   mean, I'm going to let him answer.  But he can't

3   answer in his official capacity.

4        MS. SUSLER:  No.  The question goes to his

5   knowledge of any assessment or review of the

6   Polygraph Unit.  That's what the question is,

7   and that's in the notice.  And he needs to

8   answer as a 30(b)(6) witness.

9        MS. FORDYCE:  Well, I maintain my objection

10  because you're not asking about an assessment,

11  which is a generic question that he has been

12  answering.  You're talking about specifically

13  what was in the mind of a specific

14  superintendent.  I think that's beyond the

15  scope.

16       MS. SUSLER:  No.  Then I'll reask it, because

17  I want it to be clear.

18  BY MS. SUSLER:

19       Q.   Your testimony is that each

20  superintendent has to come in and try to figure

21  out how to allocate resources best.

22       A.   Yes.

23       Q.   I understand that.  I'm asking you to

24  tell me if you're aware of any specific



1   assessment or review of the Polygraph Unit by

2   any superintendent?

3       MS. FORDYCE:  Objection to the form.

4       THE WITNESS:  Not the Polygraph Unit, but --

5   Not the Polygraph Unit, no.

6   BY MS. SUSLER:

7       Q.   Okay.  I'm glad we got that

8   straightened out.

9           And, you know, we've been focusing in

10  these questions about assessments or evaluations

11  or reviews internally.  Are you aware of any

12  external, outside the Chicago Police Department

13  review of the Polygraph Unit or any individual

14  polygraph examiner?

15      A.   No.

16      Q.   Is there any other measure of quality

17  control with respect to the Polygraph Unit that

18  you haven't already told me about?

19      A.   No, there's not.

20      Q.   Let me just ask you some questions in

21  terms of workload in the Polygraph Unit.

22          How, if at all, did the department keep

23  track of the work done in the Polygraph Unit?

24      A.   It's viewed as a resource that's



1   offered to investigative units.  I can find no

2   documentation as to records which documented

3   the -- the volume.  But honestly, I -- we would

4   have to have a head count somewhere.  And I

5   don't know if it ever was reduced to a formal

6   report.

7        Q.   You're not aware of any?

8        A.   No.

9        Q.   So is there any record of the number of

10  polygraph examinations per polygraph examiner?

11       MS. FORDYCE:  Objection:  Asked and answered.

12  BY MS. SUSLER:

13       Q.   Like, in a week or a month or a year?

14       A.   No, there's not.

15       Q.   Was there ever a quota for the number

16  of polygraph examinations polygraph examiners

17  should do per shift or week or month or year?

18       MS. FORDYCE:  Objection to the form.

19       THE WITNESS:  No.

20  BY MS. SUSLER:

21       Q.   Was there ever a limit on the number of

22  polygraph examinations that an examiner should

23  do per shift?

24       A.   No, there was not.



1      Q.   What was done to monitor the workload

2   distribution within the Polygraph Unit?

3      MS. FORDYCE:  Objection to the form.

4      THE WITNESS:  They would -- The first

5   available or next up.  They would take turns.

6   BY MS. SUSLER:

7      Q.   And you know that because?

8      A.   I was a sergeant in the crime

9   laboratory.

10     Q.   So you know that just from having been

11  there?

12     A.   Correct.

13     Q.   And that was in the '80s?

14     A.   Correct.

15     Q.   And what about after you were no longer

16  there, what is your knowledge about workload

17  distribution within the Polygraph Unit?

18     A.   I do not know how it's done.

19     Q.   Are you aware of -- Is there a way to

20  determine -- Well, strike that.

21          What, if any, documentation exists of

22  complaints detectives have made about the

23  Polygraph Unit or particular polygraph

24  examiners?



1      MS. FORDYCE:  Hold on.

2            Could you please read that back.

3                  (Whereupon, the record was read

4                   as requested.)

5      MS. FORDYCE:  Objection to the form.

6      THE WITNESS:  There is no documentation of

7   that.  However, if such incidents existed, the

8   complaint could be handled either informally or

9   formally.

10  BY MS. SUSLER:

11     Q.   Are you aware of any such complaints?

12     A.   I am not.

13     Q.   Is there a central repository for any

14  such complaints?

15     A.   Formal complaints.

16     Q.   Where would that be?

17     A.   The Independent Police Review

18  Authority.

19     Q.   Okay.  But in terms of if anyone -- Are

20  you aware of any mechanism in the police

21  department for collecting complaints about the

22  Polygraph Unit or an individual polygraph

23  examiner other than IPRA?

24     MS. FORDYCE:  Objection to form.



1    THE WITNESS:  I'm not aware of there being

2  complaints, yet there are processes to address

3  performance deficiencies.  Or perhaps I observed

4  the way that you interact with someone, and I

5  could counsel you, counsel the person.

6  BY MS. SUSLER:

7    Q.   I guess what I'm trying to find out is

8  has the department ever set up a mechanism to

9  collect specifically complaints about the

10  Polygraph Unit or any individual polygraph

11  examiner?

12    A.   No.

13    Q.   And do you agree that that could be a

14  way of monitoring the functioning of the

15  Polygraph Unit and the examiners?

16    MS. FORDYCE:  Objection:  Foundation;

17  lacks -- Strike that.

18       Objection:  Form, foundation, calls for

19  speculation.

20    THE WITNESS:  It might be one indicator.

21  BY MS. SUSLER:

22    Q.   Let me just ask you with respect to

23  polygraph examiners testifying as witnesses, are

24  you aware of whether in the Polygraph Unit,



 1   afield or outside the scope.

 2       MS. SUSLER:  All right.

 3       THE WITNESS:  The Chicago Police Department

 4   has, over the years, strived to find out what

 5   happened in court from various members'

 6   appearances in court.  You know, and for a

 7   while, we had -- we required detectives to

 8   submit a court attendance report.

 9           What happened?  It was continued.

10           What happened?  There was a motion.

11   They didn't need me.

12           What happened?  It was nolle pros'ed.

13           Or whatever the disposition might be.

14   But we have -- We no longer have that report.

15   We didn't learn much from it.

16           So there is no mechanism in place to

17   document testimony to dispositions.

18   BY MS. SUSLER:

19       Q.   So is it fair to say that there isn't a

20   mechanism set up, for example, to monitor a

21   polygraph examiner's, let's call it, success,

22   for lack of a better term?

23           For example, if the polygraph examiner

24   testifies that a person lied when -- or was



1  deceptive as a result of the polygraph

2  examination, but a state's attorney dismisses

3  the case, or a jury finds the person not guilty.

4  There's no mechanism to determine whether that

5  happens or the frequency with which it happens?

6      MS. FORDYCE:  Objection.  Objection:

7  Foundation; speculation; incomplete

8  hypothetical; outside of the scope of the

9  30(b)(6).

10      THE WITNESS:  No.  There's not.

11      MS. SUSLER:  We can take a break.

12      THE VIDEOGRAPHER:  Off the record, 11:44.

13              (Whereupon, a short break was

14               taken.)

15      THE VIDEOGRAPHER:  Back on the record, 12:03.

16      MS. SUSLER:  Avi and Shneur, are you there?

17      MR. KAMIONSKI:  Yes.

18      MR. NATHAN:  Yes.

19  BY MS. SUSLER:

20      Q.   All right.  Are you aware of any

21  mechanism for monitoring what happens with

22  respect to polygraph examiners' testimony in

23  criminal cases?

24      MS. FORDYCE:  Objection:  Beyond the scope of



1  BY MS. SUSLER:

2      Q.   Right.  Or it may just be that the

3  individual who's suing the polygraph examiner

4  doesn't cooperate with the investigation of the

5  CR, and therefore the CR is closed, unfounded?

6      A.   Correct.

7           Well, the -- there is a rather hard and

8  fast rule regarding complaints that if the

9  original complaint is not followed up by an

10  affidavit, there is no obligation to go further

11  with the investigation of the allegation.

12      Q.   I'm aware of that.

13      A.   Okay.

14      Q.   Are you aware of whether, regardless of

15  what IPRA, or previously OPS, decides to do with

16  a complaint against a polygraph examiner that is

17  named as a defendant in a lawsuit, are you aware

18  of any other mechanism in the police department

19  to look at the allegations with an eye to

20  determining what went wrong, how that behavior

21  could be avoided in the future, that kind of

22  thing?

23      MS. FORDYCE:  Objection to the form.

24



1    BY MS. SUSLER:

2        Q.   Other than the Legal Department.

3        A.   Well, our Legal Department is part of

4    the story.  They're the -- probably the first to

5    get feedback, what happened.  And we as

6    responsible administrators, managers, will

7    strive to take something from the lessons

8    learned.  Is it formalized?  I think it's on a

9    case-by-case incident.  Was it about tasers?

10   Was it about perjury?  Each civil suit may

11   provide us with new insights into our own

12   organization as to how we may or may not improve

13   policy or procedures.

14       Q.   Is there a formal mechanism to do what

15   you just described?

16       MS. FORDYCE:  Objection to the form:  Vague.

17       THE WITNESS:  I know you don't want to hear

18   this, but our Legal Affairs meets with the

19   Department of Law regularly on such matters.

20   And those interested -- Not those interested.

21   Those units of the police department are

22   subsequently contacted to discuss the matter if,

23   in fact, it falls in their jurisdiction.

24



 1  BY MS. SUSLER:

 2      Q.   Is there a documented policy to that

 3  effect?

 4      A.   No.  I think it's just good management.

 5      Q.   Just sort of an informal way of doing

 6  things?

 7      MS. FORDYCE:  Objection:  Misstates prior

 8  testimony; argumentative.

 9      THE WITNESS:  Not every aspect of every job

10  has an SOP.

11  BY MS. SUSLER:

12      Q.   Okay.  There's nothing that requires

13  that kind of an analysis?

14      A.   No.  But I think we have an obligation

15  to the public.

16      Q.   What -- What have you seen in the way

17  of monitoring lawsuits with respect to polygraph

18  examiners named as defendants in a civil

19  litigation?

20      MS. FORDYCE:  Objection:  Outside the scope

21  of the 30(b)(6); foundation; speculation.

22      THE WITNESS:  I've seen nothing other than

23  the little bit I read in the Bartik deposition,

24  there was such an incident.  But I have no



1   knowledge about the incident or what it was

2   about.

3   BY MS. SUSLER:

4       Q.   When you say the Bartik deposition, you

5   mean in Nicole Harris' case?

6       A.   Yes.

7       Q.   Okay.  And other than that, are you

8   aware of any -- anyone in the police department

9   looking at, in any kind of analytical way, the

10  litigation against individual polygraph

11  examiners in the years 1998 to the present?

12      MS. FORDYCE:  Objection to the form;

13  foundation; outside the scope of the 30(b)(6)

14  notice.

15      THE WITNESS:  I am not.

16  BY MS. SUSLER:

17      Q.   Do you know how much money the City has

18  paid in settlements or verdicts in litigation

19  against individual polygraph examiners?

20      MS. FORDYCE:  Objection:  Outside the scope

21  of the 30(b)(6); foundation.

22      THE WITNESS:  I do not.

23  BY MS. SUSLER:

24      Q.   Do you know the number of lawsuits that



1    have named polygraph examiners as individual

2    defendants?

3         MS. FORDYCE:  Same objections.

4         THE WITNESS:  I do not.

5    BY MS. SUSLER:

6         Q.   Do you know the names of any of the

7    plaintiffs in any of those cases?

8         MS. FORDYCE:  Same objections.

9         THE WITNESS:  I read one.  The defendant may

10   have been Bartik, the polygraph examiner.  But

11   only from reading that Harris deposition.

12   BY MS. SUSLER:

13        Q.   Do you know the names of any other

14   polygraph examiners who have been sued in civil

15   cases?

16        A.   I don't.

17        Q.   And do you know the names of any of the

18   plaintiffs who've sued any of the individual

19   polygraph examiners?

20        A.   I do not.

21        Q.   Are you aware of whether, as a result

22   of any civil litigation, any polygraph examiner

23   has ever been disciplined?

24        A.   I am not aware of such.

