# EXHIBIT 27

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

1    **TRANSCRIBED FROM DIGITAL RECORDING**

2              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION

4    NICOLE HARRIS,                ) Docket No. 14 CV 4391
                                   )
5            Plaintiff,            )
                                   ) Chicago, Illinois
6               vs.                ) November 10, 2015
                                   ) 10:02 o'clock a.m.
7    CITY OF CHICAGO, et al.,      )
                                   )
8            Defendants.           )

9                 TRANSCRIPT OF PROCEEDINGS - Motions
              BEFORE MAGISTRATE JUDGE SUSAN E. COX
10
     APPEARANCES:
11   For the Plaintiff:      VALOREM LAW GROUP LLC
                             BY:  MR. STUART J. CHANEN
12                                MS. MARGOT KLEIN
                             35 East Wacker Drive
13                           Suite 3000
                             Chicago, Illinois  60601
14
     For City of Chicago:    GREENBERG TRAURIG LLP
15                           BY:  MR. JOHN F. GIBBONS
                                  MR. KYLE L. FLYNN
16                           77 West Wacker Drive
                             Suite 3100
17                           Chicago, Illinois  60601

18   For Individual Officers:
                             HALE LAW LLC
19                           BY:  MR. AVI T. KAMIONSKI
                             53 West Jackson Boulevard
20                           Suite 330
                             Chicago, Illinois  60604
21
                    Laura LaCien, CSR, RMR, CRR
22                    Official Court Reporter
              219 South Dearborn Street, Suite 1902
23                    Chicago, Illinois  60604
                         (312) 408-5032
24       **PLEASE NOTIFY OF CORRECT SPEAKER IDENTIFICATION**
     NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS
25   UNINTELLIGIBLE AND INAUDIBLE.

 1     (The following digitally recorded proceedings were had in

 2  open court:)

 3          COURTROOM DEPUTY:  Case Number 14 CV 4391, Harris

 4  versus City of Chicago.

 5          THE COURT:  Good morning.

 6          MR. CHANEN:  Good morning, your Honor.  Stuart

 7  Chanen and Margot Klein on behalf of the plaintiff.

 8          MS. KLEIN:  Good morning.

 9          MR. GIBBONS:  Good morning, your Honor.  John

10  Gibbons and Kyle Flynn on behalf of the City of Chicago.

11          MR. KAMIONSKI:  Good morning, your Honor.  Avi

12  Kamionski on behalf of the individual officers.

13          THE COURT:  Okay.  Well, we have two motions to talk

14  about.  Let's talk about the one that should be, I hope, more

15  straightforward and that is the motion to compel production

16  of the personnel files and CRs and so on, which I guess there

17  was a concern on the part of the City regarding

18  confidentiality but there's been -- has there been an order

19  entered on that?

20          UNIDENTIFIED MALE SPEAKER:  Yes.  Yes, Judge.

21  September 1st.

22          THE COURT:  Protective order, yeah.  Okay.  I see

23  that.  And so is there any remaining objection to this

24  production?

25          UNIDENTIFIED MALE SPEAKER:  Your Honor, our

1  objection -- and I think counsel for the particular officers

2  also want to be heard on this -- but, you know --

3          THE COURT:  Of course.

4          UNIDENTIFIED MALE SPEAKER:  -- we've looked at

5  similar personnel files.  Just so we're all clear, there's no

6  disciplinary history, there's no illumination of facts in

7  relation to the allegations in this case contained in these

8  personnel files.

9          These personnel files are what you would normally

10 expect.  There are tax documents, there's salary information,

11 there's a lot of personal information that we all file.

12 That's what's in these files.

13         The City of Chicago has a long-standing practice to

14 object on behalf of the police department in relation to the

15 relevance of those documents.  That's the --

16         THE COURT:  How is that objection fair in federal

17 court?

18         UNIDENTIFIED MALE SPEAKER:  Are normally fairly

19 well, your Honor.  It does in other situations, though there

20 are Courts in this building that have ordered some review of

21 them.  But I think counsel for the individual officers

22 also object.

23         THE COURT:  So is your objection that there's --

24 that there is no -- there's -- how about if the officer is

25 promoted, is that reflected, or demoted or duty is changed

1    for some reason, is that reflected in the personnel file?

2              UNIDENTIFIED MALE SPEAKER:  There would be at times

3    information regarding promotion and salary increases or --

4              THE COURT:  Or the opposite?

5              UNIDENTIFIED MALE SPEAKER:  No.  The demotions or

6    the CR or disciplinary history are contained in other

7    documents that have already been produced to the plaintiffs.

8    That type of information is not in the personnel files.

9              THE COURT:  Okay.  And is that the -- that's your

10   sole objection that there's nothing relevant in the files?

11             UNIDENTIFIED MALE SPEAKER:  Correct.

12             THE COURT:  Okay.

13             UNIDENTIFIED MALE SPEAKER:  But I think

14   the officers --

15             THE COURT:  Do you have something to add?

16             UNIDENTIFIED MALE SPEAKER:  From the officer's

17   perspective, we don't know exactly what's in all the files.

18             THE COURT:  Okay.  Haven't you seen them?

19             UNIDENTIFIED MALE SPEAKER:  We have not seen them.

20             THE COURT:  Why not?

21             UNIDENTIFIED MALE SPEAKER:  They have not been

22   ordered by the City of Chicago.  The City of Chicago has

23   them, counsel for the City -- the City of Chicago is in

24   possession of them.  We have not gotten them ordered yet by

25   the City of Chicago --

```
 1            THE COURT:  Well, then how do we know what's in
 2   them?
 3            UNIDENTIFIED MALE SPEAKER:  We don't know what's in
 4   them.  I'm not sure what's in them.
 5            THE COURT:  Well, then -- but you're asking me to
 6   then rule that there's no relevant information on files that
 7   you haven't looked at; am I correct about that?
 8            UNIDENTIFIED MALE SPEAKER:  Well, that's the
 9   individual officers.  I know what's in them.
10            THE COURT:  Why wouldn't you have seen your own
11   officers -- I'm not following.
12            UNIDENTIFIED MALE SPEAKER:  The police department,
13   your Honor, as a practice does not allow absent a court order
14   lawyers to come in and look at police officers' files.
15            THE COURT:  And why not?
16            UNIDENTIFIED MALE SPEAKER:  Because there's safety
17   concerns in relation to the information such as spouses,
18   Social Security numbers, addresses --
19            THE COURT:  Well, that's why we have protective
20   orders in federal court.
21            UNIDENTIFIED MALE SPEAKER:  -- and children.  I
22   understand that and I'm just -- I'm here on behalf of the
23   City and the superintendent making a relevance argument.
24            THE COURT:  Yeah; I understand what you're saying.
25   Thank you.  All right.  I'll hear from the plaintiff.
```

1      MR. CHANEN:  Judge, we're very surprised to hear

2  Mr. Gibbons say that these are never produced in part because

3  we've gotten them in other cases and in part --

4      THE COURT:  Yeah.  I know that you produced in other

5  cases and --

6      MR. CHANEN:  But in part --

7      THE COURT:  -- not in others.

8      MR. CHANEN:  Because the document request that we

9  issued, their response was -- they issued some standard

10  objection, overbroad, vague, ambiguous, those.  And then they

11  said subject to and without waiving the general objections,

12  the City will produce non-privileged responsive documents in

13  its custody, possession or control subject to a protective

14  order once parties reach mutually --

15      THE COURT:  That's why I thought this was a

16  straightforward motion.

17      MR. CHANEN:  Right.

18      THE COURT:  It sounds like you waived that

19  objection.

20      MR. CHANEN:  And they didn't -- yeah.  They didn't

21  say, Judge, we've --

22      THE COURT:  Did they say they were irrelevant in the

23  objection?

24      MR. CHANEN:  No.

25      THE COURT:  Is there a relevance objection made in

1    the response?

2             MR. CHANEN:  No, Judge.

3             MS. KLEIN:  No.

4             THE COURT:  If there isn't, you failed to raise that

5    objection.

6             MR. CHANEN:  And then, Judge -- I'm sorry.  One

7    other issue, Judge.

8             Then when Mr. Gibbons' firm moved the protective

9    order into evidence before Judge Darrah, they wrote the

10   parties have requested documents through discovery that

11   include confidential information such as internal

12   administrative information, complaint register files,

13   personal health information, personnel files and discipline

14   information of non-parties.  To protect such information, the

15   parties have agreed on a proposed type of (unintelligible).

16            THE COURT:  Yeah, yeah.

17            MR. CHANEN:  In the very motion they moved before

18   Judge Darrah, they listed the personnel files as the basis

19   for the protective order.

20            THE COURT:  I mean, I certainly believe that the

21   police department has the right to redact information like --

22   and no plaintiff wants to look at their history of their

23   health care --

24            MR. CHANEN:  Absolutely, Judge.

25            THE COURT:  -- or their Social Security numbers

1   or -- there's a lot of information.  I mean, I've often said,

2   and many judges have, people always want personnel files but

3   in point of fact, most people's personnel files are rather

4   less than revelatory about having anything to do with much

5   but you didn't make that objection originally.

6        It seems to me the objection you made was the

7   confidentiality.  That has been dealt with by the protective

8   order and I think you waived any further objection.  Like I

9   said, redact what isn't -- doesn't have to do with promotion,

10  history and the like and the rest you need to produce to them

11  so the motion is granted.

12       Let's get to the next thing which is a lot more

13  complicated, it seems to me.  Let me tell you -- let me tell

14  you what I think isn't complicated or what I'm prepared to

15  address today; and of course I'd want to hear your thoughts

16  on it.  But the third -- the third section of plaintiff's

17  motion which deals specifically with the names of witnesses

18  who witnessed certain statements, purported statements, it

19  seems to me that the City ought to be able to list people

20  without the qualifications that you've raised in your

21  response with one exception, I would say.

22       This question about demeanor, what the demeanor of

23  the person identified and what the -- and what they observed

24  about the -- I think that is better suited to, once you have

25  the names of the people, I assume you're going to depose all

1   or some sub-set of that, that's the kind of question, you

2   know, is better to me left to a deposition. I think it's a

3   hard thing to put in a narrative to an interrogatory of --

4            UNIDENTIFIED MALE SPEAKER: We're fine with that.

5            THE COURT: -- things like demeanor. It's just --

6   you know, depending on the -- it would be a very -- it would

7   be very burdensome for them to go to each person and ask and

8   get a description. I think that you can explore face-to-face

9   when you have the deponent.

10           But as to sort of the who, where, when, kinds of --

11   or identification of the who, what, when, that to me seems

12   perfectly reasonable and I don't understand why you need to

13   qualify it. Assuming -- I assume you've interviewed folks

14   and you know the answer to this question so it may have or it

15   could have -- I mean, go to them and say did you or didn't

16   you because if they have no memory of it, then that's the

17   answer. But otherwise, I'm not sure why this answer is

18   qualified other than the demeanor part of it which I think is

19   a reasonable objection to make.

20            UNIDENTIFIED MALE SPEAKER: I just want to make sure

21   the Court understands all our roles here. We represent the

22   City. We don't represent the officers.

23            THE COURT: Right. I know. I've got the guy who

24   represents the officers.

25            UNIDENTIFIED MALE SPEAKER: And the allegation is a

1    Monell claim, whether there were unconstitutional practices

2    or policies that existed in 2005 that led to unconstitutional

3    behavior.

4              THE COURT:  Well, that's weird --

5              UNIDENTIFIED MALE SPEAKER:  Normally that --

6              THE COURT:  -- and a first.

7              MS. KLEIN:  It is weird.

8              THE COURT:  I don't --

9              UNIDENTIFIED MALE SPEAKER:  I would say more

10   illuminated normally.

11             THE COURT:  Well, yeah.  Maybe the powers that be

12   don't agree with that.  Yeah, okay.  I think we can continue

13   though because -- I mean, I can still see --

14             UNIDENTIFIED MALE SPEAKER:  So to specifically

15   answer your answer, to accomplish our role in the case, we

16   don't necessarily need to go out and conduct those sorts of

17   detailed interviews.  I'm sure that counsel for the police

18   officers do.  So what we're going on is paper, police reports

19   that were created back in 2005 almost ten years after the

20   fact.

21             If the Court's order is that we're supposed to

22   supply information of the who, what, when and where beyond

23   what's in the police reports, we can attempt to do that but

24   it's not going to be very more illuminating --

25             THE COURT:  It --

1       UNIDENTIFIED MALE SPEAKER:  -- than the depositions

2  they're going to take avoids defense anyway.

3       THE COURT:  It may -- it may not but they may

4  choose not to take a deposition or five if, in fact, people

5  have no memory of having witnessed those conversations or

6  encounters, okay?  I mean, it's a question of like knowing

7  who the universe is and the way the question is answered.

8       And I take what you're saying but I really think it

9  unlikely if this case proceeds that you will not as the

10  counsel for the City of Chicago have those conversations and

11  you certainly will.  And it seems to me that this question

12  should be answered without this qualification.  And if people

13  don't remember, they don't remember it and that's the answer.

14  Right?  They're not people who have not -- who can be

15  identified as having specific knowledge and answer to the

16  interrogatory.  I mean, I don't think this is rocket science

17  myself.

18       UNIDENTIFIED MALE SPEAKER:  Well, it's difficult

19  when you have scattered recollection --

20       THE COURT:  Understood.

21       UNIDENTIFIED MALE SPEAKER:  -- interspersed with

22  refreshed recollections sitting down with a report that was

23  authored by somebody else ten years ago.  That's very hard to

24  capture in a narrative.

25       THE COURT:  But that's what we do when we prepare

1    for trial or any other process.  That's what you do.

2              UNIDENTIFIED MALE SPEAKER:  That's what you do when

3    you take a deposition, you flush out the recollection.  Is

4    that an independent recollection you have today, sir, or is

5    that a recollection refreshed by you reading a report.

6    That's hard to do in a narrative.

7              If the Court's order that we should attempt to do

8    that, we will --

9              THE COURT:  It is my order.

10             UNIDENTIFIED MALE SPEAKER:  -- but it's not going to

11   be easy.

12             THE COURT:  I'm sorry for that.  It is my order,

13   pardon me, that you do that.  And so the motion to compel

14   with respect to all but the demeanor aspect is granted as to

15   that.  The other things --

16             UNIDENTIFIED MALE SPEAKER:  Your Honor, before we

17   get away from that --

18             THE COURT:  Sure.

19             UNIDENTIFIED MALE SPEAKER:  -- can I just seek

20   clarity?  We now have to go out and interview these folks.

21   We're going to have to then rewrite interrogatory answers.

22   What sort of time frame are we expecting to get that done?

23             THE COURT:  When does your discovery close?

24             UNIDENTIFIED MALE SPEAKER:  In mid January, I

25   believe.

```
 1          THE COURT:  Well, you know, he's -- it's Judge
 2  Darrah, right?
 3          UNIDENTIFIED MALE SPEAKER:  Yeah.  We have -- I
 4  mean, we have about ten depositions scheduled in --
 5          THE COURT:  Are there folks that you know that
 6  you'll depose regardless of the answer to this question?
 7          UNIDENTIFIED MALE SPEAKER:  Yes.
 8          THE COURT:  Will this -- then the delay here
 9  shouldn't impact you particularly.
10          UNIDENTIFIED MALE SPEAKER:  Okay.  Could we --
11          THE COURT:  I don't think you need more than two or
12  three weeks, though.  I really don't.
13          UNIDENTIFIED MALE SPEAKER:  I was going to ask for
14  two weeks, I mean, because these are discovery requests that
15  were served in August.
16          THE COURT:  Yeah.  I understand.  Is that
17  sufficient?
18          UNIDENTIFIED MALE SPEAKER:  With the caveat that
19  we've not attempted to interview any of them -- police
20  officers take furloughs particularly at the end of the year
21  when they have use-and-lose time -- we will endeavor to do
22  our best is all I can represent to the Court.
23          THE COURT:  Well, I would suggest that you do that
24  and then -- and -- which means that I would expect in the
25  next 24 to 48 hours you would inform these police officers
```

1   that you wish to speak with them so that we don't have any

2   confusion about their need to talk to you.

3          UNIDENTIFIED MALE SPEAKER:  Your Honor, from a

4   logistic standpoint, these are requests that were served on

5   the City not on the individual officers.  There's no motion

6   against our discovery responses.  We have a schedule set

7   starting tomorrow continuing throughout November of

8   depositions almost every day this month of all of our clients

9   who wrote the reports.  We would not want to be in a

10  situation where we have to come back, re-produce our

11  clients --

12         THE COURT:  You know what, that's sort of tough.  I

13  mean, you know, I don't bring people back for depositions

14  unless there's a really good reason so I'll say that right

15  now to plaintiff's counsels.  But if there's something that

16  comes up in response to an amended answer to interrogatory

17  that's fair game, you will have to bring that person back and

18  that's just the way it goes because I think this question

19  should have been answered, so.  That's where I -- you know.

20         UNIDENTIFIED MALE SPEAKER:  So we can just hold off

21  on the depositions until the following --

22         THE COURT:  No.  I don't think you should hold off

23  on the depositions.  I think that would be a real -- I think

24  that would be a real bad move.  You're talking about -- what

25  is it November 10th today?  You're talking about a discovery

1    cutoff in January.  It's Judge Darrah.  He's not likely to

2    extend it, at least his usual practice holds, so why would

3    you want to -- and you're coming into the holiday season and

4    you've just told me it was your -- your co-counsel has just

5    told me that people go on furloughs, people use lose-and-use

6    and I know that to be true.  Why would you delay anything in

7    this case?  It seems to be that would be the height of --

8         UNIDENTIFIED MALE SPEAKER:  We don't want to delay.

9    We're ready to produce him.  We don't want --

10        THE COURT:  Well, produce him.

11        UNIDENTIFIED MALE SPEAKER:  We don't want to produce

12   him more than once.

13        THE COURT:  Well, I'm sorry about that.  But if

14   there's a -- I am; and I've already told you that I'm not

15   going to bring somebody back just so people get a second

16   crack at him.  But if there's something legitimate that needs

17   to be explored with these witnesses and because of an order

18   that I've entered it can't be in the, you know, in the normal

19   course, then we're going to deal with that issue but they're

20   going to have to have a good reason.  So, you know what, do

21   not -- I mean, the last thing anybody in this case should do

22   is delay anything because you are not likely to get a

23   discovery extension in this case.

24        UNIDENTIFIED MALE SPEAKER:  And if I hear the Court

25   correctly, they're going to ask those questions of those very

1    deponents which will allow me in effect to answer those

2    interrogatories based on their deposition testimony.  I mean,

3    that's the best interview --

4              THE COURT:  Are we re-arguing something that I've

5    already ruled on because I'd rather move on?

6              UNIDENTIFIED MALE SPEAKER:  No.

7              THE COURT:  Okay.

8              UNIDENTIFIED MALE SPEAKER:  I'm not.  I'm just

9    trying to figure out the sequence of it.

10             THE COURT:  Well, that's your problem.  My problem

11   is I have no authority to change the schedule.  What I have

12   is the authority to rule on the things that are in front of

13   me and that's what I intend to do.  I realize that those --

14   that my rulings can present logistic problems for you and I'm

15   sorry about that, I really am, but that's my ruling.  Okay.

16   And so let's move on to some of these other things because

17   we've got other issues.

18             The -- there are -- there's a complaint about the

19   scope of the general orders and other --

20             UNIDENTIFIED MALE SPEAKER:  Judge, may I speak

21   to that?

22             THE COURT:  Yeah.  Absolutely.

23             UNIDENTIFIED MALE SPEAKER:  All right.  So this is

24   number -- Roman Numeral I and Roman Numeral IV --

25             THE COURT:  Right.

1          UNIDENTIFIED MALE SPEAKER:  -- in our motion and it
2 all focuses on the polygraph unit --
3          THE COURT:  Right.
4          UNIDENTIFIED MALE SPEAKER:  -- and Mr. Gibbons'
5 colleague has repeatedly said that they have given us every
6 manual, directive, review, analysis, assessment covering both
7 the issues we've raised in I and IV.  We don't -- we don't
8 believe that's correct.  We think as we start to do
9 depositions and we ask the polygraphers, you know -- it
10 almost is starting to come across as a rogue unit, Judge.
11 They had no manual to operate under.  They had no
12 supervisors.  They wrote that in their brief to you that was
13 stricken but there were no supervisors in the units.  There
14 were three polygraph people and they basically did what they
15 want.  And I can't -- I can't insist that they have something
16 that they're telling me they don't have.  So for the time
17 being, we'll take them at --
18          THE COURT:  Yeah.
19          UNIDENTIFIED MALE SPEAKER:  -- their word that there
20 are no other manuals, directives, training manuals --
21          THE COURT:  Yeah.
22          UNIDENTIFIED MALE SPEAKER:  -- rules that these guys
23 had to follow --
24          THE COURT:  Right.
25          UNIDENTIFIED MALE SPEAKER:  -- and we'll just take

1    the 33 occasions --

2            THE COURT:  It's verified, right?

3            UNIDENTIFIED MALE SPEAKER:  Right.

4            THE COURT:  Their answers are verified?

5            MS. KLEIN:  They would be --

6            THE COURT:  If they're not verified, they better be

7    verified.

8            UNIDENTIFIED MALE SPEAKER:  Yeah.  We should get

9    them verified but --

10            THE COURT:  You absolutely need to verify that.  So

11   that issue for the time being is moot but I'll say this,

12   which I say every time this comes up, you verify your answers

13   and if it turns out in some deposition that there is some

14   policy, procedure, something that would fairly fall under the

15   scope of this request and you haven't produced it, there will

16   be consequences.  What those consequences will be depends on

17   the prejudice to -- if any, to the plaintiff but that's why

18   we verify interrogatory answers so there's a period at the

19   end of a sentence so that if all of the sudden down the line

20   for either side somebody discovers something that's germane

21   to the case, there's no question but that they should have

22   found it earlier because they're on notice to do that and

23   they verify in their answers to interrogatories that they

24   have done so.

25            So if it is as they say, which I have no reason at

1  this point to doubt, then when you depose these folks, there

2  shouldn't be some surprise.  But if there is, as I've just

3  stated, there will be consequences but get a verification.

4  Verify your answers to interrogatories.

5          UNIDENTIFIED MALE SPEAKER:  Judge, and then Ms.

6  Klein correctly pointed out that although I did say this was

7  focused on the polygraph unit and the --

8          THE COURT:  It's beyond that, right?

9          UNIDENTIFIED MALE SPEAKER:  Yeah.  There were a --

10         THE COURT:  I thought it was.

11         UNIDENTIFIED MALE SPEAKER:  -- few additional

12  categories.  So closing a case for -- and I'll give them two

13  or three by example but I'm not trying to limit it.  Closing

14  a case by confession or closing --

15         THE COURT:  Right.

16         UNIDENTIFIED MALE SPEAKER:  -- a case involving the

17  death of a child so there are a few additional examples

18  over -- that are in Request Number 7 --

19         THE COURT:  Yeah.

20         UNIDENTIFIED MALE SPEAKER:  -- and the same basic

21  principle would apply.

22         THE COURT:  This is a classic -- this is a

23  classic -- you know, this is not the first time that someone

24  believes that they don't have everything that should exist

25  with respect to a particular topic.  But if the defendant

1    says that they produced everything, then I have to take them

2    at their word and I won't reiterate what I've already said

3    about that so -- so that particular part of the motion is --

4    on the general orders all are -- is moot which leaves the --

5              UNIDENTIFIED MALE SPEAKER:  2000 to 2005.

6              THE COURT:  Yeah.

7              UNIDENTIFIED MALE SPEAKER:  And you've --

8              THE COURT:  And the, sort of, evaluations of the

9    polygraph unit and the potential discipline of folks who were

10   involved or supervised the polygraph unit, those kinds of

11   topics.  I mean, at first blush it seems like that's a lot of

12   years to be asking for.

13             UNIDENTIFIED MALE SPEAKER:  May I speak to that

14   briefly?

15             THE COURT:  Uh-huh.

16             UNIDENTIFIED MALE SPEAKER:  I was listening, Judge,

17   when I heard you say to some other lawyers standing up here a

18   minute ago that ten years is a long time.  However, this is a

19   very focused unit.  This is a unit with three people and no

20   rules so when we say --

21             THE COURT:  Well, I'm sure the City would dispute

22   that.

23             UNIDENTIFIED MALE SPEAKER:  Would disagree.  Or at

24   least no supervisors, let's go with that.  This happened --

25             THE COURT:  There were really no supervisors with

```
 1   that unit?  Who did they report to?  Who they were evaluated

 2   by?  People --

 3            UNIDENTIFIED MALE SPEAKER:  I'm not prepared to

 4   answer that.

 5            UNIDENTIFIED MALE SPEAKER:  At the time there's --

 6   at that time we were part of the forensic services unit so

 7   there was evidence technicians, there's the whole --

 8   polygraph is one of the parts of forensic services so there's

 9   a supervisor of forensic services who is on top -- who

10   supervises --

11            THE COURT:  Those different units within that.

12            UNIDENTIFIED MALE SPEAKER:  -- those different

13   units.

14            THE COURT:  Have you disclosed their identity to the

15   plaintiff?

16            UNIDENTIFIED SPEAKER:  No.

17            THE COURT:  Well, that seems like a good answer to

18   that question.  What you've just described should be

19   disclosed under oath that, okay, the polygraph unit was part

20   of a forensic evidentiary gathering unit and the supervisor

21   of that was whoever it was on top of those divisions so I

22   would expect, you know, you would say that.  But what else?

23            UNIDENTIFIED MALE SPEAKER:  So our main point is

24   this, Judge.  This happened in May of 2005.  That's -- that's

25   when we --
```

1          THE COURT:  That answers one of my questions.

2          UNIDENTIFIED MALE SPEAKER:  Right; and it's a

3  central position in our case that the polygraph unit was used

4  as a technique as a device to get Ms. Harris from Area 5

5  where she was being interrogated to the polygraph unit and

6  the existence of a potential to exculpate herself by giving a

7  truthful polygraph exam was turned against her by telling her

8  she had failed the test and what we want is the other people

9  who worked in the unit for the years that follow.

10          Now at our meet-and-confer, we were told by

11  Ms. Fordyce, Mr. Gibbons' partner, that they think that

12  that's a -- anything that happens after 2005 falls in the

13  category of subsequent remedial measure and we're not

14  entitled to it and we disagree with that on two grounds:

15          The first ground is that we're allowed to know who

16  worked in the -- and by the way, for all practical purposes,

17  and we're going to fight about exactly how this came about,

18  the unit was substantially disbanded in 2013.  We know that

19  for a fact.  So between 2005 and 2013, there were other

20  people who worked in the unit.  We believe we're entitled to

21  know who they were because if the unit was being used for

22  nefarious purposes, we should be able to -- there might be

23  someone who is willing to flip on the City who doesn't work

24  there anymore or there might be someone who we want to depose

25  to see if the practices that we believed in 2005 continued

1    into 2010.  We might want to talk to the people about why the

2    unit was ultimately disbanded.  But we -- at this stage for

3    this narrow of a request at least showing us the picture of

4    who worked in the unit and who their supervisors were and how

5    the unit came to be disbanded in 2013, that '05 to '13 period

6    seems to us reasonable to ask because if you don't allow

7    that, then basically they get to put who we claim are the

8    wrongdoers in 2005 as the only polygraphers that we get to

9    know about are the guys who engaged in what we believe is

10   improper conduct.  One of the --

11           THE COURT:  And are not likely to give you any

12   information.

13           UNIDENTIFIED MALE SPEAKER:  Information.  One of

14   them is a defendant in this case; the two others are not

15   defendants in this case although they happen to be charged in

16   other cases with the same kind of conduct.

17           THE COURT:  Other cases.  Other civil cases?

18           UNIDENTIFIED MALE SPEAKER:  Yes, Judge.

19           THE COURT:  Pending here?

20           UNIDENTIFIED MALE SPEAKER:  I believe so.  We don't

21   have a -- I am not -- I am not the guy on our team who is in

22   charge of chasing the polygraph issues.  It's being done by

23   People's Law Office.  But yes, it's my belief that there are

24   numerous civil cases in the Northern District that have to do

25   with this unit being used in this manner.

1    UNIDENTIFIED MALE SPEAKER:  Your Honor, I think

2  counsel basically acknowledged that they're fishing.  They

3  want names to see if they can interview or depose somebody

4  who might know about some unconstitutional act that were

5  going on in 2005.  They have everyone who was working in the

6  unit in 2005.  They have those records.  Those have been

7  produced.

8    The people who worked in 2006, 2010 and 2013 have

9  nothing to do with what happened in May of 2005.  If they're

10  going to prove their case, they have to prove that some

11  unconstitutional acts occurred in May of 2005 be it through a

12  policy or through a practice.  That's what this case is

13  about.

14    THE COURT:  Was this supervisor the same through

15  that period?

16    UNIDENTIFIED MALE SPEAKER:  I'm sorry?

17    THE COURT:  Was the supervisor of the unit the same

18  through that period?  Was it the same -- you know, that

19  structure that described to me by counsel, did that continue

20  to exist through this period?

21    UNIDENTIFIED MALE SPEAKER:  Through the period after

22  2005?

23    THE COURT:  Yeah.  Let's say --

24    UNIDENTIFIED MALE SPEAKER:  I don't --

25    THE COURT:  -- 2009 to two thousand -- let's just

1  pick 2009.

2          UNIDENTIFIED MALE SPEAKER:  I don't know off the top

3  of my head who the supervisor was ending calendar year 2006

4  to the present.

5          THE COURT:  Was there ever an evaluation of the

6  efficacy of this unit that was prepared for or done at the

7  City?

8          UNIDENTIFIED MALE SPEAKER:  No.

9          THE COURT:  So the --

10         UNIDENTIFIED MALE SPEAKER:  And we've responded to

11  that.

12         THE COURT:  So has the decision -- was there a

13  decision to disband this unit at any point?

14         UNIDENTIFIED MALE SPEAKER:  Disbanding is the wrong

15  word.

16         THE COURT:  Okay.  What's the right word?

17         UNIDENTIFIED MALE SPEAKER:  The people were shifted

18  over to the human resources department because they were

19  doing pre-employment applications for police officers.

20         THE COURT:  Well, that sounds like a very different

21  kind of job.

22         UNIDENTIFIED MALE SPEAKER:  But they're polygraph

23  examinations of pre-employment polygraph (unintelligible).

24         THE COURT:  Right.  So they were doing polygraphs

25  but for a different purpose?

1    UNIDENTIFIED MALE SPEAKER:  My client indicates from

2    time to time they are also used in criminal investigations.

3    It's not that polygraphs have been terminated from the use of

4    criminal investigations.  That's my understanding.  I

5    don't have firsthand knowledge of that but that's my

6    understanding as well.

7    THE COURT:  And you're saying there is no -- there

8    are no documents that reflect what seems to be a fairly major

9    change in the policy with respect to how polygraphs are used

10   at the City of Chicago?  That seems unlikely to me.

11   UNIDENTIFIED MALE SPEAKER:  Well, I think you're

12   assuming facts that counsel just uttered as being truthful

13   but they're not.

14   THE COURT:  No.  I'm assuming --

15   UNIDENTIFIED MALE SPEAKER:  The polygraph --

16   THE COURT:  I'm -- I'm basing the statement I just

17   made on nothing that counsel for plaintiff said.  I'm basing

18   it what the count -- your co-counsel just said which is that

19   these folks have been moved over to primarily deal with

20   administering polygraph examinations to folks that are

21   applying for jobs with the police department which -- and

22   that they only occasionally but they still are involved in

23   criminal investigations which is, it seems to me to be, a

24   rather dramatic shift from what was described in the

25   motion.

1          UNIDENTIFIED MALE SPEAKER:  They're no longer in the

2    forensic division.  Now maybe disbanded is the --

3          THE COURT:  They're in human resources.

4          UNIDENTIFIED MALE SPEAKER:  Correct, Judge.

5          THE COURT:  Well, that's a policy.  It seems to be

6    that that's a -- that potentially is a fairly big shift and

7    what I'm asking you is whether there are any documents that

8    reflect why that happened and have you looked for documents

9    that reflect why that happened because that is not a -- you

10   know, not an insubstantial thing that he's described.  I

11   don't know whether -- there could be great reasons for it but

12   was there some -- is there --

13         UNIDENTIFIED MALE SPEAKER:  Here's my

14   understanding --

15         THE COURT:  Okay.

16         UNIDENTIFIED MALE SPEAKER:  -- and the answer is

17   directly to your question, I believe we have one.  But the

18   shift that you're discussing is not this radical shift that I

19   think might be the impression.  Pre-employment polygraph

20   became a much bigger part of the unit's job when the HR

21   department decided to utilize that department.  So for that

22   reason, they just functionally moved it under HR.

23         THE COURT:  Okay.

24         UNIDENTIFIED MALE SPEAKER:  They still are

25   available, those polygraph examiners are still available to

1    detectives who want to utilize them in a criminal

2    investigation --

3              THE COURT:  Understood.

4              UNIDENTIFIED MALE SPEAKER:  -- just as they've

5    always been.

6              THE COURT:  But here's the problem I have with

7    this -- this is why I think it is a rather big -- it may not

8    be the dramatic shift that plaintiffs see but it seems to be

9    more of a shift than you're acknowledging.  If what you're

10   saying is true, it seems to me that the -- you know, that's

11   a -- there would be more people hired.  In other words, if

12   they were always doing employment stuff but now they've

13   moved -- you know, now that's their focus and they were

14   also -- they were basically just doing criminal stuff and

15   there were three of them doing that and then you shift it

16   over to doing -- moving them into human resources but they

17   still may be working criminal, it seems to me that there

18   would be more people actually doing this.

19             It seems like they were devoted primarily to one

20   purpose and now they're devoted primarily to another but

21   still have some duties with the latter and that means that

22   they're being used -- the inference there for me is they're

23   being used rather less frequently on the criminal side and

24   that that might be the result of some decision-making process

25   and so that's my -- that's what I'm struggling with.

1          It seems like there was a decision to -- with

2     respect to this unit which may have nothing to do with any of

3     the allegations in this case.  The problem is, they don't

4     know that and frankly I don't know that based on what I've

5     heard this morning.

6          UNIDENTIFIED MALE SPEAKER:  Okay.  So if I'm

7     understanding this --

8          THE COURT:  Yeah, yeah.

9          UNIDENTIFIED MALE SPEAKER:  -- we're to look for

10    documents about shift in 2013 --

11         THE COURT:  A shift at any --

12         UNIDENTIFIED MALE SPEAKER:  -- because it may be

13    relevant to what happened in May of 2005?

14         THE COURT:  It may -- depending on what the

15    discussion is in those documents it actually could be.  I

16    mean, is it that unlikely to think that somebody might

17    reference this particular incident or other --

18         UNIDENTIFIED MALE SPEAKER:  Yes.

19         THE COURT:  Well, okay, but you don't know because

20    you haven't actually looked.  Have you?

21         UNIDENTIFIED MALE SPEAKER:  We have; and I can tell

22    you if we had found any documents which reference that to

23    changes premised on allegations in this complaint premised in

24    May of 2005, we would produce those.

25         THE COURT:  Well, how about other allegations that

1   are substantially similar to those in this complaint?

2          UNIDENTIFIED MALE SPEAKER:  Fair enough.

3          THE COURT:  Okay.

4          UNIDENTIFIED MALE SPEAKER:  And I don't think they

5   exist.  We can certainly look.

6          THE COURT:  Problems with the polygraph unit,

7   problems with the way polygraphs were administered, problems

8   with the way people were chosen to do polygraphs, all of

9   these things.  I mean, it's not just whether they mention

10   this particular individual or this case but in general were

11   there issues in and around the use of this unit.  Maybe there

12   weren't and great, that's great for you, but it seems to me

13   that there's relevance to that category of documents.  And

14   I'm not sure I -- I'm not sure that it makes sense to --

15   when -- I mean, I just -- I'm not sure right now whether it

16   makes sense to expand the scope of people who administered

17   polygraphs post the time frame of these events or not because

18   I'm still unsure based on what I've heard this morning when

19   this change occurred and why it occurred and like -- and what

20   the current state of this unit is versus how it was

21   functioning when these events took place.  I don't -- I don't

22   know the answers to the -- to those questions based on what

23   I've heard so I'm not just -- I'm not prepared to just say

24   yeah, you get three -- how many people were doing the

25   polygraphs back when this happened, three people that you've

1    identified, that that's the end especially if the supervisor

2    of that unit stayed the supervisor of that unit and was sort

3    of in charge of administering that unit for a longer period

4    than this time frame.  It's -- that suggests that maybe

5    others could be relevant, though I'm not sure I see why we

6    need '05 to '13 even after your argument, Mr. Chanen.

7            MR. CHANEN:  Well, Judge, I would only just direct

8    you to exhibit -- and I know we gave a big stack of exhibits

9    because we had to have them --

10           THE COURT:  That's okay.

11           MR. CHANEN:  -- we had to have all the discovery.

12   Exhibits 9 and 10 are articles from the Chicago Tribune.  Now

13   I understand, I respect that Mr. Gibbons is going to say you

14   can't take at its word everything that appears in a Tribune

15   article --

16           THE COURT:  Gosh, I hope not.

17           MR. CHANEN:  -- and I'm fine with that and I agree a

18   hundred percent but now we're in discovery in this case and

19   there are a lot of statements in here about the serious

20   problems in the polygraph unit.  Now they may be true; they

21   may not be true.  The City may have cared about them; the

22   City may not have cared about them.  But this article came

23   out in March of 2013; and by November of 2013, there was no

24   longer a polygraph unit in the -- a polygraph unit in the

25   forensic division.

1          And so what we would -- I mean, so that's why we

2    think '13 is important because that's when the City addressed

3    it.  That's when -- if there is such a memo as your Honor

4    just asked about, a discussion, an analysis, a -- because the

5    opposite is even scarier that an article like this Exhibit 9

6    would come out in the Chicago Tribune and the Chicago Police

7    Department would do absolutely nothing about it, that's

8    scarier than finding the memos where they decide to disband

9    the unit.

10          THE COURT:  So I take it your argument is that the

11   time frame isn't -- needs to be expanded because it's

12   possible that these documents, if they exist at all, would

13   reflect events that occurred largely before the time, you

14   know, that would refer to incidents or a series of incidents

15   that occurred substantially before 2013?

16          MR. CHANEN:  Correct, Judge.

17          THE COURT:  So if you limit it --

18          UNIDENTIFIED MALE SPEAKER:  In 2005.

19          THE COURT:  No.

20          UNIDENTIFIED MALE SPEAKER:  This is May of 2005.

21          THE COURT:  Yeah; I understand.

22          UNIDENTIFIED MALE SPEAKER:  Something either

23   happened or didn't happen in May of 2005.

24          UNIDENTIFIED MALE SPEAKER:  But, Judge --

25          THE COURT:  Yeah; but the City's view of it and the

1  witnesses that were involved isn't necessarily limited to

2  2005.  I mean, that's an artificial line to say, okay, that's

3  a -- we look no further, we don't look before and we don't

4  look after.  That doesn't make sense to me.

5  UNIDENTIFIED MALE SPEAKER:  I understand.  And we

6  have looked to see if there's anything relevant that should

7  be produced that reflects back in time to the events in 2005

8  and there are none.

9  THE COURT:  Well, I think what you said before was

10  that you looked specifically to the allegations raised in

11  this complaint and I'm suggesting that your review should be

12  rather more broad than that.

13  UNIDENTIFIED MALE SPEAKER:  But --

14  THE COURT:  It should be -- it should have to do

15  with reasons why this change in how the polygraph unit

16  because it seems to me there clearly was a change in focus.

17  I mean, you can -- we can spin to what extent that it did

18  change but, you know, having it in one place and then moving

19  it to human resources at the City of Chicago, that's a pretty

20  big shift that occurred.

21  UNIDENTIFIED MALE SPEAKER:  Eight years later.

22  THE COURT:  Well, right, but there was a --

23  UNIDENTIFIED MALE SPEAKER:  They're asking you to

24  draw the line now to 2013, '14 and '15 for events that

25  happened in 2005.

1          THE COURT:  Right.

2          UNIDENTIFIED MALE SPEAKER:  And they're just

3   fishing.  They cite articles and then say there must be

4   reasons.

5          THE COURT:  But what's the harm in looking --

6          UNIDENTIFIED MALE SPEAKER:  Pardon?

7          THE COURT:  What's the harm in looking and then

8   answering under verification that there are no documents that

9   have -- that exist between that time frame in 2013 that deal

10  with changes in the polygraph unit for reasons fairly raised

11  in the plaintiff's complaint which doesn't just include this

12  incident but incidents like it or substantially similar,

13  what's the harm in that?  Either those documents exist or

14  they don't exist.

15         UNIDENTIFIED MALE SPEAKER:  That's fair.

16         THE COURT:  If they don't exist, all you do -- all

17  you have to say is they don't -- there is nothing in -- there

18  are no documents that reflect why this change was made.

19         UNIDENTIFIED MALE SPEAKER:  That's fair.

20         THE COURT:  Right?

21         UNIDENTIFIED MALE SPEAKER:  I agree with the

22  Court.

23         THE COURT:  Okay.  Well, I think that's my ruling

24  with respect to that.  What else is left?

25         UNIDENTIFIED MALE SPEAKER:  I really believe that

1    covers --

2              THE COURT:  Wow.

3              UNIDENTIFIED MALE SPEAKER:  -- all of it or if

4    there's some little things that drop out, I think we can work

5    them out.

6              THE COURT:  Okay.

7              UNIDENTIFIED MALE SPEAKER:  Here's the person who

8    knows to the --

9              THE COURT:  Yeah.  Ms. Klein, feel free to jump in

10   whenever; and I apologize to the people that have been

11   waiting so patiently.

12             UNIDENTIFIED FEMALE SPEAKER:  It was fine because

13   I'm learning.

14             THE COURT:  Okay.  She's pro se so it's probably

15   good experience.

16             UNIDENTIFIED MALE SPEAKER:  Yeah, Judge.  If it

17   would be all right and I don't want to --

18             THE COURT:  Yeah.

19             UNIDENTIFIED MALE SPEAKER:  -- counsel either, if we

20   could take a short break, let you call a case --

21             THE COURT:  You may.

22             UNIDENTIFIED MALE SPEAKER:  -- we'll just go through

23   the motion and --

24             THE COURT:  Yeah.  Go ahead, right, and see if

25   there's anything else.  You guys can talk.

1          UNIDENTIFIED MALE SPEAKER:  And also if there are

2    loose ends, there may be things we can just resolve with

3    them.

4          THE COURT:  Sure.  Okay.  Good.  That's great.

5          MS. KLEIN:  Thank you, Judge.

6          THE COURT:  Thank you.

7          UNIDENTIFIED MALE SPEAKER:  Thank you, your Honor.

8          UNIDENTIFIED MALE SPEAKER:  Thank you, Judge.

9      (WHEREUPON the Court turned her attention to another case

10   on her call; after which the following digitally recorded

11   proceedings were had in open court at 10:52 a.m.:)

12         COURTROOM DEPUTY:  Recalling Case Number 14 CV 4391,

13   Harris versus City of Chicago.

14         MS. KLEIN:  Thank you, Judge.  Margot Klein for

15   Harris.

16         THE COURT:  Oh.  You're welcome.

17         MR. CHANEN:  Stuart Chanen for Harris.

18         MR. GIBBONS:  Good morning again.  John Gibbons and

19   Kyle Flynn.

20         THE COURT:  Good morning.

21         MR. KAMIONSKI:  Avi Kamionski (unintelligible).

22         THE COURT:  Good morning to all of you again.

23         UNIDENTIFIED MALE SPEAKER:  So, Judge, thank you for

24   all the time that you gave them.

25         THE COURT:  No problem.

1      UNIDENTIFIED MALE SPEAKER:  We -- there was a loose

2  end and --

3      THE COURT:  Okay.

4      UNIDENTIFIED MALE SPEAKER:  -- then we -- then we

5  had a discussion about it in the hallway and we made good

6  progress but then there -- but there's still a part where we

7  really just don't have agreement.

8      THE COURT:  Okay.  Okay.  What's that?

9      UNIDENTIFIED MALE SPEAKER:  So it was a little bit

10  unclear to us whether we do or do not get the names of the

11  polygraphers.

12      THE COURT:  Right now, no.

13      UNIDENTIFIED MALE SPEAKER:  Okay.  So then that's

14  going affect questions B and C.  In their -- one of their

15  supplemental answers, Exhibit 14, they point to three of the

16  polygraphers who were there up to 2005 and say there are no

17  complaints against them of any kind all the way up through to

18  2015.

19      THE COURT:  All right.

20      UNIDENTIFIED MALE SPEAKER:  Or -- through 2014,

21  okay.  Then they also say that Mr. Bartik who is a defendant

22  in this case had a complaint against him on issues of

23  polygraphy in 2014 and had a complaint filed against him in

24  2015 but that they will not give us any of those documents

25  and to us that doesn't make sense.  It doesn't make sense

1  temporally and it doesn't make sense now.

2          They say it's because it's an ongoing investigation

3  but to us, that's -- it's just not an appropriate answer.  We

4  should be able to get to see those CRs.

5          THE COURT:  He's the defendant in this case.

6          UNIDENTIFIED MALE SPEAKER:  He is a defendant in the

7  case.

8          UNIDENTIFIED MALE SPEAKER:  It's our understanding

9  from the police department that it's an ongoing

10 investigation.  They're in the midst of investigating the

11 allegation we made and because --

12         THE COURT:  What is the allegation?  Are you

13 prepared to say what it is?

14         UNIDENTIFIED MALE SPEAKER:  I'm not because I don't

15 know.

16         THE COURT:  Okay.

17         UNIDENTIFIED MALE SPEAKER:  To me, it's either 2014

18 and 2015.

19         UNIDENTIFIED MALE SPEAKER:  Correct.

20         UNIDENTIFIED MALE SPEAKER:  It sounds like the

21 initiation to the lawsuit.  The initiation to the lawsuit --

22 there's this lawsuit and then another lawsuit --

23         THE COURT:  Right, and apparently --

24         UNIDENTIFIED MALE SPEAKER:  And there's another

25 lawsuit so those lawsuits may initiate an investigation.

```
 1              THE COURT:  Not -- not automatically.
 2              UNIDENTIFIED MALE SPEAKER:  Okay.  Well then --
 3              THE COURT:  Believe me, if there was an
 4    investigation every time somebody filed a complaint against
 5    the police -- the police department, we'd -- you know, there
 6    would be many, many more than there are.  Now that's -- that
 7    doesn't necessarily follow.  So what you're saying is --
 8              UNIDENTIFIED MALE SPEAKER:  Judge, that's in my
 9    experience.
10              THE COURT:  Yeah, yeah.
11              UNIDENTIFIED MALE SPEAKER:  I haven't seen it
12    before.
13              THE COURT:  Yeah.  I mean, it's not an un -- it's
14    not an unreasonable -- hey, the problem is I don't know what
15    this investigation is about so, you know.
16              UNIDENTIFIED MALE SPEAKER:  Well, maybe we'll --
17    Maybe we'll have it, Judge.  I mean, here's what they say:
18    Any additional information related to these complaints cannot
19    be disclosed since the files have not been closed and the
20    investigation is continued.  That's --
21              THE COURT:  You know, I know this has been litigated
22    in other cases, this very issue of --
23              UNIDENTIFIED MALE SPEAKER:  Well, we can go look at
24    it.
25              THE COURT:  And I think you both should look at it
```

1  because it seems to me -- I mean, there -- and again, I could

2  be completely off base and if I am I apologize in advance.

3  But I know this issue has come up where folks that are being

4  sued in the police department have ongoing investigations

5  that are in -- could be in and around the allegations of the

6  particular case as you suggest which doesn't -- it's not

7  like (unintelligible) seems potentially reasonable here and

8  I -- it's my recollection that the judges have allowed

9  some -- you know, if there are witness statements or other

10  materials that at least under a protective order have allowed

11  like the factual information, not necessarily the conclusions

12  that the investigators are drawing, like things that would

13  be, you know, fairly protected either by privilege or, you

14  know, but the actual like statements of -- like the witnesses

15  made a statement that's germane, those have been -- again,

16  this is just, you know, from reading other people's opinions

17  which I do from time to time --

18          UNIDENTIFIED MALE SPEAKER:  Sure.

19          THE COURT:  -- that's my recollection that that's

20  how they've divided the -- that's how they've split that baby

21  in that there is a difference between -- even when something

22  is ongoing.  I mean, that -- I think I need to know more

23  about this.

24          UNIDENTIFIED MALE SPEAKER:  Can we ask for a week to

25  investigate this --

```
 1          UNIDENTIFIED MALE SPEAKER:  Sure.

 2          THE COURT:  Yes.  I mean, I want to --

 3          UNIDENTIFIED MALE SPEAKER:  -- and maybe submit

 4   simultaneous briefs --

 5          THE COURT:  Yeah.

 6          UNIDENTIFIED MALE SPEAKER:  -- regarding on that?

 7          THE COURT:  I mean, I think it's -- I think -- and I

 8   do want to know sort of the answer to the question that we

 9   tossed around a lot about, you know, that any documents, you

10   know, that post-date this incident about this particular unit

11   and what's raised in that because depending on what we say

12   about that, that may close the door on the issue of whether

13   they get other names or it might open it.  I just don't know

14   so I kind of want to know about that.

15          UNIDENTIFIED MALE SPEAKER:  Thank you, Judge.  And

16   then the last thing I'll say about it; and we will take the

17   week.  I'm not asking for a ruling but an example that I

18   think of is if they added a fifth polygrapher or they

19   replaced the polygrapher in 2006 and that polygrapher had a

20   complaint filed against him or her in 2008, it would strike

21   me that given that this is a Monell claim that we're focusing

22   on --

23          THE COURT:  Yeah, policy.

24          UNIDENTIFIED MALE SPEAKER:  -- the policies and

25   practices of the City that the name of that person and the
```

1 complaint history against that person would be appropriate

2 for our Monell claim.  We're at the discovery stage.  I'm not

3 saying it's necessarily admissible but to say that a 2006

4 hire or a 2008 complaint against someone who just didn't

5 happen to be sitting next to Mr. Bartik in 2005 when he did

6 this to Ms. Harris, that doesn't seem to me the right

7 standard in the Monell claim.  We are looking at the course

8 and conduct of the department --

9     THE COURT:  Right.

10     UNIDENTIFIED MALE SPEAKER:  -- for a substantial

11 period of time.

12     THE COURT:  But now you're substantially temporally

13 limiting your class in your example which I'm -- you know, I

14 mean, the --

15     UNIDENTIFIED MALE SPEAKER:  Well, okay.  I mean --

16     THE COURT:  You know what I mean?  The problem I had

17 is you're asking from 2005 until 2013 --

18     UNIDENTIFIED MALE SPEAKER:  Right.

19     THE COURT:  -- and it seems the farther along you

20 get, the farther this has -- I mean, the more it does seem

21 like a fishing expedition.  Now you just want --

22     UNIDENTIFIED MALE SPEAKER:  Judge, one of the

23 ways --

24     UNIDENTIFIED MALE SPEAKER:  The Monell claim has to

25 be predicated on actions that led to the unconstitutional

1  behavior in May 2005.  It's a -- Monell is a backward-looking

2  event.

3          THE COURT:  Well, right, but it's -- I mean, you

4  know, I don't think it's too -- it's too crazy to say that

5  something that happened relatively quickly after the event

6  depending on what it was would likely lead to or potentially

7  lead to admissible evidence.

8          UNIDENTIFIED MALE SPEAKER:  Hypothetically I can see

9  that argument.

10         THE COURT:  You can see that argument.  The farther

11 along you get --

12         UNIDENTIFIED MALE SPEAKER:  I can see we'll

13 foreclose that.  I'm pretty certain this is ripe but we can

14 inform the Court formally when I get the furthest.

15         THE COURT:  Yeah.  I mean, I think that that's a

16 good idea.

17         UNIDENTIFIED MALE SPEAKER:  There are no CRs for any

18 polygrapher in 2006 definitely.  I'm fairly comfortable with

19 that.

20         THE COURT:  Well, you should -- if you're willing

21 to -- you know, if you're willing to say that under

22 verification, I mean, I think they'd like to know that.

23 Right?

24         UNIDENTIFIED MALE SPEAKER:  Sure.  I mean, you know,

25 you understand.

1          THE COURT:  I do.

2          UNIDENTIFIED MALE SPEAKER:  The City gets sued every

3  day and I have to -- if one side takes a position and answers

4  a question in this courtroom, next week I have Jon Loevy

5  telling me the City agreed to that question in front of Judge

6  Cox, why aren't they answering it now.  We live with that

7  argument all the time and I understand -- I respect the

8  ruling.

9          THE COURT:  I understand that concern, I do, and

10  I've been -- I've had that happen to me where I feel one way

11  and then I hear that -- you know.  But I do think that -- I

12  do think the City here is sometimes answering questions more

13  than they need to.  I mean, the facts that you've just

14  posited about there not being CRs for these particular

15  polygraphers in the time frame, it seems to me that would be

16  something you would want to put out there in this case.  I

17  mean, just hypothetically.

18          UNIDENTIFIED MALE SPEAKER:  Again, it's on this

19  case.

20          THE COURT:  I know but I think --

21          UNIDENTIFIED MALE SPEAKER:  It serves my purpose in

22  this case.

23          THE COURT:  -- you know, in the end your job is to

24  defend the City in this case.  I mean, that's what you're --

25  that's what you were hired to do.  And if it serves your

1  client in this case, it seems to me you should consider doing

2  it but that's way beyond what I needed -- and that's -- we're

3  just talking now.

4         UNIDENTIFIED MALE SPEAKER:  Precedent gets set and

5  that's dangerous.

6         THE COURT:  We're just talking now.  What -- all

7  right.  So you guys want to file simultaneous briefs on these

8  last remaining issues?

9         UNIDENTIFIED MALE SPEAKER:  That's fine, Judge, and

10  we'll keep talking --

11         THE COURT:  Okay.  When would you --

12         UNIDENTIFIED MALE SPEAKER:  And we'll keep talking.

13         THE COURT:  And keep talking because maybe -- so

14  when would you like to do that given everything that else

15  that you've --

16         UNIDENTIFIED MALE SPEAKER:  I have one bit of

17  clarification which may impact that answer.

18         THE COURT:  Sure.

19         UNIDENTIFIED MALE SPEAKER:  Since Mr. Flynn has

20  been --

21         THE COURT:  Yeah.

22         UNIDENTIFIED MALE SPEAKER:  -- and Ms. Fordyce have

23  been the ones really conducting discovery --

24         THE COURT:  Yeah.

25         UNIDENTIFIED MALE SPEAKER:  -- I'm told that we

1    referenced 38 witnesses in our -- 30 or so police officers,

2    some from the ME's office, some from the family and some fact

3    witnesses who were there, under the Court's present order, we

4    have to go and amend -- interview and amend responses for 38

5    people.  I'm just telling the Court now I don't know that we

6    can physically do that even with the best of efforts in 14

7    days.  We will try.

8         THE COURT:  Well, do your best and then report back

9    to me on how you're doing.

10        UNIDENTIFIED MALE SPEAKER:  Okay.

11        THE COURT:  And that's all I can -- I mean, I

12   understand what you're saying.  That's all I can say in

13   response.  So in terms of scheduling, what makes sense?  You

14   propose.  I get -- my back seems to hurt when I sit too

15   much.

16        UNIDENTIFIED MALE SPEAKER:  So, Judge, we'll keep

17   talking and clarifying --

18        THE COURT:  Yeah.

19        UNIDENTIFIED MALE SPEAKER:  -- and gathering

20   information and asking questions of one another and if we can

21   get simultaneous short briefs a week from today.

22        THE COURT:  Telling me what's still out -- telling

23   me what's still outstanding and what your legal argument is

24   and I'll rule.

25        UNIDENTIFIED MALE SPEAKER:  And hopefully some of

1    the things we've agreed upon.

2         THE COURT:  Yeah, yeah.  And if -- is a week

3    sufficient?

4         UNIDENTIFIED MALE SPEAKER:  If --

5         THE COURT:  All right.

6         UNIDENTIFIED MALE SPEAKER:  Part of it is that

7    everyone is very focused on deps so almost getting --

8         THE COURT:  Yeah.

9         UNIDENTIFIED MALE SPEAKER:  -- doing it on a

10   narrower time frame actually may help everybody.

11        THE COURT:  Okay.  So today is the 10th so that's

12   the 17th.  And then why don't I -- why don't I see you then

13   on the 18th?  I'll set it for like 10:00 o'clock so you don't

14   have to sit through the call, if you're available.  If that

15   doesn't work -- I'd like to like see you before -- I'm taking

16   off the week of Thanksgiving and I'd like to see you before I

17   adjourn.

18        UNIDENTIFIED MALE SPEAKER:  There's a deposition on

19   Wednesday at 10:00 o'clock.

20        THE COURT:  Okay.  So what makes sense then?

21        UNIDENTIFIED MALE SPEAKER:  James Kelly is getting

22   deposed.

23        UNIDENTIFIED MALE SPEAKER:  Where?

24        UNIDENTIFIED MALE SPEAKER:  At (unintelligible).

25        UNIDENTIFIED MALE SPEAKER:  All right.  So we --

1  that's going to be taken by somewhere from (unintelligible)

2  so it doesn't affect Margot and me so we could do the 18th

3  but --

4        THE COURT:  Okay.

5        UNIDENTIFIED MALE SPEAKER:  -- obviously you need to

6  be there, right, you two or you and Tiffany?

7        UNIDENTIFIED MALE SPEAKER:  Right, at the dep.

8  Correct.

9        UNIDENTIFIED MALE SPEAKER:  Could we do 9:30 and be

10  first on the call?

11        THE COURT:  Yeah, or you could do even 9:00 o'clock

12  if you can get here.  I may -- I mean -- yeah.

13        UNIDENTIFIED MALE SPEAKER:  9:00 o'clock?

14        UNIDENTIFIED MALE SPEAKER:  That's good.

15        THE COURT:  Yeah.

16        UNIDENTIFIED MALE SPEAKER:  Thank you, your Honor.

17        THE COURT:  No problem.  Good luck.

18        MS. KLEIN:  Thank you, Judge.

19        THE COURT:  Interesting case.  And if you do want to

20  try to settle it, I'm here.  I don't have that authority now

21  but, believe me, Judge Darrah would -- may be too happy to --

22        UNIDENTIFIED MALE SPEAKER:  Thank you, your Honor.

23        UNIDENTIFIED MALE SPEAKER:  Thank you, your Honor.

24     (Which concluded the proceedings in the above-entitled

25  matter.)

1                   C E R T I F I C A T E

2           I hereby certify that the foregoing is a

3   transcription of proceedings transcribed from digital

4   proceedings held before the Honorable Susan E. Cox on

5   November 10, 2015.

6

7   */s/Laura LaCien*

8   _____        November 16, 2015
    Laura LaCien                             Date
9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25