# EXHIBIT 29

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS**
**REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

February 8, 2016

Stuart Chanen, Esq.
Valorem Law Group
35 East Wacker Drive, Suite 3000
Chicago, IL 60601

Re:    *Nicole Harris v. City of Chicago, et al*.
       Case No. 1:14 CV 04391
       United States District Court, Northern District of Illinois

Dear Mr. Chanen,

        This report is per your request in the above-referenced case of *Nicole Harris v. City of Chicago et al*.

## I. Qualifications

        I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine.  My areas of research, training, and specialization include social psychology, criminology, sociology, and law.  For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions.  In 1992 and 1993, I spent nine months doing field research inside the Oakland Police Department, which included sitting in on and contemporaneously observing one-hundred twenty-two (122) felony interrogations; in 1993, I also observed sixty (60) fully videotaped interrogations in the Vallejo and Hayward Police Departments in northern California.   Since then, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 2

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications.  My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court on multiple occasions.  To date, I have consulted with criminal and civil attorneys on approximately eighteen- hundred (1,800) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and eleven (311) times in state, federal, and military courts in thirty-three (34) states plus the District of Columbia, including thirteen times in federal courts and seven times in military courts.  I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report as Appendix A.  A list of my court and deposition testimony in the last four years is attached to this report as Appendix B.  I am being compensated for my time at the rate of $375 per hour.  My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the materials listed in Appendix C to this report.

## III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination, and indicia of unreliability.  I will then discuss these issues as they relate to the investigation, interrogations and confession statement of Nicole Harris.[1]

More specifically, in my professional opinion:

1)        It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;

2)        Nicole Harris's account of her multiple interrogations during her over 30 hours at Area 5 on May 14-16, 2005 is consistent with the social science empirical research literature on

---

[1]        Because police investigators failed to electronically record the interrogations of Nicole Harris, we are forever deprived of an objective record of what occurred during these interrogations.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 3

the types of interrogation techniques and investigative practices that are associated with increase the risk of and are known to cause innocent individuals to falsely confess[2];

3)      The accounts of the various Chicago police investigators who detained and/or interrogated Nicole Harris during her over-30-hours at Area 5 are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;

4)      In her account of what occurred during her police custody and/or interrogations on May 14-16, 2015, Nicole Harris describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven.  Nicole Harris describes interrogation procedures whose goal was not to find the truth but to break down her denials of guilt and elicit from her a confession to killing her son Jaquari Dancy;

5)      Before interrogating her, the investigators misclassified Nicole Harris as guilty when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about;

6)      The initial spontaneous "confession" attributed to Nicole Harris, which she denies, is inconsistent with empirical social science research on police interrogation and confessions, as well as with logic and the physical evidence in this case;

7)      The multiple interrogations described by Nicole Harris were both physically and psychologically coercive:  Nicole Harris's account of what occurred during her multiple interrogations contains interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

8)      Nicole Harris' account of what occurred during her multiple interrogations contains numerous interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent. These included false evidence ploys, minimization, implied and explicit threats, and implied and explicit promises;

---

[2]      There is a factual dispute as to when the questioning of Ms. Harris began at the police station.  Ms. Harris believes that it started when she first arrived at the station, which was at approximately 7:00 p.m., while the Detectives assert that they did not begin questioning her until 9:00 p.m., which is the first GPR covering an interview of Ms. Harris.  I do not attempt to resolve this factual dispute, but will generally refer to the total time between her arrival at the station and the end of her videotaped confession as her "over 30 hours at Area 5."

There is also a factual dispute about whether Ms. Harris was in police custody from her arrival near 7:00 p.m. and her being placed into custody at 12:45 a.m.  The police assert that she was free to leave, and she asserts that she did not know she was free to leave.  Regardless how that dispute is resolved, however, there is no dispute that Ms. Harris was in police custody for more than 24 hours before giving her videotaped statement of confession.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 4

9)     Nicole Harris was also at a heightened risk during her interrogations of making and/or agreeing to a false and unreliable confession because of her general personality traits (i.e., *personal* risk factors), specifically her submissiveness and high suggestibility, as well as specific personality traits she had at that time (her overwhelming grief over the loss of her son);

10)    The interrogations described by Nicole Harris involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Nicole Harris' confession statement would, misleadingly, appear to be detailed and self-corroborating;

11)    The confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

### IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions.  This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community.  Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community and therefore accepted expert testimony in criminal and civil rights litigation.[3]

---

[3]    See *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of a civil rights plaintiff's false confession expert Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of a civil rights plaintiff's false confession expert Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) *aff'd*, 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's false confession expert Richard Ofshe).  In addition to these cases, which have allowed and upheld the testimony of false confession experts, a unanimous court in *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012), although it did not reach that precise issue, nevertheless referred to the following five articles in the next paragraph as "the leading research on false confessions" and held that these articles and their findings establish that there are several reasons to doubt the reliability of Ms. Harris's confession *in this case*.  *Id.* at 631-32 & n.12.

Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to ... extract confessions"); Gisli H. Gudjonsson et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth,* 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police); Brandon L. Garrett, *The Substance of False Confessions,* 62 Stan. L.Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 5

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[4] The fact that police-induced false confessions can and do occur has been well-documented and is not disputed by anyone in the law enforcement or academic community. Indeed, leading police interrogation training manuals have, at least since 2001, contained entire chapters and sections on the problem of police-induced false confessions and what investigators need to know to better understand and avoid eliciting false confessions from innocent suspects.[5] Social scientists have documented approximately four-hundred and fifty to five-hundred proven false confessions in America since the early 1970s,[6] but this is surely an underestimate and thus the tip of a much larger iceberg for several reasons. First, false confessions are difficult for researchers to discover because neither the state nor any organization keeps records of the interrogations producing them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of proving the confessor's *absolute* innocence. As a result, Richard Ofshe and I coined the term "proven false confession" in 1998,[7] showing that there are only four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

---

that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation."); Richard A. Leo, *False Confessions: Causes, Consequences, and Implications,* 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's postadmission narrative.... If the entire interrogation is captured on audio or video recording, then it may be possible to trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his postadmission narrative."); Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions,* 32 Loy. U. Chi. L.J. 337, 339–41 (2001) (*accord*).

4   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

5   See, for example, *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers, Inc.) at 411-448; and David Zulawski and Douglas Wicklander (2002). PRACTICAL ASPECTS OF INTERVIEWING AND INTERROGATION, 2nd Edition (CRC Press) at 73-104.

6   The largest published study of proven false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, see Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE. At that time, there were approximately two-hundred and fifty to three-hundred proven false confessions in the documented literature. Since 2004, Steve Drizin, Gillian Emmerich and I have collected an additional two-hundred proven false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

7   Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 6

1) when it can be objectively established that the suspect confessed to a crime that did not happen;
2) when it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;
3) when the true perpetrator is identified and his guilt is objectively established; and/or
4) when scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of proven false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been thousands (if not tens or hundreds of thousands) more police-induced false confessions than researchers have been able to discover and classify as proven false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[8]

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[9] Police detectives receive specialized training in psychological interrogation techniques; most people do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

---

[8]  Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," Law and Human Behavior, 31, 381-400.

[9]  *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008), "An Empirical Basis for the Admission of Expert Testimony on False Confessions," *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011) "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" in *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010), "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" in *The Journal of Legal Empirical Studies,* 7, 231-247.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 7

## V. The Social Psychology of Police Interrogation[10]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation. To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[11] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting unreliable confessions or statements.

Contemporary American interrogation methods are structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess. Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[12] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

---

[10] See Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications." *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

[11] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room," In William O'Donohue, ED (2004), *Handbook of Forensic Psychology* (San Diego: Academic Press). Pp. 897-996.

[12] *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, see Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 8

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation. [13] Investigators also use scenarios to plant

---

[13]   See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 332.( "The goal of interrogation is therefore to decrease the suspect's

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 9

ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements.

*Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in their most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower

---

perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 10

criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* incentives can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[14] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had

---

[14]    This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 11

the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

## VI. The Three Types of False Confessions

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in the United States. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[15] These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt. Regardless of type, false confessors typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

## VII. The Three Sequential Police Errors
## That Can Lead to False (But Sometimes Detailed) Confessions

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big

---

[15]   *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 12

difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true. This is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[16]

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit.[17] Properly-trained police interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime. Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to

---

[16]  Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[17]  Although the "Reid" Manual (CRIMINAL INTERROGATION AND CONFESSIONS by Fred Inbau et al.) did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," implicitly, if not explicitly, suggesting that police interrogator do know that suspects can be made to falsely confess to crimes they did not commit.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 13

demonstrate, independent knowledge of the crime scene details and case facts.  Properly-trained police interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime.  Instead, they will let the suspect supply the details of the case independently.  Properly-trained police interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence.  Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[18]

## VIII. Populations with Particular Vulnerability in the Interrogation Room

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession.  This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes juveniles and individuals with a low IQ or low-level cognitive functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures.  Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations.  Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.

## IX. Evaluating the Reliability of Incriminating
## Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases.  To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission

---

[18]  Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*.  Vol. 88, No. 2.  Pp. 429-496.  This observation has been made in the police interrogation training literature as well.  See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 14

narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[19]

      The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that is full of gross errors and disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination, the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

      The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Properly trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence. For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge. Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

---

[19]   *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 15

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[20] This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because properly-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides a gold mine of potential evidence to the unbiased, properly-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

---

[20]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).   CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 16

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This problem is discussed in detail in the following section.

## X. The Problem of Contamination

The post-admission narrative process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[21] In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened— the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his or her emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know.

The problem of contamination in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[22]. Because they are trained to presume the guilt of those whom they interrogate, American police assume that they are interrogating suspects who already know the correct crime facts. But this is not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative. Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration. After police interrogators have

---

[21] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

[22] Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 17

contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading specialized knowledge."[23] In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators. Of course, if the interrogation process is not electronically recorded, the interrogator is free to assert that these crime facts were volunteered by the suspect and the trial devolves into a swearing contest between the suspect and the interrogators over who was the source of the details in the confession. If the entire process is recorded, however, then it may be possible to trace the contamination.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[24] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[25]

In sum, the problem of contamination means that when applying the fit test to assess the reliability of the confession, it is essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

## XI. The Interrogations and Confession Statement of Nicole Harris

### A) Nicole Harris' Description of Her Custody and Interrogations on May 14-16, 2005

According to Ms. Harris, on May 14, at approximately 6:15 p.m., as she was arriving at the hospital, the doctors pronounced Jaquari dead, which caused her to collapse and scream in grief. She was subsequently taken to the hospital chapel, where she and her then fiancé Sta-von Dancy started to grieve with their 5-year old son Diante. Soon thereafter, at

---

[23]  Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).
[24]  Brandon Garrett (2011). CONVICTING THE INNOCENT (Harvard University Press)
[25]  Brandon Garrett (2015). "Contaminated Confessions Revisited," Forthcoming in *University of Virginia Law Review*.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 18

approximately 6:45 p.m., Chicago police detectives approached her at the hospital chapel and asked her to come to the police station, claiming it was standard procedure. Ms. Harris requested to see Jaquari before going to the station, but the investigators denied her request. They did, however, indicate that they she would be able to return and see Jaquari.

Too grief-stricken to drive, she asked police to drive her to the station. The police drove her and Sta-Von to the station separately. When they arrived at the station at approximately 7:15, Ms. Harris was put into a room with Diante and Sta-Von was placed in a separate room.

According to Ms. Harris, she and Diante were placed in the "Butterfly Room" or "Quiet Room," where police investigators questioned her. Ms. Harris reports that she did not feel free to leave. Shortly after 11:00 p.m., DCFC Social Worker Scott Peterson arrived at Area 5. He subsequently took Diante from Ms. Harris. Immediately afterwards, investigator moved her out of the Butterfly room and one of the investigators shoved her into another room, yelling at her that she was "under arrest for murdering her fucking son." The investigator also pushed her onto a bench, while handcuffing her arm to a bar over the bench. Several investigators then interrogated her, repeatedly accusing her of lying and of playing games with them, as she repeatedly denied killing her son. According to Ms. Harris, she asked for a lawyer but they told her that she did not need one. Ms. Harris repeatedly asserted her innocence and told them she was telling the truth, crying throughout. Berating and mocking her for crying fake tears, the investigators repeatedly demanded that she stop lying to them and accused her of playing games with them. The investigators also told her, falsely, that Sta-von thought she could have murdered Jaquari.

At some point, the investigators told her that she needed to take a polygraph, but they could not schedule it until the next day. So they left her in the interrogation room overnight, with no bed. Ms. Harris was now under arrest. Ms. Harris reports that she was not able sleep and that she pounded on the door to the interrogation room, which was locked from the outside, in order to go to the bathroom. Only after an hour had passed was she allowed to go to the bathroom.

The next day, at approximately 11 a.m., the investigators took Ms. Harris to be polygraphed by Officer Bartik. According to Ms. Harris, Bartik administered the polygraph examination to her for approximately an hour. After concluding the exam, Bartik told Ms. Harris, falsely, that she failed the polygraph, accused her of lying, pissing him off, and acting like a monster. She further testified that an investigator came into the room where Bartik was interrogating her and yelled at her, berated her, and jabbed her in the shoulder. Ms. Harris reports that she tried to ask for an attorney, but was told that she did not need an attorney if she was telling the truth. Ms. Harris reports that she was crying, feared for her life, and was completely exhausted. She had repeatedly told Bartik and the other investigators that she did not kill her son and had been telling the truth about this the whole time, but that no one was listening to her.

According to Ms. Harris, other investigators entered the polygraph room and continued the aggressive interrogation. Ms. Harris was threatened that if she did not cooperate and confess

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 19

to killing her son, she would spend the rest of her life in prison. Another investigator repeated the threat, telling her that she killed her son and that if she did not confess to killing her son, the state would "slam her ass," the investigators would turn her case over to the state, and she would spend the rest of her life in prison and never be able to see her son Diante again. However, if she cooperated and confessed, one of the investigators told her, the investigators could help her. Instead of being charged with first degree intentional murder and spending the rest of her life in prison, she would be charged with voluntary manslaughter, and one of them explained to her how the different states of mind factored into the different punishment she could receive.

She also reports that she was told that if she admitted to killing Jaquari, she could go home, that her bail would be set at a low amount like $15,000, her father could come get her, and that they could fight the case from the outside. Ms. Harris reports that she was devastated, terrified, and confused and thus subsequently started to agree with whatever the investigators told her and asked of her. She also described feeling hopeless, that nothing she said could change their minds, and the only way for her to escape this coercive interrogation was to tell the investigators what they wanted to hear so that she could go home.

Eventually the investigators took Ms. Harris back to the Area 5 station house, where they rehearsed her confession statement. The investigators had been coaching her all along, telling her what she did (*e.g.*, that she got angry, that she had whipped Jaquari, that she pulled the elastic down from the bed sheet, that she put it around Jaquari's neck four or five times), and she repeated back to them the version of events that they had wanted to hear. Again, the investigators told her that by making the statement she would be able to avoid a first degree murder charge, secure a low bond, and be able to go home. They repeatedly rehearsed the statement with her. They also told her that she needed to repeat the statement on tape and show remorse. Ms. Harris reports that she was exhausted, devastated, and wiped out.

ASA O'Reilly was present at the stationhouse, and Ms. Harris complained to O'Reilly that she was mistreated by the detectives, but he did not do anything about it. Subsequently, ASA Grogan arrived to take her statement, and Ms. Harris complained to her too that she [Ms. Harris] had been mistreated by the detectives, including that she had been physically and psychologically coerced by them into agreeing to make her statement. As with ASA O'Reilly, ASA Grogan did nothing about these complaints. Finally, after nearly thirty hours in police custody from May 14 at 7:15 p.m. to May 16 at 1:00 a.m. and after multiple interrogations, Ms. Harris gave a false confession on videotape in which she stated that she had killed Jaquari and provided the details and the scripted narrative that the detectives had fed her and pressured her into repeating back.

### B) The Chicago Police Investigators' Account of Nicole Harris's Custody and Interrogation on May 14-16, 2005

According to the Chicago police detectives, Ms. Harris was first questioned at the Area 5 police station on May 14, at approximately 9 p.m. The detectives describe this session as consisting of interview-like questions in which they were coming in and out of the interview

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 20

room to ask questions as part of their death investigation. Approximately four hours later, on May 15, at around 12:45 a.m., the investigators state that they "confronted" Ms. Harris with what they regarded as "inconsistencies" in her answers, specifically that Dinajia Arnold, an 8-year old girl who lived next door had seen Ms. Harris hitting Jaquari and Diante with a belt earlier that day (May 14, 2005), information that Ms. Harris had withheld from them. According to the Detectives, immediately after this confrontation, Ms. Harris broke down, started crying, and spontaneously stated – not in response to a question – that she wrapped the telephone cord around Jaquari's neck, and then wrapped the elastic band from the bed sheet around his neck, to make it look like an accident. According to the detectives, they asked her no questions at this point, placed her under arrest, read her the Miranda rights, and moved her from the "Butterfly" Room to a locked interrogation room, Interrogation Room A. According to detectives, Ms. Harris stated that the reason the strangled Jaquari was because of he had been outside playing despite her telling him earlier in the day to only play inside. This process, according to Detectives, took approximately seven minutes. When asked why they did not ask Ms. Harris any follow-up questions at this time, the detectives asserted that it was because Ms. Harris was so emotional that she would not answer follow up questions following her confession.

According to the detectives, approximately one hour later, May 15, at 1:45 a.m., when they returned to the interrogation room to tell Ms. Harris that the Felony Review prosecutor was on the way to the station, Ms. Harris recanted her alleged "spontaneous" confession and denied harming Jaquari.

At approximately 2:25 a.m., the investigators asked Ms. Harris if she would be willing to take a polygraph exam, and Ms. Harris agreed to do so. They told her, however, that the polygraph exam could not be scheduled until the following morning. The detectives then left Ms. Harris in the locked interrogation room overnight.

On May 15, at approximately noon, the detectives transported Ms. Harris to the Chicago police polygraph unit, where Officer Bartik administered a polygraph exam. According to Bartik, he told Ms. Harris that the results of the exam were inconclusive. After Bartik had informed Ms. Harris of this, he and other investigators continued to question Ms. Harris, imploring her to tell the truth. The investigators claim that shortly after 4:00 p.m., Ms. Harris made another, second confession to killing Jaquari, this time stating that she strangled Jaquari because he had come out of the bedroom looking for food. Detectives assert that this time Ms. Harris stated that she spanked Jaquari again, then placed Jaquari on the upper bunk, put the dangling elastic cord once around Jaquari's neck, and then left the room.

According to detectives, they returned with Ms. Harris to the Area 5 police station, arriving between 6:00 and 7:00 p.m., and they continued to question her at Area 5. They testified that they again confronted her with inconsistencies, this time regarding the manner in which Jaquari died, telling her that it was physically impossible for Jaquari to have fallen from the top bunk to the floor because of the bed rail. Eventually, according to the Detectives, Ms. Harris changed her account once again, stating this time that she had grabbed the elastic cord that was dangling from the bed and wrapped it four or so times around Jaquari's neck until he

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 21

stopped crying. When she saw blood coming from his nose, she left the room, leaving Jaquari on the floor.

Ms. Harris was subsequently questioned by ASAs O'Reilly and Grogan, to whom she confessed. Finally, on May 16, at approximately 1 a.m., ASA Grogan made the 23-minute videotape of Nicole Harris confessing to strangling Jaquari.

The investigators denied yelling at Ms. Harris; calling her names; berating her; mocking her; chaining or handcuffing her to a wall; or pushing or poking her, They further denied that Ms. Harris made any requests for counsel; that they denied her access to counsel; that they threatened her with harsher punishment, including that she would go to prison for the rest of her life on a first degree murder charge if she did not confess; or that she would never see Diante again if she did not confess. Finally, they deny that they promised her leniency (involuntary manslaughter) and/or the ability to get a reasonable bond to escape custody if she did confess.

## XII. Professional Opinions

Because Chicago police investigators only recorded 23 minutes of the thirty hours Nicole Harris was in the Area 5 police station, circa 7 p.m. on May 14, 2005 to circa 1:23 a.m. on May 16, 2005, there is no objective record of what occurred during her interrogation sessions. Prior to the videotape being turned on for 23 minutes at approximately 1 a.m. on May 16, 2005, the only, highly imperfect, record that exists of Ms. Harris' multiple interrogation sessions are the recollections of the various participants: Nicole Harris and the various Chicago police officers who testified at her pre-trial hearings, her trial, and subsequently in deposition testimony in this case. This case therefore presents a classic swearing contest: the accounts provided by Nicole Harris and the various Chicago police detectives almost could not be more different.

I am neither a fact witness nor a finder of fact, and therefore it is not my role in this case to decide whose version of the facts is more accurate. In addition, the only audio or video tape of the investigators' interrogation of Ms. Harris is the final 23 minute videotaped confession statement. None of the preceding almost 30 hours is recorded. While the officers did create reports briefly mentioning parts of these encounters, those reports are generally limited in their detail, and in any event, the officers' testimony sometimes contradicted the reports. I therefore cannot opine about whose account of what occurred during the off-tape interrogation sessions and lengthy custody is more factually accurate nor is it my role to do so. I can only evaluate the accounts provided by the various participants of these off-tape interrogations in light of decades of empirical social science research on the psychology, practice, and effects of American police interrogation and the elicitation of confession evidence. In the remainder of this report, I will apply the findings of this empirical social science literature to each set of accounts of the many hours of off-tape interrogation, discussing the implications and concerns that it raises for each set of accounts and offering my professional expert opinions.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 22

## (A) Nicole Harris Description of Her Interrogations from May 14-16, 2005

In her testimony at trial, as well as in her subsequent deposition testimony, Nicole Harris provides a robust account of what she recalls occurring during her off-tape interrogation sessions and how and why the Chicago police investigators moved her from denial to admission and then a full confession to a murder of which she has now been declared factually innocent. The multiple interrogations of Nicole Harris utilized numerous techniques that the empirical social science research has shown significantly increase the risk of eliciting unreliable and false confessions when applied to innocent suspects. These include:

1) *Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias.*[26] Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[27] When investigators begin with or arrive at a premature presumption of guilt, they seek to build a case against an individual whose guilt they assume *a fortiori* -- rather than seeking to even-handedly collect factual information and objectively investigate a case. Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis. This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, misinterpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[28] Most significantly, social science research has demonstrated that investigators' pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[29]

According to Nicole Harris, the Chicago police investigators who interrogated her almost from the beginning assumed that she had murdered Jaquari, even though they had no evidence that his death was a crime or that she had caused it, and they quickly became accusatory and confrontational. Ms. Harris reports that from the moment DCFS social worker Scott Peterson took Diante from her on May 14th at approximately 11:20 p.m., Chicago investigators repeatedly

---

[26] See Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation." *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011), "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions." *Law and Human Behavior*, 35, 452-465.

[27] See Carol Tavris and Elliott Aronson (2007*). Mistakes Were Made* (But Not By Me). (Harcourt Books).

[28] See Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

[29] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 23

accused her of murdering Jaquari, repeatedly accused her of lying when she denied that she killed Jaquari, and repeatedly mocked, belittled, and/or called her names, including as she was crying. If Ms. Harris's account is accurate, the Chicago police investigators misclassified her as guilty when, in fact, no evidence linked her to the death of her son Jaquari or even suggested that he had been murdered. One of the most fundamental law enforcement standards of American police interrogation is to thoroughly "investigate before you interrogate," as the leading interrogation training manual in America states.[30] But that did not happen in Nicole Harris's case. Instead, the investigators did little actual investigation of Jaquari's death, and whether it was a crime, prior to launching into a guilt-presumptive accusatory interrogation whose goal was to elicit a murder confession from Ms. Harris without regard to her innocence. If Ms. Harris' account is accurate, the detectives' investigative failures and unwavering presumption of guilt led to the tunnel vision and behavioral confirmation bias that has been documented in so many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[31]

   2) *Lengthy Interrogation and Sleep Deprivation*. Lengthy interrogation/custody and sleep deprivation are two related *situational* risk factors for making or agreeing to a false confession during police interrogation.[32] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[33] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[34] The Reid and Associates police interrogation training manual specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[35] Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[36] especially where investigators use physically or psychologically coercive

---

[30]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[31]   Keith Findley and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases," University of Wisconsin Law Review, 291-397.

[32]   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[33]   Richard A. Leo (1996). "Inside the Interrogation Room," Journal of Criminal Law and Criminology, 86, 266-303. See also Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[34]   Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[35]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Gaithersburg, Maryland: Aspen Publishers, Inc) at 597.

[36]   Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 24

methods.[37]  It can also lead to sleep deprivation, which, as mentioned earlier, heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[38]  The longer an interrogation lasts, the more pressure investigators bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission.  Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions because breaks between accusation and questioning add to the stress and fatigue of the interrogation and  sometimes is used as an interrogation technique itself.

According to Nicole Harris, she was interrogated multiple times over the almost thirty hours that she was at Area 5 and the polygraph unit from May 14 to May 16, 2016.  Even though Ms. Harris was in a shocked and grief-stricken state following the death of her 4-year old son, she was left alone overnight at the Area 5 police station on May 14th in a locked interrogation room with no bed or comfortable space in which to sleep, and she reports that she continued to be harshly interrogated, off and on, throughout the following day on May 15th and then into the early morning hours of May 16th.  Ms. Harris reports that she was unable to sleep at the police station and became increasingly fatigued, worn down, and psychologically spent by the aggressive interrogation.  It appears that Ms. Harris had little, if any, sleep in the over 38 hours from the time she woke on May 14 until the time she was videotaped in the early morning hours of May 16.  Ms. Harris not only suffered from a lack of significant sleep during her lengthy hours in police custody, but she was not provided with much food during her interrogations and did not eat the little she was given.  (Ms. Harris identified being given one McDonald's meal, which she says she did not eat.)  Even compared to most *proven* false confessions, the length of time during which Ms. Harris was interrogated and/or in custody for purposes of interrogation, was extraordinary,[39] and therefore, along with the sleep deprivation and lack of food, it became a potent risk factor for false confession.

3) *False evidence ploys*.  Police interrogators routinely tell criminal suspects that the evidence establishes their guilt:  if police possess real evidence, this is called a true evidence ploy.  If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy.  The social science research literature has demonstrated that false evidence ploys are virtually always present in, and substantially likely to increase, the risk of eliciting false statements, admissions, and/or confessions.  False evidence ploys are among the most well-documented situational risk factors for eliciting false and unreliable statements, admissions,

---

[37]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[38]  Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied*, 2, 48-59.  See also Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions."  Forthcoming in the *Proceedings of the National Academy of Sciences.*

[39]  Steven Drizin and Richard A. Leo (2004).  "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 25

and/or confessions, as described in the social science research literature.[40]  Many people do not know that police detectives can legally lie by pretending to have incriminating evidence that does not exist, is fabricated or is exaggerated; even those who suspect that the police may be bluffing about the evidence are likely to fear that police will manipulate evidence to prosecute them. The use of false evidence ploys can create or contribute to the suspect's perception that he or she is trapped, there is no way out, and/or that his conviction will be inevitable, thus leading to the perception that he or she is in a hopeless situation and has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of the suspect's situation.

According to Nicole Harris, the Chicago police investigators repeatedly "confronted" her with supposed evidence that irrefutably established that she had murdered Jaquari.  She reports that the police detectives repeatedly told her that the evidence established that she killed Jaquari; that Sta-Von, her boyfriend and the father of her two children, believed that she had killed Jaquari; and that she had failed the polygraph exam that supposedly proved her guilt to a scientific certainty.  If the jury agrees that there was no evidence whatsoever indicating that Ms. Harris had killed Jaquari, much less that he had died non-accidentally; that Mr. Dancy never said nor believed that Nicole Harris murdered or would murder Jaquari, and that Bartik and the detectives misrepresented the results of the polygraph, then each of these would qualify as a false evidence ploy.

As a century of basic psychological research on misinformation effects has shown[41] (as well as decades of psychological research on police lying to suspects during interrogation),[42] false evidence ploys are effective at eliciting compliance,[43] confusing some suspects into believing that they have been framed or that such evidence really does exist,[44] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[45] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[46]  Based on well-established basic and applied social scientific research going back decades, if Ms. Harris's description of these

[40]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[41]  Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory, *Learning & Memory*, 12, 361-366.

[42]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[43]  Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[44]  Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[45]  Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[46]  Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) See also Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence," *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014).  "Constructing Rich False Memories of Committing Crime," *Psychological Science*, Pp. 1-11. Published online, January 14, 2015.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 26

events is credited, the false evidence ploys that the Chicago police investigators used in their multiple interrogations of her significantly increased the risk of eliciting a false and unreliable confession from her, especially the longer her interrogation lasted and the more sleep deprived and frightened she became.

4) *Minimization and Maximization*. A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious. Interrogation techniques and strategies that minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting false confessions. Such minimization strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[47]

Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – i.e., suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement -- are also associated with and known to increase the risk of eliciting false confessions. Such maximization strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess, including potential imposition of capital punishment, which, according to Ms. Harris, was used in this instance. Nicole Harris reports that the Chicago investigators minimized the legal consequences of confessing to Jaquari's death – particularly after they told her that she failed the polygraph on May 15th -- by suggesting that if she confessed, she could go home, would only be charged with manslaughter, would receive a low bond and could fight the case from the outside, especially since she said she was innocent; but that if she continued to deny that she intentionally killed Jaquari, the investigators would turn her over to the State, who would "slam" her and she would be charged and likely convicted of first degree murder and either be considered for capital punishment or have to spend the rest of her life in prison and never be able to see her son Diante again. If Ms. Harris's testimony that such statements were made to her is credited, the use of minimization and maximization techniques during multiple interrogations over the course of Ms. Harris's over 30 hours at Area 5 significantly increased the risk a false and unreliable confession from her.

5) *Explicit Promises and Threats*. These minimization and maximization techniques did not merely *imply* leniency and freedom (in exchange for compliance and confession) and threaten substantially harsher punishment (in the absence of compliance and confession), but rather *explicitly communicated* it. As just mentioned, the Chicago police investigators explicitly and repeatedly promised that she would be able to put an end to and escape what had become an

---

[47]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 27

intolerably stressful, draining, and coercive experience if she only confessed to what they wanted to hear and that she would receive a reduced charge (manslaughter), reduced bond (bail), and a reduced sentence (3 years in prison) if she confessed to killing Jaquari; whereas they threatened her with among the most serious possible consequences if she did not confess: that she would be charged with first degree murder, spend the rest of her life in prison, and never see her young son Diante again. Ms. Harris reports that these explicit promises and threats finally broke her will and motivated her decision to, at that point in the late afternoon of May 15th, involuntarily agree to falsely confess to killing Jaquari.

The use of explicit promises of leniency, immunity and/or a tangible benefit, as well as the use of explicit threats of harm, significantly increases the risk of eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency—like threats of harm or harsher punishment and whether explicit or implicit—are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. There may be no psychological interrogation technique more potent than the use of threats and promises.

6) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions. In my professional opinion, if the multiple and lengthy interrogations that Nicole Harris describes are credited, I believe that they were psychologically coercive for at least three reasons.

First, as just mentioned, the interrogation is replete with explicit promises and threats, techniques that are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements, especially over the course of over 30 hours at Area 5, in which Ms. Harris was subject to custody, interrogation, and substantial sleep deprivation.

Second, from Ms. Harris' description it is clear that she was made to perceive that she had no ability meaningful control over the conditions of her custodial confinement and interrogation, and ultimately that she had no meaningful choice but to comply with the demands of her interrogators. According to Ms. Harris, she repeatedly attempted to invoke her Miranda rights and terminate the increasingly hostile and aggressive interrogations, but each time she was told that she did not need a lawyer, and the accusatory and threatening interrogations continued. Ms. Harris also describes that on the night of May 14th, she knocked on the interrogation room door for an hour before she was finally allowed to use the bathroom, again signaling her powerlessness.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 28

Finally, she describes feeling broken and having no choice when, approximately 20 hours into her custody and interrogation, the interrogators persuaded her to perceive that the only way to save herself from life imprisonment and be able to ever see her 5-year old son again was to agree with her interrogators' actions and repeat back everything they wanted her to say.

In my professional opinion, the cumulative impact of the investigators interrogation techniques on Ms. Harris', she became persuaded that she had no meaningful choice but to comply with the detectives' demands if she wished to persuade them to terminate the interrogation.

7) *Physical Intimidation and Coercion*. Once common, the historical use of physical coercion by American police detectives to extract confessions has been well-documented,[48] as has both the historical[49] and more recent use of physical force by the Chicago Police in particular to extract confessions of guilt from accused criminal suspects.[50] The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – no longer dispute it, and it has been prohibited by federal constitutional law that applies to the States for more than 80 years. Police interrogation training manuals strictly advise police never to use any physical force or intimidation whatsoever during interrogation because it is recognized as apt to make an innocent person falsely confess. From my experience, it is rare outside of Chicago for interrogated suspects to allege that police interrogators used physical force or coercion to elicit their interrogation statements.

Ms. Harris describes that at approximately 11:40 p.m. on May 14 a detective that Ms. Harris believes was Detective Noradin shoved her into an interrogation room, pushed her onto a bench, handcuffed her arm to a bar over the bench, and yelled demeaning obscenities at her. The second instance of physical abuse that Ms. Harris reports was being jabbed in the shoulder by a detective following the polygraph exam coupled with the aggressive post-polygraph interrogation in the afternoon of May 15. Physical coercion works to terrorize individuals into compliance and confession by instilling fear of additional physical abuse, especially in combination with other threatening and overbearing interrogation techniques. If Ms. Harris's statements that such abusive physical intimidation occurred, it is my professional opinion that such the physical interrogation coercion increased the risk of eliciting a false and unreliable confession from her.

8) *Personality Traits as Risk Factors for False Confession*. In addition to the many situational risk factors present in her account – the presumption of guilt, lengthy interrogation, sleep deprivation, false evidence ploys, minimization, implicit and explicit threats and promises, and physical and psychological coercion – Nicole Harris was at a heightened risk of making and

---

[48]   See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[49]   Wickersham Commission, Lawlessness in Law Enforcement (1931).

[50]   John Conroy (2000). Unspeakable Acts, Ordinary People: The Dynamics of Torture (Alfred Knopf).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 29

agreeing to a false and unreliable confession because of her personality traits and characteristics, i.e., *personal risk factors*. Specifically, as Dr. Frumkin indicated in his 2006 assessment, Nicole Harris was in 2005, extremely suggestible, testing in the 99th percentile. This means, as he states, that she has an extreme tendency to succumb to the demands of authority figures, especially when placed under pressure, and to give in to leading questions in response to negative feedback to placate them. She is more likely to be easily led and manipulated. As a result of the personality traits identified by Dr. Frumkin, Nicole Harris was at that time highly vulnerable to making and/or agreeing to a false and/or unreliable confession in order to please her interrogators, especially the longer and/or more intense the interrogation(s) last. Dr. Frumkin notes that Nicole "loses her ability to make rational use of information when she is under stress." Ms. Harris's high level of interrogative suggestibility appears to be explained by the personality traits identified by Dr. Frumkin. In short, Ms. Harris is highly suggestible, compliant and conflict averse, personality traits that clinical psychological research has, for decades, shown to increase the risk that individuals will yield to the pressures of interrogation and shift their answers to satisfy their interrogators. I therefore believe that Ms. Harris was especially vulnerable to making or agreeing to a false confession during his her guilt-presumptive, accusatory, and coercive interrogations by Chicago police investigators. The inherent personality traits that Dr. Frumkin identifies were then likely exacerbated by the extreme grief that Ms. Harris was experiencing and which numerous witnesses identified. 9) *Police Contamination and Scripting.* As mentioned earlier, police interrogators are universally trained not to contaminate a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination taints prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but the claim is made that they were volunteered by the suspect). Related to contamination, police investigators sometimes "script" a suspect's confessions when they not only provide the suspect with details of the crime, but coach or lead the suspect to adopt a narrative of how and why he and she committed the crime. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[51]

According to Ms. Harris, the investigators repeatedly supplied her with details of the death scene so that she would parrot back a version of events that fit their changing theory of the crime; and later scripted her confession not only by coaching her through the details of what they wanted her to say, but also how they wanted it to later appear on camera, so that it would appear to be persuasively true to third parties viewing the recapped 23 minute recorded confession that followed 30 hours at Area 5, more than 24 of which were in custody. Ms. Harris reports that from the moment she was aggressively accused of killing Jaquari, the investigators told her how Jaquari died, first that they believed he was strangled by a telephone cord, then that she wrapped

---

[51] Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 30

the bed sheet around his neck and leaving him on the top bunk, and finally that she grabbed the elastic band from the top bunk and wrapped it around Jaquari's neck four time until he stopped crying, noticed blood coming from his nose, panicked and left him on the ground. Since Jaquari was found by Mr. Dancy, not Ms. Harris, she reports that she did not know how he had died other than what Mr. Dancy and the police investigators had subsequently told her.

Ms. Harris reports that following the post-polygraph examination, investigator Bartik told her that if she worked with them, they would work with her. According to Ms. Harris she was told that that she wrapped the cord from the fitted bed sheet around Jaquari's neck and the number of times. Ms. Harris also states that the investigators showed her a picture of the kids' tilted bunk bed in an effort to get her to relay an account of how she killed Jaquari that was consistent with the investigators' theory of his death. Apart from this contamination, Ms. Harris indicates that the investigator Cordaro, in the interrogation at the Area 5 police station on the evening of May 15th, repeatedly went over the details of what they wanted her to confess to. In effect, according to Ms. Harris' account, investigator Cordaro scripted her final confession by not only giving her the specifics of what to confess to (e.g., that she whipped Jaquari with a belt, that she put the cord around his neck 4 times, that Jaquari was crying), but also to describe a motive for killing Jaquari (that she was angry that he had gone outside) and that she needed to needed to show a lot of emotion when the videotape was turned on to make it appear persuasive to third parties.

Police contamination and scripting is not so much a risk factor for eliciting a confession – since it often occurs after an admission has already been made – as much as of making an otherwise false confession appear true. Police contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (e.g., a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[52] Contamination and scripting therefore increase the risk that once a suspect has falsely confessed to a crime he or she did not commit, third parties – such as prosecutors, judges, juries, the media, and outside observers – will mistakenly believe that the confession is true. Given the contamination and scripting that occurred here, it is not surprising that Ms. Harris was wrongfully convicted of first degree murder by the jury in her criminal trial. The Chicago police investigators' contamination and scripting did not increase the risk that she would falsely confess as much it increased the risk that her false confession, once given, would cause third parties to erroneously believe that in contained indicia of reliability and erroneously convict her.

10) *Hallmarks of a False Confession (or Multiple False Confessions)*. The confession statements of Nicole Harris contained numerous factual and logical errors, inconsistencies,

---

[52] Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 31

omissions, and other indicia of unreliability that are the hallmarks of proven false confessions. According to Nicole Harris, she never made the first confession that police have attributed to her – that she killed Jaquari by placing a phone cord around his neck and then the cord sheet to make his murder appear to be an accident. However, everyone agrees that if Ms. Harris had made this confession, it was a false confession, since Jaquari did not die from the strangulation by a telephone cord. This first false confession (again attributed to Ms. Harris by police but denied by her) reflected the investigators' mistaken theory at the time (the evening of May 14) of how Jaquari had died. It did not fit with the death scene facts or evidence. The investigators only found out the following morning, after Dr. Denton performed an autopsy, that Jaquari had not died from strangulation by a telephone cord (but that the ligature marks around his neck had most likely come from the elastic from Jaquari's bedsheet), and the investigators thereafter pressured Ms. Harris to agree to a different version of how she alleged killed Jaquari.

The second confession that the police investigators attributed to Ms. Harris – that Ms. Harris put Jaquari on the upper most level of the bunk bed and wrapped the loose end of an elastic band from a fitted sheet around his neck before leaving the apartment – also did not match the death scene evidence. Jaquari slept on the bottom bunk, not the top one, and he was found on the ground. He could not have rolled off the top bunk, where Ms. Harris' second confession places him, because of the guard rail on the top bunk. This error is corrected in Ms. Harris' third and final confession which has Ms. Harris leaving Jaquari on the ground after strangling him with the dangling elastic band from the top bunk approximately four times. But even that confession contains an error that does not match any other evidence or testimony – that the cord had been wrapped around Jaquari's neck approximately 10 times.

Assuming Ms. Harris' account, her multiple false confessions to strangling Jaquari not only contain the kinds of factual errors that social science research has shown are associated with false and unreliable confessions, but they also make little logical sense, another indicia of an unreliable confession. It makes no sense that Ms. Harris would violently strangle her son Jaquari to death merely because he had been playing outside after she had asked him to stay inside. Ms. Harris' confession statements are not only contradicted by extrinsic evidence, but also by logic and plausibility.

There is an additional inconsistency that is significant in my opinion. Suspects in police interrogations do not confess spontaneously to a murder and then fail to provide details. Rather police interrogation-induced false confessions typically occur after hours of coercive pressure and persuasion. Once an innocent suspect has been moved to falsely confess, he or she is motivated to agree, parrot back or speculate about whatever details the police are seeking in order to please his or her interrogators, because false confessors typically wish to put an end to the aversive interrogation in order to escape from it. The suggestion that Ms. Harris spontaneously provided a confession to murdering her son and then immediately refused to supply any details about how or why she would have killed her son is doubly inconsistent with the empirical social science research literature on police interrogation and false confessions, another likely indicia of reliability.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 32

Finally, and most significantly in my professional opinion, none of the death scene evidence suggests that Jaquari was killed intentionally or that a crime occurred. In other words there is no corroboration of Ms. Harris' police-induced confessions. There is simply no physical evidence consistent with Ms. Harris' confessions or linking her to Jaquari's death, which one would expect to exist if her confession were true. Moreover, the testimony of Diante, who witnessed the death, that Jaquari accidently strangled himself directly contradicts Ms. Harris' confessions, and is a substantial indicia of its unreliability.

(B) The Chicago Police Investigators' Account(s) of Nicole Harris'<br>Custody and Interrogations on May 14, 2005 to May 16, 2005

Contrary to Nicole Harris' robust and detailed account of what occurred during her almost thirty hours of custody and interrogation that she describes as moving her from denial to falsely confessing to murdering her son Jaquari, the investigators accounts of what occurred during this time are relatively sparse. Even if the investigators' testimony about what occurred during the Harris's interrogation and custody are credited, many of the professional opinions and concerns I have expressed above remain for at least the following four reasons:

First, based on the social science research, it is my professional opinion that the investigators' account of what occurred during Nicole Harris's custody and interrogation are highly incomplete. The various Chicago detectives' descriptions of what occurred to move Nicole Harris from repeated denial to confession fails to fit with what we would expect from decades of empirical social science research on how police interrogation works to break down a suspect's denials and elicit a confession of guilt. If the investigators' accounts are to be credited, the only interrogation technique they used was confronting Ms. Harris with alleged inconsistencies in her account, after which she either spontaneously or near-spontaneously confessed each time. We know from empirical social science research that police interrogations involve the use of far more interrogation techniques than the investigators describe, especially when interrogations are lengthy,[53] and that suspects rarely give spontaneous false or unreliable confessions during police interrogation.[54] Put differently, while I cannot judge the veracity of the various interrogators' accounts, they are contrary to everything one would expect both from the social science research on police interrogation and confessions, as well as the police training manuals on the subject. At best, the interrogating officers' accounts of what moved Nicole Harris from denial to confession over many hours of custody and interrogation is simply incomplete; at worse they failed to remember or disclose much of what occurred during their multiple interrogations of Nicole Harris on May 14-16, 2005 that led her to stop denying and start confessing to the killing her four-year old son.

---

[53] Richard A. Leo (1996). "Inside the Interrogation Room," Journal of Criminal Law and Criminology, 86, 266-303. See also Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[54] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 33

Second, even if we credit the investigators' accounts, several risk factors for false confession remain. The length of Nicole Harris' interrogation and custody was extraordinary, and, as mentioned above, significantly increased the risk of her making or agreeing to a false confession. So too did her sleep deprivation: investigators conceded that they left her overnight in a locked interrogation room that contained only a hard bench. The testimony suggests that Ms. Harris did not eat during her more than 30 hours at Area 5 (although she was offered food), and from their own records, she appears to have been rarely afforded a bathroom break.

Third, even if we credit the investigators' accounts, the indicia of unreliability mentioned above remain. Ms. Harris purportedly confessed three different times. The first confession that the investigators attribute to Ms. Harris, which she denies, is indisputably false. It fit the investigators theory at the time of how Jaquari died, until Dr. Denton ruled it out the following morning. Ms. Harris' second confession statement again reflects the investigators' theory of the how Jaquari died at the time it was given, but was subsequently shown to be contradicted by the physical evidence. At both points, the investigators claim that Ms. Harris intentionally lied to them about how she killed Jaquari but that her underlying confession to killing Jaquari was nevertheless true. It makes no sense to admit to committing the underlying act – in this case murder – and then to intentionally provide false details about how and why she committed the murder (as the investigators alleged Ms. Harris did in her first and second confession statements) nor is it consistent with the social science research on people who confess.[55]

Finally, there is no evidence indicating that Jaquari's death was intentional or a crime. Even if it was a crime, there is no physical evidence linking Nicole Harris to it or corroborating her third, and final, confession. Most significantly, the only witness evidence – Diante's statements to the Children's Advocacy Center and to the DCFS – contradict Nicole Harris' confession.

## XII. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1)      It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;

---

[55] Richard Ofshe and Richard A. Leo (1997). "The Decision to Confess Falsely: Rational Choice and Irrational Action." 74 *Denver University Law Review* at 992-993("A guilty suspect who voluntarily makes an admission is thereby demonstrating a willingness to cooperate with the interrogator to some extent. Since a suspect is unlikely to realize the distinction between an admission and a confession, he is likely to think that he has already confessed when he utters the words "I did it," and is likely to view his post-admission narrative as nothing more than an elaborated 'I did it' statement. A suspect who says 'I did it' should also be willing to tell some, if not all, of the story of the crime.").

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 34

2)      Nicole Harris's account of her multiple interrogations during her more than 30 hours at Area 5 on May 14-16, 2005 is consistent with the social science empirical research literature on the types of interrogation techniques and investigative practices that are associated with, increase the risk of, and are known to cause innocent individuals to falsely confess;

3)      The accounts of the various Chicago police investigators who interrogated Nicole Harris for between 28 and 30 hours on May 14-16, 2016, are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;

4)      In her account of what occurred during her police custody and/or interrogations on May 14-16, 2015, Nicole Harris describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven. Nicole Harris describes interrogation procedures whose goal was not to find the truth but to break down her denials of guilt and elicit from her a confession to killing her son Jaquari Dancy;

5)      Before interrogating her, the investigators misclassified Nicole Harris as guilty when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about;

6)      The initial spontaneous "confession" attributed to Nicole Harris, which she denies, is inconsistent with empirical social science research on police interrogation and confessions, as well as with logic and the physical evidence in this case;

7)      The multiple interrogations described by Nicole Harris were both physically and psychologically coercive: Nicole Harris's account of what occurred during her multiple interrogations contains interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

8)      Nicole Harris' account of what occurred during her multiple interrogations contains numerous interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent. These included false evidence ploys, minimization, implied and explicit threats, and implied and explicit promises;

9)      Nicole Harris was also at a heightened risk during her interrogations of making and/or agreeing to a false and unreliable confession because of her personality traits (i.e., *personal* risk factors), most specifically her submissiveness and suggestibility, which in turn were likely exacerbated by her grief;

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 35

     10)    The interrogations described by Nicole Harris involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Nicole Harris' confession statement would, misleadingly, appear to be detailed and self-corroborating;

     11)    The confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

     The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

     If you have any questions, please do not hesitate to contact me.

     Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and
Social Psychology
University of San Francisco

February 2016

**APPENDIX A**          **DR. RICHARD A. LEO, PH.D, J.D.**

## CURRICULUM VITAE

### ADDRESSES

**Professional Office (Mailing Address)**          **University Office**
15 Ashbury Terrace                                 University of San Francisco
San Francisco, CA 94117                            School of Law
                                                   San Francisco, CA 94117

Phone:     (415) 661-0162                          415-422-6513
FAX:       (415) 422-6433                          (415) 422-6433
Email:     rleo@usfca.edu                          rleo@usfca.edu

Webpage:   http://www.usfca.edu/law/faculty/fulltime/leor.html
SSRN:      http://ssrn.com/author=1020356
BePress:   http://works.bepress.com/richardleo/

### POSITIONS HELD

7/06-Present          Hamill Family Professor of Law and Psychology
                      University of San Francisco

8/05-Present          Fellow, Institute for Legal Research
                      Criminal Justice Studies Program
                      University of California, Berkeley School of Law

9/14-6/15             Fellow, Center for the Advanced Study in the Behavioral Sciences
                      Stanford University

7/13-6/14             Visiting Professor of Law and
                      Co-Director, Program on Understanding Law, Science and Evidence
                      University of California, Los Angeles

7/97 – 6/06           Associate Professor of Psychology and Social Behavior; and
                      Associate Professor of Criminology, Law and Society
                      University of California, Irvine (Tenured in 2001)

8/94 - 5/97           Assistant Professor of Sociology and Adjunct Professor of Law
                      University of Colorado, Boulder

1

## EDUCATION

8/90 - 8/94      Ph.D. in Jurisprudence and Social Policy
**Specialization: Criminology and Social Psychology**
University of California, Berkeley

8/92 - 5/94      J.D., Boalt Hall School of Law
University of California, Berkeley

9/87 - 6/89      M.A. in Sociology
University of Chicago

9/81 - 5/85      A.B. in Sociology, with Honors
University of California, Berkeley

## ACADEMIC SPECIALIZATION

| | | |
|---|---|---|
| Criminal Procedure/Criminal Law | Psychology and Law | Social Psychology |
| Criminology and Criminal Justice | Law and Social Science | Police Organization/Behavior |

## RESEARCH SPECIALIZATION

| | | |
|---|---|---|
| Police Interrogation | Wrongful Convictions | Coercive Persuasion |
| False Confessions | Miscarriages of Justice | Influence and Decision-Making |

## AWARDS

Lifetime Achievement Award (2014). Society for the Study of Social Problems, Crime and Juvenile Delinquency Division. (For distinguished scholarship in the fields of crime and delinquency).

Paul Tappan Lifetime Achievement Award (2014). Western Society of Criminology. (For outstanding contributions to the field of criminology).

The President's Award (2014). Western Society of Criminology. (For contributions to the field of criminology and positive influence on the current Western Society of Criminology President's career).

Fellowship, Center for the Advanced Study in the Behavioral Sciences (2014-2015). Stanford University.

William J. Chambliss Lifetime Achievement Award (2013). Society for the Study of Social Problems, Law and Society Division. (For career-spanning excellence and achievement in the area of law and society).

Guggenheim Fellowship (2011). John Simon Guggenheim Memorial Foundation. (For men and women who have already demonstrated exceptional capacity for productive scholarship or exceptional creative ability in the arts). New York, N.Y.

Edwin H. Sutherland Outstanding Scholarship Award from the Society for the Study of Social Problems, Law and Society Division (2010) for *Police Interrogation and American Justice* (Harvard University Press, 2008). Inaugural award.

Outstanding Book Award (2010) from the Academy of Criminal Justice Sciences for *Police Interrogation and American Justice* (Harvard University Press, 2008).

Herbert Jacob Book Prize (2009) from the Law and Society Association for *Police Interrogation and American Justice* (Harvard University Press, 2008)

Distinguished Scholarship Award (2009) from the Pacific Sociological Association for *Police Interrogation and American Justice* (Harvard University Press, 2008). Honorable Mention.

Soros Senior Justice Fellowship (2004). Open Society Institute. Soros Foundation. New York, N.Y.

The Saleem Shah Career Achievement Award (2000). Given by The American Psychology-Law Society (Division 41 of the American Psychological Association) and the American Academy of Forensic Psychology for early career excellence and contributions to psychology, law and public policy.

The Ruth Shonle Cavan Young Scholar Award (1999). Given by The American Society of Criminology to recognize outstanding scholarly contributions to the discipline of criminology.

Distinguished Assistant Professor Award for Research (2000-2001). University of California, Irvine. Conferred by the Academic Senate of the University of California, Irvine for distinguished research.

Faculty Career Development Award (1998-1999). University of California, Irvine.

Graduate Student Paper Award, Honorable Mention (1994) from the American Sociological Association, Crime, Law, and Deviance Section.

Outstanding Graduate Student Instructor Award (1993). University of California, Berkeley. Department of Legal Studies.

Prosser Prize (1992), "Guggenheim Crime Policy Seminar." University of California, Berkeley, Boalt Hall Law School.

## ADDITIONAL HONORS AND DISTINCTIONS (SELECTIVE)

Member (Elected), American Law Institute (October, 2011-Present).

Listed in Brian Leiter, *Most Cited Law Professors by Specialty, 2000-2007*, Criminal Law and Procedure, (http://www.leiterrankings.com/faculty/2007faculty_impact_areas.shtml)

*Member*, Scientific Advisory Board. National Center for Reason and Justice (3/02-Present).

*Board member*, Forensic Social Sciences Association (2/14-Present).

*Affiliate*, Center on Police Practices and Community (COPPAC). University of California, Santa Barbara Institute of Social, Behavioral & Economic Research (7/01-Present).

Fellow, Earl Warren Legal Institute Criminal Justice Program, University of California, Berkeley School of Law (10/98-8/05)

*Visiting Scholar*, Boalt Hall School of Law, University of California, Berkeley (8/03-8/05).

*Visiting Professor* of Sociology, Nankai University, Tianjin, China (10/96).

## PUBLICATIONS

### BOOKS

2017    Richard A. Leo and Tom Wells. THE INNOCENCE REVOLUTION: A POPULAR HISTORY OF THE AMERICAN DISCOVERY OF THE WRONGLY CONVICTED. (In Progress). Expected Publication Date: 2017

- Received Guggenheim Fellowship Award (2011) to write this book

2012    CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (with George C. Thomas III). New York: Oxford University Press. ISBN #: 978-0-19-533893-5. Available at: http://www.oup.com/us/catalog/general/subject/Sociology/CriminalJustice/?view=usa&ci=9780195338935

- Translated into Chinese by SHANGHAI JIAOTONG UNIVERSITY PRESS of Shanghai (2014)

2008    POLICE INTERROGATION AND AMERICAN JUSTICE (2008). Cambridge: Harvard University Press. ISBN #: 0-674-02648-9. Available at: http://www.hup.harvard.edu/catalog/LEOPOL.html or http://www.amazon.com/Police-Interrogation-American-Justice-Richard/dp/0674026489

- Edwin H. Sutherland Outstanding Scholarship Award. The Society for the Study of Social Problems (2010). Inaugural award.

- Outstanding Book Award (2010). Academy of Criminal Justice Sciences.

4

- Herbert Jacob Book Prize (2009).  Law and Society Association.

- Distinguished Scholarship Award (2009).  Pacific Sociological Association.  Honorable Mention.

- Excerpts reprinted in Yale Kamisar et. al. (2008).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Twelfth Edition.  (St. Paul, MN: West Publishing).  Pp. 540, 624, 719-720

- Paperback version published in August, 2009

- Translated into Chinese by China University of Political Science and Law Press (2012)

- Translated into Korean by Humanitas Press (2014)

2008    THE WRONG GUYS: MURDER, FALSE CONFESSIONS AND THE NORFOLK FOUR (2008) (with Tom Wells). New York: The New Press.  ISBN #: 978-1-59558-401-4.   Available at: http://amazon.com or http://thenewpress.com.  See also: http://www.wrongguys.com.

- Nominated for a National Book Award and a Pulitzer Prize

- The subject of a *New Yorker* magazine article by Jeffrey Toobin (August 24, 2009).  See: http://www.newyorker.com/talk/2009/08/24/090824ta_talk_toobin

- Received Soros Senior Justice Fellowship (2004) to write this book

2008    THE PROBLEM OF FALSE CONFESSIONS IN THE POST-DNA WORLD (2008) (with Steven Drizin).  Published as a book in Japan by Nippon Hyoronsha Co., LTD.  ISBN #: 978-4-535-51664-9.

1998    THE MIRANDA DEBATE: LAW, JUSTICE AND POLICING (1998) (with George C. Thomas III, Eds).  Boston: Northeastern University Press.  ISBN #: 1-55553-338-8.

1998    THE AMERICAN CRIMINAL JUSTICE SYSTEM (1998), (Ed).  (Simon & Schuster).  ISBN #:  0-536-00826-4.

## **ARTICLES, BOOK CHAPTERS AND OTHER PUBLICATIONS**

2016    "Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence."  Forthcoming in Daniel Medwed, Ed. (2016).  (Boston, MA: Cambridge University Press).  *Wrongful Convictions and the DNA Revolution: Twenty-Five Years of Freeing the Innocent*.

2016.   "The Path to Exoneration" (with Jon Gould).  Forthcoming in the *Albany Law Review*.

5

Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016 "Police Interrogation and Coercion in Domestic American History: Lessons for the War on Terror" (with Alexa Koenig). Forthcoming in Scott Anderson and Martha Nussbaum and Scott Anderson, Eds. (2016). *Confronting Torture: Essays on the Ethics, Legality, History, and Psychology of Torture Today.* (Chicago: University of Chicago Press). Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 1 (2010).

2016. "A Damning Cascade of Errors" (with Deborah Davis). Forthcoming in Fiona Bookman, Ed. (2016). *Handbook on Homicide* (Wiley-Blackwell). Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 9, No. 1 (2016)

2016 "When Exoneration Seems Hopeless: the Special Vulnerability of Sexual Abuse Suspects to False Confession" (with Deborah Davis). Forthcoming in Ros Burnett, Ed. (2016). *Vilified: Wrongful Allegations of Child and Sexual Abuse* (New York: Oxford University Press). Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 5 (2014)

2016 "Her Story, His Story: Sexual Miscommunication, Motivated Remembering, and Intoxicaton as Pathways to Honest False Testimony Regarding Sexual Consent." (with Guillermo Villalobos and Deborah Davis). Forthcoming in Ros Burnett, Ed. (2016). *Vilified: Wrongful Allegations of Child and Sexual Abuse* (New York: Oxford University Press). Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 6 (2014)

2015 "The Sound of Silence: *Miranda* Waivers, Selective Literalism and Social Context." Forthcoming in Lawrence Solan, Janet Ainsworth and Roger Shuy, Eds. (2015). *Speaking of Language and Law* (New York: Oxford University Press). Pp. 255-259. Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 7, No. 4 (2014)

6

2014    "The Justice Gap and the Promise of Criminological Research." *Criminology, Criminal Justice, Law & Society*, Vol. 15, No. 3.  Pp. 1-37.  Available at: http://ssrn.com/author=1020356

- Reprinted in Michelle Travis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Vol. 8, No. 1 (2015)

2014    "Predicting Erroneous Convictions" (with Jon Gould, Julia Carrano and Katie Hail-Jares). *Iowa Law Review*, Vol. 99, Pp. 471-522.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 3 (2013)

2014    "Disputed Interrogation Techniques in America: True and False Confessions and the Estimation and Valuation of Type I and II Errors" (with Deborah Davis) in Sarah Cooper, Ed. (2014). *Controversies in Innocence Cases in America* (Surrey, England: Ashgate Publishing Ltd).  Pp.  57-72. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014    "Innocent Defendants: Divergent Case Outcomes and What They Teach Us" (with Jon Gould, Julia Carrano, and Katie Hail-Jares) in Marvin Zalman and Julia Carrano, Eds. (2014), *Wrongful Conviction and Criminal Justice Reform: Making Justice* (London: Routledge).  Pp. 73-92. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2014    "Interrogation and Confessions" (with Deborah Davis) in Jay Albanese, Ed. (2014). *The Encyclopedia of Criminology and Criminal Justice*, Vol. III (New York: John Wiley & Sons). Pp. 1199-1206.   Available at: http://ssrn.com/author=1020356

2013    "Why Interrogation Contamination Occurs," The *Ohio State Journal of Criminal Law*, Vol. 11. Pp. 193-215.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 4 (2013)

2013    "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" (with Peter Neufeld, Steven Drizin, and Andrew Taslitz). *Temple Law Review*, Vol. 85, Pp. 759-838. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research

Paper Series.  University of San Francisco School of Law.  Volume 6, No. 2 (2013)

2013    "False Confessions and the Constitution: Problems, Possibilities and Solutions."  John T. Parry and L. Song Richardson, Eds. (2013).  *The Constitution and the Future of Criminal Law in America* (New York: Cambridge University Press).  Pp. 169-186.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 6, No. 1 (2013).

2013    "The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection" (with Deborah Davis) in Stephen Morewitz and Mark Goldstein, Eds. (2013).  *Handbook of Forensic Sociology and Psychology* (New York: Springer).   Pp. 47-75.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 5 (2012).

2013    "Acute Suggestibility in Police Interrogation:  Self-Regulation Failure as a Primary Mechanism of Vulnerability" in Anne Ridley, Ed. (2013). *Suggestibility in Legal Contexts: Psychological Research and Forensic Applications*.  (Chicester: John Wiley & Sons, Ltd.).  Pp. 171-195.  Available at: http://ssrn.com/author=1020356

2013    "The Law of Interrogation" (with George C. Thomas III).  G.J.N. Bruinsma and D.L. Weisburd, Ed. (2013).  *Encyclopedia of Criminology & Criminal Justice* (New York: Springer).  Pp. 2835-2840.  Available at: http://ssrn.com/author=1020356

2012    "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" (with Deborah Davis).  *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 4 (2011).

2012    "To Walk In Their Shoes: The Problem of Missing, Misrepresented, and Misunderstood Context in Judging Criminal Confessions" (with Deborah Davis).  *New England Law Review*.  Vol. 46, No. 4.  Pp. 737-767.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 4 (2012).

2012    "Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent" (with Deborah Davis) in Lawrence Solan and Peter Tiersma, Eds. (2012).  *Oxford Handbook on Language and the Law* (Oxford University Press).  Pp. 354-366.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 4, No. 2 (2011).

2011 "Three Prongs of the Confession Problem: Issues and Proposed Solutions" (with Deborah Davis). In Carol Henderson and Jules Epstein, Eds. (2011). *The Future of Evidence: How Science and Technology Will Change The Practice of Law* (Chicago: American Bar Association Books). Pp. 233-264. Available at: http://ssrn.com/author=1020356

2011 "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" (with Iris Blandon-Gitlin and Kathryn Sperry). *Psychology, Crime and Law*. Vol. 17, 239-260. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 4, No. 1 (2011).

2010 "One-Hundred Years Later: Wrongful Convictions After a Century of Research" (with Jon Gould). *Journal of Criminal Law and Criminology*. Vol. 100, 825-868. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 4 (2010).

2010 "The Gatehouse and Mansions: Fifty Years Later" (with Alexa Koenig). T*he Annual Review of Law and Social Science*, Vol. 6, 323-339. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 3 (2010).

2010 "From False Confession to Wrongful Conviction: Seven Psychological Processes" (with Deborah Davis). *The Journal of Psychiatry and the Law*, Vol. 38, 9-56. Available at: http://ssrn.com/author=1020356

- Excerpted in Open Access Journal of Forensic Psychology (2009), Vol. 1. Available at: http://www.forensicpsychologyunbound.ws/

- Reprinted in Asifa Begum, Ed. (2009). *Law and Justice – Psychology Role Play* (Amicus Books: The Icfai University Press) and in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 2, No. 5 (2009)

2010 "White Paper Commentaries: Looking Ahead" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*. Vol. 34, Pp. 49-52. Available at: http://ssrn.com/author=1020356

2010    "Police-Induced Confessions: Risk Factors and Recommendations" (with Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson and Allison Redlich). *Law and Human Behavior*.Vol. 34, Pp. 3-38.  Available at: http://ssrn.com/author=1020356

- Designated a "White Paper" of the American-Psychology Law Society, Division 41 of the American Psychological Association.

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 2 (2010).

2010    "Selling Confession: Setting the Stage with the Sympathetic Detective with a Time-Limited Offer (with Deborah Davis and William Follette).  *Journal of Contemporary Criminal Justice*, Vol. 26, Pp. 441-457.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 4 (2010).

2010    "Overcoming Judicial Preferences For Person Versus Situation-Based Analyses of Interrogation Induced Confessions" (with Deborah Davis).  *The Journal of the American Academy of Psychiatry and the Law*, Vol. 38. Pp. 187-194. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 3 (2012).

2010    "Reply to Samuel R. Gross and Barbara O'Brien" (with Jon Gould).  *The Ohio State Journal of Criminal Law*, Vol. 8, Pp. 277-279.  Available at: http://ssrn.com/author=1020356

2010    "Moving Targets: Placing the Good Faith Doctrine in the Context of Fragmented Policing" (with Hadar Aviram and Jeremy Seymour).  *The Fordham Urban Law Journal*.  Vol. 37, Pp. 709-742.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 5, No. 2 (2012).

2010    "The Three Errors: Pathways to False Confession and Wrongful Conviction" (with Steve Drizin) in Daniel Lassiter and Christian Meissner, Eds. (2010).  *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations*.  (Washington, D.C.: American Psychological Association). Pp. 9-30.  Available at: http://ssrn.com/author=1020356

- *Police Interrogation and False Confessions* selected as recipient of the 2011 American Psychology-Law Society's Outstanding Book Award and the 2010 Publishers Award for Professional and Scholarly Excellence in the field of psychology

10

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 5, No. 1 (February 29, 2012).

2009    "Studying Wrongful Convictions: Learning From Social Science" (with Jon Gould). *The Ohio State Journal of Criminal Law,* Vol. 7, Pp. 7-30.   Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 3, No. 2 (2010).

2009    "False Confessions: Causes, Consequences and Implications."  *The Journal of the American Academy of Psychiatry and the Law*, Vol. 37, Pp. 332-343. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 2, No. 2. (March 13, 2009).

2009    "What Do Potential Jurors Know About Police Interrogation and False Confessions?" (with Brittany Liu). *Behavioral Sciences and the Law*, Vol. 27, Pp. 381-399. Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 2, No. 3. (May 29, 2009).

2009    "Psychological and Cultural Aspects of Interrogations and False Confessions: Using Research to Inform Legal Decision-making" (with Mark Costanzo and Netta Shaked) in Daniel A. Krauss and Joel D. Lieberman, Eds (2009).  *Psychological Expertise in Court: Psychology in the Courtroom.*  Volume II.  (Burlington, VT: Ashgate Publishing Co).  Pp. 25-56.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series. University of San Francisco School of Law. Volume 4, No. 1 (2011).

2009    "Interrogation" (with Mark Costanzo) in Allan Jamieson and Andre Moenssens (eds). The Wiley Encyclopedia of Forensic Science (London: John Wiley & Sons).  Volume 3.  Pp. 1586-1590. Available at: http://ssrn.com/author=1020356

2008    "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds.  *Practical Rape Investigation: A Multidisciplinary Approach*.  4th Edition. (Boca Raton, Florida: CRC Press).  Pp. 211-217.

2007    "The Problem of False Confession in America."  *The Champion*.  Vol. 41, No. 10. Pp. 30-35.

2007   "Mandate the Electronic Recording of Police Interrogations" (with Kimberly D. Richman). *Crime and Public Policy*, Vol. 6, Pp. 791-798.  Available at: http://ssrn.com/author=1020356

2007   "Police Interviewing and Interrogation: A Self-report Survey of Police Practices and Beliefs" (with Saul M. Kassin, Christian A. Meissner, Kimberly D. Richman, Lori H. Colwell, Amy Leach, and Dana LaFon).  *Law and Human Behavior*. Vol. 31, Pp. 381-400.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 3, No. 2 (2010).

2007   "Mental Health Status and Vulnerability to Police Interrogation Tactics" (with William Follette and Deborah Davis).  *Criminal Justice* (A publication of the American Bar Association), Vol. 22, Pp. 42-49.

2007   "Research and Expert Testimony on Interrogation and Confessions" (with Mark Costanzo).  In Mark Costanzo, Dan Krauss and Kathy Pezdek, Eds. (2007). *Expert Psychological Testimony For The Courts*.  (New Jersey: Erlbaum).  Pp. 69-98.  *Available at*: http://ssrn.com/author=1020356

2006   "Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century" (with Steven Drizin, Peter Neufeld, Brad Hall and Amy Vatner).  *Wisconsin Law Review*. Vol. 2006, Pp. 479-539.  *Available at*: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 2, No. 1. (January 15, 2009).

2006   "Strategies for Preventing False Confessions and Their Consequences" (with Deborah Davis). In Mark Kebbell and Graham Davies, Eds. (2006). *Practical Psychology for Forensic Investigations and Prosecutions*.  (New York: John Wiley & Sons).  Pp. 121-149.  Available at: http://ssrn.com/author=1020356

- Reprinted in Joshua Davis, Legal Scholarship Network (SSRN): Legal Studies Research Paper Series.  University of San Francisco School of Law.  Volume 4, No. 3. (July 21, 2010).

2006   "Psychological Weapons of Influence: Applications in the Interrogation Room" (with Deborah Davis).  *Nevada Lawyer*.  Pp. 14-19.

2005   "Re-Thinking the Study of Miscarriages of Justice: Developing a Criminology of Wrongful Conviction."  *Journal of Contemporary Criminal Justice*.  Vol. 21, Pp. 201-223.  *Available at*: http://ssrn.com/author=1020356

2005   "Interrogating Guilty Suspects: Why Sipowicz Never Has to Admit He is Wrong" (with George

C. Thomas III).  In Glenn Yeffeth, Eds (2005).  *What Would Sipowicz Do?: Race, Rights and Redemption* (Dallas: BenBella Books).  Pp. 35-46.

2005    "Interrogation and Confessions," in J. Miller Mitchell & Richard A. Wright, Eds. *The Encyclopedia of Criminology* (New York: Routledge). Vol. 2, Pp. 819-825.

2004    "The Problem of False Confessions in the Post-DNA World" (with Steve Drizin).  *North Carolina Law Review*.  Vol. 82.  Pp. 891-1007.  *Available at*: http://ssrn.com/author=1020356

- Cited by United States Supreme Court in *J.D.B. v. North Carolina*, 2011 WL 2369509.

- Cited by United States Supreme Court in *Corley v. United States*, 129 S. Ct. 1558 (2009).

- Published as a book in Japan in 2008 by Nippon Yoronsha Co., Ltd

- Reprinted in Yale Kamisar et al. (2008).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Twelfth Edition.  (St. Paul, MN: West Publishing).  Pp. 652 and 718.  Reprinted in Andrew E. Taslitz and Margaret Paris (2007).  *Constitutional Criminal Procedure*, 3rd Edition (Foundation Press).

2004    "The Third Degree and the Origins of Psychological Interrogation in America."  In Daniel Lassiter, Ed. (2004).  *Interrogations, Confessions and Entrapment.*  Perspectives in Law and Psychology Series, Vol. 20 (New York: Kluwer Academic/Plenum Publishers).  Pp. 37-84.  *Available at*: http://ssrn.com/author=1020356

2004    "Beating a Bum Rap."  *Contexts*.  Vol. 3, Pp. 68-69.

2002    "The Effects of *Miranda v. Arizona*: Embedded in Our National Culture?" (with George C. Thomas III).  In Michael Tonry, Ed.  *Crime and Justice – A Review of Research, Crime and Justice*.  Vol. 29, Pp. 203-271.  *Available at*: http://ssrn.com/author=1020356

2002    "*Miranda*, Confessions and Justice: Lessons for Japan?" In Malcolm Feeley and Setsuo Miyazawa, Eds. (2002). *The Japanese Adversary System in Context: Controversies and Comparisons* (London: Palgrave). Pp. 200-219. *Available at*: http://ssrn.com/author=1020356

2002    "Interrogation."  In David Levinson, Ed. *The Encyclopedia of Crime & Punishment* (Great Barrington, MA: Berkshire Reference Works).  Pp. 927-931.

2001    "Questioning the Relevance of *Miranda* in the Twenty-First Century." *The Michigan Law Review*.  Vol. 99. Pp. 1000-1029.  *Available at*: http://ssrn.com/author=1020356

- Cited by the United States Supreme Court in *Missouri v. Seibert*, 124 S. Ct. 2601 (2004).

- Reprinted in Yale Kamisar, Wayne LaFave, and Jerold Israel (2002).  *Modern Criminal Procedure: Cases, Comments*, *Questions*.  Ninth Edition.  (St. Paul, MN: West Publishing).

13

2001   "The Truth About False Confessions and Advocacy Scholarship" (with Richard Ofshe).  *The Criminal Law Bulletin*.  Vol. 37, Pp. 293-370.  *Available at*: http://ssrn.com/author=1020356

2001   "False Confessions: Causes, Consequences, and Solutions." In Saundra D. Westervelt and John A. Humphrey, Eds. (2001). *Wrongly Convicted: Perspectives on Failed Justice* (Newark: Rutgers University Press).  Pp. 36-54.

2001   "Police Interrogation and False Confessions in Rape Cases." In Roy Hazelwood and Ann Burgess, Eds.  *Practical Rape Investigation: A Multidisciplinary Approach*.  3rd Edition.  (Boca Raton, Florida: CRC Press).  Pp. 233-241.

2001   "Confessions" in Gillian Lindsey and Jonathan Michie, Eds.  *Reader's Guide to the Social Sciences*.  Vol. 1. (London: Fitzroy Dearborn Publishers).  Pp. 266-267.

2000   "Autism, Rape and Arson" (with Ann Burgess, David Elkovitch, Jay Jackman).  *Sexual Assault Report*. Vol. 4, Number 2.  November/December.  Pp. 17, 28-30.

1999   "Adapting to *Miranda*: Modern Interrogators' Strategies For Dealing With The Obstacles Posed By *Miranda*" (with Welsh S. White). *Minnesota Law Review*.  Volume. 84. Pp. 397-472.  *Available at*: http://ssrn.com/author=1020356

  •   Cited by the United States Supreme Court in *Maryland v. Shatzer*,  130 S. Ct. 1213 (2010)

1998   "Using the Innocent to Scapegoat *Miranda*: Another Reply to Paul Cassell" (with Richard Ofshe).  *The Journal of Criminal Law and Criminology*. Vol. 88, Pp. 557-577.  *Available at*: http://ssrn.com/author=1020356

1998   "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe).  *The Journal of Criminal Law and Criminology*.  Vol. 88, Pp. 429-496.  *Available at*: http://ssrn.com/author=1020356

  •   Reprinted in Alisa Smith (2004).  *Law, Social Science, and the Criminal Courts* (Durham: Carolina Academic Press).  Pp. 286-295.

1998   "*Miranda* and the Problem of False Confessions." In Richard A. Leo and George C. Thomas, III. Eds.  *The Miranda Debate: Law, Justice and Policing* (Boston: Northeastern University Press).  Pp. 271-282.

1998   "Civil Rights and Civil Liberties: Videotaping the Police." *Criminal Justice Ethics*.  Vol. 17, No. 1.  Winter/Spring.  Pp. 44-45.

1998   "Witness for False Confession No Expert." *The Forensic Echo: The Monthly Newsmagazine of Psychiatry, Law & Public Policy*.  Vol II., No. 3 (February).  Pp. 14-15.

14

1998    "False Confessions and Miscarriages of Justice." *The Defender* (January). Pp. 3-6.

1997    "The Social and Legal Construction of Repressed Memory." *Law & Social Inquiry*, Vol. 22, Pp. 653-693. *Available at*: http://ssrn.com/author=1020356

1997    "Missing the Forest for the Trees: A Response to Paul Cassell's 'Balanced Approach' to the False Confession Problem" (with Richard Ofshe). *Denver University Law Review*. Vol. 74, Pp. 1135-1144. *Available at*: http://ssrn.com/author=1020356

1997    "The Decision to Confess Falsely: Rational Choice and Irrational Action" (with Richard Ofshe). *Denver University Law Review*. Vol. 74, Pp. 979-1122. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Myron Moskovitz (2010). *Cases and Problems in Criminal Procedure: The Police*. 5th Edition.

1997    "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" (with Richard Ofshe). *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251. Available at: http://ssrn.com/author=1020356

1997    "Some Thoughts about Police and Crime." In Lawrence Friedman and George Fisher, Eds. (1997). *The Crime Conundrum: Essays on Criminal Justice* (Boulder: Westview Press). Pp. 121-125.

1997    "False Confessions and Miscarriages of Justice Today." In Richard A. Leo, Ed. (1997). *The American Criminal Justice System* (Simon & Schuster). Pp. 169-206.

1997    "A Historical Overview of Confession Law." In Richard A. Leo, Ed. (1997). *The American Criminal Justice System* (Simon & Schuster). Pp. 151-160.

1997    "The Criminal Justice System: An Overview." In Richard A. Leo, Ed. (1997). *The American Criminal Justice System* (Simon & Schuster). Pp. 1-20.

1996    "Police Scholarship for the Future: Resisting the Pull of the Policy Audience." *Law & Society Review*, Vol. 30, Pp. 865-879. *Available at*: http://ssrn.com/author=1020356

1996    "The Impact of *Miranda* Revisited." *The Journal of Criminal Law and Criminology*. Volume 86, Pp. 621-692. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998). *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press). Pp. 208-221.

1996    "*Miranda*'s Revenge: Police Interrogation as a Confidence Game." *Law & Society Review*, Vol. 30, Pp. 259-288. *Available at*: http://ssrn.com/author=1020356

15

- Reprinted in Ronald Allen et al. (2005). Comprehensive Criminal Procedure (New York: Aspen Publishers). 2nd Ed. Pp. 888-889.

1996 "Inside the Interrogation Room." *The Journal of Criminal Law and Criminology*. Vol. 86, Pp. 266-303. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Jeannine Bell, Ed. (2006), *Police and Policing Law*. Ashgate Publishing, Ltd. Pp. 99-136. Also reprinted in Joshua Dressler and George C. Thomas III (1999), *Cases and Materials on Criminal Procedure* (West Publishing). Pp. 566-568, 598, 673-676.

1996 "The Ethics of Deceptive Research Roles Reconsidered: A Reply to Kai Erikson." *The American Sociologist*. Vol. 27, Pp. 122-128.

1995 "Trial and Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers." *The American Sociologist*. Vol. 26, Pp. 113-134.

- Reprinted in Robert Emerson (2001), *Contemporary Field Research: Perspectives and Formulations* (Prospect Heights: Waveland Press). 2nd Edition. Pp. 260-279.

1994 "Police Interrogation and Social Control." *Social and Legal Studies*: An International Journal, Vol. 3, Pp. 93-120. *Available at*: http://ssrn.com/author=1020356

1994 "Police Interrogation in America: A Study of Violence, Civility and Social Change" (Ph.D. dissertation, University of California at Berkeley). *Available at* http://0-proquest.umi.com.ignacio.usfca.edu/pqdweb?did=742035331&sid=1&Fmt=2&clientId=16131&RQT=309&VName=PQD.

1993 "The Yale White-Collar Crime Project: A Review and Critique" (with David T. Johnson). *Law and Social Inquiry*, Vol. 18, Pp. 63-99. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael Levi, Ed (1998). *Fraud: Organizational, Motivation, and Control*, Volume II (England: Ashgate Publishing Ltd). Pp. 51-88.

1992 "From Coercion to Deception: The Changing Nature of Police Interrogation in America." *Crime, Law, and Social Change: An International Journal*. Vol. 18, Pp. 35-59. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Richard A. Leo and George C. Thomas, III. Eds (1998). *The Miranda Debate: Law, Justice and Crime Control* (Boston: Northeastern University Press). Pp. 65-74.

1992 "The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick). *Criminal Justice Ethics*. Vol. 11, No. 1. Winter/Spring. Pp. 3-12. *Available at*: http://ssrn.com/author=1020356

- Reprinted in Michael C. Braswell, Belinda R. McCarthy and Bernard J. McCarthy (2005) *Justice, Crime and Ethics*. Fifth Edition. Pp. 69-84. Reprinted in Jeffrey Reiman (2000),

*Criminal Justice Ethics* (New York: Prentice-Hall). Reprinted in *The Leadership Journal* (January-March, 1993). Pp. 23-27; (Cincinnati: Anderson Publishing Co). Reprinted in *The Boalt Hall Transcript*, Spring, 1993. Pp. 21-23; Revised and expanded as a chapter in John Bizzack (Ed), *Issues In Policing: New Perspectives*. (Lexington: Autumn House Publishing). Pp. 75-95.

## OTHER WRITINGS

"Predicting Erroneous Convictions: A Social Science Approach to Miscarriages of Justice" (with Jon Gould, Julia Carrano and Joseph Young). Report to the National Institute of Justice. (December, 2012).

Amicus Curiae Brief, United States Supreme Court. *State of Florida v. Kevin DeWayne Powell* (October 30, 2009) (No. 08-1175). Sole author.

## CITATION BY APPELLATE COURTS

### United States Supreme Court

*J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011)
*Maryland v. Shatzer*, 130 S. Ct. 1213 (2010)
*Corley v. United States*, 129 S. Ct. 1558 (2009)
*Missouri v. Seibert*, 124 S. Ct. 2601 (2004)

### Canadian Supreme Court

*R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).

### All Appellate Courts

2015    Alcox v. Beard, No. CV 08-1587-JVS (C.D. Cal. Nov. 3, 2015).
*Barros v. State*, No. PM/11-5771, 2015 R.I. Super. LEXIS 66 (R.I. Super. Ct. May 18, 2015).
*In re* Elias V., No. A140263, 2015 WL 3561620 (Cal. Ct. App. June 9, 2015).
*Walker v. State*, No. CR-11-0241, 2015 WL 505356 (Ala. Ct. Crim. App. Feb. 6, 2015).
*Lapointe v. Comm'r Correction*, 316 Conn. 225 (2015).
*Mullen v. Barnes*, No. 2:13-cv-0165-MCE-EFBP, 2015 WL 2000764 (E.D. Cal. Apr. 30, 2015).
*Williams v. Schmidt*, No. 3:10-cv-0025 TMB, 2015 WL 1396800 (D. Alaska March 25, 2015).
*Spence v. Beard*, No. 14-cv-1624 BAS (KSC), 2015 WL 1956436 (S.D. Cal. Apr. 29, 2015).
*People v. Vega*, 236 Cal. App. 4th 484 (2015).
*Commonwealth v. Bland*, No. 33 EAP 2013, 2015 WL 3370266 (Pa. May 26, 2015).
*Barros v. State*, No. PM/11-5771, 2015 R.I. Super. LEXIS 66 (R.I. Super. Ct. May 18, 2015).

17

2014     *Gumm v. Mitchell*, No. 11-3363, 2014 WL 7247393 (6th Cir. Dec 22, 2014)
         *Soffar v. Stephens*, No. H-12-3783, 2014 U.S. Dist. LEXIS 175331 (S.D. Tex. Dec. 18, 2014).
         *Teleguz v. Davis*, No. 7:10CV00254, 2014 WL 3548982 (W.D. Va. July 17, 2014).
         *Commonwealth v. Alicia*, 92 A.3d 753 (Penn. 2014).
         *People v. Yi*, No. B251560, 2014 WL 5409066 (Cal. Ct. App. Oct. 24, 2014).
         *People v. Boyce*, 59 Cal. 4th 672 (2014)
         *State v. Fernandez-Torres*, 337 P.3d 691 (Kan. Ct. App. 2014)
         *Commonwealth v. Scuderi*, No. CP-51-CR-1010101-1994, 2014 Phila. Ct. Com. Pl. LEXIS 140 (Phila. Ct. Com. Pl. May 16, 2014)
         *Bies v. Sheldon*, Nos. 12-3431 & 12-3457, 2014 WL 7247396 (6th Cir. Dec. 22, 2014)
         *Sessoms v. Grounds*, 768 F.3d 882 (9th Cir. 2014).
         *Dean v. State*, 288 Neb. 530 (2014)
         *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)
         *People v. Carino*, No. B244423, 2014 WL 1256072 (Cal. Ct. App. March 27, 2014).
         *People v. Mays*, No. E055989, 2014 Cal. App. Unpub. LEXIS 405 (Cal. Ct. App. Jan. 21, 2014).
         *People v. Whatley*, No. G049642, 2014 WL 1499553 (Cal. Ct. App. Apr. 17, 2014).
         *Woodall v. State*, 754 S.E.2d 335 (Ga. 2014).
         *Commonwealth v. Hoose*, 5 N.E.3d 843 (Mass. 2014).
         *State v. Juranek*, 844 N.W.2d 791 (Neb.2014).
         *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014).
         *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014).
         R.v. Reid, 2014 CarswellNfld 59 (Can. Nfld.) (WL).

2013     *Livers v. Schenck*, No. 8:08CV107, 2013 WL 5676881 (D. Neb. Oct. 18, 2013).
         *Steele v. Harrington*, No. LA CV 10-04872-VBF-E, 2013 WL 5441750 (C.D. Cal. Sept. 25, 2013).
         *Dean v. County of Gage*, No. 4:09CV3144, 2013 U.S. Dist. LEXIS 182187 (D. Neb. Dec. 31, 2013).
         *Wright v. Comm'r of Corr.*, 143 Conn. App. 274 (2013).
         *People v. Sanford*, No. 291293, 2013 WL 5379673 (Mich. Ct. App. Sept. 26, 2013).
         *People v. Linton*, 56 Cal. 4th 1146 (2013)
         *Irwin v. Commonwealth*, 465 Mass. 834 (2013)
         *Coleman v. State*, No. 14-12-00553-CR, 2013 WL 5758084 (Tx. Ct. App. Oct. 24, 2013)
         *People v. Sanders*, No. A134386, 2013 WL 4470551 (Cal. Ct. App. Aug. 19, 2013).
         *Shelby v. State*, 986 N.E. 2d 345 (Ind. Ct. App. 2013).
         *Commonwealth v. Harrell*, 65 A.3d 420 (Pa. Super. Ct. 2013).
         *U.S. v. Preston*, 706 F.3d 1106 (9th Cir. 2013).
         *Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013).
         *People v. Carrera*, No. E053997, 2013 WL 1883289 (Cal. Ct. App. May 7, 2013).
         *People v. Ortega*, No. B235552, 2013 WL 1635909 (Cal. Ct. App. Apr. 17, 2013).
         *In re Tyler S.*, No. 4-11-0540, 2013 WL 1552421, (Ill. Ct. App. Apr. 12, 2013).
         *State v. Dassey*, 827 N.W.2d 928 (Wis. Ct. App. 2013).
         *Dorsey v. United States*, 60 A.3d 1171 (D.C. 2013)

18

2012 *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012).
   *U.S. v. Fugate*, No. 11-3694, 2012 WL 3893114 (6th Cir. Sept. 7, 2012).
   *U.S. v. Deuman*, 892 F. Supp. 2d 881 (W.D. Mich. 2012).
   *People v. Spence*, 212 Cal. App. 4th 478 (2012)
   *Vent v. State*, 288 P.3d 752 (Alaska Ct. App. 2012).
   *Simmons v. State*, 105 So. 2d 475 (Fla. 2012).
   *Ex parte Soffar*, Nos. WR-29980-03, WR-29980-04, 2012 WL 4713562 (Tex. Crim. App. Oct. 3, 2012).
   *State ex rel. A.W.*, 51 A.3d 793 (N.J. 2012).
   *People v. Kowalski*, 821 N.W.2d 14 (Mich. 2012).
   *State v. Stevens*, 822 N.W.2d 79 (Wis. 2012).
   *United States v. Ford*, 683 F.3d 761 (7th Cir. 2012).
   *State v. Rafay*, 285 P.3d 83 (Wash. Ct. App. 2012).
   *People v. Perez*, 946 N.Y.S.2d 835 (N.Y. Sup. Ct. 2012).
   *State v. Abdulle*, 275 P.3d 1113 (Wash. 2012).
   *People v. Kinstley*, No. A130102, 2012 WL 831535 (Cal. Ct. App. Mar. 12, 2012).
   *People v. Mullen*, No. C062851, 2012 WL 758145 (Cal. Ct. App. Mar. 8, 2012).
   *Miner v. Neotti*, No. CV 10-07419 ODW (SS), 2012 WL 1116078 (C.D. Cal. Feb. 16, 2012).

2011 *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011).
   *Bell v Ercole*, No. 05 CV 4532(ERK), 2011 WL 5040436 (E.D.N.Y. Oct. 21, 2011)
   *White v. Smith*, 808 F. Supp. 2d 1174 (D. Neb. 2011).
   *Dean v. Smith*, 805 F. Supp. 2d 750 (D. Neb. 2011).
   *Brown v. Blumenfeld*, 930 N.Y.S. 2d 610 (N.Y. App. Div. 2011). Decided Oct. 4, 2011.
   *People v. Gaono*, No. D055290, 2011 WL 4500857 (Cal. Ct. App. Sept. 29, 2011)
   *Commonwealth v. Rios*, No. 2007-1051, 2011 WL 4089553 (Mass. Super. Ct. Sept. 7, 2011)
   *United States v. Michael Jacques* 784 F. Supp.2d 59 (D.Mass. 2011)
   *People v. Hernandez*, No. B215707, 2011 Cal. App. Unpub. LEXIS 3039 (Apr. 25, 2011).
   *People v. Dimas*, No. B223795, 2011 Cal. App. Unpub. LEXIS 2464 (Apr. 11, 2011).
   *United States v. Ross*, No. CR S-99-0043 WBS EFB, 2011 WL 1253870 (E.D. Cal. Mar. 30, 2011).
   *Commonwealth v. Wright,* 14 A. 3d 798 (Pa. 2011).
   *People v. Sanchez*, No. 2-08-1243, 2011 Ill. App. Unpub. LEXIS 872 (Ill. App. Ct. 2/4/2011).

2010 *People v. Polk*, 942 N.E. 2d 44 (Ill. App. Ct. 2010).
   *People v. Garcia*, No. B216793, 2010 WL 4868186 (Cal. Ct. App. Nov. 30, 2010).
   *State v. Lockhart*, 4 A. 3d 1176 (Conn. 2010).
   *United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010).
   *United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010).
   *People v. Kowalski*, No. 294054, 2010 WL 3389741 (Mich. Ct. App. Aug. 26, 2010).
   *Dorsey v. United States*, 2 A.3d 222 (D.C. 2010).
   *Crowe v. County of San Diego*, 593 F.3d 841 (9th Cir. 2010).
   *Milke v. Ryan*, No. CV 98-60-PHX-RCB, 2010 WL 383412 (D. Ariz. Jan. 29, 2010).
   *Kaguyutan v. Rozum*, No. 2:08-1022, 2010 WL 483791 (W.D. Pa. Feb. 5, 2010).
   *Maryland v. Shatzer*, 130 S. Ct. 1213 (2010).

*Rathbun v. Scribner*, No. CV 08-3339-AG, 2010 WL 1266666 (C.D. Cal. Feb. 10, 2010).
*State v. A.N.J.*, 225 P.3d 956 (Wash. 2010).
*Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010).
*People v. Vargas*, No. G041999, 2010 WL 2525582 (Cal. Ct. App. 4th June 23, 2010).

2009   *Cason v. Hedgpeth*, No. CV 08-4576-JVS (RNB), 2009 WL 1096209 (C.D. Cal. 4/22/2009).
*Corley v. U.S.*, 129 S. Ct. 1558 (2009).
*R. v. Cech*, [2009] Q.C.C.S. 1041 (Can.).
*R. v. Edwards* [2009] CarswellOnt 6324 (Can.).
*R. v. Merceus*, [2009] Q.C.C.S. 3205 (Can.).
*R. v. T.E.*, [2009] ON.C. LEXIS 4222 (Can.).
*People v. Leon*, No. G037950, 2009 WL 249362 (Cal. Ct. App. Feb. 3, 2009).
*People v. Olague*, No. C053372, 2009 WL 924503 (Cal. Ct. App. April 7, 2009).
*State v. Fairconatue*, 773 N.W.2d 226 (Wash. Ct. App. 2009).
*State v. Riofta*, 209 P.3d 467 (Wash. 2009).
*Wade v. Brady*, 612 F. Supp. 2d 90 (D. Mass. April 30, 2009).
*People v. Robles*, No. G038739, 2009 WL 1364364 (Cal. Ct. App. May 15, 2009).
*Bush v. State*, No. CR-03-1902, 2009 WL 1496826 (Ala. Crim. App. May 29, 2009).
*People v. Lucas*, No. C057593, 2009 WL 2049984 (Cal. Ct. App. Aug. 4, 2009).
*Wroten v. Felker*, No. CV 08-04352-AG, 2009 WL 3171705 (C.D. Cal. Sept. 30, 2009).
*In re D.K.*, No. 289371, 2009 WL 3401152 (Mich. Ct. App. Oct. 22, 2009).
*People v. Singletary*, No. B211849, 2009 WL 3931360 (Cal. Ct. of App. Nov. 20, 2009).

2008   *People v. Madrigal*, No. F051127, 2008 WL 192310 (Cal. Ct. App. Jan. 24, 2008).
*U.S. v. Chancellor*, No. 07-20578-CR, 2008 WL 622937 (S.D. Fla. Feb. 8, 2008).
*Anthony v. State*, 980 So. 2d 610 (Fla. Dist. Ct. App. 2008).
*In re Taylor*, 144 Wash. App. 1038 (2008).
*People v. Cerda*, No. E041249, 2008 WL 2123855 (Cal. Ct. App. May 21, 2008).
*In re Detention of Law*, 144 Wash. App. 1047 (June 2, 2008).
*People v. Rosario*, 862 N.Y.S.2d 719 (2008).
*People v. Steele*, No. B193519, 2008 WL 2410394 (Cal. Ct. App. June 16, 2008).
*R. v. Choy*, [2008] 456 A.R. 177 (Can.).
*R. v. Fabas*, [2008] B.C.S.C. 677 (Can.).
*R. v. Leslie*, [2008] O.N.C.J. 666 (Can.).
*R. v. Modjani*, [2008] 458 A.R. 96 (Can.).
*Bell v. Ercole*, No. 05 CV 4532(ERK), 2008 WL 2484585 (E.D.N.Y. June 20, 2008).
*State v. Montejo*, 974 So.2d 1238 (La. 2008).
*State v. Turner*, 187 P.3d 835 (Wash. Ct. App. 2008).
*State v. Unga*, 196 P.3d 645 (Wash. 2008).
*State v. Wooden*, No. 23992, 2008 WL 2814346 (Ohio Ct. App. July 23, 2008).

2007   *People v. Cason*, No. B187189, 2007 WL 891292 (Cal. Ct. App. March 26, 2007).
*In re Bradford*, 165 P.3d 31 (Wash. Ct. App. 2007).
*In re Genaro R.*, No. A112572, 2007 WL 934886 (Cal. Ct. App. March 29, 2007).
*People v. Bean*, 847 N.Y.S.2d 903 (2007).

20

*People v. Villarreal*, No. H029622, 2007 WL 1556645 (Cal. Ct. App. May 30, 2007).
*People v. Rathbun*, No. B178509, 2007 WL 2391258 (Cal. Ct. App. Aug. 23, 2007).
*Doughtie v. Scribner*, No. CIV S-06-1695-FCD-CMK-P, 2007 WL 2669922 (E.D. Cal. 9/7/07)
*People v. Muratalla*, No. B192446, 2007 WL 4376374 (Cal. Ct. App. Dec. 17, 2007).
*People v. Wroten*, No. B188462, 2007 WL 4501776 (Cal. Ct. App. Dec. 26, 2007).
*R. v. Osmar*, [2007] 84 O.R.3d 321 (Can.).
*R. v. Osmar*, [2007] ONCA 50 (Can.).
*State v. Bannister*, 734 N.W.2d 892 (Wis. 2007).
*State v. Lawrence*, 920 A.2d 236 (2007).

2006    *Edmonds v. State*, 955 So. 2d 864 (Miss. Ct. App. 2006).
*People v. Doughtie*, No. C049197, 2006 WL 137426 (Cal. Ct. App. Jan. 18, 2006).
*People v. Smann*, No. D045166, 2006 WL 1075228 (Cal. Ct. App. April 25, 2006).
*R. v. Hammerstrom*, [2006] B.C.S.C. 1700 (Can.).
*R. v. Wilson*, [2006] 213 O.A.C. 207 (Can.).
*Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820 (Tenn. Crim. App. 6/ 22/06)
*People v. Fuentes*, No. B184728, 2006 WL 2102898 (Cal. Ct. App. July 31, 2006).
*Washington v. Wilmore*, No. Civ.A. 3:02CV00106, 2006 WL 2471511 (W.D. Va.8/23/2006).
*Reyes v. Duncan*, No. C 05-04078 SI, 2006 WL 2529106 (N.D. Cal. Aug. 31, 2006).
*Milke v. Schriro*, No. CV-98-0060-PHX-RCB, 2006 WL 3421318 (D. Ariz. Nov. 27, 2006).

2005    *In re Jerrell C.J.*, 699 N.W.2d 110 (Wis. 2005).
*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005).
*People v. Ford*, No. A100574, 2005 WL 236593 (Cal. Ct. App. Jan. 31, 2005).
*People v. Mora*, No. B167805, 2005 WL 1140646 (Cal. Ct. App. May 16, 2005).
*Scott v. State*, 165 S.W.3d 27 (Tex. App. 2005).
*Singletary v. Fischer*, 365 F. Supp. 2d 328 (E.D.N.Y. 2005).
*U.S. v. Bresnahan*, 62 M.J. 137 (C.A.A.F. 2005).
*In re Owens*, No. D045194, 2005 WL 2160209 (Cal. Ct. App. Oct. 7, 2005).

2004    *Commonwealth v. Cornelius*, 856 A.2d 62 (Pa. Super. Ct. 2004).
*Commonwealth v. DiGiambattista*, 813 N.E.2d 516 (Mass. 2004).
*Kerkowich v. Wwanesa Mutual Ins. Co.*, [2004] M.B.Q.B. 110 (Can.).
*Medley v. Commonwealth*, 602 S.E.2d 411 (Va. Ct. App. 2004).
*Missouri v. Seibert*, 124 S. Ct. 2601 (2004).
*People v. Ramos*, 121 Cal. App. 4th 1194 (2004).
*People v. Reyes*, No. A097648, 2004 WL 831245 (Cal. Ct. App. April 19, 2004).
*People v. Sowl*, No. A098094, 2004 WL 1080171 (Cal. Ct. App. May 14, 2004).
*People v. Ford*, No. A100574, 2004 WL 1776598 (Cal. Ct. App. Aug. 10, 2004).
*State v. Cook*, 847 A.2d 530 (N.J. 2004).
*Thorson v. State*, 895 So.2d 85 (Miss. 2005).
*Weeks v. State*, 140 S.W.3d 39 (Mo. 2004).
*West v. State*, 876 So.2d 614 (Fla. Dist. Ct. App. 2004).
*Cobb v. Bruce*, No. CIV.A. 03-3400-KHV, 2004 WL 3019345 (D. Kan. Dec. 29, 2004).
*Kerkowich v. Wawanesa Mutual Insurance Co.*, 2004 M.B.C. LEXIS 188 (Can. Man.) (Lexis).

21

2003    *Brown v. Crosby*, 249 F. Supp. 2d 1285 (2003).
        *In re C.J.*, 674 N.W.2d 607 (Wis. Ct. App. 2003).
        *People v. Martinez*, No. B157095, 2003 WL 1438802 (Cal. Ct. App. March 21, 2003).
        *People v. Gonzalez*, No. B154557, 2003 WL 22977531 (Cal. Ct. App. Dec. 19, 2003).
        *R v. Chalmers*, [2003] CarswellOnt 4704 (Can.).
        *R. v. Watts*, [2003] B.C.S.C. 1403 (Can.).
        *R. v. Wiegand*, [2003] 335 A.R. 157 (Can.).
        *State v. Mauchley*, 67 P.3d 477 (Utah 2003).
        *State v. Patton*, 826 A.2d 783 (N.J. Super. Ct. App. Div. 2003).
        *U.S. v. Villalba-Alvarado*, 345 F.3d 1007 (8th Cir. 2003).
        *Green v. City of Wenatchee*, 2003 WL 26089744 (E.D. Wash. Mar. 14, 2003)
        *Vent v. State*, 67 P.3d 661 (Alaska Ct. App. 2003).

2002    *Franks v. State*, 90 S.W.3d 771 (Tex. Ct. App. 2002).
        *People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. Feb. 27, 2002).
        *Monroe v. Angelone*, No. 3:98CV254, 2002 U.S. Dist. LEXIS 26310 (E.D. Va. 3/28/2002).
        *In re Jorge R.*, No. G028977, 2002 WL 31121106 (Cal. Ct. App. 2002).
        *People v. Escobedo*, No. B150558, 2002 WL 31160879 (Cal. Ct. App. Sept. 30, 2002).
        *People v. Smann*, No. D038219, 2002 WL 31608283 (Cal. Ct. App. Nov. 21, 2002).
        *People v. Hernandez*, No. E030489, 2002 WL 31781129 (Cal. Ct. App. Dec. 13, 2002).
        *R. v. MacKay*, [2002] 222 Sask. R. 259 (Can.).
        *State v. Cobb*, 43 P.3d 855 (Kan. Ct. App. 2002).
        *State v. Conger*, 652 N.W.2d 704 (Minn. 2002).
        *U.S. v. Cantres*, No. 00 C 3555, 2002 WL 276132 (N.D. Ill. Feb. 27, 2002).
        *U.S. v. Faulkingham*, 295 F.3d 85 (1st Cir. 2002).
        *U.S. v. Rodgers*, 186 F. Supp. 2d 971 (E.D. Wis. 2002).

2001    *Cherrix v. Braxton*, 131 F. Supp. 2d 756 (E.D. Va. 2001).
        *Monroe v. Angelone*, No. 3:98CV254, 2001 U.S. Dist. LEXIS 25216 (E.D. Va. 2001 4/18/01).
        *People v. DeWeaver*, No. A091078, 2001 WL 1515830 (Cal. Ct. App. 2001).
        *R. v. Tessier*, [2001] 245 N.B.R.2d 1 (Can.).
        *U.S. v. Astello*, 241 F.3d 965 (8th Cir. 2001).

2000    *Hearndon v. Graham*, 767 So.2d 1179 (Fla. 2000).
        *Lapointe v. Warden*, No. CV 970571161, 2000 WL 1409721 (Conn. Super. Ct. Sept. 6, 2000).
        *R. v. Leahey*, [2000] 278 A.R. 201 (Can.).
        *R. v. Oickle*, [2000] 2 S.C.R. 3 (Can.).
        *State v. Davis*, 32 S.W.3d 603 (Mo. Ct. App. 2000).

1999    *Moriarty v. Garden Sanctuary Church of God*, 511 S.E.2d 699 (S.C. Ct. App. 1999).
        *People v. Philips*, 692 N.Y.S.2d 915 (1999).
        *State v. Rettenberger*, 984 P.2d 1009 (Utah 1999).
        *State v. Schofield*, 97 Wash. App. 1085 (1999).

22

1998    *State v. Meade*, 963 P.2d 656 (Or. 1998).

### MEDIA COVERAGE, APPEARANCES, AND CITATION OF RESEARCH

2015    *New York Times*                          *Life of the Law* (Podcast)
        Los Angeles Times                         Slate
        *AP Online*                               *Virginia Pilot*
        *The Marshall Project*                    *New York Law Journal*
        *The Guardian*                            *Peru Tribune*
        *Criminal Law Reporter*

2014    *Philadelphia Inquirer*                   *Pittsburgh Post-Gazette*
        *Beatrice Daily Sun*                      *San Quentin Times*
        *The Daily Times*                         *Modesto Bee*
        *The Buffalo News*                        *Omaha World-Herald*

2013    *The New York Times*                      *The Atlantic*
        *The New Yorker*                          *The Nation*
        *The Philadelphia Inquirer*               *The San Diego Union-Tribune*
        *KPIX TV* (Channel 5, San Francisco)      *KPBS Radio* (San Diego)
        *Christian Science Monitor Weekly*        *The Buffalo News*
        *Evansville Courier-Press*                *Connecticut Law Tribune*
        *The Philadelphia Daily News*             *CBS News*

2012    *USA Today*                               *New York Times*
        *Chicago Tribune*                         *Philadelphia Inquirer*
        *Pacific Standard Magazine*               *Oregon Register-Guard*
        *San Francisco Chronicle*                 *San Francisco Business Times*
        *Crestline Courier- News*                 *Fairbanks Daily News-Miner*
        *Ground Report*                           *Evansville Courier Press*
        *Owensboro Messenger-Inquirer*            *Inland Valley Daily Bulletin*

2011    *San Francisco Chronicle*                 *Detroit Free Press*
        *Chicago Tribune*                         *Philadelphia Inquirer*
        *New York Times*                          *Los Angeles Times*
        *The Lawton Constitution*                 *Memphis Commercial Appeal*
        *Vancouver Sun*                           *Chicago Sun-Times*
        *Brooksville, FLA Hernando Today*         *Great Falls Tribune*
        *Tampa Tribune*                           *Chicago Daily Herald*

2010    *Chicago Tribune*                         *KTVU News Channel 2* (San Francisco)
        *The New York Times*                      *Appleton Post-Crescent*
        *Columbia Missourian*                     *Yakima-Herald*
        *Houston Chronicle*                       *Grand Rapids Press*
        *Seattle Times*                           *Manitowoc Herald Times Reporter*

23

*Oshkosh Northwestern*                *Wausau Daily Herald*
*Sheboygan Press*                     *Chambersburg Public Opinion*
*Aolnews.com*                         *Green Bay Press Gazette*
*Joplin Globe*                        *KY3 News* (Missouri)
*Voice of America*                    *San Francisco Examiner*
*New York Magazine*                   *PBS Frontline*
*Mississippi Clarion-Ledger*          *KUCI FM* (Orange County, CA)
*Kansas City Star*

2009   *The New Yorker*                *The Atlantic*
       *San Francisco Chronicle*       *St. Petersburg Times*
       *Miami Herald*                  *The Detroit News*
       *Livingston Daily News*         *American Lawyer*
       *Columbia Missourian*           *California Lawyer*
       *KAOS Radio (Evergreen, WA)*    *Boulder Daily Camera*
       *Transitions,* Syndicated NPR   *The Texas Observer*
       *Siskiyou Daily News*           *The Virginia Pilot*
       *The Ft. Collins Coloradoan*

2008   *Columbia Missourian*           *Washington Post*
       KQED Radio, San Francisco, CA   *The Virginia Pilot*
       *Orlando Sentinel*              *San Jose Mercury News*
       WUIS Radio, Springfield, Illinois   *Oakland Tribune*
       KPIX, Channel 5 Bay Area        *Fairbanks News-Miner*
       *Springfield State Journal-Register*   KGO Radio
       KKSU Perspectives, Syndicated NPR   *Baltimore Examiner*
       *Legal Intelligencer*           *KPCC Radio* Los Angeles
       *Columbia Daily Tribune*        *Riverside Press-Enterprise*
       *Albuquerque Journal*           *Justice Denied Magazine*
       *Seattle Weekly*                *Palm Beach Daily Business Review*
       *Broward Daily Business Review*  *Miami Daily Business Review*
       *Omaha World Herald*            *NBC Dateline*
       *Style Weekly*                  *National Law Journal*
       *Contra Costa Times*            *Arkansas Democrat-Gazette*
       *Illinois Times*                *Fault Lines*
       *Washington Examiner*

2007   *San Francisco Chronicle*       KQED Radio, San Francisco, CA
       *Arkansas Democrat-Gazette*     *The Westchester Guardian*
       *New York Times*                *Chicago Tribune*
       *Akron Beacon Journal*          *Wisconsin Lawyer*
       *Bakersfield Californian*       *National Public Radio*
       *Missoula Independent*          *Evansville Courier & Press*
       *Mr. Big* (Documentary)

2006 *San Jose Mercury News*     *National Law Journal*
   *Contra Costa Times*       *Los Angeles Times*
   *Oprah Magazine*       *Oklahoma City Journal Record*
   *Atlanta Journal-Constitution*   *New York Law Journal*
   *Wisconsin State Journal*    *Connecticut Law Tribune*
   *Richmond-Times Dispatch*   *Pittsburgh Post-Gazette*
   *Missoula Independent*     *Palm Beach Post*
   *Cox News Service*      *ABC News*
   *Business Wire*       *Fulton County Daily Report*
   *San Mateo County Times*    *Tennessean*
   *Virginian-Pilot*       *Salon.Com*

2005 *California Lawyer*      *Wisconsin State Journal*
   *Vermont Brattleboro Reformer*  *Louisville Courier-Journal*
   *Arizona Republic*      *Chronicle of Higher Education*
   *Chicago Reader*       *Newsday*
   *New York Law Journal*    *Court TV*

2004 *San Diego Union-Tribune*    *New York Times*
   *Los Angeles Times*     *Pittsburgh Post-Gazette*
   *Legal Times*       *San Francisco Recorder*
   *Court TV*        *Village Voice*
   *Orange County Register*    *Fort Lauderdale Sun-Sentinel*
   *Winston Salem Journal*    *Hayward Daily Review*
   *Rochester Democrat and Chronicle*

2003 *Miami Herald*       *San Diego Union-Tribune*
   *New York Times*      *Chicago Tribune*
   *Los Angeles Times*     *CBS News*
   *Law and Order*      *Copley News Service*
   *Seattle Times*       *CNN*
   *Modesto Bee*       *Amnesty International Magazine*
   *USA Today*        *Arts & Entertainment Channel*
   *San Antonio News-Express*   *Toronto Star*
   *Birmingham Post-Herald*    *Orange County Register*

2002 *Miami Herald*       *San Jose Mercury News*
   *New York Times*      *National Public Radio*
   *Oprah Magazine*      *Wisconsin State Journal*
   *Pittsburgh Post-Gazette*    *Virginian-Pilot*
   *Deseret Morning News*    *Fort Lauderdale Sun-Sentinel*
   *National Public Radio, This American Life* *Forensic Files*
   *Milwaukee Journal Sentinel*   *Harpers Magazine*
   *Austin American-Statesman*   *San Mateo County Times*
   *FBI Law Enforcement Bulletin*  *Capital Times*

2001  *New York Times*                          *Pittsburgh Post-Gazette*
      *Orange County Register*                  *St. Louis Post-Dispatch*
      *Forensic Files*                          *Minnesota Star Tribune*
      *Detroit Free Press*                      *Boston Globe*
      *Charleston Post and Courier*             *Port Huron Times Herald*
      *Grand Rapids Press*

2000  *San Jose Mercury News*                   *New York Times*
      *Chicago Tribune*                         *Los Angeles Times*
      *Modesto Bee*                             *Boston Globe*
      *Ascribe Newswire*                        *Dallas Morning News*
      *University Wire*                         *Chicago Daily Law Bulletin*
      *San Francisco Examiner*                  *Syracuse Post-Standard*
      *Washington Times*                        *Fort-Worth Star Telegram*
      *American Prospect*                       *Reason*

1999  *San Francisco Chronicle*                 *Washington Post*
      *National Public Radio*                   *Los Angeles Times*
      *Newsday*                                 *Milwaukee Journal Sentinel*
      *Rochester Democrat and Chronicle*        *Daily Press.Com*
      *New York Law Journal*                    *Nation*
      *American Bar Association Journal*        *Chicago Magazine*
      *Seattle Post-Intelligencer*             *Playboy Magazine*
      *Federal News Service*                    *Baltimore Sun*

1998  *Washington Post*                         *Riverside Press-Enterprise*
      *San Diego Union-Tribune*                 *New York Times*
      *Chicago Tribune*                         *Los Angeles Times*
      *Seattle Times*                           *St. Louis Post-Dispatch*
      *Dallas Morning News*                     *U.S. News & World Report*
      *Hartford Courant*                        *Chicago Sun-Times*
      *Baltimore Sun*                           *New Orleans Times-Picayune*
      *Raleigh News & Observer*

1997  *Boulder Daily Camera*                    *Orlando Sentinel*
      *Riverside Press-Enterprise*              *San Diego Union-Tribune*
      *Newsday*                                 *Detroit Free Press*
      *Boston Globe*                            *Charleston Post and Courier*
      *Dallas Morning News*                     *Hartford Courant*
      *Denver Post*                             *Maury Povich Show*
      *New York Post*                           *Geraldo Rivera Live*
      *New York Daily News*                     *Newark Star-Ledger*
      *Memphis Commercial Appeal*               *Memphis Commercial Appeal*
      *Vancouver Columbian*                     *Indianapolis News*

26

| | |
|---|---|
| *Philadelphia Inquirer* | *Gary Post-Tribune* |
| *Morristown Daily Record* | *Wilmington News Journal* |
| *Belleville News-Democrat* | *Mobile Register* |
| *Greenville News* | *Charleston Gazette-Mail* |
| *Cleveland Plain Dealer* | *Wheeling Sunday News-Register* |
| *Everett Herald* | *Augusta Chronicle* |
| *Columbus Dispatch* | *Columbus Leger-Enquirer* |
| *Worchester Telegram* | *Macon Telegraph* |
| *Scranton Times* | *Contra Costa Times* |
| *Dayton Daily News* | *Canton Repository* |
| *Eugene Register-Guard* | *Tacoma News Tribune* |
| *Salem Statesman Journal* | *Trenton Times* |
| *Bridgewater Courier-News* | *Hackensack Record* |
| *Shreveport Times* | |

1996  *Los Angeles Times*                       *Louisville Courier-Journal*
       *Legal Times*                             *Shreveport Times*
       *New Jersey Law Journal*

1995  *Boulder Daily Camera*

# **PRESENTATIONS**

2015  "Successes and Failures of the Innocence Revolution." Duke University Law School. "Present and Future of Civil Rights Movements: Race and Reform in 21st Century America." Durham, North Carolina.

"Reflections on a Classic Ten Years Later: Richard Leo's "Rethinking the Study of Miscarriages of Justice." American Society of Criminology. Washington, DC. November, 2015.

"Wrongful Convictions and the Death Penalty." University of San Francisco School of Law. Criminal Law Society. November, 2015.

"Police Interrogation, False Confessions, and Alleged Child Abuse Cases." University of Michigan, School of Law. Conference on Child Abuse Evidence: Perspectives from Law, Medicine, Psychology and Statistics. Ann Arbor, MI. November, 2015

"The Path to Exoneration (with Jon Gould). National Science Foundation and National Institute of Justice Conference. "Elephants in the Courtroom: Examining Overlooked Issues in Wrongful Convictions." Arlington, Virginia. October, 2015.

"Has the Innocence Movement Become an Exoneration Movement? The Risks and Rewards of Redefining Innocence "Wrongful Convictions and the DNA Revolution: 25 Years of Freeing The Innocent" Conference." Northeastern University School of Law. September, 2015.

"A Damning Cascade of Investigative Errors."  Southeastern Association of Law Schools. Boca Raton, FLA.  August, 2015.

"The Problem of Wrongful Conviction."  Center for the Advanced Study in the Behavioral Sciences.  Stanford University. Palo Alto, CA.  May, 2015.

"False Confessions: The Psychological Science."  American Psychology-Law Society.  San Diego, CA.  March, 2015.

"The Social Psychology of Police Interrogation, False Confessions and Wrongful Conviction." Department of Psychology, Social Psychology Program.  Stanford University.  Palo Alto, CA. March, 2014.

2014     "Litigating False Confession Cases" and "Presenting Expert Testimony."  National Forensic College.  Cardozo Law School.  New York, New York.  June, 2014.

"False Confessions, Erroneous Convictions and Safeguarding the Innocent." The Rand Corporation.  Santa Monica, CA. May, 2014

"The Problem of Wrongful Conviction."  University of California, Irvine.  The Newkirk Center for Science and Society, The Center for Law, Society and Culture, and The Center for Psychology and Law.  Irvine, CA. April, 2014.

"Police Interrogation and Coerced and False Confessions."  Los Angeles Public Defender's Office. Van Nuys and Downtown Offices.  Los Angeles, CA.  April, 2014.

"False Confession and Wrongful Conviction: Causes, Consequences, and Solutions." Susquehanna University.  Arlin M. Adams Center For Law and Society Distinguished Lecture. Selinsgrove, PA.  April, 2014.

"Legal Scholarship Employing Theory: A Critique."  Northwestern University School of Law. Boston, MA.  March, 2014.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2014.

"The Justice Gap and the Promise of Criminological Research."  Western Society of Criminology.  Honolulu, HI.  February, 2014.

2013     "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  UCLA School of Law.  Los Angeles, CA.  August, 2013.

"Why Interrogation Contamination Occurs."  Association of American Law Schools.  Mid-year

28

Criminal Justice Conference.  San Diego, CA.  June, 2013.

"Social Psychological Testimony Regarding Interrogations and Confessions."  American-Psychology Law Society.  Portland, OR.  March, 2013.

"To Walk in Their Shoes: The Problem of Recognizing False Confessions" (with Deborah Davis).  American-Psychology Law Society.  Portland, OR.  March, 2013.

"False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar.  Monterey, CA.  February, 2013.

2012   "Contaminated Confessions: Accuracy and Error in Decision-Making in the Criminal Justice Process."  Duke University School of Law.  Durham, North Carolina.  December, 2012.

"Innocent Differences? An Empirical Study of Wrongful Convictions vs. "Near Misses" (with Jon Gould and Julia Carrano).  American Society of Criminology. Chicago, IL.  November, 2012.

"False Confessions: Causes, Consequences, Solutions."  Roosevelt University, Department of Psychology. Wrongful Convictions Distinguished Speakers Series.  Chicago, IL.  November, 2012.

"Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Hearings to Prevent Wrongful Convictions."  American University School of Law.  Washington, D.C.  September, 2012.  U.C. Davis School of Law.  Davis, CA.  October, 2012.  Temple University School of Law.  Philadelphia, PA.  November, 2012.

"An Early Peek at the Results: An Empirical Study of Wrongful Convictions versus "Near Misses" (with Jon Gould and Julia Carrano).  Law and Society Association.  Honolulu, HI.  June, 2012.

"The Science of False Confessions."  Washington State Courts Continuing Judicial Education Conference.  Cle Elum, Washington.  April, 2012.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection".  Western Psychological Association.  San Francisco, CA.  April, 2012.

"Interrogation Through Pragmatic Implication: Sticking to the Letter of the Law While Violating Its Intent."  Loyola University Law School.  Los Angeles, CA.  April, 2012.

"Two Real-Life Studies, a Meta-Analysis, and the Effects of Unanticipated Questions."  American Psychology-Law Society.  San Juan, Puerto Rico.  March, 2012.

"False Confessions: Understanding and Litigating the Issues."  New Mexico Criminal Defense Lawyers Association.  Albuquerque, NM.  March, 2012.

29

"False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2012.

2011 "The Dynamics of False Confessions." The Texas Bar, Continuing Legal Education. Dallas, Texas. December, 2011.

"Studying Wrongful Convictions: Learning From Social Science" (with Jon Gould). American Society of Criminology. Washington, D.C. November, 2011.

"False Confessions: Why Innocent People Confess." Northern California Innocence Project. Santa Clara University School of Law. Santa Clara, CA. October, 2011.

"The Problem of Interrogation-Induced False Confession: Sources of Failure in Prevention and Detection." Federal Public Defender, Capital Habeas Unit. Los Angeles, CA. August, 2011.

"The Science of False Confessions." Texas Criminal Defense Lawyers Association. Austin, TX. August, 2011.

"Police Interrogation Methods and False Confessions." New York State Justice Task Force on Wrongful Convictions. New York, NY. June, 2011.

"Police Interrogation: Tactics, Responses and Outcomes." University of Minnesota School of Law. Conference on Barry Feld's forthcoming book, *Police Interrogation of Juveniles: Practice and Policy*. May, 2011.

"The Truth About False Confessions: Interrogation-Related Regulatory Decline: Ego-depletion, Failures of Self-Regulation and the Decision to Confess." Western Psychological Association Conference. Los Angeles, CA. April, 2011.

"False Confessions: Causes, Consequences, Solutions." National Innocence Network Conference. University of Cincinnati School of Law. April, 2011.

"Police Interrogation in the Shadow of Trial." New York University School of Law. Hoffinger Criminal Justice Colloquium. March, 2011.

"Confessions of the Innocent: Causes, Consequences and Solutions." Forensic Mental Health Association of California Annual Conference. Keynote Address. Seaside, CA. March, 2011.

"Three Prongs of the Confession Problem: Issues and Proposed Solutions." University of Washington School of Law. Faculty Colloquium. Seattle, WA. January, 2011.

2010 "Purpose-Driven Scholarship, Justice Work, and the Problem of Wrongful Conviction." University of San Francisco School of Law. Justice Forum. November, 2010.

30

"Innocent: Recent Advances in Uncovering Wrongful Convictions." Stanford University School of Law. Shaking the Foundations Conference. October, 2010.

"*Miranda* at 50: What Have We Learned?" Seattle University School of Law. Faculty Colloquium. September, 2010.

"The Gatehouses and the Mansions: 50 Years Later." University of San Francisco School of Law. Faculty Brown Bag Series. July, 2010.

"A Doctrinal Analysis of *Miranda v. Arizona* and its Progeny: Why the Conventional Explanation is Wrong and What's Really Going On." University of San Francisco School of Law. Faculty Colloquium. April, 2010.

"Police Interrogation, Psychological Coercion and False Confessions: Understanding and Litigating the Issues." Los Angeles County Bar Association. April, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions." University of California, Berkeley School of Law. Center for the Study of Law and Society Faculty Colloquium. March, 2010.

"The Psychology of Coerced and False Confessions" and "Litigating Coerced and False Confession Cases." Department of the Army, U.S. Trial Defense Service Conference. Ft. Lewis, WA. March, 2010.

"Stage Setting in Police Interrogation: Interactive Effects of a Pretext for Interrogation and Minimization" (with Osvaldo Hernandez, Deborah Davis, Crissa Draper and William Follette). American Psychology-Law Society Conference. Vancouver, Canada. March, 2010.

"When Lightning Strikes Twice: Analyzing Double Wrongful Convictions." Emory University School of Law Faculty Colloquium. February, 2010.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2010.

"Interrogation Through Pragmatic Implication: Communicating Beneficence and Promises of Leniency" (with Deborah Davis and William Follette). Society for Personality and Social Psychology Conference. Las Vegas, NV. January, 2010.

"One Hundred Years of Getting It Wrong? Wrongful Convictions After a Century of Research" (with Jon Gould). Northwestern University School of Law. Conference on a Century of Criminal Law and Criminology. Chicago, IL. January, 2010

"Police Interrogation and False Confessions: A Review of the Research." Association of American Law Schools Annual Conference. New Orleans, LA. January, 2010.

31

2009   "The Wrong Guys: Author Meets Critics."  American Society of Criminology Conference. Philadelphia, PA.  November, 2009.

"False Confessions: Science and Research" Office of the State Appellate Defender and Illinois Institute for Continuing Legal Education Conference. Keynote Address.  Springfield, IL. October, 2009.

"Police-Induced Confessions: Risk Factors and Recommendations."  UC Hastings School of Law.  Faculty Colloquium.  San Francisco, CA.  September, 2009.

"The Psychology of Forced Confessions" and "Litigating False Confession Cases."  Indiana Public Defender Council Conference.  Indianapolis, IN.  August, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." National Association of Criminal Defense Attorneys Conference.  Santa Fe, NM.  April, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence."  Illinois Institute for Continuing Legal Education Death Penalty Conference. Keynote Address.  Chicago, IL. March, 2009.

"Interrogation, Coercion and False Confessions: Understanding and Identifying the Issues." Contra Costa County Public Defender's Office.  Martinez, CA.  March, 2009.

"False Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2009.

"False Confessions: Challenging Police-Induced Testimonial Evidence."  San Francisco Public Defender's Office.  February, 2009

"False Confessions: Causes, Consequences and Reforms."  Texas Court of Criminal Appeals. Criminal Justice Integrity Unit.  Austin, TX.  January, 2009.

2008   "The Wrong Guys: Murder, False Confessions and the Norfolk 4."  Northwestern University School of Law.  Chicago, IL.  November, 2008.

"Police Interrogation and American Justice: Author Meets Critics" and "When Lightning Strikes Twice: Studying Double Wrongful Convictions."  American Society of Criminology Conference.  St. Louis, Missouri.  November, 2008.

"The Psychology of False Confessions: Causes, Consequences and Reforms."  University of Illinois, Springfield.  Institute for Legal and Policy Studies and  Downstate Illinois Innocence Project.  November, 2008.

"The Wrong Guys: Murder, False Confession and the Norfolk 4."  University of San Francisco,

School of Law.   November, 2008.

"Police Interrogation, Psychological Coercion, and False Confessions."  California Defense Investigators Association Conference.  San Jose, CA.  November, 2008.

"False Confessions: Causes, Consequences, and Implications."  American Academy of Psychiatry and Law Conference.  Keynote address.  Seattle, WA.  October, 2008.

"Police Interrogation and American Justice."  New York University School of Law.  Hoffinger Criminal Justice Colloquium.    September, 2008.

"False Confessions and Wrongful Convictions."  Innocence Project.  New York, NY.  September, 2008.

"Police Interrogation and False Confessions."  Alaska Investigators Association and Alaska Innocence Project Conference.  Anchorage, AL.  September, 2008.

 "False Confessions, Wrongful Convictions and Legal Reform."  Association of American Law Schools.  Mid-year Meeting, Evidence Section.  Cleveland, Ohio.  June, 2008.

"False Confessions" and "Police Interrogation, False Statements and Confessions".  Habeas Corpus Resource Center Conference.  San Francisco, CA.  June, 2008

"False Confessions."  National Association of Criminal Defense Attorneys Conference.  Las Vegas, NV.  April, 2008.

"Litigating False Confession Cases." National Innocence Network Conference. University of Santa Clara School of Law.  March, 2008.

 "Recommending False Confession for the Innocent" (with Deborah Davis and William Follette).  American Psychology Law Society Conference.  Ft. Lauderdale, FL.  March, 2008.

"Police Interrogation and Coercion in Domestic American History."  University of Chicago School of Law.  Conference on Torture, Law and War.  March, 2008

"Persuaded False Confessions."  University of Chicago School of Law.  Criminal Law Faculty Colloquia.  February, 2008.

"Understanding False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2008.

2007   "Understanding False Confessions."  California Public Defenders' Association Conference.  Yosemite, CA.  November, 2007.

33

"Persuaded False Confessions" and "Effects of Interrogation Tactics on Recommendation of False Confessions for the Innocent" (with Deborah Davis and William Follette). University of Texas, El Paso. "Interrogation and Confessions: A Conference Exploring Current Research, Practice and Policy." September, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." Florida Public Defender Association Conference. Orlando, FlA. September, 2007.

"Effects of Failed Polygraph Results on Perceived Wisdom of True and False Confessions" (with Deborah Davis). American Psychological Association Conference. San Francisco, CA. August, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." District of Columbia Public Defender Service. Washington, DC. June 2007.

"Understanding the Reid Method and How It Coerces Confessions." Habeas Corpus Resource Center Conference. San Francisco, CA. June, 2007.

Wrongful Convictions and False Confessions. Tel Aviv University, School of Law. Conference on New Directions in Courtroom Research. Tel Aviv, Israel. May, 2007.

"False Confessions: Causes, Consequences, Solutions." Ohio Innocence Project. University of Cincinnati School of Law. Cincinnati, OH. March, 2007.

"Wrongful Conviction: Legal and Judicial Perspectives." Academy of Criminal Justice Sciences Conference. Seattle, WA. March, 2007.

"False Confessions and the Wrongful Conviction of the Innocent." National Innocence Network Conference. Harvard University Law School. March, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." National Legal Aid and Defender Association. Annual Conference on Indigent Defense. Dallas, TX. March, 2007.

"Understanding the Reid Method and How It Coerces Confessions." California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA. February, 2007.

"The Social Psychology and Consequences of Police-Induced False Confessions." Northern California Innocence Project. Santa Clara, CA. February, 2007.

"Police Interrogation, Psychological Coercion, False Confessions." Santa Clara County Public Defender's Office. San Jose, CA. February, 2007.

"Why Do Suspects Falsely Confess?"Administrative Offices of the United States Courts. Conference on Forensic Evidence and the Criminal Law. New Orleans, LA. January, 2007.

34

2006    "Police Interrogation, False Confession and American Justice."  University of Oklahoma, Department of Psychology.  Faculty Colloquium.  Norman, OK.  December, 2006.

"Police interrogation, Psychological Coercion, False Confessions."  Missouri State Public Defender System Conference.  St. Louis, MO.  December, 2006.

"Police Interrogation and American Justice." University of San Francisco School of Law.  Faculty Colloquium.  November, 2006.

"The Limits of *Miranda*."  University of Colorado School of Law.  Conference on the 40th Anniversary of *Miranda v. Arizona*.  Boulder, CO.  October, 2006.

"Interrogating Guantanamo Detainees."  University of San Francisco School of Law.  October, 2006.

"Coerced and False Confessions."  National Child Abuse Defense & Resource Center Conference.  September, 2006.  Las Vegas, NV.

"False Confessions: Causes, Consequences and Solutions." California Commission on the Fair Administration of Justice.  Los Angeles, CA.  June, 2006.

"Sympathetic Detectives with Time Limited Offers: Effects on Perceived Consequences of Confession" (with Deborah Davis, Deborah Knaack and David Bailey).  Association for Psychological Science Conference. New York, NY.  May, 2006.

"Police Interrogation and Confessions."  San Mateo Private Defender Program.  Burlingame, CA.  May, 2006.

"*Miranda*'s Past, Present and Future."  Harvard University School of Law.  Conference on Criminal Procedure Stories.  Cambridge, MA.  April, 2006.

"Incriminating Ourselves?"  U.C.L.A. School of Law.  Conference on the Faces of Wrongful Conviction:  Examining California Justice Gone Wrong.  April, 2006.

"Police Interviewing and Interrogation: Toward A National Self-Report Survey of Police Practices and Beliefs" (with Saul Kassin, Kimberly Richman, L.H., Colwell, Amy Leach, Dana La Fon, & Christian Meissner) and  "Evaluating Law Enforcement Evidence Ploys when Confessions are False: Mock Juror Perceptions of Deception and Coercion" (with Jennifer A. Bienhoff, Krista D. Forrest & Brad J. Stastny) and "Evaluating Evidence Ploys: The Role of Ploy Type in Perceptions of Deception and Coercion" (with Brad Stastny, Krista Forrest & Jennifer Bienhoff).  American Psychology-Law Society Conference.  St. Petersburgh, FL.  March, 2006.

"Police Interrogation and False Confessions: Best Practice Guidelines."  Wisconsin Criminal

Justice Study Commission.  Milwaukee, Wisconsin.  February, 2006.

"Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century."  University of San Francisco School of Law.  Faculty Colloquium.  January, 2006.

2005    "Preventing Wrongful Convictions: Re-Examining Fundamental Principles of Criminal Law to Protect the Innocent" (with Steve Drizin).  University of Wisconsin Law School. Conference on Wrongful Convictions.  November, 2005.

"Reforming Criminal Interrogation: Legal Solutions." University of Chicago Law School. November, 2005.

"Bringing Reliability Back In: False Confessions and Legal Safeguards."   Seattle University Law School.  Faculty Colloquium. November, 2005.

"Police Interrogation and the American Adversary System."  Washington University School of Law.  Faculty Colloquium.  St. Louis, Missouri. October, 2005.

"Police Interrogation and the American Process of Justice."  Loyola University School of Law. Faculty Colloquium. Los Angeles, CA.  September, 2005.

"The Social Psychology and Consequences of Police-Induced False Confessions."  Northern California Innocence Project.  Santa Clara, CA.  July, 2005.

"Re-Thinking the Study of Wrongful Conviction."  Law and Society Association Conference. Las Vegas, NV.  June, 2005

"Beyond CSI: Psychology, Crime and Justice."   University of California, Irvine. The UCI Think Forum Series. May, 2005.

"True, False, and Suspicious Confessions: Research and Testimony on Interrogations and Confessions (with Mark Costanzo).  Symposium on Applied Social Psychology.  Claremont McKenna College.  Claremont, CA.  April, 2005.

"Proven False Confessions: What They Tell Us About Police Interrogations."  American Psychology Law Society Conference.  San Diego, CA.  March, 2005.

"Teaching Law and Society in Undergraduate Programs."  West Coast Law and Society Retreat.  University of California, Berkeley.  March, 2005.

"The Psychology of Police Interrogation and False Confessions."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program. Monterey, CA.  February, 2005.

"The Evidentiary Aspects of Wrongful Convictions." The Association of American Law

36

Schools Annual Conference.  San Francisco, CA.  January, 2005.

2004    "Police Interrogation and False Confessions."  Northern California Innocence Project.
University of Santa Clara.  Santa Clara, CA.  November, 2004.

"Police Interrogation, Psychological Coercion and False Confessions."  Distinguished Faculty
Scholar Lecture.  University of Pittsburgh, School of Law.   November, 2004

"Psychological Coercion and Unreliable Confessions" (with Richard Ofshe). American Society
of Criminology Conference.  Nashville, TN.  November, 2004.

"The Psychology of Police Interrogation and False Confessions: What You Need to Know."
Solano County Bar Association.  Fairfield, CA.  November, 2004.

"Police Interrogation and False Confessions."  Los Angeles County Bar Association.  Los
Angeles, CA.  November, 2004.

"Police Interrogation and Unreliable Statements: Thinking about the James Tucker Case."
Northern California Innocence Project.  Golden Gate University School of Law.  San
Francisco, CA.  September, 2004.

"Police Interrogation, Psychological Coercion and False Confessions."   National Defender
Investigation Association Western Regional Conference.  Redondo Beach, CA.  September,
2004.

"The Search for Truth."  2004 Northern District of California Judicial Conference, Ninth
Circuit.  Santa Cruz, CA.  May, 2004.

"Interrogation, Confession and Innocence."  Innocence Project, Benjamin N. Cardozo Law
School.  New York, N.Y.  May, 2004.

"Protecting Human Subjects vs. Preserving Social Research."  University of California,
Berkeley, School of Law.  Berkeley, CA.  April, 2004.

"Police Interrogation and Confessions."  Santa Clara County Public Defender's Office.  San
Jose, CA.  March, 2004.

"Police Interrogation: A Study in Deception."  San Mateo County Private Defenders Program.
Burlingame, CA.  January, 2004.

2003    "Confessions, Admission, and False Statements."  California Attorneys for Criminal Justice
Conference.  San Francisco, CA.  December, 2003.

"Procedures for Interrogation and Confession."  The University of California, Irvine.
Conference on Science and the Law of Evidence.  November, 2003.

"Confessions and Coercion."  Habeas Corpus Resource Center Conference.  San Francisco, CA.  November, 2003.

"Understanding Police Interrogation, Coercion and Confessions."  San Francisco Public Defenders' Office.  San Francisco, CA.  October, 2003.

"Videotaping Interrogations: Does it Enhance the Jury's Ability to Distinguish True and False Confessions?" (with Saul Kassin, C. Crocker and Lindsay Holland).  Psychology & Law International Interdisciplinary Conference.  Edinburgh, Scotland.  July, 2003.

"Exploding the Myths of False Confession: Lessons from the Central Park Jogger Case" (with Steve Drizin).  The Law and Society Association Conference.  Pittsburgh, PA.  June, 2003.

"Analyzing Confessions and Their Consequences."  The Advanced Judicial Academy for Illinois Judges."  University of Illinois.  Champaign, Illinois.  June, 2003

"The Social Psychology of Police Interrogation and False Confession."  San Diego Psychology-Law Society.  San Diego, CA.  May, 2003.

"The Psychology of Police Interrogation and False Confession."  The National Judicial Institute.  Victoria, British Columbia.  May, 2003.

"The Psychology of Police Interrogation, Coercion and False Confession."  Full day training course."  Miami Beach Police Department.  Miami Beach, FLA.  February, 2003

"False Statements."  California Attorneys for Criminal Justice/California Public Defenders Association Case Defense Seminar Program.  Monterey, CA.  February, 2003.

2002    "The Psychology of Police Interrogation and False Confession."  National Judicial Institute. Judicial Safeguards for the Prevention of Wrongful Convictions Seminar.  Ottawa, Ontario. Canada.  December, 2002.

"The Consequences of False Confessions Revisited in the DNA Age" (with Steve Drizin).  The American Society of Criminology Conference.  Chicago, IL.  November, 2002.

"Influence, Persuasion and Compliance: The Psychology of Police Interrogation and Confession Evidence."  University of California, San Diego. Department of Psychology. Faculty Colloquium.  November, 2002.

"Studying Police Interrogation and Confessions."  Long Beach Police Department.  Long Beach, CA.  November, 2002.

"The Psychology of Interrogation, Coercion and Police-Induced False Confession."  California Public Defenders Association Conference.  Rohnert Park, CA.  August, 2002

38

"The Psychology of Police Interrogation and False Confession." Three day training course for investigators at the Broward County Sheriff's Office. Ft. Lauderdale, Florida. July, 2002.

"False Confessions." Spokane Criminal Defense Attorneys. Spokane, WA. June, 2002.

"Thinking About Miscarriages of Justice." The Law and Society Association Conference. Vancouver, Canada. May, 2002.

"Police Interrogation, False Confessions and Miscarriages of Justice." California State University, Northridge. Department of Sociology. Faculty Colloquium. May, 2002.

"Public Perceptions of Interrogation Tactics in Criminal Setting" (with Jodi Quas and Brianne Beck). The Western Psychological Association Conference. Irvine, CA. April, 2002.

The Psychology of Police Interrogation and False Confessions." Invited Lecture to Military Prosecutors as part of the "Prosecuting Complex Litigation" Course Seminar. Naval Justice School. San Diego, CA. April, 2002.

"Video-taping, Police-Induced False Confessions and Interrogation Reform: Defining the Problems, Finding the Solutions." National Innocence Network Conference, California Western School of Law. San Diego, CA. January, 2002.

2001    "Police Interrogation and False Confessions." Annual Trial Defense Service Conference. United States Army. Las Vegas, Nevada. November, 2001.

"Analyzing False Confession Cases: How to Know Them When You See Them; What to Do When You Get Them." The Federal Defenders Program and the Illinois Association of Criminal Defense Lawyers Conference. Chicago, IL. October, 2001.

"How Police Induce False Confessions." Wisconsin Public Defender Conference. Milwaukee, WI. October, 2001.

"Influence, Coercion and Confession: Connecting Scholarly Research and Courtroom Testimony." The American Psychological Association Conference. San Francisco, CA. August, 2001.

"Investigating and Correcting Official Misconduct: Preliminary Lessons from the Rampart Scandal" (with Bill Thompson and Paul Kaplan). The Society for the Study of Social Problems Conference. Anaheim, CA. August, 2001.

"Police Interrogation, Coercion and False Confessions: Exposing Police Misconduct Inside the Interrogation Room and Exonerating the Innocent." The National Association of Criminal Defense Attorneys Conference. Minneapolis, MN. August, 2001.

"Police Interrogation Techniques and False Confessions." New Mexico Criminal Defense Lawyers Association Seminar. Albuquerque, NM. July, 2001.

"Police Interrogation, Coercion and False Confessions." Los Angeles Public Defender's Office. Los Angeles, CA. June, 2001.

"Thinking Critically About False Memories, False Confessions and False Accusations: Past, Present and Future." University of California, Irvine. Students for Science and Skepticism. May, 2001.

"Police Interrogation, Coercive Influence Techniques, and False Confessions." Western Circuit Workshop, United States Air Force. Travis Air Force Base. Sacramento, CA. March, 2001.

"Proving Your Client's Confession is False or Coerced." Capital Case Defense Seminar. California Attorneys for Criminal Justice and the California Public Defenders Association. Monterey, California. February, 2001.

"False Confessions." Benjamin N. Cardozo School of Law, Innocence Project Lecture Series. New York City, N.Y. January, 2001.

2000   "Questioning the Relevance of *Miranda* in the Twenty-First Century." University of Michigan, School of Law. Conference on *Miranda* After *Dickerson*: The Future of Confession Law. Ann Arbor, MI. November, 2000.

"Studying Miscarriages of Justice in the Age of DNA, Video Technology and Death Row Exonerations: Understanding and Solving the Problem." Distinguished Faculty Lecture. University of California, Irvine. November, 2000.

"Police Misconduct Inside the Interrogation Room" and "Police-Induced False Confessions, Wrongful Deprivations of Liberty, and Miscarriages of Justice. The American Society of Criminology Conference. San Francisco, CA. November, 2000.

"Confessions: Creating New Approaches to Excluding False, Coerced and Unlawfully Obtained Statements." San Diego County Public Defenders' Office. November, 2000.

"The False Confession." Orange County Public Defender's Training Seminar. Santa Ana, California. November, 2000.

"Miscarriages of Justice in the 21st Century: Coercion, False Confessions and the Wrongful Conviction of the Innocent." Marian Miner Cook Athenaeum Distinguished Lecture. Claremont McKenna College. Claremont, CA. September, 2000.

"Interviewing/Interrogation." Full day Training Session. Cyprus Police Training Program. Ministry of Justice and Public Order of the Republic of Cyprus. Nicosia, Cyprus. September, 2000.

"Psychological Research and Wrongful Convictions: Influence, Suggestion and Coercion." The American Psychological Association Conference. Washington, D.C. August, 2000.

"Obtaining Truthful Confessions, Avoiding Coerced and/or False Confessions." Training Seminar. Law Enforcement Coordinating Committee for the Fifth Circuit. San Antonio, TX. July, 2000.

"Going to a Different Ivory Tower." Association of American Law Schools Mid-Year Conference on Criminal Justice. Washington, D.C. June, 2000.

"Police Interrogation Methods, Coercion, and False Confessions." West Virginia Public Defender Conference. Davis, West Virginia. June, 2000

"Police-Induced False Confessions." The Mississippi Judicial College, University of Mississippi. Tunica, Mississippi. May, 2000.

"Coercive Interrogation and False Confessions: Reflections on the Wenatchee Cases." The University of Washington, Washington Law School Foundation. Seattle, WA. April, 2000.

"The Legal Consequences of False Confessions." The American Psychology-Law Society Conference. New Orleans, LA. March, 2000.

"Suggestive Interrogation and False Confessions." University of California, Irvine. Miscarriages of Justice Conference. School of Social Ecology. March, 2000.

"Interrogations and Confessions: Implications for Attorneys and Psychologists." Half-day course for prosecutors, defense attorneys and psychologists. Sponsored by Goebel & Vigen: Clinical, Forensic & Organizational Psychology. Shreveport, Louisiana. March, 2000.

"False Confession Theory and Application." Central Circuit Defense Team Conference, United States Air Force. Randolph Air Force Base. San Antonio, Texas. January, 2000.

"Police Interrogation, Coercive Influence Techniques, and False Confessions." Federal Defenders of San Diego Conference. San Diego, CA. January, 2000.

1999    "Coerced and False Confessions." Indiana Public Defender Council Conference. Indianapolis, Indiana. December, 1999.

"False Confessions: Causes, Consequences, and Solutions." The American Society of Criminology Conference. Toronto, Canada. November, 1999.

"Coerced Confessions." The Colorado State Public Defenders' Association Conference. Crested Butte, CO. October, 1999.

41

"Video-taping Interrogations and Confessions." Testimony before the Illinois House of Representatives. Task Force on Videotaping Interrogation and Confessions. Chicago, IL. September, 1999.

"Litigating a False Confession Case." National Seminar on Mental Illness and the Criminal Law. The Federal Defender Training Group. Washington, D.C. June, 1999.

"Adapting to *Miranda*: Modern Interrogators' Strategies For Dealing With The Obstacles Posed By *Miranda*." University of Southern California School of Law. Faculty Colloquium. March, 1999.

"Analyzing Coerced and/or False Confessions." National Association of Criminal Defense Attorneys Conference. St. Louis, Missouri. March, 1999.

"False Confessions: Inside the Interrogation Room from Coercion to Deception." Criminal Defense Attorneys of Michigan Conference. Detroit, Michigan. March, 1999.

"The Social Psychology of Police Interrogation and False Confession." University of California, Santa Barbara. Department of Psychology. Social Psychology Symposium. January, 1999.

"The Social Psychology of Police Interrogation and False Confession." University of California, Irvine. Department of Psychology and Social Behavior. Faculty Colloquium. January, 1999.

1998    "The Regulation and Memorialization of Confessions." Northwestern University School of Law. Conference on Wrongful Convictions and the Death Penalty. November, 1998.

"Science in the Courtroom." The American Society of Criminology Conference. Washington, D.C. November, 1998.

"Analyzing Coerced Confession Cases." Arizona Attorneys for Criminal Justice Conference. Tucson, AZ. September, 1998.

"The Social Psychology of False Confessions." American Sociological Association Conference. San Francisco, CA. August, 1998.

"The Psychology of Confession Evidence: From the Ivory Tower to the Realities of Practice." The Law and Society Association Conference. Aspen, CO. June, 1998.

"*Miranda* and the Adversary System: Lessons for Japan." University of California, Berkeley School of Law. Center for the Study of Law and Society. Conference on Japanese Criminal Justice. April, 1998.

"The Truth About False Confessions: Understanding Their Causes and Consequences." Wayne

State University . Center for Legal Studies.  Faculty Colloquium.  Detroit, MI.  April, 1998.

"The Truth About False Confessions: What Criminologists Should Know."  The Academy of Criminal Justice Sciences Conference.  Albuquerque, NM.  March, 1998.

"Coerced Statements, False Confessions and Creating Memory, Parts I and II." The Federal Judicial Center Conference.  San Diego, CA and Atlanta, GA. March, 1998.

"The Causes and Consequences of False Confessions."  University of Washington, Seattle. Department of Sociology.  Faculty Colloquium.  January, 1998.

1997 "Police Interrogation, False Confessions and Miscarriages of Justice."  The University of California, Irvine School of Social Ecology. Newport Beach, CA.  November, 1997.

"Police Interrogation, False Confessions and Expert Witnesses."  American Society of Criminology Conference.  San Diego, CA.  November, 1997.

"The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" (with Richard Ofshe).  Law and Society Association Conference.  St. Louis, Missouri.  May, 1997.

"The Decision to Confess."  The University of Denver College of Law. Symposium on Coercion, Exploitation and the Law.  Denver, CO. March, 1997.

"Police Interrogation, False Confessions, and Expert Witnessing."  University of Colorado, Boulder.  Department of Sociology, Graduate Student Forum.  March, 1997.

"Explaining False Confessions."  The University of Colorado, Boulder School of Law.  Faculty Colloquium.  Boulder, CO. February, 1997.

"False Confessions and Miscarriages of Justice *Today*."  Conference sponsored by The Justice Committee.  Salem, MA. January, 1997.

1996 "Coerced False Confessions."  American Society of Criminology Conference.  Chicago, Illinois.  November, 1996.

"False Confessions: Documenting, Explaining and Preventing Miscarriages of Justice." University of California, Irvine.  Department of Criminology, Law and Society.   Faculty Colloquium. November, 1996.

"Is *Miranda* Enough or Should We Video-tape All Confessions?"  Seton Hall University Law School.  Newark, NJ. October, 1996.

"The Principles and Practices of Criminal Law in the United States."  Tsingua University School of Law. Bejing, China.  October, 1996.

43

"Police Interrogation in America." Chinese People's Public Security University. Department of Criminology. Bejing, China. October, 1996.

"Police Interrogation and False Confessions in America." Supreme People's Procuratorate of the People's Republic of China." Bejing, China. October, 1996

"Deception by Sociologists." American Sociological Association Conference. New York, NY. August, 1996.

"Secrecy and the Interrogation of Suspects." University of Colorado, Boulder. Conference on George Simmel's Actual and Potential Impact on Contemporary Society. April, 1996.

"Between Reality and Metaphor: A Friendly Critique of *The Myth of Repressed Memory*." Pacific Sociological Association Conference. Seattle, WA. March, 1996.

1995    "The Context and Outcome of Police Interrogation: A Quantitative Analysis." American Society of Criminology Conference. Boston, MA. November, 1995.

"The Social and Legal Construction of Recovered Memories." University of Delaware at Newark, Department of Legal Studies. November, 1995.

"False Confessions and Miscarriages of Justice: A Preliminary Study" and "The Mythology and Sociology of Recovered Memories." Northern Arizona University, Departments of Sociology and Criminal Justice. Flagstaff, AZ. October, 1995.

"The Social Meaning of the O.J. Simpson Case." University of Colorado, Boulder. Department of Sociology, Diversity Forum. October, 1995.

"Interrogation and Surveillance: Changing Trends in Police Detection and Social Control." American Sociological Association Conference. Washington, D.C. August, 1995.

"False Memory, False Confession: When Police Interrogations Go Wrong." Law & Society Association Conference. Toronto, Canada. June, 1995.

"Trial *and* Tribulations: Courts, Ethnography, and the Need for an Evidentiary Privilege for Academic Researchers." The Pacific Sociological Association Conference. San Francisco, CA. April, 1995.

"Police Interrogation: Empirical Observations, Legal Questions, Ethical Dilemmas." University of Colorado, Boulder School of Law. Faculty Colloquium. February, 1995.

"Violence, Civility and Social Change: The Case of American Police Interrogation in the Twentieth Century." University of Minnesota, Minneapolis. Department of Sociology. Faculty Colloquium. January, 1995.

1994    "Westville Revisited: A Contemporary Analysis of Order, Legality, and Crime Detection."
American Society of Criminology Conference.  Miami, FLA, November, 1994.

"The Sociologist as Detective: Reflections on the Methodology and Ethics of Fieldwork Inside
the Police Interrogation Room."   University of California, Los Angeles.  Department of
Sociology. October, 1994.

"The Historical Sociology of the Third Degree in America: Analyzing the Rise and Fall of a
Violent Social Practice."  American Sociological Association Conference.  Los Angeles, CA.
August, 1994.

"The Impact of *Miranda* Revisited: Analyzing an Old Question with New Data."  Law &
Society Association Conference.  Phoenix, AZ, June, 1994.

"Police Interrogation as a Confidence Game."  Western Society of Criminology Conference.
Berkeley, CA, February, 1994.

1993    "Inside the Interrogation Room: A Participant Observation Study of Custodial Police
Questioning."  American Society of Criminology Conference.  Phoenix, AZ, October, 1993.

"How to More Effectively Elicit Confessions." Presentation to the Hayward Police, CA
Department, Criminal Investigation Division. August, 1993.

"Violence, Civility and Institutional Change: The Case of American Police Interrogation."
University of Colorado, Boulder.  Department of Sociology.  Faculty Colloquium.  January,
1993.

1992    "Criminal Interrogation and Confessions Revisited: An Analysis and Critique of Inbau and
Reid's Police Training Manuals and Courses." American Society of Criminology Conference.
New Orleans, LA, November, 1992.

"Police Interrogation and Social Control."  Law and Society Association Conference.
Philadelphia, PA, May, 1992.

1991    "From Coercion to Deception: An Empirical Analysis of the Changing Nature of Police
Interrogation in America."  American Society of Criminology Conference.  San Francisco, CA.
November, 1991.

"The Ethics of Deceptive Interrogation" (with Jerome H. Skolnick).  University of California,
Berkeley, School of Law.  Faculty Colloquium. September, 1991.

"The Social Psychology of Coerced-Internalized False Confessions" (with Richard J. Ofshe).
American Sociological Association Conference. Cincinnati, OH, August, 1991.

"Research on Police Interrogation: Some Thoughts and Questions About the Permissible Limits of Deception." University of California, Berkeley. Jurisprudence and Social Policy Program, Friday Forum. May, 1991.

## <u>LEGISLATIVE, JUDICIAL AND EXECUTIVE TESTIMONY</u>

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Court of Criminal Appeals. Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
The Illinois House of Representatives (1999)

## <u>GRANTS AND FELLOWSHIPS</u>

Stanford University, Center for the Advanced Study in the Behavioral Sciences (2014-2015)
Guggenheim Foundation (2011-2012)   Open Society Institute (2004-2005, 2008)
National Science Foundation (2005-2006)   Univ. of California, Irvine (1998-2002)
MacArthur Foundation (1992-1993)   Univ. of Colorado, Boulder (1994-1996)

## <u>COURSES TAUGHT</u>

| <u>LAW</u> | <u>UNDERGRADUATE</u> |
|---|---|
| Criminal Procedure | Introduction to Criminology, Law and Society |
| Criminal Law | Interrogation, Confession and the Law |
| Wrongful Convictions | Miscarriages of Justice |
| White Collar Crime | Influence, Memory and the Law |
| | Topics in Criminology |
| | Criminal Justice in the United States: An Introduction |
| <u>GRADUATE</u> | American Criminal Justice System: Advanced Overview |
| | Critical Thinking |
| Miscarriages of Justice | Sociology of Law |
| Police Organization and Behavior | Police, Law and Society |
| Police Scandal and Misconduct | Police Interrogation and False Confessions |
| Topics in Criminology | Sociology of White-Collar Crime |

## <u>POLICE INTERROGATION TRAINING (GIVEN)</u>

2/03   Taught 8 hour training course on interrogation methods, psychological coercion and false confessions for felony investigators in the Miami Beach Police Department. Miami Beach, FL.

7/02   Taught three 8 hour training courses on interrogation methods, psychological coercion and false confessions for felony investigators in the Broward County Sheriff's Office. Ft. Lauderdale, FL.

9/00     Taught a full-day training session on interview and interrogation to the Cyprus Police as part of their training program in the Ministry of Justice and Public Order. Republic of Cyprus. Nicosia, Cyprus.

7/00     Taught training seminar on obtaining truthful confessions and avoiding coerced and/or false confessions to the Law Enforcement Coordinating Committee for the Fifth Circuit. San Antonio, TX.

## POLICE INTERROGATION TRAINING (RECEIVED)

3/93     Attended and participated in one week advanced interrogation training course taught by the Federal Law Enforcement Training Center (FLETC). Glynco, Georgia. Received certificate.

1/92     Attended and participated in one week interrogation training course taught by the San Mateo Community College, Administration of Criminal Justice Department. San Mateo, California. Received certificate.

11/91    Attended and participated in two day advanced interrogation training course taught by Reid &Associates. San Francisco, California. Received certificate.

3/91     Attended and participated in three day introductory interrogation training course taught by Reid & Associates. Los Angeles, California. Received certificate.

12/90    Attended one-day in-house interrogation training course for Sergeants. Criminal Investigation Division, Oakland Police Department. Alameda, California.

## OTHER LAW ENFORCEMENT RELATED SERVICE WORK

10/01-6/03     Member, Academic Education and Action Research Advisory Committee to the Chief of Police, Long Beach Police Department. Long Beach, CA.

5/84-8/84     Voluntary Internship. San Francisco District Attorney's Office, Consumer Fraud Division. San Francisco, CA.

## PROFESSIONAL ACTIVITIES (SELECTIVE)

Editorial Board, *Law and Society Review* (1998-2002)

Peer Reviewer, Journals:

*Law & Society Review* (1996-2000; 2002-2003; 2012, 2014, 2016)
*Stanford Law Review* (2015)
*Behavioral Sciences & The Law* (2014)
*Philosophy, Science and Law* (2014)

47

*Journal of the American Academy of Psychiatry and the Law* (2014)
*Current Directions in Psychological Science* (2014)
*Psychology, Public Policy and Law* (2013-2014)
*Law & Human Behavior* (2005-2006, 2008-2009; 2012-2013)
*Justice Quarterly* (1998, 2000, 2005, 2009, 2013)
*Sociological Quarterly* (1998, 2013)
*Law & Social Inquiry* (1997-1998; 2001; 2005; 2013)
*American Journal of Criminal Justice* (2013)
*Journal of Law and Courts* (2012)
*British Journal of Sociology* (2012)
*Basic and Applied Social Psychology* (2011)
*Psychology, Crime and Law* (2009)
*Regulation and Governance* (2009)
*Journal of Criminal Justice* (2000, 2006, 2008)
*Criminology and Public Policy* (2007)
*Legal and Criminological Psychology* (2006)
*Journal of Law, Economics & Organization* (2005)
*Psychological Science* (2004)
*Psychological Science in the Public Interest* (2004)
*Law, Culture and the Humanities* (2004)
*Queen's Law Journal* (2004)
*Criminal Justice Ethics* (2003)
*Criminology* (2001-2002)
*Research in Crime & Delinquency* (1995, 1999)
*Sociological Forum* (1998-1999)
*Journal of Criminal Law and Criminology* (1996)
*Studies in Law, Politics and Society* (1996)
*Social Problems* (1996)
*American Journal of Sociology* (1995)

Peer Reviewer, Book Manuscripts:

*Ankerwycke Books* (2016)
*New York University Press* (2006-2007, 2011-2012, 2015)
*University of California Press* (2014)     *Oxford University Press* (2013-2014)
*Lexington Books* (2011)                    *Princeton University Press* (2008)
*University of Arizona Press* (2008)        *Cornell University Press* (2006)
*University of Michigan Press* (2005)       *AltaMira Press* (2004)
*University of Chicago Press* (2004)        *Academic Press* (2003)
*Aspen Publishers, Inc.* (2000)             *Northeastern University Press* (1999)

Tenure and Promotion Reviews:

University of Pittsburgh, School of Law (2015)
University of North Carolina, Greensboro, Department of Sociology (2015)

48

Roger Williams University, Department of Psychology (2015)
Emory University, Department of Psychology (2014)
Arizona State University, School of Criminology and Criminal Justice (2014)
University of Washington, School of Law (2013)
John Jay College of Criminal Justice (New York), Department of Psychology (2010)
UC Hastings College of Law, San Francisco, CA (2010)
University of Nevada, Reno, Department of Psychology (2004)
University of California, Berkeley, School of Law (2004)
Lafayette College (Pennsylvania), Department of Sociology (2003)
Northwestern University School of Law (2002)
Franklin and Marshall College (Pennsylvania), Department of Sociology (2001)

## PROFESSIONAL MEMBERSHIPS

American Law Institute
American Psychological Association
Association for Psychological Science
Academy of Criminal Justice Sciences
Society for the Study of Social Problems
Pacific Sociological Association
Western Society of Criminology

American Society of Criminology
American Psychology-Law Society
Law and Society Association
Association of American Law Schools
The American Sociological Association
Western Psychological Association

## CONSULTATIONS (SELECTIVE)

Law Enforcement

State of California, Department of Justice, San Diego, CA (2002-2004; 2013)
Maricopa County Sheriff's Office, Phoenix, AZ (2011)
Riverside County Sheriff's Association, Riverside, CA (2006)
Solicitor's Office, State of South Carolina, Seventh Judicial Circuit (2005)
Wyoming Association of Correctional Employees (2005)
Miami Beach Police Department, Miami Beach, FLA (2003)
Broward County Sheriff's Office, Ft. Lauderdale, FLA (2002)

Legislative, Judicial and Executive Organizations

New York State Justice Task Force on Wrongful Convictions (2011)
Texas Criminal Justice Integrity Unit (2009)
California Commission on the Fair Administration of Justice (2006)
Wisconsin Criminal Justice Study Commission (2006)
Illinois State Legislature, Task Force on Recording of Interrogations (1999-2000)

Innocence Projects and Universities (Selective)

Rudolf, Widenhouse and Fialko, Charlotte, NC (2015)
MacArthur Justice Center, Northwestern University Law School (2009-2011; 2013; 2015)
Northern California Innocence Project, San Francisco, CA (2004-2005; 2014-2015)
Minnesota Innocence Project (2011-2015)
University of Oklahoma Innocence Project (2012-2015)
Midwest Innocence Project (2014)
Pennsylvania Innocence Project (2014)
University of Wisconsin Innocence Project (2006; 2011-2014)
PACE University Law School Post-Conviction Criminal Defense Clinic (2010-2013)
Innocence Project, Benjamin N. Cardozo Law School. New York, NY (1999-2000, 2009; 2012)
University of California Davis School of Law, Immigration Clinic (2011-2012)
American University, Preventing Wrongful Convictions Project, Washington D.C. (2011-2013)
Centurion Ministries, Princeton, NJ (1998-2011)
Center for Wrongful Conviction, Northwestern University School of Law (2011)
George Washington University, Preventing Wrongful Convictions Project (2010-2011)
Maryland Innocence Project (2008-2010)
Downstate Illinois Innocence Project, University of Illinois (2008-2010)
Ohio Innocence Project (2007-2010)
Bluhm Legal Clinic, Northwestern University (2008-2010)
Innocence Project Northwest, University of Washington (1998-1999; 2005-2006; 2008-2010)
MacArthur Justice Center, University of Chicago Law School (1999; 2005-2006)
Innocence Project, Osgoode Hall Law School, York University.  Toronto, Ontario (2000)

Law Firms (Selective)

Loevy & Loevy, LLP, Chicago, IL (2012-2013; 2015)
Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C. (2014-2015)
Squire, Patton and Boggs LLP, New York, NY (2009-2015)
Venable LLP, Washington D.C. (2007-2015)
Drinker, Biddle & Reath LLP, New Jersey (2011-2015)
Sideman Bancroft LLP, San Francisco (2015)
Neufeld, Scheck and Brustin, LLP, New York, NY (2013-2014)
Kirkland & Ellis, LLP, Washington, DC (2013-2014)
Bingham McCutchen LLP, Boston, MA (2005-2014)
Beldock, Levine & Hoffman, LLP, New York, NY (2004-2014)
Sidley Austin LLP, Chicago, IL (2009-2014)
Goodwin Procter LLP, Boston, MA (2012-2013)
Morgan, Lewis and Bockius LLP, Chicago, IL (2012-2013)
Williams & O'Connolly LLP, Washington, D.C. (2011-2012)
Reed Smith, New York, NY (2011-2012)
Fredrikson & Byron, P.A., Minneapolis, MN (2009-2012)
McGwire Woods LLP, Richmond, VA (2011)
Lane Powell, Seattle, WA (2008-2010)
Paul, Weiss, Rifkind, Wharton & Garrison LLP (2009-2010)
Sidley & Austin LLP, San Francisco, CA (2009)

Weil, Gotshal & Manges LLP, New York, N.Y. (2009)
Kirkland & Ellis LLP, New York, N.Y. (2008-2009)
Cochran, Neufeld, and Scheck  LLP. New York, N.Y. (2003-2009)
Holland & Knight LLP, New York, NY (2004-2005, 2007-2009)
Goodwin Proctor LLP, New York, N.Y. (2008-2009)
Covington & Burling LLP, Washington, D.C. (2006)
O'Melveny & Myers LLP Los Angeles, CA (2003, 2005-2006)
Kelley, Drye & Warren LLP, New York (2006)
Joseph, Greenwald & Laake, PA, Greenbelt, Maryland (2005-2006)
Tamburello & Hanlon, San Francisco, CA (2005)
Hallinan, Wine & Sabelli, San Francisco, CA (2003)
Jenner & Block, Chicago, IL (2000-2001)
Jackson Walker LLP, Houston, TX (2000)
Day, Berry and Howard LLP, Hartford, CT (1999-2000)

<u>Other (Selective)</u>

Government of Mexico (2014)
NAACP Legal Defense Fund (2007-2009)
*Good Morning America.* ABC, New York, New York (2009)
Equal Justice Institute, Montgomery, ALA (2001-2004)
Beverly Monroe Coalition for Justice, Richmond, VA (1997-2003)
*Sixty Minutes*, CBS, New York, NY (2003)


**References Available on Request**

51

APPENDIX B

*State of California v. Lewis Romero*.  Trial. Los Angeles County Superior Court. Compton, CA.  February, 2012.

*State of California v. Jae Hee Yi*.  Trial. Los Angeles County Superior Court.  Pomona, CA.  April, 2012.

*United States vs. Clifton Yarborough*.  Post-Conviction Hearing.  Superior Court of District of Columbia.  Washington, D.C.  April, 2012.

*State of Indiana v. Ryan Shelby*.  Trial.  Warrick County Circuit Court.  Boonvile, Indiana. May, 2012.

*State of Oregon v. Angelica Swartout*.  Trial.  Lane County Superior Court.  Eugene, Oregon.  May, 2012.

*State of California v. Israel Lopez*.  Suppression Hearing. Santa Clara County Superior Court.  San Jose, CA.  May, 2012.

*State of California v. Francisco Estanol*.  Trial.  Ventura County Superior Court. Ventura, CA.  June, 2012

*State of California v. Rickie Lee Fowler*. Trial.  San Bernardino County Superior Court. San Bernardino, CA.  July, 2012

*State of New Mexico v. Marvin Williams*. Trial.  San Juan County 11th Judicial District Court.  Aztec, New Mexico.  August, 2012.

*State of California v. Jose Hernandez*.  Trial.  Contra Costa County Superior Court. Martinez, CA.  August, 2012.

*Ada Joann Taylor v. Richard Smith et al*; *Ada Joann Taylor v. Richard Smith et al*. Trial (Bench).  Civil.  Gage County Superior Court. Beatrice, Nebraska. September, 2012.

*State of California v. Ronnie Cavazos*.  Suppression Hearing.  Stanislaus County Superior Court.  Modesto, CA.  September, 2012.

*State of Wyoming v. John Balczewski*.  Suppression Hearing.  Laramie County District Court.  First Judicial District.  Cheyenne, Wyoming.  September, 2012

*State of California v. Leonel Contreras*.  Trial. San Diego County Superior Court.

San Diego, CA.  October, 2012.

*Kincaid v. Kincaid*. Trial (Civil).  Los Angeles County Superior Court. Pasadena, CA. October, 2012.

*Commonwealth of Kentucky v. Ronald Fairchild*.  Trial.  Rowan County Circuit Court. Morehead, KY.  November, 2012.

*State of California v. Angel Gonzalez*.  Suppression Hearing.  Los Angeles County Superior Court.
Los Angeles, CA.  December, 2012.

*State of California v. John Loren*.  Trial.  San Francisco County Superior Court.
San Francisco, CA.  February, 2013

*State of California v. Vrej Zadurian*.  Suppression hearing. Los Angeles County Superior Court.  Los Angeles, CA.  February, 2013.

*State of California v. Jae Hee Yi*.  Re-Trial. Los Angeles County Superior Court.
Pomona, CA.  March, 2013.

*State of California v. Edgar Santana*.  Trial.  Los Angeles County Superior Court.
Los Angeles, CA.  June, 2013

*State of California v. Jose Luis Garcia*. Trial. Riverside County Superior Court.
Indio,  CA.  June, 2013.

*State of California v. Miguel Bastida*.  Suppression Hearing.  Solano County Superior Court.
Fairfield, CA.  July, 2013.

*State of California v. Miguel Bastida*.  Trial.  Solano County Superior Court.
Fairfield, CA.  August, 2013.

*United States v. Ivan Teleguz*.  Post-conviction hearing.  Abington, VA.  United States District Court,
Western District of Virginia.  Washington County, VA.  November, 2013.

*State of California v. Richard Tuite*. Trial (testified for prosecution). San Diego County, CA.  December, 2013.

265) *James Dean et al v. Richard Smith et al*.  Trial.  United States District Court for the District of Nebraska.  8th Circuit.  Lincoln, Nebraska (Lancaster County).  January, 2014.

*State of New Mexico v. Jess Carpenter.*  Trial.  Eddy County, New Mexico.  Fifth Judicial District Court.  Carlsbad, New Mexico.  January, 2014.

*State of California v. Lisandro Magana.*  Trial.  Santa Clara County Superior Court. San Jose, CA.  January, 2014.

*State of California v. Victoria Martinez.* Suppression Hearing. Alameda County Superior Court.  Oakland, CA. January, 2014.

*State of Oregon v. Brian Canady.*  Suppression Hearing.  Washington County Superior Court.  Hillsborough, OR.  January, 2014.

*State of California v. Jose Luis Garcia.* Re-Trial. Riverside County Superior Court. Indio,  CA.  February, 2014.

*State of California v. David Gomez.*  Trial. Los Angeles County Superior Court. Compton, CA.  March, 2014.

*State of California v. Jae Williams*.  Trial.  Santa Clara County Superior Court.  San Jose, CA.  May, 2014

*State of California v. Marcel Ballier*.  Trial.  Riverside County Superior Court. Murrieta, CA.  May, 2014

*State of California v. Richard Calkins*.  Trial.  Solano County Superior Court.  Fairfield, CA. June, 2014.

*State of California v. Manuel Ramirez.*  Suppression Hearing. Los Angeles County Superior Court. Los Angeles, CA.  June, 2014.

*State of Wisconsin v. Patrick Donley.* Post-Conviction Hearing. Brown County Circuit Court.  Green Bay, WI.  June, 2014

*State of California v. Eduardo Cruz.* Suppression Hearing. Santa Clara County Superior Court. San Jose, CA. July, 2014.

*State of California v. Armando Velasquez.* Trial. Santa Clara County Superior Court. San Jose, CA.  July, 2014.

*State of Tennessee v. Jimmy Rauhuff.*  Trial. Blount County Circuit Court. Maryville, TN.

July, 2014.

*State of California v. Lynn Quach*.  Suppression Hearing. Orange County Superior Court. Santa Ana, CA.  August, 2014.

*State of California v. Gabriel Rodriguez*. Trial. Orange County Superior Court. Santa Ana, CA. August, 2014.

*State of California v. Jose Diazvillalta*. Trial.  Orange County Superior Court. Westminster, CA.  September, 2014.

*State of California v. John Angol*.  Trial. Los Angeles County Superior Court.  Lancaster, CA.  October, 2014

*State of California v. Tommy Franks*. Trial. Stanislaus County Superior Court. Modesto, CA. October, 2014.

*State of California v. Marco Hernandez*.  Suppression Hearing.  San Francisco County Superior Court. San Francisco, CA.  October, 2014.

*State of California v. Cameron Weaver*.  Preliminary Hearing. Marin County Superior Court. San Rafael, CA.  November, 2014.

*State of Colorado v. Anthony Nieto*.  Trial. Broomfield Combined Courts.  Broomfield, CO. November, 2014.

*State of Iowa v. Anthony Rodrigutez*.  Pre-Trial Suppression Hearing.  Waukon, Iowa. Allamakee County District Court.  November, 2014.

*State of California v. Juan Martinez*.  Trial. Santa Clara County Superior Court.  San Jose, CA.  December, 2014

*State of California v. Jonathan Riley*. Trial San Diego County Superior Court. San Diego, CA.  December, 2014

*State of Nevada v. Megan Johnson*.  Suppression Hearing. Washoe County District Court. Reno, NV.  January, 2015

*State of California v. Marco Hernandez*.  Trial.  San Francisco County Superior Court. San Francisco, CA. January, 2015.

*State of California v. Rene Centeno*. Trial.  Orange County Superior Court. Santa Ana, CA. January, 2015.

4

*Dan Williams et al. v. State of Virginia.* Habeas Hearing (Schlup, Actual Innocence). Federal District Court. Eastern District of Virginia. Richmond, Virginia. April, 2015.

*State of California v. Yor Xiong.* Trial testimony. San Joaquin County Superior Court. Stockton, CA. April, 2015

*State of California v. Patrick Alley.* Suppression Hearing. Solano County Superior Court. Fairfield, CA. April, 2015.

*State of California v. Louis Emmanuel.* Trial. Santa Clara County Superior Court. San Jose, CA. May, 2015.

*State of California v. Alfredo Torres.* Trial. Los Angeles County Superior Court. Van Nuys, CA. May, 2015.

*State of California v. Daniel Flores.* Suppression Hearing. Napa County Superior Court. Napa, CA. May, 2015

*State of California v. Daniel Flores.* Trial. Napa County Superior Court. Napa, CA. June, 2015

*Daniel Blank v. Burl Cain.* Post-Conviction Hearing (State Habeas). 32nd Judicial District Court for the Parish of Terrebone. Houma, Louisiana. July, 2015

*State of California v. Laron Gilbert.* Suppression Hearing. Solano County Superior Court. Fairfield, CA. August, 2015.

*State of Indiana v. Timothy Jimerson.* Trial. Miami County Circuit Court. Peru, Indiana. August, 2015.

*State of California v. Cheryl Lucero.* Trial. Tuolumne County Superior Court. Sonora, CA. August, 2015.

*State of California v. Abel Martinez.* Suppression Hearing. San Diego County Superior Court. El Cajon, CA. September, 2015

*State of California v. Omar Wright.* Trial. Los Angeles County Superior Court. Burbank, CA. September, 2015.

*State of California v. Jose Venegas.* Trial. Los Angeles County Superior Court. Los Angeles, CA. September, 2015

*State of California v. Abel Martinez*. Trial. San Diego County Superior Court. El Cajon, CA. October, 2015

*State of California v. Elgian Bailey*. Suppression Hearing. Los Angeles County Superior Court. Los Angeles, CA. October, 2015

*State of Arizona v. Robert Resendez*. Trial. Coconino County Superior Court. Flagstaff, AZ. November, 2015.

*State of California v. Joseph Castro*. Trial. Santa Barbara County Superior Court. Santa Barbara, CA. January, 2016.

*State of California v. Patrick Alley*. Trial. Solano County Superior Court. Fairfield, CA. January, 2016.

## <u>DEPOSITIONS</u>

*Deborah Kincaid v. Jeffrey Kincaid* (civil). September 5, 2012.

*James Andrews v. Jon Burge et al*. (civil). October 2, 2012.

*Eric Caine v. Jon Burge et al.* (civil). April 10, 2013

*Sampson v.Schenk et al.* (civil). June 21, 2013.

*Krystal Bustamante v. Wal-Mart Stores et al.* (civil). October 1, 2013.

*Donald Williams v. City of Chicago et al*. (civil). February 25, 2014.

*State of Vermont v. Jeanette Maxfield* (Criminal). September 19, 2014.

*Rafael Garcia Miranda v. City of Anaheim* (Civil). February 17, 2015.

*Trevon Yates v. County of St. Clair* (Civil). June 18, 2015

**APPENDIX C**

5/14/2005    Chicago Police Department event query regarding 911 call.  CITY000053-24

5/14/2005    Officer Lopez's Initial report.  CITY0000394-95

5/14/2005    Crime scene processing report regarding photographs taken at the scene.
         CITY0000455

5/14/2005    Chicago Police Department event query.
         CITY0000520

5/14/2005    Chicago Police Department event query regarding death and blue blanket with
         an elastic strip used for suffocation. CITY0000521-22

5/14/2005    Chicago Police Department event query regarding ambulance record.
         CITY0000528

5/14/2005    Chicago Police Department event query regarding death of Jaquari.
         CITY0000525-27

5/14/2005    Event History records Event #0513415597 regarding death of Jaquari.
         CITY0000514-18

5/14/2005    Event History records Event #0513415597 regarding death of Jaquari.
         CITY0000511-13

5/14/2005    General progress report by Wo regarding the family's information and the
         detectives on the case.  CITY0000414-15

5/14/2005    General progress report by Kelly regarding the family's information.
         CITY0000410

5/14/2005    Supplementary Report regarding death of Jaquari.   CITY0000396

5/14/2005    General progress report with drawings of the apartment and bedroom where
         incident took place.  CITY0000416-17

5/14/2005    General progress report by Wo regarding blue fitted sheet. CITY0000418

5/14/2005    Crime scene processing report regarding photos taken at the scene and physical
         evidence.  CITY0000454

5/14/2005    Property inventory No. 10532844 (child's notebook computer), No. 10532848
         (red blanket), No. 10532852 (white sheet with blue/green stripes and red stain),
         and No. 10532854 (blue sheet with red stain.)   CITY0000457-60

| | |
|---|---|
| 5/14/2005 | General progress report regarding Stavon Dancy information and what he did in the past 24 hours. Another general progress report on Nicole Harris regarding the same.  CITY0000419-20 |
| 5/14/2005 | Nicole Harris criminal record.  CITY0000471-75 |
| 5/14/2005 | Stavon Dancy criminal records.  CITY0000466-69 |
| 12/09/2003 | General progress report regarding contact with Edwardsville Police Department.  CITY0000405 |
| 12/09/2003 | Narrative Supplement regarding Harris driving on a suspended license.  CITY0000476 |
| 12/09/2003 | Fax cover sheet; Event information regarding Harris driving on a suspend/revoked license.  CITY0000477-81 |
| 08/02/2004 | Fax cover sheet; Event information about Dancy disorderly conduct and damage of property at Rally's Hamburgers.  CITY0000482-91 |
| 5/11/2004 | Fax cover sheet; Event information regarding Dancy being arrested for driving on a suspended license and operating an insured motor vehicle.  CITY0000492-96 |
| 5/14/2005 | Fax cover sheet; SIUE Police Department contact/criminal history regarding Nicole Harris.  CITY0000497-505 |
| 5/14/2005 | General progress report by Kelly regarding former address, and who lives in the residence.  CITY0000411 |
| 5/14/2005 | General progress report by Kelly regarding Nicole Harris' Interview.  CITY0000412-13 |
| 5/14/2005 | General progress report by Landando regarding interview of Alexis Fultis and Dinajia Arnold.  CITY0000397-98 |
| 5/14/2005 | Crime scene processing report includes photos taken, and physical evidence (phone cord)  CITY0000453 |
| 5/14/2005 | Property inventory No 10532876 (phone cord)  CITY0000461 |
| 5/14/2005 | Fax cover sheet; Original case incident report RD# HL356544 regarding personnel handling case.  CITY0000508 & 530-31 |
| 5/14/2005 | General progress report regarding DCFS worker that took custody of Diante Dancy.  CITY0000400 |

| | |
|---|---|
| 5/15/2005 | General progress by Landando report regarding a summary of Nicole's actions that day (includes when they read her Miranda rights and when she confessed.) CITY0000399 |
| 5/15/2005 | Nurses Notes.  CITY0000506-07 |
| 6/01/2005 | City of Chicago Office of Emergency communication: archive voice recordings in relationship to 5/14/2005 death.  CITY0000519 |
| 5/15/2005 | General progress report by Noradin regarding Nicole Harris statement. CITY0000421 |
| 5/15/2005 | General progress report by Wo regarding Stavon Dancy second interview. CITY0000422 |
| 5/15/2005 | General progress report by Noradin regarding Nicole Harris agreeing to polygraph.  CITY0000423 |
| 5/15/2005 | General progress report by Kelly regarding Post Mortem and ligature marks. CITY0000408-09 |
| 5/15/2005 | Crime scene processing report by Wo regarding items sent to Dr. Denton. CITY0000456, 462-63 |
| 5/15/2005 | Chicago Children's Advocacy Center Multidisciplinary Investigative Intake regarding Diante Dancy.  CITY0000509 |
| 5/15/2005 | Draft general progress report regarding interview with Diante Dancy. CITY0001220-21 |
| 5/15/2005 | General progress report regarding interview with Diante Dancy. CITY0001218-19 |
| 5/15/2005 | General progress report by Wo regarding interview with Diante Dancy. CITY0000406-07 |
| 5/15/2005 | Nicole Harris' polygraph consent form.  CITY0000577 |
| 5/15/2005 | Polygraph examiner's worksheet of Nicole Harris' polygraph.  CITY0000575 |
| 5/15/2005 | Stavon Dancy's polygraph consent form  CITY0000578 |
| 5/15/2005 | Polygraph lining.  CITY0000580-86 |
| 5/15/2005 | Polygraph examiner's worksheet of Stavon Dancy's polygraph.  CITY0000579 |
| 5/15/2005 | Polygraph Case Review of Nicole Harris and Stavon Dancy.  CITY0000576 |

| | |
|---|---|
| 5/15/2005 | General progress report by Noradin regarding interview with Harris after polygraph test. CITY0000424 |
| 5/15/2005 | General progress report by Noradin regarding Nicole Harris finding Jaquari's body in bedroom. CITY0000425 |
| 5/15/2005 | Consent to videotape statement of strangulation of Jaquari Dancy by Nicole Harris. CITY0000510 |
| 5/16/2005 | Video statement of Nicole Harris' statement of strangulation death of Jaquari Dancy. PL Nicole Harris 11586-608 |
| 5/16/2005 | Statement of Stavon Dancy. CITY0000433-43 |
| 2/19/1988 | City of Chicago Department of Police criminal history for Stavon Dancy. CITY0000465 |
| 5/16/2005 | Felony Minutes Form 101 for Nicole Harris by Noradin, Wo, Day, Kelly, Balodimas, & Landando. CITY0000431 |
| 5/16/2005 | General progress report by Noradin summarizing events on 5/14/2005-5/16/2005. CITY0000401-04 |
| 5/16/2005 | Chicago Police Department arrest report regarding Nicole Harris CB# 16181506. CITY0000972-76 |
| 5/16/2005 | Chicago Police Department arrest report regarding Nicole Harris CB# 16181506. CITY0000426-30 |
| 5/16/2005 | Chicago Police Department Arrest report for Nicole Harris CB# 16181506. CITY0000532-39 |
| 5/16/2005 | Videotape of Nicole Harris and transcript of same |
| 5/17/2005 | Complaint for preliminary examination. CITY0000432 |
| 5/17/2005 | Case supplementary report regarding Jaquari Dancy's death and polygraph test of parents #HL356544. CITY0000571-74 |
| 5/17/2005 | Case supplementary report regarding Jaquari Dancy's death and polygraph test of parents #HL356544. CITY0000540-43 |
| 5/18/2005 | Case supplementary report regarding Jaquari Dancy's death and case of death #HL356544. CITY0000544-45 |

| | |
|---|---|
| 5/19/2005 | Case supplementary report regarding Jaquari Dancy's death and case of death #HL356544.  CITY0000546-47 |
| 5/22/2005 | Chicago Police Department criminal history report of Nicole Harris. CITY0000470 |
| 5/25/2005 | Office of Medical Examiner of Cook County report of drugs in blood for Jaquari Dancy.  CITY0000450 |
| 5/26/2005 | Tape research log for 911 calls.  CITY0000529 |
| 6/02/2005 | Case supplementary report regarding Jaquari Dancy's death and case of death #HL356544 by Wo and Day.  CITY0000386-93 |
| 6/02/2005 | Case supplementary report regarding Jaquari Dancy's death and case of death #HL356544 by Wo and Day.   CITY0000548-55 |
| 6/7/2005 | Property inventory No. 10547199 (photographs of child's bedroom.) CITY0000464 |
| 6/21/2005 | Case supplementary report regarding Jaquari Dancy's death and case of #HL356544 by Noradin, Kelly, Day, and Wo.   CITY0000371-85 |
| 6/21/2005 | Case supplementary report regarding Jaquari Dancy's death and case of #HL356544 by Noradin, Kelly, Day, and Wo.  CITY0000556-70 |
| 7/08/2005 | Office of Medical Examiner of County of Cook, IL report of postmortem examination.  CITY0000444-52 |
| 7/22/2005 | Original case incident report RD# HL356544.  CITY0000530-31 |
| 7/22/2005 | Chicago Police department electronic list of inventory from case. CITY0000607-09 |
| 11/28/2005 | Circuit Court of Cook County adult probation department investigative report regarding Nicole Harris.  PL Nicole Harris 14086-93 |
| 10/00/2005 | Transcript of Nicole Harris Trial |
| 10/26/2005 | Jury Verdict Form |
| 03/13/2009 | *People v. Harris* (Ill. Ct. of Appeals) |
| 10/18/2012 | *Harris v. Thompson* (7th Cir.) |
| 01/23/2014 | Certificate of Innocence |
| 05/19/2014 | Nicole Harris Complaint |
| 12/15/2014 | Brief in Opposition to the Police Officers' Motion to Dismiss |

03/19/2015          Court Opinion denying Motion to Dismiss against Officers

08/20/2015          Confidentiality Order

11/11/2015          Landando Deposition Transcript

11/12/2015          Day Deposition Transcript

11/13/2015          Wo Deposition Transcript

11/16/2015          Balodimas Deposition Transcript

11/23/2015          Noradin Deposition Transcript

11/24/2015          Bartik Deposition Transcript

12/10/2015          Alexandra Levi Transcript

12/22/2015          Harris Deposition Transcript

05/00/2005          Deposition Exhibit 106, CITY-DCFS0001-72

04/18/2006          Dr. Bruce Frumkin Affidavit

## Literature Used/Reviewed

Blagrove, Mark (1996). "Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied*, 2, 48-59

Blandon-Gitlin, Iris, Kathryn Sperry, and Richard A. Leo (2011) "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" in *Psychology, Crime and Law*, 17, 239-260

Chojnacki, Danielle, Michael Cicchini and Lawrence White (2008), "An Empirical Basis for the Admission of Expert Testimony on False Confessions," *Arizona State Law Journal*

Conroy, John (2000). Unspeakable Acts, Ordinary People: The Dynamics of Torture (Alfred Knopf).

Costanzo, Mark, Netta Shaked-Schroer and Katherine Vinson (2010), "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" in *The Journal of Legal Empirical Studies.*

Davis, Deborah and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.

Davis, Deborah and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room," In William O'Donohue, ED (2004), *Handbook of Forensic Psychology* (San Diego: Academic Press). Pp. 897-996.

Drizin, Steven A. & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions,* 32 Loy. U. Chi. L.J. (2001)

Drizin, Steven and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

Feld, Barry (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press)

Findley, Keith and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases," University of Wisconsin Law Review, 291-397

Frenda, Stephen, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions." Forthcoming in the *Proceedings of the National Academy of Sciences*

Garrett, Brandon (2011). *Convicting the Innocent*, (Harvard University Press)

Garrett, Brandon (2015). "Contaminated Confessions Revisited," Forthcoming in *University of Virginia Law Review*.

Garrett, Brandon L., *The Substance of False Confessions,* 62 Stan. L.Rev. (2010)

Gudjonsson, Gisli (2003), *THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK* (John Wiley & Sons Inc)

Gudjonsson, Gisli H. et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth,* 41 Personality & Individual Differences (2006)

Henkel, Linda, et al. (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*

Hill, C., A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation." *Legal & Criminological Psychology*, 13, 357-371

Inbau, Fred, John Reid and Joseph Buckley (1986). *CRIMINAL INTERROGATION AND CONFESSIONS*, Third Edition (Baltimore, MD: Williams & Wilkins)

Inbau, Fred, John Reid, Joseph Buckley and Brian Jayne (2001). *CRIMINAL INTERROGATION AND CONFESSIONS*, 4th Edition (Aspen Publishers, Inc.)

Inbau, Fred, John Reid, Joseph Buckley and Brian Jayne (2013). *CRIMINAL INTERROGATION AND CONFESSIONS*, 5th Edition (Burlington, MA: Jones & Bartlett Learning)

Jayne, Brian (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986*). CRIMINAL INTERROGATION AND CONFESSIONS*, Third Edition (Baltimore, MD: Williams & Wilkins)

Kassin, Saul M. et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 L. & Hum. Behav. (2010)

Kassin, Saul, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Kassin, Saul, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

Kassin, Saul, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," *Law and Human Behavior,* 31, 381-400.

Leo, Richard A. (1996). "Inside the Interrogation Room," *Journal of Criminal Law and Criminology*, 86, 266-303

Leo, Richard A. (2008). *Police Interrogation and American Justice* (Harvard University Press).

Leo, Richard A. (2009). "False Confessions: Causes, Consequences and Implications." *Journal of the American Academy of Psychiatry and Law*, 37, 332-343

Leo, Richard A. and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496

Leo, Richard and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*

Loftus, Elizabeth (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory, *Learning & Memory*, 12, 361-366.

Narchet, Fadia, Christian Meissner, and Melissa Russano (2011), "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions." *Law and Human Behavior*, 35, 452-465

Ofshe, Richard and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251

Ofshe, Richard and Richard A. Leo (1997). "The Decision to Confess Falsely: Rational Choice and Irrational Action." 74 *Denver University Law Review* at 992-993

Shaw, Julia and Don Read (2014). "Constructing Rich False Memories of Committing Crime," *Psychological Science*, Pp. 1-11. Published online, January 14, 2015

Tavris, Carol and Elliott Aronson (2007*). Mistakes Were Made* (But Not By Me). (Harcourt Books).

Wickersham Commission, *Lawlessness in Law Enforcement* (1931).

Wright, Deborah, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence," *Psychonomic Bulletin Review*, 20, 812-818

Zulawski, David and Douglas Wicklander (2002). *PRACTICAL ASPECTS OF INTERVIEWING AND INTERROGATION*, 2nd Edition (CRC Press)