# EXHIBIT 30

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                    )
                                  )
            Plaintiff,            )
                                  )
        vs.                       )        No. 14 CV 4391
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
            Defendants.           )

        The deposition of ROBERT BARTIK, pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Carmella T. Fagan, C.S.R., R.P.R., Notary Public
within and for the County of Cook and State of
Illinois, at 1180 North Milwaukee Avenue, Third
Floor, in the City of Chicago, Cook County, Illinois,
commencing at 10:12 a.m. on the 24th day of November,
2015.

        BREHON REPORTING (708) 442-0027

Page 15

1    A.    I believe I did.  Yes.

2    Q.    Was there any kind of exam at the

3  conclusion of that test?

4    A.    No.

5    Q.    Or at any time during that -- that

6  class?

7    A.    No, ma'am.

8    Q.    Was there any evaluation of your

9  comprehension of the materials, if you know?

10   A.    No.

11   Q.    Anything that you learned in that

12  class have any effect on how you conducted yourself

13  as a polygraph examiner in the Chicago Police

14  Department?

15   A.    No.

16   Q.    The PC sex offender testing course,

17  when was that?

18   A.    Also mid-2000s, I believe.

19   MR. NATHAN:  (Coughing.)  Excuse me.

20  BY MS. SUSLER:

21   Q.    And how long was that class?

22   A.    One week.

23   Q.    Where was it?

24   A.    It was in a hotel out in Elmhurst.

Page 16

```
 1          Q.        Who offered it?

 2          A.        Dan Sosnowski.

 3          Q.        Were there any techniques that were

 4   discussed in that class?

 5          A.        What it was, it was, you were

 6   certified -- after you took that class, you were then

 7   certified able to conduct post-conviction polygraph

 8   examinations on convicted sex offenders.

 9          Q.        So in terms of your role as a

10   polygraph examiner for the Chicago Police Department

11   other than testing sex offenders, did it have any

12   effect?

13          A.        No.

14          Q.        And the continuing education you

15   mentioned in Greensboro, when was that?

16          A.        I believe it was 2013; 2012, 2013.

17   You'll have to forgive me, ma'am.  I'm horrible when

18   it comes to dates.

19          Q.        How long was that class?

20          A.        That was also a week.

21          Q.        Who was it offered by?

22          A.        The -- I forget.  I was -- I was sent

23   there by the police department.

24          Q.        So you don't know who offered the
```

Page 17

1    class?

2         A.        Actually, no.  They -- they -- they

3    told me I was going.

4         Q.        What was the subject of the class?

5         A.        I mean, it was more of a continuing

6    education refresher course.

7         Q.        What, if any, techniques were

8    addressed in that class?

9         A.        There were a bunch of examiners there

10   who all did -- or they exercised different

11   techniques.

12        Q.        My question was:  What, if any,

13   techniques were discussed in the class, were taught

14   in the class?

15        A.        Yeah.  That, I don't remember.

16        Q.        Was there any evaluation of your

17   comprehension of the materials?

18        A.        No, ma'am.

19        Q.        Did it have any effect in your -- on

20   your practice as a polygraph examiner in the Chicago

21   Police Department?

22        A.        No.

23        Q.        Any other education with respect to

24   polygraph examination that you haven't told me about

Page 20

1        Q.        There's no continuing education

2     requirement?

3        A.        No.

4        Q.        Are there any requirements in the

5     licensing law in the State of Illinois about how you

6     must conduct and score polygraph tests?

7        A.        I don't know.

8        Q.        Okay.  And how about if I ask you that

9     as of 2005?  If you know, were there any requirements

10    in the licensing law about how you had to conduct or

11    score polygraph testing?

12       A.        That, I don't know.

13       Q.        Are there any requirements about what

14    documentation you must maintain and for how long?

15       A.        I believe we have to -- and I'm -- I'm

16    just guessing.  I believe it's we have to keep the

17    charts, and I believe it's for a matter of five

18    years.

19       Q.        And is that a Chicago Police

20    Department requirement or a State of Illinois

21    requirement?

22       A.        I believe it's the State of Illinois.

23       Q.        Have you had any discipline in rel --

24    in relation to your license of -- for detection of

                    BREHON REPORTING (708) 442-0027

Page 21

1    deception?

2           A.      No.

3           Q.      Have you had any complaints registered

4    with respect to your practice as an examiner of

5    detection of deception to the licensing body?

6           A.      No.

7           Q.      You've never been informed of any

8    complaints with respect to your license?

9           A.      No.

10          Q.      Have you ever been a member of a

11   professional organization related to polygraph

12   examination?

13          A.      I was a member of the American

14   Polygraph Association for one year, and I was a

15   member of the Illinois Polygraph Society for, I

16   believe, two or three.

17          Q.      Which year were you a member of the

18   APA?

19          A.      Unknown.  I don't remember.

20          Q.      Was it close to the time that you

21   grad -- you finished your program at Reid?

22          A.      I don't remember, ma'am.

23          Q.      All right.  How about the Illinois

24   Polygraph Society, what years were those?

BREHON REPORTING (708) 442-0027

1       A.      That, I also don't remember.

2       Q.      Was it earlier in your career?

3       A.      I think so.  I'm -- I don't remember.

4       Q.      Did you ever attend professional

5  conferences or meetings with respect to polygraph

6  examination?

7       A.      No.

8       Q.      Did you ever subscribe to a

9  professional journal?

10      A.      No.

11      Q.      Did you ever publish an article about

12  polygraph examination?

13      A.      No.

14      Q.      Did you ever teach or give a

15  presentation in a professional setting about

16  polygraph examination or anything related to it?

17      A.      No.

18      Q.      And how about in any other setting

19  other than a professional setting?

20      A.      I one time gave a presentation to

21  newly-promoted detectives.

22      Q.      When was that?

23      A.      That was June of 2014.

24      Q.      What did presentation consist of?

BREHON REPORTING (708) 442-0027

Page 24

1     A.     One of the supervisors.  I believe

2     there was -- one of the -- one of the people who was

3     conducting the detective class saw me in the hallway

4     and said, "I need you to do this."  So. . .

5     Q.     Fair enough.  Do you think it's

6     important for a professional polygraph examiner to

7     receive continuing education so he can remain current

8     on developments and new research in the profession?

9     MR. NATHAN:  Object to the form of the

10    question.

11    THE WITNESS:  Polygraph is an -- is an

12    interesting dilemma because you're -- it's -- I feel

13    that with polygraph, what they're doing is they're

14    just reinventing the horse.

15    BY MS. SUSLER:

16    Q.     Can you say what you mean, please?

17    A.     They're basing a lot of what they do

18    on the same criteria and same technique that has

19    use -- been used for years.  And if it's not broke,

20    don't fix it.

21    Q.     So would it be fair to say that you

22    don't think that continuing education is important

23    for polygraph career professionals?

24    A.     No, that's not safe.  I would say that

Page 25

1    it's -- it's always -- it's always beneficial to know

2    what people are doing, but just because it's new

3    doesn't mean it's better.

4         Q.    Your -- your philosophy with respect

5    to polygraph examination is that it can't be improved

6    on?

7         MR. NATHAN:  Objection, mischaracterizes the

8    testimony.

9         THE WITNESS:  No.  That's not my -- I'm saying

10   that the polygraph -- I have not seen any -- any

11   other technique that proves that it's better than any

12   other one.

13   BY MS. SUSLER:

14        Q.    Say what you mean.

15        A.    There are -- the -- the Army MGQT is a

16   type, a form, of polygraph technique.  It is, sight

17   and sound, side-by-side, almost exactly the same as

18   the Reid polygraph technique, except for one or two

19   small little tweaks that they have inserted.  They

20   have decided that those small tweaks make it better.

21   That's their decision; that's what they use.

22        Q.    And you're not convinced.

23        A.    I don't think it -- I don't think they

24   were necessary.

1       Q.     Okay.

2       A.     I think they're -- they're -- the job

3 of the Reid technique and the M -- the Army MGQT,

4 although they are almost the same, they -- you know,

5 they have their small differences.

6       Q.     So if -- if I'm -- understand you

7 correctly, you are partial to the Reid technique.

8       A.     That's what I was trained in.

9       Q.     Yes.  And in the three courses that

10 you told me about, you -- is it fair to say that

11 you -- since you didn't -- it didn't affect your

12 practice as a polygraph examiner, you were not

13 persuaded by any of the exposure that you had to

14 other techniques, that you needed to do anything

15 different other than the Reid technique?

16       A.     I have been trained in the Reid

17 technique.  The Reid technique works for me, so

18 that's what I'm going to continue to use.

19       Q.     In the continuing education classes

20 that you attended, was scientific research on

21 polygraph testing covered in any of them?

22       A.     I don't remember.

23       Q.     Do you read journals or magazines or

24 newsletters or papers as part of your ongoing, either

1    personal or professional, edification as a polygraph

2    examiner?

3          A.      No.

4          Q.      What was the last article or anything

5    that you read about polygraph examination?

6          A.      That, I can't re -- I don't remember.

7          Q.      Did you have any secondary employment

8    while you've been with the Chicago Police Department?

9          A.      Yes.

10         Q.      When was the last time you did any

11   work for Bart & Associates?

12         A.      Probably about five years ago.

13         Q.      Do you have an economic interest in

14   Bart & Associates?

15         A.      Economic how?  What do you mean?

16         Q.      Financial.

17         A.      Do I own it?

18         Q.      Do you have any interest --

19         A.      I get paid.

20         Q.      -- financially?

21         A.      I -- I get paid.

22         Q.      All right.

23         A.      Other than that --

24         Q.      Do you get -- do you get paid

                    BREHON REPORTING (708) 442-0027

1    to eight years ago.

2            Q.      Under what circumstances did she

3    leave?

4            A.      She retired.

5            Q.      Now, you started the department in

6    1988?

7            A.      Yes.

8            Q.      And that was after you'd finished

9    Reid?

10           A.      Yes.

11           Q.      And you worked on parole -- patrol?

12           A.      Yes.

13           Q.      Transferred to the polygraph in '98?

14           A.      Sounds about right.  It's -- once

15   again, like I said, when it comes to dates, ma'am,

16   I'm real iffy.

17           Q.      How long were you in the Polygraph

18   Unit?

19           A.      For the time -- I left the Polygraph

20   Unit in May of 2014.

21           Q.      And why did you leave?

22           A.      I got promoted to sergeant.

23           Q.      So how many years did you work in

24   the -- in the Polygraph Unit?

                    BREHON REPORTING (708) 442-0027

Page 52

1    A.       When I first started?  No.

2    Q.       There -- at some point there was a

3  document that set forth guidelines and --

4    A.       I was -- when I first started, I

5  didn't know there was one, but there is one.  Yes.

6    Q.       Okay.  I'm sorry.  I'm a little

7  confused.  When you first started there was one, you

8  just didn't know about it?

9    A.       Yes, ma'am.  That's correct.

10   Q.       Okay.  When did you become aware of

11  the document?

12   A.       I don't remember.

13   Q.       How many years had you been working in

14  the Polygraph Unit before you first became aware of

15  that document?

16   A.       I believe we were still at 1121 South

17  State Street before the building was razed and

18  lowered, so within three, four years of being there.

19   Q.       Okay.  When was the building at

20  1121 South State razed?

21   A.       I don't remember.

22   Q.       How many years had you been in the

23  Polygraph Unit at 1121 South State?

24   A.       Three to four year -- and this is an

BREHON REPORTING (708) 442-0027

1   estimate, three to four years.

2          Q.       Okay.  How was it that you became

3   aware that there was a document?

4          A.       I don't remember how.

5          Q.       What was the document?

6          A.       The standard operating procedures of

7   the Polygraph Unit.

8          Q.       And which division was the Polygraph

9   Unit in at the time that you saw this document?

10         A.       Crime lab.

11         Q.       And is that also called Technical

12  Services?

13         A.       Yes.

14         Q.       Okay.  Did someone show you the

15  document?

16         A.       I don't remember, ma'am.  I don't

17  remember how I became -- how I came upon it.

18         Q.       Did anyone ever communicate to you,

19  before you first saw that document, the contents of

20  that document without your having seen the document?

21         A.       I don't know.  I don't remember.

22         Q.       What happened after 1121 South State

23  was razed?  Where did the Polygraph Unit go?

24         A.       We were relocated to 1011 South Homan

Page 56

1   you have a chain of command?

2          A.      Yes.

3          Q.      What was your chain of command?

4          A.      I had a sergeant, a lieutenant, and a

5   commander.

6          Q.      And they weren't just for the

7   Polygraph Unit?

8          A.      No.

9          Q.      They were for other --

10         A.      They were -- they were for the entire

11  crime lab.

12         Q.      And who -- who was in your chain of

13  command for the years you were at 1121 South State?

14         A.      My sergeant was Curtis Gray, my

15  lieutenant was Jack Huels, and I forget who my

16  commander was at the time.  I apologize.  I'm drawing

17  a blank.

18         Q.      If you think of it --

19         A.      Later on --

20         Q.      -- while we're here --

21         A.      -- I would be more than happy to let

22  you know.

23         Q.      That's great.  And what, if any,

24  supervision did you get from your chain of command

Page 57

1   with respect to your responsibilities as a polygraph

2   examiner?

3          A.      They were not polygraph examiners.

4          Q.      No -- Curtis Gray wasn't?

5          A.      No.

6          Q.      And Lieutenant Huels wasn't?

7          A.      No.

8          Q.      And the commander wasn't?

9          A.      No.

10         Q.      So what, if any, supervision did you

11  get from them with respect to your duties as a

12  polygraph examiner?

13         MR. NATHAN:  Object to the form of the

14  question.

15         THE WITNESS:  None.

16  BY MS. SUSLER:

17         Q.      Did you get any supervision of your

18  polygraph duties and responsibilities from anyone

19  else?

20         A.      No.

21         Q.      When the unit moved to 1011 South

22  Homan, did you also have a chain of command?

23         A.      Yes, ma'am.

24         Q.      Can you tell me what it was?

1      A.     Sergeant, lieutenant, commander.

2      Q.     That's pretty much true for any

3  assignment in the Chicago Police Department?

4      A.     Yes, ma'am.

5      Q.     Okay.

6      A.     (Coughing.)  Excuse me.

7      Q.     Are you okay?

8      A.     Yeah.  I'm fine.  I apologize.

9      Q.     Who was your sergeant, lieutenant, and

10  commander at 1011 South Homan?

11     A.     My sergeant was Sergeant Rick Pavone;

12  my lieutenant was Jack Huels; my commander was -- I

13  had two commanders.  I had Commander Frank Kehoe,

14  K-e-h-o-e, and Mary West, and I had Commander Joe

15  Murphy.

16     Q.     Were any of them polygraph examiners?

17     A.     No.

18     Q.     And what, if any, supervision did you

19  get with anyone in your chain of command with respect

20  to your duties and responsibilities as a polygraph

21  examiner?

22     MR. NATHAN:  Object to the form of the

23  question, foundation.

24          Go ahead.

Page 59

```
 1            THE WITNESS:  None.
 2    BY MS. SUSLER:
 3            Q.      And did you get any supervision from
 4    anyone else in the Chicago Police Department with
 5    respect to your duties and responsibilities as a
 6    polygraph examiner during the time you were at
 7    1011 South Homan?
 8            A.      No.
 9            Q.      At either 1121 South State or
10    1011 South Homan, during your years there as
11    polygraph examiner, were -- if you know, were you
12    ever evaluated or given any kind of job performance
13    evaluation?
14            A.      I don't know.
15            Q.      You're not aware of any?
16            A.      I don't -- I don't remember.  I
17    might -- I might have been.  I don't remember.
18            Q.      Okay.  Were you ever given anything in
19    writing to let you know that you had been given some
20    kind of performance evaluation?
21            A.      I believe I was given, at one time,
22    performance cards, evaluation cards.  Yes.
23            Q.      When was that?
24            A.      That, I don't remember.
```
                    BREHON REPORTING (708) 442-0027

Page 63

1          THE WITNESS:  And I apologize to you, ma'am.

2          MS. SUSLER:  Yeah, I'll -- we'll both try.

3    BY MS. SUSLER:

4          Q.      When you went to Pershing, it was you

5    and Howley?

6          A.      And Tina Figueroa.  Yes.

7          Q.      Okay.  Anybody else?

8          A.      At that time, no.

9          Q.      And for the couple years that you were

10   there, what was your chain of command?

11         A.      The same:  Sergeant, lieutenant,

12   commander.

13         Q.      Sergeant Rick Pavone;

14   Lieutenant Huels; and Commanders Kehoe, West and

15   Murphy?

16         A.      Yes.

17         Q.      In the years that passed, had any of

18   them become polygraph examiners?

19         A.      No.

20         Q.      And what, if any, supervision did any

21   of your chain of command provide to you while the

22   unit was at Pershing?

23         MR. NATHAN:  Objection, form, foundation.

24         THE WITNESS:  None.

Page 64

1   BY MS. SUSLER:

2          Q.      And did you receive supervision from

3   any other source while you were at Pershing with

4   respect to your performance as a polygraph examiner?

5          MR. NATHAN:  Objection, form, foundation.

6          THE WITNESS:  No.

7   BY MS. SUSLER:

8          Q.      Did you have the same performance

9   evaluation cards on Pershing or not?

10         A.      I don't remember.

11         Q.      And then you said that -- when you

12  moved to the academy -- who were the polygraph

13  examiners there?

14         A.      At the beginning, it was the same.

15         Q.      You and Howley and Figueroa?

16         A.      Yes.

17         Q.      And was Tovar still working?

18         A.      No.  Tovar had since retired at that

19  point.

20         Q.      Do you know where he is now?

21         A.      No idea.  Mr. Tovar has a habit of

22  disappearing, I believe.

23         Q.      Okay.  What does that mean?

24         A.      He -- once he left the police

1    A.    Yes.

2    Q.    And the same questions about

3  supervision -- well, first, did any of them, if you

4  know, become trained polygraph examiners in the

5  interim?

6    A.    No, ma'am.

7    Q.    And what, if any, supervision did any

8  of them give you with respect to your performance as

9  a polygraph examiner?

10    MR. NATHAN:  Objection, form, foundation.

11    THE WITNESS:  None.

12  BY MS. SUSLER:

13    Q.    What, if any, supervision did you get

14  from anywhere else in -- in the police department

15  with respect to your performance as a polygraph

16  examiner?

17    A.    None.

18    Q.    Did you continue to get the

19  performance evaluation cards?

20    A.    No.

21    Q.    Was there any other supervision that

22  you ever got in any of the 16 years you were a

23  polygraph examiner at the Chicago Police Department

24  that you haven't told me about?

BREHON REPORTING (708) 442-0027

Page 69

1          A.          Not that I remember.

2          Q.          The standard operating procedure that

3     you mentioned you saw three or four years after you

4     started as a polygraph examiner, what did that

5     provide?

6          A.          Information, basic gli -- guidelines.

7     It was part of the overall -- I don't know if it was

8     a department notice or if it was a special order

9     concerning all aspects of the Technical Services

10    Division.

11                     You know, the Technical Disservi --

12    Service Division had the ETs, the mobile crime lab

13    guys, the gun unit, evidence evaluation.  And it

14    showed what each and every department did, what their

15    hours were, how to get in contact with them.  And one

16    of them was the polygraph.

17         Q.          What -- what specifically did the

18    document provide with respect to the Polygraph Unit's

19    standard operating procedures?

20         A.          Can you be more specific?

21         Q.          Yeah.  I just want to know what -- the

22    document that you said was the standard operating

23    procedures, the one that you found out about three or

24    four years after you were --

Page 74

1    was --

2         Q.      Which was?

3         A.      Six, seven years ago.

4         Q.      Do you -- where -- where was the unit

5    at the time?

6         A.      The unit was at -- I believe the unit

7    was at the academy.

8         Q.      Okay.

9         A.      I'm almost -- yes.  The unit was at

10   the academy when Lieutenant Huels retired.

11        Q.      Any other changes with respect to that

12   supervision?

13        A.      At that point -- if I remember, I'll

14   try to amend it --

15        Q.      Sure.

16        A.      -- again like this one.

17        Q.      Let's just go back to the standard

18   operating procedures, then.  Did -- did anyone ever

19   talk to you about the standard operating procedures,

20   either the version that existed before the revision

21   or the revised version?

22        A.      No.

23        Q.      And as far as you know, was there ever

24   any other revision or changes in the standard

1    operating procedures?

2         A.      Not that I know of.

3         Q.      When -- have you ever seen any

4    statistics about the Polygraph Unit, like how many --

5    for example, how many polygraph examinations are done

6    annually?

7         A.      No.

8         Q.      Do you know whether the Chicago Police

9    Department keeps any such statistics?

10        A.      I don't know.

11        Q.      Do you know whether there's ever been

12   any kind of a -- an evaluation or a review or an

13   analysis of the polygraph examination unit?

14        A.      I don't know.

15        Q.      Are -- are you aware of any?

16        A.      No.

17        Q.      Do you know how many polygraph

18   examinations were -- are done annually for any year?

19        A.      No, ma'am, I don't.

20        Q.      Do you know how many you do annually?

21        A.      No.

22        Q.      Is there anything you do to keep track

23   of the polygraph examinations that you administer?

24        A.      No.

                   BREHON REPORTING (708) 442-0027

Page 78

1          Q.      Do you have any idea how Howley

2    conducted his polygraph examinations?

3          A.      No.

4          Q.      And, if you know, did Howley have any

5    idea how you conducted your polygraph examinations?

6          A.      No.

7          Q.      Did Figueroa have any idea how you

8    conducted your polygraph examinations?

9          A.      No.

10         Q.      So is it fair to say there wasn't any

11   what you might call peer review of the polygraph

12   examinations that you all conducted in the Polygraph

13   Unit?

14         A.      That would be correct.

15         Q.      When you went to Reid, that was here

16   in Chicago?

17         A.      Yes.

18         Q.      And do you know at the time that you

19   were attending whether it was accredited by the

20   American Polygraph Association?

21         A.      I don't know.

22         Q.      What was the criteria for admission,

23   if you know?

24         A.      You had to apply; you had to have a

                   BREHON REPORTING (708) 442-0027

Page 86

1    examiner?

2            A.      Yes.

3            Q.      And that would be true for 2005 as

4    well?

5            A.      Yes.

6            Q.      The entire time.

7            A.      Yes.

8            Q.      What qualifies as a validated

9    polygraph technique according to the American

10   Polygraph Association, if you know?

11           A.      I don't know.

12           Q.      The scoring of the reactions that you

13   are recording in the Reid technique, I think you

14   mentioned it was global.

15           A.      Yes.

16           Q.      Is that the word you used?

17           A.      Yes.

18           Q.      And what is the training in terms of

19   how you do a global scoring?  What training did you

20   get?

21           A.      With the Reid technique?

22           Q.      Yes.  That's -- that was your --

23           A.      Yes, ma'am.

24           Q.      -- training, right?

Page 87

1          A.        Yes, ma'am.  We were shown each

2    different type of reactions; we were shown different

3    charts for -- we were shown hundreds of charts.  We

4    looked at them; we evaluated them; we determined

5    whether or not these charts were deceptive,

6    nondeceptive.  We were -- we did a lot of practice on

7    looking at them and making determinations.

8                   During the course of our 125

9    examinations that we had administered, we looked at

10   those and we -- excuse me -- and we evaluated those

11   globally and made a determination also.

12         Q.        Is it fair to say that the global

13   scoring method that Reid -- that is in the Reid

14   technique is subjective?

15         A.        I think all scoring is subjective.

16         Q.        Okay.  But my question to you is --

17         A.        Yes.

18         Q.        Okay.  So the -- the Reid global

19   scoring technique is a subjective method of scoring.

20         THE WITNESS:  Yes.

21         MR. NATHAN:  Object to the form of the

22   question.

23   BY MS. SUSLER:

24         Q.        And by "subjective," that means it
                   BREHON REPORTING (708) 442-0027

1    depends on who's reading the score.

2            A.      Yes.

3            Q.      In -- when you are doing the global

4    scoring of a polygraph examination, about how long

5    does that take?

6            A.      Probably about five minutes.

7            Q.      And the longer you're a polygraph

8    examiner, the quicker it -- it is, right, you know

9    what you see pretty quickly?

10           A.      You can look -- yes, ma'am.  You

11   get -- you get used to reading the charts.

12           Q.      And you can actually see -- as the

13   person is hooked up to the instrument, you can

14   actually see, as the test is proceeding, how the

15   person is doing.

16           A.      You can see earmarks, you can see

17   reactions as it's coming off.  Yes.

18           Q.      Do you know how to do numerical

19   scoring of a polygraph examination?

20           A.      Yes.

21           Q.      Have you ever done that in any of the

22   polygraph examinations you administered with the

23   Chicago Police Department?

24           A.      Yes.

1          Q.        When?

2          A.        I have done numerical scoring for all

3      the examinations I did for the Human Resources

4      Division.

5          Q.        When was that?

6          A.        For the year from, I believe it was,

7      from about December 20 -- was it 2012 to May of

8      2015 -- or, I'm sorry -- December 2013 to May of

9      20 -- May of 2015.

10         Q.        So that was while you were at the

11     academy?

12         A.        Yes.

13         Q.        And those were some of the personnel

14     polygraphs that were done?

15         A.        Yes.

16         Q.        So you did criminal as well as Human

17     Resource --

18         A.        Yes, ma'am.

19         Q.        -- polygraphs?

20         A.        Yes, ma'am.  We were asked at one

21     point to help with the applicants.

22         Q.        So let me just see -- and you should

23     correct me if I'm wrong.  For all of the criminal

24     polygraph investigations that you did in your career

                    BREHON REPORTING (708) 442-0027

1    as a polygraph examiner with the Chicago Police

2    Department, you used the Reid technique and global

3    scoring.

4          A.      Yes.

5          Q.      And for the Human Resources Division,

6    when you did polygraph examinations for the Chicago

7    Police Department in the pre-employment context, you

8    used a numerical scoring.

9          A.      Yes.

10         Q.      Why?

11         A.      For consistency.  The other examiners

12   who were there, they used numerical scoring in all of

13   their results.  The examinations of police

14   applicants, it's a very rigid examination.  The

15   questions are structured; there's no change in them.

16   You have to ask the same exact questions to say --

17   every person, and they wanted it very structured.

18         Q.      And when you say, "They wanted it very

19   structured" --

20         A.      I -- I apologize.  The police

21   department, the -- the Human Resources people wanted

22   us to keep it very structured and all the same.

23         Q.      So you were told, when you were

24   administering the polygraph examination for the Human

                   BREHON REPORTING (708) 442-0027

1          Q.        Do you know anything about the

2    decision to hire you as a polygraph examiner by the

3    Chicago Police Department?

4          A.        No.

5          Q.        Just one day you were in patrol and

6    then after this interview with Huels, you were a

7    polygraph examiner?

8          MR. NATHAN:   Object to the form of the

9    question.

10          THE WITNESS:  Yes.

11   BY MS. SUSLER:

12          Q.        And Huels was the one who hired you?

13          A.        I don't know.

14          Q.        Did you ever see anybody else in the

15   process of the application?

16          A.        No.

17          Q.        Do you know whether -- do you know who

18   made the decision to hire you?

19          A.        No.

20          Q.        Do you know why you were selected?

21          A.        No.

22          Q.        Once you were selected as a -- to be a

23   polygraph examiner, were you provided with any

24   written post or job description?

1          A.      No.

2          Q.      Have you ever had a written post or

3    job description as a polygraph examiner in the CPD?

4          MR. NATHAN:  Objection to the extent it calls

5    for speculation.

6                  Answer if you know.

7          THE WITNESS:  No.

8    BY MS. SUSLER:

9          Q.      How did you know what your job was?

10         A.      To administer polygraph examinations.

11         Q.      That -- that was it?  You're hired as

12   a polygraph examiner and that was your job, to

13   administer polygraph exams.

14         A.      Yes.

15         Q.      Did you -- when you started as a

16   polygraph examiner, if you know, was there a general

17   order in the police department with respect to

18   polygraph examination?

19         A.      That, I don't know.

20         Q.      Did you ever see one?

21         A.      That, I don't know.  I -- have I ever

22   seen one?  I -- no.

23         Q.      At no time, throughout your career as

24   a polygraph examiner, have you ever seen a Chicago

1    Q.    All right.  But there wasn't ever any

2  kind of routine testing to see if it was working all

3  right.

4    A.    No.

5    Q.    Was there any record of the

6  maintenance of the equipment kept?

7    A.    No.

8    Q.    Are you aware of whether there are any

9  requirements other than what you've already told me

10  in the Chicago Police Department for the polygraph

11  procedure?

12    A.    No.

13    Q.    Basically you were free to do whatever

14  you thought was appropriate?

15    MR. NATHAN:  Objection to the form of the

16  question.

17    THE WITNESS:  Appropriate how?

18  BY MS. SUSLER:

19    Q.    In terms of administering the

20  polygraph examination.

21    A.    As far as what technique we were to

22  use?

23    Q.    Correct.

24    A.    Yes.

                BREHON REPORTING (708) 442-0027

1          Q.     Or any other -- any -- anything else?

2          MR. NATHAN:  Object to the form --

3          THE WITNESS:  Anything else how?

4          MR. NATHAN:  -- of the question.

5   BY MS. SUSLER:

6          Q.     Was there any -- any requirements that

7   the Chicago Police Department communicated to you

8   about the polygraph procedure at any time?

9          A.     No.

10         Q.     Was there any -- anything communicated

11  to you by anyone in the Chicago Police Department

12  about following national standards?

13         A.     No.

14         Q.     About note taking?

15         A.     No.

16         Q.     About recording?

17         MR. NATHAN:  Objection, foundation as to time

18  frame.

19         THE WITNESS:  After a while, we were required

20  to record all homicides.

21  BY MS. SUSLER:

22         Q.     Before you were required to record all

23  homicides, was there ever anything communicated to

24  you by anyone in the Chicago Police Department about

                    BREHON REPORTING (708) 442-0027

1    requirements were as far as interviewing people and

2    keeping them recorded.

3         Q.       You understood that for all polygraph

4    examinations that you administered, for people who

5    were either accused or suspected of homicide, that

6    you were to make video and audio recordings?

7         A.       Yes.

8         Q.       In the Polygraph Unit, in your entire

9    career, are you aware of whether there was ever a

10   quality control review?

11        A.       I don't -- I don't know.

12        Q.       Are you ever aware --

13        A.       No.

14        Q.       -- that there was one?

15        A.       No.

16        Q.       As far as you know, there was never

17   any quality control review of your polygraph

18   examinations?

19        A.       No.

20        Q.       Let's make sure that came out right.

21   Are you aware of any quality control reviews of your

22   polygraph examinations at any time throughout your

23   career as a polygraph examiner for the Chicago Police

24   Department?

                    BREHON REPORTING (708) 442-0027

Page 126

1  what we've marked as Exhibit 38?

2          A.      I don't remember.

3          Q.      How, if at all, did these SOPs in

4  Exhibit 38 affect your practice as a polygraph

5  examiner in the Chicago Police Department once you

6  saw them?

7          A.      It didn't.

8          Q.      Do you know how the implementation or

9  monitoring or supervision of these SOPs was

10  implemented by the Chicago Police Department --

11          A.      No.

12          Q.      -- if it was at all?

13          A.      No, I don't.

14          Q.      Has anyone responsible for monitoring

15  or supervising the implementation of these SOPs ever

16  talked to you about them?

17          A.      No.

18          Q.      Do you know whether other polygraph

19  examiners in the unit implemented these SOPs?

20          MR. NATHAN:  Object to the form of the

21  question, calls for speculation.

22          THE WITNESS:  No, I don't.

23  BY MS. SUSLER:

24          Q.      Do you know whether these SOPs when

BREHON REPORTING (708) 442-0027

1          Q.        As far as you knew, in 2011, the grief

2     and shock and other aftereffects of -- of the death

3     of a close loved one were still something that could

4     affect the outcome of a polygraph examination,

5     correct?

6          A.        Yes.

7          Q.        Did you have any input into those SOPs

8     that are Exhibit 39?

9          A.        No.

10         Q.        Were you consulted in any way before

11    the SOPs were revised and published?

12         A.        No.

13         Q.        Did you ever see any statistics -- I

14    know I asked you a related question; I don't think

15    this is the same one -- any statistics from the

16    police department about the Polygraph Unit?

17         A.        No.

18         Q.        You never saw any that said that --

19    what -- what's the average waiting time for a

20    requesting detective to get a subject a polygraph

21    exam?

22         A.        No, ma'am.

23         Q.        How many times subjects were found

24    unsuitable?

                    BREHON REPORTING (708) 442-0027

Page 159

 1          A.       No, ma'am.

 2          Q.       How many times the results were

 3   inconclusive?

 4          A.       No, ma'am.

 5          Q.       How many times the results were des --

 6   deception detected?

 7          A.       No, ma'am.

 8          Q.       Or truth detected?

 9          A.       No, ma'am.

10          Q.       No statistics of any kind whatsoever.

11          A.       No, ma'am.

12          Q.       And I know I asked you before if you

13   kept your own.  But you didn't keep any statistics

14   about your own polygraph --

15          A.       No, ma'am.

16          Q.       -- examinations?

17                   Did you ever administer a second

18   polygraph examination to the same person?

19          A.       I don't believe I have.

20          Q.       When a polygraph examination is

21   inconclusive, if you had reason to think that

22   administering a second exam would give you a

23   different result, is there any reason not to do a

24   second exam?

                BREHON REPORTING (708) 442-0027

1   had subsequently -- they were -- they were charged.

2          Q.      Do you know anybody's name?

3          A.      No.

4          Q.      How about an error the other way,

5   people who you said were deceptive and who were later

6   exonerated?

7          A.      That, I don't know.

8          Q.      You -- you never heard of any -- any

9   such case in any of your polygraph examinations.

10         A.      Not off the top of my head.  No.

11         Q.      How many men did you test that

12  later -- that passed and were later --

13         A.      I believe there were three.

14         Q.      Could an error on a polygraph

15  examination lead to a false confession?

16         MR. NATHAN:  Object -- object to the form of

17  the question, calls for speculation.

18         THE WITNESS:  I don't know.

19  BY MS. SUSLER:

20         Q.      How would you recognize a false

21  confession?

22         A.      I --

23         MR. NATHAN:  Objection -- one second.

24                 Objection, form, foundation, calls for

Page 183

1    speculation.

2              Go ahead.

3              THE WITNESS:  Yeah.  I don't know.

4    BY MS. SUSLER:

5         Q.    Do you believe false confessions

6    occur?

7         A.    No.

8         Q.    There's no circumstance under which

9    you can think that a false confession could occur?

10        A.    No.

11        Q.    What do you think a polygraph examiner

12   can do to avoid a false confession?

13        A.    What do you mean?

14        Q.    What do you think a polygraph examiner

15   can do to make sure that any inculpatory statement

16   elicited during the polygraph examination is not a

17   false confession?

18        A.    Well, once the statement is given,

19   then that goes back to the detective to investigate

20   that statement.  If that detective comes back and

21   says there's, you know -- there's -- there's a

22   problem with it, then we -- and then I can -- you

23   know, we can go from there, and if he wants to retest

24   it or whatever.

                    BREHON REPORTING (708) 442-0027

Page 184

1          Q.      Has that ever happened?

2          A.      No.

3          Q.      Would you agree that polygraph

4    examiners should avoid false confessions?

5          A.      Avoid?  I've never had a false

6    confession.

7          Q.      Well, that's not really my question.

8    The question is:  Would you agree that a polygraph

9    examiner should avoid false confessions?

10         A.      If a person is confessing, you take it

11   on -- you take it at face value and you would notify

12   the detectives who are there, who are responsible for

13   that investigation.

14         Q.      So you would not agree that a

15   polygraph examiner should avoid false confession?

16         MR. NATHAN:  Objection, mischaracterizes his

17   testimony, asked and answered.

18         THE WITNESS:  Any information gleaned from a

19   polygraph examination that is of an inculpatory

20   nature should be transmitted -- or transmitted to the

21   appropriate detective for his -- his or her actions.

22   BY MS. SUSLER:

23         Q.      So -- you said any -- any confession

24   that is elicited through a polygraph examination you

Page 185

1    take at face value?

2           A.      And transmit it to the appropriate

3    detective for them to investigate.

4           Q.      Okay.  Do you believe, when someone

5    gives you an inculpatory ex -- statement during a

6    polygraph examination, that the person is always

7    telling the truth?

8           A.      Yes.

9           Q.      And if the person denies guilt, do you

10   believe that person is always not telling the truth?

11          A.      No.

12          Q.      Depends on the result of the

13   polygraph --

14          A.      Yes, ma'am.

15          Q.      -- examination.

16                  But if the person denies guilt, you

17   don't take that at face value?

18          A.      No.

19          Q.      Only when the person confesses, you

20   take it at face value?

21          A.      The person that's coming in to me

22   because he's denying guilt.

23          Q.      You already know that because --

24          A.      That's why --

Page 188

1    the truth?

2         A.       I'm assuming new information --

3         MR. NATHAN:  One second.  One second.

4              Objection, asked and answered.

5              Go ahead.

6         THE WITNESS:  New information has been

7    gleaned.  At that point the detectives have a right

8    to know what that information is.

9    BY MS. SUSLER:

10        Q.       Okay.  And in the cases where you've

11   gotten confessions in the pretest interview --

12        A.       Um-hum.

13        Q.       -- and the person makes an inculpatory

14   statement, you don't then conduct a polygraph exam,

15   do you?

16        A.       No.

17        Q.       And that's because you take it as

18   truth when the person makes an inculpatory statement.

19        MR. NATHAN:  Objection, asked and answered.

20        THE WITNESS:  No.  I transmit that information

21   to the detectives who then take over the

22   investigation from there.

23   BY MS. SUSLER:

24        Q.       But you're making a decision that
                   BREHON REPORTING (708) 442-0027

1    there's no reason to test the truth or the deception

2    of the inculpatory statement because you don't go

3    ahead and do the polygraph exam --

4            A.      It's --

5            Q.      -- right?

6            A.      At that point, once the new

7    information has been brought forth, it is up to the

8    detective on whether or not he wants to do -- to

9    administer a polygraph examination at that time.

10           Q.      In the over 100 cases where you've

11   gotten inculpatory statements or confessions in the

12   pretest interviews, have you ever conducted a

13   polygraph examination on those individuals?

14           A.      No.

15           Q.      And each time you decided not to

16   conduct a polygraph exam, that was your decision or

17   the detective's?

18           A.      The detective's.

19           Q.      Not yours?

20           A.      No.

21           Q.      Do -- do you think you could recognize

22   a false confession?

23           A.      No.

24           Q.      Do you believe that fabricated eff --

BREHON REPORTING (708) 442-0027

Page 190

1    confessions occur?

2          A.      No.

3          Q.      There's no circumstance under which

4    you could ever fathom a fabricated confession?

5          A.      No.

6          Q.      Do you think a fabricated confession

7    is something that a polygraph examiner has a -- a

8    responsibility to avoid?

9          A.      Yes.

10         Q.      Why is that?

11         A.      Well, if it's not the truth, it's not

12   the truth.

13         Q.      How many polygraph examinations have

14   you conducted?

15         A.      I really don't know.

16         Q.      Thousands?

17         A.      Yes.

18         Q.      And as of May of 2005, how many had

19   you conducted?

20         A.      Don't know.

21         Q.      But they were all using the same

22   technique that you described for me earlier.

23         A.      Yes.

24         Q.      Is there any scientific data showing
                   BREHON REPORTING (708) 442-0027

Page 327

1        Q.        Where -- where did you get that and

2    the other information that's on the first two pages?

3        A.        That is automatically input into the

4    report when you insert the RD number in.

5        Q.        On a computer?

6        A.        Yes.

7        Q.        So you got that from the automatic --

8    whatever the computer pulls up.  It says here your

9    approving supervisor was Robert Konrath,

10   K-o-n-r-a-t-h.

11       A.        Yes, ma'am.

12       Q.        That's one of the people up your chain

13   of command and -- as of May of 2005?

14       A.        Yes.  He was the day supervisor.

15       Q.        And that he was not a polygraph

16   examiner?

17       A.        No.

18       Q.        He was the sup -- day supervisor of

19   what?

20       A.        Forensic Services.

21       Q.        Now, in Exhibit 47, you indicate, as

22   you've testified, that the results of Ms. Harris's

23   polygraph examination were inconclusive, correct?

24       A.        Yes, ma'am.

Page 328

1      Q.       And you indicate that, with respect to

2  Mr. Dancy, in the last page, "No examination subject

3  to emotion."

4      A.       Yes, ma'am.

5      Q.       In this report you had an opportunity

6  to provide the -- some of the detail that you've told

7  us here today about why it was inconclusive, did you

8  not?  With respect to Ms. Harris?

9      A.       Could you say that again, please.

10      Q.       Sure.  This report was an opportunity

11  for you to explain the results of Ms. Harris's

12  polygraph examination.

13      A.       This report was the results of her

14  examination.

15      Q.       I see that you put "Examination

16  result, inconclusive."  I guess my question is:  Was

17  there any reason why you couldn't have said,

18  "Ms. Harris's physiological responses were flat"?

19      A.       I said Mrs. -- I stated that

20  Mrs. Har -- Ms. Harris's was inconclusive.  That was

21  it.

22      Q.       Okay.

23      A.       That's all I wanted to say.

24      Q.       Is there any reason why you couldn't

Page 329

1    have said that her physiological responses were shut

2    down, the way you testified today?

3           A.      Because that's not what we do.  These

4    are -- these reports here are what -- what is our

5    results.  That's it.

6           Q.      So there is or is not a reason why you

7    couldn't have written --

8           A.      There's no reason why I couldn't have.

9           Q.      Okay.

10          A.      I didn't.

11          Q.      Could you have said, " Ms. Harris's

12   physiological responses are shut down which could be

13   an indication of her grief as a result of having lost

14   her four-year-old and had her five-year-old taken by

15   DCFS"?

16          A.      Could I have wrote that down there?

17          Q.      Yeah.

18          A.      I could have.

19          Q.      And is there any reason you didn't?

20          A.      Because this is the polygraph results.

21   That's all it is.  And I indicated the results of her

22   polygraph examination.

23          Q.      Could you have said, "I think Ms." --

24   "I think the investigation could benefit from

                    BREHON REPORTING (708) 442-0027

1          A.       That's right.

2          Q.       So they don't necessarily know why it

3     didn't work, right, unless you explain it to them?

4          A.       I have no recollection of what I said

5     to them.  I just -- I know I explained to them that

6     she was inconclusive.

7          Q.       All right.  Is it fair to assume that

8     if you don't explain to them why you think it was

9     inconclusive, they don't know, because they're not

10    trained polygraph examiners?

11         A.       Well, let me -- I don't remember

12    saying to them specifically, "She's inconclusive,

13    bring her back, this is the reason why she's

14    inconclusive."  Okay.  I have no specific

15    recollection.  That doesn't mean that I didn't

16    actually say something to them as regards to, you

17    know, the -- the woman just lost her child, that's

18    why she's inconclusive.  I don't know that.  I don't

19    know whether I did or I didn't --

20         Q.       Have you --

21         A.       -- I have no recollection, ma'am.

22         Q.       In your -- what you're calling your

23    protocol and I'm calling your routine, have you ever

24    reported polygraph results to detectives who bring in

1   subjects other than to say inconclusive, deceptive,

2   truthful or I didn't do the exam?

3          A.      No.

4          Q.      That's what you report?

5          A.      Yes.

6          Q.      Okay.  That's your routine?

7          A.      Yes.

8          Q.      Have you -- do -- in your memory right

9   now, can you tell me about any other time that you

10  told a detective anything other than those four

11  options when you were reporting the results?

12         A.      I don't believe so.

13         Q.      Okay.  So is there any reason to think

14  you did anything else in this case except say

15  inconclusive?

16         A.      I don't remember what I said.

17         Q.      All right.  And you didn't have any

18  report indicating that you told the detectives

19  anything other than that it was inconclusive.

20         A.      That's correct.

21         Q.      If you were a detective, do you think

22  you'd want to know if the polygraph examiner thought

23  that it might be fruitful to readminister the

24  polygraph exam at a later date when they might be

                    BREHON REPORTING (708) 442-0027

Page 344

1     Q.      What else about this particular

2  investigation stands out in your mind?

3     A.      Truly, nothing.

4     Q.      Do you remember anything Stavon said

5  to you?

6     A.      No.

7     Q.      Now, have you ever been accused in any

8  way of any wrongdoing in connection with your role as

9  a polygraph examiner with the police department?

10    A.      Yes.

11    Q.      What have you been accused of?

12    A.      I've been accused of -- let's see --

13  one gentleman said that I was going to put him in a

14  room in a cell and cattle prod him.

15    Q.      What was that person's name?

16    A.      I forget.

17    Q.      When was that?

18    A.      A number of years ago.

19    Q.      How many?

20    A.      Ten, twelve.

21    Q.      And what was the nature of the

22  accusation?  Was it a CR?  Was it a lawsuit?

23    A.      It was a CR number, I believe.

24    Q.      Okay.  What happened as a result --
                BREHON REPORTING (708) 442-0027

1        A.     I don't --

2        Q.     -- of that accusation?

3        A.     I don't know.

4        Q.     Is it still pending --

5        A.     No.

6        Q.     -- or is it resolved?

7        A.     I have no pending CR numbers, ma'am.

8        Q.     Did you give any kind of interview or

9 have to write a to-from?

10      A.     I believe I had to write a to-from.

11      Q.     Did you deny it?

12      A.     Absolutely.

13      Q.     Were there any witnesses?

14      A.     No.

15      Q.     What happened?

16      A.     In regards to this situation?

17      Q.     Yes.

18      A.     I was informed by my supervisor that

19 there was an allegation made against me.

20      Q.     Were you ever informed of a -- a

21 conclusion?

22      A.     No.

23      Q.     No.  So you don't know whether it was

24 sustained or not sustained or exonerated, unfounded?

1          A.      No.

2          Q.      Do you care?

3          A.      No.

4          Q.      Any other accusations of wrongdoing in

5    connection with your being a polygraph examiner --

6          A.      I've been --

7          Q.      -- at the CPD?

8          A.      -- accused of fabricating confessions.

9          Q.      Tell me about that.

10         A.      A number of individuals have said that

11   I've made up their confessions.

12         Q.      "A number."  How many?

13         A.      Two, three.

14         Q.      What are their names?

15         A.      Donny McGee, and I don't know if Danny

16   Lanza would count.  Danny Lanza was a Spanish

17   speaker, and he spoke Spanish and only Spanish, and

18   somehow I was brought into the middle of it.  He

19   confessed to a detective in my presence, and he spoke

20   only Spanish.

21                And I believe there was also

22   Lamar Blount -- no, actually, Lamar Blount has never

23   accused me of doing anything.  Other people have

24   accused me in Lamar Blount's name, but Lamar Blount

1   himself has never accused me of anything.

2        Q.      Okay.  When, and under what

3   circumstances, was the Donny McGee accusation that

4   you fabricated a confession?

5        A.      Donny McGee confessed to killing his

6   next-door neighbor to myself and two detectives.

7        Q.      And did you do the polygraph

8   examination?

9        A.      No.

10        Q.      Because he confessed in the pretest

11   interview?

12        A.      Yes.

13        Q.      And you believed him when he said he

14   was guilty?

15        A.      Yes.

16        Q.      Okay.  And so you didn't do the

17   polygraph examination because there wasn't any need

18   to test whether he was truthful or deceptive?

19        A.      Because after the detectives

20   questioned him when I brought the detectives in, it

21   was their decision not to ad -- administer the

22   examination.

23        Q.      Okay.  And so what happened with

24   respect to that?

                    BREHON REPORTING (708) 442-0027

Page 348

1          A.        A lawsuit was filed.

2          Q.        Yes, and?

3          A.        And a settlement was reached.

4          Q.        What happened before the lawsuit was

5    filed?

6          A.        There was a trial.  Before the

7    lawsuit?  Oh, he was found not guilty.  Excuse me.

8          Q.        Okay.  He was found not guilty of the

9    murder?

10         A.        Yes.

11         Q.        Okay.  And was DNA part of that

12   decision?

13         A.        In the criminal trial?  No.

14         Q.        DNA didn't exclude him from?

15         A.        On the criminal trial?  No.

16         Q.        Okay.  You followed that?

17         A.        The criminal trial?  I just know that

18   there was no DN -- that the -- there was no DNA

19   introduced in the criminal trial.

20         Q.        Was there any physical evidence

21   connecting Mr. McGee to the murder?

22         MR. NATHAN:  Object to the form of the

23   question, and to the extent it calls for speculation.

24         THE WITNESS:  There was a fingerprint found of
                        BREHON REPORTING (708) 442-0027

Page 349

1   his outside the house.

2   BY MS. SUSLER:

3          Q.      Okay.  Basically --

4          A.      I don't know.

5          Q.      -- it was his confession that was

6   used?

7          A.      Yes.

8          Q.      Yeah.  And do you know how many years

9   he spent in jail waiting for trial?

10         A.      Three.

11         Q.      Three years.  And then once he was

12  found not guilty, that's when he sued you?

13         A.      Yes.

14         Q.      And he -- who defended you in that

15  case?

16         A.      Andrew Hale.

17         Q.      Same firm that's handling your defense

18  today.

19         A.      Um-hum.

20         Q.      Okay.  And at -- after -- at that

21  trial, the civil rights trial, what -- what did the

22  jury decide?

23         A.      They found in his favor.

24         Q.      Did you testify at the criminal trial?

                    BREHON REPORTING (708) 442-0027

Page 350

1          A.      Yes -- yes.  I think I did.  I'm not

2    sure, but I believe I did.

3          Q.      You told the jury that Mr. McGee

4    confessed?

5          A.      Yes.

6          Q.      And the jury didn't believe you?

7          MR. NATHAN:  Objection --

8          THE WITNESS:  The jury found him --

9          MR. NATHAN:  Objection, calls for speculation.

10         THE WITNESS:  The jury found him not guilty.

11   BY MS. SUSLER:

12         Q.      Okay.  And then did you testify at the

13   civil rights trial?

14         A.      Yes.

15         Q.      And how much did the jury award?

16         A.      At that point, 1.3 million.

17         Q.      And then ultimately the city settled

18   with Mr. McGee?

19         MR. NATHAN:  Objection, foundation --

20         THE WITNESS:  The trial --

21         MR. NATHAN:  One second.  Objection,

22   foundation, incomplete narrative.

23              Go ahead.

24         THE WITNESS:  The city appealed that decision
                    BREHON REPORTING (708) 442-0027

1   and won.  And after the appeal, then it was settled.

2   BY MS. SUSLER:

3          Q.       Okay.  Now, you didn't pay that?

4          A.       No.

5          Q.       After Mr. McGee was found not guilty

6   and after the civil trial, did anyone up your chain

7   of command ever speak to you about the situation with

8   Mr. McGee?

9          A.       Insofar as what?

10         Q.       Were you ever written up or reported?

11         A.       Oh, absolutely not.

12         Q.       And never disciplined?

13         A.       No.

14         Q.       And never sent to retraining or any

15  kind of training as a result?

16         A.       No.

17         Q.       No consequences to you whatsoever?

18         A.       No.

19         Q.       And then Danny Lanza, you said, also

20  accused you of -- of fabricating a confession.  What

21  happened to his criminal case?

22         A.       I believe it was thrown out.

23         Q.       That was a situation where you -- you

24  said that he blurted out a confession, correct?

Page 352

```
 1         A.      I don't speak Spanish.  Danny Lanza

 2    speaks nothing but Spanish.

 3         Q.      How many years in jail did Mr. Lanza

 4    serve before he -- the prosecution dropped the

 5    charges against him?

 6         A.      I have no idea.

 7         Q.      And they were dropped because the

 8    actual person who committed the crime was caught?

 9         A.      That, I don't know.  I believe -- I

10    believe there was a gentleman who was confessing to a

11    number of other cases and somehow he was included.

12    So the -- the prosecution dropped it.

13         Q.      Who was your lawyer in the civil

14    rights case?

15         A.      I think it was Andrew Hale.

16         Q.      What --

17         A.      I believe it was.  Yes.

18         Q.      What was the result of that lawsuit?

19         A.      That was settled.

20         Q.      The city paid money --

21         A.      Yes.

22         Q.      -- to Mr. Lanza?

23         A.      Yes.

24         Q.      Were you ever written up, disciplined,
```

Page 353

1    as a result of that case?

2          A.      No.

3          Q.      Ever sent to any kind of training or

4    retraining?

5          A.      No.

6          Q.      And basically no consequences?

7          A.      No.

8          Q.      You mentioned Lamar Blount.  Tell me

9    about Mr. Blount.

10          A.      Lamar Blount never accused me of

11    anything.

12          Q.      Well, you said other people accused

13    you on his behalf.  Was that of fabricating a

14    confession?

15          A.      Lamar Blount, people have -- on his

16    behalf have accused me of fabricating a confession.

17    Yes.

18          Q.      That was one of those cases where, in

19    the pretest interview, you said that he confessed and

20    there was no polygraph examination --

21          A.      Correct.

22          Q.      -- as a result?

23                  And he was acquitted at trial?

24          A.      I believe so.  I didn't testify during

BREHON REPORTING (708) 442-0027

Page 354

1    that trial.

2          Q.      Okay.  Any kind of consequences to

3    you, disciplinarywise, after Mr. Blount?

4          A.      No.

5          Q.      Do you know a Steven Earl Williams?

6          A.      No.

7          Q.      No?  He didn't allege that you falsely

8    claimed that he was deceptive during a polygraph?

9          A.      I don't have any recollection of

10   Steven Earl Williams, ma'am.

11         Q.      A carjacking?

12         A.      I don't have any recollection of

13   Steven Earl Williams, ma'am.

14         Q.      Okay.  In any event, you were never

15   disciplined or retrained as a result of any

16   involvement with the Steven Earl Williams that you're

17   aware of?

18         A.      No.

19         Q.      Do you know someone named Tarri

20   Wilson?

21         A.      Yes.

22         Q.      Okay.  Mr. Wilson accuses you of what?

23         A.      Fabricating the results of the

24   polygraph.

                    BREHON REPORTING (708) 442-0027

Page 355

1      Q.      Okay.  What happened with Mr. Wilson?

2      A.      That case is still pending.

3      Q.      What happened in the criminal case?

4      A.      He was -- he was -- he was dismissed.

5      Q.      The prosecutor dropped the charges?

6      A.      Yes.

7      Q.      After you claimed that he was lying

8   when he said he was innocent?

9      A.      That's -- the way you said it, my

10  results of the examination showed that he was being

11  deceptive.

12     Q.      Okay.  And that's what you reported to

13  the detectives?

14     A.      Yes.

15     Q.      And how was it that the prosecutor

16  dropped the charges against Mr. Wilson?

17     MR. FLYNN:  Objection, foundation.

18     THE WITNESS:  From what I understand, there

19  was a video enhance that showed it wasn't him.

20  BY MS. SUSLER:

21     Q.      So that civil rights case is pending?

22     A.      Yes.

23     Q.      Who is your lawyer?

24     A.      Jordan Marsh.

Page 356

1      Q.      Why not Mr. Hale?

2      A.      I don't know.

3      Q.      Well, who hires your lawyers?

4      A.      City of Chicago.

5      Q.      If -- were there any disciplinary

6  consequences to you as a result of Mr. Wilson's

7  prosecution being dropped?

8      A.      No.

9      Q.      And if the city ultimately settles or

10  there's a verdict against you and the other

11  detectives, do you expect that there would be any

12  discipline or retraining as a result?

13      A.      It's up to the city, ma'am.

14      Q.      Well, has that ever happened in any

15  time that there has been a not guilty verdict or

16  charges dropped or a settlement?

17      A.      No.

18      Q.      You named Danny McGee and Danny Lanza

19  and Lamar Blount.  Who else accused you of

20  fabricating confession?

21      A.      I don't remember, ma'am.

22      Q.      How many more people --

23      A.      I don't --

24      Q.      -- accused you of fabricating
                BREHON REPORTING (708) 442-0027

Page 367

1          MR. NATHAN:  Other than what we've talked

2     about here?

3          MS. SUSLER:  Yes.

4          THE WITNESS:  I don't remember.  I don't know.

5     BY MS. SUSLER:

6          Q.     Do you know whether -- I know you said

7     you don't keep statistics, but I saw some testimony

8     where you testified that you had gotten over 100

9     pretest confessions from subjects in -- during your

10    career as a Chicago police poly -- polygraph

11    examiner.

12                Do you recall that testimony?

13         A.     Yes.

14         Q.     Do you know whether anybody else in

15    the United States has a record like that?

16         A.     Don't know.

17         Q.     Do you think that's unusual?

18         A.     No.

19         Q.     How do you know?

20         A.     I don't.

21         Q.     You have no basis for saying it's

22    unusual or it's not unusual?

23         A.     Correct.

24         Q.     What do you think is unique to your

                  BREHON REPORTING (708) 442-0027

Page 368

1    technique of doing pretest interviews in polygraph

2    examinations that you could attribute to that record?

3         A.      Don't know.

4         MR. NATHAN:  Object to -- one second.  Object

5    to the form of the question, foundation, assumes that

6    it's, in fact, unique.

7              Go ahead.

8         THE WITNESS:  I don't know.

9    BY MS. SUSLER:

10        Q.      How much money has the City of Chicago

11   paid to plaintiffs in civil lawsuits as a result of

12   your role as a polygraph examiner?

13        MR. FLYNN:  Objection, foundation.

14        THE WITNESS:  Probably about 800,000, I

15   believe.

16   BY MS. SUSLER:

17        Q.      And where do you get that number?

18        A.      That was the greeter -- that was the

19   settlement with Donny McGee.

20        Q.      Well, didn't we talk about some other

21   cases that were settled?

22        A.      Lanza.  I know that was 35,000, maybe.

23   I believe.

24        Q.      Are you aware of any other payments

Page 369

1    the city has made as a result of lawsuits related to

2    your role as a polygraph examiner?

3          A.     No.

4          Q.     Do you know whether the city's ever

5    paid out any money in civil lawsuits related to any

6    other polygraph examiner in the city of Chicago?

7          MR. FLYNN:  Objection, foundation.

8          THE WITNESS:  Yes.

9    BY MS. SUSLER:

10         Q.     How much and -- and for what -- and

11   related to what polygraph examiner?

12         MR. FLYNN:  Going to object here.  I think

13   that these settlement amounts may be not public

14   information and not something that he is allowed to

15   talk about during his deposition.

16         MS. SUSLER:  Settlements are public record.

17         MR. FLYNN:  Oh, I just wanted to --

18         MS. SUSLER:  They're approved by the city

19   council.

20         MR. FLYNN:  I just wanted to advise the

21   witness that if there's anything he's been told not

22   to release as far as settlement amounts, to not

23   testify to it here today.

24   BY MS. SUSLER:

Page 370

1        Q.        Can you answer the question, please.

2        A.        I know there was a settlement amount

3   for Tina Figueroa.  I do not know what it was, how

4   much it was.

5        Q.        Was it over $500,000?

6        A.        I do not know how much it was.

7        Q.        What was the plaintiff in that case?

8        A.        No idea.

9        Q.        When did it settle?

10       A.        Don't remember.

11       Q.        Have you got any commendations related

12   to your role as a Chicago Police Department polygraph

13   examiner?

14       A.        Honorable mentions, maybe a few.

15       Q.        For what?

16       A.        Administering polygraph examinations

17   that helped through the conclusion of drop -- the

18   conclusion of an investigation.

19       Q.        Can you name any cases?

20       A.        Not off the top of my head, ma'am.

21   No.

22       Q.        And the dates of those commendations?

23       A.        Not off of top of my head, ma'am.  No.

24       MS. SUSLER:  All right.  I'm going to take a