# EXHIBIT 32

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                          )
          Plaintiff,                    )
  v.                                    ) No. 14-cv-4391
CITY OF CHICAGO; Chicago                )
Police Officers ROBERT BARTIK,          )
DEMOSTHENES BALODIMAS, ROBERT           )
CARDARO, JOHN J. DAY, JAMES M.          )
KELLY, ANTHONY NORADIN, and            )
RANDALL WO; Assistant Cook              )
County State's Attorneys                )
ANDREA GROGAN and LAWRENCE              )
O'REILLY, and THE COUNTY OF COOK,)
          Defendants.                   )


          The video deposition of DONALD O'NEILL,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before Tracy Jones, a Certified Shorthand
Reporter within and for the County of Cook and
State of Illinois, at 1180 North Milwaukee
Avenue, 4th Floor, Chicago, Illinois, on the
January 29, 2016, at the hour of 9:16 o'clock a.m.


Reported by:    Tracy Jones, CSR, RPR, CLR
License No.:    084-004553



1   are you referring to?

2        A.   What day he started employment with the

3   City of Chicago, the different pay rates or step

4   raises he got during the course of his

5   employment, promotions he may have received,

6   high school transcripts, college transcripts,

7   some of the background investigation that was

8   done prior to his hiring, and any leaves of

9   absence a person might have taken.

10       Q.   So you wouldn't expect Mr. Bartik's

11  personnel file to include anything about his

12  training?

13       MS. FORDYCE:   Objection to the form.

14  BY MS. SUSLER:

15       Q.   Other than the high school or college

16  transcripts?

17       A.   It would show when he went into the

18  training academy.   And it may have licenses in

19  it, copies of licenses, but not -- not always.

20  It will have the driver's license in it.   It

21  probably doesn't have professional licenses in

22  it.

23       Q.   Is there another place you would expect

24  to find his professional license?



19

1        A.    He would have his professional license.

2        Q.    In a Chicago Police Department record?

3        A.    No.  I don't -- I would not expect to

4    find it in a Chicago Police Department record.

5        Q.    And the questions that I've asked you

6    about what you would expect to see in

7    Mr. Bartik's personnel file, are you speaking

8    generally?

9        A.    I'm speaking generally.

10       Q.    So it wouldn't just be what you would

11   expect to find in his personnel file, it would

12   be what you expect to find in any police

13   officer's personnel file?

14       A.    Correct.

15       MS. FORDYCE:  Objection:  It's outside the

16   scope of the 30(b)(6).

17   BY MS. SUSLER:

18       Q.    And in terms of discipline, would you

19   expect to find anything in Mr. Bartik's

20   personnel file?

21       A.    No, I would not.

22       Q.    In terms of any kind of secondary

23   employment, would you expect to find anything in

24   Mr. Bartik's personnel file?



1    and find all the documentation in one place; is

2    that fair to say?

3         A.    If I wanted to get the big picture on

4    his past employment history, I could go to

5    Personnel and find out where he's worked if I'm

6    looking for a big picture.  If you're looking

7    for minutiae, no, you probably would have to go

8    to multiple locations.

9         Q.    All these different places you

10   mentioned to me, to -- you would have to go to

11   Education and Training for training, right?

12        A.    If you wanted to know how often he

13   attended court, I would probably have to go to

14   the Court Section.

15        Q.    Okay.

16        A.    If you wanted to know if he's taken the

17   fitness exam, I would probably have to go to the

18   academy.  But there's overlap in the records as

19   well.  There's multiple places you could verify.

20        Q.    But if you wanted to find out what

21   training he had undergone, you would have to go

22   to the Education and Training Academy?

23        A.    Correct.

24        Q.    And if you wanted to find out whether



1    training, the other evaluations, the discipline,

2    the litigation, would that -- would that

3    supervisor have to go to each of those offices

4    we talked about?

5        A.    He could generally call them on the

6    phone and get the information he was seeking.

7        Q.    So a supervisor would have access to

8    the information?

9        A.    Yes.

10       Q.    Merely by representing himself as,

11   I'm -- I'm Robert Bartik's supervisor; I want to

12   know what's going on?

13       A.    Correct.

14       Q.    And if a supervisor actually wanted to

15   see the documentation as opposed to just having

16   someone tell him about it, he could do that as

17   well?

18       A.    Generally speaking, yes.

19       Q.    Can he get copies sent to him, or does

20   he have to go to those offices and look at those

21   documents there?

22       A.    We don't provide copies of people's

23   personnel records to supervisors.  They can

24   review them, but we're not providing



1     documents -- I want to clarify -- and we don't

2     release people's medical records either.

3          Q.    So when you say people's personnel

4     files, you're not just talking about personnel

5     records, you're not just talking about what we

6     were talking about before as the personnel file;

7     you're talking about all those things we were

8     talking about?

9          A.    No.  I'm talking about the personnel

10    file.

11         Q.    Okay.  So if they wanted copies of any

12    of his supervision or evaluations, training,

13    discipline, or litigation, the supervisors --

14         A.    I'm sorry.  You have to -- That's

15    compound.  There's too many factors.  They're

16    all falling into different things.

17         Q.    Okay.  Thank you for telling me.

18              Is there any record, of all the records

19    we've talked about maintained on Mr. Bartik,

20    that a supervisor couldn't get copies of other

21    than medical records?

22         A.    Could not get copies of?

23         Q.    Correct.

24         A.    We generally don't provide copies of



1    most of these records.

2        Q.    Well, is there any record other than

3    medical that a supervisor couldn't get copies

4    of?  Are you saying every other record, a

5    supervisor wouldn't get copies of?

6        MS. FORDYCE:  Objection to the form.  I think

7    you're misstating his prior testimony.

8        THE WITNESS:  I think my testimony is the

9    records are available, but we don't make copies

10   of records and disperse those to supervisors.

11   BY MS. SUSLER:

12       Q.    Okay.  Do you know whether there's any

13   documentation of supervisors' requests for

14   information about Mr. Bartik's records in any of

15   the categories we've discussed?

16       MS. FORDYCE:  Objection to the form.

17       THE WITNESS:  Not that I'm aware of.

18   BY MS. SUSLER:

19       Q.    Let me ask you some questions about

20   Mr. Bartik's qualifications to serve as a

21   polygraph examiner.  What, if you know, were the

22   criteria for a Chicago Police Department

23   polygraph examiner in 1988?

24       A.    In 1988, they were required to be a



32

1    licensed polygraph examiner, licensed by the

2    State of Illinois.

3        Q.    Were those -- Are those criteria

4    documented anywhere, if you know?

5        A.    Not -- I do not know.

6        Q.    Have you ever seen any document that

7    established what the criteria were for a

8    polygraph examiner in the police department?

9        A.    Have I ever seen?  Yes.

10       Q.    What document have you seen?

11       A.    When we hired or put people through

12   polygraph exam school in the last few years,

13   I've reviewed the requirements to become a

14   polygraph examiner.

15       Q.    And that was because they applied for a

16   tuition waiver?

17       A.    No.  It's because we were training them

18   to be polygraph examiners for the Chicago Police

19   Department.

20       Q.    Was that when you implemented the

21   Preemployment Polygraph Examination Section?

22       A.    Yes.

23       Q.    So that was in what year?

24       A.    '10, 2010.



1    Q.    Before 2010, had you ever seen any

2    documentation of the criteria for a polygraph

3    examiner for the police department?

4    A.    No, I had not.

5    Q.    What, if anything, was done, if you

6    know, to determine whether Mr. Bartik met the

7    criteria you articulated?

8    A.    It was verified that he had a valid

9    license with the State of Illinois as a

10   polygraph examiner.

11   Q.    Do you know whether Mr. Bartik's State

12   license is in the possession of the Chicago

13   Police Department, or a copy thereof?

14   A.    No, I do not know.

15   Q.    Do you know who, if anyone, determined

16   whether he had a license?

17   A.    When he was first hired and first moved

18   into taking polygraph exams, it was verified he

19   had a license.  And I don't recall who it was.

20   Q.    When you say it was verified, what was

21   done?

22   A.    He presented his license.

23   Q.    Is that documented anywhere?

24   A.    No.



34

1     Q.    And how do you know?

2     A.    That's what I was told.

3     Q.    By whom, other than your lawyer?

4     A.    I had a conversation with Jack Huels a

5  few years ago, maybe six, seven years ago, about

6  the polygraph examiners and how they got the

7  positions, how they were selected, and whether

8  they should be getting extra pay for being

9  polygraph examiners.

10    Q.    Who is Jack Huels?

11    A.    Jack Luke Huels was a lieutenant in the

12  police Forensics Investigations Unit.

13    Q.    And what, if any, relationship did he

14  have to polygraph examination in the police

15  department?

16    A.    He -- The Forensics Investigation Unit

17  supervised the polygraph examiners.

18    Q.    And this conversation you had with him

19  was, you said, six or seven years ago?

20    A.    Yes.  Maybe eight years ago.

21    Q.    So that would put it at 2008?

22    A.    2008.

23    Q.    Anybody else present for that

24  conversation?



1      A.    Not -- Not that I'm aware of.

2      Q.    Where did it take place?

3      A.    I believe it took place in a restaurant

4  in Teamster City, which is at Ashland and

5  Jackson.

6      Q.    And you were having the conversation

7  because you were inquiring about whether

8  polygraph examiners should have more pay?

9      A.    Correct.

10     Q.    And what did Lieutenant Huels say?

11     A.    He -- He thought they should receive

12  more pay.  At the time, I was Commander of

13  Management, Labor Affairs Section, and we were

14  in the process of negotiating collective

15  bargaining agreements.

16     Q.    And he thought they should have more pay?

17     A.    Yes.

18     Q.    And what did you think?

19     MS. FORDYCE:  Objection:  Is very far afield

20  of the scope of the 30(b)(6).

21     THE WITNESS:  I was Commander of Management,

22  Labor Affairs Section.  And in that position, I

23  don't believe anybody should receive more pay

24  when we're negotiating a contract.



```
 1    BY MS. SUSLER:
 2         Q.   And ultimately, did polygraph examiners
 3    get an increase in pay?
 4         MS. FORDYCE:   Same objection.
 5         THE WITNESS:   No, they did not.
 6    BY MS. SUSLER:
 7         Q.   And during that conversation in 2008,
 8    what else, if anything, did Mr.- -- Lieutenant
 9    Huels say to you about Robert Bartik?
10         A.   The conversation was not about Robert
11    Bartik.  It was about polygraph examiners.
12         Q.   So Mr. Bartik's name didn't come up?
13         A.   No.
14         Q.   Other than on that occasion in 2008,
15    did you ever speak with Mr.- -- Lieutenant Huels
16    about Mr. Bartik?
17         A.   I have never talked to Jack Huels about
18    Lieutenant -- Sergeant Bartik.
19         Q.   What, if anything, was done to
20    determine -- When Mr. Bartik was hired to be a
21    polygraph examiner by the Chicago Police
22    Department, what, if anything, was done to
23    determine whether he had graduated from an
24    accredited polygraph school?
```



1    A.    He was never hired to be a polygraph

2    examiner for the Chicago Police Department.  He

3    was hired as a police officer for the Chicago

4    Police Department, and he was given the

5    assignment of doing polygraph exams.

6    Q.    Okay.  And what, if anything, was done

7    when he was given the assignment to conduct

8    polygraph examinations to determine whether he

9    had graduated from an accredited polygraph

10   school?

11   A.    It was my understanding that he

12   presented a license.  To have a license, you

13   must have graduated from college, and you must

14   have graduated from an accredited polygraph

15   school.

16   Q.    And you don't know anything more about

17   his license other than what you've already told

18   me?

19   A.    Correct.

20   Q.    What, if anything, has the police

21   department done -- anyone in the police

22   department done to determine whether Robert

23   Bartik kept his State license current?

24   A.    The police department doesn't verify



1    that people have their current licenses for

2    driver's license or FOID cards.  It's the

3    member's responsibility to maintain their

4    licensing.

5        Q.    So it would be fair to say that no one

6    in the police department ever did anything to

7    determine whether Mr. Bartik kept his license

8    current?

9        MS. FORDYCE:  Objection to the form.

10       THE WITNESS:  The member is required to

11   maintain their licensing if they're doing

12   something of that function.  So if a member is

13   required to drive a large truck for the police

14   department because they did have a CDL, it's

15   their responsibility to have the CDL before they

16   drive that truck.  If somebody is an attorney

17   working for the police department, it's their

18   responsibility to have that license and to be an

19   attorney.  So -- And if someone is a polygraph

20   examiner, it's their responsibility to be

21   properly licensed to do it.  If they do not have

22   a license, they would be subject to discipline

23   up to and including separation.

24



BY MS. SUSLER:

Q.    So basically, the police department
relied on Mr. Bartik to do what he was supposed
to do in terms of keeping his State license to
practice as a polygraph examiner current?

MS. FORDYCE:   Objection to the form.

THE WITNESS:   We rely on people to comply
with the laws of the State of Illinois.

BY MS. SUSLER:

Q.    Okay.   And I'm talking specifically
about Robert Bartik now.

A.    Okay.   Yes.

Q.    All right.   What, if anything, was done
to determine whether there were any complaints
or discipline with respect to Mr. Bartik's State
license to conduct polygraph examinations?

A.    The State's Department of Professional
Regulations conducts any investigations
concerning complaints against licensed members.
So we don't have a role in those investigations
as the Chicago Police Department.   It's
exclusively their domain.

Q.    Other than not participating in any
investigations concerning Mr. Bartik's State



1    license, what, if anything, did anyone in the

2    Chicago Police Department do to determine

3    whether there were any complaints or discipline

4    with respect to Mr. Bartik's State license?

5         MS. FORDYCE:  Objection to the form;

6    misstates prior testimony.

7         THE WITNESS:  We are not aware of any

8    complaints.  We were not informed of any

9    complaints.  If you have any complaints, we

10   would obtain a complaint register investigation

11   on those complaints.  But we don't seek out

12   information concerning if anybody has complaints

13   against anyone's license.

14   BY MS. SUSLER:

15        Q.   So is it fair to say that with respect

16   to any complaints or discipline with respect to

17   Mr. Bartik's State license to conduct polygraph

18   examinations, no one in the Chicago Police

19   Department did anything to determine whether

20   there were any complaints or discipline?

21        MS. FORDYCE:  Objection to the form:  Asked

22   and answered; misstates prior testimony.

23        THE WITNESS:  I'm not aware of any complaints

24   against his license.



1    BY MS. SUSLER:

2        Q.   Well, that's not my question, sir.  I

3    would like to know if it's fair to say that no

4    one in the police department ever took any

5    action to determine whether there were any

6    complaints or discipline with respect to

7    Mr. Bartik's State license to conduct polygraph

8    examinations?

9        MS. FORDYCE:  Same objections; asked and

10   answered.

11       THE WITNESS:  I don't know if that would be

12   fair to say.  I wasn't a direct supervisor of

13   his.  I didn't manage -- But as far as I know, I

14   took no action to investigate whether there were

15   any complaints.

16   BY MS. SUSLER:

17       Q.   Have you ever seen any documentation

18   that anyone in the police department took any

19   action to determine whether there were any

20   complaints or discipline with respect to

21   Mr. Bartik's State license to conduct polygraph

22   examinations?

23       A.   I have never seen any documentation

24   concerning any complaints against his license or



42

1  anybody looking to see if there were any

2  complaints against his license.

3      Q.    And is it fair to say that generally,

4  the police department doesn't do anything to

5  determine whether there are complaints or

6  discipline with respect to a State license?

7          That's my question.

8      MS. FORDYCE:  Objection to the form; outside

9  the scope of the 30(b)(6); foundation.

10     THE WITNESS:  No.  I don't think that would

11 be fair to say, that we don't take any action to

12 see if there are any complaints.

13         If there's -- If there was a complaint

14 lodged, a CR number lodged about some conduct

15 concerning it, we -- probably part of our

16 investigation would be to see if there's any

17 complaint filed with the Department of

18 Professional Regulation.

19 BY MS. SUSLER:

20     Q.    Let me see if I understood you

21 correctly.  If there was a CR related to

22 Mr. Bartik's performance as a polygraph

23 examiner, are you saying that the -- that it

24 should be part of the police department's



1    investigation of that CR to determine whether

2    Mr. Bartik's license was current and whether

3    there were any complaints or discipline with

4    respect to that license?

5        MS. FORDYCE:  Objection:  Misstates prior

6    testimony.

7        THE WITNESS:  Yeah.  I don't think you're

8    understanding what I'm saying.  If there is a

9    complaint, a CR number that's being investigated

10    against anyone who has a State of Illinois

11    license concerning that license, there would be

12    a parallel investigation going on by the

13    Department of Professional Regulation.  And part

14    of their investigation would be to determine

15    what the finding was of Illinois Department of

16    Professional Regulation.

17    BY MS. SUSLER:

18        Q.  Do you know whether that ever happened

19    with respect to Mr. Bartik?

20        A.  I do not believe any investigations

21    ever -- concerning his licensing ever met the

22    sworn affidavit requirements.

23        Q.  Did you ever see any documentation that

24    the State conducted an investigation with



1    in terms of monitoring Mr. Bartik's training in

2    the field of polygraph examination after his

3    assignment as a polygraph examiner, nothing was

4    done except to assume that he maintained a

5    license and that he was supervised?

6        MS. FORDYCE:  Objection:  Misstates prior

7    testimony; argumentative.

8        THE WITNESS:  That's definitely not what I

9    said.

10   BY MS. SUSLER:

11       Q.   Okay.  Then I'd like to understand.

12   And I'm just talking about now monitoring his

13   training in the field of polygraph examination.

14   Can you please tell me what you know about

15   anything that was done by anyone in the police

16   department to monitor Mr. Bartik's training in

17   the field of polygraph examination after he was

18   assigned to be a polygraph examiner.

19       MS. FORDYCE:  Object to the form.

20       THE WITNESS:  There's no requirement for

21   continuing training for polygraph examiners or

22   continuing education.  So we would just -- Our

23   responsibility would be to ensure that he

24   maintains his licensing.  So I'm not aware of



1    any monitoring.

2    BY MS. SUSLER:

3        Q.    Thank you.

4              And did the police department require

5    Mr. Bartik to get any training in the field of

6    polygraph examination at any time?

7        A.    I'm aware that we sent him to some

8    additional training, seminars.  But I don't know

9    the extent of that.

10       Q.    And when you say, We sent him, you

11   mean --

12       A.    The Chicago Police Department.

13       Q.    And when you say the police department

14   sent him, are you telling me that he was

15   required to attend those trainings?

16       A.    Yes.

17       Q.    So it wasn't of his volition; it was

18   something that the police department said, This

19   is something you need to do?

20       A.    Yes.

21       Q.    And what, if any, training was that

22   that you're referring to?

23       A.    There was a period of training in --

24   with the FBI.  There was a period of training in



 1    FBI or from Greensboro that Mr. Bartik actually

 2    attended that training?

 3         A.    Well, the FBI academy in Quantico,

 4    Virginia, they maintain their own records.  So

 5    you could contact the FBI academy in Quantico,

 6    Virginia.

 7         Q.    I asked a bad question.

 8         A.    I'm sorry.

 9         Q.    I meant where in the Chicago Police

10    Department documents would you expect to find

11    any -- any record that Mr. Bartik had attended

12    those other than the A & A sheets?

13         A.    I would not know where to expect to

14    find those documents.

15         Q.    And would that be true for Mr. Bartik

16    and police officers generally?

17         MS. FORDYCE:  Objection:  Outside the scope

18    of the 30(b)(6) to the extent you're asking

19    about police officers generally.

20    BY MS. SUSLER:

21         Q.    Yeah.  I just want to know, you're

22    not -- was there some kind of special

23    documentation or not documentation with respect

24    to the Mr. Bartik as opposed to any other police



1    officer?

2         MS. FORDYCE:  Same objection as well as to

3    the form of that latter question.

4         THE WITNESS:  I don't know where I would

5    expect to find documents about their attendance

6    at Quantico or Greensboro for any other police

7    officer.

8    BY MS. SUSLER:

9         Q.   What, if anything, did the police

10   department -- anyone in the police department do

11   to determine whether Mr. Bartik implemented any

12   of the training that he attended about polygraph

13   examination?

14        MS. FORDYCE:  Objection to the form.

15        THE WITNESS:  The training for polygraph

16   examiners, they're licensed.  They're

17   responsible for doing it.  We provide them with

18   the training, which provides different

19   techniques.  Whether an individual chooses to

20   adapt a given technique, that's his

21   responsibility as a licensed professional.

22   BY MS. SUSLER:

23        Q.   What, if anything, did anyone in the

24   police department do to determine whether



52

1    Mr. Bartik did anything to keep abreast of

2    developments in the field of polygraph

3    examination other than the two formal trainings?

4        A.   He maintained his license with the

5    State of Illinois.  And there's no requirement

6    for continuing education.  So there is -- I

7    don't believe there was any role that the police

8    department played in maintaining he followed up

9    with any periodicals or reviews or anything

10   else.

11       Q.   Or whether he joined any professional

12   polygraph organizations?

13       A.   Well, joining a club, we wouldn't

14   consider that as -- I wouldn't consider that as

15   being -- you're in the West Side Lawyers

16   Association, I don't consider that being

17   anything.  That's a club.

18         So the American Polygraph Association,

19   they can -- they can have seminars.  Or being

20   part of a professional association is not a

21   requirement, not something we would pay for for

22   him to -- or require him to be a member of.

23       Q.   Okay.  Let me ask you some questions

24   about Mr. Bartik's performance as a polygraph



54

1    properly and doing everything he's required to

2    do as part of his supervision.

3    BY MS. SUSLER:

4        Q.   Is there anything else you're aware of

5    that anyone in the police department did to

6    determine how he was performing specifically as

7    a polygraph examiner?

8        A.   They would -- His supervisors would

9    talk to the detectives that bring people down

10   for interviews, or they would respond to

11   complaints, comments, compliments that

12   detectives might have.  That would go to his

13   supervisors.

14       Q.   Now, the answer that you gave me, is

15   that an answer that applies generally, or is

16   that specific with respect to Mr. Bartik?

17       MS. FORDYCE:  Objection:  It's outside the

18   scope of the 30(b)(6) to the extent you're

19   asking about other officers other than

20   Mr. Bartik.

21       THE WITNESS:  That would apply to all

22   officers in the police department.

23   BY MS. SUSLER:

24       Q.   Are you aware of anything done



1    specifically with respect to Mr. Bartik, done by

2    anyone in the police department, to determine

3    how he performed as a polygraph examiner other

4    than what you've already told me?

5        A.   Any specific thing concerning

6    Mr. Bartik concerning his performance as a

7    polygraph examiner, other than the performance

8    evaluations, no. I am not aware of anything

9    else specifically related to Mr. Bartik.

10       Q.   So the documents that the police

11    department has to document any of the --

12    anything anybody in the police department did

13    with respect to how Mr. Bartik was performing as

14    a polygraph examiner would be found in the

15    performance cards or the computerized

16    performance evaluations?

17       MS. FORDYCE:  Objection to the form.  Did you

18    say document?

19          Did she say document?

20             (Whereupon, the record was read

21              as requested.)

22       MS. FORDYCE:  Object to the form:  Vague.

23       THE WITNESS:  It could be find -- found on

24    other documents as well.  If there were any



56

1    complaints initiated by his supervisors, if

2    there were any summary punishment action

3    requests taken, any punishment; if there were

4    any letters received, complimentary letters,

5    those would be forwarded to HR and go into the

6    Awards Section.  If there was any counseling

7    forms done, those would stay in the unit of

8    assignment.

9           I'm not aware of any of these things,

10   but those are documents that could exist

11   specifically applicable to Sergeant Bartik.

12   BY MS. SUSLER:

13       Q.    All right.  You just listed the realm

14   of the possible, and you said you're not aware

15   that any of those documents exist with respect

16   to Mr. Bartik?

17       A.    Correct.

18       Q.    So the documents that you're aware of

19   that exist with respect to Mr. Bartik in terms

20   of documenting what the police department did to

21   determine how he was performing as a polygraph

22   examiner we will find in the performance

23   evaluation cards and the computerized

24   evaluation, correct?



1      A.    Correct.

2      Q.    And you're not aware of any other

3  documentation with respect to how he performed

4  as a polygraph examiner?

5      A.    Correct.

6      Q.    So when you were -- You mentioned

7  something about the supervisor talking to

8  detectives or responding to complaints or

9  compliments; that was also the realm of the

10  possible.  But you're not aware of any of those

11  with respect to Mr. Bartik?

12      A.    I am not aware.

13      Q.    Are you aware of whether any statistics

14  were kept by anyone about Mr. Bartik's polygraph

15  examinations?

16      A.    No.  I am not aware of any statistics

17  that were kept about how many polygraph exams

18  were done, any statistics concerning polygraph

19  examinations.

20      Q.    With respect to Bartik or anything

21  else -- or anyone else?

22      MS. FORDYCE:  Objection:  Outside the scope

23  of the 30(b)(6) to the extent we're talking

24  about anyone else.



1      THE WITNESS:  We do keep statistics on

2  polygraph examiners now, on how many mock exams

3  they do, how many actual exams they do, how many

4  they have under supervision.  But in this time

5  period, 2005, I am not aware of any.

6  BY MS. SUSLER:

7      Q.    And the statistics that you do keep

8  that you were just talking about, those are

9  since you initiated the preemployment polygraph

10  testing?

11      MS. FORDYCE:  Objection:  It's outside the

12  scope of the 30(b)(6).

13      THE WITNESS:  It's preemployment and criminal

14  polygraph and whatever else, 2010.

15  BY MS. SUSLER:

16      Q.    But that's when the statistics --

17      A.    That's when I'm aware of statistics

18  being maintained.

19      Q.    And before that --

20      A.    I'm not aware of statistics before

21  that.

22      Q.    For Mr. Bartik or anyone else?

23      A.    For Mr. Bartik or anyone else.

24      Q.    Have you ever seen any documentation in



60

1    you referring to?

2        A.    The police department, the Detective

3    Division, the Records Division.

4        Q.    But you're not aware that they kept any

5    such statistics?

6        A.    I am not -- I am not aware of any

7    statistics that have been assembled.

8        Q.    And so similarly, fair to say that

9    you're not aware of any statistics regarding the

10   number of confessions that Mr. Bartik obtained

11   at any stage of a polygraph examination

12   throughout his career as a polygraph examiner?

13       A.    I am not aware of any statistics.

14       Q.    Can you tell me what, if any, role

15   numbers played in monitoring Mr. Bartik's

16   performance as a polygraph examiner?

17       MS. FORDYCE:   Objection to the form.

18       THE WITNESS:   Could you tell me what you mean

19   by numbers?

20   BY MS. SUSLER:

21       Q.    Sure.   His -- The number of confessions

22   he obtained, the number of polygraphs he

23   conducted, the number of cases he helped solve,

24   the number of mistakes he made in polygraph



1    examinations, any -- any way the role numbers

2    played in evaluating his performance as a

3    polygraph examiner?

4         MS. FORDYCE:  Objection to the form.

5         THE WITNESS:  Numbers don't drive the

6    evaluation process.

7    BY MS. SUSLER:

8         Q.   With respect to polygraph examiners or

9    police officers?

10        A.   Police officers.

11        MS. FORDYCE:  Objection as outside the scope

12   of the 30(b)(6).

13        THE WITNESS:  So I don't know what role

14   numbers would play.  That's not a self-initiating

15   group.  They do polygraph examinations of people

16   that are brought to them.

17             So if they don't have a large number of

18   polygraph exams in one period of time, we

19   wouldn't give them a negative performance

20   evaluation.  And if they had a great number of

21   polygraph examinations, we wouldn't give them a

22   more positive.  It's not a numbers-driven aspect

23   of the police department.

24             If they had more -- more confessions,



63

1      MS. SUSLER:  Let's mark this as Exhibit 132,

2   please.

3                    (Whereupon, O'Neill Deposition

4                     Exhibit No. 132 was marked for

5                     identification.)

6   BY MS. SUSLER:

7      Q.   For the record, this is City 8099

8   through 8109.  And I will represent to you, sir,

9   that this has been produced by the lawyers for

10  the City in this case as Mr. Bartik's

11  performance evaluation documents.

12     MR. NATHAN:  I need you to say the Bates

13  range again.

14     MS. SUSLER:  8099 to 8109.

15  BY MS. SUSLER:

16     Q.   Sir, I would like to direct your

17  attention to the first page, 8099.  And let's

18  read where it says:

19          Quality of work:  Has achieved a high

20  number of confessions from polygraph subjects

21  prior to the actual polygraph examination.

22          Did I read that correctly?

23     A.   Yes.

24     Q.   And if you look at the upper right-hand



64

1      corner where he gets a grade for quality of

2      work, he got a 99?

3          A.    Correct.

4          Q.    And the possible -- The highest

5      possible grade was 100?

6          A.    Correct.

7          Q.    So Mr. Bartik got almost perfect?

8          A.    Correct.

9          Q.    And is there anything other than the

10     high number of confessions in the polygraph

11     pretest examination to indicate why he would

12     get a 99?

13         A.    I don't see anything about a pretest.

14         Q.    Well, it says, Prior to the actual

15     polygraph examination.

16         A.    Okay.

17         Q.    So --

18         A.    Is that pretest or --

19         Q.    I'll -- I'll rephrase my question.

20         A.    Okay.

21         Q.    Is there anything that you see in

22     Exhibit 132 to indicate why he got a 99 for

23     quality of work other than, Has achieved a high

24     number of confessions from polygraph subjects



 1    prior to the actual polygraph examination?

 2         MS. FORDYCE:  Objection to the form:

 3    Speculation.

 4         THE WITNESS:  No.  I do not see anything.

 5    BY MS. SUSLER:

 6         Q.   Do you know what it means, a high

 7    number of confessions; like, what number?

 8         A.   No.  I do not know.

 9         Q.   What, if anything, did the police

10    department do to determine how Mr. Bartik

11    obtained a high number of confessions from

12    subjects prior to the actual polygraph

13    examination?

14         MS. FORDYCE:  Object to the form.

15         THE WITNESS:  What did the department

16    do to ...

17    BY MS. SUSLER:

18         Q.   To determine how he achieved a high

19    number of confessions from polygraph subjects

20    prior to the actual polygraph examination.

21         A.   I'm not sure what you're asking.  What

22    did the department do to see?

23         Q.   What, if anything, was done to find out

24    how is this guy getting so many confessions from



1    polygraph subjects prior to the actual polygraph

2    exam?

3        MS. FORDYCE:  Objection to the form.

4        THE WITNESS:  I don't know of anything we

5    would do if people are confessing to someone

6    about what they did.

7    BY MS. SUSLER:

8        Q.    Have you ever seen any documentation

9    that the police department took any action to

10   determine how Mr. Bartik was obtaining a high

11   number of confessions from polygraph subjects

12   prior to the actual polygraph examination?

13       MS. FORDYCE:  Same objections; objection to

14   the form.

15       THE WITNESS:  No.  I haven't seen any

16   documentation.

17   BY MS. SUSLER:

18       Q.    Let me ask you to look at the second

19   page of Exhibit 132, City 8100.

20            No.  I'm sorry.  The next page, 8101.

21            If you look at the Quantity of Work

22   section, it says:  Few surpass his output in

23   this area.

24            Did I read that correctly?



1    produces.  I don't know what other duties and
2    responsibility that he had.  But his primary
3    function was to do polygraph exams.  So if he
4    could get three polygraph exams completed in a
5    day, or if -- I think that would fall into his
6    production was very good.  And it ties in with
7    the, Organizes time to maximum efficiency.
8    BY MS. SUSLER:
9        Q.    Are you aware that Mr. Bartik testified
10   that from 1998 to 2003, he obtained 111 confessions
11   during pretest interviews?
12       A.    1998 to 2003?
13       Q.    Yes, a five-year period.
14       A.    It may have been in his deposition.  I
15   don't know if I had -- I don't know if I had
16   seen that.
17       Q.    Do you have any sense of how that
18   compares to other polygraph examiners in the
19   Chicago Police Department?
20       MS. FORDYCE:  Objection:  It's outside the
21   scope of the 30(b)(6) notice.
22       THE WITNESS:  I don't have any statistics
23   concerning the production of other polygraph
24   examiners.



70

```
 1    BY MS. SUSLER:
 2        Q.   Do you know what numbers of confessions
 3    Mr. Bartik obtained at any stage in the
 4    polygraph examination before 1998 and after
 5    2003?
 6        A.   How many he had before?
 7        MS. FORDYCE:  Repeat that, please.
 8                    (Whereupon, the record was read
 9                     as requested.)
10        MS. FORDYCE:  Objection to the temporal scope
11    as being outside the scope of the 30(b)(6).
12    He's here to testify from 1998 to the present.
13        THE WITNESS:  I don't know what he had from
14    1998 to 2003.  I don't know what he had before
15    1998, and I don't have any statistics about what
16    he had since 2003.
17    BY MS. SUSLER:
18        Q.   And you've never seen any such
19    documentation anywhere?
20        A.   Not that I'm aware of.
21        Q.   And you're not aware that any exists in
22    the police department?
23        A.   Not that I'm aware of.
24        Q.   I'm going to ask you some questions
```



1    reading this deposition, his deposition in this

2    case, that he has never been supervised by

3    anyone who knew anything about polygraph

4    examination.

5              Do you have any evidence to the

6    contrary?

7        MS. FORDYCE:  Objection to the form.

8        THE WITNESS:  I think it's a ridiculous

9    statement.  How can you have never been

10   supervised with anyone with any knowledge of

11   polygraph examinations [sic]?  I think the bulk

12   of people have knowledge of polygraph

13   examinations.  I think every police officer

14   knows that polygraph examinations can't be used

15   in court.  So how can you say they have

16   absolutely no knowledge of polygraph

17   examinations?  Everybody knows what a polygraph

18   examination is.  I mean, I think it's an

19   outlandish, ridiculous statement.

20   BY MS. SUSLER:

21       Q.   Are you aware that he testified that he

22   had never been supervised with -- by anyone who

23   was a licensed polygraph examiner?

24       A.   I am not aware of that, if it was in



1    his deposition.  But that's probably accurate.

2         I have supervised doctors, nurses, and

3    I've never had any medical training.

4    Q.    Are you aware of any evidence or any

5    documentation that anyone who supervised

6    Mr. Bartik at any point during his assignment as

7    a polygraph examination --

8    A.    I'm sorry.  I couldn't really hear you.

9    Q.    Are you aware of any documentation that

10   any -- anyone who supervised Mr. Bartik during

11   any time he was assigned as a polygraph examiner

12   was a licensed polygraph examiner him or

13   herself?

14   A.    No.  I am not aware of any

15   documentation.

16   Q.    Would you expect someone who was not a

17   licensed polygraph examiner to know whether

18   Mr. Bartik had excellent knowledge of his

19   technical field?

20   MS. FORDYCE:  Objection to the form.

21   Objection to the extent that this is a question

22   that could be reasonably within the purview of

23   the knowledge of an entire organization.

24   THE WITNESS:  I would expect his supervisors



1    to have conversations with him concerning what

2    he does so they better understand it.  And I

3    think they could come to a determination that

4    they have excellent knowledge.

5            I draw the parallel to the nurses I

6    supervise in the Medical Section and any

7    conversations with them.

8    BY MS. SUSLER:

9        Q.    Is there any document that you're aware

10   of that anyone who ever supervised Robert Bartik

11   in the performance of his conduct as a polygraph

12   examiner, that they had knowledge of the

13   technical field of polygraph examination?

14       MR. NATHAN:  Object to the form.

15       MS. FORDYCE:  Join.

16       THE WITNESS:  I have no knowledge of any

17   documentation of anybody that supervised

18   Sergeant Bartik, that they had technical

19   knowledge of the field.

20   BY MS. SUSLER:

21       Q.    All right.  Let me direct your

22   attention to Exhibit 132, page 8103, which is

23   the fifth page, down where it says:  Job

24   Knowledge:  Professional development.



```
 1    evaluation summary that was performed in August
 2    of 2010 for Mr. Bartik?
 3         A.   I don't know.  The view -- The
 4    sergeant's comments may be blank, so you may
 5    have everything.  But I don't -- I don't have
 6    any independent knowledge of what these contain.
 7    So you may not.
 8         Q.   Let me ask you, with respect to any
 9    kind of supervision or evaluation with respect
10    to quality control over Mr. Bartik's polygraph
11    examinations, are you aware of any documentation
12    of any quality control?
13         MS. FORDYCE:  Objection to the form.
14         THE WITNESS:  Quality control would be the
15    signature on the supplementary report by his
16    supervisor.
17              The actual polygraph is conducted in a
18    room with just Mr. Bartik, or Sergeant Bartik,
19    and the person being interviewed.
20    BY MS. SUSLER:
21         Q.   So if I understand you correctly, the
22    only quality control that exists with respect to
23    Mr. Bartik's polygraph examinations was the
24    supervisor's approval of the sup reports?
```



1      A.    Correct.

2      Q.    And you are aware that when Mr. Bartik

3   conducts polygraph examinations, there are

4   charts that are printed of the actual subject's

5   responses?

6      A.    Correct.

7      Q.    Okay.  Are you aware of what, if any,

8   quality control exists with respect to those

9   charts?

10     A.    Quality control by Mr. Bartik or by the

11   police department?

12     Q.    By the police department.

13     A.    I'm not aware of any quality control

14   that would be used to evaluate the charts

15   produced by Sergeant Bartik.

16     Q.    Have you ever seen any documentation of

17   any quality control with respect to Mr. Bartik's

18   polygraph examinations other than the

19   supervisor's approval on the sup reports?

20     A.    Well, there would also be any input,

21   comments from the person being interviewed or

22   the detective who brought the person over for

23   the interview.  But as far as the actual charts

24   or the conclusions reached, no, I have not seen



1    examinations?

2        A.    There would have been peer review

3    during his training cycle.  When he was being --

4    While he worked for the police department, I am

5    not aware of any review of his -- peer review of

6    his polygraph examinations.  I am not aware of

7    any.

8        Q.    When you say, His training cycle, you

9    mean when he was in polygraph school?

10       A.    Correct.

11       Q.    Other than what we have in Exhibit 132,

12    and other than the supervisor's signed sup

13    reports for Mr. Bartik, what, if any, other

14    supervision are you aware of with respect to

15    Mr. Bartik as in his performance as a polygraph

16    examiner?

17       A.    I am not aware of anything evaluating

18    his performance besides the performance

19    evaluation and the performance rating cards --

20       Q.    Okay.  My question --

21       A.    -- that you presented.

22       Q.    Sorry.  My question went not just to

23    evaluation but supervision.  And if you conflate

24    the two, that's fine.  I just need to know if



84

1     that's what you're doing.

2          A.    Let's see.   Could you repeat the

3     question or rephrase the question so I make sure

4     I understood.

5                         (Whereupon, the record was read

6                          as requested.)

7          MS. FORDYCE:   Objection to the form.

8          THE WITNESS:   Okay.   He would be subject to

9     supervision by his supervisors in his unit and

10    subject by supervisors -- any supervisor that

11    comes across him during his tour of duty.

12               If we're only talking about his

13    polygraph examinations or if he's working some

14    other special employment opportunity, at CHA,

15    CTA, he would be subject to those supervisors.

16    But if you're talking about purely his role as

17    an polygraph examiner, that would be his

18    day-to-day supervisors that would be reviewing

19    him on a day-to-day basis.

20    BY MS. SUSLER:

21         Q.    All right.   Is there any documentation

22    of any supervision of Mr. Bartik's performance

23    as a polygraph examiner other than Exhibit 132

24    and the sup reports approved by his supervisors?



85

1    MS. FORDYCE:  Objection to the form.

2    THE WITNESS:  Not that I'm aware of right

3    now.  There may be supervisor's logs that are

4    maintained by the unit, but I'm not sure what

5    they do in Forensics as far as supervisors'

6    logs.

7    MS. SUSLER:  Did you want to communicate with

8    your client?

9    MS. FORDYCE:  I wanted to wave this fly that

10   was flying over my paper.

11   BY MS. SUSLER:

12   Q.   And the supervisors' logs you're

13   referring to, those are what?

14   A.   Those are maintained in Patrol.  I

15   don't know what they have in -- in Forensics.

16   Q.   And that's something --

17   A.   It would be a daily log.  There may be

18   a watch commander's log that -- I -- I'm not

19   sure.  I want to make sure that I'm responsive

20   to your question and not missing something that

21   I'm not aware of.  But I'm not aware of

22   anything.  There might be something else; but

23   pretty much, this is what you would be looking at.

24   MS. FORDYCE:  For the record, I'm waving at a



1    MS. SUSLER:  Counsel, if that document

2    exists, I would like to have it.

3    MS. FORDYCE:  I don't know what he's talking

4    about.  And everything we reviewed yesterday is

5    documents we produced to you previously.

6    THE WITNESS:  I didn't look at any documents

7    beyond those.  So he might have mentioned in his

8    deposition, but I do remember something about an

9    honorable mention for some interview he

10   conducted.

11   BY MS. SUSLER:

12   Q.   For what purpose are Mr. Bartik's

13   complimentary awards -- what purpose do they

14   serve him?

15   A.   It's a reflection of his service to the

16   police department.  And in discipline cases, it

17   would be a mitigating factor in discipline if he

18   has an exceptional complimentary record.

19        So before imposing any discipline, a

20   supervisor reviews his complimentary and

21   disciplinary history.

22   Q.   I'm going to ask you some questions

23   about Mr. Bartik's promotion to sergeant.  At

24   the time he was promoted, what were the criteria



1    for promotion from police officer to sergeant?

2         A.   To be promoted to sergeant, he had to

3    participate in the exam process.  He had to have

4    an acceptable complimentary and disciplinary

5    record, an acceptable medical record, and he had

6    to be in a full -- full-duty status.

7         Q.   What documents are created in the

8    process of promoting a police officer to a

9    sergeant?

10        MS. FORDYCE:  Objection as outside the scope

11   of the 30(b)(6).

12        THE WITNESS:  As far as the --

13   BY MS. SUSLER:

14        Q.   I will tailor the question to

15   Mr. Bartik.  What documents were created in the

16   process of promoting Mr. Bartik from police

17   officer to sergeant?

18        A.   Well, there was an exam that was

19   administered.  It was a two-part exam.  A rank

20   order list was developed by the Department of

21   Human Resources, which is the City HR

22   department.  A list was provided to the police

23   department.  We got to his name on the list.

24   Then we get his complimentary and disciplinary



1    history and his medical report.  I review those.

2    And if he's deemed eligible to be promoted, we

3    create an administrative message that goes out

4    directing him and other people to report for

5    training at the academy for a period of time,

6    pre-service training prior to some -- prior to

7    promotion.

8        Q.   So if you look at Exhibit 134, the

9    personnel file, and if you look at 7238,

10   Mr. Bartik is, like, the sixth name on the memo

11   at 7238.  Do you see that?

12       A.   Yes.

13       Q.   So this is -- Is this the

14   administrative message you're referring to?

15       A.   No.  This is the personnel order,

16   B-series employment order promoting them and

17   assigning them.  This is an HR function.  This

18   is after they have completed their training and

19   are now being assigned to districts as

20   sergeants.

21       Q.   So this would be subsequent to the

22   administrative message you mentioned?

23       A.   Yes.

24       Q.   Where are the documents that you just



1       named that are -- were created in the process of

2       promoting Mr. Bartik from officer to sergeant?

3           A.   The exam would be in possession of

4       Department of Human Resources.   Probably not in

5       their possession because it's a vendor, and they

6       own the exam.   The results would be provided to

7       DHR, the Department of Human Resources.   They

8       compile the list.   The vendor does the scoring

9       and provides them with a rank order list.   And

10      then they provide us with the names as we

11      promote.

12              So I may have a list of the people from

13      this exam process, a rank order list from the

14      people from this exam process, which is another

15      document that would have his name on it.

16          Q.   If I understood you correctly, you said

17      that when you get to -- when you got to his name

18      on the list, that you personally reviewed his

19      complimentary and disciplinary history and his

20      medical record?

21          A.   Yes.

22          Q.   And you made the decision that he was

23      going to be promoted?

24          A.   He was eligible for promotion, yes.



1     Q.   What was it about his complimentary --

2    complimentary and disciplinary history that you

3    determined made him eligible for promotion?

4     A.   There was nothing in his disciplinary

5    history that would prevent him from being

6    promoted.

7     Q.   What -- What sort of thing in his

8    disciplinary -- in a disciplinary history would

9    prevent an officer from being promoted to a

10   sergeant?

11   MS. FORDYCE:  Objection:  It's outside the

12   scope of the 30(b)(6).  He's not going to be

13   answering on behalf of the City.

14   THE WITNESS:  There's an investigation that

15   has -- that he is going to be subject to

16   separation, and we would move that ahead to

17   start the separation process prior to promoting

18   him, rather than promoting him.

19   BY MS. SUSLER:

20    Q.   So if -- If Officer Bartik had had

21   something in his disciplinary history indicating

22   that he was subject to separation, that would

23   have been the only thing in his disciplinary

24   history that would have been an obstacle to his



1    being promoted from officer to sergeant?

2         A.    Well, he was from the rank order list.

3    There's two -- two components to this list.  One

4    is rank order list, and one is merit selection.

5    The merit selections have different requirements

6    as far as length of sustained CR numbers and

7    discipline.

8         So if -- But that wouldn't apply to

9    Mr. Bartik.  Mr. Bartik would -- to be --

10   prevent him from being promoted, he would have

11   to be relieved of police powers and subject to

12   separation.

13        Q.    Just so I can --

14        A.    Or not be on a full-duty status.

15        Q.    I just need to put Officer Bartik's

16   promotion in the context.  Now, you said there's

17   also merit promotion, which he was not on --

18   promoted with respect to his merit?

19        A.    Correct.

20        Q.    So that's a whole different process?

21        A.    Well, it's all part of the same

22   process.  It's all part of the promotion

23   process.

24        Q.    But there are different requirements



1    that obtain in terms of the disciplinary record?

2        A.   I review all the disciplinary records.

3    But this is what would disqualify somebody on

4    the rank order list.

5             So yes, there's different things that

6    would disqualify you from the rank order list as

7    opposed to the merit list.

8        Q.   And what on the merit list would

9    disqualify you from promotion?  I'm just -- I'm

10   trying to understand what happened with Bartik

11   to --

12       A.   Excessive medical roll use, a

13   substantial sustained CR numbers, substantial

14   penalty on CR numbers in a period of time.

15       Q.   Thank you.

16       A.   That would be about it.

17       Q.   Thank you.   That helps.

18            In making the decision to promote

19   Officer Bartik to sergeant, were performance

20   evaluations part of that conversation?

21       A.   No, they were not.

22       Q.   Commendations were?

23       A.   Yes.

24       Q.   And so were his CRs?



1   A.   We're talking about Sergeant Bartik?

2   Q.   Yes.

3   A.   Yes, they were reviewed.

4   Q.   But only to determine whether he was

5   subject to separation?

6   A.   Yes.

7   Q.   So would it be fair to say that the

8   allegations in the particular CRs with respect

9   to Mr. Bartik were not considered?

10   A.   They were reviewed, but they were not a

11   factor in the determination.  Because I do not

12   have -- I did not review any sustained

13   complaints against Sergeant Bartik.

14   Q.   I guess my question was with respect to

15   the allegations in the CRs.  Would it be fair to

16   say that the allegations in the respective CRs

17   Mr.- -- with respect to Mr. Bartik, that you did

18   not consider those in the decision to promote

19   him?

20   MS. FORDYCE:  Objection:  Misstates his prior

21   testimony, and objection to the form.

22   THE WITNESS:  I reviewed them and determined

23   them to be irrelevant to the promotion process.

24



1    BY MS. SUSLER:

2        Q.    And that was because you learned that

3    he was not subject to separation?

4        A.    That the CR numbers were not sustained,

5    and there was no open CR numbers that would

6    subject him to separation.

7        Q.    And at the time that you made the

8    decision to promote him, what information, if

9    any, did you have with respect to litigation

10   naming Mr. Bartik as a defendant?

11       A.    Some of the CR numbers refer to

12   litigation.  But that's the extent of the

13   information that I had.

14       Q.    And would it be fair to say, then, that

15   the fact that he had been named as a defendant

16   in lawsuits with respect to his conduct as a

17   polygraph examiner was irrelevant to your

18   decision to promote him from police officer to

19   sergeant?

20       MS. FORDYCE:  Objection to the form.

21       MR. NATHAN:  Objection:  Mischaracterizes his

22   testimony; asked and answered.

23       THE WITNESS:  I reviewed the documents and

24   determined that there was nothing to disqualify



104

1    him from being promoted.

2    BY MS. SUSLER:

3        Q.    They were irrelevant?

4        MS. FORDYCE:   Same objection.

5        MR. NATHAN:   Objection:   Asked and answered.

6        THE WITNESS:   The lawsuits -- The lawsuits or

7    the CR numbers?

8    BY MS. SUSLER:

9        Q.    I think we already talked about the CR

10   numbers, right?

11       A.    Okay.

12       Q.    So let's talk about --

13       A.    So all the information I have on the

14   lawsuits are contained in the CR numbers.   So

15   the CR numbers were not relevant to my

16   determination.

17       Q.    Okay.   What, if anything, did you know

18   about the amount of money the City paid in

19   settlements and/or judgments in the lawsuits

20   against Mr. Bartik at the time you made the

21   decision to promote him from officer to

22   sergeant?

23       MS. FORDYCE:   Objection to the form.

24       THE WITNESS:   At the time I'm making the



1    evaluation whether to promote him to the

2    position he tested for of sergeant, I do not

3    have information concerning any litigation or

4    settlements that the City may have entered into

5    on Mr. Bartik's behalf.

6    BY MS. SUSLER:

7        Q.    That information was irrelevant to the

8    decision to promote?

9        A.    It's not provided to me, and it's not

10   one of the criteria for promotion to the rank of

11   sergeant.

12       Q.    So I just want to be clear that I

13   understand what was considered in the decision

14   to promote Mr. Bartik.  And if I understood you

15   correctly, it was, he took an exam, he had a

16   rank order on a list, you got to his name on the

17   list, you looked at the complimentary and

18   disciplinary histories and his medical record,

19   and made the decision to promote him?

20       MS. FORDYCE:  Objection:  Misstates his prior

21   testimony.

22       THE WITNESS:  And determined he was a

23   full-duty sergeant not relieved of police powers

24   or in a limited duty capacity; that he had the



1    Ms. Harris sued Mr. Bartik and asked the City to

2    produce those documents?

3        MS. FORDYCE:  Objection:  Calls for

4    speculation; outside of the scope of 30(b)(6)

5    foundation.

6        THE WITNESS:  Yes.  That's one of the --

7    That's one I am certain that they review it.

8    BY MS. SUSLER:

9        Q.   Are you aware of any other review by

10   any member of the Chicago Police Department of

11   Mr. Bartik's disciplinary record as a whole?

12       MS. FORDYCE:  Objection to the form.

13       THE WITNESS:  I am not aware of any other

14   review of Sergeant Bartik's disciplinary history

15   as a whole, and I'm not even sure if it's

16   properly characterized as a disciplinary history

17   or complaint history.

18   BY MS. SUSLER:

19       Q.   But in any event, we're talking about

20   the same thing, disciplinary history and

21   complaint history?

22       A.   Yes.

23       Q.   Okay.  Are you aware of whether anyone

24   in the police department has ever reviewed



108

1    Mr. Bartik's disciplinary record as whole to

2    look for patterns in the allegations made by

3    complainants?

4        MS. FORDYCE:  Objection to the form.

5        THE WITNESS:  I am not aware of anybody in

6    the Chicago Police Department or the Independent

7    Police Review Authority that have reviewed this

8    document looking for patterns.

9    BY MS. SUSLER:

10       Q.   And just to put Mr. Bartik in context,

11   that would be true generally for police

12   officers?  That kind of review doesn't happen?

13       MS. FORDYCE:  Objection:  Outside of the

14   scope of the 30(b)(6); objection as to the form.

15       THE WITNESS:  I am not aware if that review

16   takes place in Legal Affairs; or it could take

17   place in HR under a Behavioral Intervention if a

18   commander recommended it because he had

19   independent knowledge of this.  We may search

20   for what the complaints were.  But I can't think

21   of a time it has come up in my tenure there.

22   BY MS. SUSLER:

23       Q.   And have you ever seen any

24   documentation that any review looking for



1    patterns in the allegations made by complainants

2    with respect to Mr. Bartik ever took place?

3        MS. FORDYCE:  Objection to the form.

4        THE WITNESS:  No.  I don't remember

5    Mr. Bartik's name coming up in any of that type

6    of review.

7    BY MS. SUSLER:

8        Q.   Have you ever seen any documentation of

9    any review of Mr. Bartik's disciplinary history

10   looking for issues that could be addressed by

11   counseling or retraining?

12       MS. FORDYCE:  Object to the form.

13       THE WITNESS:  Have I ever seen review of his

14   disciplinary history to identify issues that

15   could be addressed by counseling or training?

16   No, I have not seen any document of any review

17   of his disciplinary history or complaint

18   history.

19   BY MS. SUSLER:

20       Q.   And, again, to put it in context to

21   understand with respect to Mr. Bartik versus

22   generally, if an officer isn't, as you said, the

23   subject of a commander's request to put him in

24   Behavioral Intervention or something like that,



1    MS. FORDYCE:  Objection to the form and

2    outside the scope of the 30(b)(6).

3    THE WITNESS:  A supervisor can make a

4    recommendation for an employee to go back to the

5    training academy for supplemental training if

6    their performance in some category is not

7    acceptable or they feel supplemental training

8    would be appropriate, such as for report

9    writing, traffic stops, DUI writing.  An issue

10   that comes to their attention that would

11   require -- that it would be a benefit to have

12   them -- A police officer who has not been out on

13   the street for 15 years, all right, we would

14   generally get a report requesting that they go

15   back to the academy to be updated and refreshed.

16   So that's also an available tool.

17   BY MS. SUSLER:

18       Q.    Have you ever seen any documentation

19   with respect to Mr. Bartik that any supervisor

20   ever recommended that he return to the academy

21   for any kind of supplemental training?

22       A.    No.  I never received any indications

23   of concerns from the supervisors and never saw

24   any documents requesting supplemental training



1     for Sergeant Bartik.

2          Q.   If a supervisor had made such a

3     recommendation for Mr. Bartik, where in the

4     Chicago Police Department documents would you

5     expect to find that?

6          A.   I would expect to find that in

7     Forensics or the Training Academy.

8          Q.   And when you say, Forensics, what are

9     you referring to?

10         A.   If that was the unit he was in at the

11    time, Forensic Investigation Unit.

12         Q.   So would there be -- Are you referring

13    to, like, a file that Forensics would have with

14    Mr. Bartik's name on it?

15         A.   Yes.

16         Q.   With that recommendation in it?

17         A.   Yes.  If such a document existed.

18         Q.   And as far as you know, no such

19    document exists?

20         A.   I'm not aware of any such document.

21         Q.   If Mr. Bartik testified in court, what,

22    if any, documents would you expect to see

23    generated?

24         MS. FORDYCE:   Objection:   That's outside of



1     the scope of the 30(b)(6).  Is this tied to any

2     of the topics in here?

3          MS. SUSLER:  Yes.  It's foundational.

4          THE WITNESS:  Depends on what type of -- If

5     he's testifying in traffic court, I would expect

6     a copy of the ticket to be available.  If he's

7     testifying on a DUI, I would expect a copy of

8     his observations to be available.  If he's

9     testifying on a polygraph exam, I expect his

10    supplemental report to be available.

11         It depends what the state's attorney

12    wants to present as evidence or documents that

13    may be beneficial to refresh his recollection;

14    if it's for the defense attorney, whatever

15    documents they would normally request.

16    BY MS. SUSLER:

17         Q.   Are you aware of any documentation by

18    any supervisory personnel for Mr. Bartik, other

19    than a sup report, regarding any testimony he

20    ever gave in any criminal or civil case?

21         MS. FORDYCE:  Objection:  It's outside the

22    scope of the 30(b)(6).

23         MS. SUSLER:  Well, I disagree because I'm

24    talking about supervision.



115

1          But go ahead.

2      THE WITNESS:  Okay.  Am I -- Am I aware of

3  any report submitted by Sergeant Bartik

4  concerning any --

5  BY MS. SUSLER:

6      Q.    No.

7      A.    Okay.

8      Q.    Thank you for asking if you weren't

9  clear.

10          Are you aware of any documentation --

11     MS. SUSLER:  Well, can you read it back.

12              (Whereupon, the record was read

13                as requested.)

14     MS. FORDYCE:  Objection to the form.

15     THE WITNESS:  I am not aware of any report

16  submitted by any supervisor concerning any

17  testimony Sergeant Bartik has given during the

18  course of his career.

19  BY MS. SUSLER:

20     Q.    In reviewing Mr. Bartik's CRs -- Let me

21  ask you this:  Are you aware of whether there is

22  a complaint category for allegations related to

23  polygraph examinations for CRs?

24     MS. FORDYCE:  Objection:  It's outside the



```
 1        Q.    When looking at the CRs in preparation
 2    for the deposition with allegations against
 3    Mr. Bartik, what patterns, if any, did you see?
 4        MS. FORDYCE:   Objection:   Vague to the term
 5    patterns, and not -- this is not the type of
 6    information that can reasonably be known to an
 7    entity pursuant to 30(b)(6).
 8        THE WITNESS:   I did not see a pattern.   I saw
 9    a number of CR numbers over an extended career.
10    And over the past couple of years, I've seen
11    attorneys making allegations against Mr. Bartik,
12    but not a great number or anything that would
13    indicate a pattern for -- I don't -- I didn't
14    see a pattern of allegations.
15            Early in his career, they were standard
16    citizen complaints, not of the same nature, not
17    consistent verbal abuse, not consistent physical
18    abuse, not consistent physical abuse, not
19    consistent -- not consistently the same thing
20    over the course of his early career.
21            And then I did see a number of lawsuits
22    involving Mr. Bartik.   And I saw a pattern of
23    attorneys making allegations and not
24    substantiating their allegations to IAD.
```



125

1    seminar that's available several times a year

2    that people can sign up for to help them manage

3    stressful situations.  We want to -- We want to

4    ensure we are taking care of the well-being of

5    our members.  So the sergeant has an obligation

6    to do those steps.

7         Q.   Have you ever seen any documentation

8    that any supervisory personnel has referred

9    Mr. Bartik to the Employee Assistance Program or

10   the stress management seminar?

11        A.   I have not seen any documentation

12   concerning referral to Employee Assistance or

13   stress management.

14        Q.   And have you ever seen any

15   documentation indicating that Mr. Bartik feels

16   any stress whatsoever as a result of having been

17   named as a defendant in lawsuits?

18        MS. FORDYCE:  Objection:  It's outside the

19   scope of the 30(b)(6).

20        THE WITNESS:  I have not seen any

21   documentation about his stress related to a

22   lawsuit.

23   BY MS. SUSLER:

24        Q.   Have you ever seen any documentation



1    that any supervisor for Mr. Bartik was aware of

2    the allegations of -- regarding Mr. Bartik's

3    performance as a polygraph examiner for any of

4    the lawsuits in which he was named as a

5    defendant before Legal Affairs notified the unit

6    that he had been named as a defendant?

7         A.    No.   I am not aware of any

8    documentation concerning whatever the ...

9         Q.    Have you ever seen any documentation,

10   or are you aware of whether it exists, of any

11   review of Mr. Bartik's role in motions to

12   suppress statements, direct appeals,

13   post-convictions, habeas petitions alleging

14   wrongdoing with respect to his conduct?

15        MS. FORDYCE:   Objection to the form;

16   objection as outside the scope of the 30(b)(6).

17        MR. NATHAN:   I'm sorry.   Tracy, do you mind

18   reading that back.

19                     (Whereupon, the record was read

20                      as requested.)

21        MR. NATHAN:   Thank you.

22            Objection:   Form.

23   BY MS. SUSLER:

24        Q.    And let me add, his conduct as a



127

1    polygraph examiner.

2        MR. NATHAN:  Same objection:  Form.

3        THE WITNESS:  I don't -- The police

4    department would not have -- No.  I have not

5    seen, and the police department would not have

6    documents of this nature.

7    BY MS. SUSLER:

8        Q.   And is that because the police

9    department doesn't review with respect to

10   Mr. Bartik, for example -- and I'm going to try

11   to break this down so it's not too compound.

12        Let's say Mr. Bartik testifies at a --

13   at a criminal hearing for a motion to suppress a

14   statement.  And he testifies because the state's

15   attorney subpoenas him, and he testifies that

16   the defendant in the criminal case voluntarily

17   subjected himself to a polygraph examination and

18   made a statement, an inculpatory statement.  And

19   let's say that the judge, after Mr. Bartik

20   testifies, suppresses the statement because the

21   judge determines that, contrary to what

22   Mr. Bartik testified to, the statement wasn't

23   given voluntarily.  Is there any way the police

24   department has to find out that a judge rejected



132

1    court today testifying, what their testimony is

2    on each case that's before -- is that what

3    you're asking?  I don't think we have an

4    all-inclusive, line-by-line testimony.

5            No one in the police department is

6    going to review this deposition I provide today.

7    If you provide a complaint or Ms. Fordyce

8    provides a complaint about the testimony, then

9    it would be investigated.  But no, we don't have

10   supervisors reviewing every line of testimony

11   provided.

12       Q.   Are you aware of the existence of any

13   documentation of any supervisor ever reporting

14   any issue with respect to Mr. Bartik testifying

15   by deposition or trial?

16       MS. FORDYCE:  Objection:  Asked and answered.

17       THE WITNESS:  Any review of his --

18   Mr. Bartik's deposition or trial?

19   BY MS. SUSLER:

20       Q.   Any documentation that any supervisor

21   ever reported any issue with respect to

22   Mr. Bartik's testimony by deposition or trial?

23       A.   I am not aware of that.

24       MS. FORDYCE:  Objection to the form.



133

1    THE WITNESS:  I'm sorry.

2   BY MS. SUSLER:

3    Q.    Would it be fair to say a supervisor of

4   a polygraph examiner should -- should be aware

5   of litigation naming Bartik as a defendant where

6   allegations relate to his conduct as a polygraph

7   examiner?

8    MS. FORDYCE:  Object to the form.

9    THE WITNESS:  It could be.  I'm not certain.

10  I mean, these -- these lawsuits tend to involve

11  everybody that has their name on any document.

12  So it doesn't necessarily mean something.  If

13  the corporation counsel, upon reviewing this,

14  thinks there's something that needs to be

15  brought to the attention, they would direct that

16  through the Office of Legal Affairs, who would

17  take appropriate steps.  And that's how it would

18  be done.

19        But no.  It probably would not be

20  appropriate for a supervisor to know every piece

21  of litigation that involves a member under their

22  supervision.

23    MS. SUSLER:  Let's mark this as Exhibits 136.

24



1    against Mr. Bartik.

2        Q.    Would it be a helpful supervisory tool

3    with respect to Mr. Bartik to collect in one

4    place the information related to litigation

5    that's been brought against him?

6        MS. FORDYCE:  Objection to the form;

7    objection to the extent this isn't a question

8    reasonably within the knowledge of an entity.

9        MR. NATHAN:  Join.

10       THE WITNESS:  I don't know if it would be

11   beneficial to the police department to have that

12   information.

13   BY MS. SUSLER:

14       Q.    Have you ever seen any documentation

15   that Mr. Bartik, following the verdict and

16   settlement in Mr. McGee's case, was ever

17   disciplined or retrained or experienced any kind

18   of consequences whatsoever?

19       MS. FORDYCE:  Objection to the form.

20       THE WITNESS:  No.  When I -- When I had my

21   brief conversation involving McGee, it didn't

22   involve Sergeant Bartik.  Or I don't remember it

23   involving Sergeant Bartik.  So no, I don't --

24   I'm not aware of any training or anything



142

1       Q.   Is there any mechanism that you're

2   aware of in the police department where once a

3   lawsuit that initiates a CR is resolved, the

4   resolution is documented and reported to the

5   command of the officer who was named as a

6   defendant in that litigation?

7       MS. FORDYCE:  Objection:  Asked and answered.

8       THE WITNESS:  I am not aware of any

9   documentation that reports settlements to the

10  command.

11      MS. SUSLER:  Let's mark this as 137.

12               (Whereupon, O'Neill Deposition

13               Exhibit No. 137 was marked for

14               identification.)

15      MS. SUSLER:  This is City 5274 through 5319.

16  It's CR -- Well, it's Complaint Log No. 1022118,

17  a complaint made by an attorney on behalf of

18  Dany Lanza, L-A-N-Z-A.

19  BY MS. SUSLER:

20      Q.   Is this one of the documents you

21  reviewed in preparation for your deposition?

22      A.   Yes.

23      Q.   And this is another lawsuit naming

24  Mr. Bartik as a defendant?  That's what



1    inconclusive statements.

2         Yes.  We could try to identify a

3    pattern.  What you've presented to me, I don't

4    think does it.  We could look at it.  We look at

5    each of these in -- complaints and investigate

6    them thoroughly by professionals and take them

7    as far as we can go with the investigations.  So

8    far, nothing you've provided indicates

9    wrongdoing.  So is there more that could be

10   done?  I don't know.

11   BY MS. SUSLER:

12        Q.   And just so I'm clear, number one, you

13   don't -- you don't see a pattern in these last

14   four investigations done with respect to

15   Mr. Bartik?

16        A.   I see --

17        MS. FORDYCE:  Objection:  Speculation;

18   foundation.  This is not a question that an

19   entity -- that -- Strike that.

20        This is not a question that elicits

21   information known or reasonably known to the

22   organization.  This is the personal opinion of

23   one single deponent.

24        THE WITNESS:  Okay.  I see a pattern of



164

1    allegations by a group of attorneys making

2    allegations.  I do see that.  I see an

3    organization that has investigated each of those

4    allegations to the point they can.

5    BY MS. SUSLER:

6        Q.   And just so I'm clear what, if

7    anything, has anyone in the Chicago Police

8    Department done beyond Exhibits 136 through 139 to

9    investigate allegations of wrongdoing by Robert

10   Bartik in his performance as a polygraph

11   examiner?

12       MS. FORDYCE:  Objection:  Asked and answered

13   multiple times.

14       THE WITNESS:  We have responded to each

15   complaint, each allegation, conducted an

16   investigation, and have not received any

17   cooperation from the people making the

18   allegation or their clients.

19   BY MS. SUSLER:

20       Q.   My question was what, if anything, has

21   the police department done besides these four

22   investigations?

23       MS. FORDYCE:  Objection:  Asked and answered;

24   argumentative;  form of the question.

