# EXHIBIT 41

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS
REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

OFFICE OF PROFESSIONAL STANDARDS                    02 November 1990


TO:        LeRoy Martin
           Superintendent of Police

FROM:      Gayle Shines
           Chief Administrator
           Office of Professional Standards

SUBJECT:   Special Project Conclusion Reports
           (The Burge Investigation)

          On 27 March 1990, OPS Investigators Francine Sanders
and Michael Goldston were assigned to re-investigate the
allegations, captured under CR# 123543, that excessive force had
been used against Andrew Wilson in February 1982, while he was in
the custody of Area 2 personnel for the murders of Chicago Police
Officers Fahey and O'Brien.  One of the named accused officers
was Jon Burge, who was at that time a lieutenant at Area 2.

          An additional part of this assignment was to
determine if there was systematic abuse at Area 2 during that
period, and if so, to determine the culpability, if any, of Area
2 Command Personnel.

          Investigator Goldston's research addressed the latter
issue and his report and supporting data are contained in the
first section of his binder.

          Investigator Sanders' review of the original CR
investigation focussed on the circumstances surrounding Andrew
Wilson's alleged mistreatment, and her report and findings are
contained in the second section of this binder.

          Both Investigators have done a masterful job of
marshalling the facts in this intensive and extensive project
and their conclusions are compelling..



                         Gayle Shines
                         Chief Administrator
                         Office of Professional Standards

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 6722

GS/jk

Attachments

CHICAGO POLICE DEPARTMENT
OFFICE OF PROFESSIONAL STANDARDS

SPECIAL PROJECT

SECTION I    —    REPORT OF INVESTIGATOR MICHAEL GOLDSTON, STAR #73,
OFFICE OF PROFESSIONAL STANDARDS, RE: HISTORY OF
ALLEGATIONS OF MISCONDUCT BY AREA TWO PERSONNEL

SECTION II   —    REPORT OF INVESTIGATOR FRANCINE SANDERS, STAR #28,
OFFICE OF PROFESSIONAL STANDARDS, RE: ANALYSIS OF
WILSON CASE

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722.

000002

SECTION

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN _90_ C _6732_.

OFFICE OF PROFESSIONAL STANDARDS          28 SEPTEMBER 1990

TO:            Chief Administrator
               Office of Professional Standards,

FROM:          Investigator Michael GOLDSTON, Star #73

SUBJECT:       Special Project Conclusion Report.


          As directed, this report is being submitted to
present the result of my collection and analysis of available
information in the course of the above captioned project.

          I used a variety of sources to obtain and
corroborate data. As usual, some sources were more reliable than
others. The article House Of Screams which appeared in the
Chicago Reader served as a sound starting point. The names which
appeared in that article also figured prominently in my research.
The City's Corporation Counsel files provided a wealth of
material that I used to identify individuals as well as verify or
augment information on previously identified individuals. Two
sources for which I originally had high hopes proved to be
disappointments. The People's Law Office contributed a number
of names, but offered little in the way of supporting
information. The Public Defender's Office, which I understood
had a database of cases relevant to this project, was also of
little help. In fact, that office did not have such a database
and any research had to be conducted by hand. Even then, there
was no guarantee that all pertinent information on an individual
would be available since their files are cannibalized for their
purposes. When those purposes are served, the files are often
not reconstructed.

          My first order of business was to start a
computer database of individuals who came to my attention as
alleged victims. I have submitted printouts of that database in
the past with status reports. In the interim, I have modified
the database to reflect truly germane data. Previously,
witnesses were included as individual records. Now they appear
in a new column entitled "(WITNESS(ES)" as part of the
appropriate record for the alleged victim. All available
information is recorded in the database, but for some individuals
there was a distinct dearth of information. Those cases account
for the gaps in the database. As part of this report, I am
including a printout of the modified database in two forms;
sorted alphabetically, and, by date of the alleged incident.
Ongoing research during this project resulted in the
identification of some alleged incidents which did not involve
Area 2 personnel. Those have been deleted from the database.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6771.

000004

Case: 1:14-cv-04391 Document #: 173-43 Filed: 03/15/16 Page 6 of 99 PageID #:2815

I have also created individual files in this office for each individual identified. Those files have been updated as additional information has become available. The types of documents that are part of the individual files include, but are not limited to; CR investigative files, Detective Division reports, Arrest Reports, Criminal Histories, depositions, court transcripts, and medical records.

At your direction, I conducted an "intersection study" to determine the identity of individuals who met certain criteria. The result of that study appears as a separate index of this report. Information that has been added since the last submission of the "intersection study" report is indicated in highlighted and bracketed form. An updated version of the grid which accompanied the previous report is included also.

In the process of analyzing the data produced during this endeavor, credibility of the individuals and sources was paramount. The credibility of some individuals was suspect as a result of their relationships to other individuals (gang affiliation, shared criminal history, familial, etcetera). There were also a number of individuals who were contacted by the People's Law Office. The manner in which the PLO broached the subject of abuse in these cases is questionable. There were examples of their representatives initiating the contact by relating the nature of their business, which would include information that some other individual alleged physical abuse at the hands of Commander BURGE for example. The next question asked would be, "Were you ever physically abused by Jon BURGE?" BURGE had some contact with practically each person with whom the PLO spoke and each had, at the least, been suspected of committing a serious offense. Taking these facts into consideration, any response by these individuals had to be taken with the proverbial grain of salt. Others were quite credible as a result of how they related what allegedly happened to them and being supported by corroborating evidence such as medical records. In fact, some individuals were so credible that civil suits filed by them resulted in settlements. In one case, a conviction was reversed based on information given in a motion to suppress which had originally been denied.

Ultimately, an opinion must be posited based on the two questions that initiated this project. The first being, "Is there evidence that personnel assigned to Area 2 are guilty as regards the practice of systematic abuse of individuals in their custody?" The second is, "If such systematic abuse did occur, is there evidence that Area 2 command personnel were aware of such abuse and condoned same?"

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722.

030005

OFFICE OF PROFESSIONAL STANDARDS                    28 SEPTEMBER 1990
SPECIAL PROJECT CONCLUSION REPORT                             PAGE 3


          In the matter of alleged physical abuse, the
preponderance of the evidence is that abuse did occur and that it
was systematic.  The time span involved covers more than ten
years.  The type of abuse described was not limited to the usual
beating, but went into such esoteric areas as psychological
techniques and planned torture.  The evidence presented by some
individuals convinced juries and appellate courts that personnel
assigned to Area 2 engaged in methodical abuse.

          The number of incidents in which an Area 2 command
member is identified as an accused can lead to only one
conclusion.  Particular command members were aware of the
systematic abuse and perpetuated it either by actively
participating in same or failing to take any action to bring it
to an end.  This conclusion is also supported by the number of
incidents in which the Area 2 offices are named as the location
of the abuse.

          The essence of this report is included as a number
of appendices:

          Appendix A - Sources (names of individuals on whom
          information was obtained listed beneath source)

          Appendix B - Database Spreadsheet (sorted in alpha
          order by name of victim)

          Appendix C - Database Spreadsheet (sorted in order
          by Date of Incident)

          Appendix D - Intersection Study

          Appendix E - Intersection Grid

          Appendix F - Statistical Analysis

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722 .

                    Investigator Michael GOLDSTON, #73



APPROVED:


Leonard BENEFICO
Coordinator of Operations

# APPENDIX A - SOURCES

| READER ARTICLE | MOTION/SUPPRESS-HIL II | PLAINTIFF'S PROFFER | MELVIN JONES DEPOSITION | CITIZEN'S ALERT HANDOUT | CHICAGO LAWYER ARTICLE | CORPORATION COUNSEL FILES | PUBLIC DEFENDER FILES |
|---|---|---|---|---|---|---|---|
| BANKS, Gregory | MARTIN, Derrick | ADKINS, Phillip | ADKINS, Phillip | COLLINS, Howard | BROWN, Madison | ANTHONY, Dwight | ADKINS, Phillip |
| BROWN, Roy | MILLER, Doris | BANKS, Gregory | BANKS, Gregory | HOLMES, Anthony | BROWN, Roy | BANKS, Gregory | BANKS, Gregory |
| CANNON, Darrell | TRAYLOR, Donnell | BROWN, Roy | BROWN, Roy | JONES, Melvin | HARRIS, Roger | BULLOCK, Ronnie | CANNON, Darrell |
| JOHNSON, Michael | WHITE, Donald | CANNON, Darrell | COLLINS, Howard | JOHNSON, Michael | JACKSON, Ronald | COULTER, Andre | HOLMES, Anthony |
| JONES, Melvin | WILSON, Andrew | COLLINS, Howard | GOLDEN, Raynard | LEWIS, James | JOHNSON, Walter | DANIEL, James Sr. | |
| MILAN, Larry | WILSON, Jackie | GOLDEN, Raynard | HOLMES, Lee | PORCH, Willie | MILAN, Larry | HALL, Anthony | |
| MILLER, Doris | | HOLMES, Anthony | JOHNSON, Walter | POWELL, George | MILLER, Doris | HARRIS, Hozy | |
| PORCH, Willie | | HOLMES, Lee | KIDD, Leonard | WILSON, Andrew | SMITH, Alvin | HARRIS, Roger | |
| POWELL, George | | JOHNSON, Michael | LEWIS, James | | WILSON, Andrew | HARRIS, Terry | |
| WHITE, Donald | | JOHNSON, Walter | MANAFFEY, Reginald | | WILSON, Jackie | JORDAN, Nard | |
| WILSON, Andrew | | JONES, Melvin | MILAN, Larry | | | LISS, Thomas | |
| WILSON, Jackie | | KIDD, Leonard | MILKE, Larry | | | HIKE, Paul | |
| | | LEWIS, James | ORANGE, Lawrence | | | MORGAN, Solomon | |
| | | MANAFFEY, Jeffry | PINEX, Alfonso | | | PHILLIPS, William | |
| | | MANAFFEY, Reginald | PORCH, Willie | | | SMITH, Alvin | |
| | | MILAN, Larry | POWELL, Lawrence | | | STOKES, Willie | |
| | | MILLER, Doris | THOMPSON, Timothy | | | STOKES, Pearlie | |
| | | ORANGE, Lawrence | THOMPSON, Tony | | | | |
| | | PORCH, Willie | | | | | |
| | | POWELL, George | | | | | |
| | | THOMPSON, Timothy | | | | | |
| | | THOMPSON, Tony | | | | | |
| | | TRAYLOR, Donnell | | | | | |
| | | WILSON, Andrew | | | | | |
| | | WILSON, Jackie | | | | | |

ALL INDIVIDUALS INDICATED UNDER OTHER SOURCES ARE ALSO REPRESENTED IN CORP COUNSEL FILES

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000007

# APPENDIX B - SPREADSHEET / ORDER BY VICTIM NAME

| NAME | ALIASES/NICKNAMES | STATUS | SEX | RACE | DOB | IRN | DOC NUMBER | SSN |
|---|---|---|---|---|---|---|---|---|
| DICKENS, Phillip | | VICTIM | MALE | BLACK | 06 SEP 49 | 144-997 | | 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 |
| ANTHONY, Dwight | 'DOG' | VICTIM | MALE | BLACK | 23 OCT 57 | 595-297 | GRAHAM A-82878 | |
| JAMES, Gregory | IATE, Kevin | VICTIM | MALE | BLACK | 26 SEP 63 | 591-138 | | |
| BROWN, Roy Wade | BLANDON, Roy/BRONSON, Roy | VICTIM | MALE | BLACK | 05 OCT 62 | 589-308 | | 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 |
| BULLOCK, Ronnie | | VICTIM | MALE | BLACK | 13 OCT 55 | 621-688 | RENARD X-9011 | 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 |
| CANNON, Darrell | | VICTIM | MALE | BLACK | 19 SEP 49 | 227-668 | A-01592 | 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 |
| COLLINS, Howard | | VICTIM | MALE | BLACK | 13 JAN 52 | 327-562 | | |
| COULTER, Andre | | VICTIM | MALE | BLACK | 18 MAR 60 | 545-223 | | |
| DANIEL, James Sr. | | VICTIM | MALE | BLACK | 20 JUN 52 | 328-097 | | 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 |
| GOLDEN, Raymond | 'DOC' | VICTIM | MALE | BLACK | 12 NOV 60/28 AUG 63 | 535-114/608-091 | | |
| HILL, Anthony | 'COOLIE' | VICTIM | MALE | BLACK | 05 NOV 61 | 631-128 | | 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 |
| HARRIS, Mozr | | VICTIM | MALE | BLACK | | | | |
| HARRIS, Roger | | VICTIM | MALE | BLACK | 04 SEP 61 | 604-242 | CCI 814-2429 | DLN H-630-812 |
| HARRIS, Terry | | VICTIM | MALE | BLACK | 01 DEC 76 | 74-365 | | |
| HOLMES, Anthony | 'SHAM' | VICTIM | MALE | BLACK | 25 MAY 52 | 417-297 | | |
| HOLMES, Lee | MCGEE, Derryl | VICTIM | MALE | BLACK | 06 SEP 62 | 602-164 | | 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 |
| HOWARD, Stanley | SANDERS, Don | VICTIM | MALE | BLACK | | | | |
| JACKSON, Ronald | | VICTIM | MALE | BLACK | 07 MAR 53 | 269-663 | | 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 |
| JOHNSON, Michael | 'DUCE', 'PARADISE' | VICTIM | MALE | BLACK | 08 OCT 65 | 280-729 | | 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 |
| JOHNSON, Walter | 'COOL BREEZE' | VICTIM | MALE | BLACK | 01 NOV 51 | 636-076 | | FBI 163735-14 |
| JONES, Kelvin | 'FU FU' | VICTIM | FEMALE | BLACK | 18 FEB 53 | 522-531 | | |
| JORDAN, Mora | | VICTIM | MALE | BLACK | 11 MAR 61 | 59-725 | | |
| KIDD, Leonard | | VICTIM | MALE | BLACK | 25 NOV 46 | 756-187 | | 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 |
| CLARK, James | | VICTIM | MALE | WHITE | 09 SEP 80 | 310-590 | | 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 |
| KISS, Thomas | | VICTIM | MALE | BLACK | 02 JAN 54 | 523-171 | B37-3169 | |
| MANFREY, Jerry | ROSS, Jerry/Jerome/Pavit | VICTIM | MALE | WHITE | 01 JUN 59 | 437-586 | | 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 |
| RAHAFFEY, Reginald | | VICTIM | MALE | BLACK | 01 MAY 58 | 231-663 | | |
| DIXIE, Paul | | VICTIM | MALE | BLACK | 27 JAN 52 | | | |
| CHILAH, Larry | 'SHIEX' | VICTIM | FEMALE | BLACK | 14 JUL 36 | | | |
| MILLER, Doris | | VICTIM/WITNESS | FEMALE | BLACK | | | | |
| SMITH, Shadeed | RAMSEY, George | VICTIM | MALE | BLACK | 20 JUL 51 | 210-857 | | |
| NASH, Ronald | | VICTIM | MALE | BLACK | | | | |
| DRANKE, Lawrence | | VICTIM | MALE | BLACK | 2140 | | | |
| PHILLIPS, William | | VICTIM | FEMALE | BLACK | 01 AUG 63 | 620-887 | | 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 |
| PINET, Alfonzo | 'CHILLIE' | VICTIM | MALE | BLACK | 03 MAR 54 | 523-839 | | |
| POUCH, Willie | JAMES, Edward | VICTIM | MALE | BLACK | 21 APR 39 | 59-389 | | |
| POWELL, Lawrence | | VICTIM | MALE | BLACK | 30 JUN 54 | 341-358 | | |
| POWELL, George | | VICTIM | MALE | BLACK | 12 DEC 36 | | | |
| SMITH, Alvin | | VICTIM | MALE | BLACK | 22 JAN 52 | 341-946 | | |
| WILBON, Leonine | | VICTIM | MALE | BLACK | 01 DEC 53 | 535-932 | | 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 |
| JONES, Willie | | VICTIM | FEMALE | BLACK | 01 SEP 56 | | | |
| SQUKEY, Pearlie | | VICTIM | MALE | BLACK | 11 OCT 61 | 635-809 | | |
| THOMPSON, Timothy | | VICTIM | MALE | BLACK | 20 NOV 60 | 591-502 | | |
| THOMPSON, Tony | | VICTIM | MALE | BLACK | 01 DEC 63 | 252-120 | 020-6120 | |
| TAXYLOR, Donnell | 'KOJAK', 'SKI BOAT' | VICTIM | MALE | BLACK | 06 OCT 52 | | PONTIAC A-91126 | |
| WHITE, Donald | | VICTIM | FEMALE | BLACK | | | | |
| WILSON, Andrew | 'JOSEPH', 'TONY', 'GINO' | VICTIM | FEMALE | BLACK | 11 JUL 69 | 591-900 | | 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 |
| WILSON, Jackie | 'ROBERT', 'BUBBLES' | VICTIM | MALE | BLACK | 07 JUN 47 | 263-536 | | DLN U521-1201-7612 |
| WINSTON, Jesse | | VICTIM | MALE | BLACK | | | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 c 6733

000008

APPENDIX B - SPREADSHEET / ORDER BY VICTIM NAME

| NAME | FINDING | ARREST | AOS | LOA | CHARGE | CRB | ROI | OTHER POS |
|---|---|---|---|---|---|---|---|---|
| ADKINS, Phillip | NOT SUSTAINED | 07 JUN 84 | YUC, DIG, LOTITO, BOFFO | 812 W. GARFIELD | ARMED ROBBERY | 7190-3033 | F-206-057 | |
| ANTHONY, Dwight | | | | | | | | |
| BANKS, Gregory | NOT SUSTAINED | 28 OCT 83 | GALLAGHER, EGAN | 253 W. 99TH ST | MURDER | 6975-3031 | E-406-011 | NUMEROUS A2 PERSONS |
| BROWN, Madison | | DNA | DNA | DNA | DNA | DNA | D-041-364 | |
| BROWN, Roy Wade | EXONERATED/NOT SUSTAINED | 05 MAY 83 | HICK, PHELAN, O'H, DIO | 727 E. 111TH (ST) | 110/AGG SEX ASSAULT | 6830-016 | E-095-308 | |
| BULLOCK, Ronnie | UNFOUNDED/NOT SUSTAINED | 02 NOV 83 | BYRNE, DIG, ET AL | 7445 S. KINGSTON | MURDER | 6975-906 | E-403-054 | |
| CANNON, Darrell | | 02 DEC 73 | BURGE | | ARMED ROBBERY | 3966-856 | | |
| COLLINS, Howard | | | | | | | | |
| COULTER, Andre | | | | | | | | |
| DANIEL, James Sr. | NOT SUSTAINED | 28 SEP 79 | BURGE, GORMAN, ET AL | 807 W. 51ST PL | ROBBERY/ATTEMPT MURDER | 5541-072 | A-369-388 | BURGE, ET AL |
| GOLDEN, Raymond | | DNA | DNA | DNA | DNA | DNA | D-041-364 | |
| HALL, Anthony | | | | | | | | |
| HARRIS, Rozy | | | | | | | | |
| HARRIS, Roger | NOT SUSTAINED | 29 OCT 84 | BT 6614 | 7900 S. CARPENTER | MURDER | 772-8471 | F-413-087 | |
| HARRIS, Terry | | DNA | PIERIA | DNA | ROBBERY | 3816-168 | | |
| HOLMES, Anthony | NOT SUSTAINED | 29 MAY 73 | DISHAN | | RAPE | 6603-909 | | |
| HOLMES, Lee | NOT SUSTAINED | 10 SEP 82 | AREA 2 (VARIOUS) | 8958 S. CARPENTER | RAPE | 7300-630 | | |
| HOWARD, Stanley | NOT SUSTAINED | 01 NOV 84 | | 8511/DONKER | DISORDERLY CONDUCT | | E-107-217 | |
| JACKSON, Ronald | | 13 JAN 84 | FLOOD | | MURDER/ROBBERY | 3410-111 | | |
| JOHNSON, Michael | NOT SUSTAINED | DNA | DNA | DNA | DNA | DNA | D-185-741 | |
| JOHNSON, Walter | UNFOUNDED? | DNA | DNA | DNA | DUI | DNA | D-041-364 | |
| JONES, Melvin | | 05 FEB 82 | FLOOD, MCGUIRE | 2101 S. MICHIGAN | SOLICITING | 6356-710 | D-041-707 | BURGE |
| JORDAN, Nora | NOT SUSTAINED/UNFOUNDED | 02 JAN 85 | TERRAZAS | MADISON/HALSTED | MURDER | 726-7574 | | |
| KIDD, Leonard | | 13 JAN 84 | FLOOD | | MURDER/ROBBERY | 2025-17 | | |
| LEWIS, James | | 07 NOV 71/17 MAY 79 | HOKE/HOKE | | GAMBLING | 74155-074 | | |
| LILEY, Thomas | UNFOUNDED | 13 OCT 85 | POV, RIZZO | 2433 W. FARGELL | MURDER | 6924-82 | G-728-958 | |
| MAHAFFEY, Jerry | | 02 SEP 83 | BYRNE, YUC, ET AL | 1124 S. INDIANA | MURDER | 6926-957 | | |
| MAHAFFEY, Reginald | | 02 SEP 83 | YUC, BYRNE, ET AL | 3551 W. 13TH PL | | | | |
| MILKE, Paul | | | | | | | | |
| MILLER, Larry | | DNA | DNA | DNA | DNA | DNA | D-041-364 | HILL |
| MILLER, Doris | | DNA | DNA | DNA | DNA | DNA | D-041-364 | |
| MUNIN, Shadeed | | 30 OCT 85 | | | UOW | | | |
| NASH, Ronald | | | | | | | | |
| ORANGE, Lawrence | | 12 JAN 84 | FLOOD | | MURDER | 2025-918 | | |
| PHILLIPS, William | | | | | | | | |
| PINEX, Alfonzo | NOT SUS - UNF/NOT SUS | 28 JUN 85 | SMITH, BURRELL (O621) | 1717 W. 90TH PL | MURDER | 7863-561 | D-275-513 | ALC, DIG, HOKE, MADIGAN |
| PORCH, Willie | | 28 SEP 79 | BURGE, GORMAN, ET AL | | ROBBERY/ATTEMPT MURDER | 5541-071 | A-369-388 | |
| POREE, Lawrence | NOT SUSTAINED | 07 AUG 79 | WAGNER (006) | | ARMED ROBBERY | 5595-159 | | |
| POWELL, George | | 23 SEP 79 | | | MURDER | 5630-320 | | |
| SMITH, Alvin | | | | | | | | |
| STOKES, Willie | NOT SUSTAINED | | | | | | | |
| STUCKEY, Pearlie | UNFOUNDED | 28 SEP 79 | 006TH DIST | 7836 S. HONORE | ROBBERY/ATTEMPT MURDER | 5643-873 | A-369-388 | |
| THOMPSON, Timothy | | 28 SEP 79 | 006TH DIST | 74TH & HONORE | ROBBERY/ATTEMPT MURDER | 5643-248 | A-369-388 | |
| THOMPSON, Tony | | DNA | DNA | DNA | DNA | DNA | D-041-364 | |
| TRAYLOR, Donnell | | DNA | | 8401 S. CARPENTER | SUSPICION/MURDER | | D-041-364 | |
| WHITE, Donald | OPEN | 12 FEB 82 | | 10672 S. MICHIGAN | MURDER | 755-5982 | H-138-327 | O'HARA, McKENNA |
| WILSON, Leontine | NOT SUSTAINED | 09 APR 86-WILSON, Augustien, BYRNE, YUC, LOTITO | 530 W. JACKSON | ARMED ROBBERY | 636-7356 | D-041-364 | |
| WILSON, Donald | NOT SUSTAINED | 14 FEB 82 | BURGE, O'HARA, McKENNA | 5157 S. PRAIRIE | MURDER | 636-6683 | D-041-364 | |
| WILSON, Andrew | NOT SUSTAINED | 14 FEB 82 | BATES (710), ET AL | 1121 S. STATE | MURDER | 73155-618 | G-100-179/G-102-869 | GRINHARD, BYRNE |
| WILSON, Jackie | | | | | | | | |
| WINSTON, Jesse | UNFOUNDED | 20 MAR 85 | McNALLY, DIO, O'ROURKE | | MURDER | | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6721.

0000009

# APPENDIX D - SPREADSHEET / ORDER BY VICTIM NAME

| NAME | GANG AFFILIATION | DOJ | LOI | ACCUSED | ALLEGATIONS | INJURY | MEDICAL TREATMENT | CAD/DATE |
|---|---|---|---|---|---|---|---|---|
| DUKINS, Phillip | | | | | | | | |
| ANTHONY, Dwight | | | | UNIDENTIFIED | | | | |
| JONES, Gregory | | 07 JUN 84 | AREA 2 | LOTITO, BOFFO | BEATING | YES | YES/RECORD | 142201/13NOV84 |
| BROWN, Madison | | 29 OCT 83 | AREA 2 | UNIDENTIFIED | | | | |
| BROWN, Roy Wade | | | | BYRNE, DIGNAN, GRUNHARD | WEAPON, BAGGING, BEATING | YES | YES/RECORD | 134147/18NOV85 |
| BULLOCK, Ronnie | BLACK G'STER DISCIPLES | 09 FEB 82 | AREA 1 | UNIDENTIFIED | BEATING, BAGGING | YES | | 123330/13FEB82 |
| CANNON, Darrell | | 05 MAY 83 | AREA 2 | HICK, PHELAN, O'H, DIO | HARASSMENT | DMA | DMA | 151815/11JUL86(IAD) |
| COLLINS, Howard | EL RUKN | 02 NOV 83 | 2415 S. KINGSTON, UNKNOWN | HARASSMENT | SHOCK, WEAPON, HANGING | YES | YES/RECORD | 134722/07NOV83 |
| COULTER, Andre | | | CPD VEHICLE, AREA 2 | BURGE, HOKE | WEAPON, HANGING | YES | | |
| DANIEL, James Sr. | | 14 JUN 85 | 8601 S. BISHOP | UNIDENTIFIED | HARASSMENT | DMA | DMA | 155027/09MAR87(IAD) |
| GOLDEN, Raymond | | 29 SEP 79 | AREA 2 | BURGE, DOY, MAS, BASILE | WEAPON, BEATING | | | |
| HALL, Anthony | BLACK G'STER DISCIPLES | | | BURGE | | | | |
| HARRIS, Inger | | | | UNIDENTIFIED | | | | |
| HARRIS, Roger | | 13 FEB 82 | 8300 W. WESTERN | UNIDENTIFIED | BEATING | YES | YES/ | 131725/09MAR82 |
| HARRIS, Terry | | 29 OCT 83 | AREA 2 | WILSON | COOKING, THREATS | NO | DMA | 159321/23MAY86 |
| HOLMES, Anthony | ROYAL FAMILY | 30 MAY 73 | AREA 2 | BURGE | SHOCK, BAGGING | | | |
| HOLMES, Lee | | 10 SEP 82 | AREA 2 | UNIDENTIFIED | BEATING, BAGGING | YES | YES/ | 126802/10SEP82 |
| HOWARD, Stanley | | 03 NOV 84 | AREA 2 | BOFFO, LOTITO, BYRNE | BEATING, BAGGING | YES | YES/RECORD | 142017/04NOV84 |
| JACKSON, Ronald | | 11 FEB 82 | SOUTH DISTRICT | UNIDENTIFIED | BEATING | YES | YES/ | 123330/13FEB82 |
| JOHNSON, Michael | BLACK G'STER DISCIPLES | 09 JUN 82 | AREA 2 | BURGE | SHOCK, BEATING, WEAPON | YES | YES/NO RECORD | 125071/09JUN82 |
| JOHNSON, Walter | BLACK G'STER DISCIPLES | 10 FEB 82 | AREA 2 | UNIDENTIFIED | WEAPON, BEATING, BAGGING | YES | YES/NO RECORD | 159327/04OCA,123727/ |
| JONES, Kelvin | | 05 FEB 82 | AREA 3 | BURGE, FLOOD, UNID'D | SHOCK, BEATING, WEAPON | YES | | 143100/03JAN85(IAD) |
| JONES, Mora | | 02 JAN 85 | MCKENNA (012) | HARASSMENT | HARASSMENT | DMA | DMA | |
| KIDD, Leonard | | | AREA 2 | BURGE | SHOCK | | | |
| LEWIS, James | ROYAL FAMILY | 13 OCT 86 | 2435 W. FARRELL | BURGE, HOKE | HARASSMENT | NO | DMA | 151816/07DEC186(IAD) |
| LISS, Thomas | | 02 SEP 83 | AREA 2 | O'HARA (192) | BEATING | | | |
| MAHAFFEY, Jerry | | 02 SEP 83 | AREA 1 | BYRNE, YUC, GRUM, UNID'D | BEATING, BAGGING | | | |
| MAHAFFEY, Reginald | BLACK G'STER DISCIPLES | 03 FEB 82 | AREA 1 | YUCAITIS, UNID'D | BEATING, BAGGING | NO | DMA | 123343/13FEB82, |
| MIKE, Paul | BLACK G'STER DISCIPLES | 13/14 FEB 82 | AREA 1 | STEEN, CULLOM, DR'GAN | BEATING | | | 123330/13FEB82 |
| NILAW, Larry | | 30 OCT 85 | AREA 2 | BURGE, UNID'D | BEATING, BAGGING | | | |
| MILLER, Doris | | 10 FEB 82 | AREA 1 | BURGE | | | | |
| MONTH, Shaded | | | AREA 1 | UNIDENTIFIED | WEAPON, BAGGING | | | |
| NASH, Ronald | | | AREA 1 | BURGE | | | | |
| ORANGE, Lawrence | | | | UNIDENTIFIED | SHOCK | | | |
| PHILLIPS, William | | 09 FEB 82, 28 JUN 85 | 1717 W. 90TH PL, AREA 2 | MCKERROLL, RASLANKA | BEATING | NO | DMA | 123323/FEB82IAT,145979/JUN85 |
| PINEX, Alfonzo | | 29 SEP 79 | AREA 2 | BURGE, BYRNE | WEAPON, BEATING | YES | YES/ | |
| PORCH, Willie | ROYAL FAMILY | 23 SEP 79 | AREA 2 | BURGE, HOKE | SHOCK, WEAPON, BEATING | | | |
| POKEL, Lawrence | | 23 (2X), 07 AUG 79 | AREA 2 | BURGE | SHOCK, BEATING, BAGGING | | | 108817/24SEP79 |
| POWELL, George | | 23 SEP 79 | AREA 2 | UNIDENTIFIED | | | | |
| SMITH, Alvin | | 03 FEB 82 | 83/87 S. COTTAGE GROVE | YUCAITIS, DIGNAN | HARASSMENT | NO | DMA | 114636/10DEC85(IAD) |
| STOKES, Willie | | 31 OCT 85 | 113 W. 109TH ST. | YUC, GRUM, DIO | HARASSMENT | NO | DMA | 150356/13APR86(IAD) |
| STOKES, Peerlie | | 13 APR 86 | AREA 2 | BURGE | BEATING | | | |
| THOMPSON, Ilodby | | 29 SEP 79 | AREA 2 | BURGE | BEATING | YES | YES/RECORD | |
| THOMPSON, Tony | | 29 SEP 79 | AREA 2 | UNIDENTIFIED | BEATING, BAGGING | | | |
| TRAYLOR, Donnell | | 14 FEB 82 | AREA 2 | BURGE, O'HARA, HILL | BEATING, BAGGING | | | 185857/27JUL89 |
| WHITE, Donald | | 12/13 FEB 82 | NO/5TH FLOOR | | BEATING, BAGGING | | | 150279/08APR86(IAD) |
| WILBON, Leontide | | 08 APR 86 | 10822 S. MICHIGAN | PCN, BYRNE, YUC, LOTITO | VERBAL ABUSE | DMA | DMA | 123513/25FEB82 |
| WILBON, Andre | | 14 FEB 82 | AREA 2 | BURGE, YUCAITIS | SHOCK, BEATING, WEAPON | YES | YES/RECORD | 123513/25FEB82 |
| WILSON, Jeslie | | 14 FEB 82 | CPD VEHICLE, AREA 2 | O'HARA, MCKENNA, SKEFFEL | BEATING | | | 123517/25FEB82 |
| WINSTON, Jesse | | 21 FEB 85 | AREA 2 | DWYER, YUCAITIS | HANGING | YES/DECEASED | YES/RECORD | 154100/15JAN87(IAD) |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

000010

APPENDIX B - SPREADSHEET / ORDER BY VICTIM NAME

| NAME | WITNESS(IES) | CURRENT STATUS | CRIMINAL PROCEEDING | DISPOSITION | CIVIL PROCEEDING | DISPOSITION | OTHER PROCEEDING(S) | DISPOSITION |
|---|---|---|---|---|---|---|---|---|
| ADKINS, Phillip | | | | | | | | |
| ANTHONY, Dwight | | PONTIAC | YES/ | CONVICTION | YES/86-C-3039 | SETTLEMENT | MOTION TO SUPPRESS | DENIED |
| BANKS, Gregory | | | | | | | | |
| BROWN, Roy Wade | | PONTIAC | YES/83-C-24270 | CONVICTION | | | | |
| BROWN, Madison | | | | | | | | |
| BULLOCK, Ronnie | | MENARD CORR | DNA | DNA | | | MOTION TO SUPPRESS | |
| CANNON, Darrell | | PONTIAC | YES/ | CONVICTION | YES/86-C-3619 | PENDING | | |
| COLLINS, Howard | | | YES/83-C-11830 | CONVICTION | YES/86-C-7231 | SETTLEMENT | | |
| COULTER, Andre | | | DNA/REL W/O CHARGING | DNA | | | | |
| DANIEL, James Sr. | | | | | | | | |
| GOLDEN, Raymond | | | YES/79-6469 | PLED GUILTY | YES/87-C-1629 | SETTLEMENT | | |
| HALL, Anthony | | | | | | | | |
| HARRIS, Hozy | | | | | | | | |
| HARRIS, Roger | | | | | | | | |
| HARRIS, Terry | | | YES/91-C-3441 | CONVICTION | YES/86-C-2026 | DISMISSED | MOTION TO SUPPRESS | |
| HOLMES, Anthony | | | YES/92-C-8655 | CONVICTION | | | | |
| HOLMES, Lee | | | | CONVICTION | | | | |
| HOWARD, Stanley | HAWKINS, Theodore | | YES/ | CONVICTION | | | | |
| JACKSON, Ronald | | MENARD CORR | DNA | DNA | | | FBI INFO/INFO 44-STH74 | |
| JOHNSON, Michael | | | YES/82-1605 | NOT GUILTY | | | MOTION TO SUPPRESS | |
| JOHNSON, Walter | | | | | | | | |
| JONES, Melvin | | | | | | | | |
| JOGOMA, Mara | | | YES/84-C-151769 | CONVICTION | | | MOTION TO SUPPRESS | |
| KIDD, Leonard | | | YES/72-C-373/50L | CONVICTION/SOL | | | | |
| LEWIS, James | | | | | YES/86-C-6701 | SETTLEMENT | MOTION TO SUPPRESS | |
| LISS, Thomas | | | YES/83-C-260985 | CONVICTION | | | MOTION TO SUPPRESS | |
| MAHAFFEY, Jerry | | | YES/83-C-260984 | CONVICTION | | | | |
| MAHAFFEY, Reginald | | | | | | | | |
| MIKE, Paul | | DECEASED | DNA | DNA | | | | |
| MILAM, Larry | | | | | | | | |
| MILLER, Doris | | | YES/85-C-13285 | | | | MOTION TO SUPPRESS | |
| NASH, Ronald | | | | | | | | |
| NORIN, Shaded | | | YES/84-C-151770 | CONVICTION | | | | |
| ORANGE, Lawrence | | | | | | | | |
| PHILLIPS, William | | | | | | | | |
| PINEX, Alfonso | | MENARD CORR | YES/79-6469 | CONVICTION | | | | |
| PORCH, Willie | | | YES/79-C-5912 | CONVICTION | | | | |
| POWELL, Lawrence | | | YES/79-C-7235 | CONVICTION | | | | |
| POWELL, George | | | | | | | | |
| SMITH, Alvin | | | | | YES/85-C-090-838 | SETTLEMENT | | |
| STOKES, Willie | | | | | | | | |
| STUCKEY, Ferrie | | | YES/79-6469 | CONVICTION | | | | |
| THOMPSON, Timothy | | | YES/79-6469 | PLED GUILTY | | | | |
| THOMPSON, Leon | | | | | | | | |
| TRAYLOR, Donnell | | | DNA | DNA | | | | |
| WHITE, Donald | | | | | | | | |
| WILLIAM, Leonting | MILLER, Doris | | YES/82-1211;87-6028 | CONVICTION (2) | YES (2)/86-C-2360 | HUNG JURY/MISTRIAL | MOTION TO SUPPRESS | DENIED |
| WILSON, Andrew | | | YES/82-1211 | CONVICTION (2) | | | | |
| WILSON, Jackie | | DECEASED | | | YES/87-C-0169 | SUMMARY JUDGEMENT | | |
| WINSTON, Jesse | | | | | | | | |

PAGE IV

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722.

060011

# APPENDIX 0 - SPREADSHEET / ORDER BY VICTIM NAME

| NAME | STRONG LINKS | WEAK LINKS |
|---|---|---|
| COLLINS, Phillip | OTHERS THROUGH PLO | |
| STROWE, Dwight | OTHERS THROUGH PLO | |
| PARKS, Gregory | | |
| BROWN, Madison | | |
| BROWN, Ray Wase | MILAN, W. JOHNSON, MIKE | HALL, R. JOHNSON |
| BULLOCK, Ronnie | | |
| JOHNSON, Darrell | OTHERS THROUGH PLO | |
| COLLINS, Howard | OTHERS THROUGH PLO | |
| POULTER, Andre | | |
| POWELL, James Sr. | | |
| GOLDEN, Raymond | PORCH, THOMPSON(2) | R. BROWN, JOHNSON(S), MIKE, MILAN |
| DARRES, Anthony | | |
| DARRES, Rozy | | |
| DARRES, Roger | | |
| DARRES, Terry | | |
| HOLMES, Anthony | OTHERS THROUGH PLO | LEWIS, POREE |
| HOLMES, Lee | OTHERS THROUGH PLO | |
| GUARD, Stanley | | |
| ERICKSON, Ronald | | |
| JOHNSON, Michael | R. BROWN, HALL, W. JOHNSON, MIKE, MILAN | |
| JOHNSON, Walter | R. BROWN, HALL, R. JOHNSON, MIKE, MILAN | |
| JONES, Melvin | OTHERS THROUGH PLO | |
| LUDOSM, Nora | | |
| 10106, Leonard | | |
| LEWIS, James | A. HOLMES, POREE | |
| TOSS, Thomas | | |
| MANIFFEY, Jerry | R. MANIFFEY | |
| MANIFFEY, Reginald | J. MANIFFEY | |
| MIKE, Paul | R. BROWN, JOHNSON(S)(2), MILAN | HALL |
| MILAN, Larry | R. BROWN, HALL, JOHNSON(S), MIKE | TRAYLOR |
| MILLER, Doris | WILSON(2) | |
| DOMIN, Shaded | | |
| NASH, Ronald | | |
| ORANGE, Lawrence | K100 | |
| PHILLIPS, William | | |
| JANET, Alfonso | | |
| PORCH, Willie | GOLDEN, PORCH, Tony THOMPSON | |
| POREE, Lawrence | GOLDEN, PORCH, Timothy THOMPSON | |
| POWELL, George | HOLMES, LEWIS | |
| SMITH, Alvin | OTHERS THROUGH PLO | |
| STOKES, Willie | | |
| TICKET, Pearlie | | |
| THOMPSON, Timothy | MILLER, WILSON(2) | |
| THOMPSON, Tony | | |
| TRAYLOR, Donnell | MILLER, WILSON(2) | MILLER |
| ROUTE, Donald | | |
| WILSON, Leontine | | |
| WILSON, Andrew | MILLER, TRAYLOR, Jeslie WILSON | |
| WILSON, Jeslie | MILLER, TRAYLOR, Jeslie WILSON | |
| WILSON, Jesse | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6721.

000012

APPENDIX C - SPREADSHEET / ORDER BY DATE OF INCIDENT

| NAME | ALIASES/NICKNAMES | STATUS | SEX | RACE | DOB | IR# | DOC NUMBER | SSN |
|---|---|---|---|---|---|---|---|---|
| LISS, Thomas | | VICTIM | MALE | WHITE | 09 SEP 40 | 756-187 | | |
| STUCKEY, Pearlie | | VICTIM | FEMALE | BLACK | 22 JUN 52 | | | |
| WILSON, Leontine | | VICTIM | FEMALE | BLACK | 01 DEC 43 | | | |
| STOKES, Willie | | VICTIM | MALE | BLACK | 12 DEC 36 | 2148 | | |
| MUNN, Shadeed | RAMSEY, George | VICTIM | MALE | BLACK | | | | |
| WINSTON, Jesse | | VICTIM | MALE | BLACK | 07 JUN 47 | 263-536 | | DL# U253-L202 |
| DANIEL, James Sr. | | VICTIM | MALE | BLACK | | | | |
| JORDAN, Nora | | VICTIM | FEMALE | BLACK | 18 FEB 53 | 636-076 | | |
| HARRIS, Terry | | VICTIM | MALE | BLACK | 01 SEP 41 | 604-242 | CCI 844-2429 | DL# H-620-0261 |
| HOWARD, Stanley | SANDERS, Don | VICTIM | MALE | BLACK | 06 SEP 62 | 602-341 | | 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 |
| AGKINS, Phillip | | VICTIM | MALE | BLACK | 06 SEP 49 | 148-997 | GRAHAM A-82878 | 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 |
| MANAFFEY, Jerry | ROSS, Jerry/Jerome/Jervil | VICTIM | MALE | BLACK | 02 JAN 51 | 148-590 | | 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 |
| MANAFFEY, Reginald | | VICTIM | MALE | BLACK | 01 JUN 59 | 523-171 | 831-3369 | 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 |
| BANKS, Gregory | TATE, Kevin | VICTIM | MALE | BLACK | 26 SEP 63 | 597-131 | | |
| CANNON, Darrell | | VICTIM | MALE | BLACK | 19 SEP 51 | 222-660 | A-01592 | 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 |
| BULLOCK, Ronnie | | VICTIM | MALE | BLACK | 13 OCT 55 | 421-688 | RENARD C-70411 | 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 |
| HOLMES, Lee | MCGEE, Darryl | VICTIM | MALE | BLACK | 25 MAY 57 | 417-297 | | 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 |
| JOHNSON, Michael | "DICE", "PARADISE" | VICTIM | MALE | BLACK | 07 MAY 55 | 269-463 | | |
| TRAYLOR, Donnell | | VICTIM | MALE | BLACK | 18 OCT 61 | 635-809 | | |
| WILSON, Andrew | "JOSEPH", "TONY", "GINO" | VICTIM | MALE | BLACK | 06 OCT 52 | 392-150 | 828-6120 | 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 |
| WILSON, Jackie | "ROBERT", "BUBBLES" | VICTIM | MALE | BLACK | 11 JUL 60 | 501-900 | PONTIAC A-91126 | 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 |
| MILLER, Doris | | VICTIM/WITNESS | FEMALE | BLACK | 11 DEC 36 | | | |
| HARRIS, Roger | | VICTIM | MALE | BLACK | | | | |
| WHITE, Donald | "KOJAK", "SKI BOAT" | VICTIM | MALE | BLACK | 20 NOV 80 | 527-502 | | |
| JACKSON, Ronald | | VICTIM | MALE | BLACK | | | | |
| JOHNSON, Walter | "COOL BREEZE" | VICTIM | MALE | BLACK | 08 OCT 65 | 437-586 | | 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 |
| MINK, Paul | | VICTIM | MALE | BLACK | 01 MAY 58 | | | 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 |
| NASH, Ronald | | VICTIM | MALE | BLACK | | | | |
| SMITH, Alvin | | VICTIM | MALE | BLACK | 01 AUG 63 | 620-487 | | |
| PINEX, Alfonso | | VICTIM | MALE | BLACK | 05 OCT 62 | 597-308 | | 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 |
| BROWN, Roy Wade | BLANDON, Roy/BRONSON, Roy | VICTIM | MALE | BLACK | 27 JAN 52 | 231-663 | | |
| MILAN, Larry | "SHIEK" | VICTIM | MALE | BLACK | 06 NOV 51 | 280-229 | | FBI #43735-J-6 |
| JONES, Melvin | "FU FU" | VICTIM | MALE | BLACK | 20 JUN 52 | 330-697 | | |
| GOLDEN, Raymond | "DOC" | VICTIM | MALE | BLACK | 03 MAR 54 | 522-859 | | 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 |
| PORCH, Willie | "CHILLIE" | VICTIM | MALE | BLACK | 08 DEC 55 | 361-646 | | 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 |
| THOMPSON, Timothy | | VICTIM | MALE | BLACK | 01 SEP 56 | 525-932 | | |
| THOMPSON, Leon | | VICTIM | MALE | BLACK | 30 JUN 54 | 343-358 | | |
| POWELL, George | | VICTIM | MALE | BLACK | 21 APR 39 | 59-369 | | |
| POWELL, Lawrence | JONES, Edward | VICTIM | MALE | BLACK | 01 DEC 16 | 78-365 | | |
| HOLMES, Anthony | "SATAN" | VICTIM | MALE | BLACK | 25 OCT 57 | 599-297 | | |
| ANTHONY, Dwight | "DOG" | VICTIM | MALE | BLACK | | | | |
| BROWN, Madison | | VICTIM | MALE | BLACK | 13 JAN 52 | 327-362 | | |
| COLLINS, Howard | | VICTIM | MALE | BLACK | 18 MAR 60 | 345-223 | | |
| COOLEY, Andre | "COOLIE" | VICTIM | MALE | BLACK | 12 NOV 60/28 AUG 63 | 535-114(408-09) | | |
| HALL, Anthony | | VICTIM | MALE | BLACK | 05 NOV 61 | 831-128 | | 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 |
| HARRIS, Marv | | VICTIM | MALE | BLACK | 11 MAR 61 | 522-534 | | 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 |
| KIDD, Leonard | | VICTIM | MALE | BLACK | 21 NOV 46 | 59-725 | | |
| LEWIS, James | | VICTIM | MALE | BLACK | 20 JUL 51 | 210-837 | | |
| ORANGE, Leroice | PHILLIPS, William | VICTIM | MALE | BLACK | | | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

APPENDIX C : SPREADSHEET / ORDER BY DATE OF INCIDENT

| NAME | GANG AFFILIATION | DOI | LOI | ACCUSED | ALLEGATIONS | INJURY | MEDICAL TREATMENT | CRI/DATE |
|---|---|---|---|---|---|---|---|---|
| LISS, Thomas | | 86 OCT 13 | 2431 W. FARRELL | O'HARA [192] | HARASSMENT | DNA | DNA | 153116/07DEC86[1A0] |
| SHICKEY, Fearlie | | 86 APR 13 | 113 W. 109TH ST. | YUC, GRUN, DIO | HARASSMENT | NO | DNA | 150355/13APR86[1A0] |
| WILSON, Leontine | | 86 APR 08 | 10423 S. MICHIGAN | MCN, BYRNE, YUC, LOITIN | VERBAL ABUSE | DNA | DNA | 150270/01APR86[1A0] |
| STOKES, Willie | | 85 OCT 31 | 83/87 S. COTTAGE GROVE | VUCAITIS, DIGMAN | HARASSMENT | NO | DNA | 148367/03DEC85[1A0] |
| MUNN, Shaded | | 85 OCT 30 | AREA 2 | BURGE | WEAPON, BAGGING | YES/DECEASED | | |
| WINSTON, Jesse | | 85 MAR 21 | AREA 2 | DWYER, VUCAITIS | HANGING | | YES/RECORD | 151CO2715JAN87[1A0] |
| DANIEL, James Sr. | | 85 JUN 14 | 8601 S. BISHOP | DWYER, DWY, MAS, BASILE | HARASSMENT | DNA | DNA | 155027/09MAR87[1A0] |
| ODROM, Nora | | 85 JAN 02 | MADISON/HALSTED | MCKENNA [012] | HARASSMENT | DNA | DNA | 141100/03JAN85[1A0] |
| HARRIS, Terry | | 84 OCT 29 | | WILSON | CHOKING, THREATS | NO | DNA | 150937/23MAR86 |
| HOWARD, Stanley | | 84 NOV 03 | AREA 2 | BOFFO, LOITIO, BYRNE | BEATING, BAGGING | YES | YES/RECORD | 142017/08NOV84 |
| ADKINS, Phillip | | 84 JUN 07 | AREA 2 | LOITIO, BOFFO | BEATING | YES | YES/RECORD | 142201/13NOV84 |
| MANEFFEE, Jerry | | 83 SEP 02 | AREA 2 | BYRNE, YUC, GRUN, UNID'D | BEATING, BAGGING | | | |
| BANKS, Gregory | EL RUKN | 83 OCT 29 | AREA 2 | VUCAITIS, UNID'D | BEATING, BAGGING | YES | YES/RECORD | 131417/11NOV83 |
| CANNON, Darrell | | 83 NOV 02 | 7145 S. KINGSTON | BYRNE, DIGMAN, GRUNHARD | WEAPON, BAGGING, BEATING | YES | | 131723/07NOV83 |
| BULLOCK, Ronnie | | 83 MAY 05 | AREA 2 | HICK, PHELAN, O'H, DIO | HARASSMENT | | | 151831/13DEC86[1A0?] |
| HOLMES, Lee | | 82 SEP 10 | AREA 2 | UNIDENTIFIED | SHOCK, BEATING, WEAPON | YES | YES/ | 126802/10NOV82 |
| JOHNSON, Michael | BLACK G'STER DISCIPLES | 82 JUN 09 | AREA 2 | BURGE | BEATING, BAGGING | YES | YES/NO RECORD | 125071/09JUN82 |
| TRAYLOR, Donnell | | 82 FEB 14 | AREA 2 | UNIDENTIFIED | BEATING, BAGGING | | | |
| WILSON, Andrew | | 82 FEB 14 | AREA 2 | BURGE, VUCAITIS | SHOCK, BEATING, WEAPON | YES | YES/RECORD | 125531/25FEB82 |
| WILSON, Jackie | | 82 FEB 14 | CPD VEHICLE, AREA 2 | O'HARA, McKENNA, KRIPPEL | BEATING | | | 125341/25FEB82 |
| HARRIS, Roger | | 82 FEB 13 | AREA 2 | BURGE, UNID'D | CIVIL RIGHTS VIOLATIONS | DNA | DNA | |
| WHITE, Donald | | 82 FEB 12/13 | 8380 S. WESTERN | UNIDENTIFIED | BEATING | YES | YES/ | 169837/27JUL69 |
| JACKSON, Ronald | | 82 FEB 11 | 10/5TH FLOOR | BURGE, O'HARA, HILL | BEATING, BAGGING | | | 125356/25FEB82 |
| JOHNSON, Walter | BLACK G'STER DISCIPLES | 82 FEB 10 | DOUTH DISTRICT | UNIDENTIFIED | WEAPON, BEATING | YES | YES/ | 135921/04OGAC123?77[?] |
| MIKE, Paul | BLACK G'STER DISCIPLES | 82 FEB 10 | AREA 2 | UNIDENTIFIED | WEAPON, BEATING, BAGGING | YES | YES/NO RECORD | 125342/25FEB82 |
| WASH, Ronald | BLACK G'STER DISCIPLES | 82 FEB 10 | AREA 1 | STEEN, CULLOM, BR'GAN | BEATING | NO | DNA | 125541/25FEB82 |
| SMITH, Alvin | | 82 FEB 10 | AREA 1 | UNIDENTIFIED | | | | |
| FINES, Alfonzo | | 82 FEB 09, 85 JUN 28 | | McDERMOTT, MASLANKA | BEATING | YES | | 125353/FEB82[1A?][1A?] |
| BROWN, Roy Rose | BLACK G'STER DISCIPLES | 82 FEB 09 | 1717 W. 90TH PL, AREA 2 | UNIDENTIFIED | BEATING, BAGGING | YES | YES/RECORD | 125338/13FEB82 |
| MILAN, Larry | BLACK G'STER DISCIPLES | 82 FEB 09 | AREA 1 | UNIDENTIFIED | BEATING, BAGGING | | | 125338/13FEB82 |
| JONES, Nelvin | BLACK G'STER DISCIPLES | 82 FEB 09 | AREA 1 | BURGE, FLOOD, UNID'D | SHOCK, BEATING, WEAPON | YES | | |
| GOLDEN, Raymond | | 79 SEP 29 | AREA 2 | BURGE | WEAPON, BEATING | | YES/ | 127735/09MAR82 |
| PORCH, Willie | | 79 SEP 29 | AREA 2 | BURGE, BYRNE | WEAPON, BEATING | | | 125356/13FEB82 |
| THOMPSON, Timothy | | 79 SEP 29 | AREA 2 | BURGE | BEATING | YES | YES/RECORD | |
| THOMPSON, Leor | | 79 SEP 29 | AREA 2 | BURGE | SHOCK, BEATING, BAGGING | | | |
| POWELL, George | ROYAL FAMILY | 79 SEP 23 | AREA 2 | BURGE, HOKE | SHOCK, WEAPON, BEATING | | YES/RECORD | 108477/24SEP79 |
| POWELL, Lawrence | ROYAL FAMILY | 73 [21], 79 AUG 07 | AREA 2 | BURGE | SHOCK, BAGGING | NO | | |
| HOLMES, Anthony | ROYAL FAMILY | 73 MAY 30 | AREA 2 | UNIDENTIFIED | | | | |
| ANTHONY, Dwight | | | | UNIDENTIFIED | | | | |
| BROWN, Madison | | | | UNIDENTIFIED | | | | |
| COLLINS, Howard | | | CPD VEHICLE, AREA 2 | BURGE, HOKE | WEAPON, HANGING | YES | | |
| COULTER, Andre | | | | UNIDENTIFIED | | | | |
| HALL, Anthony | BLACK G'STER DISCIPLES | | | UNIDENTIFIED | | | | |
| HARRIS, Rozz | | | AREA 2 | UNIDENTIFIED | SHOCK | | | |
| KIDD, Leonard | | | AREA 2 | BURGE | BEATING | | | |
| LEWIS, James | ROYAL FAMILY | | | BURGE, HOKE | SHOCK | | | |
| ORANGE, Lawrence | | | AREA 2 | BURGE | | | | |
| PHILLIPS, William | | | | UNIDENTIFIED | | | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

0014

APPENDIX C - SPREADSHEET / ORDER BY DATE OF INCIDENT

| NAME | FINDING | ARREST | AOS | LOA | CHARGE | CEB | ROI | OTHER POS |
|---|---|---|---|---|---|---|---|---|
| LISS, Thomas | UNFOUNDED | 13 OCT 85 | POV, RIZZO | 2433 W. FARRELL | GAMBLING | 74435-074 | 6-728-858 | |
| STUCKEY, Pearlie | UNFOUNDED | | | | | | | |
| WILSON, Leontine | NOT SUSTAINED | 08 APR 86 | HILBON, Augustance, Byrne, Vuk, Lotito | 10622 S. MICHIGAN | ARMED ROBBERY | 755-5982 | H-138-377 | |
| STOKES, Willie | NOT SUSTAINED | | | | | | | |
| DUNN, Shanted | | 30 OCT 85 | MCNALLY, DIO, O'ROURKE | 1121 S. STATE | DUI | 7315-618 | 6-100-1796-102-869 | GRINHARD, BYRNE |
| WINSTON, Jesse | UNFOUNDED | 20 MAR 85 | | | MURDER | | | |
| DANIEL, James Sr. | NOT SUSTAINED | | | | | | | |
| INGRAM, Marc | NOT SUSTAINED/UNFOUNDED | 02 JAN 85 | TERRAZAS | MADISON/HALSTED | SOLICITING | 726-7574 | F-413-887 | BURGE, ET AL |
| SMITH, Terry | NOT SUSTAINED | 29 OCT 84 | BT 691A | 7900 S. CARPENTER | MURDER | 722-8673 | E-107-317 | |
| HOWARD, Stanley | NOT SUSTAINED | 01 NOV 84 | AREA 2 (VARIOUS) | 8958 S. CARPENTER | RAPE | 7230-630 | F-206-857 | |
| ADKINS, Phillip | NOT SUSTAINED | 07 JUN 84 | VUK, DIG, LOTITO, BOFFO | 812 W. GARFIELD | ARMED ROBBERY | 7130-3033 | | |
| MAHAFFEY, Jerry | NOT SUSTAINED | 02 SEP 83 | BYRNE, VUK, ET AL | 1126 S. INDIANA | MURDER | 6926-822 | E-106-001 | |
| MAHAFFEY, Reginald | NOT SUSTAINED | 02 SEP 83 | VUK, BYRNE, ET AL | 3551 W. 13TH PL | MURDER | 6926-753 | E-103-854 | NUMEROUS X7 STRESS |
| BANKS, Darrell | NOT SUSTAINED | 28 OCT 83 | GALLAGHER, EGAN | 253 W. 95TH ST | MURDER | 6973-1031 | E-095-308 | |
| CANNON, Darell | UNFOUNDED/NOT SUSTAINED | 02 NOV 83 | BYRNE, DIG, ET AL | 7443 S. KINGSTON | MURDER | 6975-906 | | |
| BULLOCK, Ronnie | EXONERATED/NOT SUSTAINED | 05 MAY 83 | HICK, PHELAN, O'H, DIO | 727 E. 111TH (ST) | KID/AGG SEX ASSAULT | 6830-016 | | |
| HOLMES, Lee | NOT SUSTAINED | 10 SEP 82 | DIGNAN | | RAPE | 6603-909 | | |
| JOHNSON, Michael | NOT SUSTAINED | DNA | DNA | DNA | DNA | DNA | D-195-741 | |
| BRANDON, Vernell | | DNA | DNA | DNA | DNA | DNA | D-044-364 | |
| WILSON, Andrew | NOT SUSTAINED | 14 FEB 82 | BURGE, O'HARA, MCKENNA | 5301 W. JACKSON | MURDER | 636-7356 | D-044-364 | O'HARA, MCKENNA |
| WILSON, Jessie | | 11 FEB 82 | BATEY (710), ET AL | 5157 S. PRAIRIE | MURDER | 636-6683 | D-044-364 | HILL |
| MILLER, Doris | | DNA | DNA | DNA | DNA | DNA | D-044-364 | |
| HARRIS, Roger | OPEN | 12 FEB 82 | DNA | 8101 S. CARPENTER | SUSPICION/MURDER | DNA | D-044-364 | |
| WHITE, Ronald | UNFOUNDED/ | DNA | DNA | 85TH/DAMEN | DISORDERLY CONDUCT | DNA | D-044-364 | |
| JACKSON, Ronald | | | DNA | DNA | DNA | | | |
| JOHNSON, Walter | | | | | | | | |
| RIEL, Paul | | | | | | | | |
| NASH, Ronald | | | | | | | | |
| SMITH, Alvin | NOT SUS - UNF/NOT SUS | 24 JUN 85 | SMITH, BURRELL (022) | 1717 W. 90TH PL | MURDER | 7385-961 | D-275-513 | ACC, DIG, MCV, MADIGAN |
| PINEX, Alfonzo | | DNA | DNA | DNA | DNA | DNA | D-044-364 | |
| BROWN, Roy Wade | | DNA | DNA | DNA | DNA | DNA | D-044-364 | |
| MILAN, Larry | | 05 FEB 82 | FLOOD, MCGUIRE | 2101 S. MICHIGAN | DUI | 6361-210 | 0-041-209 | BURGE |
| JONES, Melvin | | 28 SEP 79 | BURGE, GORMAN, ET AL | 807 W. 51ST PL | ROBBERY/ATTEMPT MURDER | 5643-072 | A-369-388 | |
| GOLDEN, Raymond | | 28 SEP 79 | BURGE, GORMAN, ET AL | | ROBBERY/ATT MURDER | 5643-071 | A-369-388 | |
| PORCH, Willie | | 24 SEP 79 | DO&H DIST | 7835 S. HONORE | ROBBERY/ATTEMPT MURDER | 5643-073 | A-369-388 | |
| THOMPSON, Timothy | | 23 SEP 79 | DO&H DIST | 79TH & HONORE | ROBBERY/ATTEMPT MURDER | 5643-268 | A-369-388 | |
| THOMPSON, Tony | | 29 SEP 79 | | | MURDER | 5638-370 | | |
| POWELL, George | NOT SUSTAINED | 07 AUG 79 | WAGNER (006) | | ARMED ROBBERY | 5595-659 | | |
| POREL, Lawrence | | 29 MAY 73 | PIENIA | | ROBBERY | 3816-168 | | |
| HOLMES, Anthony | | | | | | | | |
| ANTHONY, Dwight | | | | | | | | |
| BROWN, Madison | | 02 DEC 73 | BURGE | | ARMED ROBBERY | 3966-456 | | |
| COLLINS, Howard | | | | | | | | |
| COULTER, Andre | | DNA | DNA | DNA | DNA | DNA | D-044-364 | |
| HALL, Anthony | | | | | | | | |
| HARRIS, Harr | | | | | | | | |
| ..., Leonard | | 13 JAN 84 | FLOOD | | MURDER | 7025-17 | | |
| LEWIS, James | | 07 NOV 71/17 MAR 79 | HOKE/HOKE | | MURDER/ROBBERY | 3610-111 | | |
| GRANGE, Lawrence | | 12 JAN 84 | FLOOD | | MURDER | 7025-918 | | |
| PHILLIPS, William | | | | | | | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6753.

000015

APPENDIX C - SPREADSHEET / ORDER BY DATE OF INCIDENT

| NAME | WITNESS(ES) | CURRENT STATUS | CRIMINAL PROCEEDING | DISPOSITION | CIVIL PROCEEDING | DISPOSITION | OTHER PROCEEDING(S) | DISPOSITION |
|---|---|---|---|---|---|---|---|---|
| LISS, Thomas | | | | | YES/86-C-6701 | SETTLEMENT | | |
| TUCKER, Pearlie | | | | | | | | |
| WILSON, Leontine | | | | | | | | |
| GOPES, Willie | | | | | YES/85-C-098-838 | SETTLEMENT | MOTION TO SUPPRESS | |
| SMITH, Shaterd | | DECEASED | YES/85-C-12985 | | YES/87-C-0169 | SUMMARY JUDGEMENT | | |
| DUNSTON, Jesse | | | | | YES/87-C-1429 | SETTLEMENT | | |
| DANIEL, James Sr. | | | | | | | | |
| JORDAN, Nora | | | | | | | | |
| HARRIS, Terry | | | | | YES/86-C-2026 | DISMISSED | | |
| HOWARD, Stanley | HAWKINS, Theodore | PONTIAC | YES/ | CONVICTION | YES/86-C-2039 | SETTLEMENT | MOTION TO SUPPRESS | |
| PERKINS, Phillip | | | YES/83-C-260985 | CONVICTION | | | MOTION TO SUPPRESS | |
| DANAFEY, Jerry | | | YES/83-C-260984 | CONVICTION | | | MOTION TO SUPPRESS | DENIED |
| DANAFEY, Reginald | | | YES/83-C-126270 | CONVICTION | | | MOTION TO SUPPRESS | |
| BANKS, Gregory | | PONTIAC | YES/83-C-11830 | CONVICTION | YES/85-C-7231 | SETTLEMENT | | |
| ANNON, Darrell | | MENARD CORR | YES/ | CONVICTION | YES/86-C-3819 | PENDING | | |
| BULLOCK, Ronnie | | MENARD CORR | YES/82-C-8455 | CONVICTION | | | | |
| HOLMES, Lee | | | | | | | | |
| JOHNSON, Michael | | MENARD CORR | | | | | F&T THY/6/669 14-3107A | |
| TAYLOR, Donnell | | | YES/82-12011187-4028 | CONVICTION (2) | YES (2) 86-C-2360 | HUNG JURY/MISTRIAL | MOTION TO SUPPRESS | DENIED |
| WILSON, Andrew | MILLER, Doris | | YES/82-1211 | CONVICTION (2) | | | | |
| WILSON, Jackie | | | | | | | | |
| MILLER, Doris | | | | | | | | |
| HARRIS, Roger | | | | | | | | |
| LAURIE, Donald | | | DNA | DNA | | | | |
| JACKSON, Ronald | | | YES/ | CONVICTION | | | | |
| JOHNSON, Walter | | | DNA | DNA | | | | |
| THIEL, Paul | | | | | | | | |
| NASH, Ronald | | | | | | | | |
| SMITH, Alvin | | | | | | | | |
| ENGEL, Alfonzo | | | | | | | | |
| BROWN, Roy Wade | | | DNA | DNA | DNA | | | |
| TILLMAN, Larry | | DECEASED | DNA | DNA | | | | |
| JONES, Kevin | | | YES/82-1605 | NOT GUILTY | | | | |
| GOLDEN, Raymond | | | YES/79-6669 | PLED GUILTY | | | | |
| ORANGE, Willie | MENARD CORR | | YES/79-6669 | CONVICTION | | | | |
| THOMPSON, Timothy | | | YES/79-6669 | CONVICTION | | | | |
| THOMPSON, Tony | | | YES/79-6669 | PLED GUILTY | | | | |
| PURRELL, George | | | YES/79-C-7235 | CONVICTION | | | | |
| PURRELL, Lawrence | | | YES/79-C-5712 | CONVICTION | | | MOTION TO SUPPRESS | |
| HOLMES, Anthony | | | YES/73-C-3441 | CONVICTION | | | | |
| FANNINGS, Dwight | | | | | | | | |
| BROWN, Madison | | | | | | | | |
| COLLINS, Howard | | | NONE/ RLSD W/O CHARGING | DNA | | | | |
| TOOLER, Andre | | | | | | | | |
| HALL, Anthony | | | | | | | | |
| HARRIS, Rozy | | | | | | | | |
| LEWIS, James | | | YES/84-C-1511789 | CONVICTION | | | MOTION TO SUPPRESS | |
| ORANGE, Lawrence | | | YES/84-C-337/ SOL | CONVICTION/SOL | | | | |
| PHILLIPS, William | | | YES/84-C-191770 | CONVICTION | | | | |

PAGE IV

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722.

0016

# APPENDIX C - SPREADSHEET / ORDER BY DATE OF INCIDENT

| NAME | STRONG LINKS | |
|---|---|---|
| LISS, Thomas | | |
| STUCKEY, Pearlie | | |
| WILSON, Leontine | | |
| STOKES, Willie | | |
| RONIN, Shaeed | | |
| WINSTON, Jesse | | |
| DANIEL, James Sr. | | |
| JORDAN, Nora | | |
| HARRIS, Jerry | | |
| HOWARD, Stanley | | |
| ADKINS, Phillip | OTHERS THROUGH PLO | |
| MANAFFEY, Jerry | R. MANAFFEY | |
| MANAFFEY, Reginald | J. MANAFFEY | |
| BANKS, Gregory | OTHERS THROUGH PLO | |
| CANNON, Darrell | OTHERS THROUGH PLO | |
| BULLOCK, Ronnie | OTHERS THROUGH PLO | |
| HOLMES, Lee | OTHERS THROUGH PLO | |
| JOHNSON, Michael | R. BROWN, HALL, W. JOHNSON, MIKE, MILAM | |
| TRAYLOR, Donnell | MILLER, WILSON(12) | |
| WILSON, Andrew | MILLER, TRAYLOR, Jackie WILSON | |
| WILSON, Jackie | MILLER, TRAYLOR, Jackie WILSON | |
| MILLER, Doris | WILSON(12) | |
| HARRIS, Roger | WILSON(12) | MILLER |
| WHITE, Donald | WILSON(12) | |
| JACKSON, Ronald | WILSON(12) | TRAYLOR |
| JOHNSON, Walter | R. BROWN, HALL, M. JOHNSON, MIKE, MILAM | HALL |
| MIKE, Paul | R. BROWN, JOHNSONS(12), MILAM | HALL |
| NASH, Ronald | | |
| SMITH, Alvin | | |
| FINEX, Alfonzo | | |
| BROWN, Roy Wade | MILAM, W. JOHNSON, MIKE | HALL, M. JOHNSON |
| MILAM, Larry | R. BROWN, HALL, JOHNSONS(12), MIKE | |
| JONES, Melvin | OTHERS THROUGH PLO | |
| GOLDEN, Raymond | PORCH, THOMPSON(12) | |
| PORCH, Willie | GOLDEN, THOMPSONS(12) | |
| THOMPSON, Timothy | GOLDEN, PORCH, Tony THOMPSON | |
| THOMPSON, Tony | GOLDEN, PORCH, Timothy THOMPSON | |
| POWELL, George | OTHERS THROUGH PLO | |
| POWELL, Lawrence | OTHERS THROUGH PLO | LEWIS, POREE |
| HOLMES, Anthony | LEWIS, POREE | |
| ANTHONY, Dwight | | |
| BROWN, Madison | OTHERS THROUGH PLO | |
| COLLINS, Howard | OTHERS THROUGH PLO | |
| HALL, Anthony | | |
| COULTER, Andre | | |
| HARRIS, Mary | R. BROWN, JOHNSONS(12), MIKE, MILAM | |
| KIDD, Leonard | ORANGE | |
| LEWIS, James | A. HOLMES, POREE | |
| ORANGE, Lawrence | KIDD | |
| PHILLIPS, William | | |

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 10 C 6522.

000017

OFFICE OF PROFESSIONAL STANDARDS
APPENDIX D - INTERSECTION STUDY

28 SEPTEMBER 1990
PAGE I

SHOCKINGS

1.) Darrell CANNON - Date of Alleged Incident 02 NOV 83

- Accused: BYRNE, DIGNAN, GRUNHARD, GORMAN, BOSCO
- El Rukn gang member
- Injuries/Medical Record
- CR #134723/07NOV83 - Unfounded/Not Sustained
- Civil Suit 86-C-7231/Settlement
- Charged with murder/Convicted
[- Motion to Suppress]

2.) Anthony HOLMES - Date of Alleged Incident 30 MAY 73

- Accused: BURGE
- Royal Family gang member
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through PLO and Public
  Defender's Office.
- Additional allegation of Bagging
[- Charged with robbery/Convicted]
[- Arresting Officer: PIENTA]
[- Motion to Suppress]

3.) Michael JOHNSON - Date of Alleged Incident 09 JUN 82

- Accused: BURGE
- Black Gangster Disciple gang member
- Injuries/No Medical Record
- CR #125071/09JUN82 - Not Sustained
- No Arrest; questioned concerning murder
[- FBI Civil Rights Investigation - no action]

4.) Melvin JONES - Date of Alleged Incident 05 FEB 82

- Accused: BURGE, FLOOD, UNIDENTIFIED
- Limited information; pursued additional information through
  PLO and Public Defender's Office.
- Motion to Suppress
- Charged with UUW/Not Guilty (Subsequently charged with murder
  on same incident and convicted)
[- Arresting Officers: FLOOD, MCGUIRE]

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722 .

OFFICE OF PROFESSIONAL STANDARDS                28 SEPTEMBER 1990
APPENDIX D - INTERSECTION STUDY                          PAGE II

5.)  Leonard KIDD - Date of Alleged Incident Unknown

- Accused: BURGE
[- Charged with murder/Convicted]
[- Date of Arrest: 13 JAN 84]
[- Arresting Officer: FLOOD]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued  additional  information  through  PLO  and  Public
Defender's Office.

6.)  Lawrence ORANGE - Date of Alleged Incident Unknown

- Accused: BURGE
[- Charged with murder/Convicted]
[- Date of Arrest: 12 JAN 84]
[- Arresting Officer: FLOOD]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through PLO and Public Defend-
  er's Office.

7.)  Lawrence POREE - Date of Alleged [Incidents in 1973 Unknown;
      also 07 AUG 79]

- Accused: BURGE, HOKE
- Royal Family gang member
[- Charged with murder/Convicted (1979)]
[- Date of Arrest: 07 AUG 79]
[- Arresting Officer: WAGNER (006)]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued information through PLO and Public Defender's Office.

8.)  George POWELL - Date of Alleged 23 SEP 79

- Accused: BURGE
- CR #108817/24SEP79 - Not Sustained
- Additional allegation of Bagging
[- Charged with murder/Convicted]
[- Date of Arrest: 23 SEP 79]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through PLO and
  Public Defender's Office.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6721

OFFICE OF PROFESSIONAL STANDARDS          28 SEPTEMBER 1990
APPENDIX D - INTERSECTION STUDY                      PAGE III

9.)  Andrew WILSON - Date of Alleged Incident 14 FEB 82

- Accused: BURGE, O'HARA, MCKENNA
- Injuries/Medical Record
- CR #123543/25FEB82 - Not Sustained
- Charged with murder (two counts)/Convicted
- Motion to Suppress
- Civil Suit 86-C-2360/Hung Jury; Mistrial
[- Witnesses (Doris MILLER, Derrick MARTIN)]


HANGINGS

1.)  Howard COLLINS - Date of Alleged Incident [December 1973;
     Day Unknown]

- Accused: BURGE, HOKE
[- Arrested for Armed Robbery/Released without charging]
[- Arresting Officer: BURGE]
[- Date of Arrest: 02 DEC 73]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through PLO and Public
  Defender's Office.


2.)  Jesse WINSTON (Deceased) - Date of Alleged Incident
     21 MAR 85

- Accused: DWYER, YUCAITIS
- Injuries/Medical Record
- CR #154402/15JAN87 - Unfounded
- Arrest for murder (died before formal charging)
- Civil Suit 87-C-0169/Summary Judgement
- Arresting Officers: MCNALLY, DIOGUARDI, O'ROURKE
- Other Officers: GRUNHARD, BYRNE


BAGGINGS

1.)  Gregory BANKS - Date of Alleged Incident

- Accused: BYRNE, GRUNHARD, DIGNAN
[-Injuries/Medical Record]
- CR #134947/18NOV83 - Not Sustained
[- Charged with murder/Convicted]
[- Arresting Officers: GALLAGHER, EGAN]
[- Motion to Suppress/Denied]
[- Conviction reversed on appeal based on  MTS information]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through CPD sources, PLO,
  and Public Defender's Office.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722.

OFFICE OF PROFESSIONAL STANDARDS        28 SEPTEMBER 1990
APPENDIX D - INTERSECTION STUDY                PAGE IV

2.) Roy Wade BROWN - Date of Alleged Incident 09 FEB  82

- Accused: UNIDENTIFIED [Description provided]
- Black Gangster Disciple gang member
[- Injuries/Medical Record]
- CR #123338/13FEB82 - Not Sustained
- No Arrest; questioned concerning murder of Officers FAHEY and
  O'BRIEN

3.) Lee HOLMES - Date of Alleged Incident 10 SEP 82

- Accused: UNIDENTIFIED
- CR #126802/10SEP82 - Not Sustained
[- Charged with rape/Convicted]
- Arresting Officers: BYRNE, DIGNAN
[- Date of Arrest: 10 SEP 82]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through CPD sources, PLO, and
  Public Defender's Office.

4.) Stanley HOWARD - Date of Alleged Incident 03 NOV 84

- Accused: BOFFO, LOTITO, BYRNE
- Injuries/Medical Record
- CR #142017/04NOV84 - Not Sustained
- Charged with Rape/[- Convicted]
- Witness (Theodore HAWKINS)

5.) Walter JOHNSON - Date of Alleged Incident 10 FEB 82

- Accused: UNIDENTIFIED[Unable to provide description]
- Black Gangster Disciple gang member
- CR #123338/13FEB82 - Not Sustained
- No arrest; questioned concerning murders of Officers FAHEY and
  O'BRIEN

6.) Jerry MAHAFFEY - Date of Alleged Incident 02 SEP 83

- Accused: [YUCAITIS, UNIDENTIFIED]
- Charged with murder/Convicted
[- Date of Arrest: 02 SEP 83]
[- Motion to Suppress]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through CPD sources, PLO, and
  Public Defender's Office.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722.

```
OFFICE OF PROFESSIONAL STANDARDS          28 SEPTEMBER 1990
APPENDIX D - INTERSECTION STUDY                     PAGE V
```

7.)  Reginald MAHAFFEY - Date of Alleged Incident 02 SEP 83

- Accused: [BYRNE, YUCAITIS, GRUNHARD, UNIDENTIFIED]
- Charged with murder/Convicted
- Arresting Officer: BYRNE, YUCAITIS, ET AL
[- Date of Arrest: 02 SEP 83]
[- Motion to Suppress]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through CPD sources, PLO, and
  Public Defender's Office.

8.)  Larry MILAN (Deceased) - Date of Alleged Incident 09 FEB 82

- Accused: UNIDENTIFIED
- Black Gangster Disciple gang member
- CR #123338/13FEB82 - Not Sustained
- No arrest; questioned concerning murders of Officers FAHEY and
  O'BRIEN

9.)  Shadeed MUMIN - Date of Alleged Incident 30 OCT 85

- Accused: BURGE
- Charged with UUW/Disposition Unknown
- Motion to Suppress
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through CPD sources, PLO, and
  Public Defender's Office.

10.) Donnell TRAYLOR - Date of Alleged Incident 14 FEB 82

- Accused: UNIDENTIFIED
[- No arrest; questioned concerning murders of Officers FAHEY and
  O'BRIEN]
- Limited information; appears in PLO Proffer of Other Acts.
  Pursued additional information through CPD sources, PLO, and
  Public Defender's Office.

11.) Donald WHITE - Date of Alleged Incident 12/13 FEB 82

- Accused: BURGE, O'HARA, HILL
- CR #169867/27JUL89 - Open
[- Arrested/Suspicion of Murder - concerning deaths of Officers
  FAHEY and O'BRIEN]
[- Date of Arrest: 12 FEB 82]
- Limited information; no cooperation with CR investigation.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722.

APPENDIX E - INTERSECTION GRID

| ALLEGED VICTIM | PLAYERS* | NO RELATIONSHIP | CORROBORATING EVIDENCE | WITNESS | MINOR OFFENSE | CONVICTED OF CHARGE(S) | MOTION TO SUPPRESS | CR INVESTIGATION |
|---|---|---|---|---|---|---|---|---|
| **SHOOTINGS** | | | | | | | | |
| Darrell CANNON | x | | x | | | | | |
| Anthony HOLMES | x | | | | | x | x | x |
| Michael JOHNSON | x | | | | | [x] | [x] | x |
| Melvin JONES | [] | [] | | | | | | |
| Leonard KIDD | | | | | | [x] | | x |
| Laurence ORANGE | x | | | | | [x] | x | x |
| Laurence PORTE | x | | | | | [x] | | x |
| George POWELL | x | [] | x | | | [x] | | x |
| Andrew WILSON | x | | x | | | x | x | x |
| **CHANGINGS** | | | | | | | | |
| Howard COLLINS | x | | x | | | | | x |
| Jesse WINSTON | x | [] | x | | | | | x |
| **DRAGGINGS** | | | | | | | | |
| Gregory BANKS | x | [] | [] | | | [] | [] | x |
| Roy Wade BROWN | [] | | | | | | | x |
| Lee HOLMES | | | | | | [] | | x |
| Stanley HOWARD | x | | x | | x | [] | | x |
| Walter JOHNSON | x | | | | | | | x |
| Jerry MAHAFFEY | x | | | | | x | [] | x |
| Reginald MAHAFFEY | x | | | | | x | [] | x |
| Larry MILAN | x | | | | | | | x |
| Shadeed MUHIN | x | x | | | | | [] | x |
| Donnell TRAYLOR | x | | | | | | | x |
| Donald WHITE | x | | | | | | | |

*INDICATES AT LEAST ONE OF THE DEPARTMENT MEMBERS REFERRED TO IN CRITERIA IDENTIFIED AS HAVING SOME CONTACT WITH ALLEGED VICTIM

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722.

000023

**OFFICE OF PROFESSIONAL STANDARDS**
**APPENDIX F – STATISTICAL ANALYSIS**

        I have identified **[fifty]** alleged victims of misconduct by personnel assigned to Area 2. The dates of the alleged incidents range from May 1973 through October [1986]. Following is a breakdown of pertinent information I have gleaned in the course of this project.

- Of the incidents in which the accused could be identified [35], Commander BURGE was named as an accused in [18] or [51%] of same. I was able to identify him as having some contact with the alleged victims in [two] other cases as well,

- In incidents concerning alleged electroshock (9), Commander BURGE was named as accused eight times,

- There were [27] allegations of beatings, 13 alleged incidents involving a plastic bag or a typewriter cover being placed over the victim's head, [11] incidents in which a firearm was used to threaten or strike an alleged victim, 9 incidents of alleged electroshock abuse, and 2 alleged hanging incidents; more than one type of abuse was alleged in some instances,

- Of the incidents in which the location of the alleged abuse was identified (42), the Area 2 offices were named in [28] (or [66%] of same,

- I have been able to identify [26] CR investigations which have been initiated as a result of the alleged incidents, [17] assigned to OPS and 9 to IAD; [25] have been closed with no sustained findings, and 1 remains open,

- Civil suits were initiated in 9 instances related to the alleged incidents; [5] resulted in settlements, 1 in a mistrial, [1 was dismissed], [1 resulted in a Summary Judgement for the Defendants], and [1 is still pending],

- Serious injury was involved in 5 incidents, 4 of which resulted in civil suits (2 of those being [amongst] the settlements indicated above),

- Only [18] alleged victims show no type of relationship (familial, past criminal history, gang affiliation) with another alleged victim,

PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

0024

Case: 1:14-cv-04391 Document #: 173-43 Filed: 03/15/16 Page 26 of 99 PageID #:2835

- As regards gang affiliation, 6 alleged victims were
  identified as Black Gangster Disciples, [3 as Royal
  Family members], and 1 as an El Rukn,

- Of the alleged victims, [13] were arrested/charged
  with Murder, 4 with Attempted Murder, [8] with
  Armed Robbery, 2 with Aggravated Sexual Assault,
  [2 with Rape], and 2 with UUW.

[- Of the 15 incidents in which no accused was identi-
  ed, 1 individual was able to provide a description,
  and 1 individual was not.  There was insufficient
  information available on the remaining 13 to deter-
  mine whether a description was provided.]

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 20 C 6211.

000025

**SECTION II**

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 42 c 6722.

000026

SPECIAL PROJECT INVESTIGATIVE SUMMARY REPORT

INVESTIGATOR FRANCINE J. SANDERS, STAR #28/OPS

26 OCTOBER 1990

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 10 C 671

## TABLE OF CONTENTS

INTRODUCTION

OVERVIEW                                              PAGE  1

SCOPE OF INVESTIGATION                               PAGE  2

ISSUES                                               PAGE  3

PHOTOGRAPHIC EXHIBITS                                PAGE  4

VISIT TO LOCATION                                    PAGE  5

DIAGRAM                                              PAGE  5

COMPLAINTS-AT-LAW/CIVIL SUITS                        PAGE  5

SCENE OF ARREST

ANDREW WILSON                                        PAGE  6
*Statement to Police (14FEB82)
*Motion to Suppress Testimony (NOV82)
*Deposition (15DEC88/27JAN89)
*Civil Trial II Testimony (JUL/AUG89)

GARNETT VAUGHN                                       PAGE 15
*Motion to Suppress Testimony (NOV82)

DEPUTY SUPERINTENDENT JOSEPH MCCARTHY                PAGE 15
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

LIEUTENANT RAYMOND MILLER                            PAGE 16
*Motion to Suppress Testimony (NOV82)

DETECTIVE DANIEL BRANNIGAN                           PAGE 17
*Motion to Suppress Testimony (NOV82)

DETECTIVE JOHN YUCAITIS (See "Detention at Area Two
Headquarters.")

DETECTIVE JAMES PIENTA (See "Detention at Area Two
Headquarters.")

DETECTIVE GEORGE KARL (See "Detention at Area Two Headquarters.")

DETECTIVE LEONARD BAJENSKI (See "Detention at Area Two Head-
quarters.")

DETECTIVE PATRICK O'HARA (See "Detention at Area Two Head-
quarters.")

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6721.

000027

SCENE OF ARREST (CONT'D)

LIEUTENANT JON BURGE (See "Detention at Area Two Headquarters.")

DETECTIVE THOMAS MCKENNA (See "Detention at Area Two Head-
quarters.")

DETENTION AT AREA TWO HEADQUARTERS

JACKIE WILSON                                              PAGE  17
*Statement to Police (14FEB82)
*Motion to Suppress Testimony (NOV82)
*Deposition (JAN89)

DORIS MILLER                                              PAGE  19
*Statement to Police (14FEB82)
*Motion to Suppress Testimony (NOV82)
*Deposition (MAR89)

DERRICK MARTIN                                            PAGE  21
*Statement to Police (14FEB82)
*Motion to Suppress Testimony (NOV82)

POLICE OFFICER CHESTER BATEY                              PAGE  22
*Deposition (FEB89)
*Civil Trial II Testimony (JUL89)

POLICE OFFICER FRED HILL                                  PAGE  24
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

ASSISTANT STATE'S ATTORNEY LAWRENCE HYMAN                 PAGE  26
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

COURT REPORTER MICHAEL HARTNETT                           PAGE  29
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

ASA MICHAEL ANGAROLA                                      PAGE  30

ASA KATHLEEN WARNICK                                      PAGE  30
*Civil Trial II Testimony (JUL89)

DETECTIVE JOHN YUCAITIS                                   PAGE  31
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

DETECTIVES JAMES PIENTA, GEORGE KARL,                     PAGE  33
and LEONARD BAJENSKI
*Motion to Suppress Testimony (NOV82)
(KARL & BAJENSKI)
*Civil Trial II Testimony (JUL89)
(KARL, BAJENSKI, & PIENTA)

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6721.

DETENTION AT AREA TWO HEADQUARTERS (CONT'D)

DETECTIVE DAVID DIOGUARDI                          PAGE   34
*Motion to Suppress Testimony (NOV82)
*Deposition (DEC88)

DETECTIVE PATRICK O'HARA                           PAGE   35
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

DETECTIVE THOMAS MCKENNA                           PAGE   37
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

LIEUTENANT JON BURGE                               PAGE   37
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUL89)

TRANSPORT TO AND FROM CENTRAL DETENTION

POLICE OFFICER MARIO FERRO                         PAGE   40
*Deposition (JAN89)

POLICE OFFICER WILLIAM MULVANEY                    PAGE   42

ATTENDANCE & ASSIGNMENT RECORDS                    PAGE   42

POLICE OFFICER SALVATORE MIGLIERI                  PAGE   42
*Deposition (JAN89)

LOCKUP SCREENING RECORD                            PAGE   43

MERCY HOSPITAL

MEDICAL RECORD                                     PAGE   43

NURSE PATRICIA REYNOLDS-CROSSEN                    PAGE   45
*Motion to Suppress Testimony (NOV82)
*Civil Trial II Testimony (JUN89)

THADDEUS WILLIAMS/PATIENT CONSENT FORM             PAGE   46

DOCTOR GEOFFREY KORN                               PAGE   46
*Motion to Suppress Testimony (NOV82)
*Deposition (DEC88)
*Civil Trial II Testimony (JUL89)

26TH & CALIFORNIA

ASSISTANT PUBLIC DEFENDER BARBARA STEINBERG        PAGE   48
*Deposition (FEB89)
*Civil Trial II Testimony (JUN89)

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722.

26th & CALIFORNIA (CONT'D)

INVESTIGATOR GEORGE BROBST                        PAGE  49
*Motion to Suppress Testimony (NOV82)

CERMAK HOSPITAL

MEDICAL RECORD                                    PAGE  49

DOCTOR STEPHEN GOODMAN                            PAGE  50
*Deposition (FEB89)
*Civil Trial II Testimony (JUL89)

DOCTOR JOHN RABA                                  PAGE  51
*Motion to Suppress Testimony (NOV82)
*Deposition (DEC88)
*Civil Trial II Testimony (JUL89)

DOCTOR STANLEY HARPER                             PAGE  52
*Deposition (JAN89)
*Civil Trial II Testimony (JUL89)

ILLINOIS SUPREME COURT RULING                     PAGE  53

MISCELLANEOUS WITNESSES

WILLIAM DAVID COLEMAN                             PAGE  54
*Civil Trial II Testimony (JUL89)

MEDICAL

SYNOPSIS                                          PAGE  54

DOCTOR RAYMOND WARPEHA                            PAGE  55
*Deposition (FEB89)

DOCTOR ROBERT KIRSCHNER                           PAGE  55
*Deposition (FEB89)
*Civil Trial II Testimony (JUL89)

CONCLUSIONS                                       PAGE  57

FINDINGS:      ALLEGATIONS AGAINST JON BURGE       PAGE  63
               SUSTAINED: VIOLATION OF RULES 3,6,8,9,10

               ALLEGATIONS AGAINST JOHN YUCAITIS   PAGE  64
               SUSTAINED: VIOLATIONS OF RULES 2,6,8,9,10

               ALLEGATIONS AGAINST PATRICK O'HARA  PAGE  65
               SUSTAINED: VIOLATIONS OF RULES 2,6,10

* DOCUMENTS ANALYZED

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722.

000030

1

OVERVIEW

On 17 February 1982, Doctor John RABA, Medical Director of Cermak Health Services, sent a letter which reported allegations of physical abuse, including electroshock torture directed against Andrew WILSON and allegedly inflicted by members of the Chicago Police Department.   The letter, addressed to then Superintendent Richard BRZECZEK, noted numerous injuries, including "several linear blisters on his right thigh, right cheek and anterior chest which were consistent with radiator burns."  Doctor RABA indicated that he had examined WILSON, an inmate at the Cook County Jail which is served by Cermak Health Services, twice since his incarceration on 15 February 1982.

On 25 February 1982, at 1100 hours, in response to this letter, C.R. #123543 was registered with the Office of Professional Standards and an investigation was conducted to probe the following allegations: that on an unknown date and time, then Lieutenant Jon BURGE and Detective John YUCAITIS, both assigned to Area Two Violent Crimes, physically abused Andrew WILSON by striking and kicking him and further, that they administered electric shocks to him.   It was also alleged that unknown officers hit, kicked and shoved WILSON against a heated radiator.   Doctor RABA was named as the complainant.   The location of the alleged incident:  Area Two Headquarters.

More than three years later, on 29 July 1985, the investigation was concluded and a finding of "Not Sustained" was delivered for all allegations.  The investigator's determination was presented in a page-long summary and was reportedly based on six attachments, including medical evidence and testimony from a Motion to Suppress hearing concurrent with WILSON's criminal trial.    The case closing indicated that the then Chief Administrator of OPS, Francis A. NOLAN, attempted to get a statement from WILSON via WILSON's attorney, Public Defender Dale COVENTRY, but that COVENTRY failed to cooperate.  Also contained in the file is a copy of a letter dated 25 February 1982 sent by Superintendent BRZECZEK to Richard M. Daley, then State's Attorney of Cook County, notifying him of the allegations reported by Doctor RABA and requesting his direction in how to proceed with the investigation.

In September 1985, the case was submitted to Command Channel Review, at which time all reviewing command personnel concurred with the "Not Sustained" findings.

On 27 March 1990, in response to a request by the Office of the Superintendent, the undersigned was assigned to re-investigate the allegations initiated by C.R. #123543.   The undersigned was directed to re-review the source material used to determine the finding of the original investigation, and additionally, to analyze pertinent documents and testimony that

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722

000075

were generated since the completion of the original
investigation.

SCOPE OF INVESTIGATION

Since 1982 when Andrew WILSON and his brother, Jackie
WILSON, were first tried and convicted for the murder of two
Chicago Police Officers, Andrew WILSON has been involved in a
total of four court proceedings, including two criminal trials
and two civil suits. The testimony generated in the past eight
years amounts to tens of thousands of pages of trial transcripts
and court-reported depositions. Due to the scope of the material
and the gravity of the allegations, the undersigned conducted a
preliminary examination of all existing documents related to the
WILSON case. The primary documents that emerged from this search
include testimony from WILSON's 1982/1983 criminal trial
(including a November 1982 Motion to Suppress Hearing), the 1987
Appellate Court Opinion reversing the conviction and remanding
the case for a new trial, the 1988 criminal trial and the two
civil trials -- of February and June, 1989.

In order to direct focus to the investigation -- while still
giving attention to the broad spectrum of evidence -- the
undersigned zeroed in on testimony from the Motion to Suppress
Hearing, the first testimony which addresses WILSON's
allegations, and the second civil trial, the most recent
proceeding and most comprehensive examination of the allegations.
Testimony from WILSON's first civil trial was not incorporated in
the research (as of today's date, it is still unavailable);
however, research indicates that with the exception of Doctor
Raymond WARPEHA, all key witnesses who testified in the first
civil trial also testified in the second trial, which occurred
approximately four months later.

During the course of examining the second trial testimony,
as questions were raised regarding inconsistencies between that
testimony and prior testimony, the undersigned reviewed relevant
prior testimony in an effort to resolve the discrepancies and to
better determine a witness's credibility. As the testimony was
analyzed in hopes of extracting some "truths" about what
occurred, the following related questions served as guideposts:

   "what is most reasonable to believe considering the totality
   of the circumstances?",

   "what makes sense?", and

   "what is most believable given the context of what is
   happening at the time?"

Due to the length of elapsed time from the date of the
alleged incident to the time of this investigation and in

CONFIDENTIAL
DEFENDANT HERRERA DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 6222

000076

an effort to avoid the well-rehearsed and coached responses often indicative of testimony that has been repeated numerous times, it was decided that the bulk of the investigation would be an examination of the already-existing plethora of testimony as opposed to re-interviews of the involved players.

During the course of the investigation, several allegations surfaced involving victims other than Andrew WILSON. These allegations include those made by witnesses Jackie WILSON and Doris MILLER, as well as allegations addressed in the civil trial testimony in connection with the plaintiff's policy/conspiracy charges against the City. Due to the gravity and scope of the allegations made specifically by Andrew WILSON, it was determined that only his allegations would be explored in this investigation.

ISSUES

After analyzing the documents pertinent to this investigation, the undersigned observed that all of the witnesses interviewed provided consistent testimony regarding most of the circumstances and events of 14 February 1982. The only points of departure (invoking major disparities among testimony) surrounded several specific issues. These "issues" were addressed in the civil trials, and the conflicting testimony surrounding these issues will be presented, where applicable, in the body of this investigative report. The primary issues reflected in the conflicting testimony pertain to the nature and cause of the injuries allegedly sustained by WILSON during his incarceration at Area Two Headquarters.

Since the evidence, primarily medical testimony, undeniably supports the presence of injury to Andrew WILSON (which will be addressed in this report), the "key questions" that need to be addressed -- in order to resolve the "issues" that arose from the evidence -- are: What is the specific nature of WILSON's injuries, and how and at what location were the injuries sustained?

After examining the body of evidence, the picture that emerges is as follows: On 14 February 1982, at approximately 0600 hours, following his arrest for the murder of two Chicago Police officers, Andrew WILSON was taken to Area Two Headquarters. Except for approximately two hours when he was driven to Area One for a line-up, WILSON remained at Area Two until approximately 2200 hours, at which time he was transported via squadrol to Central Detention's lockup. After lockupkeepers refused to admit WILSON, the same squadrol drove WILSON to Mercy Hospital, where medical reports indicate that WILSON displayed at least fifteen separate injuries, including visible injuries to his head and chest and what appeared to be a second degree burn on his leg. After signing a release form "Against Medical Advice", WILSON

PURSUANT TO DOCUMENT PRODUCED
ENTERED IN PROTECTIVE ORDER
IN 90 C 6722

000077

4

was transported back to Central Detention, where lockupkeepers admitted him into the lockup. The following morning, WILSON was transported to 26th And California. After an appearance in bond court, he was admitted to Cook County Jail, where he subsequently received medical treatment at Cermak Hospital, the jail's medical facility.

In an effort to most accurately discover the answers to the "key questions", the reader, in examining the investigative report, will be presented with testimony from a wide range of individuals who had contact with WILSON on the date in question. The reader will be presented with the accounts of the arresting officers, transport officers, officers who observed WILSON during his detention, members of the State's Attorney's office who interviewed WILSON and who were present during WILSON's incarceration at Area Two, and civilian witnesses who allegedly heard the incident.

Introduced in the report is testimony from the squadrol officers who transported WILSON, the public defender who observed WILSON following his release from police custody and the photographer who photographed WILSON following his incarceration at Cook County Jail. The analyzed testimony will reflect the witnesses' contact with WILSON on the date in question as well as any observations the witness may have had based on his or her proximity to WILSON. Also included in the report is the testimony and reports of numerous medical personnel, including the doctor and on-duty nurse from Mercy Hospital, the three doctors who examined WILSON in Cermak Hospital, and two "expert" witnesses, including the deputy chief medical examiner for Cook County who is a purported world-renowned expert on "torture". In addition to a discussion of medical testimony that provides a consistent interpretation of the injuries and which corroborates the allegations, the report will also address any discrepancies or inconsistencies raised by this evidence.

PHOTOGRAPHIC EXHIBITS

Numerous photographic exhibits were offered into evidence during the course of the various proceedings. They were made reference to throughout the testimony and are often cited in this investigative summary report. The photographic evidence includes:

o   The color line-up photographs taken in Area One of Andrew WILSON, Jackie WILSON and four other prisoners on 14 February 1982, at approximately 1630 hours.

o   The Polaroid interview room photograph taken of Andrew WILSON's face on 14 February 1982 following his statement at Area Two, at approximately 18

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN _90_ C _6722_

000078

5

o     The Cook County Jail photographs (black and white) taken of
      Andrew WILSON's face, chest and legs on 15 February 1982,
      during booking.

o     The Polaroid photographs taken of Andrew WILSON's face chest
      and legs on 16 February 1982 by personnel from the Cook
      County Public Defender's Office.

VISIT TO LOCATION

      During the course of the investigation, the undersigned
visited the former site of Area Two Headquarters, 9059 S. Cottage
Grove, to observe the physical layout of the second-floor
location where the incident allegedly occurred.

      Prior to visiting the location, the undersigned learned that
the site, no longer the property of the Chicago Police
Department, underwent a substantial renovation in 1986 or 1987,
during its operation as a facility of the Department of Streets
and Sanitation.  The undersigned was informed that the only
structural changes made on the second floor were made in the
northwest corner and that with the exception of painting and
cosmetic modifications, the offices along the south wall
(formerly interview rooms) appear basically the same as they did
in 1982.

      During the visit, the undersigned observed five offices, all
approximately the same dimensions (roughly eight feet by ten
feet), situated along the south wall of the building's second
floor.  Located on the south wall of each room was a window
(facing 91st Street); directly below the window--in each of the
rooms--was a radiator.  The door to each room was made of wood.

      During the inspection, the undersigned also noted that
restraining rings and other physical features denoting a police
department facility were not evident at this time.

DIAGRAM

      During his deposition in September 1988 Detective Patrick
O'HARA created a diagram of the second floor of Area Two
Headquarters.  This diagram was subsequently used as an exhibit
during other depositions and the civil trials, and is frequently
cited throughout this investigative summary report.  This diagram
is included as the next page of this report (Page 5A).

COMPLAINTS-AT-LAW/CIVIL SUITS

      A pro se complaint, #BERG-2381QL, was initiated by Andrew

CONFIDENTIAL: DOCUMENT PRODUCED
PERSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6222

000078

5A



CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 40 C 6722

000080

6

WILSON on 1 April 1986. In this complaint, WILSON alleged various injuries while in police custody and named as defendants the City of Chicago, Police Superintendent Richard BRZECZEK, and the following members of the Chicago Police Department: J. REILLY, J. BURGE, T. McKENNA, W. MULVANEY and M. FERRO.

In October 1987, an amended complaint was filed on behalf of WILSON. In this complaint, WILSON was named as plaintiff and the defendants were: City of Chicago, Jon BURGE, Richard BRZECZEK, Michael MCKENNA, Patrick O'HARA, John YUCAITIS, MULVANEY, FERRO and "other Chicago Police Officers whose names are currently unknown". Lawrence HYMAN was also named as an unsued co-conspirator.

A second amended complaint that superseded the 1987 complaint was filed in 1989. This complaint lists Andrew WILSON vs. City of Chicago, Richard BRZECZEK, Jon BURGE, Patrick O'HARA, Thomas MCKENNA, and John YUCAITIS.

ANDREW WILSON

During the eight years since he was first arrested for the murders of Officers FAHEY and O'BRIEN, Andrew WILSON has testified extensively regarding his account of the alleged incident. Beginning with his testimony during the Motion to Suppress Hearing in November 1982, WILSON has also told his story in a four-hundred page deposition in December 1988/January 1989 and on several occasions during the civil trials of 1989. Although several disparities emerge between the various testimony, WILSON's account of the incident remains basically consistent throughout his statements.

WILSON testified that on 14 February 1982, at approximately 0400 or 0500 hours, he was sleeping on the living room couch in an apartment located at 5301 W. Jackson. He was awakened by the sound of police cars and breaking glass, at which time he put on his pants and looked outside.

The "dude" who lived in the apartment and who had allowed WILSON to spend the night (now known to be Garnett VAUGHN) exited his bedroom and his wife handed the police a set of keys to open the burglar bars. WILSON stated that the officers, all males in civilian dress, ordered him and the "dude" against the wall. WILSON's pockets were searched and he was thrown to the floor and handcuffed. He stated that he was not injured when he was thrown to the floor.

WILSON stated that while he was laying face down on the floor, a red-headed officer, whom he later identified as "Burge", walked over his neck. After being brought to his feet, an unknown officer put a jacket over his head. WILSON stated that he

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6923

000081

7

was bare-chested at the time and that he was wearing pants and depending on the testimony, either shorts or longjohns. The testimony also varied as to whether he was wearing shoes or boots. He was then escorted out of the apartment, and before being transported from the scene, Burge told the transport officers something to the effect of "don't mess with him ... we will get him when we get him to the station."

WILSON was then driven to a police station in an unmarked squad car by four male white plainclothes officers including one whom he later identified from photographs as "YUCAITIS". Upon arrival at the station, (Area Two Headquarters -- although WILSON was unable to identify the facility's location), he was "hustled" up a flight of stairs and placed in a room. The room, according to WILSON's deposition, had a desk, chair and wastebasket; he did not recall a ring on the wall or a radiator. BURGE, YUCAITIS and the other transport officers were present.

WILSON alleged that at this time the officers started beating him up -- knocking him down, hitting and kicking him about the body. He could not state specifically which officer abused him at this time; he testified that BURGE was not one of the participants. One of the officers then took a plastic bag out of the garbage can and placed it over his head. One of the officers then tried to choke him. WILSON scuffled with the officers and bit through the bag.

After the plastic bag was taken off his head, one of the officers, whom he could not identify, burned him on the arm with a cigarette. WILSON also stated that at this time, the officers slammed him into a window, causing the glass to break. He stated that some kind of covering over the window prevented him from being injured by the broken glass. He also testified that when he was down on the floor, one of the officers kicked him in the eye, causing the only injury he sustained during this "beating".

Throughout his testimony, WILSON stated the that while this beating was still taking place, BURGE came into the room, at which time the beating ceased. BURGE told the officers present- - there were approximately seven to the best of WILSON's recollection -- not to mess up WILSON's face, that he "wouldn't put no marks on me" and to get WILSON out of there. At this time, YUCAITIS took WILSON to another room on the same floor and handcuffed him to a ring on the wall. He was still dressed in only shoes and pants. WILSON could not describe the exact location of the second room, but stated that it was "not far" from or possibly next door to the first one. In the Motion to Suppress testimony, he stated he was in the first room approximately five to ten minutes.

During his various testimony, WILSON was continually

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

000082

8

questioned regarding the sequence of events. He stated repeatedly that he did not know what time the specific events occurred and explained that his watch had been broken during the initial beating in the first room. His testimony displays little concept of either time or place. Also, in response to the challenges made about the inconsistencies in his testimony WILSON stated, during cross-examination in the second civil trial, "... As I constantly come back and forth to testify, things come back to me."

Following his being escorted into the second room, WILSON stated that at some point YUCAITIS entered the room and asked WILSON to telephone WILSON's brother, Jackie. YUCAITIS unhandcuffed him from the ring and escorted him to a telephone at a desk across from the room. WILSON testified that he told YUCAITIS that he did want to call his brother and that he wanted a lawyer.

At this time, WILSON was returned to the room -- the second one -- and rehandcuffed to the ring on the wall. WILSON testified that BURGE then entered the room and told WILSON that he was going to make a statement, because BURGE's "reputation was at stake." WILSON stated that throughout the incident to this point, he had repeatedly stated to the officers that he didn't "do nothing" and he "didn't want to say nothing." A short time later, YUCAITIS reentered the room -- BURGE had left at this point -- carrying a brown paper bag. (In certain testimony, WILSON states that another, unidentified, plainclothes officer accompanied YUCAITIS at this time.) YUCAITIS then took a "gizmo" from the bag: a black box, red on the inside, with a crank. He took the two wires extending from the device and clamped one of the wires on WILSON's nose and the other on one of his ears. Then he cranked. WILSON testified that the black box "shocked" him, that it made his teeth grind.

WILSON consistently stated that at one point while he was being shocked by the crank device, he kicked YUCAITIS, who then proceeded to punch WILSON in the mouth. YUCAITIS continued to shock WILSON, at which time WILSON yelled. The shocking episode ended when some unknown person came to the door. WILSON related that he then spent a period of time alone in the room. During this period, many officers, including BURGE, came in to look at him and call WILSON "names."

The next event WILSON recalled was being taken by an officer (whom he later identified from photographs) as O'HARA to another office-like room with an adjoining office. It was daylight at this time. He and O'HARA waited in this room until the arrival of Lawrence HYMAN, whom WILSON identified (as the Assistant State's Attorney) after HYMAN's courtroom appearance. HYMAN said something to WILSON -- he could not recall the words -- at which time WILSON said something to the effect -- "you want me to make

SUBJECT TO PROTECTIVE ORDER
ENTERED IN 90 C 6211

000083

a statement after they been torturing me?" HYMAN then responded, according to WILSON's accounts, "Get the jagoff out of here." WILSON was returned to the second room by O'HARA. He did not see YUCAITIS again that day.

BURGE then entered the room and said, "fun time." He was carrying a little bag with him. BURGE put an extra set of handcuffs on WILSON's arm that had not been handcuffed; he also placed a set of cuffs on WILSON's ankles. He placed the bag in the garbage can and left. A short time later, BURGE returned, this time accompanied by an officer with a scar whom WILSON, in the second civil trial, described as a "big, fat stud". (WILSON later identified this officer in the civil trial as Officer HILL.) BURGE took the bag from the garbage can and pulled out the black box. He clamped the wires to each of WILSON's ears. Then he cranked. WILSON testified that he repeatedly rubbed the wires off and that at one point, the shocking knocked him off his chair.

After this occurred several times, BURGE and the unknown police officer later identified as Officer HILL unhandcuffed one of his arms, stretched him across the radiator that was adjacent to the ring on the wall and rehandcuffed his freed arm to something on the opposite side of the radiator. (During an inspection of the renovated former site of Area Two Headquarters, no longer a police department facility, the undersigned noted no significant structural changes in the second-floor "interview rooms"; however, restraining rings and other physical features denoting a police department operation were no longer evident.) They placed the clamps attached to the wires on each of his little fingers, and while WILSON was kneeling against the hot radiator BURGE cranked the black box. (WILSON was fully dressed at this time, wearing a shirt, pants, and a jacket.) He further stated that at this time, he was hollering and screaming out, saying he hadn't done anything and calling "Somebody help me."

WILSON testified that during this shocking episode, while in the kneeling position, his legs, chest and face made contact with the radiator. WILSON also stated that while he was stretched across the radiator, the big officer with a scar, whom he referred to as "BURGE's partner" and who is now known as Officer HILL, kicked him in the back. Another officer, whom he described as short and whose identity he did not know, was also kicking him at this time.

The next part of the incident that WILSON recalled was when BURGE pulled a second device out of the brown bag. WILSON described this device as black, round, with a wire and an electrical cord sticking out from it. He said it resembled a "curling iron with a wire". In his testimony, WILSON described how BURGE plugged the device into the wall, then ran the wire "real gentle" between his legs into his groin area. WILSON

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000084

10

stated that he was standing, spread-eagled, at this time. BURGE then jabbed the wire into WILSON's back, slamming him into the grill over the window, causing WILSON to fall back.

WILSON stated that when he began to spit blood, the torture stopped and the officer put the objects back into the brown bag. BURGE's partner then got a towel and used it to wipe off WILSON's face. In his deposition, WILSON was asked to describe where the blood came from, to which he responded his mouth. "Question: From your gums or from around your teeth or where in your mouth? Answer: I don't know. When he uses the black box, it grinds your teeth, it grinds, it grinds, that's all it do, it constantly grinds you."

WILSON also stated that at some point while he was in the second room, prior to being escorted by YUCAITIS to the telephone, he observed a friend from his neighborhood, Doris MILLER, being "drug" by the police to the door of his interview room. He said he also observed Derrick MARTIN and "Black Tony" at the station sometime during the morning.

"Awhile later" -- WILSON could not recall how much time had passed -- officers in an unmarked squad car transported WILSON to another police station. At this time, he and five other men, including his brother, Jackie, whom he had not seen that day prior to this time, were placed in a line-up. In his testimony during the second civil trial and in his pre-trial deposition, WILSON stated that prior to the line-up, in a room at Area One, BURGE stuck a revolver in his mouth, and while holding it in his mouth, cocked it.

The testimony diverges at this point. In his Motion to Suppress testimony, WILSON does not make this allegation. In his pre-trial deposition, he states that this incident occurred in a room with a mirror in it, and based on this testimony, the room appeared to be the same one in which the lineup was conducted. The question of where this alleged incident occurred is raised in the civil trial, at which time WILSON wavers in his testimony and ultimately testifies that he is not sure which room the incident occurred in and that possibly BURGE put the gun in his mouth in one room and WILSON was then taken to a different room for the lineup.

In his Motion to Suppress testimony, WILSON did not identify the officers who transported him to and from Area One. In his deposition, after viewing identification photographs of police officers, he identified O'HARA and McKENNA as the transporting officers. He also testified that en route to and from Area One, McKENNA told WILSON that he wanted to kill him, and that he was not into "all of that beating up stuff." In regard to O'HARA, WILSON stated he "stayed with me a lot" in the second room at Area Two. When asked "... did he hit you or mistreat you in

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 10 C 6722

000085

11

any way?" he responded "no."

WILSON testified that he was not sure what time of day he returned to Area Two. He was placed in the same room in which he had spent most of the day prior to going to Area One. BURGE then came in the room and told him that he was going to make a statement or that BURGE would do to him what he did earlier. At this time, "I told him I would make a statement". Officer O'HARA and ASA HYMAN entered the room at this time, and WILSON answered HYMAN's questions. A male court reporter, later identified as Michael HARTNETT, recorded the statement using a special machine. During the statement, BURGE came in the room and the others told him to leave.

WILSON, in the majority of his testimony, stated that neither ASA HYMAN nor any of the police officers with whom he had contact, read him his rights. In his Motion to Suppress testimony, however, at one point, he stated that HYMAN "may have" told him his right to have an attorney present. WILSON testified that the reason he gave the statement was because he "didn't want to be shocked no more."

When he finished giving the statement, the ASA and court reporter left. Some time later, O'HARA took WILSON to a different office -- WILSON stated that he had never been in this room prior to this time -- where his statement was read to him. He signed the statement and was returned to the second room. While WILSON was in the room, the court reporter entered and took a photograph of him. During his deposition, when shown the signature on the Waiver of Constitutional Rights form accompanying his statement, WILSON testified that it looked like his signature. He said he "signed anything they gave me" because he didn't want to be tortured anymore.

WILSON further testified that at some point during the course of the statement taking, while alone in the second room with the court reporter, he told the reporter that the officers were going to torture him more. WILSON stated that the reporter just looked at him, told him he couldn't do anything and left. Additionally, at one point during this episode, BURGE entered the room and told WILSON something like they are "gonna fry your black ass."

WILSON stated that Officer McKENNA waited with him in the second room until the arrival of the two male uniformed officers who transported WILSON to police headquarters. WILSON related that he had never seen the uniformed officers prior to this time; upon viewing photographs during his deposition, WILSON identified the officers as FERRO and MULVANEY.

In the civil trial testimony and pre-trial deposition, WILSON stated that while in the room at Area Two, prior to being transported, the two uniformed officers "beat on him". He stated

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORD— ENTERED IN 40 C 62...

000086

that they grabbed his penis and hit him with their fists about his body. WILSON stated that Officer HILL -- BURGE's partner-- told the officers to put WILSON in a cell with other prisoners so that it would look like the prisoners had beat him up. WILSON testified that to the best of his recollection, BURGE was not present at this time.

(It should be noted that WILSON did not make this allegation against the transporting officers during his Motion to Suppress testimony. He did not, in fact, testify during that proceeding regarding any excessive force allegations that occurred following the Area One line-up.)

WILSON testified that after being escorted from the second room, on his way down the stairs, Officer MULVANEY, the taller transporting officer, made several unsuccessful attempts to trip WILSON. When they reached the bottom of the stairs, MULVANEY then slammed WILSON against a wall, causing an already existing scar on his forehead to reopen. The officers then put him in a squadrol and drove him to police headquarters at 11th and State. WILSON testified that it was a "rough ride" but that at no time did he fall or suffer any injuries.

On the elevator to Central Detention, according to WILSON's testimony, MULVANEY then knocked WILSON down, twisted his right hand and hit him in the head with a .45 caliber gun. In his second civil trial testimony, WILSON stated that Officer FERRO did not get on the elevator at this time. In his deposition, however, he stated that both officers were present.

WILSON was then taken to the lockup facility. WILSON testified that the officers at the desk refused his admittance and said "we are not taking him". He also recalled the lockup officers saying something to the effect that they were going to call the brass, at which time MULVANEY said that he and FERRO would take WILSON to the hospital. The officers subsequently put leg irons on WILSON and drove him to a hospital.

WILSON provided a fairly detailed account of what happened at the hospital in both his deposition and in the second civil trial. He stated that he was taken to the emergency room and that the officers -- in his deposition, he stated specifically that it was the taller officer -- told him he should refuse treatment or they would beat him up again. WILSON stated that he refused treatment at first. Then when the "dude" who was doing the paperwork asked him again if he wanted treatment, and the officers were not looking, WILSON stated that he said, "yes". WILSON stated that his ankle cuffs were then taken off and a nurse pulled down his pants. WILSON testified that at this time the examining doctor wanted to suture him but MULVANEY was standing in the corner with his .45 displayed. The doctor asked the officer to "put his gun away", and when the officer did not

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 6722

13

comply, the doctor refused to examine WILSON. At this time, everybody left, except for one of the officers --he believed it was the taller one -- who again told WILSON that if he knew what was good for him, he would refuse treatment. WILSON stated that when the medical personnel returned to the examining room, he told them he "didn't want nothing done to me." A bandage was applied to his head and he was transported back to the lockup at 11th and State.

WILSON testified that the doctor who examined him did not ask how he sustained his injuries and that he did not volunteer any information regarding this.

Upon arrival at the lockup, the same lockupkeeper who had previously refused his admittance, admitted WILSON into the facility. WILSON stated that he was placed in a cell by himself and that it was located "right behind the front door." He said that no one in the lockup examined or talked to him and that he did not tell any of the lockup personnel that he had been tortured. He stated that he just put his coat over his head and laid down. The next morning he was transferred in a big van to 26th and California. WILSON testified that there were a "bunch more prisoners" in the big van and that he was handcuffed on each hand to another prisoner. He stated that at no time did he sustain any burns while riding in the van. He further stated that there was no radiator in the cell at the lockup.

WILSON testified that upon arrival at 26th and California, he was placed in a bullpen with other prisoners. According to his civil trial testimony, there was no radiator in the bullpen and the area was surrounded by guards. When asked how long he was locked up in the bullpen, WILSON responded "not long". He stated that bailiffs then placed him in a smaller bullpen with only his brother Jackie.

He was then taken to court, a new court date was set and he was hustled back to the bullpen. At this time, a female lawyer came to the bullpen and WILSON talked to her about what had happened to him. In his civil trial testimony, he stated that he happened to him. In his civil trial testimony, he stated that he told the lawyer that "they shocked me and burned me." WILSON stated that he also recalled that the lawyer told the judge that WILSON needed to be taken to a hospital. He stated that during his conversation with the lawyer, she advised him not to say anything else about what had happened until he spoke to his lawyers.

Later that morning -- he was not sure of the specific time- - the bailiffs took him to Cook County Jail, where he was processed and photographs taken, some "with his clothes off". WILSON testified that he was then taken to the hospital facility, where a doctor examined his head, stitched the back of his head, placed a patch on his eye and bandaged his leg wound. He was

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 40 C 6722

000088

14

then placed in a cell in Division One, along with his brother Jackie. Here, for the first time, he told Jackie that he had been tortured by the police. In his deposition testimony, WILSON stated that Jackie, at this time, related that he, too, had been "shocked" by the police.

The next day, on 16 February 1982, according to the testimony, WILSON went to court in the afternoon and for the first time met with Dale COVENTRY of the Public Defender's Office. WILSON stated that COVENTRY, a photographer and another man accompanied him to the basement of the building, at which time the photographer took a series of photographs depicting WILSON's injuries. WILSON stated that at this time he also told COVENTRY how he sustained the injuries and his account of the torture incident.

WILSON testified that in the days following, doctors regularly checked on him and changed his dressing. In his deposition, he testified that he never talked to any of these doctors about how he received his injuries. He further testified about talking to a female dentist. He stated that as a result of grinding his teeth when he was shocked by the cranking machine, some of his bottom teeth loosened.

During the course of his cross-examination in the civil trial, WILSON refused to testify regarding certain issues that may possibly impact his criminal case currently on appeal. When questioned about the content of his statements to the police or about the events of 9 February 1982, the date of the shooting, he stated that he had been instructed by his attorneys not to answer.

During various examinations, WILSON was questioned regarding his participation in an investigation conducted by the Office of Professional Standards. WILSON stated that no one from OPS ever questioned him; upon further examination, WILSON stated that he did not learn about the investigation until approximately 1987 or 1988, when Dale COVENTRY informed him that the results were "nothing" and that the investigation was "thrown away" because WILSON had been found guilty in his criminal case.

In cross examination during his second civil trial, WILSON was asked why he did not name Officers HILL or YUCAITIS as accused parties to his pro se civil complaint. WILSON, who initiated a complaint on his own behalf in April, 1986, stated that at the time he did not know HILL by name; however, he stated that he had pointed HILL out to his attorney during the Motion to Suppress hearing. WILSON testified that HILL's omission from the complaint was an "error" as was the failure to include YUCAITIS.

IMPORTANT DOCUMENT PRODUCED
ENTERED IN 90 C 622

000089

## GARNETT VAUGHN

Garnett VAUGHN, testified only once regarding the WILSON case and that was during the Motion to Suppress. He testified that a friend accompanied Andrew WILSON to his home on 13 February 1982 and asked if WILSON could stay for awhile. VAUGHN testified that he told WILSON, whom he had met once prior to this date, that he could stay one night. At the time, VAUGHN was living with his wife and two children at 5301 W. Jackson.

VAUGHN provided an account that was consistent with that of Andrew WILSON. He stated that after the police arrived at his apartment, he and WILSON were directed to a wall in the hallway. VAUGHN stated that his wife then told the officers that he was her husband, at which time the officers directed VAUGHN and his wife to their bedroom.

During questioning, VAUGHN stated that on the date and time in question, WILSON was wearing pants and no shirt. He testified that during his contact with WILSON on that date, he did not observe any marks or cuts on WILSON's face or chest. His eyes seemed "okay." VAUGHN further testified that the floors in his living room and hallway were covered with "pretty thick" carpeting.

## JOSEPH McCARTHY

On 14 February 1982, Joseph McCARTHY, a Captain of Police, was a deputy superintendent of field tactical services. For reporting purposes, he will be referred to by his status at the time of the incident as will all other officers to be discussed in this report. Captain McCARTHY testified on numerous occasions regarding his observations of Andrew WILSON's arrest, in which he was a participant. His accounts, as presented in the analyzed testimony -- the Motion to Suppress hearing and second civil trial -- reflect basically the same information as provided by other officers at the scene of WILSON's arrest.

Captain McCARTHY stated that upon arriving at the location, he first observed WILSON inside the door, at which time Lieutenant Ray MILLER and Captain McCARTHY and the other arresting officers, including Lieutenant Jon BURGE, Detective Daniel BRANNIGAN, directed WILSON to place his hands on the wall. A female inside the house retrieved the keys for the gate, at which time Captain McCARTHY opened the burglar bars.

Captain McCARTHY stated that after entering the premises, he and Detective BRANNIGAN each took one of WILSON's arms and moved him around a corner. At this time, while WILSON was up against a wall, they started to frisk him. Someone asked WILSON if he had a gun, at which time he nodded "yes", and looked in the

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 02 C 6722

16

direction of a gym bag approximately four feet away. Captain
McCARTHY stated that at this time, he and Detective BRANNIGAN,
following appropriate police procedure, threw WILSON to the
floor. Lieutenant BURGE then placed his knee on WILSON's neck
and WILSON was handcuffed. Captain McCARTHY stated that he and
Detective BRANNIGAN then assisted WILSON up from the floor.

In regard to injuries he may have observed, Captain
McCARTHY testified that he did not at any time notice any
injuries on WILSON -- no marks, burns, cuts or blood on his
chest, face or head.

Captain McCARTHY noted that WILSON was not wearing a shirt
at this time. Captain McCARTHY testified that Lieutenant BURGE
then said something to the effect "take him back to the station."
WILSON was then taken from the scene. Captain McCARTHY stated
that he did not see WILSON again on that date.

During testimony, Captain McCARTHY related that at no time
did he hear Lieutenant BURGE say anything about getting WILSON
when they get him to the station.

RAYMOND MILLER

Raymond MILLER, in his testimony during the Motion to
Suppress hearing, stated that in February 1982 he was a
lieutenant in the Chicago Police Department, assigned to the Gang
Crimes South Unit. Lieutenant MILLER stated that on 14 February
1982, he accompanied Deputy Superintendent MCCARTHY, Lieutenant
BURGE, Detective BRANNIGAN and several personnel from Area Two
Violent Crimes to 5301 W. Jackson, in order to effect the arrest
of Andrew WILSON.

Lieutenant MILLER's account of the arrest incident is
basically consistent with the accounts of the other officers at
the scene. He stated that upon arrival in the apartment, he
observed Andrew WILSON face down on the floor, handcuffed. He
saw Deputy Superintendent MCCARTHY and Detective BRANNIGAN
restraining WILSON; Lieutenant BURGE was standing near him.
Lieutenant MILLER stated that he also observed Detective
YUCAITIS.

During testimony, Lieutenant MILLER stated that he was in
the apartment for approximately five minutes before he observed
WILSON being turned over to members of Area Two Violent Crimes
for transportation to the station. He stated that at no time did
he threaten or strike WILSON, nor did he observe any other
officer on the scene abuse WILSON. He also stated that he did
not recall WILSON struggle at any time.

Lieutenant MILLER testified when he observed WILSON

000091

17

being brought up from the floor, he noticed a scratch in the vicinity of WILSON's right eye; he did not observe any other injuries.

Lieutenant MILLER did not testify in either of the civil trials.

## DANIEL BRANNIGAN

On 14 February 1982, Daniel BRANNIGAN was a detective assigned to the Gang Crimes South Unit. Detective BRANNIGAN, during testimony in the Motion to Suppress hearing (the only time he testified regarding the incident), provided an account that corroborated the testimony of Captain McCARTHY, Lieutenant MILLER and the other officers at the scene of Andrew WILSON's arrest. Consistent with Captain McCARTHY's account, Detective BRANNIGAN stated that after entering the apartment, he and Captain McCARTHY grabbed WILSON by each of his arms and moved him around the corner in the hallway.

Captain McCARTHY then searched WILSON. Someone asked WILSON if he had a gun; when he responded "yes" and gestured in the direction of a bag on the floor, Detective BRANNIGAN assisted Captain McCARTHY in throwing WILSON to the floor. At this time, WILSON was handcuffed and then escorted from the apartment. Detective BRANNIGAN stated that the only injury he observed on WILSON was a small scratch in the area around his right eye. He testified that he did not observe anyone strike or threaten WILSON. He also stated that he did not see WILSON again that day after WILSON was taken from the location.

## JACKIE WILSON

Jackie WILSON, Andrew WILSON's brother and co-defendant in the criminal case in which both WILSONs were convicted of the murders of Officers FAHEY and O'BRIEN, provided testimony during the Motion to Suppress hearing in November, 1982. In a deposition given in relation to Andrew WILSON's civil suit, on 26 January 1989, Jackie WILSON exercised his Fifth Amendment privilege and stated that he would not answer questions until the resolution of his criminal case (currently on appeal).

During his testimony, WILSON provided an account of his arrest on 14 February 1982 and the post-arrest events involving him and his brother. He stated that at approximately 0800 to 0830 hours he was arrested in the vicinity of 51st and Prairie and then transported to the 002nd District station. WILSON stated that he was detained at the station for approximately ten to twenty minutes, after which he was transported to Area Two by four male white plainclothes officers

000092

18

Upon arrival at Area Two, WILSON was placed in a room on the second floor. Numerous officers, including the transport officers and Officers McKENNA and O'HARA (whom WILSON identified from their testimony during the criminal trial) were also present. The officers asked him about the "incident" and when WILSON told them he did not want to talk without a lawyer, the officers proceeded to beat him for approximately thirty minutes. WILSON stated that at approximately 1000 or 1100 hours, he told the police officers what happened.

In the course of his testimony, WILSON stated that while he was being questioned, he heard Andrew WILSON hollering loudly in the "next room". He said he recognizes his brother's voice. He also heard the voices of "a lot" of police officers, and the sound of chairs being kicked around, "scrambling". WILSON stated that he felt, "I was next." WILSON testified that during the questioning, he was the victim of approximately six or seven beating episodes. He alleged that at one point, he was being questioned abut his relationship to "Dee" (a.k.a. Derrick MARTIN), at which time he was pulled out of his chair and pushed to the door; he then observed Dee in a room across the hall. WILSON told the officers that he did not know the man, a statement which precipitated another round of beatings. (In later testimony, WILSON related that he does know Dee and that he lied to the police during the questioning).

WILSON stated that after several hours -- he was not sure how much time had passed -- he gave a statement to the Assistant State's Attorney. Prior to giving the statement, he believes it was Office McKENNA who warned him that if he did not tell the attorney what he had told the officer, the officers were going to ask the attorney to leave and then "start all over again."

WILSON testified that McKENNA was present during his court-reported statement and that in the course of the statement, O'HARA entered the room and told WILSON that if he didn't sign, he was going to break WILSON's fingers.

Following his statement, WILSON was taken to another room, which he described as approximately twenty to thirty feet down the hall. WILSON stated that he was handcuffed to the wall; photographs were also taken at this time.

WILSON testified that he never observed Andrew WILSON at Area Two on 14 February 1982, and further, that the only time he observed his brother on that date was during a lineup at Area One. He further testified that he next observed his brother at the Criminal Courts Building, approximately twenty-four hours after first being taken into custody. At this time, WILSON observed that Andrew had a patch over one of his eyes, a patch on the back of his head and burns all over his body. He testified that Andrew told him at this time that the police had "jumped" on

000093

CONFIDENTIAL: DOCUMENT PRODUCE
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 10 C 6722

19

him, and that when he went to the hospital, the police told him
to refuse treatment.


DORIS MILLER

     Doris MILLER provided testimony during the Motion to
Suppress hearing and in a deposition on 6 March 1989.  MILLER did
not testify in either civil trial.

     MILLER's accounts of the events of 14 February 1982 were
consistent with the information provided by Andrew WILSON.
MILLER stated that on the date in question, she was an employee
of the U.S. Postal Service.  She stated that at the time in
question, she was a friend of Jackie WILSON, and that she knew
both WILSONs because they grew up in her neighborhood.

     MILLER stated that on 14 February 1982, at approximately
0100 hours, four male white plainclothes officers arrived at her
door and placed her under arrest for being an "accessory to
murder."  MILLER told the officers that on 11 February 1982, she
had driven Jackie WILSON to a building located in the vicinity of
63rd and Calumet at which time she accompanied the officers to
the building's location.

     MILLER was then taken to Area Two police headquarters.  She
was led through the back entrance, up to the second floor and
placed in a room near the back of the police station "right next
to the stairs."  She was then handcuffed to a pipe that extended
from the ceiling.  MILLER stated that the room also had a table,
at least one chair, and a window which faced an alley -- and not
91st Street.  She stated that it "was still dark out" when she
was placed in this room.

     She stated that at some point after she was placed in this
room she heard the sound of officers bringing somebody up the
stairs.  She then heard a man screaming and the sound of breaking
glass.  MILLER related that she thought the glass was from a door
at the rear stairwell. She stated, however, that she did not see
this occurrence nor did she observe the person  being escorted.
MILLER stated that the man's voice she heard was that of Andrew
WILSON; she related that WILSON has a distinctive voice which she
recognizes.

     When she heard the commotion and the hollering, according to
her testimony, MILLER said, "why don't you all stop it?"  At this
time, an unknown blond policewoman entered the room and said to
MILLER something to the effect, "we just buried our brothers."
At approximately the same time, BURGE, the only officer that
MILLER could identify, entered the room and called her "all kinds
of bitches and ugly bitches."  He then told her, "I'll come back
in here and beat your ass."  MILLER testified that she never saw

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6712

000094

20

BURGE again.

MILLER was not sure how much time had passed when one of the officers, whose identity she did not know, took her from the room and placed her in front of the opened door to another room adjacent to a "great big wide open space".

At this time, MILLER observed Andrew WILSON, naked from the waist up, seated on a stool in the room, which she described as similar to "a little cubbyhole". MILLER testified that when she observed WILSON at this time, his body was sweaty; she recalled that it was cold in the police station and that she was cold at the time. The officer asked her if this was the same person she saw go into the building. He then shoved her back from the door and told her to go inside a room directly adjacent on the left of Andrew WILSON's room. She was then handcuffed to the window sill. MILLER stated that it was still dark outside, approximately the time of dawn. When asked to compare this room to the room in which she observed Andrew, MILLER responded, "Same difference, same size. They were like little cubicles."

During testimony, MILLER stated that she remained in this room until sometime in the evening. An unknown black man, who she believed was in custody in regard to a television he had bought, was also in this room during most of her stay.

MILLER testified that at some point after arriving in the second room, she heard Andrew WILSON being beaten -- the sounds of a body falling to the floor and Andrew screaming, begging and pleading. She also heard Andrew saying, "I haven't done anything."

MILLER testified that she heard WILSON being beaten and screaming on and off for several hours. She had also requested several times to use the bathroom and at some point, after it became daylight, she could not wait any longer. She stated that at that time, she "used the ashtray to go to the bathroom." MILLER stated that sometime after this, the beating ceased. She stated that when she looked outside, she observed people catching the bus on 91st Street, which made her think they were going to church.

The next event MILLER recalled was when she heard some officers in Andrew's room say something to the effect, "Are you ready to confess now because your brother has made a confession?" She then heard a voice say, "We're getting ready to take you out of here motherfucker. If you try anything, we're going to blow your brains out." MILLER stated that she did not hear Andrew's voice again that day.

MILLER further stated that she did not see or talk to Andrew WILSON after 14 February 1982. She stated that she never saw Jackie WILSON while at Area Two on the date in question.

000095

21

She testified that at some time that evening, she gave a statement to an officer whose first name was "Fred." She stated that she had not observed this officer at any time prior to giving him a statement. MILLER stated that after she signed the statement, at approximately 2100 hours, she was allowed to go home.

During her Motion to Suppress testimony, MILLER noted that she had been in the police station approximately twenty hours, without food or the use of the bathroom. In her deposition, she testified that the reason she never filed a complaint or a lawsuit regarding her allegations was: She was glad for the ordeal to be over and "... I am afraid of the Chicago Police. I'm afraid to death of them."

During examination in both the Motion to Suppress hearing and in the deposition, MILLER was questioned extensively regarding her relationship to the WILSONs, and regarding some of the discrepancies in her testimony regarding the contact she had with the WILSONs prior to her detainment at Area Two. MILLER acknowledged that both Jackie and Andrew WILSON came to her home briefly, at approximately 1500 hours, on 9 February 1982, the date of the shooting. In her deposition, she stated that she has tried to block out the incident and that she does not remember all of the details. As for the variance between her police statement and some of her later testimony, MILLER testified at deposition that "... Up in the police station, I would do anything to get out of there. They treated me like I was an animal."


DERRICK MARTIN

Derrick MARTIN, A.K.A. Dee, a potential witness whom Andrew and Jackie WILSON named as having been present at Area Two at the time of the incident, testified as a State's witness during the Motion to Suppress hearing. MARTIN stated that on 14 February 1982, at approximately 0100 hours, he was brought to Area Two Headquarters in regard to a murder investigation. He testified that he remained at Area Two until approximately 1900 hours and that the majority of the time he was held on the second floor, in a "photo lab" located in the front of the station facing Cottage Grove.

MARTIN stated that at some point -- he gave varying accounts regarding the time -- he was taken to the washroom. MARTIN stated that he knows Andrew and Jackie WILSON, but that he did not observe either of them at Area Two on the date in question. He further stated that he did not hear any screaming or sounds of someone being beaten during his detention at Area Two. During cross-examination, MARTIN further related that the State had been

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722

22

paying his rent, room and board since shortly after the murder investigation.

## CHESTER M. BATEY JR.

Chester M. BATEY, Jr. testified in both civil trials (as a defendant's witness) and in a deposition on 11 February 1989. At the time of the incident, he was a police officer assigned to the 008th District.

Officer BATEY's various testimony provides a fairly consistent account of the incident. He stated that on 14 February 1982, at approximately 0800-0900 hours, while off duty, he followed a lead regarding Jackie Wilson's whereabouts and proceeded to the location, where he effected the arrest of Mr. Wilson. Officer BATEY stated that WILSON was transported to the 002nd District, and that BATEY also proceeded to that station in order to complete an Arrest Report.

A couple hours after the arrest, Officer BATEY learned that the operation was moving to Area Two headquarters, at which time he proceeded to that location. The time, according to Officer BATEY's recollection, was approximately 1100 or 1200 hours. Upon his arrival, he went to the second floor, where he was directed to a room off of a big common area, which was located on the east end of the building near the stairway.

Several other officers involved in the arrest were in this area doing paperwork. Officer BATEY stated that after he completed his supplemental report, he took the report to Assistant State's Attorney Michael ANGAROLA, who was situated in a room on the northwest end of the common area. ASA ANGAROLA told Officer BATEY that he wanted a To-From report instead.

Officer BATEY stated that shortly afterward, his supervisors, including his tactical lieutenant and the District Commander, arrived in the Area. He stated that a discussion ensued between his supervisors and ASA ANGAROLA, after which Officer BATEY was directed to complete a To-From. Officer BATEY related that he returned to the room he had been in and completed the to-from (which was typed by Sergeant William BATTS of the 002nd District.) Officer BATEY stated that it took him approximately one hour to complete the report. After turning in the typed report, ASA ANGAROLA told him to stay around until he or an assistant got back to him.

It was at this time, according to Officer BATEY's testimony, that he returned to the common area and asked about the WILSONs' whereabouts. It was now approximately 1400-1500 hours. Officer BATEY stated that he was then directed to a couple of interview rooms along the south wall of the building.

COPY OF THIS DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

000097

He recalled that these rooms opened onto the common area. Officer BATEY testified that he went into one of the rooms -- he was not sure of the chronological order of the rooms--at which time he observed Jackie WILSON seated and handcuffed to a ring on the wall. He also observed a radiator and a window on the wall facing the door of the room. Officer BATEY stated that at this time, WILSON was being interrogated and that he sat in on the interrogation. He said he told the two male white interrogating officers, whose identify he did not know, that "I was interested in seeing how a major homicide was handled because I had never been involved in one before".

After approximately ten to fifteen minutes, Officer BATEY exited the room and entered the room where Andrew was being interrogated by two other male white officers. Based on Officer BATEY's recollection, Andrew's room was either next door or one room away from Jackie's. Officer BATEY stated that he sat back and listened to the interrogation: "It was my first major crime, and I was just taking notes".

Officer BATEY stated that when he observed Andrew at this time, he was seated to the right of the radiator. He believed Andrew was wearing a shirt and pants; however, Officer BATEY clarified that he was in the room only a short time and that he was more interested in Jackie. Based on his recollection, the time at this point was before 1600 or 1700 hours -- the time Officer BATEY left the station.

Officer BATEY stated that over the next "short period of time", he returned to Jackie's and Andrew's rooms on two more occasions. He stated that at no time did he observe any injuries on either prisoner, nor did he observe any signs of a beating. He clarified that he observed Andrew only briefly and did not recall seeing the right side of his face. In his deposition, he stated: "At no time to my knowledge was Andrew Wilson brutalized by the police officers at any time that I was there." Officer BATEY also added that while he was in the common area, which was his location during the majority of his stay at Area Two, he never heard any screaming. He further stated that at no time did he observe Andrew or Jackie WILSON being escorted to or from their interview rooms.

In the second civil trial, during questioning regarding his observations of other police personnel Officer BATEY stated that except for members of his own team and his supervisors, he did not know the identify of the other police officers he encountered at Area Two. He stated that he did not recall anyone seated outside Andrew WILSON's interview room -- or anyone who appeared to have been guarding the room. He further related that he did not know what Lieutenant BURGE looked like at the time in question.

CONTAINS
DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722.

24

During his deposition, Officer BATEY was also questioned regarding his involvement in the WILSON case after the original incident and prior to his testimony during the civil proceedings. Officer BATEY stated that he was never called to testify prior to the 1989 deposition. He cited an occasion when he came to court during one of the criminal proceedings, at which time ASA ANGAROLA told him to "get out of the court" and to leave his name and number with his secretary. Officer BATEY never testified in that proceeding. During his deposition, Officer BATEY also stated that to the best of his recollection, ASA ANGAROLA was present at Area Two during the entire time that Officer BATEY was present.

When questioned if he had at any time been asked by anyone in the Chicago Police Department what he knew about the events at Area Two on the date in questions, Officer BATEY responded that he had never been asked.

FRED HILL

On the date and time in question, Fred HILL was assigned as a detective in the Area Two Violent Crimes Unit. Detective HILL provided testimony during the Motion to Suppress hearing, both civil trials and in a deposition in January 1989.

Detective HILL presented an account that was compatible with the testimony of the other officers involved in the incident. He testified that he was one of the main detectives assigned to the murder investigation of Officers FAHEY and O'BRIEN and that he worked under the command of Lieutenant BURGE during the entire investigation.

Detective HILL stated that on 14 February 1982, he returned to Chicago from an out-of-town trip with his family. He telephoned Area Two Headquarters, at which time he learned that two suspects in the FAHEY/O'BRIEN murder investigation had been captured and had confessed to the killings. Detective HILL stated that at this time he drove to Area Two and that upon his arrival, he was advised to go to Area One for a line-up.

Detective HILL stated that upon his arrival at Area One, at approximately 1600 hours, he conducted the line-up, which was held in a large room with a two-way mirror; the line-up included the two suspects, Andrew and Jackie WILSON, and four other prisoners. The only injury he noted on WILSON at that time was an abrasion type mark near his right eye, which WILSON was rubbing with a rag. Following the line-up, Detective HILL was present when a crime lab photographer took three photographs of the line-up. Jackie WILSON and the four prisoners were then sent downstairs to the 002nd District and Andrew WILSON was sent back to Area Two Headquarters.

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 10 C 6722

Detective HILL testified that he returned to Area Two at approximately 1730 or 1800 hours, where he stayed until WILSON left the station.

In his civil trial testimony, he stated that he observed Andrew WILSON several times during the evening and that the majority of the time he was approximately twenty to twenty-five feet outside of WILSON's door. According to his testimony, he was checking on WILSON's "security" on these occasions. Detective Hill stated that when he observed WILSON on the date in question he was always wearing a shirt.

He stated that during the course of the evening, he also interviewed a witness, Derrick MARTIN, and obtained a statement from another witness, Doris MILLER. He stated that MILLER was in an interview room approximately twenty-five feet from WILSON's. Detective HILL also stated that he was present when the squadrol officers arrived to transport WILSON. At that time, approximately 2200 hours, he entered the room, unhandcuffed WILSON and turned him over to the officers. He testified that the lighting was "okay" and that he did not observe any additional injury to WILSON. In response to one of WILSON's allegations, Detective HILL denied ever telling the squadrol officers to place WILSON in a cell with other prisoners.

During the second civil trial, Detective HILL testified that WILSON was held in the middle interview room, which was consistent with the testimony of other officers who were called during this proceeding. Detective HILL, however, testified that he did not recall the radiator not working in that room. He acknowledged that his name appears on the Case Report, but that he did not recall writing any portion of the report. He stated that either Detective McKENNA or Detective O'HARA, also authors of the report, must have written that WILSON was placed in the Property Crimes area. Detective HILL stated that he did not observe WILSON in the Property Crimes area at any time.

It was also noted in the second civil trial, during cross-examination, that several of Detective HILL's statements were inconsistent with his prior deposition testimony. Detective HILL, who allegedly assisted Lieutenant BURGE during the last electroshock episode, testified during this deposition that he returned from his vacation in the early afternoon and that he arrived at Area Two at approximately 1400 hours. Based on testimony from police officers which indicates that WILSON did not leave Area Two for the line-up until approximately 1500 hours and on WILSON's timing of the alleged abuse, Detective HILL's 1400 arrival would have allowed for him to be present during the alleged incident.

As was also pointed out in the second trial, Detective

CONFIDENTIAL DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722.

26

HILL corrected his time of arrival from 1400 to 1500 hours in errata sheets which he completed several months after his deposition. During his testimony in the trial, Detective HILL stated that he did not receive a copy of his deposition for review until several months after giving his deposition. He also stated, however, that he realized his error within days of giving the deposition and yet he never made any attempt on his own to rectify it.

Other inconsistencies noted during Detective HILL's civil trial testimony were his renewed recollection concerning certain events on the date in question. In his Motion to Suppress testimony, Detective HILL could not recall any of the other police officers present either during, before or after he conducted the line-up at Area One; further, he stated that nothing would refresh his recollection.

More than six years later, in his Civil Trial II testimony, Detective HILL, without any hesitation, stated that at the time of the line-up, he saw Lieutenant BURGE, Detective O'HARA, and numerous other officers whom he identified by name. Additionally, in his Motion to Suppress testimony, Detective HILL stated that following his contact with Andrew WILSON at Area One, he did not observe WILSON again until approximately 2230 hours. In his civil trial testimony, Detective HILL repeatedly stated that he observed WILSON at Area Two, following the line-up, on several occasions, at least three which he specifically recalled.

Detective HILL, in response to the allegations of torture and abuse, stated that at no time did he mistreat Andrew WILSON nor did he observe another officer abuse WILSON in any way.

LAWRENCE HYMAN

On 14 February 1982, Lawrence HYMAN was an Assistant State's Attorney assigned as supervisor of the Felony Review Unit. HYMAN testified numerous times regarding the events of that date. The testimony analyzed in the course of this investigation include his Motion to Suppress and Civil Trial II testimony, and portions of his January 1989 deposition. With the exception of a few discrepancies, HYMAN's account was fairly consistent throughout his various testimony.

HYMAN testified that he arrived at Area One Headquarters between approximately 0830 and 0900 hours, after receiving a phone call to go to the area in regard to the FAHEY/O'BRIEN murder investigation. Upon arrival, he spoke to one of the detectives about the status of the case. At approximately 0930 or 0945 hours, he telephoned Michael HARTNETT, a court reporter employed by the Cook County State's Attorney's office. HARTNETT arrived at the area between approximately 1015 hours.

CONFIDENTIAL DOCUMENT
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 10 C 6722

000101

In his civil trial testimony, HYMAN testified that he telephoned HARTNETT because he "wanted to ensure the presence of a court reporter at the area if the availability and opportunity came to take the court reported statements of Andrew and Jackie WILSON." HYMAN stated that prior to calling HARTNETT, he had learned that Andrew WILSON, the prime suspect in the case, had made an oral statement in which he confessed to the murders, and that Jackie WILSON, WILSON's brother and also a key suspect, had recently been arrested.

HYMAN stated that at this time, he became involved in making arrangements to ensure that Jackie WILSON was brought to Area Two. A short time later, between 1030 and 1115 hours, Jackie WILSON arrived at the area. ASA HYMAN testified that Detectives O'HARA and McKENNA entered the room where Jackie was being held and a short time later, they exited and told ASA HYMAN the substance of their conversation.

At this time, ASA HYMAN entered Jackie's room and read his constitutional rights to him, using a pre-printed form. He stated that Detectives O'HARA and McKENNA were also present. He then questioned Jackie about the events of 09 February 1982, a conversation which lasted approximately twenty minutes. ASA HYMAN testified that during this conversation, Jackie agreed to provide a court reported statement of what he had related.

ASA HYMAN testified that he then called HARTNETT into the room, at which time a court reported statement was obtained. Upon reviewing a copy of Jackie WILSON's court reported statement, ASA HYMAN, recalled that the statement began at 1220 and ended at 1243 hours. Detectives O'Hara and McKenna were present during the statement.

ASA HYMAN related that after Jackie signed his statement, at approximately 1415 hours, HARTNETT took his photograph using a Polaroid camera. During his testimony, ASA HYMAN also stated that at some point during his contact with Jackie WILSON, lunch was brought in.

According to ASA HYMAN's testimony, at approximately 1430-1445 hours, he interviewed Derrick MARTIN, who was being held in the "old robbery lieutenant's" office, also called the records office. At 1530 hours, he obtained a court-reported statement from MARTIN, during which Detective "RYAN" was also present, ASA HYMAN stated that after the statement was typed up, he advised ASA Katherine WARNICK, who was at the area to "assist" him, to witness the signature. At this time, ASA Hyman, accompanied by Michael ANGAROLA, chief of the felony unit's trial division, went to Area One, where a line-up was to be conducted.

ASA HYMAN stated that he arrived at Area One after the

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN _____ G 671

28

line-up was finished. He then returned to Area Two, by himself, at approximately 1645 hours, approximately fifteen to twenty minutes before the arrival of Andrew WILSON. HYMAN stated that it was approximately 1715 to 1730 hours when, accompanied by Detective O'HARA, he went into the room where Andrew WILSON being held. He stated that apart from briefly observing WILSON at approximately 1330 hours, this was the first time that day that he had contact with him. He introduced himself, advised WILSON of his rights--using a pre-printed form--and had an "oral conversation" with him regarding the events of 9 February 1982. ASA HYMAN testified that during this conversation, in the presence of Detective O'HARA, WILSON said he would be willing to provide a court-reported statement.

ASA HYMAN stated that he then called HARTNETT into the room, and in the presence of Detective O'HARA, WILSON provided a court-reported statement. According to a copy of the statement that ASA HYMAN reviewed during his testimony, the statement started at 1805 and ended at 1825 hours. ASA HYMAN stated that since WILSON indicated that he could not read, he read the typed pages of his statement to WILSON and requested that WILSON initial each page. ASA HYMAN witnessed WILSON's signature on the final page and at approximately 2030 hours, HARTNETT took a polaroid photograph.

During his testimony, ASA HYMAN stated that at no time during his contact with Andrew WILSON on the date in question, did he observe anyone mistreat, abuse or threaten him in any way. He stated that at no time did WILSON complain to him of any mistreatment. When asked if he observed any injuries on Andrew WILSON, he related that he saw a large, "old", healed scar over his right eyebrow, redness and irritation to that eye which caused him to rub it with a wet rag, and a scratch or abrasion underneath one of his eyebrows--which, in his Motion to Suppress testimony, he referred to as a "fresh injury."

During the Motion to Suppress hearing and in the civil trial, ASA HYMAN was questioned extensively regarding the fact that he did not take a statement from Andrew WILSON until 1800 hours, more than nine hours after HYMAN arrived at Area Two. Although he acknowledged that the court reporter arrived at 1000 or 1015 hours and that he had an opportunity at that point to obtain a statement, ASA HYMAN testified that he "decided" not to do it at that time. In the Motion to Suppress, he stated that he was busy "...synchronizing everybody, so that we could get the job done." In the second civil trial, he testified: "I decided to wait until there was evidence that I may be able to use when I interviewed Andrew WILSON". In this testimony, he also indicated that he waited because he knew Jackie WILSON was in custody and he wanted to talk to Jackie first.

During cross-examination in the second civil trial, ASA

CONFIDENTIAL
PURSUANT TO DOCUMENT PRODUCED
ENTERED IN PROTECTIVE ORDER
20 C 6722

000103

HYMAN's deposition testimony was cited: During that testimony,
HYMAN acknowledged that by waiting, there was the likelihood that
WILSON's lawyer may come to the station and that WILSON would
then decide not to provide a statement: "I guess it was a risk
apparently that I was just going to have to take. I don't know
why I didn't. I just got caught up in what was going on...".

When questioned regarding Andrew WILSON's demeanor at the
time his photograph was taken, ASA HYMAN noted that after the
statement, WILSON was offered a soda pop, at which time HYMAN,
WILSON, Detective O'HARA and "maybe" Lieutenant BURGE drank a pop
together. During his deposition, HYMAN stated on at least two
occasions that BURGE was in WILSON's interview room following
WILSON's statement. He stated clearly that Cokes were brought
into WILSON interview room, at which time WILSON and HYMAN drank
pop with Detective O'HARA and Lieutenant BURGE.

ASA HYMAN stated that he left Area Two at approximately
2215 hours, and that Andrew WILSON was still in the station at
that time. He further stated that when he observed WILSON on the
date in question, he was wearing a shirt, pants and coat. He
stated that at no time did he talk to Andrew WILSON out of the
presence of one of the detectives.

MICHAEL HARTNETT

Michael HARTNETT, court reporter, provided an account that
was basically the same as that of ASA Lawrence HYMAN. HARTNETT
testified in the Motion to Suppress hearing and in both civil
trials.

During his testimony, HARTNETT's chronology of the events of
14 February 1982 was in sync with the timetable provided by ASA
HYMAN. He stated that following his arrival at Area Two at
approximately 1000 or 1030 hours, he took down and transcribed
the statements of Jackie WILSON, Derrick MARTIN and Andrew
WILSON. He testified that he took Jackie's statement in the
second-floor Case Management office, MARTIN's in a room across
from the Case Management Office, and Andrew's in a room
approximately thirty-five feet away from the Case Management
Office. HARTNETT, upon viewing a diagram of the area's second
floor, noted that he took down Andrew's statement in a room
marked "Interview Room 2". He stated that he left the area at
approximately 2130 hours.

HARTNETT testified that following the statements of Jackie
and Andrew, he took a Polaroid photograph of each prisoner.
During the second trial, upon viewing the photograph of Andrew,
HARTNETT acknowledged that it was not a very good photograph
compared to the one taken of Jackie during daylight hours. He
also noted that the camera comprised was "not usually good quality

CONFIDENTIAL: DOCUMENT
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 02 C 6722

000104

30

camera." HARTNETT stated that the last time he saw Andrew WILSON was when he left his interview room at approximately 2045 hours, immediately after WILSON had signed the back of his photograph.

During cross-examination in the second trial, HARTNETT also testified that the only injury he observed on Andrew WILSON was a cut above his right eye, which appeared to show evidence of a previous injury. He stated, however, he did not view his chest or legs. HARTNETT stated that at no time did WILSON make any complaint to him that he had been mistreated or tortured. Contrary to WILSON's testimony, he denied ever telling WILSON that there was "nothing he could do about it."

MICHAEL ANGAROLA

Research indicates that on 14 February 1982, Michael ANGAROLA was an Assistant State's Attorney assigned to the Felony Review Unit, State's Attorney's Office. Despite reports and testimony indicating that ASA ANGAROLA was present during at least a portion of Andrew WILSON's detainment at Area 2, there was no evidence of any reports or testimony from ASA ANGAROLA regarding his observations on that date.

ASA ANGAROLA is deceased.

KATHLEEN WARNICK

Kathleen WARNICK, an Assistant State's Attorney, testified as a defense witness during the second civil trial. WARNICK, who was assigned to the felony review unit at the time in question, stated that on 14 February 1982, sometime after the breakfast hour, she received an assignment to go to Area Two. She was informed that she would be assisting in the investigation of the murder of two Chicago Police officers.

ASA WARNICK stated that she arrived at the area between approximately 0900 and 1000 hours. She proceeded to a large common area on the second floor, where she had a conversation with Larry HYMAN, her supervisor at the time. HYMAN told her she may be needed at some point, at which time she sat in an area opposite the interview rooms and waited until she was called on. ASA WARNICK testified that sometime in the afternoon, after 1500 hours, Attorney HYMAN asked her to witness a statement that had already been taken. At this time, she proceeded to a small common area and witnessed the signing and review of Derrick MARTIN's statement. WARNICK stated that a detective with the last name "RYAN" was also present.

During her testimony, ASA WARNICK was shown a copy of Derrick MARTIN's statement, which indicated that the statement

**000105**

ended at 1550 hours. Based on this information, ASA WARNICK
projected that it would have taken until approximately 1650 hours
before the typed statement would have been signed and completed.
She stated that following the witnessing of the statement, she
went to Area One and then home. She did not return to Area Two
on that date.

WARNICK testified that at no time while she was waiting in
the large common area did she see either Andrew or Jackie WILSON.
She recalled a lot of activity in the area, but she had no
recollection of any bare-shirted prisoner being led to the
telephones; she said she "would have remembered something like
that."

During cross-examination, WARNICK stated that she was never
called to testify prior to this proceeding. Further, she
testified that the first time anyone spoke to her regarding her
knowledge of what she observed on the date in question was one
month ago when she was contacted by counsel for the defense.


JOHN YUCAITIS

On the date and time in question, John YUCAITIS was a
detective assigned to Area Two Violent Crimes. Detective
YUCAITIS provided testimony during the Motion to Suppress
hearing, both civil trials and in a deposition in September 1988.
His account of what happened is basically consistent throughout
each of his testimonies.

Detective YUCAITIS stated that on 14 February 1982, he
assisted in the arrest of Andrew WILSON. His account of the
events at 5301 West Jackson supports the testimony of Captain
McCARTHY and the other officers at the scene. Following the
arrest, Detective YUCAITIS was one of the four transporting
officers who drove WILSON to Area Two. He was accompanied by
Detectives George KARL, James PIENTA and Leonard BAJENSKI, all
assigned to Area Two Violent Crimes. Detective YUCAITIS
testified that prior to leaving the scene, the only instruction
he received from Lieutenant BURGE was to take WILSON to the area
and not to talk to him or let anything happen to him.

Upon arrival at Area Two, at approximately 0600 hours,
WILSON was escorted to the second floor and placed in the
"second" interview room located "one room over" from Lieutenant
BURGE's, along the building's south wall. Detective YUCAITIS,
according to his testimony, unzipped the jacket that had been
placed over WILSON, removed his handcuffs, handed him his shirt
and jacket, and after WILSON put on his shirt and jacket,
rehandcuffed him to a ring on the wall.

Detective YUCAITIS stated that _____, he assumed his

CONFIDENTIAL.DOC
PURSUANT TO DOCUMENT PRODUCED
ENTERED IN TO PROTECTIVE ORDER
90 C 6721

000106

32

role of sentry and stood guard outside the interview room where WILSON was detained. He remained at this post, located approximately ten to fifteen feet away from the door, until approximately 1500 hours when WILSON was transported to Area One. In his testimony, Detective YUCAITIS acknowledged that his role on 14 February 1982 was to make sure nobody got to Andrew WILSON. He also stated that to the best of his recollection, this was the only case where he got a specific warning to make sure nothing happened to a prisoner.

The only injuries Detective YUCAITIS observed, according to his testimony, were a scratch or abrasion near WILSON's right eye and a scabbed-up older injury on his forehead. Detective YUCAITIS testified that to the best of his recollection, the only persons he ever observed enter Andrew WILSON's interview room were Detectives O'HARA and McKENNA. He stated that he observed the detectives enter the room at approximately 0700 hours and leave one-half hour later. Detective McKENNA typed for a short while and then he and Detective O'HARA then walked towards Lieutenant BURGE's office. Detective O'HARA re-entered WILSON's room at "noontime" and after a short while, he escorted WILSON towards the bathroom. Approximately one hour later, according to Detective's YUCAITIS' testimony, Detective O'HARA brought WILSON some food.

Detective YUCAITIS recalled that he left the security area only to use the bathroom and get food and that he was never gone longer than five minutes each time. During these occasions, he was replaced by Detectives KARL, in the early morning, and DIOGUARDI, later in the morning.

In response to WILSON's allegations, Detective YUCAITIS stated that he did not reenter WILSON's interview room after first escorting him into the station. He denied ever striking or using any electroshock device on WILSON. He also stated that at no time did he observe anyone mistreat WILSON, nor did he hear any screaming or beating sounds while he was posted outside WILSON's door.

During questioning in the second civil trial, Detective YUCAITIS testified that after learning about the injuries sustained by Andrew WILSON and WILSON's allegations regarding their cause, he never made any inquiry as to what happened. He further testified that despite his guard position on the date and time in question (he testified that he knew just about everybody who was with Andrew WILSON every minute from the time of his arrest to when WILSON left at 1500 hours), no one, prior to the Motion to Suppress hearing, ever questioned him concerning his knowledge and observations.

On the issue of the "cold" radiator, which was introduced during the civil trials, Detective YUCAITIS, in the company of

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 40 C 672

000107

several other officers who testified, waffled during cross-examination as to whether or not the radiator worked in Room #2. During the second trial, he first testified that he believed the radiator in Room #2 did not work. Finally, after more questioning, he stated, "I would have to say honestly I don't know."

## PIENTA, KARL, AND BAJENSKI

Detectives James PIENTA, Leonard BAJENSKI and George KARL, three of the Area Two Violent Crimes officers who transported Andrew WILSON from the scene of arrest to Area Two Headquarters, all provided similar accounts of the incident consistent with the testimony of Detective YUCAITIS. Except for Detective PIENTA, who did not testify at the Motion to Suppress hearing, all three detectives testified at both that proceeding and in the civil trials. Although Andrew WILSON testified that the transporting officers were present when he was beaten upon his arrival at Area Two, none of these officers were named as accused in either civil complaint.

All three detectives stated that they were at the scene of arrest, but that they did not participate in the physical arrest of WILSON. Detectives PIENTA and BAJENSKI stated that the first time they saw WILSON was when they observed him being escorted out of the apartment at the location; Detective KARL stated that he assisted Detective YUCAITIS in physically removing WILSON from the premises and placing him in their unmarked vehicle.

Consistent with Detective YUCAITIS's testimony, the three detectives stated that prior to leaving the scene, Lieutenant BURGE told them to take WILSON directly to the station and not to have any conversation with him. Detective BAJENSKI also recalled that Lieutenant BURGE told the detectives to handle WILSON "with kid gloves." They stated that upon arrival at the station, WILSON was escorted to one of the interview rooms on the second floor. During their civil trial testimony, they identified this room as the center interview room, also referred to as Interview Room #2. The detectives, in corroboration of Detective YUCAITIS's account, stated that after WILSON was placed in the room and unhandcuffed, Detective YUCAITIS gave WILSON his shirt and also placed his jacket over him.

All three officers confirmed Detective YUCAITIS's testimony that WILSON was not placed in the Property Crimes area prior to being placed in the interview room. They stated that the reference in the Case Report indicating that WILSON had been in the Property Crimes unit must have been a mistake. They all testified that after placing WILSON in the interview room, they did not have further contact with him. Detectives PIENTA and KARL stated that they left Area Two at approximately 0800 hours;

CONFIDENTIAL
THIS DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722.

000108

-34

approximately 1200 hours.   Detective KARL also testified, in
support of Detective YUCAITIS's statements, that he and Detective
YUCAITIS sat at a table directly outside Andrew WILSON's
interview room.   In his civil trial testimony, Detective KARL
stated that he remained at that location for approximately one to
one and one quarter hours, after which he left and went home.   He
did not see Andrew WILSON again on that date.

Detectives PIENTA and BAJENSKI stated that they did not
observe any injuries on WILSON.   Detective KARL related that the
only injury he observed was a slight scratch above WILSON's right
eye and that it was not bleeding.   All three denied witnessing
any officer abuse or mistreat WILSON, nor did they hear
Lieutenant BURGE make any remark about getting WILSON when they
got back to the station.

During cross-examination in the second civil trial,
Detective KARL was asked if he observed Lieutenant BURGE enter
Interview Room #2 after BURGE's arrival at Area Two.   Detective
KARL related that he did not.   At this time, Detective KARL's
deposition testimony was cited:

"Q. Did you see anyone enter the interview room?
A. At that time, no.
Q. Well ,subsequently did you see someone enter the
   interview room?
A. Yes. Lieutenant BURGE came to Area Two.   I believe
   he went in there.   I don't recall if he did right away
   or not.   I don't know exactly what time he went into
   the interview room."

All three officers stated that they did not write any
reports regarding their activities or observations on the date in
question.


DAVID DIOGUARDI

David DIOGUARDI testified in the Motion to Suppress hearing
and in a deposition in December 1988.   At the time of the
incident in question, he was a detective assigned to the Area Two
Violent Crimes Unit.   Detective DIOGUARDI was named by Detective
YUCAITIS as one of the officers who on occasion "relieved" him
from his post outside the interview room where Andrew WILSON was
being held.

Detective DIOGUARDI testified that he observed Andrew WILSON
when he was brought to the station on 14 February; he could not
recall the time when he first observed him.   Detective DIOGUARDI
stated that at this time, he noticed an injury near one of
WILSON's eyes.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000109

35

He stated that he next observed WILSON at approximately 1500 hours, when he observed him being removed from the interview room. He saw WILSON again at between 1700 and 1800 hours. Detective DIOGUARDI stated that on both occasions when he observed WILSON in the afternoon, he saw the same injury that he had observed earlier in the day. Detective DIOGUARDI testified that he did not leave the area until approximately 2100 or 2200 hours, and that the majority of the time he was within fifteen to twenty feet from the door of WILSON's interview room.

Detective DIOGUARDI stated that at no time did he hear anyone scream nor did he hear the sounds of someone being beaten.

PATRICK O'HARA

On 14 February 1982, Patrick O'HARA was a detective assigned to Area Two Violent Crimes. Detective O'HARA testified in the Motion to Suppress hearing, both civil trials and in a deposition in September 1988.

Detective O'HARA's account, as reflected in the analyzed testimony, provides a story that corroborates the accounts of the other officers who testified. Detective O'HARA stated that on the date in question, he was assigned to the murder investigation of Officers FAHEY and O'BRIEN, along with Detectives MCKENNA and HILL. During that investigation, he reported directly to Lieutenant Jon BURGE.

Detective O'HARA stated that he returned to Area Two following Andrew WILSON's arrest where he was present at the scene. At approximately 0645 to 0650 hours, he observed WILSON in Interview Room #2 on the second floor of Area Two Headquarters. (Detective O'HARA designated this room as "Interview Room #2" in a diagram of the area's second floor which he created during his deposition.) The only injury he observed on WILSON was a cut above the right eye that had a little blood. Detective O'HARA stated that he read the Miranda warnings to WILSON -- using a pre-printed card -- after which WILSON voluntarily confessed to the murders of the two slain officers. Detective O'HARA asked WILSON if he would like medical attention; WILSON declined.

After taking WILSON's oral statement, Detectives O'HARA and MCKENNA left the room and proceeded to a desk in the common area, where MCKENNA typed up notes regarding their conversation with WILSON. The detectives then went to Lieutenant BURGE's office and informed him what WILSON had told them. At this time, Lieutenant BURGE related that an Assistant State's Attorney would be coming into the area.

Detective O'HARA testified that he next saw WILSON shortly

CONFIDENTIAL; DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722

000110

after noon, when he accompanied WILSON to the bathroom. Prior to that time, according to Detective O'HARA's testimony, at approximately 1015 hours, he and Detective MCKENNA took an oral statement from Jackie WILSON, who was being detained in the Case Management Office.

During testimony, Detective O'HARA stated that to the best of his recollection, no one besides himself and Detective MCKENNA entered Andrew WILSON's interview room prior to 1500 hours, when WILSON was transported to Area One for a line-up. Further, he stated that he does not recall Detective MCKENNA entering the room anytime after noon. Detective O'HARA stated that approximately one hour after taking WILSON to the bathroom, he brought the prisoner some food. Consistent with the testimony of other officers and with WILSON, Detective O'HARA stated that he and Detective MCKENNA transported WILSON back to Area Two after the lineup.

Detective O'HARA stated that he next had contact with Andrew WILSON at approximately 1730 hours, when he witnessed WILSON's oral statement to ASA HYMAN. Detective O'HARA stated that he was also present during WILSON's court-reported statement at 1800 hours. His account of these events was consistent with those of ASA HYMAN and the court reporter, HARTNETT. Detective O'HARA testified that when he last observed WILSON on that date, at approximately 2100 to 2130 hours, he was being escorted from the interview room by two uniformed police officers. At this time, he did not observe any other injuries other than the scratch or cut he observed earlier in the day.

During the second civil trial, Detective O'HARA was questioned extensively regarding the fact that WILSON's formal statement was not obtained until approximately 1800 hours. Detective O'HARA confirmed that ASA HYMAN arrived at the area at approximately 0815 to 0830 hours, at which time HYMAN was informed about the oral confession by WILSON. During examination (as an adverse witness for the plaintiff) Detective O'HARA was asked:

> "Q. ... in the interest of creating the best case for the prosecution, it would have been in the interest to get a written statement from Andrew WILSON as soon as possible, right?"
> "A. Yes, sir."

Detective O'HARA testified in this trial that he was with Andrew WILSON probably more than anybody else on the date in question. He stated that at no time did he observe or hear anyone abuse or threaten WILSON.

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6712

000111

## THOMAS McKENNA

Thomas McKENNA, on 14 February 1982, was a detective assigned to the Area Two Violent Crimes Unit. Detective McKENNA related his account of the incident during the Motion to Suppress hearing, both civil trials and in a deposition in December 1988. His testimony was basically consistent and his story closely matched the account of Detective O'HARA.

Detective McKENNA additionally testified that the last time he spoke with Andrew WILSON at Area Two was when he interviewed him prior to 0830 hours. He stated that at this time, he asked WILSON, "Do you know why you are here? Do you know why you were arrested?" According to Detective McKENNA's civil trial testimony, WILSON responded , "Yes, because I killed two police officers."

Detective McKENNA also testified, in concert with several other officers' accounts, that he observed Detective Fred HILL at the lineup at Area One, but that he did not see him prior to this on the date in question.

Regarding the Case Report, Detective McKENNA stated that he assisted Detectives O'HARA and HILL in the preparation of the twenty-nine page supplemental report; he stated that he typed up most of the report and that after typing it, he threw away his notes.

Detective McKENNA also testified, consistent with his deposition testimony, that to the best of his recollection, the radiator in Interview Room #2, where Andrew WILSON was detained, did not work on the date in question, nor did it ever work during Detective MCKENNA's assignment at Area Two.

In response to the allegation that he threatened WILSON, Detective McKENNA denied making any comment to WILSON to the effect that he does not believe in torture and would rather kill WILSON. He stated that at no time did he abuse or threaten WILSON, not did any other officer abuse or threaten WILSON in his presence.

## JON BURGE

On 14 February 1982, Jon BURGE was a Lieutenant of Police, assigned as the commanding officer of Area Two Violent Crimes. Lieutenant BURGE testified on numerous occasions regarding his involvement in the WILSON case -- as he indicated during his testimony, he was "in charge" of the detective division phase of the Area Two FAHEY/O'BRIEN murder investigation. The analyzed testimony of Lieutenant BURGE included his Motion to Suppress and Civil Trial II testimony.

CONFIDENTIAL DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

000112

Lieutenant BURGE provided an account that closely mirrored the testimony offered by the other involved officers. His various testimony regarding what happened at the scene of arrest was highly consistent with that of the other officers involved in WILSON's arrest. In support of other officers' witness accounts, Lieutenant BURGE stated that he told the transporting officers, prior to WILSON being driven to Area Two, "not to carry on any conversation with him while en route and to treat him with kid gloves." Lieutenant BURGE denied making any comment to the effect that they would get him at the station.

Regarding his activities and observations upon arrival at the station, Lieutenant BURGE's testimony again corroborated the testimony of the other officers. He stated that he arrived at Area Two at approximately 0615 hours or 0630 hours. At approximately 1300 hours, he went to the Office of the Superintendent, where he remained for approximately two hours. He then went to the lineup at Area One headquarters, arriving at approximately 1530 hours. Following the lineup, at approximately 1730 or 1745 hours, he returned to Area Two.

Lieutenant BURGE stated that on the date on question, he observed WILSON at Area Two on a couple of occasions. He could not recall the specific times but indicated that on one of the occasions, he saw WILSON, sometime before noon, passing his office en route to the bathroom. When he observed WILSON on those occasions, he noticed a little redness to WILSON's right eye; he recalled that it looked "bloodshot." Lieutenant BURGE denied having any conversation or contact with WILSON while at Area One headquarters.

During both proceedings, Lieutenant BURGE was questioned extensively regarding his contact with WILSON at Area Two and his observations concerning other officers' contact with WILSON. Lieutenant BURGE stated that to the best of his recollection, Detectives O'HARA and MCKENNA were the only two officers who entered WILSON's interview room on the date in question. Lieutenant BURGE explained that it was understood by everyone involved that Detectives O'HARA and MCKENNA would question WILSON, as they were "the two people who were most knowledgeable regarding the entirety of the investigation." Lieutenant BURGE also stated that on several occasions, he observed Detective DIOGUARDI sitting at a table approximately eight to ten feet from the door of the interview room where WILSON was detained.

Consistently throughout his testimony, Lieutenant BURGE testified that at no time on the date in question did he enter WILSON's interview room. He stated that he was concerned about what was going on inside, but that the only time he remembers seeing WILSON at Area Two was when WILSON walked by his office. When asked if he ever stood near the door to listen to how the

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6222

000113

interrogation was proceeding, Lieutenant BURGE responded, "I don't believe I did." During both proceedings, Lieutenant BURGE testified that in the past, as commanding officer, he had at times entered or stood near the door of an interview room to ensure that an interrogation was proceeding well and that there was no misconduct on the part of the interrogating officers.

After being reminded of his admonishment to the transporting officers to treat WILSON with "kid gloves", Lieutenant BURGE was again asked about his testimony that he never entered the room to check on any possible mistreatment. Lieutenant BURGE responded, "I didn't feel I had to."

On the issue of which room WILSON was detained in, Lieutenant BURGE, in harmony with the other officers, offered testimony that was ambiguous, uneven and inconsistent. During the Motion to Suppress, Lieutenant BURGE stated that WILSON was handcuffed to the wall in the room "next door" to his office. Lieutenant BURGE testified that while he was in his office, he did not hear any voices, or any sounds of beating or screaming coming from this room. In his deposition of October 1988, Lieutenant BURGE again testified that WILSON was in a room "next door" to his office, but in this testimony, he indicated that next door or "adjacent" did not necessarily mean immediately next door.

After a brief discussion of semantics, Lieutenant BURGE stated that WILSON could have been in any of the rooms on the south wall near his office; he testified that he did not recall which room, but that he believed WILSON was held in the second room from his office heading east. The ambiguity of Lieutenant BURGE's prior testimony is pointed out during his examination in the second civil trial. At this time, in reference to the designations noted on the diagram exhibit, Lieutenant BURGE testified that he did not have a "present recollection" whether WILSON was detained in Room #1 or #2. Lieutenant BURGE, who acknowledged that he was present when his fellow defendants were deposed prior to his deposition, stated that the reason he later identified the room as Room #2 was that after hearing the other testimony, he thought he was probably wrong "due to the fact that I was not in the interview room with him myself."

Regarding the radiator question, Lieutenant BURGE, in his deposition, stated that the non-functioning radiator was in Interview Room #2. In his civil trial testimony, however, he stated, in accordance with the "waffling" testimony of other officers in regard to this issue, that he did not recall which room had the radiator that did not work. In the civil trial, Lieutenant BURGE stated that the radiator in one of the rooms did not work on the date in question and, had not worked for some period of time.

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6222.

40

During testimony, Lieutenant BURGE also testified that whichever room WILSON was in, he was in that room the entire time he was at Area Two. Lieutenant BURGE stated that he had no knowledge of WILSON ever being place in the Property Crimes area, despite this indication in the investigation's Case Report. Lieutenant BURGE testified that he read and approved the report, but stated that "it must have been an oversight on my part ..."

Lieutenant BURGE testified that he could not recall previously being assigned to an investigation as large and significant as the FAHEY/O'BRIEN case. He also testified that during the five days prior to 13 or 14 February, he had gotten little "if any" sleep.

In response to the allegations, Lieutenant BURGE testified that at no time did he shock, strike, or threaten WILSON. He further testified that he did not hear or observe any other officer mistreat WILSON in any way.

In addition to Sergeant William BATTS, several other persons were named in various testimony as having been present at some time during Andrew WILSON's detention at Area Two. Due to time considerations, and the lack of any evidence indicating that any of these persons participated in or were eyewitnesses to the alleged incident, the testimony from these witnesses was not analyzed at this time.


MARIO FERRO

The only testimony provided by Mario FERRO was during a telephone deposition on 6 January 1989. FERRO, who is currently living in Florida, retired from the Chicago Police Department in June 1983. On 14 February 1982, he was a police officer assigned to the 006th District.

Officer FERRO testified that on 14 February 1982, he was assigned to a squadrol with partner William MULVANEY, now deceased. Officer FERRO stated that he received a radio assignment to transport Andrew WILSON from Area Two Violent Crimes to 1121 South State. He stated that at the time of the assignment, he knew that WILSON had been arrested for the murders of two Chicago Police officers.

During testimony, Officer FERRO stated that upon arrival at Area Two, he and his partner entered through the front entrance and proceeded to the second floor. There, he observed several police officers in a small interview room. He asked one of the officers, whom he identified as Lieutenant BURGE, whether the prisoner in the room was the one that killed the policeman. Officer FERRO stated that BURGE responded, "that's the man." Officer FERRO stated that Lieutenant BURGE was the only person

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 90 C 6722

41

with whom he had any conversation. He did not know the names of any of the other officers.

Officer FERRO stated that when he entered the room, along with Officer MULVANEY, WILSON was sitting down next to a radiator, dressed in a shirt and pants. He could not recall if he was handcuffed at the time. Officer FERRO stated that at this time, he and his partner handcuffed WILSON and escorted him out of the building. Officer FERRO and Officer MULVANEY then placed WILSON in the back of the squadrol and transported him to the men's lockup at 11th and State.

Officer FERRO testified that WILSON was a "cooperative prisoner" and that he did not resist in any way. He stated that he "thinks" WILSON tripped and fell when he was placed in the squadrol, but that he is "not sure". Officer FERRO did not recall WILSON being injured, nor did he recall observing any blood on WILSON. Officer FERRO also stated that the squadrol was heated through the vehicle's heating system in which hot air was blown back into the back of the squadrol.

Upon arrival at the lockup, at least one uniformed police officer refused to admit WILSON, according to Officer FERRO's testimony. Officer FERRO stated he was refused because " he had a bruise on his face somewhere ..." He further testified: " I kind of remember a bruise under his eye." Officer FERRO could not recall if any of the lockup personnel filled out any forms in his presence.

' Officer FERRO stated that he and his partner then transported WILSON to Mercy Hospital's emergency room. Officer FERRO recalled WILSON receiving some treatment and that they remained at the hospital a couple of hours. Officer FERRO and MULVANEY then drove WILSON back to 11th and State, at which time he was admitted.

Officer FERRO testified that at no time did he fill out any forms with respect to his contact with WILSON.

During his deposition, Officer FERRO was also questioned regarding his knowledge of how WILSON sustained his injuries. Officer FERRO testified that he first learned that WILSON appeared to be suffering from several injuries when he read the newspaper several days after his contact with WILSON. Officer FERRO stated that WILSON may have hit his chin when he fell. In regard to the other injuries, Officer FERRO stated that he was with WILSON the entire time he was in his custody and that he does not know of any way WILSON could have sustained any burns during that time. He stated that when he watched WILSON through the window of the squadrol, he observed WILSON sitting and not "behaving unusually".

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722

000116

42

When questioned regarding his prior involvement with the WILSON case, Officer FERRO responded that he was never contacted regarding WILSON's criminal trial and that he had no previous knowledge of an OPS investigation. He stated that he first learned of the civil suit several months prior to this deposition and that he had discussed the case with no one except his attorney. Further, Officer FERRO testified that after first learning about the injuries, he did not make any inquiries as to how the injuries were sustained, nor did he recall any police personnel having any discussion with him concerning his contact with WILSON.

Although Officer FERRO was named as a party in the pro se complaint, he was not charged in the amended suits. He did not testify at either civil trial.

WILLIAM MULVANEY

Police Department records indicate that Police Officer William MULVANEY, Star #07847, formerly assigned to the 006th District, passed away on 5 August 1983.

ATTENDANCE AND ASSIGNMENT RECORDS

During the course of the civil proceedings, only one lockupkeeper from Central Detention, Salvatore MIGLIERI, was interviewed regarding the incident. Officer MIGLIERI worked Third Watch, 1400 to 2200 hours, on 14 February 1982. Although the testimony -- from Andrew WILSON and from Area Two personnel -- is vague regarding the specific time WILSON was first transported to the lockup, and despite WILSON's testimony that he observed the same lockupkeepers upon his return from Mercy Hospital, no First Watch (15 February 1982) personnel were interviewed.

Prior to 1989, no lockupkeepers testified regarding the incident.

SALVATORE MIGLIERI

In a deposition given on 20 January 1989, Officer Salvatore MIGLIERI stated, after referring to Attendance and Assignment Records, that on 14 February 1982, he was assigned to the lockup at Central Detention, 1121 South State, 11th floor, and that his duty hours on that date were 1400 to 2200 hours or Third Watch. Officer MIGLIERI stated that during his tour on that date, as indicated in the A & A sheets, he was assigned to check one of the two cell blocks located on the floor. Officer MIGLIERI related that he had no recollection of observing Andrew WILSON in

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

the lockup during his tour of duty on that date; nor did he
recall any incident on that date in which a prisoner was brought
into the lockup and then refused admittance by one of the lockup
personnel. He further stated that he did not recall any officers
named FERRO or MULVANEY.

Although Officer MIGLIERI did not provide any testimony
specifically regarding the incident, he did furnish information
relating to general procedures and conduct in the Central
Detention lockup circa 1982. Officer MIGLIERI stated that each
cell in the lockup had a bench -- affixed to the wall -- a toilet
and a sink. Some also had built-in lighting, which was screened
off so that prisoners could not have access to it. He stated
that at the time in question, the lockup had a central-type of
hot water heating system. To the best of his recollection,
there were either radiators or hot water pipes in the ceiling;
there were no heating units in any of the individual cells. He
testified that there was usually one person per cell.

Regarding the records kept by lockup personnel on the date
in question, Officer MIGLIERI stated that personnel kept only a
temporary record of prisoners in their custody. When questioned
regarding the "Receiving Screening Record for Arrestee to be Held
in Lockup", Officer MIGLIERI stated that he did not recall
whether this form was in use on the date in question, and
further, that he did not recall any form documenting a prisoner's
injuries in existence prior to this currently-used form. In
regard to prisoner's property, Officer MIGLIERI stated that a
prisoner's property was taken upon arrival in the lockup. This
included belts, watches, rings, jewelry, anything in pockets,
possibly even eyeglasses.


LOCKUP SCREENING RECORD

The "Receiving Screening Record for Arrestee to be Held in
Lockup" became effective as a Chicago Police Department form on
20 June 1982, according to the Research and Development
Division's Forms Unit.


MERCY HOSPITAL - MEDICAL RECORD

The Progress Notes -- Ambulatory Services/Medical Treatment
Record from Mercy Hospital and Medical Center indicates that on
14 February 1982, at 2245 hours, Andrew WILSON was admitted to
the facility's emergency room while in police custody.

According to page one of the report, the patient's "chief
complaint" was multiple lacerations. The brief history section,
also on page one, signed by "MURNANE" indicates that the

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722

000118

44

patient stated he fell and notes multiple laceration of face, laceration over eye, laceration on the back of head and scratch marks on the chest. The names "MULVANEY" and "FERRO" are written in the upper right hand corner of the page.

Notes from the examining physician, "Geoffrey KORN, M.D.", also appear on page one and continue through page four of the report. The time "1115p" appears adjacent to Doctor KORN's notes, which indicate that the patient has multiple bruises and lacerations. He notes that the "patient claims that he fell outside the police station and incurred all the injuries in that fashion."' The injuries noted by Doctor KORN include several small conjunctival hemorrhages to the right eye, ecchymosis below the right eyelid, a one centimeter laceration above the left eyebrow with fresh blood, two eight-centimeter long linear abrasions to the right cheek, numerous small abrasions under the right chin, a one centimeter laceration to the left occipital scalp, numerous abrasions and ecchymotic bruises on the anterior chest wall, several abrasions to the right deltoid, fifteen centimeter long linear by three centimeter wide freshly denuded area along anterior lateral aspect of right thigh with piled up superficial layers of skin at the edges, and erythema about both wrists.

Page three of the record reports Doctor KORN's Initial Impression: multiple facial and scalp bruises and lacerations, and lacerations and bruises on anterior chest, right upper arm and second degree burn to right thigh. Also included on page three of the record is the doctor's "planned workup" and a "Note". In his "note", Doctor KORN relates that he was unable to proceed with the above workup and treatment due to an occurrence during the examination, in which Officer MULVANEY held his service revolver in his hand and refused to put it away when Doctor KORN requested that he do so. When Doctor KORN explained to Officer MULVANEY that he would not work on the patient with a drawn revolver in the room, Officer MULVANEY "became infuriated and claimed that he would take him to Cook County Hospital." The notes further indicate that after Doctor KORN exited the room, Officer FERRO entered the room and then subsequently came out and claimed that the patient was now refusing treatment. Doctor KORN's notes indicate: "I then went back to talk to the patient who though previously seemed desirous of evaluation and treatment now stated that he did not want to be treated."

Doctor KORN's notes also indicate that the patient signed an AMA form.

Page five of the Progress Notes were completed by "P. REYNOLDS, Rn." The time indicated next to her notes is "1140p" Nurse REYNOLDS, in addition to similar information as reported by Doctor KORN, states that after she brought the patient into treatment Room Number Five, Officer FERRO stated, "If this guy

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722

000119

45

knows what's good for him, he'll refuse treatment." When Officer
FERRO then asked the patient if he wanted to be treated, the
patient replied, "no." Nurse REYNOLDS then explained that a
chart still needed to be completed, at which time the clerk came
in to take the information. Nurse REYNOLDS notes: "The clerk
then asked the patient if he wanted treatment, and he shook his
head no, and when the officers turned away he nodded yes." She
notes that the patient signed for consent. She further notes
that the officers were very resistant and had to be coerced into
allowing the patient's cuffs and shackles to be removed so that
the patient could be undressed for the examination.

The last page of the report is a copy of the "Medicolegal"
Release from Responsibilities for Discharge, also known as the
Against Medical Advice form. The release bears two signatures,
one of "P. REYNOLDS, Rn" and the other, "Andrew WILSON."


PATRICIA REYNOLDS-CROSSEN

Patricia REYNOLDS-CROSSEN, a registered nurse, was a staff
nurse in the emergency room of Mercy Hospital at the time of
Andrew WILSON's visit on 14 February 1982. Nurse REYNOLDS
testified during the suppression hearing and the civil trials, at
which time she provided accounts that conformed with her notes in
the Mercy Hospital medical record and were remarkably consistent
with Andrew WILSON's account.

Nurse REYNOLDS stated that at approximately 2215 or 2230
hours, Officers MULVANEY and FERRO escorted Andrew WILSON into
the emergency room, at which time she observed a laceration with
blood on WILSON's forehead. Nurse REYNOLDS directed them to a
treatment room, at which time Officer FERRO said "if this guy
knew what was good for him, he would refuse treatment". Nurse
REYNOLDS stated that she escorted the officers and WILSON, who
was handcuffed and wearing leg shackles, to the treatment room
and explained to the officers that a chart still needed to be
completed.

Thaddeus WILLIAMS, a ward clerk, then came to the room and
obtained the needed information. The officers again stated that
WILSON did not want treatment. The ward clerk explained to
WILSON that he had injuries and that it was his right to see the
doctor if he wanted to. Nurse REYNOLDS testified, as indicated
in the medical record notes, that she again asked WILSON if he
wanted treatment; he nodded "no." Then, when the officers looked
away for a moment, WILSON nodded "yes". She handed WILSON a
consent form for treatment, and at 2250 hours, in her presence,
he signed.

The remainder of Nurse REYNOLDS' account is fairly
consistent in both testimony she provided. She stated that

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 70 C 6722

000120

46

after WILSON was prepped for examination, Doctor KORN, the
attending physician, entered the room.  An argument ensued
regarding whether the officers would release WILSON's handcuffs
and shackles so that WILSON could be treated.  After the officers
finally complied, WILSON's pants and shirt were removed.  Nurse
REYNOLDS stated that at this time she observed linear scratches
on WILSON's chest and a long linear mark on his right thigh which
appeared to be a burn.  She also observed a laceration to the
back of WILSON's head.  In the second civil trial, Nurse REYNOLDS
also clarified that the injuries on WILSON's chest, which she
referred as linear marks in prior statements, also appeared to be
"burns".

Nurse REYNOLDS stated that after she told Doctor KORN that
the patient was undressed, Doctor KORN reentered the treatment
room.  A short time later, he exited and related that he could
not treat WILSON because the officer present had drawn his
revolver.  She learned that WILSON had indicated to Doctor KORN
that he did not want treatment.  Nurse REYNOLDS stated that she
then asked WILSON if he wanted to sign out against medical
advice, at which time he nodded "yes" and signed the form at 2342
hours.

THADDEUS WILLIAMS AND PATIENT Consent Form

Thaddeus WILLIAMS, the Mercy Hospital ward clerk who
allegedly witnessed Officers FERRO's and MULVANEY's attempts to
coerce WILSON into refusing treatment, was not interviewed during
any of the proceedings.  His account of the incident is therefore
not included in this investigation.

The Patient Consent Form which Nurse REYNOLDS referred to in
here testimony was not included in the medical records obtained
from Mercy Hospital.

DOCTOR GEOFFREY KORN

In February 1982, Doctor Geoffrey KORN was on staff as an
attending physician in the emergency department at Mercy
Hospital.  Doctor KORN provided his account during the Motion to
Suppress Hearing, a deposition (December 1988) and in the two
civil trials.  His testimony reflected basically the same
information that was contained in the Mercy Hospital medical
record and was consistent with the testimony of Nurse REYNOLDS
as well as that of the victim, Andrew WILSON.

Doctor KORN, as indicated in the emergency room record,
stated that he first had contact with Andrew WILSON on 14
February 1982, at 2315 hours, when he observed WILSON handcuffed
to a cart in the middle of the examining room.  Doctor KORN

CONFIDENTIAL
PURSUANT TO DOCUMENT PRODUCED
ENTERED IN PROTECTIVE ORDER
90 C 6722

47

related that he attempted to find out what happened: "the most I can remember him saying was that he fell." According to Doctor KORN's testimony, two uniformed police officers, hospital security guards and nurses were also present at this time.

Doctor KORN stated that he then proceeded to examine WILSON, at which time he observed a total of at least fifteen separate injuries, including two cuts on the face (one above the right eyebrow, one above the left eyebrow), a cut to the back of the head, red streaks or abrasions (two to three inches long) across the right cheek, red linear markings on the chest wall, a blackened eye, bleeding on the surface of the right eye, and what appeared to be a second-degree burn on the right thigh (six inches long, one and one-half to two inches wide).

During the various proceedings during which Doctor KORN testified, he was shown photographs of Andrew WILSON taken on 16 February 1982, two days after Doctor KORN's examination. Upon viewing the photographs, which showed various injuries on WILSON's head, face, chest and thigh, Doctor KORN testified that the wounds depicted in the photographs looked consistent with those he observed at the time of his examination except that the injuries looked slightly older.

During his testimony in the second civil trial, Doctor KORN also stated that to the best of his recollection, and based on his notes in the patient's chart, most of the wounds that he observed on WILSON during the examination appeared to have been sustained within the past few hours. Specifically in regard to the thigh wound, which he characterized as a second degree burn, Doctor KORN, in his Motion to Suppress testimony, stated that "it was fairly recent, within eight hours." Doctor KORN stated that he did not note any injuries to WILSON's ears, or knees, nor did he recall any cigarette burns.

During the suppression hearing, upon viewing photographs of WILSON's chest, Doctor KORN testified that the injuries depicted were similar to those he had observed. He stated based on their "blistered" appearance in the photographs (he did not observe any blisters at the time of his exam), the injuries looked like several-day-old burns. In his deposition seven years later, however, Doctor KORN stated that the injuries were not burns and "there could be several ways of sustaining those injuries." This issue was also raised during the civil trial, at which time Doctor KORN again viewed the photographs of WILSON's chest taken on 16 February 1982. During that testimony, Doctor KORN stated that the injuries could be consistent with a burn and that it can take up to twenty-four hours to actually see blisters form after a burn: "My experience is that they often look entirely different twenty-four hours later than they do on the first visit."

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722.

48

## BARBARA STEINBERG

Barbara STEINBERG, named by Andrew WILSON as the first person to whom he reported the allegations of abuse, provided testimony during a deposition on 6 February 1989 and in the second civil trial (where she appeared as a plaintiff's witness). Her account strongly paralleled that of Andrew WILSON.

STEINBERG, an Assistant Public Defender, stated that on 15 February 1982, she was assigned to bond court at 26th and California. STEINBERG stated that she first observed Andrew WILSON in the lockup area for bond court. She stated that her normal routine was to arrive approximately thirty to forty minutes before 0900 hours, the time bond court began, and that she always went to the lockup before the hearings. She testified that on the date in question, Andrew was in a lockup with his brother Jackie. STEINBERG stated that she talked only to Andrew, who related to her that he had been beaten up and shocked. She did not recall the specifics of their conversation. However, she stated that as a result of what he told her, she concluded that "it had been done to him by the police."

During her testimony, STEINBERG recalled her observations from that date. She stated that Andrew WILSON had a white bandage wrapped around his head and that fresh blood was seeping through. His face was "messed up" -- either bruised or swollen. She recalled asking WILSON if he had been hurt anywhere else, at which time WILSON raised his shirt and she observed dark, vertical marks in his abdominal area.

STEINBERG next observed WILSON in the courtroom. At this time, STEINBERG asked the judge for medical help for Andrew, which she recalled the judge "granted readily". Following the hearing, she again spoke to WILSON in the lockup. She recalled telling him he would be receiving medical attention and not to talk to anyone except attorneys from her office. She could not recall any other specifics of their conversation. STEINBERG related that this was the last time she saw WILSON. She testified that following bond court, she contacted the Public Defender's office and recommended that a photographer be sent to photograph WILSON's injuries.

Except for some slight inconsistencies, STEINBERG's accounts of her contact with Andrew WILSON are basically the same in both of her transcripts. The most notable divergence is in her testimony regarding what WILSON told her concerning his being electroshocked. In her deposition, STEINBERG testified that WILSON told her he had been electrically shocked in some manner, but did not relate any specifics about these allegations. In the second civil trial, however, she testified that WILSON indicated to her that he had been shocked in the genital area. When this variation was noted during STEINBERG's cross-examination, she

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722

000123

49

responded that "the whole thing had kind of been coming back to me in bits and pieces."

She said that immediately following her deposition, on her way down in the elevator, she recalled what WILSON had told her. She said that her memory was triggered by her remembrance of wanting to tell her husband, because it was "like something out of a bad stereotypical southern novel." She was going to tell her husband about WILSON having received some kind of electric shocks in the genitalia and then she realized this constituted an area of confidentiality, so she did not tell him. STEINBERG testified that she returned to the law office where she had been deposed and related what she had recalled, at which time all parties' attorneys decided that a court reporter was not necessary.

During the civil trial, STEINBERG was shown photographs taken of WILSON on 16 February 1982. When shown photographs of WILSON's right cheek, she stated that she did not recall the specific injuries she observed on WILSON on the date in question. In regard to the injuries depicted in the photographs of WILSON's chest, she responded that the marks looked like the marks she saw except that they appeared a little darker when she observed them.

STEINBERG stated that she was never asked to testify in any proceeding prior to the civil trials in 1989.

GEORGE BROBST

George BROBST, an investigator with the Cook County Public Defender's Office, stated that on 16 February 1982, he accompanied Public Defender Dale COVENTRY to Division 1 of the Cook County Jail. BROBST, who provided his account in the Motion to Suppress hearing, stated that he went to this location in order to take photographs of an inmate, Andrew WILSON. He stated that while in the lower level of Division 1, using a Polaroid close-up camera, he took approximately twenty to twenty-two photographs of WILSON, which he then turned over to COVENTRY.

CERMAK HOSPITAL - MEDICAL RECORD

The Medical Record from Cermak Health Services, the facility that provides hospital services to the Cook County Jail, indicates that Andrew WILSON, an inmate at the jail, was admitted to the facility's emergency room on 15 February 1982. The history portion of the Emergency Room Record indicates that the patient sustained multiple blunt trauma to his head and chest in the past forty-eight hours and a burn to the right thigh. The physical findings portion depicts lacerations and abrasions on the head, including a small left occiput (back of

CONFIDENTIAL DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722.

000124

50

the head).    Also noted are: a swollen right eye with
"subconjunctival" hemorrhages, tearing; mouth, lip and tongue
lacerations; multiple lacerations and "ecchymosis" (bruises/blood
under the skin) on the chest, a long linear second-degree burn on
the right thigh; a swollen tender right wrist and an "extensive"
five by seven millimeter corneal abrasion to the right eye.

The Emergency Room Record does not show a "time of arrival";
however, the record indicates that the examining physician,
Doctor Stephen GOODMAN, ordered a laboratory test for WILSON on
15 February 1982 at 1055 hours.  Also ordered by Doctor GOODMAN,
as indicated in the record, was a series of x-rays (the results
were negative -- no fractures noted) and a prescription to treat
corneal laceration and blunt trauma.  A diagram and checklist
noting the specific injuries observed by Doctor GOODMAN is also
included in the medical record.  Out-patient Progress Notes
indicate that Doctor RABA conducted follow-up exams of WILSON on
15 and 16 February 1982, and that follow-up care was continued
by Doctor Stanley HARPER from 17 February 1982 to 3 March 1982.

All attempts to locate any existing dental records from
Cermak Health Services were unsuccessful.

DOCTOR STEPHEN GOODMAN

Doctor Stephen GOODMAN, in the only testimony he provided
regarding his knowledge of the Andrew WILSON case, gave an
account that was basically consistent with that of Doctor John
RABA, Medical Director and with the information contained in the
Cermak Health Services medical record.  Doctor GOODMAN's
account, reported in a deposition on 6 February 1989, and later
read into evidence during the second civil trial (he was called
as a defense witness) states that he examined Andrew WILSON in
the early morning hours of 15 February 1982, sometime prior to
1055 hours, when records indicate that he ordered a lab test.

At the time of his deposition, Doctor GOODMAN stated that he
had a limited, vague recollection of WILSON's injuries and of his
conversation with WILSON regarding how he sustained the injuries.
He recalled that WILSON told him that he been thrown around
inside a police van.  He said he thinks WILSON may have also
mentioned being held against a radiator, but that even if he had,
Doctor GOODMAN would not necessarily have entered this in his
report.  He stated that he recalled numerous marks on WILSON's
face and chest.  He also recalled that the burn noted on the
thigh and some of the marks noted on the chest were consistent
with radiator-type burns.  Regarding his diagnosis of a corneal
abrasion, Doctor GOODMAN stated that he remembered it was
"striking" and "one of the worst type that type of lesion that I
had seen."

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6711

000125

During the deposition, Doctor GOODMAN was asked to view photographs of WILSON, taken on 16 February 1982, and to compare his observations of the injuries depicted with the injuries noted on the diagram he prepared.

He stated that due to the limited amount of space on the diagram, he may have omitted the designation of certain injuries. Specifically, when asked why his diagram does not indicate a burn to WILSON's face which Doctor GOODMAN observed in the photographs, Doctor GOODMAN testified that it may have been the result of incomplete notes or due to an oversight. He also pointed out another possibility: "Burns do evolve through different stages, and what is a second degree burn may not at first appear to be a second degree burn. In other words, it may take some time, it may take some hours for a burn to become obviously a burn." When questioned about his opinion of the possible cause of WILSON's chest injuries, Doctor GOODMAN stated that one or more of the lesions could possibly have been sustained in a struggle or by leaping across a car.

Further, Doctor GOODMAN testified in regard to Andrew WILSON's injuries: "I deduced that someone had inflicted these injuries on him and that he would not willingly have allowed himself to sustain those injuries had he not been prevented from fighting back or fending off the blows, or running away ..."

Consistent with the medical record, Doctor GOODMAN stated that he contacted Doctor RABA following his examination of WILSON. He did not recall the specifics of the conversation. He further stated that he did not recall discussing the case with anyone again until a few weeks prior to his deposition, when he spoke with John STAINTHORP, of the People's Law Office, counsel for Andrew WILSON in the civil action. He related he was never contacted regarding testifying at WILSON's criminal trials.

DOCTOR JOHN RABA

On 15 February 1982, the medical director of Cermak Health Services, Doctor John RABA, received a telephone call from one of his staff physicians, Doctor Stephen GOODMAN, informing him that he had observed unusual appearing injuries on an inmate he had examined and requesting that Doctor RABA take a look. The inmate was Andrew WILSON.

Doctor RABA presented his account of what happened in several proceedings: in the November 1982 Motion to Suppress hearing, in a deposition in December 1988, and in the two civil proceedings in which Andrew WILSON was named as plaintiff. Based on the testimony that was analyzed, Doctor RABA's account remained basically the same. He stated that following Doctor GOODMAN's call, at between 1700 and 2000 hours, he

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6722.

52

went to WILSON's cell in Division 1. At this time, he conducted a brief physical assessment and reviewed WILSON's complaints: that while in the custody of the Chicago Police Department, WILSON had been beaten, pushed against a radiator and that electrical shocks had been applied to his gums, lips and groin.

As indicated in his testimony and in his notes in the Cermak Health Services medical record, Doctor RABA observed that Andrew WILSON had multiple trauma to his face, chest and right leg. Specifically, he testified that the long blistering lesions or "linear bullae" were compatible with radiator-type burns and consistent with the history provided by the patient. In his deposition, Doctor RABA noted that he had seen fifty to one hundred types of burns in his career, but that he had never seen this type of burn before: "...given the location, the fact that they were linear and the fact that they were across the chest, face and arm led me to the fact that probably there was some type of heat applied to that area that caused this relatively rapid blistering." He further stated: "At this moment I can't conceive in my experience of any other way that these lesions could occur ..." Doctor RABA also observed an eye patch over WILSON's right eye -- he did not remove the patch, and noted one or two bruises on WILSON's forehead and small lacerations over both eyebrows. Medical reports also indicate that on 16 February 1982, at 1900 hours, Doctor RABA conducted a medical follow-up exam in WILSON's cell.

Doctor RABA testified that he did not see WILSON again until his criminal trial. Doctor RABA also testified that all of the injuries he observed during his assessments were between one and three days old. Doctor RABA explained that the lighting in the tier cells "is not the best" and that Doctor GOODMAN's examination, conducted in a well-lit area, was more conducive to a thorough evaluation. He further stated that he did not write notes in the cell, but when he returned to his office "I noted those things that I recalled most prominently." Doctor RABA did not note any injuries on WILSON's knees or lower legs, nor did he observe any cigarette burns.

On 17 February 1982, Doctor RABA sent a letter to Superintendent Richard BRZECZEK, informing him of his observations and the allegations of abuse and torture presented by Andrew WILSON. This was the first time he sent a letter of this type directly to the Superintendent. His reason: this was a "very, very notorious case and very, in my mind, unusual injuries."

DOCTOR STANLEY HARPER

Doctor Stanley HARPER, in his routine course of duties as medical officer for Division II of Cook County Jail, conducted

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 92 C 6721 DOCUMENT PRODUCED

000127

53

follow-up care of Andrew WILSON from 17 February until 3 March 1982. As in the case of Doctor GOODMAN, Doctor HARPER's account is limited to his testimony provided during the civil trials in 1989, including a pre-trial deposition. Doctor HARPER, as in the case of Doctor GOODMAN, was also called as a witness for the defendants. Doctor HARPER's account, which reflects the information contained in his Out-Patient Progress Notes of the Cermak Health Services medical record, indicates that on 17 February 1982, at 1400 hours, Doctor HARPER performed his first follow-up evaluation of WILSON.

Referring to his notes made during the exam, Doctor HARPER testified that the patient on this date had requested a dental evaluation for sore lower gums. On 22 February, his notes indicate that the two sutures for the laceration to the left occiput were removed. Doctor GOODMAN noted that at no time in his entries did he characterize any of WILSON's injuries as "burns". His notes of 24 February were cited: Doctor HARPER indicated that patient complains of slight drainage from his right leg "laceration". During his deposition, Doctor HARPER stated that he did not recall whether he observed any burns. He further stated he would have referred to injuries as burns and not lacerations if they had appeared to him as burns. During cross-examination in the second civil trial , Doctor HARPER stated that he had no special training with respect to burns. He also testified that several of the injuries he diagnosed as lacerations or abrasions were not inconsistent with burns.

Doctor HARPER testified that he did not have any further contact with WILSON after his 3 March exam, at which time he recommended a dressing change for WILSON's leg laceration (which was not completely healed.) At the time of his testimony, Doctor HARPER related that he had no independent recollection of any conversation he had with WILSON during the examinations.

ILLINOIS SUPREME COURT RULING

In April 1987, the Illinois Supreme Court granted Andrew WILSON a second criminal trial following an appeal of WILSON's 1982/1983 conviction for murder and armed robbery -- the conviction was obtained after the denial of WILSON's Motion to Suppress his confession as involuntary.

The Supreme Court held that the State failed to show by clear and convincing evidence that the injuries sustained by the defendant while in police custody were not inflicted as a means of producing his confession.

The Court's ruling included this observation: "The evidence here shows clearly that when the defendant was arrested at 5:15am on February 14, he may have received a cut above his right eye

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C621

54

but that he had no other injuries; it is equally clear that when the defendant was taken by police officers to Mercy Hospital sometime after 10 o'clock that night he had about fifteen separate injuries on his head, chest and leg. The inescapable conclusion is that the defendant suffered his injuries while in police custody that day, and indeed the State does not dispute that."

## WILLIAM DAVID COLEMAN

William David COLEMAN was presented as a defense witness during the second civil trial. During his testimony, COLEMAN stated that he met Andrew WILSON at Cook County Jail while WILSON was awaiting his second murder trial. COLEMAN testified that at the time, he was incarcerated on charges of escape (he testified that he had been charged with escaping from a court bus) and for possession of cocaine with the intent to deliver.

According to COLEMAN's testimony during the trial, WILSON admitted to him, during one of their conversations in early August 1987, that he had killed the two police officers and that he had burned himself on a radiator in the police station's interview room in order to make it look like his confession to the police was coerced. COLEMAN stated that his conversation with WILSON took place in the jail's dayroom and that although other prisoners were nearby, he did not believe they heard this conversation.

COLEMAN testified that he escaped from the jail in 11 August 1987, and that subsequent to his re-arrest, he entered a plea agreement with the State's Attorney Office in connection with COLEMAN's willingness to testify regarding the WILSONS' alleged role in the escape plot.

During the course of the second civil trial, the plaintiff's attorneys attempted to discredit COLEMAN by noting his numerous past offenses which involved deception and by offering to present witness testimony which would discount COLEMAN as a credible witness.

## MEDICAL SYNOPSIS

Following the incident in question, Andrew WILSON received medical treatment at Mercy Hospital, the medical facility WILSON was transported to following his detention at Area Two Headquarters, and at Cermak Hospital, where he was treated after admittance to the Cook County Jail.

At both facilities, WILSON was observed and examined by numerous medical personnel, many of whom testified in the various

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000129

55

proceedings surrounding the WILSON case and whose testimony is reflected in the body of this report. Although the medical opinion varied at times, in terms of the diagnosis and possible cause of each injury, the testimony was notably consistent in its assessment of WILSON's overall physical condition and in its timetable regarding the estimated date/time the injuries were incurred.

The medical testimony consistently was of the opinion that the majority of WILSON's injuries were incurred within a recent period of time -- several hours to one or two days prior to the examination.

During the course of the civil trials, "expert" medical witnesses were also presented by both parties. As reflected in the testimony of the medical personnel who examined WILSON immediately following the incident, the only major point of controversy is whether or not WILSON, in addition to the numerous other injuries observed and consistently documented, also suffered burns during the course of the incident.

DOCTOR RAYMOND WARPEHA

Doctor Raymond WARPEHA testified as an "expert" witness for the defense during the first civil trial. He did not testify during the second trial. At the time of his deposition (February 1989), Doctor WARPEHA was the director of the Burn Center and Chairman of the Division of Plastic and Reconstructive Surgery at Loyola Medical Center.

During his deposition testimony, Doctor WARPEHA stated that he had been contacted by the defendant's counsel several months prior to the deposition. At that time, he was made aware of the WILSON case and asked to provide an opinion regarding the nature of the injuries allegedly sustained by WILSON. To that end, he was provided with deposition testimony, medical records, and photographs depicting the injuries. Doctor WARPEHA testified that based on the information provided, it was his opinion that the wounds on Andrew WILSON's face, chest and thigh were "friction abrasions" caused by friction. They were not, according to his medical expertise, burns.

DOCTOR ROBERT KIRSCHNER

Doctor Robert KIRSCHNER is a forensic pathologist and a deputy chief medical examiner for Cook County, credentials he held when he first became involved in the WILSON case. Doctor KIRSCHNER was first introduced to the case in 1988, when WILSON's civil attorney contacted CONFIDENTIAL and asked him to review various documents. At this time, DOCTOR KIRSCHNER examined prior trial

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000130

56

testimony, depositions, photographs and medical reports. Doctor KIRSCHNER testified that in the course of preparing an evaluation he also visited the former Area Two Headquarters, at which time he examined the radiators in the second floor interview rooms.

Doctor KIRSCHNER testified as an "expert" witness during both civil trials and in a deposition on 9 February 1989. During his testimony, Doctor KIRSCHNER explained his medical and forensic background and testified that he is an expert in determining the causes of injuries, including the types of implements used to cause the injuries. In his deposition, Doctor KIRSCHNER also provided testimony regarding his extensive experience with human rights organizations and his numerous activities involving the diagnosis and evaluation of victims of torture. Doctor KIRSCHNER's testimony during the civil trials was limited to his expertise as a forensic pathologist.

During his testimony, Doctor KIRSCHNER offered a medical opinion that was highly consistent with the medical opinion reported by Doctor RABA and with the account related by the patient, Andrew WILSON. Upon viewing photographs taken of WILSON's injuries on 16 February 1982, Doctor KIRSCHNER testified that the vertical marks observed on WILSON's cheek, chest and thigh were burns (several second degree burns) and that their appearance was very consistent with those parts of the body being held up against a hot radiator.

During the second civil trial, Doctor KIRSCHNER also noted that the little marks on WILSON's ears -- visible in one of the blow-up photographs -- were patterned abrasions that were very consistent with marks caused by an implement such as an alligator clip. Doctor KIRSCHNER also testified that, in his opinion, the right ear photograph revealed a dark black, charred area consistent with a "spark mark". Spark marks, according to Doctor KIRSCHNER, are generated by an electrical shock that produces this type of burn.

During cross-examination, Doctor KIRSCHNER was questioned regarding the variations between his testimony and that of Doctor KORN, who did not designate the injuries to WILSON's cheek and chest as burns. Doctor KIRSCHNER testified that Doctor KORN's record on that point is inaccurate. He stated that examining physicians do not think like forensic pathologists and that they "...frequently either leave out things or make mistakes in diagnoses of types of injuries."

In regard to discrepancies noted between observations in the medical reports and the injuries depicted in the photographs, Doctor KIRSCHNER stated that certain injuries may not have been as noticeable or as prominent at the time of an examination compared to the time they were photographed.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 6717

000131

Doctor KIRSCHNER was not able to estimate the age of many of the injuries depicted in the photographs. He stated that the burns appeared to be approximately one day old. He also stated that it is unlikely, based on the types of injuries observed, that any of the wounds were self-inflicted.

In his deposition, Doctor KIRSCHNER also stated: "...very high degree of medical certainty to say that this man had not only been beaten and/or kicked, which let's face it, occurs in custody, but that this man has received electric shock." Further Doctor KIRSCHNER testified that everything alleged by WILSON is "consistent with those injuries and consistent with the response of somebody who has been tortured in this respect..."

Doctor KIRSCHNER stated that Andrew WILSON's story was not the type of material "you make up." He said, "this is not a made-up story... And having reviewed the whole record and reviewed the medical evidence, lacerations burns, photographs and his testimony, this guy is telling the truth. This is what happened to him."

## CONCLUSIONS

As noted in the overview section of this report, the key question that guided this investigation and which served as a barometer for evaluating the evidence was: <u>what makes sense</u>?

There is a myriad of questions raised by this investigation, many of which will unfortunately never be answered. There are loose ends, oddities, things that don't fit into any logical interpretation of reality. Both the victim's testimony and the testimony of the accused offer many challenges and often raise suspicions as to their validity. There is the question of witness credibility. Even the statements of the "expert" witnesses from the medical community is not always in harmony.

With all of these questions and question marks that linger and raise doubts, there is no question, no doubt that Andrew WILSON, on 14 February 1982, was taken into police custody at Area Two Headquarters in good physical condition and that he was released from Area Two custody later that day with numerous unexplained injuries. This is a constant, unyielding given which is not subject to any interpretation of the evidence. The only "questions" that leave room for interpretation are <u>how</u>, specifically, were these injuries sustained and <u>what</u> is the specific nature of these injuries.

The accused officers and witnesses who presented testimony on their behalf provide several explanations, discussed below, for how the injuries may have been sustained. Many of these theories are deflated by the officers' own statements and

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 6722

58

conflicting testimony. The majority of officers and defense
witnesses could not provide any explanation.

   o <u>The injuries were self-inflicted</u>: If so, when and where?
Police procedure, especially considering the crimes for
which WILSON was arrested, would lead one to believe that
WILSON was subjected to a scrupulous search at the time he
was taken into custody. Testimony from several officers
at the scene of arrest confirm that WILSON was searched at
this time. By the officers' own accounts, WILSON was handcuffed
to a restraining ring in an interview room (guarded by a
detective) during the majority of his stay at Area Two. How and
with what means did he inflict these wounds? Perhaps, he
inflicted them en route to or from Area Two, while in a police
squadrol. According to the evidence, however, there are no
heating elements or other objects in the rear of the squadrol
with which he could have sustained several of the injuries which
were observed immediately following his transport. One of the
transporting officers, in fact, testifies that he was able to
view WILSON in the back of the squadrol and that at no time did
he observe WILSON behave "unusually". Additionally, the majority
of medical opinion indicates that the possibility that the wounds
were self-inflicted is highly unlikely.

   o <u>The injuries were incurred on 9 February 1982, during the
shooting incident</u>: The question was raised that perhaps WILSON
sustained some of the injuries during the course of his struggle
with Officer FAHEY; that he scratched himself when they fell
against a tree or when WILSON leaped across his car prior to
shooting Officer O'BRIEN. This theory is used primarily to
explain the marks on WILSON's face and chest. This theory is
greatly deflated by the testimony from numerous police officers
who were at the scene of WILSON's arrest: the majority of
officers testified that they observed WILSON without his shirt
on, and that the only visible injury that they saw was a slight
cut above his eye. Garnett VAUGHN, a civilian witness present at
the time of WILSON's arrest, also stated that he did not observe
any injuries on WILSON at this time. Tyrone SIMS, the State's
key eyewitness to the shooting, in his police statement and trial
testimony, reported a struggle but made no mention of any
incident which would have resulted in the injuries sustained by
WILSON. Additionally, it should be noted that the shooting
occurred five days prior to the arrest, and the majority of
medical opinion suggests that the documented injuries occurred
within a several day period prior to 15 and 16 February 1982.

   o <u>The injuries occurred at the time of arrest</u>: Testimony
from several officers suggests that perhaps WILSON sustained the
visible injury over his eye at the time of his arrest, when he
was forced down to the floor prior to handcuffing. Evidence
indicates that the floor he was pushed onto was covered by fairly
thick carpeting. Even assuming this, the time and location of

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 672

this injury, when, where and how did he sustain the other injuries?

o <u>The injuries occurred following WILSON's detention at Area Two</u>: As noted earlier, the evidence indicates that WILSON did not sustain his injuries while inside a police squadrol. Although Officer FERRO, the only squadrol officer who testified, stated that WILSON may have sustained some kind of injury during a fall as he entered the squadrol, this still would not account for the numerous other injuries observed on WILSON immediately following his ride in the squadrol. It should be noted too, that Officer FERRO was not certain about this fall, only that it "may" have happened.

Following the lockupkeeper's refusal to admit WILSON, WILSON was transported via squadrol to Mercy Hospital's emergency room, where the attending physician observed at least fifteen separate injuries. At between approximately 0001 and 0032 hours, on 15 February 1982, WILSON was returned via squadrol to the lockup, at which time he was admitted. Testimony from the one lockupkeeper who was interviewed regarding the incident, reveals that to the best of his recollection, there were no radiators or heating units of any type in the individual cells where WILSON would have been detained.

WILSON then remained alone in a cell in the lockup, the same lockup that previously refused to admit him without medical attention, until several hours later when he was transported to 26th and California for his bond hearing. The assistant public defender who was assigned to WILSON's case testified that she briefly observed WILSON in the bullpen at approximately 0830 hours, at which time she observed fresh injuries to his face and vertical marks on his chest. She next saw WILSON at approximately 0900 hours at his bond hearing, at which time she requested of the judge that WILSON receive medical attention. WILSON was then booked into Cook County Jail and at approximately 1030 to 1100 hours, examined by a physician at Cermak Hospital.

Based on the evidence which suggests the above chronology, there does not seem to be any times or locations, outside of Area Two custody where it would be reasonable to believe that WILSON's injuries were sustained.

It should be noted that Doctor KORN, the physician who examined Andrew WILSON immediately following his detention at Area Two and while still in police custody, testified that the injuries depicted in the photographs taken on 16 February 1982 were basically the same, except slightly older, as the injuries he observed during his examination. This testimony strongly contributed to the undersigned's conclusion that it is most reasonable to believe that WILSON sustained his injuries during

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 10 C 6712

60

his custody at Area Two.

In addition to offering the above mentioned theories to explain WILSON's injuries, the defense witnesses relied heavily on the photographic evidence to support their contention that WILSON was not injured at Area Two: The photograph taken of WILSON in the interview room at Area Two following his statement (approximately 1830 hours) was offered by the defense to show that with the exception of a previously existing scar over WILSON's right eye, there are no other visible injuries. It should be noted that only one photograph was taken at this time and it shows only WILSON's face. It is not a quality photograph and offers little detail.

Michael HARTNETT, the court reporter who took the photograph, in fact testified that the photograph is not a quality one and that it was shot by a "not very good quality camera." The lineup photographs, taken on 14 February 1982, at approximately 1630 hours, are also cited as evidence to support the view that WILSON could not have been injured prior to this time. Again, these photographs show WILSON's face only and are shot at a distance. It should also be noted that photographs of WILSON taken at Cook County Jail on 15 and 16 February 1982 reveal that the lateral marks on his right cheek, diagnosed as either burns, scratches or abrasions, are located in the far lower portion of the jaw, an area not clearly visible in the 14 February 1982 photographs.

Due to the inferior quality of the photographs cited and their limited documentation of WILSON's body, this "evidence" does not satisfactorily prove the absence of injury at the time the photos were taken. This conclusion is reinforced by the substantial medical testimony which indicates that many of the injuries sustained by WILSON and later documented in photographs, may not have been fully manifest at the time the interview room and lineup photographs were taken.

As to determining the specific nature of WILSON's injuries, the medical opinion offers some variations. Despite the differences regarding the specific diagnosis of each injury, there is no dissension to the fact that WILSON was injured. The first doctor to examine WILSON in fact cites at least fifteen separate injuries at the time of his observations. Two other doctors, one, the medical director of Cermak Health Services, and the other, a deputy chief medical examiner for Cook County, both noted burn injuries (at least one second degree burn) that were consistent with WILSON's account of being burned on a radiator. Deputy Chief Medical Examiner Doctor Robert KIRSCHNER, who is also renowned as an expert on "torture", additionally testified that WILSON, in his opinion, exhibited the classic signs of an electroshock victim.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 40 C 6711

The accused's counsel presented Doctor Raymond WARPEHA as an expert medical witness during the first civil trial. Doctor WARPEHA testified that the injuries diagnosed as "burns" by the plaintiff's expert witnesses were in fact friction abrasions and not burns. The fact that Doctor WARPEHA was not called as a witness during the second civil trial may be explained by the fact that during the second trial, a defense witness (William David COLEMAN) was presented to testify that he heard WILSON confess to self-inflicting the burns.

This leads to the issue of major inconsistencies and ambiguities that colors a great deal of the testimony throughout the case's history. This ambiguity and inconsistency is most notably revealed in the changing testimony regarding the issue of the cold radiator and room number.

On the issue of the "cold radiator": During the course of the civil trials the defendant officers maintained that Andrew WILSON could not have sustained his injuries on the radiator at Area Two because the radiator did not work in the interview room where Andrew WILSON was detained. The majority of officers who testified indicated that WILSON was held in Interview Room #2 throughout most of the day. Many during pre-trial depositions testified that to the best of their recollection, the radiator in Interview Room #2 did not work -- in fact that it never worked while these officers were assigned to Area Two. Despite their prior testimony, however, many of the officers during the second trial testified that in the final analysis, they could not recall with certainty if the radiator worked or not. This parallels the defense decision to put on William David COLEMAN and refrain from using Doctor WARPEHA.

The problem is compounded by Lieutenant BURGE's own inconsistent ambiguous testimony. In the Motion to Suppress hearing, Lieutenant BURGE places Andrew in the room directly next to his office; Lieutenant BURGE in fact testifies that while he was in his office, he did not hear any sounds of beating or screaming coming from this room. In his deposition of 1988, however, he indicates that next-door or "adjacent" does not necessarily mean immediately next-door, that WILSON was in Room #2 and that the radiator did not work in this room. In his Civil Trial II testimony, he offers slightly different testimony, this time stating that he has no recollection of which room WILSON was detained in or which room had the nonfunctional radiator. It should be noted that none of the officers during the Motion To Suppress hearing stated that the radiator did not function in WILSON's interview room -- whatever the number was.

As put forth in the overview section of this report, and as repeated in the introduction to this conclusion, the primary question that propelled the undersigned in evaluating the evidence in this investigation was whether it is most believable given

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 20 C 6722

000136

the context of the circumstances?" One of the most compelling pieces of evidence turned out to be not a medical report or an eyewitness statement, but instead the testimony of one of the accused.

Lieutenant BURGE stated repeatedly that he never entered the interview room where WILSON was detained. Does it make sense that Lieutenant BURGE, after working on what was probably one of the biggest investigations of his career, a police shooting investigation which he personally orchestrated and which inspired him to go without sleep for approximately five days, finally arrested the primary suspect, Andrew WILSON, and then failed to get involved in the interrogation of this suspect? Is this believable?

Andrew WILSON is hardly a sympathetic, likeable victim. His statements are riddled with inconsistencies and his testimony through the years present many of the same discrepancies revealed in the testimony of the accused. Still, despite the discrepancies noted in WILSON's testimony and in the testimony of certain witnesses who testified in his behalf, the overwhelming evidence, bolstered by striking medical testimony, and strengthened by the lack of any other substantial theory, points to the only <u>reasonable</u> explanation for WILSON's injuries: that most, if not all, of WILSON's injuries were sustained during WILSON's detention in an interview room on the second floor of Area Two Headquarters and that they occurred at the hands of the police and under the sanction of the officer in charge. On the date and time in question, the officer in charge was Lieutenant Jon BURGE.

Based on the overwhelming body of evidence which supports the allegations, the undersigned therefore recommends that the excessive force allegations against Lieutenant Jon BURGE be "SUSTAINED."

In regard to the allegations of excessive force against other department members, a finding of "SUSTAINED" should also be rendered against Detective John YUCAITIS. This conclusion is supported by the fact that WILSON consistently identified YUCAITIS as the accused and as a result of numerous officers-- as well as YUCAITIS himself -- placing him at the scene at the time in question.

Although there is evidence to support the participation of other officers in the alleged incident, the evidence is not strong enough to support findings of "SUSTAINED". As a result, the allegations against Detective Fred HILL, named by WILSON as one of the participants in a torture episode, should not be sustained. This conclusion was reached based on WILSON's inconsistent identification of HILL and also as a result of the substantial evidence which indicates HILL was not present at

CONFIDENTIAL DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 96 C 6721

000137

the time of the alleged incident.

Considering the overwhelming evidence supporting WILSON's excessive force allegations, which has resulted in findings of "SUSTAINED" against two of the accused officers, the undersigned further recommends that those department members who in testimony placed themselves in WILSON's presence at the times in question should be cited for not only their decision to ignore the wrong-doing but also for their failure to take any action to stop it. As a result, additional findings of "SUSTAINED" have been recommended for Lieutenant BURGE, Detective John YUCAITIS and also for Patrick O'HARA, who testified on numerous occasions that he was in close proximity to and had extensive contact with WILSON on the date and times in question.

FINDINGS

In regards to the allegations against Jon Burge:

"SUSTAINED"--Violation of Rule 3, "Any failure to promote the Department's efforts to implement its policy or accomplish its goals", in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, Jon Burge, while assigned as the commanding officer of the Area Two Violent Crimes Unit, failed to promote the Department's efforts to implement its policy and accomplish its goals, in that he actively participated in the mistreatment of Andrew Wilson, a prisoner in custody of Area Two personnel, over which Burge was the commanding officer, and that he was aware of the continued mistreatment of Mr. Wilson by other department members in his command but failed to report this mistreatment in direct violation of his assigned supervisory responsibility which would require him to do so.

"SUSTAINED"--Violation of Rule 6, "Disobedience of an order or directive, whether written or oral," in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, Jon Burge failed to follow the provisions of General Order 82-14, Addendum 2, II, A., 3 and 5, in that he had direct knowledge and awareness of the continued mistreatment of Andrew Wilson, a prisoner in his custody, but failed to take any steps to investigate the mistreatment and to submit a written report documenting his knowledge of the mistreatment as specifically required in the provisions of this general order.

"SUSTAINED"--Violation of Rule 8, "Disrespect to or maltreatment of any person, while on or off duty," in that on 14 February 1982, during the morning and/or early afternoon hours, in an interview room at Area Two Headquarters, 9059 South Cottage Grove, Jon Burge, while on duty, did mistreat Andrew Wilson in

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000138

that he repeatedly administered electrical stimulation to Mr. Wilson's body in order to create pain and that he held Mr. Wilson, while handcuffed, against a hot radiator causing burns to Mr. Wilson's face, chest and thigh.

"SUSTAINED"--Violation of Rule 9, "Engaging in any unjustified verbal or physical altercation with any person, while on or off duty," in that on 14 February 1982, during the morning and/or early afternoon hours, in an interview room at Area Two Headquarters, 9059 South Cottage Grove, Jon Burge, while on duty, engaged Andrew Wilson in several unjustified physical altercations during which Mr. Wilson was handcuffed and incapable of providing any resistance.

"SUSTAINED"--Violation of Rule 10, "Inattention to Duty", in that on 14 February 1982, at Area Two Headquarters, 9059 South Cottage Grove, Jon Burge, while in a supervisory capacity as the assigned commanding officer of the Area Two Violent Crimes Unit, failed to provide prompt medical attention to Andrew Wilson, a prisoner in his custody who was suffering from multiple injuries and who upon release from Area Two custody, was refused in the Central Detention lockup as a result of these injuries.


In regard to the allegations against John Yucaitis:

"SUSTAINED"--Violation of Rule 2, "Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department", in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, John Yucaitis, while on duty, did impede the Department's efforts to achieve its policy and goals and did bring discredit upon the Department by his overall actions and conduct in that he actively participated in the mistreatment and physical torture of Andrew Wilson, a prisoner that he was guarding, and that while guarding Mr. Wilson, he had direct knowledge of other abuse that was being perpetrated against Mr. Wilson but failed to take any action to stop the abuse or to report it to supervisory personnel.

"SUSTAINED"--Violation of Rule 6, "Disobedience of an order or directive, whether written or oral," in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, John Yucaitis failed to follow the provisions of General Order 82-14, Addendum 2, II, A., 3 and 4, in that he had direct knowledge and awareness of the continued mistreatment of Andrew Wilson, a prisoner he was guarding, but failed to immediately notify a supervisory officer and submit a written report documenting his knowledge of the incident as specifically required by the provisions of this general order.

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 40 C 6721

000139

"SUSTAINED"--Violation of Rule 8, "Disrespect to or maltreatment of any person, while on or off duty," in that on 14 February 1982, during the morning and/or early afternoon hours, in an interview room at Area Two Headquarters, 9059 South Cottage Grove, John Yucaitis, while on duty, did maltreat Andrew Wilson in that he repeatedly administered electrical stimulation to Mr. Wilson's body in order to create pain.

"SUSTAINED"--Violation of Rule 9, "Engaging in any unjustified verbal or physical altercation with any person, while on or off duty," in that on 14 February 1982, during the morning and/or early afternoon hours, in an interview room at Area Two Headquarters, 9059 South Cottage Grove, John Yucaitis, while on duty, engaged Andrew Wilson in an unjustified physical altercation during which Mr. Wilson was handcuffed and incapable of providing any resistance.

"SUSTAINED"--Violation of Rule 10, "Inattention to Duty", in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, John Yucaitis failed to provide prompt medical attention to Andrew Wilson, a prisoner he was guarding and who was suffering from multiple injuries which caused him to be refused from the Central Detention lockup following his custody at Area Two Headquarters.


In regard to the allegations against Patrick O'Hara:

"SUSTAINED"--Violation of Rule 2, "Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department", in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, Patrick O'Hara, while on duty, did impede the Department's efforts to achieve its policy and goals and did bring discredit upon the Department by his overall actions and conduct in that he had direct knowledge of the mistreatment and physical torture that was being perpetrated against a prisoner, Andrew Wilson, but failed to take any action to stop the abuse or to report it to supervisory personnel.

"SUSTAINED"--Violation of Rule 6, "Disobedience of an order or directive, whether written or oral," in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, Patrick O'Hara failed to follow the provisions of General Order 82-14, Addendum 2, II, A., 3 and 4, in that he had direct knowledge and awareness of the continued mistreatment of Andrew Wilson, a prisoner, but failed to immediately notify a supervisory officer and submit a written report documenting his knowledge of the incident as specifically required in the provisions of this general order.

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 90 C 6722

000140

66

"SUSTAINED"--Violation of Rule 10, "Inattention to Duty", in that on 14 February 1982, during the morning and/or early afternoon hours, at Area Two Headquarters, 9059 South Cottage Grove, Patrick O'Hara failed to provide prompt medical attention to Andrew Wilson, a prisoner with whom he had direct knowledge of his physical condition and who was suffering from multiple injuries which caused him to be refused from Central Detention lockup following his custody at Area Two Headquarters.

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN 92 C 6722.