# EXHIBIT 49

To
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS
REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4   NICOLE HARRIS,                      )

 5          Plaintiff,                   )

 6     v.                                ) No. 14-cv-4391

 7   CITY OF CHICAGO; Chicago            )

 8   Police Officers ROBERT BARTIK,      )

 9   DEMOSTHENES BALODIMAS, ROBERT       )

10   CARDARO, JOHN J. DAY, JAMES M.      )

11   KELLY, ANTHONY NORADIN, and         )

12   RANDALL WO; Assistant Cook          )

13   County State's Attorneys            )

14   ANDREA GROGAN and LAWRENCE          )

15   O'REILLY, and THE COUNTY OF COOK,)

16          Defendants.                  )

17

18          The deposition of MICHAEL LANDANDO,
     called for examination pursuant to the Rules of
19   Civil Procedure for the United States District
     Courts pertaining to the taking of depositions,
20   taken before Tracy Jones, a Certified Shorthand
     Reporter within and for the County of Cook and
21   State of Illinois, at 35 East Wacker Drive,
     Suite 3000, Chicago, Illinois, on the 11th day
22   of November, 2015, at the hour of 10:07 o'clock a.m.

23   Reported by:     Tracy Jones, CSR, RPR, CLR

24   License No.:     084-004553
```



1      You know what?  I might have.  Because
2 he was Randy's partner.  So, you know, we had
3 shootings, and we'd help each other out.  So I
4 probably did work on a few cases with him, but
5 just on the periphery of it, though.
6      Q.   Okay.  Had you at the time -- And we'll
7 get back to some of the other detectives in a
8 second.  But had you prior to the -- this
9 investigation of Jaquari Dancy worked on any
10 case that involved a death up to that point at
11 Area 5?
12      A.   Me, personally?  Not with Randy Wo?
13 You're talking about me, personally?
14      Q.   Yes.
15      A.   Yes, sir.  Yes.
16      Q.   Okay.  And then my follow-up question
17 to that is, did you -- had you to that point at
18 Area 5 worked on a case of a death of a child?
19      A.   At that point, no.
20      Q.   Okay.  All right.  Maybe this is a good
21 place.  I don't like to jump to it right away,
22 but I think we're going to just quickly do your
23 background.
24           So your appointment was December 22nd,



1   1986, correct?
2       A.   Yes.
3       Q.   Is that your first day at the academy?
4       A.   Yes.
5       Q.   And after you graduated the academy,
6   what was your first assignment?
7       A.   I went to the 13th District as a patrol
8   officer.
9       Q.   Okay.  How long -- How long were you at
10  the 13th?
11      A.   I was there till -- I was in a patrol
12  car until 1988, then I was a TAC -- plainclothes
13  tactical officer.
14      Q.   Still at the 13th?
15      A.   Yes, sir.
16      Q.   Okay.
17      A.   And I think I left 13 in '91 or '92.
18      Q.   Okay.
19      A.   And I went to 18th District Tactical
20  Unit.
21      Q.   Okay.  How long were you there?
22      A.   Approximately '92 to -- probably about
23  seven or eight years.
24      Q.   Okay.  So approximately 1999 to 2000?



1                So you were a Violent Crimes detective
2    at Area 5 in '03 or maybe early '04?
3        A.    '04, yes.
4        Q.    And how long have you been -- Are you
5    still there?
6        A.    No.
7        Q.    Okay.  How long were you at Area 5?
8        A.    Till 2013.
9        Q.    Okay.  So about a ten-year run?
10       A.    Yes, sir.
11       Q.    And what did you do in 2013?
12       A.    I had a heart attack and triple bypass
13   surgery.
14       Q.    I'm so sorry.
15       A.    That's okay.
16       Q.    You're doing okay now?
17       A.    Yes.
18             I went back to work, but the City
19   wouldn't let me.  They found out I was working,
20   and they wouldn't let me work anymore.
21       Q.    So are you formally retired from the
22   police department?
23       A.    No.  They put me on disability.
24       Q.    Okay.

1      Do you believe there is a code of
2 silence amongst Chicago Police officers in which
3 they're reluctant to give information about the
4 bad police officers?
5    A.   No.  I've never seen it personally.
6    Q.   Have you ever been questioned by a
7 supervisor of any kind about whether the conduct
8 of a fellow officer was dishonest or corrupt or
9 violated the policies and practices of the
10 Chicago Police Department?
11   A.   No.
12   Q.   Have you ever voluntarily approached
13 anyone in the supervisory ranks or Internal
14 Affairs or anybody, for that matter, with
15 information about a cop who was acting in a
16 dishonest, corrupt manner or in violation of
17 serious policies and practices of the
18 department?
19   A.   Yes.
20   Q.   And was it with respect to one or more
21 specific officers?
22   A.   It was a case we had where a drug
23 dealer was arrested with a handgun, and he had
24 told the arresting officers that -- that the gun



1  belonged to a police officer who gave it to him
2  in exchange for some narcotics.
3      Q.  I'm going to need you to say that one
4  more time.  It went past me a little too
5  quickly.
6          It was someone who made a sustained
7  accusation that a cop took a handgun from the --
8      A.  No the police officer actually traded
9  his weapon for narcotics, and the gun was
10 registered to him.  And when they arrested the
11 guy who had the gun, right away, he told them
12 that, this gun belongs to so and so.
13         So we got involved in the case, and it
14 turned out that he did in fact give the guy a
15 gun for narcotics.
16     Q.  Was he terminated?
17     A.  Yes.
18     Q.  Was he prosecuted?
19     A.  Yes.
20     Q.  Did you testify against him?
21     A.  Yes.
22     Q.  What year was that, approximately, that
23 you made the case or that the trial --
24     A.  I think it was 2002 or '3, I think.



1  Q. Did you get some pushback from other
2 officers for having testified against a fellow
3 officer?
4  A. Surprisingly not.  No.
5  Q. And by surprisingly, you expected to
6 get pushback?
7  A. I just, you know ...
8   It didn't come -- I thought people
9 would be mad, upset at me.  But nobody was.
10  Q. And when you say you thought people
11 would be mad and upset at you, is that because
12 there exists within the department sort of an
13 unwritten code of silence in which cops are
14 expected not to testify against or speak badly
15 of other cops?
16  MR. KAMIONSKI:  Objection:  Asked and
17 answered; calls for speculation.
18  THE WITNESS:  I think, you know, it's the
19 type of person that you are.  You know, what's
20 right is right, and what's wrong is wrong.  I
21 mean, there should be no distinction between if
22 he's a cop or not.  Either do the right thing or
23 don't do the right thing.  If you don't do the
24 right thing, you go to jail.  It's that simple.