# EXHIBIT 50

**To**
**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS**
**REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT**

**March 15, 2016**

**Case No. 14-CV-4391**

Back to previous page



# Illegal arrests yield false confessions Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. SECOND OF FOUR PARTS.: [North Sports Final Edition]

Ken Armstrong, Steve Mills and Maurice Possley, Tribune staff reporters. **Chicago Tribune** [Chicago, Ill] 17 Dec 2001: 1.11.

## Find a copy

Check for full text via OCLC Link Resolver
http://chipublib.on.worldcat.org/atoztitles/link?sid=ProQ:&issn=10856706&volume=&issue=&title=Chicago+Tribune&spage=11&date=2001-12-17&atitle=Illegal+arrests+yield+false+confessions+Series%3A+COPS+AND+CONFESSIONS.+TRIBUNE+INVESTIGATION.+SECOND+OF+FOUR+PARTS.&au=Ken+Armstrong%2C+S

## Abstract

The number of illegal arrests is likely much higher. The total of 37 does not account for cases where the prosecution declined to appeal a trial judge's finding of an illegal arrest, or where the courts ruled there was an illegal arrest but then allowed the confession anyway. Courts will allow such confessions if prosecutors can show that intervening factors--for example, police confronting a suspect with incriminating evidence discovered after he was taken into custody--sufficiently separated the confession from the arrest.

## Full Text

Sidebar.

The gateway to a false confession is, in many cases, an illegal arrest--taking a person into custody on little or no evidence and subjecting him to high-pressure interrogation.

The law forbids that tactic and leading interrogation experts condemn it, saying interrogation holds such power to produce confessions that police should employ it only after a suspect's guilt has been reasonably established through other investigation.

But police in Cook County often violate that tenet and conduct the equivalent of street sweeps--picking people up on shreds of evidence and questioning them for hours or days in isolated rooms at police stations, according to the Tribune's investigation.

In rulings issued since 1991, appeals courts have thrown out the murder confessions of at least 70 defendants in Cook County, the Tribune found. In 37, confessions were suppressed based on court findings that they resulted from illegal arrests.

Defendants were arrested on such flimsy leads as an anonymous crime-line tip that did not fit the facts of the crime, or an anonymous tip about street rumors, according to court records.

The number of illegal arrests is likely much higher. The total of 37 does not account for cases where the prosecution declined to appeal a trial judge's finding of an illegal arrest, or where the courts ruled there was an illegal arrest but then allowed the confession anyway. Courts will allow such confessions if prosecutors can show that intervening factors--for example, police confronting a suspect with incriminating evidence discovered after he was taken into custody--sufficiently separated the confession from the arrest.

Appeals judges sound alarm

Appellate Court judges have expressed alarm at the prevalence of illegal-arrest claims and findings in Cook County.

"Despite the fact that arrest without probable cause has been considered illegal in Anglo-American jurisprudence since the adoption of the Magna Carta in 1215 A.D., such arrests seem almost commonplace in Cook County, if the number of appeals involving the issue is any criterion," the Illinois Appellate Court wrote in a 1991 case in which Chicago police illegally kept a teenager overnight in a small interview room without a bed.

Last year, while dissenting from a ruling that upheld a defendant's murder conviction but criticized how Chicago police handled the case, Appellate Court Judge Mary Jane Theis wrote that in Cook County, the law regarding detaining and interrogating people without probable cause is "routinely ignored."

In nearly 25 years as a detective, Ralph Vucko, who is now retired, took part in several murder investigations where police got confessions but courts later ruled the arrests were illegal. At least five defendants in those cases had their confessions thrown out and charges dropped. At least three others were convicted despite an illegal arrest--either the court allowed the confession anyway, or the defendant was convicted without it.

Vucko declined to be interviewed for this article.

One case that Vucko investigated illustrates how a questionable arrest can set in motion the machinery of the criminal justice system- -interrogation, confession, conviction--and produce a result dogged by questions of whether the real killer was caught.

Investigating the 1984 rape and murder of a 75-year-old woman on Chicago's West Side, Vucko and a partner took two teenagers to a police station and interrogated them, getting confessions from both. The teens, Anselm Holman and Richie Cole, later denied guilt, claiming they confessed because they were beaten, an allegation police denied.

Cole also argued that his confession was the product of an illegal arrest, and the Illinois Appellate Court agreed. When the detectives picked him up, all they knew was that he had been at the victim's residence the night of her killing. "Clearly such a paucity of evidence, as the police conceded, does not constitute probable cause," the court wrote.

The appeals court noted that Holman, arrested under similar circumstances, could have challenged his confession on the same basis. But in a befuddling omission, Holman's

3/15/2016
Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 3 of 34 PageID #:3201
search.proquest.com.gatekeeper.chipublib.org/chicagotribune/printviewfile?accountid=303

appellate attorney failed to raise the argument. So Cole went free--his conviction reversed and confession suppressed--while Holman remained in prison, serving a life sentence.

Fifteen years after his arrest, Holman sought DNA testing in hopes of proving his innocence. But a forensic scientist for the Illinois State Police contaminated the evidence, somehow transferring his own DNA into a semen smear on a microscopic slide.

Last year, prosecutors and Holman's lawyers made a deal. The conviction was vacated, and Holman pleaded guilty in return for a new sentence that will give him a chance at parole in less than three years.

"They knew I was innocent. They wouldn't be offering no deal for nobody with life no other way," Holman, now 35, said in an interview at Hill Correctional Center in Galesburg, Ill. "But what do you do? Wait five years or even more when there's still a chance that you lose?"

Police sidestep arrest rules

In cases where defendants have alleged illegal arrest, police have often tried to sidestep the need to show probable cause by arguing the defendant was not actually under arrest when he confessed. In such cases, police contend the defendant voluntarily accompanied officers to the police station and was free to leave at any time.

The Andre Wallace case provides a vivid example. In 1994, when Wallace was 15, he was stopped on the street by five Chicago police officers, transported in a squad car to the station, kept overnight in a locked interview room and apprised of his rights several times.

Police never told Wallace he could leave. Nonetheless, they said Wallace should have known he was not under arrest and was free to leave.

The Illinois Appellate Court disagreed, writing that it was difficult to believe "that citizens typically agree to spend extended periods of time at police stations, kept in small windowless rooms, waiting for the police to conduct their investigations and obtain probable cause for their arrest."

The appeals court threw out Wallace's confession in August--seven years after his arrest--and ordered a new trial.

Sometimes, judges have become exasperated by police claims that a suspect remained in custody voluntarily. In a ruling affirmed by the Illinois Appellate Court in 1994, Cook County Circuit Judge Leo Holt threw out the confession of a man kept for 12 hours in an 8-by-8 interrogation room after he had been shot.

Police argued the man was there of his own free will.

"It is absurd," Holt wrote, "to believe that [the defendant] stayed in the police facility for 12 hours, after having been shot, without any medication, with a cast on his leg from his foot to his crotch, simply to fulfill an obligation of citizenship that could have as easily been fulfilled from the comforts of his home."

**Illustration**
PHOTO; Caption: PHOTO (color): Anselm Holman's lawyer did not question his arrest. A co-defendant was freed because of an illegal arrest. Tribune photo by Ovie Carter.

(Copyright 2001 by the Chicago Tribune)


# Details

| | |
|---|---|
| Subject | Confessions; Police; Series & special reports; False arrests & convictions |
| Location | Cook County Illinois |
| Title | Illegal arrests yield false confessions Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. SECOND OF FOUR PARTS.: [North Sports Final Edition] |
| Author | Ken Armstrong, Steve Mills and Maurice Possley, Tribune staff reporters |
| Publication title | Chicago Tribune |
| Pages | 1.11 |
| Number of pages | 0 |
| Publication year | 2001 |
| Publication date | Dec 17, 2001 |
| Year | 2001 |
| Section | News |
| Publisher | Tribune Publishing Company LLC |
| Place of publication | Chicago, Ill. |
| Country of publication | United States |

Case: 1:14-cv-04391 Document #: 173-53 Filed: 03/15/16 Page 4 of 34 PageID #:3202

| | |
|---|---|
| Publication subject | General Interest Periodicals--United States |
| ISSN | 10856706 |
| Source type | Newspapers |
| Language of publication | English |
| Document type | News |
| ProQuest document ID | 419516732 |
| Document URL | http://gatekeeper.chipublib.org/login?url=http://search.proquest.com/docview/419516732?accountid=303 |
| Copyright | (Copyright 2001 by the Chicago Tribune) |
| Last updated | 2010-06-28 |
| Database | 4 databases View list |

Copyright © 2016 ProQuest LLC. All rights reserved. Terms and Conditions



**document 1 of 1**

# Coercive and illegal tactics torpedo scores of Cook County murder cases Series: COPS AND CONFESSIONS. A TRIBUNE INVESTIGATION. FIRST OF FOUR PARTS.: [Chicagoland Final Edition]

Ken Armstrong, Steve Mills and Maurice Possley, Tribune staff reporters. **Chicago Tribune** [Chicago, Ill] 16 Dec 2001: 1.1.

## Find a copy

Check for full text via OCLC Link Resolver
http://chipublib.on.worldcat.org/atoztitles/link?sid=ProQ:&issn=10856706&volume=&issue=&title=Chicago+Tribune&spage=1&date=2001-12-16&atitle=Coercive+and+illegal+tactics+torpedo+scores+of+Cook+County+murder+cases+Series%3A+COPS+AND+CONFESSIONS.+A+TRIBUNE+INVESTIGATION.+FIRST+OF+FO

## Abstract

PHOTOS 5 GRAPHICS 2; [Calvin Ollins] (center) was released from prison Dec. 5 after serving nearly 15 years for a 1986 rape and murder. Ollins, who was 14 years old at the time, had confessed to police. But after DNA tests indicated he was not at the scene of the crime, the state vacated his sentence and Ollins was set free along with Omar Saunders and Larry Ollins. Public defender Denise Streff represented [Sang Kim], who spent 3 1/2 years in the Cook County Jail awaiting trial for murder and a possible death sentence. "They worked on him and worked on him and worked on him until he caved," said Streff. "It's not physical coercion like brutality. It's more subtle. You're in a little room for a couple days, so you just give up.". Luster Nelson waits in his attorney's office with his mother, Gertrude. Detectives said Luster Nelson confessed to killing two teenagers in 1999. But in March, a judge threw out the alleged confession and ruled that Nelson did not understand what he was doing when he waived his [Miranda] rights. Sang Kim, who spent 3 1/2 years in Cook County Jail before murder charges against him were dropped, says the words "and death" and "and child" were added to the cover page of a 7 1/2 page confession he signed. The body of the confession, made after 30 hours in custody, does not mention a child's death.

## Full Text

Substituting interrogation for thorough investigation, police in Chicago and Cook County have repeatedly closed murder cases with dubious confessions that imprison the innocent while killers go free.

In the first investigation of its kind, the Tribune examined thousands of murder cases filed in Cook County since 1991 and found at least 247 where police obtained incriminating statements that were thrown out by the courts as tainted or failed to secure a conviction.

Some crimes offer little in the way of physical evidence or eyewitnesses and would go unsolved were it not for a confession. But the newspaper's investigation revealed case after case in which confessions were untrustworthy or unconvincing in the eyes of jurors and judges. And these cases only hint at the depth of the problems involving one of law enforcement's most potent tools.

Police have obtained confessions from men who, according to records, were in jail when the crime occurred. They have obtained confessions refuted by DNA evidence. They have obtained confessions that contradicted the facts of the crime.

Two teenagers confessed to shooting a man from across the street. The bullet was fired point-blank. Another teenager confessed to shooting a man point-blank. The bullet was fired from a distance. Yet another teenager confessed to stabbing a woman. The autopsy found no stab wounds. In all, eight defendants confessed in those three cases. All eight were acquitted.

Police have obtained scores of confessions from suspects especially vulnerable to making false admissions of guilt. Children ages 7, 8 and 9 have confessed, only to have the charges dropped. Mentally retarded men with IQs in the 40s, 50s and 60s have confessed, only to be acquitted.

All but 11 of the 247 cases were handled by the Chicago Police Department, which relies heavily on confessions but has seen an embarrassing number of these prosecutions fall apart.

Earlier this month, after DNA tests exonerated them, four men convicted of the 1986 rape and murder of Rush University medical student Lori Roscetti had their cases thrown out. Two of them, Marcellius Bradford and Calvin Ollins, had confessed to Chicago police.

At the time, Ollins was a 14-year-old boy with mild mental retardation and no prior criminal record. His explanation of why he confessed echoes the accounts of scores of defendants interrogated by Chicago police.

"They threatened to do things and got me thinking they could do them," Ollins said. "One said he would smack me in the mouth if I didn't cooperate. Another said they would put me in jail. . . . Then they told me I would go home if I gave them what they wanted.

"I thought I knew the streets a little bit, but it turned out I was just a little kid who didn't know nothing. . . . They got me good."

In a postscript written many times, Chicago police are searching anew for Roscetti's killer, 15 years after her body was found.

As evidence of guilt, confessions hold extraordinary power. But the country's mounting number of provably false confessions -- many unraveled by DNA evidence -- has undercut the belief of some law enforcement officials that nothing short of torture could persuade someone to admit a crime he did not commit.

In the 247 cases identified by the Tribune, the charges were dropped, the confession was thrown out by the courts, or the defendant was acquitted. Although an acquittal almost always means a confession was insufficient to prove guilt, judges and juries are not required to explain their verdicts.

The cases expose a system in which police have violated well- established safeguards, such as questioning suspects after they've asked for an attorney or invoked their right to remain silent, interrogating children without trying to notify their parents, or arresting people with little or no evidence and grilling them for hours or days.

Chicago Police Supt. Terry Hillard and other police officials declined to be interviewed for this series.

Cook County State's Atty. Dick Devine said he has taken steps to enhance the reliability of confessions, including videotaping many confessions and requiring police in some cases to do additional investigation before prosecutors approve charges. But he said in an interview that he does not believe false confessions are a systemic problem.

"Many people in our system, in this jurisdiction, confess to crimes they didn't commit? No, I don't believe that," Devine said.

Among the cases identified by the Tribune, 71 were confessions by suspects who were 16 years old or younger when interrogated. Police have repeatedly violated an Illinois law meant to provide minors with the protection of a concerned adult during questioning, appellate rulings and other court records show.

Since 1991, appellate courts have thrown out the murder confessions of at least 70 defendants in Cook County -- more than half because police arrested people with insufficient evidence before interrogating them. Taking people into custody without probable cause is both illegal and a precursor to many false confessions. But in Cook County, an appellate judge wrote last year, that prohibition is "routinely ignored."

Some police officers have figured prominently in a string of cases with questionable confessions. One Chicago detective has helped get confessions from more than a dozen people who were acquitted or had their charges dropped. They included one man who records show was in jail when the crime occurred and another whose confession was undermined by DNA evidence.

The precision of science has repeatedly exposed the fallibility of confessions. In Cook County, DNA has helped unravel the murder confessions of at least eight defendants, including a Death Row inmate. Forensic work also cleared two boys, ages 7 and 8, who police say confessed to murdering 11-year-old Ryan Harris. Laboratory tests showed semen on the victim, and police eventually charged a 30-year- old man with the crime.

In the past 10 years, Chicago police have obtained confessions from three people who produced records showing they were in jail when the murder occurred. In addition, 14 other people confessed to the murders -- and some had a jail alibi committed it with them.

Two of the men with jail alibis were set free. But Daniel Taylor was convicted and sentenced to life without parole. A Tribune investigation of that murder has turned up new evidence, including crucial social service records and police reports, that bolsters Taylor's alibi and undercuts the prosecution's case.

While the paper found numerous examples of defendants who appeared to have been wrongly charged through a false confession, it is likely that some defendants were guilty. But by making illegal arrests, resorting to improper interrogation tactics or failing to investigate other evidence aggressively, police contributed to them going free.

Thirty-five years ago, when the U.S. Supreme Court required police to inform suspects of their rights to remain silent or have an attorney present, some law enforcement officials predicted the confession's demise. But in Chicago, police still obtain an admission of guilt in 7 of every 10 murder cases they solve.

Many judges and legal commentators have long feared that police can become too enamored of the confession and its virtually unmatched power to close cases quickly.

In the landmark 1964 case of Escobedo vs. Illinois, the U.S. Supreme Court wrote:

"We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the `confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation."

Sang Kim's story

Before he was freed in the fall of 2000, Sang Kim spent 3 1/2 years in the Cook County Jail awaiting trial for murder and a possible death sentence. Police said that he had confessed to kicking and pushing his pregnant girlfriend so hard that she was forced to prematurely deliver a child who died hours after birth.

Friends refused his calls, and some called him a baby killer. In Kim's nightmares, jailers led him down a long tunnel into an execution chamber.

Throughout the ordeal, Kim insisted that he was innocent and that he had confessed only after Chicago police had reduced him to a state of fatigue, fear and confusion through lies, threats and manipulation.

Police have denied mistreating Kim during the interrogation and his attempt to have his confession suppressed by a judge was refused.

But, in the end, the girlfriend recanted and said no assault occurred. Unable to prove there was a murder, much less that Kim committed it, Cook County prosecutors dropped the case. Now Kim is suing police and others involved in the investigation.

Detectives arrested Kim, then 21, in the spring of 1997, after his girlfriend, Elizabeth Xiong, 17, told police that Kim's assault led to the baby being born four months premature. His account of what happened next is based on an interview with him and court records.

At Area 5 violent crimes headquarters in the Grand Central District, police handcuffed him to an interrogation-room wall, Kim said. The room had one small window in the door and was sparsely furnished with a narrow metal bench, a chair or two and a table.

Kim was left alone for about an hour before Detective Neal Jack entered and removed Kim's handcuffs. Jack said that he was investigating Xiong's claim that he had battered her. He did not mention murder. The interrogation, which would last more than 30 hours, had begun.

Sitting in the interrogation room, Kim didn't even know Xiong had given birth, let alone that the baby had died. He denied hitting Xiong. He said they had only argued. She wanted him to pay for an abortion, he told police, but he disagreed.

Jack and Detective Robert Rutherford interrogated Kim for stretches of an hour or two, then left. When Kim tried to open the door, it was locked. He banged on the door, but no one answered.

Throughout the interrogation, Kim said, he asked for a lawyer but was ignored.

At one point, police moved Kim into a chilly holding cell with a metal bed that had no pillows or blankets. He laid down and tried to sleep but could not.

The next morning, the interrogation resumed. Rutherford, Kim said, yelled at him and jabbed his finger into his chest. Jack told Kim not to worry, that he was making too much of the questioning -- they were only investigating a misdemeanor battery case.

Kim said the detectives told him that if he signed a statement, he could go home, and that if he did not, he could go to prison for 45 or 50 years. All they needed, the detectives repeatedly told Kim, was a statement from him that matched the one they had from Xiong.

3/15/2016
Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 7 of 34 PageID #:3205

Frightened and confused, Kim finally gave in.

"I was kind of numb, and I was scared," Kim told the Tribune. "I didn't know what to think."

When a prosecutor arrived, Kim tried to recite the account the detectives had provided. When he made mistakes, Jack took him into another room and yelled at him, Kim said. Finally, he signed a 7 1/2- page confession, handwritten by the prosecutor.

The body of Kim's confession says nothing about the baby dying. But on the first page, in spaces filled out by hand, the statement says it was taken regarding the "battery and death" of "Elizabeth Xiong and child." Kim alleges that when he signed the statement, those blanks contained only the words "battery" and "Elizabeth Xiong."

After Kim signed the statement, Jack walked him downstairs. Kim thought he was going home, but instead he was taken to be booked. The officer at the desk asked him, "So who did you kill?"

"That's when it hit me: This guy tricked me," Kim said.

The confession was crucial because the rest of the evidence against Kim was thin. Cook County Deputy Medical Examiner Nancy Jones had ruled that the baby died from a premature birth caused by blunt trauma. But there was no evidence of trauma on the baby, and Jones told the Tribune she never examined the mother. She said she based her ruling on Xiong's allegations.

"If mom said this happened as the result of a physical assault, that's where you go," Jones said.

After a judge ruled that prosecutors Joe Magats and Walter Hehner could use Kim's confession, they told the court that if Kim was convicted they would seek a death sentence.

"My heart just stopped," Kim recalled. "I felt like my life was over . . . . I kept thinking, how will they do it?"

Then, on Oct. 23, 2000, Magats and Hehner dropped the charges against Kim. Xiong, they said in court, admitted she had lied, saying she had not been attacked by Kim or anyone else. Xiong declined to comment to the Tribune.

Two months ago, Kim filed a lawsuit against the detectives, Jones, Xiong and the city. The suit alleges false arrest, saying Kim confessed because of "coercion and deceit."

Rutherford told the Tribune that he never pressured Kim, and said the 30 hours in custody was "not that long."

"We never tell a guy he can go home if he confesses," Rutherford said. "We just want to get to the truth, nothing else. Something caused her water bag to break . . . I believe he was guilty of the crime."

Magats said he had "no doubts" about the confession.

"[Suspects] make allegations with every single statement," he said. "He had a full hearing and the judge didn't suppress his statement."

Hehner said that Xiong's recantation did not "reflect" on the credibility of the confession.

Jack, now a sergeant in the narcotics unit, declined to comment.

"This shouldn't have happened," said John Kelly, one of Kim's attorneys in his pending lawsuit. "But since it did, somebody should be trying to find out why."

Ambiguous interrogation rules

Over the years, appeals courts have tried to provide guidelines governing police interrogations, but few clearly delineate between improper techniques and permissible ones.

When police arrest a suspect, they must give him his Miranda warning, which includes the right to remain silent and the right to have an attorney present. If a suspect invokes either right, questioning must cease. In addition, police must not use force or the threat of force to obtain a confession.

But beyond those principles lies a world of gray. Promises of leniency are generally forbidden -- but not always. Lying to a suspect is generally allowed -- but not always.

The overarching rule is that a confession must be voluntary. To determine that, courts look at "the totality of the circumstances" to decide whether a suspect's will was overcome. That means evaluating each case individually, matching the interrogation techniques used against a particular suspect's background and vulnerabilities. Techniques deemed proper in one case might be condemned in another.

In some Cook County cases where confessions have been suppressed, judges found that police continued interrogating a suspect after he invoked his right to remain silent or asked for an attorney.

But more often, cases with confessions hinge on whether the statement was voluntary.

In Cook County, police have detained suspects for as long as three days before getting a confession and interrogated people who were in severe physical distress: In a pending case in which the defendant has been found unfit to stand trial, Cook County sheriff's investigators interrogated a paralyzed gunshot victim just out of surgery. They said he confessed by blinking his eyes.

Many defendants have accused police of extracting confessions with physical force. This year, a judge threw out the murder confession of a man who alleged Chicago police beat him and used a stun gun on his genitals.

Murder suspects in Cook County have claimed that they signed false confessions because they had been deprived of food, sleep or use of a bathroom, or held for so long they simply gave in. Some said they were coerced with promises of being released or with threats such as having their children taken away.

In 1998, a jury rejected Rashon Harris' nine-page confession and acquitted him of the murder of prep basketball star Reggie Nunnery, who was gunned down in 1995 on a West Side playground.

Harris, who was 17 and did not have a criminal record when arrested, said he was high on marijuana when detectives interrogated him. He said they handcuffed him to a ring on a wall, did not give him anything to eat and refused to let him use a restroom. Harris said he finally signed a confession because the detectives told him it was a release form.

"They were saying, like, `You sign these papers and we can let you go,' " Harris said in an interview. "So I signed them papers. If I thought I was in any sort of jeopardy, I never would have signed anything."

Police denied mistreating or duping Harris. But at trial, Harris' lawyer, James A. Stamos, presented jurors with a booking photo that showed Harris smiling broadly. It was evidence,

http://search.proquest.com.gatekeeper.chipublib.org/chicagotribune/printviewfile?accountid=303

3/8

search.proquest.com.gatekeeper.chipublib.org/chicagotribune/printviewfile?accountid=303

Stamos said, that Harris believed the detectives were going to release him.

"We didn't believe that was his confession," said Sophia Dahl, of Tinley Park, who was a juror. "It was like they talked that into him. The police orchestrated the whole thing. That's the way it looked to us."

Because Cook County law enforcement agencies will sometimes videotape statements but not the interrogations that preceded them, what occurs inside the interrogation room is often disputed and largely unprovable. Typically, defendants allege mistreatment and police deny it, leaving judges to decide who is more believable. Most times, the police version prevails.

Many suspects' claims appear baseless. Defendants claim injuries that don't show up in medical reports or abuse by officers who weren't working that day. But unless they are alleging broken bones or other severe injuries, most defendants have little evidence they can offer other than their word.

Mental capacity is key

At a hearing last year, a Cook County prosecutor and Chicago police detective said that before 18-year-old Luster Nelson confessed to killing two teenagers, he read and understood the following words, commonly known as the Miranda warning:

"I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement."

Nelson confessed on Jan. 27, 1999, about 16 hours after the murders of Mark Hemphill and Steven Bausal in a second-floor apartment in the 4800 block of West Monroe Street.

At last year's hearing, a detective told a judge that Nelson read the statement explaining his rights in about 10 seconds. A prosecutor testified that Nelson took about 90 seconds and had trouble recognizing one word -- appointed.

At the same hearing, the judge heard testimony from a clinical psychologist hired by Nelson's attorney to test his level of comprehension. She testified that she visited Nelson in jail and asked him to read the Miranda warning aloud while she transcribed his words and reactions on a laptop computer.

"Uh, uh, uh, uh, I don't know that word," Nelson began. "I have the re-re-reg to remember."

He stopped and looked up, puzzled. "And --" He stopped again and sat in silence. Finally, he began once more.

"I can be --" He rubbed his forehead. "-- Me in a --" He halted again, heaved a sigh, resumed. "Kuh-kuh-court of law, law," he said, trying to sound out the words.

"I un-un-un that I have the ra-ra-ray-rate to take a law, law, law and him point pre-wha-want me."

After reading "questioning" as "Christian" and "represent me" as "repair me," Nelson finally reached the third and final sentence. He made it halfway through, then gave up, saying, "I can't."

Elapsed time: 11 minutes, 26 seconds.

In March, Cook County Circuit Judge Marcus Salone threw out the alleged confession, ruling that Nelson did not have the mental capacity to understand what he was doing when he waived his Miranda rights. Nelson, the evidence showed, had an IQ of 53, well below the dividing line for mental retardation, which is commonly placed at 70.

Since the state's remaining evidence was a 13-year-old boy who implicated Nelson and then recanted, prosecutors didn't have a case without Nelson's confession. They dropped their charges in July. Nelson maintains he was innocent.

Mentally retarded individuals are vulnerable to exploitation, susceptible to suggestion and more likely to confess falsely than other suspects, medical and legal experts say. But police and prosecutors in Cook County have repeatedly assumed the risk of building cases on little more than a confession from such defendants.

At least two dozen of the 247 defendants in the cases examined by the Tribune were mentally retarded, or had significant learning disabilities.

Eight years ago, as it threw out a mentally retarded teenager's confession in a Downstate case, the Illinois Appellate Court wrote that "society is not being served by the police obtaining a false confession from a subnormally intelligent suspect, while the real criminal remains free."

The case of the Ford Heights Four, one of Cook County's most infamous miscarriages of justice, can be traced in large part to a false confession from Paula Gray, a 17-year-old with mild mental retardation.

Under pressure from sheriff's deputies, Gray falsely implicated herself and four men in a 1978 double murder. Two of those men were sentenced to death. The four men were exonerated in 1996 and wound up receiving $36 million in a wrongful-prosecution lawsuit.

Confessions from mentally retarded suspects often prompt legal challenges concerning a defendant's ability to understand his constitutional protections.

Last year, the Illinois Appellate Court upheld a trial judge's ruling that threw out the murder confession of a 13-year-old who had scored 52 and 54 on IQ tests. A psychologist asked the boy what "silent" meant, prompting him with the song, "Silent Night."

The boy replied: "Like silent, like you said, Christmas song. Mean like what they said, some stuff. I forget."

Videotaping in question

Responding to a series of high-profile cases where confessions have unraveled, the Cook County state's attorney's office began to videotape murder confessions when suspects consent.

Since August 1999, prosecutors have videotaped more than 400 such confessions, State's Atty. Devine said.

But in all those cases the camera did not start to record until after police had finished interrogating the suspect. Critics say such limited use of videotaping does little to prevent the kinds of abuses that can occur during interrogation and lead to disputed confessions.

Although the Chicago Police Department has vigorously opposed taping interrogations, Devine said in an interview that he would support a pilot program in which interrogations would be videotaped.

The case of Corethian Bell provides a dramatic example of how a videotaped confession can fail to resolve questions of guilt.

Bell, in a videotaped confession, explained how he was angry because his mother had resumed smoking cocaine, so he grabbed "a little kitchen knife." Then, he said, he stabbed her to death in her South King Drive apartment.

"She hurted me to the point where I just walked up to her and shanked her probably like six, seven times," said Bell, then 24, who was charged with murder for the July 2000 stabbing of his mother, Netta.

But DNA tests conducted earlier this year raise questions about Bell's guilt.

Bell was picked up by police after he came home and found his mother dead. He called police to report the murder, telling them he thought she had been shot.

At the time, he made money panhandling, selling the newspaper Streetwise and washing windshields in Hyde Park. He suffered from mental illness, including schizophrenia, and he was borderline mentally retarded, court records show. He had an IQ of 74 and had only completed school to the 8th grade.

Bell was questioned repeatedly by Chicago police detectives at Area 2 headquarters in the Calumet District, and when he was not being questioned he was left alone in the interrogation room for hours at a time.

At first, Bell repeatedly denied he killed his mother. According to court documents filed by Bell's lawyers, detectives yelled at him, told him he failed a lie-detector test and insisted he confess. He said they hit him so hard he fell off his chair.

After 50 hours, Bell agreed to make a videotaped confession. He did so, he told his attorneys, only because he thought he could later tell a judge the truth and be released.

The new forensic tests show that DNA in semen found in Bell's mother and in blood spatters on the walls of her home matches DNA from another man. According to police records, the man has told police he had sex with Netta Bell shortly before her death, but he denied killing her.

That man currently is in Cook County Jail on charges that he stabbed and sexually assaulted another woman in December 2000, six months after Netta Bell was killed and roughly five blocks from where Bell was attacked.

Corethian Bell is still in jail, awaiting trial.

Tribune analysis of murder confessions

For this series, the Tribune researched thousands of murder cases and appellate opinions dating to 1991.

A confession was defined as a statement, made to police or prosecutors, in which the defendant admitted killing the victim or participating in the crime in a way that could make him eligible for murder charges.

This includes cases where a person is held accountable under the law even though he didn't fire a shot or otherwise kill someone. For example, if two men rob a store and one shoots the clerk, both men can be tried for murder.

Instances in which the defendant made what authorities call a false-exculpatory statement--in which the defendant professes innocence but provides details that can be proven false--were not counted in the Tribune analysis. Statements that were incriminating only in context--for example, if a defendant said he was wearing particular clothes that matched eyewitness descriptions of the killer's clothing--also were not considered confessions.

When there were no copies of the defendant's statement available, reporters considered the statement a confession only if other records in the file adequately described the defendant's statement, or if attorneys involved in the case clearly recalled the defendant's admissions to police.

Also, some of the statements were given orally, so there was no signed admission to examine.

Dozens of cases had all the markings of a defendant who confessed, such as descriptions of lengthy interrogations and alleged police coercion, but they were not counted when attorneys could not remember or when the file was otherwise silent on what the defendant admitted doing.

There also are at least 700 cases from this time period in which murder charges are still pending.

----

A 10-year review of questionable confessions

The Tribune used computer records and court files to examine Cook County cases in which murder charges have been filed since 1991. In at least 247 cases, a person confessed to murderbut prosecutors dropped the charges, the courts threw out the confession or the defendant was acquitted. The Chicago Police Department handled all but 11 of these 247 cases.

WHAT HAPPENED AFTER THE 247 CONFESSIONS

Total number of confessions: 247

Case went to trial: 207

Charges dropped before trial: 36

Undetermined: 4*

Defendant convicted: 29

Defendant acquitted: 178

ALL 29 CONVICTIONS WERE APPEALED

Confession and conviction thrown out: 25

Confession thrown out but defendants convicted with other evidence: 4

25 DEFENDANTS WERE PROSECUTED AGAIN

Convicted again without confession: 10

Acquitted: 1

Charges dropped: 5

Undetermined: 9 (Eight trials pending; outcome of one juvenile's case is confidential)

WHY CONFESSIONS ARE THROWN OUT

Confessions were thrown out by judges before trial or on appeal of a conviction for a variety of reasons. They include findings that police coerced a confession, violated a defendant's right to counsel or illegally arrested a defendant before the confession was made.

FINAL OUTCOME OF CONFESSIONS

TOTAL CONVICTIONS: 14

NO CONVICTIONS: 220

Undetermined: 13

*Confessions were thrown out in these cases but the outcome is unknown: three cases have not yet gone to trial and one juvenile's case is confidential. In 20 of the 36 cases in which charges were dropped before trial, a prosecutor was prompted to drop charges after a court threw out a confession.

Source: Tribune analysis of Cook County court records

Chicago Tribune

Police use admissions of guilt to help solve cases

In about seven of every 10 murder cases it solves, the Chicago Police Department obtains a confession. That rate has held constant even as the number of murders has dropped.

CHICAGO MURDER CASES SOLVED WITH CONFESSIONS

Year Total murders Total cases solved Solved using
confession
1991 927 650 471
1992 940 594 438
1993 850 555 405
1994 930 604 392
1995 827 511 334
1996 789 426 275
1997 759 429 292
1998 703 367 255
1999 641 326 219
2000 629 294 204

Note: The Chicago Police Department defines a confession as an admission of guilt, including a claim of self-defense, that results in criminal charges. A case is considered cleared, or solved, when detectives make an arrest or identify a suspect who has died, made a deathbed confession or is in a country from which he cannot be extradited.

Source: Chicago Police Department

Chicago Tribune

----------

THE SERIES

SUNDAY

Tainted confessions

Since 1991, at least 247 murder confessions have failed to hold up.

MONDAY

Police tactics

One cop's history of dubious confessions.

TUESDAY

Juvenile arrests

Police often violate laws designed to protect youths.

WEDNESDAY

A case study

When being in jail is no alibi

**Illustration**

PHOTOS 5 GRAPHICS 2; Caption: PHOTOS (color): Calvin Ollins (center) was released from prison Dec. 5 after serving nearly 15 years for a 1986 rape and murder. Ollins, who was 14 years old at the time, had confessed to police. But after DNA tests indicated he was not at the scene of the crime, the state vacated his sentence and Ollins was set free along with Omar Saunders (left) and Larry Ollins. Tribune photo by Candice C. Cusic. PHOTO: Public defender Denise Streff represented Sang Kim, who spent 3 1/2 years in the Cook County Jail awaiting trial for murder and a possible death sentence. "They worked on him and worked on him and worked on him until he caved," said Streff. "It's not physical coercion like brutality. It's more subtle. You're in a little room for a couple days, so you just give up.". Tribune photo by Ovie Carter. PHOTO: Luster Nelson waits in his attorney's office with his mother, Gertrude. Detectives said Luster Nelson confessed to killing two teenagers in 1999. But in March, a judge threw out the alleged confession and ruled that Nelson did not understand what he was doing when he waived his Miranda rights. Tribune photo by Ovie Carter. PHOTO: Sang Kim, who spent 3 1/2 years in Cook County Jail before murder charges against him were dropped, says the words "and death" and "and child" were added to the cover page of a 7 1/2 page confession he signed. The body of the confession, made after 30 hours in custody, does not mention a child's death.

(Copyright 2001 by the Chicago Tribune)

## Details

| | |
|---|---|
| Subject | Confessions;<br>False arrests & convictions;<br>Criminal investigations;<br>Questioning;<br>Series & special reports;<br>Murders & murder attempts |
| Location | Cook County Illinois |
| Title | Coercive and illegal tactics torpedo scores of Cook County murder cases Series: COPS AND CONFESSIONS. A TRIBUNE INVESTIGATION. FIRST OF FOUR PARTS.: [Chicagoland Final Edition] |
| Author | Ken Armstrong, Steve Mills and Maurice Possley, Tribune staff reporters |
| Publication title | Chicago Tribune |
| Pages | 1.1 |
| Number of pages | 0 |
| Publication year | 2001 |
| Publication date | Dec 16, 2001 |
| Year | 2001 |
| Section | News |
| Publisher | Tribune Publishing Company LLC |
| Place of publication | Chicago, Ill. |
| Country of publication | United States |
| Publication subject | General Interest Periodicals--United States |
| ISSN | 10856706 |
| Source type | Newspapers |
| Language of publication | English |
| Document type | Feature |
| ProQuest document ID | 419549486 |
| Document URL | http://gatekeeper.chipublib.org/login?url=http://search.proquest.com/docview/419549486?accountid=303 |
| Copyright | (Copyright 2001 by the Chicago Tribune) |
| Last updated | 2012-03-29 |
| Database | 4 databases View list |

Copyright © 2016 ProQuest LLC. All rights reserved. Terms and Conditions

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 13 of 34 PageID #:3211

Back to previous page



**document 1 of 1**

# Veteran detective's murder cases unravel ; Some statements cop has extracted stand out for way they fall through Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. SECOND OF FOUR PARTS.: [North Sports Final Edition]

Maurice Possley, Steve Mills and Ken Armstrong, Tribune staff reporters. **Chicago Tribune** [Chicago, Ill] 17 Dec 2001: 1.1.

### Find a copy

Check for full text via OCLC Link Resolver
http://chipublib.on.worldcat.org/atoztitles/link?sid=ProQ:&issn=10856706&volume=&issue=&title=Chicago+Tribune&spage=1&date=2001-12-17&atitle=Veteran+detective%27s+murder+cases+unravel+%3B+Some+statements+cop+has+extracted+stand+out+for+way+they+fall+through+Series%3A+COPS+AND+CON

## Abstract

PHOTOS 6 [Harold Hill], who said police hit him and he confessed falsely to murder, is contesting his conviction. An alibi freed a co-defendant; he was in jail at the time of the crime. Retired Cook County Circuit Judge [Earl Strayhorn] said he kept track of officers' testimony once he caught them lying in his courtroom. "If a case came down to a decision on an officer's credibility and he was in that file, I ruled for the defendant," Strayhorn said. [Derrick Flewellen] demonstrates how a veteran Chicago police detective allegedly choked him during an interrogation in 1995 and pressured him to confess to two murders. A judge eventually acquitted him in both cases. Harold Hill and his public defender, Ron Haze, discuss notes in a visitation room in Pontiac Correctional Center. [Dan Young Jr.] was convicted of murder and sentenced to life in prison without parole in the 1990 killing of [Kathy Morgan].

## Full Text

He has obtained a confession from a man who, records show, was in jail when the murder occurred. He has obtained a confession from a man accused of two murders, but both cases were undermined by DNA evidence.

He helped to get confessions from two mentally retarded teenagers for two separate murder cases, but they both were acquitted. And he got the confession of a 13-year-old with severe learning disabilities who experts said could not understand his rights.

Chicago Police Detective Kenneth Boudreau has helped to get confessions from more than a dozen defendants in murder cases in which charges were dropped or the defendant was acquitted at trial.

And in one case, two defendants who confessed and were convicted are challenging those verdicts with results from DNA tests conducted after trial.

A Tribune investigation of thousands of murder cases filed in Cook County from 1991 through 2000 found that Boudreau and other city detectives had been involved in a wide range of cases that ultimately collapsed even though police obtained a confession.

One veteran detective has been assailed by defense attorneys and questioned by judges for getting a string of questionable confessions from juveniles. One recently retired detective played a part in at least eight cases in which police obtained a murder confession but the courts ruled the arrest was illegal--often a precursor to a disputed confession.

But Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons.

In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs.

Boudreau, who has earned numerous commendations for his work, declined to comment for this article. In court hearings for his cases, however, he has denied any allegations of wrongdoing, and in a sworn deposition that was part of a lawsuit, he stated that he would never condone such tactics, much less participate in them.

2 murders, 2 confessions

In June 1995, Derrick Flewellen, then 30, was walking out of St. Bernard Hospital and Health Care Center, where he had been treated for a dislocated toe.

He was approached by Chicago detectives investigating the murders of two women. Flewellen's name had come up in the investigation through an acquaintance of one of the victims.

The detectives asked Flewellen to accompany them to the violent crimes unit at 51st Street and Wentworth Avenue.

There began a lengthy interrogation that ended only after he signed two confessions to murders for which he was eventually acquitted, one of which was linked to another man through DNA. Now, six years later, Flewellen is suing the detectives and Police Department in federal court for false arrest and malicious prosecution.

Boudreau and other detectives involved in the Flewellen case denied any wrongdoing during his trial and in response to his lawsuit, according to court documents.

In an interview with the Tribune, Flewellen said he first saw Boudreau when he arrived at the police station. Boudreau accompanied him to a room with a table, chairs, a bulletin board and several boxes of papers.

Boudreau, Flewellen said, asked him about the murders of Sherry Hunt and Lovie Ford, who had been killed on the South Side two days apart.

Flewellen said he told Boudreau he knew nothing about the murders. "He asked me again, and I said I'd like to have my lawyer," Flewellen said. "He took the back of his hand ... and he struck me on the side of the head."

Flewellen said he was interrogated over more than 36 hours, sometimes by Boudreau, sometimes by other detectives.

During that time, he said he was moved among as many as three rooms. He said he was slapped and hit on several occasions by Boudreau and other detectives. At one point, he said, Boudreau came in the room, closed the door and started to choke him. He said Boudreau slammed him against the wall and hit him in the face.

Another detective came in, according to Flewellen, and pulled Boudreau off. He then stomped on Flewellen's foot, which was protected only by a soft walking cast. Flewellen said he screamed in pain.

"I was on the floor, and I kept telling them I didn't do it," he said.

Not long after, Flewellen signed handwritten confessions to the two murders. "I wasn't about to go through all that again," he said. "I signed. I didn't think I had any other choice. I wasn't going to get beat up again."

Flewellen confessed to forcing Hunt into oral sex, hitting her on the head and smothering her with a towel. He told police he watched another man kill Ford and have sex with the body.

Flewellen said in the confessions that Hunt was killed because she stole $90 worth of drugs from him and Ford had to be killed because she found out about Hunt's murder.

The Cook County medical examiner's office initially could not determine the cause of Hunt's death, though natural causes were listed as a possibility because she had bronchial pneumonia and severely infected lungs at the time of her death. After Flewellen confessed, the medical examiner's office ruled Hunt's death a homicide.

Flewellen challenged his confession at a pretrial hearing where one of his friends, Gregory Watkins, testified that he was brought in as part of the investigation and was in an interrogation room near where the detectives were questioning Flewellen.

"I could hear him screaming," Watkins testified. "I heard him scream and I heard him say, `No, no' and I heard something like ..." At that point, Watkins pounded hard on the witness stand with his fist.

Watkins testified that he recognized Flewellen's voice saying, "No, I didn't do it" and then heard "smacks, screams ... thumping ... like someone was beaten up or something. ... It went on for about a half-hour, and then it stopped and it started back up again and then I didn't hear no more."

The detectives denied they had physically abused Flewellen, and Cook County Circuit Judge Marcus Salone declined to suppress the confessions.

At trial, Flewellen's lawyers pointed to recent DNA testing that showed semen taken from Ford didn't match Flewellen or the man named in his confession as an accomplice. Instead, it matched another man well known to police: Hubert Geralds, who has since pleaded guilty to killing five women and was sentenced to life in prison but was never charged in the Ford murder.

With the DNA failing to link Flewellen to the murders and even contradicting his statement, there was little evidence against him. Salone acquitted him in both murders.

"The most damaging testimony against Mr. Flewellen is his respective statements given to investigating police officers," Salone said from the bench. "No one was able to testify that they ever observed Mr. Flewellen in the company of either of the victims. There was nothing to put Mr. Flewellen in the apartment of Miss Hunt.

"The objective scientific evidence is a complete contradiction to the defendant's respective statements. The evidence falls far short of what is necessary to sustain a verdict of guilt beyond a reasonable doubt."

Depositions paint self-portrait

Testifying under oath in 1996 as part of a federal civil rights lawsuit, Boudreau explained how he viewed allegations of wrongdoing by police.

"When I go to court and the defendant makes an accusation against me, it's nothing more than perjured testimony to try and escape punishment," Boudreau testified.

That 500-page deposition, along with another deposition from June 2000 that was part of a separate lawsuit, offers a self-portrait of Boudreau as a man who views the criminal justice system, and his role in it, in stark terms. Police always follow the rules, and suspects always try to get away with crimes by accusing the detectives who catch them of wrongdoing.

"My experience with the criminal court system," he said, "[is] that whenever a defendant is charged with a serious crime, he tends to blame everybody else except himself when it comes time for trial."

Boudreau's depositions also provide a primer on his 20-year police career, one that has brought him many accolades.

By the summer of 2000, he had received nine department commendations, he testified. He had been the police officer of the month in his district on two occasions. He had received more than 70 honorable mentions.

He also has been rewarded with prestigious assignments. In recent years, he has spent time on the department's cold case squad, trying to crack aging, unsolved cases, and investigating organized crime. Currently, he is assigned to a federal violent-crime task force.

In September, he helped organize a volunteer contingent of 50 Chicago police officers to New York City to help search for victims of the attacks on the World Trade Center.

Before he joined the Chicago Police Department, Boudreau was an officer for five years in Palos Hills. He started the department's Officer Friendly program and rose to the rank of detective. He once was named officer of the year for solving a series of thefts and burglaries, said Palos Hills Police Chief Paul Madigan.

"He was an extremely good detective," Madigan said. "He cleared up a lot of cases."

In 1986, Boudreau began his career in Chicago as a patrol officer, and less than four years later he was promoted to detective.

The promotion would have sent him back to the training academy, where new detectives receive three weeks of training, including hours on interrogating suspects.

The training includes role-playing and lectures. But the real education takes place on the street, according to veteran investigators.

Boudreau's first assignment as a Chicago detective was at the now- closed violent crimes headquarters at 39th Street and California Avenue. There, a cage for prisoners was decorated with a poster of hands gripping jail bars and a caption that read: "And Another Happy Ending," Boudreau testified.

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 15 of 34 PageID #:3213

Boudreau described himself as a hard worker and, to provide a break from the grim nature of the job, an office prankster who attached photographs of his colleagues to cartoon-character bodies and hung them in the office.

Three months after his promotion, Boudreau, a member of the Army Reserves, was called to active duty in the Persian Gulf war. He worked as a bodyguard and assistant to Maj. Gen. Terrence Mulcahy, who was then the highest ranking officer in the Army Reserves.

"Ken was invaluable to me," said Mulcahy, now Wisconsin's secretary of transportation. "The professional relationship I had with him was excellent."

When Boudreau returned to the Chicago police force in June 1991, his boss, Cmdr. Jon Burge, was entangled in one of the department's biggest scandals. Burge was facing allegations that he and some of his officers at the South Side headquarters in the Calumet District had repeatedly beaten and tortured murder suspects in the 1980s.

Boudreau testified that he supported Burge, who eventually was fired. He said he sold raffle tickets and donated money to help fund Burge's legal defense.

Boudreau also testified about one mark on his record.

Police investigators recommended that he be suspended for 10 days for his failure to get a youth officer into the interrogation room as required when questioning a juvenile suspect, Boudreau said in a deposition.

But, he added, police commanders reduced his punishment to a reprimand.

The 1991 murder case that precipitated that discipline had generated headlines because of allegations of police brutality, though Boudreau was not one of the officers accused of physically mistreating any of the suspects.

Six young suspects gave confessions. Two of those confessions were thrown out, and the charges were dropped. The remaining four were acquitted, including two who had been interrogated by Boudreau.

Throwing out one of the confessions, a trial judge cited the "oppressive atmosphere" in the station that night. The Illinois Appellate Court upheld that ruling, noting the "periodic screaming throughout the night," something Boudreau testified he did not hear.

Confessions, acquittals

In a two-year period beginning in late 1991, Boudreau helped solve at least five murders with dubious confessions that ended with acquittals, according to the Tribune's review.

The suspects said Boudreau or a partner mistreated them to get a confession, allegations the officers denied.

In one case, Boudreau and a partner said Alfonzia Neal, 31, confessed to strangling William Mack, 85, who had been found dead in Mack's apartment in the 700 block of West 60th Street.

Boudreau later testified that Neal waived his rights and signed a statement handwritten by a prosecutor. The confession said Neal had gone to ask the victim, a close friend he knew as "Brother Mack," for money. When Mack turned him down, Neal attacked him.

Lawyers for Neal later asked Cook County Circuit Judge Michael Toomin to suppress the confession, arguing that Neal was incapable of intelligently waiving his Miranda rights.

Experts hired by Neal's lawyers concluded that Neal had an IQ in the 40s, well below the dividing line for mental retardation, which is commonly placed at 70. Asked what it meant to remain silent, Neal had replied, "I know like Paul and silent in the Bible, but I'm trying to see which way do that go."

Asked to define a right, he replied, "Like right now."

Boudreau said he had no reason to believe that Neal was mentally handicapped during the interrogation. "His answers were direct, responsive and in full sentences," Boudreau testified.

Toomin refused to suppress Neal's confession, which was central to the prosecution's case. But a jury later acquitted him.

In December 1993, Boudreau and Detective John Halloran solved two separate murders with confessions from two mentally retarded teenagers. One victim was the daughter of a former police officer, the other a man killed during an armed robbery.

The suspects, Fred Ewing and Darnell Stokes, both 17, were classmates in special-education courses. Court-appointed experts testified that Ewing's IQ was about 56. One expert said Ewing "was unable to comprehend the substance of the confession which he allegedly made. ... He is virtually illiterate."

Asked by a psychiatrist during one pretrial evaluation what the right to remain silent means, Ewing replied, "It means you're going to jail." Asked if he thought he had to tell police if he did something, Ewing said, "They'll beat you up and scare you if you don't."

Stokes' attorney, Martha Fitzsimmons, said Stokes was just as malleable as Ewing.

No physical evidence linked Ewing and Stokes to the murder of the daughter of the former police officer, and separate juries acquitted them both.

Cook County Circuit Judge Daniel Kelley then acquitted them both of murdering the man during an armed robbery. Not only was there no physical evidence, a witness testified that Ewing was not involved.

In 1998, in a case that echoed those of Neal, Stokes and Ewing, Boudreau helped get a murder confession from a 13-year-old boy with a verbal IQ of 59 and full scale IQ of 73.

Four months ago, Cook County Circuit Judge Bertina Lampkin ruled that the boy did not have the mental capacity to waive his rights and threw out the confession. Prosecutors then dropped the charges.

The first line of defense

Judges are regularly asked to examine defendants' claims of coerced and illegal confessions, but they face a difficult task sifting through the "he said-she said" nature of such hearings.

Police say suspects routinely invent charges of brutality and coercion.

In credibility contests, the police start with a big advantage and almost always win.

"Why aren't more confessions suppressed?" recently retired Criminal Court Judge Michael Bolan asked. "The cops are professional witnesses. They know what to say."

In 1993, the Illinois Appellate Court declared, "One of the tragic misfortunes in our society is that there is often little physical evidence of police brutality and the accused, ignorant of their legal rights, do not have the wherewithal to speak out in the midst of their entanglement with the law enforcement process."

Reflecting on a lengthy career as a defense attorney and judge, Bolan said that though proving misconduct is difficult, he believes it does occur.

"Sure, some cops stick their head in and say something threatening or give them a crack," Bolan said. "I'm certain that it occurred and it made people frightened and they fessed up. I'm certain those things happen. ... It's hard to document. Defendants don't write reports."

Bolan said some defendants lie about what happened in the interrogation room.

"But cops lie too," Bolan said. "They say, ` He stayed here for three days voluntarily.' Sometimes that is credible and sometimes it's just pure bull----."

Retired Cook County Circuit Judge Earl Strayhorn said he kept track of officers' testimony on note cards "that carried the name of every police officer that I caught lying in my courtroom."

"And," Strayhorn said, "if a case came down to a decision on an officer's credibility and he was in that file, I ruled for the defendant."

A Tribune review of hundreds of suppression motions found that although many contained allegations of physical and psychological abuse, defendants often were unable to identify the detectives who allegedly committed the acts, weakening their claims.

The interrogation process is, by its nature, intimidating. And for a suspect, learning and remembering detectives' names is not always a high priority.

What's more, defendants often are interrogated by two or more detectives who work in rotations and dress in street clothes without the nameplates that are pinned to the shirts of uniformed officers.

The first line of defense against bad cases are the prosecutors in the felony review unit of the Cook County state's attorney's office. The Chicago Police Department--except in extremely rare occasions-- does not file murder charges against suspects without the approval of a felony review attorney.

Prosecutors typically are assigned to felony review duty before being sent to courtrooms to prosecute felony cases, and they are trained to offer defendants a choice between making an oral statement, a handwritten statement, a court-reported statement or, since August 1999, a videotaped statement.

"By the time the prosecutor shows up, it's a done deal," said assistant public defender Ann Collins, who helped defend Darnell Stokes. "The detectives have done the good cop-bad cop, they've made the fictitious promises, ` You can go home if you make a statement.' Generally, that all happens before the prosecutor comes in to be there to take the statement.

"I don't think they want to know what went on before. They turn a blind eye. What they want is a confession."

But Cook County State's Atty. Dick Devine said felony review prosecutors now demand more evidence from police before they will approve charges. They are requiring police to corroborate confessions, to check out suspects' alibis and, in some cases, to wait for autopsy reports to ensure they match the suspect's confession.

Twice as many cases get rejected at the felony review stage now than when he took office, Devine said.

"We have raised the bar on bringing cases into the system," he said.

Threats of long jail terms

"By the time they were through," said Peter Williams, "I actually thought I did it."

In March 1992, Boudreau and Halloran picked up Williams, who was 19, for questioning about a murder. They put him in an interrogation room and, according to Williams, slapped and beat him with a blackjack until he confessed.

"[Boudreau] was telling me how I did it and how I was going to go down forever," Williams, now 28, said in a recent interview in a South Side apartment. "He said I was never going home."

But Williams did go home. Police found records that showed he was in jail when the murder occurred, and the charges were dropped.

Dan Young Jr. and Harold Hill--whom Williams implicated in his confession and who also implicated Williams in their statements-- were convicted and sentenced to life in prison without parole.

The investigation began in the predawn hours of Oct. 14, 1990, when firefighters were summoned to a blaze in an abandoned building in the 1400 block of West 55th Street. The partially nude body of Kathy Morgan was found in a second-floor apartment. She apparently had been killed by blunt trauma to the head and strangulation.

The case remained unsolved for 18 months, when Hill, who was 16 at the time of the crime, was arrested on unrelated charges.

Boudreau and Halloran testified that while they were interrogating Hill about that case, he confessed to taking part in the sexual assault and murder of Morgan. Hill gave a court-reported statement implicating himself, Young, who was 31, and Williams.

Hill testified at trial that he confessed only after the detectives and Assistant State's Atty. Michael Rogers fed him the story, including the names of Williams and Young, a charge that Rogers denied in court. Hill said that Boudreau slapped him in the face and "I was scared they were going to kill me."

Boudreau and Halloran denied in court that they ever struck Williams or Hill.

Two days after Hill confessed, police arrested Young, a man who court-appointed doctors said had an IQ of 56. Young gave a confession that similarly implicated Hill and Williams.

Young testified at trial that detectives whose names he did not know kicked and beat him, and that he signed a confession because he was afraid of more brutality.

Williams was arrested the next day. He told the Tribune that he was handcuffed to a radiator pipe for hours and urinated on himself when no one allowed him to use a washroom.

He was given a bologna sandwich to eat and, later, "one guy gave me a slice of pizza, but he dropped it on the floor first," Williams recalled. "I was hungry. I ate it."

The confession he gave to Boudreau and Halloran was even more detailed than either Hill's or Young's--containing comments allegedly made by Morgan during the assault.

Each confession said all three men had sex with Morgan and tortured her.

But sometime after he gave his statement, Williams figured out that he had been in Cook County Jail on a narcotics charge at the time of the crime. Detectives confirmed Williams' alibi and he was released, but prosecutors still tried Young and Hill.

At a pretrial hearing on the admissibility of Young's confession, two psychiatrists and one psychologist testified Young did not have the capacity to understand his rights to a lawyer and to remain silent.

They said Young did not know what a ship is or where the sun rises; could not count backward or subtract 6 from 10; and could not read or write anything besides his name.

The experts said his verbal IQ was 56--only 10 points above the lowest possible score. When asked if he had been getting enough sleep in jail, Young replied: "No. For breakfast. That's all."

Judge Thomas Durkin refused to suppress the confession, accepting prosecutor Rogers' explanation that he simplified the Miranda warning of suspects' rights for Young and that he understood them.

Young and Hill were tried simultaneously by separate juries. Prosecutors presented the defendants' confessions and called Dr. John Kenney, a forensic dentist, who said a bite mark found on the victim was left by Young and a bruise was left by Hill's mouth.

Hill and Young took the witness stand and denied being involved. In an attempt to undermine the confessions and discredit Boudreau and Halloran, defense lawyers also called Williams, who described his interrogation, arrest and release.

Both defendants were convicted and Durkin sentenced them to life in prison. But, in recent months, new evidence has surfaced that has prompted lawyers for Hill and Young to seek new hearings in their case.

DNA tests conducted on blood found under the victim's fingernails, which Young's defense attorney James Perlman believes was left during the struggle before her death, does not match the DNA of the victim, Hill or Young.

Also, a dental expert hired by Perlman disputes Kenney's findings, contending that Hill's jaw size didn't match the bruise.

In an interview at Pontiac Correctional Center, Hill said he didn't know Young or Williams before they were charged and locked up together.

"I never met them in my life," Hill said.

----

Why confessions are thrown out--and what happens next

Appeals courts have determined that a defendant's murder confession should have been thrown out in at least 70 cases since 1991, a Tribune search of Cook County appellate rulings shows. Confessions given by people who were taken into police custody and interrogated with insufficient evidence--considered an illegal arrest--account for more than half of those confessions.

REASONS CONFESSIONS WERE THROWN OUT . . . TOTAL: 70 Police made an illegal arrest 37 Police made illegal search 1 Problems with interrogation 32 Juvenile interrogated without guardian 12 Suspect questioned after asking for lawyer 11 Confession coerced in some manner 5 Suspect could not understand rights 4 . . . AND WHAT HAPPENED TO DEFENDANTS IN THOSE CASES TOTAL: 70 Charges were dropped 23 Convicted 22 Trial pending 11 Acquitted 5 Not guilty by reason of insanity 1 Died before retrial 2 Outcome unknown* 6 *Most of these defendants were juveniles, whose records are confidential.

Note: In 29 cases, murder charges were filed before 1991 but the appellate ruling came after that date. In the remaining 41 cases, murder charges were filed since 1991; those cases also are included in a broader Tribune study of 247 questionable confessions.

Source: Tribune analysis of Cook County court records

Chicago Tribune

----------

THE SERIES

SUNDAY

Tainted confessions

Since 1991, at least 247 murder confessions have failed to hold up.

MONDAY

Police tactics

One cop's history of dubious confessions.

TUESDAY

Juvenile arrests

Police often violate laws designed to protect youths.

WEDNESDAY

A case study

When being in jail is no alibi

**Illustration**

PHOTOS 6 GRAPHIC; Caption: PHOTOS (color): Harold Hill, who said police hit him and he confessed falsely to murder, is contesting his conviction. An alibi freed a co-defendant; he was in jail at the time of the crime. Tribune photo by Ovie Carter. PHOTO (color): Retired Cook County Circuit Judge Earl Strayhorn said he kept track of officers' testimony once he caught them lying in his courtroom. "If a case came down to a decision on an officer's credibility and he was in that file, I ruled for the defendant," Strayhorn said. Tribune photos by Ovie Carter. PHOTO (color): Derrick Flewellen demonstrates how a veteran Chicago police detective allegedly choked him during an interrogation in 1995 and pressured him to confess to two murders. A judge eventually acquitted him in both cases. PHOTO (color) : Harold Hill and his public defender, Ron Haze, discuss notes in a visitation room in Pontiac Correctional Center. Tribune photo by Ovie Carter. PHOTO (color): Dan Young Jr. was convicted of murder and sentenced to life in prison without parole in the 1990 killing of Kathy Morgan.

(Copyright 2001 by the Chicago Tribune)

## Details

| | |
|---|---|
| Subject | Series & special reports; Criminal investigations; Police -- Chicago Illinois |
| Location | Chicago Illinois |
| People | Boudreau, Kenneth |
| Title | Veteran detective's murder cases unravel ; Some statements cop has extracted stand out for way they fall through Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. SECOND OF FOUR PARTS.: [North Sports Final Edition] |
| Author | Maurice Possley, Steve Mills and Ken Armstrong, Tribune staff reporters |
| Publication title | Chicago Tribune |
| Pages | 1.1 |
| Number of pages | 0 |
| Publication year | 2001 |
| Publication date | Dec 17, 2001 |
| Year | 2001 |
| Section | News |
| Publisher | Tribune Publishing Company LLC |
| Place of publication | Chicago, Ill. |
| Country of publication | United States |
| Publication subject | General Interest Periodicals--United States |
| ISSN | 10856706 |
| Source type | Newspapers |
| Language of publication | English |
| Document type | News |
| ProQuest document ID | 419577036 |
| Document URL | http://gatekeeper.chipublib.org/login?url=http://search.proquest.com/docview/419577036?accountid=303 |
| Copyright | (Copyright 2001 by the Chicago Tribune) |
| Last updated | 2010-06-28 |
| Database | 4 databases View list |

Copyright © 2016 ProQuest LLC. All rights reserved. Terms and Conditions

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 19 of 34 PageID #:3217

Back to previous page



**document 1 of 1**

# Officers ignore laws set up to guard kids ; Detectives grill minors without juvenile officers, parents present Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. THIRD OF FOUR PARTS.: [North Sports Final Edition]

Ken Armstrong, Maurice Possley and Steve Mills, Tribune staff reporters. **Chicago Tribune** [Chicago, Ill] 18 Dec 2001: 1.1.

### Find a copy

Check for full text via OCLC Link Resolver
http://chipublib.on.worldcat.org/atoztitles/link?sid=ProQ:&issn=10856706&volume=&issue=&title=Chicago+Tribune&spage=1&date=2001-12-18&atitle=Officers+ignore+laws+set+up+to+guard+kids+%3B+Detectives+grill+minors+without+juvenile+officers%2C+parents+present+Series%3A+COPS+AND+CONFESSIONS

## Abstract

PHOTOS 7 Toimel Mays is embraced by his mother, [Mae Mays Heath]. Mays was found not guilty of a 1997 murder when a judge said that Mays' confession could not be reconciled with the medical examiner's findings. Mays was 16 years old at the time of the killing. (Cops and confessions.) [Donald Olmetti] (center), then 16, confessed in 1997 to killing a teacher. But charges were dropped when records showed he was in another school at the time. In 1998, [Eddie Huggins], then 15, confessed to fatally stabbing a woman. After being locked up for more than a year, he was acquitted and freed because an autopsy found no stab wounds. The family of the 8-year-old boy charged in the murder of [Ryan Harris] filed a lawsuit in the case. Charges were dropped against that boy and another, age 7, when tests eliminated them as suspects. In several cases, including the Ryan Harris investigation, Detective [James Cassidy] has testified that juveniles confessed to him outside the presence of a youth officer or parent. Marcus [Marcus Wiggins].

## Full Text

Putting pressure to confess on the most vulnerable of suspects, police in Chicago and Cook County have repeatedly flouted the law while interrogating juveniles, disregarding decades-old safeguards and building murder cases that later fall apart.

Since 1991, police from Cook County law enforcement agencies have obtained at least 71 murder confessions from suspects age 16 and under that were so unconvincing or improper that the courts threw them out, prosecutors dropped the charges or the juveniles were acquitted at trial, a Tribune investigation has found.

Chicago police took a 9-year-old boy from his home, questioned him without a parent present, then left him alone in a room for more than five hours. The boy confessed at about 1 a.m. However, a judge ruled in 1999 that the boy could not understand his rights against self- incrimination. Prosecutors then dropped the charges.

A 14-year-old boy questioned by four Chicago officers confessed-- first to police, then to a prosecutor. Only then was he told of his right to remain silent. An appeals court ruled in 1997 that police illegally arrested the boy, interrogating him on little or no evidence. Prosecutors dropped the charges.

Two weeks ago, the Illinois Appellate Court threw out the confession of another 14-year-old, Ezekiel McDaniel. He alleged that Chicago police slapped him and put a gun on a table, the barrel pointing at him. The court criticized detectives for preventing his mother from being with him and concluded that a youth officer responsible for protecting McDaniel's rights "showed no interest" in doing so.

Recognizing the vulnerability of youth--that minors are more likely to forfeit rights and confess to crimes they did not commit-- lawmakers and judges have directed police to provide juvenile suspects with more protection than adults, particularly in the high- pressure confines of the interrogation room.

"A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition," the U.S. Supreme Court wrote in 1948. "He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him."

But in dozens of Cook County cases, police have seized upon that powerlessness, skirting a law intended to provide juveniles with the counsel of a parent or youth officer whose job includes explaining to children their rights.

In the past four decades the Illinois General Assembly has passed laws to safeguard juveniles against false confessions, but they are often ignored by police or apply only to exceptional cases. Illinois courts, meanwhile, have adopted a litmus test for juvenile confessions that allows many to be used even when police interrogate youths while isolating them from parents or other protective adults.

Although juvenile crime has dropped in recent years along with the overall crime rate, juveniles still accounted for 7 percent of the people arrested for homicide in Illinois in 1999, the last year for which the Illinois Criminal Justice Information Authority gathered those statistics.

If severe restrictions are placed on the investigation of young suspects, police say, many crimes could go unsolved or unpunished. That concern demonstrates the tension that exists between protecting society against young criminals and protecting innocent youths against false confessions.

In Lake County, a 10-year-old girl questioned by Waukegan police confessed to the 1995 murder of a toddler she was baby-sitting. Police interrogated the girl twice within 12 hours. The first interrogation lasted from about 10 p.m. until 3 a.m., during which time police kept the girl and her grandmother apart even though each asked to see the other, according to an appeals court ruling.

The girl was allowed to go home, but police picked her up again hours later, hurrying her to the station without letting her change out of her pajamas. The girl was convicted of involuntary manslaughter, but the Illinois Appellate Court reversed her conviction in 1997, saying her confession was not voluntary and should be thrown out.

"Unquestionably, [the girl] was a child of extreme youth, tired, hungry, frightened, and, most likely, humiliated to be wearing her pajamas in a police station while being questioned by adult authority figures," the court wrote. "The coercive potential of questioning her under these circumstances is obvious."

In Chicago, controversial cases involving confessions from juveniles have become an enduring source of embarrassment.

Marcus Wiggins, 13 years old when he confessed to murder in 1991, alleged that police tortured him with electric shock. A judge threw out Wiggins' confession the following year, and the charges were dismissed. Eddie Huggins, then 15, confessed in 1998 to fatally stabbing a woman. But the autopsy showed no stab wounds, and Huggins was acquitted. Donald Olmetti, then 16, confessed in 1997 to killing a schoolteacher. But attendance records and witness statements placed Olmetti in another school more than a mile away, and the charges were dropped.

And in one of the most heavily publicized cases in Chicago police history, two boys, ages 7 and 8, confessed to the 1998 murder of 11- year-old Ryan Harris. But lab tests detected semen on the victim's underwear, eliminating the boys as suspects. Using DNA evidence, police subsequently charged a 30-year-old man with the murder.

Maywood case highlights issue

In acquitting two Maywood teenagers and an adult of a 1997 murder, Cook County Circuit Judge Frank DeBoni said he could not reconcile the medical examiner's testimony with the teenagers' confessions.

The medical examiner testified that Derek Seymore was shot once in the head at point-blank range. The confessions from Toimel Mays, 16, and Andrew Smith, 15, said they shot Seymore from across the street.

"The only facts that this court is completely convinced of is that Derek Seymore was shot and killed and that he was shot with a gun that was placed next to his head . . . " DeBoni said in acquitting Mays, who was tried separately from Smith and the third defendant, George Jones, 23.

"Without these statements, there is no evidence that Mr. Mays was involved in anything at all," DeBoni added.

The police investigation of Seymore's 1997 murder was marked by many of the problems that the Tribune found in its investigation of a decade of murder cases, particularly in cases where juveniles were suspects.

The teenagers said they were prevented from seeing their parents while being interrogated, and that the lead investigator, Maywood Police Detective Corey Cooper, had threatened them--claims that Cooper denied. The confessions were the product of interrogations that continued off and on for nearly 24 hours.

Mays and Smith said in their confessions that they were at Jones' home when he told them to go to the corner of 12th Avenue and Randolph Street and shoot somebody in retaliation for earlier gang violence. They said they rode their bicycles there, fired six or seven shots at Seymore, then rode away.

One day after the murder, in a discovery that undermined the confessions' account that the shots were fired from across the street, a police officer with a metal detector found a shell casing in a dried puddle of blood in the grass parkway where Seymore fell.

In an interview, Mays said he was at home when police came and asked to speak with him "about some broken glass or something." When his mother, Mae Mays Heath, went to the bathroom, police whisked him away to the station, he said.

"I asked what it was about and they said they would tell me when we got to the station," Mays said. "When we got there, they said it was some murder."

Mays' mother said she walked about 12 blocks to the police station, where officers told her that they would bring her son home shortly.

When her son did not come home, she said, she went back to the station and kept pressing the officers to let her see him. They said that a youth officer was with him and, consequently, she had no right to see him.

"I told him that was a lie," Heath said. "My child was 16. I'm supposed to be there before they ask him any questions."

Mays said Cooper pressured him to confess. He said Cooper told him that Smith confessed and that he "might as well tell the truth." He said that when he insisted he was not involved, Cooper yelled at him, threatening him with a long prison sentence. Then Cooper told him he was trying to help and that Mays could go home if he signed a statement.

Mays said he was alone and confused. He said he slept fitfully in a chair with his head on the table.

"I was just scared," he said. "I wanted to talk to my mama."

In an interview, Cooper called the case "airtight," and said he treated Mays and Smith well.

"That's the defense. They're always going to say they're asking to see their kids, or the kids are asking to see their mommy or daddy," said Cooper, who was recently promoted to sergeant.

Trying to account for the medical examiner's report, Cooper said that Mays and Smith fired their guns as a diversion, while another person fired the shots that killed Seymore. He said the suspects confessed as they did to undermine the prosecution.

Trial prosecutor Earl Grinbarg declined to comment. But Michael Robie, the prosecutor who took the confessions, said he did so without having the finding from the autopsy. Even with the autopsy, he said, he was convinced the teens were guilty.

"They lied about it to confuse us," said Robie, who now works as a prosecutor in Kalamazoo, Mich.

New law protects few

Prompted by the Ryan Harris case, Illinois House Speaker Michael Madigan urged colleagues last year to forbid police from questioning suspects under 15 for any crime without a lawyer or parent present, and to require police to videotape interrogations of all suspects under 18.

But police argued those measures would make their job too difficult, so lawmakers compromised. Videotaping was dropped from the bill, and the new law required that any suspect younger than 13 have a lawyer before being questioned by police. Critics, however, contend that the measure applies so narrowly it is nearly irrelevant.

Of the 71 juveniles in the Tribune study whose murder confessions were thrown out or too questionable to net a conviction, only three would have been protected by the new law, including the two boys in the Ryan Harris case. All the others were from 13 to 16 years old when interrogated.

The limited reach of that statute typifies the state's history with juveniles and confessions. For decades in Illinois, judges and legislators have recognized that minors must be interrogated with special care. But at the same time, their laws and judicial rulings have produced safeguards with little breadth and spotty enforcement.

Under a state law called the Juvenile Court Act, a police officer who arrests a juvenile must "immediately" attempt to notify the suspect's parents and "without unnecessary delay" take him to the nearest youth officer. Those requirements, which are intended to provide minors with an adult's guidance before they are questioned, have been in effect since

Jan. 1, 1966. But from the start, they have proved largely ineffectual.

In 1967, Chicago police interrogated a 16-year-old without a youth officer or parent present. Saying police violated the Juvenile Court Act, the teenager's attorneys argued that his murder confession should be thrown out. An intermediate appeals court agreed, but in 1970, the Illinois Supreme Court ruled otherwise.

The Juvenile Court Act does not impose sanctions for violations, the court said. Even if police make no attempt to notify a juvenile's parents or a youth officer before interrogating him, that would not, by itself, invalidate a juvenile's confession, the court ruled.

That ruling kept Illinois on a course already set by the U.S. Supreme Court, which has long condemned the interrogation of juveniles without a parent or lawyer but has refused to forbid such questioning. Instead, the court has embraced a "totality-of-the- circumstances" rule, in which the absence of a lawyer, parent or other concerned adult is but one of several factors that collectively determine whether a juvenile's rights against self-incrimination have been violated.

Most states, including Illinois, use the same standard. In Illinois, the circumstances that determine whether a juvenile's confession was voluntary include the defendant's "age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises," the state Supreme Court has ruled.

Consequently, confessions have often been allowed in Illinois even though a juvenile was interrogated without a parent or youth officer present.

Although states cannot reduce constitutional protections required by the U.S. Supreme Court, they can insist upon greater ones. And in the case of protecting juveniles against coerced confessions, 12 states have done so.

Those states automatically invalidate a juvenile's confession if law enforcement officials fail to meet certain safeguards. The rules in those states vary, but in general they forbid confessions from juveniles who waived their rights without a parent, lawyer or other interested adult to advise them.

In August, the Juvenile Competency Commission, a 23-member panel appointed by Cook County State's Atty. Dick Devine, filed a report with recommendations for improving the juvenile-justice system.

A majority of the panel, which included child psychiatrists, police, prosecutors, defense attorneys, social-service workers and others, said that in cases involving serious charges, confessions should be automatically invalidated if the juvenile did not consult with an attorney before being questioned. The majority said a parent "is not an adequate substitute" for legal counsel, and cited research showing that many parents acquiesce to police and encourage their children to submit to questioning.

Devine said recently that the recommendation is under review, but that a top deputy on juvenile justice believes parents, and not lawyers, should make the final decision on whether children waive their rights against self-incrimination.

Detective in kids' cases

Almost four years before he emerged from an interrogation room in August 1998 to report that two boys, ages 7 and 8, had spontaneously confessed to murdering Ryan Harris, Chicago Police Detective James Cassidy submitted a commentary to the Tribune urging passage of laws allowing for stricter punishment for juvenile crimes, particularly murder.

"The danger is real," Cassidy wrote. "Violent juvenile offenders should be incarcerated, locked away . . . Society must protect itself from this onslaught of juvenile crime before it gets entirely out of control. Let the murder of Anna Gilvis be a reminder to us all."

Cassidy knew the Gilvis case well. He solved it with a confession from a boy who lived next door to the 84-year-old woman. The boy, Cassidy wrote, confessed to beating her severely with her cane, then slitting her throat. The boy was 10 when the crime occurred and 11 when questioned.

At trial, Cassidy testified that during questioning, the boy blurted out that he had killed her. No youth officer was present.

Although the boy was convicted of murder in 1994 and sentenced to probation--all the law would allow at that time--the case was not over. Five years later, U.S. District Judge Rebecca Pallmeyer ordered a new hearing on how Cassidy obtained the boy's statement, saying she was troubled by a physical incongruity. Crime scene evidence suggested Gilvis had been dragged from the bathroom to the kitchen. The boy weighed 85 pounds. Gilvis weighed 173.

Further, lawyers for the boy note that while he confessed to tying up Gilvis with a rope from a hanging plant, there were no hanging plants in the home and the woman actually was bound with a telephone cord ripped from the wall. Fingerprints at the scene did not match the boy's, and a bloody shoeprint was adult-sized.

In court, the boy denied killing Gilvis and said he confessed falsely.

"It is possible," Pallmeyer said, "that [he] is factually innocent."

More than two years after that hearing Pallmeyer has yet to issue a ruling in the case.

A police officer since 1973, Cassidy became a detective in 1981 and is a veteran of more than 1,000 investigations in the Area 1 violent crimes unit in the Wentworth District. He declined to comment for this article.

Cassidy has obtained confessions from other juveniles in circumstances similar to the cases of the boy convicted of killing Gilvis and the two boys who were charged with--then cleared of--the murder of Ryan Harris.

In several cases reviewed by the Tribune, Cassidy testified that juveniles spontaneously confessed to him outside the presence of a youth officer or parent. He also said he considered the defendants to be witnesses--not suspects--at the time he talked to them, an important legal distinction. Juveniles who are witnesses do not have a right to request that a parent or guardian be present in the interrogation room.

In 1991, Cassidy reported that while questioning a 13-year-old boy, the youth confessed to taking part in the shooting death of Jimmie Haynes, a Chicago Housing Authority police officer. The boy's uncle left the police station after Cassidy gave assurances that the boy was helping with an investigation, according to an appellate court opinion.

After more than 14 hours at the station, the boy voluntarily implicated himself in the shooting, according to Cassidy. No youth officer was present. The confession was thrown out by a judge who ruled that the boy had been illegally arrested by other officers who yanked him from bed and took him to the police station in handcuffs. Prosecutors eventually dropped the charges.

Cassidy has also obtained questionable confessions from adults.

Also in 1991, Cassidy said he and a fellow detective obtained a confession to two murders from a 52-year-old woman with an IQ of 54. But defense lawyers say the woman confessed to pushing one victim-- causing him to fall and hit his head--while an autopsy showed he was strangled. The woman has been found unfit to stand trial.

Earlier this year, Cook County Circuit Judge Marcus Salone threw out a murder confession obtained in 1998 by Cassidy and another detective, Wayne Bunch, saying that the

defendant, Steven Hudson, had been injured after his arrest.

Hudson, 23, contended that Bunch gouged his eyes and shocked his genitals with a stun gun and that Cassidy punched and kicked him. Both officers testified and denied abusing Hudson in any way. Salone determined that Hudson had suffered an injury after being arrested, and threw the confession out.

"Somebody is not telling the truth, and I don't know who. Accordingly, the motion is granted," Salone said.

In 1999, after lawyers for the two boys in the Ryan Harris case filed lawsuits against Cassidy and numerous police officers involved in the investigation, Cassidy received a new assignment--monitoring autopsies at the Cook County medical examiner's office.

Questioning kids in isolation

Police in Cook County have frequently questioned juveniles in isolation, impeding parents who want to accompany their children or calling in youth officers only after an initial confession is obtained, appellate rulings and other court records show.

One Chicago police detective, Lawrence Thezan, has been rebuked by the Illinois Appellate Court in two separate murder cases for not promptly notifying parents of juveniles who were being interrogated.

"You get used to that," Thezan said of the court's criticism. "The policemen are always the bad guys."

In 1998, the Illinois Appellate Court reversed the murder conviction of Leonard Thomas Stafford, who was 15 years old when he confessed to the 1994 shooting death of another teenager.

Stafford, who psychiatrists described as severely learning disabled and functionally illiterate, was questioned without a parent present. Thezan testified that Stafford was not interrogated until after his mother was contacted, but the appellate judges said they did not believe Thezan.

Thezan contradicted himself while testifying at two separate hearings about what happened the night of Stafford's arrest, the court said. At the first hearing, Thezan explained the meaning of portions of his handwritten notes. At the next hearing, he said he had no idea what those passages meant.

At the first hearing, Thezan said he went searching for the murder weapon the night Stafford confessed. At the next hearing, Thezan denied that.

The court also noted that Thezan's testimony was contradicted by two other state witnesses--a youth officer and a prosecutor--and that Thezan's handwritten notes were consistent with Stafford's description of what happened that night.

In 1999, one year after that ruling, the appellate court reversed the murder conviction of Louis Piatkowski, who confessed to a 1994 murder after being handcuffed to a police station wall for about 12 hours.

Piatkowski, 16 at the time, was interrogated without his parents there, according to court records. Thezan testified that he telephoned Piatkowski's parents' four times and didn't get an answer. But the appeals court noted "there was no documentation in a police report" of Thezan's attempts to call, and Piatkowski's father testified he was home that day and that the family had an answering machine.

At the time, Piatkowski was in a Joliet prison on a prior conviction. Thezan sought Piatkowski's temporary release for questioning, and a court granted that permission on Jan. 18, 1995. Once that happened, the appeals court said, the law obligated police to try to notify Piatkowski's parents of their plans to question Piatkowski.

But Thezan and his partner made no such attempt, even though 16 days passed before they actually picked him up.

In the two cases, Piatkowski and Stafford were both convicted again without their confessions. Stafford's second conviction was reversed in October.

Asked about the rulings challenging his believability, Thezan said: "It's just an opinion. And they were both retried and convicted, so evidently I was credible."

The Tribune review of murder cases shows that police detectives have frequently failed to notify youth officers before interrogating juveniles. Often, court records show, detectives contacted a youth officer only after getting a confession--too late for the officer to provide counsel on constitutional protections against self- incrimination.

Two years ago, the Illinois Appellate Court spelled out the duties of a youth officer.

When police detain a juvenile, a youth officer should make sure the juvenile knows his rights and that his parents know he is in custody. If a parent or guardian wants to confer with the juvenile, a youth officer should see to it that questioning ceases until they can meet. A youth officer should also make sure the juvenile is treated properly, that he is fed, allowed to rest, and allowed to use the bathroom.

But rather than protect a juvenile's rights, some youth officers have violated them, playing an antagonistic role hardly distinguishable from any other police officer.

Last year, the appellate court reversed the murder conviction of a 16-year-old arrested by Ford Heights police, saying his confession was the product of an illegal arrest. Acting on an anonymous telephone tip--insufficient evidence to establish probable cause, according to the appellate court--a female youth officer picked the teenager up at his home.

She didn't tell his grandmother that he would be questioned about a murder. Nor did she ask the grandmother to accompany them. The youth officer took the teen, a special-education student, to the police station and interrogated him without any guardian or lawyer present.

More often, youth officers get criticized for performing their jobs with utter indifference. "In a serious felony investigation, they're like a potted plant. They're just there," said Steve Drizin, a law professor and supervising attorney of the Children and Family Justice Center at Northwestern University   .

In some cases, an apathetic youth officer makes it easier for police to keep parents out of the interrogation room.

Ezekiel McDaniel was 14 years old in 1996 when Chicago police said he confessed to firing shots at a passing car, killing another teenager. McDaniel alleged that Detective Kriston Kato slapped him and placed a gun on the table, the barrel pointing toward McDaniel. Kato denied those allegations in court.

McDaniel was tried as an adult and convicted of murder, but earlier this month, the Illinois Appellate Court threw out his conviction. Although it made no findings concerning the alleged brutality, the court said McDaniel's confession had been coerced. The prosecution's options now include appealing that decision, retrying McDaniel or dropping the charges.

Detectives "clearly frustrated" attempts by McDaniel's mother to see him before questioning, the appellate court said. McDaniel's mother was at the police station from about 2:30 a.m. until 8 a.m. while her son was questioned. But Kato testified that she didn't ask to see her son.

The appeals court called that "not believable" and added, "if Detective Kato was not truthful regarding Ms. McDaniel's efforts to see defendant, then the rest of his testimony is suspect as to believability . . . "

The court also chastised the youth officer, saying she "showed no interest" in protecting McDaniel's rights. The youth officer testified that she saw McDaniel's mother in a hallway at the police station prior to McDaniel's interrogation but never spoke with her.

The youth officer also never spoke with McDaniel, court records show. The officer was in the interrogation room but never said a thing.

- - -

How rules are meant to protect juveniles during police interrogation

Several states--Illinois is not among them--will automatically void a juvenile's confession to police if certain safeguards are not met.

STATES WITH LAWS TO RESTRICT JUVENILE CONFESSIONS

Although rules vary, 12 states generally forbid confessions from juveniles who waived their rights against self-incrimination without a parent, lawyer or other interested adult to advise them.

Requires adult guardian to be present during interrogation

MONT., COLO., KAN., OKLA., TEXAS, IOWA, IND., W.VA., N.C., VT., MASS., CONN.

Note: In Illinois, a person is considered a juvenile if he or she is 16 years old or younger.

HOW LAWS APPLY TO JUVENILES IN ILLINOIS

Before interrogation, a police officer who arrests a juvenile is, by law, supposed to:

- Immediately try to notify the suspect's parents

- Bring the suspect to a youth officer without unnecessary delay

But even if a police officer does not contact a protective adult before interrogation, a confession from a minor still could be admitted as evidence because courts consider several factors:

- A suspect's age, background, education and mental capacity

- Duration of questioning

- Any physical or mental abuse by police, including existence of threats or promises

A new state law prohibits police from questioning suspects younger than 13 without a lawyer. The Tribune's study of 71 juveniles who gave questionable confessions in the past decade found that only three of those minors would have been protected.

AGE WHEN INTERROGATED

16 27

15 24

14 13

13 4

12 0

11 0

10 0

9 1

8 1

7 1

Critics contend the scope of the law is so narrow that it will not apply to most juveniles who are interrogated, as reflected here.

Source: State statutes and judicial rulings

Chicago Tribune

----------

THE SERIES

SUNDAY

Tainted confessions

Since 1991, at least 247 murder confessions have failed to hold up.

MONDAY

Police tactics

3/15/2016                      search.proquest.com.gatekeeper.chipublib.org/chicagotribune/printviewfile?accountid=303

One cop's history of dubious confessions.

TUESDAY

Juvenile arrests

Police often violate laws designed to protect youths.

WEDNESDAY

A case study

When being in jail is no alibi

**Illustration**

PHOTOS 7 GRAPHIC; Caption: PHOTO (color): Toimel Mays is embraced by his mother, Mae Mays Heath. Mays was found not guilty of a 1997 murder when a judge said that Mays' confession could not be reconciled with the medical examiner's findings. Mays was 16 years old at the time of the killing. Tribune photo by Ovie Carter. PHOTO (color): (Cops and confessions.) PHOTO: Donald Olmetti (center), then 16, confessed in 1997 to killing a teacher. But charges were dropped when records showed he was in another school at the time. Tribune file photo by Jose M. Osorio. PHOTO: In 1998, Eddie Huggins, then 15, confessed to fatally stabbing a woman. After being locked up for more than a year, he was acquitted and freed because an autopsy found no stab wounds. Tribune photo by Ovie Carter. PHOTO: The family of the 8-year-old boy charged in the murder of Ryan Harris filed a lawsuit in the case. Charges were dropped against that boy and another, age 7, when tests eliminated them as suspects. Tribune file photo by John Lee. PHOTO: In several cases, including the Ryan Harris investigation, Detective James Cassidy has testified that juveniles confessed to him outside the presence of a youth officer or parent. Tribune file photo by Jose More. PHOTO: (Marcus) Wiggins.

(Copyright 2001 by the Chicago Tribune)

# Details

| Subject | Questioning;<br>Due process of law;<br>Investigations;<br>Murders & murder attempts;<br>Confessions;<br>Series & special reports;<br>Police;<br>Juvenile offenders |
|---|---|
| Location | Cook County Illinois; Chicago Illinois |
| Title | Officers ignore laws set up to guard kids ; Detectives grill minors without juvenile officers, parents present Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. THIRD OF FOUR PARTS.: [North Sports Final Edition] |
| Author | Ken Armstrong, Maurice Possley and Steve Mills, Tribune staff reporters |
| Publication title | Chicago Tribune |
| Pages | 1.1 |
| Number of pages | 0 |
| Publication year | 2001 |
| Publication date | Dec 18, 2001 |
| Year | 2001 |
| Section | News |
| Publisher | Tribune Publishing Company LLC |
| Place of publication | Chicago, Ill. |
| Country of publication | United States |
| Publication subject | General Interest Periodicals--United States |
| ISSN | 10856706 |
| Source type | Newspapers |
| Language of publication | English |

| | |
|---|---|
| Document type | Feature |
| ProQuest document ID | 419513514 |
| Document URL | http://gatekeeper.chipublib.org/login?url=http://search.proquest.com/docview/419513514? accountid=303 |
| Copyright | (Copyright 2001 by the Chicago Tribune) |
| Last updated | 2010-06-28 |
| Database | 4 databases View list |

Copyright © 2016 ProQuest LLC. All rights reserved. Terms and Conditions

Back to previous page



document 1 of 1

# When jail is no alibi in murders ; New evidence undercuts state case Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. LAST OF FOUR PARTS.: [North Sports Final Edition]

Steve Mills, Maurice Possley and Ken Armstrong. **Chicago Tribune** [Chicago, Ill] 19 Dec 2001: 1.1.

## Find a copy

Check for full text via OCLC Link Resolver
http://chipublib.on.worldcat.org/atoztitles/link?sid=ProQ:&issn=10856706&volume=&issue=&title=Chicago+Tribune&spage=1&date=2001-12-19&title=When+jail+is+no+alibi+in+murders+%3B+New+evidence+undercuts+state+case+Series%3A+COPS+AND+CONFESSIONS.+TRIBUNE+INVESTIGATION.+LAST+OF+FO

## Abstract

PHOTOS 6 GRAPHIC MAP; Cops and confessions. [Faye McCoy], who lived in the Uptown apartment building where the murders occurred, said she saw four men leave after the killings and [Daniel Taylor] was not one of them. A jury convicted Daniel Taylor in two murders and gave him a life sentence in spite of police reports that showed he was in jail at the time. Taylor had confessed to the killings. [Dennis Mixon] was also convicted in the 1992 Uptown murders and sentenced to life in prison. Mixon insisted that Daniel Taylor was wrongly charged. " He wasn't even there," Mixon said. Daniel Taylor told police that he and seven other gang members met at Clarendon Park to plot the Uptown murders. Taylor later told police his confession was false. Police said [Lewis Gardner] confessed that he was a lookout the night of the murder and said Daniel Taylor was also involved. MAP: Site of murders: 910 W. Agatite Ave. 1. Town Hall District police station 2. Phillips' apartment 3. Youth shelter Chicago Tribune.

## Full Text

Early on a December morning in 1992, a 17-year-old gang member named Daniel Taylor sat in a windowless police interrogation room and confessed to a double murder committed two weeks earlier in the Uptown neighborhood.

With a detective, a prosecutor and a stenographer in the room, Taylor said he and seven other gang members met at Clarendon Park to plot the murders.

The eight of them, Taylor said, then walked a few blocks to a second-floor apartment on Agatite Avenue. Four waited on the street, acting as lookouts, while Taylor and three others went up to the apartment.

They broke down the door and demanded money from one of the tenants. When he refused, a gang member "shot the guy on the left side of his head, around the temple area," Taylor said in his confession. Then they turned their attention to a woman who lived in the apartment, grabbing her arms.

"Please don't, please don't," she pleaded, according to Taylor's confession.

Twenty-nine minutes after Taylor had begun, prosecutors had the evidence they would need to send him to prison for the rest of his life.

But the case built upon Taylor's confession, like others examined in a Tribune investigation, was not as airtight as it seemed.

Just as he was going to be formally charged with two counts of murder, Taylor protested to detectives that he could not have committed the crimes because he had been in police custody when they occurred.

Within days, police found an arrest report that showed Taylor was locked up for disorderly conduct at 6:45 p.m. on Nov. 16, the night of the murders. A copy of a bond slip showed he had not been released from the Town Hall District lockup until 10 p.m.

The murders occurred at 8:43 p.m., according to police.

But instead of releasing Taylor and questioning how he came to confess, detectives gathered evidence putting Taylor on the street when the murders occurred and casting doubt on his arrest records.

They found a witness--a drug dealer and rival gang member--who said he saw Taylor in Clarendon Park at 7:30 p.m. They found two police officers, Michael Berti and Sean Glinski, who then filed a report saying they emerged from an apartment a half-block from the murders after making a drug arrest and saw Taylor at 9:30 p.m.

The fact that a jury chose to believe Taylor's confession over the police records that documented his arrest and his time in the lockup illustrates the remarkable potency of confessions in the criminal justice system. Taylor's conviction also shows just how difficult it can be for a defendant to disavow his confession, even when he has an alibi supported not by relatives or friends, but by police records.

A Tribune investigation of Taylor's case has uncovered new evidence that supports Taylor's version of events and his contention that his confession was false.

The witness who put Taylor in the park now says he lied at the request of detectives, and later was rewarded with leniency on a narcotics charge.

Key portions of the chronology laid out by Berti and Glinski are undermined by recent interviews and records obtained by the Tribune.

And, the Tribune found that four months before Berti and Glinski wrote their report, a Cook County Circuit judge ordered Berti off the witness stand in an unrelated case and branded him a "liar."

"I didn't do this and they know it," Taylor, now 26, said in one of several interviews at Stateville Correctional Center in Joliet. "I was in jail when this happened. No way I could have committed those murders."

Police and prosecutors involved in Taylor's case declined to comment.

Two other Chicago men have presented the same alibi to refute murder confessions. Peter Williams confessed to murder in 1992--the same year as Taylor--but the charges against him were dropped when police verified that Williams was in jail when the crime occurred. Mario Hayes confessed in 1996, but he was acquitted three years later after producing records that showed he, too, had a jail alibi.

In the murder case that sent Taylor to prison, Chicago police charged eight people in all. Taylor and four others were convicted but the cases against the other three defendants fell apart. One was acquitted at trial and prosecutors dropped charges against the other two after their confessions were thrown out.

But Taylor's alibi raises troubling questions about all of the cases. That is because all the defendants confessed and each said Taylor was with them.

Agatite Avenue murders

Nine hundred and forty people were murdered in Chicago in 1992-- more than any year since. Jeffrey Lassiter and Sharon Haugabook were only two of them. Their deaths, in a small second-floor apartment in a brick courtyard building, did not merit a mention in the daily newspapers.

The apartment, at 910 W. Agatite Ave., was rented by Lassiter, a crack-cocaine abuser with a string of arrests. Haugabook, another drug abuser who also had been arrested numerous times, including for prostitution, had recently moved in.

According to police reports and interviews, Lassiter had long allowed prostitutes from the neighborhood to bring customers to the apartment if the prostitutes paid him with cocaine.

Several weeks before the murders, Lassiter also allowed a West Side gang member named Dennis Mixon to use the apartment to sell cocaine, according to police reports and Mixon.

On Nov. 16, at 8:43 p.m., neighbors heard gunshots and called police. When detectives arrived, they found the front door broken in and Lassiter and Haugabook on the floor, both of them shot in the head at close range.

Lassiter, 41, was pronounced dead at the scene. Haugabook, 37, was taken to Illinois Masonic Hospital, where she died without regaining consciousness.

Police found no eyewitnesses to the shooting, but another building resident, Faye McCoy, told detectives that she looked out her window after she heard the shots and saw four men walking out. One of them, she said, pointed a finger at her in warning.

One of the first people detectives sought was Mixon, after a confidential informant told them that Mixon was involved in the murders, according to police reports.

Detectives showed Mixon's mug shot to McCoy, who identified him as one of the four men leaving the building that night. Mixon, police learned, also had been in "an altercation" with Lassiter a few weeks earlier over a VCR. Police were unable to locate him.

The murders were still unsolved two weeks later when, on Dec. 2, patrol officers spotted Lewis Gardner, 15, and Akia Phillips, 19, trying to sell drugs on a street corner and took them into custody.

During questioning, officers said Gardner, whose IQ of 70 indicated borderline mental retardation, told them that he got his drugs from Deon Patrick and that Patrick was involved in the murders.

According to detectives who took over the questioning, Gardner quickly admitted a role in the murders--that of a lookout. Phillips, police said, also volunteered to help the detectives solve the murders and then, like Gardner, confessed he was a lookout.

Gardner and Phillips, according to police, implicated the rest of the defendants--Taylor, Mixon, Joseph Brown, Phillips' brother Paul, Rodney Mathews and Patrick.

A few hours later, just after 2 a.m., four detectives arrived at the youth home where he was staying, and roused a sleeping Taylor. The detectives allowed him to dress, and then took him away for questioning.

Lifetime of trauma

One way or another, Daniel Taylor has been in the custody of the state of Illinois for most of his life.

He became a ward of the Department of Children and Family Services in February 1986, at age 11, though the state first took him away from his mother three years earlier because of her cocaine use.

Taylor was one of four children; he never knew his father. His mother, Debra, now 44 and working as a hospital records analyst, said that Daniel struggled with behavioral problems, particularly a temper.

DCFS has discarded most of Taylor's records, a routine practice when wards "age out" of the system. But what few records remain reveal a youth shunted from one foster home or shelter to another. By his own count, Taylor lived in more than a dozen different homes or facilities growing up.

The remaining records make note of a wide variety of incidents, large and small. One time he threw pepper at a girl. Another time he ran away and stole a car.

Taylor recalls those years as a time when he was increasingly angry and resentful at how his mother's drug use had shattered the family.

"Being in the state, having no family that's your blood, it gets to you sometimes," he said. "It's almost like jail. It's not really home."

He turned to the Vice Lords about three months before he was arrested for the murder. His friends were Vice Lords, he said, so it made sense to him to join them.

They sold drugs, mostly small amounts of cocaine and marijuana, and liked to hang around Clarendon Park, he said.

Before the Lassiter and Haugabook murders, Taylor had been arrested five times, all in the four months before the slayings-- three times for mob action and twice for theft, police records show.

Many versions of same story

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 29 of 34 PageID #:3227

http://search.proquest.com.gatekeeper.chipublib.org/chicagotribune/printviewfile?accountid=303

Three hours after Taylor arrived at the now-closed Area 6 detective headquarters, he gave a 28-page court-reported confession.

Detective Brian Killacky would later testify that Taylor first denied that he knew anything about the murders. Killacky said he then read Taylor his rights and, without any prompting, Taylor "almost immediately" admitted taking part in the murders.

Taylor's account is dramatically different.

Killacky and Detective Anthony Villardita entered the room and, said Taylor, asked what he knew of the murders. Taylor, who was handcuffed to a chair, denied knowing anything, he said. The detectives told him Gardner and Phillips had already implicated him.

When Taylor persisted in his denials, the detectives hit him once in the side with a flashlight, he said, yelled at him and told him they would let him go if he confessed.

Finally, Taylor said, he decided to tell the detectives what they wanted to hear. He said he believed that resisting further was futile, and that the detectives would make good on their promise to release him.

"They said, `We don't want you. You're not the one. We really want Rodney Mathews and Deon Patrick,' " Taylor said in an interview.

Taylor said his confession was made up of details he picked up from the detectives' questions, from information he had heard on the street and from Akia Phillips' confession, which they gave him to read.

"I just sort of put it all together," Taylor said.

In the confession, Taylor said that he, Mathews, Patrick and Mixon went to Lassiter's apartment to collect a $200 or $300 drug debt owed to Mixon. Gardner, brothers Akia and Paul Phillips, and Brown stayed outside as lookouts.

When Lassiter said he did not have the money, according to the confession, Patrick shot him. Patrick then shot Haugabook as Taylor and Mixon held her arms.

On the last page of Taylor's confession, Assistant State's Atty. Joe Magats noted the time: 5:52 a.m.

Taylor was then put in a line-up where Faye McCoy, the woman who lived in the building and saw a group of men leaving after the shooting, was asked if she recognized him.

McCoy said she had seen Taylor in the neighborhood before, but she was certain he was not one of the four men she saw after the murders.

In an interview with the Tribune, McCoy said detectives pressed her to implicate Taylor, sometimes coming to her home in the middle of the night to get her to say she saw Taylor at the building. But she refused.

"They told me, `They say they did it,' " said McCoy, 51, a neighborhood activist who has served on local school councils. "They kept on bringing me pictures and trying to get me to say it was them."

After the line-up, Taylor was jolted when he was told he was being held on murder charges. He said he searched his mind for where he was Nov. 16.

He remembered a court date, Nov. 19, and worked backward to recall that he had been arrested the night Lassiter and Haugabook were slain and could not have been involved. He then blurted out that he had been in the lockup.

Even after detectives found records that showed Taylor had indeed been arrested and locked up, Taylor still did not go free.

Three months later, detectives arrested Mixon and said that he confessed as well. Mixon told police that when the eight defendants met at Clarendon Park before they went to Lassiter's apartment, Taylor said he had just been released from the police lockup.

Mixon's confession is the only one that was made after police learned of the lockup records that gave Taylor an alibi. It also is the only confession to work Taylor's time in police custody into the narrative of the murders, providing details that would bolster the police account of what happened that night.

Taylor's case goes to trial

By the time Taylor came to trial in late August 1995, three of his co-defendants had been set free. In one case, Judge Thomas Hett ruled that the arrest was illegal--and the confession should be thrown out- -because there was insufficient evidence to take him into custody. In another, he ruled that a detective's promise to drop unrelated drug charges was an improper inducement to confess.

In the third, a jury acquitted Rodney Mathews, who said that he confessed only because detectives mistreated him.

"When they chain you up to the wall, that's something," Mathews said in an interview. "No food. Nothing. I pissed myself. Then you get all tired.

"That's how you sign it. Your heart, man, everything is gone. I was just really tired. I was wet. I just couldn't take it no more."

For Taylor's jury, the issue was simple: Was he in the apartment on Agatite Avenue when Lassiter and Haugabook were shot, or was he in custody in the Town Hall District lockup at Addison and Halsted Streets?

The prosecution was led by Thomas Needham, the son of a high- ranking Chicago police officer and later a top aide to Mayor Richard M. Daley. Currently, he works as the chief of staff at the city Police Department and is on the governor's commission studying reform of the death penalty in Illinois.

When Needham and prosecutor Jeanne Bischoff entered Hett's courtroom for Taylor's trial, their best piece of evidence against Taylor was his confession.

Fingerprints found in Lassiter's apartment did not match Taylor or his co-defendants; no DNA was found that linked Taylor or the other defendants to the murders; and police never recovered the murder weapon.

To challenge Taylor's arrest and lockup records, the prosecutors called Adrian Grimes, a convicted drug dealer who testified that he saw Taylor at Clarendon Park at about 7:30 p.m. That put Taylor at the park 45 minutes after his arrest and more than an hour before the 8:43 p.m. murders.

Prosecutors also offered testimony from Officer Sean Glinski, who with Officer Michael Berti filed the Dec. 14 report that they saw Taylor on the street--and not in jail--around 9:30 p.m.

Glinski said he was one of several officers who responded to a radio bulletin of the shooting. When one of the officers tried to question a youth spotted in an alley less than a half-block from the murder scene, the youth fled into a second-floor apartment and Glinski and other officers followed.

The apartment was the home of Akia and Paul Phillips and their mother Andrea. Officers said that they found a small amount of cocaine there and arrested the mother.

Glinski testified that when the officers left the apartment, he encountered Taylor and asked Taylor to help him find one of Phillips' sons. Glinski said that he, Berti and Taylor drove around for 10 or 15 minutes looking for the boy. Police then dropped off Taylor at 10 p.m. at the Columbus-Maryville shelter, on Montrose Avenue.

Taylor's attorney, Nathan Diamond-Falk, forced Glinski to admit that his report was filed almost two weeks after Taylor asserted his alibi and a month after the encounter.

Glinski also acknowledged that the report was not approved by a supervisor, as department rules require, and that the report of the drug arrest never mentioned the encounter with Taylor.

Like the prosecution, the defense relied on the testimony and the records of police officers.

Officer Terrence Duffy testified that he arrested Taylor across the street from Clarendon Park at 6:45 p.m. on the night of the murders. Taylor, he said, had been screaming and jumping around. He was charged with disorderly conduct.

Duffy drove Taylor to the Town Hall District police station, and handcuffed Taylor to a metal ring on the wall. He moved him to the lockup at 7:25 p.m.--about the same time the prosecution put Taylor in the park.

Lockup keeper John Meindl testified that he left for the evening at 9:15 p.m. or 9:30 p.m. and that Taylor was still in the lockup.

Officer James Gillespie testified he started work at the station's front desk at 9:30 p.m. and issued Taylor's bond slip, which said 10 p.m., although he could not recall if he saw Taylor when he was released.

Diamond-Falk also called a handwriting expert, who said that the signature on the bond slip appeared to be Taylor's.

Taylor did not testify.

In closing arguments, Needham and Bischoff sought to discredit the officers who had testified for Taylor, accusing them of covering up sloppy record keeping for fear they would be blamed for letting Taylor leave jail early to commit the murders.

"Paperwork is not foolproof," Bischoff said. "But I'll tell you what is foolproof. And what is foolproof are the defendant's own words."

Diamond-Falk, in his closing, argued that the arrest report and bond slip showed definitively that Taylor was in custody when the murders occurred.

"There isn't one reasonable doubt in this case. The whole case is doubtful," he said. "The whole case is one big doubt despite the statement."

Jurors began deliberating late in the afternoon on September 7. By that evening, they had reached their verdict: guilty.

"A couple people were skeptical for maybe a couple minutes, but once we figured it out, it was pretty easy," one juror, Donald Borta, said in an interview.

Borta said jurors found it easy to believe that the records from the lockup officers were wrong. They could not imagine a false confession.

"The only piece that didn't seem to fit was that stuff that he'd been in jail at the time," said Daniel Cacchione, another former juror. "He could have walked out the back door for all we knew. Who knew if he was really in jail?"

Taylor was sentenced to life in prison.

Mixon, who was tried simultaneously by a separate jury, was convicted as well and also sentenced to life.

In an interview at Stateville Correctional Center, Mixon acknowledged he was in the building courtyard around the time of the murders. But he denied that he was involved. He insisted that Taylor and the six other defendants were wrongly charged.

"The guys they had in this case with me, they never set foot in that apartment," Mixon said. "Daniel Taylor, he wasn't even there."

New documents cast doubts

The testimony at Taylor's trial told only part of the story.

Adrian Grimes, a prosecution witness, told the Tribune that he lied when he testified before a grand jury and at trial that Taylor was at the park a short time before the murders occurred.

He said that while the trial was under way, he was picked up on a felony narcotics charge that had been dismissed for a lack of evidence earlier that year. But prosecutors re-indicted him and an arrest warrant was issued that allowed police to take him into custody.

Grimes said two police officers, whose names he could not recall, threatened to keep him locked up if he did not cooperate in the Taylor case.

"I wasn't even at the park," Grimes said in an interview in Logan Correctional Center in Lincoln, where he is serving time for drug possession. "But [the police] kept saying, `If you testify this guy right here was at the park, we'll let you go.'

"They told me, `Won't nobody care about him. He ain't got no family. It won't be nobody's loss.' "

Two months after he testified at Taylor's trial, Grimes pleaded guilty. Although he faced one to three years in prison, he was given two years conditional discharge and was not even required to report to a probation officer.

"Mr. Grimes was a material witness to a homicide which resulted in a conviction," a prosecutor told the judge. "This was not part of his plea agreement in regards to his testifying but because he did testify and because there was two convictions, that's why we're asking for two years conditional discharge on this matter."

Grimes said he now regrets his part in Taylor's trial.

"My intention wasn't to hurt no one. Only thing they wanted me to do is point him out and say he was at the park," Grimes said. "But they used me to destroy a perfectly good young man's life."

McCoy, another prosecution witness, told the Tribune that before she took the witness stand, prosecutors--like police had done--tried to get her to say more. They hurried her to

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 31 of 34 PageID #:3229
search.proquest.com.gatekeeper.chipublib.org/chicagotribune/printviewfile?accountid=303

their offices, she said, and showed her Taylor's confession.

"They were giving me little things they wanted me to say," McCoy said. "And I wouldn't cooperate. I wouldn't lie. They said it's not lying because it's in the confessions. They just wanted the boys. And if those boys had been there, I sure would have said so, no problem."

The Tribune also has obtained documents that cast doubt on the testimony by Glinski and the report that he and his partner, Berti, filed.

Their report said that after they arrested Andrea Phillips on the drug charge, they came outside and saw Taylor on the street, around 9:30 p.m. They said they dropped him off at the Columbus-Maryville shelter around 10 p.m.

Shelter records obtained from DCFS, however, show that Taylor did not arrive at Maryville until 3 a.m. the following morning.

What's more, Phillips said in an interview that she recalled that the officers did not leave her apartment until after 10 p.m. because they stayed to watch a TV news report about police officers with criminal records. A report on that subject was, in fact, the lead story broadcast on WMAQ-Ch. 5 news the night of the murders.

Taylor said that after his release from the lockup, he walked to the Phillips' home and arrived around 10:30 p.m. or 10:45 p.m. He said he never encountered Berti and Glinski that night. He remained at the apartment, he said, until early the next morning.

Phillips, who had been arrested that night, said that while she was still at the Town Hall station, she called the apartment and told Taylor to leave. She said she believed the drugs found in the apartment were Taylor's and that he was responsible for her arrest. Police reports obtained by the Tribune say that she made a call about 1:30 a.m.

Taylor recalled that after Phillips called to order him out, he walked to Maryville.

The Tribune also uncovered the transcript of a court hearing from August 1992, four months before Berti and Glinski filed their key report, that raises questions about Berti's credibility.

During a pretrial hearing in an unrelated murder case, then-Cook County Circuit Judge Earl Strayhorn took the extremely rare action of ordering Berti off the witness stand in midtestimony, declaring, "I don't believe a thing he says. He goes down in my book as a liar."

The Tribune also discovered police reports in the files prosecutors turned over to one of Taylor's co-defendants that Taylor's lawyer said he never received.

One report, dated December 29, reads: "Need to locate James Anderson concerning the Lassiter Homicide. Anderson was locked up in 023 District with [Taylor] . . . ." A report two days after that indicates that the police were still looking for Anderson.

At the time, Anderson was a cocaine and marijuana abuser who had a lengthy record of arrests and convictions, mostly for theft. He took many of his meals at a Salvation Army shelter.

In an interview with the Tribune at the Champaign County Jail, where he was being held on a bad-check charge, Anderson said the police did find him. He recalled that he had been arrested on the day of the murders on a warrant for retail theft.

He could not recall the names of the detectives who interviewed him, but he said that he told them that he remembered being in a cell that evening with a young black man.

"I told them I remembered being in with a kid," Anderson said in the interview. "I said I remembered the kid. But then they sort of lost interest."

Under the law, prosecutors are required to turn over evidence that could be favorable to the defense. Diamond-Falk said he doesn't remember prosecutors giving him those reports and could not find them in his files. Prosecutors Needham and Bischoff declined to comment.

Diamond-Falk said the reports could have been used to find Anderson and bolster Taylor's alibi. "Why didn't I get this? Why?" he asked, looking at the papers. "I should have gotten this."

Diamond-Falk said that he did not hire an investigator to work on the case with him; instead, he tried to do his own pretrial investigation.

His itemized bill to the court, charging $7,028 to defend Taylor, shows that Diamond-Falk did about 15 hours of case investigation. That included four hours meeting with Taylor at the jail, and two hours timing various drives, such as from the youth home where Taylor had been staying to the Area 6 violent crimes unit office at Belmont and Western Avenues where he was interrogated.

Diamond-Falk conceded that he should have retrieved the Maryville records because they were critical to bolstering Taylor's alibi. He said he never tried to track down any of the prisoners who might have been in the lockup with Taylor.

"I'm a . . . moron," he said, shaking his head.

Out of touch with the world

Since coming to Stateville prison, Taylor has received his GED, and he works as a teacher's aide, making $45 a month. He has little contact with the outside world. Most of his friends do not accept his collect calls, the only kind that can be made from prison.

He also has lost touch with his family and has had only sporadic phone contact with his mother. She has never come to see him. Now, he can hardly remember her face.

"All I can remember, really, is that she's dark-skinned like me," he said.

His first appeal was denied in 1998 by a three-judge panel of the Illinois Appellate Court.

Earlier this year, he filed a second appeal on his own, using the prison's law library to research legal issues and consulting other inmates. Judge Bertina Lampkin dismissed that petition.

Taylor said that he was not surprised by Lampkin's ruling but still was disappointed.

"I don't understand how I can be in here," he said. "How many times can somebody say they can prove their innocence like me?"

- - -

New evidence undermines Daniel Taylor's conviction

Early in the morning on Dec. 3, 1992, after Chicago Police detectives roused him from sleep at a youth shelter, 17-year-old Daniel Taylor confessed to the murder of two people in an Uptown apartment. But records showed that Taylor was being held at a police station on an unrelated charge the night of the killings. A jury convicted Taylor despite his alibi, and he was sentenced to life in prison. A Tribune investigation found evidence bolstering Taylor's claim of innocence.

The night of the crime: Conflicting accounts of Nov. 16, 1992

8:43 p.m. Time of murders

Site of murders: 910 W. Agatite Ave.

1. Town Hall District police station

2. Phillips' apartment

3. Youth shelter

PROSECUTION'S EVIDENCE

7 p.m. In his confession, Taylor said he was meeting with fellow gang members in Clarendon Park.

7:30 p.m. Convicted drug dealer Adrian Grimes testifies that he saw Taylor at Clarendon Park. Grimes later told the Tribune he wasn't even at the park.

9:30 p.m. Officer Sean Glinski testifies he and Officer Michael Berti saw Taylor on the street after arresting Andrea Phillips in her apartment (2 on map ). He said Taylor rode in a police car with him for 10 or 15 minutes helping him look for Phillips' son.

10 p.m. Glinski testifies he and Berti dropped off Taylor at the Columbus-Maryville youth shelter (3 on map) on Montrose Avenue.

Nearly a month after the murders--after police learned Taylor had an alibi--Berti and Glinski filed a report (above) saying they had seen Taylor on Nov. 16. It was not signed by a supervisor.

TAYLOR'S CO-DEFENDANTS

Seven other people confessed to taking part in the crime.

- Four defendants also were convicted, with sentences ranging from 30 years in prison to a life sentence.

- Three defendants were freed. A judge ruled that police had illegally arrested one and improperly promised to drop unrelated charges against another. A jury acquitted the third.

EVIDENCE USED IN TAYLOR'S DEFENSE

6:45 p.m. Taylor was arrested near Clarendon Park for disorderly conduct, a police report shows. He was taken to Town Hall District station (1 on map) at Addison and Halsted Streets.

7:25 p.m. Records show Taylor was moved into the lockup at the station.

Between 9:15-9:30 p.m. Taylor still was in the lockup, an officer who left the station at that time testified.

10 p.m. Taylor was released from the lockup, a bond slip (right) shows.

DISCOVERED DURING TRIBUNE INVESTIGATION

Shortly after 10 p.m. Andrea Phillips said Berti and Glinski did not leave her apartment until after they had watched the first part of a 10 p.m. newscast about police misconduct.

Between 10:30 and 10:45 p.m. Taylor, a friend of Phillips' son, says he walked to the apartment after he was released from the lockup.

1:30 a.m. Police reports show Phillips placed a phone call from the station. She says she called home and told Taylor to leave when she found out he was there.

3 a.m. Computer records show Taylor arrived at the Columbus- Maryville youth shelter on Montrose.

Sources: Court and Chicago Police Department records, Illinois Department of Children and Family Services, Tribune interviews

Chicago Tribune

----------

THE SERIES

SUNDAY

Tainted confessions

Since 1991, at least 247 murder confessions have failed to hold up.

MONDAY

Police tactics

One cop's history of dubious confessions.

TUESDAY

Juvenile arrests

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 33 of 34 PageID #:3231

Police often violate laws designed to protect youths.

WEDNESDAY

A case study

When being in jail is no alibi.

- Read all of "Cops and confessions" online at chicagotribune.com

**Illustration**
PHOTOS 6 GRAPHIC MAP; Caption: PHOTO (color): Cops and confessions. PHOTO: Faye McCoy, who lived in the Uptown apartment building where the murders occurred, said she saw four men leave after the killings and Daniel Taylor was not one of them. Tribune photo by Ovie Carter. PHOTO (color): A jury convicted Daniel Taylor in two murders and gave him a life sentence in spite of police reports that showed he was in jail at the time. Taylor had confessed to the killings. Tribune photo by Ovie Carter. PHOTO: Dennis Mixon was also convicted in the 1992 Uptown murders and sentenced to life in prison. Mixon insisted that Daniel Taylor was wrongly charged. " He wasn't even there," Mixon said. PHOTO: Daniel Taylor told police that he and seven other gang members met at Clarendon Park to plot the Uptown murders. Taylor later told police his confession was false. Tribune photos by Ovie Carter. PHOTO: Police said Lewis Gardner confessed that he was a lookout the night of the murder and said Daniel Taylor was also involved. MAP: Site of murders: 910 W. Agatite Ave. 1. Town Hall District police station 2. Phillips' apartment 3. Youth shelter Chicago Tribune.

(Copyright 2001 by the Chicago Tribune)

## Details

| | |
|---|---|
| Subject | Series & special reports; Murders & murder attempts; False arrests & convictions |
| Location | Chicago Illinois |
| People | Taylor, Daniel |
| Title | When jail is no alibi in murders ; New evidence undercuts state case Series: COPS AND CONFESSIONS. TRIBUNE INVESTIGATION. LAST OF FOUR PARTS.: [North Sports Final Edition] |
| Author | Steve Mills, Maurice Possley and Ken Armstrong |
| Publication title | Chicago Tribune |
| Pages | 1.1 |
| Number of pages | 0 |
| Publication year | 2001 |
| Publication date | Dec 19, 2001 |
| Year | 2001 |
| Section | News |
| Publisher | Tribune Publishing Company LLC |
| Place of publication | Chicago, Ill. |
| Country of publication | United States |
| Publication subject | General Interest Periodicals--United States |
| ISSN | 10856706 |
| Source type | Newspapers |
| Language of publication | English |
| Document type | News |
| ProQuest document ID | 419357719 |
| Document URL | http://gatekeeper.chipublib.org/login?url=http://search.proquest.com/docview/419357719?accountid=303 |

Case: 1:14-cv-04391 Document #: 173-52 Filed: 03/15/16 Page 34 of 34 PageID #:3232

| | |
|---|---|
| Copyright | (Copyright 2001 by the Chicago Tribune) |
| Last updated | 2012-03-29 |
| Database | 4 databases View list |

Copyright © 2016 ProQuest LLC. All rights reserved. Terms and Conditions