**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 14-cv-4391 |
| | ) | |
| CITY OF CHICAGO, Chicago Police Officers | ) | Judge John W. Darrah |
| ROBERT BARTIK, DEMOSTHENES | ) | |
| BALODIMAS, ROBERT CORDARO, | ) | Magistrate Judge Susan E. Cox |
| JOHN J. DAY, JAMES M. KELLY, MICHAEL | ) | |
| LANDANDO, ANTHONY NORADIN, and | ) | |
| RANDALL WO, Assistant Cook County State's | ) | |
| Attorneys ANDREA GROGAN and LAWRENCE | ) | |
| O'REILLY, and the COUNTY OF COOK, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT
OF ADDITIONAL FACTS REQUIRING DENIAL OF
THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**BACKGROUND**

1.      On May 14, 2005, four-year-old Jaquari Dancy died of a self-induced accidental strangulation from the loose elastic band of a bedsheet.   (**Exh. 1**, CITY1218-1219; **Exh. 2**, DCFS 36; *see also* **Exh. 3**, Excerpts of Galatzer-Levy's interviews of Diante Dancy.)   At the time this occurred, his mother Nicole Harris was at a nearby laundromat.   (**Exh. 4**, CITY394-95.)   Jaquari was pronounced dead at a hospital at approximately 6:15 p.m.   (*Id.*)

2.      When the doctor told Ms. Harris Jaquari had died, she completely fell apart, screaming and wailing.   (**Exh. 5**, Day Dep. 62:18-64:17; **Exh. 6,** Harris Dep. 168:02-169:13; **Exh. 7**, Sta-Von Dancy Dep. 215:01-17.)   Less than an hour later, she and Jaquari's father, her fiancé Sta-Von Dancy, were asked to come with officers of the Chicago Police Department ("CPD") to CPD's Area 5 Headquarters, which housed its Violent Crimes Division.   (**Exh. 8**, CITY 414-15)

1

Once there, CPD detectives interrogated Ms. Harris for 30 hours, deprived her of sleep, physically shoved her, berated her, refused her requests for counsel, and threatened her with the loss of her surviving son, then five-year-old Diante Dancy.   (**Exh. 6**, Harris Dep. at 276-285.)

3.     As soon as Diante was taken from Ms. Harris to be turned over to his grandmother, Defendant Noradin shoved her into an interrogation room at Area 5, handcuffed her to a bench, and told her she was "under arrest for murdering her f**ing son." (**Exh. 6**, Harris Dep. 276:09-277:04.)

4.     He demanded she say what Defendant Officers had already decided was true: that she had killed her child.   Because she insisted she had not, she was left locked in the interrogation room for hours, deprived of sleep and prevented from using the restroom.   (***Id.***, 282:16-285:24.)

5.     According to both CPD's Standard Operating Procedures and Plaintiff's police practices expert Gregg O. McCrary, the first phase of a criminal investigation is to determine whether or not a crime has been committed.   (**See Exh. 9,** Detective Div. Standard Operating Procedures, excerpt, at CITY246; **Exh. 10,** McCrary Expert Rpt. at 7.)   Here, however, the City and several officers denied that to be the case.   (**Exh. 11,** City's Resp. to Plaintiff's First Set RTAs - No. 3; **Exh. 5**, Day Dep. 62:18-64:17; **Exh. 12**, Balodimas Dep.40:16-41:13; **Exh. 13,** Wo Dep. 28:08-29:03.)   Several of the officers testified that they believed Ms. Harris had killed Jaquari from their first interaction with her, before any evidence had come in to support a belief that it was either an accidental death or a murder.   (***Id.***)

6.     When the Detectives were initially unable to get Ms. Harris to confess, they fabricated a confession that they attributed to her in a case report.   (**Exh. 14**, CITY399.) The Defendant Officers soon learned that the confession they fabricated and attributed to Ms. Harris did not match the physical evidence, so they then claimed that she recanted this confession.   (Exh.

**15**, CITY421; **Exh. 6,** Harris Dep. 280-07-281:16; *see also Harris v. Thompson*, 698 F.3d 609, 614 (7th Cir. 2012) ("That first confession was undisputedly false").

7.      After more than 15 hours in custody, she was taken to another police station for a polygraph examination at the CPD's Polygraph Unit (or "the Unit").   (**Exh. 16**, Noradin Dep. 181:11.)   Ms. Harris believed that the polygraph examination would exonerate her since she had not harmed Jaquari, but Defendants lied to her about her polygraph results, telling her it showed she was lying when in fact it showed she was telling the truth.   (**Exh. 6**, Harris Dep. 203:03-10, 217:10-217:19; **Exh. 17**, Honts Rpt. ¶¶ 20.5, 22.) They continued to hold her at the Polygraph Unit, calling her names and threatening her. (**Exh. 6**, Harris Dep. 203:03-10, 217:10-19.) Defendant Bartik, then a CPD-polygrapher, along with Detectives Noradin, Day, and Kelly, used the polygraph examination process as a tool to break Ms. Harris, and pressured her until they got what they wanted: her acquiescence to a confession that the Defendant Officers themselves had fabricated and fed to her.   (**Exh. 6**, Harris Dep. 204:03-10, 218:01-224:03; **Exh. 17**, Honts Rpt. ¶¶ 20.5, 22.)

8.      After hours at the Polygraph Unit, when Ms. Harris was brought back to Area 5, Detective Cordaro assured her she should say what they needed her to say, and "fight the case from the outside" – that this was the way she "would be able to go home."   (**Exh. 6**, Harris Dep. 408:08-409:18.)

9.      At the time Ms. Harris was arrested, the Defendant Officers knew that she had been at a nearby laundromat when Jaquari suffocated from that elastic band.   Ms. Harris had specifically told them this fact, Diante Dancy had told them this fact (**Exh. 1**, CITY 1218-19), and Sta-Von Dancy, who *had been home at the time of the incident*, also specifically told them this fact.   (**Exh. 4**, CITY394-95; **Exh. 18,** CITY412-413.)   CPD officers never took any step to verify

whether Ms. Harris was in fact at the laundromat at that time.   (**Exh. 12**, Balodimas Dep. 73:21-74:10.)

10.     The Defendant Officers also knew that Ms. Harris's five-year-old son Diante had witnessed Jaquari place the elastic band around his own neck.   On Sunday, May 15, 2005, Diante had made this statement in front of two CPD Detectives, Wo and O'Shea, to Ale Levy of the Chicago Children's Advocacy Center.   (**Exh. 1**, CITY 1218-1219, **Exh. 1a** CITY1220-21.)   The following day, he made the same statement to Karen Wilson of the Illinois Department of Children and Family Services ("DCFS").   (**Exh. 2**, DCFS 36 ("Diante sates that Jaquari put a sheet around his neck and that is why he is dead.   [I] asked Diante who put the sheet around Jaquari's neck. He states that Jaquari did.   [I] asked Diante if he saw his mommy or daddy tie the sheet to Jaquari's neck.   He states that he did not see either one of them tie a sheet to Jaquari's neck.").)

11.     After Ms. Harris had purportedly confessed and been formally charged, the Defendant Officers did what they could to bury Diante's exculpatory statements that Jaquari had harmed himself.   First, someone wrote "**DRAFT**" in bold letters across Detective Wo's GPR – something Wo testified he did not do and had never seen done to a GPR.   (**Exh. 1 and 1a**; **Exh. 13**, Wo Dep. 164:07-22.)   Numerous other defendants also testified that they had never seen the word **DRAFT** written on a GPR in this manner.   (**Exh. 16**, Noradin Dep. 401:11-402:17; **Exh. 12**, Balodimas Dep. 170:13-23; **Exh. 19**, Kelly Dep. 282:24-283:23; **Exh. 20**, Cordaro Dep. 204:06-205:04.)   None took responsibility for writing the draft – it just mysteriously appeared on the document.

12.     Second, Defendant Officers Noradin, Kelly, Day, and Wo intentionally omitted from their Cleared and Closed Supplemental Report not only Diante's repeated statements to Levy, Wo, O'Shea, and Wilson, but also the undeniable fact that Diante had been a witness to Jaquari's

accident. **(Exh. 21**, Cleared & Closed Rpt. at CITY 373-74.) Although Defendant Officers Noradin, Kelly, Day and Wo each admit a role in the preparation of the Cleared and Closed Report, not one of them is willing to take responsibility for omitting Diante Dancy as a witness from the Cleared and Closed Report or for omitting from that report the specific statements Diante made. (**Exh. 16,** Noradin Dep. 378:01-383:04; **Exh.19**, Kelly Dep. 264:19-23, 284:23-285:05, 288:09-289:23; **Exh. 5**, Day Dep at 244:5-246:6; **Exh. 13**, Wo Dep at 10:10-11:14.)

13. In September 2005, Ms. Harris was tried and convicted for the murder of her son Jaquari. The trial court did not allow Diante to testify. *Harris v. Thompson*, 698 F.3d 609, 612 (7th Cir. 2012). On October 18, 2012, the Seventh Circuit Court of Appeals vacated Ms. Harris's conviction. *Id.* at 650; **Exh. 22**, City's Resp. Am. Third Set RTAs No. 1.) On June 17, 2013, the Cook County State's Attorney moved to vacate the conviction and dismiss the charges against her in their entirety (**Exh. 23**, PL Nicole Harris 5141-46; **Exh. 22**, City's Resp. Am. Third Set RTAs - No. 2.). On January 23, 2014, the Chief Judge of the Circuit Court of Cook County Criminal Division granted Ms. Harris a long overdue Certificate of Innocence. (**Exh. 24**, PL Nicole Harris 9677.) Although the statute expressly allows for it, 735 ILCS 5/2-702(e), the Cook County State's Attorney did not oppose Ms. Harris's petition. (**Exh. 22**, City's Resp. Am. Third Set RTAs - No 4.)

14. Ms. Harris's certificate of innocence is a judicial declaration that she is innocent as a matter of the law of the crime for which she was convicted. *See* 735 ILCS 5/2-4702(h).

### *MONELL I*

**Since at least 1989, if not earlier, the Chicago Police Department ("CPD") intentionally did not supervise its Polygraph Unit, enabling it to act in flagrant violation of constitutional rights, as well as state and national polygraph standards. CPD unabashedly used this unsupervised Polygraph Unit and the polygraph examination process as a tool to coerce individuals to falsely confess, knowing full well that polygrapher misconduct was never investigated, addressed, or disciplined in any way.**

## THE POLYGRAPH UNIT GENERALLY

15.     From at least 1998 to at least 2010, the City of Chicago used its Polygraph Unit and the polygraph examination process as a tool to coerce individuals to falsely confess to crimes. (**Exh. 17**, Honts Rpt. ¶ 20.5.)

16.     During this period, the City of Chicago:

a.     Failed to establish any policy whatsoever to ensure the administration of reliable polygraph examinations (**Group Exh. 25**, CITY1455-61, CITY1447-50, 8551-58, 8559-66; **Exh. 26**, Hickey Dep. 15:06-17:09, 18:17-26:16; 31:11-32:18 (James Hickey represented and spoke for the City as a Rule 30(b)(6) witness as to the CPD's policies, practices and/or customs, training, supervision and discipline with respect to the Polygraph Unit));

b.     Failed to establish any policy or practice to ensure that its polygraph examiners were properly licensed and educated (**Exh. 26**, Hickey Dep. 27:08-28:11);

c.     Failed to establish any policy or practice to ensure that its polygraph examiners applied standard-of-care scoring to polygraph examinations (***id.***, 63:07-23);

d.     Failed to establish any policy or practice to ensure that its polygraph examiners followed – or even knew of – national standards for the administration of polygraph examinations (***id.***, 39:21-40-07; 45:11-13);

e.     Failed to establish any policy or practice to ensure that its polygraph examiners

followed – or even knew of – Illinois law with regard to the administration of polygraph examinations (***id***., 41:16-44:16; 44:18-45:10); or

      f.    Failed to supervise the Unit and its examiners in any substantive way whatsoever (***id***., 45:01-47:02; 49:06-11).

17.    The City has ***never*** conducted any review of the Polygraph Unit. (**Exh. 26**, Hickey Dep. 44:18-45:10; 45:01-47:02; 49:06-50:07; **Exh. 27** City's lead attorney John Gibbons' Nov. 10, 2015 statements to the Court at 25:05-08; **Exh. 28,** Verif. Third Resp. to First Set Interrogs. No. 4 (identifying three pages of performance rating cards for two of Unit's polygraphers as the only documents responsive to an interrogatory about any reviews or analyses of Unit).)

## POLYGRAPH EXAMINATION AS FALSE EVIDENCE PLOY

18.    In 2005, the City encouraged and condoned the use of the polygraph examination and process associated with polygraph examinations as a false evidence ploy. (**Exh. 17**, Honts Rpt. ¶ 20.5.) A "false evidence ploy" involves the presentation of false evidence during an interrogation. (***Id.*** ¶ 20.5.1. **Exh. 29**, Leo Expert Rpt. at 3, 24-26.) False evidence ploys are commonly found as a contributing factor in verified cases of false confessions, including false confessions confirmed false by DNA. (**Exh. 17**, Honts Rpt. ¶ 20.5.1.)

## THE CITY WAS AWARE OF THE RISK OF FALSE CONFESSIONS

19.    In 2005, the CPD was generally aware of the risk of false confessions following polygraph tests, and yet the CPD admits that it took no measures to avoid manipulation of the polygraph process to prevent false confessions. (**Exh. 17**, Honts Rpt. ¶¶ 20.5, 24; **Exh. 26**, Hickey Dep. 71:13-73:10; **Exh. 30**, Bartik Dep. 182:14-185:14.) Indeed, the CPD intentionally created an organizational structure in which the Polygraph Unit was allowed to function without any

professional oversight and without any substantive supervision. (**Exh. 26**, Hickey Dep. 45:01-47:02; 49:06-50:07.) These failures demonstrate that as Ms. Harris's May 2005 confession, the City of Chicago was unconcerned about improper polygraph techniques, inaccurate polygraph results, or the improper use of the polygraph process leading to false confessions. (**Exh. 17**, Honts Rpt. ¶ 20.4.)

20. Defendant Bartik was equally unconcerned and remains unconcerned to this day. (**Exh. 30**, Bartik Dep. 184:07-22.) Indeed, Bartik does not believe false or fabricated confessions occur. (***Id.***, 183:05-07.) He testified that he never obtained or witnessed a false confession, and he cannot think of a circumstance under which a false or fabricated confession might occur. If a subject confesses or gives an inculpatory statement during a polygraph examination, he believes the person is always telling the truth; if the confession takes place during the pre-test stage, he is so confident that the person is telling the truth that he does not then administer a polygraph examination. He deems it wholly unnecessary in such a circumstance. (***Id.***, at 184:03-185:22, 188:24-190:12; **Exh. 31,** Bartik McGee Dep. at 120:23-122:08, 129:04-08, 157:23-158:24.)

## NO SUBSTANTIVE POLICIES, PRACTICES, OR PROCEDURES IN THE UNIT

21. Although polygraph examinations were routinely used as a tool in criminal investigations during the applicable time period, the CPD had no policy, practice, or procedure regarding the criteria required to be used by a CPD polygraph examiner. (**Exh. 32**, O'Neill Dep. 33:01-04 (Donald O'Neill represented and spoke for the City as a Rule 30(b)(6) witness as to Bartik's qualifications as a polygraph examiner, his supervision, and his personnel evaluations and/or discipline from 1998 through the present).) The City did no investigation to verify whether a polygraph examiner graduated from an accredited school; which technique, if any, the polygraph examiner learned or applied; or which method of scoring the polygrapher used. (**Exh. 26**, Hickey

8

Dep. 63:07-23.) It did not monitor the status of its examiners' state licenses; it did not require *any* peer review of polygraph examinations; and it did not employ any quality control whatsoever with respect to polygraphs. (*Id.* 27:08-28:1, 63:13-64:08, 66:10-67:21; **Exh. 30**, Bartik Dep. 115:08-116:24.)

22.     The CPD understood its responsibility to ensure that Bartik maintained his state deception detection license. (**Exh. 32**, O'Neill Dep. 46:22-24.) There is, however, no documentation whatsoever that CPD ever: (a) verified that Bartik or any polygraph examiner graduated from a certified school of deception detection; (b) verified that Bartik or any polygraph examiner had obtained a state deception detection license; (c) verified whether Bartik's or any other polygrapher's examiner's license (if any) was current; or (d) determined whether any citizen had registered a state complaint regarding Bartik's or any other polygraph examiner's license. (**Exh. 26**, Hickey Dep. 33:01-36:18; **Exh. 32**, O'Neill Dep. 37:20-42:02.)

23.     To the limited extent that the CPD Polygraph Unit had any written Standard Operating Procedures ("SOPs") that were in effect in 2005, those SOPs were substandard as compared to professional standards and practices in effect nationally in 2005. (**Exh. 17**, Honts Rpt. ¶ 20.)

## NO TRAINING IN THE POLYGRAPH UNIT

24.     Bartik's training was not in compliance with any of the major professional organizations' recommendations for continuing education. He admitted to reading no professional literature, and he showed no interest in the basic science of polygraphy, no interest in learning new material, and no awareness of the problem of false confessions, demonstrating a flagrant disregard for science, professionalism, and justice. (**Exh. 30**, Bartik Dep. 22:04-21, 24:11-25:03, 26:23-27:6; **Exh. 17**, Honts Rpt. ¶¶18.3.4-18.3.4.4.)

25.     Bartik had no reason to keep current in polygraphy.   The City had no continuing education requirement for Bartik or any of its polygraph examiners. (**Exh. 32**, O'Neill Dep. 46:20-47:01.)   O'Neill testified that in his 28-year CPD career Bartik had attended only two trainings and in any event, CPD had maintained no record of his attendance at either.   (***Id.,*** 50:09-14; **Exh. 30**, Bartik Dep. 30:05-20.)   Further, the CPD did nothing to determine whether Bartik implemented any other training or otherwise kept abreast of the developments in the polygraph field. (**Exh. 32**, O'Neill Dep. at 46:20-47:03; 51:15-52:10.)   Indeed, Bartik testified that nothing he learned at these two limited trainings that he had attended had any effect on his conduct as a polygraph examiner.   (**Exh. 30**, Bartik Dep. at 15:11-15, 16:09-13, 17:19-22.)

26.     The utter lack of training and of supervision enabled Bartik and other polygraph examiners to manipulate the polygraph process to produce the results the CPD wanted, despite the known risk of false confessions in conjunction with polygraph examinations.   (**Exh. 17,** Honts Rpt. ¶¶20.5, 24.)

## NO SUPERVISION OF THE POLYGRAPH UNIT

27.     In May 2005, the Polygraph Unit was a sub-unit of the Detective Division, and no supervisor of the Unit was trained in polygraphy.   (**Exh. 26**, Hickey Dep. 49:06-10; 51:02-06.) Such informed supervision was in fact impossible because from 1998 through at least 2010 no supervisor of the Polygraph Unit was trained in polygraphy.   (***Id.***)

28.     The City employed no quality control of any kind whatsoever over the work of the Polygraph Unit – a fact both the City and Bartik admitted.   (**Exh. 26**, Hickey Dep. 65:18-66:15; 67:16-21, 70:15-71:01**; Exh. 30**, Bartik Dep. 123:08-15;).   Neither CPD nor any external agency retained by CPD ever once conducted an audit of the Polygraph Unit, and the CPD established no mechanism to collect complaints about the Polygraph Unit or its examiners. (**Exh. 26**, Hickey Dep.

76:14-77:15, 90:16-18, 94:23-99:20.)   The City did not maintain any statistics regarding true, false, or inconclusive polygraph results, let alone confessions stemming from visits to the Unit. (*Id.*, 54:05-11, 56:12-58:06.)

29.     Rather, the City only began to maintain statistics when the focus of the Polygraph Unit switched from criminal investigations to administering pre-employment examinations. (**Exh. 32**, O'Neill Dep. 57:16-58:23.)

<u>**NO SUPERVISION OF POLYGRAPH PROCEDURE**</u>

30.     Consistent with the City not supervising the Polygraph Unit, the City also did not supervise any polygraph exams administered by any individual polygrapher.   Bartik testified that the CPD never communicated to him any requirements about polygraph procedure, and that he was free to do whatever he thought was appropriate in terms of polygraph technique.   (**Exh. 30**, Bartik Dep. at 52:6-9, 53:18-21; 74:17-22; 126:03-22)   Bartik was never given a written "polygraph examiner post order" or job description, and he worked as a CPD polygraph examiner for three or four years before he even learned that the Unit had a Standard Operating Procedure ("SOP').   (*Id.*, 109:22-110:7.)   That was of no matter:   he testified that no supervisor ever monitored the Unit for compliance with the SOP, and it had no effect whatsoever on his practice as a polygraph examiner.   (*Id.*, at 126:03-17.)   The City likewise acknowledged that it relied on its individual polygraphers to act in accordance with their licenses – despite that the City never checked their validity.   (**Exh. 26**, Hickey Dep. 64:24-65:17; **Exh. 32** O'Neill Dep. 18:23-19:14, 31:24-36:18.)   The City therefore allowed and enabled Bartik to use archaic and discredited testing and scoring techniques that were not accepted as valid practices in the polygraph profession in May 2005.   (**Exh. 26** Hickey Dep. 63:07-23; **Exh. 17**, Honts Rpt. ¶¶ 16, 18.3.4.)

31.     Bartik readily conceded that throughout his entire CPD polygraph career, he used a subjective global assessment (the "Reid technique") to score polygraph examinations in criminal investigations, although he used numerical scoring in more recent years **at the CPD's insistence** for pre-employment polygraph examinations only. (**Exh. 30**, Bartik Dep. at 86:08-90:09.)  By the time of Ms. Harris' 2005 polygraph, it was well known within the scientific community that global assessment scoring was vastly inferior to numerical scoring, and indeed considered archaic and discredited.  (**Exh. 17**, Honts Rpt. ¶¶ 16.1, 16.3.6, 17.)  Indeed, the questions asked of Ms. Harris were not properly formulated under well-known 2005 scientific standards, and were in fact biased toward a false positive outcome (*i.e.*, "an actually innocent person failing the examination").  Moreover, quite to the contrary of what Bartik reported and/or found, an analysis of Ms. Harris' 2005 polygraph examination data using 2005 scientifically-accepted numerical scoring indicated that she had been truthful.  (*Id.* ¶ 23.)

## NO PERFORMANCE REVIEW AS A POLYGRAPHER AND LIMITED REVIEW AS A POLICE OFFICER

32.     Over a 13-year period, from January 2000 to October 2012, Bartik was only evaluated as a police officer seven times: 1/2000, 1/2001, 8/2001, 8/2002, 8/2010, 8/2011 and 8/2012.  H was given no reviews at all from September 2002 to May 2005, the 2 ½ years before he administered an exam to Ms. Harris and participated in obtaining her false and fabricated confession.  He also received no review at all for the next 5 ½ years that followed that exam. (**Group Exh. 33**, CITY 8099-8199.)

33.     When Bartik was reviewed, none of Bartik's evaluations were performed by a person trained in polygraphy, and the CPD did nothing to determine how Bartik performed as a polygrapher.  (**Exh. 32**, O'Neill Dep. at 54-57; **Exh. 26**, Hickey Dep. 49:06-10; 51:02-06; **Exh.**

12

**30**, Bartik Dep. 56:23-57:03, 58:16-17, 68:02-06; **Exh. 32,** O'Neill Dep. at 75-77.).) Bartik

testified he was not supervised at all. (**Exh.30,** Bartik at 57:10-20, 59:3-8, 63:20-64:6, 68:7-69:1)

Not only was he not supervised, but there also was no peer review among polygraph examiners.

(**Exh. 32**, O'Neill Dep. at 83; **Exh. 30,** Bartik Dep. 78:10-14). The only thing the City could

remotely point to as "quality control" over Bartik's polygraph examinations was his non-

polygrapher supervisor's signature on his supplementary reports. (**Exh. 32**, O'Neill Dep. 80:08-

81:15, 84-85.) On the other hand, Bartik testified that the bulk of supplementary reports are

already filled in on the computer, and that the portion he completes is the "one word" describing

the result of the polygraph exam. (**Exh. 30,** Bartik Dep. 327:16, 328:24-329:4, 331:22-332:7.)

34. The CPD did not document an officer's performance, including that of Bartik and

other polygraph examiners, in one finite place. (**Exh. 32**, O'Neill Dep. 27.) A supervisor would

have to make calls to various sites scattered throughout the CPD to learn about a subordinate's

prior reviews (**Id**., O'Neill Dep. at 29-31.) and even then, the supervisor could not obtain copies

of the documents. (**Id.**, O'Neill Dep. at 29-30; *see especially* **Exh. 34,** Summary Chart of CPD's

scattered record locations of officers' performance.)

35. The City has no documentation that any supervisor ever requested Bartik's records

from the various sources, or that anyone ever reviewed Bartik's disciplinary history as a whole,

including to look for patterns or for issues that could be addressed by counseling or training (**Exh.

32,** O'Neill Dep. 31:12-17, 107:6-109:18). The CPD likewise has no documents reviewing

Bartik's testimony or his role in motions to suppress, appeals, or post-conviction or habeas

petitions, including those cases in which the subject alleged wrongdoing relating to his role as a

polygrapher. (**Id.,** at 125:24-127:6, 132:12-32.)

36.     Even in preparation for the City's 30(b)(6) deposition, the City turned a blind eye to Bartik:   Mr. O'Neill testified that he had reviewed Bartik's Complaint Registers ("CRs") and, although he noted a number of lawsuits alleging civil rights violations with respect to Bartik's polygraph examinations, he saw no pattern other than attorneys making allegations and failing to substantiate them to the Internal Affairs Division.   (**Exh. 32**, O'Neill at 117, 163-164.)

## NO POLICY, PRACTICE, PROCEDURE, OR
## DIRECTIVE RELATED TO FALSE CONFESSSIONS

37.     There was from 1988 and remains to this day no policy or practice for the Polygraph Unit with respect to false confessions.   (**Exh. 26**, Hickey Dep. 71:13-72:01.)

38.     CPD has no written policy, practice, procedure, or directive from 1998 to the present directing CPD detectives and officers regarding the risk of using the Polygraph Unit as a tool to obtain false or fabricated confessions.   (**Exh. 26**, Hickey Dep. 75:21-76:06.)   It likewise had no policy, practice, or procedure from 1998 to the present directing CPD detectives and officers <u>not</u> to use polygraph examinations or the polygraph examination setting to obtain confessions.  (***Id.***)

39.     The City simply relied on its polygraph examiners' professional licenses (which they had not even bothered to check) to ensure that its polygraphers somehow knew how not to extract false confessions in the context of polygraph examinations.   (***Id.***, 73:03-9; **Exh. 10** McCrary Rpt. at 24-25.)

## THE CITY NEVER INVESTIGATED THE HIGH NUMBER
## OF CONFESSIONS COMING OUT OF POLYGRAPH UNIT

40.     During the applicable time period, the City never investigated the exceedingly high number of purported confessions coming out of the Polygraph Unit and from Bartik in particular. This is so despite multiple lawsuits and citizen complaints against Defendant Bartik and other CPD

14

polygraph examiners. (**Exh. 26,** Hickey Dep. 97:21-99:20, 103:19-104:10; 109-112:02; **Exh. 32,** O'Neill Dep. 66:08-16.) For example, between 1998 and 2003, Bartik purportedly obtained 144 confessions in the pre-test phase of the polygraph examination, though neither he nor the Department keeps statistics about polygraphs or confessions (**Exh. 30**, Bartik Dep. 75:03-10, 158:13-17, 159:10-11, 367:6-16; **Exh. 26,** Hickey Dep. 54:05-58:06; **Exh. 32,** O'Neill Dep. 60:08-61:06, 69:09-70:23; **Exh. 51,** DEF911 (list of 144 pre-test confessions) (filed under seal).) In other words, even though Bartik's sole job was to conduct a non-biased, scientific deception test in accordance with Illinois state law (**Exh. 30**, Bartik dep. at 110:09-14; *see also* 68 Ill. Admin. Code 1230.20 *et seq.*,) and in furtherance of a CPD investigation, Bartik instead was purportedly able to get 144 individuals to confess *before he even administered the examination* for which the individual had been brought to him. Notably, Illinois law forbids a polygraph examiner from initiating an interrogation prior to the test for the purpose of eliciting a confession or admission against interest. *See* 68 Ill. Admin. Code 1230.90(c) ("The examiner shall not initiate an accusatory interrogation prior to the test for the purpose of eliciting a confession or admission against interest from the prospective subject"). Further, while Bartik obtained 144 in an approximately 5-year period (29 per year), a past president of the American Polygraph Association told the *Chicago Tribune* that in his 30 years of administering polygraphs he obtained no more than five confessions (which is 1/6 of one confession per year). (**Exh. 35**, 3/10/13 Tribune article.)

41. Indeed, the City rewarded Bartik's performance. (E.g., **Group Exh. 33**, CITY 8099-8109.) Instead of being alarmed by the number of confessions he claimed and even though he was supposed to act as an independent scientist, not a detective, for the CPD, in 2000 (five years before Ms. Harris's confession), Bartik was rated 99 out of a possible 100 for the quality of his work, specifically for "achiev[ing] a high number of confessions from polygraph subjects prior to

the actual polygraph examination." (*Id.* at CITY 8099; **Exh. 32**, O'Neill Dep. 63:14-65-04.) The CPD did nothing to determine how Bartik obtained such a shocking number of confessions, and there is no documentation that the CPD ever took any action to determine how Bartik was able to obtain confessions at this rate or had even a remote understanding or concern that virtually all of these purported confessions were likely in violation of state law. (**Exh. 32**, O'Neill Dep. 65:09-66:16.)

### THE CITY NEVER INVESTIGATED THE NUMEROUS CIVIL LAWSUITS ALLEGING MISUSE OF POLYGRAPH TO SECURE CONFESSIONS

42. Defendant Bartik testified as to the numerous times he has been sued for civil rights violations in connection with the polygraph process. (**Exh. 30**, Bartik Dep. 346:4-351:01.) The City paid $835,000 to settle the *McGee* and *Lanza* lawsuits alleging that Bartik had obtained false and fabricated confessions related to polygraphs. (*Id.*, 368:10-23.) This amount covers just two of the cases in which Bartik was sued. It does not include what the City paid to resolve the *Williams* and *Wilson* cases, which amounts were unknown to Bartik. (*Id.*, 354:3-355:22.) This amount also does not relate to and does not include payments in litigation against other polygraph examiners in the CPD polygraph unit other than Bartik. (*Id.*, 369:04-370:10.) (There are interrogatory requests pending which ask these questions.)

43. Unless otherwise public, information about lawsuits against a CPD officer is not accessible – even to that officer's supervisor. The City has no documentation that reports to supervisors when officers are named as defendants. (**Exh. 32**, O'Neill Dep. 142:01-10.) Indeed, the City testified through O'Neill that it would probably be *inappropriate* for a supervisor to know about litigation involving someone under his supervision. (*Id.*, 133:03-22, 140:02-12.)

44. Just like Mr. Hickey, Mr. O'Neill was unaware of any CPD analysis of litigation

against its polygraph examiners from 1998 to the present, the number of lawsuits against them, or the total amount of money that the City has paid in settlements or verdicts; and he was not aware whether as a result of civil litigation any polygraph examiner had been disciplined, or re-trained, or whether any lawsuit had had any effect whatsoever on the Polygraph Unit. (**Exh. 32**, O'Neill Dep. 112:18-115:18.)

45. Other than the review by the legal affairs department in order to defend a lawsuit, the CPD does not have in place any formal mechanism to review allegations against a polygraph examiner, to explore what if anything went wrong and how to avoid such conduct in the future. Further, there is no requirement within the CPD to conduct such an investigation or analysis. (**Exh. 26,** Hickey Dep. 109:14-113:05.)

## BARTIK SUFFERED NO CONSEQUENCES

46. Not surprisingly, Bartik suffered no consequence as a result of the multiple claims and successful civil rights lawsuits against him – he was never disciplined or even re-trained, and he was never discouraged from continuing to abuse the polygraph process and engage in misconduct. (**Exh. 30**, Bartik Dep. 20:23-21:06, 352:24-353:07, 354:02-04, 356:09-17.) Likewise, Bartik suffered no consequences as result of the four cases in which he was personally sued along with the City - including one resulting in a substantial jury verdict before settlement - and in which the City paid substantial settlements. (***Id.***, 351:05-18, 352:24-353:7, 354:14-18.) As to Bartik's complaint history, Mr. O'Neill specifically testified on behalf of the City that none of the complaints against Bartik ever had sustained findings because they never "met the sworn affidavit requirement[]" for a CR to even be considered. (**Exh. 32**, O'Neill Dep. 43:20-43:22.)

47.     When the City was asked whether it would be a helpful supervisory tool to collect in one place the information related to litigation brought against Bartik, Mr. O'Neill testified: "I don't know if it would be beneficial to the police department to have that information." (*Id.*, 140:02-12.)

48.     By failing to review any of the Polygraph Unit's or Bartik's work, by failing to ensure licensure, train, keep records, apply Illinois law, or any national standard to the Polygraph Unit, by a complete lack of supervision, quality control, audit, or statistics, including no supervision of the Unit or Bartik by anyone the least bit familiar with polygraphy, CPD created – intentionally created – an environment where polygraphers and other CPD officers could and did manipulate the work of the Unit with absolute impunity, even as the City paid settlements to numerous individuals who claimed that Defendant Bartik, other polygraphers, and other officers intentionally and specifically used the polygraph process to improperly obtain false confessions. (**Exh. 26**, Hickey Dep. 66:10-66:15; 67:16-21; **Exh. 30**, Bartik Dep. 346:10-356:13.)   More specifically, the City enabled Bartik to manipulate the results of polygraphs that he knew no supervisor would ever review, and the City enabled him and the detectives to coerce a false confession from Ms. Harris, ensuring a wrongful conviction about which they knew no colleague or supervisor would ever complain.   (**Exh. 17**, Honts Rpt. ¶¶16.1, 17, 21, 22-22.3.)

### THE *CHICAGO TRIBUNE* EXPOSES POLYGRAPH UNIT ABUSES & THE CITY OF CHICAGO *STILL* DOES NOTHING

49.     In March 2013, the *Chicago Tribune* published an exposé on the Polygraph Unit, describing in detail the Unit's failure to follow national standards when administering exams, failure to require peer review, failure to require continuing education, failure to routinely take pre-test notes or record examinations, and failure to use numerical scoring of examinations until as

late as 2012. (**Exh. 35**, 3/10/13 article.) It reported at length about six civil rights lawsuits against the City for false and coerced confessions obtained in conjunction with the polygraph examination process. Bartik was the polygrapher in five of those six cases. (*Id.*)

50. The City admits that even after this *Chicago Tribune* article was published, it *still* did not investigate:

a. Whether polygraph exams were an appropriate or valuable investigative tool in criminal cases;

b. Whether the use of polygraphs and polygrapher testimony in criminal cases was an asset or liability to criminal prosecutions;

c. Whether CPD had or needed continuing education requirements for its polygraphers;

d. Whether CPD polygraphers were required under state law to take notes of pre-test interviews and whether they repeatedly failed to do so;

e. Whether CPD polygraphers failed to use numerical scoring of polygraph exams prior to 2012;[1]

f. Whether CPD polygraphers had a custom or rule that no polygraph result was ever reviewed by a second examiner or that no Polygraph result was required to be reviewed by a supervisor;

g. Whether CPD polygraphers conducted exams other than in the test taker's native tongue;

h. Whether CPD polygraphers were violating national industry standards by not having: continuing education requirements for polygraphers, exam results reviewed by a second examiner, numerical scoring for exams prior to 2012, and exams in a taker's non-native tongue; *or even*

---

[1] The City denies (a) that it waited until 2012 to apply numerical scoring and (b) that its officers had an obligation to take notes during the pre-test interview. These are disputed issues of fact.

i.  Whether CPD had made a specific decision to ignore national polygrapher standards; if so, who made that decision; and if so, whether that person was authorized to do so.

(**Exh. 36**, City's Second Supp. Resp. Third Am RTAs at Resp. Nos. 12(4)-(7), (10)-(16), and (18)-(23) (the City did not undertake any investigation into these matters); No. 12(a) (4)-(7), (10)-(16), and (18)-(23) (CPD did not undertake any investigation into these matters); No. 12(b)(1)-(24) (IPRA did not undertake any investigation into any of the twenty-four specific allegations against the Unit contained in the *Tribune* article).)

51.  When asked whether it ever investigated any of the assertions in the *Tribune* article, the City responded in a verified interrogatory answer that "**the Chicago Police Department does not initiate investigations in response to unfounded, biased and unsubstantiated allegations contained in a newspaper article**."   (**Exh. 37**, City's Verif. Resp. to Second Set Interrogs. - No. 1 (emphasis added).)

## BARTIK PROMOTED TO SERGEANT

52.  In May 2014, *one year after the Tribune article was published*, the CPD and O'Neill promoted Bartik to the rank of sergeant, with the City admitting that the multiple citizen complaints and civil lawsuits against him were *not considered in any way* in assessing his qualifications for promotion. (**Exh. 32**, O'Neill Dep. 95:22-105:11; **Exh. 30**, Bartik Dep. 344:07-346:24, 354:05-354:18, 355:01-22; **Exh. 17**, Honts Rpt. at ¶¶20-20.4; **Exh. 10,** McCrary Rpt. at 24-25.)

53.  The criteria to advance Bartik were: (a) to be on full-duty status; (b) to have an acceptable medical record; (c) to take an exam; and (d) to have an *acceptable* disciplinary record – meaning only that he was not subject to separation from the department (in other words, anyone who has not been expelled from the department – regardless of disciplinary record – is

eligible for promotion). (**Exh. 32,** O'Neill Dep. 95:22-96:06.)   In deciding to promote Bartik, the CPD *did not* consider: (1) his performance evaluations; (2) the number of CRs filed against him; (3) the pattern, if any, of CRs filed against him; (4) whether any CRs had been sustained against him; or even (5) the amount of money the City had paid to settle litigation involving him. (*Id.*, 102:01-105:11.)   The CRs were considered for one reason only: to determine whether any CR had led to him being separated from the CPD.   (*Id.*, 101:18-102:06)   Indeed, O'Neill testified that he had "reviewed [CRs] and determined them to be irrelevant to the promotion process," including those CRs that referred to litigation (*Id.*, 102:22-23); he then "determined that there was nothing to disqualify [Bartik] from being promoted."   (*Id.*, 103:23-104:01.)

**AFTER REPEATEDLY DENYING THAT THE POLYGRAPH UNIT
HAS EVER BEEN INVESTIGATED, THE CITY NOW IMPLICITY CLAIMS
THAT IT HAS "INVESTIGATED" THE UNIT IN CONJUNCTION WITH
LAWSUITS, BUT THAT ALL SUCH INVESTIGATIONS ARE CONFIDENTIAL**

54.    After repeatedly informing Ms. Harris and the Magistrate Judge that no investigation was ever undertaken to investigate the Polygraph Unit (*e.g.*, **Exh. 27**, City's lead attorney John Gibbons' Nov. 10, 2015 statements to the Court at 25:05-08), the City asserted for the first time on March 1, 2016 that it *has* investigated whether its polygraphers: (a) acted improperly to obtain confessions; (b) falsely told test takers that they had failed the polygraph exam when in fact the exam indicated that those test takers were being truthful; (c) acted improperly to obtain confessions by interrogating subjects before administering the polygraph exam; and (d) specifically whether Officer Bartik had obtained confessions from suspects by berating them, threatening them, and lying to them.   (**Exh. 36**, City's Resp. Third Am. RTAs No. 12(1)-(3), (17); City's Resp Third Am. RTAs No. 12(a)(1)(3), (17).)   Having repeatedly taken the position that it never investigated the allegations set forth in the *Tribune* article, its current position

appears to be that it did "investigate" these four topics as part of the City's defense of its polygraphers in lawsuits brought against them. It asserts, however, that because the polygrapher defendants were represented by the City's inside and outside attorneys, any investigation conducted with respect to these four topics are completely privileged. Despite being compelled to produce any such materials as far back as November 10, 2015, and never having once provided any privilege log of the material being withheld, the City has still not disclosed any documents related to the alleged investigation into these four topics.

### *MONELL II*

**Since at least 1972, the Chicago Police Department has had a *de facto* custom, policy, and practice of encouraging, supporting, and condoning its Detectives and Officers to coerce confessions from innocent people in order to obtain convictions in cases that were not otherwise being solved and that such custom, policy, and practice has been shielded from scrutiny because of a well-established Code of Silence, officers refusing to identify such misconduct by fellow officers and the City refusing to investigate and take any meaningful step to stop such practices. By 2005, it had been established that coerced confessions had repeatedly led to the convictions of innocent individuals, and since 2005, there have been numerous additional examples that further establish the City's custom, policy, and practice of coercing false confessions, and about which the City continues to take no action.**

### SOME OF THE FALSE CONFESSION
### EXONERATIONS KNOWN TO THE CITY PRIOR TO 2005

55. Since 1989, the Cook County State's Attorney's Office and/or Judges of the Cook County Criminal Court have exonerated at least 42 individuals who had been charged and convicted based primarily (and in some cases exclusively) on the defendants coerced confessions. *See* **Exh. 38** (chart of 42 cases in which CPD obtained a "confession" that was later proven to be false and/or fabricated and about which defendant was fully exonerated). *See also* **Exhibit 29,** Leo Rpt. at 2 ("It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit.").

22

56.    In 2001 – four years before Nicole Harris was interrogated – the *Chicago Tribune* in a 4-part series called *Cops and Confessions,* exposed the practice of Chicago Police Department Detectives coercing confessions (**Exhibit 50,** 2001 *Tribune* articles**)**.

57.    A comparison of the 42 known coerced confessions that resulted in convictions and later led to exonerations to the known coerced confessions and exonerations from outside of Chicago, demonstrates that the City has more proven coerced confessions than the states of California, Texas, Florida, Michigan, Pennsylvania, Louisiana, Alabama, and Georgia combined.

| City or State | Proven False Confessions |
|---|---|
| Chicago | 61 |
| State of New York | 29 |
| State of Illinois outside of Chicago | 17 |
| West Virginia | 8 |
| California, Texas, and Virginia (each) | 7 |
| Florida, Michigan, Nebraska, Pennsylvania, Wisconsin (each) | 6 |
| Louisiana, Mississippi, North Carolina, Oklahoma (each) | 5 |
| Indiana, Missouri (each) | 4 |
| Massachusetts | 3 |
| Alabama, Arizona, Connecticut, Georgia, Maryland, Ohio, Oregon, Tennessee (each) | 2 |

| Colorado, Iowa, Kansas, Kentucky, New Jersey, Nevada, Utah (each) | 1 |
|---|---|

(**Exh. 39,** Harris Resp. to First Set Interrogs. Resp. No. 1.)

58.     More specifically, the following individuals were wrongfully convicted as a result of false confessions coerced by Chicago Police Department officers.   Each of these exonerations were publicly announced long before CPD interrogated Nicole Harris on May 14-16, 2005.   The City was uniquely aware by then of the risk of false confessions and the tactics that Chicago Police officers were using in order to obtain confessions.   (**Exh. 17**, Honts Rpt. ¶ 24.)   The summaries below are proffered not for the truth of the matter as to each exoneree, but rather to support the position that the City was indeed aware of the reversal of this large number of purported confessions by 2005.[2]

59.     On May 17, 1999, Ronald Jones' murder conviction and death sentence were reversed and vacated, and prosecutors dropped all charges against him.   In 2003, the City paid Jones $2.2 million to settle his civil rights case against the police who had coerced his confession. Detectives obtained Jones' confession in 1985 after 18 hours of interrogation, coercing Jones into falsely confessing to the 1985 rape and murder of Debra Smith.   Jones was beaten into making this false confession and maintained his innocence throughout trial.   Jones was later fully exonerated based on DNA testing that definitively eliminated him as the source of the semen found at the crime scene.   The City admits that it investigated the circumstances of CPD detectives

---

[2]     Ms. Harris has issued additional requests to admit regarding the factual propositions set for in the National Registry of Exonerations regarding the facts set forth in this Statement of Facts, paragraphs Nos. 58-68.

obtaining the confession of Ronald Jones. (**Exh. 40**, City Resp. Second Set RTAs No. 18.);

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3340

60. In 2001, prosecutors moved to dismiss all charges against Miguel Castillo; in 2003, he was pardoned on the basis of innocence; and in 2004, the City paid him $1.2 million to settle his civil rights case against the police who had fabricated his confession. Police arrested Castillo in January 1989 for the May 1988 murder of his neighbor Rene Chinea. Three police officers claimed that Castillo confessed to the murder, and Castillo always claimed that when their beatings of him failed to produce a confession, they simply fabricated a confession. Even though the State's own evidence established that Castillo was in Chicago police department custody at the time of Ms. Chinea's murder, he was convicted based on his purported confession and sentenced to 48 years in prison. The real perpetrator or perpetrators of Chinea's murder went free. The City admitted that it investigated the circumstances of CPD detectives obtaining the confession of Miguel Castillo. (**Exh. 40**, City Resp. Second Set RTAs No. 7.);

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3094

61. In 2001, Marcellius Bradford and Calvin Ollins were fully exonerated by DNA evidence of the October 1986 rape and murder of Lori Roscetti. (Two co-defendants, Larry Ollins, and Omar Sanders, were also exonerated, but there cases did not involve a false and fabricated confession.) Police arrested all four in January and February 1987, and police claimed that Bradford and Calvin Ollins had confessed, stating that they ambushed Roscetti at random to get bus for Calvin to return home. Bradford stated that the police physically abused him during his interrogation and threatened him with the death penalty. The actual killers were later arrested and pled guilty to the crime in exchange for 75-year sentences. In 2006, the City paid Bradford $900,000 and Calvin Ollins $1.5 million to settle their civil rights claims against the police. The

City admitted that it investigated the circumstances of CPD detectives obtaining the confession of Calvin Ollins but inexplicably deny that it investigated the circumstances of detectives obtaining the confession of Marcellius Bradford. (**Exh. 40**, City Resp. Second Set RTAs No. 22, 4.);

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3039
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3445

62.     In March 2002, Eric Kittler was acquitted of the murder of Abdel Khalil, a candy salesman, and in October 2003, Kittler sued the Chicago police officers who Kittler asserted had coerced a murder confession from him, and withheld and fabricated material evidence.   Shortly after the murder, police arrested Thomas Harvey, age 17, who admitted participating in the armed robbery of Khalil, but attributed the murder to 17-year old Eric Orr.   When the police went searching for Orr, however, they ended up instead at the home of then-15-year-old Kittler. Police took Kittler to the police station, where they quickly got him to sign a confession. Based on the confession, Kittler was convicted and sentenced to 35 years in prison, but the Illinois Appellate Court reversed the conviction, holding that the police did not have probable cause to arrest Kittler. When the state retried Kittler, he was acquitted. In October 2006, the City Council approved a $2 million to Kittler to settle his civil rights case. The real perpetrator or perpetrators of Khalil's murder went free. The City admits that it investigated the circumstances of CPD detectives obtaining Kittler's confession. (**Exh. 40**, City Supp. Resp. Am. Second Set RTAs No. 20.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3357

63.     In 2002, the criminal convictions of Edar Duarte Santos, Omar Aguirre, and Luis Ortiz were vacated and in February 2003, all charges against them were dismissed.   In 2006, a jury awarded Aguirre $3 million and Santos $3 million in their lawsuits against Chicago police officers.   In November 1997, Chicago police arrested and interrogated Omar Aguirre, who

purportedly confessed to the torture-murder of 56-year old furniture dealer Sindulfo Miranda in the Logan Square neighborhood. Aguirre also allegedly implicated Santos in his confession. Shortly thereafter, the police claimed that Ortiz had also confessed. Based on these purported confessions and other false evidence, Aguirre was convicted in 1999 and sentenced to 55 years, Ortiz was convicted in 2000 and sentenced to life, and in 2002 Santos pled guilty to the murder in return for a sentence of 12 years. In 2002, the FBI and U.S. Attorney's Office in Chicago uncovered evidence proving the purported confessions to be false and fabricated, and in 2003, the convictions of Santos, Ortiz, and Aguirre were all vacated, as well as that of a fourth defendant, Robert Gayol, who had also been convicted and sentenced to life in prison (but about whom police had not claimed to have taken a confession). In December 2002, the U.S. Attorneys' Office charged nine members of the Latin Kings street gang with the murders. Notwithstanding the repudiation of the confessions that CPD officers had purportedly taken, notwithstanding the involvement of the FBI and the U.S. Attorney's Office in this case, and also notwithstanding that the City paid Messrs. Aguirre and Santos $6 million, the City insists that it never investigated the circumstances of CPD detectives obtaining the "confessions" of Messrs. Aguirre, Ortiz, and Santos. (**Exh. 40**, City Resp. Second Set RTAs No. 1, 24, 30.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3611
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=2986
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3357

64. On January 9, 2003, Madison Hobley received a gubernatorial pardon based on innocence for the 1987 arson-related murder of seven individuals. Although Hobley's own wife and infant son were among the victims of the apparent arson fire, Chicago Police nevertheless instigated Hobley's prosecution after claiming that Chicago Police Officers, including now-convicted Jon Burge, had obtained Hobley's confession to their murder and that of five others.

The police theory at that time was that Hobley wanted to shed his family responsibilities to clear the way for an affair with another woman.   Although Area 2 Detectives claimed that Hobley had made "admissions" to the crime, there was no record of Hobley's purported statements.   On officer said that he had taken notes of the confession but threw them away when something spilled on the notes.   Based on the confession and other now-discredited evidence, Hobley was convicted and sentenced to death.   Shortly after the Supreme Court affirmed the conviction with the conclusion that the evidence had been "overwhelming," it was disclosed that the police had withheld exculpatory police reports that established that the fire had not started in front of Hobley's apartment (as the State had repeatedly asserted throughout the trial), but rather had actually originated in an apartment on a lower floor.   In 2007, the City paid Hobley $7.8 million to settle the lawsuit that he had filed against the police who had framed him.   The fire was either an accidental fire, or if it was arson, the real perpetrator or perpetrators of these seven murders went free.   The City admits that it investigated the circumstances of CPD detectives obtaining the confession of Madison Hobley. (**Exh. 40**, City Resp. Second Set RTAs No. 15.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=2977

65.   On January 10, 2003, Aaron Patterson received a gubernatorial pardon based on innocence for the 1989 murders of an elderly couple Vincent and Rafaela Sanchez.   Patterson was convicted based on his confession, which was extracted through torture by Chicago Police Detectives.   The Illinois Supreme Court reversed Patterson's conviction in 2000 based on evidence of the torture he had suffered.   In 2007, the City of Chicago paid Patterson $5 million. The exoneration of Patterson's co-defendant Eric Caine took longer.   On March 16, 2011, the State moved to vacate and dismiss all charges against Caine on the ground that his confession had also been coerced by CPD detectives, and he was freed the following day.   Ironically, Caine

walked out of prison on the same day that Jon Burge entered prison to serve a federal sentence for perjury and obstruction. The real perpetrator or perpetrators of the Sanchezes' murders was never identified and went free. The City admits that it investigated the circumstances of CPD detectives obtaining the confession of Aaron Patterson. (**Exh. 40**, City Resp. Second Set RTAs No. 26.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=2977

66.    On January 10, 2003, Leroy Orange was pardoned based on innocence for four 1984 murders to which he had purportedly confessed. Chicago Police instigated the prosecution of Orange for the stabbing deaths of three adults and a child, based primarily on Orange's purported confession to Area 2 Detectives. Orange contended his confession had been extracted from him through intermittent torture, including beating, suffocation, and electroshock at the hands Area 2 detectives. Based on the confessions, Orange was convicted and sentenced to death. Orange's appeal was pending when Governor Ryan granted Orange a full pardon based on innocence. In December 2007, the City agreed to pay $5.5 million to Orange to settle his lawsuit against Chicago police officers for wrongfully coercing and fabricating his confession. During Orange's trial, his half-brother Leonard Kidd confessed to committing the crime alone, but the jury did not believe him and convicted Orange based on the confession. Kidd pled guilty to the murders three months later and was sentenced to crime during Orange's trial and three months later, pled guilty, and he was also sentenced to death; his sentence was later commuted to life without parole. The City admits that it investigated the circumstances of CPD detectives obtaining the confession of Leroy Orange. (**Exh. 40**, City Resp. Second Set RTAs No. 23.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3447

67.    **On July 12, 2004, Lafonso Rollins** was fully exonerated of based on DNA evidence, which unequivocally excluded him from being the perpetrator of four sexual assaults of

which he had been convicted in 1993, *based on his purported confession*. Rollins was a 17-year old special-education ninth-grader when Area 2 detectives picked him up and interrogated him for 13 hours, promising Rollins he could go home if he admitted to the crimes and submitted to DNA testing. Rollins ultimately confessed to three of the four assaults and was charged with all four. Rollins was convicted in late 1993 and sentenced in March 1994 to 75 years in prison. In June 2004, however, DNA test results excluded him as the assailant, and in January 2006, the City settled his claim against the officers who extracted the confession for $9 million. The real perpetrator or perpetrators of the assaults went free. The City admits that it investigated the circumstances of CPD detectives obtaining the confession of Lafonso Rollins. (**Exh. 40**, City Resp. Second Set RTAs No. 29.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3447

68. On January 31, 2005, prosecutors moved to vacate the convictions of and dismiss all charges against Harold Hill and Dan Young, Jr., who had purportedly confessed to the October 14, 1990 rape and murder of 39-year old Kathy Morgan. Morgan had been doused with gasoline and set afire. Chicago Police detectives ultimately arrested Hill, age 16 at the time of the crime, and Young, who had an IQ of 59, although neither had any prior criminal record at the time of their arrest. Two police detectives then physically beat Hill and Young into confessing to the crime, and based on the confessions, both were convicted. Each was sentenced to life in prison without parole, and each served just short of 13 years in prison. Fourteen months after the DNA results exonerated him and he was released, Young was killed by a hit-and-run driver in Chicago. In 2011, the City paid Hill $1.25 million to settle the lawsuit that he had filed for the detectives' conduct in obtaining his false and fabricated confession. The real perpetrator or perpetrators of Ms. Morgan's murder were never charged. The City admits it investigated the circumstances of

CPD detectives obtaining a confession from Dan Young but inexplicably denies that it investigated the circumstances of CPD detectives obtaining a confession from Harold Hill. (**Exh. 40**, City Resp. Second Set RTAs No. 43, 14.)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3447
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3773

## ADDITIONAL CONFESSIONS TAKEN BEFORE 2005 WHICH RESULTED IN CONVICTIONS, WHICH CONVICTIONS WERE REVERSED AND DISCREDITED AFTER 2005

69.     In addition to these specific examples of cases in which convictions based on purported confessions were reversed prior to May 2005, there are additional examples of cases in which purported confessions were taken, and the individual was exonerated prior to May 2005. Four of these cases were investigated by the City of Chicago:

Melvin Jones, exonerated 1989
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4176

David Bates, exonerated 1996
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4625

Michael Evans, Exonerated 2003
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3208

Stanley Howard, Exonerated 2003
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3310

(**Exh. 40**, City Resp. Second Set RTAs Nos. 17, 3, 9, 16.)   Three of these cases the City asserts it never investigated at all:

Joaquin Varela, exonerated 1991
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3704

Emmaline Williams, exonerated 1995
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4463

Hubert Geralds, Jr., exonerated 2000
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3795

(**Exh. 40**, City Resp. Second Set RTAs Nos. 37, 40, 12.)

70.     In addition to these specific examples of cases in which convictions based on purported confessions were reversed prior to May 2005, there are also many more examples of cases in which purported confessions were taken prior to May 2005, but the conviction was not vacated or individual defendant exonerated until after May 2005.   Nevertheless, the City admitted that it investigated each of the following eighteen examples of individuals who were convicted based on a purported confession taken by CPD officers, and whose convictions have been reversed and vacated, and all charges related to the purported confession have been dismissed.   These include but are not limited to the following individuals, many of whom have also received Certificates of Innocence:

James Andrews, exonerated 2008
David Fauntleroy, exonerated 2009
Ronald Kitchen, exonerated 2009
Michael Tillman, exonerated 2010
Eric Caine, exonerated 2011
Harold Richardson, exonerated 2012
Michael Saunders, exonerated 2012
Terrill Swift, exonerated 2012
Vincent Thames, exonerated 2012
James Kluppelberg, exonerated 2012
Carl Chatman, exonerated 2013
Daniel Taylor, exonerated 2013
Nicole Harris, exonerated 2013
Stanley Wrice, exonerated 2013
Deon Patrick, exonerated 2014
Lewis Gardner, exonerated 2014
Paul Phllips, exonerated 2014
Wayne Washington, exonerated 2015

(**Exh. 40**, City's Resp. 2d Set RTAs - Nos. 2, 10, 19, 36, 6, 28, 31, 33, 35, 21, 8, 34, 13, 42, 25, 11, 27, 39.)

## CPD COMMANDER JON BURGE AND DETCTIVES YUCAITIS AND O'HARA

71.     Jon Burge is a convicted felon and former Chicago Police Department detective and Commander who is believed to have tortured or caused the torture of more than 200 criminal suspects between 1972 and 1991, in order to force confessions.   By 2002, Burge and the Chicago Police Department were under investigation regarding the accusations of torture and other coercion in the obtaining of confessions.   In 1989, 1991, and 1993, at least six torture victims filed lawsuits against Burge and others for brutality and torture.   In addition to the direct claims by these plaintiffs, these lawsuits included accusations relate to 23 additional incidents of torture against black and Hispanic suspects between 1972 and 1985 alone.   *See, e.g., United States v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013) ("Former Chicago Police Commander Jon Burge presided over an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette. The use of this kind of torture was designed to inflict pain and instill fear while leaving minimal marks."); *Hinton v. Uchtman,* 395 F.3d 810, 82–23 (7th Cir. 2005) ("a mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department") (Wood, J., concurring); *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) ("It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions.").

72.     In November 1990, the Chicago Police Department's Office of Professional Standards issued what has been come to be known as the Goldston and Sanders OPS Investigative

Report, which found not only that systematic abuse of suspects had occurred at Area 2 under Jon Burge's supervision, but further found that Area 2 command personnel were aware of and condoned the abuse. (*See* **Exh. 41**, http://chicagojustice.org/foi/relevant-documents-of-interest/goldston-sanders-ops-investigative-report-on-burge. More specifically, the report concluded that Burge and detectives under his command engaged in "methodical" and "systematic" torture, and "the type of abuse described *was not limited to the usual beating*, but went into such esoteric areas as psychological techniques and planned torture." This specific report included specific sustained charges against both Burge and Burge's supervisor Patrick O'Hara.

73.     In light of these findings, it is significant that between 1982 and 1986, every complaint of misconduct against Area 2 detectives for abusing suspects in their custody was held unsustained, CPD did not itself discipline during this period a single detective.

74.     It is also significant that even though Burge was fired from CPD on February 10, 1993, Detective O'Hara and another detective under investigation, John Yucaitis, both of whom had been suspended without pay while accusations against them were being investigated, were ultimately given a suspension of 15-months without pay and reinstated, which amounted to "time served." This is true even though the sustained findings against O'Hara, for example, were that he "did bring discredit upon the Department by his overall actions and conduct in that he had direct knowledge of the mistreatment and physical torture that was being perpetrated against a prisoner . . . but failed to take any action to stop the abuse or to report it to supervisory personnel." *Id.* at 140.

75.     Numerous Illinois Supreme Court and Illinois Appellate Court opinions have also extensively identified the torture at Area 2 prior to Ms. Harris's purported confession in May 2005. *See also People v. Wilson*, 116 Ill. 2d 29, 41–42 (1987); *People v. Patterson*, 192 Ill. 2d 93, 106-

110 (2000); *People v. King*, 192 Ill. 2d 189, 198–99 (2000); *People v. Banks*, 192 Ill. App. 3d 986, 990–94 (1st Dist. 1989); *People v. Bates*, 267 Ill. App. 3d 503, 504–07 (1st Dist. 1994); *People v. Cannon*, 293 Ill. App. 3d 634, 640–42 (1st Dist. 1997); *People v. Clemon*, 259 Ill. App. 3d 5, 9–11 (1st Dist. 1994).

## THE SCIENTIFIC STUDY OF POLICE INTERROGATION AND FALSE CONFESSIONS HAS BEEN ACCEPTED BY NUMEROUS JUDGES IN OUR CIRCUIT

76.　　There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions.　*See* **Exh. 26,** Leo Rpt. at 4.　This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community.　Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community and therefore accepted expert testimony in criminal and civil rights litigation.　*Id.*, at 4 & n.3, *citing Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of a civil rights plaintiff's false confession expert Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of a civil rights plaintiff's false confession expert Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's false confession expert Richard Ofshe).

77.    In addition to these cases, which have allowed and upheld the testimony of false confession experts, a unanimous court in *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012), referred to the following five articles as "the leading research on false confessions" and held that these articles and their findings establish that there are several reasons to doubt the reliability of Ms. Harris's confession *in this case*.  ***Id.*** at 631-32 & n.12, *citing* Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to ... extract confessions"); Gisli H. Gudjonsson et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth,* 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police); Brandon L. Garrett, *The Substance of False Confessions,* 62 Stan. L.Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation."); Richard A. Leo, *False Confessions: Causes, Consequences, and Implications,* 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's postadmission narrative.... If the entire interrogation is captured on audio or video recording, then it may be possible to trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his postadmission narrative."); Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions,* 32 Loy. U. Chi. L.J. 337, 339–41 (2001) (*accord*).

**THE REPORT OF DR. RICHARD LEO IDENTIFIES NUMEROUS
RISK FACTORS FOR OBTAINING FALSE CONFESSIONS WHICH,
IF MS. HARRIS'S TESTIMONY WERE TO BE ACCEPTED BY THE JURY,
WERE PROMINENT IN DEFENDANTS' INTERROGATION OF MS. HARRIS**

78.     Dr. Richard Leo is the Hamill Family Professor of Law and Psychology at the
University of San Francisco, and formerly an Associate Professor of Psychology and an Associate
Professor of Criminology at the University of California, Irvine.   He has a Master's Degree in
Sociology from the University of Chicago and both a J.D. Degree in Law and a Ph.D. in
Jurisprudence and Social Policy from the University of California at Berkeley.   **Exh. 29**, Report
of Dr. Richard Leo at App. A, p. 1.

79.     Dr. Leo's areas of research, training, and specialization include social psychology,
criminology, sociology, and law.   For more than two decades, he has conducted extensive
empirical research on police interrogation practices, the psychology of interrogation and
confessions, psychological coercion, police-induced false confessions, and erroneous convictions.
In 1992 and 1993, he spent nine months doing field research inside the Oakland Police Department,
which included sitting in on and contemporaneously observing one-hundred twenty-two felony
interrogations; in 1993, he also observed sixty fully videotaped interrogations in the Vallejo and
Hayward Police Departments in northern California.   Since that time, he has analyzed thousands
of cases involving interrogations and confessions.   *Id.*

80.     Dr. Leo has researched, written, and published numerous peer-reviewed articles on
these subjects in scientific and legal journals, and he has written several books on these subjects,
including *Police Interrogation and American Justice* (Harvard University Press, 2008) and
*Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

Dr. Leo has won numerous awards for his scholarship, including a 2011 Guggenheim Fellowship. *Id.* at 1.

81.     In Dr. Leo's written report with respect to this case, attached as **Exhibit 29**, he concludes that "[t]he multiple interrogations of Nicole Harris utilized numerous techniques that the empirical social science research has shown significantly increase the risk of eliciting unreliable and false confessions when applied to innocent suspects." *Id.* at 22.   Dr. Leo concludes that Ms. Harris's account "is consistent with the social science empirical research literature on the types of interrogation techniques and investigative practices that are associated with, increased the risk of false confession and are known to cause innocent individuals to falsely confess." *Id.* at 34.

82.     The techniques Dr. Leo identified as being present in Ms. Harris's description of her interrogation include, but are not limited to:

a.     **Interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven**, the goal of which is not to find the truth but to break down a suspect's denials of guilt and elicit confessions.   In this instance, the Officer Defendants "misclassified Nicole Harris as guilty when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about." *Id*. at 3.

b.     **The false evidence ploy is a situational risk factor** that has been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent. *Id*. at 3, 24-26.

c.     **Minimization is another situational risk factor** that has been shown to increase the risks of eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent.  *Id*. at 3, 26.

d.     **Implied and explicit threats is another situational risk factor** that has been shown to increase the risks of eliciting false confessions.  *Id*. at 3, 10-11, 26-27.

e.     **Implied and explicit promises is another situational risk factor** that has been shown to increase the risks of eliciting false confessions.  *Id*. at 3, 10, 27.

f.     **Lengthy interrogation is a risk factor** for suspects making or agreeing to a false confession during police interrogation, which was present in the interrogation of Ms. Harris.  *Id.* at 23-24.

g.     **Sleep deprivation is a risk factor** for suspects making or agreeing to a false confession during police interrogation, which was present in the interrogation of Ms. Harris.  *Id*. at 23-24.

h.     **Food deprivation is a risk factor** for suspects making or agreeing to a false confession during police interrogation, which was present in the interrogation of Ms. Harris.  *Id.* at 11, 16, 24, 33.

i.     **Police interrogation contamination (*i.e*., leaking and disclosing non-public case facts) and scripting** that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Nicole Harris's confession statement would, misleadingly, appear to be detailed and self-corroborating. *Id.* at 4, 14-17, 29-30.

j.     **Physically coercive interrogation techniques** that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or

39

requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.  *Id*. at 3, 12, 19, 23-24.

      k.    **Psychologically coercive interrogation techniques** that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.  ***Id*.** at 3, 12, 19, 23-24.

83.    Dr. Leo also concluded that the initial spontaneous "confession" attributed to Nicole Harris, which she denies and which the Seventh Circuit has described as "knowingly false," is inconsistent with empirical social science research on police interrogation and confessions, as well as with logic and the physical evidence in this case.  ***Id*.** at 3.

84.    Dr. Leo also concluded that Nicole Harris was at a heightened risk during her interrogations of making and/or agreeing to a false and unreliable confession because of her overwhelming grief over the loss of her son.  ***Id*.** at 4.

85.    Dr. Leo also concluded that the "confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions."  ***Id*.** at 4, 30-31.

### <u>MONELL III</u>

**Since at least 2005, if not substantially before, the CPD and its officers have maintained a *de facto* Code of Silence– in which CPD officers (including detectives and polygraphers) conceal each other's misconduct and refuse to come forward to expose the known misconduct of another CPD officer. This *de facto* Code of Silence enables and encourages CPD officers to engage in the misconduct alleged above.  Defendants' belief that they could take illegal, unconstitutional, and other improper actions without fear of consequences was a moving force behind their unconstitutional actions in this case.**

## MAYOR ADMITS TO CPD'S CODE OF SILENCE

86.     On December 9, 2015, Mayor Rahm Emanuel gave a prepared statement to the City Council in which he acknowledged the Code of Silence within the CPD and the fact that it enabled officers to commit misconduct with impunity.   The Mayor stated, "The problem is sometimes referred to as the Thin Blue Line.   Other times it is referred to as the code of silence.   It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues." (**Exh. 42**, Emanuel Address at 6.)   He declared that in order to address this long-term problem, the Bureau of Internal Affairs will "have to examine decades of past practices that have allowed abusive police officers with records of complaints to escape accountability."   (**Id**. at 5.)   Mayor Emanuel explained, "We cannot ask citizens in crime-ravaged neighborhoods to break the code of silence if we continue to allow a code of silence to exist within our own Police Department."   (**Id**. at 6.)

87.     The previous day, on December 8, 2015, Mayor Rahm Emmanuel was asked in a televised interview on WTTW: "Is there a code of silence that exists among police officers?"   He answered, "The short answer is yes."   (**Exh. 43**, Emanuel Interview at minute 9:00-08, available at http://chicagotonight.wttw.com/2015/12/08/mayor-emanuel-police-reform-accountability, (last visited 3/14/16 and provided to the Court on CD.)   Mayor Emanuel added, "There's no doubt of what we have and it exists, there's a couple . . . what I think . . .   let me refer to as a culture and that is a culture that what we refer to as the thin blue line, etc.   You are asked to uphold the law, not act like you're above the law.   And your job is if you see something and say nothing, you're actually adding to a culture."   (**Id.**, at 9:08-9:34.)   Mayor Emanuel acknowledged, "There's both policies and practices, and I'm responsible to make sure they get implemented and followed." (**Id.**, at 10:58 -11:03.)   He stated further,

It's one thing to have a practice. It's one thing to have a policy. It is another thing which is what culture is, is to change a mindset, and to work on an attitude, and make people understand that the police department . . . . They have to act with professionalism. They have to have the . . . courage to understand that their professionalism and their trust in the public is not . . . loyalty . . . is not just to their colleagues, but is to the public. And when an officer and a colleague acts wrongly, and we have a culture where you're permissive, it undermines your work as a good officer. And we have good officers in the PD, but when you have an officer who is breaking the law, undermining the law, you have the responsibility to make sure that that does not happen. And that culture of permissiveness exists. We have to be honest about it.

(*Id.,* at 11:19-12:07.)

88. He concluded that a culture had built up within CPD where officers believe that by protecting a colleague they are protecting the police department, but "my view is protecting a colleague is not protecting the police department, protecting the police department is upholding the highest standards." (*Id.,* at 17:50 -18:01.)

89. The City of Chicago admitted in response to Requests to Admit that Mayor Emanuel acknowledged on December 8 or 9, 2015 that there exists a Code of Silence within the CPD, a culture within the CPD that enables its officers to act above the law, and a permissive culture within the CPD that enables its officers to act with impunity. (**Exh. 36**, City's Resp. Am. Third Set RTAs ¶¶ 14, 17-18.)[3]

---

[3] With respect to the "code of silence" finding in *Obrycka v. City of Chicago*, the City responded to a request to admit by stating that it "made reasonable inquiry into this Request [to Admit] and the information known or readily obtainable by the City is insufficient to enable the City to admit or deny" whether the *Obrycka* jury had found that in 2007 there existed a code of silence among Chicago police officers or a widespread custom or practice of failing to investigate or discipline its officers when they engaged in misconduct. *See* Exhibit 22 ¶¶ 19, 19(a), and 19(b).

## THE CITY HAS INTENTIONALLY ESTABLISHED A CR SYSTEM
## THAT IS DESIGNED TO PROTECT OFFICERS
## <u>AND HAVE AS FEW SUSTAINED FINDINGS AS POSSIBLE</u>

90.    According to the CPD's own Annual Reports for 2000-2005:

a.  Of the 551 investigations of civil rights violations imitated in 2000, only 8, or 1.45% resulted in sustained findings. (**Exh. 44**, 2001 Annual Report at 44.)

b.  Of the 1,108 investigations of civil rights violations imitated in 2001, only 16, or 1.44%, resulted in sustained findings. (**Exh. 44**, 2001 Annual Report at 44.)

c.  Of the 1,447 investigations of civil rights violations imitated in 2002, only 6, or $4/10^{th}$ of 1%, resulted in sustained findings.   (**Exh. 45**, 2002 Annual Report at 42.)

d.  Of the 1,458 investigations of civil rights violations imitated in 2003, only ½ of 1%, resulted in sustained findings.   (**Exh. 46**, 2003 Annual Report at 42.)

e.  Of the 1,684 investigations of civil rights violations by officers in 2004, only 11, or 2/3 of 1% resulted in sustained findings.   (**Exh. 47**, 2004 Annual Report at 42.)

f.  Of the 1,592 investigations of civil rights violations by officers in 2005, only 5, less than 1/3 of 1% resulted in sustained findings.   (**Exh. 48**, 2005 Annual Report at 42.)

91.    Each of the eight Defendant Officers has served as CPD officers for more than 20 years.  As set forth below, collectively, they had never heard of an officer falsely arresting someone or coercing or fabricating a confession.

92.    **Defendant Demosthenes Balodimas:**    Defendant Balodimas has been a CPD officer for almost 35 years, since April 1981.   (**Exh. 12,** Balodimas Dep. 21:10-16.)   He testified that he has never witnessed, and never heard of, a CPD officer coercing a confession, fabricating a confession, using excessive force, or falsely arresting someone. (***Id.,*** 241:08-21.)    He has never learned from the Department that a CPD officer had been terminated or even disciplined for

43

excessive force, false arrest, fabricating a statement, or coercing a confession. (*Id.,* at 242:23-243:24.) Balodimas knows of no case where a Chicago Police officer was responsible for a wrongful conviction. (*Id.,* at 244:01-04.) In his 35 years, he personally has never reported another officer for misconduct of any kind, and has never been interviewed with regard to another officer's misconduct. (*Id.,* 241:22-242:03.) Indeed, he testified that he has never even heard of an officer testifying against another officer for misconduct. (*Id.,* at 242:19-22.) Defendant Balodimas testified that he understands the term "Code of Silence" to mean "Officers not telling on each other," and he has heard that term used in the context of CPD. (*Id.,* 256:17-257:04.)

93.    **Defendant John Day:** Defendant Day was a CPD officer for 20 years, from September 1986 to 2006. (**Exh. 5,** Day Dep. 84:12-17; 101:1-13.) He too testified that he had never seen, never heard through the Department, and never heard from a fellow officer of another CPD officer coercing a confession, falsely arresting someone, or using excessive force. (*Id.,* at 332:01-24.) He is unaware of any CPD officer ever fabricating evidence and is also unaware of any CPD officer ever reporting another officer for using excessive force, fabricating evidence, or coercing a confession. (*Id.,* at 333:01-334:07.) He knows of no case in which he learned from a CPD source that the Chicago Police Department was responsible for a wrongful conviction. (*Id.,* at 336:05-08.) Finally, he testified that he had heard the term "code of silence" only in movies, but that he has discussed the term in a "sarcastic way" with fellow officers. (*Id.,* 336:09-19.)

94.    **Defendant Anthony Noradin**: Defendant Noradin has been a CPD officer for 22 years. (**Exh. 16**, Noradin Dep. at 400:01-04.) Defendant Noradin went one step further than his co-defendants, testifying that he did not know what the phrase "code of silence" even meant and had never even heard those words used by any person associated with the CPD. (*Id.,* 440:18-20; 442:12-15.) Noradin testified, "I know it's a movie. That's all I know about it." (*Id.,* 441:03-

07.)   Noradin also testified, however, that in his 22 years with CPD, he had never once reported another CPD officer for any misconduct and had never once heard of an officer reporting another officer for misconduct.   (*Id.,* 441:2-442:03.)

95.     **Defendant Robert Cordaro**:   Defendant Cordaro was a CPD officer for 30 years, from 1980-2010.   (**Exh. 20,** Cordaro Dep. 27:03-15.)   He testified that he too had never reported another officer for conducting an improper interrogation, had never advised a citizen to make a complaint against a fellow officer, had only ever been called upon to support an officer's version of events (in contradiction to the complaint of a citizen), and had never heard of an officer being disciplined for an improper interrogation.   (*Id.,* 200:02-23.)

96.     **Defendant Michael Landando**:   Defendant Landando worked as a CPD officer for nearly 27 years, from 1986 to 2013.   (**Exh. 49,** Landando Dep. 18:24-19:04; 26:07-13.)   He testified that during those years he had never been questioned by a supervisor of any kind about whether the conduct of a fellow police officer was dishonest or corrupt or whether another officer had violated the policies and practices of the CPD.   (*Id.*, 230:06-11.)   Defendant Landando, unlike his co-defendants, expressly acknowledged the CPD's code of silence. (*Id.*, 230:21-231:09.) He explained that following the single criminal case in which he testified against a CPD officer (who was accused of trading a gun to a dealer for drugs), he expected to get "pushback" from his fellow officers.   (*Id.*, 232:01-09.)

97.     As Mayor Emanuel correctly put it, "We need a painful and honest reckoning of what went wrong – not just in this one instance – but over decades . . . Supervision and leadership in the police department and the oversight agencies that were in place *failed*.   And that has to change.   . . . No officer should be allowed to behave as if they are above the law just because they are responsible for upholding the law." (**Exh. 42**, Emanuel Address at 6.) (emphasis added).

Dated:   March 15, 2016                         */s/ Margot Klein*_____
                                                One of Nicole Harris' Attorneys


Nicole N. Auerbach            Janine L. Hoft            J. Samuel Tenenbaum
Stuart J. Chanen             Joey L. Mogul             Bluhm Legal Clinic
Margot Klein                 Jan Susler                Northwestern University
Valorem Law Group            People's Law Office       School of Law
35 E. Wacker Dr., Suite 3000 1180 N. Milwaukee Ave.    357 E. Chicago Ave.
Chicago, IL 60601            Chicago, IL 60642         Chicago, IL 60611
(312) 676-5460               (773) 235-0070            (312) 503-4808

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 15, 2016, I caused a copy of the attached, **PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**, to be served upon all counsel of record via the Court's ECF system.

*/s/ Margot Klein*_____
Margot Klein
