# GROUP APPENDIX 1

Case: 1:14-cv-04391 Document #: 188-1 Filed: 03/29/16 Page 2 of 98 PageID #:3450

# CHICAGO POLICE DEPARTMENT

# ANNUAL REPORT 1989





**LE ROY MARTIN**
**Superintendent of Police**



**RICHARD M. DALEY**
**Mayor, City of Chicago**

# TYPES OF DATA PRESENTED

The tabulations and graphs which follow give data on crimes reported, on arrest and other results of police information.

The basis of reporting the data is the 12-month calendar year.

12 - MONTH YEAR (1 January through 31 December 1989)

The 12 - Month calendar year (365 days) is used where the data relates to the Federal Bureau of Investigation, Illinois Uniform Crime Reporting, City of Chicago and certain other reports.

## 1. I-UCR Part 1 Offenses By Type - Offenses and Clearances

| OFFENSES | NUMBER | CLEARANCES *<br>NUMBER | PERCENT<br>CLEARED |
|---|---|---|---|
| Murder | 742 | 540 | 72.8 |
| Involuntary Manslaughter | 10 | 10 | 100.0 |
| Criminal Sexual Assault - Total | 3,645 | 2,270 | 62.3 |
| Attempt Criminal Sexual Assault | 428 | 247 | 57.7 |
| Criminal Sexual Assault | 3,217 | 2,023 | 62.9 |
| Robbery - Total | 31,588 | 6,567 | 20.8 |
| Armed Robbery | 15,852 | 2,929 | 18.5 |
| Strong Armed Robbery | 15,736 | 3,638 | 23.1 |
| Aggravated Assault - Total | 37,615 | 22,581 | 60.0 |
| Burglary - Total | 51,580 | 6,628 | 12.8 |
| Forcible Entry | 38,635 | 4,708 | 12.2 |
| Unlawful Entry | 8,848 | 1,306 | 14.8 |
| Attempt, Forcible Entry | 4,097 | 614 | 15.0 |
| Theft | 130,153 | 32,057 | 24.6 |
| Motor Vehicle Theft | 45,898 | 7,319 | 15.9 |
| Arson | 2,558 | 393 | 15.4 |
| TOTAL OFFENSES | 303,789 | 78,365 | 25.8 |

*Solution of crime. One arrest, death or other event may result in one or more clearances.

## 2. All Arrests and Citations

| NON-TRAFFIC VIOLATIONS ARRESTS | NUMBER | PERCENT |
|---|---|---|
| Murder | 865 | 0.3 |
| Criminal Sexual Assault | 764 | 0.3 |
| Aggravated Assault | 10,307 | 3.7 |
| Robbery | 5,027 | 1.8 |
| Burglary | 8,262 | 3.0 |
| Theft | 40,760 | 14.7 |
| Motor Vehicle Theft | 8,868 | 3.2 |
| Arson | 221 | 0.1 |
| Other Non-Traffic Arrests | 201,838 | 72.9 |
| TOTAL NON-TRAFFIC ARRESTS | 276,912 | 100.0 |

| Traffic Violations Citations | | |
|---|---|---|
| Hazardous | 460,287 | 9.5 |
| Non-Hazardous | 4,399,396 | 90.5 |
| TOTAL TRAFFIC | 4,859,683 | 100.0 |

See Table 13 For Further Breakdown

**4**

# CHICAGO POLICE DEPARTMENT

# ANNUAL REPORT 1991







**MATT L. RODRIGUEZ**
**Superintendent of Police**

**RICHARD M. DALEY**
**Mayor, City of Chicago**

# TYPES OF DATA PRESENTED

The tabulations and graphs which follow give data on crimes reported, on arrest and other results of police information.

The basis of reporting the data is the 12-month calendar year.

## 12 - MONTH YEAR (1 January through 31 December 1991)

The 12 - Month calendar year (365 days) is used where the data relates to the Federal Bureau of Investigation, Illinois Uniform Crime Reporting, City of Chicago and certain other reports.

## 1. I-UCR Part 1 Offenses By Type - Offenses and Clearances

| OFFENSES | NUMBER | CLEARANCES *<br>NUMBER | PERCENT<br>CLEARED |
|---|---|---|---|
| Murder | 927 | 741 | 79.9 |
| Involuntary Manslaughter | 35 | 35 | 100.0 |
| Criminal Sexual Assault - Total | 3,575 | 1,998 | 55.8 |
|     Attempt Criminal Sexual Assault | 375 | 174 | 46.4 |
|     Criminal Sexual Assault | 3,200 | 1,824 | 57.0 |
| Robbery - Total | 43,783 | 7,750 | 17.7 |
|     Armed Robbery | 25,438 | 4,009 | 15.7 |
|     Strong Armed Robbery | 18,345 | 3,741 | 20.3 |
| Aggravated Assault - Total | 42,237 | 24,047 | 56.9 |
| Burglary - Total | 52,234 | 6,098 | 11.6 |
|     Forcible Entry | 39,495 | 4,221 | 10.6 |
|     Unlawful Entry | 9,163 | 1,256 | 13.7 |
|     Attempt, Forcible Entry | 3,576 | 621 | 17.3 |
| Theft | 131,688 | 33,002 | 25.0 |
| Motor Vehicle Theft | 47,396 | 6,585 | 13.8 |
| Arson | 2,069 | 335 | 16.1 |
| **TOTAL OFFENSES** | **323,944** | **80,591** | **24.8** |

*Solution of crime. One arrest, death or other event may result in one or more clearances.

## 2. All Arrests

| NON-TRAFFIC VIOLATIONS ARRESTS | NUMBER | PERCENT |
|---|---|---|
| Murder | 1,096 | 0.4 |
| Criminal Sexual Assault | 942 | 0.3 |
| Aggravated Assault | 8,453 | 2.7 |
| Robbery | 5,788 | 1.8 |
| Burglary | 7,242 | 2.3 |
| Theft | 39,068 | 12.3 |
| Motor Vehicle Theft | 8,899 | 2.8 |
| Arson | 264 | 0.1 |
| Other Non-Traffic Arrests | 244,799 | 77.3 |
| **TOTAL NON-TRAFFIC ARRESTS** | **316,551** | **100.0** |

See Table 13 For Further Breakdown

4

**Chicago Police Department**

# Annual

# 1995

# Report



Richard M. Daley, Mayor
Matt L. Rodriguez, Superintendent

**Figure 13**

# Index Crime Clearances

Nearly 25 percent of reported index crimes were cleared in 1995, almost the same percent as in 1994. Individual crime categories had either relatively high or relatively low clearance rates. Among the crimes most likely to be cleared were murder, criminal sexual assault, and aggravated assault. Those less likely to be cleared included burglary, motor vehicle theft, robbery, arson, and theft.

## 1995 Reported Offenses and Clearances

|  | Offenses | Clearances* | Percent Cleared |
|---|---|---|---|
| Murder | 827 | 511 | 61.8% |
| Criminal sexual assault—total | 2,896 | 1,669 | 57.6% |
| Attempted criminal sexual assault | 286 | 140 | 49.0% |
| Criminal sexual assault | 2,610 | 1,529 | 58.6% |
| Robbery—total | 30,086 | 5,540 | 18.4% |
| Armed robbery | 17,527 | 2,684 | 15.3% |
| Strongarmed robbery | 12,559 | 2,856 | 22.7% |
| Aggravated assault—total | 39,205 | 21,544 | 55.0% |
| Gun | 12,183 | 5,636 | 46.3% |
| Knife or cutting instrument | 9,125 | 6,332 | 69.4% |
| Other dangerous weapon | 16,680 | 8,835 | 53.0% |
| Hands, fists, feet, etc. | 1,217 | 741 | 60.9% |
| Burglary—total | 40,239 | 4,332 | 10.8% |
| Forcible entry | 28,690 | 2,922 | 10.2% |
| Unlawful entry | 8,830 | 1,028 | 11.6% |
| Attempted forcible entry | 2,719 | 382 | 14.0% |
| Theft | 121,487 | 27,109 | 22.3% |
| Motor vehicle theft | 36,197 | 5,237 | 14.5% |
| Arson | 1,241 | 235 | 18.9% |
| **TOTAL** | **272,178** | **66,177** | **24.3%** |

▾ A clearance is the solution of a crime. An arrest, death, or other event may result in one or more clearances.



# *Chicago Police Department*

## 19 Annual 96 Report

### *A History-Making Performance*

Richard M. Daley, Mayor
Matt L. Rodriguez, Superintendent



 **Index Arrests and Clearances – 1995/1996 Comparison**

be cleared were murder, criminal sexual assault, and aggravated assault. Those less likely to be cleared included burglary, motor vehicle theft, robbery, arson, and theft. Index arrests increased by more than 3 percent between 1995 and 1996.

## Index Arrests and Clearances – 1996

|  | Offenses | Clearances* | Percent Cleared | Arrests** |
|---|---|---|---|---|
| Murder | 789 | 426 | 54.0% | 767 |
| Criminal Sexual Assault – Total | 2,752 | 1,490 | 54.1% | 457 |
|     Attempted Criminal Sexual Assault | 233 | 111 | 47.6% | |
|     Criminal Sexual Assault | 2,519 | 1,379 | 54.7% | |
| Robbery – Total | 26,860 | 5,051 | 18.8% | 3,279 |
|     Armed Robbery | 15,846 | 2,524 | 15.9% | |
|     Strongarmed Robbery | 11,014 | 2,527 | 22.9% | |
| Aggravated Assault – Total | 37,097 | 20,584 | 55.5% | 8,182 |
|     Gun | 11,146 | 5,104 | 45.8% | |
|     Knife or Cutting Instrument | 8,757 | 6,117 | 69.9% | |
|     Other Dangerous Weapon | 16,109 | 8,750 | 54.3% | |
|     Hands, Fists, Feet, etc. | 1,085 | 613 | 56.5% | |
| Burglary – Total | 40,475 | 3,976 | 9.8% | 4,350 |
|     Forcible Entry | 28,981 | 2,666 | 9.2% | |
|     Unlawful Entry | 8,636 | 926 | 10.7% | |
|     Attempted Forcible Entry | 2,858 | 384 | 13.4% | |
| Theft | 119,492 | 26,373 | 22.1% | 33,548 |
| Motor Vehicle Theft | 34,091 | 4,944 | 14.5% | 8,566 |
| Arson | 1,560 | 318 | 20.4% | 174 |
| **TOTAL** | **263,116** | **63,162** | **24.0%** | **59,323** |

* Solution of crime. One arrest, death or other event may result in one or more clearances.
** Arrests may be for crimes committed in other years.



# Chicago Police Department

**Biennial Report 1999 / 2000**

Richard M. Daley
Mayor

Terry G. Hillard
Superintendent of Police

# Case Clearance

While index crimes decreased by 4.5 percent between 1999 and 2000, case clearances remained stable at slightly more than 21 percent. As previously noted in this report, theft accounted for 50 percent of all index offenses in both 1999 and 2000, and as such the overall clearance rate was driven by the rate for theft (20.1 percent) in each of the two years.

On average, violent crimes were about twice as likely to be cleared as property crimes—34.8 percent vs. 17.7 percent in 1999, and 33.2 percent vs. 17.9 percent in 2000.

In both years, murder was the offense type with the highest clearance rate—49.8 percent and 46.6 percent in 1999 and 2000, respectively.

Similarly, in both years, burglary was the offense type with the lowest clearance rate— 10.7 percent and 12.4 percent in 1999 and 2000, respectively.

**Fig. 15a. Index Offenses and Clearances - 1999**

| | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 641 | 319 | 49.8% |
| Criminal Sexual Assault | 2,092 | 994 | 47.5% |
| Robbery | 20,001 | 3,331 | 16.7% |
| Aggravated Assault/Battery | 27,788 | 12,941 | 46.6% |
| **Violent Crime Subtotal** | **50,522** | **17,585** | **34.8%** |
| Burglary | 29,861 | 3,186 | 10.7% |
| Theft | 111,676 | 22,497 | 20.1% |
| Motor Vehicle Theft | 30,434 | 4,740 | 15.6% |
| Arson | 1,188 | 288 | 24.2% |
| **Property Crime Subtotal** | **173,159** | **30,711** | **17.7%** |
| **Total** | **223,681** | **48,296** | **21.6%** |

**Fig. 15b. Index Offenses and Clearances - 2000**

| | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 631 | 294 | 46.6% |
| Criminal Sexual Assault | 1,984 | 914 | 46.1% |
| Robbery | 19,341 | 3,207 | 16.6% |
| Aggravated Assault/Battery | 26,543 | 11,679 | 44.0% |
| **Violent Crime Subtotal** | **48,499** | **16,094** | **33.2%** |
| Burglary | 28,321 | 3,510 | 12.4% |
| Theft | 106,020 | 21,318 | 20.1% |
| Motor Vehicle Theft | 29,735 | 4,385 | 14.8% |
| Arson | 1,062 | 289 | 27.2% |
| **Property Crime Subtotal** | **165,138** | **29,502** | **17.9%** |
| **Total** | **213,637** | **45,596** | **21.3%** |

\* Includes both the actual offense and attempts to commit that offense.

\*\* Solution of crime. An arrest, death or other event may result in one or more clearances.

Note: A case clearance may occur during the year in which the offense was committed or in a subsequent year. The clearance is then recorded in the year in which the crime occurred.

**Chicago Police Department**

# 2001

Annual Report



Richard M. Daley, Mayor
Terry G. Hillard, Superintendent of Police

### Fig. 15a. Index Offenses and Clearances, 2001

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 666 | 361 | 54.2% |
| Criminal Sexual Assault | 1,933 | 898 | 46.5% |
| Robbery | 18,450 | 3,005 | 16.3% |
| Aggravated Assault/Battery | 25,544 | 11,476 | 44.9% |
| **Violent Crime Subtotal** | **46,593** | **15,723** | **33.7%** |
| Burglary | 26,009 | 2,766 | 10.6% |
| Theft | 97,939 | 19,118 | 19.5% |
| Motor Vehicle Theft | 27,689 | 3,986 | 14.4% |
| Arson | 1,004 | 282 | 28.1% |
| **Property Crime Subtotal** | **152,641** | **26,152** | **17.1%** |
| **Total** | **199,234** | **41,875** | **21.0%** |

### Fig. 15b. Index Offenses and Clearances, 2000

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 631 | 335 | 53.1% |
| Criminal Sexual Assault | 2,029 | 966 | 47.6% |
| Robbery | 19,344 | 3,251 | 16.8% |
| Aggravated Assault/Battery | 26,544 | 11,728 | 44.2% |
| **Violent Crime Subtotal** | **48,548** | **16,280** | **33.5%** |
| Burglary | 28,329 | 3,613 | 12.8% |
| Theft | 106,245 | 21,359 | 20.1% |
| Motor Vehicle Theft | 29,721 | 4,417 | 14.9% |
| Arson | 1,062 | 290 | 27.3% |
| **Property Crime Subtotal** | **165,357** | **29,679** | **17.9%** |
| **Total** | **213,905** | **45,959** | **21.5%** |

* Includes both the actual offense and attempts to commit that offense.

** Solution of crime. An arrest, death or other event may result in one or more clearances.

## Case Clearances

The percent of cases cleared in 2001 approximated the percent in 2000 (21.0 percent vs. 21.3 percent). As noted elsewhere in this report, theft accounted for some 50 percent of all index offenses, and the overall clearance rate was therefore driven by the rate for theft (19.5 percent).

On average, violent crimes were about twice as likely to be cleared as property crimes — 33.7 percent vs. 17.1 percent. Murder was the offense type with the highest clearance rate (54.2 percent) and burglary, the lowest (10.6 percent). All of these figures are typical of recent years.



# chicago
# police
# department

**2002 annual report**

Richard M. Daley, Mayor
Terry G. Hillard, Superintendent of Police

**Exhibit 5a. Index Offenses and Clearances, 2002**

| | Offenses* | Clearances** | % Cleared |
|---|---:|---:|---:|
| Murder | 648 | 301 | 46.5% |
| Criminal Sexual Assault | 1,971 | 790 | 40.1% |
| Robbery | 18,533 | 2,933 | 15.8% |
| Aggravated Assault/Battery | 25,005 | 11,546 | 46.2% |
| **Violent Crime Subtotal** | **46,157** | **15,570** | **33.7%** |
| | | | |
| Burglary | 25,399 | 2,889 | 11.4% |
| Theft | 96,439 | 17,499 | 18.1% |
| Motor Vehicle Theft | 25,238 | 3,890 | 15.4% |
| Arson | 1,022 | 217 | 21.2% |
| **Property Crime Subtotal** | **148,098** | **24,495** | **16.5%** |
| **Total** | **194,255** | **40,065** | **20.6%** |

**Exhibit 5b. Index Offenses and Clearances, 2001**

| | Offenses* | Clearances** | % Cleared |
|---|---:|---:|---:|
| Murder | 666 | 361 | 54.2% |
| Criminal Sexual Assault | 1,933 | 898 | 46.5% |
| Robbery | 18,450 | 3,005 | 16.3% |
| Aggravated Assault/Battery | 25,544 | 11,476 | 44.9% |
| **Violent Crime Subtotal** | **46,593** | **15,740** | **33.7%** |
| | | | |
| Burglary | 26,009 | 2,766 | 10.6% |
| Theft | 97,939 | 19,118 | 19.5% |
| Motor Vehicle Theft | 27,689 | 3,986 | 14.4% |
| Arson | 1,004 | 282 | 28.1% |
| **Property Crime Subtotal** | **152,641** | **26,152** | **17.1%** |
| **Total** | **199,234** | **41,892** | **21.0%** |

## Case Clearances

The percentage of cases cleared in 2002 was 20.6 percent, a figure typical of recent years. As noted elsewhere in this report, theft accounted for some 50 percent of all index offenses, and the overall clearance rate was therefore driven by the rate for theft (18.1 percent).

On average, violent crimes were about twice as likely to be cleared as property crimes, 33.7 percent vs. 16.5 percent. Again, these figures are typical of recent years. Murder had the highest clearance rate at 46.5 percent, compared to 54.2 percent in 2001. Burglary had the lowest rate, 11.4 percent, although this was higher than the 10.6 percent in 2001.

* Includes both the actual offense and attempts to commit that offense.

** Solution of crime. An arrest, death or other event may result in one or more clearances.

Note: The numbers reported for case clearances may be lower than the actual number of clearances for the offenses in a given year. This is due to the fact that a case clearance may occur during the year in which the offense was committed or in a subsequent year. The clearance then becomes recorded in the year in which the crime occurred. For comparative purposes, the case clearance data in Exhibit 4b. match the numbers reported in the CPD 2001 Annual Report and do not reflect any clearances to those cases which may have occurred in subsequent years.

>>> chicago police department

annual report
# 2003
year in review





## INNOVATIVE CRIME REDUCTION STRATEGIES
## HELPING TO MAKE CHICAGO THE SAFEST BIG CITY IN AMERICA

philip j. cline • superintendent

# Case Clearances

### Exhibit 5a. Index Offenses and Clearances, 2003

| | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 600 | 304 | 50.7% |
| Criminal Sexual Assault | 1,805 | 732 | 40.6% |
| Robbery | 17,324 | 2,882 | 16.6% |
| Aggravated Assault | 7,332 | 4,020 | 54.8% |
| Aggravated Battery | 12,468 | 4,701 | 37.7% |
| **Violent Crime Subtotal** | **39,529** | **12,639** | **32.0%** |
| | | | |
| Burglary | 25,102 | 2,567 | 10.2% |
| Theft | 97,098 | 16,865 | 17.4% |
| Motor Vehicle Theft | 22,784 | 3,342 | 14.7% |
| Arson | 945 | 188 | 19.9% |
| **Property Crime Subtotal** | **145,929** | **22,962** | **15.7%** |
| **Total** | **185,458** | **35,601** | **19.2%** |

Clearances as of 25 Feb 2004

### Exhibit 5b. Index Offenses and Clearances, 1999-2002

| | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 2,590 | 1,456 | 56.2% |
| Criminal Sexual Assault | 8,254 | 4,000 | 48.5% |
| Robbery | 76,287 | 13,164 | 17.3% |
| Aggravated Assault | 32,450 | 18,135 | 55.9% |
| Aggravated Battery | 66,487 | 25,983 | 39.1% |
| **Violent Crime Subtotal** | **186,068** | **62,738** | **33.7%** |
| | | | |
| Burglary | 109,830 | 13,438 | 12.2% |
| Theft | 414,709 | 81,258 | 19.6% |
| Motor Vehicle Theft | 112,745 | 17,345 | 15.4% |
| Arson | 4,273 | 1,091 | 25.5% |
| **Property Crime Subtotal** | **641,557** | **113,132** | **17.6%** |
| **Total** | **827,625** | **175,870** | **21.2%** |

Data taken from 2002 Annual Report

\* Includes both the actual offense and attempts to commit that offense.

\*\* Solution of crime. An arrest, death or other event may result in one or more clearances.

Note: The numbers reported for case clearances may be lower than the actual number of clearances for the offenses in a given year. This is due to the fact that a case clearance may occur during the year in which the offense was committed or in a subsequent year. The clearance then becomes recorded in the year in which the crime occurred. For comparative purposes, the case clearance data in Exhibit 4b. match the numbers reported in the CPD 2001 Annual Report and do not reflect any clearances to those cases which may have occurred in subsequent years.

The percentage of cases cleared in 2003 was 19.2 percent, a figure slightly lower than the average for the previous five years (21.2 percent). As noted elsewhere in this report, theft accounted for more than half of all index offenses, and the overall clearance rate was therefore driven by the rate for theft (17.4 percent).

On average, violent crimes were twice as likely to be cleared as property crimes, 31.9 percent vs. 15.7 percent. This ratio is typical of recent years. Aggravated assault had the highest clearance rate at 54.8 percent, while burglary had the lowest, at 10.2 percent.

2003

YEAR IN REVIEW

chicago police department • annual report

11

the chicago police department

[ annual report
2004
year in review ]

philip j. cline • superintendent

# [ case clearances ]

### exhibit 5a. index offenses and clearances, 2004

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 448 | 234 | 52.2% |
| Criminal Sexual Assault | 1,706 | 758 | 44.4% |
| Robbery | 15,895 | 2,847 | 17.9% |
| Aggravated Assault | 7,257 | 4,148 | 57.2% |
| Aggravated Battery | 11,474 | 4,894 | 42.7% |
| **Violent Crime Subtotal** | **36,780** | **12,881** | **35.0%** |
|  |  |  |  |
| Burglary | 24,419 | 2,277 | 9.3% |
| Theft | 93,809 | 15,946 | 17.0% |
| Motor Vehicle Theft | 22,753 | 3,072 | 13.5% |
| Arson | 773 | 151 | 19.5% |
| **Property Crime Subtotal** | **141,754** | **21,446** | **15.1%** |
| **Total** | **178,534** | **34,327** | **19.2%** |

### exhibit 5b. index offenses and clearances, 2003

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 599 | 304 | 50.8% |
| Criminal Sexual Assault | 1,805 | 732 | 40.6% |
| Robbery | 17,324 | 2,882 | 16.6% |
| Aggravated Assault | 7,332 | 4,020 | 54.8% |
| Aggravated Battery | 12,468 | 4,701 | 37.7% |
| **Violent Crime Subtotal** | **39,528** | **12,639** | **32.0%** |
|  |  |  |  |
| Burglary | 25,102 | 2,567 | 10.2% |
| Theft | 97,098 | 16,865 | 17.4% |
| Motor Vehicle Theft | 22,784 | 3,342 | 14.7% |
| Arson | 945 | 188 | 19.9% |
| **Property Crime Subtotal** | **145,929** | **22,962** | **15.7%** |
| **Total** | **185,457** | **35,601** | **19.2%** |

The percentage of cases cleared in 2004 was 19.2 percent, the same as in 2003. This figure is slightly lower than the combined percentage for the previous five years, which was 20.9 percent. As noted elsewhere in this report, theft accounted for more than half of all index offenses, and the overall clearance rate was therefore driven by the rate for theft.

On average, violent crimes were twice as likely to be cleared as property crimes (35.0 percent vs. 15.1 percent). This ratio is typical of recent years. Aggravated assault had the highest clearance rate at 57.2 percent, while burglary had the lowest, at 9.3 percent.

Data taken from 2003 Annual Report.

* Includes both the actual offense and attempts to commit that offense.

** Includes incidents that were cleared when the offender(s) is arrested, charged, and prosecuted and those cleared exceptionally. Incidents are cleared exceptionally when an offender has been identified, there is enough evidence to arrest, charge, and prosecute the offender, and the offender's location is known so that he/she can be taken into custody, but circumstances outside the control of the police department have prevented the arrest, charging, and/or prosecution of an offender (Federal Bureau of Investigations, 2004).

Note: The numbers reported for case clearances may be lower than the actual number of clearances for the offenses in a given year. This is due to the fact that a case clearance may occur during the year in which the offense was committed or in a subsequent year. The clearance then becomes recorded in the year in which the crime occurred. For comparative purposes, the case clearance data in Exhibit 5b. match the numbers reported in the CPD 2003 Annual Report and do not reflect any clearances to those cases which may have occurred in 2004.

# CHICAGO POLICE DEPARTMENT

# ANNUAL REPORT
# 2005
# YEAR IN REVIEW



Gold Star Families Memorial and Park •• "Central Gathering Plaza"

Richard M. Daley • Mayor              Philip J. Cline • Superintendent

## Case Clearances

### Exhibit 5a.
### Index Offenses and Clearances, 2005

| | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 448 | 195 | 43.5% |
| Criminal Sexual Assault | 1,619 | 651 | 40.2% |
| Robbery | 15,964 | 3,031 | 19.0% |
| Aggravated Assault | 6,683 | 3,694 | 55.3% |
| Aggravated Battery | 11,260 | 4,632 | 41.1% |
| Total Violent Crime | 35,974 | 12,203 | 33.9% |
| | | | |
| Burglary | 25,314 | 2,556 | 10.1% |
| Theft | 83,373 | 15,087 | 18.1% |
| Motor Vehicle Theft | 22,496 | 2,834 | 12.6% |
| Arson | 682 | 164 | 24.0% |
| Total Property Crime | 131,865 | 20,641 | 15.7% |
| Total Index Crime | 167,839 | 32,844 | 19.6% |

The percentage of cases cleared in 2005 was 19.6 percent, virtually the same as in 2004 (19.2 percent). As noted elsewhere in this report, theft accounted for approximately half of all index offenses, and the overall clearance rate was therefore driven by the rate for theft (18.1 percent).

On average, violent crimes were twice as likely to be cleared as property crimes (33.9 percent vs. 15.7 percent, respectively). This ratio is typical of recent years. Aggravated assault had the highest clearance rate, at 55.3 percent, while burglary had the lowest, at 10.1 percent.

### Exhibit 5b.
### Index Offenses and Clearances, 2004

| | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 448 | 234 | 52.2% |
| Criminal Sexual Assault | 1,706 | 758 | 44.4% |
| Robbery | 15,895 | 2,847 | 17.9% |
| Aggravated Assault | 7,257 | 4,148 | 57.2% |
| Aggravated Battery | 11,474 | 4,894 | 42.7% |
| Total Violent Crime | 36,780 | 12,881 | 35.0% |
| | | | |
| Burglary | 24,419 | 2,277 | 9.3% |
| Theft | 93,809 | 15,946 | 17.0% |
| Motor Vehicle Theft | 22,753 | 3,072 | 13.5% |
| Arson | 773 | 151 | 19.5% |
| Total Property Crime | 141,754 | 21,446 | 15.1% |
| Total Index Crime | 178,534 | 34,327 | 19.2% |

Source: Data taken from 2004 Annual Report.

* Includes both the actual offense and attempts to commit that offense.

** Includes incidents that were cleared when the offender(s) is arrested, charged, and prosecuted and those cleared exceptionally. Incidents are cleared exceptionally when an offender has been identified, there is enough evidence to arrest, charge, and prosecute the offender, and the offender's location is known so that he/she can be taken into custody, but circumstances outside the control of the police department have prevented the arrest, charging, and/or prosecution of an offender (Federal Bureau of Investigations, 2004).

Note: The numbers reported for case clearances may be lower than the actual number of clearances for the offenses in a given year. This is due to the fact that a case clearance may occur during the year in which the offense was committed or in a subsequent year. The clearance then becomes recorded in the year in which the crime occurred. For comparative purposes, the case clearance data in Exhibit 5b. match the numbers reported in the CPD 2004 Annual Report and do not reflect any clearances to those cases which may have occurred in subsequent years.

# Chicago Police Department



Richard M. Daley
Mayor

Dana V. Starks
Interim Superintendent






# Year in Review

## 2006 Annual Report

# Case Clearances

The percentage of index cases cleared was 18.9 percent, close to the 2005 figure of 19.6 percent. As noted elsewhere in this report, theft accounted for approximately half of all index offenses, and the overall clearance rate for 2006 was therefore driven by the rate for theft (16.5 percent).

On average, violent crimes were more than twice as likely to be cleared as property crimes (34.7 percent vs. 14.6 percent). This ratio is typical of recent years. Aggravated assault had the highest clearance rate, at 56.3 percent, while burglary and motor vehicle theft had the lowest, at 11.2 percent each.

### Exhibit 5a.
#### Index Offenses and Clearances, 2006

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 467 | 181 | 38.8% |
| Criminal Sexual Assault | 1,537 | 594 | 38.6% |
| Robbery | 15,868 | 3,384 | 21.3% |
| Aggravated Assault | 6,524 | 3,671 | 56.3% |
| Aggravated Battery | 10,939 | 4,434 | 40.5% |
| **Total Violent Crime** | **35,335** | **12,264** | **34.7%** |
| Burglary | 24,196 | 2,710 | 11.2% |
| Theft | 84,007 | 13,827 | 16.5% |
| Motor Vehicle Theft | 21,806 | 2,443 | 11.2% |
| Arson | 713 | 137 | 19.2% |
| **Total Property Crime** | **130,722** | **19,117** | **14.6%** |
| **Total Index Crime** | **166,057** | **31,381** | **18.9%** |

### Exhibit 5b.
#### Index Offenses and Clearances, 2005

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 448 | 195 | 43.5% |
| Criminal Sexual Assault | 1,619 | 651 | 40.2% |
| Robbery | 15,964 | 3,031 | 19.0% |
| Aggravated Assault | 6,683 | 3,694 | 55.3% |
| Aggravated Battery | 11,260 | 4,632 | 41.1% |
| **Total Violent Crime** | **35,974** | **12,203** | **33.9%** |
| Burglary | 25,314 | 2,556 | 10.1% |
| Theft | 83,373 | 15,087 | 18.1% |
| Motor Vehicle Theft | 22,496 | 2,834 | 12.6% |
| Arson | 682 | 164 | 24.0% |
| **Total Property Crime** | **131,865** | **20,641** | **15.7%** |
| **Total Index Crime** | **167,839** | **32,844** | **19.6%** |

Source: 2005 data were taken from the 2005 Annual Report.

* Includes both the actual offense and attempts to commit that offense

**Includes incidents that were cleared when the offender(s) is arrested, charged, and prosecuted and those cleared exceptionally. Incidents are cleared exceptionally when an offender has been identified, there is enough evidence to arrest, charge and prosecute the offender, and the offender's location is known so that he/she can be taken into custody, but circumstances outside the control of the police department has prevented the arrest, charging, and/or prosecution of an offender (Federal Bureau of Investigations, 2004).

Note: The numbers reported for clearances may be lower than the actual number of clearances for the offenses in a given year. This is because a clearance may occur during the year in which the offense was committed or in a subsequent year. For comparative purposes, the clearance data in Exhibit 5b match the numbers reported in the 2005 Annual Report and do not reflect any clearances which may have occurred in subsequent years.

# CHICAGO POLICE DEPARTMENT

## 2008 ANNUAL REPORT

---

## A YEAR IN REVIEW

CITY OF CHICAGO

RICHARD M. DALEY

MAYOR

CHICAGO POLICE DEPARTMENT

JODY P. WEIS

SUPERINTENDENT OF POLICE

# CASE CLEARANCES

The percentage of index cases cleared was 18.4 percent, virtually identical to the 2007 figure of 18.7 percent. As noted elsewhere in this report, theft accounted for approximately half of all index offenses, and the overall clearance rate was therefore driven by the clearance rate for theft (16.4 percent).

On average, violent crimes were more than twice as likely to be cleared as property crimes (33.0 percent vs. 14.4 percent). This ratio is typical of recent years. Aggravated assault had the highest clearance rate, at 53.1 percent, while burglary had the lowest, at 10.3 percent, almost a percentage point less than in 2007 (11.2 percent).

## Exhibit 5a.

### Index Offenses and Clearances, 2008

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 510 | 181 | 35.5% |
| Criminal Sexual Assault | 1,578 | 589 | 37.3% |
| Robbery | 16,661 | 3,400 | 20.4% |
| Aggravated Assault | 6,241 | 3,314 | 53.1% |
| Aggravated Battery | 10,807 | 4,338 | 40.1% |
| **Total Violent Crime** | **35,797** | **11,822** | **33.0%** |
| Burglary | 26,101 | 2,698 | 10.3% |
| Theft | 86,506 | 14,197 | 16.4% |
| Motor Vehicle Theft | 18,871 | 2,021 | 10.7% |
| Arson | 633 | 83 | 13.1% |
| **Total Property Crime** | **132,111** | **18,999** | **14.4%** |
| **Total Index Crime** | **167,908** | **30,821** | **18.4%** |

## Exhibit 5b.

### Index Offenses and Clearances, 2007

|  | Offenses* | Clearances** | % Cleared |
|---|---|---|---|
| Murder | 442 | 175 | 39.6% |
| Criminal Sexual Assault* | 1,599 | 599 | 37.5% |
| Robbery* | 15,426 | 3,215 | 20.8% |
| Aggravated Assault | 6,283 | 3,396 | 54.1% |
| Aggravated Battery | 11,145 | 4,554 | 40.9% |
| **Total Violent Crime** | **34,895** | **11,939** | **34.2%** |
| Burglary | 24,766 | 2,770 | 11.2% |
| Theft | 83,118 | 13,243 | 15.9% |
| Motor Vehicle Theft | 18,607 | 2,252 | 12.1% |
| Arson | 700 | 137 | 19.6% |
| **Total Property Crime** | **127,191** | **18,402** | **14.5%** |
| **Total Index Crime** | **162,086** | **30,341** | **18.7%** |

\* With the exception of murder, aggravated battery, and aggravated assault, the totals include both the actual offense and attempts to commit that offense.

\*\* Includes incidents that were cleared when the offender is arrested, charged, and prosecuted and those cleared exceptionally. Incidents are cleared exceptionally when an offender has been identified, there is enough evidence to arrest, charge and prosecute the offender, and the offender's location is known so that he/she can be taken into custody, but circumstances outside the control of the police department has prevented the arrest, charging, and/or prosecution of an offender (Federal Bureau of Investigations, 2004).

Note: Clearance percentages for earlier time periods tend to be higher, as there has been a longer period of time for detectives to clear the case. For Exhibit 5b., instead of updating clearance percentages for 2007 cases, we retained percentages originally published in the 2007 Annual report. We did this to facilitate comparison between 2007 and 2008.

Source: 2007 data were taken from the 2007 Annual Report.
Note that, in Exhibit 5b, the 2007 murder total is different than in Exhibit 2. This is because the total in Exhibit 2 was revised to reflect updated information, whereas, in Exhibit 5b we retained the total from the 2007 Annual Report. We did this to facilitate comparison in clearance percentages between 2007 and 2008.

# CHICAGO POLICE DEPARTMENT

# 2009

# ANNUAL REPORT

| POLICING | PARTNERSHIPS | PROFESSIONALISM |
| --- | --- | --- |

  

# A YEAR IN REVIEW

RICHARD M. DALEY
MAYOR

JODY P. WEIS
SUPERINTENDENT

## CASE CLEARANCES

As of early 2010, 19.0% of reported 2009 index crime incidents had been cleared. This percentage was similar to a 2008 percentage (18.4%) that was calculated around the same time one year earlier, thus providing a fair annual comparison.

Clearance rates differed by crime type. Aggravated assault had the highest clearance rate (54.0%), followed by criminal sexual assault (44.3%). Burglary and motor vehicle theft had the lowest clearance rates (10.7% and 10.8%).

A greater percentage of violent crime incidents were cleared. For example, 54% of reported aggravated assault incidents were cleared, while 10.7% of burglary incidents were cleared

### Exhibit 5a
**Index Offenses and Clearances, 2009**

|  | Offenses | Clearances* | % Cleared |
|---|---|---|---|
| Murder | 461 | 160 | 34.7% |
| Criminal Sexual Assault | 1,458 | 646 | 44.3% |
| Robbery | 15,918 | 3,404 | 21.4% |
| Aggravated Assault | 5,726 | 3,090 | 54.0% |
| Aggravated Battery | 10,065 | 4,137 | 41.1% |
| **Total Violent Crime** | **33,628** | **11,437** | **34.0%** |
| Burglary | 26,630 | 2,859 | 10.7% |
| Theft | 79,212 | 13,430 | 17.0% |
| Motor Vehicle Theft | 15,462 | 1,669 | 10.8% |
| Arson | 607 | 94 | 15.5% |
| **Total Property Crime** | **121,911** | **18,052** | **14.8%** |
| **Total Index Crime** | **155,539** | **29,489** | **19.0%** |

### Exhibit 5b
**Index Offenses and Clearances, 2008**

|  | Offenses | Clearances* | % Cleared |
|---|---|---|---|
| Murder | 510 | 181 | 35.5% |
| Criminal Sexual Assault* | 1,578 | 589 | 37.3% |
| Robbery* | 16,661 | 3,400 | 20.4% |
| Aggravated Assault | 6,241 | 3,314 | 53.1% |
| Aggravated Battery | 10,807 | 4,338 | 40.1% |
| **Total Violent Crime** | **35,797** | **11,822** | **33.0%** |
| Burglary | 26,101 | 2,698 | 10.3% |
| Theft | 86,506 | 14,197 | 16.4% |
| Motor Vehicle Theft | 18,871 | 2,021 | 10.7% |
| Arson | 633 | 83 | 13.1% |
| **Total Property Crime** | **132,111** | **18,999** | **14.4%** |
| **Total Index Crime** | **167,908** | **30,821** | **18.4%** |

Source: Data were taken from the 2008 Annual Report.

*Includes incidents that were cleared when the offender(s) is arrested, charged, and prosecuted and those cleared exceptionally. Incidents are cleared exceptionally when an offender has been identified, there is enough evidence to arrest, charge, and prosecute the offender, and the offender's location is known so that he/she can be taken into custody, but circumstances outside the control of the police department have prevented the arrest, charging, and/or prosecution of an offender (Federal Bureau of Investigations, 2004).

Note: The numbers reported for clearances may be lower than the actual number of clearances for the offenses in a given year. This is because a clearance may occur during the year in which the offense was committed or in a subsequent year. For comparative purposes, the clearance data in Exhibit 5b match the numbers reported in the 2008 Annual Report and do not reflect any clearances which may have occurred in subsequent years.

# CHICAGO POLICE DEPARTMENT

# ANNUAL REPORT



# 2010

# A YEAR IN REVIEW



RICHARD M. DALEY
MAYOR

JODY P. WEIS
SUPERINTENDENT

# CASE CLEARANCES

As of July 2011, 17.0% of reported 2010 index crime incidents had been cleared. This percentage was similar to the percentage reported in the 2009 Annual Report (18.4%). However, the 2009 percentage was calculated earlier in the previous year (February 2010), precluding precise comparison. Clearance rates change over time and are sensitive to the amount of time elapsed since the incident occurred.

A larger percentage of violent index crimes were cleared (33.3% vs.12.9% for property index crime). Aggravated assault had the highest clearance rate (51.2%), followed by criminal sexual assault (46.0%). Burglary and motor vehicle theft had the lowest clearance rates (9.1% and 7.7%).

## Exhibit 5a
### Index Offenses and Clearances, 2010

|  | Offenses | Clearances* | % Cleared |
|---|---|---|---|
| Murder | 437 | 148 | 33.9% |
| Criminal Sexual Assault | 1,400 | 644 | 46.0% |
| Robbery | 14,265 | 2,851 | 20.0% |
| Aggravated Assault | 5,062 | 2,592 | 51.2% |
| Aggravated Battery | 9,386 | 3,933 | 41.9% |
| Total Violent Crime | 30,550 | 10,168 | 33.3% |
| Burglary | 26,347 | 2,408 | 9.1% |
| Theft | 75,608 | 11,697 | 15.5% |
| Motor Vehicle Theft | 19,015 | 1,461 | 7.7% |
| Arson | 511 | 80 | 15.7% |
| Total Property Crime | 121,481 | 15,646 | 12.9% |
| Total Index Crime | 152,031 | 25,814 | 17.0% |

## Exhibit 5b
### Index Offenses and Clearances, 2009

|  | Offenses | Clearances* | % Cleared |
|---|---|---|---|
| Murder | 461 | 160 | 34.7% |
| Criminal Sexual Assault | 1,458 | 646 | 44.3% |
| Robbery | 15,918 | 3,404 | 21.4% |
| Aggravated Assault | 5,726 | 3,090 | 54.0% |
| Aggravated Battery | 10,065 | 4,137 | 41.1% |
| Total Violent Crime | 33,628 | 11,437 | 34.0% |
| Burglary | 26,630 | 2,859 | 10.7% |
| Theft | 79,212 | 13,430 | 17.0% |
| Motor Vehicle Theft | 15,462 | 1,669 | 10.8% |
| Arson | 607 | 94 | 15.5% |
| Total Property Crime | 121,911 | 18,052 | 14.8% |
| Total Index Crime | 155,539 | 29,489 | 19.0% |

Source: Data were taken from the 2009 Annual Report.

*Includes incidents that were cleared when the offender(s) is arrested, charged, and prosecuted and those cleared exceptionally. Incidents are cleared exceptionally when an offender has been identified, there is enough evidence to arrest, charge, and prosecute the offender, and the offender's location is known so that he or she can be taken into custody, but circumstances outside the control of the police department have prevented the arrest, charging, and/or prosecution of an offender (Federal Bureau of Investigations, 2004).

Note: The clearance data in Exhibit 5b match the numbers reported in the 2009 Annual Report. That is, 2009 clearance data was not updated to reflect new clearances that occurred subsequent to publication of the 2009 Annual Report. Republication of static clearance rates facilitated comparison between 2009 and 2010 clearance rates as, had 2009 rates been updated, they would have been higher than 2010 rates, simply because CPD detectives had more time to clear 2009 cases.

# APPENDIX 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NICOLE HARRIS,                )<br>                              )<br>     Plaintiff,         )<br>                              )<br>     v.                 )<br>                              )<br>CITY OF CHICAGO, Chicago Police )<br>Officers ROBERT BARTIK, #3078;  )<br>DEMOSTHENES BALODIMAS,          )<br>#21204, ROBERT CORDARO, #20680, )<br>JOHN J. DAY, #20926, JAMES M.   )<br>KELLY, #21121, MICHAEL          )<br>LANDANDO, #20417, ANTHONY       )<br>NORADIN, #21252, and RANDALL    )<br>WO, #20232; Assistant Cook County )<br>State's Attorneys ANDREA GROGAN )<br>and LAWRENCE O'REILLY; and the  )<br>COUNTY OF COOK,                 )<br>                              )<br>     Defendants.        )<br>_____ ) | No. 1:14-cv-04391<br><br>Hon. John W. Darrah<br><br><br><br>Hon. Mag. Susan E. Cox |

## DECLARATION OF DONALD J. O'NEILL

I, Donald J. O'Neill, state as follows:

1.    I am the Director of Human Resources with the Chicago Police Department ("CPD"), ands was designated as the 30(b)(6) witness on behalf of the City of Chicago (the "City") to testify regarding certain matters pertaining to Robert Bartik, including his disciplinary history. I am over the age of 18. I have personal knowledge of the facts stated herein. If called upon to testify, I could and would competently do so.

2.    I am providing this Declaration in support of the City's Reply in Support of its Motion for Partial Summary Judgment in *Harris v. City of Chicago*.

1

3.     Attached to the City's Supplemental Rule 56 Statement as ~~Exhibit~~ _App 3_ is a true and correct copy of the document that I referenced on p. 147 of my deposition transcript in which I referenced an internal affairs investigation into allegations of misconduct of Robert Bartik. This investigation was initiated at the behest of the Superintendent of the Chicago Police Department at the time. The then Chief of Internal Affairs, Tina Skahill, brought the matter to the Superintendent's attention, and he approved the investigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this Declaration was executed this 29th day of March in 2016 in Chicago, Illinois.

Executed on March 29, 2016

Donald J. O'Neill
Director of Human Resources
Chicago Police Department

2

# APPENDIX 3

01-Dec-2008  11:28     From-1 A D RECORDS                    +3127456092        T-639   P.003/004   F-232

**BUREAU OF PROFESSIONAL STANDARDS**                        **19 NOVEMBER 2008**
Internal Affairs Division

TO:             Jody P. Weis
                Superintendent of Police

FROM:           Tina M. Skahill
                Chief
                Internal Affairs Division

SUBJECT:        **Authorization for Investigation**
                **Pursuant to Fraternal Order of Police Contract Article 6.1 D**

            I am seeking approval to investigate allegations brought forth in a civil action against the City, suit #08 CV 5103. The complainant Dany Lanza alleges the officers falsely accused him of confessing to molesting two young girls.

            In light of the seriousness of the charges, I am requesting authorization to initiate a complaint log investigation in this matter. As the allegations are more than five years old, the investigation may not proceed unless authorized by the Superintendent.

                                                    Tina M. Skahill
                                                    Chief
                                                    Internal Affairs Division

Approved:

Peter F. Brust
Deputy Superintendent
Bureau of Professional Standards

Jody P. Weis
Superintendent of Police

TMS/mjc
c:\documents and settings\pclogin\desktop\myfiles\request to investigate more than 5 years\request to initiate of investigation - D. Lanza .doc

CONFIDENTIAL                                          CITY0005293

# APPENDIX 4

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   NICOLE HARRIS,                    )

5          Plaintiff,                 )

6     v.                              ) No. 14-cv-4391

7   CITY OF CHICAGO; Chicago          )

8   Police Officers ROBERT BARTIK,    )

9   DEMOSTHENES BALODIMAS, ROBERT     )

10  CARDARO, JOHN J. DAY, JAMES M.    )

11  KELLY, ANTHONY NORADIN, and       )

12  RANDALL WO; Assistant Cook        )

13  County State's Attorneys          )

14  ANDREA GROGAN and LAWRENCE        )

15  O'REILLY, and THE COUNTY OF COOK,)

16          Defendants.               )

17
         The video deposition of DONALD O'NEILL,
18  called for examination pursuant to the Rules of
    Civil Procedure for the United States District
19  Courts pertaining to the taking of depositions,
    taken before Tracy Jones, a Certified Shorthand
20  Reporter within and for the County of Cook and
    State of Illinois, at 1180 North Milwaukee
21  Avenue, 4th Floor, Chicago, Illinois, on the
    January 29, 2016, at the hour of 9:16 o'clock a.m.

22

23  Reported by:    Tracy Jones, CSR, RPR, CLR

24  License No.:     084-004553



1    he had any discipline or complaints, you would

2    have to go to Internal Affairs or IPRA?

3        A.    Internal Affairs would have the

4    records, yes.

5        Q.    And if you wanted to find out about

6    litigation, you would have to go to Internal

7    Affairs or the Office of Legal Affairs?

8        MS. FORDYCE:  Objection.  It's outside the

9    scope of the 30(b)(6).

10       THE WITNESS:  Yes.

11   BY MS. SUSLER:

12       Q.    Let me ask you -- Well, if Mr. Bartik's

13   supervisor at any point during his career wanted

14   to look at his personnel file, would he have

15   access to that?

16       A.    Yes, he would.

17       Q.    And he would just have to go to Human

18   Resources?

19       A.    Yes.

20       Q.    And represent himself as his

21   supervisor?

22       A.    Yes.

23       Q.    And if his supervisor wanted to look at

24   any of those other records we talked about, the



1    training, the other evaluations, the discipline,

2    the litigation, would that -- would that

3    supervisor have to go to each of those offices

4    we talked about?

5        A.   He could generally call them on the

6    phone and get the information he was seeking.

7        Q.   So a supervisor would have access to

8    the information?

9        A.   Yes.

10       Q.   Merely by representing himself as,

11   I'm -- I'm Robert Bartik's supervisor; I want to

12   know what's going on?

13       A.   Correct.

14       Q.   And if a supervisor actually wanted to

15   see the documentation as opposed to just having

16   someone tell him about it, he could do that as

17   well?

18       A.   Generally speaking, yes.

19       Q.   Can he get copies sent to him, or does

20   he have to go to those offices and look at those

21   documents there?

22       A.   We don't provide copies of people's

23   personnel records to supervisors.  They can

24   review them, but we're not providing



```
1    documents -- I want to clarify -- and we don't

2    release people's medical records either.

3        Q.   So when you say people's personnel

4    files, you're not just talking about personnel

5    records, you're not just talking about what we

6    were talking about before as the personnel file;

7    you're talking about all those things we were

8    talking about?

9        A.   No.  I'm talking about the personnel

10   file.

11       Q.   Okay.  So if they wanted copies of any

12   of his supervision or evaluations, training,

13   discipline, or litigation, the supervisors --

14       A.   I'm sorry.  You have to -- That's

15   compound.  There's too many factors.  They're

16   all falling into different things.

17       Q.   Okay.  Thank you for telling me.

18            Is there any record, of all the records

19   we've talked about maintained on Mr. Bartik,

20   that a supervisor couldn't get copies of other

21   than medical records?

22       A.   Could not get copies of?

23       Q.   Correct.

24       A.   We generally don't provide copies of
```



1   most of these records.

2      Q.  Well, is there any record other than

3   medical that a supervisor couldn't get copies

4   of?  Are you saying every other record, a

5   supervisor wouldn't get copies of?

6      MS. FORDYCE:  Objection to the form.  I think

7   you're misstating his prior testimony.

8      THE WITNESS:  I think my testimony is the

9   records are available, but we don't make copies

10   of records and disperse those to supervisors.

11   BY MS. SUSLER:

12      Q.  Okay.  Do you know whether there's any

13   documentation of supervisors' requests for

14   information about Mr. Bartik's records in any of

15   the categories we've discussed?

16      MS. FORDYCE:  Objection to the form.

17      THE WITNESS:  Not that I'm aware of.

18   BY MS. SUSLER:

19      Q.  Let me ask you some questions about

20   Mr. Bartik's qualifications to serve as a

21   polygraph examiner.  What, if you know, were the

22   criteria for a Chicago Police Department

23   polygraph examiner in 1988?

24      A.  In 1988, they were required to be a



1      Q.    Before 2010, had you ever seen any

2   documentation of the criteria for a polygraph

3   examiner for the police department?

4      A.    No, I had not.

5      Q.    What, if anything, was done, if you

6   know, to determine whether Mr. Bartik met the

7   criteria you articulated?

8      A.    It was verified that he had a valid

9   license with the State of Illinois as a

10  polygraph examiner.

11     Q.    Do you know whether Mr. Bartik's State

12  license is in the possession of the Chicago

13  Police Department, or a copy thereof?

14     A.    No, I do not know.

15     Q.    Do you know who, if anyone, determined

16  whether he had a license?

17     A.    When he was first hired and first moved

18  into taking polygraph exams, it was verified he

19  had a license.  And I don't recall who it was.

20     Q.    When you say it was verified, what was

21  done?

22     A.    He presented his license.

23     Q.    Is that documented anywhere?

24     A.    No.



1      MS. SUSLER:  Counsel, if that document

2  exists, I would like to have it.

3      MS. FORDYCE:  I don't know what he's talking

4  about.  And everything we reviewed yesterday is

5  documents we produced to you previously.

6      THE WITNESS:  I didn't look at any documents

7  beyond those.  So he might have mentioned in his

8  deposition, but I do remember something about an

9  honorable mention for some interview he

10  conducted.

11  BY MS. SUSLER:

12      Q.   For what purpose are Mr. Bartik's

13  complimentary awards -- what purpose do they

14  serve him?

15      A.   It's a reflection of his service to the

16  police department.  And in discipline cases, it

17  would be a mitigating factor in discipline if he

18  has an exceptional complimentary record.

19          So before imposing any discipline, a

20  supervisor reviews his complimentary and

21  disciplinary history.

22      Q.   I'm going to ask you some questions

23  about Mr. Bartik's promotion to sergeant.  At

24  the time he was promoted, what were the criteria



```
 1    for promotion from police officer to sergeant?
 2        A.   To be promoted to sergeant, he had to
 3    participate in the exam process.  He had to have
 4    an acceptable complimentary and disciplinary
 5    record, an acceptable medical record, and he had
 6    to be in a full -- full-duty status.
 7        Q.   What documents are created in the
 8    process of promoting a police officer to a
 9    sergeant?
10        MS. FORDYCE:  Objection as outside the scope
11    of the 30(b)(6).
12        THE WITNESS:  As far as the --
13    BY MS. SUSLER:
14        Q.   I will tailor the question to
15    Mr. Bartik.  What documents were created in the
16    process of promoting Mr. Bartik from police
17    officer to sergeant?
18        A.   Well, there was an exam that was
19    administered.  It was a two-part exam.  A rank
20    order list was developed by the Department of
21    Human Resources, which is the City HR
22    department.  A list was provided to the police
23    department.  We got to his name on the list.
24    Then we get his complimentary and disciplinary
```



```
 1   history and his medical report.  I review those.
 2   And if he's deemed eligible to be promoted, we
 3   create an administrative message that goes out
 4   directing him and other people to report for
 5   training at the academy for a period of time,
 6   pre-service training prior to some -- prior to
 7   promotion.
 8       Q.   So if you look at Exhibit 134, the
 9   personnel file, and if you look at 7238,
10   Mr. Bartik is, like, the sixth name on the memo
11   at 7238.  Do you see that?
12       A.   Yes.
13       Q.   So this is -- Is this the
14   administrative message you're referring to?
15       A.   No.  This is the personnel order,
16   B-series employment order promoting them and
17   assigning them.  This is an HR function.  This
18   is after they have completed their training and
19   are now being assigned to districts as
20   sergeants.
21       Q.   So this would be subsequent to the
22   administrative message you mentioned?
23       A.   Yes.
24       Q.   Where are the documents that you just
```



1    named that are -- were created in the process of

2    promoting Mr. Bartik from officer to sergeant?

3        A.   The exam would be in possession of

4    Department of Human Resources.  Probably not in

5    their possession because it's a vendor, and they

6    own the exam.  The results would be provided to

7    DHR, the Department of Human Resources.  They

8    compile the list.  The vendor does the scoring

9    and provides them with a rank order list.  And

10   then they provide us with the names as we

11   promote.

12           So I may have a list of the people from

13   this exam process, a rank order list from the

14   people from this exam process, which is another

15   document that would have his name on it.

16       Q.   If I understood you correctly, you said

17   that when you get to -- when you got to his name

18   on the list, that you personally reviewed his

19   complimentary and disciplinary history and his

20   medical record?

21       A.   Yes.

22       Q.   And you made the decision that he was

23   going to be promoted?

24       A.   He was eligible for promotion, yes.



1    Q.   What was it about his complimentary --

2    complimentary and disciplinary history that you

3    determined made him eligible for promotion?

4    A.   There was nothing in his disciplinary

5    history that would prevent him from being

6    promoted.

7    Q.   What -- What sort of thing in his

8    disciplinary -- in a disciplinary history would

9    prevent an officer from being promoted to a

10   sergeant?

11   MS. FORDYCE:  Objection:  It's outside the

12   scope of the 30(b)(6).  He's not going to be

13   answering on behalf of the City.

14   THE WITNESS:  There's an investigation that

15   has -- that he is going to be subject to

16   separation, and we would move that ahead to

17   start the separation process prior to promoting

18   him, rather than promoting him.

19   BY MS. SUSLER:

20   Q.   So if -- If Officer Bartik had had

21   something in his disciplinary history indicating

22   that he was subject to separation, that would

23   have been the only thing in his disciplinary

24   history that would have been an obstacle to his



1   being promoted from officer to sergeant?

2        A.   Well, he was from the rank order list.

3   There's two -- two components to this list.  One

4   is rank order list, and one is merit selection.

5   The merit selections have different requirements

6   as far as length of sustained CR numbers and

7   discipline.

8             So if -- But that wouldn't apply to

9   Mr. Bartik.  Mr. Bartik would -- to be --

10  prevent him from being promoted, he would have

11  to be relieved of police powers and subject to

12  separation.

13       Q.   Just so I can --

14       A.   Or not be on a full-duty status.

15       Q.   I just need to put Officer Bartik's

16  promotion in the context.  Now, you said there's

17  also merit promotion, which he was not on --

18  promoted with respect to his merit?

19       A.   Correct.

20       Q.   So that's a whole different process?

21       A.   Well, it's all part of the same

22  process.  It's all part of the promotion

23  process.

24       Q.   But there are different requirements



1 that obtain in terms of the disciplinary record?

2     A.    I review all the disciplinary records.

3 But this is what would disqualify somebody on

4 the rank order list.

5          So yes, there's different things that

6 would disqualify you from the rank order list as

7 opposed to the merit list.

8     Q.    And what on the merit list would

9 disqualify you from promotion?  I'm just -- I'm

10 trying to understand what happened with Bartik

11 to --

12     A.    Excessive medical roll use, a

13 substantial sustained CR numbers, substantial

14 penalty on CR numbers in a period of time.

15     Q.    Thank you.

16     A.    That would be about it.

17     Q.    Thank you.  That helps.

18          In making the decision to promote

19 Officer Bartik to sergeant, were performance

20 evaluations part of that conversation?

21     A.    No, they were not.

22     Q.    Commendations were?

23     A.    Yes.

24     Q.    And so were his CRs?

```
1        A.    We're talking about Sergeant Bartik?

2        Q.    Yes.

3        A.    Yes, they were reviewed.

4        Q.    But only to determine whether he was

5    subject to separation?

6        A.    Yes.

7        Q.    So would it be fair to say that the

8    allegations in the particular CRs with respect

9    to Mr. Bartik were not considered?

10       A.    They were reviewed, but they were not a

11   factor in the determination.  Because I do not

12   have -- I did not review any sustained

13   complaints against Sergeant Bartik.

14       Q.    I guess my question was with respect to

15   the allegations in the CRs.  Would it be fair to

16   say that the allegations in the respective CRs

17   Mr.- -- with respect to Mr. Bartik, that you did

18   not consider those in the decision to promote

19   him?

20       MS. FORDYCE:  Objection:  Misstates his prior

21   testimony, and objection to the form.

22       THE WITNESS:  I reviewed them and determined

23   them to be irrelevant to the promotion process.

24
```

1    BY MS. SUSLER:

2        Q.   And that was because you learned that

3    he was not subject to separation?

4        A.   That the CR numbers were not sustained,

5    and there was no open CR numbers that would

6    subject him to separation.

7        Q.   And at the time that you made the

8    decision to promote him, what information, if

9    any, did you have with respect to litigation

10   naming Mr. Bartik as a defendant?

11       A.   Some of the CR numbers refer to

12   litigation.  But that's the extent of the

13   information that I had.

14       Q.   And would it be fair to say, then, that

15   the fact that he had been named as a defendant

16   in lawsuits with respect to his conduct as a

17   polygraph examiner was irrelevant to your

18   decision to promote him from police officer to

19   sergeant?

20       MS. FORDYCE:  Objection to the form.

21       MR. NATHAN:  Objection:  Mischaracterizes his

22   testimony; asked and answered.

23       THE WITNESS:  I reviewed the documents and

24   determined that there was nothing to disqualify



```
1    him from being promoted.
2    BY MS. SUSLER:
3        Q.   They were irrelevant?
4        MS. FORDYCE:  Same objection.
5        MR. NATHAN:  Objection:  Asked and answered.
6        THE WITNESS:  The lawsuits -- The lawsuits or
7    the CR numbers?
8    BY MS. SUSLER:
9        Q.   I think we already talked about the CR
10   numbers, right?
11       A.   Okay.
12       Q.   So let's talk about --
13       A.   So all the information I have on the
14   lawsuits are contained in the CR numbers.  So
15   the CR numbers were not relevant to my
16   determination.
17       Q.   Okay.  What, if anything, did you know
18   about the amount of money the City paid in
19   settlements and/or judgments in the lawsuits
20   against Mr. Bartik at the time you made the
21   decision to promote him from officer to
22   sergeant?
23       MS. FORDYCE:  Objection to the form.
24       THE WITNESS:  At the time I'm making the
```

1    evaluation whether to promote him to the

2    position he tested for of sergeant, I do not

3    have information concerning any litigation or

4    settlements that the City may have entered into

5    on Mr. Bartik's behalf.

6    BY MS. SUSLER:

7        Q.   That information was irrelevant to the

8    decision to promote?

9        A.   It's not provided to me, and it's not

10   one of the criteria for promotion to the rank of

11   sergeant.

12       Q.   So I just want to be clear that I

13   understand what was considered in the decision

14   to promote Mr. Bartik.  And if I understood you

15   correctly, it was, he took an exam, he had a

16   rank order on a list, you got to his name on the

17   list, you looked at the complimentary and

18   disciplinary histories and his medical record,

19   and made the decision to promote him?

20       MS. FORDYCE:  Objection:  Misstates his prior

21   testimony.

22       THE WITNESS:  And determined he was a

23   full-duty sergeant not relieved of police powers

24   or in a limited duty capacity; that he had the



```
 1    time in service; that he was an active member of
 2    the police department not on a leave of absence.
 3    Yes, that's -- that's what I basically looked at.
 4    BY MS. SUSLER:
 5       Q.   Okay.  Thank you.
 6            Are you aware of whether anyone in the
 7    Chicago Police Department has ever reviewed
 8    Mr. Bartik's disciplinary record as a whole?
 9       MS. FORDYCE:  Objection to the form.
10       MR. NATHAN:  Object to the form of the
11    question.
12       THE WITNESS:  I am certain that people in the
13    police department have reviewed his disciplinary
14    record as a whole, including Commander Klimas
15    and whoever else produced this document for you.
16    BY MS. SUSLER:
17       Q.   By this document, what are you
18    referring to?
19       A.   His -- The CR files that were in the
20    handouts.  It would have been produced by
21    Phyllis Muzupappa at the direction of Commander
22    Klimas.  So I'm sure those two members are aware
23    of his CR history.
24       Q.   And that review took place because
```



1      Q.    When looking at the CRs in preparation

2  for the deposition with allegations against

3  Mr. Bartik, what patterns, if any, did you see?

4      MS. FORDYCE:  Objection:  Vague to the term

5  patterns, and not -- this is not the type of

6  information that can reasonably be known to an

7  entity pursuant to 30(b)(6).

8      THE WITNESS:  I did not see a pattern.  I saw

9  a number of CR numbers over an extended career.

10  And over the past couple of years, I've seen

11  attorneys making allegations against Mr. Bartik,

12  but not a great number or anything that would

13  indicate a pattern for -- I don't -- I didn't

14  see a pattern of allegations.

15          Early in his career, they were standard

16  citizen complaints, not of the same nature, not

17  consistent verbal abuse, not consistent physical

18  abuse, not consistent physical abuse, not

19  consistent -- not consistently the same thing

20  over the course of his early career.

21          And then I did see a number of lawsuits

22  involving Mr. Bartik.  And I saw a pattern of

23  attorneys making allegations and not

24  substantiating their allegations to IAD.



1        THE WITNESS:  I'm sorry.

2    BY MS. SUSLER:

3        Q.    Would it be fair to say a supervisor of

4    a polygraph examiner should -- should be aware

5    of litigation naming Bartik as a defendant where

6    allegations relate to his conduct as a polygraph

7    examiner?

8        MS. FORDYCE:  Object to the form.

9        THE WITNESS:  It could be.  I'm not certain.

10   I mean, these -- these lawsuits tend to involve

11   everybody that has their name on any document.

12   So it doesn't necessarily mean something.  If

13   the corporation counsel, upon reviewing this,

14   thinks there's something that needs to be

15   brought to the attention, they would direct that

16   through the Office of Legal Affairs, who would

17   take appropriate steps.  And that's how it would

18   be done.

19            But no.  It probably would not be

20   appropriate for a supervisor to know every piece

21   of litigation that involves a member under their

22   supervision.

23       MS. SUSLER:  Let's mark this as Exhibits 136.

24



1    Cook and Donny McGee?

2    BY MS. SUSLER:

3        Q.   Sure.

4        A.   Am I aware of any other investigation

5    into those claims?  Is that what you're --

6        Q.   Are you aware of whether the police

7    department conducted any investigation into

8    those allegations other than Exhibit 137 and, of

9    course, 136?

10       A.   No.  I am not aware of any other

11   investigation concerning these matters.

12       Q.   Have you ever seen any documentation

13   that any supervisory personnel for Mr. Bartik

14   ever took any action or -- ever took any action

15   with respect to these allegations?

16       MS. FORDYCE:  Object to the form.

17       THE WITNESS:  I have no documentation of any

18   supervisor taking any action based on the

19   attorney's assertions.

20   BY MS. SUSLER:

21       Q.   Mr. Bartik testified at his deposition

22   in this litigation that Mr. Lanza's lawsuit

23   settled for maybe $35,000 that the City paid and

24   that he was never written up or disciplined or

```
 1   sent to retraining as a result of this
 2   litigation.
 3            I'd like to ask you the same questions
 4   I asked you with respect to the McGee IAD
 5   investigation.  Following the resolution of the
 6   lawsuit, are you aware of whether IAD or any
 7   other part of the Chicago Police Department
 8   conducted any further investigation with respect
 9   to Mr. Lanza's claims against Mr. Bartik once
10   that lawsuit was resolved?
11       A.   I am not aware of any further
12   investigation that was conducted regarding this
13   2001 incident that was opened up at the
14   direction of the Superintendent after five
15   years.  And I am not aware of any other
16   investigation or any other complaints from the
17   attorney or his client.
18       Q.   And is it fair to say that the only way
19   this investigation would be reopened by the
20   police department is if the attorney or the
21   plaintiff, Mr. Lanza, asked the police
22   department to do that?
23       A.   No.  That is not fair to say.
24       Q.   Okay.  How else would this
```



# APPENDIX 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                                    )
                                                  )
                        Plaintiff,                )
                                                  )
        v.                                        )        No. 1:14-cv-04391
                                                  )
CITY OF CHICAGO, Chicago Police                   )        Hon. John W. Darrah
Officers ROBERT BARTIK, #3078;                    )
DEMOSTHENES BALODIMAS,                            )
#21204, ROBERT CORDARO, #20680,                   )
JOHN J. DAY, #20926, JAMES M.                     )        Hon. Mag. Susan E. Cox
KELLY, #21121, MICHAEL                            )
LANDANDO, #20417, ANTHONY                         )
NORADIN, #21252, and RANDALL                      )
WO, #20232; Assistant Cook County                 )
State's Attorneys ANDREA GROGAN                   )
and LAWRENCE O'REILLY; and the                    )
COUNTY OF COOK,                                   )
                                                  )
                        Defendants.               )
                                                  )

RULE 56(d) DECLARATION OF KYLE L. FLYNN

I, Kyle L. Flynn, state as follows:

1.      I am an Associate with the law firm Greenberg Traurig, and represent the City of Chicago in this matter. I have personal knowledge of the facts stated below and with the proceedings in this case and, if called to testify, I would testify in accordance with the following statements.

2.      I am providing this Declaration in support of the City of Chicago's Reply in Support of its Motion for Partial Summary Judgment in this case.

3.      The document attached to the City's Reply as App. 6, is a true an accurate copy of a screenshot from the website of the Illinois Department of Financial and Professional

1

Regulation, which demonstrates that Defendant Robert Bartik's polygraph license has at all times been current and that he has never been disciplined.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 29, 2016

Kyle L. Flynn
Attorney

# APPENDIX 6

Credential Details

## Illinois Department of Financial and Professional Regulation

### Contact

| Name | City/State/Zip | DBA/AKA |
|---|---|---|
| ROBERT A BARTIK | CHICAGO, IL 60656 | |

Contact Information

### License

| License Number | Description | Status | First Effective Date | Effective Date | Expiration Date | Ever Disciplined |
|---|---|---|---|---|---|---|
| 094000462 | DETECTION OF DECEPTION EXAMINER | ACTIVE | 10/26/1988 | 03/24/2015 | 05/31/2017 | N |

License Information

# APPENDIX 7

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

```
_____
                                )
NICOLE HARRIS,                  )
                                )
        Plaintiff,              )
                                )
vs.                             )    No. 14-cv-04391
                                )
CITY OF CHICAGO, et al.,        )
                                )
        Defendants.             )
_____)
```

DEPOSITION OF RICHARD A. LEO, Ph.D., J.D.

San Francisco, California

Monday, March 21, 2016

Volume I

(Page 37 is bound in a separate transcript marked

"Confidential.")

Reported by:

CATHERINE A. RYAN, CMR, CRR, CSR No. 8239

1   psychologically coercive, but, correct, a psychologist

2   might come to the conclusion that that's coercive;

3   whereas, a judge may come to a conclusion that it is

4   not.

5        Q    I mean -- I apologize if we covered this

6   already, but false evidence ploys are legally permitted;

7   right?

8        A    They are legally permitted, but they are part

9   of the totality of the circumstances analysis.  So a

10  judge could say that's what tipped the scales in the

11  favor of coercion and excluded confession, but if you

12  extract them from their context by themselves, they are

13  not regarded as legally coercive and they are permitted.

14       Q    Okay.  So just the tactic itself --

15       A    Correct.

16       Q    Again, my next questions are just for the sake

17  of simplicity.  I'm just talking about the tactic

18  itself --

19       A    Sure.

20       Q    -- of polygraph examining someone.  That is

21  not legally coercive by itself?

22       A    Correct.  That's my understanding.

23       Q    And minimizing someone's involvement in the

24  course of an interrogation, that itself is not legally

25  coercive?

Page 205

1    A    If you don't imply leniency, correct, in

2   exchange for a confession.

3    Q    Now, some implications of leniency are

4   actually legally permissible; correct?

5    A    I'm not sure.  I think -- I think there's wide

6   disagreement.  What -- what I'm imagining you're asking

7   about is something like the police officer says, "If you

8   confess, we will tell the prosecutor that you

9   cooperated."  I think everybody would agree that that is

10  not legally coercive in and of itself, and yet you might

11  say to me, "But doesn't that suggest some kind of

12  leniency that you tell the prosecutor you cooperated?"

13  If that's what you mean --

14   Q    Yeah.

15   A    -- that would be an example of some slight

16  implications of leniency.  They're typically not

17  regarded in law as legally coercive.

18   Q    As long as it's not an explicit promise, it's

19  not regarded as a -- strike that.

20       As long as it's not an explicit promise of a

21  quid pro quo, it's not a legally coercive?

22   A    That's where we would disagree.  I think

23  implicit promises of quid pro quo are legally coercive,

24  but some judges will permit it nonetheless.

25   Q    Okay.

# APPENDIX 8

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )       No. 14 CV 4391
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
          Defendants.             )

          The videotaped deposition of HECTOR LOPEZ,

pursuant to notice and pursuant to the Federal Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Carmella T. Fagan, C.S.R., R.P.R., Notary

Public within and for the County of Cook and State of

Illinois, at 1180 North Milwaukee Avenue, Third

Floor, in the City of Chicago, Cook County, Illinois,

commencing at 10:38 a.m. on the 4th day of November,

2015.

41

1                I go, "Ma'am, I need all the

2     information I can gather about this whole accident

3     that happened, so, you know, please be patient."  And

4     she wasn't too cooperative with me.

5          Q.     Well, did you ever ask her any

6     questions?

7          A.     Yes, I did.

8          Q.     Okay.  What did you ask her?

9          A.     I asked her where she was at.  She

10    said she was at the laundromat.

11         Q.     Did you ask her anything else?

12         A.     I don't recall.  I spent a lot more

13    time with the husband, asking him, engaging him, and

14    he was a lot more was talkative and cooperative with

15    me.

16         Q.     What was her demeanor like when she

17    was in the room?

18         A.     She was emotional.  She just wasn't as

19    emotional as he was.  He couldn't seem to stop

20    crying, and, you know, pausing and catching his

21    breath and just, you know, putting his hands on his

22    face and being very upset about the whole situation.

23         Q.     Okay.  Well, was the wife crying?

24         A.     She might have been, but I don't

42

1    really remember her crying and being as emotional as

2    he was.

3            Q.      Well, you said she was emotional.  Can

4    you just describe for me how she was emotional?

5            A.      She was emotional in a noncooperative

6    way with me.  You know, she had indicated to me that

7    she didn't do anything wrong, why am I asking so many

8    questions, and would -- wouldn't answer any more

9    questions that I would ask her.  And so I talked to

10   the dad.  She says she wasn't there, she was at the

11   laundromat when the incident happened.

12           I had indicated to her that there's

13   more people that are going to ask you questions.  I

14   need to find out because I need to make this report,

15   and you're going to get a cop -- you're going to get

16   the RD of -- of this accident that happened.  "Your

17   husband said it was an accident, that's what I'm

18   putting it down as," at that moment.

19           Q.      And did you take notes of what she

20   said to you as well?

21           A.      I might have.  I don't remember.

22           Q.      Did you note that she was not being

23   cooperative?

24           A.      No, I didn't.

# APPENDIX 9

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )        No. 14 CV 4391
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
            Defendants.           )

            The videotaped deposition of JOHN DAY,

pursuant to notice and pursuant to the Federal Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Carmella T. Fagan, C.S.R., R.P.R., Notary

Public within and for the County of Cook and State of

Illinois, at 1180 North Milwaukee Avenue, Third

Floor, in the City of Chicago, Cook County, Illinois,

commencing at 10:09 a.m. on the 12th day of November,

2015.

62

1    remember -- I don't know that that's correct.  I kind

2    of think that may have happened, but basically it was

3    just some general information thing.

4              Q.      Did you -- do you know who sought that

5    information?

6              A.      I don't -- I don't remember.

7              Q.      Did you ever look through those DCFS

8    records?

9              A.      I don't believe so.

10             Q.      And during this interview with Stavon

11   Dancy and Nicole Harris, were they -- were they both

12   talking, like, an equal amount?

13             A.      I don't -- that's -- I -- I couldn't

14   judge it as far as equality.

15             Q.      Okay.  But they were both talking and

16   responding to questions?

17             A.      Yeah.  Yes.

18             Q.      And you testified earlier that at some

19   point you made the decision that Nicole Harris and

20   Stavon Dancy should come back to the station?

21             A.      Yes.

22             Q.      And why did you make that decision?

23             A.      Because of the cause of death, the --

24   what I -- what I -- what I would say is the demeanor

63

1    of Ms. Harris as opposed to the demeanor -- demeanor

2    of Stavon, the fact that their -- their most brief

3    statement just kind of aroused suspicion.

4            And I don't remember much about the

5    other child at that point, but I knew there was

6    another child in the house, in the family, however

7    you want to describe it. And I -- I -- I wanted to

8    be sure that whatever needed to be done beyond

9    notifying DCFS about the incident would be done.

10       Q.     So I'm clear: So one of the reasons

11    you said why you believe Nicole Harris and Stavon

12    Dancy had to come back to Area 5 was the cause of

13    death?

14       A.     Right.

15       Q.     What about the cause of death made you

16    believe there was need for further investigation?

17       A.     Well, it's -- it's -- when one -- when

18    one uses the term "accidental" or "violent," they can

19    be interchangeable even though there's no criminal

20    behavior. Strangulation in and of itself is a

21    violent way to die, even if it's accidental. I

22    wanted further clarification on that.

23            I also, because you have to be

24    prudent, particularly when children are involved, you

334

1     Q.      Again, indirectly?

2     A.      Newspaper accounts over, you know,

3  something that is alleged to have happened.

4     Q.      But not from a police source?

5     A.      No police officer has ever told me

6  that, and no one has ever officially told me that

7  directly.

8     Q.      And have you ever observed or

9  witnessed any member of the Chicago Police Department

10  fabricating evidence?

11    A.      No.

12    Q.      Have you ever reported a member of the

13  Chicago Police Department for any misconduct?

14    A.      Yes.

15    Q.      What -- under what circumstances?

16    A.      Well, I'll make this as -- as brief as

17  possible.  While -- while working a 17th District

18  Tactical Unit, we stumbled upon a major auto theft

19  ring that was operating between the states of

20  Indiana, Wisconsin, Illinois, and internationally.

21  It was -- it was a very sophisticated operation.

22          During an interview with a -- a

23  primary suspect who happened to have a handful of

24  blank titles from Indiana, during an interview with

# APPENDIX 10

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   NICOLE HARRIS,                    )

5          Plaintiff,                 )

6     v.                              ) No. 14-cv-4391

7   CITY OF CHICAGO; Chicago Police   )

8   Officers ROBERT BARTIK,           )

9   DEMOSTHENES BALODIMAS, ROBERT     )

10  CARDARO, JOHN J. DAY, JAMES M.    )

11  KELLY, ANTHONY NORADIN, and       )

12  RANDALL WO; Assistant Cook County )

13  State's Attorneys ANDREA GROGAN   )

14  and LAWRENCE O'REILLY, and THE    )

15  COUNTY OF COOK,                   )

16          Defendants.               )

17

18          The video deposition of DEMOSTHENES
    BALODIMAS, called for examination pursuant to
19  the Rules of Civil Procedure for the United
    States District Courts pertaining to the taking
20  of depositions, taken before Tracy Jones, a
    Certified Shorthand Reporter within and for the
21  County of Cook and State of Illinois, at 35 East
    Wacker Drive, Suite 3000, Chicago, Illinois, on
22  November 16, 2015, at the hour of 10:05 o'clock a.m.

23  Reported by:    Tracy Jones, CSR, RPR, CLR

24  License No.:    084-004553



```
 1        Q.   I'm just --
 2        A.   From all the information I gathered.  I
 3   don't -- I don't exactly remember what they told
 4   me, but the information I learned.
 5        Q.   So the time you first talked to
 6   Ms. Harris, you did not believe it could have
 7   been an accident because of the evidence you had
 8   about beating the child and something that
 9   Detective Noradin told you, but you don't
10   remember what?
11        MR. KAMIONSKI:  Objection:  Asked and
12   answered.
13        THE WITNESS:  Yes.
14   BY MS. KLEIN:
15        Q.   Did you know anything else before you
16   talked to Ms. Harris about the case?
17        A.   No.
18        Q.   Did you listen to the 911 tapes?
19        A.   You asked me that.  No.
20        Q.   Sorry.
21             Did you have any knowledge of any 911
22   tapes?
23        A.   No.
24        Q.   Actually, I asked you if you listened
```



# APPENDIX 11

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN FOR THE DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                    )
                                  )
              Plaintiff,          )
                                  )
       vs.                        )      No. 14 CV 4391
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
              Defendants.         )

          The videotaped deposition of ROBERT CORDARO,

pursuant to notice and pursuant to the Federal Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Carmella T. Fagan, C.S.R., R.P.R., Notary

Public within and for the County of Cook and State of

Illinois, at 1180 North Milwaukee Avenue, Third

Floor, in the City of Chicago, Cook County, Illinois,

commencing at 10:17 a.m. on the 30th day of November,

2015.

148

1        Q.      Did you discuss anything about a bond

2   with Ms. Harris?

3        A.      No.

4        Q.      Did you hear anyone say that if

5   Ms. Harris gave a statement, she could fight the case

6   from outside on bond?

7        A.      No.

8        Q.      And you never told her if she got out

9   on bond, she could fight her case from the outside?

10       A.      No.

11       Q.      Have you ever told any suspect that if

12   they gave a statement, their bond would be lower?

13       A.      No.

14       Q.      Have you ev -- would that be proper to

15   tell a suspect, that if they gave a statement, their

16   bond would likely be lower?

17       A.      No, it wouldn't be proper.

18       Q.      And why not?

19       A.      I don't know.  I think it compromises

20   the investigation.

21       Q.      And have you ever told a suspect that

22   once released on bond, that they could better fight

23   their case or --

24       A.      No.

# APPENDIX 12

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4   NICOLE HARRIS,                    )

 5         Plaintiff,                  )

 6     v.                              ) No. 14-cv-4391

 7   CITY OF CHICAGO; Chicago          )

 8   Police Officers ROBERT BARTIK,    )

 9   DEMOSTHENES BALODIMAS, ROBERT     )

10   CARDARO, JOHN J. DAY, JAMES M.    )

11   KELLY, ANTHONY NORADIN, and       )

12   RANDALL WO; Assistant Cook        )

13   County State's Attorneys          )

14   ANDREA GROGAN and LAWRENCE        )

15   O'REILLY, and THE COUNTY OF COOK,)

16         Defendants.                 )

17

18         The video deposition of JAMES K. HICKEY, called
     for examination pursuant to the Rules of Civil
19   Procedure for the United States District Courts
     pertaining to the taking of depositions, taken
20   before Tracy Jones, a Certified Shorthand Reporter
     within and for the County of Cook and State of
21   Illinois, at 1180 North Milwaukee Avenue,
     4th Floor, Chicago, Illinois, on the 21st day of
22   January, 2016, at the hour of 9:18 o'clock a.m.

23   Reported by:    Tracy Jones, CSR, RPR, CLR

24   License No.:    084-004553
```



1    A.   It's different schools which are

2  license -- which issue the license for the

3  polygraph examiners.

4    Q.   The schools issue the licenses?

5    A.   No.  The State of Illinois issues

6  licenses for those who have attended accredited

7  polygraph schools.

8    Q.   What, if anything, did the Chicago

9  Police Department do at any time in the history

10  of having polygraph examiners work for the

11  police department to determine whether the

12  polygraph schools attended by those people were

13  accredited?

14    MS. FORDYCE:  Okay.  Objection to the form

15  and objection to the extent you're asking him

16  information beyond the temporal scope of the

17  30(b)(6) notice.

18    MS. SUSLER:  Fine.  I'm happy to limit it to

19  the scope of the notice, which was 1998 to the

20  present.

21  BY MS. SUSLER:

22    Q.   Do you remember the question?

23    A.   Chicago Police Department does not

24  review the accreditations of schools except in

1    one matter.  I think tuition reimbursement, they

2    want schools to be accredited by the various

3    regional accreditations organizations as a

4    criteria for tuition reimbursement.

5        Q.    Other than for purposes of tuition

6    reimbursement, are you aware of what, if

7    anything, the police department does to

8    determine whether the schools attended by

9    polygraph examiners who work for the Chicago

10   Police Department are accredited?

11       A.    I am not aware of anything.

12       Q.    And is what you're saying about the

13   tuition reimbursement, is that documented

14   somewhere?

15       A.    Yes, it is.

16       Q.    Where?

17       A.    We have a directive on the topic of

18   tuition reimbursement.

19       Q.    And that says where it would be

20   documented what the police department did to

21   determine whether the schools to which they

22   provided tuition reimbursement were

23   accredited --

24       MS. FORDYCE:  Objection to the form.



1    which might affect the Polygraph Unit to change

2    something, such as electronic recorded

3    interrogations was a State law intended to

4    videotape the interrogation of those being

5    investigated for murder violations, but it also

6    spilled over into those conducting the

7    investigations through polygraph if, in fact, it

8    was a homicide investigation.

9          So that would be an example where Legal

10   Affairs would inform members -- select members

11   of the police department, there's been a change;

12   there's something you need to know about.

13   BY MS. SUSLER:

14      Q.   What, if anything -- Well, let me ask

15   it this way first:  Who -- Who, if anyone, in

16   the police department was responsible for

17   determining whether the Polygraph Unit and its

18   examiners complied with State law other than

19   leaving it to the individual polygraph examiner

20   to meet his or her professional

21   responsibilities?

22      MS. FORDYCE:  Objection to the form; asked

23   and answered; misstates prior testimony.

24      THE WITNESS:  The supervisors of the



1    Polygraph Unit would have some supervisory

2    responsibility if it was something they had

3    observed that might be a deviation from a State

4    law or department policy.

5    BY MS. SUSLER:

6        Q.   What did the police department do to

7    determine whether the supervisors of the

8    Polygraph Unit had any knowledge about State law

9    with respect to polygraph?

10       A.   Again, if there is a legally mandated

11   change, it is communicated from the Legal

12   Affairs office of the police department.

13       MS. FORDYCE:  I need to take a quick,

14   five-minute break.

15       MS. SUSLER:  All right.

16       THE VIDEOGRAPHER:  Off the record, 10:13.

17                  (Whereupon, a short break was

18                   taken.)

19                  (Whereupon, the record was read

20                   as requested.)

21       THE VIDEOGRAPHER:  Back on the record, 10:21.

22   BY MS. SUSLER:

23       Q.   Mr. Hickey, other than being notified

24   through some sort of general order, as you gave



# APPENDIX 13

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )      No. 14 CV 4391
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
            Defendants.           )

        The deposition of ROBERT BARTIK, pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Carmella T. Fagan, C.S.R., R.P.R., Notary Public

within and for the County of Cook and State of

Illinois, at 1180 North Milwaukee Avenue, Third

Floor, in the City of Chicago, Cook County, Illinois,

commencing at 10:12 o'clock a.m. on the 24th day of

November, 2015.

19

1     was behavioral techniques, there was physiology.  We

2     had to do so many classroom hours of all of the -- of

3     all the different criteria, and then we had to also

4     administer -- at that time, we had to administer 125

5     supervised polygraph examinations in order to be able

6     to be qualified to sit for the examination to become

7     licensed.

8          Q.    It was a written test?

9          A.    Yes.

10         Q.    Was there an oral test?

11         A.    No.

12         Q.    Did you have to perform a polygraph

13    examination as part of the testing process to get

14    your license?

15         A.    No.

16         Q.    What's the criteria, if you know, for

17    the renewal of your license other than paying a fee

18    to the --

19         A.    There is none.

20         Q.    -- state?

21               You just have to pay a fee?

22         A.    Yes, ma'am.

23         Q.    So no criteria for the renewal?

24         A.    No.

20

1      Q.      There's no continuing education

2  requirement?

3      A.      No.

4      Q.      Are there any requirements in the

5  licensing law in the State of Illinois about how you

6  must conduct and score polygraph tests?

7      A.      I don't know.

8      Q.      Okay.  And how about if I ask you that

9  as of 2005?  If you know, were there any requirements

10 in the licensing law about how you had to conduct or

11 score polygraph testing?

12     A.      That, I don't know.

13     Q.      Are there any requirements about what

14 documentation you must maintain and for how long?

15     A.      I believe we have to -- and I'm -- I'm

16 just guessing.  I believe it's we have to keep the

17 charts, and I believe it's for a matter of five

18 years.

19     Q.      And is that a Chicago Police

20 Department requirement or a State of Illinois

21 requirement?

22     A.      I believe it's the State of Illinois.

23     Q.      Have you had any discipline in rel --

24 in relation to your license of -- for detection of

36

1            Q.      So --

2            A.      I do apologize.

3            Q.      Well, I mean --

4            A.      I -- I know better.

5            Q.      -- you know, we're just getting

6  started --

7            A.      I know.

8            Q.      -- so let's go back over that.  I was

9  interested in knowing who in the Chicago Police

10  Department asked you to go and get this training

11  certificate.

12           A.      My supervisors at the Forensic

13  Services Division.

14           Q.      Who were?

15           A.      At the time was Ja -- Lieutenant Jack

16  Huels and Commander Mary West.

17           Q.      All right.  Did they do that in

18  writing?

19           A.      No, ma'am.

20           Q.      It just -- was just a verbal thing --

21           A.      Yes, ma'am.

22           Q.      -- they approached you and said, "You

23  need to go and get this training certificate."

24           A.      Yes.

36

1          Q.      So --

2          A.      I do apologize.

3          Q.      Well, I mean --

4          A.      I -- I know better.

5          Q.      -- you know, we're just getting

6    started --

7          A.      I know.

8          Q.      -- so let's go back over that.  I was

9    interested in knowing who in the Chicago Police

10   Department asked you to go and get this training

11   certificate.

12         A.      My supervisors at the Forensic

13   Services Division.

14         Q.      Who were?

15         A.      At the time was Ja -- Lieutenant Jack

16   Huels and Commander Mary West.

17         Q.      All right.  Did they do that in

18   writing?

19         A.      No, ma'am.

20         Q.      It just -- was just a verbal thing --

21         A.      Yes, ma'am.

22         Q.      -- they approached you and said, "You

23   need to go and get this training certificate."

24         A.      Yes.

# APPENDIX 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:14-cv-04391 |
| | ) | |
| CITY OF CHICAGO, Chicago Police | ) | Hon. John W. Darrah |
| Officers ROBERT BARTIK, #3078; | ) | |
| DEMOSTHENES BALODIMAS, | ) | |
| #21204, ROBERT CORDARO, #20680, | ) | |
| JOHN J. DAY, #20926, JAMES M. | ) | Hon. Mag. Susan E. Cox |
| KELLY, #21121, MICHAEL | ) | |
| LANDANDO, #20417, ANTHONY | ) | |
| NORADIN, #21252, and RANDALL | ) | |
| WO, #20232; Assistant Cook County | ) | |
| State's Attorneys ANDREA GROGAN | ) | |
| and LAWRENCE O'REILLY; and the | ) | |
| COUNTY OF COOK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ERIC WINSTROM

I, Eric Winstrom, state as follows:

1. I am a Sergeant with the Chicago Police Department ("CPD") and I currently work in the Office of the General Counsel where I supervise the Discovery Unit.

2. I am providing this Declaration in support of the City of Chicago's Reply in Support of its Motion for Partial Summary Judgment in *Harris v. City of Chicago*. Through my capacity supervising the Discovery Unit of the Office of the General Counsel, I possess personal knowledge of the matters set forth herein and, if called to testify, I would testify in accordance with the following statements.

1

3.     The spreadsheet attached as App. 15, bearing Bates labels CITY15878-15878_106, is a true and accurate copy of the list of CPD criminal polygraph examinations that occurred from November, 1999 to May, 2013. The spreadsheet has been redacted for privacy purposes but it was produced in its entirety to Harris.

4.     The Discovery Unit oversaw the production of all Complaint Registers filed against Defendant Robert Bartik, produced in this case. A total of six of those Complaint Registers pertained to incidents that occurred during Bartik's employment in the CPD Polygraph Unit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 29, 2016

Eric Winstrom
Office of the General Counsel
Supervising Attorney - Discovery Unit

3