1              <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4      NICOLE HARRIS,                    )
                                         )
5                       Plaintiff,       )
                                         )   Case No. 14 CV 04391
6      -vs-                              )
                                         )   Chicago, Illinois
7      CITY OF CHICAGO, et al.,          )   February 16, 2016
                                         )   10:00 AM
8                       Defendant.       )

9                    TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SUSAN E. COX, MAGISTRATE JUDGE
10
       APPEARANCES:
11
       For the Plaintiff:      VALOREM LAW GROUP LLC
12                             BY:  MR. STUART J. CHANEN
                                    MS. MARGOT KLEIN
13                             35 East Wacker Drive
                               Suite 3000
14                             Chicago, IL 60601

15     For the Defendant:      GREENBERG TRAURIG
       City of Chicago         BY:  MR. KYLE L. FLYNN
16                                  MS. TIFFANY S. FORDYCE
                               77 West Wacker Drive
17                             Suite 3100
                               Chicago, IL 60601
18

19        **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
          NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
20                PORTIONS UNINTELLIGIBLE AND INAUDIBLE

21     Transcriber:

22              SANDRA M. TENNIS, CSR, RPR, RMR, FCRR
                     Official Court Reporter
23                United States District Court
                219 South Dearborn Street, Room 2260
24                  Chicago, Illinois  60604
                 Telephone:  (312) 554-8244
25              Sandra_Tennis@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2   For Defendant:              HALE LAW, LLC
     Robert Bartik               BY:  MR. AVI T. KAMIONSKI
 3                               53 West Jackson Boulevard
                                 Suite 330
 4                               Chicago, IL 60604

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2              THE CLERK:  Case No. 14 CV 4391, Harris versus City

3    of Chicago.

4              MS. KLEIN:  Good morning, Judge.  Margot Klein on

5    behalf of the plaintiff.

6              THE COURT:  Good morning.

7              MR. KAMIONSKI:  Good morning, your Honor.  Avi

8    Kamionski on behalf of the individual officers.

9              THE COURT:  Good morning.

10             MR. CHANEN:  Good morning.  Stuart Chanen on behalf

11   of plaintiff, Nicole Harris.

12             THE COURT:  Good morning.

13             MR. FLYNN:  Good morning, your Honor.  Kyle Flynn

14   on behalf of the City of Chicago.

15             THE COURT:  Good morning.  Do you have all your

16   people here?

17             MS. FORDYCE:  My apologies.

18             THE COURT:  That's okay.

19             MS. FORDYCE:  Good morning, your Honor.  Tiffany

20   Fordyce on behalf of the City of Chicago.

21             THE COURT:  All right.  Well, let's do the easy

22   stuff first.  I have a motion for an order directing DCFS to

23   provide certain things in an un-redacted fashion.  Apparently

24   they need an order from me before they will comply with the

25   subpoena and give the plaintiff the un-redacted copies of

1    these documents.  If there is no objection to this, I'll
2    enter that order.  That's Docket No. 149.

3                And then I think that was the only -- yeah, okay.
4    So that gets us to the sort of gut -- the motion to compel
5    and then the motion for protective order, which, the motion
6    to compel is about more than the motion for a protective
7    order.  So why don't we start with the stuff that's not about
8    the request to admit.

9                There are some motions with respect to Robert
10   Bartik, and then there is some photographs at issue in that
11   motion.  So what's the City's position on that?

12               MR. KAMIONSKI:  Sure.  As to the photographs, we
13   took the plaintiff's deposition on December 22nd, 2015.  And,
14   at the deposition, we had gotten photographs of the
15   defendants at work contemporaneous, 2015 photographs.

16               THE COURT:  Yeah.

17               MR. KAMIONSKI:  And we had them -- we had her go
18   through each photograph, see if she recognized anybody.  And
19   the only person that she recognized was Defendant Bartik.  We
20   were -- this request -- we offered the plaintiff's counsel a
21   compromise, saying we have some photos from 2005 time period.
22   We can do an attorney's eyes only, show them to you, to see
23   if they look the same as the 2015 ones, if they're similar.
24   If you think that they're really not so similar, why don't we
25   do a short dep to see if she recognizes the people or not so

1    that we -- our concern was is that they would look at the --

2    she would look at the 2005 photos and say:  Oh, now they look

3    familiar.  The 2015 ones were really accurate of what I

4    recall them to look like in 2005.  And now that I had a

5    chance to see the 2005 photos, I do recognize the individual

6    officers.  So that was -- our concern was based on the fact

7    that, in a deposition, she couldn't identify anyone except

8    for one officer.

9              THE COURT:  Because the photographs were ten years.

10             MR. KAMIONSKI:  Correct.  So now that we have some

11   photos that are ten years earlier, the deposition is over, we

12   could show them to her, just for the purposes of asking, do

13   you know these people.  And we'll give them the -- we'll give

14   them the photographs anyway after the deposition.  But just

15   so that a trial wouldn't come around and say like, oh, I

16   didn't have the benefit of earlier photos.

17             THE COURT:  So you don't have an objection to

18   producing the photographs?

19             MR. KAMIONSKI:  Correct.

20             THE COURT:  Okay.  And why weren't these

21   photographs produced prior to her deposition?

22             MR. CHANEN:  Judge, there is a little -- there is a

23   little bit of confusion about that.  I -- well, go ahead.

24             THE COURT:  It seems like those would be the better

25   photographs to show someone --

1          MR. CHANEN:  Sure.

2          THE COURT:  -- since they're -- I mean, I've just

3  been doing a project with my family called Scan My Photos.

4  And, I will tell you, as much as I don't like to admit it,

5  when I look at pictures of myself from 15 years ago, I look a

6  little different.  So, you know, it seems like those would

7  have been better to use with somebody, since those are the --

8  to the extent she has memories of people with whom she -- or

9  who she encountered, it seems like the earlier photographs

10  would be more likely to trigger something than later

11  photographs, but --

12          MS. FORDYCE:  Your Honor, on behalf of the City,

13  they just didn't have them prior to the deposition.

14          THE COURT:  Why not?

15          MS. FORDYCE:  We received them from the City.  They

16  searched, and we didn't get them until after the deposition.

17  So we were not able to provide those.

18          THE COURT:  Who searched?

19          MS. FORDYCE:  The Office of Legal Affairs and the

20  representatives from the City.

21          THE COURT:  But then they found them?  I mean, you

22  know, we're -- were they requested prior to her deposition?

23          MR. CHANEN:  Yes.

24          THE COURT:  Well, then, I really don't understand

25  why they're just being found now.

1          MR. CHANEN:  Yeah.  Judge?

2          THE COURT:  I mean, this is just like -- this is

3    the kind of thing that's very frustrating.  It's like those

4    are the photographs, it seems to me, that would be better for

5    the purpose that you want them.  And, you know, they clearly

6    existed.  So I don't understand why they weren't produced in

7    a timely way.

8          MR. CHANEN:  But more than that, Judge, not just

9    not produced, but the individual defendant's counsel then

10   went out over the weekend, preceding the deposition, and

11   photographed their own clients and then tried to use those

12   pictures to establish a principle that Ms. Harris doesn't

13   remember these people from ten years later while the request

14   was pending for the 2005 photographs.  Then after the

15   deposition, they respond in a written response by saying, oh,

16   no, we're not going to give you those because it could harm

17   officer safety.  Actually, the City did not object, but the

18   individual defendants objected.

19         THE COURT:  Right.

20         MR. CHANEN:  So I don't understand.  If we're

21   holding these eight pictures that are contemporaneous, how

22   producing pictures from ten years ago puts officer safety at

23   risk.

24         THE COURT:  Well, it doesn't.  I mean, I don't hear

25   the -- I don't hear them making that objection.

1       MR. KAMIONSKI:  And I offered, since the first

2    phone conference about this 37.2, to go over to Mr. Chanen's

3    office, show him the photos.

4       THE COURT:  But here is the thing.  I don't know

5    why you should get the benefit of a special procedure when

6    the photographs were asked for.  You didn't produce them.

7    And now they've shown up, which means that somebody dropped

8    the ball.  And I'm not suggesting it was counsel.  But

9    whoever was -- because it probably wasn't.  But somebody

10   dropped the ball because these pictures existed.  And those

11   were the pictures that should have been used in her

12   deposition.  You shouldn't get the benefit of the fact that

13   the City couldn't locate these photographs in a timely

14   fashion.  You shouldn't get a special process.  I mean,

15   that's almost -- if I do that, I'm basically saying, oh,

16   it's -- it's okay not to find stuff.  And then, you know,

17   then you have the deposition, she doesn't recognize the --

18   the new pictures that were just taken.  And those pictures,

19   if there was any security risk to the officers, would be in

20   the more recent photographs, not the older photographs.

21   Though I think I would have overruled that objection anyway.

22       But I don't -- I don't see why I should craft a

23   whole process for you when, if the City had done what it was

24   supposed to do and found the photographs, they would have

25   been used in the deposition.  And then Ms. Harris would have

1   either recognized these individuals, or she wouldn't have.

2   There wouldn't be this ambiguity.  The ambiguity occurred

3   because you didn't find -- not you because, again, I know

4   it's not.  But at some point there has to be some

5   responsibility for the fact that documents aren't located in

6   a timely fashion.  Somebody has got to bear the brunt of it.

7   And I don't think it should be plaintiff in this instance.

8           So produce the photographs.  That part of the

9   motion is granted.  Now, what about this Bartik stuff?

10          MS. KLEIN:  Your Honor, I'm sorry, but, can we just

11  be sure that we're clear on that; because the motion was

12  directed both to the City and to the individuals.

13          THE COURT:  Well, who has the photograph?

14          MS. KLEIN:  Well, we --

15          MR. CHANEN:  Go ahead.

16          MS. KLEIN:  We served the defendant requests to

17  each because we suspect they have different photographs in

18  their possession.  And we're looking for what we can find

19  from 2005.  So just to be clear, is the order granted as to

20  all of the defendants?

21          THE COURT:  The photographs that were located, who

22  located them, and from whom?

23          MS. FORDYCE:  The City has photographs.  And I,

24  your Honor, can't promise that they're from 2005 exactly.

25  They found as close as they could to 2005.

1          THE COURT:  And what about the individual

2    defendants?  Have they looked for photographs from 2005?

3          MR. KAMIONSKI:  They have.  And the ones that have

4    found ones, I have them.

5          THE COURT:  All right.  So all -- all photographs,

6    whether they were requested from the individual defendants or

7    from the City circa 2005 of the individual defendants, must

8    be turned over to the plaintiff.

9          MS. KLEIN:  Thank you.

10          THE COURT:  Because, as I said, they should have --

11    those -- if there was going to be a fight about that, it

12    should have occurred before the plaintiff's deposition.  And

13    the fact that it didn't I think is on the City and the

14    individual defendants and not on the plaintiff.

15          Okay.  So let's get to the Bartik stuff.  What's

16    the status of this?

17          MR. KAMIONSKI:  Okay.  The documents that are being

18    requested are 111 polygraph reports from pre-2005 related to

19    Bartik that was involved in litigation called the Don McGee

20    versus City of Chicago.  In that case, plaintiff was alleging

21    that there was a -- that Bartik was claiming that he

22    confessed in what's called the pre-test interview.  In a

23    polygraph examination, there is two components.  There is the

24    pre-test --

25          THE COURT:  I know.

11

1          MR. KAMIONSKI:  Okay.  So he confessed -- so there
2     was litigation in that case concerning whether or not it was
3     reasonable for somebody to confess during the pre-test, how
4     often does that occur during the pre-test.  And there was --
5     that was an issue in that case.  And, in that case, the City
6     produced these 111 documents concerning individuals who
7     Bartik asserted made statements in the pre-test.  Out of
8     5,000 polygraphs in his history, they found 111 that there
9     are agreed pre-test confessions.
10          In this case, Ms. Harris is not making any
11     allegations about pre-test confessions.  Bartik doesn't even
12     claim Nicole Harris ever confessed to her pre-test or
13     post-test.  They just issued their expert report from their
14     expert on polygraphs, which was 107-page production.  Nothing
15     about pre-test confessions, nothing about Bartik being
16     unreasonable in pre-test confessions.  They -- they -- again,
17     similarly, I've offered to compromise.  We talked to them
18     about, if there is somebody -- even out of these 111, not all
19     111 people claimed that their confession was coerced or was
20     fabricated or was unreasonable.  And I said to Stuart Chanen,
21     if there are people that filed lawsuits or made CR complaints
22     of these pre-tests, we'll get you the documents.  But why
23     should we fish -- why should there be a fishing expedition
24     for all these 111 when the client is not making that
25     allegation in this case, Ms. Harris.

1    The expert, 170 pages, nothing about Bartik's

2  pre-test confession issues or any claim of it or any --

3  nothing to do with the case.  It has got absolutely nothing

4  to do with the case.  So they're just fishing about these

5  documents that may or may not be relevant at all.  They don't

6  even -- all they tell you is somebody did not take a

7  polygraph and gave a statement before a polygraph was given.

8  So that has nothing to do with this case.  And so --

9    THE COURT:  Well, I don't -- I mean, saying it has

10  nothing to do with this case is not accurate.  I mean, the --

11  the allegations in this complaint have to do with the misuse

12  of the polygraph unit to induce false confessions.  So I

13  think you're overstating your argument of it.

14    But why -- is it true that -- well, Mr. Chanen,

15  what does your expert say about the polygraph unit?

16    MR. CHANEN:  He -- the expert was not retained to

17  look at the polygraph unit as a whole and says somewhere

18  between very little or virtually nothing on that subject.

19  What he says is that Mr. Bartik lied to -- purposely lied to

20  Ms. Harris because Mr. Hans (phonetic) reviewed the poly --

21  the squiggly line.  I was not the lawyer who worked with

22  Mr. Hans, so I'm not going to use good polygraph terminology.

23  But the squiggly line sheet that he studied, as a very highly

24  regarded expert, he concluded that Ms. Harris was being

25  truthful with response to every question issued by Bartik.

1    Now, Bartik, when he left the polygraph area, told
2    Ms. Harris -- this is her testimony, they dispute it -- that
3    she had failed the polygraph exam.  Which was one of the
4    techniques we believe Bartik used on a regular basis.  But,
5    for purposes of the documentation, he wrote that the report
6    was inconclusive.  And Mr. Hans' opinion is it was neither
7    inconclusive nor false.  He does not take on, nor does he
8    have -- nor have we gathered the evidence yet, nor are we
9    going to ask an expert to take on the entire polygraph unit.
10   He may issue -- again, I did not work with him, another
11   lawyer did.  He may issue some limited opinions about what is
12   and is not proper procedure within a polygraph unit.  But he
13   is not making our case that the polygraph unit, you know, was
14   used -- purposely used by detectives and by the polygraphers,
15   both pre-test and post-test, to coerce confessions from
16   suspects.  Now, was she questioned pre-test?  Yes, she was
17   questioned a lot pre-test by the detectives at Area 5.  And
18   they worked there and they worked there and they worked
19   there.  And they concluded that they would benefit by
20   bringing her to the polygraph unit.  It happens that, in this
21   particular case, Mr. Bartik did not polygraph -- did not
22   make -- as I understand it, make concerted efforts to get her
23   to confess in the pre-test process.  But we don't believe
24   that that means that the pre-test process is irrelevant for
25   how this unit was being conducted.  We have a very detailed

1    Monell claim, in Paragraph 135(e) of our complaint, in which

2    we go into real detail, both generally what the police

3    department has done in terms of failing to train, supervise,

4    monitor its detectives regarding interrogation technique and

5    coerce and confession.  And then, at the end of that

6    paragraph, we have a very specific reference to Mr. Bartik

7    and his role in obtaining these coerced confessions.  So

8    we -- you know, this is not burdensome.  They were --

9              THE COURT:  No, they're not arguing that it's

10   burdensome.  They're arguing that it's not relevant.

11             MR. CHANEN:  Well, we -- you know, I think you will

12   recall, Judge, that in an article we attached --

13             THE COURT:  Yes.

14             MR. CHANEN:  -- to a very early motion, not

15   Mr. Hans, our expert, but a former president of the polygraph

16   association said that 111 pre-test confessions to a police

17   officer, before they ever enter a polygraph room, is

18   extraordinary.  And that, in his 30 years of criss-crossing

19   the world on behalf of the United States government giving

20   polygraphs to people, he had obtained, I believe the number

21   was, less than five in 30 years.

22             THE COURT:  But that's not what --

23             MR. CHANEN:  Bartik had -- Bartik had 111 in five

24   years.

25             THE COURT:  That's not what you're claiming

1    occurred in this case.

2                 MR. CHANEN:  But, Judge, we have a Monell claim

3    about the manner in which the polygraph unit was used.  So

4    let me give you an example.  And this is where Mr. Kamionski

5    agreed to compromise, but I think the offer sort of proved

6    the relevance of the 111 files.  He said, you know, what if

7    one of these 111 files match one of the 43 people who have

8    been exonerated even after giving a confession, what if that

9    circles back to Bartik.  What if there is a CR out there from

10   one of the 111 claiming that Bartik tricked him into giving a

11   confession.  You know, we -- we would certainly -- let's just

12   take that as an example.  I'm not saying it exists because I

13   haven't seen it.  But if there is a CR out there that says

14   one of the people that Bartik is bragging about in McGee as

15   I've taken these 111 confessions later complained that it was

16   coerced, at least we should be able to hear what that person

17   had to say.  I mean, it's relevant in that regard.  It's

18   relevant in showing that Bartik is not using the polygraph

19   process in a proper way.  And I -- I mean, I just reject, and

20   I -- but I've got to obviously convince your Honor that it's

21   slicing it too thin to say the greeting at the door is one

22   part; but she didn't say he greeted at the door in a funky

23   way.  Then the pre-test questioning.  Then the ten questions.

24   Then his report back to her the ten questions.  Then whether

25   he -- you know, he entered the room with the detectives after

16

1  the exam and participated in the coercion.  So I just don't

2  think we can cut it that fine when we're trying to determine

3  whether the polygraph unit was intentionally being used to

4  improperly coerce confessions.

5          THE COURT:  And what are these -- I mean, these are

6  basically documents that memorialize the interviews that were

7  had with these individuals?

8          MR. KAMIONSKI:  Right.  They would be a -- it would

9  be a one-page report saying that there was no tests given, as

10  opposed to like a finding of --

11         THE COURT:  Uh-huh.

12         MR. KAMIONSKI:  So it would say no test.  There

13  would be a report of, like, no test because gave statement

14  beforehand, or it would be, like, maybe a two or three line

15  statement of what the individual would have said.  And that's

16  about it for each of these individuals.  Maybe I think the

17  questions as well that might have been asked, like the

18  initials questions that he was going to ask in the pre-test.

19  But during the pre-test, he formulates the questions that he

20  would ask during the actual --

21         THE COURT:  And he puts those in his report?

22         MR. KAMIONSKI:  It's like a handwritten notes that

23  he is taking on a -- on the polygraph case review sheet.  So

24  just -- I'm just trying to picture in my head if that's -- if

25  on the back there would be, like, some of the relevant

1    questions that might be prepared to be asked.

2            And so for the individuals that -- I think counsel

3    is saying that you continue that really the allegation is not

4    the pre-test issue in this case.  And as far as those

5    individuals, there is no evidence that 111 people complained

6    that those -- that the statements --

7            THE COURT:  Well, he can't know that because he

8    doesn't know who they are.

9            MR. KAMIONSKI:  Right.  That's why I offered to

10   say, the individuals that filed CRs, or lawsuits complaining

11   that Bartik fabricated, coerced, whatever the allegations

12   against Bartik of those 111, we would be happy to turn over.

13           THE COURT:  Why isn't this sufficient for your

14   purposes?

15           MR. CHANEN:  For two reasons, Judge.  First of all,

16   I've got to say, I did not in any way concede the pre-test

17   was -- was irrelevant.

18           THE COURT:  Well, I know, but why -- but, really,

19   what you want to do is you want to -- you want to make some

20   argument, it seems to me, that -- that -- you know, I'm

21   thinking out loud here because if -- if these individuals

22   didn't complain about Bartik's behavior, then those reports

23   aren't going to tell you anything.

24           MR. CHANEN:  Judge?

25           THE COURT:  Right.

1              MR. CHANEN:  No, I disagree with that.

2              THE COURT:  What -- well, what are they going to

3      tell you?

4              MR. CHANEN:  It could show patterns, Judge.  We

5      have the same bivalent sheet that he prepared for Ms. Harris

6      by looking at the -- well, let's back up.

7              THE COURT:  Yeah, Ms. Harris didn't --

8              MR. CHANEN:  At a minimum, we should get the 111

9      names because then we can go ahead and do the cross checks.

10     So that's number one.  I don't think I should have to rely --

11     I mean, when someone hasn't complained or filed a CR or filed

12     a lawsuit, that could mean a lot of things, including --

13             THE COURT:  It could.

14             MR. CHANEN:  -- they couldn't find a lawyer.  You

15     know, I don't --

16             THE COURT:  It could mean a lot of things.

17             MR. CHANEN:  It could mean a lot of things.

18             THE COURT:  Some people don't file CRs.

19             MR. CHANEN:  Yeah.

20             THE COURT:  Some people feel CRs are a worthless

21     waste of time.  I've heard people actually say that.  So I

22     don't know that it necessarily -- I mean, I understand the

23     point with respect to the names because if you want to chase

24     these people down, I suppose you should be entitled to do

25     that to find out -- I'm just trying -- I mean, it seems to

1  me --

2              MR. CHANEN:  Here is the thing, Judge.  I think

3  that, by giving the 111, we can see certain patterns in the

4  document and also compare that pattern to Ms. Harris'.  But I

5  would have no problem with Mr. Kamionski giving you --

6              THE COURT:  Oh, God.

7              MR. CHANEN:  -- one -- you don't have to read 111

8  because I'm not asking you to find the pattern for us.  He

9  could give you one or two.  At least then you'd have in front

10  of you what the document is that we're talking about.

11              THE COURT:  I'm still trying to understand how that

12  would help you.  I mean, it's going to be a list of

13  questions.  I mean, you know, and the thing is, you're not

14  complaining -- you're not complaining about -- about -- I

15  mean, she didn't -- whatever he did in the pre-test phase

16  with her isn't the subject of your lawsuit.

17              MR. CHANEN:  Well, Judge --

18              MR. KLEIN:  That's not exactly right.  Can I hand

19  up to you the complaint?

20              THE COURT:  I've seen the complaint.  I just

21  don't -- I'm trying to -- I'm trying to understand, like --

22  I'm having trouble understanding how you -- how -- how you

23  would -- how these documents would be used at trial.  That's

24  what I'm having trouble understanding.  How you would use

25  these documents.

1        MR. CHANEN:  I'm not sure we would use these

2    documents at trial, Judge.  I think we would use these

3    documents --

4        THE COURT:  What's your best-case scenario, then?

5        MR. CHANEN:  Using the discovery tools available to

6    us with the 111 names and the way Bartik conducted these

7    pre-test interviews with these people.  Keep in mind, Judge,

8    all the 111 of these people purportedly confessed.  We should

9    be -- we have a client who purportedly confessed who a judge

10   has ruled is completely innocent of the crime.

11       THE COURT:  Well, that's why I think there is --

12   that's why I think that those folks are tied to lawsuits or

13   complaints or even, if you have the names, those -- I think

14   I'm with you so far.  I'm just not sure why you're entitled

15   to all 111 pre-test reports.

16       MR. CHANEN:  I'll make -- then -- at the risk of

17   angering Ms. Klein, I'm going to completely give in on this

18   one.

19       THE COURT:  Completely give in, when I already told

20   you I was probably going to rule.  So, you know, it's a huge

21   concession.

22       MR. CHANEN:  Judge, we're fine with the 111 names

23   and the people who have filed CRs or lawsuits.  At least then

24   we get to see a sample of what the document looks like.  And

25   if we look at it and say, we can't get much further than

1   this, it's what Mr. Kamionski said, it's very little --

2          THE COURT:  And if you see a pattern, if you see a

3   pattern, you can come back and argue that the rest of them

4   are relevant.  But I think that it -- I think the compromise

5   makes sense in this case.  So I'm going to order that you

6   produce the list of names.  You produce the documents,

7   insofar as those individuals have filed either lawsuits or

8   CRs.  And then they can pursue the ones that haven't done

9   either to, whatever; or, as I say, you'll get a sampling of

10  the documents.  And if you see that there is an obvious

11  pattern, you'll have much more to argue to me next time.

12         MR. CHANEN:  Thank you, your Honor.

13         THE COURT:  So the motion is granted in part and

14  denied in part.

15         MS. KLEIN:  Judge, since the documents are already

16  in the possession of Mr. Kamionski, can you set a short date?

17         THE COURT:  Yeah.  When can you get these to them?

18         MR. KAMIONSKI:  Three days?

19         THE COURT:  Sure.  Okay.  And that gets us, I

20  think, to the request for admission.

21         MR. CHANEN:  Unless you want to do the -- unless

22  you want to just get rid of the documents.  So, Judge, this

23  is not really a dispute.  The City's lawyers -- every

24  category we've listed in that last section are documents that

25  they said they will produce.

1          THE COURT:  Uh-huh.

2          MR. CHANEN:  Some of them they have produced since

3     we filed the motion.  We also got late last night another

4     production from the City.  And so -- and we haven't gotten to

5     see what's in there yet.  Our paralegal is working on that.

6     But he may identify additional ones.  So we have agreement.

7     It's not really a matter of -- but we're getting close to the

8     end of the discovery.

9          THE COURT:  Yeah, what is this?

10         MR. CHANEN:  And he is getting a lot of pushback

11    from his client because they're very busy on other big

12    related matters, as you can imagine.  But we would like you

13    to set firm deadlines for the production of these documents.

14    They may end up blowing the deadlines you set, and then we

15    can deal with that at that time.  But, for now, we think your

16    pushing them will help the lawyers get the client to do what

17    it needs to do.

18         THE COURT:  What's the date of discovery close?

19         MR. CHANEN:  April 15th, I believe.

20         MR. FLYNN:  Yes, your Honor.

21         THE COURT:  And what would you propose?

22         MS. KLEIN:  Well, you can see in our motion the

23    dates when the discovery was due.

24         MR. CHANEN:  Well, why don't we -- yeah.

25         MS. KLEIN:  I mean, the last bulk of it was due in

1  December or January, so.

2  THE COURT:  What's the holdup here?

3  MS. FORDYCE:  Pardon?

4  THE COURT:  What's the holdup here?

5  MR. FLYNN:  Your Honor, if I may?

6  THE COURT:  Sure.

7  MR. FLYNN:  Most of the documents that are listed

8  were already produced in the last couple weeks.  Many of them

9  were produced last night.  Your Honor, many of the -- all of

10  the documents that were produced last night we got in on

11  Friday.  I went through them over the weekend and yesterday

12  as well, made necessary redactions and got them out as soon

13  as I could.

14  THE COURT:  And what's the origin of these

15  documents, and where are you getting them from?  The police

16  department?

17  MR. FLYNN:  Yes.  I primarily work with the Office

18  of Legal Affairs.  But then they need to -- depending on what

19  the request is asking for, they need to speak to many other

20  different departments that would have these documents.

21  THE COURT:  Like what departments?

22  MR. FLYNN:  Bureau of Internal Affairs, the

23  Detectives Division, the Forensics Division.

24  THE COURT:  They need to get -- they need to be

25  moving along faster than they -- is what I would say.  Not

1   just in this case, but in general.  You have -- and you don't

2   really know -- you don't really know right now because you

3   haven't had a chance to go through the most recent production

4   what's still outstanding; correct?

5              MR. CHANEN:  Correct, Judge.

6              MS. KLEIN:  The rest of the production, that's

7   right.

8              THE COURT:  Well, I think that everything needs to

9   be to the plaintiff no -- everything needs to be to the

10  plaintiff no later than February 24th.  So I'll put that in

11  the order.

12             MR. CHANEN:  Thank you, Judge.

13             THE COURT:  And you can tell your folks to expedite

14  this case maybe over something else because some of these

15  are -- have been outstanding for a while.  As far -- you may

16  have produced them already, I don't know.  I'm not saying

17  that you haven't.

18             Okay.  Now we get to the -- the significant dispute

19  between you.  One thing I will say off the bat is I'm not

20  sure I understand why it is that you went through almost two

21  months of negotiations only to interpose an overall objection

22  to these.

23             MS. FORDYCE:  Well, your Honor, I'd like to walk

24  you through that timeline because I do think there is some

25  misrepresentations in their motion to compel, which, your

1    Honor, respectfully, we filed our motion for protective
2    order, and then they subsequently filed their motion to
3    compel.  I understand that it was broader than just the
4    request for admission.  But it strikes me as really a
5    backdoor way to get at a response to our motion for
6    protective order.
7              THE COURT:  Okay.  But that doesn't address the
8    question I asked you.
9              MS. FORDYCE:  Okay.
10             THE COURT:  I understand what you're saying, but
11   why is it that -- why is it that there were multiple
12   extensions and sort of re-statements of these requests to
13   admit when it seems pretty clear that the City had no
14   intention of answering them?
15             MS. FORDYCE:  Okay.  Well, first of all, that's not
16   entirely true.
17             THE COURT:  Okay.
18             MS. FORDYCE:  Through this period we actually --
19   notwithstanding the fact that we found these requests to be
20   objectionable, we actually seriously considered responding to
21   them just so we wouldn't have to -- avoid --
22             THE COURT:  If they were objectionable, why didn't
23   you just file objections?  I mean, this is what I'm saying.
24   Like, it seems to me that, you know, this period of time, you
25   know, where you're considering and reconsidering and

1    considering it again.  But, in the end, you basically

2    objected to every single one of these.

3              MS. FORDYCE:  We didn't though, your Honor.  That's

4    not true.

5              THE COURT:  Well, the ones that are in front of me

6    you did.  And that's quite a few.

7              MS. FORDYCE:  Well, we respond -- okay.  Can I

8    please walk you through this time --

9              THE COURT:  Sure.

10             MS. FORDYCE:  -- because I don't think that that's

11   quite accurate.

12             THE COURT:  Absolutely you can.

13             MS. FORDYCE:  Okay.  So on December 30th we had our

14   first meet-and-confer.  We raised several objections orally

15   through the meet-and-confer.  On that day, we made clear, and

16   we have an e-mail if your Honor would like to see it, we

17   said, we need you to amend some of these.  We have objections

18   to several of them.  They agreed to do it.  And that's when

19   we got the first extension.  And what that extension did was

20   it obviated the need for us to file a motion for protective

21   order.  And that was memorialized in an e-mail on

22   December 30th.  We were trying to take some time to see if we

23   could work it out so that the motion wouldn't be necessary.

24   So at this point we're going through a normal meet-and-confer

25   process where we're trying to determine if we can narrow

1    issues.  And we did ultimately narrow a lot of these issues.

2    That happened on December 30th.  We have the e-mail.

3            On January 20th -- I'm sorry, January 8th of 2016,

4    we did receive by e-mail some modified requests for admission

5    with respect to Sets 1 and 3.  Set 2 they said, we're not

6    going to modify those.  And so it didn't --

7            THE COURT:  Have they ever modified those?

8            MS. FORDYCE:  Set 2, no.  So they, for some that we

9    asked them to amend, they didn't.  They took some time to

10   consider it.  And for others that we asked them to amend,

11   they didn't.  And with respect to January 8th, we -- they did

12   give us at that point another extension on Sets 2 and 3.  And

13   Mr. Chanen said in an e-mail on January 8th, and I quote, and

14   we have it, your Honor, if you'd like to see it:  "If you

15   plan to file a motion, we should have one more

16   meet-and-confer, although I believe it can be brief."  So it

17   was clear, I think, to all parties that we were continuing to

18   meet-and-confer, continue to narrow the issues.  And that --

19   the idea that we may file a motion for protective order was

20   very much on the table and everybody understood that.

21           On January 15th, we responded to their first set of

22   requests for admission, and that was in the neighborhood of

23   75, your Honor.  So that was a significant response.  And on

24   January 22nd, again, there was another discussion of a motion

25   memorialized in an e-mail.  And that's when we got this

1   extension of February 2nd.  And let me please be clear that,

2   during this process, we were trying to find these documents

3   because, like I said, we were trying to avoid another motion

4   before your Honor.  And we still don't have them up.  We

5   still cannot meaningfully respond to all of them.  So it was

6   not a foregone conclusion that we weren't going to respond.

7   And we continue to meet-and-confer.  And we will continue to

8   try to narrow the issues.

9          On January 26th is when -- I mean, and this is

10  frankly around the time it first came to my attention that we

11  were getting these amended requests just by way of e-mails.

12  And I was not comfortable with that.  I felt that it was

13  proper to serve an amended stand-alone request.  Otherwise,

14  I'm looking at two sets of e-mails and three sets of

15  documents to get a cogent set of requests to admit.  And so

16  we asked, hey, look, we need a cohesive set.  And we got

17  amended requests for admit to the third set again.

18         So, again, we're meeting and conferring.  We're

19  narrowing the issues.  We're tweaking the requests to try to

20  address the City's objections; and that happened on

21  January 27th.  Again, Mr. Flynn, in an e-mail that we're

22  happy to provide your Honor, stated we reserve our right to

23  object to the extent the RFAs still do not comport with

24  Rule 36.

25         So we're not talking about this time period we're

1  just sitting on our hands.  We're talking about --

2          THE COURT:  Okay.  You made your point.

3          MS. FORDYCE:  Okay.  Thank you.

4          THE COURT:  So do you concede that this information

5  is relevant?

6          MS. FORDYCE:  I think it's relevant, but my biggest

7  concern is I don't think that the Rule 36 request for admit

8  is the proper tool.

9          THE COURT:  So what would be the proper tool?

10          MS. FORDYCE:  Interrogatories and requests for

11  admissions.

12          THE COURT:  So, really, if I gave them permission

13  to ask these questions by interrogatories, you would have to

14  answer them; is that right?

15          MS. FORDYCE:  Yeah, and --

16          THE COURT:  Is there a number of the

17  interrogatories that you're objecting to?

18          MS. FORDYCE:  I think we will push up on an issue

19  as to the number, potentially.  I think some of them, not all

20  of them, may be discoverable, not relevant, but probably

21  discoverable to the Monell claim.  But I think asking us to

22  go through all this through a request to admit to get a

23  judicial admission is not proper.

24          THE COURT:  But is it really that difficult to say

25  whether there was an investigation or not?  And should it be?

1  I mean, this is where I really -- this is where I really

2  struggle.  I mean, I understand what you're saying, but I

3  look at this and it's a pre -- with respect to the

4  certificate of innocence, the 43 people, is it really so

5  difficult to find out whether there was an independent police

6  review authority investigation or any other -- I mean, this,

7  to me, seems -- the fact that this is so difficult highlights

8  some of the basic problems that are structural in -- in

9  the -- with the police department and IPRA.  I mean, this

10 should not be difficult.  This should be -- this should be a

11 database.  These folks were declared innocent.  There were

12 circumstances that led to that.  They involved some

13 allegations of police misconduct, some of them.  I'm guessing

14 not all of them, but probably a lot of them.  Why is it so

15 difficult to answer this question?

16         MS. FORDYCE:  So I understand your frustration.  I

17 mean --

18         THE COURT:  It's not just my frustration, it's the

19 frustration I think is shared by many.

20         MS. FORDYCE:  I understand the Court's frustration

21 globally.

22         THE COURT:  Yeah.

23         MS. FORDYCE:  I mean, I can only work within the

24 system that I am provided.

25         THE COURT:  I got you.

1       MS. FORDYCE:  And as far as is it difficult?  Yes.

2       THE COURT:  To go to IPRA, you say, did you

3    investigate, you know, did you make -- did you investigate,

4    you know, this case.

5       MS. FORDYCE:  By way of example, okay, so we give

6    them a list of names.  They can't pull up through their

7    database, as my understanding, looking at just at names of

8    the complainants or the victims.  So then we have to track

9    down birth dates, we have to track down dates of arrest.

10   We've been doing --

11      THE COURT:  Can they track down the officers'

12   names?

13      MS. FORDYCE:  Well, that's not -- if we knew the

14   officers' names, but all we have is a list of people from

15   this University of Michigan website that we can't -- I mean,

16   I can't assume, for purposes of defending my client, that the

17   information on a website --

18      THE COURT:  No, you know that these people were

19   given certificates of innocence.  Do you not know that as a

20   fact?

21      MS. FORDYCE:  No, I don't.  And we're looking into,

22   then we go to the circuit court and we try to figure out, did

23   you get a certificate of innocence.  We have to pull the

24   orders.  We get all this background information that we can

25   feed to BIA and IPRA so they can use their database.

1    Unfortunately, it's not wrapped up in a bow.

2           But I think the more important point, your Honor,

3    is that under Vergara and under Pontiac, it's very clear

4    that, if you have to rely on numerous outside documents and

5    information --

6           THE COURT:  It's not so clear.  And I read --

7           MS. FORDYCE:  I know.  I know you read it.

8           THE COURT:  -- Vergara, and it's not so clear.

9    This is actually a very complicated issue.  And -- and the

10   law is all over the place on requests for admissions.  I

11   mean, it really is.  It just -- so are you saying -- are you

12   saying, then, that you can't take the names of these

13   individuals and you can't run them through the IPRA database

14   to find out whether they've made a complaint?

15          MS. FORDYCE:  No.  I mean, that's -- because we --

16          THE COURT:  Wouldn't the complaint originate with

17   these folks?  That's absurd.  That is the most absurd thing I

18   think I've ever heard.  And, again, it's not your absurdity,

19   but it's an absurdity, nonetheless.  That there is no way to

20   check a database based on who the complainant is.  Because

21   that's what you're representing to me.  Is that what IPRA --

22   if there was an IPRA lawyer here, would they say that?  Wow.

23          MS. FORDYCE:  We have -- and we have on our --

24          MR. CHANEN:  But it's not about the victims, Judge.

25   It's about protecting the officers.

1    THE COURT:  Well, I'm not going to get into that.
2  I'm just talking about as a structural database, that's
3  absurd.  The notion that there can't be -- that you cannot go
4  into a database and check to see whether Calvin Ollins filed
5  a complaint against the officer involved in this case after
6  he was exonerated by the Circuit Court of Cook County,
7  assuming for purposes of our dialogue that he was.

8    MS. FORDYCE:  I mean, but, your Honor, we have been
9  taking that leg work.  We have been going through those extra
10  steps and --

11    THE COURT:  Because they're entitled to this
12  information, are they not, in some form?

13    MS. FORDYCE:  In some form.  But I don't think the
14  request to admit is the proper format.

15    THE COURT:  So all I would have to do, then,
16  assuming this information is relevant is I could tell them to
17  rewrite these as interrogatories, essentially, and they would
18  get the information that way.

19    MS. FORDYCE:  They may get that information that
20  way.  You know, we do have a motion for summary judgment
21  that's pending.  But that, to me, is an absolutely different
22  discussion.  And I think, you know --

23    THE COURT:  But I have the power to do that; right?
24  I mean, really, this is sort of a form over -- if there is no
25  relevance objections, this is kind of a form over substance

34

1    kind of thing.  I mean, I get what you're saying when you --
2    when you object to information that's within, like, the
3    state's attorney's purview, you know, if you -- there is --
4    no -- I mean --
5                MR. CHANEN:  Judge?
6                THE COURT:  That is a legitimate objection.
7                MR. CHANEN:  Can I answer to that?
8                THE COURT:  Yes, quickly because I've got now two
9    criminal matters.  I'm backed up here.
10               MR. CHANEN:  I'll be real quick.  When we say to
11   that, Chicago -- look, we've had in the last ten years a
12   series of people who the Chicago Police Department claim
13   confessed to rapes and murders.  And then through DNA or
14   other evidence --
15               THE COURT:  Understood.
16               MR. CHANEN:  -- we've established that that
17   confession could not have been a truthful confession.
18               THE COURT:  Right.
19               MR. CHANEN:  The person couldn't have done what
20   they said they did.  If I am the Chicago Police Department
21   and I get 43 of these, I should be very concerned about them.
22               THE COURT:  Well, that's a whole -- we can have --
23               MR. CHANEN:  I have an obligation to train my
24   officers, discipline my officers.
25               THE COURT:  Okay.  But you're off point.  You're

1    making a closing argument, and that's awesome.  But that's

2    not -- that's not what's in front of me, Mr. Chanen.

3                MR. CHANEN:  For them --

4                THE COURT:  They're saying -- they are saying that

5    it's not as simple as you say it is.  That they can't --

6    they're saying on the record that IPRA cannot search for

7    these people's names in their file, which, as I say, is a

8    complete absurdity, from my perspective.  But that's what

9    they're representing.  Right?

10               MR. CHANEN:  Judge, my point is that for IPRA to

11   answer that question, you do not need to go into the minds of

12   the state's attorneys to ask them why they took a position or

13   didn't take a position on a certificate.  This is in their

14   brief, Judge.

15               MS. FORDYCE:  These are two different issues, your

16   Honor.

17               MR. CHANEN:  I'm sorry, Judge.  This is in their

18   brief.  This is them saying this is too burdensome for us,

19   Judge.

20               THE COURT:  No, they're saying that they don't have

21   actual knowledge, I suspect that's what they're saying, which

22   is, if that's what you're saying -- if that's not what you're

23   saying, you better clarify the record that you don't --

24               MR. CHANEN:  Look --

25               THE COURT:  Hold on, Mr. Chanen.  I talk, you talk,

1    they talk.  That's how it works.

2              MR. CHANEN:  I apologize, your Honor.

3              THE COURT:  You're saying you don't -- the City of

4    Chicago, the City of Chicago, the entire city, has no

5    personal knowledge as to whether these individuals had

6    certificates of innocence issued?  Because that's what

7    they're asking you to admit or deny in those -- on those.

8              MS. FORDYCE:  The only way we would know if a

9    certificate of innocence is issued -- and on some of these

10   we've tracked it down; and if we get an interrogatory

11   response, I'm happy to respond.

12             THE COURT:  Why can't you admit it or deny it, if

13   you know it?

14             MS. FORDYCE:  For some of them.  Because I still

15   think it's objectionable because it's inconsistent with

16   Rule 36.

17             THE COURT:  It's not.  I don't think -- I don't

18   think that is.

19             MS. FORDYCE:  But we wouldn't know it unless there

20   was a lawsuit filed or a CR filed and that information is in

21   that file.  And the petitioner files a certificate of

22   innocence -- I'm sorry, if a petitioner files for a

23   certificate of innocence, they only have to notify the

24   Attorney General's office and the State's Attorney's office.

25   The City doesn't have notice.  So if we're going to answer

1   that for the vast majority of them, we have to go to the

2   circuit court and figure out and find the file to see if a

3   certificate of innocence was petitioned or granted.  I am not

4   taking the University of Michigan's website at their word.

5   I'm going to do my due diligence and make sure I don't admit

6   something erroneously.

7           THE COURT:  Yeah, but you're -- I mean, what you're

8   saying here is truly troubling.  Because what you are

9   implicitly saying is that when these folks are let out of

10  jail on certificates of innocence that the City of Chicago

11  does absolutely nothing.

12          MS. FORDYCE:  It doesn't get notice.  Nobody asks

13  the City of Chicago if they object to that.  I mean, that's

14  another huge issue that's circulating in the circuit courts.

15          THE COURT:  But there is no -- but that doesn't

16  trigger any, you know, process within the police department

17  to find out why?

18          MS. FORDYCE:  There is no -- we don't even -- the

19  police department doesn't, as a matter of course, even get

20  notice when these petitions are entered.  Half the time they

21  find out because a lawsuit was filed.  We don't even have

22  standing as the City of Chicago or the Chicago Police

23  Department to object.  And that's something the circuits are

24  split on right now.

25          MR. CHANEN:  Then why can't they just say admit?

1   We admit there was no investigation.

2           MS. FORDYCE:  Because I don't know --

3           THE COURT:  Well, you're talking about two

4   different things, and that's my fault because I switched to a

5   different issue.  I mean, I don't -- the issue with respect

6   to the investigations, I mean, as I said, I'm very troubled

7   by the fact that with respect to these individuals that there

8   is no relatively simple way to determine whether there was an

9   IPRA investigation into, you know, the conduct that gave rise

10  to the exoneration or not.  I really want to know for a fact

11  that that's the case.

12          MS. FORDYCE:  Well, and some of these, your Honor,

13  let's be clear, are 25 years old.  We're talking about 43

14  alleged false confessions --

15          THE COURT:  Again --

16          MS. FORDYCE:  Alleged, over a 25-year period.  Some

17  of these databases doesn't even exist that they had --

18          THE COURT:  So isn't the -- all right.  So isn't

19  the answer, then, I don't know with respect to those?

20          THE LAW CLERK:  Lack knowledge.

21          THE COURT:  Yeah, that you lack knowledge one way

22  or the other with respect to that?  I suspect the plaintiffs

23  could live with that for some of these people.  You just have

24  no way of knowing.  But with respect to the people who filed

25  IPRA complaints, it seems like you do have a way of knowing.

1    It's burdensome because of the way the City has chosen to

2    maintain these records, which was a choice that the City

3    made, not the plaintiffs.  If the City chose to maintain a

4    database that cannot be searched by the complainant's name,

5    that's on you, really.  I mean, again, not you personally,

6    but on your client.  It's almost -- it's -- it's the worse

7    possible way to run a railroad, it seems to me.  But that's

8    the choice that has been made.  But you could search these

9    files to find out if there was an investigation or not.

10            MS. FORDYCE:  Well, we would be looking at several

11    outside documents, several outside --

12            THE COURT:  What outside document?  This question

13    asks you whether there was an IPRA investigation.  IPRA is a

14    unit of the City of Chicago.  IPRA maintains complaint

15    registers and a database.  It's not asking you to look at

16    outside information.  It's asking you whether IPRA undertook

17    an investigation.  If you can't -- if there was no IPRA

18    existing with respect to some of these folks, then the answer

19    is no because there was no IPRA investigation because there

20    was no IPRA.  With respect to other people, you know, either

21    there was an investigation or there wasn't.  I don't see why

22    you can't answer that.  That doesn't require you to do

23    anything but search IPRA.  And -- and I forget what the

24    predecessor of IPRA was, a different name.

25            MS. FORDYCE:  BIA and OPS.

1          THE COURT:  Yeah.

2          MS. FORDYCE:  I mean, yeah, so we are, we're

3   talking about multiple -- and we are talking about because of

4   how it's set up, and I understand your concerns.

5          THE COURT:  That's your problem.  I'm not really

6   sympathetic -- I'm not that sympathetic to that, to tell you

7   the truth.  If they want to maintain a database that can't be

8   searched by the victim's name, the complainant's name, that's

9   their problem, it's not mine, it's not the plaintiff's.  I

10  mean, then you're going to have to, I guess, figure out how

11  to -- I don't know how it can be searched.  I mean, how is it

12  searched, you know, when plaintiffs file lawsuits?

13         MS. FORDYCE:  So, you know, my understanding is

14  that you can search by name, but you need additional

15  information.  And that's what we've been trying to track

16  down.

17         THE COURT:  Like what?

18         MS. FORDYCE:  The date of the arrest, the date of

19  birth of the complainant or the victim.  I mean, there is

20  additional information they need to feed into the system and,

21  but --

22         THE COURT:  Well, it sounds like that data would be

23  necessary to ensure you're talking about the right guy.  It's

24  not necessarily -- I mean, because there might be people with

25  multiple names.

1        MS. FORDYCE:  Because we're talking about tons of

2    thousands of arrests that happen a year.

3        THE COURT:  But we're not--

4        MR. CHANEN:  We're talking about convictions and

5    exonerations.  We're not talking about arrests.

6        THE COURT:  Yeah, and we're talking about people

7    who have made complaints.  Okay?  That's what the questions

8    asks you, which is why I'm not real sympathetic to this

9    notion that you have to look at a zillion different things.

10   What you need to look at is IPRA files to find out whether or

11   not these individuals filed complaints and there was an

12   investigation.  You know, and I really don't -- it's

13   obviously relevant information.  I don't understand why you

14   can't answer this question.  I mean, I understand why it's

15   difficult.  But, again, I think that's because of the way the

16   records are maintained.  That's not really -- you know, I

17   think that's a problem you're just going to have to resolve.

18   And, really, finding the birth dates for these individuals

19   doesn't seem like it would be that difficult either.

20       So I'm going to order that you -- I'm going to

21   order that you answer that set of requests for admissions, on

22   whether or not there was an IPRA or other investigation

23   after.  Just -- that's a question, actually.  You don't have

24   to -- you know, that's the whole question.

25       MS. FORDYCE:  So, your Honor, are you ordering a

1    response on the second set of requests for admission; and

2    that was the one with the 43 individuals?

3              THE COURT:  Yeah.  You're assuming, I guess -- you

4    don't want to assume that Calvin Ollins was exonerated in

5    2001, is that what you said before?

6              MS. FORDYCE:  Some of these are obviously public

7    cases.  So some of them we know.  Some of them we don't.

8    And, like I said, we've been doing our due diligence.  We've

9    been trying to get the information.  But, no, I'm not taking

10   anything on this website for granted.  That's not evidence.

11             THE COURT:  Okay.  But why -- then just -- then the

12   question could be rephrased -- if you don't want to buy into

13   the premise of the plaintiff's question, the question could

14   just be was there an IPRA investigation into any allegations

15   raised by Calvin Ollins regarding his arrest.  I mean,

16   couldn't you just do that?

17             MR. CHANEN:  Yeah, we can certainly take --

18             THE COURT:  Can't you rephrase it in a way -- I

19   mean, you know --

20             MR. CHANEN:  We did take out the -- we can take out

21   the --

22             THE COURT:  What?

23             MR. CHANEN.  Certificate -- the certificate of

24   innocence premise.  And -- no, Ms. Klein is right.  She is

25   saying it goes -- it goes to the issue of Monell, Judge.

1    We're trying to determine what the City is doing about

2    coercion of false confessions.

3              THE COURT:  All right.  I can't hold my other

4    people up.

5              MR. CHANEN:  All right.

6              THE COURT:  We're not done.  Take a seat.  And I'm

7    going to deal with my criminal matters.  They shouldn't take

8    very long.

9         (Case passed and recalled at 10:55 AM.)

10             THE CLERK:  Recalling Case No. 14 CV 4391, Harris

11   versus City of Chicago.

12             MS. KLEIN:  Margot Klein on behalf of the

13   plaintiff.

14             MR. CHANEN:  Stuart Chanen, also on behalf of the

15   plaintiff.

16             MS. FORDYCE:  Tiffany Fordyce on behalf of the City

17   of Chicago.

18             MR. FLYNN:  Kyle Flynn on behalf of the City of

19   Chicago.

20             MR. KAMIONSKI:  Avi Kamionski on behalf of the

21   individual officers.

22             THE COURT:  All right.  Where were we?

23             MS. FORDYCE:  I think we were talking about how to

24   potentially rephrase the 43 requests that appear in request

25   to Admit No. 2.

1   MR. CHANEN: Yeah. Judge, we can solve that really

2   easily. Instead of saying after Mr. Ollins was exonerated in

3   2013 -- 2003, we're going to change the phrasing to admit

4   that, between 2003 and 2015, and then the rest of the

5   admission is exactly the same.

6   THE COURT: Yeah. And I'm going to order that you

7   answer that. Now, there may be some answers that are going

8   to be, we lack knowledge. You know, and if that's the

9   answer, the rule permits you to do that. I mean, you know,

10  if there are -- like, you know, the point you made that some

11  of these are -- you know, go back very far. If that's the

12  case, then your answer is going to be, I don't know. And

13  that is appropriate once you've done the appropriate

14  investigation. And that very well may be what you have to

15  say in response to some of these. But certainly the more

16  recent ones and the ones involving IPRA I think you can

17  answer. And so we'll do that. So, okay. So that takes care

18  of, like, some of these, but not all of them.

19  MS. FORDYCE: Your Honor, may I have one point of

20  clarification, just to make sure I'm not accused of

21  wrongdoing. Can we get a clean set of the amended ones with

22  your Honor's orders so we have all of the requests in one

23  place from the plaintiff. And then what is your Honor's

24  deadline for us to respond? Because, otherwise, we have the

25  set that was served on us and now it's amended.

```
 1              THE COURT:  You don't have a problem with that; do
 2    you?
 3              MR. CHANEN:  I don't have a problem.  I'll have it
 4    an hour after I walk out of this.
 5              THE COURT:  Okay.  It's a word processing thing.
 6              MS. FORDYCE:  And, your Honor, when would you like
 7    us to respond?
 8              THE COURT:  Well, you've been looking at this for a
 9    while now; right?
10              MR. CHANEN:  December --
11              THE COURT:  Yeah.
12              MR. CHANEN:  -- 11th.
13              THE COURT:  Okay.  So two weeks.
14              MS. FORDYCE:  That's fine, your Honor.  That's why
15    I ask.
16              THE COURT:  Like I said, if the answer is I don't
17    know, then the answer is I don't know, which, you know,
18    you've have to live with that.
19              MS. FORDYCE:  I just wanted to make sure.
20              THE COURT:  And then -- okay, so, but that's
21    just -- there is -- there is more to this than --
22              MS. FORDYCE:  So then the third set of RFAs -- and
23    some of them we have withdrawn, your Honor.  So some of this
24    is off the table.  We did serve responses to some of them on
25    the 12th per our stipulated deadline.  But there are still
```

1    some that are outstanding.  So, your Honor, if you turn your
2    attention to Exhibit C of our motion, we still have object to
3    requests for Admission No. 6.  We --
4         THE COURT:  Hold on.
5         MS. FORDYCE:  I'm sorry.
6         THE COURT:  I don't have --
7         MR. CHANEN:  It's our Tab 9, your Honor.
8         THE COURT:  I don't have all the tabs.  I bring out
9    my court copies which were just the briefs.  You're going to
10   have to hand it up.  Sorry.  I promise I won't write on it.
11   Okay.  So --
12        MS. FORDYCE:  So we're on the third amended set and
13   it's Request for Admission No. 6, your Honor.
14        THE COURT:  And why can't you answer this?
15        MS. FORDYCE:  This is going to the issue of the
16   fact that we have to go to the circuit court.  We're not
17   necessarily going to have internal records about vacating
18   convictions because the state's attorney does that without
19   any knowledge, input, consent, anything, from the City.
20        THE COURT:  So your answer would be, I don't know.
21        MR. CHANEN:  But it has nothing to do with the
22   state's attorney, Judge.  This is the Circuit Court of Cook
23   County.
24        THE COURT:  But that's not a party in the case.  So
25   if you don't know the answer, then the answer is, I don't

1  know.

2  MS. FORDYCE:  And is that sufficient?  We don't

3  have to go back --

4  THE COURT:  That's the answer.  I mean, if it's

5  truly the answer, that's the answer.  I mean, you know, it

6  seems like you should know; but if you don't, you don't.

7  MR. CHANEN:  Yeah.

8  THE COURT:  I mean, you have to live with that, I

9  guess.  Because if you're saying they don't get notice and

10  they -- then who at the City would have personal knowledge of

11  this?

12  MR. CHANEN:  Well, we're going to find out, Judge.

13  THE COURT:  Well, at some point you probably will.

14  But I think, you know, she is right.  I mean, to answer this,

15  she would have to go, or somebody from the City would have to

16  go and look up the records for each and every one of these

17  persons at a third party, which is the county and, you know,

18  and answer yes or no.  And I don't think -- unless there

19  is -- but, again, I would be -- I would be careful here.  If

20  there is somebody at the City who has personal knowledge of

21  this, they're going to have to answer -- you're going to have

22  to answer the question.

23  MS. FORDYCE:  Like I said, as to some of them, if

24  we have a lawsuit and we know by way of --

25  THE COURT:  Yes, then, you would answer yes.

1        MS. FORDYCE:   Then we would know.   But it goes back

2   to the issue of requiring us to do additional homework, which

3   I think is not what --

4        THE COURT:   Well, that's what every -- that's what

5   every party has to do that has more than one person working

6   for it.   And you are in a difficult situation because there

7   is many possible repositories of information here.   But it

8   seems to me that the legal department either knows this or

9   they don't know it.   And I think, if they don't know it, they

10  don't have to answer it.   If they do know it because one of

11  these people has sued the City and they're defending a

12  lawsuit, then somebody does know it.

13       MS. FORDYCE:   Yeah, and that's fair.   I just want

14  to make sure your order doesn't require us to go to the

15  circuit court --

16       THE COURT:   It does not.   It does not.

17       MS. FORDYCE:   -- if we don't have it in our

18  personal knowledge.

19       THE COURT:   It does not because I couldn't require

20  you to do that to answer requests for admission.

21       MS. FORDYCE:   Okay.   Thank you.   And then No. 7 is

22  similar.

23       THE COURT:   Yeah.   I mean, again, if you have

24  personal knowledge that this has occurred, you have to answer

25  it.   If you don't, you say you don't know.

1          MS. FORDYCE:  No. 8, your Honor, is a similar
2    issue.  And I assume your ruling would be the same?
3          THE COURT:  Same thing, yeah.
4          MS. FORDYCE:  No. 9?
5          THE COURT:  Same thing.  It's personal knowledge of
6    somebody at the City.
7          MS. FORDYCE:  And same goes with No. 10, your
8    Honor?
9          THE COURT:  Uh-huh.  But No. 11 you should answer.
10         MS. FORDYCE:  We did answer No. 11.
11         THE COURT:  Okay.
12         MS. FORDYCE:  So, your Honor, No. 12 and 13A are a
13   little bit different.  And that's going to these articles
14   that they attached.  And there are numerous issues raised in
15   those articles.  Again, and, in fact, an interrogatory was
16   propounded on this issue that we responded to; which I think
17   goes back to our point that that's a proper mechanism to get
18   this type of information on a request to admit.  But
19   essentially, I mean, just looking at, you know, the first
20   page or two of these articles, to give your Honor a sense of
21   what's in there, we're talking about the McGee case that
22   Mr. Kamionski talked about.  Whether or not polygraphs are
23   used as a tool to obtain false confessions.  "Five particular
24   defendants unnamed who were charged with murder occurred in
25   2002.  Industry standards for --" it's so much.  There is no

1    way we can cleanly admit or deny.  I mean, this is an

2    interrogatory truly in disguise.  And, your Honor, it's not a

3    proper request to admit under Rule 36.

4            THE COURT:  It is.  It is.

5            MR. CHANEN:  Judge?

6            THE COURT:  I mean, it was a long article.  It took

7    me quite a bit of time to get through it.  I mean, what

8    exactly are you talking about?

9            MR. CHANEN:  I'm talking about the outrageous --

10           THE COURT:  Leave the adjectives off and just tell

11   me what you're talking about.

12           MR. CHANEN:  All right.  We served an

13   interrogatory.  I found it very interesting that Ms. Fordyce

14   just mentioned it and no where mentioned it in their brief.

15   Here is what the interrogatory said.

16           THE COURT:  Okay.

17           MR. CHANEN:  Identify the person or persons within

18   the Chicago Police Department, if any, who investigated or

19   otherwise inquired into the allegations in the Chicago

20   Tribune's March 13, 2013, article which is attached as

21   Exhibit A.

22           THE COURT:  Okay.

23           MR. CHANEN:  And then we break it down into

24   subparts.

25           THE COURT:  What the issues are.

1    MR. CHANEN:  The same for all.

2    THE COURT:  So what was the answer?

3    MR. CHANEN:  Oh, you're going to like this answer,

4    Judge.

5    THE COURT:  Well, I don't have to like it or

6    dislike it.  I just need to hear it.

7    MR. CHANEN:  Subject to or without waiving the

8    foregoing objections and general objections, the Chicago

9    Police Department does not initiate investigations in

10   response to unfounded, bias, and unsubstantiated allegations

11   contained in a newspaper article; and, therefore, has no

12   person or persons to identify in response to Interrogatory

13   No. 1.

14   Why are we arguing about requests to admit that

15   they -- that already answered in response to the

16   interrogatory?

17   THE COURT:  Then the question could be flipped on

18   you, Mr. Chanen.  Why are you bothering to ask this request

19   for admit because you already have your answer?

20   MR. CHANEN:  Because we want it in the form of a --

21   we want in the form of an admission.  That's the whole point.

22   We're damned if we do, we're damned if we don't.

23   THE COURT:  You're not.  You have a great

24   interrogatory answer.

25   MR. CHANEN:  She wrote in the brief how requests to

1    admit are only to be used to confirm information you already

2    know.  And so they're telling you, Judge, what they're

3    telling you, and they spent pages in their brief, they used

4    this very one as an example, of all the hoops that they would

5    have to jump through to get an answer to that question when

6    the answer is right there in the interrogatory answer.  Why

7    are they telling me that this is an unreasonable, overbroad

8    request to admit when they know that no one has investigated

9    any of the subject matters in this article.

10            MS. FORDYCE:  No, there was no investigation as a

11   result of that article.  There was no investigation as a

12   result of that article.  And that's what our answer said.

13   And, your Honor, they have a verified response as to the

14   interrogatory response.

15            THE COURT:  The question is:  Admit that between

16   November 2013, when the Chicago Tribune article attached this

17   Exhibit B was published and November 2nd, 2015, when the

18   article was attached to a motion, IPRA did not undertake any

19   investigation into matters reported in that article.

20            That's the question.

21            MS. FORDYCE:  Well, 12 says the City of Chicago, or

22   the CPD.  12A says IPRA.

23            THE COURT:  Okay.  So there are different parties

24   within the City of Chicago.

25            MS. FORDYCE:  Correct.  Correct.

1    THE COURT:  And would the answer to that question

2    be that there were -- that there were no -- there was no

3    investigation done about anything raised in the article?

4    Because that's what your interrogatory said.

5    MS. FORDYCE:  Is the answer were there no

6    investigations --

7    THE COURT:  Yeah.

8    MS. FORDYCE:  -- between 2013 and --

9    THE COURT:  Into matters raised.  Were there

10   investigations that weren't -- that -- into those matters?  I

11   mean, because there is -- you're kind of splitting a hair.

12   In your interrogatory answer you're saying that article did

13   not --

14   MS. FORDYCE:  Trigger an investigation.

15   THE COURT:  Right.  Were there other -- were there

16   investigations of the matters going on anyway?

17   MS. FORDYCE:  Between that timeframe of 2013 and

18   2015?

19   THE COURT:  Yeah.

20   MS. FORDYCE:  I do not believe so, but I still

21   maintain that --

22   THE COURT:  Because this is a specific timeframe

23   they're asking.  It's not -- there is no causation of the

24   article in this admission.  It's saying, between

25   November 2013 and November 2nd, were investigations -- and,

1    you know, you could break it --

2              MR. CHANEN:  That's --

3              THE COURT:  Hold on.  Let me think out loud.  And

4    I'm not as quick as you, Mr. Chanen.  And, you know, you know

5    this case a lot better than I do.  I have to kind of proceed

6    methodically.

7              MR. CHANEN:  I apologize.

8              THE COURT:  This doesn't require -- this request to

9    admit does not require the article to cause the

10   investigation.  The article is used as a framing device for a

11   time period; right?

12             MS. FORDYCE:  Yeah, I would have -- and before I

13   could answer that, you know, I would have to look to see if

14   there is any other open cases.  I think that there have

15   continued to be ongoing investigation by way of the attorneys

16   as counsel of record in this case into the polygraph unit.

17   There has been several 30(b)(6) depositions, and the like.

18   So I'm not sure that I could cleanly admit or deny the

19   entirety of it.

20             THE COURT:  I mean, you know, what they want to

21   establish, you know, is whether there has ever been an

22   investigation into the polygraph unit or the -- or some of

23   the things that they're alleging took place, you know, in

24   that unit.  It seems like that should be -- you should maybe

25   know that.

1    MS. FORDYCE:  Well, your Honor, we had a 30(b)(6)

2  deposition on the polygraph unit and these questions were

3  asked and answered.  And another ground that you strike --

4  I'm sorry, a request to admit is if you ask these same

5  questions in a deposition.  So it's not that they don't have

6  it.  It's not like we're trying to hide the ball.  But I

7  think they're using the incorrect mechanism to get

8  information that we've already given to them by way of

9  deposition testimony and a verified interrogatory response.

10    THE COURT:  Well, the interrogatory is different.

11  The interrogatory asks a question whether the article itself

12  prompted investigations.  And your answer to that is

13  unequivocally no.

14    MS. FORDYCE:  The article did not.

15    THE COURT:  Right.

16    MS. FORDYCE:  That's correct.

17    THE COURT:  This is -- these questions are

18  different.  These questions use, as I say, the article as the

19  framing device for a time period.  But they don't require the

20  investigation to be prompted by the article or anything

21  raised in the article.

22    MS. FORDYCE:  But they asked these questions of our

23  30(b)(6) deponent.

24    THE COURT:  And what were the responses?

25    MS. KLEIN:  Judge, if I may?  This is the first

1    time we've heard this argument.  And it might be because

2    these requests to admit were served well in advance of the

3    30(b)(6) deposition, number one.  And No. 2, if Ms. Fordyce

4    is now saying that the City does have documents that were

5    not -- that show an investigation of the polygraph unit but

6    were not the result of that newspaper article, that would be

7    quite stunning, given other discovery that we served that you

8    compelled responses to, including requests for reviews

9    analysis, etc., etc., of the polygraph unit.

10            THE COURT:  Yeah, because I remember the City

11   saying pretty clearly that there would never been any --

12            MR. CHANEN:  And that's why we're using the -- and

13   that's why we're using the motion date to -- to cabin the

14   timeframe because we don't want to include whatever

15   investigation Ms. Fordyce or Mr. Flynn have taken as part of

16   this investigation.  We were asking whether they did it

17   independently prior.  We could have used the complaint date

18   or the motion date, but prior to Ms. Harris making a

19   statement.

20            THE COURT:  The problem I have with these requests,

21   though, is just the matters reported in that article.

22   Because the article raises all kinds of different things.

23            MR. CHANEN:  Here is what we will do, Judge.  We

24   will re-issue them.  And I can either use the list that

25   Ms. Fordyce just read into the record or I can use the list

1  we created --

2  MS. FORDYCE:  That was not a comprehensive list.

3  MR. CHANEN:  We can use the list we used in the

4  interrogatory.  Because they keep telling us to ask the

5  interrogatory first and the request to admit after.  So we're

6  going to issue, you know, subparts A, B, C, D, E and F.  And

7  we'll just track the language from the interrogatories so

8  they can tell us.  You know, Judge, eight months ago we stood

9  in front of you and you raised the question.  You looked at

10  Ms. Fordyce and said:  Don't you know whether your polygraph

11  unit has been investigated or not.

12  THE COURT:  I remember.

13  MR. CHANEN:  And everyone has been saying over and

14  over, it hasn't, it hasn't, it hasn't.  Then we issue a

15  request to admit that says, please confirm that it hasn't and

16  they won't sign -- they won't sign the admission.

17  MS. FORDYCE:  Because there is 50 different topics

18  in those articles that have nothing to do with the polygraph.

19  THE COURT:  I -- that objection I sustained.  I

20  think the --

21  MR. CHANEN:  We will be specific.

22  THE COURT:  -- request to admit as drafted -- and

23  I, frankly, don't think you need to put the -- you just need

24  to say between X time and Y time were the following matters

25  investigated by the City of Chicago.  And you can -- and I

1  think making it department by department is probably a good

2  idea here.  And the answer is either yes, no, or I don't

3  know.  But it should be very specific.  To say, you know,

4  that article raised all kinds of things, including some

5  things that are very extrinsic to this case.  I mean, it was

6  a pretty broad article, as I recall.  I mean, I read it a

7  while ago, but.

8              MR. CHANEN:  We will be very specific.

9              THE COURT:  And then, you know -- all right.  And

10  now we got 14 --

11             MR. CHANEN:  Judge, we will issue those today.  And

12  can we have an answer in two weeks?

13             THE COURT:  All right.  Answer them in two weeks.

14  And then, okay, so what's left here?

15             MS. FORDYCE:  So, your Honor, 14, we withdrew our

16  objection, and we answered that on the 12th.

17             THE COURT:  Okay.

18             MS. FORDYCE:  16, we withdrew our objection and we

19  answered on the 12th.  Hold on.  Let me just --

20             THE COURT:  Who is the final policymaker?  You

21  don't need to answer that.  I'm just curious.

22             MS. FORDYCE:  Thank you.  17, we withdrew that

23  objection, and we answered on the 12th.

24             THE COURT:  Okay.

25             MS. FORDYCE:  18, we withdrew that objection, and

1    we answered on the 12th.  And 19 --

2              THE COURT:  You have the same issue here.

3              MS. FORDYCE:  -- through 19B, I suspect I know your

4    Honor's ruling.

5              THE COURT:  Yeah.  I mean, you know the answer to

6    this question.  Either they did or they didn't.

7              MS. FORDYCE:  I --

8              THE COURT:  The legal department knows this; right?

9              MS. FORDYCE:  Yes, we're pulling the jury verdict

10   forms to see if there were special interrogatories that

11   elucidate this.  I know there was a --

12             THE COURT:  If there isn't --

13             MS. FORDYCE:  Then we don't know.  I mean, I know

14   there was a finding of liability as to these specific

15   questions.  As I sit here today, I don't know the answer.

16   Obviously I was standing on the --

17             THE COURT:  Well, their other option, then, is just

18   to get this information off of -- off of CM and, you know,

19   and attempt to use it, you know, at trial.  But you guys --

20   this is -- either this is in the records or it's not.  And

21   you guys have these as well.  So I don't see why you can't

22   answer them.  If there is no -- if there is no -- if there

23   aren't special interrogatories, though, I mean --

24             MS. FORDYCE:  I may not be able to answer.

25             THE COURT:  You may not be able to.  You may not be

1    able to.  And, like I said, you always have that option with

2    request for admissions, as long as you've done your due

3    diligence.  If you don't know the answer, you don't know the

4    answer.  But you've got to live with it, then, you know.

5    Anything else?

6              MS. KLEIN:  Well, just to clarify, for the record.

7    With respect to the recitation of the request to admit that

8    the City answer, just to make it clear that our silence does

9    not indicate that we have accepted their answer as responsive

10   just because we just received that --

11             THE COURT:  Okay.

12             MS. KLEIN:  -- and we need to digest them.

13             THE COURT:  Okay.  Your position is duly noted for

14   the record.  That's fine.  So, I mean, they seem like -- I

15   mean -- I'll leave it at that.  If you want to bring

16   something back, you certainly can.

17             MS. KLEIN:  Great.

18             THE COURT:  So are we all clear on what the rulings

19   were?

20             MS. FORDYCE:  I believe we're clear, your Honor, on

21   behalf of the City.

22             THE COURT:  If you have an issue, you know, when

23   you get the minute order, if there is anything you think that

24   we missed, feel free to contact us.  I will be off -- I will

25   be out of the court from Wednesday, tomorrow, until next

1    Monday.  But if there is any issue, just raise it with my law

2    clerk.  And we'll -- we'll -- we will be in contact so we can

3    correct it.  Because there is a lot that happened today.

4    Okay?  All right.  Well, good luck.

5              MS. FORDYCE:  Thank you for your time, your Honor.

6              THE COURT:  You're welcome.

7              MR. CHANEN:  Thank you, Judge.

8         (Which were all the proceedings heard.)

9                          CERTIFICATE

10        I certify that the foregoing is a correct transcript

11   from the digital recording of proceedings in the

12   above-entitled matter to the best of my ability, given the

13   limitations of using a digital-recording system.

14

15   /s/Sandra M. Tennis              March 1, 2016

16   _____      _____
     Sandra M. Tennis                 Date
17   Official Court Reporter

18

19

20

21

22

23

24

25