# Exhibit C

Nicole Harris v. City of Chicago, et al.
Deposition of Robert M. Galatzer-Levy, M.D. - Taken 4/5/2016

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,            )
                          )
        Plaintiff,        )
                          )
    vs.                   ) No. 1:14 CV 04391
                          )
CITY OF CHICAGO, Chicago Police  )
Officers ROBERT BARTIK, #3078;   )
DEMOSTHENES BALODIMAS, #21204;   )
ROBERT CORDARO, #20680; JOHN     )
J. DAY, #20926; JAMES M. KELLY,  )
#21121; MICHAEL LANDANDO, #20417; )
ANTHONY NORADIN, #21252; and     )
RANDAL WO, #20232; Assistant Cook )
County State's Attorneys ANDREA  )
GROGAN and LAWRENCE O'REILLY; and )
the COUNTY OF COOK,       )
                          )
        Defendants.       )

The subpoenaed deposition of ROBERT GALATZER-LEVY, M.D., called by the Defendants for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Monica Kim, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public, at 53 West Jackson Boulevard, Suite 330, Chicago, Illinois, commencing at 1:31 p.m. on April 5th, 2016.

Page 2

1  APPEARANCES:
2    PEOPLE'S LAW OFFICES
     MS. JANIS M. SUSLER
3    1180 North Milwaukee Avenue
     3rd Floor
4    Chicago, Illinois 60642
     Phone: 773.235.0070
5    E-mail: jsusler@gmail.com
6       On behalf of the Plaintiff;
7    GREENBERG TRAURIG, LLP
     MR. KYLE L. FLYNN
8    77 West Wacker Drive
     Suite 3100
9    Chicago, Illinois 60601
     Phone: 312.456.8400
10   E-mail: flynnk@gtlaw.com
11      On behalf of the City of Chicago;
12   HALE LAW, LLC
     MR. SHNEUR Z. NATHAN
13   53 West Jackson Boulevard
     Suite 330
14   Chicago, Illinois 60604
     Phone: 312.341.9646
15   E-mail: snathan@ahalelaw.com
16      On behalf of the Defendant Chicago Police
        Officers Robert Bartik, #3078; Demosthenes
17      Balodimas, #21204; Robert Cordaro, #20680;
        John J. Day, #20926; James M. Kelly, #21121;
18      Michael Landando, #20417; Anthony Noradin,
        #21252; and Randal Wo, #20232.
19
              * * * * * *
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS                          PAGE
3  ROBERT GALATZER-LEVY, M.D.
4    Examination by Mr. Nathan ................ 4
5
6
7
              E X H I B I T S
8
   DEPOSITION EXHIBIT                PAGE
9
     No. 170 .................................. 6
10
     No. 171 .................................. 8
11
     No. 172 .................................. 8
12
     No. 173 .................................. 11
13
     No. 174 .................................. 11
14
   (Retained by Ms. Susler.)
15
16
17
18
19
20
21
22
23
24

Page 4

1         (Galatzer-Levy Deposition Exhibit
2          Nos. 170 to 173 marked as
3          requested.)
4         (Witness sworn.)
5      MR. NATHAN: Good afternoon, Doctor. Can you
6  please just state your name for the record?
7      THE WITNESS: My name is Dr. Robert Galatzer-Levy;
8  Galatzer-Levy spelled G-A-L-A-T-Z-E-R, hyphen, L-E-V-Y.
9      MR. NATHAN: This is a deposition being taken in
10 connection with the case Nicole Harris versus the City
11 of Chicago et al.
12     WHEREUPON:
13        ROBERT GALATZER-LEVY, M.D.,
14 called as a witness herein, having been first duly
15 sworn, was examined and testified as follows:
16             EXAMINATION
17 BY MR. NATHAN:
18   Q.  And you've been identified as an expert
19 witness by the plaintiff. Do you have that same
20 understanding?
21   A.  I do.
22   Q.  Okay. What did you do to prepare for this
23 deposition?
24   A.  In preparation for this deposition, I reviewed

1 (Pages 1 to 4)

Case: 1:14-cv-04391 Document #: 213-3 Filed: 01/06/17 Page 3 of 5 PageID #:3998

Nicole Harris v. City of Chicago, et al.
Deposition of Robert M. Galatzer-Levy, M.D. - Taken 4/5/2016

Page 33

1   MS. SUSLER: Oh, okay.
2   BY MR. NATHAN:
3   Q. Next page, you say to Diante, "No. Okay. Do
4   you know who Miss Mitchell is?"
5       He re- -- You can read the next few lines.
6       But does that refresh your memory as to
7   whether at the time you interviewed Diante in April of
8   2006 you understood that he was receiving some kind of
9   mental health treatment?
10      MS. SUSLER: No. Objection to form and
11  Rule 26.
12      BY THE WITNESS:
13      A. I'm unable to answer your question because of
14  the issue of privilege involved.
15      Q. We're staring right now at a transcript that's
16  been disclosed. It's talking about Ms. Mitchell.
17  Did -- And you're asking Diante about that, correct?
18      A. That's correct.
19      Q. And you're -- You rely on this transcript in
20  order to develop your opinions in this case, correct?
21      A. Correct.
22      Q. And you're refusing to answer about whether
23  that refreshes your memory as to whether Diante was
24  receiving mental health treatment at the time that you

Page 34

1   evaluated him?
2       MS. SUSLER: Well, objection. You're assuming
3   facts not in evidence and you're being argumentative.
4   BY MR. NATHAN:
5       Q. Are you refusing to answer that question?
6       A. Yes.
7       Q. When you looked over your file in preparation
8   for this deposition, did you see any records of Diante
9   Dancy's mental health treatment?
10      MS. SUSLER: Objection, I think asked and answered
11  BY THE WITNESS:
12      A. No.
13      Q. Why did you choose to have two different
14  interviews of Diante?
15      A. For several reasons. One was simply to
16  provide myself with additional time to interview him;
17  another was to avoid the situation where or perhaps the
18  child was in some sort of state of distress or
19  physically ill or whatever at the time of one of the
20  interviews. I wanted to see him at two different times.
21  And, finally, because I wanted to develop some sort of
22  rapport with the child and felt that given the
23  additional time he'd be more able to respond to my
24  questions.

Page 35

1       Q. Was there any other reason why you scheduled a
2   second interview with Diante?
3       A. No.
4       Q. Can you please describe the nature of your
5   current practice in the field of psychiatry?
6       A. Yes.
7       Q. And I would also add, can you please describe
8   the nature of your current practice either in the field
9   of psychology or any other field that you think is
10  relevant to your opinions in this case?
11      A. My current practice, which is almost entirely
12  psychiatric, consists in seeing patients in -- ranging
13  in age from two to late 80s in psychotherapy and general
14  psychiatric practice including psychoanalysis and
15  teaching psychiatrists and other mental health
16  professionals in training both in psychiatry and
17  psychoanalysis and related disciplines; in providing
18  education to other individuals including attorneys and
19  academics about psychoanalysis in consulting with
20  colleagues who are -- seek me out for private
21  consultation about their cases; in evaluating
22  individuals in situations for the Courts such as current
23  in this case; and providing consultations to family
24  businesses and other businesses on psychological aspects

Page 36

1   of operating businesses.
2       Q. In this case, you weren't -- you're not
3   evaluating the case for the court; you're evaluating
4   case on behalf of Nicole Harris, correct?
5       A. Yes. When I speak of in -- in the field of
6   forensic psychology, we refer to all the work as for
7   evaluating for the Court even though we're not employed
8   by the Court, so for the purposes of presentation to the
9   Court.
10      Q. That's the term that you use?
11      A. That's right.
12      Q. In Exhibit 171, you're listed -- which is your
13  list of testimony. Were each of these cases listed here
14  situations where you were hired by one of the parties in
15  a -- in a matter that was pending in front of a court?
16      A. I'm not sure. I'd have to look.
17      Q. Please do.
18      A. In McDonald v. Linton, though I was paid by
19  one of the parties, I was the Court's expert. The
20  others -- All the others I was hired by one of the
21  parties.
22      Q. How did the Court in Birmingham, Alabama come
23  to appoint you, or how did you -- Let me ask it in
24  your -- in your words. You said that in the

Case: 1:14-cv-04391 Document #: 213-3 Filed: 01/06/17 Page 4 of 5 PageID #:3999

Nicole Harris v. City of Chicago, et al.
Deposition of Robert M. Galatzer-Levy, M.D. - Taken 4/5/2016

Page 45

1  BY THE WITNESS:
2      A.  There are guidelines of various organizations
3  that address the proper way to conduct such interviews.
4      Q.  And which guidelines did you follow?
5      A.  I combined the guidelines of the American
6  Academy of Child and Adolescent Psychiatry and the
7  American Academy of Psychiatry and the law.
8      MR. NATHAN:  Do you mind reading that back?
9          (Record read as requested.)
10 BY MR. NATHAN:
11     Q.  So did you follow the guide- -- the guidelines
12 of the American Academy of Child and Adolescent
13 Psychology?
14     A.  Psychiatry.
15     Q.  Psychiatry?
16     A.  I operated within the parameters that they set
17 forward.  They -- they don't have a recipe for
18 conducting the interview.
19     Q.  And why did you operate within the ACAP [sic]
20 parameters?
21     A.  Both because I'm a member of that organization
22 and they are, in my opinion, solid parameters to follow.
23     Q.  Do you mind just pointing me to where in your
24 CV it shows that you're a member of the American Academy

Page 46

1  of Child and Adolescent Psychiatry?
2      A.  Sure.
3      Q.  Hold on.  I think you have that.  You have it.
4      A.  Okay.  Let's see.
5          (Witness viewing document.)
6      MS. SUSLER:  I think it starts at page 29,
7  professional associations, unless it's somewhere else.
8  BY THE WITNESS:
9      A.  I do not see it listed here.
10     Q.  Okay.  But you're saying you are a member of
11 that organization?
12     A.  I am.
13     Q.  Would you agree with the statement that in the
14 last couple decades there was a C change in the child
15 custody evaluation process?
16     A.  Yes.
17     Q.  And why is that?
18     A.  Could you clarify the question?  Are you
19 asking for the motivation for it, or are you asking for
20 what the change was?
21     Q.  Why do you have that opinion that there was a
22 C change?
23     A.  I have that opinion because a number of us
24 were very much of the opinion that the process of child

Page 47

1  custody evaluation that had been commonly employed in
2  the courts until around 1990s resulted in the Court
3  getting significant misinformation about the best
4  interests of children, and in particular, that many of
5  the evaluations failed to live up to minimal standards
6  of scientific adequacy.  And as a result, several child
7  psychiatrists and psychologists and other mental health
8  professionals came to advocate for evaluations that had
9  greater scientific merit and both published extensively
10 about what was problematic in terms of the old custody
11 evaluations and also what might constitute adequate
12 custody evaluations.
13         And as we engaged in that process, the Courts
14 simultaneously influenced by the Daubert Decision, which
15 although it didn't technically apply to, for example,
16 courts in Illinois, came to expect a higher standard for
17 evaluations or all scientific, especially psychiatric
18 and mental health testimony.  And I'm proud to say that
19 I think the book I coauthored was one of the influences
20 that led to the change that you're describing.
21     Q.  You're talking about the scientific basis for
22 child custody evaluations?
23     A.  Yes.
24     Q.  And you're saying that the first edition of

Page 48

1  your book led to the change?
2      A.  Contributed.  It was among the things that
3  contributed to that change.
4      Q.  When was that book first published?
5      A.  That book was first published in 2002, I
6  believe.
7      Q.  At what point did the process of child
8  evaluations -- child mental health evaluations in
9  connection with the courts change?
10     A.  It began to change in the '90s, and it has
11 continued to change to this day.
12     Q.  Okay.  But you said that your book, which was
13 published in 2002, was important in contributing to that
14 change.
15     A.  Yes.
16     Q.  And you were proud of that?
17     A.  Yes.
18     Q.  Right.  So when did your book actually
19 contribute to that change or when did you see the
20 effects from your book starting to contribute to that
21 change?
22     A.  When it began to be quoted in court decisions,
23 which was shortly after its publication.
24     Q.  Okay.  Do you have any examples of that?

Nicole Harris v. City of Chicago, et al.
Deposition of Robert M. Galatzer-Levy, M.D. - Taken 4/5/2016

Page 57

1   Q. Which Ceci book?
2   A. I believe Ceci -- Ceci, S. and Bruck, M, 1995,
3  Jeopardy in the Courtroom: A Scientific Analysis of
4  Children's Testimony.
5   Q. And you're saying you're not sure if that's in
6  there or it is in there?
7   A. No. What I'm saying is I'm sure that's what's
8  in there is an indication of the harm that's done by not
9  adequately recording interviews with children.
10   Q. Okay. I'm just confused as to where I went
11  wrong the last time I asked you the question about
12  whether this topic was included in anything in here --
13  listed in 174.
14     MS. SUSLER: Objection, form.
15  BY MR. NATHAN:
16   Q. Did I --
17   A. Yeah.
18   Q. Didn't I ask you that before?
19   A. We'd have to go back to the record.
20     MS. SUSLER: Object to form.
21  BY THE WITNESS:
22   A. I haven't memorized your examination of me.
23   Q. Isn't it true that in 2000- -- as of 2007, it
24  was still -- Strike that.

Page 58

1     Isn't it true that as of 2007, the most widely
2  used method for documenting forensic child interviews
3  was by note-taking?
4   A. I don't know.
5   Q. Isn't it true that in 2005, the most widely
6  used method of recording child forensic interviews was
7  note-taking?
8   A. I don't know.
9   Q. That is possible, though?
10     MS. SUSLER: Objection, form.
11  BY THE WITNESS:
12   A. As I say, in many contexts, virtually anything
13  is possible.
14   Q. So turning to paragraph 24 of your 2016
15  report, paragraph 28, you assert that Detective Wo's
16  notes --
17     MS. SUSLER: Why don't you let him get to it.
18  Sorry to interrupt.
19        Looks like it's on page 13.
20     THE WITNESS: Uh-huh.
21     MS. SUSLER: You're on Exhibit 170, right?
22     MR. NATHAN: Yeah.
23     MS. SUSLER: Okay.
24

Page 59

1  BY MR. NATHAN:
2   Q. Are we on the same page?
3   A. Yes.
4   Q. On paragraph 28, you assert that
5  Detective Wo's notes are "woefully deficient." See
6  that?
7   A. Yes.
8   Q. What is that assertion based upon?
9   A. That assertion is based on the content of the
10  notes.
11   Q. Were you present at that interview?
12   A. No.
13   Q. Okay. So what is it about the contents of the
14  notes that indicate to you they're woefully deficient?
15   A. They're woefully deficient in the following
16  ways: The notes do not note the context of the
17  interview, the information provided to the child, the --
18  they failed to describe the questions asked of the
19  child; they do not attempt to record verbatim what the
20  child has said; their brevity in comparison to what I
21  believe was the duration of the interview would indicate
22  that they omit a great deal; and some of the notes
23  themselves simply don't make sense. That is they're --
24  Things like single words, which aren't in the form of a

Page 60

1  declarative sentence nor are they indications that those
2  single words are spontaneous utterances of somebody.
3   Q. When you interviewed Diante, did he always
4  make sense?
5   A. No.
6   Q. How long was the interview by Alexandra Levy
7  at the Chicago Children's Advocacy Center?
8   A. I don't remember as I sit here.
9   Q. What is it about the context of the interview
10  that you would want to see in those notes?
11   A. I would want to see what the child was told
12  about the nature of the interview, including who the
13  interviewer was, for what purpose the interview was
14  being used.
15   Q. What was --
16   A. Or an indication that that information was not
17  provided to the child.
18   Q. What was the information that you provided to
19  Diante about the nature of your interview with him or
20  your interviews with him?
21   A. Okay. I would -- I want to answer your
22  question accurately, and I would have to refer back to
23  my notes.
24   Q. The transcript?

15 (Pages 57 to 60)

Royal Reporting Services, Inc.
312.361.8851