# Exhibit C

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS,             )
                           )
        Plaintiff,    )
                           )
    vs.                )   No. 14 CV 4391
                           )
CITY OF CHICAGO, et al.,   )
                           )
        Defendants.    )

The deposition of ROBERT BARTIK, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Carmella T. Fagan, C.S.R., R.P.R., Notary Public within and for the County of Cook and State of Illinois, at 1180 North Milwaukee Avenue, Third Floor, in the City of Chicago, Cook County, Illinois, commencing at 10:12 a.m. on the 24th day of November, 2015.

BREHON REPORTING (708) 442-0027

## Page 2

1   There were present during the taking
2   of this deposition the following counsel:
3
4       PEOPLE'S LAW OFFICE,
        BY:  MS. JANIS M. SUSLER
5       (1180 North Milwaukee Avenue
        Third Floor
6        Chicago, Illinois 60642)
        (773) 235-0070  Ext. 118
7       jansusler@gmail.com?
            Appeared on behalf of
8            the Plaintiff;
9
        VALOREM LAW GROUP, L.L.C.,
10      BY:  MS. MARGO KLEIN
        (35 East Wacker Drive
11       Suite 3000
         Chicago, Illinois 60601)
12      (312) 676-5484
        margo.klein@valoremlaw.com
13          Appeared on behalf of
             the Plaintiff;
14
15      ANDREW M. HALE & ASSOCIATES, L.L.C.,
        BY:  MR. SHNEUR Z. NATHAN
16      (53 West Jackson Boulevard
         Suite 330
17       Chicago, Illinois 60604-3406)
        (312) 870-6927
18      snathan@ahalelaw.com
            Appeared on behalf of
19           Robert Bartik;
20
21
22
23
24

BREHON REPORTING (708) 442-0027

## Page 3

1       There were present during the taking
2   of this deposition the following counsel:
3
4       GREENBERG TRAURIG, L.L.P.,
        BY:  MR. KYLE L. FLYNN,
5       (77 West Wacker Drive
        Suite 3100
6        Chicago, Illinois 60601)
        (312) 476-5126
7       flynnk@gtlaw.com
            Appeared on behalf of
8            the City of Chicago;
9
10  ALSO PRESENT:
11
        MR. RICK KOSBERG, LEGAL VIDEOGRAPHY,
12           Videographer;
        MR. STUART J. CHANEN, Valorem Law Group, LLC.
13           Attorney for the Plaintiff;
14
        MS. NATALIE JENKINS, Valorem Law Group, LLC.
15           Paralegal.
16
17
18
19
20
21
22
23
24

BREHON REPORTING (708) 442-0027

## Page 4

1               I N D E X
2
3   WITNESS:                        PAGE:
4   ROBERT BARTIK
5       Examination By Ms. Susler        6
        Continued Examination By Ms. Susler   201
6
7
8
9           E X H I B I T S
10  Exhibit No. 37              120
    Exhibit No. 38              124
11  Exhibit No. 39              155
    Exhibit No. 40              164
12  Exhibit No. 41              244
    Exhibit No. 42              269
13  Exhibit No. 43              312
    Exhibit No. 44              317
14  Exhibit No. 45              318
    Exhibit No. 46              319
15  Exhibit No. 47              326
    Exhibit No. 48              333
16  Exhibit No. 49              372
17
18
19
20
21
22
23
24

BREHON REPORTING (708) 442-0027


Page 237

1  then on the right arm?
2      A.    Correct.
3      Q.    Why do you do that?
4      A.    Because of the way they --
5  attachments -- the -- there is a long cord for the
6  attachments and I can -- where I'm sitting here
7  (indicating) when I -- and when I inflate the cuff, I
8  can see the cuff, I can see the arm.
9      Q.    So the -- as we said before, the
10 subject's right arm is closer to you.
11     A.    Yes.
12     Q.    Do you think that if you had known
13 that Ms. Harris's other young son had been taken from
14 her while she was in custody by the police and the
15 Department of Corr -- of -- Department of Children
16 and Family Services, that that could have had an
17 impact on her reactions that would have affected the
18 outcome of the polygraph examination?
19     A.    Sure.
20     Q.    And that's because it would be
21 something similar to grief or shock?
22     A.    Absolutely.
23     Q.    Was there any reason that you couldn't
24 wait until the next day or the next week to

BREHON REPORTING (708) 442-0027

Page 238

1  administer a polygraph examination to Ms. Harris?
2      A.    That would have been up to the
3  detectives.  She was willing at that point.
4      Q.    But you could have exercised your
5  discretion to say, "I think we should wait since
6  you've just had this loss; I think the results might
7  be more reliable if we wait a day or a week"?
8      A.    Well, she was -- she was there and she
9  was given an opportunity to pass this examination,
10 and if she was -- and if she was brought in and she
11 passed, then there would have been no reason to
12 retest her.  I would have walked -- walked out and
13 told Detective Noradin that she had passed the
14 examination.
15     Q.    Okay.  I think my question was:  Was
16 there any reason why you could not have exercised
17 your discretion to say that it would -- the test
18 results would have been more reliable if you'd waited
19 a day or longer in order to administer the polygraph
20 to Ms. Harris?
21     A.    The results would have been probably
22 more reliable.  We would have gotten a better -- a --
23 I don't know if I'd say better -- more of an
24 understanding as to whether she was telling the truth

BREHON REPORTING (708) 442-0027

Page 239

1  or not.
2            As it was, we couldn't, but while she
3  was there, we wanted to give her every opportunity to
4  pass the examination.  She was there and there was --
5  you know, there's always a possibility that she would
6  have passed that -- that -- that examination.
7      Q.    So you left it up to her to decide.
8  It wasn't your discretion.  It was up to her to
9  decide whether to proceed?
10     A.    No.  It was up to me and her.  If she
11 said "I don't want to do this," we would have
12 stopped.  If she was upset, I would have stopped.
13 How --
14     Q.    And if she thought that was her ticket
15 to get out of custody and be able to grieve her son
16 not in police custody --
17     A.    Then I should --
18     Q.    -- she had every motivation to go
19 forward.
20     A.    Then I should -- and I should afford
21 her that opportunity.
22     Q.    Even if you knew there were factors
23 that would affect the reliability of the results?
24     A.    Yes.

BREHON REPORTING (708) 442-0027

Page 240

1      Q.    And the reason for that was?
2      A.    Because she could have passed that
3  examination.
4      Q.    And you made the decision not to wait
5  even though the SOP said that there were several
6  factors that would affect the suitability of
7  Ms. Harris as a subject.
8      A.    Yes.  I wanted her to pass, give her
9  every opportunity to pass the exam.
10     Q.    Well, do you know whether she would
11 have passed the following day?
12     A.    No, I don't.
13     Q.    Did you give her the opportunity to
14 try to pass the following day?
15     A.    It wasn't my decision.
16     Q.    Did you suggest to the detectives, to
17 Noradin or anyone else who was with her, "I think
18 we -- we can't tell on this test the way that I read
19 it using my global assessment.  I think we had better
20 try this again when she's not so close to the death
21 of her four-year-old son"?
22     A.    No, I didn't.
23     Q.    Why not?
24     A.    Don't know.

BREHON REPORTING (708) 442-0027

Page 241

1  Q. No reason?
2  A. No reason.
3  Q. Why did you want her to pass?
4  A. It's not that I wanted her to pass. I
5  wanted to give her the opportunity to pass.
6  Q. Why?
7  A. Everybody is afforded the opportunity
8  to pass.
9  Q. So no different from any other subject
10 that you're -- you're giving a polygraph --
11 A. Nope.
12 Q. -- exam to?
13    Nothing special about Ms. Harris; is
14 that right?
15 A. Correct.
16    (WHEREUPON, Mr. Stuart Chanen and
17     Ms. Natalie Jenkins entered the
18     deposition.)
19 MR. NATHAN: I just would like everybody to
20 indicate who they are for the record, because two
21 additional people walked in.
22 MS. SUSLER: Yeah. These are people on
23 Ms. Harris's team.
24 MR. NATHAN: Okay. Well I . . .

BREHON REPORTING (708) 442-0027

Page 242

1  MS. SUSLER: Okay. I mean, you know Stuart
2  Chanen, he was --
3  MR. NATHAN: I know Mr. Chanen.
4  MS. SUSLER: -- just here yesterday;
5  Ms. Jenkins is a paralegal working on the case.
6  MR. NATHAN: Hi.
7  MS. SUSLER: All right.
8  BY MS. SUSLER:
9  Q. Anything you can tell me about your
10 pretest with Ms. Harris to distinguish whether it was
11 an interrogation or an interview?
12 A. No.
13 Q. Did Ms. Harris ever refuse to answer a
14 question?
15 A. I don't know.
16 Q. How long did the pretest take?
17 A. I don't remember.
18 Q. How long did it take you to formulate
19 the questions?
20 A. I don't remember.
21 Q. Did you consult with Noradin or the
22 other detectives about the questions?
23 A. No.
24 Q. Well, you did in the office before you

BREHON REPORTING (708) 442-0027

Page 243

1  went into the pretest, right?
2  A. Yes.
3  Q. Okay. Did you take any notes when you
4  were in the pretest with Ms. Harris?
5  A. Yes.
6  Q. How long did it take you to read her
7  the questions?
8  A. I don't remember.
9  Q. Did she have any questions as you read
10 her the questions?
11 A. No.
12 Q. You remember that?
13 A. If she had a question on the
14 examination, I would have changed the question for
15 her or I would have explained it because part of my
16 testing is I review the questions with her before I
17 give her the test.
18 Q. But do you have any specific memory
19 about whether Ms. --
20 A. No, ma'am.
21 Q. Okay.
22 MS. SUSLER: We're up to 41?
23 MS. REPORTER: We are.
24 MS. SUSLER: There's two there.

BREHON REPORTING (708) 442-0027

Page 244

1     (WHEREUPON, Exhibit 41 was marked
2      and tendered to Witness.)
3  BY MS. SUSLER:
4  Q. Earlier you said you took notes on
5  a -- a polygraph worksheet. What I've handed you is
6  Bates stamped City 575 that's titled "Polygraph
7  Examiner's Worksheet." Do you recognize this?
8  A. Yes.
9  Q. What is it?
10 A. This is Ms. Harris's examiner
11 worksheet.
12 Q. Whose handwriting is on it?
13 A. Mine.
14 Q. All the handwriting on this anywhere
15 is all yours?
16 A. Yes.
17 Q. Okay.
18 A. Except -- excuse me. Except for this
19 circle. I don't know what that is. I don't know who
20 put that there. That's not mine.
21 Q. Okay. That -- this --
22 A. But other than that --
23 Q. -- one right here (indicating) --
24 A. Yes.

BREHON REPORTING (708) 442-0027