**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLE HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14-cv-4391** |
| **v.** | ) | |
| | ) | **Judge Darrah** |
| **CITY OF CHICAGO, et al.,** | ) | **Magistrate Cox** |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF HARRIS' MOTION IN LIMINE TO LIMIT
DEFENDANTS' INQUIRY OF PLAINTIFF'S EXPERT
PROFESSOR CHARLES HONTS**

# EXHIBIT B

## CHARLES R. HONTS, PH.D.

January 29, 2016

Jan Susler, Attorney at Law
People's Law Office
1180 N. Milwaukee
Chicago IL 60642

Re: Polygraph Examination of Nicole Harris Conducted by Robert Bartik

Ms. Susler,

At your request, I conducted a quality control review of a psychophysiological detection of deception examination conducted on Nicole Harris by Chicago Police Officer Robert Bartik. The reviewed examination (hereinafter referred to as the Harris Examination) addressed the death of Ms. Harris' son Jaquari Dancy, which happened the day before the polygraph test. The examination was conducted in Chicago, Illinois at the Polygraph Section of the Chicago Police Department on May 15, 2005.

In particular, your request of me was to evaluate the Harris Examination to see if: 1) it was conducted according to the standards of the polygraph profession in 2005, 2) it was scored correctly according to the standards of 2005, and 3) my opinion about whether or not the technique that was used was considered reliable and accurate in 2005. Furthermore, you asked that I evaluate the policies and practices with respect to polygraphs in use by the Chicago Police Department to see if they were in compliance with the recommended best practices for law enforcement polygraph testing in 2005.

**My Employment, Training, Education, and Recognitions**

1. A true and correct current copy of my Curriculum Vitae is provided with this report as Attachment A. My Curriculum Vitae accurately provides a list of my education, training, academic appointments, professional licensure, publications, presentations, and a history of my sworn appearances as an expert witness.

2. At present, I am employed in several different venues:

   2.1. In my primary employment I am currently a Professor of Psychology at Boise State University, 1910 University Drive, Boise, Idaho 83725. A complete list of my academic appointments is provided in my Curriculum Vitae.

2.2.  I also maintain a practice as a polygraph examiner. In 1976 I was trained as a polygraph examiner at the Backster School of Lie Detection in San Diego, California. I practiced full time as a polygraph examiner between 1976 and 1980 when I went to graduate school to study Psychology.  My polygraph practice continues to this day as a secondary professional pursuit to my career in Psychology.  Currently I am licensed as a Polygraph Examiner in the state of New Mexico. My New Mexico license was originally issued in July of 1995.  Other states where I have been licensed are listed in my Curriculum Vitae.  In 2010 I completed an American Polygraph Association approved training course in Post-conviction Sex Offender Polygraph Testing.

2.3.  Since 1982 I have offered basic instruction and continuing education in a number of venues in the polygraph, law enforcement, psychological, and legal professions.  Those educational activities include lectures and instruction with: the United States Department of Defense Polygraph Institute (now known as the National Center for Credibility Assessment), the United States Secret Service, the Federal Bureau of Investigation and the Canadian Police College.  On invitation, I have given continuing education lectures and instruction in the United States and in a number of other countries. Those other countries include Canada, China, Columbia, Israel, Mexico, Norway, Sweden and the Netherlands.

2.4.  I also have a private consulting practice where I offer services as a consulting and/or testifying expert to the legal profession.  I have appeared as an expert witness on the polygraph and on my other areas of research expertise in a number of courts of law in the United States and elsewhere. A complete list of my sworn-testimony appearances is provided in my Curriculum Vitae.

2.5.  I am the Managing Partner of Honts, Handler, and Hartwig, LLC.  Honts, Handler, and Hartwig, LLC is currently in the startup phase.  Beginning sometime during the first half of 2016 the LLC will be offering online and in-person continuing education in evidence-based questioning technique alternatives to the traditional confession-focused interrogation techniques in common use in North America.  The target students for the LLC will be law enforcement, government personnel, and others who are involved in obtaining information from job candidates, witnesses, and suspects.

2.6.  I am also a member of the Advisory Board of Converus, Inc., 3315 Mayflower Ave., Ste. 2, Lehi, Utah 84043.

3.  I hold a Ph.D. degree in Psychology with a concentration in human experimental psychology. My central area of study and research is in the sub-discipline of Psychology known as Psychology and Law.  Polygraph testing in particular has been a focus over the length of my academic career.  I have also done research on jury behavior, eyewitness identification, eyewitness memory, assessing the credibility of child witnesses, interrogations and confessions.  I have published a number of peer-reviewed scientific papers, book chapters, and training materials on the polygraph and on the other areas of my expertise. I have given a

large number of papers and invited addresses at scientific and professional meetings around the world. A complete list of my publications and presentations is provided in my Curriculum Vitae.

4. I am a Charter Member and Fellow (elected in 2006) of the Association for Psychological Science, the largest professional association of psychological scientists in the world.

5. In 2009, I was awarded The John E. Reid Memorial Award for distinguished achievements in polygraph research, teaching or writing by the American Polygraph Association. In 2014, I was awarded The Harry Detwiler Award for contributions to the polygraph profession in Latin America through advances in practice and research by the Asociación Latinoamericana de Poligrafistas.

**Materials Provided for Review:**

6. A document, SCHEDULE OF MATERIALS PROVIDED TO CHARLES R. HONTS, Ph.D., is attached to this report as Attachment B. That document lists all of the materials provided to me.

**Authority Generally Relied Upon in My Review:**

7. My own publications including all of their incorporated references.

8. In particular, for contemporaneous practice and science references related to this case I made heavy use of: Raskin, D. C., & Honts, C. R. (2002). The comparison question test. In M. Kleiner (Ed.), *Handbook of polygraph testing.* London: Academic (1-49), along with its incorporated references and citations. (Hereinafter, The Handbook).

**My Evaluation of the Harris Examination**

9. In this case, as is my standard practice in reviewing examinations conducted by other examiners, I evaluated the physiological data before reviewing any of the other materials. The physiological data were provided as photocopies. The photocopies were on 8.5 X 11 inch sheets and were of only fair quality. I was able to piece them back together and determined that they were of sufficient quality to attempt a numerical scoring analysis.

10. The test took the form of a comparison question test (CQT) with four relevant questions and two comparison questions. The questions were ordered in the format commonly referred to in the polygraph profession as the Mixed General Question Test, or the Reid Comparison Question Test. The questions were repeated three times while physiological data were collected with an analog instrument. The standard three physiological measures were recorded, respiration (abdominal and thoracic), electrodermal activity (also known archaically as galvanic skin response), and relative blood pressure (often referred to in the polygraph profession as cardio). The physiological recordings were all relatively stable, but the sensitivity settings for abdominal respiration, electrodermal activity and the relative blood

pressure were below professional standards, although they were minimally sufficient for scoring. The electrodermal activity appears to have been collected with the circuit in automatic centering mode[1]. In summary, the physiological recordings minimally met the polygraph profession's standards of 2005 and were, in my opinion, of sufficient quality to submit to a numerical scoring analysis.

11. I evaluated the physiological recordings using the numerical scoring system developed and scientifically validated at the University of Utah. Peer-reviewed scientific research shows the Utah scoring system to be the most accurate of the numerical scorings systems currently available[2].

12. The four relevant questions in this examination were[3]:

   12.1. #3: Did you do anything to cause the death of Jaquari?

   12.2. #5: Did you wrap a cord around Jaquari's neck?

   12.3. #8: Are you withholding any information about what you said happened yesterday with Jaquari?

   12.4. #9: Do you know who the person was who killed Jaquari?

13. In the Utah Scoring System, when evaluating an examination where the relevant questions address a single incident or issue, a total numerical score of +6 or greater indicates truthfulness. A total numerical score of -6 or less indicates deception. Total numerical scores between -6 and +6 are considered inconclusive outcomes. In my opinion, the Harris Examination addressed a single incident and therefore only the total score is of interest.

---

[1] With the old analog instruments examiners had the option to run the electrodermal channel in an Automatic Centering Mode. Choosing that mode introduced a high-pass, short time constant, filter into the circuit and eliminated much of the rise time and recovery time information from the electrodermal tracing, see, Horvath, F. (2002) An experimental comparison of the psychological stress evaluator and the galvanic skin respond is detection of deception. *Polygraph*, *31*, 135-134. Unfortunately, actually innocent subjects rise time and recovery times are selectively longer to comparisons questions, thus running the electrodermal channel in the Automatic Centering Mode selectively biases the test against actually innocent individuals. For an early example see, Podlesny, J. A., and Raskin, D. C. (1978). Effectiveness of techniques and physiological measures in the detection of deception. Psychophysiology, 15, 344-359. The professional preference against using the Automatic Centering Mode was part of my polygraph training in 1976. The biasing nature of the Automatic Centering modes was always discussed at the University of Utah annual workshops at least since 1982 when I first attended.

[2] Brian G. Bell, David C. Raskin, Charles R. Honts, & John C. Kircher, The Utah Numerical Scoring System, 28 *Polygraph* 1 (1999). Also see the review by by David C. Raskin & Charles R. Honts, The Comparison Question Test. In Murray Kleiner (Ed.), *Handbook of Polygraph Testing* (2002).

[3] Question wordings were taken from Mr. Bartik's testimony in deposition in this case, page 246-247, 24 November 2015.

14. I initially scored the data from the first three repetitions of the test questions.  My scoring of the three repetitions of the Bartik Examination questions produced a total numerical score of +15.  In the Utah Scoring System that score indicates truthfulness to the relevant questions of the examination.

15. After completing my analysis of the physiological data, I evaluated the other materials from the Harris Examination.  As a result of that evaluation I reached the following conclusions:

15.1.   The polygraph examination should never have been conducted at the time it was conducted. There were three issues which clearly rendered Ms. Harris unsuitable for testing on May 15, 2005.

15.1.1. First, the previous day Ms. Harris' son Jaquari died under unknown circumstances.  She was taken to be given a polygraph test less than 24 hours after the death of her child.

15.1.2. Second, the previous day, Ms. Harris' other child was taken from her by the State, and she was separated from her fiancé.

15.1.3. Third, Ms. Harris was held in custody for a night in a room without a bed.  When asked about sleep during the pretest interview of the polygraph examination Mr. Bartik's recollection is that, "I think she said that she had dozed off a little while[4]." Document CITY0000575 indicates that when Mr. Harris was asked about how much sleep she had the night before the examiner  made the following note, "Sleep - I dozed off for a while." I would refuse to test someone until they had slept under appropriate conditions.

15.1.4. In my opinion, any one of the factors described above in Paragraphs 15.1.1, 15.1.2, and 15.1.3 clearly renders a person unsuitable for testing.  No reasonable polygraph examiner I know would have even considered testing a mother less than 24 hours after the death of her son, regardless of what the subject said.  Similarly, the taking of her child by the State and her lack of sleep clearly contraindicate conducting a polygraph examination.  The decision about suitability of a subject for conducting a polygraph lies completely with the polygraph examiner, never with the subject. By definition, an unsuitable subject is incompetent to make the decision about suitability.  Together the three factors described above in Paragraphs 15.1.1, 15.1.2, and 15.1.3 make the fact that a test was conducted appear outrageous.

15.1.5. Moreover, there was absolutely no reason not to delay this examination.  No one else was in immediate danger of harm and steps to keep Ms. Harris from fleeing could easily have been taken (if that was a concern).  In my opinion there was

---

[4] Id at 229.

absolutely no justification for Mr. Bartik continuing with this examination under these circumstances. In my opinion, Mr. Bartik's testing of Ms. Harris on May 15, 2005 was willfully irresponsible and dangerous to any actually innocent subject in that it would set them up to fail.

15.2. The relevant questions of the Harris Examination (Paragraph 12 above) are acceptable in form and content under the professional polygraph practices of 2005. However, without a recording of the examination it is not possible to evaluate how these questions were presented to Ms. Harris. For example, with Relevant Question #3, "Did you do anything to cause the death of Jaquari?", we are left to speculate about what was included in the discussion of the term "anything"? With Relevant Question #8, "Are you withholding any information about what you said happened yesterday with Jaquari?", we are unable to know exactly what Ms. Harris said happened yesterday, because there was no recording of the interview.

15.3. There were two comparison questions:

15.3.1. #6: Have you ever done anything where people would consider you to be a bad mother?

15.3.2. #11: Have you ever lied to me about anything else that we talked about here today?

15.4. The quality of comparison questions is particularly difficult to evaluate without a recording of the examination. The present examination is a variant of the comparison question test that uses comparison questions known as probable-lie comparison questions. Those questions must be of a form and content that allows them to compete for attention with the relevant questions of an examination when an actually innocent subject is tested. Moreover, probable-lie comparisons MUST be presented to the subject in a way that establishes them as having roughly the same form and importance to the outcome of the test as the relevant questions[5]. As was noted in The Handbook, "Comparison questions are designed to provide the innocent suspect with an opportunity to become more concerned about questions other than the relevant questions, thereby causing the innocent suspect to react more strongly to the comparison than to the relevant questions. If the subject does react with greater strength to the control questions, the result is interpreted as truthful. On the other

---

[5] John Reid, the inventor of the probable-lie comparison question described them thus: "Special consideration must be given to the selection of Question 6, the "comparative response" question, because the magnitude of the response to that question is to be compared with responses to questions pertaining to the actual crime, and may therefore serve to include or exclude definitely the subject as a suspect in the crime under investigation. If the examiner is fortunate enough to have in his possession certain information concerning a situation or offense involving the subject (but of less importance than the actual crime being investigated) which the examiner knows or feels reasonably sure the subject will lie about, a question based on such information and actually lied to will serve very well to indicate the subject's responsiveness when lying. Such a question thereby affords a basis for evaluating the nature of the response to the questions pertinent to the offense under investigation." (p. 544), Reid, J. (1947). A revised questioning technique in lie-detection tests. *Journal of Criminal Law, Criminology and Police Science, 37*, 542-547

hand, stronger reactions to the relevant questions are interpreted as indicating that the subject was deceptive to the relevant questions. The problem of no specific lie response is circumvented by the procedure of drawing inferences about truth or deception by comparing the relative strength of this particular subject's reactions to relevant and control questions."(p. 7)

15.4.1. However, there is a general problem with the Reid approach to probable lie questions that was noted in The Handbook:  "First, the examiner must develop a question to which the subject's denial is known to be deceptive. This requires the independent development of comparison question information. Unfortunately, such information is usually difficult or impossible to obtain. Therefore, the Reid examiner must choose a very general question to which the subject answers "No" and is assumed to be deceiving. This is risky because a subject who actually answers the question truthfully would not have the benefit of an adequate comparison question and could fail the test even when answering truthfully to the relevant questions." (pp. 8-9)

15.4.2. In my opinion the comparison questions in the Harris Examination were likely deficient and did not meet the standards of practice in 2005.

15.4.2.1.  Comparison questions are supposed to cover an issue similar in nature to the topic of the relevant questions.  The relevant questions in this test addressed the death of a child. Appropriate topics for probable lie questions in such a test might include harming or hurting others or thinking about harming or hurting others.  The comparison questions in the Harris Examination addressed the opinions of others about Ms. Harris' quality as a mother, and about Ms. Harris lying to the examiner during the polygraph examination.

15.4.2.2. In my opinion the topics of the comparison questions in the Harris Examination are weak and thus biased the examination toward a false positive outcome (an actually innocent person failing the examination).

15.4.2.3.  It is also my opinion that as a general matter the comparison questions used in the Harris examination would not have been considered acceptable under the standards of the polygraph profession nor under an analysis of the best professional practices based upon the state of the science and polygraph professional practice in 2005.

16. Mr. Bartik indicates that he used a global analysis procedure to evaluate the results of the Harris Examination[6].  Mr. Bartik expressed that he has a lot of confidence in global analysis[7]. Global Analysis, as developed by Reid in the 1950s, involves visually inspecting the charts

---

[6] Supra Note 3 at 84.

[7] Id, at 195

for noticeable responses.  No numbers are assigned nor is there any operational definition for what is a truthful or deceptive set of charts.  The decision of truth or deception in Global Analysis is made completely from clinical judgments by the polygraph examiner administering the test.

16.1. In 2005, visual inspection analysis (Global Analysis) was considered to be a vastly inferior scoring method as compared to the numerical scoring methods that were in general use by that time.  Moreover, it was well known long before 2005 that visual inspection (global) analysis, and the general Reid approach to polygraph testing, were associated with a high risk of false positive outcomes.

16.2. In 1986, Raskin[8] described Global Analysis as follows:  "The oldest method of diagnosis is a global evaluation. The evaluation begins with an overall inspection of the polygraph charts to form a general impression of the reactions produced by the various questions. That general impression is combined in an unspecified manner with other information, such as the case facts, the subject's nonverbal behavior and demeanor and whatever the examiner may feel is important in arriving at a diagnosis. Although some examiners still practice the global method of diagnosis, scientific research has demonstrated that it is inferior to the more systematic methods employed in numerical evaluation. Most federal and local law enforcement agencies employ some type of numerical scoring system." (p. 37; footnotes omitted).

16.3. The scientific evidence against the Reid approach and visual inspection analysis came from several sources that were extremely well known in the polygraph profession by 2005:

16.3.1. A field validity study was conducted by Frank Horvath in 1974 as his doctoral dissertation. Dr. Horvath was trained as a polygraph examiner with John Reid and was for a time Chief Examiner at John E. Reid and Associates.  Dr. Horvath's doctoral dissertation was subsequently published in a peer-reviewed scientific journal (Horvath, 1977)[9]. Horvath reported that in cases conducted by a large state police agency by examiners who used a version of the Reid Technique with global analysis (Horvath, 1974), the overall accuracy rate was only 63.3% with most of the errors occurring with individuals who were later confirmed to be innocent. With the innocent, the polygraph tests in Horvath's dissertation was only accurate 51% of the time against a chance expectancy of 50%. Horvath (1977) thus reported one of the lowest accuracy rates ever reported for the Comparison Question Test.

---

[8] David C. Raskin The polygraph in 1986: Scientific, professional and legal issues surrounding application and acceptance of polygraph evidence. 1986 UTAH LAW REVIEW, 29 (1986).

[9] Horvath, F. S. (1974). The accuracy and reliability of police polygraphic ("lie detector") examiners' judgments of truth and deception: The effect of selected variables (Doctoral dissertation, Michigan State University). Available from ProQuest Dissertations and Theses database.(UMI No. 7514753).  Horvath, F. S. (1977). The effect of selected variables on interpretation of polygraph records. *Journal of Applied Psychology, 62*, 127-136.

16.3.2. In 1977, Raskin, Barland and Podlesny published the results of a field study in *Polygraph*, the journal of the American Polygraph Association, that showed global evaluation to be significantly less accurate than numerical scoring[10].

16.3.3. In 1981 Szucko and Kleinmuntz reported a laboratory study in the *American Psychologist*[11]. Later (1984) they reported a field study in the journal *Nature*[12]. In both of those studies, published in very prominent scientific journals, the examinations were conducted at the Reid organization in Chicago. In both of those studies, very low estimates of accuracy were obtained with the actually innocent, 49% and 63%, respectively.

16.3.4. These four scientific studies clearly demonstrating the inferiority of the Reid polygraph technique and global analysis were all either published directly in, or discussed in, *Polygraph*, the journal of the American Polygraph Association more than two decades before the Harris Examination. The examinations in two of those studies were conducted at and by members of the Reid organization. Since Mr. Bartik was trained at the Reid organization after these studies it seems to me implausible that they would not have been discussed in a Reid College basic polygraph examiner course, if for no other reason than to offer an explanation for the abysmal performance by the Reid examiners in those studies.

16.3.5. In my opinion, Mr. Bartik's high confidence in the global analysis process was clearly unjustified by reference to both the scientific and professional literature that was readily available and well known by 2005.

16.3.6. It is also my opinion that in 2005, any polygraph examiner, with even a cursory curiosity about the basis for, and accuracy of, his professional practice would have known that global analysis was a discredited approach to evaluating polygraph charts and would have abandoned it for one of the validated scoring systems.

**Summary Concerning the Harris Polygraph**

17. The testing and scoring techniques used in the Harris Examination were considered to be archaic and discredited in 2005.

17.1. It is my opinion that any properly trained polygraph examiner who had received the professionally recommended continuing education would have known that the technique and the analysis methods associated with the Reid technique were considered

---

[10] Raskin, Barland & Podlesny, Validity and reliability of detection of deception, 6 POLYGRAPH 1, 18 (1977).

[11] Szucko & Kleinmuntz (1981). Statistical versus clinical lie detection. *American Psychologist*, *36*, 488-496. This study was reprinted in *Polygraph* the journal of the American Polygraph Association during the same year.

[12] Szucko & Kleinmuntz (1984). A field study of the fallibility of polygraphic lie detection, *Nature*, *308*, 449-450.

invalid, biased against the actually innocent, and were being rapidly abandoned by the polygraph profession.

17.2. Despite the problems with the form of the critical questions in the Harris Examination, the application of a valid numerical scoring system revealed that in fact Ms. Harris Examination was not inconclusive, it produced a strongly truthful result.

**Deficiencies in Officer Bartik's Training, Continuing Education, and Professionalism**

18. Basic and Continuing Education: Polygraph is a relatively new applied psychological science. Tremendous gains in knowledge and innovations in practice were made over the last 40 years. The professional and accreditation organizations with the polygraph profession have promulgated accreditation standards for basic training and continuing education for polygraph examiners. There are two primary organizations that have promulgated curriculum standards for the training of polygraph examiners. The oldest is the American Polygraph Association and the more recent is the American Society for Testing and Materials.

18.1. In the 1980s the American Polygraph Association required all accredited polygraph schools to meet a basic curriculum for the basic training of polygraph examiners[13].

18.1.1. Mr. Bartik claims to have never had any exposure to research on the accuracy of the polygraph, but at least 4 hours of such training was required in American Polygraph Association accredited schools at the time Mr. Bartik received his training.

18.2. Starting in the late 1990s the American Society for Testing and Materials (ASTM) promulgated a standard for basic training of polygraph examiners. In 2000, ASTM also required 4 hours of instruction in polygraph research, paragraph, 5.3.2. That standard is included Attachment C to this report.

18.3. During years preceding the Harris Examination there were clear standards from the polygraph profession as to the importance of annual continuing education. Recommendations were as follows:

18.3.1. American Polygraph Association, Polygraph Association Goals, Membership Benefits, Code of Ethics, Standards, downloaded from http://www.polygraph.org/ apa1.htm#code, retrieved 9/10/01 1:02AM. Standards of Practice, Paragraph 3.2.5 A polygraph examiner shall, where applicable, comply with state continuing education requirements. A polygraph examiner conducting evidentiary

---

[13] American Polygraph Association (1983), *Manual for Polygraph School Inspections*. Section VI.A.1.g POLYGRAPH RESEARCH & RESEARCH METHODS ( 4 hours) - Includes an explanation of validity, reliability and polygraph research procedures. As well, includes a literature survey to familiarize students with published, scientific polygraph research data and journals.

examinations shall have completed a minimum of thirty (30) Continuing Education hours every two years. (p. 6: Document provided as Attachment D)

18.3.2. American Association of Police Polygraphists, Standards and Principles of Practice, downloaded from http://www.worldnet.net/aapp/standards/htm, retrieved 0/10/01 9:34AM. Section VII. RESPONSIBILITIES OF THE AGENCY/ DEPARTMENT TO THE POLYGRAPHISTS. In order for the polygraphist to maintain and improve his/her professional competency, the employing agency/ department should allow the examiner:

18.3.2.1. To attend a minimum of one professional polygraph seminar on a yearly basis. Traveling, living and attendance expenses in this regards, should be paid for by the agency/department employment [sic] the polygraphists.

18.3.2.2. To require memberships in appropriate professional organizations, reimbursing the actual cost of membership and/or assessments. (p. 4: Document provided as Attachment E.)

18.3.3. The American Society for Testing and Materials, Standard Guide of Minimum Continuing Education of Individuals Involved in the Psychophysiological Detection of Deception (PDD), Designation: E 2064-00, adopted in 2000. Paragraph 5.1 The required number of minimum hours of training to maintain professional competence is 40 hours, every two calendar years, starting with the date on which the basic PDD (polygraph) training was completed. (p.1: Document provided as Attachment F).

18.3.4. In my opinion, based upon Mr. Bartik's sworn testimony, and his Employee Training Record (CITY0000820-830), at the time of the Harris Examination Mr. Bartik was not in compliance with any of the major professional organizations' recommendations for continuing education. Moreover, a number of Mr. Bartik's sworn statements reveal that he had, and has, an extreme lack of interest in the basic science of his chosen profession and apparently no interest in learning new material nor in maintaining continuing competence as professional ethics and standards would dictate. For example:

18.3.4.1. Mr. Bartik stated in deposition[14] that while at the John Reid College receiving his training as a polygraph examiners he was provided two books by Reid and Inbau, *Truth and Deception* and *Interview and Interrogation*. Mr. Bartik stated that he never studied or read either of those books while at polygraph school and although he kept the books, he never read them.

---

[14] DONNY MCGEE v. CITY OF CHICAGO, Et.AL., No. 04C6352, Deposition of OFFICER ROBERT BARTIK, p. 18-19.

18.3.4.2.  Mr. Bartik denies every having subscribed to a professional journal[15] and yet he also says that he was a member of the American Polygraph Association[16].  All members of the American Polygraph Association received the journal *Polygraph,* a peer-reviewed and indexed journal that publishes scientific articles about the polygraph.  All members of the American Polygraph Association also receive a monthly professional magazine, *APA Magazine: The magazine for the polygraph professional.*

18.3.4.3.  The following exchange from the Bartik deposition[17] in this matter illustrates what is in my opinion a nearly pathological incuriosity about polygraph science and professionalism.

Q. Do you read journals or magazines or newsletters or papers as part of your ongoing, either personal or professional, edification as a polygraph examiner?

A. No.

Q. What was the last article or anything that you read about polygraph examination?

A. That, I can't re -- I don't remember.

18.3.4.4.  This following deposition exchange betrays an extreme lack of awareness of the problem of false confessions, a problem that has been highlighted by a number of well publicized cases in the greater Chicago area over the last few years. In my opinion the following statement express a flagrant disregard for science, professionalism, and justice and it is inexcusable that such an extreme opinion could be voiced under oath by any polygraph examiner.

Q. Do you believe false confessions occur?

A. No.

Q. There's no circumstance under which you can think that a false confession could occur?

A. No.

---

[15] Supra Note 3 at 21-22

[16] Id at 21

[17] Id at 26-27

**Chicago Police Department Polygraph Unit Practices**

19. There were five documents supplied to me concerning the operation of the Chicago Police Department Polygraph Unit. The first was titled, Bureau of Technical Services, Forensic Services Division, Standard Operating Procedures (City 1447-1450). The second was titled, Bureau of Detectives, Forensic Services Division, Standard Operating Procedure (City 1451-1454)[18]. The third was the deposition transcript of James Hickey. I was also provided two exhibits from the Hickey deposition, City 8551-8558 and City 8559-8566. As was noted in the Hickey deposition, the two exhibits addressed the location of the Polygraph Unit in the organizational structure of the Chicago Police Department. Mr. Hickey also represented these documents to be the sole Chicago Police Department directives addressing polygraphs (Hickey deposition, 15, 17-22).

20. The Standard Operating Procedure document in effect at the time of the Harris Examination is acceptable as far as it goes. However a review of the Standard Operating Procedure document in combination with James Hickey's deposition reveals the standard practices of the Chicago Police Department Polygraph Unit (CPDPU) to be very limited and generally substandard as compared to professional standards and practices in effect in 2005. A number of normally included standard practices and procedures are simply absent from the CPDPU.

20.1. Perhaps the most glaring feature lacking from the CPDPU practices is any mechanism for quality control. The U.S. Federal Government runs the largest polygraph program in the world. One of the critical elements for the U.S. polygraph programs is Quality Control. The Federal Quality Control program is described in detail in the *Federal Psychophysiological Detection of Deception Examiner Handbook*[19] (provided with this report as Attachment G). Details of the procedures to be used for the quality control of every Federal polygraph examination are provided in Chapter II.D.1-6 at 6. Of note, Chapter II.D.2 states, "Independent and Objective QC. QC procedures shall be independent and objective, without undue influence of the original examiner or other sources." at 6. Chapter II.D.3 states the details of the materials that will be Quality Controlled for every Federal Examination, "All PDD reports, technical documents and charts shall undergo a QC review to ensure satisfactory tracing quality and correctness of opinion rendered." at 6. In 2005, none of the polygraph examinations conducted in the CPDPU received this type of quality control.

---

[18] The former standard operating procedure document (City 1447-1450) was the standard operating procedure in effect at the time of the Harris Examination.

[19] *Federal Psychophysiological Detection of Deception Examiner Handbook*. December 1, 1998, Chapter II Quality Control at 5-7. For a specific example of a quality control program within a department see, Department of the Army Polygraph Activities, 29 September 1995 at 2.7.a.1: Within 3 workdays after a USACIDC polygraph examination, examiners will send the following documents by registered mail to the Director, U.S. Army Crime Records Center, ATTN: CICR-RD, 2301 Chesapeake Avenue, Baltimore, MD 21222-4099, for quality control review: (a) All polygrams collected. (b) A listing of all questions used during the examination. (c) DA Form 2801. (d) Polygraph Examination Report in narrative format. (e) DA Form 2805, or electronic message. (f) Polygraph examiner worksheet.

20.2. A second glaring deficiency highlighted by the Standard Operating Procedures document, Mr. Hickey's testimony, and Mr. Bartik's testimony was the fact that neither Mr. Bartik nor any of the examiners in the CPDPU have ever had a supervisor who possessed training in polygraph techniques. Within the Federal Government, supervision of polygraph examiners by senior polygraph examiners is considered a critical feature. The *Federal Psychophysiological Detection of Deception Examiner Handbook,* Chapter II.C, Administration of Quality Control, provides detail about the Federal requirements and qualifications of those who supervise polygraph quality control[20]. Notably in the Federal government personnel who administer Quality Control should be experienced and certified polygraph examiners (Chapter II.C.4), who have a minimum of two years experience as a polygraph examiner (Chapter II.C.4.a). Moreover, within the Federal Government, "QC personnel should have technical authority over PDD examiners and should have input into their performance ratings." (Chapter II.C.4.c). Given the highly technical nature of polygraph testing, it is inconceivable to me that a supervisor, untrained in polygraph testing, could give any meaningful oversight or evaluation of a staff of full time polygraph examiners. Without competently trained polygraph examiners in supervisory positions the line polygraph examiners could, and apparently did, commit terrible miscarriages of justice without any possibility of administrative control or restraint as in the Harris Examination and others.

20.3. I was also struck by Mr. Bartik's[21] cavalier and callous response to the processing of complaints against him. For example concerning an allegation from a polygraph subject that Mr. Bartik made a threat of physical violence:

> Q. Now, have you ever been accused in any way of any wrongdoing in connection with your role as a polygraph examiner with the police department?
>
> A. Yes.
>
> Q. What have you been accused of?
>
> A. I've been accused of -- let's see -- one gentleman said that I was going to put him in a room in a cell and cattle prod him.

Later with regard to the same accusation:

> Q. What happened?
>
> A. In regards to this situation?
>
> Q. Yes.

---

[20] Id, *Federal Psychophysiological Detection of Deception Examiner Handbook,* Chapter II.C.1-5, at 5.

[21] Supra note 3 at 344-346

A. I was informed by my supervisor that there was an allegation made against me.

Q. Were you ever informed of a -- a conclusion?

A. No.

Q. No. So you don't know whether it was sustained or not sustained or exonerated, unfounded?

A. No.

Q. Do you care?

A. No.

20.4.  Near the end of Mr. Bartik's deposition in this matter[22] he is asked about a series of at least five accusations that he (Bartik) produced a false confession or manufactured a false polygraph result, all in cases were the suspects were eventually released and where, in many cases, the former suspects won lawsuits or were given settlements. When asked if he (Bartik) had ever been disciplined or even officially talked to about the cases, Mr. Bartik denied there ever having been any discipline.  Typical of these exchanges is this:

Q. After Mr. McGee was found not guilty and after the civil trial, did anyone up your chain of command ever speak to you about the situation with Mr. McGee?

A. Insofar as what?

Q. Were you ever written up or reported?

A. Oh, absolutely not.

Q. And never disciplined?

A. No.

Q. And never sent to retraining or any kind of training as a result?

A. No.

Q. No consequences to you whatsoever?

A. No.

---

[22] Id at 351.

In considering this, one is left to wonder why any police polygraph unit would tolerate such a long history of inaccurate results and confirmed false confessions without even counseling the poorly performing polygraph examiner. The tolerance of inaccurate polygraph test results, and associated false confessions, by the Chicago Police Department was clarified and amplified by the testimony of Mr. Hickey. With regard to errors in polygraph tests the follow exchange took place during the deposition[23]:

> Q. No statistics on the number of errors in polygraph examinations?

> MS. FORDYCE: Objection to the form.

> THE WITNESS: I don't know what you mean by errors.

> BY MS. SUSLER:

> Q. Times when polygraph examiners found the person to be truthful, for example, and then that that person later was convicted of an offense?

> A. I'm not aware of any such statistic being kept.

With regard to false confessions obtained in the CPDPU[24]:

> BY MS. SUSLER:

> Q. What, if any, police department policy, practice, or procedure existed between 1998 and the present with respect to false confessions?

> MS. FORDYCE:· Objection.

> Can you repeat the question.

> (Whereupon, the record was read as requested.)

> MS. FORDYCE: Okay.· Objection. That's beyond the scope of the 30(b)(6) notice.

> MS. SUSLER: I can amend the question to say within the Polygraph Unit.

> MS. FORDYCE: Thank you. Then I'll withdraw.

> THE WITNESS: None.

---

[23] Hickey deposition, Page 57, lines 13-24.

[24] Id. at page 71, lines 12-24 and Page 72, line 1.

The only conclusion I can draw is that the Chicago Police Department was, and is, unconcerned about inaccurate polygraph results or false confessions by actually innocent suspects.

20.5. In my opinion, the apparent lack of concern by the Chicago Police Department about inaccurate polygraph results or false confessions seems to indicate an organizational climate that, at best condones, and at worst encourages, the use of the polygraph as an evidence ploy to gain confessions, even if it is a false evidence ploy.

20.5.1. A false evidence ploy involves the presentation of false evidence during an interrogation. That is, telling the suspect that evidence exists against him or her when it does not exist. False evidence ploys are commonly found as a contributing factor in verified cases of false confession, including a number of confessions confirmed false by DNA[25].

20.5.2. Moreover, experimental research has demonstrated that introduction of false evidence can cause the false confession rate to double. The innocent, when told that there is physical evidence like fingerprints or video, often reason that since they know they are actually innocent the physical data must show that they are actually innocent. The actually innocent then go on to further reason that appeasing the police with a false confession will allow the interrogation to end, but the falsity of their confession will be revealed by the physical evidence they were told exists. When the evidence that they were told existed never existed the actually innocent false confessor is then left without a means to demonstrate their actual innocence.[26]

20.5.3. Polygraph test results can become false evidence ploys either intentionally or through incompetence. Polygraph false evidence ploys have contributed to a number of wrongful convictions.[27] The dangers of the misuse of polygraphs to produce false confessions were known in the polygraph profession before 2005.[28]

---

[25] Kassin, S. M., Drizin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R., & Redlich, A. D. (2010). Police-induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34*, 3-28.

[26] Id.

[27] Bonpasse, M., (2013). Polygraphs and 215 wrongful conviction exonerations. Polygraph, 42, 112-127.

[28] National Research Council, Committee to Review the Scientific Evidence on the Polygraph, Division of Behavioral and Social Sciences and Education. (2003). *The polygraph and lie detection*. Washington, DC: National Academies Press.

**Summary Opinions**

21. The Harris Examination conducted in 2005 used archaic and discredited testing and scoring techniques that were no longer accepted as valid best practices in the polygraph profession. Those archaic and discredited techniques resulted in a false confession and wrongful conviction[29].

22. The false confession and wrongful conviction might well have been avoided had valid polygraph practices been followed. The most egregious failures to use valid polygraph practice were:

   22.1. Ms. Harris, the potential polygraph subject, was an unsuitable subject for testing on May 15, 2005, because her son had died and the state had taken her surviving child less than 24 hours before the polygraph examination. Moreover, she had not had sufficient sleep the night before. The examiner, Mr. Bartik, unprofessionally and recklessly abdicated his duty to delay the examination to the alleged willingness of Ms. Harris to proceed.

   22.2. The testing technique used in the 2005 Harris Examination was, at that time, notorious for its use in scientific studies that had produced the highest rates of false positive outcomes ever seen in the polygraph research literature. In 2005, any competently trained examiner should have known that the Reid MGQT was of very poor accuracy and was highly prone to a high rate of false positive errors (that is, failing the actually innocent) and inconclusive outcomes with the actually innocent.

   22.3. An inferior and archaic scoring technique, global analysis, was used to evaluate the Harris Examination. Since the 1970s it had been well known in the professional and scientific literatures and communities that global analysis was significantly less accurate than numerical scoring analysis and that the difference between the two was large. In particular, it was known that global analysis was prone to very high rates of false positive error. In my opinion, the use of global analysis in 2005 showed either a willful disregard or deliberate ignorance for the 30 years of scientific research and advances in professional practice that had gone before. Using global analysis in 2005 was a reckless professional practice.

23. Despite the weakness with the testing technique used, and Ms. Harris' unsuitable condition on May 15, 2005, my scoring of the Harris Examination with the Utah Scoring System produced an outcome of Truthful with regard to the four relevant questions of the examination. It is my opinion that Mr. Harris was being truthful when she answered the relevant questions in the Harris Examination. Moreover, it is my opinion that in 2005 any properly trained examiner who used one of the valid numerical scoring systems available at that time would have reached the same conclusion.

---

[29] Harris v. Thompson, 698 F.3d 609; 2012 U.S. App. LEXIS 21727.

24. The supervisory and professional practices of the Chicago Police Department in place in 2005 condoned and encouraged an organizational climate where the use of the polygraph as a false evidence ploy was tolerated, passively encouraged, and possibly actively encouraged. The risk of false confessions following polygraph tests was generally known in 2005, and there is no apparent evidence that the Chicago Police Department took any measures to avoid such use.

25. The opinions stated in this report are held to a reasonable degree of scientific and professional certainty. However, this is a preliminary report, and I reserve the right to amend or supplement this report if further information is provided.


Sincerely,



Charles Robert Honts, Ph. D.
Detection of Deception Examiner
Professor of Psychology


Attachments:  (A) Curriculum Vitae of Charles R. Honts, Ph. D.

(B) Honts Schedule of Materials

(C) ASTM Basic Training

(D) APA Standards 2001

(E) AAPP Standards 2001

(F) ASTM Continuing Education

(G) Federal Psychophysiological Detection of Deception Examiner Handbook

24. The supervisory and professional practices of the Chicago Police Department in place in 2005 condoned and encouraged an organizational climate where the use of the polygraph as a false evidence ploy was tolerated, passively encouraged, and possibly actively encouraged. The risk of false confessions following polygraph tests was generally known in 2005, and there is no apparent evidence that the Chicago Police Department took any measures to avoid such use.

25. The opinions stated in this report are held to a reasonable degree of scientific and professional certainty. However, this is a preliminary report, and I reserve the right to amend or supplement this report if further information is provided.

Sincerely,

Charles Robert Honts, Ph. D.
Detection of Deception Examiner
Professor of Psychology

Attachments:  (A) Curriculum Vitae of Charles R. Honts, Ph. D.

(B) Honts Schedule of Materials

(C) ASTM Basic Training

(D) APA Standards 2001

(E) AAPP Standards 2001

(F) ASTM Continuing Education

(G) Federal Psychophysiological Detection of Deception Examiner Handbook

ATTACHMENT A
CURRICULUM VITAE OF CHARLES R. HONTS, PH. D.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

**Academics**

Department of Psychology
Boise State University
1910 University Drive
Boise, ID 83725-1715
USA

**Business**

Honts, Handler, & Hartwig, LLC
3105 Sweetwater Drive
Boise, ID 83716-5664

**Email:**

Chonts@boisestate.edu
HONTS@MAC.COM

**Voice:**     208.867.2027
**FAX:**       208.385.7754

**WWW:** http://charleshontsphd.com

**Prepared: January 29, 2016**

## Education:

Ph.D., Psychology (Emphasis Human Experimental), University of Utah, Salt Lake City, Utah, Awarded, June 1986.

M.S., Psychology (Emphasis Human Experimental), Virginia Polytechnic Institute and State University, Blacksburg, VA.  Awarded, June 1982.

B.S., Psychology, Virginia Polytechnic Institute and State University, Blacksburg, VA. Awarded, June 1974.

## Faculty Appointments:

Professor of Psychology,                                    1995 to present
Department Head                                            2000 to 2003
Full Member of the Graduate Faculty
Boise State University, Boise, Idaho.

Associate Professor of Psychology, Full Member of the Graduate Faculty    1990 to 1995
Promoted from Assistant Professor in 1993 (3rd year)
University of North Dakota, Grand Forks.

Adjunct Assistant Professor, Psychology Department, University of Utah,    1987 to 1995
Salt Lake City.

Adjunct Professor, College of Graduate Studies and Continuing Education    1989 to 1990
Jacksonville State University, Jacksonville, Alabama.

## Professional Service and Awards:

Recipient of The Harry Detwiler Award for contributions to the polygraph profession in Latin America through advances in practice and research. Asociación Latinoamericana de Poligrafistas, November 8, 2014, Cancún, Mexico.

**Charles R. Honts, Ph. D.**                                        **Curriculum Vitae**

Recipient of The John E. Reid Memorial Award for distinguished achievements in polygraph research, teaching or writing. American Polygraph Association, August 6, 2009, Nashville, Tennessee.

President-Elect, President, Immediate Past-President, and Member of the Executive Committee of the Rocky Mountain Psychological Association, 2004-2007.

Charter Member and Fellow (Elected 2006) of the Association for Psychological Science.

## Professional Employment:

| | |
|---|---|
| Professor of Psychology, Department of Psychology, Boise State University, Boise, Idaho. | 1995 to present |
| Associate Professor of Psychology, Psychology Department, University of North Dakota, Grand Forks. | 1993 to 1995 |
| Assistant Professor of Psychology, Psychology Department, University of North Dakota, Grand Forks. | 1990 to 1993 |
| Research Psychologist - Research Team Leader (GS-14) Department of Defense Polygraph Institute - Research Division Fort McClellan, Alabama. | 1988 to 1990 |
| Research Assistant (4 years) / Associate (2 years) Department of Psychology, University of Utah, Salt Lake City Projects: *A Study of the Validity of Polygraph Examinations in Criminal Investigations.* Funded by the National Institute of Justice *The Effects of Physical and Mental Countermeasures on the Physiological Detection of Deception.* Funded by the Department of Psychology, University of Utah. | 1982 to 1988 |
| Teaching Assistant, Department of Psychology Virginia Polytechnic Institute and State University, Blacksburg, VA. | 1981 to 1982 |
| Detection of Deception Examiner, Various Employers. | 1976 to 1980 |

## Specialized Training:

The Backster School of Lie Detection (Polygraph Examiner's Course) San Diego, California (September - October 1976).

Workshop on the Assessment of Truthfulness of Alleged Victims of Sexual Offenders Through Statement Reality Analysis. Professor Udo Undeutsch, Instructor. Salt Lake City, Utah (March, 1985).

Interdisciplinary Seminar on Interviewing and Assessing Credibility of Alleged Victims and Perpetrators in Sexual Abuse Cases. Scottsdale, Arizona (April, 1986).

**Charles R. Honts, Ph. D.**                                      **Curriculum Vitae**

Contracting Officer's Representative Course.  Army Logistics Management College, Fort Lee, Virginia (June 1988).

Interview and Assessment Techniques in Child Sexual Abuse Cases.  Seminar sponsored by University of Utah, Department of Psychology, and Division of Continuing Education. (May, 1991).

Post Conviction Sexual Offender Testing.  Forty hour course conducted at the New England Polygraph Institute.  Instruction provided by Raymond Nelson an American Polygraph Association Primary PCSOT Instructor. Course conducted June 28, 2010 through July 2, 2010, inclusive. Certificate dated, July 2, 2010.


## Thesis And Dissertation:


Honts, C. R. (1982).  *The effects of simple physical countermeasures on the physiological detection of deception.*  Unpublished master's thesis, Virginia Polytechnic Institute and State University, Blacksburg.

Honts, C. R. (1986).  Countermeasures and the physiological detection of deception:  A psychophysiological analysis.  *Dissertation Abstracts International, 47*, 1761B. (Order No. DA8616081)


## Professional Publications and Reports:

### 2016

1. Honts, C. R., Kassin, S. M., Forrest, K., McBride, S., & Anderson, A. (2016). Polygraph examiners perform poorly at discriminating true from false juvenile confessions. Manuscript reviewed and under revision for publication.

2. Handler, M., & Honts, C. R. (2016).  Successive hurdles employment screening with complementary technologies, manuscript accepted for publication in *The American Association of Police Polygraphist January Digest 2016.*

3. Handler, M., & Honts, C. R. (2016). Screening survival analysis - *Understanding base rates, accuracies, & successive hurdles in credibility assessment screening with complementary technologies.* Submitted for consideration of publication.

### 2015

4. Handler, M., Honts, C. R., & Blalock, B., (2015). A literature review of polygraph countermeasures and the comparison question technique. *APA magazine: The magazine for the polygraph professional, 48*(3), 81-96.

5. Handler, M., Honts, C. R., & Goodson, W. (2015). A literature review of Polygraph Countermeasures and the Comparison Question Technique. Manuscript in press for publication in *Polygraph, 44,* 129-139.

6. Honts, C. R. (2015). A new paradigm for the study of malintent. *Polygraph, 44,* 187-192.

**Charles R. Honts, Ph. D.**                                     **Curriculum Vitae**

7.    Honts, C. R., Handler, M., Shaw, P., & Gougler, M. (2015). The vasomotor response in the comparison question test. *Polygraph, 44*, 62-78.

8.    Honts, C. R., & Reavy, R., (2015). The comparison question polygraph test: A contrast of methods and scoring. *Physiology and Behavior, 143*, 15-26. Published online 24 February 2015, doi:10.1016/j.physbeh.2015.02.028

9.    Raskin, D. C., Honts, C. R., Nelson, R., & Handler, M. (2015). Monte carlo estimates of the validity of four relevant question polygraph examinations. *Polygraph, 44*, 1-27.

## 2014

10.   Goodson, W., Honts, C. R., Handler, M., Nelson, R., Hicks, M., & Westerman, D. (2014). Pre-test breathing instructions increase perceptions of respiratory countermeasures. *Polygraph, 43*, 114-122.

11.   Honts, C. R. (2014). Countermeasures and credibility assessment. In, Raskin, D. C., Honts, C. R., & Kircher, J. C. *Credibility assessment: Scientific research and applications: First Edition* (pp. 131-158). Oxford, UK: Academic Press. http://dx.doi.org/10.1016/B978-0-12-394433-7.00003-8

12.   Honts, C. R., & Handler, M. (2014). Scoring respiration when using directed lie comparison questions. *Polygraph, 43*, 71-78.

13.   Honts, C. R., & Handler, M. (2014). Information gain of the relevant irrelevant technique. *Polygraph, 43,* 137-147.

14.   Honts, C. R. & Hartwig, M. (2014). Credibility assessment at portals. In, Raskin, D. C., Honts, C. R., & Kircher, J. C. *Credibility assessment: Scientific research and applications.* (pp. 37-61). Oxford, UK: Academic Press. http://dx.doi.org/10.1016/B978-0-12-394433-7.00002-6

15.   Honts, C. R., Kassin S. M. & Craig, R. (2014). 'I'd know a false confession if I saw one': A constructive replication with juveniles. *Psychology, Crime and Law, 20,* 695-704. (published online 15 November 2013). http://dx.doi.org/10.1080/1068316X.2013.854792

16.   Raskin, D. C., Honts, C. R., & Kircher, J. C. (2014). *Credibility assessment: Scientific research and applications.* Oxford, UK: Academic Press. ISBN: 978-0-12-394433-7 (ebook version available online 17 December 2013).

## 2013

17.   Handler, M., Honts, C. R., & Nelson, R. (2013). Information gain of the directed lie screening test. *Polygraph, 42,* 192-202.

18.   Honts, C. R. (2013). Deception detection, in A. Jamieson and A.A. Moenssens (Eds.) *Wiley Encyclopedia of Forensic Science*, John Wiley: Chichester. http://DOI: 10.1002/9780470061589.fsa495.pub2. Available online 17th June 2013.

19.   Honts, C. R., & Handler M. (2013). A case study of the validity of the Arther Examination Procedures in a criminal case with DNA confirmation. *Polygraph, 42*, 61-71.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

<u>**2011**</u>

20.  Honts, C. R., & Kircher, J. C. (2011). Research methods for psychophysiological deception detection. In Rosenfeld, B., & Penrod, S. D., (Eds.) *Research Methods in Forensic Psychology*, (pp. 105-121) Hoboken, NJ, USA: Wiley.

<u>**2010**</u>

21.  Handler, M., Nelson, R., Krapohl, D., Honts, C. (2010). An EDA primer for polygraph examiners. *Polygraph, 39,* 68-108 .

22.  Handler, M., Nelson, R., Krapohl, D., Honts, C. (2010). An EDA primer for polygraph examiners. *The Police Polygraph Digest,* January*, 9-35.* A revision and republication of the article originally published in *Polygraph.*

<u>**2009**</u>

23.  Handler, M. D., Honts, C. R., Krapohl, D. J., Nelson, R., & Griffin, S. (2009). Integration of pre-employment polygraph screening into the police selection process. *Journal of Police and Criminal Psychology*, 24, 69-86. (Published online 20 May 2009.)

24.  Honts, C. R., (2009). Deception detection technology, in, Jamieson, A., & Moenssens, A., (Eds.) *Wiley Encyclopedia of Forensic Science*. West Sussex, UK: Wiley.

25.  Honts, C. R., Hartwig, M., Kleinman, S. M., & Meissner, C. A. (2009). *Credibility assessment at portals: Portals committee report.* Final report of the Portals Committee to the Defense Academy for Credibility Assessment / U. S. Defense Intelligence Agency.

26.  Honts, C. R., & Reavy, R., (2009). Effects of Comparison Question Type and Between Test Stimulation on the Validity of Comparison Question Test. Final Progress Report on Contract No. W911Nf-07-1-0670, submitted to the Defense Academy of Credibility Assessment (DACA). Boise State University. Available: http://www.dtic.mil/dtic/tr/fulltext/u2/a505303.pdf

27.  Honts, C. R., & Schweinle, W., (2009). Information gain of psychophysiological detection of deception in forensic and screening settings. *Applied Psychophysiology and Biofeedback, 34,* 161-172. (Available online July 2009)

28.  Webb, A. K., Honts, C. R., Kircher, J. C., Bernhardt, P. C., and Cook, A., E. (2009). Effectiveness of pupil diameter in probable-lie comparison question tests for deception. *Legal and Criminological Psychology, 14*, 279-292, (Available online June 2009).

<u>**2008**</u>

29.  Handler, M. D., & Honts, C. R. (2008). You can run, but you can't hide: A critical look at the fight or flight response in psychophysiological detection of deception. *European Polygraph, 2,* 193-207.

30.  Honts, C. R., (2008). *Credibility assessment at portals.* Report of the Credibility Assessment Research Summit Portal Committee, to the U. S. Department of Defense.

31.  Honts, C. R. (2008). Polygraph and polygraph techniques. In B. L. Cutler (Editor), *Encyclopedia of psychology and law (Volume 2)*, (pp. 596-600). Thousand Oaks, CA: Sage Publications.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

32.  Honts, C. R., Raskin, D. C., & Kircher, J. C. (2008). Scientific Status: The case for polygraph tests.  In, D. L. Faigman, M. J. Saks, J. Sanders, and E. Cheng (Eds.) *Modern scientific evidence: The law and science of expert testimony (Volume 5): 2008-2009 Edition.* Thompson West: Eagan, Minnesota.

33.  Voas, B., Johnson, M., Turrisi, R., Taylor, D., Honts, C. R., & Nelson, L. (2008).  Bringing alcohol on campus to raise money: Impact on student drinking and drinking problems. *Addiction, 103,* 940-950.

**2007**

34.  Handler, M. D., & Honts, C. R. (2007). Psychophysiological mechanisms in deception detection: A theoretical overview. *Polygraph 36,* 221-232.

35.  Honts, C. R. & Alloway, W. (2007). Information does not affect the validity of a comparison question test.  *Legal And Criminological Psychology, 12,* 311-312. (Available online in 2006)

36.  Honts, C. R. & Amato, S. (2007). Automation of a screening polygraph test increases accuracy. *Psychology, Crime & Law, 13*, 187-199.

**2006**

37.  Honts, C. R. (2006). Recent theoretical and applied findings for autonomic psychophysiological deception detection.  *International Journal Of Psychophysiology 61,* 304-305.  (Abstract)

**2005**

38.  Honts, C. R. (2005). Rocky mountain psychological association: Report of the 75th annual meeting. *American Psychologist, 60, 1022-1024.*

39.  Honts, C. R., Raskin, D. C., & Kircher, J. C. (2005). Scientific Status: The case for polygraph tests.  In, D. L. Faigman, D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence: The law and science of expert testimony (Volume 4):  Forensics 2005-2006 Edition.* Thompson West: Eagan, Minnesota, (571-605).

**2004**

40.  Honts, C. R. (2004). The psychophysiological detection of deception, in P. Granhag and L. Strömwall (Eds.) *Detection of deception in forensic contexts.*  London: Cambridge University Press 103-123.

41.  Honts, C. R., Amato, S., & Gordon, A. (2004).  Effects of outside issues on the Control Question Test. *The Journal of General Psychology, 151,* 53-74.

42.  Thurber, S., Bonynge, E., & Honts, C. R. (2004).  Barron's revised ego-strength scale as a measure of test taking style:  Relationships with the validity scales of the MMPI-2. *Counseling and Clinical Psychology Journal, 1,* 119-124.

**2003**

43.   Honts, C. R. (2003).  Participant perceptions support the rationale of the comparison questions test for the psychophysiological detection of deception.  *Psychophysiology, 40,* S48. (Abstract)

Charles R. Honts, Ph. D.                                                                  *Curriculum Vitae*

## 2002

44.   Honts, C. R., & Amato, S. (2002).  Countermeasures, in M. Kleiner (Ed.), *Handbook of polygraph testing*. London: Academic (251-264).

45.   Honts, C. R., Raskin, D. C., & Kircher, J. C. (2002). The scientific status of research on polygraph techniques:  The case for polygraph tests.  In, D. L. Faigman, D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence:  The law and science of expert testimony (Volume 2)*. West: St. Paul Minnesota, (446-483).

46.   Otter-Henderson, K., Honts, C. R., & Amato, S. L. (2002). Spontaneous countermeasures during polygraph examinations: An apparent exercise in futility. *Polygraph*, *31*, 9-14.

47.   Raskin, D. C., & Honts, C. R. (2002). The comparison question test. In M. Kleiner (Ed.), *Handbook of polygraph testing*. London: Academic (1-49).

48.   Thurber, S., Snow, M., & Honts, C. R. (2002). The Zung Self-Rating Depression Scale: Convergent validity and diagnostic discrimination. *Assessment, 9,* 401-405.

## 2001

49.   Honts, C. R., & Amato, S. (2001).  Psychophysiological credibility assessment.  *Journal of Forensic Psychology Practice, 1,* 87-99.

50.   Honts, C. R., Amato, S. & Gordon, A. K.  (2001).  Effects of spontaneous countermeasures used against the comparison question test. *Polygraph, 30,* 1-9.

## 2000

51.   Honts, C. R. (2000). A brief note on the misleading and the inaccurate: A rejoinder to Matte (2000) with critical comments on Matte and Reuss (1999). *Polygraph, 29,* 321-325.

52.   Honts, C. R., (2000).  Comments on *State v. Shively*, 999 Pacific 2d, 952 (2000).  Invited commentary.  *The Forensic Panel Letter*, November, Available:  www.forensicpanel.com

53.   Honts, C. R., (2000). Comments on *State of Hawaii v. William K. Naone*, 92 Haw. 289.  Invited commentary.  *The Forensic Panel Letter Online*, May, Available: http://www.forensicpanel.com

54.   Honts, C. R., Amato, S., & Gordon, A. (2000). *Validity of outside-issue questions in the control question test: Final report on grant no. N00014-98-1-0725.* Submitted to the Office of Naval Research and the Department of Defense Polygraph Institute.  Applied Cognition Research Institute, Boise State University. DTIC# ADA376666.

55.   Honts, C. R., Raskin, D. C., Amato, S. L., Gordon, A., & Devitt, M. K. (2000). The hybrid directed lie test, the overemphasized comparison question, chimeras and other inventions: A rejoinder to Abrams (1999). <u>Polygraph</u>, <u>29</u>, 156-168.

56.   Raskin, D. C., Honts, C. R., Amato, S., & Kircher, J. C. (2000).  The scientific status of research on polygraph techniques: The case for the admissibility of the results of polygraph examinations: In D. L. Faigman, D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence: The law and science of expert testimony: Volume 1 2000 Pocket Part* (201-217).

**Charles R. Honts, Ph. D.**                                   **Curriculum Vitae**

## 1999

57.  Bell, B. G., Raskin, D. C., Honts, C. R., & Kircher, J. C. (1999).  The Utah numerical scoring system. *Polygraph, 28, 1-9.*

58.  Honts, C. R. (1999). The discussion of comparison questions between list repetitions (charts) is associated with increased test accuracy. *Polygraph, 28, 117-123.*

59.  Honts, C. R. (1999).  Flaws detected in polygraph study. *The Forensic Panel Letter*, 3(11), 1,5.

60.  Honts, C. R., & Amato, S. L. (1999).  *The automated polygraph examination: Final report.*  Final report of U. S. Government Contract No. 110224-1998-MO.  Applied Cognition Research Institute, Boise State University.

61.  Raskin, D. C., Honts, C. R., Amato, S., & Kircher, J. C. (1999).  The scientific status of research on polygraph techniques: The case for the admissibility of the results of polygraph examinations:  1999 Pocket Part to Vol. 1 of D. L. Faigman,  D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence: The law and science of expert testimony.*  (pp. 160-174).

62.  Tye, M. C., Amato, S. L., Honts, C. R., Devitt, M. K.,  & Peters, D. P. (1999).  The willingness of children to lie and the assessment of credibility in an ecologically relevant laboratory setting. *Applied Developmental Science, 3,* 92-109. doi: 10.1207/s1532480xads0302_4

## 1998

63.  Honts, C. R., & Gordon, A. (1998).  A critical analysis of Matte's analysis of the directed lie. *Polygraph, 27,* 241-252.

64.  Honts, C.R. (1998).  Louder and longer:  A review of the second edition of Lykken's *A Tremor in the Blood.  Polygraph, 27*, 302-304.

65.  Honts, C. R. (1998).  Criterion development and validity of the control question test in field application. *Polygraph*, *27*, 219-230. Reprinted from: *The Journal of General Psychology, 123,* 309-324 (1996).

## 1997

66.  Devitt, M. K., Honts, C. R., & Vondergeest, L. (1997).  Truth or just bias:  The presentation of polygraph testing in introductory psychology text books. *The Journal of Credibility Assessment and Witness Psychology, 1, 9-32.*

67.  Honts, C. R. (1997).  Truth or bias: Psychology and the polygraph.  *The National Psychologist*, *6*, 15.

68.  Honts, C. R., & Peterson, C. F. (1997). *Brief of the Committee of Concerned Social Scientists as Amicus Curiae.  United States v. Scheffer*, in the Supreme Court of the United States. Available from the author.

69.  Honts, C. R., Raskin, D. C., & Kircher, J. C. (1997).  A rejoinder to Iacono and Lykken. Chapter in, D. L. Faigman, D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence:  The law and science of expert testimony* (pp. 629-631).

70.  Horowitz, S. W., Kircher, J. C., Honts, C. R., & Raskin, D. C.  (1997).  The role of comparison questions in physiological detection of deception. *Psychophysiology, 34,* 108-115.

**Charles R. Honts, Ph. D.**                                     **Curriculum Vitae**

71.  Raskin, D. C., Honts, C. R., & Kircher, J. C. (1997). The scientific status of research on polygraph techniques: The case for polygraph tests. Chapter in, D. L. Faigman, D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence: The law and science of expert testimony* (pp. 565-582).

72.  Raskin, D. C., Honts, C. R., & Kircher, J. C. (1997). A response to professors Iacono and Lykken  Chapter in, D. L. Faigman, D. Kaye, M. J. Saks, & J. Sanders (Eds.) *Modern scientific evidence: The law and science of expert testimony* (pp. 619-627).

## **1996**

73.  Amato-Henderson, S. L., Honts, C. R., & Plaud, J. J. (1996). Effects of misinformation on the Concealed Knowledge Test. *Psychophysiology, 33*, S18. [Abstract]

74.  Honts, C. R. (1996). Criterion development and validity of the control question test in field application. *The Journal of General Psychology, 123,* 309-324.

75.  Honts, C. R., Devitt, M. K., Winbush, M., & Kircher, J. C. (1996). Mental and physical countermeasures reduce the accuracy of the concealed knowledge test. *Psychophysiology, 33,* 84-92.

## **1995**

76.  Amato Henderson, S. L., & Honts, C. R. (1995). Horizontal gaze nystagmus test: The state of the science in 1995. *North Dakota Law Review, 71*, 671-700.

77.  Honts, C. R., & Kircher, J. C. (1995). Legends of the concealed knowledge test: Lykken's distributional scoring system fails to detect countermeasures. *Psychophysiology, 32*, S41. (Abstract)

78.  Honts, C. R., Kircher, J. C., & Raskin, D. C. (1995). Polygrapher's dilemma or psychologist's chimaera: A reply to Furedy's logico-ethical considerations for psychophysiological practitioners and researchers. *International Journal of Psychophysiology, 20,* 199-207.

79.  Honts, C. R. & Quick, B. D., (1995). The polygraph in 1995: Progress in science and the law. *North Dakota Law Review, 71,* 987-1020.

80.  Kircher, J. C., Raskin, D. C., Honts, C. R., & Horowitz, S. W. (1995). Lens model analysis of decision making by field polygraph examiners. *Psychophysiology, 32*, S45. (Abstract)

## **1994**

81.  Amato, S. L., & Honts, C. R. (1994). What do psychophysiologists think about polygraph tests? A survey of the membership of SPR. *Psychophysiology*, *31*, S22. (Abstract).

82.  Burlingame, G., Kircher, J. C., & Honts, C. R. (1994). Analysis of variance versus bootstrap procedures for analyzing  dependent observations in small group research. *Journal of Small Group Research, 25,* 486-501.

83.  Honts, C. R. (1994). The psychophysiological detection of deception. *Current Directions in Psychological Science, 3,* 77-82.

84.  Honts, C. R. (1994). Assessing children's credibility: Scientific and legal issues in 1994. *North Dakota Law Review, 70,* 879-903.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

85.   Honts, C. R. (1994).  Field validity study of the Canadian Police College polygraph technique.  *Psychophysiology*, *31*, S57.  (Abstract)

86.   Honts, C. R. (1994).  Research Report:  Termination of Data Collection and Statistical Analyses.  Interim report on Science and Services Canada Contract No. M9010-1-F107/01ST, Field validity study of Canadian police college polygraph technique.  Grand Forks, North Dakota: C. Honts, Consultations.

87.   Honts, C. R. (1994).  *Final Report:  Field Validity Study of the Canadian Police College Polygraph Technique.*  Science Branch:  Supply and Services Canada Contract No. M9010-3-2219/01ST.  Grand Forks, North Dakota:  C. Honts, Consultations.

88.   Honts, C. R. (1994).  Field Validity Study of the Canadian Police College Polygraph Technique.  TR-07-94.  Ottawa, Canada:  Canadian Police Research Centre.

89.   Honts, C. R., Raskin, D. C., & Kircher, J. C. (1994).  Mental and physical countermeasures reduce the accuracy of polygraph tests.  *Journal of Applied Psychology, 79,* 252-259.

90.   Honts, C. R., Winbush, M., & Devitt, M. K. (1994).  Physical and mental countermeasures can be used to defeat guilty knowledge tests.  *Psychophysiology*, *31*, S57. (Abstract)

91.   Kircher, J. C., Raskin, D. C., Honts, C. R., & Horowitz, S. W. (1994).  Generalizability of statistical classifiers for the detection of deception.  *Psychophysiology*, *31*, S11. (Abstract)

**1993**

92.   Honts, C. R. (1993).  Heat without light:  A review of Theories And Applications In The Detection Of Deception.  Psychophysiology, 30, 317-319.

93.   Honts, C. R., & Devitt, M. D. (1993).  Credibility assessment of verbatim statements (CAVS):  Final Report of Office of Naval Research Grant No. N0014-92-J-4006.  Psychology Department, University of North Dakota, Grand Forks.

94.   Vondergeest, L., Honts, C. R., & Devitt, M. K. (1993).  Effects of juror and expert witness gender on jurors' perceptions of an expert witness.  Modern Psychological Studies, 1, 1-6.

**1992**

95.   Honts, C. R., (1992).  Counterintelligence scope polygraph (CSP) test found to be a poor discriminator.  *Forensic Reports, 5*, 215-218.

96.   Honts, C. R., (1992).  A laboratory study of the reliability and validity of statement validity assessment:  Final report of Faculty Research Committee Grant #1813-2001-2138.  University of North Dakota, Grand Forks.

97.   Honts, C. R., (1992).  Field validity study of Canadian police college polygraph technique:  Interim report on contract No. M9010-1-F107/01ST. Science and Services Canada  Grand Forks, North Dakota: C. Honts, Consultations.

98.   Honts, C. R., & Devitt, M. K. (1992).  Bootstrap decision making for polygraph examinations:  Final report of DOD/PERSEREC Grant No. N00014-92-J-1794. University of North Dakota, Grand Forks, DTIC# ADA304662.  Available: http://www.dtic.mil/dtic/tr/fulltext/u2/a255854.pdf

99.   Honts, C. R., & Devitt, M. K. (1992).  *Bootstrap decision making for polygraph examinations:  Report No. D0DPI92-R-0002.*  Department of Defense Polygraph Institute, Fort McClellan, Alabama.

Charles R. Honts, Ph. D.                                                    Curriculum Vitae

100. Honts, C. R., & Perry, M. V. (1992). Polygraph admissibility: Changes and challenges. *Law and Human Behavior, 16*, 357-379.

101. Honts, C. R., Devitt, M. K., & Amato, S L. (1992). Neural network classifiers and the detection of deception revisited: Depth of learning and overfitting. *Psychophysiology, 29*, S38. (Abstract)

102. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1992). Effectiveness of control questions answered "Yes": Dispelling a polygraph myth. *Forensic Reports, 5*, 265-272.

**1991**

103. Honts, C. R., (1991). The emperor's new clothes: Application of polygraph tests in the American workplace. *Forensic Reports, 4*, 91-116.

104. Honts, C. R. (1991). Converging evidence indicates invalidity for national security screening polygraph tests. *Psychophysiology, 28*, S30. (Abstract)

105. Honts, C. R. (1991). Field validity study of Canadian police college polygraph technique: Task 1 report on contract No. M9010-1-F107/01ST, Science and Services Canada. Grand Forks, North Dakota: C. Honts, Consultations.

106. Honts, C. R., & Devitt, M. K. (1991). Jackknife analyses of discriminant, logistic regression and back propagation neural network classifiers in a psychophysiological detection of deception problem. *Psychophysiology, 28*, S30. (Abstract)

**1990**

107. Barland, G. H., & Honts, C. R. (1990). *A laboratory study of the validity of the ZCT: An executive summary*. Department of Defense Polygraph Institute Research Report. Fort McClellan, Alabama. DTIC #: ADA339267.

108. Barland, G. H., Honts, C. R., & Barger, S. D. (1990). *The detection of deception for multiple issues: An executive summary*. Department of Defense Polygraph Institute Research Report. Fort McClellan, Alabama. DTIC #: ADA339187, available http://www.dtic.mil/dtic/tr/fulltext/u2/a339187.pdf

109. Barland, G. H., Honts, C. R., & Barger, S. D. (1990). The relative utility of skin resistance and skin conductance. Department of Defense Polygraph Institute Research Report, No. DoDPI90-R-0005, DTIC #: ADA339184.

110. Honts, C. R., & Barger, S. D. (1990). A comparison of the relative utility of skin conductance and skin resistance couplers for the measurement of electrodermal activity in the detection of deception. *Polygraph, 19*, 199-207.

111. Honts, C. R., & Barland, G. H. (1990). *A laboratory study of the validity of the MGQT: An executive summary*. Department of Defense Polygraph Institute Research Report. Fort McClellan, Alabama.

112. Honts, C. R., & Carlton, B. (1990). The effects of incentives on the detection of deception. *Psychophysiology, 27*, S39. (Abstract)

113. Honts, C. R., & Carlton, B. (1990) *The effects of incentives on the detection of deception: Report No. DoDPI90-R-0003*. Department of Defense Polygraph Institute, Fort McClellan, AL 36205, DTIC# ADA305810. Available: http://www.dtic.mil/dtic/tr/fulltext/u2/a305810.pdf

Charles R. Honts, Ph. D.                                    Curriculum Vitae

## 1989

114. Barland, G. H., Honts, C. R., & Barger, S. D. (1989).  The validity of detection of deception for multiple issues.  *Psychophysiology, 26*, S13. (Abstract)

115. Barland, G. H., Honts, C. R., & Barger, S. D. (1989).  *Studies of the Accuracy of Security Screening Polygraph Examinations*.  Department of Defense Polygraph Institute, Fort McClellan, Alabama.  DOI: 10.13140/RG.2.1.1700.8803

116. Honts, C. R., Barland G. H., & Barger, S. W. (1989).  The relative validity of criminal and screening approaches to detection of deception.  *Psychophysiology, 26*, S33.  (Abstract)

117. Honts, C. R., & Driscoll. L. N. (1989).  Validity of the positive control polygraph test:  Comments on Forman and McCauley.  *Polygraph, 18*, 158-167.

118. Honts, C. R., & Barger, S. D. (1989).   A comparison of the relative utility of skin conductance and skin resistance couplers for the measurement of electrodermal activity in the detection of deception.  Department of Defense Polygraph Institute Research Report.  Fort McClellan, Alabama.

119. Honts, C. R. (1989).  *The relative validity of two CSP question series*.  Department of Defense Polygraph Institute Research Report.  Fort McClellan, Alabama.

120. Raskin, D. C., Kircher, J. C., Horowitz, S. W., & Honts, C. R. (1989).  Recent laboratory and field research on polygraph techniques.  In J. C. Yuille (Ed.), *Credibility Assessment*.  Dordrecht,  The Netherlands: Kluwer, 1-24.

## 1988

121. Honts, C. R., & Driscoll, L. D. (1988).  A field validation study of the rank order scoring system (ROSS) in multiple issue control question tests.  *Polygraph, 17*, 1-16.

122. Honts, C. R., & Raskin, D. C. (1988). A field study of the validity of the directed lie control question.  *Journal of Police Science and Administration, 16*, 56-61.

123. Honts, C. R., Raskin, D. C., Kircher, J. C., & Hodes, R. L. (1988).  Effects of spontaneous countermeasures on the physiological detection of deception.  *Journal of Police Science and Administration, 16*, 91-94.

124. Honts, C. R., Kircher, J. C., & Raskin, D. C. (1988).  Patterns of activation and deception.  *Psychophysiology,  25*, 455.  (Abstract)

125. Horowitz, S. W., Raskin, D. C., Honts, C. R., & Kircher, J. C. (1988).  Control questions in physiological detection of deception.  *Psychophysiology, 25*, 455.  (Abstract).

126. Kircher, J. C., Raskin, D. C., Honts, C. R., & Horowitz, S. W. (1988).  Generalizability of mock crime laboratory studies of the control question polygraph technique.  *Psychophysiology, 25*, 462-463.  (Abstract)

127. Raskin, D. C., Kircher, J. C., Honts, C. R., & Horowitz, S. W. (1988).  Validity of control question polygraph tests in criminal investigations.  *Psychophysiology, 25*, 476.  (Abstract)

128. Raskin, D. C., Kircher, J. C., Honts, C. R., & Horowitz, S. W. (1988).  *A Study of the Validity of Polygraph Examinations in Criminal Investigations*.  Final Report to the National Institute of Justice,  Grant Number 85-IJ-CX-0400, Department of Psychology, Salt Lake City, University of Utah.

Charles R. Honts, Ph. D.                                                    Curriculum Vitae

## 1987

129. Driscoll, L. N., Honts, C. R., & Jones D.  (1987).  The validity of the positive control physiological detection of deception technique.  *Journal of Police Science and Administration, 15*, 46-50.

130. Honts, C. R. (1987).  Interpreting research on countermeasures and the physiological detection of deception.  *Journal of Police Science and Administration, 15*, 204-209.

131. Honts, C. R. & Driscoll, L. N. (1987).  An evaluation of the reliability and validity of rank order and standard numerical scoring of polygraph charts. *Polygraph, 16* 241-257.

132. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1987). Effects of physical countermeasures and their electromyographic detection during polygraph tests for deception.  *Journal of Psychophysiology, 1*, 241-247.

## 1986

133. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1986).  Individual differences and the physiological detection of deception.  *Psychophysiology, 23*, 442 (Abstract).

## 1985

134. Honts, C. R., Hodes, R. L., & Raskin, D. C. (1985). Effects of physical countermeasures on the physiological detection of deception.  *Journal of Applied Psychology, 70*, 177-187.

135. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1985).  Effects of socialization on the physiological detection of deception.  *Journal of Research in Personality, 19*, 373-385.

136. Raskin, D. C., Kircher, J. C., & Honts, C. R. (1985).  Computerized polygraph interpretations and detection of physical countermeasures.  In *Anti-terrorism; Forensic science; Psychology in police investigations.* Jerusalem: Heiliger, 179-189.

## 1984

137. Honts, C. R.  (1984). Countermeasures and the physiological detection of deception. *Psychophysiology, 21*, 566-567 (Abstract).

138. Honts, C. R., Raskin, D. C., Kircher, J. C., & Hodes, R. L. (1984). Effects of spontaneous countermeasures on the physiological detection of deception.  *Psychophysiology, 21*, 583 (Abstract).

139. Kircher, J. C., Raskin, D. C., & Honts, C. R.  (1984). Electrodermal habituation in the detection of deception.  *Psychophysiology, 21*, 585 (Abstract).

## 1983

140. Honts, C. R. & Hodes, R. L. (1983).  The detection of physical countermeasures.  *Polygraph, 12*, 7-17.

141. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1983). Detection of deception:  Effectiveness of physical countermeasures under high motivation conditions.  *Psychophysiology, 20*, 446-447 (Abstract).

Charles R. Honts, Ph. D.                                                Curriculum Vitae

## 1982

142. Honts, C. R. & Hodes, R. L. (1982). The effect of simple physical countermeasures on the detection of deception. *Psychophysiology, 19*, 564 (Abstract).

143. Honts, C. R. & Hodes, R. L. (1982). The effects of multiple physical countermeasures on the detection of deception. *Psychophysiology, 19*, 564-565 (Abstract).

## Grants and Research Contracts:

### Principal/Co-Principal Investigator:

*Effects of Comparison Question Type and Between Test Stimulation on the Validity of the Comparison Question Test.* Research grant originated with the Defense Academy for Credibility Assessment and issued through the Army Research Office (Awarded, 28 September 2007, closed 20 September 2009). Grant amount, $299,537.

*Credibility Assessment Research Initiative.* Three years of funding as a directed appropriation to Boise State University under Research and Development Defense-Wide (RDDW), Line #171. Appropriation amount, $3,700,000. Directed appropriations approved in 2005, 2005, 2007. The Department of Defense did not awarded as per the language of the appropriation.

*Campuses selling alcohol: Profit or problem?* Subcontract from the Pacific Institute for Research and Evaluation (PIRE) for Year 5 of National Institute of Alcohol Abuse and Alcoholism (NIAAA) Grant #5 R37 AA012972-03, CFDA # 93.273. Subcontract amount, $107,828.

*Juvenile Confessions: Stimulus Materials Collection.* Dean's Research Award. College of Social Sciences and Public Affairs, Boise State University, October 2004. Award amount, $600.

*Campuses selling alcohol: Profit or problem?* Subcontract from the Pacific Institute for Research and Evaluation (PIRE) for Year 4 of National Institute of Alcohol Abuse and Alcoholism (NIAAA) Grant #5 R37 AA012972-03, CFDA # 93.273. Subcontract amount, $149,895.

*A Cautionary note for the teaching of psychology and law: Media images may be more persuasive than data.* Faculty Teaching Award (Travel), Boise State University, March, 2004. Award Amount, $500.00.

Rocky Mountain Psychological Association Executive Committee. Dean's Service Award (Travel), College of Social Sciences and Public Affairs, Boise State University, March, 2004. Award Amount, $200.00.

*Scientific Attitudes Regarding the Science and Validity of Polygraph Testing.* Faculty Research Award (Travel), Boise State University, September 2001. Award amount $500.00.

*Truth or just bias: The strange mix of psychology, law and the detection of deception.* Faculty Research Award (Travel), Boise State University, April 2001. Award amount $500.00.

**Charles R. Honts, Ph. D.**                                             **Curriculum Vitae**

*Outside issues dramatically reduce the accuracy of polygraph tests given to innocent individuals.* Faculty Research Award (Travel) Boise State University, September 1999.  Award amount $400.00.

*Human v. machine:  Research examining the automation of polygraph testing.* Faculty Research Award (Travel), Boise State University, March 1999.  Award amount $400.00.

*Survey of Professional Knowledge and Opinions Regarding Polygraph Testing.*  Co-principal investigator Susan Amato.  Faculty Research Award, Boise State University, November 1998.  Award amount $500.00.

*Survey of Professional Knowledge and Opinions Regarding Polygraph Testing.* Co-principal investigator Susan Amato.   Undergraduate Research Initiative Award, Boise State University, November 1998.  Award amount $500.00.

*The Polygraph after Daubert.* Faculty Research Award (Travel), Boise State University, March 1998.  Award amount $400.00.

*Validity of Outside-Issue Questions in the Control Question Test (DoDPI97-P-0012).*  Co-principal investigator, Susan Amato.  Research grant originated with the Department of Defense Polygraph Institute, issued through the Office of Naval Research, 9 March 1998.  Award amount $129,042.50.

*The Automated Polygraph Examination (APE).*  Co-principal investigator, Susan Amato.  Research Contract with the United States Federal Government.  Start date: 11 December 97.  Contract Amount, $132,000.00.

Theory Development and Psychophysiological Credibility Assessment:  An Application of Structural Equation Modeling to Increase Basic Understanding of a Technique Already in Use in the Field.  Research Associate award from Boise State University.  Awarded 1 June 1996.  Award amount, $3,900.00.

*Assessing the Credibility of the Child Witness.*  Travel award from the Faculty Research Committee of the University of North Dakota to support paper presentations at the Society for Research in Child Development meetings.  Awarded, 13 February 1995, Award amount $383.00.

*Research on the Creation of False Memory and the Misinformation Effect.*  Grant No. 4394-0403 from ND EPSCoR, the National Science Foundation's Experimental Program to Stimulate Competitive Research, April 1994.  Grant Amount, $1500.

*Quantitative Techniques in the Psychophysiological Detection of Deception.*  Summer 1993 Research Professorship awarded by the Graduate School of the University of North Dakota, February 1993.  Stipend amount, $5,400.

*Credibility Assessment of Verbatim Statements (CAVS).*  Grant No. N00014-92-J-4006 from PERSEREC through the Office of Naval Research.  Awarded 1 September 1992.  Grant Amount $19,959.

*Bootstrap Computer Decision Making for Polygraph Examinations.*  Grant No. N00014-92-J-1794 from PERSEREC through the Office of Naval Research.  Awarded 1 April 1992.  Grant amount: $19,994.

**Charles R. Honts, Ph. D.**                                        **Curriculum Vitae**

*A Laboratory Study of the Validity of the Reliability and Validity of Statement Validity Assessment.* Research award from the Faculty Research Committee of the University of North Dakota. Awarded 28 October 1991.  Award amount $500.00.

*The Hired Gun Cross Examination Tactic Reduced Mock Jurors' Perception of Expert Witness' Credibility.*  Travel award from the Faculty Research Committee of the University of North Dakota to support paper presentation.  Awarded 28 October 1991, Award amount $398.00

*Field Validity Study of Canadian Police College Polygraph Technique, Contract No. M9010-1-F107/01-ST.*  Science Branch, Supply and Services Canada.  Awarded 18 September 1991.   Contract Amount, Phase I,  $25,400.

*Psychophysiology Laboratory Start-Up Award.*  Award No. 2015-1806-2001.  Office of Research and Program Development and the College of Arts and Sciences, University of North Dakota. Awarded August 1990.  Award amount $12,000.


**Research Associate:**


*A Study of the Validity of Polygraph Examinations in Criminal Investigations.*  Grant Number 85-IJ-CX-0400,  National Institute of Justice.  David C. Raskin, Principal Investigator.  Grant amount $60,000

Charles R. Honts, Ph. D.                                                      Curriculum Vitae

## Scientific Paper Presentations and Invited Addresses and Lectures

### 2016

1.   Honts, C. R., Reavy, R. (2016). *The Construct Validity of the Comparison Question Test for Physiological Deception Detection.* Paper submitted for consideration of presentation.

### 2015

2.   Honts, C. R. (2015, March). *Credibility assessment and false confessions: The latest from psychological science.* Invited lecture given at The American Inns of Court CXXX, Boise, Idaho.   http://home.innsofcourt.org

3.   Honts, C. R. (2015, April). *Psychological science and actual innocence: Roles, responsibilities and policy making.* Convention Kickoff Plenary and Past-President's Address given at the annual meeting of the Rocky Mountain Psychological Association, Boise, Idaho.

4.   Honts, C. R. (2015, May). *The vasomotor response: New research.* Invited lecture given at the annual meeting of New Jersey Polygraphists, Inc., Atlantic City, New Jersey.

5.   Honts, C. R. (2015, May). *The computer analysis of polygraph data.* Invited lecture given at the annual meeting of New Jersey Polygraphists, Inc., Atlantic City, New Jersey.

6.   Honts, C. R. (2015, May). *Base rates and information gain.* Invited lecture given at the annual meeting of New Jersey Polygraphists, Inc., Atlantic City, New Jersey.

7.   Honts, C. R. (2015, May). *Interrogations, interviews, false confessions and actual innocence: New approaches from psychological science.* Invited address given at the annual meeting of New Jersey Polygraphists, Inc., Atlantic City, New Jersey.

8.   Honts, C. R. (2015, September). *The Wizard's 1st Rule is alive and well in the polygraph profession!* Invited lecture given a the annual meeting of the American Polygraph Association, Chicago, Illinois.

9.   Honts, C. R. (2015, September). *The vasomotor response: Old and new research.* Invited lecture given a the annual meeting of the American Polygraph Association, Chicago, Illinois.

10.  Honts, C. R. (2015, November) Interviews, interrogations, and confessions: Scientifically valid and invalid approaches. Invited guest lecture at the Academy of Polygraph Science basic polygraph examiners' course. Boise, Idaho

11.  Honts, C. R., & Schweinle, W. (2015, September). *Statistical assessment & decision making with polygraph data.* Invited lecture given a the annual meeting of the American Polygraph Association, Chicago, Illinois.

12.  Honts, C. R., & Schweinle, W. (2015, September). *Base rates and information gain.* Invited lecture given a the annual meeting of the American Polygraph Association, Chicago, Illinois.

### 2014

13.  Bertulis, K. M., Yasuhara, K., & Honts, C. (2014, September) *False confession identification accuracy in groups of college students.* Poster presented at the annual Summer Undergraduate Research Fellowship Research Day, West Haven, CT.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

14.   Duren, G., Connor, J., Skogsberg, K., & Honts, C. R. (2014, May).  *Concussions and college students: What do they know?* Paper presented at the 2014 annual meeting of the Midwestern Psychological Association in Chicago, Illinois.

15.   Honts, C. R. (2014, May).  *Computer analysis of polygraph data.*  Invited lecture given at the American Association of Police Polygraphists, Annual Seminar, Las Vegas, Nevada.

16.   Honts, C. R. (2014, May).  *Base rates and information gain.*  Invited lecture given at the American Association of Police Polygraphists, Annual Seminar, Las Vegas, Nevada.

17.   Honts, C. R. (2014, May).  *Tactical polygraph: The Wizard's 1st rule lives!.*  Invited lecture given at the American Association of Police Polygraphists, Annual Seminar, Las Vegas, Nevada.

18.   Honts, C. R. (2014, November).  Interviews, interrogations, and confessions: Scientifically valid and invalid approaches (Entrevistas, Interrogaciones y Confesión:  Approximations Científicamente Validadas e Inválidas). Invited address given at the annual meeting of the Asociación Latinoamericana de Poligrafistas, Cancún, Mexico.

19.   Honts, C. R. (2014, November).  *Polygraph: The good, the bad, and the ugly.*  Invited colloquium, Department of Psychology, University of North Dakota, Grand Forks.

20.   Honts, C. R. & Goodson, A. (2014, March). *Public knowledge of and support for compensating the wrongfully convicted.*  Paper presented at the 2014 annual meeting of the American Psychology Law Society meeting in New Orleans, Louisiana.

21.   Honts, C. R., & Hartwig, M. (2014, November). *Credibility assessment at portals (EVALUACIÓN DE CREDIBILIDAD EN PortalEs).* Invited address to be given at the annual meeting of the Asociación Latinoamericana de Poligrafistas, Cancún, Mexico.

22.   Woody, W. D., Honts, C. R., Forrest, K. D., Provenza, K. R., Best, R. B., Williams, B. J., Woods, L., & Grogan, C. (2014, April).  *Jurors' perceptions and decisions related to polygraph examinations during police interrogation.*  Paper presented at the Rocky Mountain Psychological Association, Salt Lake City, Utah.

## 2013

17.   Honts, C. R. (2013, March). *Current FBI polygraph/interrogation practices put the actually innocent at risk of false confession.* Paper presented at the 2013 annual meeting of the American Psychology-Law Society, Portland, Oregon.

18.   Honts, C. R. (2013, May). *Deception and deception detection.*  Invited address at the Osher Lifelong Learning Institute.  Boise ID.

19.   Honts, C. R. (2013, May). *Liars liars everywhere, and an apathetic psychology does not seem to care.*  Invited address given as the National Psi Chi Distinguished Speaker at the 25th Association for Psychological Science Annual Convention in Washington, D.C.

## 2012

20.   Honts, C. R. (2012, February). *Interrogation, false confessions & actual innocence,* invited address at the College of Social Sciences and Public Affairs Speaker Series, Boise State University, Boise, Idaho.

21.   Honts, C. R. (2012, July). *The Utah approach to polygraph testing: A scientifically validated approach.* Invited address given at the XII Seminario Internacional de Entrenamiento Avanzado en Poligrafia, Mexico City, Mexico.

**Charles R. Honts, Ph. D.**                                                      **Curriculum Vitae**

22.   Honts, C. R. (2012, July). *Interviews, interrogations and confession: Scientifically valid and invalid approaches.* Invited address given at the XII Seminario Internacional de Entrenamiento Avanzado en Poligrafia, Mexico City, Mexico.

23.   Honts, C. R., Craig, R. A., & Kassin, S. (March, 2012). *Medium of presentation and the assessment of juvenile false confessions.* Paper presented at the annual meeting of the American Psychology-Law Society, San Juan, Puerto Rico.

24.   Marchak, F. M., Keil, T. L., McBride, S., & Honts, C. R. (March, 2012). *Ocular and physiological assessment of eyewitness identification.* Paper presented at the annual meeting of the American Psychology - Law Society, San Juan, Puerto Rico.

## 2011

25.   Honts, C. R. (2011, August). *Interrogations, false confessions, and the polygraph: Issues and concerns from psychological science.* Invited address at the annual meeting of the Canadian Association of Police Polygraphists, Ottawa, Ontario, Canada.

26.   Honts, C. R. (2011, November). *Actual innocence and the paradox of false confessions.* Invited address at the Osher Lifelong Learning Institute. Boise ID.

27.   Honts, C. R., & Handler, M. (2011, April). *Interrogations, false confessions and the polygraph: Issues and concerns from psychological science.* Invited workshop (half day) at the American Association of Police Polygraphists annual meeting, Boston, MA.

## 2010

28.   Honts, C. R. (2010, January). *Interrogations, Confessions, Psychology and Law.* Invited address at the Federal Defenders' 3rd Thursday meeting, Boise, Idaho.

29.   Honts, C. R. (2010, August). *The Utah Approach to the Comparison Question Test.* Invited address a the annual meeting of the Canadian Association of Police Polygraphists, Ottawa, Ontario, Canada.

30.   Honts, C. R. (2010, August). *Countermeasures in 2010: What We Know and What We Don't Know.* Invited address at the annual meeting of the Canadian Association of Police Polygraphists, Ottawa, Ontario, Canada.

31.   Honts, C. R. (2010, October). *Countermeasures; What We Know and What We Don't Know.* Invited address at the World Congress of Forensic Sciences and Polygraph (Congreso Mundial de Ciencias Forenses y Poligrafia) Cartagena, Columbia.

32.   Honts, C. R. (2010, October). *Interrogations, False Confessions and the Polygraph: Issues and Concerns From Psychological Science.* Invited address at the World Congress of Forensic Sciences and Polygraph (Congreso Mundial de Ciencias Forenses y Poligrafia) Cartagena, Columbia.

33.   Honts, C. R., & Crawford, M. (2010, March). *Polygraph countermeasures cannot be detected from respiratory signatures: Government policy puts the innocent at risk.* Paper presented at the 2010 meeting of the American Psychology Law Society, Vancouver, British Columbia, Canada.

34.   Honts, C. R., & Hartwig, M. (2010, March). *Nine years After 9-11, why so little progress on assessing credibility at portals?* Paper presented at the 2010 meeting of the American Psychology Law Society, Vancouver, British Columbia, Canada.

Charles R. Honts, Ph. D.                                                    Curriculum Vitae

## 2009

35.  Honts, C. R. (2009, January). *Research on Countermeasures and the Utah Polygraph Technique*. Invited address at the annual meeting of the National Polygraph Association, Las Vegas, Nevada.

36.  Honts, C. R. (2009, August). *Countermeasures in 2009: What We Know and What We Don't Know.*  Invited address at the annual meeting of the American Polygraph Association, Nashville, Tennessee.

37.  Honts, C. R. (2009, August). *A Scientific Perspective of the Comparison Question Test.*  Invited address at the annual meeting of the American Polygraph Association, Nashville, Tennessee.

38.  Honts, C. R. (2009, August). *The Scientific Community's View of Interrogations, Confessions, False Confessions, and Actual Innocence.*  Invited address at the annual meeting of the American Polygraph Association, Nashville, Tennessee.

39.  Honts, C. R. (2009, September). *Psychophysiological Detection of Deception: A Scientific Perspective in 2009*. Invited address at the annual meeting of New Jersey Polygraphists.

40.  Honts, C. R. (2009, September). *A Scientific Perspective of the Comparison Question Test.* Invited address at the annual meeting of the New Jersey Polygraphists, Atlantic City, New Jersey.

41.  Honts, C. R. (2009, September). *The Utah Scoring System.*  Invited address at the annual meeting of the New Jersey Polygraphists.

42.  Honts, C. R. (2009, September). *Countermeasures in 2009: What We Know and What We Don't Know*. Invited address at the annual meeting of the New Jersey Polygraphists, Atlantic City, New Jersey.

43.  Honts, C. R., Kassin, S., Forrest, K. D. (2009, March). *Polygraph Examiners Unable to Discriminate True and False Juvenile Confessions: Reid Training Detrimental.*  Paper presented at the 2009 meeting of the American Psychology Law Society, San Antonio, Texas.

44.  Honts, C. R., & Raskin, D. C. (2009, November). *Countermeasures in 2009: What We Know and What We Don't Know.*  Invited address at Asociacion Colombiana de Poligrafistas, Bogota, Colombia.

45.  Honts, C. R., Reavy, R., Markowski, K., McBride, S., Pitman, J., & Pitman, F. (2009, March). *Variations in Comparison Question Test Methods Have Little Impact*. Paper presented at the 2009 meeting of the American Psychology Law Society, San Antonio, Texas.

**46.**  Raskin, D. C., Kircher, J. C., & Honts, C. R. (2009, November).  *Utah Zone Technique*. Invited address at Asociacion Colombiana de Poligrafistas, Bogota, Colombia.

## 2008

47.  Honts, C. R. (2008, March). The polygraph:  Misrepresented, misunderstood, and misused. Invited address Psychology and Law Lecture Series at The Marian Miner Cook Athenaeum, Claremont McKenna College, Claremont, California.

48.  Honts, C. R., Pittman, F. A., Pittman, J. V., McBride, S. T., Anderson, A. B., & Christiansen, A. K., (2008, May). A New Paradigm for the Study of Deception Detection at Portals.  Paper presented at the Association for Psychological Science annual meeting in Chicago, Illinois.

**Charles R. Honts, Ph. D.**                                                    **Curriculum Vitae**

## 2007

49.  Christiansen, A., & Honts, C. R. (2007, March). The Incomprehensibility of judicial instructions and subsequent jury decisions. Paper presented at Off the Witness Stand: Using Psychology in the Practice of Justice, John Jay College of Criminal Justice, New York.

50.  Christiansen A. K., Honts, C. R., & Oldemeyer, L. (2007, May). *Relationship Between Aggressive Authoritarianism And Juror Bias In Capital Trials*, paper presented at the Western Psychological Association, Vancouver, British Columbia, Canada.

51.  Forrest, K. D., Simonsen, S., & Honts, C. R. (2007, September). A comparison of maximization and minimization in the cheating paradigm. Paper presented at Interrogations & Confessions: A Conference Exploring Current Research, Practice, and Policy, The University of Texas at El Paso, Texas.

52.  Honts, C. R. (2007, March). Munsterberg's polygraph in 2007: The emergence of the polygraph as an effective tool in criminal justice and national security. Paper presented at Off the Witness Stand: Using Psychology in the Practice of Justice, John Jay College of Criminal Justice, New York.

53.  Honts, C. R. (2007, May). *Assessing Credibility at Portals*. Invited address given at the *Credibility Assessment Research Summit (CARS)* held by the Counterintelligence Field Activity (CIFA), Combating Terrorism Technology Support Office (CTTSO), and the Defense Academy for Credibility Assessment (DACA). Vienna, Virginia.

54.  Honts, C. R. & Kassin, S. M. (2007, March). False confessions by juvenile offenders found more believable than the truth. Paper presented at Off the Witness Stand: Using Psychology in the Practice of Justice, John Jay College of Criminal Justice, New York.

55.  Honts, C. R. & Kassin, S. M. (2007, September). False confessions by juvenile offenders as believable as true confessions. Paper presented at *Interrogations & Confessions: A Conference Exploring Current Research, Practice, and Policy*, The University of Texas at El Paso, Texas.

## 2006

56.  Forrey, S. A. & Honts, C. R. (2006, April). *Individual views of felons returning to the community.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

57.  Honts, C. R. (2006, March). *The science of false confessions.* Invited address presented at: *Life in the Balance 2006: Defending Death Penalty Cases.* National Legal Aid & Defender Association, Philadelphia, Pennsylvania.

58.  Honts, C. R. (2006, March). *The polygraph in 2006: Basic issues and novel uses.* Invited address presented at: *Life in the Balance 2006: Defending Death Penalty Cases.* National Legal Aid & Defender Association, Philadelphia, Pennsylvania.

59.  Honts, C. R. (2006, March). *Polygraph in the American courts: Current status, novel uses, and future prospects.* Invited address presented at the European Expert Meeting on Polygraph Testing: Practical Session, Maastrich, The Netherlands.

60.  Honts, C. R. (2006, March). *The science of psychophysiological deception detection: An analysis from an applied scientific perspective.* Invited address presented at the European Expert Meeting on Polygraph Testing: Research Session, Maastrich, The Netherlands.

Charles R. Honts, Ph. D.                                                    **Curriculum Vitae**

61. Honts, C. R. (2006, April). *Contemporary research on the comparison question test.* Invited address given at the Unit for Criminal, Legal and Investigative Psychology, Göteborgs Universitet, Göteborg, Sweden.

62. Honts, C. R. (2006, April). *Deception and deception detection: The unwanted psychology.* Presidential address delivered at the annual meeting of the Rocky Mountain Psychological Association, The Canyons, Utah.

63. Honts, C. R. (2006, October). *The psychophysiological detection of deception: The state of the science in 2006.* Invited address given at the University of Nebraska at Kearney.

64. Honts, C. R., Huck, B., & Sanders, S. (2006, April). Certainly, I would know a false confession by a juvenile if I saw one? Paper presented in the Presidential symposium: Contemporary deception and deception detection research in the Rocky Mountain Region, at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

65. Turnblom, K.A. & Honts, C. R. (2006, April). *Mortality Salience and attitudes toward the death penalty.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

66. Turnblom, K. A., & Honts, Charles, C. R. (2006, April). *Indications of truthfulness resulting from race perceptions.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

## 2005

67. Forrest, K., Ewton, S., & Honts, C. R., (2005, March). *"I confess …I hit the 'ALT' key:" Could the "ALT" key be misleading special knowledge?* Paper presented at the American Psychology-Law Conference in La Jolla, California, USA.

68. Honts, C. R. (2005, March). *Information gain for the psychophysiological detection of deception.* Paper presented at the American Psychology-Law Conference in La Jolla, California, USA.

69. Honts, C. R. (2005, May). *Polygraph countermeasures.* Invited lecture at 第二届全国心 理测试高级培训班（中国洛阳）Second Chinese National Seminar on Polygraph. Luoyang, China.

70. Honts, C. R. (2005, November). The psychology of false confessions. Invited address at the Atlantic Canadian Conference: Understanding Wrongful Convictions, sponsored by Saint John Police Force and Office of the Attorney General of New Brunswick. Saint John, New Brunswick, Canada. http://www.uwcsaintjohn.ca/index.html

71. Honts, C. R., & Raskin, D. C. (2005, May). *The directed lie comparison question.* Invited lectures at 第二届全国心理测试高级培训班（中国洛阳）Second Chinese National Seminar on Polygraph. Luoyang, China.

72. Honts, C. R., & Raskin, D. C. (2005, May). *The polygraph in employment and national security.* Invited lectures at 第二届全国心理测试高级培训班（中国洛阳）Second Chinese National Seminar on Polygraph. Luoyang, China.

73. Honts, C. R. (2005, September). *Deception and deception detection.* Invited address at the Fraud and Identity Theft Conference, Boise State University, Boise, Idaho.

74. Honts, C. R., & Turnblom, K. A., (2005, August). *Eyewitness identification more difficult under low illumination: Live event experiment.* Paper presented at the annual meetings of the American Psychological Association, Washington DC.

**Charles R. Honts, Ph. D.**                                   **Curriculum Vitae**

75. Raskin, D. C., & Honts, C. R. (2005, May). *Polygraph techniques.* Invited lectures at 第二届全国心理测试高级培训班（中国洛阳）Second Chinese National Seminar on Polygraph. Luoyang, China.

76. Raskin, D. C., & Honts, C. R. (2005, May). *Polygraph numerical scoring system.* Invited lectures at 第二届全国心理测试高级培训班（中国洛阳）Second Chinese National Seminar on Polygraph. Luoyang, China.

77. Raskin, D. C., & Honts, C. R. (2005, July). *Using the polygraph in employment and national security.* Paper presented at: Workshop on the Use of Autonomic and Somatic Measures for Security Evaluations, John C. Kircher, Chair, National Science Foundation and Office of Science and Technology Effort to Propose an Agenda for Research on Security Evaluations. National Science Foundation, Arlington, Virginia.

78. Turnblom, K., & Honts, C. R. (2005, March). *The accuracy of eyewitness identification under differing illumination condition.* Paper presented at the American Psychology-Law Conference in La Jolla, California USA.

79. Turnblom K., & Honts, C. R. (2005, April). *The accuracy of eyewitness identification in sequential lineups and varied illumination.* Paper presented at the Rocky Mountain Psychological Association meeting in Phoenix, Arizona.

80. Turnblom K., & Honts, C. R. (2005, April). *Intrinsic Vs. Extrinsic Religiosity And Feelings Of Regret About Sexual Behavior.* Paper presented at the Rocky Mountain Psychological Association meeting in Phoenix, Arizona.

## **2004**

81. Anders, S., Forrest, K. D., & Honts, C. R., (March, 2004). Uncommon knowledge: getting judges past what they think they know and gaining acceptance for expert testimony in social science disciplines. Paper presented at the biennial meeting of the American Psychology-Law Society, Scottsdale, Arizona.

82. Forrest, K. D., Honts, C. R., & Anders, S. (March, 2004). *Laypersons' predictions of research findings sometimes fail to demonstrate common knowledge.* Paper presented at the biennial meeting of the American Psychology-Law Society, Scottsdale, Arizona.

83. Hill, B., Honts, C., Lutsky, N., & Lodge, G. (2004, April). *Perspectives on teaching: The young, old, & the aged.* STP/CTUP Conversation Hour, R. Miller, Moderator, Rocky Mountain Psychological Association, Reno, Nevada.

84. Honts, C. R. (2004, March). *The polygraph in 2004: How to tell the good from the bad in both science and practice.* Invited address presented at Life in the Balance 2004: Defending Death Penalty Cases. National Legal Aid & Defender Association, Memphis, Tennessee.

85. Honts, C. R., & Forrest, K. D., (2004, April). *A cautionary note for the teaching of psychology and law: Media images may be more persuasive than data.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Reno, Nevada.

86. Honts, C. R., & Raskin, D. C. (March, 2004). *Polygraph critics advocate convicting the innocent.* Paper presented at the biennial meeting of the American Psychology-Law Society, Scottsdale, Arizona.

Charles R. Honts, Ph. D.                                                                    Curriculum Vitae

## 2003

87.   Bell, V., Booras, A., Hunsaker, C., Mower, K., Villamarin, V., Wilson, S., Forrest, K., & Honts C. R. (2003, April). *Women give fewer false confessions than men in a laboratory study*. Paper presented at the Rocky Mountain Psychological Association Meeting, Denver Co.

88.   Forrest, K. D., Wilson, S. L., & Honts, C. R. (2003, July). *Think about what you have done in the past:  Does rumination elicit false confessions?* Paper presented at the Second International Interdisciplinary Conference on Psychology and Law, Edinburgh, Scotland.

89.   Honts, C. R. (2003, March).  *The psychophysiological detection of deception: The state of the science in 2003.*  Invited address given at:  Rättspsykologiskt symposium:  Hur avslöjas en lögnare? (Deception Detection in Forensic Contexts.) Sponsored by the Unit for Criminal, Legal and Investigative Psychology, Göteborgs Universitet, Göteborg, Sweden.

90.   Honts, C. R. (2003, October). Participant perceptions support the rationale of the comparison question test for the psychophysiological detection of deception.  Paper presented at the annual meeting of the Society for Psychophysiological Research, Chicago, Illinois.

91.   Skogsberg, K., & Honts, C. R., & Wolfe, G. (2003, April).  *Case studies of EEG biofeedback training using a measurement of affect*. Paper presented at the Rocky Mountain Psychological Association Meeting, Denver, Colorado

## 2002

92.   Alloway, W. R., & Honts, C. R. (2002, April). *An information countermeasure has no effect on the validity of the Test for Espionage and Sabotage (TES)*. Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

93.   Honts, C. R. (2002, April).  *A higher education application of Áronson's Jigsaw Technique.* Invited lecture sponsored by the APA Higher Education Directorate & the Society for the Teaching of Psychology at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

94.   Honts, C. R. (2002, September). *Countermeasures, can we detect them, the scientific research, and can we neutralize them.*  Invited address at the Midwest Polygraph Training Seminar. Sponsored by the National Polygraph Association, Kansas Polygraph Association, Missouri Polygraph Association and the Nebraska Polygraph Association, Overland Park, Kansas.

95.   Honts, C. R. (2002, September). *The directed lie technique.*  Invited address at the Midwest Polygraph Training Seminar.  Sponsored by the National Polygraph Association, Kansas Polygraph Association, Missouri Polygraph Association and the Nebraska Polygraph Association, Overland Park, Kansas.

96.   Honts, C. R., Thurber, S., Cvencek, D., & Alloway, W. (2002, March). *General acceptance of the polygraph by the scientific community: Two surveys of professional attitudes*. Paper presented at the American Psychology-Law Society biennial meeting, Austin, Texas.

97.   Villamarin, V. A., Honts, C. R. (2002, April). *A comparison of three methods of scoring comparison question polygraph tests*.  Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Park City, Utah.

**Charles R. Honts, Ph. D.**                                                    **Curriculum Vitae**

<u>**2001**</u>

98.  Cvencek, D., Honts, C. R., Kruger-Warn, E., Alloway, W., Hunsaker, C., & Nudson, O. N. (2001, April).  *Psycho-legal scholars report positive attitudes towards polygraph validity*. Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Reno, Nevada.

99.  Honts, C. R. (2001, April).  *Truth or just bias: The strange mix of psychology, law and the detection of deception.*  RMPA Invited Lecture, presented at the annual meeting of the Rocky Mountain Psychological Association, Reno, Nevada.

100. Honts, C. R. (2001, April). *Truth or bias: Psychology and the polygraph.*  Invited address, distinguished lectures in Psychology, The University of Nebraska, Kearney.

101. Honts, C. R. (2001, April). *Child Witness: Credibility and Assessment.*  Invited address, distinguished lectures in Psychology, The University of Nebraska, Kearney.

102. Honts, C. R. (2001, April).  *Documenting your credentials when applying for graduate school and for academic employment.* In S. Amato, C. R. Honts, & J. Purdy: Where's the beef? Obtaining and demonstrating skills essential for employment and graduate school,  a symposium presented at the annual meeting of the Rocky Mountain Psychological Association, Reno, Nevada.

103. Honts, C. R. (2001, April).  *Undergraduate involvement in an active detection of deception laboratory.*  In A. Webb:  Undergraduate teaching and research:  Roles are constrained only by imagination, Society for the Teaching of Psychology (Div 2) Invited symposium presented at the annual meeting of the Rocky Mountain Psychological Association, Reno, Nevada.

104. Honts, C. R. (2001, July).  *Validity of the polygraph when used for national security screening.*  Invited presentation before the National Academy of Sciences National Research Council Division on Behavioral and Social Sciences and Education, Committee to Review the Scientific Evidence on the Polygraph.  Woods Hole, Massachusetts.

<u>**2000**</u>

105. Amato, S. L., Dillinger, R. J., & Honts, C. R. (2000, March).  *Psychophysiological detection of deception exams in the treatment of sex offenders.* Paper presented at the American Psychology-Law Society biennial meeting, New Orleans, Louisiana.

106. Hanson, G., Kruger-Warn, E. R., Honts, C. R.,  & Thurber, S. (2000, May).  *Approaches to the analysis of 2 X 3 contingency tables in detection of deception research:  A Monte Carlo analysis.*  Paper given at the annual meeting of the Idaho Psychological Association, Boise, Idaho.

107. Honts, C. R., Amato, S., & Gordon, A. (2000, March). *Outside issues dramatically reduce the accuracy of polygraph tests given to innocent individuals.*  Paper presented at the American Psychology-Law Society biennial meeting, New Orleans, Louisiana.

108. Kruger-Warn, E. R., Hanson, G., Honts, C. R.,  & Thurber, S. (2000, May).  *Approaches to the analysis of 2 X 3 contingency tables in detection of deception research:  A power analysis for a small effect.*  Paper given at the annual meeting of the Idaho Psychological Association, Boise, Idaho.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

## 1999

109. Amato, S. L., & Honts, C. R. (1999, May). *Automated polygraph examination outperforms human in employment screening context.* Paper presented at the annual meeting of the Midwestern Psychological Association, Chicago, Illinois.

110. Amato, S. L., & Honts, C. R. (1999, July). *Polygraph testing in the American courts: A mismatch between science and the law.* Paper presented at the International Psychology Law Conference, Dublin, Ireland.

111. Honts, C. R. (1999, August). *Polygraph algorithms: What are they? and Do they work?* Invited address at the annual meeting of the American Polygraph Association, Dallas, Texas.

112. Honts, C. R., & Amato, S. (1999, April). *Human v. machine: Research examining the automation of polygraph testing.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Fort Collins Colorado.

113. Otter, K. D., Amato, S., & Honts, C. R. (1999, April). *Spontaneous countermeasures during polygraph examinations: An apparent exercise in futility.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Fort Collins Colorado.

## 1998

114. Amato, S. L. & Honts, C. R. (1998, March). *The impairing effects of misinformation: Challenging the permanence of memory.* Paper presented at the American Psychology-Law Biennial Conference, Redondo Beach, California.

115. Devitt, M. K., Honts, C. R., & Letterman, M. R. (1998, March). *Regional differences effect mock juror decisions and trial outcome in cases involving sexual abuse allegations.* Paper presented at the American Psychology-Law Biennial Conference, Redondo Beach, California.

116. Honts, C. R. (1998, April). *Psychological science in the courtroom: Five years after Daubert.* Symposium presented (and chaired) at the joint meeting of the Western Psychological Association and the Rocky Mountain Psychological Association, Albuquerque, New Mexico.

117. Honts, C. R. (1998, April). *The polygraph after Daubert.* Paper presented at the joint meeting of the Western Psychological Association and the Rocky Mountain Psychological Association, Albuquerque, New Mexico.

## 1997

118. Amato, S. L., & Honts, C. R. (1997, May). *Understanding misinformation's effect on memory through a concealed knowledge test paradigm.* Paper presented at the annual meeting of the American Psychological Society, Washington, DC.

119. Honts, C. R. (1997, May). *Is it time to reject the friendly polygraph examiner hypothesis (FEPH)?* Paper presented at the annual meeting of the American Psychological Society, Washington, D.C.

120. Nowell, B., Lamet, J. Amato, S. L., & Honts, C. R. (1997, April). *Child abuse vs. normal interactions: A review of the literature.* Paper presented the annual meeting of the Rocky Mountain Psychological Association, Reno, Nevada.

**Charles R. Honts, Ph. D.**                                         **Curriculum Vitae**

121. Orner, V. L., Devitt, M. K., Honts, C. R., & Donaldson, J. S. (1997, March). *Regional attitude differences toward repressed and nonrepressed memories.* Paper presented at the Oklahoma Psychological Association and Oklahoma Psychological Society 15th Annual Spring Conference to Encourage and Develop Psychological Research, Edmond, OK.

122. Orner, V. L., Devitt, M. K., & Honts, C. R. (May, 1997). *Regional differences in attitudes toward repressed and nonrepressed memories.* Paper presented at the annual meeting of the Southwestern Psychological Association, Fort Worth, Texas.

**1996**

123. Amato-Henderson, S. L., Honts, C. R., & Plaud, J. J. (October, 1996). *Effects of misinformation on the concealed knowledge test.* Paper presented at the annual meeting of the Society for Psychophysiological Research, Vancouver, British Columbia, Canada.

124. Devitt, M. K., Honts, C. R., & Loftus, E. F. (April, 1996). *The effects of misinformation on memory for complete events.* Paper presented at the 1996 Southwestern Psychological Association Annual Conference, Houston, Texas.

125. Devitt, M. K., Honts, C. R., & Timm, T. M. (April, 1996). *Sleeping memories revisited: Mock jurors' attitudes regarding repressed memories.* Paper presented at the 1996 Southwestern Psychological Association Annual Conference, Houston, Texas.

126. Devitt, M. K., Loftus, E. F. & Honts, C. R. (November, 1996) *'Memory for fictitious events.* Paper presented at the 37th Annual Meeting of the Psychonomic Society, Inc, Chicago, IL.

127. Honts, C. R. (April, 1996). *Science and the child witness: Credibility and its assessment.* Invited address given at the Idaho Psychological Association meetings in Sun Valley, Idaho.

128. Tye, M. J. C., & Honts, C. R. (August, 1996). Evaluating children's testimonies with training in criteria based content analysis. Paper presented at the meetings of the American Psychological Association, Toronto, Ontario, Canada.

**1995**

129. Gillund, B., Ferraro, F. R., Petros, T., & Honts, C. R. (June, 1995). *Time course of word recognition resource allocation between good and poor readers.* Paper presented at the annual meetings of the American Psychological Society, New York City.

130. Honts, C. R. (January, 1995). *Credibility assessment with children.* Paper presented at CRIMECON: The International INTERNET Conference on Crime and Criminal Justice.

131. Honts, C. R. (October, 1995). The Raskin legacy: Psychophysiology, psychology, and the law. Paper given in C. R. Honts and S. W. Porges, The Raskin legacy: From Pavlov to the law: A preconference symposium honoring David C. Raskin. Special Event at the annual meetings of the Society for Psychophysiological Research, Toronto, Canada.

132. Honts, C. R., Devitt, M. K., Tye, M. J. C., Peters, D. P., & Vondergeest, L. (April, 1995). *credibility assessment with children.* Paper presented at the Society for Research in Child Development meetings in Indianapolis, Indiana.

133. Honts, C. R., & Kircher, J. C. (October, 1995). *Legends of the concealed knowledge test: Lykken's distributional scoring system fails to detect countermeasures.* Paper presented at the meetings of the Society for Psychophysiological Research, Toronto, Canada.

134. Kircher, J. C., Raskin, D. C., Honts, C. R., & Horowitz, S. W. (October, 1995).  *Lens model analysis of decision-making by field polygraph examiners*.  Paper presented at the meetings of the Society for Psychophysiological Research, Toronto, Canada.

135. Tye, M. J. C., & Honts, C. R. (April, 1995).  *Adults are no better than chance at detecting children's narrative deception*.  Paper presented at the Society for Research in Child Development meetings in Indianapolis, Indiana.

136. Tye, M. J. C., & Honts, C. R. (November, 1995).  *Training in a new assessment technique (SVA) for the diagnosis of the sexually abused child*.  Paper presented at the annual meeting of the Association for Advancement of Behavior Therapy, Washington, DC.

137. Tye, M. J. C., Henderson, S. A., & Honts, C. R. (January, 1995).  *Evaluating children's testimonies:  CBCA and lay subjects*.  Paper presented at CRIMECON:  International INTERNET Conference on Crime and Criminal Justice.

**<u>1994</u>**

138. Amato, S.  L.  & Honts, C. R. (October, 1994).  *What do psychophysiologists think about polygraph tests?  A survey of the membership of SPR*.  Paper presented at the annual meeting of the Society for Psychophysiological Research, Atlanta, GA.

139. Amato, S. L., & Honts, C. R. (March, 1994).  *A survey of the Society for Psychological Research regarding the polygraph*.  Paper presented at the Red River Valley Psychology Conference, Fargo ND.

140. Devitt, M. K., Honts, C. R., Gillund, B. E., Amato, S. L., Peters, D. P., & Norton, M.  (March, 1994).  *A study of the willingness of children to make false accusations about a serious matter*.  Paper presented at the American Psychology - Law Society Meetings, Sante Fe, NM.

141. Devitt, M. K., Honts, C. R., & Timm, T. (October, 1994).  *Sleeping memories revisited:  The effects of repressed and non-repressed memories on jurors*.  Paper presented at the annual meeting of the North Dakota Psychological Association, Grand Forks.

142. Honts, C. R. (May, 1994).  *False allegations in sexual abuse cases*.  Invited address at the 1st Annual Conference on Psychiatry and the Law,  Missoula Psychiatric Services, Missoula, Montana.

143. Honts, C. R. (August, 1994).  *The psychophysiological detection of deception*.  Invited address given  at Vitnepsykologi - 94:  Psychological Methods in the Investigation and Court Treatment of Sexual Abuse, Tromsø, Norway.

144. Honts, C. R. (September, 1994).  *Uses and abuses of polygraph test used in child sexual abuse litigation*.  Invited address at the Third International Conference of the National Child Abuse Defense and Resource Center, Cleveland, Ohio.

145. Honts, C. R. (September, 1994). *Child witness credibility:  Influence factors and methods of assessment.*   Invited address at the Third International Conference of the National Child Abuse Defense and Resource Center, Cleveland, Ohio, September 23, 1994

146. Honts, C. R. (October, 1994).  *Field validity study of the Canadian Police College polygraph technique.*   Paper presented at the annual meeting of the Society for Psychophysiological Research, Atlanta, GA.

147. Honts, C. R., & Devitt, M. K. (March, 1994).  *Credibility assessment of verbatim statements (CAVS): A study of statement analysis with adults*.  Paper presented at the meeting of the American Psychology - Law Society, Sante Fe, NM.

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

148. Honts, C. R., Winbush, M., & Devitt, M. K. (October, 1994). *Physical and mental countermeasures can be used to defeat guilty knowledge tests.* Paper presented at the annual meeting of the Society for Psychophysiological Research, Atlanta, GA.

149. Honts, C. R., & Raskin, D. C. (August, 1994). *The susceptibility of children to suggestion and influence.* Invited address given at Vitnepsykologi - 94: Psychological Methods in the Investigation and Court Treatment of Sexual Abuse, Tromsø, Norway.

150. Kircher, J. C., Raskin, D. C., Honts C. R., & Horowitz, S. W. (October, 1994). *Generalizability of statistical classifiers for the detection of deception.* Paper presented at the annual meeting of the Society for Psychophysiological Research, Atlanta, GA.

151. Raskin, D. C., & Honts, C. R (1994). *A bootstrap reanalysis of the results of Boychuk, 1991.* Invited address given at Vitnepsykologi - 94: Psychological Methods in the Investigation and Court Treatment of Sexual Abuse, Tromsø, Norway.

152. Telander, R., & Honts, C. R. (March, 1994). *Bingo: Who is playing and why?* Paper presented at the Red River Valley Psychology Conference, Fargo, ND.

153. Tye, M. J. C., & Honts, C. R. (March, 1994). *Evaluating children's testimonies.* Paper presented at the Red River Valley Psychology Conference, Fargo, ND.

154. Tye, M. J. C., Amato, S. L., Honts, C. R. (October, 1994). *Evaluating children's testimonies: Recent research.* Paper presented at the annual meeting of the North Dakota Psychological Association, Grand Forks.

## **1993**

155. Amato, S. L., & Honts, C. R. (October, 1993). *Scientific Attitudes about the polygraph: Implications for admissibility following the death of Frye.* Paper presented at the annual meeting of the North Dakota Psychological Association, Fargo, ND.

156. Devitt, M. K., & Honts, C. R. (June, 1993). *Multivariate classifiers perform as well as experts in the detection of deception.* Paper presented at the annual meeting of the American Psychological Society, Chicago.

157. Devitt, M. K., Honts, C. R., & Gillund B. (June, 1993). *Stealing thunder does not ameliorate the effects of the hired gun cross-examination tactic.* Paper presented at the annual meeting of the American Association for Applied and Preventive Psychology, Chicago.

158. Honts, C. R. (February, 1993). The application of computationally intensive statistical techniques in a psychophysiological detection of deception problem. University of North Dakota, Computer Science Colloquium. Grand Forks, North Dakota.

159. Honts, C. R. (October, 1993). *Symposium: Assessing children's credibility.* (Chair) Symposium presented at the annual meeting of the North Dakota Psychological Association, Fargo, ND.

160. Honts, C. R. (October, 1993). *Statement validity assessment: A technique for assessing the veracity of a child witness.* Paper presented in C. R. Honts, Chair, Symposium: Assessing children's credibility. North Dakota Psychological Association, Fargo, ND.

161. Honts, C. R., & Devitt, M. K. (June, 1993). *Bootstrap statistical decision maker developed for use in the detection of deception.* Paper presented at the annual meeting of the American Psychological Society, Chicago.

Charles R. Honts, Ph. D.                                                    Curriculum Vitae

162. Honts, C. R., Devitt, M. K., & Amato, S. L. (June, 1993). *Explanatory style predicts perceptions of expert witness believability.* Paper presented at the annual meeting of the American Association of Applied and Preventive Psychology, Chicago.

163. Vondergeest, L. K., Honts, C. R., & Devitt, M. K. (June, 1993). *No gender effects found on mock juror's perceptions of expert witness credibility.* Paper presented at PSY-CHI session at the annual meeting of the American Psychological Society, Chicago.

## 1992

164. Devitt, M. K., Honts, C. R., & Peters, D. P. (1992, April). *Truth or just bias: The presentation of polygraph testing in introductory psychology texts.* Paper presented at the Red River Valley Psychology Conference.

165. Devitt, M. K., Peters, D., Honts, C. R., & Amato, S. (1992, May). *A study of the willingness of children to make a false accusation about a serious matter.* Paper presented at the NATO ASI: The Child Witness in Context: Cognitive, Social, and Legal Perspectives, IL Ciocco, Italy.

166. Honts, C. R., & Devitt, M. K. (1992, March). *The hired gun cross examination tactic reduced mock jurors' perception of expert witness' credibility.* Paper presented at the biennial meeting of the American Psychology-Law Society/Division 41 San Diego, CA.

167. Honts, C. R. (1992, April). *The psychophysiological detection of deception: Sparks fly at the intersection of science, psychology, and the law.* Keynote address of the Red River Psychology Conference, North Dakota State University, Fargo.

168. Honts, C. R., Peters, D., Devitt, M. K., & Amato, S. L. (1992, May). *Detecting children's lies with statement validity assessment: A pilot study of a laboratory paradigm.* Paper presented at the NATO ASI: The Child Witness in Context: Cognitive, Social, and Legal Perspectives, IL Ciocco, Italy.

169. Honts, C. R., Devitt, M. K., & Amato, S. L. (1992, October). *Neural network classifiers and the detection of deception revisited: Depth of learning and overfitting.* Paper presented at the annual meeting of the Society for Psychophysiological Research, San Diego, CA.

170. Vondergeest, L. K., Honts, C. R., & Devitt, M. K. (1992, April). *Effects of juror and expert witness gender on jurors' perception of the expert witness.* Paper presented at the Red River Valley Psychology Conference.

## 1991

171. Devitt, M. K., Shubert, L. E., & Honts, C. R. (1991, April). *Male and female knowledge of and responsibilities in the use of contraceptives.* Paper presented at the Red River Psychology Conference, Moorhead, Minnesota.

172. Honts, C. R. (1991, February). *Psychophysiological detection of deception.* Presentation given at the Psychiatry Grand Rounds of North Dakota. North Dakota Educational Telephone Network (ETN).

173. Honts, C. R. (1991, June). *The counterintelligence scope polygraph test found to be a poor discriminator.* Paper presented at the annual meeting of the American Psychological Society, Washington, D. C.

174.  Honts, C. R. (1991, November).  Jackknife, cross-validation, bootstrapping, and neural networks?  An introduction to the application of computationally intensive methods in psychology.  University of North Dakota, Psychology Department Colloquium Series, Grand Forks, North Dakota.

175.  Honts, C. R., & Kristjanson, A. (1991, June).  *A back-propagation neural network fails to out perform discriminant analysis in a physiological detection of deception task.*  Paper presented at the First Annual Convention of the American Association of Applied and Preventive Psychology (AAAPP), Washington,  D. C.

176.  Honts, C. R. (1991, October).  *Converging evidence indicates invalidity for national security screening polygraph tests.*  Paper presented at the annual meeting of the Society For Psychophysiological Research, Chicago, IL.

177.  Honts, C. R., & Devitt, M. K. (1991, October).  Jackknife analyses of discriminant, logistic regression and back propagation neural network classifiers in a psychophysiological detection of deception problem.  Paper presented at the annual meeting of the Society for Psychophysiological Research, Chicago, IL.

**1990**

178.  Honts, C. R. (1994, December).  *Polygraph tests: Facts, fables, and the future.*  Colloquium given at the Department of Psychology, North Dakota State University, Fargo, North Dakota.

179.  Honts, C. R., & Raskin, D. C. (1990, March).  *The "Yes" answered control question:  Dispelling one of the myths of the polygraph profession.*  Paper presented at the 1990 American Psychology-Law Society/Division 41 Biennial Meeting, Williamsburg VA.

180.  Honts, C. R., & Carlton, B. (1990, October).  *Effects of incentives on the detection of deception.*  Paper presented at the annual meeting of the Society for Psychophysiological Research, Boston, MA.

**1989**

181.  Barland, G. H., Honts, C. R., & Barger, S. D. (1989, October).  *The validity of detection of deception for multiple issues.*  Paper presented at the annual meeting of the Society for Psychophysiological Research, New Orleans, LA.

182.  Honts, C. R., Barland, G. H., & Barger, S. D. (1989, October).  *The relative validity of criminal and screening approaches to the detection of deception.*  Paper presented at the annual meeting of the Society for Psychophysiological Research, New Orleans, LA.

**1988**

183.  Honts, C. R., Raskin, D. C., Kircher, J. C., & Horowitz, S. W. (1988, March).  *A field validity study of the control question test.*  Paper presented at the American Psychology and Law Society / Division 41 Midyear Conference, Miami, Florida.

184.  Honts, C. R., & Driscoll, L. D. (1988, April).  *The development of a rank order scoring system for detection of deception.*  Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Snowbird, Utah.

**Charles R. Honts, Ph. D.**                                                **Curriculum Vitae**

185. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1988, April). *Visceral perception and the detection of deception.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Snowbird, Utah.

186. Honts, C. R., Horowitz, S. W., & Raskin, D. C. (1988, April). *Can the short Eysenck questionnaire be substituted for the Eysenck Personality Inventory.* Paper presented at the annual meeting of the Rocky Mountain Psychological Association, Snowbird, Utah.

187. Honts, C. R., Kircher, J. C., & Raskin, D. C. (1988, October). *Patterns of activation and deception.* Paper presented at the annual meeting of the Society for Psychophysiological Research, San Francisco, CA.

188. Horowitz, S. W., Collins, S., Raskin, D. C., & Honts, C. R. (July, 1988). *Facial expressions of deceit.* Paper presented at the NATO Advanced Study Institute, Credibility Assessment: A Unified Theoretical and Research Perspective, Maratea, Italy.

189. Horowitz, S. W., Raskin, D. C., Honts, C. R., & Kircher, J. C. (1988, October). *Control questions in physiological detection of deception.* Paper presented at the annual meeting of the Society for Psychophysiological Research, San Francisco, CA.

190. Kircher, J. C., Raskin, D. C., Honts, C. R., & Horowitz, S. W. (1988, October). *Generalizability of mock crime laboratory studies of the control question polygraph technique.* Paper presented at the annual meeting of the Society for Psychophysiological Research, San Francisco, CA.

191. Raskin, D. C., Kircher, J. C., Honts, C. R., & Horowitz, S. W. (1988, October). *Validity of control question polygraph tests in criminal investigation.* Paper presented at the annual meeting of the Society for Psychophysiological Research, San Francisco, CA.

## **1987**

192. Honts, C. R. (February, 1987). *Countermeasures to the physiological detection of deception.* Colloquium given at the Psychology Department, Wake Forest University, Winston-Salem, North Carolina.

193. Honts, C. R. & Prestrude, A. M. (1987, April). *Interocular effect on specific thresholds for flicker.* Paper presented at the meeting of the Rocky Mountain Psychological Association, Albuquerque, New Mexico.

194. Honts, C. R. (1987, April). *Polygraph credibility assessment.* In John Yuille (Chair), Symposium: *Assessing eyewitness credibility.* Paper presented at the meeting of the Rocky Mountain Psychological Association, Albuquerque, New Mexico.

195. Honts, C. R. & Raskin, D. C. (1987, May). *A field validation study of directed lie and standard control questions.* Paper presented at the meeting of the Rocky Mountain Psychological Association, Albuquerque, New Mexico.

196. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1987, August). *Is polygraph test accuracy related to perceptions of test accuracy?* Paper presented at the annual meeting of the American Psychological Association, New York.

Charles R. Honts, Ph. D.                                                    Curriculum Vitae

**1986**

197. Honts, C. R. (April, 1986).  Clinical versus statistical decision making in the physiological detection of deception: Possible solutions to problems of application.  Colloquium given at the Department of Psychology, Virginia Polytechnic Institute and State University, Blacksburg.

198. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1986, March).  Socialization and the detection of deception.  Paper presented at the American Psychology and Law Society / Division 41 Midyear Conference, Tucson, Arizona.

199. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1986, August).  Countermeasures and the detection of deception. Paper presented at the annual meeting of the American Psychological Association, Washington, D. C.

200. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1986, October). Individual differences and the physiological detection of deception.  Paper presented at the annual meeting of the Society for Psychophysiological Research, Montreal Canada.

**1985**

201. Raskin, D. C., Kircher, J. C., & Honts, C. R.  (1985, February).  *Computerized polygraph interpretations and detection of physical countermeasures.*  Invited paper, IDENTA '85 International Congress on Techniques for Criminal Identification, Jerusalem, Israel.

202. Honts, C. R., (1985, August). *Research on countermeasures and the physiological detection of deception.*  Paper presented at the annual meeting of the American Psychological Association, Los Angeles, CA.

**1984**

203. Honts, C. R.  (1984, October). *Countermeasures and the physiological detection of deception.*  Paper presented at the meeting of the Society for Psychophysiological Research, Milwaukee, WI.

204. Honts, C. R., Raskin, D. C., Kircher, J. C., & Hodes, R. L. (1984, October). *Effects of spontaneous countermeasures on the physiological detection of deception.*  Paper presented at the meeting of the Society for Psychophysiological Research, Milwaukee, WI.

205. Kircher, J. C., Raskin, D. C., & Honts, C. R.  (1984, October).  *Electrodermal habituation in the detection of deception.*  Paper presented at the meeting of the Society for Psychophysiological Research, Milwaukee, WI.

**1983**

206. Honts, C. R., Raskin, D. C., & Kircher, J. C. (1983, September).  *Detection of deception: Effectiveness of physical countermeasures under high motivation conditions.*  Paper presented at the meeting of the Society for Psychophysiological Research, Pacific Grove, CA

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

### 1982

207. Honts, C. R. (1982, April). *The interocular effect and specific thresholds for flicker.* Paper presented at the Experimental Area Annual Research Fest, Department of Psychology, Virginia Polytechnic Institute and State University, Blacksburg.

208. Honts, C. R. & Hodes, R. L. (1982, October). *The effect of simple physical countermeasures on the detection of deception.* Paper presented at the meeting of the Society for Psychophysiological Research, Minneapolis, MN.

209. Honts, C. R. & Hodes, R. L. (1982, October). *The effects of multiple physical countermeasures on the detection of deception.* Paper presented at the meeting of the Society for Psychophysiological Research, Minneapolis, MN.

### 1981

210. Honts, C. R. (1981, April). *Effects of instructions and feedback on the control of phasic electrodermal activity.* Paper presented at the Experimental Area Annual Research Fest, Department of Psychology, Virginia Polytechnic Institute and State University, Blacksburg.

Charles R. Honts, Ph. D.                                                                 Curriculum Vitae

## Public Addresses and Other Public Service Activities:

"Validity and reliability of detection of deception examinations in the laboratory and in the field."
     Bonneville Community Corrections Center, Salt Lake City, Utah, May 18, 1983.

"Countermeasures:  The detection of attempts to defeat the polygraph test."  Arizona Polygraph
     Association Seminar, Phoenix, Arizona, April 7, 1984.

"Commercial uses and abuses of the polygraph."  Bountiful Area Chamber of Commerce, Bountiful,
     Utah, June 20, 1984.

"Countermeasures".  The Third Annual colloquium on Polygraph Science and Methodology.
     Sponsored by: The Academy of Polygraph Science and Methodology and The Department of
     Psychology, University of North Carolina, Charlotte.  June 3, 1985.

"Countermeasures, the directed lie control question, socialization, and other things."  Canadian
     Association of Police Polygraphists Annual Seminar, Ottawa, Canada, August 21, 1986.

"The polygraph in 1987".   The Intermountain Junior Science and Humanities Symposium.
     University of Utah, Salt Lake City, Utah, February 26, 1987.

"The ethics of the use of polygraph tests in the work place". Business Ethics Seminar, College of
     Business, University of Utah, Salt Lake City, Utah, August 3, 1987.

"A computer assisted polygraph system".  Utah Polygraph Association, Salt Lake City, Utah,
     December 16, 1987.

"Countermeasures and psychophysiological patterning in the detection of deception".  Department
     of Defense Polygraph Institute, Fort McClellan, Alabama, March 7, 1988.

"Changes and future directions for the Department of Defense Polygraph Institute", Federal
     Interagency Polygraph Seminar, FBI Academy, Quantico, Virginia, June 6, 1989.

"Research in the detection of deception", Panel Discussion, Federal Interagency Polygraph Seminar,
     FBI Academy, Quantico, Virginia, June 9, 1989.

"The evaluation of psychophysiological data from polygraph examinations".  United States Secret
     Service - 1989 Polygraph Conference, Washington, D. C., November 11, 1989.

"Validity of the positive control question test and the effects of countermeasures on the control
     question test".  Naval Investigative Service Annual Polygraph Seminar, Department of Defense
     Polygraph Institute, Fort McClellan, Alabama.  July 16, 1990.

"Topics in the detection of deception". Panel Discussion.  The 21st Annual National Polygraph
     Workshop, Delta College, University Center, Michigan.  May 10, 1991.

"The directed lie control question: Research and practice".  The 21st Annual National Polygraph
     Workshop, Delta College, University Center, Michigan.  May 10, 1991.

"Countermeasures and the detection of deception:  Facts not fables".  The 21st Annual National
     Polygraph Workshop, Delta College, University Center, Michigan.  May 10, 1991.

**Charles R. Honts, Ph. D.**                                                  **Curriculum Vitae**

"Credibility assessment with adults and children."  Invited address to the North Dakota State's Attorneys Association.  University of North Dakota Law School.  February 11, 1994.

"Junk science in the courtroom."  Presentation at the North Dakota Supreme Court Judicial Institute, University of North Dakota Law School, Grand Forks.  May 23, 1994.

"New developments in the assessment of children's credibility."  Presentation at the North Dakota Supreme Court Judicial Institute, University of North Dakota Law School, Grand Forks.  May 23, 1994.

"The polygraph in 1994."  Presentation at the North Dakota Supreme Court Judicial Institute, University of North Dakota Law School, Grand Forks.  May 24, 1994.

"Uses and abuses of polygraph test used in child sexual abuse litigation."  Invited address at the Third International Conference of the National Child Abuse Defense and Resource Center, Cleveland, Ohio, September 22, 1994.

"Child witness credibility:  Influence factors and methods of assessment."   Invited address at the Third International Conference of the National Child Abuse Defense and Resource Center, Cleveland, Ohio, September 23, 1994.

"The child witness."  Invited address at the Thirteenth Annual "Helen Hamilton Day" meetings at the University of North Dakota Law School.  Sponsored by the University of North Dakota Law Women's Caucus.  Grand Forks, North Dakota, May 1995.

"Legal admissibility of the polygraph in 1996",  Invited presentation at the Federal Public Defender's Third Thursday meeting.  Boise, Idaho, March 1996.

"The polygraph after Daubert", Invited lectures at the Indiana Public Defender Council 1997 Death Penalty Seminar.  Indianapolis, Indiana, September 1997.

Hannity and Colmes, 3 November 1997, Appearance on nationally broadcast television show concerning *Commonwealth v. Woodward*.  Fox News Network.

The Alan Colmes Show.  Nationally syndicated radio talk show, 4 November 1997, Appearance on nationally broadcast radio talk show concerning *Commonwealth v. Woodward*.

The Victoria Jones Show.  Nationally syndicated radio talk show, 4 November 1997, Appearance on nationally broadcast radio talk show concerning *U. S. v. Scheffer* before the U. S. Supreme Court, and *Commonwealth v. Woodward*.

KIVI News, 10 November 1997. Appearance on Boise evening news concerning *Commonwealth v. Woodward*.

KTVB News, 10 November 1997. Appearance on Boise evening news concerning *Commonwealth v. Woodward*.

KBCI News, 10 November 1997. Appearance on Boise evening news concerning *Commonwealth v. Woodward*.

German National Television, February 1998, *Lugeudetektor*, NTSC.  Appearance on nationally broadcast documentary.

**Charles R. Honts, Ph. D.**                                                    **Curriculum Vitae**

National Criminal Defense Lawyers Association, April 1998, What the Polygraph Can Do For Your Client: Scientific and Practical Aspects of the Polygraph After Daubert. Invited Address at the Spring Seminar, Santa Monica, California.

Washington Defenders' Conference, May 1998, Scientific Credibility Assessment: Life After Daubert and Scheffer. Two talks: Child Witnesses 1 May 1998, The Polygraph, 2 May 1998. Invited lectures at the annual conference. Sun Mountain Lodge, Winthrop, Washington.

Insight, The BBC World Service, November 1998, world-wide broadcast documentary.

Idaho Association of Criminal Defense Lawyers, March 1999, 1999 Winter Seminar: World Class Defenders & World Class Skiing. Repressed Memory: Junk Science in the Courtroom. Elkhorn Resort, Sun Valley, Idaho.

Idaho Association of Criminal Defense Lawyers, June 1999, The 1999 Spring Seminar. The Polygraph in Y2K. Idaho Falls, Idaho.

*Deadline Discovery*. January 31, 2001. Interview concerning the validity of Brain-fingerprinting. Broadcast on the Discovery Channel.

*60 Minutes II, Final Exam* with Scott Pelley, December 12, 2001, Feature on polygraph in national security. Broadcast on the CBS network.

Idaho Juvenile Corrections Management Team, May 21, 2002, *The Polygraph: Basic issues regarding sex offender testing.* Nampa, Idaho.

Juvenile Justice Advisory Team of Magistrate Judges, July 23, 2002, *The Polygraph: Basic issues regarding sex offender testing.* Boise, Idaho.

Juvenile Corrections Board, August 16, 2002, The Polygraph: Basic issues regarding sex offender testing. Boise, Idaho.

Federal Public Defender's Third Thursday Meeting, September 19, 2002. Invited presentation, "Assessing the credibility of a child witness," Boise, Idaho.

KCBI, Channel 2 News, *10 at 10.* Interview and news feature concerning the validity of polygraph testing. July 28, 2003, Boise, Idaho.

KBSU, Boise State Public Radio, New Horizons in Education, Interview regarding the validity of polygraph testing. June 4, 2004, rebroadcast August 6, 2004.

Dateline NBC, appeared on the episode, *The Mystery in Rock Hill*, first broadcast, 9 July 2010.

**Charles R. Honts, Ph. D.**                                              **Curriculum Vitae**

## World Wide Web Services:

*Polygraph Law Resource Page*,  http://truth.boisestate.edu/polygraph/polylaw.html (1997-2012)

*The Credibility Assessment and Witness Psychology List* - CAAWP@listserv.boisestate.EDU (1997-2007)

## Workshops and Conferences Organized and/or Conducted:

*The First Annual Psychology and Law Conference* of the Psychology Department & the Division of Continuing Education, University of North Dakota, Grand Forks, Co-Organized with Douglas Peters, July, 1991

NATO Advanced Study Institute - *The Child Witness in Context:  Cognitive, Social, and Legal Perspectives.*  IL Ciocco, Lucca, Italy.  Executive Assistant to the Director, Douglas Peters On-site Program Manager, May, 1992

*Interviewing Children and Assessing Their Credibility.*  Workshop sponsored by the Ward County (North Dakota) State's Attorney and the Ward County Social Service Board.  Minot, North Dakota. April, 1994.

NATO Advanced Study Institute - *Credibility:  International Perspectives on Assessment, Methods, and Research.*  Director: Charles R. Honts, Organizing Committee: Marisa Alonso-Quecuty, Guenter Koehnken, and Sven Svebak.  Proposed for 1995, not funded.

The State of New Mexico.  *The polygraph in 1998: Advances in Polygraph Science.*  Continuing education workshop for New Mexico Polygraph Examiners, Albuquerque, New Mexico, 18 and 19 April 1998.  Partially funded by the State of New Mexico, Private Investigator and Polygraph Board.

The State of New Mexico.  *The polygraph in 1999: Advances in Polygraph Science.*  Continuing education workshop for New Mexico Polygraph Examiners, Albuquerque, New Mexico, 20 and 21 March, 1999.   Co-conducted with John C. Kircher, Ph. D.  Partially funded by the State of New Mexico, Private Investigator and Polygraph Board.

Court Appointed Special Advocate.  Child witnesses: Credibility and its assessment.  In service training.  Boise, Idaho 10 September 2001, 26 November 2002, 1 February 2005.

Idaho Criminal Defense Lawyers Association, Invited CLE lecture, *The Psychology of Confessions: Issues and Concerns from Psychological Science.*  November 3, 2006, Boise, Idaho.

The State of New Mexico.  *The polygraph in 2007.*  Continuing education workshop for New Mexico Polygraph Examiners, Albuquerque, New Mexico, January 20, 2007.   Funded by the State of New Mexico, Private Investigator and Polygraph Board. (8 hours of presentation.)

Mississippi Polygraph Association. *The polygraph in 2007.*  Continuing education workshop for Polygraph Examiners. Tunica Mississippi.  (8 hours of presentation).

*Credibility Assessment Research Summit (CARS)* held by the Counterintelligence Field Activity (CIFA), Combating Terrorism Technology Support Office (CTTSO), and the Defense Academy for

**Charles R. Honts, Ph. D.**                                        **Curriculum Vitae**

*Credibility Assessment* (DACA). Vienna, Virginia May 23-25, 2007, Member of the Organizing Committee.

Texas Association of Law Enforcement Polygraph Investigators (TALEPI). 2007 Training Seminar. Topics covered: False Confessions, Polygraph Technique Validation Studies, Utah Zone Technique, Polygraph Countermeasures. Austin Texas, June 18 and 19, 2007. http://www.talepi.org/07SeminarARC.pdf

Israeli Polygraph Examiners Association. 2008 Training Seminar. *The Utah Approach to the Comparison Question Test* (6 hours) and *Polygraph Countermeasures* (2 hours), Dead Sea, Israel, January, 18 and 19, 2008.

Credibility Assessment at Portals Workgroup held by the Defense Academy for Credibility Assessment (DACA). McLean, Virginia, December 4 and 5, 2008.

Conducting research with the comparison question test. Workshop held at the Psychology Department, John Jay College of Criminal Justice, New York, New York, 2 April 2009.

I provided continuing education instruction in an advanced polygraph course in Lexington, KY to a group of 15 Singapore and Bruneian government examiners. During this course, I provided 16 hours of instruction on the topics of the Utah Technique, Utah Scoring System, Use of DLCs, Countermeasures and False Confessions. (June 4-5, 2013).

*Basic polygraph instrumentation and an introduction to polygraph testing.* A workshop provided for faculty and graduate students in the Department of Psychology, University of North Dakota, Grand Forks, (November 17, 2014).

## Editorial Activities:

**Founder and Editor of**:
| | |
|---|---|
| *The Journal of Credibility Assessment and Witness Psychology* | 1996-2010 |
| *Polygraph-Law Resource Page* | 1996-2011 |

**Associate Editor**, *Polygraph*                                  1988-1990, 2015, 16

**Member of the Editorial Board**,

| | |
|---|---|
| *Forensic Reports* | 1991-1992 |
| *European Polygraph* | 2008-2013 |

**Ad Hoc Editorial Consultant:**

| | |
|---|---|
| American Psychological Society, Convention Proposal Reviewer | 1993 |
| American Psychology - Law Society, Convention Proposal Reviewer | 1993, 04, 12, 13 |
| American Psychological Association Convention Proposal Reviewer | 2004 |
| American Psychological Association Book Reviewer | 2009 |
| *Applied Cognitive Psychology* | 2001, 06(3), 07, 08, 09, 15 |
| *Applied Developmental Science* | 2001 |
| *Arab Journal of Forensic Sciences and Forensic Medicine* | 2016 |
| *Behavioral Sciences and the Law* | 1996 |

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

| | |
|---|---|
| *Crime Laboratory Digest* | 1993 |
| *Criminal Justice and Behavior* | 2002, 2004, 2005 |
| Decepticon: International Conference on Deceptive Behavior | 2015 |
| Cambridge, United Kingdom, paper reviews | |
| *Developmental Psychology* | 1995 |
| *Forensic Science Communications Review* | 2000, 01, 03 |
| *Journal of Applied Psychology* | 1992, 93, 00, 02, 03 |
| *Journal of Applied Research in Memory and Cognition* | 2014 |
| *Journal of Experimental Psychology: General* | 2002, 2004 |
| *Journal of Experimental Psychology: Applied* | 2003, 04-07, 10 |
| *Journal of Forensic Sciences* | 2002, 07 |
| *Journal of General Psychology* | 1998 |
| *Journal of Personality and Social Psychology* | 1991 thru 1998 |
| *Journal of Personality and Social Psychology: Personality Processes and Individual Differences* | 2004 |
| *Journal of Physiology and Behavior* | 2007, 2008 |
| *Journal of Psychophysiology* | 1999 |
| *Law and Human Behavior* | 1994, 2004, 05, 06(2) 07(4), 08, 12, 15 |
| *Learning and Motivation* | 2015 |
| *Legal and Criminological Psychology* | 2006 |
| *Nature* | 2001 |
| *Nordic Psychology* | 2013 |
| New York University Press | 2009 |
| *Perceptual and Motor Skills* | 2013 |
| *Perspectives on Psychological Science* | 2015 |
| *Physiology and Behavior* | 2014 |
| *Psychology, Crime & Law* | 2011 |
| *Psychology, Public Policy, & Law* | 2007, 09, 10, 11 |
| *Psychological Bulletin* | 1993, 94, & 99 |
| *Psychological Science* | 2014 |
| *Psychophysiology* | 1995, 98, 99, & 04 |
| Rocky Mountain Psychological Association Program Committee | 1987, 88, 99, 02 |
| Worth Publishing, book chapter reviewer | 2012 |

**Grant Proposal/Report Reviewer:**

| | |
|---|---|
| National Science Foundation | 1997, 2001 |
| European Science Foundation | 2009 |
| Israel Science Foundation | 2011 |
| Department of Defense Polygraph Institute | 2001, 02, 03, 04(2) |
| National Center for Credibility Assessment | 2011 |
| Social Sciences and Humanities Research Council of Canada | 2004, 05, 06, 13 |

Charles R. Honts, Ph. D.                                                    Curriculum Vitae

## Student Supervision:

### Psychology Department, University of North Dakota

### Doctoral Committees (Chair):

Martine Mizwa. *Validation of the victim empathy scale.* Completed: August 1993

Mary Devitt, *Time and suggestion by significant persons: Effects on memory for complete events.* Completed: May 1995

Susan Amato. *Effects of misinformation on the concealed knowledge test.* Completed, April 1996.

Marcia Moberg. *The utility of statement validity assessment in differentiating between false reports and true memories in children.* Completed December 1999.

Marcus Tye. *Effects of brief training in statement validity assessment on the ability of lay evaluators to determine the truthfulness of children's statements.* Completed, April, 1996.

Member: Jacqueline Brouse, Anne Dowrenwend, Nasrin Erfanian, Ron Hougen, Jeff Kearney, Maria Kearney, Sally Kennedy, Arlinda Kristjanson, Cami Lokken, Don Newberry, Kate Onyeneho, Marty Witucki

### Master's Committees (Chair):

Sheila Rydell, *Defendant occupation and victim resistance as mediators of attributions of responsibility for rape.* Completed : July, 1992.

Mary Devitt, *A study of the relative accuracy of discriminant analysis, logistic regression, and back propagation neural network classifiers in a psychophysiological detection of deception problem.* Completed: August, 1992.

Susan Amato, *A survey of member of the Society for Psychophysiological Research regarding the polygraph: Opinions and implications.* Completed: December 1993.

Marcia Moberg, *A study of differential effects of defense and prosecution expert witnesses.* Completed : August 1993.

Marcus Tye, *Criteria-based content analysis of children's statements about a mock crime compared with the evaluations of naive subjects.* Completed May 1994.

Lynelle Vondergeest, *Juror decision making.* Completed: May 1995.

Steven Westby, General media publicity and jury deliberations. Completed : July 1994.

Member: Jean Caraway, Brent Gillund, Heidi Jensen, Jeff Kearney, Don Newberry, Margo Norton, Gail Robbins, Shannan McKenzie

**Charles R. Honts, Ph. D.**                                             **Curriculum Vitae**

**Senior Thesis Committees (Chair):**

Randy Telander, *Bingo, who is playing and why?* Completed:  May 1995.

Lynelle Vondergeest, *Effects of juror and expert witness gender on jurors' perceptions of the expert witness.* Completed: February, 1992.

Marcus Winbush. *Countermeasures and the guilty knowledge test.* Completed: May 1993.

Member:  Margo Adams, Keri Anderson, Shelly Kumru

**Boise State University, Department of Psychology**

**Senior Thesis**

Katieann Skogsberg, *Case studies of EEG biofeedback training using a measurement of affect.* Completed May 2003. (Chair).

Ginny Gragg, *Boostrapping the polygraph.* Completed:  May 1999. (Chair)

Cara Lundquist (1999).

Wendy Alloway.  *The effects of internet information on the validity of the TES.* Thesis project for AY 2001-2002 (Chair).

Andrea Webb (2002). The *effects of age, gender, religion, and religious strength on obedience to authority: A comparative study.*  Honor's Thesis.  Completed May 2002. (Member).

Julie Crow (2006). *Treatment of sex offenders.*  Honor's Thesis. Completed May 2006. (Chair)

**Post-Doctoral**

Anne Gordon, Ph. D. (1998 - 2000)
Racheal Reavy, Ph. D.  (2008 - 2009)

**Doctoral**

Paul Bernhardt (2005; University of Utah). *Effects of Prior Demonstrations of Polygraph Accuracy on Outcomes of Probable-lie and Directed-lie Polygraph Tests* (Member).

Andrea Webb (2008; University of Utah).  *Effects of Motivation and Item Difficulty On Oculomotor and Behavioral Measures of Deception.* (Member).

**Charles R. Honts, Ph. D.**                               **Curriculum Vitae**

## University Instruction:

### Department of Psychology, Boise State University

| | |
|---|---|
| Research Methods | 1995-2000, 10, 11 |
| Introduction to Statistics | 1996, 04, 05 |
| Psychology and Law | 1998-2015 |
| General Psychology (Large Lecture with TAs) | 1999, 01, 04 |
| General Psychology (Small Section) | 2002 |
| Physiological Psychology | 2000, 2005-12 |
| Cognitive Psychology | 2001 |
| Learning Theory | 2007 |
| History and Systems in Psychology | 2009-14 |
| Industrial/Organizational Psychology | 2012-15 |
| The Biological Bases of Behavior | 2013, 15 |
| Personality Theories | 2014-15 |

### Psychology Department, University of North Dakota

| | |
|---|---|
| Introductory Psychology (Large Lecture with 2 TAs) | 1990-91-92 |
| Introduction to Statistics (Large Lecture with 2 TAs) | 1990-91-93-94 |
| Industrial & Organizational Psychology | 1991-92-94-95 |
| Introduction to Personality Theory | 1991 |
| Advanced Univariate Statistics + Research Design (Graduate Course) | 1991 thru 1995 |
| Cognitive and Affective Bases of Behavior (Graduate Course) | 1993-95 |
| Theories of Personality (Graduate Course) | 1993-95 |
| Psychology and Law (Graduate Seminar) | 1992 |
| Advanced Topics in Research Design and Statistics (Graduate Seminar) | 1994 |

### Psychology Department, University of Utah

| | |
|---|---|
| Detection of Deception Workshop (Annual) | 1982 thru 1994 |
| Sensation & Perception | 1984-85-87 |
| Theories of Personality | 1985-87 |
| Research Methods, with Laboratory | 1986 |
| Introduction to Psychology (Large Section with 1 TA) | 1987 |
| Statistical Methods in Psychology | 1988 |

### Department of Psychology, Virginia Polytechnic Institute and State University

| | |
|---|---|
| Introductory Psychology Laboratory | 1981 |
| Sensation Laboratory | 1981 |
| Perception Laboratory | 1982 |
| Teaching Fellow for History and Systems in Psychology | 1982 |

### Department of Psychology, Jacksonville State University and the Department of Defense Polygraph Institute joint Master's Degree Program

| | |
|---|---|
| Psychological Bases of the Detection of Deception (Graduate Course) | 1989 |
| Psychophysiological Assessment (Graduate Course) | 1990 |

**Charles R. Honts, Ph. D.**                    **Curriculum Vitae**

## Other Professional Instruction:

### Arizona School of Polygraph Science

Psychology and Physiology in the Basic Polygraph Examiner Course          1985-88, 91

### Canadian Police College

Psychophysiology, Psychopharmacology, Polygraph Research,          1986 88 90-98
Numerical Scoring for the Basic Polygraph Examiner Course

### Center for Professional Development, The Air University at Maxwell AFB

Guest Instructor in the Advanced Trial Advocacy Course (ATAC)          1989-90

### Department of Defense Polygraph Institute, Fort McClellan, Alabama

Research Methods, Basic Polygraph Examiner Course          1989
Instructor, Courtroom Testimony Course          1990

### Federal Bureau of Investigation, FBI Academy, Quantico, Virginia

Advanced Topics in Detection of Deception          1989

### Utah Academy of Forensic Polygraph, Orem Utah

Instructor, Advanced Topics in Detection of Deception          1983

## Professional Organizations:

Association for Psychological Science (formerly American Psychological
Society; Charter Member; Fellow, 2006)          Joined: 1989
American Psychological Association          Joined: 1984
American Psychology - Law Society          Joined: 1987
Rock Mountain Psychological Association          Joined: 1987
Society for Psychophysiological Research          1981 to 1997

## Psychology Department Committee Service, University of North Dakota:

Graduate Admissions          90/91 - 92/93
Colloquium          1990 to 1992
Departmental Resources          1991/92
Personnel (Chair)          1991/92
Faculty Evaluation          1992/93

**Charles R. Honts, Ph. D.**                                      **Curriculum Vitae**

## Psychology Department Committee Service, Boise State University:

| | |
|---|---|
| Tenure and Promotion (College) | 1996/97/11/12 |
| Curriculum (College) | 1997/98 |
| Faculty Development (Senate) | 1997/98 |
| Personnel (Department) | 98/99/00/03/04/06/10 |
| | 11/12/13/14/15 |
| Dean's Research Awards Committee | 2000/01/04 |
| General Psychology Subject Pool (Department) | 00/01/03/04-08 |
| SSPA Dean's Evaluation Committee (University) | 2003, 12 |
| Webmaster Experimetrix/Experiment Management System | 2008-11 |
| Department Head Search Committee (Chair) | 2013 |
| Faculty Search (Cognitive) Committee (Chair) | 2015 |

## Professional Licensing:

Commonwealth of Virginia, Polygraph Examiner, Certificate #310, Inactive.
Issued: 7 June 1977

State of Utah, Detection of Deception Examiner, License #860065, Inactive.
Issued 1 January 1983

State of North Dakota, Detection of Deception Examiner, D-0025
Issued 6 October 1992 through 2007. Inactive.

State of New Mexico, Detection of Deception Examiner, 152 Y
Issued 1 July 1995. Active.

## Consultations for Public Agencies:

Arizona Department of Public Safety
Indiana State Police
Idaho Department of Health and Welfare:  Family and Children's Services
Inspector General, State of Utah
Inspector General, State of Oklahoma
Police Department, Duchesne County; Utah
Police Department, Fargo, North Dakota
Police Department, Lincoln County; Wyoming
Police Department, University of Utah
Police Department, West Valley City, Utah
Quebec Provincial Police
Royal Canadian Mounted Police
United States Secret Service
United States Air Force Office of Special Investigations

**Charles R. Honts, Ph. D.**                                          *Curriculum Vitae*

## Expert Witness Testimony:

1.  Alamogordo, New Mexico. New Mexico Board of Education, Appeals, August 19, 1983 (Polygraph)
2.  Los Angeles, California. *United States vs. DeLorean*. Federal District Court, November 23, 1983 (Polygraph Admissibility Hearing).
3.  Carson City, Nevada. Nevada Gaming Control Board, February 7, 1984 (Polygraph)
4.  Davis County, Utah District Court, August 13, 1984 (Polygraph)
5.  Salt Lake County, Utah District Court, September 26, 1984 (Polygraph)
6.  Utah Medical Association, Grievance Committee, February 28, 1985 (Polygraph)
7.  Box Elder County, Utah District Court, March 15, 1985 (Polygraph)
8.  Campbell County Court, Gillette, Wyoming, May 17, 1985 (Polygraph)
9.  Duchesne County, Utah District Court, September 24, 1985 (Polygraph)
10. Salt Lake County, Utah District Court, November 6, 1985 (Polygraph)
11. Bernalillo County, New Mexico District Court, August 1, 1986 (Polygraph)
12. Quebec Provincial Court, District of Terrebonne, Canada, June 29,1993 (Jury Trial: False Confession & the polygraph).
13. Troop County, Georgia State Court, August 20, 1993, *Georgia v. Rilling.* (Polygraph hearing.)
14. Sweetwater County, Wyoming District Court, October 29, 1993, *Wyoming v. Muniz*, CR-9212-0035 (Jury Trial: Statement Analysis and Child Witness Issues)
15. East Saint Louis, IL., Federal District Court, November 18, 1993, *U. S. v. Davis*, Criminal No. 93-30003-WLB  (Deposition: False Confession & the Polygraph)
16. Hubbard County, Minnesota, District Court, April 5, 1994 *In the matter of the welfare of Timothy John Schmid,* No. J7-93-50113 (Jury Trial: Statement Analysis and Child Witness Issues)
17. Santa Fe, New Mexico, Federal District Court, March 10, 1995, *U. S. v. Galbreth*, Criminal No. 94-197 MV (Polygraph hearing)
18. Clarke County, Superior Court, Athens Georgia, April 7, 1995,  (Polygraph hearing)
19. Bismarck, ND, Federal District Court, May 25, 1995, *U. S. v. Poitra*, No. ALL 94-02 (Statement Analysis with Child Witnesses hearing)
20. Bernalillo County, New Mexico District Court, September 12, 1995, *New Mexico v. Harris*, No. CR 92-01433 (Jury Trial: Polygraph)
21. Ada County, Idaho District Court, *Griffith v. Melgaard,* November 17, 1995 (Jury Trial: Polygraph, at trial)
22. Ada County, Idaho District Court, *Griffith v. Melgaard,* November 22, 1995 (Jury Trial: Polygraph and Child Witness Issues, at trial)
23. Savanah, Georgia, United States District Court, July 11, 1996, *U. S. v. Gilliard,* No. CR-196-019 (Polygraph hearing)
24. Colorado Springs, Colorado, District Court, September 3, 1996, *David Law v. City of Colorado Springs et al.*, Civil Action No. 92CV0896 (Jury Trial: Polygraph)
25. Alameda, California, District Court, October 8, 1996 *People v. Winger*, No. 128040A (Polygraph hearing)
26. Lafayette, Louisiana, United States District Court, November 12, 1996, *U. S. v. Callier* (Polygraph hearing).
27. Thermopolis, Wyoming, District Court, *LaBoy v. Upton*, 1996 (Jury Trial: Polygraph).
28. Sandy, Utah, Utah District Court, February 24, 1997, *Utah v. Rappleye* (Jury Trial: Child Witness Issues)
29. Lincoln, Nebraska, United States District Court, 8 April 1997, *Richter v. Bartee,* No. 4: CV95-3309 via telephone (Polygraph, post-conviction hearing.)
30. Cambridge, Massachusetts, Superior Court, July 14, 1997, *Commonwealth v. Woodward*, No. 97-433 (Polygraph hearing)

**Charles R. Honts, Ph. D.**                                       **Curriculum Vitae**

31. Martinsville, Indiana, District Court, December 15, 1997, *Indiana v. Hubbard*, CAUSE NO: 55C01-9612-CF-271 (Polygraph hearing)
32. Bisbee, Arizona, Cochise County Superior Court, February 5, 1998, *Arizona v. Sebastian*, No. CR97000030via telephone (Polygraph hearing)
33. Albuquerque, New Mexico, New Mexico District Court, February 17, 1998, *New Mexico v. Mann*, CR No. 96-2874 (Jury Trial: Polygraph)
34. Fairfax, Virginia, Circuit Court of Fairfax, 4 March 1998, *Commonwealth v. Iliff.* (Child Witness Issues, admissibility hearing)
35. Cambridge, Massachusetts, Superior Court, 19 March 1998, *Commonwealth v. Henry*, Nos. 96-129 (001-002). (Polygraph hearing)
36. Phoenix, Arizona, United States District Court, 31 March 1998, *U. S. v. Guyer.* (Polygraph hearing)
37. Santa Ana, California, United States District Court, *U. S. v. Gillett*, SA CR 97-70-AHS 10 July 98. (Polygraph hearing).
38. Colorado Springs, Colorado, District Court, 17 July 98, *Colorado v. Morgan.* (Polygraph hearing)
39. Colorado Springs, Colorado, District Court, 21 July 98, *Colorado v. Morgan.* (Jury Trial: Child Witness Issues)
40. Tucson, Arizona, United States District Court, 20 October 98. *U.S. v. Benavidez-Benavidez*, Case No. Cr 98-674-TUC-FRZ, *U.S. v. Pisciotta* (Combined Polygraph Hearing)
41. Pocatello, Idaho, District Court, 23 October 98. *Idaho v. Wilkins*, Case No. CRFE 98-00284B (Polygraph hearing)
42. Portage County, Ohio, The Ohio Court of Common Pleas, 30 April 1999. *State v. Resh*, Case No. 90 CR 0068, and *State v. Gondor*, Case No. 90 CR 0067 (Polygraph, post conviction evidentiary hearing, cases consolidated)
43. Columbus, Ohio, Franklin County Court, 27 August 1999. *State v. Nichols*, Case No. 95CR-4299. (Jury Trial: Polygraph)
44. Indianapolis, Indiana, 14 October 1999, via telephone. *Indiana v. Ben-Yisrayl.* Sworn testimony as an offer of proof in death penalty appeal (Polygraph).
45. Idaho Falls, Idaho, 25 October 1999, Idaho District Court, *Idaho v. Welch*, Case No. CR-99-2362 Additional testimony given in the same case on 12 November 1999 (Polygraph Hearing).
46. Springfield, Massachusetts, 18 and 19 November 1999, Superior Court, Hampden, ss, *Commonwealth v. Slonka*, Case Nos. 91-1479 & 91-1480. (Polygraph Hearing).
47. Albuquerque, New Mexico, 24 August 2000, 9th Judicial District Court, *State of New Mexico v. Eddie Taylor.* No. D-905-CR-99000118. (Polygraph Hearing, Telephone).
48. Denver, Colorado, 14 August 2000, *People v. Nathan Dunlap*, Case No. 95CR605, Arapahoe County District Court. Rule 35 motion for post-conviction review. (Polygraph)
49. Dallas, Texas, 6 September 2000, *Morse et al., v. Henson et al.* Sworn deposition. (Polygraph)
50. Boston, Massachusetts, 19 September 2000, *Commonwealth v. Toro*, Case No, 81-035974, 74. (Polygraph Hearing).
51. Albuquerque, New Mexico, 17 Nov 2000, 9th Judicial District Court, *State of New Mexico v. Eddie Taylor.* No. D-905-CR-99000118. (Polygraph Hearing, Telephone).
52. Coeur d'Alene, Idaho, 7 Feb 2001, First Judicial District (Kootenai County), *State of Idaho v. Mitch Cougar*, Case No. CRF 99-07211. (Jury Trial: Polygraph)
53. Ogden, Utah, 25 April 2001, Second Judicial District, *Sate of Utah v. Phillip Christiansen.* (Jury Trial: Child Witness Issues).
54. Santa Fe, New Mexico, 9 August 2001, First Judicial District, *In the Matter of M-S,* #JQ-01-09 (Bench Trial: Polygraph).
55. Boise, Idaho, 11 March 2002, *Idaho v. Shaver*, Ada County Sentencing hearing. (Polygraph).

**Charles R. Honts, Ph. D.**                                        **Curriculum Vitae**

56.  Bradenton, Florida, 11 October 2002, *State of Florida v. William T. Stacks*, Case no. 2001 CF 2419. Deposition via satellite. (Polygraph Malpractice).
57.  Mount Holly, New Jersey, 24 October 2002, *State of New Jersey v. Patrick Free*, Indictment No. 98-06-0397-I. (Polygraph Malpractice, False Confession).
58.  Bradenton, Florida, 26 November 2002, *State of Florida v. William T. Stacks*, Case no. 2001 CF 2419. (Deposition via satellite Polygraph Malpractice).
59.  Las Cruces, New Mexico, 16 and 17 January 2003.  *State of New Mexico v. Kevin Lee*, Cause No. F-01-10-1029 Dona Ana County.  (Daubert Hearing, Polygraph.)
60.  Caldwell, Idaho, 29 January 2003.  *State of Idaho v. Joshua King*. Canyon County.  Sentencing Hearing (Polygraph.)
61.  Nezperce, Idaho, 23 April 2003.  *State of Idaho v. Craig T. Perry*.  District Court of Lewis County, Case No. CR-02-00082. (Daubert Hearing, Polygraph.)
62.  Lexington, Kentucky, 22 May 2003 and 14 July 2003. *Commonwealth of Kentucky v. Harold I. Stone, Jr.,* Case Number: 01-CR-00001.  (Daubert Hearing, Polygraph).
63.  Albuquerque, New Mexico, 2 and 3 July 2003. *Kevin Lee, et al., Petitioners, v. Hon. Lourdes Martinez, Respondents*, County of Bernalillo, State of New Mexico, Second Judicial District Court, No. CS-2003-00026  (Supreme Court No. 27,915 special combined Daubert Hearing, Polygraph.)
64.  Caldwell, Idaho, 24 July 2003 (hearing/offer of proof) and 25 July 2003 (testimony before the jury). *Idaho v. Sarah Pearce*, Case #03-5092C. (Jury Trial: Eyewitness Memory)
65.  Tucson, Arizona, 31 July 2003, Jacquelyn Smith, Severance Hearing (testimony by telephone, Polygraph)
66.  Perth, Western Australia, 29 August 2003, *Between Andrew Mark Mallard and The Queen*, in the Supreme Court of Western Australia, Court of Criminal Appeal, CCA 135 of 2002. Testimony via satellite.  (Polygraph Hearing).
67.  Boise, Idaho, 10 March 2004, *Idaho v. Michael Roberts*, Case No. H0300981. (Sentencing hearing, Polygraph)
68.  Rapid City, South Dakota, 2 September 2004, *United States v. Jonas Seth Not Help Him*, CR 04-50004.  (Suppression hearing, Interrogation techniques and false confession)
69.  York, South Carolina, 16 September 2004, *State of South Carolina v. Billy Wayne Cope,* Case Nos. H-023255; H-023258; H-023259; H-023260; H-023262; H-023263; H-023275; H-023276; H-023277; H-023278: H-509259.  (Jury Trial: Polygraph)
70.  Rapid City, South Dakota, 22 September 2004, *United States v. Jonas Seth Not Help Him*, CR 04-50004. (Jury Trial. Interrogation techniques)
71.  Boise, Idaho, 18 April 2005, *State of Idaho v. Daniel Levitt.* (Probation Violation Hearing, Polygraph and False Confession)
72.  Boise, Idaho 27 April 2005, *State of Iowa v. Jaun Macias* Criminal No. FECR052969 Iowa District Court for Woodbury County.  (Deposition regarding polygraph malpractice.)
73.  Atlanta, Georgia 8 & 9 September 2005, *United States v. Ricardo Cortez Williams*, Criminal Action No. 1:03-CR-636-JEC, In The United States District Court For The Northern District Of Georgia, Atlanta Division. (*Daubert* Hearing, Polygraph)
74.  Mineola, Nassau County, New York, 17 November 2005, *The People of the State of New York v. John Kogut,* Indictment 61029, Supreme Court of the State of New York, County of Nassau. (Bench Trial, Polygraph Malpractice).
75.  Albuquerque, New Mexico, 9 February 2006, *State of New Mexico v. Mario Lucas Chavez*, No. CR-04-03558, Second Judicial District Court, County of Bernalillo. (Jury Trial, Polygraph)
76.  Caldwell, Idaho, 11 July 2006 *Idaho v. Sarah Pearce,* Idaho Supreme Court docket #30502, case #03-5092C, evidentiary proceeding for the district court to take proffered testimony pursuant to a limited remand from the Idaho Court of Appeals. (Eyewitness Identification Procedures).

**Charles R. Honts, Ph. D.**                                    **Curriculum Vitae**

77. Caldwell, Idaho, 28 March 2007 *Idaho v. Jeremy Hall*, CR# 06-23125, Canyon County. (Daubert hearing and testimony before the jury, Interrogation and False Confession).
78. Santa Fe, New Mexico, 10 October 2007. *City of Santa Fe v. Thomas K. Reed.* Municipal Court of Santa Fe, New Mexico. (Jury Trial: Polygraph).
79. Payette, Idaho, 12 February 2008, *Idaho v. Dale Morris Kyle, Sr.*, Payette County District Court, (Pre-trial Motions Hearing; Polygraph).
80. Rapid City, South Dakota, 11 September 2008, *U.S. v Benjamin High Horse*, CR 07-50091 (Suppression Hearing, testimony given by telephone; False Confession and Polygraph).
81. Waukegan, Illinois, 13 November 2008, *People of the State of Illinois v. Jaun Rivera*, No. 92 CF 2751 (Suppression Hearing, False Confession and Polygraph).
82. Boise, Idaho, 8 June 2009, *Laura Lee vs. Mahendra Gupta. M.D and Linton Hospital. d/b/a Linton Medical Center.* Case No. 15-06-C-00057, Civil No: 06-C-57, State of North Dakota in District Court, County of Emmons, South Central Judicial District. (Deposition by telephone)
83. Flagstaff, Arizona, 24 June 2009, *State of Arizona vs. Daphne Henry*, CR2009-0165 (Coconino County, AZ) (Suppression Hearing, False Confession and Polygraph) by telephone.
84. Sante Fe, New Mexico, 25 June 2009. *State of New Mexico v. Steven James Cordova.* Testimony before the Grand Jury. (Polygraph).
85. Caldwell, Idaho, 3 November 2009. *State of Idaho v. Christopher James Latham*, CR-2008-24561-C. Third Judicial District Court of the State of Idaho (Daubert Hearing, Interrogation and False Confession).
86. Caldwell, Idaho, 6 November 2009. *State of Idaho v. Christopher James Latham*, CR-2008-24561-C. Third Judicial District Court of the State of Idaho (Jury Trial, Interrogation and False Confession).
87. Boise, Idaho, 9 June 2010, *State of Idaho v. Nolan.* Hearing concerning the admissibility of expert testimony on eyewitness factors. Juvenile Court.
88. Conway, South Carolina, 11 January 2011. *State of South Carolina, County of Horry v. Robert Andrew Palmer.* In the Court of General Sessions, Case Nos. 10G-GS 02196/02195 and 08-GS-26-04120 (Daubert Hearing on Polygraph Admissibility).
89. Clovis, New Mexico, 28 March 2011. *State v. Lonzell Wiggins*; D-0905-CR-200900892, Ninth Judicial District Court-Curry County, Clovis, NM (Rule 11-707 Hearing on the Polygraph, by telephone).
90. Boise, Idaho, 31 May 2011, *Stephan Cordova v. City of Albuquerque*, No. CV-2009-15455, State of New Mexico, County of Bernalillo, Second Judicial District Court. (Deposition, Polygraph).
91. Clovis, New Mexico, 3 November 2011. *State v. Lonzell Wiggins*; D-0905-CR-200900892, Ninth Judicial District Court-Curry County, Clovis, NM (Jury Trial, Polygraph).
92. Vernal, Utah, 7 November 2011. *State of Utah, in the interest of Crow, Kes DOB 04/17/2007, A minor child*, Family Court. (Jury Trial: Child witness issues)
93. Albuquerque, New Mexico 8 August 2012. *State of New Mexico v. Grand Jury Target (MT), DA # 2009-01672-1.* (Testimony before the Grand Jury concerning a polygraph result.)
94. Albuquerque, New Mexico 14 August 2012. *Melissa Gutierrez vs. Barbara Germain Killian,* Unemployment Compensation Appeal New Mexico Department of Workforce Solutions Appeals Tribunal (Testimony concerning a polygraph result.)
95. Huntsville, Missouri, 17 September 2012, *State v. Roland, Randolph County Case No. 12RA-CR00073-01.* Randolph County Court, (Suppression Hearing, Polygraph and False Confession).
96. Juneau, Alaska, 20 November 2012, *State of Alaska v. Joseph Randall Dennis, Case No. 1JU-12-21 CR*, (Jury Trial, Child Witness Interviews).
97. Morehead, Kentucky, 27 November 2012, *Commonwealth of Kentucky vs Ronald Christopher Fairchild, No. 12-CR-238*, Rowan Circuit Court (Jury Trial, Polygraph Malpractice and False Confessions).

**Charles R. Honts, Ph. D.**                                                                  **Curriculum Vitae**

98. Kamloops, British Columbia, Canada, 9 April 2013, *Regina vs. Adams, Carry and Correia, Court File No., 28732* in the Supreme Court of British Columbia. Testimony concerning the use of polygraph with informants (Suppression Hearing) via video link from Boise Idaho.
99. Washington, DC, 22 April 2013, United States Department of Energy Administrative Hearing, designation *PSH-12-0144* (Sworn Presentation of Polygraph Examination Results via telephone from Boise, Idaho.)
100. Boise, Idaho, 29 April 2013, *Livers v. Schenck, et al.* No. 8:08 C 107, In the United States District Court for the District of Nebraska. Sworn Deposition taken at the offices of the Attorney General of the State of Idaho. (Polygraph malpractice resulting in a false confession)
101. Boise, Idaho, 30 July 2013, *State of Idaho vs. Patrick I. Rodriguez*, Case No. CR-FE-2012-13989. (Sentencing hearing, Polygraph)
102. Gallup, New Mexico, 20 November 2013, *State of New Mexico vs. John Mayes, Case No. D-1116-CR-201100780 - 1*, (Jury Trial, Polygraph).
103. Idaho Falls, Idaho, 16 April 2014, *State of Idaho vs. Leroy Wayne Simpson, Case No. CR-2013-10350.* Suppression hearing via video link from Boise, Idaho. (False Confession)
104. Boise, Idaho, 28 May 2014, *Jeffrey Deskovic vs. City of Peekskill, No. CV-07-8150*, United State District Court Southern District of New York (Deposition, Polygraph malpractice resulting in a false confession).
105. Clayton, Missouri, 16 July 2014, *State of Missouri vs. Shermell Crockett.* Case No. 12SL-CR05127, Saint Louis County Court. Suppression hearing. (False Confession)
106. Clayton, Missouri, 7 August 2014, *State of Missouri vs. Shermell Crockett.* Case No. 12SL-CR05127, Saint Louis County Court. Suppression hearing continuation. (False Confession by telephone)
107. White Plains, New York, 15 October 2014, *Jeffrey Deskovic v. Putnam County and Daniel Stephens*, United States District Court, Southern District of New York, Case No. 07-CV-8150 (Jury Trial: Polygraph malpractice resulting in a false confession).
108. St. Albans, Vermont 19 November 2014, *State of Vermont v. Kevin W. Stanley*, Docket No. 1056-8-08 Frcr. Testimony by telephone. (Hearing regarding problems with post-conviction sex offender polygraph testing.)
109. Lihue, Kauai, Hawaii, 30 January 2015, *State of Hawaii v. Dean C. Wilson*, CR. No. 12-1-0345, In the Circuit Court of the Fifth Circuit, State of Hawaii. (Polygraph Admissibility Hearing)
110. Coeur d' Alene, Idaho, 5 Feb 2015, First Judicial District (Kootenai County), *State of Idaho v. Daniel Abram Taylor*, Case No. CR-2013-0024363. (Jury Trial, False Confessions).
111. Lihue, Kauai, Hawaii, 6 March 2015, *State of Hawaii v. Dean C. Wilson*, CR. No. 12-1-0345, in the Circuit Court of the Fifth Circuit, State of Hawaii. (Polygraph Admissibility Hearing, conclusion of testimony #108.)
112. Fort Bragg, North Carolina, 7 April 2015, *United States v. Dobbins, Jason P. SSG, U.S. Army*, in the Second Judicial Circuit, U.S. Army. (Testimony by telephone in a hearing on a motion to compel expert assistance.)
113. Clarksville, Tennessee, 16 April 2015, *State of Tennessee v. Keven Yaepez*, Docket No. 441300576. (Suppression hearing, false confessions and psychological coercion)
114. Iowa City, Iowa, 17 August 2015, *State of Iowa v. Tristan Loughran.* (Deposition by telephone concerning polygraph malpractice and false confessions.)
115. St. Louis County, Missouri, 18 September 2015, *State of Missouri v. Casey*, Case No. 14SL-CR07287-01. (Deposition by telephone concerning interrogation, psychological coercion and false confessions.)
116. Iowa City, Iowa 5 October 2015, *State of Iowa, vs. Tristan Alexander Loughran*, Case No. FECR101523. (Suppression Hearing testimony by telephone concerning polygraph malpractice, interrogation, psychological coercion and false confessions.)
117. Coeur d' Alene, Idaho, 3 December 2015, First Judicial District (Kootenai County), *State of Idaho v. Daniel Abram Taylor*, Case No. CR-2013-0024363. (Jury Trial, False Confessions).

**Charles R. Honts, Ph. D.**                                           **Curriculum Vitae**

118. Albuquerque, New Mexico, 21 January 2016, United States District Court for the District of New Mexico, *United States of America vs. Jamaica Tennison*, No. 15-cr-00212 MCA. (Suppression Hearing, Polygraph Malpractice resulting in a false confession.)

ATTACHMENT B
HONTS SCHEDULE OF MATERIALS

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLE HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 4391** |
| **v.** | ) | |
| | ) | **Judge John W. Darrah** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**SCHEDULE OF MATERIALS
PROVIDED TO CHARLES R. HONTS, Ph.D.**

Nicole Harris' complaint

PL Nicole Harris 6983-7001
Transcript of Bartik testimony at motion to suppress statements

PL Nicole Harris 7924-7943
Transcript of Bartik testimony at criminal trial

PL Nicole Harris 7802-7923
Transcript of Nicole Harris testimony at criminal trial

City 540-543
CPD supp report, Field Investigation Polygraph Report, submitted May 17, 2005
RO Bartik

City 571-574
CPD supp report, VC Investigation Polygraph Report, submitted May 17, 2005
RO Bartik

City 575
Polygraph examiner's worksheet, May 15, 2005
RO Bartik

City 576
Polygraph case review, May 15, 2005

1

City 577
Polygraph subject consent, May 15, 2005
Nicole
RO Bartik

City 578
Polygraph subject consent, May 15, 2005
Stavon
RO Bartik

City 579
Polygraph examiner's worksheet, May 15, 2005
Stavon
RO Bartik

City 580-586
(untitled) Polygraph graph

City 588
CPD 5 year employee complaint register history, July 23, 2014
Bartik

City 596
CPD Complimentary history, July 22, 2014
Bartik

City 820-830
CPD employee training record, November 3, 2014
Bartik

City 909-926
909-195 CPD Employee complaint history from CRMS, January 1, 2000 - October 29, 2014
        912: Bartik

City 916-923
Pre 2000 Mainframe complaint register history, January 1, 1967 - December 31, 1999
        916: Bartik

City 1447-1450
CPD Bureau of Technical Services, Forensic Services Division, Standard Operation Procedure
for Polygraph Unit Operations

2

City 1451-1454
CPD Bureau of Detectives, Forensic Services Division, Standard Operation Procedure for
Polygraph Unit Operations

City 54-64
GO 93-3, Special situations (addendum 5B, effective 1 October 2002)

City 371-385
Case Supplementary Reports, RD # HL 356544
Field Investigation Cleared Closed (Arrest and Prosecution) Report, submitted June 21, 2005
RO Noradin, Kelly, Day and Wo

City 386-393
Case Supplementary Reports, RD # HL 356544
Field Investigation Progress-Violent (Scene) Report, submitted June 2, 2005
RO Wo, Day

City 397-398
GPR, submitted May 14, 2005
RO Landando

City 399
GPR, submitted May 15, 2005
RO Landando

City 400-405
GPR, submitted May 14, 2005
RO Noradin

City 406-407
GPR, submitted May 15, 2005
(Deante interview CACC Ale Levy)
RO Wo #20232

City 412-413
GPR, submitted  May 14, 2005
(interview Nicole)
RO Kelly #21121

City 421
GPR, submitted May 15, 2005
(Nicole recants, says not guilty)
RO Noradin

City 423-425

3

GPR, submitted May 15, 2005
(Nicole agrees to polygraph, offered food & drink, re-advised of rights)
RO Noradin

City 426-430
Arrest report, May 15, 2005
RO Wo, Lopez, Day, Kelly, Balodimas

PL Nicole Harris 6911-6982
Transcript of Detective Noradin testimony at motion to suppress

PL Nicole Harris 7531-7595
Transcript of Detective Noradin testimony at criminal trial

PL Nicole Harris 7691-7714
Transcript of Detective Wo testimony at criminal trial

PL Nicole Harris 7596-7623
Transcript of Detective Balodimas testimony at criminal trial

PL Nicole Harris 8012-8022
Transcript of Detective Landando testimony at criminal trial

Bartik deposition in *Donny McGee v. City of Chicago*, No. 04 C 6532 (N.D. Ill.)

Bartik deposition in *Larry Scott v. City of Chicago*, No. 07 C 3684 (N.D. Ill.)

Polygraph documents for Larry Scott, October 2000

Polygraph documents for Estella Gonzalez, August 2000 (Larry Scott case)

City 1455-1461
GO 05-01, Digital recording of homicide investigations (effective date 15 July 2005)

City R580-586
Polygraph graph for Nicole Harris

Bartik testimony at motion to suppress and at trial in *People v. Donny McGee,* No. 01 CR 12829 (Cook County Circuit Court)

Bartik testimony at trial in *Donny McGee v. City of Chicago*, No. 08 L 3503 (Cook County Circuit Court) (direct and cross)

Exhibits in McGee (17, 18, 19, 80, 83)

4

Bartik deposition in *Dany Lanza v. City of Chicago*, No. 08 C 5103 (N.D. Ill.)

Kevin Howley deposition in *Corethian Bell v. Cummings*, No. 02 L 8857 (Cook County Circuit Court)

Video of Nicole Harris false confession

Bartik deposition transcript in Nicole Harris

City 912
Bartik CR history 2000-2014

City 916
Bartik CR history 1967-1999

City 588
Bartik 5 year CR history July 2014

City 596
Bartik Complimentary history

City 820
Bartik training record

City 8099
Bartik rating card January 2000

City 8100
Bartik rating card January 2001

City 8101
Bartik rating card August 2001

City 8102
Bartik rating card August 2002
City 8103
Bartik evaluation August 2010

City 8105
Bartik evaluation August 2011

City 8107
Bartik evaluation October 2012

725 ILCS 5/103-2: Treatment While in Custody

5

225 ILCS 430/11: Qualifications for licensure as an examiner

225 ILCS 430/15: Unlawful act or violations as cause for revocation of license

225 ILCS 430/14.1: Prohibited subjects of inquiry

50 ILCS 725/3.11: Polygraph or chemical tests

Nicole Harris deposition transcript

*Nicole Harris v. Thompson*, 2013 U.S. App. LEXIS 16715 (7th Cir.)

James Hickey deposition transcript

City 8551-8558
Organization and Functions of the Bureau of Investigative Services, effective date 26 March 2003 (Addendum to General Order 03-01)

City 8559-8566
Organization and Functions of the Bureau of Investigative Services, effective date 01 January 2004 (Addendum to General Order 04-01)

ATTACHMENT C
ASTM BASIC TRAINING

**Designation: E 2000 – 98**

AMERICAN SOCIETY FOR TESTING AND MATERIALS
100 Barr Harbor Dr., West Conshohocken, PA 19428
Reprinted from the Annual Book of ASTM Standards. Copyright ASTM

# Standard Guide for
# Minimum Basic Education and Training of Individuals
# Involved in the Detection of Deception (PDD)[1]

This standard is issued under the fixed designation E 2000; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This guide covers the minimum basic education and training required for an individual involved in the psychological detection of deception in using instruments which measure physiological responses in the areas of breathing or respiration, changes in electrodermal activity, and changes in pulse rate and relative blood pressure.

1.2 For additional standards promulgated by ASTM Committee, see Practice E 1954.

## 2. Referenced Documents

2.1 *ASTM Standards:*
E 1954 Practice for Conduct of Research in Psychophysiological Detection of Deception (Polygraph)[2]

## 3. Significance and Use

3.1 This practice is intended for use by any individual when reasonably expected to be the subject of litigation. The intent of this guide is to set forth the minimum requirements for education and training of an individual who administers psychophysiological examinations, and who renders an opinion as to attempted deception or truthfulness of a subject who has been tested.

3.2 Since polygraph standards have changed during the period from 1966 to January 1998, and the standards herein represent the current industry standards, individuals who can document that they were trained at a polygraph school which was fully accredited by the American Polygraph Association prior to January 1998, shall be deemed to have met the minimum professional standards for polygraph examiner training at the time they received their initial basic polygraph training.

3.3 Individuals who received basic polygraph training prior to January 1998 at a polygraph training school which was not fully accredited by the American Polygraph Association standards may be qualified, providing they can document that their basic polygraph training was substantially equivalent in length and curriculum as required for American Polygraph Association polygraph school accreditation.

## 4. Minimum Requirements for Basic Polygraph Education and Training

4.1 *Facility*:

4.1.1 The training facility must be licensed or recognized, or both, and approved by the appropriate state, county, or municipal licensing authority, or both, wherein such authority exists. In addition, the facility must be approved by local agencies such as zoning, fire department inspection, health department, and have the local licenses or certification, or both, to operate such a school wherein such authority exists.

4.1.2 The facility housing the polygraph school must reflect an operation which provides a proper educational environment which should include, as a minimum, the following:

4.1.2.1 Controlled access to and from the classroom instruction and supervision areas.

4.1.2.2 Adequate and regulated heating, cooling, and lighting of all classroom/instructional student work areas.

4.1.2.3 Isolated and controlled facilities for student testing.

4.1.2.4 A classroom setting sufficient in size with available space for lectures/demonstrations for all enrolled students.

4.2 *Instructional Aids, Supplies and Equipment*

4.2.1 The polygraph school shall maintain a library with reference sources available to students that includes as a minimum:

4.2.1.1 The journal Polygraph published by the American Polygraph Association for at least the last 3 years.

4.2.1.2 Professional practitioner journals which relate to the application of polygraph sciences for at least the last 3 years.

4.2.1.3 Research articles or journals, or both, containing published research that document validity, reliability, and procedural data pertinent to the polygraph profession.

4.2.1.4 Reference and resource materials pertaining to psychology, physiology, psychophysiology, interviewing, interrogation, and the law as it relates to polygraph.

4.2.1.5 Polygraph texts and publications recognized within the polygraph profession for historical or contemporary contributions.

4.2.1.6 A school may satisfy the requirements above by providing students with official access to technical libraries that maintain said publications.

4.2.2 The school should have sufficient teaching aids and supplies available on site to effectively present the instructional materials to all students enrolled.

---

[1] This guide is under the jurisdiction of Committee E 52 on Forensic Psychophysiology and is the direct responsibility of Subcommittee E 52.04 on Examiner, Education and Training.

Current edition approved Sept. 10, 1998. Published March 1999.
[2] *Annual Book of ASTM Standards,* Vol 14.02.

 **E 2000**

4.3 The polygraph course of instruction must meet one of the following:

4.3.1 The course must be no less than a minimum of 300 continuous classroom contact hours, conducted over a period of not less than 10 consecutive weeks.

4.3.2 The course must be no less than a minimum of 300 continuous classroom contact hours, conducted over a period of not less than 8 consecutive weeks in residence and followed by 2 additional weeks of credit earned in by non-residence independent study. The independent study credit must be completed within 3 consecutive calendar months from the initial course starting date.

4.3.3 The student must be physically present at the school facility for not less than 90 % of the actual instruction time, with remedial studies required for any missed time.

4.3.4 The student may not be credited with completing more than 8 hours of instruction within any consecutive 24-h period. The student may not be *required* to attend more than 8 h of instruction during a 24-hour period.

4.3.5 The student may not be credited with completing more than 6 instruction days within any given instruction week consisting of 7 consecutive 24-h days. The student may not be *required* to attend more than 6 instruction days within any 7-day instruction week.

4.4 *Polygraph Instrumentation Requirements*:

4.4.1 The polygraph school shall be required to have available for all students sufficient polygraphs, fully operational and properly calibrated to reasonably allow all students sufficient instrument time to complete a minimum of 90 min of total chart time during the course. As a minimum, one instrument, either analog or computer, shall be available for each 3 students enrolled.

4.4.1.1 If the school advertises they teach polygraph exclusively using the computer, the school shall be required to have available for all students sufficient computer polygraphs to allow a minimum of 90 min of total chart time. As a minimum, one complete computer polygraph system shall be available for each 3 students enrolled.

4.4.1.2 All polygraphs assigned by any school for student use shall record visually, permanently, and simultaneously on continuously moving charts at least 3 physiological tracings: (1) pneumographic, (2) cardiosphygmographic, and (3) electrodermal activity. This shall not be interpreted to preclude the recording of additional physiological phenomena on the same chart. Computers displaying these three physiological tracings on a computer screen which may be printed, will meet this instructional requirement.

4.5 *School Record Requirements*:

4.5.1 Each polygraph school shall maintain the following student records permanently:

4.5.1.1 Date the course/instruction started.

4.5.1.2 Date classroom instruction completed or date the student withdraws and reason therefore.

4.5.1.3 Date of final certification or graduation from the complete polygraph training program.

4.5.1.4 Method used and amount of Independent Credit awarded if any.

4.5.1.5 A written transcript reflecting performance of the student on all written examinations or internship, or both, practical skills.

4.5.2 All other student records including charts conducted, student complaints, testing materials, documentation as to credit earned by a non-residence member, and any other documents required for professional inspection, shall be maintained for a period of not less than 3 years.

4.5.3 All records related to any student candidate who was not accepted for training shall be maintained for a period of not less than 3 years.

4.5.4 All records related to any student who withdraws, takes leave of absence or is suspended or expelled from the school for any reason shall be maintained for a period of not less than 3 years.

4.6 *Instructor Requirements*:

4.6.1 The selection, development, and retention of competent faculty at all levels are of major importance to the quality of a polygraph school.

4.6.1.1 A resume or curriculum vitae of each faculty member must be kept on file.

4.6.1.2 The school must demonstrate that the size of the faculty is sufficient to achieve the school's stated mission.

4.6.1.3 The school must present designated criteria for periodic evaluation of faculty members along with evaluation reports.

4.6.2 Instructor requirements in primary course materials, to include polygraph instruction in methodology, techniques for detection of deception, and instrumentation must meet or exceed the following requirements.

4.6.2.1 Must possess, as a minimum, a degree at the Baccalaureate level from a college or university accredited by the appropriate regional accreditation board(s). Individuals who are a Full Member, in good standing, of the American Polygraph Association who have been approved as a primary polygraph instructor at an American Polygraph Association accredited polygraph school for a period of 5 consecutive years prior to adoption of this guide and do not possess the required degree, shall be deemed qualified so long as they continue as a primary instructor with no breaks in service.

4.6.2.2 Must have administered a minimum of 200 polygraph examinations of the type in which they will be presenting instruction.

4.6.2.3 Must have completed a basic polygraph school course at a school which meets or exceeds the requirements set forth in ASTM standards. Exceptions are made for instructors who received their basic polygraph training prior to the acceptance of the above ASTM standards, providing the training was equivalent to the prevailing American Polygraph Association school standards at the time training was received.

4.6.2.4 Must have at least 3 years experience as a practicing polygraph examiner.

4.6.2.5 Exceptions to 4.6.2.1 which have been granted to persons on a case by case basis by the American Polygraph Association prior to January 1998, will be deemed to satisfy these requirements for instructors in primary polygraph areas.

4.6.2.6 An individual expelled for cause from the American Polygraph Association (APA) or any other professionally recognized National or State Polygraph Association, or anyone

 E 2000

convicted of a felony or discharged from related employment for cause, may not qualify as a primary instructor. Similarly, individuals in a polygraph licensing state or who were licensed in any state, who have had their polygraph license revoked for cause may not qualify as a primary instructor.

4.6.3 An individual not meeting all of the criteria described in section 4.6.2 as necessary for primary instruction, may provide instruction in primary course work; however, they will not be considered as primary instructors and they may not substitute where the physical presence of the primary instructor is required under 4.6.4.5.

4.6.4 Individuals qualifying as primary instructors must be physically present with the students and must provide the instruction to the student no less than 75 % of the minimum hours of primary course material instructor required. This shall be interpreted as follows:

4.6.4.1 Minimum total required hours = no less than 300 continuous classroom hours in residence.

4.6.4.2 Required hours of supplemental instruction is = 64 h.

4.6.4.3 Required hours of primary instruction is = 236 h.

4.6.4.4 75 % of 236 = 177 h instruction requiring the physical presence of a primary instructor.

4.6.4.5 Therefore, it will be required that regardless of the course length, a primary instructor must be physically present with the students and provide student instruction during no less than 177 h of scheduled primary course material instruction.

4.6.4.6 At least 50 h of the total time of scheduled instruction in primary course materials must be taught by an additional primary instructor or instructors. Thus, any basic polygraph course will require at least two qualified primary instructors provide the primary instruction to the students.

4.6.4.7 Where a primary instructor is not required to be physically present, additional methods of presenting course material to students may be utilized, that is, guest instructors, and so forth.

4.6.5 Instructors for supplemental disciplines must meet the following requirements.

4.6.5.1 *Legal Issues*—Instructors teaching legal issues or legal aspects related to polygraph sciences must possess a law degree which is recognized by the appropriate national or regional bar association, or be, currently licenced to practice law by an appropriate governmental or regulatory licensing authority; and, be a member in good standing with the bar association in their state or residence where applicable. They need not be practicing polygraph examiners.

4.6.5.2 *Physiology Issues*—Instructors teaching physiological issues related to polygraph sciences must possess, as a minimum, a degree at the Masters level from a regionally accredited college or university, in physiology or in a discipline defined as closely related or aligned with physiology, that is, psychophysiology, physiological psychology, and so forth. They need not be practicing polygraph examiners.

4.6.5.3 *Psychology Issues*—Instructors teaching psychological issues or aspects related to polygraph must possess, as a minimum, a degree at the Masters level from a regionally accredited college or university in psychology. They need not be practicing polygraph examiners.

4.6.5.4 *Research Methods*—Instructors teaching research methods or aspects related to polygraph must posses, as a minimum, a degree at the Baccalaureate level from a regionally accredited college or university, in the area of research or statistics, physiology or psychology. They need not be practicing polygraph examiners.

4.6.6 Documentation of instruction in all primary and supplemental course materials must be documented for each class presentation and must include, as a minimum, the following.

4.6.6.1 Name of instructor, date, and time of the instruction.

4.6.6.2 Method of instruction, that is, by primary instructor, by guest instructor, by videotape presentation, demonstration, practical exercises, and so forth.

4.6.6.3 Record of student attendance and testing of materials, if appropriate.

## 5. Polygraph Course Curriculum

5.1 Basic polygraph course curriculum requirements shall consist of a minimum of 300 instruction hours to include formal classroom instruction, in-house supervised instrument time, in-house research activities, as well as any other approved method of instruction.

5.2 Primary course work consists of polygraph methodology and techniques, and instrumentation, and the following minimum contact hours of instruction in major topics are required:

5.2.1 The History and Development in the Detection of Deception through scientific means — 8 h.

5.2.2 Mechanics of Instrument Operation including mechanics and functioning of the instrument components, instrument activation and operation, chart making, instrument maintenance and calibration, and related area — 20 h.

5.2.3 Test Question Construction which includes semantics and test questions formation — 30 h.

5.2.4 Polygraph Techniques including an understanding of multi-technique procedures and must include instruction for understanding the comparison question techniques; relevant-irrelevant techniques; peak of tension procedures; and other testing techniques which are generally accepted in the field as being valid testing techniques. Major emphasis and minor emphasis may be taught depending upon the orientation and philosophy of each respective polygraph school; however, all students must acquire a least introductory knowledge of different examination procedures prominently in use by polygraph examiners in the field today — 60 h.

5.2.5 Chart Analysis including skills development in chart evaluation which must provide the student with at least an introductory knowledge of the different chart analysis procedures prominently in use by examiners today, that is Numerical Chart Scoring Procedures; Global Procedures; the school may emphasize and teach a major chart analysis procedure — 45 h.

5.2.6 Interviewing/Post-test Procedures including skills development in the pre-test and post-test interview methods and procedure— 14 h.

5.2.7 Ethics to include a thorough understanding of the ethical obligations of the examiner to the polygraph examinee, to the examiner, and to the profession. Additionally, students must be familiarized with professional polygraph organizations

 **E 2000**

on a national and local level that are concerned with the development of, and the ethics within the profession — 6 h.

5.2.8 Development of Student Skills including proficiency in chart work and test procedures. This should include a minimum of the student producing 90 min of charts to be maintained in the student's files and not including maintenance and calibration charts as described in 5.2.2. Students are prohibited from conducting live polygraph examinations until after they have completed the minimum requirements in primary course work and supplemental disciplines (300 h). This does not preclude students from conducting practice examinations on each other or on role players — 37 h.

5.2.9 Topics to be determined at the School Director's Discretion — 16 h.

5.3 Instruction in the supplemental disciplines should consist of the following.

5.3.1 Legal issues relating to polygraph including appropriate federal, state and local matters along with matters relating to EPPA and ADA as appropriate — 8 h.

5.3.2 Psychological and physiological issues relating to polygraph to include basic psychology, physiological, and psychophysiological areas forming the foundations of polygraph sciences and appropriate research in those areas. Topics should include not less than 20 h in psychology, 20 h in physiology and 4 h in research area — 44 h.

5.3.3 Student Performance Evaluations in both academic and practical areas relating to polygraph — 12 h.

## 6. Keywords

6.1 forensic psychophysiology; polygraph instrumentation; polygraph training

*The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 100 Barr Harbor Drive, West Conshohocken, PA 19428.*

ATTACHMENT D
APA STANDARDS 2001

## GOALS OF THE APA

The goal of the **American Polygraph Association** is to provide mankind with a valid and reliable means to verify the truth of the matter asserted by:

> \* **Serving the cause of truth with integrity, objectivity and fairness** to all persons

> \* **Encouraging and supporting research, training and education** to benefit members of the Association as well as those who support its purpose and by providing a forum for the presentation and exchange of information derived from such research, training and education

> \* **Establishing and enforcing standards** for admission to membership and continued membership in the Association

> \* **Governing the conduct of members** of the Association by requiring adherence to a Code of Ethics and a set of Standards and Principles of Practice

## BENEFITS OF MEMBERSHIP IN THE APA

The **American Polygraph Association**, established in 1966, is the largest polygraph association consisting of examiners in the private, law enforcement, and government fields. The **APA** continues to be the leading professional association of its kind, establishing standards of ethical practices, techniques, instrumentation, research, and advanced training and continuing educational programs. The **APA** has approximately 2,000 members, who are required to maintain the highest standards of moral, ethical and professional conduct and they are further required to discharge their duties with complete impartiality, dignity and respect. Members recognize that their primary responsibility is to the person being examined, and are forbidden to allow considerations of race, religion, politics, union activity, or economic status to play any part in their examinations, and they are pledged to issue an objective and unbiased opinion and to protect the confidentiality of the examination. The following is a sampling of the benefits that you will receive as a member of the **APA:**

> \* **Toll free access to the National Office,** staffed with a full-time Office Manager that is a clearing house for all polygraph related issues and is the primary custodian of all records and publications

> \* **Subscriptions to the quarterly journal "Polygraph"** which is the most authoritative, thorough, and up-to-date journal in the field

> \* **Subscriptions to the bi-monthly publication of the APA "Newsletter"** which contains everything from **APA** and state organizations, to recent court decisions

> \* **an annually published Directory of Membership** by names and geographic location, along with listings of Officers, memorials, state associations, licensing boards, and accredited polygraph schools with a free listing of your membership status

> \* **advanced notice and reduced rates for annual seminars and continuing education programs** with a seminar & Continuing Education Committee dedicated to provide members with the most up-to-date training and information on technological advances in the polygraph profession

**\* a chance to obtain a Certificate of Advanced and Specialized Training** which exceeds the minimum APA membership guidelines through continuing education

**\* reduced rates on numerous APA publications** and reference materials

**\* access to the latest information on legal issues** to include areas such as EPPA, ADA, police applicant screening, testing victims of sex crimes and polygraph testing of sexual offenders

**\* recruitment incentives** that can be used towards your membership dues and/or seminar registration fees

**\* job referral and placement service**

**\* access to the APA Archives** for written, visual and auditory materials relevant to educational information and the polygraph profession, including taped seminar sessions

**\* access to the Research Center**, its progressive research, and its publications in areas of techniques, validity, scientific issues, current practices, assessments, surveys of attitudes and problems facing the polygraph profession, where its publications and papers have been presented at APA seminars as well as at other criminal justice and related conferences

**\* access to a Legislation Committee and state liaisons** who bring forth any areas of interest of the APA in all matters relating to legislation, proposed or enacted, at federal, state and local levels which affect or may affect the Association, it's members and the polygraph profession in general

**\* assistance to any state organization for legislation restricting or prohibiting the use of polygraph**, as well as assistance in other areas that may affect members and the profession

**\* annual awards presentation** that identifies those persons who through their unselfish and extraordinary efforts promote and advance the best interest of the polygraph profession

**\* an Ethics & Grievance Committee who receives and investigates all allegations of misconduct against members of the APA**

**\* an Educational Accreditation Committee that establishes minimum criteria for evaluation and accreditation of polygraph training programs** to enhance the instruction and learning experiences of those seeking to be polygraph professionals

**\* free referrals and advance notice of accredited training programs** and other approved advanced continuing education seminars

**\* the chance to network with approximately 2,000 other members in the polygraph profession**

**\* E-Mail capabilities and Internet home page** which is currently under construction

In addition to the services you will receive, the **APA** Board of Directors, it's Officers and Committee Members, are **dedicated to the polygraph profession** and who, unceremoniously and unselfishly, go about the tasks of running an organization to benefit the entire polygraph profession. On any given day,

you will find those Officers and Committee Members corresponding, teaching, recruiting, developing new initiatives, conducting research, establishing and reviewing accredited polygraph schools, resolving ethical issues and disputes, preparing publications, fighting anti-polygraph legislation, and providing liaisons between the individual needs of state associations, as well as liaison between the needs of private, law enforcement and government sectors. **Services, guidance, references, networking and publications are only a phone call away!**

For more information about the **American Polygraph Association**, contact **Robbie Bennett, National Office Manager**, 1-800-APA-8037 or at (423) 892-3992; by FAX at: (423) 894-5435; or via mail at: APA National Office, PO Box 8037, Chattanooga, TN 37414-0037

**The APA Secretary, Vickie T. Murphy, can be reached telephonically at**: (410)987-6665 or by E-Mail: MDMICJ@aol.com.

## APA CODE OF ETHICS

### All voting members of the American Polygraph Association shall:

A. Support the purposes and objectives of the **APA.**

B. Maintain the highest standards of profession, moral and ethical conduct by assuming the responsibility for conduct and behavior designed to serve the cause of truth and justice.

C. Respect the dignity of all persons and be just, fair and impartial with each individual in discharging professional duties and objectives.

D. Hold themselves apart from influences intended to benefit their political, personal or financial well-being and objectives.

E. Abide by all the provisions of the **APA Standards and Principles of Practice.**

### Division IV - Code of Ethics

#### 4.1 Rights of Examinees

4.1.1. A member shall respect the rights and dignity of all persons to whom they administer polygraph examinations.

#### 4.2 Standards of Rendering Polygraph Decisions.

4.2.1 A member shall not render a conclusive diagnosis when the physiological records lack sufficient quality and clarity. This may include, but is not limited to, excessively distorted recordings possibly due to manipulations by the examinee, recordings with insufficient responsivity, or recordings with tracing amplitudes less than that generally accepted by the profession.

#### 4.3 Post-Examination Notifications of Results.

4.3.1 A member shall afford each examinee a reasonable opportunity to explain physiological reactions to relevant questions in the recordings. There are three exceptions.

4.3.1.1  When the examinee is represented by an attorney who requests that no post-examination interview be conducted, and that the results of the examination be released only to the attorney.

4.3.1.2  When the examination is being conducted by a court order which stipulates that no post-examination interview is to be conducted.

4.3.1.3  Instances of operational necessity.

## 4.4  Restrictions on Rendering Opinions

4.4.1  A member shall not provide any report or opinion regarding the medical or psychological condition of the examinee for which the member is not professionally qualified to make.  This shall not preclude the examiner from describing the appearance or behavior of the examinee. Polygraph outcome decisions shall be restricted to only those based on polygraph data.

## 4.5  Restrictions on Examinations.

4.5.1  A member shall not conduct a polygraph examination when there is reason to believe the examination is intended to circumvent or defy the law.

## 4.6  Fees.

4.6.1  A member shall not solicit or accept fees, gratuities, or gifts which are intended to influence his or her opinion, decision, or report. No member shall set any fee for polygraph services which is contingent upon the findings or results of such services, nor shall any member change his or her fee as a direct result of his or her opinion or decision subsequent to a polygraph examination.

## 4.7  Standards of Reporting.

4.7.1  A member shall not knowingly submit, or permit employees to submit, a misleading or false polygraph examination report.  Each polygraph report shall be a factual, impartial, and objective account of information developed during the examination, and the examiner's professional conclusion based on analysis of the polygraph data.

## 4.8  Advertisements.

4.8.1  A member shall not knowingly make, publish, or cause to be published any false or misleading statements or advertisements relating to the Association or the polygraph profession.  No member shall make any false representation as to category of membership in the Association.  All advertisements making reference to membership in the Association shall
also list the category of membership.

## 4.9  Release of Nonrelevant Information.

4.9.1  A member shall not dislcose to any person any irrelevant personal information gained during the course of a polygraph examination which has no connection to the relevant issue, and which may embarrass or tend to embarrass the examinee, except where such disclosure is required by law.

## 4.10  Restrictions on Examination Issues.

4.10.1  A member shall not include in any polygraph examination, questions intended to inquire into or develop information on activities, affiliations, or beliefs on religion, politics, or race except where there is relevancy to a specific investigation.

## 4.11  APA Oversight Authority.

4.11.1  A member who administers or attempts to administer any polygraph examination in violation of the Code of Ethics or the Principles of Practice may be subject to investigation, censure, suspension or expulsion from the Association, as provided by Article IV of the APA Constitution.

# STANDARDS OF PRACTICE

## Statement of Purpose

It is the position of the APA that a polygraph examination, properly administered by a well trained and competent polygraph examiner and using a validated testing technique, has a high degree of accuracy in detecting truthfulness or deception.  In order to ensure this high degree of accuracy, the APA establishes for its membership the following Standards of Practice. All examinations shall be conducted in compliance with governing local, state, and federal regulations and laws.

### 3.1 Definitions.

3.1.1  Evidentiary Examination - a polygraph examination, the written and stated purpose for which, agreed to by the parties involved, is to provide the diagnostic opinion of the examiner as evidence in a scheduled judiciary proceeding.  This is not intended to prevent admission as evidence of a confession obtained during the examination.

3.1.2  Investigative Examination - a polygraph examination for which the examination is intended to supplement and assist an investigation and for which the examiner has not been informed and does not reasonably believe that the results of the examination will be tendered for admission as evidence in a court of record.  Preemployment examinations shall be deemed to be investigative examinations.

3.1.3  Validated Testing Technique - a polygraph testing technique, for which exists a body of acceptable scientific studies.  A polygraph testing technique both endorsed by the APA Research and Development Committee, and published in Polygraph, shall be presumed to be a validated testing technique.

3.1.4  Specific Issue Examination Polygraph - a single-issue examination, almost always administered in conjunction with a criminal investigation.

### 3.2 Polygraph Examiner.

3.2.1  A polygraph examiner shall meet the training and educational requirements of his or her category of membership as set forth in Division V of the By-laws.

3.2.2 Evidentiary examinations shall be conducted only by Full or Associate members. Intern members shall conduct evidentiary examinations only by stipulation of the parties, or under the supervision of a full or associate member.

3.2.3 Polygraph examinations for clinical polygraph examination of sex offenders shall be conducted by members who have completed specialized training for sex offender polygraphs consistent with guidelines issued by the APA.

3.2.4 A polygraph examiner shall, where applicable, be licensed (or certified) by the regulatory organization of his or her jurisdiction.

3.2.5 A polygraph examiner shall, where applicable, comply with all state continuing education requirements. A polygraph examiner conducting evidentiary examinations shall have completed a minimum of thirty (30) Continuing Education hours every two years.

## 3.3 Polygraph Examinee.

3.3.1 The examiner shall make reasonable efforts to determine that the examinee is a fit subject for testing, where allowed by law. Basic inquiries into the medical and psychological condition of the examinee as well as any recent drug use should be made where allowed by law. Mental, physical or medical conditions of the examinee that should be observable to, or that should be reasonably known by the examiner, should also be evaluation prior to testing. No test should be conducted where valid results could not be reasonably foreseen.

3.3.2 During the pretest interview, where allowed by law, the examiner will specifically inquire of the person to be examined whether or not he or she is currently receiving or has in the past received medical or psychiatric treatment or consultation.

3.3.3 If an examiner has a reasonable doubt concerning the ability of an examinee to safely undergo an examination, a release from the examinee and his or her physician shall be obtained.

## 3.4 Instrumentation and Recording.

3.4.1 Polygraph examinations shall be conducted with APA approved instrumentation and shall record, at a minimum, the following channels or components:

3.4.1.1 Respiration patterns recorded by pneumograph components. Thoracic and abdominal patterns shall be recorded separately, using two pneumograph components.

3.4.1.2 Electrodermal activity reflecting relative changes in the conductance or resistance of current by the epidermal tissue.

3.4.1.3 Cardiograph to record relative changes in pulse rate, pulse amplitude, and relative blood volume.

3.4.2  Physiological recording during each test shall be continuous, and shall be of sufficient amplitude to be easily readable by the examiner and any reviewing examiner.  Pneumograph and cardiograph tracings over one-half inch in amplitude will be considered of sufficient size to be easily readable.

3.4.3  The polygraph shall be given a functionality or calibration test consistent with manufacturer recommendations.  The functionality or calibration test shall be administered prior to all evidentiary examinations.  At a minimum these tests shall be maintained by the examiner for no less than one year.  Compliance with state and federal law shall be required.

## 3.5  Test Location and Conditions.

3.5.1 Conditions under which testing occurs shall be free from distractions that would interfere with the ability of the examinee to appropriately focus on the issues being addressed.  The examination site should be relatively free from outside noise and distraction.

3.5.2 Examiners performing live polygraph examinations in public shall not render opinions regarding the truthfulness or deception of the examinees.  Examiners shall attempt to ensure that reenactments of polygraph examinations are clearly conveyed as such to viewers.

## 3.6  Preparation.

3.6.1  An examiner shall, prior to the examination, dedicate sufficient time to identify the issues and any potential problems in any area of testing.

## 3.7 Pretest Practices.

3.7.1  The examiner shall obtain information sufficient to identify the examinee.

3.7.2  The examiner shall obtain the consent of the examinee prior to testing.

3.7.3  Sufficient time should be spent to ensure that the examinee has a reasonable understanding of the polygraph process and the requirement for cooperation.

3.7.4  Sufficient time shall be spent to discuss the issues to be tested and to allow the examinee to fully explain his or her answers.

3.7.5  Sufficient time shall be spent to ensure the examinee recognizes and understands each question.  Attempts by the examinee to rationalize should be neutralized by a pretest discussion in which the examinee demonstrates he or she understands the test questions to have the same meaning as does the examiner.  Questions shall be asked in a form that would prevent a reasonable person, facing a significant issue, from successfully engaging in a rationalization process to avoid culpability.

3.7.6  The examiner shall not express bias in any manner regarding the truthfulness of the

examinee prior to the completion of testing.

## 3.8 Testing.

3.8.1  A member polygraph examiner shall use a validated testing technique.  Evidentiary examinations shall not materially deviate from the protocol of a validated testing technique. Where investigative examinations deviate from the format or protocol of a validated testing technique, such deviation shall, where the test is subjected to quality control by a reviewing examiner, be noted and justified in writing.  For the resolution of specific issues, each polygraph examination shall use a validated testing technique.

3.8.2  A stimulation test or acquaintance test shall be required for all evidentiary examinations.  A stimulation or acquaintance test should be conducted for all initial examinations for any specific issue or investigative examination.

3.8.3  Questions shall be asked with clarity and distinctiveness.

3.8.4  Questions shall be balanced in terms of length and impact for each category of questions utilized. Questions used in the assessment of truth and deception shall be preceded and followed by time intervals of not less than 20 seconds.  When approved validated research supports the use of another time interval, that time span shall prevail.

3.8.5  Examiners shall collect a sufficient number of charts so as to acquire sufficient data for proper evaluation, in conformance with a validated testing technique.

3.8.6  Nothing in these standards is intended to prevent the use of new or unvalidated testing techniques for purposes of research.

3.8.7  Standardized chart markings, recognized and utilized within the polygraph profession should be employed.

3.8.8  An audio or an audio/video recording of the pretest and in-test phases shall be made and maintained for evidentiary examinations, in conformance with governing state and federal laws.

## 3.9 Scoring.

3.9.1  Examiners shall employ quantitative or numerical scoring for all evidentiary examinations and for all specific issue investigative examinations.

3.9.2  Examiner notes of the test evaluation shall have sufficient clarity and precision so that another examiner could read them.

3.9.3  Examiners shall not disclose the results of the examination until it has been adequately and sufficiently analyzed.

3.9.4  Examiners shall maintain the confidentiality of their work conducted under privilege

until a release by the client is obtained.

3.9.5 An examiner subject to a quality control evaluation of a case shall fully disclose all relevant information regarding the case under review. Any doubts as to relevancy shall be resolved through disclosure.

### Post Conviction Sex Offender Testing

3.10.1 The practice of post conviction sex offender testing is a specialized subdiscipline in polygraphy, unique in its application. Practitioners are required to satisfy the provisions set forth in the Standards of Practice for investigative examinations, in addition to those standards below.

### 3.10.2 Minimum Training.

3.10.2.1 A minimum of 40 hours of post conviction specialized instruction, beyond the basic polygraph examiner training course requirements, shall be requisite to those who practice sexual offendertesting.

### 3.10.3 Written Examination.

3.10.3.1 A final examination, approved by the American Polygraph Association (APA) or its designated representative, shall be given subsequent to the approved training. The student must pass this written
examination to receive a diploma for the training. The written examination shall be properly controlled and protected to prevent exposure of the test questions or answers to any unauthorized persons.

### 3.10.4 Instructors' Knowledge of the Written Examination Content.

3.10.4.1 The instructors of the approved course shall be informed of the topic areas, along with a pool of possible test questions, for the final written examination. However, those questions specifically selected
for any given final examination shall not be made known to the instructors before the administration of the test to the students.

### 3.10.5 Quality Control Requirements.

3.10.5.1 All polygraph examinations of sexual offenders submitted for quality control shall be recorded in their entirety. Though video recording is the preferred medium, audio recording is sufficient to meet this standard.

### 3.10.6 Testing Facilities.

3.10.6.1 Testing facilities shall support recording equipment, either audivisual or audio.
3.10.7 In-test Specifications.

3.10.7.1 All recorded physiological data shall be retained as part of the examination file as

long as required by regulation or law, but for a minimum of one year.

3.10.7.2 Each single-issue examination shall employ a technique and format that has been validated through research.

3.10.7.3 Reasonable departures from validated formats are permissible, to the extent that an independent examiner/reviewer would concur that the employed method was not significantly dissimilar from the format validated in research. Any deviations from validated formats shall be fully explained and justified by the examiner in writing where this test is subjected to an independent quality control.

---

## Return to Home Page

ATTACHMENT E
AAPP STANDARDS 2001



# THE AMERICAN ASSOCIATION OF POLICE POLYGRAPHISTS

STANDARDS & PRINCIPLES

OFFICERS & BOARD MEMBERS

PRESIDENT'S MESSAGE

MEMBERSHIP INFORMATION

BYLAWS & CONSTITUTION

POSITION ON VOICE STRESS ANALYSIS

SEMINAR INFORMATION

CERTIFIED POST CONVICTION EXAMINERS

HOME

## Standards and Principles of Practice

### AMERICAN ASSOCIATION OF POLICE POLYGRAPHISTS (AAPP) BY-LAWS

1. Robert's Rules of Order will be used as a guideline for conducting all official meetings of the AAPP.

2. The President may appoint any member to standing committees to conduct specific business of the AAPP.

3. Public criticism regarding professional conduct of one member by another, other than before the Committee of Standards and Ethics or the Board of Directors (filed in writing and signed by the writer) is condemned and expressly forbidden for all AAPP MEMBERS.

4. Any member who knowingly makes a false certification or endorsement regarding an applicant's eligibility and/or qualifications, will be subject to termination of membership.

### STANDARDS AND PRINCIPLES OF PRACTICE FOR THE AMERICAN ASSOCIATION OF POLICE POLYGRAPHISTS (AAPP)

#### I. PRIMARY PURPOSE

The primary purpose of a polygraph examination is to determine if the person being examined is being truthful or untruthful to the issue under investigation.

#### II. BASIC USES OF THE POLYGRAPH

A. The polygraph examination should be a supplement to, not a substitute for, a field investigation.

B. The effectiveness of the polygraph examination, to a large extent, will be based upon the thoroughness of the investigation, prior to having the person take the examination.

C. To maximize the effectiveness of the polygraph examination, the investigator and the polygraphist must work together as a team.

D. The polygraph examination may be used to test the veracity of:

1. Suspects
2. Victims
3. Informants

## III. POLYGRAPHISTS CREDENTIALS

A. Only fully trained polygraphists, or intern polygraphists under the direct supervision of a senior polygraphist should be allowed to conduct polygraph examinations.

B. All law enforcement polygraphists should be bound individually and collectively to the standards, objectives, and principals of practice of the American Association of Police Polygraphists, and existing law(s).

## IV. POLYGRAPH INSTRUMENT

A. Polygraph instruments must be capable of recording visually, permanently and simultaneously, indications of a person's:

1. Cardiovascular pattern and changes therein.,
2. Respiratory pattern and changes therein.
3. Changes in skin resistance (Electrodermal Responses).
4. The polygraph instrument should be calibrated as per manufacturer's instructions.

## V. INVESTIGATOR RESPONSIBILITIES

A. During an investigation in which the polygraph might be utilized, the investigator should not resort to any misleading statements. If the person who determines that he/she was deceived later takes a polygraph examination, he/she may be overly suspicious of both the procedure and the polygraphist. Such a mental attitude may cause the person's reactions to be so erratic that no conclusive chart interpretation could be made.

B. The investigator must emphasize to a person who may take a polygraph examination that the polygraph technique is an extremely effective method of establishing the truth. Confidence should be expressed in both the accuracy of the procedure and the impartiality of the polygraphist.

C. Prior to the examination, the investigator should withhold, from the person to be examined, certain information believed to be known only to the victim, the investigator, and a person with guilty knowledge. These facts could be of vital importance to the polygraphist in test and question formulation.

D. When requesting a person to submit to a polygraph examination, the investigator should inform the person that they will be given the polygraph examination only if they are freely and voluntarily in agreement to take the examination. It is also recommended that the polygraphist have the examinee sign a consent form.

1. If the person exhibits fear of the test procedure, the investigator should assure the person that the polygraphist will thoroughly explain the procedure prior to the examination.

2. No attempt should be made by the investigator to explain the procedure, except to express complete confidence in the reliability.

3. Threats to use the polygraph in an effort to obtain a confession are forbidden.

E. Polygraph examinations should be approved for scheduling only when the following conditions have been met:

1. An investigation by other means has been as thorough as circumstances permit.

2. The person taking the examination has been interviewed.

F. The investigator should provide the polygraphist with as many case facts and documents as possible, including the complete complaint file. In addition, information concerning the background of the person being examined should be available.

G. At least one investigator working on the case should be immediately available during the polygraph examination to assist the polygraphist, should a matter arise with which the polygraphist is not familiar.

H. If the person being examined is under arrest, the investigator should have custodial responsibility.

I. In those situations where it is necessary to cancel a scheduled polygraph examination, the polygraphist should be notified as soon as practical.

J. The investigator should not subject the person taking the polygraph examination to interrogation immediately prior to a polygraph examination.

## VI. POLYGRAPHIST'S RESPONSIBILITIES

A. The responsibility of the conduct of the polygraph examination, areas to be covered, test questions, and all related procedures should lie with the polygraphist.

B. The polygraphist should have sole responsibility to determine if any

particular examination should take place and the time and location.

C. A polygraph examination should never be conducted where, in the polygraphist's opinion, poor examination atmosphere and/or surrounding(s) prevail.

D. The polygraphist should, if requested, submit a written report at the conclusion of each polygraph examination.

E. The polygraphist should be responsible for properly maintaining and protecting the polygraph files and records.

F. Results of a polygraph examination, and disposition of such written reports shall be in accordance with departmental policies and existing law(s).

G. The polygraphist shall not attempt to make a physical or psychiatric diagnosis of the examinee except to make a determination as to the testability of the person taking the polygraph examination.

H. The polygraphist shall produce a minimum of two polygraph charts relative to the testing issue.

I. Association members may also avail themselves of the review functions of the Association's Quality Control Committee.

## VII. RESPONSIBILITIES OF THE AGENCY/DEPARTMENT TO THE POLYGRAPHIST

In order for the polygraphist to maintain and improve his/her professional competency, the employing agency/department should allow the examiner:

1. To attend a minimum of one professional polygraph seminar on a yearly basis. Traveling, living and attendance expenses in this regard, should be paid for by the agency/department employment the polygraphist.

2. To require membership in appropriate professional organizations, reimbursing the actual cost of membership and/or assessments

## IX. REEXAMINATION

A. As a person's mental and physical condition affects the test results, the polygraphist must occasionally conduct reexaminations. Even after reexamination, the polygraphist is not always able to determine if the person is being truthful or untruthful.

B. If an indefinite finding is reported by the polygraphist, it is not to be interpreted as indicating truthfulness or untruthfulness. It merely indicates that the person should have the same status as if no polygraph examination has been administered. When an indefinite finding is

reported, it is the responsibility of the polygraphist to decide if a reexamination should be conducted.

C. Due to the complexities involved in recording and analyzing physiological reactions, it is possible for a polygraphist to make an incorrect interpretation. When such a decision is discovered, it should be brought to the polygraphist's attention. Research of such cases provide information which would prevent or lessen such future interpretations.

# What is an Unethical Examiner?

According to the ethical standards of our profession today, the below list represents activities of UNETHICAL EXAMINERS:

1. Self- sponsored tests
2. Short cuts Standard Operating Procedures
3. Conducts tests on persons who are not medically, physically, or psychologically able to be tested
4. Unauthorized release of test information and results
5. Improper physical and sexual advances
6. Circumventing the laws
7. Conducting too many examinations in a day
8. Violating E.P.P.A.
9. Violating A.D.A.
10. Uses non-recognized test procedures
11. Uses SELF-MADE test procedures and techniques
12. Violates laws and ethical procudures
13. Does NOT utilize Quality Control

**Select the application link to obtain a copy of the membership application.**

Standards & Principles || Officers & Board Members || President's Message
Membership Information || Bylaws & Constitution
Position on Voice Stress Analysis || Seminar Information || Home

ATTACHMENT F
ASTM CONTINUING EDUCATION

**ASTM**

**Designation: E 2064 – 00**

# Standard Guide for
# Minimum Continuing Education of Individuals Involved in the Psychophysiological Detection of Deception (PDD)[1]

This standard is issued under the fixed designation E 2064; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This guide establishes the minimum amount of advanced continuing education required for individuals engaged in psychophysiological detection of deception (PDD) examinations.

## 2. Referenced Documents

2.1 *ASTM Standards:*
E 2000 Guide for Minimum Basic Polygraph Training and Education[2]

## 3. Terminology

3.1 *basic PDD training*—the initial training required to administer PDD (Polygraph) Examinations in accordance with Guide E 2000.

3.2 *continuing education training*—advanced polygraph training and education completed after the basic training has been accomplished.

3.3 *primary polygraph curriculum*—advanced training in the areas of polygraph methodology and techniques such as instrumentation, chart analysis, test question construction, interviewing, and testing techniques.

3.4 *secondary polygraph curriculum*—training in polygraph-related areas such as law, psychology, physiology, research, and other areas, which relate to PDD activities. These may include, but are not limited to:

3.4.1 Computer courses, which may relate to PDD, such as, word processing, small business administration, accounting, and other appropriate areas.

## 4. Significance and Use

4.1 This guide is intended to ensure that those individuals who are practicing PDD (polygraph) examinations maintain their proficiency in the profession. Changes are constantly being made in the areas of instrumentation, testing format, and procedures, as well as legislation which affects the conduct of the industry. It is important that the individual PDD examiner be aware of changes in technology.

## 5. Minimum Requirements for Advanced Continuing Education PDD Training

5.1 The required number of minimum hours of training to maintain professional competence is 40 h, every two calendar years, starting with the date on which the basic PDD (polygraph) training was completed.

5.2 A minimum of 20 h of continuing education training must be in the primary area of instruction, and up to 20 h may be in the secondary area of instruction. A normal classroom contact hour is 50 consecutive min.

5.3 All continuing education must be documented in the form of a certificate, diploma, continuing education units (CEU) certificate, or letter transcript setting forth the following minimum information:

5.3.1 Name, address, and location of the training.

5.3.2 Name of the instructor or instructor(s) providing the instruction along with a resume of the instructor(s).

5.3.3 Date(s) of training and name of the person receiving the training.

5.3.4 Number of hours of training broken down by curriculum or subject matter and appropriate course outline(s).

## 6. Sources for Advanced Continuing PDD Training

6.1 Acceptable PDD (polygraph) advanced training may be obtained from any of the following areas:

6.1.1 Any formal PDD (polygraph) school meeting the criteria for Basic Polygraph Training in accordance with Guide E 2000.

6.1.2 Any recognized national or state polygraph association.

6.1.3 Any accredited college or university offering formal courses which are related to PDD curriculum areas.

6.1.4 Advanced related courses which are presented at any formal police department or police training academy or similar group.

6.1.5 Advanced related courses which are presented by any federal investigative agency, federal government agency, or U.S. military department which are related to PDD testing.

6.1.6 Other training which is directly related to PDD in which the instructor(s) are qualified and recognized PDD

---

[1] This guide is under the jurisdiction of ASTM Committee E-52 on Forensic Psychophysiology and is the direct responsibility of Subcommittee E52.04 on Examiner, Education and Training.
Current edition approved Jan. 10, 2000. Published April 2000.
[2] *Annual Book of ASTM Standards*, Vol 14.02.

Copyright © ASTM, 100 Barr Harbor Drive, West Conshohocken, PA 19428-2959, United States.

 **E 2064**

(polygraph) examiners in the area in which the instruction is presented.

**7. Keywords**

7.1 advanced PDD training; continuing education; forensic psychophysiology; PDD examinations; polygraph examiner

*The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

ATTACHMENT G

FEDERAL PSYCHOPHYSIOLOGICAL DETECTION OF DECEPTION EXAMINER HANDBOOK



# Federal Psychophysiological

# Detection of Deception

# Examiner Handbook

# December 1, l998

**FOR OFFICIAL USE ONLY**

**Table of Contents**

Chapter I  Introduction ......................................................................3

Chapter II  Quality Control ...............................................................5

Chapter III  Quality Assurance Procedures .......................................7

Chapter IV  Education Guidelines .....................................................9

Chapter V Test Question Construction ............................................15

Chapter VI  Test Data Analysis .......................................................20

Chapter VII  Acquaintance Test.......................................................23

Chapter VIII  Zone Comparison Test................................................26

Chapter IX  You Phase Zone Comparison Test ................................30

Chapter X  Comparison Test Formats...............................................34

Chapter XI  Peak of Tension Test ....................................................39

Chapter XII  Relevant/Irrelevant Screening Test ..............................43

Chapter XIII  Specific Issue Relevant/Irrelevant Test .......................48

Chapter XIV  Test for Espionage and Sabotage ...............................52

Chapter XV  Law Enforcement Applicant Screening .........................57

Glossary of Terms ..........................................................................61

**Chapter I**

**Introduction**

A.  Concept of Federal Psychophysiological Detection of Deception.

　　1.  Psychophysiological detection of deception (PDD) is accepted as a valuable forensic application within the federal government. As with any discipline, established, standardized methodologies must be implemented to assure proper application. The procedures in this handbook detail PDD standards as taught by the Department of Defense Polygraph Institute.

　　2.  To ensure standardization consistent with the unique requirements of individual agencies, the procedures in this handbook should be followed as closely as operational requirements allow. These standards will help to ensure that the PDD discipline is utilized in the most professional manner possible while maintaining an effective investigative aid.

B.  Scope.

　　Nothing in this handbook or the referenced guidelines should be construed to limit the authority of individual agency heads to manage their PDD programs in the manner best suited to their individual agencies. Failure to abide by any or all parts of this handbook shall not give rise to any claim cognizable in a court of law. This handbook is intended only to improve the internal management of federal PDD programs. It is not intended and does not create any right to administrative or judicial review, or any other right, or benefit, or trust, responsibility, substantive or procedurals enforceable by a party against the Unites States, its agencies or instrumentalities, its officers or employees or any other person.

C.  Policies and Procedures for the Conduct of Examinations.

　　1.  Agency heads should establish procedures for the supervision of PDD programs to insure the highest ethical, professional, and technical standards. General principles for PDD examinations are contained in the Federal Guidelines for Psychophysiological Detection of Deception.

　　2.  Requests to modify the handbook should be made through the Director, DoDPI. Requests received by the director will be forwarded for review at a meeting of the federal PDD program managers. If a consensus opinion accepting the modification is achieved, the modification will be added to the handbook.

D. Definitions.

1.  Forensic Psychophysiological Detection of Deception (PDD). The science that deals with the relationship and applications of PDD tests within the legal system. It is the academic discipline that provides the student, the practitioner, and the researcher with the theoretical and applied psychological, physiological, and psychophysiological fundamentals for a thorough understanding of PDD tests, and the skills and qualifications for conducting PDD examinations. The modifier "forensic" delineates and delimits this discipline from the broader discipline of psychophysiology.

2.  Personnel Screening PDD Examination. A PDD examination conducted to aid in determining an individual's eligibility for initial or continued access to designated programs, or an examination conducted to aid in determining an individual's eligibility for initial access to sensitive law enforcement positions.

3.  Polygraph Instrument. A diagnostic instrument used during a PDD examination which is capable of monitoring, recording and/or measuring at a minimum, respiratory, electrodermal, and cardiovascular activity as a response to verbal or visual stimuli.

4.  Psychophysiological Detection of Deception (PDD). The academic discipline that provides the student, the practitioner, and the researcher with the theoretical and applied psychological, physiological, and psychophysiological fundamentals for a thorough understanding of PDD tests, and the skills and qualifications for conducting PDD examinations.

5.  PDD Examination. A process that encompasses all activities that take place between a PDD examiner and an examinee during a specific series of interactions. These interactions may include the pretest interview, the use of the polygraph instrument to collect physiological data from the examinee while presenting a series of tests, the test data analysis phase, and the post-test phase, which may include the interrogation of the examinee.

6.  PDD Examiner. Someone who has successfully completed formal education and training in conducting PDD examinations and is certified by their agency to conduct such examinations.

7.  PDD Report. A PDD document that may contain identifying data of the examinee, a synopsis of the basis for which the examination was conducted, the relevant questions utilized, and the examiner's conclusion.

8.  Specific Issue PDD Examination. A PDD examination conducted to resolve a specific issue, e.g., criminal, espionage, sabotage, or source validation.

**Chapter II**

**Quality Control**

A.  Scope.

This guide establishes the essential elements for quality control (QC) within the federal government.

B.  Background.

In order to develop minimum standards for the conduct of QC within the federal government, the federal psychophysiological detection of deception (PDD) program managers and the Department of Defense Polygraph Institute established the Quality Assurance Working Group which developed the basis for these QC standards.

C.  Administration of QC.

1.  QC Program. Each agency within the federal government with a PDD capability shall maintain a QC program, or obtain a cooperative agreement with another federal agency which has an adequate existing QC program.

2.  Technical Supervision of PDD Examiners. QC procedures for the technical supervision of PDD examiners should ensure ethical, professional, and technical standards are maintained.

3.  QC Supervision. The QC of PDD examinations should be under the supervision of the PDD program manager.

4.  QC Personnel. QC procedures should only be accomplished by designated, experienced, certified PDD examiners.

a.  Personnel assigned responsibilities of QC should have a minimum of two years experience as a PDD examiner.

b.  QC personnel should have a grade level commensurate with their authority, responsibility, and technical abilities.

c.  QC personnel should have technical authority over PDD examiners and should have input into their performance ratings.

5.  Centralized QC. To ensure consistent implementation of agency policy, QC procedures should be as centralized as possible.

5

D.  QC Procedures.

    1.  Operating Procedures. Each agency should have standard operating procedures for the conduct of their QC program.

    2.  Independent and Objective QC. QC procedures shall be independent and objective, without undue influence of the original examiner or other sources.

    3.  QC Review. All PDD reports, technical documents and charts shall undergo a QC review to ensure satisfactory tracing quality and correctness of opinion rendered.

    4.  QC Authority. QC should have the authority to direct reexamination.

    5.  Examination Results. Agency policy should be established to ensure that the results of an examination are not considered final until the examination has been subjected to the agency's QC program.

    6.  QC Review Indicated. Each PDD file should indicate that a QC review of the examination has been completed.

E.  PDD Approval Procedures.

    1.  Approval Authority. Each agency will identify those persons authorized to approve the conduct of a PDD examination. The approval authority within each agency should be as centralized as possible. All PDD examinations should be approved prior to being conducted.

    2.  Accounting Procedures. An accounting procedure for the approval and conduct of specific issue PDD examinations that are requested individually should be established.

    3.  Approval of Personnel Screening PDD Examinations. Personnel screening examinations are authorized by public law, directive, regulation, and agency policy.

**Chapter III**

**Quality Assurance Procedures**

A.  Scope.

   This guide establishes the essential elements for quality assurance oversight within the federal government.

B.  Background.

   In order to implement federal minimum quality assurance standards, federal psychophysiological detection of deception (PDD) program managers and the Department of Defense Polygraph Institute (DoDPI) developed the Quality Assurance Program (QAP).

C.  Responsibilities.

   The DoDPI is responsible for maintaining a QAP. The QAP should inspect the procedures of all federal PDD agencies to ensure ethical, professional and technical standards are maintained.

D.  Standards.

   The QAP inspections will be based upon the standards established in the Federal PDD Handbook, and the policies and procedures established by the inspected agency. The scope of an inspection may be expanded only upon a request from the inspected agency. The scope of an expanded inspection shall be agreed upon beforehand with the program manager.

E.  Inspection Format.

   1.  Inspection Pre-briefing. QAP will brief agency quality control (QC) personnel at least 30 days prior to their scheduled inspection date. During this pre-briefing, the areas to be inspected and the scope of the inspection will be addressed.

   2.  On-site Inspection. Inspections will involve an on-site inspection of agency quality control procedures, interviews of agency personnel, and a  review of policies, procedures and statistics. A detailed review of a representative sample of PDD examinations will be completed to ascertain adherence to these standards. This review, when appropriate, will entail a thorough review of PDD reports, technical documents, charts and allied documents.

   3.  Exit Briefing. At the completion of the on-site inspection by the QAP, a draft report will be provided to the agency during an exit briefing.

F.  Inspection Report.

    1.  Response to Recommendations. A final report of inspection will be forwarded to the supervisor of the PDD program manager. The inspected agency shall respond, in writing, to the Director, DoDPI, to recommendations noted in the final inspection report.

    2.  Final Disposition--Concur. In those instances wherein the QAP and the inspected agency concur that all recommendations have been satisfied, the compliance with these standards will be attested to, in writing, by the Director, DoDPI.

    3.  Final Disposition--Non-concur. In those instances in which the QAP and the inspected agency do not concur on the findings of the inspection, the issues of disagreement will be forwarded, through the Director, DoDPI to the program manager's supervisor.

G.  Reinspection.

    When necessary, a reinspection will occur within approximately six months unless specifically declined by the agency.

H.  Biennial Inspections.

    The QAP will inspect the PDD program quality control procedures of each federal PDD agency biennially.

I.  Personnel.

    Personnel assigned to the QAP will be experienced criminal investigators and/or security professionals/special agents trained in counterintelligence matters. Criminal investigators will be experienced in conducting criminal specific issue examinations, and counterintelligence/security personnel will be experienced in conducting screening and other intelligence related examinations. Personnel will be experienced certified PDD examiners with a minimum of five years PDD experience with at least two years QC or supervisory experience.

**Chapter IV**

**Education Guidelines**

A. Introduction.

    1. Core Curriculum. This curriculum represents the minimum standards for the education and training of federal psychophysiological detection of deception (PDD) examiners.

        a. A PDD course curriculum will be composed of a core program, and clinical laboratory activities.

        b. All PDD students will be required to take the core curriculum described below. The two important aspects of the core curriculum are the didactic portion, which includes traditional classroom work, and the clinical laboratory activities during which the student applies the knowledge gained in the classroom.

    2. Basic Course Curriculum Concept.

        a. A PDD curriculum will emphasize enduring educational principles in common with all institutions of higher learning. The PDD curriculum will focus on forensic psychophysiology in its subject matter. Rapidly evolving technologies along with research findings in psychology and physiology have produced a great need for federal examiners who are broadly educated and thus intellectually equipped to deal effectively and competently with the complexity of the PDD processes.

        b. Inevitable resource constraints in the years immediately ahead mandate that the United States achieve maximum efficiency regarding investigations and security concerns within all the various agencies. A PDD curriculum will be configured to meet these two converging requirements by providing a superior quality graduate-level education in forensic psychophysiology which ensures competency when utilizing the government's most effective case-resolving forensic science.

        c. A PDD curriculum should build on its historical role and the research of forensic psychophysiology, and continuously evolve with a long-range strategy of enhancement of  this science.

3.  Interdisciplinary Approach to Curriculum.

a.  A PDD curriculum will be both multidisciplinary and interdisciplinary. It will contain a core program, a scientific research component and a clinical aspect.

b.  Each part of the curriculum will be based on the intricate interplay of the parent disciplines, including forensic science, the legal system, physiology and psychology.

c.  The academic program will engage the student in a variety of teaching methodologies, including seminars, individual study, research, clinical practica and group exercises.

d.  Student comprehension and achievement will be measured in a variety of ways, including written examinations and laboratory performance evaluations.

B.  PDD Curriculum Objectives.

1.  Broad Objectives. The general objectives of a PDD curriculum will be to:

a.  Produce broadly educated students who possess in-depth knowledge and experience in PDD.

b.  Develop in military, career civil service special agents and others competency to conduct valid examinations and to make effective decisions and policies regarding PDD application in complex, rapidly changing criminal justice and national security environments.

2.  General Learning Objectives.

a.  Understand critical theories, concepts and principles related to PDD.

b.  Be able to apply these theories, concepts and principles through the conduct of PDD examinations which address a wide range of issues, both specific and general in nature, regarding criminal, intelligence, counterintelligence and screening situations.

c.  Analyze physiological data to identify psychological attention to stimuli at a level in which highly valid inferences regarding truth and deception can be made.

10

d. Synthesize a broad range of theories and concepts suggested from research material, lectures and other acquired knowledge; think critically and creatively about the relevance and applicability of the ideas, and formulate effective strategies and examination approaches to address national security, criminal and intelligence issues.

e. Incorporate ethical considerations; evaluate the propriety of various alternative methodology designed to address national security, criminal and intelligence issues; and defend decisions regarding the selection or rejection of alternatives.

f. Participate effectively in laboratory practica and live field applications of various PDD approaches in which learned theories, concepts and principles are utilized in solving problems and making decisions.

g. Demonstrate professional-level competency and capability in forensic psychophysiology through technical application, oral presentation and written communication.

C. Basic PDD Course Curriculum.

1. PDD Operations.

120 Total Hours - The objectives of this course will be to provide students with an understanding of and the ability to conduct PDD examinations utilizing forensic psychophysiology concepts. Emphasis is focused on test question formulation, the psychological aspects of pretest and posttest interviews and the analysis of physiological test data.

2. PDD Methods.

80 Total Hours - This course will focus on history, ethical considerations and methods. Students will be introduced to the various PDD formats. Class work will include the theoretical and applied aspects of each testing format. Specialized lectures and experiential opportunities will be provided to expose the students to countermeasures and the use of interpreters.

3. PDD Clinical Laboratory Activities.

140 Total Hours - Students apply academic instruction of PDD operations and methods in laboratory environment through the actual conduct of detection of deception examinations using state-of-the-art polygraph instrumentation. A two-to-one student-to-instructor ratio will routinely be maintained during all laboratory practica to ensure constant and immediate instruction and guidance to students regarding proper application. All laboratory

practica should be video recorded. The laboratory setting will exclude outside distractions and ensure privacy. A minimum of 30 examinations shall be conducted during each basic course on a non-student/faculty population to simulate real life conditions.

    4.  Physiological Principles in the Detection of Deception.

      40 Total Hours - Students should receive a graduate level understanding of the anatomical and physiological systems associated with the detection of deception. Emphasis is placed on the nervous system, selected muscle systems, cardiovascular system, respiratory system and the endocrine system (sweat gland activity) as these functions relate to the detection of deception.

    5.  Psychological Principles in the Detection of Deception.

      40 Total Hours - In this course, students will be instructed in the various psychological theories supporting psychophysiological detection of deception methodology, concepts of attention, significance, rapport building, communication, and ego defense mechanisms. Instruction will include the psychological aspects of classification, prediction, and modification of behavior associated with the detection of deception.

    6.  Research Theories and Issues.

      20 Total Hours - The objective of this course will be to introduce students to the scientific literature so that they may read, understand, and critically evaluate relevant research studies and literature. The lectures will focus on basic psychometric principles, basic research design, and issues involved with establishing the reliability and validity of PDD methods. Students will be introduced to a variety of computerized systems, equipment, technologies, and sensors frequently used in the conduct of psychophysiological research.

D.  Faculty

    1.  Faculty Composition.

      a.  Instructor positions may be full-time, or adjunct faculty members may be used when the instruction falls within their particular expertise.

      b.  Instructors will have at least a baccalaureate degree from an accredited university. At least 50 percent of the instructors will have an advanced degree in a discipline related to the field of PDD.

c.  Instructors will be senior PDD examiners, or will have a doctoral degree in their particular area of instruction, or have recognized expertise in their particular area of instruction.

2.  Faculty Organization.

a.  The school will be organized around a core faculty to ensure continuity, stability, and scholarly substance for the curriculum.

b.  With the exception of adjunct and academician faculty members, the school director and/or Chief of Instruction will have direct input into the evaluations of all faculty members.

c.  Because the quality of an institution of higher learning can be no greater than the quality of its faculty, the school will develop a multifaceted approach to faculty development to attract and retain high-quality members.

d.  Faculty members will be encouraged to participate in the full range of professional associations and to do extensive outreach activities with federal agencies and other professional groups.

e.  All faculty members will receive 40 hours of formal training in instructional methods prior to being certified as instructors.

E.  Learning Resources System.

1.  Traditional Library.

a.  Publications in the area of forensic psychophysiology will be available for student use. This includes periodicals published by such organizations as the American Polygraph Association.

b.  Publications in related areas such as physiology, psychology, and criminal justice will also be available for student use.

2.  Electronic Information Capability.

a.  Access to the Internet and electronic access to bibliographic records, book listings, and periodicals relating to PDD will be available to students.

b.  Access to computer systems will be available to students and faculty members to conduct research, facilitate in the preparation of lesson plans, and to interface with the use of the computerized polygraph equipment.

F.  Admission Requirements.

All student candidates must meet the following minimum requirements:

1.  Be a US citizen.

2.  Be at least 25 years of age.

3.  Hold an earned baccalaureate degree from an accredited four-year college.

4.  Have at least two years experience as an investigator with a US Federal Government agency, Department of Defense agency, or local or state law enforcement agency.

5.  Be of high moral character and sound emotional temperament, based on a background investigation.

6.  Be judged suitable for the position after taking a PDD examination to ensure that he or she fully realizes the impact of such an examination on persons.  This examination shall be given before the beginning of the course of instruction.

## Chapter V

## Test Question Construction

A.  Scope.

This guide establishes essential elements for test question construction for the federal government as taught by the Department of Defense Polygraph Institute.

B.  Background.

A test question is a specifically designed sentence posed to an examinee during the data collection phase of a psychophysiological detection of deception (PDD) examination. Test questions are designed to maximize differences in the elicited response patterns between truthful and deceptive examinees. There are several types of test questions used in PDD testing.

C.  Question Types.

1.  Relevant Question. This question pertains directly to the matter under investigation or to the issue(s) for which the examinee is being tested. Primary and secondary questions are the two types of relevant questions used in most PDD test formats. The following guidelines provide the generally recognized process by which a relevant question should be constructed.  Relevant questions should:

a.  Be clear and concise.

b.  Avoid legal terms, if possible.

c.  Be constructed in such a manner that they may be answered yes or no.

d.  Not be worded in the form of an accusation or contain an inference which presupposes knowledge or guilt. e. In specific issue tests, when testing for multiple items or amounts of money, use the phrase, "any of", e.g., "Did you steal any of that money?"

f.  In specific issue tests, only address one issue in each question.

g.  In specific issue tests, only address one incident in each series.

2. Primary Relevant. This question tests the possible direct involvement of the examinee. In PDD screening questioning formats, all relevant questions are considered primary relevant questions.

3. Secondary Relevant. This question tests the examinee's possible involvement in the offense under investigation. A secondary relevant question should be constructed to address a secondary issue such as help, plan, or participate; test for secondary involvement in, such as seeing, hearing, or knowing; or focus on the nature or location of evidence and/or physical acts that support the primary offense. There are three types of secondary relevant questions:

a. Evidence connecting. An evidence connecting question is designed to determine if the examinee was involved with any of the evidence of the crime, or is aware of the nature or location of various items of evidence, for example:

Do you know where any of that money is now?

b. Guilty Knowledge. This question is used to determine if the examinee has any knowledge of who committed the incident under investigation, for example:

Do you know for sure who shot that man?
Do you know who stole any of that money?

c. Secondary Involvement. This question tests for secondary involvement such as seeing or hearing, or focuses on physical acts that support the primary offense. An example is:

Did you participate in the theft of any of that money?

4. Comparison Question. Physiological responses of comparison questions are compared to physiological responses of relevant questions. The comparison question is designed to produce a greater physiological response for the non-deceptive person. The probable lie and directed lie questions are the two types of comparison questions utilized within the federal government.

a. Probable Lie Comparison (PLC) Question. This question is designed to be a probable lie for the examinee. The PLC question should be similar in nature but unrelated to the specific crime or issue being tested. The question should be separated from the relevant issue by either time, place or category. The comparison question should use the same action verb or similar in nature action verb as that of the relevant issue. A comparison question should

16

be broad in scope and time so that it captures as many of the examinee's past life experiences as possible. An example is:

Theft issue: Before 1997, did you ever steal anything?

b. Directed Lie Comparison (DLC) Question. The DLC question is a specialized comparison question. A properly constructed DLC question involves a minor transgression which should have some personal significance to the examinee. Upon acknowledging having committed such a transgression, the examinee is directed to lie when asked that question on the test. The question is separated from the relevant issue by category. An example is:

Did you ever commit a minor traffic violation?

5. Sacrifice Relevant Question. When utilized, this is the first question that refers to the relevant issue, and it prepares the examinee for the introduction of the relevant questions. Sacrifice relevant questions are not scored during the test data analysis phase of a PDD examination. Examples are:

Regarding whether you stole that car, do you intend
   to answer truthfully each question about that?  (you phase ZCT)
Regarding the theft of that car, do you intend to answer each question
   truthfully?

6. Symptomatic Question. This question is designed to test for an outside issue that could be more significant for an examinee than the relevant and comparison issues. Symptomatic question responses are evaluated, though not numerically scored, during the test data analysis phase of a PDD examination. Examples are:

Do you believe I will only ask you the questions we reviewed?
Is there something else you are afraid I will ask you a question about?

7. Irrelevant Questions in Comparison Question Formats. The irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is designed to allow the orienting response to habituate before a scoreable question is asked, and it can be used to establish homeostasis when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issue being tested. Irrelevant questions are not scored. Several irrelevant questions may be reviewed and used as needed. Examples are:

Are you now in Alabama?
Are you sometimes called Tom?

17

8.  Irrelevant Questions in Relevant/Irrelevant (R/I) Formats. In R/I formats the irrelevant question is designed to allow the orienting response to habituate before a relevant question is asked, and as well, has special applications in the R/I question format. They are designed to be neutral, but should appear to be meaningful to the examinee. Irrelevant questions should be non-emotion evoking and unrelated to the issue under investigation. Several irrelevant questions may be reviewed and used as needed. Irrelevant questions are not scored against relevant test questions during the data analysis phase. Examples are:

> Is today Friday?
> Are you now in Alabama?
> Do you live in MD?

9.  Overall Truth Question. This is an optional question which may be utilized in an R/I question format. It is similar to the sacrifice relevant question in comparison question formats. It is intended to elicit a physiological response which may be indicative of the examinee's overall response capability. This question may be asked near the beginning and/or at the end of a PDD chart. Examples are:

> Do you intend to answer truthfully all of the questions on this test?
> Have you truthfully answered all of the questions on this test?

10.  Stimulus Question. This question is an optional question which may be utilized in an R/I question format to determine the examinee's overall capacity for response. It is only used when the examinee exhibits a consistent lack of response. The two types of stimulus questions taught by DoDPI are the math and the specific issue R/I stimulus questions. The specific issue R/I stimulus question is used only in the specific issue R/I format.

a.  Math Question. The examinee is told that a math question may be asked during the examination but the exact wording of the question is not reviewed. Examples are:

> Does 10 + 9 = 19?
> Does  7 + 5 = 12?

b.  Specific Issue R/I Stimulus Question. This question is utilized to determine the examinee's overall capacity for response. It is used primarily when the examinee exhibits a consistent lack of response. When utilized in this R/I format, the stimulus question can be directed at specific thoughts, beliefs or actions of the examinee as it relates to the issue under investigation.

18

Responses to stimulus questions will not be utilized as comparison questions. An example is:

Were you on that bridge that night?

D.  References.

1.  Abrams, S. (1989). <u>The complete polygraph handbook</u>. Lexington, MA: Lexington Books.

2.  Janniro, M. J. (1993). Effects of computer-based instruction on student learning of psychophysiological detection of deception test question formulation. <u>Journal of Computer-Based Instruction, 20</u> (2, Spring), 58-62.

3.  Matte, J. A. (1980). <u>The art and science of the polygraph technique</u>. Springfield, IL: Charles C. Thomas Publisher.

4.  Matte, J. A. (1996). <u>Forensic psychophysiology using the polygraph: Scientific truth verification-lie detection</u>. Williamsville, NJ: J.A.M. Publications.

5.  Weinstein, D. A. (1994). <u>Anatomy and physiology for the forensic psychophysiologist</u>. Fort McClellan, AL: Department of Defense Polygraph Institute.

**Chapter VI**

**Test Data Analysis**

A.  Scope.

    1.  This guide establishes essential elements for test data analysis for the federal government as taught by the Department of Defense Polygraph Institute (DoDPI).

    2.  The physiological recordings which comprise a psychophysiological detection of deception (PDD) examination are addressed in this standard. The respiratory, electrodermal, and cardiovascular are the three currently accepted channels for collecting PDD data.

B.  Background.

    1.  Relevant/Irrelevant (R/I). The R/I test data analysis process was in large part developed by Leonard Keeler. The basic tenants of that evaluation process were adopted by the DoDPI from the United States Army Military Police School (USAMPS) and were subsequently adopted by agencies of the federal government.

    2.  Numerical Test Data Analysis. The numerical evaluation procedure in large part was developed by Cleve Backster. A variation of that procedure was adopted by the USAMPS, DoDPI, and subsequently utilized by agencies of the federal government.

C.  Test Data Analysis.

    1.  Evaluation Procedures. There are four methods used to analyze PDD test data in the federal government: the three-position and seven-position scales, global test data analysis, and the rank order scoring system (ROSS). In the three-position and seven-position scales, numerical values are assigned to the test data. Global test data analysis does not utilize a numerical system. ROSS may be used to help support conclusions based on a global analysis of the R/I test technique. While scoring methods differ, the evaluation criteria used in analyzing the data collected on the charts are standard among each method.

    2.  Numerical Evaluation. The three-position and seven-position numerical evaluation procedures are used to evaluate comparison question formats. The responses to the relevant questions are compared to the responses at the comparison questions. For the three-position scale, a plus (+) value is assigned when the physiological responses are greater to the comparison questions. A minus (-) value is assigned when the physiological responses are greater to the

relevant questions. A value of zero (0) is assigned when the responses to the comparison and relevant questions appear to have no apparent difference in magnitude. An "A" is assigned when the question is unable to be evaluated due to artifacts. For the seven-position scale, numerical values ranging from plus three (+3) to minus three (-3) are assigned to each independent physiological tracing at each relevant test question position.

3.  Global Analysis. This analysis method is a system of rendering an opinion by viewing the PDD chart as a whole. This approach does not employ the use of numerical values. This method is used in the R/I and peak of tension question formats. Since there are no comparison questions in this technique, the presence or absence of responses to a question is compared with the rest of the chart tracings in their entirety.

4.  ROSS. The ROSS ranks the questions on the charts from greatest to least responsiveness. In ROSS, each physiological parameter, i.e., respiration, electrodermal, and cardiovascular, is evaluated separately. ROSS provides the examiner with a cumulative picture of the consistent, significant and timely responses on the PDD charts. This method of evaluation is used exclusively to evaluate the R/I questioning formats.

5.  Evaluative Criteria. Only data that is timely with the applied stimulus and free of artifacts and unwanted noise on the signal of interest can be evaluated. What is evaluated is the response or lack thereof when a stimulus is applied by the examiner. PDD test data consists of the signal of interest which may contain unwanted noise, artifact, homeostatic change, or response. Not all test data is evaluated. If unwanted noise, an artifact, or homeostatic change occurs at the time of an applied stimulus, the evaluation of that test data may not be achieved. In comparison question formats, physiological response can only be compared against physiological response. A question spacing of 20 to 25 seconds from onset of applied stimulus should be maintained throughout the examination.

6.  Evaluation Criteria for Each Component. Only that physiological criteria taught by DoDPI will be utilized to evaluate test data.

7.  Test Data Analysis Opinions. The following six opinions are those that may be rendered when sufficient test data is collected during a PDD examination: deception indicated (DI), significant responses (SR), no deception indicated (NDI), no significant responses (NSR), no opinion (NO).

    a.  Opinions of DI and NDI are appropriate in a specific issue series.

    b.  Opinions of NSR and SR are appropriate in screening examinations.

8.  Administrative Opinions. These opinions reflect the results of a series or an examination that are not based upon physiological responses to the applied stimuli, such as when the examinee terminates an examination or is practicing countermeasures. In such instances, administrative opinions such as inconclusive, purposeful non-cooperation, etc., are appropriate.

D.  Reference Documents.

1.  Abrams, S. (1989). The complete polygraph handbook. Lexington, MA: Lexington Books.

2.  Matte, J. A. (1980). The art and science of the polygraph technique. Springfield, IL: Charles C. Thomas Publisher.

3.  Matte, J. A. (1996). Forensic psychophysiology using the polygraph: Scientific truth verification-lie detection. Williamsville, NJ: J.A.M. Publications.

4.  Weinstein, D. A. (1994). Anatomy and physiology for the forensic psychophysiologist. Fort McClellan, AL: Department of Defense Polygraph Institute.

## Chapter VII

## Acquaintance Test

A. Scope.

    This guide establishes essential elements for the conduct of the acquaintance test (ACQT) for the federal government as taught by the Department of Defense Polygraph Institute (DoDPI).

B. Background.

    1. The ACQT, as taught by DoDPI, is a form of the known solution peak of tension test (POT), and is utilized to demonstrate the basic concepts of the psychophysiological detection of deception (PDD) to an examinee. The primary purpose of the ACQT is to assure the examinee that the PDD process is effective for that individual. The ACQT should also reinforce the concept of psychological set for the examinee.

    2. The ACQT is referred to as an acquaintance test since it is administered, in part, to acquaint the examinee with PDD procedures. A known solution ACQT is the only type of ACQT taught by DoDPI.

C. Pretest Phase.

    1. Question Review. During the pretest phase, the fact that an ACQT will be conducted is mentioned and all questions are reviewed prior to the test being conducted.

    2. Questions Utilized in the ACQT.

        a. The Key. This represents the number chosen by the examinee.

        b. Padding Questions. These questions are placed before and after the key number, and consist of questions relating to the other numbers on the test.

        c. Preparatory Phrase. This is the first part of the first question of the ACQT, and it is utilized to focus the examinee's attention to the issue which is being tested, for example:

            Regarding the number you wrote ….

23

      d.  Prefix Phrase. This is the prefix to each of the questions, for example:

          Was it number.....

D.  Data Collection.

    1.  Question Sequence (example).

| Preparatory phrase | Regarding the number you wrote,… |
|---|---|
| Prefix | was it number… |
| Padding | 4? |
| Padding | 5? |
| Padding | 6? |
| Key | 7? |
| Padding | 8? |
| Padding | 9? |

    2.  Question Format Procedures. The ACQT is conducted in a mini-PDD format. It consists of a pretest interview, data collection phase, data analysis phase, and post-test interview. This PDD process should reassure the non-deceptive examinee and stimulate the deceptive examinee.

      a.  A visual stimulus is utilized in the ACQT to insure the examinee knows the sequence of the examination, to include the location of the selected key.

      b.  All questions are worded to elicit a no answer.

E.  Test Data Analysis.

    Evaluation Process. The ACQT is not evaluated numerically. It is evaluated utilizing the test data analysis procedures for POT as taught by DoDPI.

F.  References.

    1.  Bradley, M. T. & Janesse, M. P. (1981). Accuracy demonstrations, threat, and the detection of deception: Cardiovascular, electrodermal, and pupillary measures, Psychophysiology, 18, 307-315.

    2.  Dufek, M. (1969). A contribution on the problem of polygraph examinations, Czechoslovak Criminalistics.

3.  Gustafson, L. A. & Orne, M.T. (1965). Effects of perceived role and role success on the detection of deception. <u>Journal of Applied Psychology, 49,</u> 412-417.

**Chapter VIII**

**Zone Comparison Test**

A.  Scope.

   This guide establishes essential elements for the conduct of zone comparison tests (ZCT) for the federal government as taught by the Department of Defense Polygraph Institute.

B.  Background.

   The ZCT was designed by Cleve Backster, and a variation of that format was subsequently adopted by the United States Army Military Police School in l961. The ZCT, as taught by DoDPI, has changed little from the original Backster testing format.

C.  Pretest Phase.

   1.  Question Review. During the pretest interview, all ZCT questions are reviewed with the examinee prior to the collection of charts. The following sequence is used in introducing the questions:

> Sacrifice Relevant (SR)
> Relevant ( R )
> Comparison ( C )
> Irrelevant ( I )
> Symptomatic (SYM)

   2.  Questions Utilized in the ZCT.

   a.  Primary Relevant. This question tests the possible direct involvement of the examinee. The primary relevant questions are R5 and R7. Question R7 is an extension of or a paraphrasing of R5. Examples are:

> R5   Did you steal that Mustang?
> R7   Did you steal that Mustang from that parking lot?
> R7 (Alternate) Are you the person who stole that Mustang from the Sears parking lot?

   b.  Secondary Relevant. This question tests the examinee's secondary involvement in or guilty knowledge of the offense under investigation. The secondary relevant question is R10. Under no circumstance should question R10 be a primary relevant question.  Examples are:

Did you help steal that Mustang?
Do you know how that car was disposed of?
Do you know for sure who stole that Mustang?
Did you plan with anyone to steal that Mustang?

c.  Probable Lie Comparison (PLC) Question. This question is designed to be a probable lie for the examinee. The PLC question should be similar in nature but unrelated to the specific crime or issue being tested. The questions should be separated from the relevant issue by either time, place or category. The comparison questions should use the same action verb or similar in nature action verb as that of the relevant issue. A comparison question should be broad in scope and time so that it captures as many of the examinee's past life experiences as possible. An example is:

Theft issue: Before 1997, did you ever steal anything of value?

d.  Sacrifice Relevant Question. This is the first question of the ZCT format that refers to the relevant issue, and it prepares the examinee for the introduction of the relevant questions. An example is:

Regarding the theft of that car, do you intend to answer each question truthfully?

e.  Irrelevant Question. The irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is designed to allow the orienting response to habituate before a scoreable question is asked, and it can be used to establish homeostasis when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issue being tested. Irrelevant questions are not scored. Several irrelevant questions may be reviewed and used as needed. Examples are:

Are you now in Alabama?
Are you sometimes called Tom?

f.  Symptomatic Question. This question is designed to test for an outside issue that could be more significant for an examinee than the relevant and comparison issues. Symptomatic question responses are not scored during the test data analysis phase of a PDD examination. The symptomatic questions are always Questions #3 and #8 on the ZCT.  Examples are:

SYM #3  Do you believe I will only ask you the questions we reviewed?
SYM #8  Is there something else you are afraid I will ask you a question about?

D. Data Collection.

1. Question Sequence. With the possible exception of irrelevant questions, all questions reviewed during the pretest phase of the examination will be asked during the data collection phase.

I      Are you sometimes called Mike?
SR    Regarding that stolen money, do you intend to answer each question truthfully?
SYM   Do you believe I will only ask you the questions we reviewed?
C      Prior to 1996, did you ever steal anything from someone who trusted you?
R      Did you steal any of that money?
C      Prior to coming to Alabama, did you ever steal anything?
R      Did you steal any of that money from Jones' footlocker?
SYM   Is there something else you are afraid I will ask you a question about?
C      Prior to this year, did you ever steal anything from an employer?
R      Do you know where any of that stolen money is now?

2. Question Rotation. Following the collection of the first ZCT chart, the comparison questions may be rotated. The comparison question exhibiting the greatest physiological response should be placed adjacent to the relevant question exhibiting the greatest physiological response. The rotation of the comparison questions may be made on all subsequent charts.

3. Chart Requirements. In most instances, the collection of three charts is appropriate. A fourth chart is only authorized if an artifact occurred which precluded a conclusive opinion from being rendered. If after three charts a conclusive opinion can be rendered from those components not affected by artifacts, then the test is complete. The numerical total required for a conclusive opinion remains the same as for a three-chart series.

4. Conduct of an Acquaintance Test (ACQT). The ACQT may be collected as the first chart of this examination. It is conducted, in part, to acquaint the examinee with PDD procedures. The known solution ACQT is the only ACQT taught by DoDPI.

E. Test Data Analysis.

1. Numerical Analysis. The two numerical evaluation procedures are referred to as the three-position and seven-position scales.

2. Spot Analysis. Relevant questions are grouped together and referred to as spots. The examiner monitors and evaluates the examinee's response in these spots. The three spots of the ZCT are:

a. SPOT I - Questions in positions C4 & C6 compared to R5.

28

b.  SPOT II - Question in position C6 compared to R7.

c.  SPOT III - Question in position C9 compared to R10.

3.  Test Data Analysis Procedures.  When comparing relevant and comparison questions, each component tracing will be reviewed and compared independently. The greatest physiological response of the comparison question(s) will be compared to the adjacent relevant question.

4.  Opinion Rendering Criteria.

a.  Deception Indicated (DI). To render an opinion that the examinee is deceptive on the ZCT, the score must be minus three (-3) or less in any overall vertical spot or a grand horizontal total of minus six (-6) or less for all spots.

b.  No Deception Indicated (NDI). To render an opinion of non-deception, there must be a plus one (+1) or greater in every overall vertical spot with a horizontal grand total of plus six (+6) or more for all spots.

c.  No Opinion (NO). If it is not DI or NDI, it is NO with the exception of administrative opinions.

F.  References.

1.  Bersh, P. J. (1969). A validation study of polygraph examiner judgments. Journal of Applied Psychology, 53, 399-403.

2.  Blackwell, N. J. (1996). Polyscore: A comparison of accuracy (Rep. No. DoDPI 95-R-0001). Fort McClellan, AL: Department of Defense Polygraph Institute.

3.  Janniro, M. J. (1993). Effects of computer-based instruction on student learning of psychophysiological detection of deception test question formulation. Journal of Computer-Based Instruction, 20 (2, Spring), 58-62.

4.  Shull, K. W. & Crowe, M. (1993). Effects of two methods of comparing relevant and control questions on the accuracy of psychophysiological detection of deception (Rep. No. DoDPI 93-R-0002). Fort McClellan, AL: Department of Defense Polygraph Institute.

## Chapter IX

## You Phase Zone Comparison Test

A. Scope.

This guide establishes essential elements for the conduct of the "you phase" zone comparison test (ZCT), previously known as the bi-zone, for the federal government as taught by the Department of Defense Polygraph Institute (DoDPI).

B. Background.

The you phase ZCT was designed by Cleve Backster, and a variation of that format was subsequently adopted by the United States Army Military Police School in l961. The you phase ZCT, as taught by DoDPI, has changed little from the original Backster testing format.

C. Pretest Phase.

1. Question Review. During the pretest interview, all questions are reviewed with the examinee prior to the collection of charts. The following sequence is used when introducing the questions:

> Sacrifice Relevant (SR)
> Relevant ( R )
> Comparison ( C )
> Irrelevant ( I )
> Symptomatic (SYM)

2. Questions Utilized in the You Phase.

a. Primary Relevant. This question tests the possible direct involvement of the examinee. The primary relevant questions are R5 and R7. Question R7 is an extension or a paraphrasing of question R5, for example:

> R5   Did you steal that Mustang?
> R7   Did you steal that Mustang from that parking lot?
> R7   (Alternate) Did you steal that Mustang from the Sears parking lot?

b. Probable Lie Comparison Question (PLC). This question is designed to be a probable lie for the examinee. The PLC question should be similar in nature but unrelated to the specific crime or issue being tested. The

30

question should be separated from the relevant issue by either time, place or category. The comparison question should use the same action verb or similar in nature action verb as that of the relevant issue. A comparison question should be broad in scope and time so that it captures as many of the examinee's past life experiences as possible. An example is:

> Theft issue:  Before 1997, did you ever steal anything of value?

c.  Sacrifice Relevant. This is the first question of the you phase format that refers to the relevant issue, and it prepares the examinee for the introduction of the relevant questions. The relevant questions in the you phase ZCT address only the primary issue, i.e., "Did you steal that Mustang?". Therefore, the scope of the sacrifice relevant question should be limited to the specific issue addressed by the relevant question. The sacrifice relevant question is always the #2 question in the you phase ZCT. An example is:

> Regarding whether you stole that Mustang, do you intend to answer
> each question truthfully?

d.  Irrelevant Question. The irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is designed to allow the orienting response to habituate before a scoreable question is asked, and it can be used to establish homeostasis when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issue being tested. Irrelevant questions are not scored. Several irrelevant questions may be reviewed and used as needed.  Examples are:

> Are you now in Alabama?
> Are you sometimes called Tom?

e.  Symptomatic Questions. This question is designed to test for an outside issue that could be more significant for an examinee than the relevant and comparison issues. The symptomatic question responses are not scored during the test data analysis phase of a PDD examination. The symptomatic questions are #3 and #9 in the you phase test format. Examples are:

> SYM #3  Do you believe I will only ask you the questions we reviewed?
> SYM #9  Is there something else you are afraid I will ask you a question
> about?

D. Data Collection.

  1. Question Sequence.

     I     Are you sometimes called Mike?

     SR   Regarding whether you stole that money, do you intend to answer each question truthfully?

     SYM Do you believe I will only ask you the questions we reviewed?

     C    Prior to 1996, did you ever steal anything from someone who trusted you?

     R    Did you steal any of that money?

     C    Prior to coming to Alabama, did you ever steal anything?

     R    Did you steal any of that money from Jones' footlocker?

     C    Prior to this year, did you ever steal anything from an employer?

     SYM Is there something else you are afraid I will ask you a question about?

  2. Question Rotation. Following the collection of the first ZCT chart, the comparison questions may be rotated. The comparison question exhibiting the greatest physiological response should be placed between the two relevant questions. The rotation of the comparison questions may be made on all subsequent charts.

  3. Chart Requirements. In most instances, the collection of three charts is appropriate. A fourth chart is only authorized if an artifact occurred which precluded a conclusive opinion from being rendered. If after three charts a conclusive opinion can be rendered from those components not affected by artifacts, then the test is complete. The numerical total required for a conclusive opinion remains the same as a three-chart series.

  4. Conduct of an Acquaintance Test (ACQT). The ACQT may be collected as the first chart of this examination. It is conducted, in part, to acquaint the examinee with PDD procedures. The known solution ACQT is the only ACQT taught at DoDPI.

E. Test Data Analysis:

  1. Numerical Analysis. The two numerical evaluation procedures are referred to as the three-position and seven-position scales.

  2. You Phase Spot Analysis. Relevant questions are grouped together in spots. The examiner monitors and evaluates the examinee's response in these spots. The two spots of the you phase ZCT are:

a. SPOT I - Questions in positions C4 & C6 compared to R5.

b. SPOT II - Questions in positions C6 & C8 compared to R7.

3. Test Data Analysis Procedures. When comparing relevant and comparison questions, each component tracing will be reviewed and compared independently. The greatest physiological response of the comparison question(s) will be compared to the adjacent relevant question.

4. Opinion Rendering Criteria.

a. Deception Indicated (DI). To render an opinion that the examinee is deceptive on the you phase ZCT, the score must be minus three (-3) or less in any overall vertical spot or a grand horizontal total of minus four (-4) or less for all spots.

b. No Deception Indicated (NDI). To render an opinion of non-deception, there must be a plus one (+1) or greater in every overall spot with a grand horizontal total of plus four (+4) or more for all spots.

c. No Opinion (NO). If it is not DI or NDI, it is NO with the exception of administrative opinions.

F. References.

1. Hammond, D. L. (1980). The responding of normals, alcoholics, and psychopaths in a laboratory lie detection experiment. Dissertation Abstracts International, 41, (6-B) 2374.

2. Raskin, D. C. (1976). Reliability of chart interpretation and sources of error in polygraph examinations. (Report No. 76-3 National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, US Department of Justice, Contract No. 75-NI-99-0001, Department of Psychology, University of Utah).

## Chapter X

## Comparison Test Formats

A.  Scope.

This guide establishes essential elements for the conduct of comparison test formats (CTF) for the federal government as taught by the Department of Defense Polygraph Institute (DoDPI).

B.  Background.

The term CTF is an umbrella term which addresses variations of the modified general question test (MGQT). Although the zone comparison test (ZCT) is also a CTF, the ZCT will be considered separate since research and the psychophysiological detection of deception (PDD) community address this question format as unique. The variations of the MGQT question formats addressed in this document have been validated through research and/or have been taught at DoDPI. These formats are among those utilized for personnel screening, source validation and criminal specific PDD testing.

C.  Pretest Phase.

1.  Order for Question Review. During the pretest interview, all questions are reviewed with the examinee prior to the collection of charts. The following sequence should be used in introducing questions:

> Sacrifice Relevant (SR) (if applicable)
> Relevant ( R )
> Comparison ( C )
> Irrelevant ( I )

2.  Questions Utilized in the CTF. The following question types may be used in CTF applications.

a.  Primary Relevant. This question tests the possible direct involvement of the examinee. An example is:

> Did you steal that car from that parking lot?

b.  Secondary Relevant. This question tests the examinee's possible involvement in the offense under investigation. A secondary relevant question should be constructed to: address a secondary issue such as help, plan, or participate; test for secondary involvement in, such as seeing, hearing, or knowing; or focus on the nature or location of evidence and/or physical acts that

34

support the primary offense. In the CTF, there are three types of secondary relevant questions:

1) Evidence connecting. An evidence connecting question is designed to determine if the examinee was involved with any of the evidence of the crime, or is aware of the nature or location of various items of evidence. An example is:

Do you know where any of that money is now?

2) Guilty Knowledge. This question is used to determine if the examinee has any knowledge of who committed the incident under investigation. Examples are:

Do you know for sure who shot that man?
Do you know who stole any of that money?

3) Secondary Involvement. This question tests for secondary involvement such as seeing, hearing, or focuses on physical acts that support the primary offense. An example is:

Did you participate in the theft of any of that money?

c. Probable Lie Comparison (PLC) Question. This question is designed to be a  probable lie for the examinee. The PLC question should be similar in nature but unrelated to the specific crime or issue(s) being tested. The question should be separated from the relevant issue by either time, place or category. The comparison question should use the same action verb or similar in nature action verb as that of the relevant issue. A comparison question should be broad in scope and time so that it captures as many of the examinee's past life experiences as possible. An example is:

Theft issue: Before 1997, did you ever steal anything of value?

d. Directed Lie Comparison (DLC) Question. The DLC question is a specialized comparison question. A properly constructed DLC question involves a minor transgression which should have some personal significance to the examinee. Upon acknowledging having committed such a transgression, the examinee is directed to lie when asked that question on the test. The DLC question is separated from the relevant issue by category. The DLC question, in the CTF context, may be used in counterintelligence matters. It is inappropriate to utilize DLC and PLC questions in the same test. An example of a DLC question is:

Did you ever lie to a coworker about anything?

e.  Sacrifice Relevant Question. When utilized, this is the first question that refers to the relevant issue, and it prepares the examinee for the introduction of the relevant questions. An example is:

> Regarding the theft of that car, do you intend to answer each question truthfully?

f.  Irrelevant Question. An irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is designed to allow the orienting response to habituate before a scoreable question is asked, and can be used to establish homeostasis when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issue being tested. Irrelevant questions are not scored.  Several irrelevant questions may be reviewed and used as needed. Examples are:

> Are you now in Alabama?
> Are you sometimes called Tom?

D.  Data Collection Phase.

1.  Question Format. With the possible exception of irrelevant questions, all questions reviewed during the pretest phase of the examinations will be asked during the data collection phase. The exact sequence in which the questions are to be asked in the data collection phase is not revealed.

2.  The test format should begin with an irrelevant question. Irrelevant questions may be inserted into each chart as needed. A sacrifice relevant question may be included in the test format. Two to five relevant and two to four comparison questions may be utilized.

3.  If a single relevant question test is required, the you phase ZCT should be utilized.

4.  Test Operations. After the first chart, comparison questions may be rotated, or a mixed series may be utilized. At least one of the subsequent charts must be a mixed series. After the first chart, subsequent charts should be constructed so that the relevant question displaying the greatest physiological responses is adjacent to the comparison question(s) with the greatest physiological responses. Each relevant question should be bracketed by comparison questions in at least one chart of each series.

5.  Chart Requirements. In most instances, three askings of each relevant question is appropriate. An additional asking of all questions, i.e., a fourth chart,

is only authorized if an artifact occurred which precluded a conclusive opinion from being rendered. If after three askings a conclusive opinion can be rendered from those components not affected by artifacts, the test is complete. The numerical total required for a conclusive opinion when four charts are conducted remains the same as for a three-chart series. Under no circumstance is a fifth asking (chart) authorized.

     6.  Conduct of an Acquaintance Test (ACQT). The ACQT may be collected as the first chart of this examination. It is conducted, in part, to acquaint the examinee with PDD procedures. The known solution ACQT is the only ACQT taught by DoDPI.

E.  Test Data Analysis.

     1.  Numerical Analysis. The two numerical evaluation procedures are referred to as the three-position and seven-position scales.

     2.  Spot Analysis. Relevant questions are grouped together in spots. The examiner monitors and evaluates the examinee's response in these spots.

     3.  Test Data Analysis Procedures. When comparing relevant and comparison questions, each component tracing will be reviewed and compared independently. The greatest physiological response of the comparison question(s) will be compared to the adjacent relevant question(s).

     4.  Opinion Rendering Criteria.

       a.  Deception Indicated (DI). To render an opinion that the examinee is deceptive on the CTF, the score must be minus three (-3) or less in any overall vertical spot. There is no overall horizontal spot total utilized to render an opinion, as is the case in the ZCT.

       b.  No Deception Indicated (NDI). To render an opinion of non-deception, there must be a plus three (+3) or greater in every overall vertical spot when utilizing a seven-position scale.

       c.  No Opinion (NO). If based upon physiological responses to the applied stimuli an opinion of NDI or DI cannot be rendered, the opinion is NO. When appropriate, an administrative opinion should be rendered.

F. References.

1. Barland, G. H., Honts, C. R., & Barger, S. D. (1990). The detection of deception for multiple issues. (Project No. DoDPI89-P-0005). Fort McClellan, AL: Department of Defense Polygraph Institute.

2. Davidson, W. A. (1979). Validity and reliability of the cardio activity monitor. Polygraph, 8, 104-111.

3. Janniro, M. J. (1993). Effects of computer-based instruction on student learning of psychophysiological detection of deception test question formulation. Journal of Computer-Based Instruction, 20 (2, Spring), 58-62.

4. Patrick, C. J., & Iacono W. G. (1987) Validity and reliability of the control question polygraph test: A scientific investigation. Paper presented at the Society of Psychophysiological Research Meeting, Amsterdam, 1987.

5. Podlesny, J. A. & Truslow, C. M. (1993). Validity of an expanded-issue (modified general question) polygraph technique in a simulated distribution-crime-roles context. Journal of Applied Psychology, 78, 788-797.

6. Raskin, D. C., Kircher, J. C., Honts, C. R. & Horowitz, S. W. (1988) A study of the validity of polygraph examinations in criminal investigation (Grant No. 85-IJ-CX-0040). Washington, DC: National Institute of Justice.

7. Yankee, W. J., (1990). Position statement pertaining to control question techniques. Fort McClellan, AL: Department of Defense Polygraph Institute.

## Chapter XI

## Peak of Tension Test

A.  Scope.

This guide establishes essential elements for the conduct of the peak of tension (POT) formats for the federal government as taught at the Department of Defense Polygraph Institute (DoDPI).

B.  Background.

The POT was developed by Leonarde Keeler to determine possible guilty knowledge possessed by an examinee. It is used most frequently after an examination in which a deception indicated (DI) opinion has been rendered. The known solution POT is utilized when an examinee denies any knowledge regarding a specific element of a crime or incident that has been verified through investigation or other means. The searching POT (SPOT) is utilized when the crucial key area is suspected to be known by an examinee who denies any such knowledge. This format is also known as the unknown or probing POT.

C.  Pretest Phase.

1.  Question Review. During the pretest interview, all POT and SPOT questions are reviewed with the examinee prior to the collection of charts. The questions are reviewed in the sequence they are to be asked.

a.  The following is an example of the sequence for introducing a POT:

Preparatory Phrase
Prefix phrase
Padding
Key
Padding

b.  The following is an example of the sequence for introducing a SPOT:

Preparatory Phrase
Prefix phrase
Padding
Key choices
Coverall
Padding

2.  Questions Utilized in the POT and SPOT.

    a.  POT Key. The POT key is a fact about the crime which should be known only by the perpetrator, the examiner, and the investigators.

    b.  SPOT Key Choices. The SPOT key is a fact about the crime known only by the perpetrator.

    c.  Padding Questions. Padding questions are used before and after the key. They must be similar to the key, and the same prefix should be used with padding questions and the key. Padding questions must not involve the relevant issue.

    d.  False Key. This is an optional padding question which has special meaning to the examinee. It is always placed in the second position and has at least one padding question between it and the key. The principal of the false key is similar to a comparison question. The examinee will react to it because he/she has been sensitized to it; the deceptive examinee should display the most significant response to the key. A false key is only used in a known solution POT.

    e.  Preparatory Phrase. This is the prefix to the first question of a POT or SPOT. It is utilized to focus the examinee's attention to the issue which is being tested. It is only stated at the beginning of the first question, for example:

        Regarding the amount of money stolen from that wallet….

    f.  Prefix Phrase. This phrase is a continuation of the preparatory phrase. It is asked with each question utilized within the POT and SPOT structure. Since the purpose is to test for guilty knowledge, the prefix phrase is worded,  "Was it,…?", or "Is it…?"

    g.  Coverall Question. This question is utilized in the SPOT. The question  following the prefix phrase is worded, e.g.,  "…somewhere else not mentioned?", and is normally placed in the seventh position. It is intended to cover any other area or possible key not previously addressed.

D.  Data Collection.

1.  Question Sequence.

    a.  Known Solution (example).

| | |
|---|---|
| Preparatory phrase | Regarding the color of that car,… |
| Prefix | was it… |
| Padding question | red? |

|   |   |
|---|---|
| Padding question | blue? |
| Padding question | green? |
| Key question | white? |
| Padding question | silver? |
| Padding question | black? |

b.  Searching POT (example).

|   |   |
|---|---|
| Preparatory phrase | Regarding the location of that property,… |
| Prefix | is it located in… |
| Padding question | Geneva? |
| Padding question | London? |
| Key choice | area A? |
| Key choice | area B? |
| Key choice | area C? |
| Key choice | area D? |
| Coverall | an area (I have) not mentioned? |
| Padding question | Frankfurt |
| Padding question | Milan? |

2.  Question Rotation. The SPOT and POT normally consists of three charts. The first two charts are asked in the above sequence. The third chart is reviewed and conducted in reverse sequence. If no opinion can be rendered after three charts, a fourth, unreviewed, and mixed sequence chart may be collected.

3.  Known Solution Format Procedures. The known solution POT examination may consist of six to nine questions. The key should not be placed in the middle of the examination. Only one key can be tested per examination.

a.  A visual stimulus is utilized in the POT to insure the examinee knows the sequence of the examination.

b. The POT is normally utilized following a deceptive initial examination.

c.  All questions are worded to elicit a no answer.

4.  SPOT Format Procedures. The key is unknown and the examination normally consists of nine questions. There must be at least two padding questions at the beginning and end of the sequence.

a.  A visual stimulus is utilized in the SPOT to insure the examinee knows the sequence  of the examination.

   b.  The SPOT is generally utilized following a deceptive initial examination.

   c.  All questions are worded to elicit a no answer.

E.  Test Data Analysis.

   1.  Global Analysis. The POT and SPOT are not evaluated numerically as in comparison question formats. They are evaluated utilizing the test data analysis procedures for POT and SPOT as taught by DoDPI.

   2.  Opinion Rendering Criteria.

   a.  If the examinee displayed physiological responses at the same question on at least two of the three POT or SPOT charts collected, the examiner must conclude that there were significant responses.

   b.  If the examinee does not display evaluative criteria at the same test question in any of the recorded physiological parameters on at least two of the three charts collected, the examiner must conclude that there were no significant responses.

   c.  For administrative purposes, an opinion of significant response (SR) indicates guilty knowledge.

F.  References.

   1.  Dufek, M. (1969). A contribution of the problem of polygraph examinations. Czechoslovak Criminalistics.

   2.  Lieblich, I., Naftali, G., Shmueli, J., & Kugelmas, S. (1974). Efficiency of GSR detection of information with repeated presentation of series of stimuli in two motivational states. Journal of Applied Psychology, 59, 113-115.

   3.  Thackray, R. I. & Orne, M. T. (1967). Methodological studies in detection of deception (Research Contract No. DA-49-193-MD-2647). Philadelphia, PA: Unit for Experimental Psychiatry Institute of Pennsylvania Hospital U.S. Army Medical Research and Development Command.

## Chapter XII

## Relevant/Irrelevant Screening Test

A.  Scope.

   This guide establishes essential elements for the conduct of the relevant/ irrelevant (R/I) screening format for the federal government as taught by the Department of Defense Polygraph Institute.

B.  Background.

   The R/I technique was developed in large part by Leonard Keeler, and subsequently adopted by agencies of the federal government.

C.  Pretest Phase.

   1.  Question Review. During the pretest interview, the relevant, irrelevant, and overall truth questions, if utilized, are reviewed with the examinee. The exact wording of the math question is not reviewed. The following sequence is used in introducing the questions.

> Relevant ( R )
> Irrelevant ( I )
> Overall truth (OT)
> Math ( M )

   2.  Questions Utilized in the R/I.

      a.  Relevant Question. This question pertains directly to the matter under investigation or to the issue(s) for which the examinee is being tested. In R/I screening examinations, all relevant questions are considered primary relevant questions. Examples are:

> Have you ever engaged in espionage against the United States?
> Have you ever been involved in subversive activity?
> Have you ever provided classified information to an unauthorized person?

      b.  Irrelevant Questions. In R/I formats, the irrelevant question is designed to allow the orienting response to habituate before a relevant question is asked, and as well, has special applications in the R/I question format. They are designed to be neutral, but should appear to be meaningful to the examinee. Irrelevant questions should be non-emotion evoking, and unrelated to the issue under investigation. Several irrelevant questions may be reviewed and used as

43

needed. Irrelevant questions are not scored against relevant test questions. Examples are:

> Is today Friday?
> Are you now in Alabama?
> Do you live in MD?

    c.  Overall Truth Question. This is an optional question which may be utilized in an R/I question format. It is similar to the sacrifice relevant question in comparison question formats. It is intended to elicit a physiological response which may be indicative of the examinee's overall response capability. This question may be asked near the beginning and/or at the end of a PDD chart. Examples are:

> Do you intend to answer truthfully all of the questions on this test?
> Have you truthfully answered all of the questions on this test?

    d.  Stimulus Question. This question is an optional question which may be utilized to determine the examinee's overall capacity for response. It is only used when the examinee exhibits a consistent lack of response. The stimulus question taught by DoDPI in the R/I format is the math question. The examinee is told that a math question may be asked during the examination. Examples are:

> Does 10 + 9 = 19?
> Does  7 + 5 = 12?

D.  Data Collection.

    1.  Question Sequence. The initial question sequence, as well as subsequent question sequencing, is at the discretion of the examiner. The examiner has the flexibility to utilize the most appropriate question order based upon the demonstrated physiological responses of the examinee. Questions may be repeated during a chart when using an R/I format. An example of an initial question sequence is as follows:

> I     Is today Friday?
> I     Are you now in Alabama?
> R    Have you ever been involved in a serious crime?
> R    Have you deliberately falsified any part of your security forms?
> R    Have you been involved in illegal drugs during the past five years?
> I     Do you live in Maryland?
> R    Have you deliberately falsified any part of your security forms?
> R    Have you ever been involved in a serious crime?

R    Have you been involved in illegal drugs during the past five years?

OT    Have you truthfully answered all of the questions on this test?

2.  Question Rotation. The order of questions on subsequent charts is at the discretion of the examiner based upon the responses of the examinee and format procedures.

3.  Question Format Procedures.

a.  Acquaintance Test (ACQT). This test is optional. If an ACQT is conducted it should be conducted as the first chart.

b.  Question Interval. Each chart will normally consist of no more than 12 questions. A question spacing of 20 to 25 seconds from onset of applied stimulus should be maintained throughout the examination. Irrelevant questions may be inserted as needed.

c.  Pattern Avoidance. The test must be conducted in an unpredictable manner that is consistent with the following R/I format rules. Subsequent charts should start with a different irrelevant question. The ratio of relevant questions to irrelevant questions should be varied. Never ask more than three relevant questions in a row. Pattern avoidance can be accomplished by varying the wording of questions to require a yes or no answer.

d.  Number of Charts. A minimum of two charts and no more than four charts are conducted for each series of an R/I examination. No more than six artifact-free askings of a relevant question should routinely be collected during a series. If additional askings are necessary, an additional series should be constructed utilizing a different testing format or an R/I format with new relevant questions. A phase may be made up of multiple series.

e.  Breakdown Test. A breakdown test is conducted to verify an examinee's statements regarding an issue after specific responses to one question have been observed during an R/I screening examination. The issue is separated from the remaining test questions, and a breakdown test is conducted. To devise appropriate breakdown questions, divide the issue into its logical components and design a question to cover each key area. The breakdown test can be conducted using an R/I format or a comparison question format.

f.  Clearing Test. The clearing test should be utilized in the R/I format after a breakdown test. The clearing test is made up of the remaining relevant

45

test questions that were not covered in the breakdown test from the original series. The test will not contain any questions dealing with the issue covered in the breakdown. The relevant questions asked on the clearing test must be asked a minimum of two times with no artifacts or significant physiological responses for an NSR decision. On occasion, it may be appropriate to conduct the clearing chart prior to the breakdown examination. This determination will be made by the examiner in coordination with individual agency policies and procedures.

   g. Askings of Relevant Questions. There must be at least two artifact-free examples of each relevant question in order for them to be evaluated. Each test should be made up of no more than five relevant questions. Relevant questions may be asked two times during a chart. No more than three relevant questions should be asked consecutively on a chart.

   h. Askings of Irrelevant Questions. These questions are placed at the beginning of each chart, and are interspersed between the relevant questions throughout the chart as needed. Irrelevant questions should be asked after any relevant question that results in a lengthy response.

  4. Conduct of an Acquaintance Test (ACQT). The ACQT is conducted, in part, to acquaint the examinee with PDD procedures. The ACQT is optional with this question format. The known solution ACQT is the only ACQT taught by DoDPI.

E. Test Data Analysis.

  1. Global Analysis. The evaluation procedure utilized in the federal government for R/I screening examinations is the global test data analysis procedure. This evaluation process requires the examiner to evaluate each PDD chart as a whole, and does not employ the use of numerical values. Since there are no comparison questions in this technique, the presence or absence of responses to a question is compared with the rest of the chart tracings in their entirety. Only data that is timely and consistent with the applied stimulus and free of artifacts and noise on the signal of interest is considered.

  2. Opinion Rendering criteria.

   a. Significant Response (SR). The examinee has exhibited consistent, timely, significant responses to at least one of the relevant questions.

   b. No Significant Response (NSR). The charts revealed that the subject failed to exhibit consistent, timely, and significant responses to the relevant questions.

    c.  No Opinion (NO). The examiner cannot render an opinion based upon the physiological responses to the relevant questions.

    3.  Rank Order Scoring System (ROSS). The ROSS ranks the questions on the charts from greatest to least responsiveness. In ROSS, each physiological parameter, i.e., respiration, electrodermal, and cardiovascular, is evaluated separately. ROSS provides the examiner with a cumulative picture of the consistent, significant and timely responses on the PDD charts. This method of evaluation is used exclusively to evaluate the R/I questioning formats.

F.  References.

    1.  Argenbright, F. A. (1997). Validation of R/I screening format. Unpublished manuscript.

    2.  Barland, G. H., Honts, C. R., & Barger, S. D. (1989). Studies of the accuracy of security screening polygraph examination (Rep. No. DoDPI89-R-0001), Fort McClellan, Alabama: Department of Defense Polygraph Institute.

    3.  Correa, E. I. & Adams, H. E. (1981). The validity of pre-employment polygraph examination and the effects of motivation. Polygraph 10, 143-155.

47

**Chapter XIII**

**Specific Issue Relevant/Irrelevant Test**

A.  Scope.

This guide establishes essential elements for the conduct of the specific issue relevant/irrelevant (R/I) format for the federal government as taught by the Department of Defense Polygraph Institute.

B.  Background.

The specific issue R/I technique was developed in large part by Leonard Keeler and was subsequently adopted by various agencies of the federal government.

C.  Pretest Phase.

1.  Question Review. During the pretest interview, all questions will be reviewed with the examinee prior to the collection of charts. The order of review is the examiner's option, but the questions should be reviewed in groups, i.e., relevant questions, irrelevant questions, and overall truth questions. A recommended order of review is:

> Relevant ( R )
> Irrelevant ( I )
> Overall Truth (OT)
> Stimulus (S)

2.  Questions Utilized in the specific issue R/I.

a.  Relevant Question. This question pertains directly to the matter under investigation or to the issue(s) for which the examinee is being tested.

1)  Primary Relevant. This question tests the possible direct involvement of the examinee. An example is:

> Did you shoot that man?
> Did you steal any of that money?

2)  Secondary Relevant. This question tests the examinee's possible indirect involvement in the offense under investigation. This involves matters such as evidence connecting, guilty knowledge, or secondary involvement, for example:

> Did you help steal that car?
> Do you know how that car was disposed of?
> Do you know for sure who stole that car?
> Did you plan with anyone to steal that car?

b.  Irrelevant question. An irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is designed to allow the orienting response to habituate before a relevant question is asked, and can be used to establish homeostasis when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issue being tested. Irrelevant questions are not scored. Several irrelevant questions may be reviewed and used as needed. Examples are:

> Are you now in Alabama?
> Are you sometimes called Tom?

c.  Overall Truth Question.  This is an optional question which may be utilized in an R/I question format. It is similar to the sacrifice relevant question in comparison question formats.   It is intended to elicit a physiological response which may be indicative of the examinee's overall response capability. This question may be asked near the beginning and/or at the end of a PDD chart. Examples are:

> Do you intend to answer truthfully to all of the questions on this test?
> Have you truthfully answered all of the questions on this test?

d.  Specific Issue R/I Stimulus Question. This question is utilized to determine the examinee's overall capacity for response. It is primarily used when the examinee exhibits a consistent lack of response. When utilized in this R/I format, the stimulus question can be directed at specific thoughts, beliefs, or actions of the examinee as it relates to the issue under investigation. Responses to the applied stimulus question will not be utilized as comparison questions. Examples are:

> Do you feel threatened by this test?
> When you were accused of stealing, were you mad?

D.  Data Collection Phase.

1.  Question Sequence. Question sequence in the specific issue R/I format is flexible and the examiner has the choice in the manner in which the charts are collected. The following is one example:

| | |
|---|---|
| I | Is today Monday? |
| I | Is this the month of October? |
| OT | Have you deliberately withheld any pertinent information from me during this interview? |
| R | Did you receive anything of benefit from that registered pouch? |
| R | Did you remove any of the contents of that pouch? |
| I | Are you now in the city of Birmingham? |
| R | Did you steal that pouch? |
| R | Do you know where any of the contents of that pouch are now? |
| OT | Have you lied to any question on this test? |
| I | Is today Monday? |

2.  Question Rotation. The examiner may collect three or four charts with each relevant question being asked once on each chart, or two charts containing a combined total of at least three askings of each relevant question. There should never be fewer than three undistorted askings of each relevant question. Each chart must contain all relevant questions asked at least one time. Relevant questions may be repeated on individual charts.

3.  Test Format Operations.

   a.  If an acquaintance test is utilized, it will be the first chart collected.

   b.  No more than three relevant questions will be asked in sequence. Do not repeat any question back to back.

   c.  The first operational chart begins with at least two irrelevant questions or one irrelevant question and one overall truth question.

   d.  The overall truth questions will be asked prior to the first relevant question, or after the last relevant has been asked on the chart.

   e.  The most responsive relevant question on the previous chart(s) should not be the first relevant question asked on the next chart.

   f.  At least three and no more than five relevant questions will be asked during a series.

   g.  Only questions addressing elements associated with the issue being tested can be asked. Relevant questions covering different crimes are not permitted.

4.  Conduct of an Acquaintance Test (ACQT). The ACQT is conducted, in part, to acquaint the examinee with PDD procedures. The ACQT is optional with this question format. The known solution ACQT is the only ACQT taught by DoDPI.

E.  Test Data Analysis.

1.  Global Analysis. This evaluation process requires the examiner to evaluate each PDD chart as a whole. This approach does not employ the use of numerical values. Since there are no comparison questions in this technique, the presence or absence of response to a question is compared with the rest of the chart tracings in their entirety. Only data that is timely and consistent with the applied stimulus and free of artifacts and noise on the signal of interest is considered.

2.  Opinion Rendering criteria.

a.  Deception Indicated (DI). The subject has exhibited consistent, timely, and significant responses to one or more of the relevant questions the majority of times that it was asked.

b.  No Deception Indicated (NDI). The charts revealed that the subject failed to exhibit consistent, timely, and significant responses to the relevant questions.

c.  No Opinion (NO). If it is not DI or NDI, it is NO with the exception of administrative opinions.

F.  Reference Documents.

1.  Bersh P. J. (1969). A validation study of polygraph examiner judgments. Journal of Applied Psychology, 53, 399-403.

2.  Blum, R. H., & Osterloh, W. (1968). The polygraph examination as a means for detecting truth and falsehood in stories presented by police informants. The Journal of Criminal Law, Criminology, and Police Science, 59, 133-137.

3.  Crowe, M. J., Peters, R. D., Suarez, Y., & Claeren, L. (1988). The research project to compare the relative validity of the positive control and the relevant-irrelevant polygraph techniques (Tech. Rep No. MDA 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). Jacksonville, AL: Jacksonville State University Psychology Department.

4.  Crowe, M. J., Chimarys, M., & Schwartz, J. (1995). The GQT polygraph test: Scoring and validity. Polygraph, 24, 234-236.

**Chapter XIV**

**Test for Espionage and Sabotage**

A.  Scope.

This guide establishes essential elements for the conduct of the test for espionage and sabotage (TES) question format for the federal government as taught by the Department of Defense Polygraph Institute (DoDPI).

B.  Background.

The TES was designed and researched by the DoDPI Research Division Staff and subsequently adopted by DoDPI for use in counterintelligence screening PDD (CSP) examinations.

C.  Pretest Phase.

1.  Question Review. During the pretest interview, only the questions for the sub-test about to be tested are reviewed with the examinee prior to the collection of charts. The following sequence is used in introducing the questions:

> Sacrifice Relevant  (SR)
> Relevant  (R1 & R2, or R3 & R4, or R5 & R6 if utilized)
> Directed Lie Comparison  (C1 & C2)
> Irrelevant (I1 & I2)

2.  Questions Utilized in the TES.

a.  Relevant Question. This question pertains directly to the issue(s) being tested. The relevant question tests the possible direct involvement of the examinee.

b.  Directed Lie Comparison (DLC) Question. The DLC question is a specialized comparison question. A properly constructed DLC question involves a minor transgression which should have some personal significance to the examinee. Upon acknowledging having committed such a transgression, the examinee is directed to lie when asked that particular question on the test. The question is separated from the relevant issue by category. An example is:

> Did you ever commit a minor traffic violation?

c.  Sacrifice Relevant Question. This is the first question of the TES format that refers to the relevant issues, and it prepares the examinee for the introduction of the relevant questions. Examples are:

> Do you intend to answer the security questions truthfully?
> Regarding the security questions, do you intend to answer truthfully?

d. Irrelevant Question. An irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is designed to allow the orienting response to habituate before a scoreable question is asked, and can be used to establish homeostasis when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issue being tested. Irrelevant questions are not scored. Several irrelevant questions may be reviewed and used as needed. Examples are:

> Are you now in Alabama?
> Are you sometimes called Tom?

D. Data Collection.

1. Sub-Tests. The TES was originally designed to test four relevant questions. The format can be expanded to test six relevant questions. The TES consists of two sub-tests, A and B, when four relevant questions are tested, and three sub-tests, A, B and C, when six relevant questions are tested.

2. Question Sequence. Sub-tests A, B and C are sequenced the same. Relevant questions #1 and #2 are asked on sub-test A. Relevant questions #3 and #4 are asked on sub-test B, and relevant questions #5 and #6 are asked on sub-test C. If desired, the DLC and irrelevant questions may be different for each sub-test. The question sequence for sub-test A is as follows:

| | |
|---|---|
| I1 | Irrelevant |
| I2 | Irrelevant |
| SR | Sacrifice relevant |
| 1C1 | First asking of DLC #1 |
| 1R1 | First asking of relevant #1 |
| 1R2 | First asking of relevant #2 |
| 1C2 | First asking of DLC #2 |
| 2R1 | Second asking of relevant #1 |
| 2R2 | Second asking of relevant #2 |
| 2C1 | Second asking of DLC #1 |
| 3R1 | Third asking of relevant #1 |
| 3R2 | Third asking of relevant #2 |
| 2C2 | Second asking of DLC #2 |

3. Question Format Procedures. Test procedures require a minimum of three askings of each relevant question. The physiological tracings should be free of artifacts in at least two of the three component tracings at each asking of

the relevant questions, and able to be evaluated against at least one of the bracketing comparison questions. If after three askings of the relevant questions, artifacts prevent scoring of one or both of the relevant questions, an additional asking of both relevant questions for that sub-test will be conducted. One of the following procedures will be used to accomplish this:

a. If the examiner realizes that a fourth asking is necessary prior to the completion of the chart, a fourth asking may be collected on the same chart. The following questions are added after 2C2:

| | |
|---|---|
| 4R1 | Fourth asking of relevant #1 |
| 4R2 | Fourth asking of relevant #2 |
| 3C1 | Third asking of DLC #1 |

b. If the examiner does not realize that a fourth asking is necessary until the chart has been collected, a short chart may be collected. The format for a short chart is as follows:

| | |
|---|---|
| I1 | Irrelevant |
| I2 | Irrelevant |
| SR | Sacrifice relevant |
| 3C1 | Third asking of DLC #1 |
| 4R1 | Fourth asking of relevant #1 |
| 4R2 | Fourth asking of relevant #2 |
| 3C2 | Third asking of DLC #2 |

c. Each sub-test, A, B, and C, is administered and resolved as an individual test. After the resolution of a sub-test, the questions for the next sub-test are introduced and tested.

d. Either sub-test A, B, or C, may be administered first. Regardless of the order in which the sub-tests are administered, a subsequent sub-test should not be administered if the previous sub-test has not been resolved.

e. When a sub-test results in a decision of significant response (SR), and subsequent clearing sub-tests continue to yield SR decisions, no more than four (4) sub-tests may be administered during any 24 hour period. A delay of 48 hours is recommended before continuing testing.

4. Conduct of an Acquaintance Test (ACQT). The ACQT will be collected as the first chart of this examination. It is conducted, in part, to acquaint the examinee with PDD procedures. The known solution ACQT is the only ACQT taught by DoDPI.

54

E.  Test Data Analysis.

    1.  Numerical Analysis. TES PDD charts are analyzed utilizing the seven-position scale.

    2.  No Split Opinions. An examinee is SR, NSR or NO to the test, not to a question.

    3.  Administrative Opinions. These opinions reflect the results of a series or an examination that are not based upon physiological responses to the applied stimuli, such as when the examinee terminates an examination or is practicing countermeasures. In such instances, administrative opinions such as inconclusive, purposeful non-cooperation, etc., are appropriate.

    4.  Spot Analysis. The seven-position numerical evaluation system analyzes the physiological responses recorded on the chart by comparing the relevant questions to the largest response by component tracing of the DLC questions as follows:

        1R1 and 1R2 compared to 1C1 or 1C2
        2R1 and 2R2 compared to 1C2 or 2C1
        3R1 and 3R2 compared to 2C1 or 2C2
          When a fourth asking is required:
        4R1 and 4R2 compared to 2C2 or 3C1
           When a short test is required:
        4R1 and 4R2 compared to 3C1 or 3C2

    5.  Test Data Analysis of a Fourth Asking. When a fourth asking of the relevant questions is necessary, only the relevant question(s) that could not be evaluated due to artifacts will be scored.

F.  Opinion Rendering Criteria.

    1.  SR. A minus three (-3) or less in any overall vertical spot, or an overall horizontal total score of minus four (-4).

    2.  NSR. At least a plus one (+1) at each overall vertical spot, and an overall horizontal total score of at least plus four (+4).

    3.  NO. If it is not SR or NSR, it is NO with the exception of administrative opinions.

G.  References.

1.  Department of Defense Polygraph Institute Research Division Staff (in press). Physiological detection of deception accuracy rates obtained using the test for espionage and sabotage (Rep. No. DoDPI94-R-009). Fort McClellan, AL: Department of Defense Polygraph Institute.

2.  Department of Defense Polygraph Institute Research Division Staff (1995). A comparison of psychophysiological detection of deception accuracy rates obtained using the counterintelligence scope polygraph and the test for espionage and sabotage question formats (Rep. No. DoDPI194-R-0008). Fort McClellan, AL: Department of Defense Polygraph Institute.

3.  Department of Defense Polygraph Institute (1998). TES administration manual. Fort McClellan, AL: Department of Defense Polygraph Institute.

4.  Honts, C. R., & Raskin, D. C., (l988). A field study of the validity of the directed lie control question. Journal of Police Science and Administration, 16, 56-61.

**Chapter XV**

**Law Enforcement Applicant Screening**

A.  Scope.

This guide establishes essential elements for the conduct of law enforcement applicant screening (LEAS) formats as utilized by Agencies within the federal government.

B.  Background.

LEAS formats are a specific application of the comparison test formats (CTF). LEAS formats were developed by federal agencies as the primary personnel screening technique to test applicants for employment in sensitive law enforcement positions. LEAS formats address national security, integrity and suitability issues.

C.  Pretest Phase.

1.  Order for Question Review. During the pretest interview, all questions are reviewed with the examinee prior to the collection of charts. The following sequence should be used in introducing questions:

Sacrifice Relevant (SR)
Relevant ( R )
Comparison ( C )
Irrelevant ( I )

2.  Questions Utilized in LEAS. The following question types are generally used in LEAS applications.

a.  Relevant. This question pertains directly to the issues being tested. The relevant question tests the possible direct involvement of the examinee. Examples are:

Have you ever had any unauthorized foreign contacts?
Have you ever sold any illegal drugs?

b.  Probable Lie Comparison (PLC) Questions. This question is designed to be a probable lie for the examinee. The PLC question should be similar in nature but unrelated to the issues being tested. The comparison question should be separated from the relevant issues by either time, place or category. The PLC question should be broad in scope and time so that it captures as many of the examinee's past life experiences as possible. An example is:

Prior to your 18th birthday, did you ever lie to anyone who trusted you?

c. Sacrifice Relevant Question. This is the first question of the format that refers to the relevant issues, and it prepares the examinee for the introduction of the relevant questions. The question addresses the relevant issue and should not exceed the scope of the relevant issue. An example is:

In connection with your application for employment, do you intend to answer each question truthfully?

d. Irrelevant Question. An irrelevant question is the first question asked during the data collection phase. It may also be asked in other positions on the chart. It is used to allow the orienting response to habituate, and it can be used to reestablish baseline when an artifact occurs on the chart. Irrelevant questions should be unrelated to the issues being tested. Irrelevant questions are not scored. Several irrelevant questions may be reviewed and used as needed. An example is:

Are you now in Alabama?

D. Data Collection Phase.

1. Question Format. The test format should begin with an irrelevant question. Irrelevant questions may be inserted into each chart as needed. A sacrifice relevant question will be included in the test format. Two to five relevant questions may be utilized.

2. Question Sequence. With the possible exception of irrelevant questions, all questions reviewed during the pretest phase of LEAS examinations will be asked during the data collection phase. However, the exact sequence in which the questions are to be asked in the data collection phase is not revealed.

a. An example of a possible question sequence for the national security examination is:

I  SR  C  R  C  R  C  R  C  R  C

b. An example of a possible question sequence for the integrity and suitability examination is:

I  SR  C  R  C  R  C  R  C

3. Data Collection Phase. After the first chart, relevant and comparison questions may be rotated, or a mixed series may be utilized. At least one of the subsequent charts must be a mixed series. After the first chart, subsequent

58

charts should be constructed so that the relevant question displaying the greatest physiological responses is adjacent to the comparison question(s) with the greatest physiological response. Each relevant question should be bracketed by comparison questions in at least one chart of each series.

    4.  Chart Requirements. In most instances, three askings of each relevant question is appropriate. An additional asking of all questions, i.e., a fourth chart, is only authorized if an artifact occurred which precluded a conclusive opinion from being rendered. If after three askings a conclusive opinion can be rendered from those components not affected by artifacts, the test is complete. The numerical total required for a conclusive opinion when four charts are conducted remains the same as for a three-chart series. Under no circumstances is a fifth asking (chart) authorized.

    5.  Conduct of Acquaintance Test (ACQT). The ACQT may be collected as the first chart of this examination. It is conducted, in part, to acquaint the examinee with the PDD procedures. The known solution ACQT is the only ACQT taught by DoDPI.

E. Test Data Analysis.

    1.  Numerical Analysis. The seven-position scale is normally utilized to evaluate test data.

    2.  Spot Analysis. Relevant questions are grouped together in spots. The examiner monitors and evaluates the examinee's responses in these spots.

    3.  Test Data Analysis Procedures. When comparing relevant and comparison questions, each component tracing will be reviewed and compared independently. The greatest physiological response in the comparison question(s) will be compared to the adjacent relevant question(s).

    4.  Opinion Rendering Criteria.

        a.  Significant Response (SR). To render an opinion of SR, the numerical score must be minus three (-3) or less in any overall vertical spot. There is no overall horizontal spot total utilized to render an opinion, as is the case in the ZCT.

        b.  No Significant Response (NSR). To render an opinion of NSR, the numerical score must be plus three (+3) or greater in every overall vertical spot when using a seven-position scale.

        c.  No Opinion (NO). If based upon physiological responses to the applied stimuli an opinion of SR or NSR cannot be rendered, the opinion is NO. When appropriate, an administrative opinion should be rendered.

5.  Administrative Opinions. These opinions reflect the results of a series or an examination that are not based upon physiological responses to the applied stimuli, such as when the examinee terminates an examination or is practicing countermeasures. In such instances, administrative opinions such as inconclusive, purposeful non-cooperation, etc., are appropriate.

F.  References.

The following research applies to this issue. Additional validations studies are pending.

1.  Barland, G. H., Honts, C. R., & Barger, S. D. (1989). Studies of the accuracy of security screening polygraph examination (Rep. No. DoDPI89-R-001). Fort McClellan, Alabama: Department of Defense Polygraph Institute.

2.  Barland, G. H., Honts, C. R., & Barger, S. D. (1990). The detection of deception for multiple issues (Project No. DoDPI89-P0005). Fort McClellan, AL: Department of Defense Polygraph Institute.

3.  Meesig, R. T., & Horvath, F. S. (1993). Changes in usage, practices and policies in pre-employment polygraph testing in law enforcement agencies in the United States 1964-1991. Polygraph, 22, 1-16.

4.  Yankee, W. J., (1990). Position statement pertaining to control question techniques. Fort McClellan, AL: Department of Defense Polygraph Institute.

5.  Schofield, D. L. (1993). Hiring standards: Ensuring fitness for duty. Polygraph, 22, 323-331.

## Glossary of Terms

The terms utilized in this document are designed for the policies and procedures as applied within the federal government.

**Acquaintance Test (ACQT) -** A questioning format which is a form of the known solution peak of tension test. It is utilized to demonstrate and acquaint the examinee with the basic concepts of the PDD examination. The primary purpose of this test is to assure the examinee that the PDD process is effective.

**Administrative Opinion -** Opinions that reflect the results of a series or an examination that are not based upon physiological responses to the applied stimuli, such as when the examinee terminates an examination or when the examinee is practicing countermeasures. In these instances, administrative opinions such as inconclusive, purposeful non-cooperation, etc., are appropriate.

**Artifact -** A change in a physiological pattern not attributable to a stimulus question or homeostatic change.

**Breakdown Test** - A test conducted to verify an examinee's statement regarding an issue after specific responses to one question have been observed and recorded during a screening examination. The issue is separated from the remaining test questions and a breakdown test is conducted. To devise appropriate breakdown questions, divide the issue into its logical components and design a question to cover each key area. The breakdown test can be conducted using an R/I format, or a comparison question format. If the results of the breakdown test clear the issue for which the test was conducted, a clearing test should be conducted.

**Bracketed Relevant Questions -** The procedure wherein comparison questions are placed adjacent to or in close proximity to a relevant question for the purpose of comparing physiological responses.

**Cardiovascular Tracing -** The display of physiological patterns of the subject's relative blood volume and pulse rate. The cardiograph component records this activity. The criteria used to evaluate this component are: change in baseline, change in amplitude and change in rate.

**Certification Process -** Personnel authorized to conduct PDD examinations will be certified by each agency. The agency certifies that the examiner has met and maintains all qualifications and training requirements. Only fully certified examiners, examiners being recertified, or intern examiners under the supervision of a certified examiner are authorized to conduct PDD examinations.

**Chart -** A graphic representation containing selected physiological data generated by an examinee during the testing phase of a PDD examination.

**Clearing Test** - A test which is utilized in the R/I format after a breakdown test. The clearing test is made up of the remaining relevant test questions that were not covered in the breakdown test. The test will not contain any questions dealing with the issue covered in the breakdown. The relevant questions asked on the clearing test must be asked a minimum of two times with no artifacts or significant physiological responses for an NSR decision.

**Comparison Question -** A question which is designed to produce a physiological response. The physiological responses of the comparison questions are compared to the physiological responses of the relevant questions. The probable and directed lie are the two types of comparison questions utilized within the federal government.

**Counterintelligence Scope PDD Examination** -  A PDD screening examination administered to detect and deter espionage, security breaches, sabotage, or other acts against the federal government.

**Deception Indicated (DI)** - An opinion which indicates that an analysis of the PDD charts revealed the physiological responses to the relevant question(s) were indicative of deception.

**Directed Lie Comparison (DLC) Question** - A specialized comparison question addressing a minor  transgression to which most people will readily admit. Upon acknowledging having committed such a transgression, the examinee is directed to lie when asked that question on the test.

**Electrodermal Tracing** - The display of physiological patterns of either skin resistance or skin conductance obtained through exosomatic recording with a galvanograph component. The criteria considered when evaluating this component are change in amplitude, complexity of the response, and duration of the response.

**Examiner Internship** - Upon successful completion of the PDD training course, each candidate will serve an internship. This internship will be a minimum of six months and usually will not exceed twelve months. During this time, the intern will conduct at least twenty-five (25) PDD examinations under the direct supervision and guidance of a senior certified examiner.

**Expanded Scope PDD Examination -** A personnel security screening PDD examination whose relevant questions usually address involvement in serious crime, illegal drugs, falsification of forms, as well as the counterintelligence scope questions.

**Forensic Psychophysiological Detection of Deception (PDD)** - The science that deals with the relationship and applications of PDD tests within the legal system. It is the academic discipline that provides the student, the practitioner, and the researcher with the theoretical and applied psychological, physiological, and psychophysiological fundamentals for a thorough understanding of PDD tests, and the skills and qualifications for conducting PDD examinations. The modifier "forensic" delineates and delimits this discipline from the broader discipline of psychophysiology.

**Global Test Data Analysis** - A system of rendering an opinion by viewing the PDD chart as a whole, as opposed to making systematic comparisons among questions. This approach does not employ the use of numerical values. This method is used primarily in the relevant/irrelevant and peak of tension question formats.

**Homeostasis -** A complex interactive regulatory system by which the body strives to maintain a state of internal equilibrium.

**Homeostatic Change -** A deviation in a tracing attributable to a physiological phenomenon occurring as a compensatory action after a response or an artifact.

**Irrelevant Question** - A question which is designed to be non-emotion evoking and unrelated to the issue being tested.

**Math Question** - A stimulus question that involves the unrehearsed presentation of a simple arithmetic problem.

**No Deception Indicated (NDI)** - An opinion which indicates that an analysis of the PDD charts revealed the physiological responses to the relevant question(s) were not indicative of deception.

**No Opinion (NO) -** An evaluation which indicates the examiner cannot render an opinion based upon the physiological data on the charts.

**No Significant Response (NSR)** - This opinion indicates that the analysis of the PDD charts revealed no consistent, significant, timely, physiological responses to the relevant questions in personnel screening, source validation, or POT tests.

**Overall Truth Question** - An optional question which may be utilized in an R/I question format. It is similar to the sacrifice relevant question in the comparison question format. It is intended to elicit a physiological response which may be indicative of the examinee's overall response capability.

**Personnel Screening PDD Examination -** A PDD examination conducted to aid in determining an individual's eligibility for initial or continued access to designated programs, or an examination conducted to aid in determining an individual's eligibility for initial access to sensitive law enforcement positions.

**Polygraph Instrument** - A diagnostic instrument used during a PDD examination which is capable of monitoring, recording and/or measuring at a minimum, respiratory, electrodermal, and cardiovascular activity as a response to verbal or visual stimuli.

**Probable Lie Comparison (PLC) Question** - A question designed to be a probable lie for the examinee. The DLC question should be similar in nature but unrelated to the specific crime or issue being tested. The question should be separated from the relevant issue by either time, place or category. The comparison question should use the same action verb or similar in nature action verb as that of the relevant issue. A comparison question should be broad in scope and time so that it captures as many of the examinee's past life experiences as possible.

**Psychological Set** - A specific application of set theory regarding the focus of attentional resources and the preparation of responses. In psychology, set is defined as a temporary orientation or state of preparedness toward a particular stimulus.

**Psychophysiological Detection of Deception (PDD)** - The academic discipline that provides the student, the practitioner, and the researcher with the theoretical and applied psychological, physiological, and psychophysiological fundamentals for a thorough understanding of PDD tests, and the skills and qualifications for conducting PDD examinations.

**PDD Examination** - A process that encompasses all activities that take place between a PDD examiner and an examinee during a specific series of interactions. These interactions may include the pretest interview, the use of the polygraph instrument to collect physiological data from the examinee while presenting a series of tests, the test data analysis phase, and the post-test phase, which may include the interrogation of the examinee.

**PDD Examiner -** Someone who has successfully completed formal education and training in conducting PDD examinations and is certified by their agency to conduct such examinations.

**PDD File** - The file in which all PDD reports, technical documents, charts and related documents should be maintained until properly disposed.

**PDD Report** - A PDD document that may contain identifying data of the examinee, a synopsis of the basis for which the examination was conducted, the relevant questions utilized, and the examiner's conclusion.

**PDD Series** - The collection of the required PDD chart(s) for a particular testing format.

**Rank Order Scoring System (ROSS) -** A scoring system which ranks the questions on the charts from greatest to least responsiveness. In ROSS, each physiological parameter, i.e., respiration, electrodermal, and cardiovascular, is evaluated separately. ROSS provides the examiner with a cumulative picture of the consistent, significant and timely responses on the PDD charts. This method of evaluation is used exclusively to evaluate relevant/irrelevant questioning formats.

**Relevant Question** - A question that pertains directly to the matter under investigation or to the issue(s) for which the examinee is being tested.

**Respiratory Tracing -** The display of physiological patterns indicative of the examinee's breathing activity as recorded by the pneumograph component. Evaluation criteria considered are changes in amplitude, changes in rate, changes in baseline, loss of baseline and apnea.

**Response** - The physiological change to the applied stimulus which can either be phasic or tonic.

**Sacrifice Relevant Question** - A question that prepares the examinee for the introduction of the relevant questions.

**Significant Response (SR)** - An opinion which indicates that the analysis of the PDD charts revealed consistent, significant, timely physiological responses to the relevant questions in personnel screening, source validation, or POT tests.

**Specific Issue PDD Examination -** A PDD examination conducted to resolve a specific issue, e.g., criminal, espionage, sabotage, or source validation.

**Spot Analysis** - The procedure wherein each component tracing is separately evaluated by comparing the response of a relevant question to the response of a comparison question.

**Stimulus Question** - A question which may be utilized in an R/I question format to determine the examinee's overall capacity for response.

**Symptomatic Question** - A question which is designed to test for an outside issue that could be more significant for an examinee than the issues being tested.

**Technical (Test) Questions** - A specifically designed question posed to an examinee during the data collection phase of a PDD examination. Test questions are designed to maximize differences in the elicited response patterns between truthful and deceptive examinees. There are several types of test questions used within PDD.

**Test Data** - The signal of interest which may consist of unwanted noise, artifact, homeostatic change, or psychophysiological responses of the examinee in response to stimuli.

**Test Data Analysis** - The analysis of the psychophysiological responses recorded on the PDD charts. Only data that is timely with the applied stimulus and free of artifacts and unwanted noise on the signal can be evaluated.