Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117
_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

February 8, 2016

Stuart Chanen, Esq.
Valorem Law Group
35 East Wacker Drive, Suite 3000
Chicago, IL 60601

Re:     *Nicole Harris v. City of Chicago, et al.*
        Case No. 1:14 CV 04391
        United States District Court, Northern District of Illinois

Dear Mr. Chanen,

This report is per your request in the above-referenced case of *Nicole Harris v. City of Chicago et al.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In 1992 and 1993, I spent nine months doing field research inside the Oakland Police Department, which included sitting in on and contemporaneously observing one-hundred twenty-two (122) felony interrogations; in 1993, I also observed sixty (60) fully videotaped interrogations in the Vallejo and Hayward Police Departments in northern California. Since then, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 2

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications.  My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court on multiple occasions.  To date, I have consulted with criminal and civil attorneys on approximately eighteen- hundred (1,800) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and eleven (311) times in state, federal, and military courts in thirty-three (34) states plus the District of Columbia, including thirteen times in federal courts and seven times in military courts.  I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report as Appendix A.  A list of my court and deposition testimony in the last four years is attached to this report as Appendix B.  I am being compensated for my time at the rate of $375 per hour.  My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the materials listed in Appendix C to this report.

## III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination, and indicia of unreliability.  I will then discuss these issues as they relate to the investigation, interrogations and confession statement of Nicole Harris.[1]

More specifically, in my professional opinion:

1)        It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;

2)        Nicole Harris's account of her multiple interrogations during her over 30 hours at Area 5 on May 14-16, 2005 is consistent with the social science empirical research literature on

---

[1]        Because police investigators failed to electronically record the interrogations of Nicole Harris, we are forever deprived of an objective record of what occurred during these interrogations.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 3

the types of interrogation techniques and investigative practices that are associated with increase the risk of and are known to cause innocent individuals to falsely confess[2];

3)     The accounts of the various Chicago police investigators who detained and/or interrogated Nicole Harris during her over-30-hours at Area 5 are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;

4)     In her account of what occurred during her police custody and/or interrogations on May 14-16, 2015, Nicole Harris describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven.  Nicole Harris describes interrogation procedures whose goal was not to find the truth but to break down her denials of guilt and elicit from her a confession to killing her son Jaquari Dancy;

5)     Before interrogating her, the investigators misclassified Nicole Harris as guilty when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about;

6)     The initial spontaneous "confession" attributed to Nicole Harris, which she denies, is inconsistent with empirical social science research on police interrogation and confessions, as well as with logic and the physical evidence in this case;

7)     The multiple interrogations described by Nicole Harris were both physically and psychologically coercive:  Nicole Harris's account of what occurred during her multiple interrogations contains interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

8)     Nicole Harris' account of what occurred during her multiple interrogations contains numerous interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent. These included false evidence ploys, minimization, implied and explicit threats, and implied and explicit promises;

---

[2]     There is a factual dispute as to when the questioning of Ms. Harris began at the police station.  Ms. Harris believes that it started when she first arrived at the station, which was at approximately 7:00 p.m., while the Detectives assert that they did not begin questioning her until 9:00 p.m., which is the first GPR covering an interview of Ms. Harris.  I do not attempt to resolve this factual dispute, but will generally refer to the total time between her arrival at the station and the end of her videotaped confession as her "over 30 hours at Area 5."

There is also a factual dispute about whether Ms. Harris was in police custody from her arrival near 7:00 p.m. and her being placed into custody at 12:45 a.m.  The police assert that she was free to leave, and she asserts that she did not know she was free to leave.  Regardless how that dispute is resolved, however, there is no dispute that Ms. Harris was in police custody for more than 24 hours before giving her videotaped statement of confession.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 4

9)       Nicole Harris was also at a heightened risk during her interrogations of making and/or agreeing to a false and unreliable confession because of her general personality traits (i.e., *personal* risk factors), specifically her submissiveness and high suggestibility, as well as specific personality traits she had at that time (her overwhelming grief over the loss of her son);

10)     The interrogations described by Nicole Harris involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Nicole Harris' confession statement would, misleadingly, appear to be detailed and self-corroborating;

11)     The confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions.  This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community.  Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community and therefore accepted expert testimony in criminal and civil rights litigation.[3]

---

[3]     See *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of a civil rights plaintiff's false confession expert Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of a civil rights plaintiff's false confession expert Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) *aff'd*, 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's false confession expert Richard Ofshe).  In addition to these cases, which have allowed and upheld the testimony of false confession experts, a unanimous court in *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012), although it did not reach that precise issue, nevertheless referred to the following five articles in the next paragraph as "the leading research on false confessions" and held that these articles and their findings establish that there are several reasons to doubt the reliability of Ms. Harris's confession *in this case*.  *Id.* at 631-32 & n.12.

Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to ... extract confessions"); Gisli H. Gudjonsson et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth,* 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police); Brandon L. Garrett, *The Substance of False Confessions,* 62 Stan. L.Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 5

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[4]  The fact that police-induced false confessions can and do occur has been well-documented and is not disputed by anyone in the law enforcement or academic community.  Indeed, leading police interrogation training manuals have, at least since 2001, contained entire chapters and sections on the problem of police-induced false confessions and what investigators need to know to better understand and avoid eliciting false confessions from innocent suspects.[5]  Social scientists have documented approximately four-hundred and fifty to five-hundred proven false confessions in America since the early 1970s,[6] but this is surely an underestimate and thus the tip of a much larger iceberg for several reasons.  First, false confessions are difficult for researchers to discover because neither the state nor any organization keeps records of the interrogations producing them.  Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of proving the confessor's *absolute* innocence.  As a result, Richard Ofshe and I coined the term "proven false confession" in 1998,[7] showing that there are only four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

---

that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation."); Richard A. Leo, *False Confessions: Causes, Consequences, and Implications,* 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's postadmission narrative.... If the entire interrogation is captured on audio or video recording, then it may be possible to trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his postadmission narrative."); Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions,* 32 Loy. U. Chi. L.J. 337, 339–41 (2001) (*accord*).

[4]   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" in  *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

[5]   See, for example, *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001).  CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers, Inc.) at 411-448; and David Zulawski and Douglas Wicklander (2002).  PRACTICAL ASPECTS OF INTERVIEWING AND INTERROGATION, 2nd Edition (CRC Press) at 73-104.

[6]   The largest published study of proven false confessions to date is Steven Drizin and Richard A. Leo (2004).  "The Problem of False Confessions in the Post-DNA World.  *North Carolina Law Review*, 82, 891-1007.  For a review of the literature documenting proven false confessions, see Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE.  At that time, there were approximately two-hundred and fifty to three-hundred proven false confessions in the documented literature.  Since 2004, Steve Drizin, Gillian Emmerich and I have collected an additional two-hundred proven false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

[7]   Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*.  Vol. 88, No. 2.  Pp. 429-496.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 6

1) when it can be objectively established that the suspect confessed to a crime that did not happen;
2) when it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;
3) when the true perpetrator is identified and his guilt is objectively established; and/or
4) when scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of proven false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been thousands (if not tens or hundreds of thousands) more police-induced false confessions than researchers have been able to discover and classify as proven false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[8]

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[9] Police detectives receive specialized training in psychological interrogation techniques; most people do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

---

[8]   Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," Law and Human Behavior, 31, 381-400.

[9]   *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008), "An Empirical Basis for the Admission of Expert Testimony on False Confessions," *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011) "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" in *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010), "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" in *The Journal of Legal Empirical Studies,* 7, 231-247.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 7

## V. The Social Psychology of Police Interrogation[10]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation. To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[11] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting unreliable confessions or statements.

Contemporary American interrogation methods are structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess. Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[12] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

---

[10]  See Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications." *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

[11]  Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room," In William O'Donohue, ED (2004), *Handbook of Forensic Psychology* (San Diego: Academic Press). Pp. 897-996.

[12]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, see Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 8

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation. [13] Investigators also use scenarios to plant

---

[13]   See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 332.( "The goal of interrogation is therefore to decrease the suspect's

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 9

ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements.

*Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in their most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower

---

perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 10

criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* incentives can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[14] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had

---

[14] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 11

the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

## VI. The Three Types of False Confessions

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in the United States. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[15] These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt. Regardless of type, false confessors typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

## VII. The Three Sequential Police Errors
## That Can Lead to False (But Sometimes Detailed) Confessions

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big

---

[15]   *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 12

difference between interrogation and interviewing:  unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true.  This is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[16]

The second important decision point in the process occurs when the police interrogate the suspect.  Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission.  To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques.  As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him.  However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect.  This is referred to as the post-admission phase of the interrogation.  The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission.  Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit.[17]  Properly-trained police interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.  Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to

---

[16]   Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[17]   Although the "Reid" Manual (CRIMINAL INTERROGATION AND CONFESSIONS by Fred Inbau et al.) did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades.  From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," implicitly, if not explicitly, suggesting that police interrogator do know that suspects can be made to falsely confess to crimes they did not commit.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 13

demonstrate, independent knowledge of the crime scene details and case facts.  Properly-trained police interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime.  Instead, they will let the suspect supply the details of the case independently.  Properly-trained police interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence.  Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[18]

## VIII. Populations with Particular Vulnerability in the Interrogation Room

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession.  This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes juveniles and individuals with a low IQ or low-level cognitive functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures.  Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of autonomy needed to resist simple police pressures and manipulations.  Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.

## IX. Evaluating the Reliability of Incriminating
## Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases.  To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission

---

[18]  Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*.  Vol. 88, No. 2.  Pp. 429-496.  This observation has been made in the police interrogation training literature as well.  See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 14

narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[19]

      The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that is full of gross errors and disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination, the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

      The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Properly trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence. For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge. Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

---

[19]   *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 15

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[20] This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because properly-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides a gold mine of potential evidence to the unbiased, properly-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

---

[20]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 16

     This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details.  If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This problem is discussed in detail in the following section.

## X. The Problem of Contamination

     The post-admission narrative process is about more than merely eliciting information from the suspect.  Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[21]  In this way, confessions are scripted or constructed by interrogators.  A persuasive crime narrative requires an explanation of why the crime happened— the motives and explanations of the suspect for committing the crime.  It also should contain a statement of the suspect's emotions, not only his or her emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime.  Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary.  Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect.  Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know.

     The problem of contamination in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[22] .  Because they are trained to presume the guilt of those whom they interrogate, American police assume that they are interrogating suspects who already know the correct crime facts.  But this is not true when they are mistakenly interrogating an innocent person.

     Instead, the innocent suspect is pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative.  Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration.  After police interrogators have

---

[21]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.
[22]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 17

contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading specialized knowledge."[23] In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators. Of course, if the interrogation process is not electronically recorded, the interrogator is free to assert that these crime facts were volunteered by the suspect and the trial devolves into a swearing contest between the suspect and the interrogators over who was the source of the details in the confession. If the entire process is recorded, however, then it may be possible to trace the contamination.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[24] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[25]

In sum, the problem of contamination means that when applying the fit test to assess the reliability of the confession, it is essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

## XI. The Interrogations and Confession Statement of Nicole Harris

### A) Nicole Harris' Description of Her Custody and Interrogations on May 14-16, 2005

According to Ms. Harris, on May 14, at approximately 6:15 p.m., as she was arriving at the hospital, the doctors pronounced Jaquari dead, which caused her to collapse and scream in grief. She was subsequently taken to the hospital chapel, where she and her then fiancé Sta-von Dancy started to grieve with their 5-year old son Diante. Soon thereafter, at

---

[23]   Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

[24]   Brandon Garrett (2011). CONVICTING THE INNOCENT (Harvard University Press)

[25]   Brandon Garrett (2015). "Contaminated Confessions Revisited," Forthcoming in *University of Virginia Law Review*.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 18

approximately 6:45 p.m., Chicago police detectives approached her at the hospital chapel and asked her to come to the police station, claiming it was standard procedure.  Ms. Harris requested to see Jaquari before going to the station, but the investigators denied her request.  They did, however, indicate that they she would be able to return and see Jaquari.

Too grief-stricken to drive, she asked police to drive her to the station.  The police drove her and Sta-Von to the station separately.  When they arrived at the station at approximately 7:15, Ms. Harris was put into a room with Diante and Sta-Von was placed in a separate room.

According to Ms. Harris, she and Diante were placed in the "Butterfly Room" or "Quiet Room," where police investigators questioned her.  Ms. Harris reports that she did not feel free to leave.  Shortly after 11:00 p.m., DCFC Social Worker Scott Peterson arrived at Area 5.  He subsequently took Diante from Ms. Harris.  Immediately afterwards, investigator moved her out of the Butterfly room and one of the investigators shoved her into another room, yelling at her that she was "under arrest for murdering her fucking son."  The investigator also pushed her onto a bench, while handcuffing her arm to a bar over the bench.  Several investigators then interrogated her, repeatedly accusing her of lying and of playing games with them, as she repeatedly denied killing her son.  According to Ms. Harris, she asked for a lawyer but they told her that she did not need one.  Ms. Harris repeatedly asserted her innocence and told them she was telling the truth, crying throughout.  Berating and mocking her for crying fake tears, the investigators repeatedly demanded that she stop lying to them and accused her of playing games with them. The investigators also told her, falsely, that Sta-von thought she could have murdered Jaquari.

At some point, the investigators told her that she needed to take a polygraph, but they could not schedule it until the next day.  So they left her in the interrogation room overnight, with no bed.  Ms. Harris was now under arrest.  Ms. Harris reports that she was not able sleep and that she pounded on the door to the interrogation room, which was locked from the outside, in order to go to the bathroom.  Only after an hour had passed was she allowed to go to the bathroom.

The next day, at approximately 11 a.m., the investigators took Ms. Harris to be polygraphed by Officer Bartik.  According to Ms. Harris, Bartik administered the polygraph examination to her for approximately an hour.  After concluding the exam, Bartik told Ms. Harris, falsely, that she failed the polygraph, accused her of lying, pissing him off, and acting like a monster.  She further testified that an investigator came into the room where Bartik was interrogating her and yelled at her, berated her, and jabbed her in the shoulder. Ms. Harris reports that she tried to ask for an attorney, but was told that she did not need an attorney if she was telling the truth.  Ms. Harris reports that she was crying, feared for her life, and was completely exhausted.  She had repeatedly told Bartik and the other investigators that she did not kill her son and had been telling the truth about this the whole time, but that no one was listening to her.

According to Ms. Harris, other investigators entered the polygraph room and continued the aggressive interrogation.  Ms. Harris was threatened that if she did not cooperate and confess

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 19

to killing her son, she would spend the rest of her life in prison.  Another investigator repeated
the threat, telling her that she killed her son and that if she did not confess to killing her son, the
state would "slam her ass," the investigators would turn her case over to the state, and she would
spend the rest of her life in prison and never be able to see her son Diante again.  However, if she
cooperated and confessed, one of the investigators told her, the investigators could help her.
Instead of being charged with first degree intentional murder and spending the rest of her life in
prison, she would be charged with voluntary manslaughter, and one of them explained to her
how the different states of mind factored into the different punishment she could receive.

       She also reports that she was told that if she admitted to killing Jaquari, she could go
home, that her bail would be set at a low amount like $15,000, her father could come get her, and
that they could fight the case from the outside.  Ms. Harris reports that she was devastated,
terrified, and confused and thus subsequently started to agree with whatever the investigators
told her and asked of her.  She also described feeling hopeless, that nothing she said could
change their minds, and the only way for her to escape this coercive interrogation was to tell the
investigators what they wanted to hear so that she could go home.

       Eventually the investigators took Ms. Harris back to the Area 5 station house, where they
rehearsed her confession statement.  The investigators had been coaching her all along, telling
her what she did (*e.g.*, that she got angry, that she had whipped Jaquari, that she pulled the elastic
down from the bed sheet, that she put it around Jaquari's neck four or five times), and she
repeated back to them the version of events that they had wanted to hear.  Again, the
investigators told her that by making the statement she would be able to avoid a first degree
murder charge, secure a low bond, and be able to go home.  They repeatedly rehearsed the
statement with her. They also told her that she needed to repeat the statement on tape and show
remorse.  Ms. Harris reports that she was exhausted, devastated, and wiped out.

       ASA O'Reilly was present at the stationhouse, and Ms. Harris complained to O'Reilly
that she was mistreated by the detectives, but he did not do anything about it.  Subsequently,
ASA Grogan arrived to take her statement, and Ms. Harris complained to her too that she [Ms.
Harris] had been mistreated by the detectives, including that she had been physically and
psychologically coerced by them into agreeing to make her statement.  As with ASA O'Reilly,
ASA Grogan did nothing about these complaints.  Finally, after nearly thirty hours in police
custody from May 14 at 7:15 p.m. to May 16 at 1:00 a.m. and after multiple interrogations,
Ms. Harris gave a false confession on videotape in which she stated that she had killed Jaquari
and provided the details and the scripted narrative that the detectives had fed her and pressured
her into repeating back.

## B) The Chicago Police Investigators' Account of
## <u>Nicole Harris's Custody and Interrogation on May 14-16, 2005</u>

       According to the Chicago police detectives, Ms. Harris was first questioned at the Area 5
police station on May 14, at approximately 9 p.m.  The detectives describe this session as
consisting of interview-like questions in which they were coming in and out of the interview

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 20

room to ask questions as part of their death investigation. Approximately four hours later, on May 15, at around 12:45 a.m., the investigators state that they "confronted" Ms. Harris with what they regarded as "inconsistencies" in her answers, specifically that Dinajia Arnold, an 8-year old girl who lived next door had seen Ms. Harris hitting Jaquari and Diante with a belt earlier that day (May 14, 2005), information that Ms. Harris had withheld from them. According to the Detectives, immediately after this confrontation, Ms. Harris broke down, started crying, and spontaneously stated – not in response to a question – that she wrapped the telephone cord around Jaquari's neck, and then wrapped the elastic band from the bed sheet around his neck, to make it look like an accident. According to the detectives, they asked her no questions at this point, placed her under arrest, read her the Miranda rights, and moved her from the "Butterfly" Room to a locked interrogation room, Interrogation Room A. According to detectives, Ms. Harris stated that the reason the strangled Jaquari was because of he had been outside playing despite her telling him earlier in the day to only play inside. This process, according to Detectives, took approximately seven minutes. When asked why they did not ask Ms. Harris any follow-up questions at this time, the detectives asserted that it was because Ms. Harris was so emotional that she would not answer follow up questions following her confession.

According to the detectives, approximately one hour later, May 15, at 1:45 a.m., when they returned to the interrogation room to tell Ms. Harris that the Felony Review prosecutor was on the way to the station, Ms. Harris recanted her alleged "spontaneous" confession and denied harming Jaquari.

At approximately 2:25 a.m., the investigators asked Ms. Harris if she would be willing to take a polygraph exam, and Ms. Harris agreed to do so. They told her, however, that the polygraph exam could not be scheduled until the following morning. The detectives then left Ms. Harris in the locked interrogation room overnight.

On May 15, at approximately noon, the detectives transported Ms. Harris to the Chicago police polygraph unit, where Officer Bartik administered a polygraph exam. According to Bartik, he told Ms. Harris that the results of the exam were inconclusive. After Bartik had informed Ms. Harris of this, he and other investigators continued to question Ms. Harris, imploring her to tell the truth. The investigators claim that shortly after 4:00 p.m., Ms. Harris made another, second confession to killing Jaquari, this time stating that she strangled Jaquari because he had come out of the bedroom looking for food. Detectives assert that this time Ms. Harris stated that she spanked Jaquari again, then placed Jaquari on the upper bunk, put the dangling elastic cord once around Jaquari's neck, and then left the room.

According to detectives, they returned with Ms. Harris to the Area 5 police station, arriving between 6:00 and 7:00 p.m., and they continued to question her at Area 5. They testified that they again confronted her with inconsistencies, this time regarding the manner in which Jaquari died, telling her that it was physically impossible for Jaquari to have fallen from the top bunk to the floor because of the bed rail. Eventually, according to the Detectives, Ms. Harris changed her account once again, stating this time that she had grabbed the elastic cord that was dangling from the bed and wrapped it four or so times around Jaquari's neck until he

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 21

stopped crying. When she saw blood coming from his nose, she left the room, leaving Jaquari on the floor.

Ms. Harris was subsequently questioned by ASAs O'Reilly and Grogan, to whom she confessed. Finally, on May 16, at approximately 1 a.m., ASA Grogan made the 23-minute videotape of Nicole Harris confessing to strangling Jaquari.

The investigators denied yelling at Ms. Harris; calling her names; berating her; mocking her; chaining or handcuffing her to a wall; or pushing or poking her, They further denied that Ms. Harris made any requests for counsel; that they denied her access to counsel; that they threatened her with harsher punishment, including that she would go to prison for the rest of her life on a first degree murder charge if she did not confess; or that she would never see Diante again if she did not confess. Finally, they deny that they promised her leniency (involuntary manslaughter) and/or the ability to get a reasonable bond to escape custody if she did confess.

## XII. Professional Opinions

Because Chicago police investigators only recorded 23 minutes of the thirty hours Nicole Harris was in the Area 5 police station, circa 7 p.m. on May 14, 2005 to circa 1:23 a.m. on May 16, 2005, there is no objective record of what occurred during her interrogation sessions. Prior to the videotape being turned on for 23 minutes at approximately 1 a.m. on May 16, 2005, the only, highly imperfect, record that exists of Ms. Harris' multiple interrogation sessions are the recollections of the various participants: Nicole Harris and the various Chicago police officers who testified at her pre-trial hearings, her trial, and subsequently in deposition testimony in this case. This case therefore presents a classic swearing contest: the accounts provided by Nicole Harris and the various Chicago police detectives almost could not be more different.

I am neither a fact witness nor a finder of fact, and therefore it is not my role in this case to decide whose version of the facts is more accurate. In addition, the only audio or video tape of the investigators' interrogation of Ms. Harris is the final 23 minute videotaped confession statement. None of the preceding almost 30 hours is recorded. While the officers did create reports briefly mentioning parts of these encounters, those reports are generally limited in their detail, and in any event, the officers' testimony sometimes contradicted the reports. I therefore cannot opine about whose account of what occurred during the off-tape interrogation sessions and lengthy custody is more factually accurate nor is it my role to do so. I can only evaluate the accounts provided by the various participants of these off-tape interrogations in light of decades of empirical social science research on the psychology, practice, and effects of American police interrogation and the elicitation of confession evidence. In the remainder of this report, I will apply the findings of this empirical social science literature to each set of accounts of the many hours of off-tape interrogation, discussing the implications and concerns that it raises for each set of accounts and offering my professional expert opinions.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 22

## (A) Nicole Harris Description of Her Interrogations from May 14-16, 2005

       In her testimony at trial, as well as in her subsequent deposition testimony, Nicole Harris provides a robust account of what she recalls occurring during her off-tape interrogation sessions and how and why the Chicago police investigators moved her from denial to admission and then a full confession to a murder of which she has now been declared factually innocent. The multiple interrogations of Nicole Harris utilized numerous techniques that the empirical social science research has shown significantly increase the risk of eliciting unreliable and false confessions when applied to innocent suspects. These include:

       1) *Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias.*[26] Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[27] When investigators begin with or arrive at a premature presumption of guilt, they seek to build a case against an individual whose guilt they assume *a fortiori* -- rather than seeking to even-handedly collect factual information and objectively investigate a case. Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis. This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, misinterpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[28] Most significantly, social science research has demonstrated that investigators' pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[29]

       According to Nicole Harris, the Chicago police investigators who interrogated her almost from the beginning assumed that she had murdered Jaquari, even though they had no evidence that his death was a crime or that she had caused it, and they quickly became accusatory and confrontational. Ms. Harris reports that from the moment DCFS social worker Scott Peterson took Diante from her on May 14th at approximately 11:20 p.m., Chicago investigators repeatedly

---

[26] See Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation." *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011), "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions." *Law and Human Behavior*, 35, 452-465.

[27] See Carol Tavris and Elliott Aronson (2007). *Mistakes Were Made* (But Not By Me). (Harcourt Books).

[28] See Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

[29] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 23

accused her of murdering Jaquari, repeatedly accused her of lying when she denied that she killed Jaquari, and repeatedly mocked, belittled, and/or called her names, including as she was crying. If Ms. Harris's account is accurate, the Chicago police investigators misclassified her as guilty when, in fact, no evidence linked her to the death of her son Jaquari or even suggested that he had been murdered. One of the most fundamental law enforcement standards of American police interrogation is to thoroughly "investigate before you interrogate," as the leading interrogation training manual in America states.[30] But that did not happen in Nicole Harris's case. Instead, the investigators did little actual investigation of Jaquari's death, and whether it was a crime, prior to launching into a guilt-presumptive accusatory interrogation whose goal was to elicit a murder confession from Ms. Harris without regard to her innocence. If Ms. Harris' account is accurate, the detectives' investigative failures and unwavering presumption of guilt led to the tunnel vision and behavioral confirmation bias that has been documented in so many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[31]

      2) *Lengthy Interrogation and Sleep Deprivation*. Lengthy interrogation/custody and sleep deprivation are two related *situational* risk factors for making or agreeing to a false confession during police interrogation.[32] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[33] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[34] The Reid and Associates police interrogation training manual specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[35] Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[36] especially where investigators use physically or psychologically coercive

---

[30]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[31]   Keith Findley and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases," University of Wisconsin Law Review, 291-397.

[32]   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[33]   Richard A. Leo (1996). "Inside the Interrogation Room," Journal of Criminal Law and Criminology, 86, 266-303. See also Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[34]   Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[35]   Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Gaithersburg, Maryland: Aspen Publishers, Inc) at 597.

[36]   Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 24

methods.[37]  It can also lead to sleep deprivation, which, as mentioned earlier, heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[38]  The longer an interrogation lasts, the more pressure investigators bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission.  Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions because breaks between accusation and questioning add to the stress and fatigue of the interrogation and  sometimes is used as an interrogation technique itself.

According to Nicole Harris, she was interrogated multiple times over the almost thirty hours that she was at Area 5 and the polygraph unit from May 14 to May 16, 2016.  Even though Ms. Harris was in a shocked and grief-stricken state following the death of her 4-year old son, she was left alone overnight at the Area 5 police station on May 14th in a locked interrogation room with no bed or comfortable space in which to sleep, and she reports that she continued to be harshly interrogated, off and on, throughout the following day on May 15th and then into the early morning hours of May 16th.  Ms. Harris reports that she was unable to sleep at the police station and became increasingly fatigued, worn down, and psychologically spent by the aggressive interrogation.  It appears that Ms. Harris had little, if any, sleep in the over 38 hours from the time she woke on May 14 until the time she was videotaped in the early morning hours of May 16.  Ms. Harris not only suffered from a lack of significant sleep during her lengthy hours in police custody, but she was not provided with much food during her interrogations and did not eat the little she was given.  (Ms. Harris identified being given one McDonald's meal, which she says she did not eat.)  Even compared to most *proven* false confessions, the length of time during which Ms. Harris was interrogated and/or in custody for purposes of interrogation, was extraordinary,[39] and therefore, along with the sleep deprivation and lack of food, it became a potent risk factor for false confession.

3) *False evidence ploys*.  Police interrogators routinely tell criminal suspects that the evidence establishes their guilt:  if police possess real evidence, this is called a true evidence ploy.  If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy.  The social science research literature has demonstrated that false evidence ploys are virtually always present in, and substantially likely to increase, the risk of eliciting false statements, admissions, and/or confessions.  False evidence ploys are among the most well-documented situational risk factors for eliciting false and unreliable statements, admissions,

---

[37]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[38]  Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied*, 2, 48-59.  See also Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions."  Forthcoming in the *Proceedings of the National Academy of Sciences.*

[39]  Steven Drizin and Richard A. Leo (2004).  "The Problem of False Confessions in the Post-DNA World.  *North Carolina Law Review*, 82, 891-1007.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 25

and/or confessions, as described in the social science research literature.[40]  Many people do not know that police detectives can legally lie by pretending to have incriminating evidence that does not exist, is fabricated or is exaggerated; even those who suspect that the police may be bluffing about the evidence are likely to fear that police will manipulate evidence to prosecute them. The use of false evidence ploys can create or contribute to the suspect's perception that he or she is trapped, there is no way out, and/or that his conviction will be inevitable, thus leading to the perception that he or she is in a hopeless situation and has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of the suspect's situation.

According to Nicole Harris, the Chicago police investigators repeatedly "confronted" her with supposed evidence that irrefutably established that she had murdered Jaquari.  She reports that the police detectives repeatedly told her that the evidence established that she killed Jaquari; that Sta-Von, her boyfriend and the father of her two children, believed that she had killed Jaquari; and that she had failed the polygraph exam that supposedly proved her guilt to a scientific certainty.  If the jury agrees that there was no evidence whatsoever indicating that Ms. Harris had killed Jaquari, much less that he had died non-accidentally; that Mr. Dancy never said nor believed that Nicole Harris murdered or would murder Jaquari, and that Bartik and the detectives misrepresented the results of the polygraph, then each of these would qualify as a false evidence ploy.

As a century of basic psychological research on misinformation effects has shown[41] (as well as decades of psychological research on police lying to suspects during interrogation),[42] false evidence ploys are effective at eliciting compliance,[43] confusing some suspects into believing that they have been framed or that such evidence really does exist,[44] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[45] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[46]  Based on well-established basic and applied social scientific research going back decades, if Ms. Harris's description of these

---

[40]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[41]  Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory, *Learning & Memory*, 12, 361-366.

[42]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[43]  Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[44]  Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[45]  Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[46]  Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) See also Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence," *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014).  "Constructing Rich False Memories of Committing Crime," *Psychological Science*, Pp. 1-11. Published online, January 14, 2015.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 26

events is credited, the false evidence ploys that the Chicago police investigators used in their multiple interrogations of her significantly increased the risk of eliciting a false and unreliable confession from her, especially the longer her interrogation lasted and the more sleep deprived and frightened she became.

4) *Minimization and Maximization*.  A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious.  Interrogation techniques and strategies that minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting false confessions. Such minimization strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[47]

Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – i.e., suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement -- are also associated with and known to increase the risk of eliciting false confessions. Such maximization strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess, including potential imposition of capital punishment, which, according to Ms. Harris, was used in this instance. Nicole Harris reports that the Chicago investigators minimized the legal consequences of confessing to Jaquari's death – particularly after they told her that she failed the polygraph on May 15th -- by suggesting that if she confessed, she could go home, would only be charged with manslaughter, would receive a low bond and could fight the case from the outside, especially since she said she was innocent; but that if she continued to deny that she intentionally killed Jaquari, the investigators would turn her over to the State, who would "slam" her and she would be charged and likely convicted of first degree murder and either be considered for capital punishment or have to spend the rest of her life in prison and never be able to see her son Diante again.  If Ms. Harris's testimony that such statements were made to her is credited, the use of minimization and maximization techniques during multiple interrogations over the course of Ms. Harris's over 30 hours at Area 5 significantly increased the risk a false and unreliable confession from her.

5) *Explicit Promises and Threats*. These minimization and maximization techniques did not merely *imply* leniency and freedom (in exchange for compliance and confession) and threaten substantially harsher punishment (in the absence of compliance and confession), but rather *explicitly communicated* it.  As just mentioned, the Chicago police investigators explicitly and repeatedly promised that she would be able to put an end to and escape what had become an

---

[47]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 27

intolerably stressful, draining, and coercive experience if she only confessed to what they wanted to hear and that she would receive a reduced charge (manslaughter), reduced bond (bail), and a reduced sentence (3 years in prison) if she confessed to killing Jaquari; whereas they threatened her with among the most serious possible consequences if she did not confess: that she would be charged with first degree murder, spend the rest of her life in prison, and never see her young son Diante again. Ms. Harris reports that these explicit promises and threats finally broke her will and motivated her decision to, at that point in the late afternoon of May 15th, involuntarily agree to falsely confess to killing Jaquari.

The use of explicit promises of leniency, immunity and/or a tangible benefit, as well as the use of explicit threats of harm, significantly increases the risk of eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency—like threats of harm or harsher punishment and whether explicit or implicit—are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. There may be no psychological interrogation technique more potent than the use of threats and promises.

6) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions. In my professional opinion, if the multiple and lengthy interrogations that Nicole Harris describes are credited, I believe that they were psychologically coercive for at least three reasons.

First, as just mentioned, the interrogation is replete with explicit promises and threats, techniques that are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements, especially over the course of over 30 hours at Area 5, in which Ms. Harris was subject to custody, interrogation, and substantial sleep deprivation.

Second, from Ms. Harris' description it is clear that she was made to perceive that she had no ability meaningful control over the conditions of her custodial confinement and interrogation, and ultimately that she had no meaningful choice but to comply with the demands of her interrogators. According to Ms. Harris, she repeatedly attempted to invoke her Miranda rights and terminate the increasingly hostile and aggressive interrogations, but each time she was told that she did not need a lawyer, and the accusatory and threatening interrogations continued. Ms. Harris also describes that on the night of May 14th, she knocked on the interrogation room door for an hour before she was finally allowed to use the bathroom, again signaling her powerlessness.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 28

Finally, she describes feeling broken and having no choice when, approximately 20 hours into her custody and interrogation, the interrogators persuaded her to perceive that the only way to save herself from life imprisonment and be able to ever see her 5-year old son again was to agree with her interrogators' actions and repeat back everything they wanted her to say.

In my professional opinion, the cumulative impact of the investigators interrogation techniques on Ms. Harris', she became persuaded that she had no meaningful choice but to comply with the detectives' demands if she wished to persuade them to terminate the interrogation.

7) *Physical Intimidation and Coercion*.  Once common, the historical use of physical coercion by American police detectives to extract confessions has been well-documented,[48] as has both the historical[49] and more recent use of physical force by the Chicago Police in particular to extract confessions of guilt from accused criminal suspects.[50]  The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – no longer dispute it, and it has been prohibited by federal constitutional law that applies to the States for more than 80 years.  Police interrogation training manuals strictly advise police never to use any physical force or intimidation whatsoever during interrogation because it is recognized as apt to make an innocent person falsely confess.  From my experience, it is rare outside of Chicago for interrogated suspects to allege that police interrogators used physical force or coercion to elicit their interrogation statements.

Ms. Harris describes that at approximately 11:40 p.m. on May 14 a detective that Ms. Harris believes was Detective Noradin shoved her into an interrogation room, pushed her onto a bench, handcuffed her arm to a bar over the bench, and yelled demeaning obscenities at her.  The second instance of physical abuse that Ms. Harris reports was being jabbed in the shoulder by a detective following the polygraph exam coupled with the aggressive post-polygraph interrogation in the afternoon of May 15. Physical coercion works to terrorize individuals into compliance and confession by instilling fear of additional physical abuse, especially in combination with other threatening and overbearing interrogation techniques.  If Ms. Harris's statements that such abusive physical intimidation occurred, it is my professional opinion that such the physical interrogation coercion increased the risk of eliciting a false and unreliable confession from her.

8) *Personality Traits as Risk Factors for False Confession*.  In addition to the many situational risk factors present in her account – the presumption of guilt, lengthy interrogation, sleep deprivation, false evidence ploys, minimization, implicit and explicit threats and promises, and physical and psychological coercion – Nicole Harris was at a heightened risk of making and

---

[48]   See Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[49]   Wickersham Commission, Lawlessness in Law Enforcement (1931).
[50]   John Conroy (2000).  Unspeakable Acts, Ordinary People: The Dynamics of Torture (Alfred Knopf).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 29

agreeing to a false and unreliable confession because of her personality traits and characteristics, i.e., *personal risk factors*. Specifically, as Dr. Frumkin indicated in his 2006 assessment, Nicole Harris was in 2005, extremely suggestible, testing in the 99th percentile. This means, as he states, that she has an extreme tendency to succumb to the demands of authority figures, especially when placed under pressure, and to give in to leading questions in response to negative feedback to placate them. She is more likely to be easily led and manipulated. As a result of the personality traits identified by Dr. Frumkin, Nicole Harris was at that time highly vulnerable to making and/or agreeing to a false and/or unreliable confession in order to please her interrogators, especially the longer and/or more intense the interrogation(s) last. Dr. Frumkin notes that Nicole "loses her ability to make rational use of information when she is under stress." Ms. Harris's high level of interrogative suggestibility appears to be explained by the personality traits identified by Dr. Frumkin. In short, Ms. Harris is highly suggestible, compliant and conflict averse, personality traits that clinical psychological research has, for decades, shown to increase the risk that individuals will yield to the pressures of interrogation and shift their answers to satisfy their interrogators. I therefore believe that Ms. Harris was especially vulnerable to making or agreeing to a false confession during his her guilt-presumptive, accusatory, and coercive interrogations by Chicago police investigators. The inherent personality traits that Dr. Frumkin identifies were then likely exacerbated by the extreme grief that Ms. Harris was experiencing and which numerous witnesses identified. 9) *Police Contamination and Scripting.* As mentioned earlier, police interrogators are universally trained not to contaminate a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination taints prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but the claim is made that they were volunteered by the suspect). Related to contamination, police investigators sometimes "script" a suspect's confessions when they not only provide the suspect with details of the crime, but coach or lead the suspect to adopt a narrative of how and why he and she committed the crime. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[51]

According to Ms. Harris, the investigators repeatedly supplied her with details of the death scene so that she would parrot back a version of events that fit their changing theory of the crime; and later scripted her confession not only by coaching her through the details of what they wanted her to say, but also how they wanted it to later appear on camera, so that it would appear to be persuasively true to third parties viewing the recapped 23 minute recorded confession that followed 30 hours at Area 5, more than 24 of which were in custody. Ms. Harris reports that from the moment she was aggressively accused of killing Jaquari, the investigators told her how Jaquari died, first that they believed he was strangled by a telephone cord, then that she wrapped

---

[51] Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 30

the bed sheet around his neck and leaving him on the top bunk, and finally that she grabbed the elastic band from the top bunk and wrapped it around Jaquari's neck four time until he stopped crying, noticed blood coming from his nose, panicked and left him on the ground.  Since Jaquari was found by Mr. Dancy, not Ms. Harris, she reports that she did not know how he had died other than what Mr. Dancy and the police investigators had subsequently told her.

Ms. Harris reports that following the post-polygraph examination, investigator Bartik told her that if she worked with them, they would work with her.  According to Ms. Harris she was told that that she wrapped the cord from the fitted bed sheet around Jaquari's neck and the number of times.  Ms. Harris also states that the investigators showed her a picture of the kids' tilted bunk bed in an effort to get her to relay an account of how she killed Jaquari that was consistent with the investigators' theory of his death.  Apart from this contamination, Ms. Harris indicates that the investigator Cordaro, in the interrogation at the Area 5 police station on the evening of May 15th, repeatedly went over the details of what they wanted her to confess to.  In effect, according to Ms. Harris' account, investigator Cordaro scripted her final confession by not only giving her the specifics of what to confess to (e.g., that she whipped Jaquari with a belt, that she put the cord around his neck 4 times, that Jaquari was crying), but also to describe a motive for killing Jaquari (that she was angry that he had gone outside) and that she needed to needed to show a lot of emotion when the videotape was turned on to make it appear persuasive to third parties.

Police contamination and scripting is not so much a risk factor for eliciting a confession – since it often occurs after an admission has already been made – as much as of making an otherwise false confession appear true.  Police contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (e.g., a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[52]  Contamination and scripting therefore increase the risk that once a suspect has falsely confessed to a crime he or she did not commit, third parties – such as prosecutors, judges, juries, the media, and outside observers – will mistakenly believe that the confession is true.  Given the contamination and scripting that occurred here, it is not surprising that Ms. Harris was wrongfully convicted of first degree murder by the jury in her criminal trial.  The Chicago police investigators' contamination and scripting did not increase the risk that she would falsely confess as much it increased the risk that her false confession, once given, would cause third parties to erroneously believe that in contained indicia of reliability and erroneously convict her.

10) *Hallmarks of a False Confession (or Multiple False Confessions).*  The confession statements of Nicole Harris contained numerous factual and logical errors, inconsistencies,

---

[52] Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 31

omissions, and other indicia of unreliability that are the hallmarks of proven false confessions. According to Nicole Harris, she never made the first confession that police have attributed to her – that she killed Jaquari by placing a phone cord around his neck and then the cord sheet to make his murder appear to be an accident. However, everyone agrees that if Ms. Harris had made this confession, it was a false confession, since Jaquari did not die from the strangulation by a telephone cord. This first false confession (again attributed to Ms. Harris by police but denied by her) reflected the investigators' mistaken theory at the time (the evening of May 14) of how Jaquari had died. It did not fit with the death scene facts or evidence. The investigators only found out the following morning, after Dr. Denton performed an autopsy, that Jaquari had not died from strangulation by a telephone cord (but that the ligature marks around his neck had most likely come from the elastic from Jaquari's bedsheet), and the investigators thereafter pressured Ms. Harris to agree to a different version of how she alleged killed Jaquari.

The second confession that the police investigators attributed to Ms. Harris – that Ms. Harris put Jaquari on the upper most level of the bunk bed and wrapped the loose end of an elastic band from a fitted sheet around his neck before leaving the apartment – also did not match the death scene evidence. Jaquari slept on the bottom bunk, not the top one, and he was found on the ground. He could not have rolled off the top bunk, where Ms. Harris' second confession places him, because of the guard rail on the top bunk. This error is corrected in Ms. Harris' third and final confession which has Ms. Harris leaving Jaquari on the ground after strangling him with the dangling elastic band from the top bunk approximately four times. But even that confession contains an error that does not match any other evidence or testimony – that the cord had been wrapped around Jaquari's neck approximately 10 times.

Assuming Ms. Harris' account, her multiple false confessions to strangling Jaquari not only contain the kinds of factual errors that social science research has shown are associated with false and unreliable confessions, but they also make little logical sense, another indicia of an unreliable confession. It makes no sense that Ms. Harris would violently strangle her son Jaquari to death merely because he had been playing outside after she had asked him to stay inside. Ms. Harris' confession statements are not only contradicted by extrinsic evidence, but also by logic and plausibility.

There is an additional inconsistency that is significant in my opinion. Suspects in police interrogations do not confess spontaneously to a murder and then fail to provide details. Rather police interrogation-induced false confessions typically occur after hours of coercive pressure and persuasion. Once an innocent suspect has been moved to falsely confess, he or she is motivated to agree, parrot back or speculate about whatever details the police are seeking in order to please his or her interrogators, because false confessors typically wish to put an end to the aversive interrogation in order to escape from it. The suggestion that Ms. Harris spontaneously provided a confession to murdering her son and then immediately refused to supply any details about how or why she would have killed her son is doubly inconsistent with the empirical social science research literature on police interrogation and false confessions, another likely indicia of reliability.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 32

Finally, and most significantly in my professional opinion, none of the death scene evidence suggests that Jaquari was killed intentionally or that a crime occurred. In other words there is no corroboration of Ms. Harris' police-induced confessions. There is simply no physical evidence consistent with Ms. Harris' confessions or linking her to Jaquari's death, which one would expect to exist if her confession were true. Moreover, the testimony of Diante, who witnessed the death, that Jaquari accidently strangled himself directly contradicts Ms. Harris' confessions, and is a substantial indicia of its unreliability.

<u>(B) The Chicago Police Investigators' Account(s) of Nicole Harris'
Custody and Interrogations on May 14, 2005 to May 16, 2005</u>

Contrary to Nicole Harris' robust and detailed account of what occurred during her almost thirty hours of custody and interrogation that she describes as moving her from denial to falsely confessing to murdering her son Jaquari, the investigators accounts of what occurred during this time are relatively sparse. Even if the investigators' testimony about what occurred during the Harris's interrogation and custody are credited, many of the professional opinions and concerns I have expressed above remain for at least the following four reasons:

First, based on the social science research, it is my professional opinion that the investigators' account of what occurred during Nicole Harris's custody and interrogation are highly incomplete. The various Chicago detectives' descriptions of what occurred to move Nicole Harris from repeated denial to confession fails to fit with what we would expect from decades of empirical social science research on how police interrogation works to break down a suspect's denials and elicit a confession of guilt. If the investigators' accounts are to be credited, the only interrogation technique they used was confronting Ms. Harris with alleged inconsistencies in her account, after which she either spontaneously or near-spontaneously confessed each time. We know from empirical social science research that police interrogations involve the use of far more interrogation techniques than the investigators describe, especially when interrogations are lengthy,[53] and that suspects rarely give spontaneous false or unreliable confessions during police interrogation.[54] Put differently, while I cannot judge the veracity of the various interrogators' accounts, they are contrary to everything one would expect both from the social science research on police interrogation and confessions, as well as the police training manuals on the subject. At best, the interrogating officers' accounts of what moved Nicole Harris from denial to confession over many hours of custody and interrogation is simply incomplete; at worse they failed to remember or disclose much of what occurred during their multiple interrogations of Nicole Harris on May 14-16, 2005 that led her to stop denying and start confessing to the killing her four-year old son.

---

[53]   Richard A. Leo (1996). "Inside the Interrogation Room," Journal of Criminal Law and Criminology, 86, 266-303. See also Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[54]  Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 33

Second, even if we credit the investigators' accounts, several risk factors for false confession remain.  The length of Nicole Harris' interrogation and custody was extraordinary, and, as mentioned above, significantly increased the risk of her making or agreeing to a false confession.  So too did her sleep deprivation: investigators conceded that they left her overnight in a locked interrogation room that contained only a hard bench.  The testimony suggests that Ms. Harris did not eat during her more than 30 hours at Area 5 (although she was offered food), and from their own records, she appears to have been rarely afforded a bathroom break.

Third, even if we credit the investigators' accounts, the indicia of unreliability mentioned above remain.  Ms. Harris purportedly confessed three different times.  The first confession that the investigators attribute to Ms. Harris, which she denies, is indisputably false.  It fit the investigators theory at the time of how Jaquari died, until Dr. Denton ruled it out the following morning.  Ms. Harris' second confession statement again reflects the investigators' theory of the how Jaquari died at the time it was given, but was subsequently shown to be contradicted by the physical evidence.  At both points, the investigators claim that Ms. Harris intentionally lied to them about how she killed Jaquari but that her underlying confession to killing Jaquari was nevertheless true. It makes no sense to admit to committing the underlying act – in this case murder – and then to intentionally provide false details about how and why she committed the murder (as the investigators alleged Ms. Harris did in her first and second confession statements) nor is it consistent with the social science research on people who confess.[55]

Finally, there is no evidence indicating that Jaquari's death was intentional or a crime.  Even if it was a crime, there is no physical evidence linking Nicole Harris to it or corroborating her third, and final, confession.  Most significantly, the only witness evidence – Diante's statements to the Children's Advocacy Center and to the DCFS – contradict Nicole Harris' confession.

## XII. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1)        It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;

---

[55]    Richard Ofshe and Richard A. Leo (1997).  "The Decision to Confess Falsely: Rational Choice and Irrational Action." 74 *Denver University Law Review* at 992-993("A guilty suspect who voluntarily makes an admission is thereby demonstrating a willingness to cooperate with the interrogator to some extent. Since a suspect is unlikely to realize the distinction between an admission and a confession, he is likely to think that he has already confessed when he utters the words "I did it," and is likely to view his post-admission narrative as nothing more than an elaborated 'I did it' statement. A suspect who says 'I did it' should also be willing to tell some, if not all, of the story of the crime.").

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 34

2)      Nicole Harris's account of her multiple interrogations during her more than 30 hours at Area 5 on May 14-16, 2005 is consistent with the social science empirical research literature on the types of interrogation techniques and investigative practices that are associated with, increase the risk of, and are known to cause innocent individuals to falsely confess;

3)      The accounts of the various Chicago police investigators who interrogated Nicole Harris for between 28 and 30 hours on May 14-16, 2016, are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;

4)      In her account of what occurred during her police custody and/or interrogations on May 14-16, 2015, Nicole Harris describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven.  Nicole Harris describes interrogation procedures whose goal was not to find the truth but to break down her denials of guilt and elicit from her a confession to killing her son Jaquari Dancy;

5)      Before interrogating her, the investigators misclassified Nicole Harris as guilty when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about;

6)      The initial spontaneous "confession" attributed to Nicole Harris, which she denies, is inconsistent with empirical social science research on police interrogation and confessions, as well as with logic and the physical evidence in this case;

7)      The multiple interrogations described by Nicole Harris were both physically and psychologically coercive:  Nicole Harris's account of what occurred during her multiple interrogations contains interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

8)      Nicole Harris' account of what occurred during her multiple interrogations contains numerous interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent. These included false evidence ploys, minimization, implied and explicit threats, and implied and explicit promises;

9)      Nicole Harris was also at a heightened risk during her interrogations of making and/or agreeing to a false and unreliable confession because of her personality traits (i.e., *personal* risk factors), most specifically  her submissiveness and suggestibility, which in turn were likely exacerbated by her grief;

Stuart Chanen, Esq.
Valorem Law Group
February 8, 2016
Page 35

      10)    The interrogations described by Nicole Harris involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Nicole Harris' confession statement would, misleadingly, appear to be detailed and self-corroborating;

      11)    The confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

      The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

      If you have any questions, please do not hesitate to contact me.

                    Sincerely yours,

                    Richard A. Leo, Ph.D., J.D.
                    Hamill Family Professor of Law and
                    Social Psychology
                    University of San Francisco