**PAUL G. CASSELL**
Ronald N. Boyce Presidential Professor of Criminal Law
S.J. Quinney College of Law at the University of Utah
383 South University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
cassellp@law.utah.edu*

March 30, 2016

Shneur Nathan, Esq.
Hale Law LLC
53 W. Jackson, Suite 330
Chicago, IL 60604
(312) 870-6927
snathan@ahalelaw.com

Re:     Harris v. City of Chicago, et al., 14-cv-4391 (N.D.Il.)

Dear Mr. Nathan:

Per your request, this export report analyzes the expert report from the plaintiff's expert, Professor Richard Leo. For the reasons explained below, it is my conclusion that his opinions concerning Ms. Harris' alleged false confession are generally either unreliable or unhelpful to the jury. Professor Leo cannot reliably opine, for example, on various "risk" factors that might have caused a "false" confession by Ms. Harris. The scientific literature on false confessions does not provide a sufficient basis for reaching such conclusions.

Part I sets out my qualifications regarding the subject of false confessions. Part II enumerates the materials I have reviewed specifically related to this case. Part III turns to Professor Leo's specific opinions, concluding that he has not reliably evaluated the record in this case. Part IV reviews problems with Professor Leo's reasoning to the conclusion that Ms. Harris' confession is "false" based solely on the lack of "fit" with the crime scene evidence. Part V discusses the reasons why Professor Leo cannot reliably offer an opinion about whether psychological techniques used during the questioning of Ms. Harris increased the risk of extracting a false (as opposed to a true) confession. Part VI reviews problems in the underlying false confessions literature that Professor Leo relies upon. And finally, Part VII discusses other court decisions that have excluded expert testimony by Professor Leo (and other similar experts) as unreliable.

## I. Qualifications

I am the Ronald N. Boyce Presidential Professor of Criminal Law at the S.J. Quinney College of Law at the University of Utah. I teach criminal procedure, criminal law, crime victim's rights, and other related subjects. I am an expert on criminal justice issues, with particular expertise on police interrogations and false confessions.

I graduated from Stanford University with a B.A. in Economics in 1981 (with honors) and from Stanford Law School with a J.D. in 1984 (Order of the Coif and President of the *Stanford Law Review*). I then served as a law clerk to then-Judge Antonin Scalia of the U.S. Court of Appeals for the D.C. Circuit (1984-85) and then to Justice Warren E. Burger of the U.S.

Supreme Court (1985-86). From 1986-88, I served as an Associate Deputy Attorney General in the U.S. Department of Justice, followed by three-and-a-half years as a federal prosecutor in the Eastern District of Virginia. As a federal prosecutor, I handled many prosecutions involving police questioning of suspects and legal issues pertaining to the admissibility of confessions.

In 1992, I began teaching at the University of Utah College of Law, teaching criminal procedure, criminal law, crime victims' rights, and related courses. I published a number of law review articles, including articles on *Miranda* and false confession issues.

In 2001, I was nominated by President George W. Bush to serve as a federal district court judge for the District of Utah. In 2002, I was confirmed by the United States Senate to that position. From 2002 to 2007, I handled many criminal cases, including cases involving confession issues. I was also appointed by Chief Justice William Rehnquist to serve as the Chair of the Judicial Conference's Criminal Law Committee. In 2007, I resigned my position to return to teaching law.

In 2008, I was given a presidential professorship at the S.J. Quinney College of Law at the University of Utah, which I have held ever since. As a professor at the College of Law, I have published a number of scholarly articles on issues relating to confessions and the American criminal justice system in prominent law reviews,[1] including several articles dealing specifically with the subject of false confessions.[2] I have been invited to participate in academic symposia on innocence issues, including false confession issues, including a September 2015 symposium at Northeastern University School of Law and a 2011 symposium on "innocence" issues held at New York Law School. The paper I presented at the Northeastern symposium has been accepted for publication as a chapter in a book that will be published in 2016 by Cambridge University Press.[3] The paper I presented at New York Law School lead to a 2012 publication in the *New York Law Review*.[4]

I have been called to testify as an expert witness in state and federal cases on the subject

---

[1] *See, e.g.,* Paul G. Cassell & Richard Fowles, *Handcuffing the Cops? A Thirty Year Perspective on Miranda's Effects on Law Enforcement*, 50 STANFORD L. REV. 1055 (1998); Paul G. Cassell, Miranda's *"Negligible" Effect on Law Enforcement: Some Skeptical Observations*, 20 HARV. J. L. & PUB. POL'Y 327 (1997); Paul G. Cassell & Bret S. Hayman, *Police Interrogation in the 1990s: An Empirical Study of the Effects of Miranda*, 42 UCLA L. REV. 839 (1996); Paul G. Cassell, Miranda's *Social Costs: An Empirical Reassessment*, 90 NORTHWESTERN U.L. REV. 387 (1996).

[2] *See, e.g.,* Paul G. Cassell, *Freeing the Guilty Without Protecting the Innocent: Some Skeptical Observations on Proposed New 'Innocence' Procedures*, 56 N.Y.L. SCHOOL L. REV. 1063 (2012); Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 HARV. J.L. & PUBLIC POL'Y 523 (1999); Paul G. Cassell, *Protecting the Innocent from False Confessions and Lost Confessions — And from* Miranda, 88 J. CRIM. L. & CRIMINOLOGY 497 (1998).

[3] Paul G. Cassell, *Can We Protect the Innocent Without Freeing the Guilty? Thoughts on Innocence Reforms that Avoid Harmful Tradeoffs*, in WRONGFUL CONVICTIONS AND THE DNA REVOLUTION: REFLECTIONS ON TWENTY-FIVE YEARS OF FREEING THE INNOCENT (forthcoming Cambridge Univ. Press 2016).

[4] *See* Paul G. Cassell, *Freeing the Guilty Without Protecting the Innocence: Some Skeptical Observations on Proposed New "Innocence" Procedures*, 56 N.Y.L. SCH. L. REV. 1063 (2012).

of false confessions in both civil and criminal cases.[5]  I have presented papers in academic symposia on the issue of false confessions and related innocence issues.[6]  I have been quoted frequently in scholarly articles relating to false confessions.[7]  Finally, the United States Supreme Court appointed me to brief and argue a case, *Dickerson v. United States*,[8] concerning the *Miranda* rule and confessions.  I have consulted with state Attorneys General offices, prosecutors, and defense attorneys about false confessions.  As a result of my research, publications, and experience, I am regarded as an expert on police questioning of suspects and confessions, including false confessions.

The attached Curriculum Vitae accurately and more fully reflects my education and experience.  It also lists the publications that I have authored and the recent cases in which I have testified in court as an expert.

I am testifying in my own private capacity.

## II.  Materials Reviewed Regarding My Report.

In preparing this report, I have reviewed what I believe to be the relevant parts of the following materials:

1. Complaint, Harris v. City of Chicago et al., 1:14-cv-04391.
2. Office Lopez's Initial Report (May 14, 2005) (CITY0000394-05).
3. Crime Scene processing report regarding photographs taken at the scene (May 14, 2005) (CITY0000455).
4. Chicago Police Department event query (May 14, 2005) (CITY0000520).

---

[5] *E.g., United States v. Robel Phillipos*, No. 1:13-cr-10238-DPW (D. Mass. 2014) (expert testimony via affidavit in a Boston Marathon bombing-related case; testimony of Richard Leo excluded based, in part, on my affidavit) (discussed at greater length in Part VII, below); *State v. Morales*, No. 31-342 (First Jud. Dist., WY 2013) (admissibility hearing; testimony of defendant's false confessions expert Richard Ofshe excluded based on my testimony); *People v. Thomas*, No. 08-1074 (Superior Court County of Rensselaer, NY) (admissibility hearing; testimony of defendant's expert Richard Ofshe excluded based, in part, on my testimony); *State v. Maughan*, No. 051100355 (1st Dist. Court, UT 2009) (provided expert report and testified; defendant's expert Richard Leo excluded); *Marlatt et al. v. Perez*, et al. No. CS-00-0221-AAM (E.D. Wash. 2001) (video deposition taken); *United States v. Wildcat*, No. CR-99-2-E-BLW (D. Idaho July 7, 1999) (called as an expert by the United States; defendant's expert Richard Leo excluded).

[6] *See* Paul G. Cassell, *Can We Protect the Innocent Without Freeing the Guilty? Thoughts on Innocence Reforms that Avoid Harmful Tradeoffs*, in Wrongful Convictions and the DNA Revolution: Reflections on Twenty-Five Years of Freeing the Innocent (forthcoming Cambridge Univ. Press 2016); Paul G. Cassell, *Freeing the Guilty Without Protecting the Innocence: Some Skeptical Observations on Proposed New "Innocence" Procedures*, 56 N.Y.L. Sch. L. Rev. 1063 (2012) (publishing revised paper delivered at New York Law School symposium); Paul G. Cassell, *Balanced Approaches to the False Confession Problem: A Brief Comment on Ofshe, Leo and Alschuler*, 74 Denv. U.L. Rev. 1123 (1997) (publishing revised paper delivered at symposium at University of Denver College of Law).

[7] *See, e.g.,* Richard A. Leo, *Miranda and the Problem of False Confessions*, in The Miranda Debate: Law, Justice, and Policing 271, 281, 282 (Richard A. Leo and George C. Thomas III, eds. 1998) (citing article by Cassell); George C. Thomas III & Richard A. Le, Confessions of Guilty: From Torture to *Miranda* and Beyond 272 (2012) (citing articles by Cassell).

[8] 530 U.S. 428 (2000).

5. Chicago Police Department event query (May 14, 2005) (CITY000521-22).
6. Chicago Police Department event query regarding ambulance (May 14, 2005) (CITY0000528)
7. Chicago Police Department event query regarding death of Jaquari (CITY0000525-27).
8. Chicago Police Department event history regarding death of Jaquari (CITY0000514-18).
9. Chicago Police Department Event History Table regarding death of Jaquari (CITY0000511-13).
10. General Progress Report by Officer Wo noting crime scene information (CITY0000414-15).
11. General Progress Report by Officer Kelly regarding family information (May 14, 2005) (CITY0000410-11).
12. Supplementary Report regarding death investigation (May 14, 2005) (CITY0000396).
13. General Progress Report regarding injuries, etc. (May 14, 2005) (CITY000414-18).
14. Crime Scene Processing Report (May 14, 2005) (CITY0000454).
15. Chicago Police Department Property Inventory (May 14, 2005) (CITY0000457).
16. General Progress Report regarding Stavon Dancy and Nicole Harris (May 14, 2005) (CITY0000419-20).
17. Nicole Harris Criminal Records (CITY0000471-75).
18. Stavon Dancy Criminal Records (CITY000466-69).
19. General Progress Report Regarding Interview of Dancy and Contact with Edwardsville P.D. (CITY000405).
20. Supplement Regarding Harris Driving on a Suspended License (CITY0000476).
21. Fax Cover Sheet and Other Information Regarding Harris Driving on a Suspended License (CITY0000477-81).
22. Event information about Dancy's Disorderly Conduct (CITY0000482-91).
23. Event information about Dancy's Criminal History (CITY0000492-96).
24. SIUE Police Department information regarding Harris Criminal History and reported telephone harassment (CITY0000497-505).
25. General Progress Report by Kelly regarding who lives in the residence (CITY000411).
26. General Progress Report by Kelly regarding Harris Interview (CITY0000412-13).
27. General Progress Report by Landando regarding interviews of Alexis Fultis and Dinajia Arnold (CITY0000397-98).
28. Crime Scene Processing Report (CITY0000453).
29. Property Inventory No. 10532876 regarding phone cord (CITY0000461).
30. Case Report regarding personnel handling the case and fax cover sheet (CITY0000508, 530-31).
31. General Progress Report regarding custody of Diante Dancy (CITY0000400).
32. General Progress Report by Landando regarding Harris' actions (including timing issues) (CITY0000399).
33. Nurses Notes (CITY0000506-07).
34. Emergency Communications – Recorded Voice Transmissions Request (CITY0000519).
35. General Progress Report by Noradin regarding Harris recanting statement (CITY0000421).
36. General Progress Report by Wo regarding Dancy second interview (May 15, 2005) (CITY0000422).

37. General Progress Report by Noradin regarding polygraph and re-advice of rights and later statements and confession (May 15, 2005) (CITY0000423-25).
38. General Progress Report by Kelly regarding ligature marks (CITY0000408-09).
39. Crime Scene Processing Report regarding items sent to Dr. Denton (CITY0000456, 462-63).
40. Chicago Children's Advocacy Center Multidisciplinary Investigative Intake (May 15, 2005) (CITY000509).
41. Draft General Progress Report regarding interview with Diante Dancy (CITY0001220-21).
42. General Progress Report regarding interview with Diante Dancy (CITY0001218-19).
43. General Progress Report by Wo regarding interview with Diante Dancy (CITY0000406-07).
44. Nicole Harris Polygraph Consent form (CITY0000577).
45. Polygraph examiner's worksheet of Nicole Harris' polygraph exam (CITY0000575).
46.  Sta-von Dancy's Polygraph Consent form (CITY0000578).
47. Polygraph record sheet (CTIY0000580-86).
48. Polygraph examiner's worksheet of Sta-von Dancy's polygraph exam (CITY0000579).
49. Polygraph case review of Nicole Harris and Sta-von Dancy (CITY0000576).
50. General Progress Report by Noradin regarding pre- and post-polygraph interview with Harris (CITY0000423-25).
51. Consent to videotape statement by Nicole Harris (May 15, 2005) (CITY0000510).
52. Statement of Sta-Von Dancy (CITY0000433-43).
53. Chicago Police Department criminal history for Sta-von Dancy (CITY0000465).
54. Felony Minutes Form 101 for Nicole Harris (CITY0000431).
55. General Progress Report by Noradin summarizing events on May 14 to 16 (CITY0000400-04).
56. Chicago Police Department arrest report regarding Nicole Harris (CITY0000972-76).
57. Chicago Police Department arrest report regarding Nicole Harris (CITY0000426-30).
58. Chicago Police Department arrest report regarding Nicole Harris (CITY0000532-39).
59. Complaint for Preliminary Examination (CITY0000432).
60. Chicago Police Department Case supplementary report regarding Jaquari Dancy's death and polygraph test of parents (CITY0000571-74).
61. Chicago Police Department Case supplementary report regarding Jaquari Dancy's death and polygraph test of parents (CITY0000540-43).
62. Chicago Police Department Case supplementary report regarding cause of death (CITY0000544-45).
63. Chicago Police Department Case supplementary report regarding cause of death (CITY0000546-47).
64. Chicago Police Department criminal history report of Nicole Harris (CITY0000470).
65. Office of the Medical Examiner of Cook County toxicologic analysis of Jaquari Dancy's blood (CITY0000450).
66. Tape research log for 9-1-1 calls (CITY0000529).
67. Case supplementary report regarding Jaquari Dancy's death and cause of death by WO and Day (CITY00005386-93).
68. Case supplementary report regarding Jaquari Dancy's death and cause of death by WO

and Day (CITY0000548-55).

69. Property inventory No. 10547199 (photographs of child's bedroom) (CITY0000464).
70. Case supplementary report regarding Jaquari Dancy's death by Noradin, Kelly, Day, and Wo (CITY0000556-70).
71. Case supplementary report regarding Jaquari Dancy's death by Noradin, Kelly, Day, and Wo (CITY0000371-85).
72. Original case incident report (CITY0000530-31).
73. Chicago Police Department electronic list of inventory from case (CITY0000607-09).
74. Circuit Court of Cook County adult probation department investigative report regarding Nicole Harris (Nov. 28, 2005).
75. Report of Postmortem Examination, Office of the Cook County Medical Examiner (examination conducted May 15, 2005).
76. Video Statement of Nicol Harris (May 16, 2005) (video format) and associated transcript.
77. Statement of Sta-Von Dancy (May 16, 2005).
78. Chicago Police Department Report of Detective A. Noradin et al., (June 21, 2005) ("Supp. Report").
79. Chicago Police Department Report of Detective R. Wo (June 2, 2005).
80. Investigation Transition/Handoff Document (CITY-DCFS0001-72).
81. Grand Jury Transcript (May 16, 2005) (Sta-Von Dancy).
82. Photograph of Blue Bedsheet (Bates Number City0001468).
83. Bruce Frumkin, Psychological Assessment of Nicole Harris (Apr. 18, 2006).
84. Trial Proceedings, People v. Nicole Harris.
85. People v. Harris, 389 Ill.App.3d 107 (2009).
86. Harris v. Thompson, 698 F.3d 609 (7th Cir. 2012).
87. Harris v. Chicago Complaint, DE1, Case No. 1:14-cv-04391 (June 12, 2014).
88. Plaintiff's Opp. to Defendant Officers' Motion to Dismiss, DE 78 (Dec. 15, 2014).
89. Memorandum Op. and Order Denying Motion to Dismiss, DE 87 (March 19, 2015).
90. Confidentiality Order, DE 100 (Sept. 1, 2015).
91. Tr. of Deposition of Landando (Nov. 11, 2015).
92. Tr. of Deposition of John Day (Nov. 12, 2015).
93. Tr. of Deposition of Randall Wo (Nov. 13, 2015).
94. Tr. of Deposition of Demosthenes Balodimas (Nov. 16, 2015).
95. Tr. of Depo of Anthony Noradin (Nov. 2015).
96. Tr. of Deposition of Robert Bartik (Nov. 24, 2015).
97. Tr. of Deposition of Alexandra Levi (Dec. 10, 2015).
98. Tr. of Deposition of Nicole Harris (Dec. 22, 2015).
99. Tr. of Deposition of Scott Denton (Jan. 7, 2016).
100. Tr. of Deposition of Diante Dancy (Jan. 18, 2016).
101. Tr. of Depo. of Bruce Frumkin including notes (Jan. 28, 2016).
102. Report from Brian L. Peterson, M.D. (Jan. 26, 2016).
103. Report from Gregg McCrary (Feb. 5, 2016).
104. Tr. of Deposition of Richard Leo (March 21, 2016).
105. Report of Orest Eugene Wasyliw regarding psychological test report prepared by Bruce Frumkin (March 25, 2016).

I reserve the right to amend this report if additional materials are received.[9]

### III. Professor Leo's Proposed Testimony Is Unreliable Because He Has Not Reliably Reviewed the Record in this Case.

One of the key pieces of Professor Leo's anticipated testimony, as described in his report, is that there is "no corroboration" of Ms. Harris' confession.[10]  Professor Leo also identifies this fact as the "most significant[]" reason for concluding that Ms. Harris' version of event should be credited over that of the police officers.[11]  His conclusion on this point appears to be inaccurate.

After reviewing Ms. Harris' version of events, Professor Leo concludes that "no" evidence corroborates the confession:

> Finally, and most significantly in my professional opinion, *none* of the death scene evidence suggests that Jaquari was killed intentionally or that a crime occurred.  In other words there is *no corroboration* of Ms. Harris' police-induced confessions.  There is simply *no* physical evidence consistent with Ms. Harris' confessions or linking her to Jaquari's death, which one would expect to exist if her confession were true.[12]

Precisely how Professor Leo reaches this conclusion is unclear.  He does not appear to be claiming expertise in crime scene forensics or similar sciences.  And, more important, his conclusion appears to be incorrect – indeed, so inaccurate that it calls into question his other conclusions.

We can begin with Professor Leo's statement that "none of the death scene evidence suggests that Jaquari was killed intentionally . . . ."  In fact, the death scene evidence clearly supported the suggestion of an intention killing.  The medical examiner concluded that the death of the four year old child, Jaquari, was "due to [s]trangulation."[13]  That conclusion would, of course, be entirely consistent with Ms. Harris' confession that she strangled Jaquari to death.

Further support for this this conclusion comes from the medical examiner (Dr. Denton), who elaborated on this point at his recent deposition – a deposition that Professor Leo does not list among the materials that he reviewed.  The medical examiner testified that the injuries to Jaquari's neck were "consistent with [the force] coming from . . . some person pulling" on

---

[9]  It is my understanding that Ms. Harris has received a certificate of innocence.  Professor Leo recently stated that he does not believe "that the certificate of innocence is foundational to any of the 11 opinions that I have provided on pages 3 and 4 of the opinion that are an overview of the report," Tr. of Leo Depo. at 103, and so I have reviewed materials that presumably are, in some sense, foundational.

[10]  Leo Report at 32.

[11]  Leo Report at  32.

[12]  Leo Report at 32 (emphases added).

[13]  Report of Postmortem Examination, Office of the Cook County Medical Examiner at 6 (examination conducted May 15, 2005).

whatever was around Jaquari's neck.[14]   Indeed, the medical examiner reported that the findings were "*most* consistent with another person's help" in causing the death.[15]   And contrary to Professor Leo's conclusion, the medical examiner later reviewed Ms. Harris' video-recorded statement and specifically found that it "fit the findings of [Jaquari's] body . . . .,"[16] although the part about wrapping the neck four times was not consistent with the wrapping touching his neck four times.[17]

The medical examiner's findings are confirmed by the findings of another expert, Dr. Brian L. Peterson, who is in the Milwaukee County Medical Examiner's Office – again, another expert that Professor Leo does not have appear to have directly considered in writing his report. Dr. Peterson opines that "[i]n the case at hand multiple autopsy findings are consistent with the ligature having been placed by another individual" – i.e., being placed by someone other than Jaquari.[18]   After reviewing the relevant evidence, Dr. Peterson concludes: "My conclusion is that the cause of death of Jaqu[a]ri Dancy is ligature strangulation, *the manner homicide.*"[19]

Perhaps Professor Leo means to offer a contrary expert opinion to these two medical experts (who have each conducted hundreds of autopsies) and opine that no physical evidence supported the conclusion of a homicide.  But it appears from Professor Leo's report that he is only claiming expertise in areas related to "social psychology, criminology, sociology, and the law."[20]   And if he is not offering a contrary expert opinion to these two medical experts, then Professor Leo's "most significant[]" conclusion is wrong: there is, in fact, "corroboration" of Ms. Harris' confession to having strangled Jaquari; and there is "physical evidence consistent with Ms. Harris' confessions."

Professor Leo's conclusion that there was "no corroboration" of the confession also stands at odds with the conclusion of all three judges on the Illinois Court of Appeals who reviewed the issue.  The Court unanimously explained that:

> In the instant case, we find that the independent evidence did indeed tend to inspire belief in defendant's confession. First, although Dr. Denton initially believed that Jaquari's strangulation resulted from an accidental hanging, additional evidence led him to change his opinion to an intentional killing or homicide. Denton earlier had been led to understand that Jaquari had fallen from

---

[14] Tr. of Deposition of Scott Denton at 141 (Jan. 7, 2016); *see also id.* at 160-63 (autopsy finding are "most consistent with strangulation" – i.e., with a homicide).  The medical examiner would reach this conclusion even without considering Ms. Harris' confession. *Id.* at 161.  The finding are thus "consistent with someone pulling on the cord, on the elastic band, on both sides of the band, toward the back right side of the neck." *Id.*  at 202-03.

[15] *Id.* at 161-62 (emphasis added).

[16] Tr. of Deposition of Scott Denton at 110 (Jan. 7, 2016); *see also id.* at 115-16 (finding confession  and autopsy to be "all consistent"); *id.* at 123 ("Her statements and the police report are consistent with the autopsy report or autopsy findings").

[17]   *Id.* at 185.  The medical examiner later explained that this did not necessarily mean that the neck was not wrapped four times. *Id.* at 186-90.

[18]   Report of Dr. Brian L. Peterson at 6 (Jan. 26, 2016).

[19]   *Id.* at 7 (emphasis added).

[20] Leo Report at 1.

the top bunk and become entangled in the elastic band. However, new evidence established that Jaquari slept on the bottom bed. Dr. Denton also learned that Jaquari had been physically punished by his mother, struck with a belt and sent to his room.[21]

The implications of Professor Leo's inaccurate conclusion – that "no corroboration" exists – are far reaching. Professor Leo himself explains that physical evidence "consistent with Ms. Harris' confessions" is precisely what "one would expect to exist if her confession were true."[22] Thus, it is unclear how Professor Leo will provide to the jury an accurate assessment of the reliability versus unreliability of her confession, given that (if the foregoing analysis is correct) he must concede that there is corroborating evidence supporting the conclusion that the confession is reliable.

Professor Leo's report also suffers from other errors that draw into question whether he has reliably evaluated the evidence in this case. For example, in assessing the accuracy of Ms. Harris' third and videorecorded statement, Professor Leo describes Ms. Harris as having erroneously confessed to wrapping the cord around Jaquari's neck *ten* times:

> [In Ms. Harris' third and final confession] . . . contains an error that does not match any other evidence or testimony – that the cord had been wrapped around Jaquari's neck approximately *10 times*.[23]

As with other parts of Professor Leo's report, it is hard to determine what the factual support is for this statement, because he does not cite any particular document or record for this assertion.[24] But, so far as I can determine, he is mistaken in his assertion that Ms. Harris stated that she wrapped the cord around Jaquari's neck *ten* times.[25] She says *four* times. Here is what appears to be relevant passage from the transcript in the videotaped confession:

> Q: Now, where was the blue sheet?
> A: The top bunk.
> Q: And what kind of string was it?
> A: Elastic.
> Q: And what did you do with it?
> A: I put it around his neck.
> Q: Put it – could you, could you speak up.
> A: I put it around his neck.
> Q: And how many time did you do that?
> A: About *four* maybe.

---

[21] People v. Harris, 389 Ill. App. 3d 107, 130, 904 N.E.2d 1077, 1096 (2009).
[22] Leo Report at 32.
[23] Leo Report at 31.
[24] In contrast, in this report, I have tried to footnote all important factual assertions with a pinpoint citations to a particular document in the record.
[25] During his recent deposition, Professor Leo could not recall what the basis was for his assertion. *See* Tr. of Leo Deposition at 61.

> Q: And after you wrapped the string around – the elastic around his neck four times, what did he do?
>
> A:  Nothing .
>
> Q: Was he, was he crying anymore?
>
> A: No.[26]

Ms. Harris confession that she wrapped the elastic "maybe" four times around the neck matches what Sta-von Dancy said that he found when he first discovered Jaquari's body.[27]

Once again, given Professor Leo's apparent mistake about Ms. Harris confessing to a ten-fold wrapping, the implications of that mistake are significant in the context of his report. Not only does the mistake raise a general question of the reliability of his methods, but more broadly it raises a question about his basic conclusions. The *only* specific factual error that Professor Leo identifies in Ms. Harris' ultimate videotaped confession is the fact that she supposedly confessed to wrapping the elastic around Jaquari's neck ten times[28] – an error that Professor Leo appears to identify as one of the "hallmarks of proven false confessions."[29] But if Professor Leo's assertion means anything, it must also mean that the flip-side is true – i.e., that if the error disappears, then one of the hallmarks a false confession has disappeared and perhaps a "hallmark" of a true confession has appeared. Precisely how Professor Leo will then distinguish between indicia of true and false confessions remains to be explained.

While Professor Leo does not identify any other specific factual error in Ms. Harris' videotaped confession, he also apparently plans to opine that her confession "make[s] little logical sense, another indicia of an unreliable confession."[30] Leo elaborates that "[i]t makes no sense that Ms. Harris would violently strangle her son Jaquari to death merely because he had been playing outside after she had asked him to stay inside. Ms. Harris's confession statement[] [is] not only contradicted by extrinsic evidence, but also by logic and plausibility."[31]

It is unclear that this kind of testimony is expert scientific testimony as opposed to simply picking one side over the other in the case. Professor Leo seems to be saying that he can identify what is "logical" and what is not in the context of a suspect's admission to a crime. But Leo never appears to recognize that the event in question involved something highly unusual: the death of a child by strangulation. Any assessment of "plausibility" has to account for that stark fact. Moreover, at some level, it is never logical for any crime to be committed. Indeed, in the

---

[26]  Transcript of Video Statement of Nicol Harris at 14-15 (May 16, 2005). Perhaps Professor Leo means to testify that the transcript is in accurate and rather than saying "four" times, as reflected in the transcript above, he believes that Ms. Harris actually said, "ten" times. I have reviewed the pertinent audiorecording several times and believe that Ms. Harris clearly stated "four" times. It is also relevant to note that, immediately following Ms. Harris' statement, the prosecutor conducting the questioning proceeds on the basis (as reflected directly in the next question) that Ms. Harris had said that she had wrapped the cord around Jaquari's neck "four" times.

[27] *See* Statement of Sta-von Dancy ("the elastic was wrapped about 4 or 5 times.") (CITY0000439).

[28] *See* Tr. of Leo Deposition at 62 ("Q: But you didn't put any other examples [of inaccuracies] in your report, correct? A: Correct.") (March 21, 2016).

[29]  Leo Report at 31.

[30]  Leo Report at 31.

[31]  Leo Report at 31.

context of child abuse, one can wonder why anyone would physically abuse a four-year or five-year old child.  Presumably any confession to such abuse can be deemed illogical.[32]

An illustration of the malleability of such words as "illogical" and "implausible" comes from considering the fact that Ms. Harris confessed to not only strangling Jaquari but earlier to beating him with a belt.[33]  Beating Jaquari with a belt because he had not followed instructions is plainly an overreaction – and thus the confession to the beating could be disputed by calling it illogical or implausible.  But child abuse is, by definition, an overreaction to the circumstances that a parent finds herself in.

In an effort to make Ms. Harris' confession seem implausible, Professor Leo apparently glosses over what seems to have been an escalating situation of violence.  Ms. Harris explained in her videotaped confession that, after Jaquari and his brother Diante had disobeyed her instructions, she whipped both of them.[34]  She also sent both of them to the bedroom.  Later, she "went in[to] the kid's room [be]cause Jaquari was crying."[35]  At that point, she "told him to be quiet and shut up, [there] wasn't anything wrong with him."[36]  The four-year-old Jaquari, however, was unable to comply that instruction and was "still crying."[37]  So, Ms. Harris whipped him with a belt again and told him to "go to sleep and stop crying."[38]  But, again, Jaquari was unable to comply, so Ms. Harris removed the elastic from the sheet "and put it around his neck."[39]  And it was this action that ended Jaquari's crying.[40]

Ms. Harris' admission to the beating appears to be an accurate admission – Leo does not appear to argue otherwise in his report and there was corroborating evidence.[41]  Perhaps part of the reason that Professor Leo appears to have glossed over the escalating pattern of violence is that his review of the case did not include all of the violence.  At his recent deposition, Professor Leo was asked whether, when he formed his opinion, his understanding was that Ms. Harris had

---

[32] In his recent deposition, Leo acknowledged that "it never makes logical sense to murder a child, but it's – it makes logical sense that when . . . studying homicides and attributing motives to people in understanding why somebody might kill a child, why it made logical sense to them." Tr. of Leo Deposition at 76.

[33] Transcript of Video Statement of Nicol Harris at 12 (May 16, 2005) ("I got a belt and I whooped him.").

[34] Transcript of Video Statement of Nicol Harris at 11-12.  This fact was corroborated by the police on May 14, 2005, through an interview of Dinajia Arnold.  CITY000398.  Dinajia also said that Ms. Harris "was mad" at both Jaquari and Diante.  *Id.*

[35] Transcript of Video Statement of Nicol Harris at 13.

[36] Transcript of Video Statement of Nicol Harris at 14.

[37] Transcript of Video Statement of Nicol Harris at 14.

[38] Transcript of Video Statement of Nicol Harris at 14.

[39] Transcript of Video Statement of Nicol Harris at 14.

[40] Transcript of Video Statement of Nicol Harris at 14-15.

[41] Diante Dancy confirmed stating that he had been hit with a belt by his mother, although at his recent deposition he could not recall specifically whether it was his mother.  *See* Tr. of Diante Dancy at 64-65, 67,68, 70, 71, 72-73, 78-79, 82, 94-95 (Jan. 18, 2016). This fact of Ms. Harris using the belt was also corroborated by police through an interview of Dinajia Arnold.  CITY0000398.  Further supporting this conclusion is the fact that Ms. Harris was interviewed by her own expert, Dr. Frumkin, at the request of her lawyers.  In his notes of the interview, Dr. Frumkin writes: "I asked her [about her] trial testimony [and] why she doesn't mention spanking kids when she comes home from laundromat. Her lawyers told her to leave it out. Lying in court?"  Frumkin notes at p. 19, discussed in Tr. of Deposition of Bruce Frumpkin at 104-07 (Jan. 28, 2016).

no history of hitting her children. Leo stated that was his understanding.[42] Here again, given the evidence corroborating that Ms. Harris had hit her children with a belt on the day in question – evidence that Leo does not appear to have considered -- his review of the relevant materials was one-sided and did not include information that tending to support the plausibility and reliability of Ms. Harris' confession.[43]

The plausibility of abuse by Ms. Harris is also established by the opinion of the person who perhaps knew her the best: Mr. Dancy, her live-in boyfriend. Interviewed on May 15, 2005, Dancy told the police that he stayed with Ms. Harris because she had an "anger problem" and he was "afraid [she] will hurt the kids."[44]

Far from being "contradicted" by "logic and plausibility,"[45] Ms. Harris' confession seems (sadly) to track many other descriptions of child abuse. A frustrated parent, unable to stop a child's crying, resorts to escalating level of violence.[46] To be sure, only a tiny fraction of parents ultimately go so far as to strangle their child. But given that there was physical evidence of a homicidal strangulation, a confession from one of the two adults in the house[47] that she was responsible for the death hardly seems implausible. In any event, the issue of the logic and plausibility of confession appears to be one that the jury is well situated to determine. The jury does not need expert testimony from Professor Leo to evaluate the subject.

## IV. Problems from Inferring that a Confession is "False" Solely from Lack of Fit.

Professor Leo's opinions suffers from a further difficulty. He appears to believe that it is possible to identify a false confession from the fact that a suspect's statement to police contains inaccuracies.[48] The literature on false confessions has reviewed this issue of the relation or "fit" between confessions and crime scene facts. This literature demonstrates that even true confessions – i.e., confessions given by those who have committed the crime – often do not track the actual crime scene facts. Accordingly, a divergence in Ms. Harris' confession from crime scene facts does not necessarily demonstrate, or even likely demonstrate, that she gave a false confession.

---

[42] Tr. of Leo Deposition at 85.

[43] The fact that Professor Leo was not aware of this abuse is also similar to the question that Dr. Frumkin had when he wondered about Ms. Harris "lying in court" and about Ms. Harris' response that her "lawyers told her to leave it out." Frumkin notes at p. 19, discussed in Tr. of Deposition of Bruce Frumpkin at 104-07 (Jan. 28, 2016).

[44] General Progress Report by Wo regarding Dancy second interview (May 15, 2005) (CITY0000422). At his recent deposition, Professor Leo did not recall Mr. Dancy making that statement. Tr. of Leo Deposition at 80.

[45] Leo Report at 31.

[46] Ms. Harris was, at the time, apparently undergoing anger management counseling as part of a court-ordered program in connection with a domestic violence arrest, with Dancy as the victim of an apparent attack by her. CITY0000413. Here again, one could also apparently argue that the domestic violence attack on Dancy was "contradicted" by "logic and plausibility," because such an attack does not seem rational either.

[47] I have not seen a claim from Ms. Harris that it was a stranger who entered the house and strangled Jaquari. Instead, from the materials I have reviewed, it appears that Ms. Harris is claiming that police interrogation caused her to confess to a strangulation death that was, instead, accidentally caused by Jaquari himself. *See also* CITY0000411 (noting "no one else watched the kids" on day in question).

[48] *See, e.g.,* Leo Report at 14.

**A.  Even True Confessions Frequently Diverge from Crime Scene Facts.**

The false confessions literature considers the extent to which confessions track crime scene facts.  But that literature is much more nuanced than Professor Leo suggests.  Leo appears to be arguing that the "fit" between the suspect's incriminating statements and the crime that has been committed can be regarded as a clear or likely indicator of innocence. While there are undoubtedly cases where a false confession included facts that did not match the crime scene, there are also numerous reasons why a true confession might not "fit" or match the actual crime scene facts.  As a result, it is not possible to directly infer from the fact that a confession contains discrepancies to the conclusion that the confession was given by someone innocent of a crime.

The suggestion that lack of fit would demonstrate innocence is not a well-founded or scientific conclusion because it fails to consider many reasons why statements from guilty defendants might not track the facts of a crime.  To begin with, the "confession" that many suspects give might be more accurately described as an "incriminating statement."  By definition, such statements will fail to fit the facts of the crime, even if they accurately suggest guilt.  Consider, for example, a suspect's claim that she was at the scene where a person was killed, but was not involved in killing the victim.  Such a statement may be quite important to a successful prosecution of the suspect; but if the prosecution is attempting to obtain a murder conviction, the prosecution's entire theory will be that the suspect was involved in the killing and that this part of the narrative does not fully track the facts of the crime.

This scenario where a suspect does not admit to all of the crime scene facts unfolds very frequently, as two empirical studies on the results of police questioning demonstrate.  In a 1996 *UCLA Law Review* article, Bret Hayman and I reported data that among suspects who gave incriminating statements, thirty-six percent (36%) provided something less than a full confession.[49]  An even larger percentage comes from Professor Leo's empirical study in northern California, which found that, among suspects giving incriminating statements, sixty three percent (63%) gave something less than a "full" confession.[50] Both these studies suggest that vast numbers of suspects' incriminating narratives will be at odds with the facts of the case simply because suspects do not confess to the crime in its entirety.

In addition to the difference between confessions and incriminating statements, it is well known in the confessions literature that the statements guilty suspects give to police officers frequently fail to "fit" the facts of the crime.  Law professor George Thomas (a co-author with Professor Leo on false confessions issues) has explained that "even 'true' confessions are often riddled with half-truths because suspects want to paint the most favorable picture possible."[51]

---

[49] Cassell and Hayman, *supra* note 1, at 869 tbl. 4.

[50] *See* RICHARD ANGELO LEO, POLICE INTERROGATION IN AMERICA: A STUDY OF VIOLENCE, CIVILITY AND SOCIAL CHANGE 268 tbl. 7 (1994) (unpublished Ph.D dissertation) (data derived by dividing "full confession" category by all three incriminating statement categories). The utility of this data in Leo's study is somewhat impaired by the broad definitions of the various incriminating statement categories. *See* Cassell & Hayman, *supra* note 1, at 929-30.

[51] George C. Thomas III, *Telling Half-Truths*, LEGAL TIMES, Aug. 12, 1996, at 20.

Significantly, the leading police interrogation manual indicates that it is "rare" for a confession to reveal all the details of a crime: "Rarely will a suspect tell the complete and absolute truth during a confession. If a confession lacks details in certain areas, or even contains information that turns out to be false, this alone *should not serve as a clear indication that the entire confession is false.*"[52] Many offenders "will admit guilt to a very serious offense, while at the same time refusing to do so regarding a less related one that was part of the same series of events."[53] For example, a suspect might confess to a murder but deny stealing a crucifix from the victim.[54]

One common reason that a confession may not track the true facts of the crime is that a suspect may want to minimize either the seriousness of the crime or her own role in it.[55] To give a hypothetical example, a suspect who kills someone may want to (falsely) downplay the viciousness of the crime. In such a scenario, the suspect's confession (or incriminating statements) will obviously not track the facts of the crime, because the suspect is trying to avoid admitting her complete culpability. Moreover, in such a situation, the confession may not match the crime scene evidence.

The false confessions literature demonstrates numerous reasons why suspects might give otherwise truthful confessions that deviate (or apparently deviate) from the crime scene's facts, including:

- A desire to cover for family members or friends;
- An attempt to minimize the seriousness of an offense;
- A drug-induced memory problem or confabulation;
- An intention to throw the police investigation "off track";
- A desire to give the impression of having "blacked out" around the time of the crime;
- An insufficiently precise description of the location of incriminating evidence to block its recovery;
- An inability to complete questioning because of legal restrictions on police interrogation; and
- A manipulative suspect.[56]

Evidence that a confession does not fit the facts of crime *may* be evidence that a confession is false – i.e., that the person confessing did not commit the crime. Research on false confessions has established that in most cases where a suspect gives a false confession, that

---

[52] INBAU ET AL, CRIMINAL INTERROGATION AND CONFESSIONS 357 (5th ed. 2013) (emphasis added).

[53] INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 90-91 (3rd ed. 1986).

[54] *Id.* at 91.

[55] INBAU ET AL, CRIMINAL INTERROGATION AND CONFESSIONS 356 (5th ed. 2013).

[56] *See* Cassell, The Guilty and the "Innocent," *supra* note 2, at 594-95 (discussing Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. CRIM. L. & CRIMINOLOGY 429).

confession will be contradicted by crime scene or other evidence.[57]  But the same can be said of vastly larger number of cases where a suspect gives a *true* confession – those kinds of confessions also frequently contain statements that are contradicted by crime scene or other evidence.  Without taking into account the relative frequency of false confessions to truthful confessions, it is impossible to deduce that an inconsistency in a confession is evidence of a true confession or a false confession.

If anything, the available evidence suggests that it is far more likely that any confession containing inconsistencies in it will be turn out to be a true confession rather than a false confession.  To establish this point, it is necessary to have some rough measure of the relative proportion of false confessions to true confessions. While precise quantification is impossible, the empirical literature suggests (unsurprisingly) that the great majority of confessions and incriminating statements are true.[58]  And, as discussed above, a majority of these confessions and false statements will have inconsistencies in them.  Accordingly, from an empirical point of view, it would not be possible to simply reason backwards from lack of "fit" in a confession to the conclusion that it was likely the confessor did not commit the crime.  Instead, a more holistic assessment would have to be made of these various possibilities.

To be clear, I am not trying to invade the province of the jury here and decide for them what they should think about all the conflicting evidence on these issues.[59]  The jury will hear all the factual evidence in the case and make appropriate decisions on such issues.  My limited point is that, as part of that decision making process, the jury should consider the well-settled fact that many cases of guilty suspect involve incriminating statements that do not track the crime scene facts – a fact that Professor Leo does not appear to acknowlege.

### B.  Lack of "Fit" In Ms. Harris' Statements.

Professor Leo's assessment of the "fit" in this case is also complicated by the disputed question of precisely what statements Ms. Harris made to police and the circumstances in which she made those statements.  For example, Ms. Harris alleges that the detectives coerced her into giving her confession and "fabricated" facts for her to recount in her confession.[60]  The law enforcement officers and others involved have denied those allegations.  I do not purport to wade broadly into that debate, which will (if the case is allowed to proceed to trial) need to be resolved

---

[57] *See, e.g.,* Brandon L. Garrett, *The Substance of False Confessions*, 62 STAN. L. REV. 1051, 1087 (2010), discussed in *Harris v. Thompson*, 698 F.3d 609, 631 (7th Cir. 2012).

[58] *See, e.g.,* Cassell, *Protecting the Innocent from False Confessions and Lost Confessions – And From* Miranda, 88 J. Crim. L. & Criminology 497, 507-13 (1998). *See also* Marvin Zalman, *Qualitatively Estimating the Incidence of Wrongful Convictions*, 48 CRIM. L. BULL. 221 (2012) (surveying available empirical literature on wrongful convictions and estimating an overall trial error rate for *all* cause at between 0.5% and 1.0% for felony offenses).

[59] *Cf.* Richard J. Ofshe, *Inadvertent Hypnosis During Interrogation*, 40 INT'L J. CLINICAL & EXPERIMENTAL HYPNOSIS 125, 151 (1992) ("[i]f a decision is ever to be made about questions of guilt or innocence, it should be made by a jury not by a contributor for or readers of scientific journals.").

[60] *See, e.g.,* Complaint, *Harris v. City of Chicago et al.*, No. 1:14-cv—04391 at ¶¶ 85-100; *see generally* Transcript of Deposition of Nicole Harris (Dec. 22, 2015).

by a finder of fact. Professor Leo also does not purport to take sides on who is telling the truth.[61] But then, in his report he contends that the officer's accounts are "contrary to everything one would expect both from the social science research on police interrogation and confessions, as well as the police training manuals on the subject."[62] It appears that the focus of his argument is the suggestion that from the officers that, at one point, Ms. Harris made a "spontaneous" statement. But even Professor Leo concedes this is a possibility in interrogation.[63] It is unclear how he reaches his conclusion.

To demonstrate the problems with Professor Leo's approach, I want to focus on one particular issue: Whether deviations from at least some parts of Ms. Harris' confession with the crime scene facts allow a strong inference that the confession was false, as Professor Leo has argued.[64] His conclusion is not well-founded.

For purposes of analyzing this question, I needed some recounting of Ms. Harris' various statements to review. I have relied on the Seventh Circuit's summary of those statements, supplemented on a few details by the underlying police reports or testimony on which it ultimately appears to draw (via review of state court proceedings).

Ms. Harris gave several statements to law enforcement about her role in Jaquari's death. It may be useful to break these statements down into separate statements. The first I will refer to as the "phone cord" statement. According to police detectives, after approximately fifteen minutes of questioning, Harris broke down, started crying, and spontaneously admitted, "I wrapped the phone cord around Jaquari's neck and then I wrapped the elastic band from the sheet around his neck to make it look like an accident."[65] It can be argued that this statement was false, because a later autopsy report would appear to show that the telephone cord played no role in Jaquari's death.[66]

Harris later recanted her statement, took a polygraph examination, and then confessed a second time – this time saying she had used the elastic band, which conformed to some of the physical evidence.[67] She stated, however, that she had left Jaquari on the top bunk. Later, detectives reinterviewed Ms. Harris, asking her about the inconsistencies in her account of events, such as her statement about leaving Jaquari on the top bunk. Ms. Harris then stated that she wanted to be completely forthcoming and cooperate. This time, she recited essentially the

[61] *See* Tr. of Leo Depo. at 17 ("I'm not taking a position on which version [Ms. Harris' or the police officers'] is factual") (March. 21, 2016).

[62] Leo Report at 32.

[63] *See* Leo Report at 32 ("We know from empirical social research that . . . suspects *rarely* give spontaneous false or unreliable confessions during police interrogation"). If I am reading this sentence correctly, it appears that Leo is conceding that spontaneous truthful confessions can occur. This concession is necessary, because there clearly are documented cases spontaneous confessions. *See, e.g., Colorado v. Connelly*, 479 U.S. 157 (1986).

[64] *See, e.g.,* Leo Report at 4.

[65] *See Harris v. Thompson*, 698 F.3d 609, 614 (7th Cir. 2012).

[66] *Id.* In stating that the cord played no role in the death, the Seventh Circuit appears to have been saying that it was not the final instrument of death. It is, of course, a possibility that Ms. Harris abused Jaquari with the phone cord at another time or in another way.

[67] *Id.*; Supp. Report at 13.

same facts, except that she added the fact that she wrapped the dangling elastic band around Jaquari's neck approximately four times until he stopped crying.[68]  She stated that she noticed blood coming from Jaquari's nose, panicked, and laid Jaquari down as she left the apartment.[69]

A prosecutor later arrived and obtained a videotaped statement from Ms. Harris.  In the videotaped statement, Ms. Harris said that she had struck Jaquari with a belt when she came over from the laundromat and that because he would not stop crying, she wrapped the sheet's elastic band around his neck until she saw blood coming from his nose.[70]  I will refer to this statement as the "videotaped statement."

Seizing on possible inconsistencies among the various statements, Professor Leo argues that they contain "factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions."[71]  But the available empirical and related literature on confessions suggests several reasons why even if Ms. Harris was simply confessing what she did, she might have given these various (and arguably conflicting) statements.  One reason is that she may have wanted to try and minimize what she had done.  The medical examiner's conclusions suggest that Jaquari's death was a homicide given the ligature mark that was found on the body.[72]  And the medical examiner's report suggests that one way in which the homicide could have been committed would have been pressure from the killer on the Jaquari, which caused the mark to appear on one side of Jaquari's neck more than another.[73]  The medical examiner's conclusion is supported by the expert conclusion of Dr. Brian L. Peterson, who concludes that the autopsy findings are "consistent with an attacker behind Jaqu[a]ri, pulling the ligature (around his neck) while holding him down by the back and shoulders.  The abrasions in Jaqu[a]ri's mouth[] were most likely caused by pressure placed on the mouth – such as his face[] being pushed into the floor – just prior to his death causing his teeth to abrade his mouth."[74]  Ms. Harris' confessing to wrapping the band around the neck while being unwilling to admit to the additional – and more vicious – act of pressing her son's face down onto the floor to strangle him would be consistent with the recognized fact that guilty criminals frequently confess in a way that minimizes the seriousness of their crime or the way in they committed it.[75]  A similar point can be made about the fact that Ms. Harris tried to explain away the fact that she did not do anything to help Jaquari, ostensibly because she "didn't think [anything] was wrong with him."[76]  Of course, it may well have been apparent to Ms. Harris that

---

[68] Supp. Report at 14.

[69] *Id.*

[70] 698 F.3d at 614; Videotaped Statement of Ms. Harris.

[71] Leo Report at 4.

[72] Report of Report of Postmortem Examination, Office of the Cook County Medical Examiner (examination conducted May 15, 2005) at 6; Transcript of Deposition of Scott Denton at 52 (Jan. 7, 2016); *see also id.* at 112 (noting "strong support" for homicide conclusion from another  doctor).

[73] *Id.* at 136-38, 161-64.

[74] Report of Dr. Brian L. Peterson at 6 (Jan. 26, 2016).

[75] INBAU ET AL, CRIMINAL INTERROGATION AND CONFESSIONS 356 (5th ed. 2013); Cassell, The Guilty and the "Innocent," *supra* note 2, at 594-95 (discussing Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. CRIM. L. & CRIMINOLOGY 429).

[76] Transcript of Videotaped Statement of Ms. Harris at 16.

something was wrong with Jaquari – but it is far easier to justify her inaction by declining to reveal that fact.

This is not the only possible explanation for Ms. Harris' statements deviating from the crime scene facts, as other possibilities also exist. For example, suspects have been known to confabulate various facts connected with the crime.[77] And suspects have sometimes tried to manipulate police officers by including some facts that don't quite match the crime scene facts.[78]

Professor Leo appears to take the position that an inconsistency between two statements is an indicator or "hallmark" of a false confession.[79] But a more discriminating assessment is required. In trying to sort out whether Ms. Harris' statements were a true or false confession, one approach is offered by the leading police interrogation manual – the "Inbau" manual entitled *Criminal Interrogation and Confessions* (currently in its fifth edition). The manual explained that it is not unusual for "a guilty suspect [to] . . . tell the truth about committing a crime but withhold other information related to his crime or even lie about certain aspects of the crime."[80] Indeed, as noted earlier, the manual explains that "[r]arely will a suspect tell the complete and absolute truth during a confession. If a confession lacks details in certain areas, or even contains information that turns out to be false, this alone should not serve as a clear indication that the entire confession is false."[81]

The Inbau manual provides guidelines to "assist in identifying probable true or false confessions."[82] Of note here, it appears that many of the applicable guidelines suggest that Ms. Harris' videotaped statement was a true confession – guidelines that Professor Leo does not discuss in his report and does not appear to have considered.

The first guideline is that "[a] confession that was not retracted until days or weeks after it was made is probably truthful."[83] Here, it does not appear that Ms. Harris attempted to retract her ultimate confession close in time to when she provided it. There is evidence suggesting a series of confessions, including a first confession to Detectives Noradin and Cordaro.[84] She apparently then confessed again to Assistant State's Attorney Lawrence O'Reilly.[85] She apparently recounted it yet again to Assistant State's Attorney Andrea Grogan.[86] And there can be no doubt that she confessed to Ms. Grogan on videotape.[87]

So, having made a videotaped statement clearly implicating herself in the death of

---

[77] Inbau et al., Criminal Interrogation and Confessions 360 (5th ed. 2013)
[78] Cassell, The Guilty and the "Innocent," *supra* note 2, at 560.
[79] Leo Report at 4.
[80] Fred E. Inbau et al., Criminal Interrogation and Confessions at 356 (5th ed. 2013).
[81] *Id.* at 357.
[82] *Id.*
[83] *Id.*
[84] Tr. Testimony of Anthony Noradin, Oct. 24, 2006, at 75-76 (Bates Numbers 1254-55 in this case).
[85] Tr. Testimony of Lawrence O'Reilly, Oct. 24, 2006, at 39-40 (Bates Numbers 1219-20 in this case).
[86] *See* Transcript of Deposition of Nicole Harris at 245-46 (Dec. 22, 2015); *see also*
[87] Transcript of Videotaped Statement of Ms. Harris; *see also* Tr. Testimony of Andrea Grogan, Oct. 21, 2006, at 506 (Bates Numbers 506 in this case).

Jaquari, the question of interest is how quickly did she try to recant that statement.[88] From the materials I have reviewed, there is no clear indication that Ms. Harris attempted to retract her confession in the days immediately following its recording.[89] This failure to immediately recant the statement is significant because, as the Inbau manual explains, "As soon as the threat of the interrogation has been removed, it would be expected that the innocent suspect would denounce the confession and protest innocence to anyone willing to listen."[90] That does not appear to have happened here – or, at the very least, Professor Leo does not argue that this happened here.[91]

The second guideline is that "[t]he suspect's explanation for offering a false confession should be carefully scrutinized."[92] The jury will, of course, have the opportunity to do exactly that. For purposes of this report, it is perhaps enough to note that the authors of the Inbau manual observed that "[i]n our experience, the vast majority of retracted confessions are, in fact, trustworthy statements coming from the person who committed the crime."[93] Here again, Professor Leo does not discuss this fact.

The third guideline is that "[t]he absence of any specific corroboration within the confession should be viewed suspiciously."[94] The Inbau manual notes that "[o]ur experience has been that, if a guilty suspect can be persuaded to admit committing the crime, then he will also discuss the details of the crime, at least some extent."[95] In this case, the video-recording of the Ms. Harris' statement leaves no doubt that she did discuss, at least to some extent, the details of the crime. For example, Ms. Harris clearly described details leading up to the crime, how she wrapped the elastic band around Jaquari's neck four times, how his nose was bleeding afterwards, and other details.[96] She also stated that she "whooped [Jaquari] with a belt."[97] Moreover, as discussed earlier, the medical examiner found that video-recorded statement "fit the findings of [Jaquari's] body . . . .,"[98] although the part about wrapping the neck four times was not consistent with the wrapping touching his neck four times.[99] And Dr. Peterson concludes: "My conclusion is that the cause of death of Jaqu[a]ri Dancy is ligature strangulation, *the manner homicide*."[100] Here again, it does not appear that Professor Leo has considered these

---

[88] As noted earlier, Ms. Harris' had made an earlier recantation, but her ultimate statement to authorities was the recorded statement.

[89] *See, e.g.,* Transcript of Deposition of Nicole Harris at 343-45 (Dec. 22, 2015); *see also* Complaint, *Harris v. City of Chicago et al.*, No. 1:14-cv-04391 at ¶¶ 95-100 (acknowledging videotaped confession, but not alleging immediate recantation).

[90] FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS at 357.

[91] *See, e.g.,* Leo Report at 19.

[92] *Id.*

[93] *Id.* at 358.

[94] *Id.*

[95] *Id.*

[96] Transcript of Videotaped Statement of Ms. Harris at 14-16.

[97] *Id.* at 14.

[98] Tr. of Deposition of Scott Denton at 110 (Jan. 7, 2016); *see also id.* at 115-16 (finding confession and autopsy to be "all consistent"); *id.* at 123 ("Her statements and the police report are consistent with the autopsy report or autopsy findings").

[99] *Id.* at 185. The medical examiner later explained that this did not necessarily mean that the neck was not wrapped four times. *Id.* at 186-90.

[100] Report of Dr. Brian L. Peterson at 7 (Jan. 26, 2016) (emphasis added).

facts.

The next guideline is that "[i]t is not unusual for a true confessor to accept full responsibility for committing the crime but omit specific emotional details, especially when blamed on memory failure."[101]  There is some suggestion of this possibility in Ms. Harris' videotaped statement.  For example, in discussing the blood that she saw coming from Jaquari's nose when she returned from the laundromat, Ms. Harris said she saw "just a little bit . . . ."[102]  As another example, her statement about just wrapping the elastic around Jaquari's neck does not discuss the degree of force used to tighten the elastic.  It could thus be argued that, with regard to the videotaped statement, it appears that it may contain inconsistencies from the crime scene facts.  The medical examiner concluded that the ligature mark on Jaquari's neck does not go all the way around the neck – suggesting simply wrapping the elastic would not be sufficient to have caused the injuries.[103]  But this is simply the kind of a scenario in which a suspect's confession "fails to include emotional elements [that] certainly does not suggest a false confession."[104]  Instead, as discussed earlier, a perfectly plausible explanation is that Ms. Harris did not want to admit the full violence of her actions to keep Jaquari from crying.  She may not have wanted to admit that she was a person pulling on the cord.[105]  These facts, too, do not appear to have been considered by Professor Leo.

A final guideline applicable to this case[106] is that "[w]hen a suspect offers multiple confessions to the police that contain substantial differences, the confession should be viewed with skepticism."[107]  The key question with regard to this guideline is whether the differences between the two confessions are substantial.  For instance, the Inbau manual cites the example of a suspect who gave seven different statements to police – a far cry from the situation here.

The main difference between the phone cord statement and videotaped confession is Ms. Harris' description of what she wrapped around Jaquari's neck.  It is not clear whether this would not necessarily be substantial difference.  For one thing, it is entirely possible that at various points during the day, Ms. Harris used *both* the phone cord and the elastic on Jacquiri in an effort to keep him silent.  If so, the differences between the two statements could be attributable to Ms. Harris simply conflating the different events.

To be clear, one possibility is that all of Ms. Harris' statements are false statements – and that she somehow decided to tell police that she killed Jaquari even though he had somehow

---

[101]  FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 358 (5th ed. 2013).

[102]  Transcript of Videotaped Statement of Ms. Harris at 16.  The medical examiner found no evidence of a nose bleed, but concluded that he could "say if [Jaquari] bled from his nose one way or the other."  Tr. of Deposition of Scott Denton at 189 (Jan. 7, 2016).  He also reported that a red fluid came out of Jaquari's nose that could look like blood to someone who didn't know better.  *Id.* at 204-05.

[103]  Tr. of Deposition of Scott Denton at 131-38 (Jan. 7, 2016).

[104]  FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 360 (5th ed. 2013).

[105]  *Cf.* Tr. of Deposition of Scott Denton at 141 (Jan. 7, 2016) (injuries consistent with pulling on the neck).

[106]  The Inbau manual also offers a guideline that "[i]nconsistencies between the confessor's statement and those of the victim are commonplace in true confessions."  *Id.*  Of course, in this case there is no statement from the victim because the victim is dead.

[107]  *Id.*

accidentally strangled himself. But this argument appears to run into a substantial problem. The idea that it was police interrogation that introduced a homicide into this case appears inconsistent with the physical evidence – as discussed earlier in this report.[108]

In any event, the limited point of this expert report is not to definitively argue which of the various possible scenarios the single most likely. That is a task that would appear to be beyond the competence of an expert. In this case, a finder of fact is going to have carefully evaluate all of the competing evidence and determine which of the scenarios is most likely. The limited point here is that Professor Leo cannot reliably opine that the finder of fact (i.e., a jury) can simply reason from any inconsistencies in the statements to the conclusion that Ms. Harris was not involved in the crime. Inconsistencies are a standard feature of true confessions, and the inconsistencies in Ms. Harris' statements do not necessarily demonstrate that she gave a false confession.

**V.    Professor Leo Can Not Reliably Offer an Opinion About Whether the Psychological Techniques Used During the Questioning of Ms. Harris Increased the Risk of Extracting a False Confession.**

Professor Leo also plans to opine that the officers questioning Ms. Harris used numerous psychological questioning techniques that create the "risk" of a false confession. Here again, it is not immediately clear how Professor Leo's proposed testimony is truly expert testimony as opposed to simply accepting Ms. Harris' side of the story. A significant part of this proposed testimony does not appear to be helpful or expert testimony, as it simply involves the indisputable proposition that people can be physically pressured into confessing falsely, particularly in a laboratory setting where a "confession" does not have the same types of consequences as a confession to a law enforcement officer. But to the extent that Leo plans to venture beyond this terrain, there is no reliable body of science undergirding his conclusions about "risk factors" for real world false confessions.

The fundamental problem with Professor Leo's position is the "disconnect" between the science he refers to and the critical subjects about which Professor Leo plans to testify. In his report, Professor Leo indicates that he plans to testify that "the multiple interrogations of Nicole Harris utilized numerous techniques that the empirical social science research has shown significantly increase the risk of eliciting unreliable and false confessions when applied to innocent suspects."[109] How Leo will do this reliably is unclear.

Professor Leo appears to proceed from the premise that police interrogation contains a "risk" of producing false confessions – i.e., that innocent people can be induced to confess to very serious crimes they did not commit.[110] But that very general point will not "help the trier of fact to understand the evidence or determine a fact in issue."[111] The relevant issue in this case, of course, is not whether some people in the annals of millions of American criminal law

---

[108] *See* Report of Dr. Brian L. Peterson at 7 (Jan. 26, 2016) (manner of death is "homicide").
[109] Leo Report at 22.
[110] *Id.* at 5.
[111] Fed. R. Evid. 702(a).

prosecutions can be identified who have falsely confessed; instead, the issue is whether *Ms. Harris* falsely confessed. It is only if Professor Leo is allowed to testify about "risk" factors for a false confession that the very general literature to which he refers has any connection to the particular facts of this case.

The overarching problem is that "to date, no empirical data exists that demonstrates either how often false confessions occur generally, or how often they occur when a suspect is subjected to certain interrogation tactics."[112] This means that Professor Leo's assessments of risk are unreliable.

## A. Guilt Presumptive Questioning.

The first false confession "risk" factor that Professor Leo identifies is "guilt-presumptive" questioning.[113] In Professor Leo's view, "social science research has demonstrated that investigators' pre-existing presumption of guilt *innocent* suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation."[114]

The problem with calling this a "risk" factor is that it is essentially a tautology. If police were not pushing to obtain a confession from an *innocent* person, then – by definition – they would not obtain a *false* confession. In fact, once the premise of the argument is accepted (i.e., police have incorrectly identified a suspect as guilty) then the possibility of a false confession does plainly increase: it goes from 0% (the chance of getting a "false" confession from a guilty suspect[115]) to whatever the risk is of obtaining a false confession from an innocent person (a figure that is small, but still greater than 0%). The assertion is essentially meaningless.

A further problem with applying this risk factor to real world questioning is that identifying what is "guilt-presumptive" questioning is extremely subjective. Indeed, a very strong case can be made that essentially *all* police interrogation in America today is, in some sense, guilt presumptive. Professor Leo has written, for example, that "American detectives . . . assume that every suspect they interrogate is guilty but will initially deny his guilt"[116] and that "police are trained to interrogate only those suspects whose culpability they 'establish' on the basis of their initial investigation."[117] In light of these facts, it would hardly be surprising to learn that virtually all police interrogations leading to false confessions are in some sense "guilt-presumptive" because virtually all police interrogations are guilt-presumptive. Put another way, it is surely true that aggressive police questioning leads to false confessions; but then again, that same questioning is what leads to truthful confessions.

---

[112] David A. Perez, *The (In)admissibility of False Confession Expert Testimony*, 26 TOURO L. REV. 23, 73 (2010).

[113] Leo Report at 22-23.

[114] Leo Report at 22 (emphasis added).

[115] For simplification, this discussion assumes that the police are questioning a suspect only about one crime. A suspect guilty of one crime could, of course, be questioned about other crimes and falsely confess to them.

[116] RICHARD A. LEO, POLICE INTERROGATION AND AMERICAN JUSTICE 121 (2008).

[117] Saul M. Kassin, Richard A. Leo et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW HUM. BEHAV. 36 (2010).

Given that the available evidence suggests that virtually all successful police interrogation leads to truthful confessions,[118] it is hard to understand how ordinary police questioning can somehow be identified as a "risk factor' for a false confession. It is simply part of the background landscape that produces true and (very rarely) false confessions.

The issue of guilt presumptive questioning has been the subject of very little empirical research based on actual police interrogation. It has, however, been the subject of (for example) two studies (cited by Professor Leo[119]) that are "laboratory" studies – that is, studies in which college students were questioned about theoretical crimes. The usefulness of these studies for identifying risk factors for real-world false confessions is unclear.

For example, in one study, the students were divided into two groups: one group was told to enter a room and commit a "crime" – i.e., to enter a room and "steal" a $100 bill. The other group went to the room but did not take anything. These "suspects" were then interrogated by another group of college students, who were either told to be suspicious or not suspicious of the students they were questioning. The result of the study was that the student interrogators who were told to be suspicious of those they were questioning were, in fact, more suspicious of those they were questioning – i.e., they identified their "suspects" as more likely guilty – than the other group of questioning students.[120]

While these findings are interesting, their transferability to real world police questioning of criminal suspects is not immediately clear. Indeed, even if the research transfers completely to real world questioning, the study does not involve false confessions at all, but rather the suspicions of police questioners. The study's authors also pointedly conclude that "more research is needed to test various aspects of this process."[121]

The second of the two studies – "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" – also involved college students in a psychology class. As this is the only study that deals directly with false confessions cited by the defense in support of the first risk factor, it is worth extended discussion.

An experiment was arranged where some of the students became "guilty" of cheating – specifically, helping other students on their team with a problem when, for that particular aspect of the problem, they were supposed to work on alone. Other college students were assigned to play the role of "interrogators" – i.e., to ask questions about whether the innocent or "guilty" students had shared information. The student interrogators were allowed to question the suspected students for up to fifteen minutes and were given differing information about whether the suspects were guilty or not – the "investigator bias" variable that the researchers were

---

[118] *See, e.g.,* Cassell & Hayman, *supra* note 3.

[119] *See* Leo Report at 22.

[120] Saul M. Kassin et al., *Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt*, 27 LAW & HUM. BEHAV. 187, 196 (2003).

[121] *Id.* at 201.

testing.[122]

The first point to be made about the study is that it found that true confessions were far more likely to occur than false confessions. For each of the three investigator bias conditions (innocent bias, guilt bias, or control), true confessions were far more likely.[123] This makes it difficult to argue that the study says anything about whether investigator bias is a risk factor for a false confession. Indeed, to the contrary, as the authors pointed out, under all assumptions "Consistent with prior research . . . , true confessions were significantly more likely than false confessions."[124]

The second point is that the study is difficult to interpret as support for the proposition that a guilty bias is more likely to lead to false confessions. The study also found that an *innocent* bias is more likely to lead to false confessions. While 20% of the control interrogators extracted false confessions, and even higher percentage of the *innocent*-biased interrogators – 26% -- extracted a false confession. While this percentage was less than the 47% false confession rate of the guilt-biased interrogators, the figure still stands for the proposition that an interrogator who though a suspect was innocent would be more likely to produce a false confession. Given that this particular finding appears to undercut the hypothesis that the researchers were exploring, it is unsettling that this finding does not appear to be specifically discussed in the research paper.[125]

The larger issue lurking behind this "laboratory" study (and others like it) is its applicability to real world police interrogations. It is unclear how getting a student to "confess" to being guilty of "cheating" is or is not relevant to getting a criminal suspect to confess to, for example, making a false confession about killing a child. This particular study involved students who had been recruited to participate in a psychology experiment where they were given instructions about not collaborating with other students. Whether they would be "guilty" of academic misconduct if they succumbed to human nature and provided assistance to a fellow student was not completely clear in the study. Nor is it clear what sort of assistance was forbidden. Perhaps this is why nearly half of all the "innocent" students aggressively questioned (47%) admitted to cheating.[126] And the study's authors specifically noted that "our data regarding confession rates are not intended to replicate confession rates that may be observed under real world conditions."[127]

Perhaps the best that can be said for this one study is that further research is warranted on these topics. Indeed, that is what the study's authors say, as they concluded that "[c]learly, further research is warranted to continue the investigation of the psychological processes leading to confession, and to better understand the vulnerability of innocent suspects within the

---

[122] Fadia M. Narchet, *Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions* at pp. 6-7(on-line Dec. 14, 2010).
[123] *Id.* at 8 tbl. 1.
[124] *Id.* at 7; *see also id.* at 8 tbl. 1.
[125] *Id.* at 7-8 (discussing findings of table 1; more false confessions from innocent bias not discussed).
[126] *Id.* at 6 (descripting instructions given to student); *id.* at 8 tbl1. (47% false confession rate).
[127] *Id.* at 12.

interrogation room."[128]   It is hard to see how this single study can serve as the basis for concluding that Professor Leo's proposed testimony on guilt-presumptive questioning rests on a reliable scientific foundation.

### B. Lengthy Interrogation and Sleep Deprivation.

Professor Leo next claims that lengthy interrogation is a significant risk factor for a false confession.  He writes that: "Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation, especially where investigators use physically or psychologically coercive methods."[129]   Professor Leo also claims that "the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours."[130]   He then goes on to argue that, by his calculations, "[a]ccording to Nicole Harris, she was interrogated multiple times over the almost thirty hours that she was at Area 5 and the polygraph unit from May 14 to May 16, 2016 [sic – should refer to 2005]."[131]

Common sense suggests that Professor Leo is correct in suggesting that a lengthy interrogation can, at some point, cross the line from being permissible to being impermissible. But starting from that uncontroversial point, he proceeds to draw unreliable conclusions about this case. A basic problem is that Leo is incorrect in suggesting that there is some sort of ordinary time for police interrogation which marks a boundary of "excessive" questioning.  The few studies that have been done on the subject of police questioning (including published empirical research I have conducted[132]) have focused on interrogations for more run-of-the-mill crimes (e.g., thefts, burglaries, etc.), not the extraordinary situation of homicide of a child.  This is presumably where Professor Leo finds support for his claim in his report that "the overwhelming majority of routine custodial interrogations last less than one hour…." [133]  But there can be little doubt that police officers are expected to invest far more time and resources into investigating a possible child abuse homicide than in catching ordinary offenders. Therefore, given the limited state of the literature, it is not possible to extract a "typical" time for questioning someone suspected of involvement in the murder of a child against which to compare the time that Ms. Harris' questioning took in this case.

In other cases, Leo has given sworn testimony that "you could have a very lengthy interrogation that involved entirely appropriate techniques.  You can't infer, if all you know is the length of the interrogation, that police use[d] any particular technique."[134]  So it is hard to understand how he generalizes in this case simply from the length of interrogation to the risk of a

---

[128] *Id.*
[129] Leo Report at 23-24.
[130] Leo Report at 23.
[131] Leo Report at 24.
[132] Cassell & Hayman, *supra* note 1, at 892.
[133] Leo Report at 23.
[134] Deposition of Richard A. Leo, Eric Caine v. Jon Burge, Apr. 10, 2013, Case No. 11-CV-08996  (N.D. Ill.), depo. tr. at 256.

false confession.

Professor Leo also lacks firm scientific foundation for the assertion that the "combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours."[135]  Professor Leo's source for this assertion is a single article written by himself and a co-author (Steven Drizin). That article suffers from the problem of identifying "proven" false confessions from which to extract conclusions. But even setting that problem aside, the study itself notes that "[u]nfortunately, the length of interrogation either was not reported or could not be determined in almost two-thirds (65%) of the sample."[136]  This creates the obvious problem of selection bias.[137]  Perhaps the length of interrogation was reported for cases falling in the 35% of the sample precisely because they were exceptional – i.e., because they were long.  In any event, this single study with only a 35% data collection rate is not a sufficient basis for generalizing generally accepted scientific conclusions about the connection between the length of interrogation and false confessions.

Even assuming that more than six hours of interrogation could be argued to be a risk factor of some sort, considerable question remains about how that factor would fit with the facts of this case.  It appears that even assuming that Professor Leo is correct in his assertion that it typically takes more than six hours for an interrogation to lead to a false confession,[138] that would be a factor that *undercuts* Ms. Harris claim that she falsely confessed rather than supports it.  Professor Leo's report, for example, contains a timeline from police officers that has the questioning beginning at around 9 p.m., leading to an incriminating statement about four hours later.[139]  This would fall inside the time line.

Another way of evaluating this issue is to look at what happened following the polygraph test.  As recounted by the Seventh Circuit, Ms. Harris appears to have given a statement about strangling here child shortly after the polygraph test was concluded – and thus would have confessed following interrogation of approximately less than an hour.  Another author in the false confession field has written that "[n]obody confesses falsely in an hour."[140]

The important point for present purposes is that Professor Leo's suggestion that Ms. Harris gave incriminating statements due to "interrogation[in] multiple times over . . . almost thirty hours"  does not explain why she made incriminating statements much earlier in the process.

---

[135] Leo Report at 23.
[136] Drizin & Leo, *supra* note 196, at 948.
[137] "Selection bias" is systematic error due to a non-random sample of a population, causing some members of the population to be less likely to be included than others, resulting in a biased sample.
[138] Seemingly attempting to anticipate this objection, Professor Leo claims that Phillipos was subjected to "combined" period of questioning that ending up totaling around twelve hours.  He reaches this figure by adding up questioning on multiple days.  He does not support any literature indicating that the relevant way to calculate length of interrogation is adding up the time spent on all the various days, which seems counter-intuitive to the theory being expressed.
[139] Leo Report at 19-20.
[140] Saul Kassin, *"I Confess,"* PSYCHOLOGY TODAY, Mar 2003, at 12.

Professor Leo appears to be on firmer ground in arguing that sleep deprivation can cause a false confession.[141] Sleep deprivation has been used as a way of extract confessions by, for example, communist Chinese interrogators during the Korean War. But it is not clear how the research regarding sleep "deprivation" that Leo recites fights with Ms. Harris' situation. She testified during her deposition that she had a bench to sleep on, but was unable to sleep.[142] She does not suggest that someone was waking her up to disturb sleep patterns. In any event, if someone were deliberately trying to deprive her of sleep to extract a confession it would fall into the explicit threats discussed below. Few would be surprised to learn that if a suspect is told (explicitly or implicitly) that she will be deprived of sleep until she confesses, any resulting confession may be false. And the application of sleep deprivation to the timing of Ms. Harris' statements in this case is uncertain. Professor Leo points to Ms. Harris being sleep deprived on May 16.[143] But, as just discussed, Ms. Harris made incriminating statements much earlier than that. Professor Leo does not attempt to explain how sleep deprivation explained Ms. Harris first incriminating statement, for example.

### C. False Evidence Ploys.

The next risk factor that Professor Leo plans to testify about is "false evidence ploys," specifically situations where police officers "are making up, lying about or exaggerating non-existent evidence."[144] In Professor Leo's view, the factual predicate for the discussing this alleged risk factor is that the officers, according to Ms. Harris, "repeatedly 'confronted' her with supposed evidence that irrefutably established that she had murdered Jaquari."[145]

It is not immediately clear that, at trial, the factual predicate for believing Ms. Harris was confronted with "false" evidence ploys will be established. But assuming that sufficient evidence of a false evidence ploy exists to warrant discussion of this factor, only thin scientific literature supports a conclusion that this is a risk factor for a false confession. There are a handful of "laboratory" studies that discuss this issue. The circumstances tested, however, were all a far cry from the circumstances present in real world criminal investigations.

The laboratory studies all involve college students being tested for a psychology experiment. For example, three studies involved an alleged computer keystroke error by the students. The students were told that they were participating in a reaction time study, where their ability to rapidly type letters on a desktop computer keyboard was being measured. The students were specifically warned against pressing the ALT key on the keyboard, which (they were told) would cause the computer to crash. At that point, the experimenters read a list of letters to the subject students, and the students were to type the letters in on the keyboard. At about one minute into the experiment, the computer was rigged to fail and crash. The experimenters then accused the students of having hit the ALT key. In some cases – and in varying conditions – the

---

[141] Leo Report at 24.

[142] Tr. of Deposition of Nicole Harris at 285 (Dec. 22, 2015).

[143] Leo Report at 24 ("It appears that Ms. Harris had little, if any, sleep in the over 38 hours from the time she woke on May 14 until the time she was videotaped in the early morning hours of May 16.").

[144] Leo Report at 24.

[145] Leo Report at 25.

experimenters were able to get the student to falsely "confess" to having hit the ALT key. Indeed, the experimenters were able to extract false confessions from most of the participants in these studies. The three studies reported false confession rates of approximately 57-61%, 69% and 82% respectively.[146]

A fourth study also involved a computer display. Students involved in the study were asked to perform a series of tasks and then ultimately were shown a computer screen with either a green tick or red cross. If the green tick was shown, the student was entitled to take some money. If the red cross was shown, the student was not entitled to do so. At the end of the tasks, the students were confronted with doctored videotapes purporting to show that they had acted improperly. In these circumstances, the experimenters were able to extract false confessions from 100% of the study participants.[147]

While these studies' findings are interesting, their applicability to confessions to serious real world crimes (i.e., child abuse homicide) is uncertain. The students were all "confessing" not to an intentional criminal act, but rather to what would have been an unintentional mistake – for example, a keystroking error on a keyboard with which they were unfamiliar. It remains to be proven that obtaining a confession to such an event – a mistake – is the same as obtaining a confession to a serious crime such as murdering a child.

This limitation suggests caution against applying this research directly to criminal cases. For example, Professors Kassin and Kiechel explicitly warned that "[a]n obvious and important empirical questions remains concerning the external validity of the present results: To what extent do they generalize to the interrogation behavior of *actual crime suspects*."[148] They explained that "[w]e developed a laboratory paradigm in which subjects were accused *merely of an unconscious act of negligence*, not of an act involving explicit criminal intent . . . . In this paradigm, there was only a minor consequence for liability. At this point, it is unclear whether people could similarly be induced to internalize false guilt for . . . acts that *emanate from conscious intent*."[149]

Applying these studies about false confessions to trivial, unintentional acts to a criminal case involving alleged important, deliberate crimes raises a serious question of "fit." For scientific evidence to be admissible, it must fit – that is, apply to – the facts and issues in a particular case.[150] It is hard to see how studies about false confessions to unintentional acts fit a

---

[146] *See* Jennifer T. Perillo & Saul M. Kassin, *Inside Interrogation: The Lie, The Bluff, and False Confessions*, LAW & HUM. BEHAV. (on-line Aug. 24, 2010) ); Saul M. Kassin & Katherine L. Kiechel, *The Social Psychology of False Confessions: Compliance, Internalization, and Confabulation*, 7 PSYCHOLOGICAL SCI. 125 (1996); Robert Horselenberg et al., Individual Differences and False Confessions: A Conceptual Replication of Kassin and Kiechel, 9 PSYCHOLOGY 1 (2003).

[147] Robert A. Nash & Kimberly A. Wade, *Innocent But Proven Guilty: Eliciting Internalized False Confessions Using Doctored-Video Evidence*, 23 APPLIED COGNITIVE PSYCHOLOGY 624 (2008).

[148] Kassin & Kiechel, *supra*, at 127 (emphasis added).

[149] *Id.* (emphases added).

[150] See, e.g., *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir. 1995) (noting that the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

case involving lying to federal agents about terrorist events. As one commentator recently explained after reviewing the Kassin and Keichel ALT-key study: "The built-in limitations of this experiment are obvious: none of the subjects were accused of an actual crime, and no suspect faced anything close to the high stakes a criminal suspect faces. Kassin concedes that the subjects themselves are not the typical false confession victims, given that they were relatively intelligent college students under very little pressure to defend themselves against a relatively trivial allegation."[151] As result of these limitations, "The entire experiment might as well have been for naught since the most important empirical question remained unanswered: to what extent did the students' behavior generalize to criminal suspects under interrogation?"[152] In short, "[t]here is no substitute for a real interrogation where the interrogating party is pulling all the stops, and the suspect has far more riding on its outcome than simply taking the fall for a mistaken keystroke. Without valid parallels with real interrogations, the empirical research will always be fatally limited to unrealistic experiments that prove very little."[153]

Another problem with these studies is that it is debatable whether they replicate real world interrogation methods. In one of the studies, for example, the students were told that there was a hidden videocamera. There were further reassured that, if the hidden camera exonerated them, they would not get in any trouble by signing a previously-prepared statement. According to the study, the participants were told, "Stop wasting my time and sign this" – which many participants did. The problem with generalizing from a study using such tactics is that, if employed by police officers, they would produce confessions that would be inadmissible under current legal doctrine, which forbids making promises to extract confessions. As one critic points out, "The tactic [in the study] falls just short of having the suspect sign a blank document that the investigator later fills in with a confession. To reiterate, laboratory findings cannot be generalized to field situations, unless they replicate what actually happens during real-life interviews and interrogations."[154]

Turning to studies of real world interrogations, one finds scant support for the proposition that deceptive questioning causes false confessions. A noted criminal procedure scholar recently explained that the laboratory studies should be discounted because "[s]tudies of actual interrogations are much more equivocal about the impact of deceptive techniques. After looking at the available research on why and how often innocent people confess, Professor Laurie Magid, for one, concluded that 'the studies on false confessions fail to prove, or even strongly to suggest, that a significant number of persons have been wrongly convicted because of false confessions obtained by police using deceptive interrogation techniques.'"[155]

---

[151] David A. Perez, *The (In)admissibility of False Confession Expert Testimony*, 26 TOURO L. REV. 23, 48-49 (2010).

[152] *Id.* at 49.

[153] *Id.*

[154] Fred E. Inbau et al., Criminal Interrogation and Confessions 364 (5th ed. 2013) (discussing Jennifer T. Perillo & Saul M. Kassin, *Inside Interrogation: The Lie, The Bluff, and False Confessions*, LAW & HUM. BEHAV. (on-line Aug. 24, 2010).

[155] Christopher Slobogin, *Lying and Confessing*, 39 TEX. TECH L. REV. 1275, 1290 (2007) (citing Laurie Magid, *Deceptive Police Interrogation Practices: How Far is Too Far?*, 99 MICH. L. REV. 1168, 1194 (2001)).

A surprising thing to read in Professor Leo's report is the claim that "the social science research literature has demonstrated that false evidence ploys are virtually always present in, and *substantially likely* to increase, the risk of eliciting false statements, admissions, and/or confessions."[156] It is not clear how Professor Leo can talk about evidence ploys making false confessions "likely," much less "substantially likely." Professor Leo himself has done research suggesting that confronting suspects with false evidence of guilt is a common tactic. His study in California suggests that in 30% of all interrogations police confront the suspect with "false evidence of guilt."[157] Applying the 30% figure across the number of adult arrests each year in this country produces a reasonable, ballpark estimate that police officers in America use this tactic in approximately 475,000 interrogations each year.[158] Assuming for sake of argument the accuracy of the claim that false evidence ploys are "substantially likely" (i.e.., more than 50% likely) to produce a false confession, then we might expect to observe in the real world more than 200,000 false confessions each year in America stemming from false evidence ploys. The available data show nothing even remotely approaching such a number of false confessions. It is unclear how Professor Leo can reliably offer an opinion about the likelihood of evidence ploys causing false confessions.

### D. Minimization and Maximization Techniques.

The next risk factor Professor Leo discusses is the use of "minimization and maximization techniques."[159] Assuming for sake of argument some kind of factual predicate could be established for discussing this factor, maximization and minimization is a technique in which a police officer may try to portray an offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious.[160] This is a common police tactic that American police officers use on a daily basis. Professor Leo has written elsewhere that:

> Suggesting minimizing scenarios is one of the most fundamental methods of psychological interrogation. Every modern interrogation training manual recommends "themes" or scenarios of one sort or another; one manual even provides a list of more than 1,600 scenarios for police to use when interrogating suspects in more than 50 possible crimes. Regardless of the department, training firm, or part of the country in which interrogators work, the use of minimizing scenarios to motivate admissions is widespread.[161]

The undisputed fact that police frequently use minimization scenarios undercuts any

---

[156] Leo Report at 24.
[157] *See* Cassell, *Protecting the Innocent from False Confessions and Lost Confessions*, 88 J. Crim. L. & Criminology at 533 (discussing Richard A. Leo, *Inside the Interrogation Room*, 86 J. Crim. L. & Criminology 266 (1996)).
[158] *See* Cassell, 88 J. Crim. L. & Criminology at 533.
[159] Leo Report at 26.
[160] *See* Leo Report at 26.
[161] Richard A. Leo, Police Interrogation and American Justice 153 (2008).

usefulness to Leo's conclusion that this was a "risk factor" present during Ms. Harris' questioning: This risk factor will be present in many, many police interrogations, since it is a "fundamental" police tactic. Professor Leo's identification of this alleged "risk factor" in this case does not provide any special guidance to a factfinder as to whether Ms. Harris confession is a true one or a false one.

More generally, Professor Leo has not explained how he can accurately pinpoint minimization tactics as a "risk factor" for obtaining a false confession. Given that this is a widely-used police technique, it would not be surprising to find this technique showing up in an anecdotal collection of false confession cases. If this is a very commonly-used police tactic, then it should show up in hundreds of thousands of police interrogations each year,[162] meaning literally tens of millions of suspects have been exposed to such techniques in the last several decades. Finding a handful of cases where suspects have falsely confessed after such techniques does not establish any causal relationship. To reach a causal conclusion that something is a real world "risk" factor for a false confession requires more discriminating analysis that Professor Leo has yet to provide, either in his report here or his other writings. For this reason, his "[f]alse confession expert testimony should not be admitted because it invariably robs the jury of its exclusive role as the arbiter of witness credibility.[163]

Professor Leo may point to a handful of laboratory studies to argue that minimization/maximization techniques increase the probability of obtaining a false confession. As discussed above, the research underlying these studies involves college students who "confessed" to events that were not crimes. This research does not establish a basis for expert testimony that Ms. Harris may have falsely confessed to a serious crime.[164]

For example, one study involved college students who were given materials to read – specifically a transcript of trial testimony in a hypothetical case. The students were then divided up into various groups, and given slightly differing information about the nature of the interrogation of the defendant and related subjects. The students were finally given a questionnaire to complete about what their assessment was of (for example) possible sentences for the defendant. The study concluded that the students understood that interrogations involving minimization might be conveying a promise of a lighter sentence.[165] The relevance of this finding to real world interrogations would, of course, depend on the precise statements made to a suspect during questioning. The studies' authors also pointedly observed that "it is important to note that because our findings are based on inferences drawn by college students . . . *it remains to be seen whether similar inferences are drawn by real crime suspects* . . . ."[166]

A second study – another college student study -- has been analyzed earlier and suffers

---

[162] *See* Cassell, 88 J. CRIM. L. & CRIMINOLOGY at 533 (discussing how to extrapolate to number of interrogations each year in which an interrogation technique is used).

[163] David A. Perez, *The (in)admissibility of False Confession Expert Testimony*, 26 TOURO L. REV. 23, 55 (2010).

[164] *See* Part V.A – V.B, *supra.*

[165] Saul M. Kassin & Karly McNall, *Communicating Promises and Threats by Pragmatic Implication*, 15 LAW & HUM. BEHAV. 233 (1991) .

[166] *Id.* at 249-50 (emphasis added).

from similar limitations.[167]

The third study – another college student study – involved the ALT key scenario. Some of the students were questioned by an experimenter "who feigned sympathy and blamed external sources." This strategy produced more false "confessions" than telling students that they had ruined the entire project.[168]

Translating these findings to actual police interrogations of suspected criminals is problematic. The study's authors explained that "[a] major limitation of the present study is the restricted ecological validity of the experimental design. First, the current paradigm is limited by its ability to represent real-life legal situations. For example, there may have been few perceived consequences for falsely confessing to the momentary and unintentional allegation of pressing the forbidden key."[169] The study's authors called for further research on such issues.[170]

A fourth study – another college student study – involved students who were placed in a position where they had apparently violated instructions not to cooperate with other students. The students were divided into groups, where some were told that there were greater consequences to admitting the cheating and others were not. The study found that many of the students were willing to give false confessions to cheating, and that more were willing to do so if there were consequences for cheating. False confession rates of about 20 to 40% were found.[171]

Here again, the relation of these laboratory findings of questioning students to police interrogations remains to be established. The study's authors acknowledge that the minimization-maximization techniques "represent the most pervasive techniques used by law enforcement,"[172] which should mean high rates of false confessions if they commonly cause false confessions. But the study's authors make no effort to reconcile their findings with the real world observation of extremely low false confession rates. The study's authors also called for further research, explaining that "[i]t is important that we develop a better theoretical and practical understanding of these techniques, including the various psychological mechanisms (e.g., internal vs. external sources of pressure) that result in true versus false confessions."[173]

Rather than citing these underlying studies, Professor Leo cites a "White Paper" regarding "Police-Induced Confessions," written by Professor Leo and several other co-

---

[167] Fadia M. Narchet, *Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions* at pp. 6-7(on-line Dec. 14, 2010).
[168] Jessica R. Klaver et al., *Effects of Personality, Interrogation Techniques and Plausibility in an Experimental False Confession Paradigm,*13 LEGAL & CRIMINOLOGICAL PSYCHOLOGY 71 (2008).
[169] *Id.* at 83.
[170] *Id.* at 84.
[171] Allyson J. Horgan et al., *Minimization and Maximization Techniques: Assessing the Perceived Consequences of Confessing and Confession Diagnosticity*, 18 PSYCHOLOGY, CRIME & LAW 65 (2012.
[172] *Id.* at 76.
[173] *Id.* at 77.

authors.[174]  The study reviews research in the false confession area, including research on minimization-maximization techniques.[175]  In the White Paper, the authors acknowledge that "[o]ne needs to be cautious in generalizing from laboratory experiments."[176]  With regard to minimization and maximization techniques, the authors argue that the risk of false confessions from such techniques is not a mere laboratory phenomenon, pointing to the presence of such techniques in the catalog of false confessions assembled by Professors Leo and Ofshe.[177]  The problems with the way in which that catalog was assembled and in generalizing from it have been discussed elsewhere.[178]  The authors also urge further investigation of such techniques, explaining that "[m]ore research is . . . needed to distinguish among the different tactics that interrogators are trained to use (e.g, the provocation, peer pressure, and accident scenarios), and the pragmatic inferences that these tactics lead suspects to draw concerning the consequences of confession."[179]  None of these caveats are discussed by Professor Leo.

In sum, there is not reliable science on whether suspects interrogated by police officers through the minimization-maximization technique are at special risk for a false confession. Moreover, the evidence strongly suggests that this widely-used technique is more likely to produce a truthful confession than a false confession.

### E.  Testimony Regarding Explicit Promises and Threats Allegedly Made to Ms. Harris.

Professor Leo also discusses "explicit promises and threats,"[180] arguing that the techniques that officers used to question Ms. Harris "did not merely *imply* leniency and freedom (in exchange for compliance and confession) and threaten substantially harsher punishment (in the absence of compliance and confession), but rather *explicitly communicated* it."[181]  Professor Leo places emphasis on threats the officers allegedly made to Ms. Harris. Leo writes:

> As just mentioned, the Chicago police investigators explicitly and repeatedly promised that she would be able to put an end to and escape what had become an intolerably stressful, draining, and coercive experience if she only confessed to what they wanted to hear and that she would receive a reduced charge (manslaughter), reduced bond (bail), and a reduced sentence (3 years in prison) if she confessed to killing Jaquari; whereas they threatened her with among the most

---

[174] Leo Report at 26 n.47 (*citing* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38).

[175] Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3 (2010).

[176] *Id.* at 17.

[177] *Id.* at 19.

[178] *See* Part VI, *infra.*

[179] Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 30 (2010).

[180] Leo Report at 26.  In a later part of his report, Professor Leo also discusses "physical intimidation and coercion." Leo Report at 28.  The argument there largely duplicates the argument here, and so I do not analyze it separately.

[181] Leo Report at 26 (emphasis in original).

serious possible consequences if she did not confess: that she would be charged with first degree murder, spend the rest of her life in prison, and never see her young son Diante again. Ms. Harris reports that these explicit promises and threats finally broke her will and motivated her decision to, at that point in the late afternoon of May 15th, involuntarily agree to falsely confess to killing Jaquari.[182]

Setting aside the issue of Professor Leo simply crediting Ms. Harris' version of events over the officers' version, all Professor Leo appears to be asserting is that physically threatening someone – e.g., Ms. Harris -- can induce her to confess to something that is not true. Of course, that is the whole underpinning of the requirement that a confession be "voluntary" before it can be introduced into evidence in court. And, more important, that proposition is self-evident – a jury can recognize that obvious point without additional expert testimony.

Leo goes on to argue, in addition, that the use of "explicit threats of harm[] significantly increases the risk of eliciting an involuntary false statement, admission, and/or confession when applied to the innocent."[183] It is unclear exactly what Leo means by this confusing assertion. Using an explicit threat of harm to extract a statement from a suspect is, by definition, to obtain an involuntary statement. *Any* statement obtained from a suspect in such a situation will be an involuntary statement. So this is not a situation where "risk" analysis has any meaning.

To the extent that Professor Leo is attempting to assert some sort of specialized knowledge about empirical research on the use of threats to obtain confessions, it is hard to see where that support would come from. Involuntary confessions are excluded from trials – and thus never lead to wrongful convictions. Unsurprisingly, the false confessions literature is interested in the causes of wrongful convictions, and thus focuses not on impermissible threats to extract confessions but rather on other permissible psychological techniques. In his writings elsewhere, Professor Leo has made clear that physical abuse, for example, is not the way in which false confessions are typically obtained. Instead, he notes that "[o]nce interrogation commences, the primary cause of police-induced confession is *psychologically* coercive police methods."[184] Professor Leo does note that there are unusual "examples" of "the old third degree," but he concludes that "[i]n the modern era . . . these techniques are rare."[185]

To be clear, if the officers explicitly threatened Ms. Harris to extract a confession, that conduct would be improper and could obviously lead to a false (or true) confession. But, in sorting through that issue, the jury will not be assisted by Professor Leo's testimony.

### F. Psychological Coercion.

Many of the same points about explicit promises and threats can be made with regard to

---

[182] Leo Report at 26-27.
[183] Leo Report at 27.
[184] RICHARD A. LEO, POLICE INTERROGATION AND AMERICAN JUSTICE 230 (2008) (emphasis added) hereinafter cited as "LEO, POLICE INTERROGATION").
[185] *Id.*

Professor Leo's position about "psychological coercion."[186] Interestingly, the first point that Leo makes one this subject is that "*as just mentioned*, the interrogation is replete with explicit promises and threats, techniques that are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements . . . ."[187] This seems to equate explicit promises and threats with psychological coercion – which raises a question about whether this concept is truly a separate category. Leo never gives a precise definition of what he means by "psychological coercion."

Leo also recounts Ms. Harris' allegations that she "repeatedly attempted to invoke her Miranda rights and terminate the increasingly hostile and aggressive interrogations," only to be rebuffed.[188] Leo also recounts Ms. Harris "feeling broken and having no choice" but to give a confession.[189] Based on these facts, Professor Leo opines: "In my professional opinion, [as a result of] the cumulative impact of the investigators interrogation techniques on Ms. Harris, she became persuaded that she had no meaningful choice but to comply with the detectives' demands if she wished to persuade them to terminate the interrogation."[190] It is not clear exactly how Professor Leo reached the conclusion about what, in fact, "persuaded" Ms. Harris to take certain actions. Leo does not claim any specialized psychiatric expertise or other ability to discern what motivated Ms. Harris to act. For example, it is also possible that Ms. Harris decided that she wanted to confess having committed a horrible crime because of sudden pangs of conscience. Leo does not explain how it is even possible to distinguish between these two competing possibilities, much less how he reliably made that distinction. His testimony is not really expert testimony, but simply agreeing with one witness' version of events.

### G. Personality Traits.

Professor Leo also discusses specific personality traits of Ms. Harris which, he contends, made her susceptible to giving a false confession.[191] Professor Leo concedes that he is not a clinical psychologist and has not made any diagnoses with respect to Ms. Harris. In addition, I have not seen any argument from Professor Leo in his report that he believes that a police officer interacting with Ms. Harris should have seen that she was particularly susceptible to rendering false statements. In any event, I understand this subject is being addressed by other experts for Ms. Harris and the officers. Accordingly, I do not address that issue any further here.

### VI. Professor Leo's Opinion is Not Based on Reliable Science.

In reaching his conclusions, Professor Leo also relies on the general academic literature on false confessions. I am familiar with this literature, including articles by not only Professor Leo, but also by other professors, including Professors Steven Drizin, Brandon Garrett, Gisli Gudjonsson, Saul Kassin, Richard Ofshe, and Welsh White. To be clear, that literature clearly

---

[186] Leo Report at 27.
[187] Leo Report at 27 (emphasis added).
[188] Leo Report at 27.
[189] Leo Report at 28.
[190] Leo Report at 28.
[191] Leo Report at 28-29.

demonstrates that in various cases over the last half century, American police officers have obtained false confessions from suspects they have questioned. In some tragic cases, those false confessions have led to convictions for very serious criminal charges. But in terms of providing assistance to a finder of fact, the critical issue is what specific factors cause false confessions. That literature contains limitations that undercut the ability of Professor Leo to reliably offer an opinion about Ms. Harris' alleged false confessions.

The present body of empirical research does not permit expert conclusions to be reached confidently about the causal mechanisms underlying false confessions – specifically what police techniques produce false confessions and how they do so.[192] In particular, as explained more fully below, the false confession theories have not been sufficiently tested, have an unacceptably high rate of error, depart from accepted standards in the area, and have not been accepted in the relevant scientific community. Each of these factors counsels against finding the conclusions of Professor Leo to be reliable – as various courts have found.

An assertion that certain police questioning techniques are likely to produce false confessions can be tested. To date, however, no researcher has conducted scientific research of actual police questioning to determine whether particular police techniques actually produce false confessions. As a result, there appears to be a consensus in the academic literature on the subject of false confessions - including articles co-written by Professor Leo - that "no one can authoritatively estimate the rate of police induced confessions."[193]

Given the unknown universe of false confession cases, testing the probabilities of particular techniques eliciting such confessions would require different research than has been conducted to date. Police obtain approximately 900,000 confessions and incriminating statements to serious crimes each year.[194] The false confession research has examined only a tiny, tiny sliver of police interrogations. Generalizing from such a tiny fraction of cases does not permit confident conclusions to be drawn. A recent review of the literature concludes that this is a "gaping hole" that precludes offering reliable expert testimony on the subject:

> At this point, however, no evidence exists that adequately addresses the question of how often certain interrogation tactics lead to false confessions. In fact, very little evidence exists that even answers the more general question of how often the phenomenon of false confessions occurs – regardless of the police tactic used. This rather gaping hole in the empirical research presents not only serious

---

[192] *See, e.g.,* Paul G. Cassell, *Protecting the Innocent from False Confessions and Lost Confessions — And from Miranda,* 88 J. CRIM. L. & CRIMINOLOGY 497, 578-90 (1998).

[193] Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation,* 88 J. CRIM. L. & CRIMINOLOGY 429 (1998); *see also* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World,* 82 N.C. L. Rev. 891, 930 (2004) ("scholars do not know how frequently interrogation-induced false confessions occur . . . ."); Brandon L. Garrett, *The Substance of False Confessions,* 62 Stan. L. Rev. 1051,1060 (2009) (sample "cannot tell us why many criminal suspects falsely confess" and "there is every reason to think that these [studied] cases are unrepresentative even of other false confessions").

[194] Paul G. Cassell, *Protecting the Innocent from False Confessions and Lost Confessions — And from Miranda,* 88 J. CRIM. L. & CRIMINOLOGY 497, 531-32 (1998).

problems for those advocating an overhaul of police interrogation tactics, but also for those who seek to proffer false confession expert testimony.[195]

Research by Professors Leo, Ofshe, and Drizin does not alter this conclusion. Leo and Drizin's 2004 article in the *North Carolina Law* Review discusses only 125 of wrongful convictions from the period 1977 to 2001 – roughly five cases from each year. Leo and Ofshe's 1998 article in the *Journal of Criminal Law and Criminology* reports 29 cases of allegedly "wrongful" convictions from false confessions from the period 1973 to 1996. The authors concede that this research did not rest on a random sample of cases.[196] Most important, during this time police interrogated literally tens of millions of criminal suspects. Because this research examined only an infinitesimal fraction of police interrogations, it does not permit general conclusions to be drawn about how those interrogations operate.[197]

The validity of assertions about false confessions could be tested by taking random samples of cases, identifying the subset of cases involving false confessions, and then looking for factors correlated with those false confessions. Researchers have collected two random samples of cases involving confessions in recent years. In 1994, I drew a sample of 173 filed cases from Salt Lake City and found no example of a false confessions.[198] In 1993, Richard Leo drew a sample of 182 cases from the California Bay Area. He has never claimed, to my knowledge, that any one of those cases involved a false confession.[199] As a result, neither of these studies, nor any other randomized study in this country, contains sufficient numbers of false confessions to scientifically test claims about which police techniques (if any) are likely to elicit false confessions. Moreover, given that these samples did not detect even a single example of false confession emerging from standard police interrogation techniques, it is apparent that these techniques produce false confessions (if at all) in only a miniscule percentage of cases.

Judge Stephen Pfeffer of the First Judicial District Court in New Mexico relied upon this fact, among others, as a basis for excluding Professor Leo's testimony on false confessions. As Judge Pfeffer explained: "Even if one were to concede the methodology of determining whether a confession is false to a high probability, the numbers used are extremely small."[200]

A very serious problem in research on "false" confessions is the extraordinarily high rate of error in identifying which confessions are actually false. In one article, Professor Leo and co-author Richard Ofshe, analyzed twenty-nine cases of wrongful convictions from false

---

[195] David A. Perez, *The (in)admissibility of False Confession Expert Testimony*, 26 TOURO L. REV. 23, 45 (2010).
[196] Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 930 (2004) (cases discussed "*not* obtained through a random sample of police interrogation cases"); Leo and Ofshe, *supra* note 8, at 435-35 (the cases discussed below do not constitute a statistically adequate sample of false confession cases).
[197] *See* Cassell, *The Guilty and the "Innocent"*, at 526-31; *see also* Cassell, *Protecting the Innocent from False Confessions and Lost Confessions, supra* note 3, at 503-13.
[198] *See* Cassell, *The Guilty and the "Innocent"*, at 529 (discussing Paul G. Cassell & Brett S. Hayman, *Police Interrogation in the 1990s: An Empirical Study of the Effects of Miranda*, 42 UCLA L. REV. 839 (1996)).
[199] *See* Cassell, *The Guilty and the "Innocent"*, at 529 (discussing Richard A. Leo, *Inside the Interrogation Room*, 86 J. CRIM. L. & CRIMINOLOGY 266 (1996)).
[200] *State v. Lance Four Star*, No. D-0101-CR-2000000276 (1st Jud. D.C. of New Mex., Aug. 23, 2001) (attached to this report as Attachment E).

confessions.[201]   Of these twenty-nine cases, nine cases were undisputed - that is, they did not require any special expertise or identification because all parties conceded the confessions were false and the convictions should be overturned.  Removing these nine uncontested cases leaves twenty in which the truth or falsity of the confession was disputed. A careful analysis of those twenty cases demonstrates that in at least nine, Leo and Ofshe have incorrectly concluded that the defendants were probably innocent.[202]   Even giving Leo and Ofshe the generous benefit of the doubt that they were entirely correct on the remaining eleven cases, their error rate in identifying false confession in the disputed cases is considerable – an error rate of at least 45% (9/20), barely better than one would expect from flipping a coin to decide a controverted issue.[203]

One recent, independent review of the Leo and Ofshe study found serious questions of reliability:

> [R]egarding the twenty-nine cases that involved a conviction, there is a serious question about whether Professors Leo and Ofshe are actually correct when they claim that the suspects were innocent, and that therefore their confessions were false. Their assertions that the suspects' confessions were false are hardly indisputable, since the methodology used to make these determinations, at times, is tenuous, which raises corollary concerns about their methodology's empirical legitimacy; a portion of their research is based upon secondary sources and old press accounts of the crime and the subsequent trial. For one case, Leo and Ofshe rely primarily on a segment of ABC's 20/20, to conclude that a defendant was wrongfully executed based upon his false confession. Perhaps the most peculiar instance where Leo and Ofshe claim that a false confession led to a miscarriage of justice involves the case of Paul Ingram, where the only supporting citation is an article written by Ofshe himself.[204]

It may be useful to provide one illustration of the kind of case that false confession literature accepts as a proven false confession.  Professors Leo and Ofshe claim that Joseph Giarratano was wrongfully sentenced to death for murdering Barbara Kline and raping and killing her fifteen-year-old daughter.[205]  To reach this conclusion, Leo and Ofshe ignore a wide range of evidence against Giarratano, including pubic hair that was microscopically indistinguishable from Giarratano's found on the daughter and the blood the same type as one of the victims' on Giarratano's boot.  Leo and Ofshe also ignore all but one of Giarratano's multiple confessions to the crime, including one confession volunteered to police and another made to a *defense* psychiatrist (who concluded that Giarratano committed the crime).[206]

---

[201] *See* Leo & Ofshe, *supra* note 9.  The study also analyzed additional cases of false confession that did not lead to a wrongful conviction.  Because a wrongful conviction is the most serious malfunction in the criminal justice process, I focus on wrongful convictions here.

[202] The reasons for concluding that these nine defendants are probably guilty are spelled out at considerable length in Cassell, *The Guilty and the "Innocent"*, *supra* note 2, at 537-75 (collecting court records and ample other evidence of guilt for these nine convicted prisoners).

[203] Even if one includes the additional nine undisputed cases, the error rate is extraordinarily high – 9/29 or 31%.

[204] David A. Perez, *The (in)admissibility of False Confession Expert Testimony*, 26 TOURO L. REV. 23, 46-47 (2010).

[205] *See* Leo & Ofshe, *supra* note 9, at 489.

[206] *See* Cassell, *The Guilty and the "Innocent"*, *supra* note 2, at 543-47.

Professors Leo and Ofshe's extremely high rate of error appears to be linked to their persistent departure from standard research techniques used to determine miscarriages of justice. Rather than use primary sources (such as appellate court records, transcripts, and the like) for their research, Professors Leo and Ofshe consistently use secondary sources such as newspaper articles or television programs. For example, in the Giarratano case, discussed earlier, Leo and Ofshe rely on the opinion pieces and newspaper articles often written or generated by death penalty opponents.[207] Ofshe and Leo do not cite, much less discuss, the Virginia Supreme Court decision affirming Giarratano's death sentence, which reviewed the evidence against Giarratano more objectively and more thoroughly.[208] Unfortunately such problems are not confined to the Leo and Ofshe study. As one recent review concluded, many conclusions reached in the false confessions are simply unreliable.[209]

## VII. Other Courts Have Excluded Testimony from Professor Leo and Other Similar Experts As Unreliable.

Professor Leo refers to some court cases where his testimony (or that of similar experts – such as Professor Leo's dissertation advisor, Professor Richard Ofshe) has been accepted. In a number of those cases, however, the admissibility of his testimony was not the subject of a contested evidentiary hearing, where an opposing expert witness testified.[210]

Vigorously contested cases of admissibility have often produced a different result. For example, I testified against the admissibility of Professor Ofshe's false confessions testimony in state court in New York. (Professor Leo and Professor Ofshe have worked closely together and their analysis of false confession issues often runs in parallel.) In October 2009, in the case of *People v. Adrian Thomas*,[211] the Court precluded Professor Ofshe from testifying on grounds that included unreliability. The Court concluded, first, that there was no need for specialized expert

---

[207] *See* Leo & Ofshe, 88 J. CRIM. L. & CRIMINOLOGY at 489-90, *citing* Coleman McCarthy, *More than a Reasonable Doubt,* WASH. POST, Feb. 16, 1991, at A27; Pamela Overstreet, *Rally Scheduled on Behalf of Condemned Killer,* UPI REGIONAL NEWS, Feb. 7, 1991, at 1; June Arney, *Joseph M. Giarratano; Bloody Boot Prints Led Him to Doubt His Own Confession,* VIRGINIA-PILOT AND LEDGER STAR, June 26, 1994; Jim Clardy, *Reasonable Doubt? New Trial Sought for Death Row Prisoner,* WASH. TIMES, May 24, 19990, at A1; David Kaplan & Bob Cohn, *Pardon Me, Governor Wilder,* NEWSWEEK, Mar. 4, 1991, at 56.

[208] *Compare* Giarratano v. Commonwealth, 266 S.E.2d 94 (Va.1980) (carefully reviewing all the evidence presented at trial) *with* Leo & Ofshe, 88 J. CRIM. L. & CRIMINOLOGY at 489-90 (selectively reviewing evidence against Giarratano based on second-hand sources during hotly contested public debate over whether Giarratano should be executed).

[209] David A. Perez, *The (in)admissibility of False Confession Expert Testimony*, 26 TOURO L. REV. 23, 46-47 (2010).

[210] One illustration of this phenomenon is *State v. Perea*, 2013 UT 68, 322 P.3d 624, in which a prosecutor introduced my 1999 *Harvard Journal of Law and Public Policy* article alone as a basis for excluding Professor Ofshe from testifying. I was never contacted or called as a witness in that case – and the prosecution's sole argument appears to have been that my 1999 article speaks for itself. In concluding that defense counsel in that case had developed an adequate record for admitting Professor Ofshe's testimony, the Utah Supreme Court explained that the 1999 article "does not speak to the wealth of studies generated in the intervening years that the defense presented to the district court." *Id.* at ¶ 78, 322 P.3d at 642. In this report, I speak directly to developments since my 1999 article.

[211] No. 08-1074 (New York County Court – County of Rensselaer) (Oct. 20, 2009).

testimony. After reviewing the circumstances of the case, the Court explained: "Accordingly, given all of the foregoing, there is no reason to conclude that the jury is incapable of recognizing the coercive ploys and motivators that were used and assessing their effect on the defendant's admissions." Attachment A at 7.

The Court then turned to the question of the reliability of Professor Ofshe's testimony, in light of my rebuttal testimony (which was similar to the analysis offered in this report). With regard to existence of a sufficient sample size in the Ofshe-Leo study to draw firm conclusions, the Court explained: "The Court credits Professor Cassell's testimony that this sample was not large enough and not random enough to be considered reliable." *Id.* at 9. Turning to the more general question of scientific research on how police questioning might produce false confessions, the Court held: "Moreover, there was no scientific basis offered for distinguishing false confessions from truthful ones. Professor Cassell noted that there is a lack of research on the subject of how certain statements made or methodologies used by the police might be understood or perceived by suspects, and how that might impact whether a confession is true or false. Nor was there evidence as to what specific vulnerabilities unique to an individual, such as the defendant, will contribute to the risk that he would falsely confess. In short, anecdotal observations of certain police tactics have not yet developed into any reliable method for discerning false confessions from truthful ones." *Id.* at 10. The Court therefore granted the People's motion in limine, precluding Professor Ofshe from testifying. I have attached a copy a copy of the Court's ruling as Attachment A.

The trial judge's ruling to exclude Professor Ofshe's testimony, based in part on my competing testimony, was recently affirmed by the New York Supreme Court (Appellate Division, Third Department). In *People v. Thomas*,[212] the Court explained that the trial judge properly credited my testimony:

> The record, including the hearing testimony of the People's expert, a law school professor [i.e., Paul Cassell] expressly credited by County Court, fully supports the court's ruling that the psychologist's proffered testimony neither concerned a subject matter outside of the ken of the average juror, nor had the principles upon which the psychologist relied been established as accepted within the relevant scientific community (see *People v. LeGrand*, 8 N.Y.3d at 455–457, 835 N.Y.S.2d 523, 867 N.E.2d 374; *People v. Wernick*, 89 N.Y.2d 111, 115, 651 N.Y.S.2d 392, 674 N.E.2d 322 [1996]; *People v. Wesley*, 83 N.Y.2d 417, 422, 611 N.Y.S.2d 97, 633 N.E.2d 451 [1994]; *People v. Taylor*, 75 N.Y.2d 277, 286–288, 552 N.Y.S.2d 883, 552 N.E.2d 131 [1990]; *People v. Shepard*, 259 A.D.2d 775, 777, 687 N.Y.S.2d 196 [1999], lv. denied 93 N.Y.2d 979, 695 N.Y.S.2d 65, 716 N.E.2d 1110 [1999] ). The court determined that current research fails to establish either a consensus connecting specific interrogation techniques to the occurrence of false confessions or a reliable basis for distinguishing false confessions from truthful ones. We agree with the court that the jury—having watched the videotaped interviews and defendant's trial testimony explaining why

[212] 93 A.D.3d 1019, 941 N.Y.S.23d 722 (N.Y. App. Div. 2012).

he had confessed falsely, as well as the defense's vigorous cross-examination of the interviewing officers, which fully exposed the tactics employed—was "perfectly capable of assessing whether it believes that the [d]efendant's statements were true and accurate, or whether they were falsely made as a result of police tactics and coercion." . . . Given the foregoing, we discern no abuse of discretion or error in the court's ruling.

93 A.D.3d at 1031; 941 N.Y.S.2d at 733-74.  I have attached a copy of the Court's ruling as Attachment B.  It should be noted that the New York Supreme Court's decision was later reversed on other grounds by the New York Court of Appeals.  The New York Court of Appeals specifically stated that it was not reaching the question of whether Ofshe's testimony was or was not properly excluded.[213]

Also excluding Ofshe's testimony is a 2007 opinion by the Georgia Supreme Court, which held that the trial court did not abuse its discretion by refusing to allow Professor Ofshe's testimony on false confession theory.  There, the trial court ruled that it would not allow the testimony because "such theory had not reached a verifiable stage of scientific certainty, and because whether [the suspect's] inculpatory statements were the results of threats or coercion was a matter the jury could discern for itself."[214]  I have attached the court's opinion as Attachment C.

Likewise, in 2008, a United States Navy-Marine Corps Court of Criminal Appeals held that the trial court did not abuse its discretion by excluding the testimony of Professor Ofshe regarding his theory on coercive interrogations.  That court upheld the finding that Dr. Ofshe's theory was "not based on rigorous scientific analysis or even subject to scientific testing but was rather Dr. Ofshe's own subjective review of a group of particularly selected cases."[215]  I have attached the court's opinion as  Attachment D.

In November 2009, a district court judge in the First Judicial District of Utah held an evidentiary hearing at which both Professor Leo and I testified.  After that hearing, in January 2010, the judge excluded Professor Leo from testifying on "false" confession issues.  The court explained:

While the occurrence of false confessions may be an important subject of study and has been discussed to some extent in relevant academic literature, the Court is not persuaded that the principles or methods underlying the testimony meet the threshold showing that they are generally accepted, reliable, based upon sufficient facts or data, or can be reliably applied.  Dr. Leo himself concedes that [it] is

---

[213] *People v. Thomas*, 22 N.Y.3d 629, 646, 985 N.Y.S.2d 193, 202 (2014) ("Inasmuch as we conclude that defendant's confession should not have been placed before the jury, there is no need to address whether defendant's expert should have been permitted to testify about the phenomenon of false confession and the interrogation techniques employed to elicit defendant's admissions.").  On retrial, where Thomas' confession was not introduced, Thomas was found not guilty.
[214] *Lyons v. State*, 282 Ga. 588, 595-96 (Ga. 2007).
[215] *United States v. Wilson*, 200 WWl 1701866 (N.M. Ct. Crim. App. 2007)

impossible to estimate with any reliability the rate at which false confessions occur. Without reliable estimates of the frequency of false confessions, it is difficult, if not impossible, to derive meaningful evidence for the degree with which particular interrogation techniques may be associated with false confessions. Due to the resulting lack of statistically reliable evidence, the current research does not form a sufficient basis for definite conclusions regarding the existence of a causal relationship or even a significant correlation between any coercive police interrogation techniques and false confessions. The few studies of false confessions that Dr. Leo cites are not based on randomly selected cases but, rather, cases selected for study because they are deemed to have a high probability of being false, in part, because they bear some of the very hallmarks of false confessions the studies seek to identify. The studies, therefore, produce evidence that is more anecdotal in nature than reliably empirical.[216]

I have attached a copy of the court's opinion as Attachment E.

In a 2000 case, the U.S. District Court for the Southern District of California concluded that proffered testimony on false confessions by Professor Leo would not satisfy the reliability requirements for scientific evidence. The court held: "Therefore the motion to call Dr. Leo will be denied. I find there is inadequate showing that the reasoning or methodology underlying the proffered testimony is reliable nor has it gained acceptance in the relevant scientific community."[217] That federal court cited my research as one reason for reaching its conclusion. After reviewing my article in the *Harvard Journal of Law and Public Policy*, the court explained: "Professor Cassell . . . concluded that all nine people were in fact, likely guilty . . . . That, at the very least, casts doubt on the methodology o[f] the study that Dr. Leo conducted and whether or not it is substantially or scientifically reliable or valid."[218] Because this ruling may be useful in evaluating this issue, I have attached the court's ruling as Attachment F.

In a similar ruling, a district court judge in New Mexico also found Professor Leo to be unreliable. The court explained: "While the area of specialty of Dr. Leo is an important area of study, nevertheless, as recognized by Dr. Leo, there are considerable limitations which presently exist for the analysis of interrogation techniques and their bearing upon false confessions."[219] Moreover, the court explained: "The conclusions of Dr. Leo are arrived at from an analysis of a small number of cases (sixty) which are not randomly selected . . . . Even if one were to concede the methodology of determining whether a confession is false to a high probability, the numbers used are extremely small."[220] Because this ruling may be useful in evaluating this issue, I have attached the court's ruling as Attachment G.

Further, in another 2008 opinion, the Ohio Court of Appeals also held that the trial court did not abuse its discretion by excluding the testimony of Professor Leo on coercive police

---

[216] Mem. Decision and Order, *State of Utah v. Maughan*, No. 051100355 (1st Jud. Dist. Ct. Utah Jan. 29, 2010).
[217] *See United States v. Juan Carlos Higuera-Cruz,* No. 99CR 2975-TW (S.D. Cal. Feb. 8, 2000), tr. at 145.
[218] *See id.* at 142-43.
[219] *State v. Lance Four Star*, No. D-0101-CR-2000000276, op. at 1-2 (1st Jud. D.C. of New Mex., Aug. 23, 2001).
[220] *Id.* at 2.

interrogation tactics. The Appellate Court affirmed the finding that Dr. Leo's false confessions theory "fail[ed] to support any reliable conclusions," and that Dr. Leo's testimony would not assist the jury in understanding matters beyond their knowledge as lay people.[221] I have attached the court's opinion as Attachment H to this declaration.

Most recently, on March 4, 2013, I testified in the First Judicial District of the State of Wyoming in the case of *State v. Morales* in opposition to the testimony of Professor Richard Ofshe. After hearing from both Professor Ofshe and me, and after reviewing the basic principles regarding admissible expert testimony, the Court agreed with me and excluded Professor Ofshe:

> Applying those legal principles, the Court finds that Dr. Ofshe's opinions are not based on sufficiently reliable science and methodology, and they do not satisfy the standard for the admissibility of expert opinion testimony. In short, the Court finds the testimony of Professor Cassell to be more credible and convincing on this topic. The Court agrees that there are a number of reasons why the testimony of Professor Ofshe should not be allowed in this case.[222]

The Court gave several grounds for excluding Professor Ofshe, including the fact that the science regarding his conclusions was not sufficiently developed to be regarded as reliable:

> the Court also agrees with Professor Cassell that Professor Ofshe's false confession theory has not been widely accepted as reliable in the relevant scientific community. The problem here is that the present body of empirical research and data does not permit expert conclusions to be reached with any degree of confidence as to what police techniques may produce false confessions and how if, in fact, they do so. . . . [T]he Court also agrees with Professor Cassell that Professor Ofshe's false confession theory has not been widely accepted as reliable in the relevant scientific community. The problem here is that the present body of empirical research and data does not permit expert conclusions to be reached with any degree of confidence as to what police techniques may produce false confessions and how if, in fact, they do so.[223]

I have attached a copy of the Court's full opinion at Attachment I to this testimony.

Finally, the Michigan Supreme Court recently affirmed a lower court decision to exclude testimony from Professor Leo. The Michigan Supreme Court affirmed a lower court's conclusion that "Leo 'starts with the conclusion that the confession is false and then he works backwards' to find commonalities. The circuit court concluded that, rather than yielding factors common to all false confessions, Leo's method seemed to yield only factors common to confessions Leo believed to be false."[224] The Michigan Supreme also noted that "[w]ith regard to the data underlying Leo's testimony, the circuit court reasonably determined that its sources

---

[221] *State v. Wooden*, 2008 WL 2814346 (Ohio App. 9 Dist. 2008).
[222] *State v. Morales*, No. 31-342, tr. at 6 (Wyo. 1st Jud. Dist. Mar. 4, 2013).
[223] *Id.* at 8.
[224] *People v. Kowalski*, 821 N.W.2d 14, 31 (Mich. 2012).

were unreliable because they were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review."[225] The Michigan Supreme Court also noted "multiple legitimate concerns about the 'manner in which [Leo] interpret[ed] and extrapolate[d] from those data.'' The unreliable methodology, as the circuit court described, resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process."[226] I attach a copy of the Court's opinion as Attachment J.

In addition, other courts have excluded similar testimony. For example, in 2010, a Louisiana appellate court explained:

> Dr. Ofshe's testimony at the *Daubert* hearing suggested that there was no methodology about false confessions that could be tested, or that would permit any error rate to be determined. In this area of research, the result of the lack of any reliable testing format to establish predictors of when a false confession might occur is a methodology consisting of analyzing false confessions only after a confession has been determined to be false. . . . .The trial court did not err in finding Dr. Ofshe's proposed trial testimony inadmissible under *Daubert*.[227]

A New York court has likewise excluded Professor Ofshe's testimony:

> Dr. Ofshe's testimony did not contain sufficient evidence to confirm that the principles upon which the expert based his conclusions are generally accepted by social scientists and psychologists working in the field. Therefore, his anticipated testimony that psychological coercion was employed during the interrogation of defendant, Argelis Rosario, which in his opinion would induce a person to falsely confess, does not meet the *Frye* standard for admissibility.[228]

Finally, in a recent federal court prosecution related to the Boston Marathon bombing, U.S. District Court Judge Douglas P. Woodlock reviewed proposed expert testimony from Richard Leo – as well as proposed responsive testimony from me. Based on the competing expert reports, Judge Woodlock concluded that the Professor Leo did not satisfy the requirements for admissibility in federal court. A transcript of the ruling on the issue is as follows:

> Well, I have received the defendant's sealed Motion *in Limine* to exclude the testimony of Professor Cassell, and attached was a, I guess, PowerPoint presentation by Professor Davis with snippets of this and that. I guess the issue for me -- I have given a fair amount of thought to this, because I have been aware of the preparation of experts in this case, in part because I have to authorize payment for it, is that we are at the threshold, and as far as I am concerned Dr. Leo

---

[225] *Id.*
[226] *Id.* at 32.
[227] *State v. Lamonica*, 44 So.3d 895, 906-07 (La. App. 1 Cir. 2010).
[228] *People v. Rosario*, 862 N.Y.S.2d 719, 726 (N.Y. Sup. Ct. 2008) (citations omitted).

stumbles at the threshold.

There is no question that there is a phenomenon that we call "false confession" that arises in some number of cases; how many, what percentage is not particularly well-known. And it is true that Dr. Leo is someone who has labored in the vineyard of these kinds of events, or perceived events, over the years, but in terms of identifying the body of cases from which reasonable scientific analysis could be undertaken, I am afraid that my sense is that Dr. Leo, and a number of others who are working in this area, are, at best, archivists of particular occasions in which it is perceived that there was a false confession, and, at worst, anecdotalists regarding that phenomenon.

The short of it is, the body of experience from which some sort of scientific analysis could reasonably be taken, at least in terms of actual experience, is not sufficiently rigorously developed to, from my perspective, provide a meaningful basis for presenting to a jury and, perhaps, usurping from the jury evidence that would inflect their common-sense judgments about whether or not in this case there was a false confession given.

I have, of course, reviewed what Professor Cassell has to say. There is some force in the argument made by Mr. Phillipos and his counsel that this is a lawyer's brief, that he, himself, is not an expert in this area, which is perhaps to say there are no experts in this area, experts that I am prepared to visit upon a jury. It is important to understand what the role of the trial judge is in this area, and that is as a gatekeeper to assure that there is being presented to the jury the kind of testimony that is rigorous and exposes the jury to learning or experience that they do not have.

I will turn, first, to the experience question. This is really at the core of what trials are all about, what the evaluation of the credibility of witnesses is all about, what the weighing of reasonable doubt is all about. The jury is presented with the underlying evidence in the case, and there is no indication that Dr. Leo brings any special competence in directing the jury to the underlying evidence in this case. Rather, he prescinds from the evidence and attempts to offer a series of what I will call "speculations" about what research might sooner or later develop for analysis of encounters between law enforcement and suspects in cases. In terms of sizing up witnesses and deciding whether or not you believe them or not, the jury is better at that, and it would introduce the jury, I think, to a kind of faux science to present Dr. Leo's testimony in this case. It is not science, it is speculation.

Now, maybe at some point there will develop some better, more reliable, more rigorous, more useful scientific effort, but what we have here are a collection of what I would call "pre-Pleistocene" psychological testing, not yet fully developed in the civilized fashion in a way that would provide for verifiable testing. There are the efforts to understand but no indication that there is a body of reliable

material that constitutes understanding in this area.

I have sifted through the various kinds of experiments on which Dr. Leo relies. They simply are not robust enough to justify distracting a jury with his testimony. There are suggestions of various kinds of investigative techniques that may or may not in this particular case have been such as to induce Mr. Phillipos to make false statements, but there is no rigor to analysis of them. They are simply laid out like a smorgasbord of perspectives on the credibility of what Mr. Phillipos said under particular circumstances. They have been to some degree exploited by the defense, and I will assume that they will continue to be exploited by the defense, and they will be argued forcefully to the jury, but that argument will not be tarted up with the presentation of an individual whose science is not up to the standards that are required.

I do this briefly so we can move this along. I, of course, reserve the right to make a much more fulsome determination and explanation, but I think I have delivered my views clearly enough about this.

I urge that Dr. Leo not be put on a plane to come out here tomorrow, and to the degree that we can save the Government some money on this, you can inform the carrier that this is by Court order that he not travel. . . .

As I say, this is a matter of stumbling at the threshold. If I were of the view that there was simply a disagreement about the science, I would be put in a more difficult position of how to present that properly or permit it to be presented properly to the jury. But I am making this preliminary determination on the basis of the materials that have been submitted to me, which I have tried to read as carefully as I can, and I am simply left with the conclusion that we are not dealing here with the kind of discipline that is appropriate to display to the jury without distracting them from their fundamental responsibilities to decide who tells the truth in this case.

There is a certain irony that this, like polygraph, is an anodyne for the painful process that the jury will have to go through in weighing the evidence and evaluating the credibility of the witnesses. I am not going to insulate the jury from that pain by permitting someone like Dr. Leo to testify before them.[229]

For all of these reasons, opinions that Professor Leo might offer concerning false confessions and the circumstances likely to produce them are unreliable.

---

[229] *U.S. v. Phillipos*, No. 12:13-cr-10238-DPW-3 (transcript) (D. Mass. Oct. 14, 2014), *currently on appeal to the First Circuit*.

**CONCLUSION**

For all the above reasons, the opinions of Professor Leo regarding Ms. Harris' alleged false confession are either unreliable or unhelpful to the jury. To be clear, nothing in my report is intended to offer an opinion on whether Ms. Harris' confessions and related incriminating statements are true or false. That remains an issue to be determined by the jury after it hears all of the evidence in the case.

Sincerely,

PAUL G. CASSELL