## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
-ooOoo-

NICOLE HARRIS,   : DEPOSITION OF:
Plaintiff,   : PAUL G. CASSELL
v.   : Case No. 1:14-CV-04391
CITY OF CHICAGO, et al.,   : TAKEN: May 3, 2016
Defendant.   :

-ooOoo-

    Deposition of PAUL G. CASSELL, taken on behalf of the Plaintiff, at the offices of Reporters Inc., 10 West 100 South, Suite 250, Salt Lake City, Utah, before DEIRDRE RAND, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to notice.

## Page 2

APPEARANCES

For the Plaintiff:

    STUART CHANEN (Via telephone)
    VALOREM LAW GROUP
    35 East Wacker Drive
    Suite 3000
    Chicago, Illinois 60602
    stuart.chanen@valoremlaw.com

For the Defendants:

    SHNEUR NATHAN
    HALE LAW LLC
    53 W. Jackson Boulevard
    Suite 330
    Chicago, Illinois 60604
    snathan@ahalelaw.com

    KYLE L. FLYNN (Via telephone)
    GREENBERG TRAURIG
    77 West Wacker Drive
    Suite 3100
    Chicago, Illinois 60601
    flynnk@gtlaw.com

Also present:

    DR. RICHARD LEO, Expert Witness

-ooOoo-

## Page 3

INDEX
WITNESS    PAGE
PAUL G. CASSELL

Examination by Mr. Chanen.......................... 4

-ooOoo-

EXHIBITS
DESCRIPTION    PAGE

No. 197  Expert report by Paul G. Cassell......... 54

No. 198  Curriculum Vitae.......................... 77

No. 199  Expert report by......................... 190
    Richard Leo, Ph.D., J.D.

No. 200  Brief for AMICUS CURIAE American......... 268
    Psychological Association, People of the
    State of Illinois vs. Juan A. Rivera

No. 201  Brief of AMICUS CURIAE The Innocence..... 268
    Network in Support of
    Defendant-Appellant, People of the
    State of Illinois v. Juan Rivera

-ooOoo-

## Page 4

 1    May 3, 2016    8:56 a.m.
 2        PROCEEDINGS
 3        PAUL G. CASSELL,
 4  called as a witness and duly sworn by the Certified
 5  Court Reporter to tell the truth, was examined and
 6        testified as follows:
 7        EXAMINATION
 8  BY MR. CHANEN:
 9    Q. Mr. Cassell, my name is Stuart Chanen. I'm a
10  lawyer in Chicago, and I represent Nicole Harris in this
11  case in which Ms. Harris has sued the City of Chicago
12  and eight individual Chicago police officers.
13    Mr. Cassell?
14    A. Yes.
15    Q. Wrongful convictions exist, correct?
16    A. Yes. I assume you mean by "wrongful
17  conviction," conviction of those people who are
18  factually innocent of crimes?
19    Q. Correct.
20    A. Yes.
21    Q. Let's go with that definition.
22    A. All right.
23    Q. I've -- we know that the criminal justice
24  system is fallible, correct?
25    A. Sure.

Paul G. Cassell     5/3/2016

Page 17

```
                                                            09:15   1   gangs, and gang members may want to take the rap,
                                                                    2   quote/unquote, for someone or cover for another person.
                                                                    3   And so you have that question of voluntary false
                                                                    4   confessions.
09:15                                                               5       Q. Okay. But, sir, my question to you is,
                                                                    6   excluding all voluntary false confessions --
                                                                    7       A. All right.
                                                                    8       Q. -- excluding all mental retardations, and
                                                                    9   excluding all situations in which police officers take
09:15                                                              10   their guns out of their holsters, put them next to the
                                                                   11   head of the suspect and demand that they confess to a
                                                                   12   crime that they didn't commit -- excluding those three
                                                                   13   examples, I'm asking you, as a self-declared expert,
                                                                   14   what are the causes of false confessions as we know them
09:15                                                              15   as of 2016?
                                                                   16       MR. NATHAN: Objection; form. Argumentative.
                                                                   17       THE WITNESS: So let me just make sure I
                                                                   18   understood the question. I'm excluding all voluntary
                                                                   19   false confessions?
09:16                                                              20       Q. (BY MR. CHANEN:) Yes. As you defined as
                                                                   21   someone who had a motivation either through publicity or
                                                                   22   helping a friend confessing for some internal personal
                                                                   23   motive, we're going to exclude those kinds of voluntary
                                                                   24   confessions.
09:16                                                              25       So with those two exclusions, my question is,
```

Page 18

```
         1   what -- because you agree that false confessions exist,
         2   correct?
         3       A. Correct.
         4       Q. All right. So I'm asking you, as of 2016, not
09:16    5   as of 1999, and as a person who claims to be an expert
         6   in this area, what are the causes of false confessions?
         7       A. Right. And so the reason that I -- I,
         8   obviously, want to give you as much information as you
         9   want here. The difficulty I'm having with the form of
09:16   10   that question is you say I should be excluding voluntary
        11   false confessions. And one way of dividing the world
        12   would be to say there's a universe of confessions, some
        13   of which are voluntary, some of which are involuntary.
        14       So if I exclude all voluntary false
09:17   15   confessions, then it seems to me I'm looking at a world
        16   of involuntary false confessions, where -- maybe not a
        17   gun to the head, but some sort of pressure, coercion, or
        18   something else that rendered the confession involuntary
        19   would be the causal factor.
09:17   20       And so, you know, there could be a situation
        21   of an involuntary false confession where even though a
        22   gun to the head wasn't used, there could be a threat.
        23   There could also be a promise of leniency if someone --
        24   you know, the flip side to saying, "We're going to throw
09:17   25   you in prison for ten years if you confess," is to say,
```

Page 19

```
09:17    1   "We're not going to throw you in prison for ten years if
         2   you confess." The promise of leniency.
         3       So those would be, again, promises -- those
         4   would be situations where there would be the potential
09:17    5   for a false confession being obtained. So those would
         6   be the kind of things that could cause a false
         7   confession.
         8       For example, circling into this case, I know
         9   Ms. Harris had said that she was threatened to give a
09:18   10   confession, and that's why, in her view, she falsely
        11   confessed. And so that -- if I understand it, you know,
        12   circling into this particular case, that would be one of
        13   the issues that would be germane.
        14       Q. Okay. Other than threats and promises of
09:18   15   leniency, what are other causes of involuntary
        16   confessions?
        17       A. Of involuntary confessions? Right. Well,
        18   threats can include -- let's be clear what we're
        19   excluding, then, when we say, okay, just to exclude
09:18   20   threats. I mean, for example, one of the arguments in
        21   this case is a question of sleep deprivation. And so if
        22   somebody is told, "Look, I'm going to deprive you of
        23   sleep unless you confess," that, to my mind, would be an
        24   example of the kind of threat that could render a
09:18   25   confession involuntary.
```

Page 20

```
         1       There could be psychological threats that are
         2   made, as well. And so those, again, would be the kind
         3   of things that could lead to false confessions.
         4       I mean, I think the point being -- I've tried
09:19    5   to list, you know, a series of different factors that
         6   can come in. It's likely to be a concatenation of
         7   factors in a particular case, and I don't know that it's
         8   possible to say, without looking -- you know, in the
         9   abstract, what is -- you know, is there one single
09:19   10   factor that causes false confessions? No, I don't think
        11   that there is. And I think you have to look at
        12   particular cases to try to decide what's going on in
        13   particular circumstances.
        14       Q. Okay. But you've studied the literature --
09:19   15   you've studied cases in which -- in which you believe --
        16   well, let me ask a different question.
        17       You said that you identified, in your 1999
        18   article, nine cases of false confessions that you
        19   believed were undisputed false confessions, correct?
09:20   20       A. That's correct. Yes.
        21       Q. All right. And between 1999 and 2016, have
        22   you become aware of more cases of undisputed false
        23   confessions?
        24       A. Yes.
09:20   25       Q. And tell me, please, how you go about
```

5 (Pages 17 to 20)

Page 29

universe of cases to explore, because there we had what were most assuredly false confessions, that it wasn't -- didn't seem to be anyone arguing the contrary of that proposition. And so then that became an interesting universe of cases to look at to see if there were any common denominators among those nine cases.

Q. Okay. So other than agreements between the defendant, the police authorities, and the prosecuting authorities, is there any other way in which you, in your research, identify an undisputed confession?

A. Undisputed false confession?

Q. Yes. I'm sorry. I should have -- and that was badly phrased by me. Yes, sir, an undisputed false confession.

A. No. I mean, if there are other -- if there are disputes out there, then almost by definition it's not an undisputed false confession.

Q. All right. And let me ask the question a different way. What quantum of evidence do you need to consider a false confession to be false, for purposes of your research?

A. Well, there are different thresholds that one could set. You could set a threshold of there being a probable false confession, you could have some kind of highly probable false confession, or you would have an

Page 30

undisputed false confession.

And so a probable false confession would be one in which the preponderance of the evidence would show that the confession is false. A highly probable false confession is an intermediate category of cases. You could have something like a clear and convincing evidence standard, I suppose. And then of course we've been talking at length this morning about the undisputed false confession, where you'd have essentially a certainty that the confession was false.

Q. But -- and so how do you -- which do you think is appropriate measure of evidence to treat a confession -- a false confession as undisputed? Should you -- should scientists and other researchers use objective standards or subjective standards?

A. Well, I mean, that's an interesting question, and it's one that I know the National Registry of Exonerations at the University of Michigan Law School has wrestled with. How do you put somebody into the registry as an innocent person? What kind of standards do you have to employ?

Ideally, we would have, I guess, objective standards, although then we can get into a debate about what it means to be objective in this case. If everyone agrees that someone is innocent, then, objectively

Page 31

speaking, it's hard to see where there would be any doubt about putting that confession into the false confession category. If there is a dispute, then you have to come up with these methodologies for deciding, all right, how much proof are you going to have before you put something in the false confession category?

Q. Well, let me ask you a question, sir -- it's related, but on a slightly different topic. Do you believe in the presumption of innocence?

A. Sure. In our criminal justice system? Absolutely.

Q. Okay. And do you teach presumption of innocence in your criminal law class?

A. Yes. In my criminal law class we talk about In re Winship and some of the other cases where presumption of innocence is viewed as a foundation of the American criminal justice system.

Q. When you say foundation, I mean, it is the bulwark of the American criminal justice system, correct?

A. Yeah. I don't know that it's an exclusive bulwark, there are other things as well, but it is certainly a bulwark of the American criminal justice system that before someone is convicted and sent to prison, we're going to presume that they're innocent and

Page 32

we're going to require the state to establish, by proof beyond a reasonable doubt, that the person is, in fact, guilty of a crime.

Q. All right. And when we put them through that -- we put them through something we call a trial, correct?

A. Yeah, in the criminal justice system? Sure. A criminal trial.

Q. Yeah. And when we put them through a criminal trial, if a jury rules that they are -- based on the evidence that the jury hears, that the person is guilty beyond a reasonable doubt, then that -- the defendant loses their presumption of innocence, correct?

A. That's right, the presumption has been dissipated at that point, or disproven, and so the defendant, at that point, has been found guilty in the criminal justice system.

Q. Right. But then in addition to the trial of the criminal justice system, there are also other aspects of the system. For example, appeals, correct?

A. Oh, certainly. Yes, if the defendant is convicted, the defendant is entitled in all jurisdictions, as I understand it, to seek review in an appellate court of that conviction.

Q. Okay.

Page 53

10:04
1  was there supporting evidence for the officers'
2  position; had the officers' position been litigated in
3  court where there was an opportunity for adversary
4  testing of both the pros and cons of the profession;
5  whether the officers' position was credible or
6  incredible; what were the motivations of the officers in
7  contesting the dispute; whether the officers were
8  inventing an allegation that the confession was truthful
9  only at the eleventh hour and had never maintained that
10 position earlier. Those would be all the kinds of
11 factors I'd want to look at in making such a
12 determination.
13     Q. Okay.
14        Have you done any -- ever done any experiments
15 of any kind that relate to the issue of false
16 confession?
17     A. By "experiments," are we talking about
18 laboratory types of experiments, you know, the kinds
19 that --
20     Q. Yeah, scientific experiments, whether in a
21 laboratory or another setting.
22     A. No, I haven't done something like that --
23     Q. Okay.
24     A. -- personally.
25     Q. Go ahead.

Page 54

1      A. I mean, I've reviewed other -- you know, other
2  people have written up laboratory studies, but I have
3  not personally conducted such a study.
4      Q. Well, one of the things you say here near the
5  very beginning of your report is that you are an expert
6  on police -- well, actually, to quote you precisely, you
7  say, "I am an expert on criminal justice issues, with
8  particular expertise on police interrogations and false
9  confessions."
10         Is that something you say in your report?
11     A. I mean, I don't think I used the exact words
12 you're using there. I'm looking at -- are you looking
13 at page 3, about five lines down from the top?
14     Q. No. I'm looking at your March 30, 2016,
15 letter to Shneur Nathan --
16     A. Okay. Yes.
17     Q. -- page 1, paragraph three, line three,
18 beginning, "I am an expert."
19     A. Oh, I see. Yes. There we go.
20     Q. So you consider yourself an expert on police
21 interrogation, correct?
22     A. Correct.
23     Q. And an expert on false confessions, correct?
24     A. Correct.
25     Q. All right. And tell me, sir, in your own

Page 55

1  words, what makes you an expert on the issue of police
2  interrogation.
3      A. Sure. So I have extensive experience in the
4  criminal justice system. I went to Stanford Law School
5  for 1981 to '84, where I took a number of classes on
6  criminal justice issues.
7         After that, I worked on criminal justice cases
8  for two years as a law clerk, from '84 to '85. I worked
9  for then Judge Antonin Scalia when he served on the D.C.
10 circuit. And then from 1985 to '86 I worked with Chief
11 Justice Burger, as his law clerk, on the U.S. Supreme
12 Court.
13        In the D.C. circuit, I would say that about 15
14 percent of the cases were criminal cases. And in the
15 U.S. Supreme Court, I would say about 40 to 45 percent
16 of the cases were criminal cases.
17        Following that, I served a two-year -- two
18 years as an associate deputy attorney general in the
19 U.S. Department of Justice, working with the deputy
20 attorney general. There were, I think, five or six of
21 us who were associate deputy attorney generals, and we
22 each had different portfolios. My portfolio included
23 criminal justice issues, with a special emphasis on
24 confessions. For example, I was responsible for
25 reviewing all of the appellate memos that went through

Page 56

1  the Solicitor General's Office regarding Miranda issues
2  that were being raised in federal criminal cases.
3         Following that, from -- I believe it was 1988
4  to 1991, I was an assistant United States attorney in
5  the Eastern District of Virginia, a federal prosecutor,
6  to use the shorthand. And I started out, for the first
7  six months, in the misdemeanor unit, and then for the
8  next approximately three and a half years, I was in the
9  general crimes unit of that office, handling a whole
10 host of crimes ranging from homicides, to assaults, to
11 gun running, to -- you name it. I mean, it was whatever
12 didn't fit into the drug unit of the fraud unit, I think
13 we handled.
14        And so I handled probably several hundred
15 cases and conducted more than 20 jury trials, if I
16 recall correctly, on criminal cases, many of which
17 involved confessions issues, many of which involved me
18 looking at the audio tapes or other records of the
19 confessions, admissibility issues and things related to
20 that.
21        Then I became a law professor at the
22 University of Utah College of Law in 1992, and was
23 assigned to teach criminal procedure, criminal law, and
24 other related classes such as evidence and crime
25 victims' rights. And so I've taught, practically every

Paul G. Cassell                5/3/2016

Page 69

```
10:24   1    Q. (BY MR. CHANEN:) That's called contamination,
        2  correct, sir?
        3    A. Yeah. So now -- those are two different --
        4  let me just answer your second question. I think you've
        5  described there a situation that does sound like
        6  contamination would be possible for the interrogation.
        7  And, obviously, contamination, other things being equal,
        8  is something that should be avoided.
        9    Q. Okay.
10:25  10    Let's go back, then, to your -- the issue of
       11  your being an expert. You've given other depositions in
       12  your capacity for being an expert, other than in this
       13  case, correct?
       14    A. That's correct.
10:25  15    Q. Right.
       16    And did you answer the questions that were
       17  presented to you at those prior depositions truthfully?
       18    A. Yes.
       19    Q. Okay. Because you understand you're sworn,
10:25  20  under oath, to tell the truth, and so you -- it's your
       21  position that you've told the truth at every deposition
       22  you've given as an expert or as a proposed expert,
       23  correct?
       24    A. Absolutely.
10:25  25    Q. All right.
```

Page 70

```
        1    So it's correct -- and so -- let's go back to
        2  your background. Do you have a degree in psychology?
        3    A. Well, here I think what I would propose to do
        4  is -- you had earlier propounded a question to me as
10:26   5  what made me an expert on police interrogations,
        6  including false confessions, and I was halfway through
        7  completing that answer when I -- when you jumped in with
        8  a specific question.
        9    And so, I think for purposes of having a
10:26  10  complete record, I should go through the rest of the
       11  things now, and then you can follow up with -- if you
       12  believe that there are, you know, deficiencies in my
       13  background, you can certainly highlight those at that
       14  point. But I would like, in fairness to me, to make
10:26  15  sure that all of the information that I have that I
       16  think lends to me being an expert is in the record.
       17    And so we were up through --
       18    Q. You know what, sir, I agree with you that you
       19  should have the right to -- if you feel that that
10:26  20  question had an incomplete answer and you want to
       21  complete the answer, I agree, in absolute fairness, I
       22  should give you the opportunity to do that, and I am
       23  going to give you the opportunity to do that.
       24    But my question right now is, do you have a
10:27  25  degree in psychology? Yes or no?
```

Page 71

```
        1    A. No.
        2    Q. Do you have a degree in sociology?
        3    A. No.
        4    Q. Did you take any psychology classes when you
10:27   5  were an undergraduate student at Stanford University?
        6    A. And Western Washington University. And I
        7  believe the answer is no.
        8    Q. Okay.
        9    Tell me -- I misunderstood one thing you said
10:27  10  there. You named another university other than
       11  Stanford.
       12    A. Yes.
       13    Q. What was that university?
       14    A. Yes. So from 1977 through 1979 I attended
10:27  15  Stanford University. From 1979 through 1981 I
       16  transferred to Western Washington University in
       17  Bellingham, Washington. And then in the summer of 1981
       18  I returned to Stanford University and got my BA in
       19  economics. And then after that, I got a JD from
10:28  20  Stanford Law School from the period 1981 through 1984.
       21    Q. What took you out to Western -- I'm not trying
       22  to get personal here.
       23    A. Sure.
       24    Q. If there was some family or personal
10:28  25  circumstances you don't want to talk about, I'm not
```

Page 72

```
        1  trying to pry in that regard. But if you can talk about
        2  it, what got you to leave Stanford and go to Western
        3  Washington?
        4    A. Sure. There was a unique opportunity
10:28   5  available at Western Washington to be part of a debate
        6  team that traveled nationally around the country, and so
        7  I accepted that opportunity to join their debate team
        8  for two years before returning back to Stanford to
        9  finish my undergraduate degree.
10:28  10    Q. Got it. And -- okay.
       11    So you did not take any psychology classes
       12  when you were at Stanford, and you did not take any
       13  psychology classes when you were at Western Washington;
       14  is that correct?
10:28  15    A. I believe that's correct. I don't have my
       16  transcript right in front of me, but that's my
       17  recollection.
       18    Q. All right.
       19    And you don't have a degree in social
10:29  20  psychology, correct?
       21    A. That's correct.
       22    Q. And you have no formal training in psychology,
       23  sociology, or social psychology, correct?
       24    A. Yeah. If by that you mean undergraduate or
10:29  25  graduate education, that's correct.
```

18 (Pages 69 to 72)

Page 73

10:29
1  Q. Well, during your graduate school, you didn't
2  take any classes in psychology, did you?
3  A. No. Those were law classes. I guess the
4  question becomes what do you mean by formal training in
5  psychology? I mean, I wasn't taking any psychology
6  classes, I was taking law classes. Sometimes the law
7  classes do talk about psychology, the psychology of
8  trials or something along those lines.
9  Q. Well, do you agree that modern police
10:29
10 interrogation techniques rely heavily upon psychological
11 principles?
12 A. Sure. I mean, that's one of the things we
13 talked about in my Miranda classes that I teach and in
14 the Miranda class that I took at Stanford Law School.
10:29
15 Q. Do you have any postgraduate education in any
16 social -- well, let's break them down. Do you have any
17 postgraduate degree in psychology?
18 A. No.
19 Q. Sociology?
10:30
20 A. No.
21 Q. Social psychology?
22 A. No. My only -- just to -- I know your time is
23 limited. To speed things up, my only postgraduate
24 degree is a juris doctorate from Stanford University.
10:30
25 Q. Got it.

Page 74

1  I want to go back for a second to the Eastern
2  District of Virginia, because I'm not sure I understand
3  the jurisdiction of the Eastern District of Virginia.
4  Were you working only with federal agents, or were you
10:30
5  also working with state agents in terms of law
6  enforcement?
7  A. Right. It was primarily federal agents, but
8  there were some cases that were prosecuted jointly by --
9  through task forces which would have had both federal
10:30
10 and state agent participation. Sometimes state agents
11 were cross-designated to be federal agents. But
12 certainly, the primary agents I was interacting with
13 were federal agents.
14 Q. Okay.
10:31
15 And so did you, as an AUSA in the Eastern
16 District of Virginia, ever handle or have -- either lead
17 an investigation or be on a trial team in a murder case?
18 A. There was a prison... I don't -- there was a
19 prison shanking, and I can't recall off the top of my
10:31
20 head whether that was a homicide or aggravated assault.
21 Q. Okay. What about rape?
22 A. I was involved in -- I did not -- not -- on a
23 trial team?
24 Q. Or a lead prosecutorial investigator.
10:31
25 A. Not on a trial team or a lead prosecutor on a

Page 75

1  rape case, no.
2  Q. Okay.
3  Did you ever have a case while at the Eastern
4  District of Virginia that involved an interrogation by
10:32
5  state law -- state or municipal law enforcement officers
6  inside a police station?
7  A. I believe... I mean, the problem that I'm
8  having -- there were cases that involved custodial
9  interrogation, but those would have been primarily
10:32
10 federal agents. I can't recall whether any were
11 cross-designated as state agents or whether we --
12 sometimes the phrase is used "going federal," where we
13 took a state investigation and then handled in the
14 federal system.
10:32
15 Some of the cases that I handled were
16 narcotics cases, for example, and it's my impression
17 that some of those originated with state law enforcement
18 officers and then were turned over to us for prosecution
19 because of the significant federal penalties for illegal
10:33
20 narcotics distribution.
21 Q. So is the answer you don't recall?
22 A. I think that's right. I mean, I want to be --
23 I want to be clear that most of my involvement was with
24 federal law enforcement agencies on what would have
10:33
25 been, I suppose, in your nomenclature, you know, purely

Page 76

1  federal cases.
2  Q. So when you say you had -- when you write in
3  your report that you had cases at the Eastern District
4  of Virginia that involved confessions, you're not
10:33
5  talking about -- well, let me rephrase that.
6  Do you include in that description confessions
7  that are made in a plea agreement?
8  A. No, I wasn't thinking of that. I was thinking
9  of two DEA agents, for example, catching a guy with a
10:33
10 bunch of cocaine, arresting him, and then interrogating
11 him about where he got the cocaine.
12 Q. And so I'm -- okay. Good. So now -- so
13 you're excluding all situations involving a plea
14 agreement; is that correct?
10:34
15 A. So are we -- you're talking now about the
16 sentence in my report -- let me just make sure I'm --
17 yeah, "As a federal prosecutor, I handled many" -- I'm
18 looking now, just so the record is clear, at page 2 of
19 my report, three lines down from the top. "As a federal
10:34
20 prosecutor, I handled many prosecutions involving police
21 questioning of suspects and legal issues pertaining to
22 the admissibility of confessions."
23 So, for example, I remember very clearly that
24 I sat outside the room in -- I think it was at
10:34
25 Washington National Airport while two DEA agents were

Page 89

1  district court.
2      Q. So let me ask you this, are there any federal
3  courts of appeals in the country that have ruled that
4  expert testimony on the causes of false confession are
5  sufficiently accepted in the scientific community that
6  we will -- that, assuming all other requirements of
7  Rule 702 are met, we will allow such testimony on the
8  subject of the causes of false confession?
9      A. Well, when you talk about causes of false
10 confessions, I think that you may be going a bit beyond
11 some of the court of appeals' decisions. I mean, I'm
12 not here today as an expert on what the body of federal
13 court of appeals or state court of appeals law is on
14 confessions. I mean, if you want to ask specifically
15 about how something interacts with -- I think you're
16 referring to the Hall decision in the Seventh Circuit,
17 perhaps, maybe, lurking in the background there. Or I
18 would refer to the Kowalski decision from the Michigan
19 Supreme Court as another decision that's lurking in the
20 background there. So, you know, there are particular
21 decisions we could talk about.
22     But I want to be clear. I mean, I respect
23 very much my limited role here. I'm not a legal expert.
24 I'm not here to offer a legal opinion about how the
25 district court judge in this case should or should not

Page 90

1  rule on legal issues. That's, obviously, up to the
2  judge handling the case.
3      Q. Well, let me ask a slightly different
4  question. Have you ever testified, in your capacity as
5  an expert on the issue of false confession, in front of
6  a jury?
7      A. No.
8      Q. Okay. And so is it fair to say that any time
9  you have -- so, is it fair to say you have never been
10 qualified by a trial judge to render opinions on the
11 issue of false confessions to a jury?
12     A. Well, that, I think, requires more of a leap
13 than I could go. Typically, I'm hired as a rebuttal
14 expert to an expert witness, you know, sometimes Richard
15 Leo, sometimes Richard Ofshe, sometimes some others.
16 And it's -- sometimes it's my testimony that aspects of
17 their testimony are impermissible or unreliable, and so
18 sometimes judges rely on my opinion to exclude, for
19 example, Richard Leo, and then at that point I'm no
20 longer required to be a witness in the case.
21     An example is U.S. versus Phillipos, which was
22 in the District of Massachusetts. It was one of the
23 cases related to the Boston Marathon bombing case. And
24 there I testified that Professor Leo's expert testimony,
25 was which, in some respects, similar to the testimony

Page 91

1  we're considering here, was not reliable.
2      I submitted an expert report. Professor Leo,
3  submitted, of course, his expert report that I was
4  responding to, and based on those reports and arguments
5  of counsel, the federal district court judge in that
6  case excluded Professor Leo from testifying, based in
7  part on my report and, I'm assuming, in part on other
8  legal and factual considerations as well.
9      So that would be an example of a case where --
10 I don't know how it would factor into your position,
11 because I'm serving as a rebuttal expert in that kind of
12 a case.
13     Q. But when you say typically -- I want to make
14 sure I understand two things you just said.
15     A. Sure.
16     Q. When you say you're typically retained for
17 purposes of asserting that another false confession
18 expert should not be permitted to testify, are you
19 saying that there are other situations where you're
20 retained as a false confession expert for any other
21 purpose?
22     A. Yeah. I've -- you know, again, we've been
23 speaking in shorthand. Maybe I need to amplify just a
24 little bit. Typically, I'm retained after the
25 plaintiff's counsel, for example, on a civil case has --

Page 92

1  or after criminal defense attorney's counsel has
2  retained in a criminal case a false confessions expert.
3  And it's frequently -- you know, I looked at the
4  evidence that's being -- or testimony that's being
5  proposed, and I -- in some cases, it has been my expert
6  opinion that the proposed testimony is either
7  unreliable, and therefore should be excluded in its
8  entirety, or if it is admitted, it should be given
9  little weight by a jury that's considering the matter.
10 And it's that kind of testimony that I end up providing.
11     Sometimes, though -- and I don't know, perhaps
12 this may be a case -- I don't -- again, I'm not trying
13 to testify as a legal expert here. Whether somebody
14 could view my report as offering opinions that could be
15 affirmative opinions presented on behalf of, say, one of
16 the defendants in its own capacity, that's an issue that
17 I would, you know, leave up to the lawyers in this case
18 to discuss among themselves and, if necessary, go to the
19 judge to get a ruling on.
20     Q. But at this point in this case, you are not
21 offering -- at least in your report that you issued to
22 Mr. Nathan, you -- there is no affirmative testimony
23 that you are suggesting the judge permit you to give to
24 the jury in the trial of this case; is that correct?
25     A. Well, again, I -- my -- what I have to say on

Page 113

1  that one.
2      Q. (BY MR. CHANEN:) And here's my new question.
3  You wrote a report -- is it correct you wrote a report
4  in a case called Caine versus Burge in the Northern
5  District of Illinois?
6      A. Yes.
7      Q. All right. And who -- in Caine versus Burge,
8  Mr. Caine wanted to put in the expert testimony of
9  Dr. Richard Leo on the issue of false confession; is
10 that correct?
11     A. Yes. On a number of issues related to false
12 confession, that's correct.
13     Q. All right.
14        And the Sotos law firm, specifically Jim Sotos
15 and Elizabeth Ekl, hired you to be a rebuttal expert to
16 Dr. Leo; is that correct?
17     A. That's correct, as I recall.
18     Q. All right.
19        And you wrote a report, a letter to Ms. Ekl,
20 setting forth the reasons you believed that the district
21 court should not permit Dr. Leo's testimony; is that
22 correct?
23     A. That's oversimplified. My report said that
24 Professor Leo's conclusions on a number of aspects were
25 unreliable, and he should either be precluded from

Page 114

1  testifying to the jury, or if he was permitted to
2  testify to the jury, his evidence should ultimately be
3  given little weight.
4      Q. I'm sorry, little weight by the jury or little
5  weight by the judge in allowing it to go to the jury?
6      A. Little weight by the finder of fact. That is,
7  if there were a jury trial in that case by the jury.
8      Q. All right.
9         If the judge did view -- in addition to
10 writing a letter report to Ms. Ekl, did you also testify
11 at any Frye or Daubert hearing in federal district court
12 in Chicago in relation to the Caine case?
13     A. My recollection is -- and if I could take a
14 look at my report. I provided an expert report. I may
15 have been deposed, although my resume doesn't indicate
16 that. So my instinct is that I was not deposed, and so
17 I did not provide testimony in front of a judge, is my
18 recollection.
19     Q. All right. But if I tried to refresh your
20 memory by -- hold on one second. If I told you that you
21 were deposed on May 24, 2013, by an individual named
22 David Owens --
23     A. Okay. Yes.
24     Q. -- a young African American man who works at
25 the law firm of Loevy & Loevy --

Page 115

1      A. Yes, that refreshes my recollection. Thank
2  you. He was a very capable lawyer, and there was a
3  deposition out here, in Salt Lake City.
4      Q. All right.
5         Did anyone ever -- to your knowledge, was
6  there ever a ruling in Caine versus Burge by the judge
7  as to whether Dr. Leo would be permitted to give
8  testimony to a jury should the case go to trial?
9      A. My understanding is -- and again, this would
10 be second- or third-hand. I'd let the records speak for
11 themselves. But my understanding was that the judge
12 agreed with me in part and disagreed with me in part.
13 That he excluded some aspects of Professor Leo's
14 testimony based on arguments I was making, but with
15 respect to other aspects of Professor Leo's testimony,
16 he said that the issue of reliability would be one that
17 would be determined by a jury, and they would decide
18 those issues as a finder of fact.
19        And my understanding is that the case
20 ultimately resolved before trial. I have no
21 recollection of providing any trial testimony.
22     Q. Yeah. And you wouldn't have any recollection
23 of giving any trial testimony, because you've never
24 appeared during a merits trial as an expert on false
25 confessions, correct?

Page 116

1      A. That's correct.
2      Q. All right.
3         So did you make -- when you wrote to Shneur
4  Nathan the report in this case, did you make a conscious
5  decision, Mr. Cassell, to leave out of your report the
6  judge's ruling on your rebuttal deposition -- I'm sorry,
7  let's back up one question, because I didn't ask this
8  directly.
9      A. Sure.
10     Q. After you gave the deposition in Salt Lake
11 City to Mr. Owens, to your knowledge, did the issue of
12 whether Dr. Leo's testimony would be blocked -- would
13 that -- that was given to the court, correct? I mean,
14 maybe I did establish it, because you said the judge
15 allowed some of his testimony to go forward but not
16 other parts of his testimony.
17        So at some level, it was given to the judge as
18 a contested issue, correct?
19     A. That's my understanding today, yes.
20     Q. All right.
21        Did you come to Chicago to testify in front of
22 the judge to give your rebuttal testimony orally to the
23 court at a Daubert hearing?
24     A. To the best of my recollection, no.
25     Q. Okay. I appreciate that.