IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14-CV-4391 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Robert Bartik, Demosthenes Balodimas, Robert Cordaro, James Kelly, Michael Landando, Anthony Noradin, and Randall Wo (collectively, "Defendants") have moved to bar the testimony of Plaintiff Nicole Harris's proposed expert, Dr. Ryan Stevens, pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). For the following reasons, the Court, in its discretion, grants in part and denies in part Defendants' motion.

## BACKGROUND

### I. Factual Background

This is a wrongful conviction case against eight Chicago Police Officers. Plaintiff alleges that, on October 26, 2005, a jury in the Circuit Court of Cook County convicted her of murdering her four-year-old son, Jaquari Dancy, based in large part on a false and fabricated confession elicited during 27 hours of intermittent interrogation by Chicago Police Officers. Plaintiff alleges that Defendants fabricated a police report, subjected Plaintiff to sustained and aggressive questioning, held her overnight in a cell, and ultimately elicited the false and fabricated

confession, which the Defendants captured on videotape, that Plaintiff killed her son. *See Harris v. Thompson*, 698 F.3d 609, 612 (7th Cir. 2012). In October 2012, the Seventh Circuit overturned Plaintiff's conviction. *Id.* at 650. On June 17, 2013, the Cook County State's Attorney dismissed all charges against Plaintiff. Plaintiff was granted a Certificate of Innocence, pursuant to 735 Ill. Comp. Stat. 5/2-702.

## II. Dr. Ryan Stevens's Background

Dr. Stevens is a physician specializing in Otolaryngology and Ear, Nose, and Throat surgery. (R. 220-1, Stevens Report and Resume, 1.) He holds a Doctorate of Medicine from Oregon Health Sciences University in Portland, Oregon. (*Id.*, 1-2.) He completed his residency in Otolaryngology-Head and Neck Surgery in 2000 at the University of Colorado in Denver, Colorado, and became board certified in Otolaryngology and Head and Neck Surgery in 2001. (*Id.*, 2.) He previously served as Chief of Staff and Chief of Surgery at Good Samaritan Regional Center in Corvallis, Oregon, from January 2007 to December 2008. (*Id.*, 1.) He is currently an independent physician practicing in Corvallis, Oregon. (*Id.*)

Dr. Stevens spent five years performing clinical studies and researching data on "the mechanisms of injury, the forces involved, the internal effects of the forces applied, and the situations in which accidental hanging and strangulation occur." (*Id.*, 2.) The studies included "the measurement of the force required for airway occlusion; the measurement of the force required for occlusion of the jugular vein; and the individual events of asphyxia in children to identify preventable events based on medical and situational data." (*Id.*) Every four or five years, he reviews literature relating to hanging and strangulation in children. (*Id.*) He has given presentations relating to research on childhood hanging and strangulation to multiple medical societies, manufacturers of consumer products, and the U.S. Consumer Product Safety

Commission. (*Id.*) His published research includes: (1) Prevention of Accidental Childhood Strangulation: A Clinical Study. *Annals of Otology Rhinology, & Laryngology*. 200; 209:191-802 and (2) Prevention of Accidental Childhood Strangulation: Where is the Site of Obstruction? *International Journal of Pediatric OtoRhinoLaryngology - Supplement Proceedings of the 7th International Congress of Pediatric Otorhinolaryngology*. 1999 49: S321-322. (*Id.*, 2-3.)

### III. Dr. Ryan Stevens's Opinions

Plaintiff hired Dr. Stevens to "provide expert opinion testimony on the topic of pediatric asphyxia, including its frequency, mechanisms, and causes, as well as to opine in this case as to the cause and mechanism of the death of Jaquari Dancy." (*Id.*, 2.)

Dr. Stevens's report begins with a review of the incidence of asphyxia. Asphyxia includes "inhalations, aspirations, airway blockages and mechanical suffocation due to hanging strangulation or lack of air due to a closed space or a plastic bag." (*Id.*, 3.) From 2000 to 2006, asphyxia was the fourth leading cause of unintentional injury deaths in the United States for children between the ages of one and four. (*Id.*) CDC data show that, of total asphyxia deaths between 1999 and 2004 for children ages one to four, 159 were accidental deaths compared to 17 homicidal deaths. (*Id.*) Ropes or cords were involved in 24% of asphyxias. (*Id.*)

Dr. Stevens also discusses the amount of force necessary to cause asphyxiation in children. (*Id.*, 6.) Dr. Stevens performed a study of the forces involved in, and the internal mechanisms of, airway obstruction. (*Id.*) The study was performed on 88 children between 5 months and 5 ½ years of age. (*Id.*) For this study, a force transducer and force gauge was applied on the neck. (*Id.*) The range of force required for airway obstruction was 0.2 to 4.6 pounds, with a mean of 1.6 pounds and a standard deviation of 0.78 pounds. (*Id.*) Dr. Stevens also performed a study of external compression on the neck sufficient to obstruct the internal

jugular vein in children aged 6 months to 5 ½ years. (*Id.*) The mean force required to obstruct the internal jugular vein was 0.37 pounds. (*Id.*) The studies demonstrated that the force required to cause fatal asphyxiation in children is low, and significantly less than is necessary for adults. (*Id.*, 7.) The report also discusses situations involving accidental childhood strangulation and hanging, the most common methods of strangulation and hanging by age groups, events involving beds, and chances of survival. (*Id.*, 7-15.) Further, the report provides that marks on the neck may or may not be found in both accidental and homicidal asphyxiations. (*Id.*, 15.)

In preparing his report, Dr. Stevens considered the medical examiner, Dr. Scott Denton's, report and photographs from the autopsy, as well as Dr. Denton's trial testimony from the criminal case and deposition. Dr. Stevens also considered a police report with handwritten notes of an interview with Jaquari's brother, Diante Dancy, an Illinois Department of Children and Family Services report documenting an interview with Diante, a copy of a handwritten statement by Sta-von Dancy, the children's father, a transcript of Sta-von's testimony from the criminal case, and photographs of the children's bunk beds. (*Id.*, 15-16.) Dr. Stevens states that accidental asphyxia is a common cause of childhood mortality and accidental asphyxiation is more common than homicidal asphyxiation, by a ratio of ten to one, based on a CDC review for 1999-2003. (*Id.*, 16.)

Dr. Stevens gives the following opinions in this case:

(a) Accidental asphyxia is a common cause of childhood mortality.

(b) Accidental asphyxiation events are more common than homicidal asphyxiation events by a ratio of almost 10 to 1.

(c) Hanging and strangulation events can occur with low levels of force that cause airway and venous obstruction.

(d) Events of hanging can occur with partial suspension and are just as lethal as hanging events involving full suspension. Hanging events can occur from low points of suspension.

(e) Loop events are most common, but loops that are not drawn tight around the neck can cause death, and a free cord wrapped around the neck can cinch and hold enough force to result in death. Moreover, even an accidental wrapping of a free cord around a neck especially a cord with elastic properties, can be very difficult for the victim to remove.

(f) Beds, including bunk beds, are common sites of accidental childhood asphyxiation.

(g) A rescue needs to occur within 5 to 10 minutes in order for the child to survive.

(h) Witness of an event by a sibling or other child does not necessarily result in a rescue.

(i) Marks on the neck can be missing or be incomplete.

(*Id.*, 16-17.)

Dr. Stevens concludes that "Jaquari Dancy's death was accidental based on a reasonable degree of medical certainty." (*Id.*, 17.) Dr. Stevens believes that the fitted sheet on the top bunk wrapped around Jaquari's neck multiple times while Diante and Jaquari were playing in their bedroom and concludes "[t]he physical and pathological evidence is consistent with Jaquari wrapping the elastic band around his own neck causing his own asphyxiation." (*Id.*, 17, 18.)

**LEGAL STANDARD**

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in [*Daubert*]." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). "The rubric for evaluating the admissibility of expert evidence considers whether the expert [is] qualified, whether his methodology [is] scientifically reliable, and whether the testimony would . . . assist[] the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO*

*Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* . . . de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States*, 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) ("The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible."). Once the Court determines that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000))). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Hartman*, 758 F.3d at 818. "[T]he key to the gate is not the ultimate correctness of the expert's conclusions," rather, "it is the soundness and care with which the expert arrived at her opinion[.]" *C.W. ex rel. Wood v.*

*Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (second alteration in original) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**ANALYSIS**

Defendants contend that (1) Dr. Stevens is not qualified to offer opinions on the cause or manner of Jaquari's death, (2) Dr. Stevens's opinions are unreliable, and (3) Dr. Stevens's testimony is not relevant.

**I.    Dr. Stevens is Qualified to Testify as to Cause of Death**

Defendants challenge Dr. Stevens's qualifications to offer opinions on the cause or manner of Jaquari's death. *See* Fed. R. Evid. 702 (requiring that an expert be qualified "by knowledge, skill, experience, training, or education").

Dr. Stevens is qualified to testify as to the cause of Jaquari's death. Dr. Stevens has performed research on asphyxiation events, through both his studies as a resident and his research of reports from other cases. The clinical studies took place from 1995 to 2001 and looked at both airway and internal jugular vein obstruction in children. (R. 330, Stevens Deposition, 62:1-3). Dr. Stevens also performed a case study wherein he reviewed the medical records for 112 cases of accidental asphyxiation in Colorado from 1998 to 2000. (*Id.*, 78:5-8.) In that study, Dr. Stevens looked at the situation, the time for survival, whether interventions made a difference, and the outcome of the incident. (*Id.*, 80:17-20.) Defendants object that Dr. Stevens's research studies were neither published nor peer reviewed. To the contrary, his airway study was published as "Prevention of Accidental Childhood Strangulation: A Clinical

7

Study" in *Annals of Otology, Rhinology, & Laryngology*, for which he received an award. Regardless, publication, or lack thereof, in a peer reviewed journal is a relevant but not dispositive consideration. *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 594). Dr. Stevens also has experience with asphyxiation-related neck injuries through his Otolaryngology and Ear, Nose, and Throat surgery practices. (R. 330, 43:1-2) ("I've had living patients that have both hanged and strangled.") One of the cases involved a three and a half year old girl who was found hanging from a slide when a green cord around her neck got caught on a split beam. (*Id.*, 45:13-21.) Another involved a sixteen year old who tied a bedsheet to a railing and was partially hung. (*Id.*, 49:6-12.) Further, Dr. Stevens reviews childhood asphyxiation studies and reports every four to five years.

Based on his research and experience, Dr. Stevens is qualified to testify about asphyxiation events involving children generally and what kind of force is required for a child to asphyxiate as compared to an adult. Dr. Stevens, for example, may testify that a child of Jaquari's age and size could be asphyxiated by an elastic sheet being wrapped around his neck without another individual applying outside force. While Defendants argue that such testimony would be speculation, the Seventh Circuit has permitted similar testimony. *See Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010) (holding that district court erred by not allowing doctor's testimony that "vomiting combined with her diuretic medications *may have contributed* to her tachycardia and subsequent death") (emphasis added). In addition, this testimony is relevant to the cause of Jaquari's death.

Dr. Stevens has sufficient experience to testify to the following conclusions related to the cause of death:

(a) Accidental asphyxia is a common cause of childhood mortality.

8

(c) Hanging and strangulation events can occur with low levels of force that cause airway and venous obstruction.

(d) Events of hanging can occur with partial suspension and are just as lethal as hanging events involving full suspension. Hanging events can occur from low pointes of suspension.

(e) Loop events are most common, but loops that are not drawn tight around the neck can cause death, and a free cord wrapped around the neck can cinch and hold enough force to result in death. Moreover, even an accidental wrapping of a free cord around a neck especially a cord with elastic properties, can be very difficult for the victim to remove.

(g) A rescue needs to occur within 5 to 10 minutes in order for the child to survive.

(i) Marks on the neck can be missing or be incomplete.

(R. 220-1, 16, 17.)

Defendants further argue that Dr. Stevens has no experience in pathology and is therefore unqualified to opine on the manner of Jaquari's death, *i.e.*, whether his death was accidental or a homicide. The Court agrees. While Dr. Stevens has had living patients with neck injuries arising from hanging and strangulation, he has no similar experience with deceased individuals. (R. 330, 42:19-43:18.) Although Dr. Stevens admitted that he has never worked as a forensic pathologist and has never conducted an autopsy, (*Id.*, 41:16-20), "[t]he fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). In *Hall*, the Seventh Circuit upheld a district court exclusion of a doctor's opinion that an individual's cause of death was heart-related. *Id.* The court, however, excluded the opinion because that doctor had no experience in cardiology, not because he had no experience in pathology. *Id.* Furthermore, as seen in *Hall* and other cases, physicians are not required to be pathologists in order to testify as to cause of death. *See id.* (rejecting argument that pediatric

9

neurologist could not testify as to cause of death because he had no pathology experience) (citing *Gayton*, 593 F.3d at 618 ("[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field."); *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24025 (1st Cir. 2003) ("The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline. In fact, it would have been an abuse of discretion for the court to exclude [the expert]'s testimony [about plaintiff's pregnancy] on the sole basis that his medical specialty was something other than gynecology or obstetrics."); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (explaining that a district court abuses its discretion by excluding testimony simply because "the proposed expert does not have the specialization that the court considers most appropriate")).

Here, Dr. Stevens has extensive experience child asphyxiation, which was the undisputed cause of death. That does not mean, however, that he is qualified to testify regarding the manner of Jaquari's death. What is determinative is whether the expert's "qualifications provide a foundation for [him] to answer a specific question." *Gayton*, 593 F.3d at 617 (citations omitted). As Dr. Stevens admits, he has never worked as a forensic pathologist or a medical examiner and has never conducted an autopsy. (Dkt. 330, 41:16-20; 148:18-20.) Dr. Stevens also admits that he is not familiar with any specific factors used to determine the manner of death. (*Id.*, 148:18-20.) He has not had experience with homicidal asphyxiation. Dr. Stevens does not have the qualifications or experience to answer the specific question of whether Jaquari's death was an accident or a homicide.

As discussed above, Dr. Stevens has sufficient experience with asphyxiation, and especially asphyxiation in children, to testify as to the cause of death in this case, but does not

10

have sufficient qualifications to answer the specific question of the manner of Jaquari's death under Rule 702 and *Daubert*.[1]

## II. The Reliability of Dr. Stevens's Opinions

Defendants also claim Dr. Stevens's opinions are unreliable. In its role as gatekeeper, the Court must determine if expert testimony is sufficiently reliable. *See Higgins*, 794 F.3d at 704. To determine reliability of an expert's testimony, courts consider various nonexclusive factors, including "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017); *Mednick v. Precor, Inc.*, No. 14 C 3624, 2016 WL 3213400, at *4 (N.D. Ill. June 10, 2016) (citing *Daubert*, 509 U.S. at 593–94). "[N]o single factor is either required in the analysis or dispositive as to its outcome." *Baugh*, 845 F.3d at 844 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

### A. The Basis of Dr. Stevens's Opinions

Defendants argue that Dr. Stevens's opinions are based solely on statistics. This is inaccurate, as Dr. Stevens considered the medical examiner's report and photographs of the bunk beds, as well as trial testimony, deposition reports, and statements from Sta-von and Diante. (R. 330, 16-17.) Dr. Stevens stated in his deposition that he did not base his conclusions on statistics but on his review of the materials in this case. (*Id.*, 106:12-17) ("Well, statistics show it's likely to be 90 percent or more that it's accidental compared to homicidal, but that's not − the

---

[1] Defendants repeatedly imply that Dr. Stevens is not qualified as an expert because he has never been offered as an expert witness or qualified as one before. However, "there is a first time in court for every expert" and Dr. Stevens need not be "a professional witness" to be qualified as an expert witness. *United States v. Parra*, 402 F.3d 752, 758-59 (7th Cir. 2005).

situation is mainly based on the information I received from – about what the child saw and what the husband described, who were the ones that were there, as close as can be."); (*Id.*, 131:14-16) ("Percentages are not the way to determine the cause of death. It's the situation. It's the people there. But one has to have an open mind when the fact that it is 90 percent likely to be unintentional when, one is also saying this is likely homicidal.")

The basis for two of Dr. Stevens's opinions, however, is not clear. Dr. Stevens stated that his opinion that "[b]eds, including bunk beds, are common sites of accidental childhood asphyxiation," (R. 220-1, p. 17), is based on CDC data, but he did not recall what the data is or how specific it is, (R. 330, 132:1-133:9). Dr. Stevens also stated his conclusion that "[w]itness of an event by a sibling or other child does not necessarily result in a rescue", (R. 220-1, p. 17), is based on "my studies what I did on – in 35, a[s] well as the events there that – This is Rauchschwalbe. This is the person I met at the CDC – the Consumer Product Safety," (R. 330, 133:15-18). It is unclear whether this conclusion was reached due to information from the Consumer Product Safety Commission, his own study of asphyxiations in Colorado, or the study.

Dr. Stevens has not articulated a sufficiently reliable basis for the following opinions:

(f) Beds, including bunk beds, are common sites of accidental childhood asphyxiation.

(h) Witness of an event by a sibling or other child does not necessarily result in a rescue.

(R. 220-1, 16, 17.)

**B. Dr. Stevens's Methodology**

Defendants also question the methodology that Dr. Stevens used to form his opinions. As discussed above, Dr. Stevens considered the medical examiner's report and photographs of the bunk beds, as well as trial testimony, deposition reports, and statements from Sta-von and

12

Diante. (R. 220-1, 16-17.) Physicians commonly look at medical records and autopsy reports to determine a cause of death or other medical condition. *See Hall*, 840 F.3d at 928 (7th Cir. 2016) (finding that doctor's opinions were based on sufficiently reliable methodology based on his review of autopsy report, medical records, and deposition testimony); *Gayton*, 593 F.3d at 618 (holding that doctor arriving at his conclusions based on autopsy report, medical records, and testimony of witnesses was reliable methodology); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (allowing doctor's expert medical opinion based on medical records). Dr. Stevens also relied on his experience regarding childhood asphyxiation and neck injuries. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data . . .").

Additionally, Defendants' argument that no evidence exists regarding non-loop bands causing accidental strangulations is belied by Dr. Stevens's examples of published cases in his report. (R.220-1, 9-10); (R. 330, 31:10-12) (". . . 24(a) through (f) are all published cases. They directly show the similar events.") While Defendants claim it would be impossible to cross-examine Dr. Stevens on the published cases, they were provided to Defendants. (R. 330, 32:12-13.) If Dr. Stevens cannot remember all of the details of those published cases, his inability may go to the weight of the testimony but not the admissibility. *Metavante*, 619 F.3d at 762 (criticism of quality of testimony goes to weight of expert testimony, not admissibility)

Plaintiff has established the requisite reliability of Dr. Stevens's expert testimony.

**II.     Dr. Stevens's Testimony is Relevant**

In their motion, Defendants state that Dr. Stevens has no relevant evidence for the jury. Defendants, however, fail to make any argument supporting this statement in their motion or

13

reply brief. In fact, Defendants concede the relevance of his testimony in their opening brief. Specifically, Defendants note that the manner of Jaquari's death is directly related to whether Defendants coerced Plaintiff's confession. Further, Dr. Stevens's testimony on the cause of Jaquari's death is clearly relevant to Plaintiff's allegations.

Defendants, however, correctly note that the statistics cited by Dr. Stevens are not relevant to this particular death. While, according to CDC statistics, 90% of asphyxiations in children are accidental, that does not mean that this particular asphyxiation was as well. Similar logic applies to the seven open-loop child asphyxiation cases, the same type of asphyxiation in this case, that were determined to be accidental.[2] Dr. Stevens's testimony must be based on the facts and evidence in this case and not in statistics gleaned from other cases. Dr. Stevens may not testify regarding his opinion that "(b) [a]ccidental asphyxiation events are more common than homicidal asphyxiation events by a ratio of almost 10 to 1." (R. 220-1, 16.)

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion. Dr. Stevens does not have sufficient experience to testify as to the manner of Jaquari's death, may not testify as to statistics regarding accidental asphyxiation deaths versus homicidal asphyxiation deaths, and has not articulated a sufficiently reliable basis for the following opinions: (f) Beds, including bunk beds, are common sites of accidental childhood asphyxiation; and (h) Witness of an event by a sibling or other child does not necessarily result in a rescue.

**DATED:** May 15, 2017

**ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge

---

[2] This is not to say that those seven open-loop child asphyxiation cases cannot be discussed in terms of Dr. Stevens's knowledge about child asphyxiation or as examples of child asphyxiation cases.