---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICOLE HARRIS, )
)
Plaintiff, )
)
vs. ) Case No. 14-cv-
) 4391
CITY OF CHICAGO; Chicago Police )
Officers ROBERT BARTIK, #3078; )
DEMOSTHENES BALODIMAS, #21204, )
ROBERT CORDARO, #20680, JOHN J. )
DAY, #20926, JAMES M. KELLY, )
#21121, MICHAEL LANDANDO, #20417, )
ANTHONY NORADIN, #21252, and )
RANDALL WO, #20232; Assistant Cook )
County State's Attorneys ANDREA )
GROGAN and LAWRENCE O'REILLY; and )
the COUNTY OF COOK, )
)
Defendants. )

THE DEPOSITION of SCOTT DENTON, M.D., a
witness, called by the Plaintiff for examination in
the above-entitled cause, pursuant to the Federal
Rules of Civil Procedure, taken before me, Brenda L.
Zeitler, CSR-RPR, License No. 084-004062, at 104 West
Front Street, in the City of Bloomington, County of
McLean, and State of Illinois on the 7th day of
January, 2016, commencing at 10:10 a.m.

---

**Page 2**

1  APPEARANCES:
2
3       PEOPLE'S LAW OFFICE
        BY:  JOEY L. MOGUL, ESQ.
        and JAN SUSLER, ESQ.
4       Attorneys at Law
        1180 North Milwaukee Avenue, 3rd Floor
5       Chicago, Illinois  60642
        (773) 235-0070
6       joeymogul@aol.com
             On Behalf of the Plaintiff.
7
        HALE LAW LLC
8       BY:  AVI T. KAMIONSKI, ESQ.
        Attorney at Law
9       53 West Jackson Boulevard, Suite 330
        Chicago, Illinois  60604
10      (312) 341-9646
        akamionski@ahalelaw.com
11           On behalf of Defendants Bartik,
               Balodimas, Cordaro, Day, Kelly,
12             Landando, Noradin, and Wo.
13      GREENBERG TRAURIG, LLP
        BY:  KYLE L. FLYNN, ESQ.
14      Attorney at Law
        77 West Wacker Drive, Suite 3100
15      Chicago, Illinois  60601
        (312) 476-5126
16      flynnk@gtlaw.com
             On Behalf of Defendant City of Chicago.
17  ALSO PRESENT:
18
        GARRETT SOMMER, Video Specialist
19
20
21
22
23
24

---

**Page 3**

1                   I N D E X
                                               Page
2  WITNESS:
3  SCOTT DENTON, M.D.
        Direct Examination by Ms. Mogul .........   5
4       Cross-Examination by Mr. Kamionski ...... 131
        Cross-Examination by Mr. Flynn .......... 169
5       Redirect Examination by Ms. Mogul ....... 170
        Recross-Examination by Mr. Kamionski..... 202
6       Further Redirect Examination by Ms. Mogul 208
7  EXHIBITS:
8       HARRIS DEPOSITION EXHIBIT NO. 95Z ........  23
           Email
9
        HARRIS DEPOSITION EXHIBIT NO. 96Z ........  49
10         Materials Received Pursuant to
           Subpoena from the Medical Examiner's
11         Office in Cook County with Respect
           to the Jaquari Dancy Investigation
12
        HARRIS DEPOSITION EXHIBIT NO. 97Z ........ 208
13         Curriculum Vitae
14 *    DEPOSITION EXHIBIT NO. 10 ............... 107
           Clear and Closed Supplemental
15         Report
16 *    DEPOSITION EXHIBIT NO. 12 ...............  59
           General Progress Report Drafted by
17         Detective Wo Regarding the Interview
           with Diante Dancy on May 15, 2005
18
   *    DEPOSITION EXHIBIT NO. 30 ...............  99
19         Notes of Detective Kelly
20 *    DEPOSITION EXHIBIT NO. 75 ............... 183
           Transcript of Nicole Harris's
21         Confession
22
   *    Designates an exhibit that was marked in a
23       prior deposition but was referred to herein.
24

---

**Page 4**

1        THE VIDEOGRAPHER:  We are on the record.
2  Today's date is January 7, 2016.  The time is
3  approximately 10:10 a.m.  The location is 104 West
4  Front Street in Bloomington, Illinois.  My name is
5  Garrett Sommer, Video Specialist, representing
6  McCorkle Litigation Services, 200 North LaSalle
7  Street, Suite 2900, Chicago, Illinois, 60601.
8        This is Case No. 14-CV-4391 entitled Nicole
9  Harris versus City of Chicago, et al, and the deponent
10 is Dr. Scott Denton.
11       Counselors, will you please identify
12 yourselves for the record.
13       MS. MOGUL:  Good morning, my name is Joey
14 Mogul, and I am one of the counsel for the Plaintiff,
15 Nicole Harris.
16       MS. SUSLER:  Jan Susler also representing
17 Nicole Harris.
18       MR. FLYNN:  Kyle Flynn on behalf of the City
19 of Chicago.
20       MR. KAMIONSKI:  Avi Kamionski on behalf of
21 the individual officers.
22       THE VIDEOGRAPHER:  The deponent may now be
23 administered the oath by the court reporter, Brenda
24 Zeitler.

SCOTT DENTON

Page 5

```
1              (Witness sworn.)
2              SCOTT DENTON, M.D.,
3   a witness, called by the Plaintiff, after having been
4   first duly sworn to tell the truth, was examined and
5   testified upon his oath as follows:
6              DIRECT EXAMINATION
7              BY MS. MOGUL:
8       Q.   Good morning, Dr. Denton.  Could you just
9   please state and spell your name for the record?
10      A.   Sure.  I'm Dr. Scott Denton, D-e-n-t-o-n.
11      Q.   And is this your first deposition?
12      A.   No.
13      Q.   How many depositions have you previously
14  done?
15      A.   A couple hundred.
16           MS. MOGUL:  So forgive me, but I'll just go
17  over a few ground rules.
18           THE WITNESS:  Sure.
19           MS. MOGUL:  As you can see, everything is
20  both being transcribed by the court reporter and the
21  video recorder.  And so for the sake of the court
22  reporter though, let's make sure all our answers are
23  verbal and no nods of the head because she can't
24  figure out what that means, the court reporter.  Okay?
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 6

```
1           THE WITNESS:  Okay.
2           MS. MOGUL:  If there's a question I ask that
3   you don't understand, please let me know.  Otherwise,
4   if you answer the question, I am going to assume you
5   understood it and you're answering it correctly.  Is
6   that fair?
7           THE WITNESS:  Yes.
8           MS. MOGUL:  Today's deposition is taken
9   pursuant to subpoena and the Federal Rules of Civil
10  Procedure.  You agreed to accept service for the
11  subpoena today?
12          THE WITNESS:  Sure.
13      Q.   Are there any medications or any issues you
14  have that are going to prevent you from understanding
15  any questions and answering them correctly today?
16      A.   Not that I'm aware of.
17      Q.   What did you do in preparation for your
18  deposition today?
19      A.   In preparation for my deposition, I read the
20  subpoena that was sent to me.  I reviewed the autopsy
21  report for Jaquari Dancy that I prepared and then the
22  notes that go with it, the body diagrams, things of
23  that nature.
24          I read the Chicago Police Department Case
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 7

```
1   Supplementary Report.  I read General Progress Report
2   from Chicago Police Department.  And I read my trial
3   transcript from the first trial or from the e-trial.
4       Q.   Are there any other materials you looked at?
5       A    I looked at the Kodachromes for the autopsy
6   pictures a few days ago.
7       Q.   And what is the Koda -- you said
8   "Kodachromes," meaning pictures?
9       A.   Right, the 35 millimeter film, photographs
10  from the autopsy.
11      Q.   And those are Kodachrome pictures that you
12  have in your possession?
13      A.   Yes.
14      Q.   Do you have any other materials in your
15  possession related to this case?
16      A.   I don't think so, no.
17      Q.   Did you read any other testimony in this
18  case?
19      A.   No.
20      Q.   Did you look at any materials on the
21  Internet with respect to this case?
22      A.   I did.
23      Q.   What materials did you look at?
24      A.   There was -- I basically -- I Googled Nicole
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 8

```
1   Harris, and there were some hits that came up about
2   her when she got out of jail.  I don't think there was
3   much more than that.  I think there was something from
4   Northwestern.
5       Q.   When did you look at those materials?
6       A.   Within the last week or two.
7       Q.   And so these were newspaper articles or
8   media reports?
9       A.   Right.  Things on the Internet, I believe,
10  yes.
11      Q.   Okay.  Anything else you may have looked at?
12      A.   Not recently, no.  I think, after this case
13  was brought up in another trial, I went and looked at
14  that because I didn't know what happened in the
15  meantime, since I left Cook County.
16      Q.   And when -- when was that other case?
17      A.   That was recently.  That was here in McLean
18  County.  It was a strangulation homicide case.  And
19  the defense attorney brought up this case on the
20  stand, and I frankly didn't remember it until he
21  started telling me about it.
22      Q.   Okay.  Do you know what month or year that
23  case was?
24      A.   I would be guessing.  Probably several
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 9

1   months ago, I would say.
2       Q.   You and I had occasion to speak on the
3   phone, November 16 of 2015, right?
4       A.   I don't remember the date; but I remember
5   you called, and I answered the phone, and we talked,
6   yes.
7       Q.   And then you and I had an opportunity to
8   speak in person on December 2nd, 2015, correct?
9       A.   Right.  Again, I don't remember the date.  I
10  remember you came here and we talked, yes.
11      Q.   And I was present with Chris Clutter, a
12  paralegal in my office?
13      A.   Again, I don't remember his name; but yes,
14  there was someone else with you.
15      Q.   Have you, before your deposition, had an
16  opportunity to speak with any of the defense attorneys
17  in this case?
18      A.   Yes.
19      Q.   Okay.  When was the last time you spoke with
20  the defense attorneys?
21      A.   Last time?  I would say probably two days
22  ago, I believe.
23      Q.   Okay.  And who did you speak with?
24      A.   Avi.

SCOTT DENTON

Page 10

1            MR. KAMIONSKI:  Kamionski.
2       A.   Mr. Kamionski.
3       Q.   Okay.  And was this in person or over the
4   phone?
5       A.   It was over the phone.
6       Q.   Okay.  And how long was this conversation?
7       A.   Five minutes.
8       Q.   Okay.  And what was discussed during this
9   conversation two days ago?
10      A.   If I can remember, it was basically just if
11  the deposition was still going.  It was basically just
12  going over the autopsy findings about the ligature
13  mark around the neck, and I don't think there was much
14  else.  It was very short.  I was driving; so it was --
15  I was driving between Peoria and here.
16      Q.   Okay.  What exactly did you say about the
17  ligature marks over the neck?
18      A.   I think we discussed the nature of it.  It
19  was mostly horizontal.  There was a gap in the
20  ligature mark.  So what would that would be consistent
21  with?
22           I think we talked about the petechiae above
23  the ligature mark on the skin.
24           I think we talked about the findings of the

SCOTT DENTON

Page 11

1   autopsy itself, you know, aren't consistent with what
2   we think of as a typical hanging, hanging-type death,
3   where there's suspension.
4            If there's something else, I don't remember.
5       Q.   Okay.  When you say the autopsy findings
6   aren't typical of a hanging-type death, what do you
7   mean by that?
8       A.   Right.  When you -- usually when someone
9   dies of a hanging death, there's suspension.  The rope
10  is usually suspended above the head or ligature is
11  above the head, and the person puts the weight of
12  their neck on the ligature.  So it's usually a
13  slanting ligature mark.  It's usually an inverted
14  V-shape either on the front or side of the neck or on
15  the back of the neck.
16           I'm indicating with my fingers.  Usually
17  it's an upside down V-shape.  And this -- Jaquari
18  Dancy had none of those findings; so that would be not
19  consistent with a hanging-type death.
20      Q.   And that would be a hanging-type death where
21  it was directly vertical, the string being above the
22  person's head?
23      A.   Yes.
24      Q.   And again, when I say "vertical," let me say

SCOTT DENTON

Page 12

1   would that be typical of a hanging in that the string
2   is -- how would I say? -- if the head is horizontal,
3   the string would be vertical?
4       A.   When I say "vertical," it's like the
5   ligature is vertical and the body is vertical; so
6   everything is straight.  If you're --
7       Q.   I see.
8       A.   Perpendicular would be different.
9       Q.   Okay.
10      A.   If the ligature is vertical and the body is
11  perpendicular, that would be different.
12      Q.   Okay.  And with respect to the ligature
13  marks that you discussed with Mr. Kamionski, you were
14  aware of those ligature marks back in 2005?
15      A.   Yes.
16      Q.   And you were -- you took note of the angle
17  of those ligature marks back in 2005?
18      A.   Right.  I don't think I did the angle
19  exactly.  What I measured was the ligature mark around
20  the neck, so on the front of the neck from the top of
21  the head, the sides, the back.
22           So that's -- it showed me, you know, the
23  distance from the top of the head circumferentially
24  around the head, around the head.

Page 13

1    Q.   You also discussed the petechiae above the
2  ligature marks in this case?
3    A.   Yes.
4    Q.   What exactly did you discuss with him about
5  the petechiae above the ligature marks?
6    A.   That they were there, that it indicates, you
7  know, pressure on the neck from the ligature.  So the
8  same mechanism that causes petechiae is arterial
9  pressure going up and then venous pressure not being
10 able to come out of the head.  So it causes those
11 capillaries to burst.
12        So again, it indicates that, at first, he
13 was alive, when he sustained this ligature mark on his
14 neck because he had arterial pressure.  And then it's
15 not a sudden constriction because a sudden tight
16 constriction will get both, I believe, the artery and
17 the vein.
18    Q.   Okay.  Is there anything else you discussed
19 with Mr. Kamionski in this conversation?
20    A.   Not that I can remember.
21    Q.   Did he ask you what your opinion was with
22 respect to the cause and manner of death in this case?
23    A.   I believe the cause of death, I said, still
24 is strangulation.  I mean, that's from the autopsy

Page 14

1  itself.  And then the manner of death depends on the
2  circumstances.  So I said whatever the circumstances
3  are is the manner of death.
4    Q.   Was there anyone else present for that phone
5  conversation?
6    A.   No.  I was alone in my car.
7    Q.   Okay.  Prior to this conversation with
8  Mr. Kamionski two days ago, did you have any other
9  conversations?
10   A.   Yes.
11   Q.   Tell me about the other conversations you
12 had with Mr. Kamionski.
13   A.   Sure.  Again, he called me.  I don't
14 remember dates or times.  I believe it was twice else
15 he called me, just as you had; and I think we talked
16 about basically the same things:  the ligature mark,
17 petechiae, manner of death, cause of death, things of
18 that nature.
19   Q.   Well, okay, I understand.  So you just told
20 me about the conversation you had two days ago.  Tell
21 me about the conversation you had before that with
22 Mr. Kamionski.
23   A.   They were a little bit longer.  Basically it
24 was the same thing, talking about the marks on the

Page 15

1  neck.  I think we went into more detail in the past
2  about the manner of death or how you would determine
3  the manner of death, and that again is the
4  circumstances.
5        I don't remember much else.
6    Q.   Okay.  But when you discussed the -- in the
7  previous conversation to this one two days ago, you
8  discussed the manner of death with him?
9    A.   Yes.
10   Q.   What exactly did you say, or what exactly
11 did he say to you?
12   A.   I mean, I said, "Currently it's a homicide.
13 The manner of death is homicide.  That hasn't been
14 changed, as far as I know, from anyone in Cook County:
15        And then the manner of death, you know, it
16 depended -- the manner of death does depend on the
17 statements made by Nicole Harris of how this occurred.
18        So that confession or the confession I was
19 given, that is important.  Just as I testified
20 initially, those statements are important.
21        And the only other thing that I can think of
22 we talked about, he asked me about emails, if I
23 received any emails on this case.  I think I received
24 an email and a phone call from a Northwestern student

Page 16

1  that I mentioned.  That was about it.
2    Q.   Okay.  Did he mention any statements made by
3  Diante Dancy, Jaquari Dancy's brother, in this
4  conversation?
5    A.   Not that I can recall, no.
6    Q.   What exactly -- did he make any comments
7  regarding Nicole Harris's confession in this case?
8    A.   I'm trying to remember.  I think the only
9  comment was that the confession was never thrown out.
10 The confession stood.  So the case -- I think there
11 was even comment about the case isn't really about the
12 confession.  But I don't even know what that means.
13 I'm not -- I wasn't involved in that aspect of the
14 case.
15   Q.   Did you ask him what he meant by that?
16   A.   No.
17   Q.   How long was this conversation you had with
18 him?
19   A.   Trying to recall.  It wasn't very long.
20 Maybe 20 minutes, half hour.
21   Q.   Was it over the phone or in person?
22   A.   It was over the phone.
23   Q.   Was it this month, in January?
24   A.   It was -- I would say probably it was a week

SCOTT DENTON

Page 17

1 after we talked, after we met.

2    Q.   Was there anyone else on the phone?

3    A.   Not on my end, no.

4    Q.   Can you tell me anything else that

5 Mr. Kamionski said or that you said during this

6 conversation?

7    A.   I can't remember.

8    Q.   You said there was another conversation with

9 Mr. Kamionski?

10    A.   I believe there were two, yes.

11    Q.   Two total or two before this last one you

12 had two days ago?

13    A.   Total would be three.  So there was the one

14 two days ago in the car that was very brief, and then

15 there were two phone conversations after we met and

16 talked.

17    Q.   Okay.  So you told me about one conversation

18 you had after December 2nd, 2015, that you had with

19 Mr. Kamionski.

20         Tell me about the other conversations.

21    A.   I think I'm blurring them.  They both were

22 very similar; so I can't -- I don't know if I can

23 separate the two out.

24    Q.   Okay.  Well, is there anything else you can

SCOTT DENTON

Page 18

1 tell me that was discussed in either of these

2 conversations between you and Mr. Kamionski?

3    A.   Not that I can remember, no.

4    Q.   You just told me about how long the one

5 conversation was.  How long was the other

6 conversation?

7    A.   It was much shorter, maybe ten minutes.

8    Q.   Was there anyone else on the phone during

9 either of those conversations?

10    A.   Not on my side, no.  I was alone in my

11 office.

12    Q.   Did Mr. Kamionski -- was there anyone else

13 on Mr. Kamionski -- on the other end of the phone?

14    A.   It didn't seem like it.

15    Q.   Any other conversations you had with any

16 other attorneys from the defendant officers?

17    A.   No.

18    Q.   Have you ever spoken with any attorneys from

19 the City?

20    A.   No.

21    Q.   Have you spoken with any other attorneys

22 regarding this case?

23    A.   No, except for you two.

24    Q.   Okay.  You mentioned a phone call you had

SCOTT DENTON

Page 19

1 with someone from Medill Journalism School?

2    A.   I don't know if it was Medill.  She told --

3 she called my house.  I was in the kitchen.  I picked

4 up the phone, and there was a conversation that was

5 about this case.

6    Q.   Okay.  When was this phone call?

7    A.   It was years ago.

8    Q.   Do you know the name of the person you spoke

9 with?

10    A.   No.  It was a female, a young female, from

11 what I could tell; but I don't remember her name.

12    Q.   Okay.  So you don't know as you sit here

13 today whether she worked for Medill or was part of the

14 Medill Journalism School or not?

15    A.   She said she was from Northwestern at the

16 Innocence Project and she was a journalism student.

17    Q.   Do you know what year this was?

18    A.   I mean, I would have to be guessing.  I

19 would say within the last -- I would say probably two

20 or three years ago, maybe four years ago.

21    Q.   Okay.  How long was this conversation?

22    A.   It was very short.  She introduced herself.

23 She made some statements, and then I basically said I

24 wasn't going to talk to her.

SCOTT DENTON

Page 20

1    Q.   Okay.  You say it's very short.  Can you --

2 is it -- was it a matter of minutes?

3    A.   I would say it was probably a minute or two,

4 max.

5    Q.   Okay.  And what statements did she make?

6    A.   She said she was writing a story on me about

7 how I changed my opinion on a case, and the

8 information she had was very unfavorable and that I

9 should tell my side of the story so she could, you

10 know, set the record straight or tell my side so it

11 was more balanced.

12         And I said -- I basically said, "No thank

13 you," and "Good luck on your journalism career."

14    Q.   Do you know if this person published

15 anything?

16    A.   I don't.

17    Q.   When you did your Internet search, you

18 didn't see anything?

19    A.   No.  There was a Northwestern story, but it

20 didn't have my name in it; so that was good.

21         I mean, if I can add, I think she said she

22 emailed me beforehand and I didn't respond to her

23 email; so I -- and I don't have that email anymore.  I

24 deleted it.

SCOTT DENTON

Page 21

1    Q.   Okay.  What email -- Okay.  Did you ever
2  speak with any attorneys representing Nicole Harris
3  during her criminal proceedings?
4    A.   I don't specifically remember talking to
5  anyone.  I mean, I would have talked to the State's
6  Attorneys before I testified.
7    Q.   Okay.  And why was it that you would have
8  talked to the State's Attorneys before you testified?
9    A.   It was extremely common.  I mean, that was
10  the protocol.  We would either talk to them before the
11  trial at the Medical Examiner's Office, or we'd talk
12  to them an hour before we testified.
13    Q.   Did you do that in this case?
14    A.   I don't remember if I did, but I'm sure I
15  did.
16    Q.   Okay.
17    A.   We would have to do that at least to tell
18  them what pictures to use or what pictures would best
19  represent the autopsy; so I'm sure I did.
20    Q.   In this case, do you know who you spoke
21  with?
22    A.   No.  I read my transcript.  I believe it was
23  State's Attorney Somerville; so I'm sure I either
24  talked to him or his partner, whoever his partner was.

SCOTT DENTON

Page 22

1    Q.   Okay.  But as you sit here today, you can't
2  tell me anything they said to you or you said to them
3  prior to trial?
4    A.   No.  It was ten year ago.  I don't remember.
5    Q.   Would anything refresh your memory?
6    A.   I don't think so, not on that.  I mean, if
7  there's written notes, that might help, but other than
8  that, no.
9    Q.   Okay.  And you don't -- you don't remember
10  speaking with Kenneth Wright or anyone from the Wright
11  Hollis Law Firm prior to Nicole Harris's trial?
12    A.   I mean, I read that he was the defense
13  attorney; but if I spoke to him, I don't remember it.
14    Q.   After Ms. Harris's trial, did you speak with
15  any counsel from Northwestern?
16    A.   No.
17    Q.   Did you speak with any counsel from Jenner &
18  Block Law Firm in Chicago?
19    A.   Not that I recall, no.
20       MS. MOGUL:  Okay.  I'm going to show you
21  what I'm going to mark as Harris Deposition Exhibit A,
22  and I'm doing that because I don't know what the
23  exhibits were last night and we have a simultaneous
24  dep today.

SCOTT DENTON

Page 23

1       Do you have any other suggestion?
2       MR. KAMIONSKI:  Well, all the deps -- I'm
3  sure all the deps today were previously marked, all
4  the sergeant deps.  So we finished off last night at
5  94, I think, was the last one.  So you would be on 95.
6  I'm comfortable with that.
7       MS. MOGUL:  Okay.  You're comfortable with
8  that, okay.  All right.
9       MR. KAMIONSKI:  You can blame it on me if it
10  gets messed up.
11       MS. MOGUL:  Okay.  I'll do -- well, how
12  about we do this.  Why don't we do 95Z?  And we're
13  going to just include Z on this.  And if it doesn't --
14  we don't need the Z and there's others, then we'll
15  figure it out.  Okay?
16             (Harris Deposition Exhibit No. 95Z
17             marked for identification.)
18    Q.   I'm showing you an exhibit that we've now
19  marked as Harris Deposition Exhibit 95Z.  Can you take
20  a look at it?
21    A.   Okay.  Looks like a long email.  Do you want
22  me to read it?
23    Q.   I do.
24    A.   Okay.  Is there more to it, or is this it?

SCOTT DENTON

Page 24

1    Q.   This is it.
2    A.   Okay.  So I did not respond to this email or
3  anything?
4    Q.   Well, why don't you -- can you just read it
5  first, and then I'll ask you some questions.  I just
6  want to make sure you have an opportunity to review
7  it.
8    A.   Okay.  If there's more to this email, I'd
9  like to read it at the same time.
10    Q.   No.  My unders-- I will represent that, my
11  understanding, this is the full email that was sent.
12    A.   Okay.
13             (Pause in proceedings.)
14       THE WITNESS:  Okay.
15    Q.   Now that you've had a chance to review this,
16  did you ever get this email?
17    A.   I honestly don't recall ever reading any of
18  this.
19    Q.   Okay.  Was your email address ever
20  sdentonmd@gmail.com?
21    A.   It is, yes.
22    Q.   But you don't recall ever seeing this?
23    A.   Honestly, I don't recall ever seeing this.
24    Q.   Did you ever speak with an Anwar Shatat?

SCOTT DENTON

Page 25

```
 1      A.  I don't recall ever speaking with
 2  Mr. Shatat, no.
 3      Q.  Did you ever speak with a Robert Stauffer?
 4      A.  I don't recall, no.
 5      Q.  Did you ever speak with Steve Drusen
 6  (phonetic)?
 7      A.  The name sounds familiar.  Maybe it's on
 8  another case, but I don't recall speaking to him about
 9  this case.
10      Q.  Okay.  And did you ever speak with an Alison
11  Flaum?
12      A.  I don't believe so, no.
13      Q.  So as you sit here today, you have no
14  recollection of ever reading or receiving this email?
15      A.  No.
16      Q.  And, therefore, you didn't ever respond to
17  this email?
18      A.  Apparently, I didn't.  So I don't know if it
19  went to Spam, or I don't know where it went.  Or I
20  just skipped over it.  It was -- 2011 was a pretty
21  crazy year.
22      Q.  Why was 2011 such a crazy year?
23      A.  Before that, my partner had died of
24  pancreatic cancer; so I was doing a lot of autopsies.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 26

```
 1  From 2011 until I got another partner in July of 2011,
 2  it was extremely busy.
 3      Q.  I see.  Okay.  Well, I'm sorry for the loss
 4  of your partner.
 5      A.  Thank you.
 6      Q.  Did Mr. Kamionski ever send you any
 7  materials with respect to this case?
 8      A.  No.
 9      Q.  Where do you currently work?
10      A.  I work here at the McLean County Coroner's
11  Office and also at the Peoria County Coroner's Office.
12      Q.  Are you part time at each location?
13      A.  It's probably full time at each location.
14  Between my partner and I, we're both probably working
15  more than we should.
16      Q.  Who is your current partner in this work?
17      A.  Dr. Youmans, Y-o-u-m-a-n-s.
18      Q.  Okay.  And are you a contractual employee
19  for both coroner's offices?
20      A.  I mean, there's no written contract.  It's
21  basically, you know, coroner system Illinois is
22  coroners who are elected, and then they have basically
23  forensic pathologists who are private practice who
24  they call to do autopsies.  And we currently do
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 27

```
 1  autopsies out of those two morgue facilities.
 2      Q.  I see.  So you are currently in private
 3  practice?
 4      A.  I would describe it as that, yes.
 5      Q.  And where is your office located?
 6      A.  They give me rooms here and in Peoria, and
 7  my main office is at my house.
 8      Q.  I see.  Okay.
 9          What's the name of your -- do you have a
10  name for your practice?
11      A.  No.
12      Q.  Okay.  And then other than being requested
13  to do autopsies for McLean County or Peoria County, do
14  you do any other autopsies in any other counties in
15  Illinois?
16      A.  I mean, those are -- those are, they call
17  them hubs or hub morgue facilities.  So there's about
18  -- it varies between, you know, two dozen and 30
19  counties that use these two facilities.  It's central
20  Illinois.
21      Q.  How many autopsies have you conducted as of
22  today?
23      A.  That's a good question.  I don't keep an
24  exact count.  The best estimate is probably somewhere
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 28

```
 1  between 8,500 and 9,000.
 2      Q.  And prior to -- prior to May of 2005, how
 3  many autopsies had you conducted?
 4      A.  In Cook County, it was about -- I did about
 5  300 full autopsies a year and then another 150
 6  examinations.  So from '96 to 2005 would be about nine
 7  years.  So probably about 2,500, 2,700 autopsies,
 8  around there, plus the external examinations.
 9      Q.  Meaning outside of Cook County?
10      A.  No.  They were still in Cook County, but
11  they were -- we just looked at the body.  We didn't
12  open the body up.  An autopsy is where you actually
13  remove the organs.
14      Q.  I see.
15      A.  And then they call it an external
16  examination if you don't remove the organs.
17      Q.  And how many autopsies had you done of
18  children prior to May of 2005?
19      A.  I never added them up.  It was quite a few.
20  We had numerous infant deaths and numerous child
21  deaths.  If it was maybe a couple a month, that would
22  be kind of an average.
23      Q.  And those were autopsies that you worked on?
24      A.  Yes.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 29

1  Q.   And how many of those cases involved a death
2  that involved strangulation or asphyxiation?
3  A.   That's difficult.  Asphyxiation is a very
4  broad term.  We have many overlaying deaths or
5  asphyxia by infants.  I had a young man who
6  asphyxiated by hanging by a lanyard.  Honestly, it's
7  quite a while ago.  I don't remember.
8  Q.   Okay.  You say -- what's a lanyard?  Can you
9  explain that to me?
10  A.   The thing around the neck that holds
11  identification badges.
12  Q.   That was an adult or a child?
13  A.   That was a child.  I think I published it,
14  too.
15  Q.   You published --
16  A.   Or I presented it at least at a meeting.
17  Q.   How exactly was the manner of death in that
18  case?
19  A.   That was an accident because he was jumping
20  on a bed and it caught in a ceiling fan.
21  Q.   How old was that child?
22  A.   I don't remember.  He was young.
23  Q.   Older or younger than 5 years old?
24  A.   Older than 5, I believe.  Preteen, probably.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 30

1  Q.   Do you know what year that was?
2  A.   I'd have to look.
3  Q.   Was this in Cook County?
4  A.   It was.
5  Q.   Beyond this one asphyxiation case you've
6  described, can you describe any other asphyxiation
7  cases of children that you worked on prior to May of
8  2005?
9  A.   Not -- it's hard for me to remember that far
10  back.  I'd have to look at my log books.
11  Q.   Did you deal with any -- well, would you
12  consider hanging cases to be included within the
13  rubric of asphyxiation cases?
14  A.   Yes.
15  Q.   Would you say that this child whose lanyard
16  got caught in the ceiling fan -- was that a hanging
17  case?
18  A.   That was.
19  Q.   So let me just ask it a different way then.
20  Can you tell us about any other hanging cases
21  involving children that you worked on prior to May of
22  2005?
23  A.   Not that I can remember.
24  Q.   Since 2005, have you dealt with any cases

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 31

1  involving children who were asphyxiated?
2  A.   Again, there's numerous infant deaths of
3  overlaying, things like that.  I'd have to -- I'd have
4  to look at my records again.
5  Q.   Do you keep records of all autopsies you
6  conduct?
7  A.   Yes.
8  Q.   What kind of records do you keep with
9  respect to all autopsies?
10  A.   Basically the cause of death, and I keep a
11  log of the cases I do.
12  Q.   And so in the log, what information would
13  you note?
14  A.   The name of the deceased, the case number,
15  the date of death, what the cause of death at the time
16  of the autopsy I believe to be, and then when I
17  submitted the report to the coroner.
18  Q.   Would you note any other information with
19  respect to that autopsy, that investigation?
20  A.   No.
21  Q.   Where do you keep this log?
22  A.   On a Word file.
23  Q.   And did you keep this log while you worked
24  at Cook County?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 32

1  A.   No.  No, we had Charles Dickinson log books.
2  Q.   Handwritten log books?
3  A.   Yes.
4  Q.   Is there such a log book at -- was there
5  such a log book at Cook County in May of 2005?
6  A.   Yes.
7  Q.   Would it keep any additional information
8  beyond what you just described for me?
9  A.   No.  I pretty much did the same thing there
10  too.
11  Q.   Can you tell me, just generally, what is the
12  role of a forensic pathologist?
13  A.   The role is determined -- that's an
14  interesting question.  It depends on what system you
15  are in.  If you are in a medical examiner system, the
16  role of a forensic pathologist is to determine the
17  cause of death and then the manner of death, so the
18  cause of death based on the autopsy and the manner of
19  death based on investigation from investigation
20  sources.
21       And then the forensic pathologist's role in
22  a coroner system is to determine the cause of death
23  and not the manner of death.
24  Q.   Okay.  So if you work for a medical

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 33

1 examiner's office, your role is to both determine the
2 cause of death and then the manner of death?
3     A.   Yes.
4     Q.   And the cause of death is determined by the
5 medical and pathological investigation that you do?
6     A.   Right.  Well, the cause of death is
7 basically the body.  You know, what does the body say
8 happened to them.  That's the cause of death, either
9 through the autopsy or the toxicology findings or
10 radiology findings or microscopic findings.  That's --
11 usually the cause of death is determined that way.
12          And then the manner of death is the
13 circumstances from the investigation.
14     Q.   And what type of investigation?
15     A.   The context of the death from all and any
16 sources that have information.
17     Q.   Okay.  So the context of the death would be
18 who witnessed the death?  That would be one source,
19 right?
20     A.   Yes.
21     Q.   What information people had about the
22 circumstances of the death?
23     A.   Yes.
24     Q.   And this would be information that you

SCOTT DENTON

Page 34

1 generally in the medical examiner system would learn
2 from the police?
3     A.   When I was there, the police were the prime
4 investigators, usually, for us.  That's why -- that's
5 why his death certificate, after I changed it from
6 accidental hanging, says "pending police
7 investigation," because that's -- that was office
8 policy.  We pended cases for pending police
9 investigation.
10     Q.   So you're referring to the fact that you
11 changed the death certificate in this case with
12 respect to Jaquari Dancy?
13     A.   Right.  After I did the autopsy with no
14 other information except the autopsy and the medical
15 examiner's investigation report, I did the autopsy and
16 just signed it out as, I think, an accidental hanging.
17     Q.   Okay.  So you're saying -- so you're saying,
18 when you worked with the Cook County Medical
19 Examiner's Office, your role was to both determine
20 cause and manner of death?
21     A.   Right.  I believe that's by Cook County
22 Statute, the Medical Examiner's Ordinance.
23     Q.   And then you're saying that's different from
24 being a forensic pathologist?

SCOTT DENTON

Page 35

1     A.   In the coroner system.  Right.  Because
2 forensic pathology is -- or forensic pathology or
3 forensic pathologist is a specialty or subspecialty of
4 medicine; so that is just a physician who specializes
5 in death investigation and autopsies.  And then,
6 depending on where you work, it changes your job
7 description, whether you work for a coroner system or
8 you work for a medical examiner system.
9     Q.   Well, in McLean County, is it a coroner or
10 medical examiner's system?
11     A.   Every other county except Cook is a coroner
12 system.
13     Q.   Okay.  So when you are doing autopsies for
14 the McLean County --
15     A.   Coroner.
16     Q.   -- Coroner, are you just determining cause
17 of death and not manner of death?
18     A.   Correct.
19     Q.   And when you are doing autopsies for the
20 Peoria Coroner's Office, are you just determining
21 cause of death, not manner of death?
22     A.   Correct.
23     Q.   And so you're just -- in these cases, you're
24 just looking at what the body tells you and what other

SCOTT DENTON

Page 36

1 tests are done on the body to determine the cause of
2 death?
3     A.   Essentially, yes.  And then I want to make
4 sure that my autopsy findings aren't completely
5 contradictory from the circumstances; so I usually ask
6 the coroner to see their investigation report.  But
7 they determine the manner of death.
8     Q.   Okay.  And who -- so in McLean County, who
9 does this coroner's investigation?
10     A.   The coroner and their deputy coroners.
11     Q.   And what investigation do they do in those
12 cases?
13     A.   They go to the scene of death.  So in McLean
14 County and Peoria County, all deaths that are
15 unattended are -- the deputy coroner goes to the scene
16 and writes investigation reports, and then those
17 investigation reports usually are given to me before
18 the autopsy, not always but often.  And then I perform
19 the autopsy.
20     Q.   What happens if your autopsy report is
21 contradicted or different than what the investigator's
22 report indicates?
23     A.   I mean, the simple answer is then one of us
24 is wrong.  There's either more information that needs

SCOTT DENTON

Page 37

1  to be collected or my autopsy is wrong.
2      Q.  Has that ever happened in any of the cases
3  you've worked on?
4      A.  Sure.
5      Q.  And what do you do in those cases?  What's
6  your role when you find that the report you got from
7  the autopsy is different from the investigator's
8  findings in the coroner's office?
9      A.  I alert the coroner.  I let the coroner know
10  that I either am not finding what is expected or I am
11  finding things that are unexpected.  And then I
12  usually let the coroner deal with that with law
13  enforcement or whoever, or whoever is providing the
14  information.  In my experience, those are cases that
15  cause the most trouble.
16      Q.  Have you ever changed the findings of your
17  autopsy in light of an investigator's report?
18      A.  I mean, Nicole Harris I did, based on the
19  information that I was asked basically to hold off --
20  so I did -- for investigation.
21          I don't know if I've changed -- I know I
22  haven't in the coroner system because I don't --
23  usually the investigation is usually pretty much done
24  the day or two after the autopsy; so either it's been

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 38

1  resolved or it's just going to be undetermined.
2          I've had conflicts with different agencies
3  down here regarding my cause of death versus their
4  opinions on the cause of death or how the death
5  occurred.  That certainly is not uncommon.  That
6  happens in every death investigation system,
7  differences of opinion.
8      Q.  Right.  I understand there's differences of
9  opinion.  But you acknowledge that, in Nicole Harris's
10  case, that as a result of the police officer's
11  investigation and information the police provided to
12  you, you changed the cause of death in the case?
13      A.  Right.  I took the information that was
14  provided -- well, first, I was asked to hold off on
15  determining the cause of death; so I did.
16          I made it pending police investigation that
17  day.  And then I believe there was a delay, maybe a
18  month, maybe a little bit longer than a month -- I
19  don't remember how long it was -- for all of that
20  information to be provided.
21          And then we had a protocol for unpending
22  deaths at the Medical Examiner's Office.  It has to go
23  before all the other medical examiners at the 2:00
24  quality assurance meeting.  So everything I had would

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 39

1  be presented to other medical examiner's office, and
2  then Dr. Donoghue, the chief, had the final say
3  whether or not -- you know, what the cause of death
4  would be since his name was on the death certificate.
5      Q.  I understand that.  Let me just ask:  Other
6  than Nicole Harris's case, have you ever changed the
7  cause of death as a result of the police investigation
8  or a coroner's investigation?
9      A.  Not that I can recall.  I might have, but I
10  don't remember, sitting here.
11      Q.  When you said you were asked to hold off on
12  the cause of death, you were asked by Chicago police
13  detectives to hold off on the cause of death in Nicole
14  Harris's case?
15      A.  Yes.
16      Q.  And that was after you originally had
17  concluded that this was an accidental death that was
18  caused by a hanging, correct?
19      A.  Right.
20      Q.  Do you dispute that the leading cause of
21  death in children in the United States is accidental
22  trauma?
23      A.  I'd have to know the age group, I guess.
24      Q.  Okay.  Well, for children 5 and under, would

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 40

1  you agree that the leading cause of death -- well,
2  strike that.  Yeah, let me ask that.
3          Do you dispute that, for children ages 5 and
4  under, the leading cause of death in the United States
5  is accidental trauma?
6      A.  That's probably true because if you --
7  especially if you include infants, I would say.  Yes.
8      Q.  Do you dispute that asphyxia is the fourth
9  leading cause of unintentional injury deaths in the
10  United States for children between ages 1 and 4?
11      MR. KAMIONSKI:  Objection to the form.
12  Foundation.  Calls for speculation.
13      A.  I don't know what the other three are above
14  that.  So I mean, I would consider the source, and I
15  would certainly read it.  It sounds okay.
16      Q.  Okay.  So you don't dispute it, but you
17  can't adopt it?
18      A.  Right.  I'd like to see the other three
19  ranked in order.
20      Q.  Do you dispute that injury from hanging or
21  strangulation occurs very quickly?
22      A.  It does, yes.  I don't dispute that.
23      Q.  Do you dispute that the amount of force
24  required for a child to asphyxiate is very low?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 41

1    **A.**   I think "low" is a fair term.  It's
2  certainly a few pounds or several pounds of pressure
3  on the neck, maximum.
4    **Q.**   Okay.  When you say "several pounds," what
5  do you mean by that?
6    **A.**   It depends.  Usually the weight of someone's
7  head, 15 pounds, is enough to asphyxiate.  You can
8  block the jugular veins at 6 or 7 pounds.  So it
9  depends on what structures you're blocking.
10   **Q.**   For children, would you say it could be less
11 than 7 pounds?
12   **A.**   It could, sure.
13   **Q.**   You don't dispute that children have smaller
14 structures that collapse easily when forces are
15 applied?
16   **A.**   I don't dispute that.
17   **Q.**   And you don't dispute that the amount of
18 force required to occlude blood vessels in children is
19 significantly less than in adults?
20   **A.**   I would agree with that.
21   **Q.**   And you don't dispute that obstruction of
22 the jugular vein is -- contributes to asphyxia,
23 unconsciousness, and death in cases?
24   **A.**   It contributes and also can cause death.

---

SCOTT DENTON

Page 42

1    **Q.**   And that's the same with children as well,
2  right?
3    **A.**   Yes.
4    **Q.**   And you don't dispute that young children 5
5  and under can have significant difficulties freeing
6  themselves from strangulation-type cases?
7    **A.**   I do not dispute that.
8    **Q.**   And you don't dispute that children 5 and
9  under also lack comprehension of dangerous situations?
10   **A.**   I don't dispute that either.
11   **Q.**   In this case, you determined that the
12 instrument of death was an elastic band from a fitted
13 bed sheet, right?
14   **A.**   That's most consistent with what I believe
15 happened, yes.
16   **Q.**   And so that would be the ligature, --
17   **A.**   Yes.
18   **Q.**   -- the elastic band?
19   **A.**   Yes.
20   **Q.**   Do you dispute that injury and death can
21 occur from a hanging or strangulation even where a
22 ligature is free at one or both ends?
23   **A.**   Can you repeat that?
24   **Q.**   Do you dispute that injury and death can

---

SCOTT DENTON

Page 43

1  occur from a hanging or strangulation even where the
2  ligature is free at one or both ends?
3    **A.**   I'm having a hard time imagining both ends
4  being free and causing ligature strangulation unless
5  the cord is wrapped multiple times around the neck and
6  cannot free itself.
7         And I would say the same would apply to one
8  end.  But usually both ends are secure unless
9  something is wrapped tightly around and it can't free
10 itself.
11   **Q.**   So if the ligature -- the string is wrapped
12 around one's neck and it overlaps, that could cause it
13 to be -- one end to be unable to be freed, right?
14   **A.**   Yes.
15   **Q.**   Do you dispute that hanging and
16 strangulation events in children can occur with low
17 levels of force that cause airway and venous
18 obstruction?
19   **A.**   Low level of force can cause venous
20 obstruction.  I think it's harder to occlude the
21 trachea or the larynx with low level of force.  That
22 would require more, I would say.
23   **Q.**   Okay.  So when you're saying "low level,"
24 what does that mean to you?

---

SCOTT DENTON

Page 44

1    **A.**   It would compress probably the jugular veins
2  and the carotid arteries.  Probably more force would
3  be required to compress the larynx or the trachea.
4    **Q.**   Okay.  But if the jugular vein was occluded,
5  that could then lead to unconsciousness, right?
6    **A.**   Yes.
7    **Q.**   And then that unconsciousness could then
8  eventually lead to death, right?
9    **A.**   Yes.
10   **Q.**   You don't dispute -- or strike that.
11        Do you dispute that accidental asphyxia is a
12 common cause of childhood mortality?
13        MR. KAMIONSKI:  Objection to the form.
14 Foundation.
15   **A.**   That word "common" -- I mean, it occurs,
16 unfortunately.  I don't know if it's common, but it
17 occurs.  That's kind of a relative term.
18   **Q.**   Do you dispute that accidental asphyxiation
19 events are more common than homicidal asphyxiation
20 events by a ratio of almost 10:1?
21        MR. KAMIONSKI:  Objection to the form.
22 Foundation.  Calls for speculation.
23   **A.**   Could you repeat that?
24   **Q.**   Do you dispute that accidental asphyxiation

SCOTT DENTON

Page 45

```
 1   events are more common than homicidal asphyxiation
 2   events by a ratio of almost 10:1?
 3        A.   I don't know about the ratio, but accidental
 4   asphyxia is more common than homicidal asphyxia, yes.
 5        Q.   Do you dispute that events of hanging can
 6   occur with partial suspension and are just as lethal
 7   as hanging events involving full suspension?
 8        A.   Sure.  Yes.
 9        Q.   You dispute that?
10        A.   No, I do not dispute.  I agree with it.  I'm
11   sorry.
12        Q.   And do you dispute that such hanging events
13   can occur from low points of suspension?
14        A.   Yes, they can.
15        Q.   Do you dispute that an accidental wrapping
16   of a free cord around a neck, especially a cord with
17   elastic properties, can be very difficult for a victim
18   to remove?
19        A.   Sure.  Yes.
20        Q.   You dispute that?
21        A.   No.  I'm sorry.  I don't dispute that.
22   Especially in a small child with low motor skills,
23   that would be difficult for them to free, if it was
24   wrapped multiple times.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 46

```
 1        Q.   Is -- let me get back to your -- so both as
 2   a forensic pathologist and as a pathologist in a
 3   medical examiner's office -- let me strike that.
 4        I mean, would you say you're a forensic
 5   pathologist in both a medical examiner's office and a
 6   coroner's office?
 7        A.   Yes.
 8        Q.   So your job is -- or your title is you are a
 9   forensic pathologist, right?
10        A.   Right.  By medical school and residency and
11   fellowship training, I am a forensic pathologist.
12        Q.   Okay.  And whether you're working in a
13   coroner system or a medical examiner system, your role
14   is to determine cause of death, right?
15        A.   Yes.
16        Q.   And how many options are there for
17   determining a cause of death?
18        A.   Cause of death?
19        Q.   Yes.
20        A.   Thousands.
21        Q.   Okay.  I see.
22        A.   Like how someone dies?  I guess I don't
23   understand.
24        Q.   Well, you made a distinction between
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 47

```
 1   determining a cause of death versus a manner of death.
 2        A.   Right.  Cause of death is different than the
 3   manner or the category of death.
 4        Q.   Okay.  And so can you help explain that to
 5   me?  Because I'm a little confused.
 6        A.   Sure.  Cause of death is -- the way I
 7   explain it:  The cause of death is the anatomic
 8   finding that I can actually show someone that caused
 9   someone's death, such as a blocked coronary artery or
10   head trauma or bleeding around the brain or fractures
11   or a toxicology report that shows a lethal amount of
12   heroin.  That's something I can demonstrate physically
13   this is the cause of death of this person.
14        Q.   Okay.
15        A.   The manner of death is the category, which
16   is usually for public health purposes, what category
17   that death best fits into.  And there's natural versus
18   unnatural.  The unnatural ones are homicide, suicide,
19   accident, and undetermined.
20        Q.   Okay.  Now I understand.  So in terms of
21   manner of death, there are five categories that would
22   be a conclusion?
23        A.   In Illinois, yes.
24        Q.   Natural, homicide, suicide, accidental, and
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 48

```
 1   undetermined?
 2        A.   Yes.
 3        Q.   And you're saying the cause of death is the
 4   physical or medical findings as to how one's death
 5   resulted?
 6        A.   Yes.
 7        Q.   It's your -- okay.  And it's your testimony
 8   that when you are serving as a forensic pathologist in
 9   a medical examiner's office, in addition to
10   considering the medical and physical findings, you're
11   also supposed to look at what investigation is done to
12   determine the manner of death?
13        A.   Yes.
14        Q.   And that's what then leads you to determine
15   whether it's natural, homicide, suicide, accident, or
16   undetermined?
17        A.   Yes.
18        Q.   And when working at the Cook County Medical
19   Examiner's Office, when you were making determinations
20   as to the manner of death, you primarily relied on
21   information that was provided to you by the Chicago
22   Police Department when working on cases in the city of
23   Chicago?
24        A.   Yes.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 49

1     **Q.** So in this case -- and you testified that
2 you made an original cause and manner of death
3 conclusion in this case, right?
4     **A.** Yes.
5     **Q.** And that was accidental -- hold on a second.
6     MS. MOGUL: Well, actually, let me do this.
7 Let me withdraw the question.
8     I'm going to mark this as Exhibit No. 96Z.
9         (Harris Deposition Exhibit No. 96Z
10         marked for identification.)
11     MS. MOGUL: So this is an exhibit that's
12 Plaintiff Nicole Harris ME subpoena 00001, and it goes
13 all the way through 66.
14     **Q.** Do you recognize this -- the documents in
15 this exhibit?
16     **A.** Yes.
17     **Q.** Okay. These are the -- this exhibit
18 contains all the materials that we received pursuant
19 to subpoena from the Medical Examiner's Office in Cook
20 County with respect to the Jaquari Dancy
21 investigation.
22     **A.** Okay.
23     **Q.** So I'm going to just ask you to turn your
24 attention to page 19 of this exhibit.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 50

1     **A.** Okay.
2     **Q.** This is the first death certificate you
3 completed with respect to Jaquari Dancy's death
4 investigation?
5     **A.** Right. Right after I finished the autopsy,
6 yes.
7     **Q.** Okay. And at that time, you noted the cause
8 of death was hanging?
9     **A.** Yes.
10     **Q.** And that it was an accident?
11     **A.** Yes.
12     **Q.** And as to how the injury occurred, you said,
13 "hanged on elastic cord," correct?
14     **A.** Yes.
15     **Q.** And then you indicated previously that the
16 police asked you to hold off on making your cause and
17 manner of death determinations, and they asked you to
18 wait for the police investigation, correct?
19     **A.** If I remember -- yes. If I remember
20 correctly, that day, yes, they came to the autopsy
21 room and said, "Can you hold off?"
22     **Q.** And they -- okay. So at that time, is that
23 when you then put an "X" through exhibit page 19 of
24 96Z, and you put "Void" on this?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 51

1     **A.** Yes.
2     **Q.** Okay. And then I'm going to ask you to turn
3 the page to exhibit 20 -- or page 20 of Exhibit 96Z.
4     This is another death certificate you
5 completed in this case, right?
6     **A.** Yes.
7     **Q.** And if you see, with respect to 18A, it
8 states "pending police investigation," right?
9     **A.** Yes.
10     **Q.** When did you complete this document? Or let
11 me ask this. When did you put "pending police
12 investigation"?
13     **A.** Looking at the dates, it looks like I did
14 the autopsy on May 15, 2005. And then this -- looking
15 at the date signed, it looks like May 16, 2005. I
16 would have done this the next day.
17     **Q.** So the next day you then completed this
18 second death certificate?
19     **A.** Yes.
20     **Q.** And then it looks like, later, on June 14 --
21 or strike that.
22     It seems that you then amended this second
23 death certificate, correct?
24     **A.** Right. Or finalized it.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 52

1     **Q.** Okay. You finalized it. And then that's
2 when you wrote down that this was a strangulation?
3     **A.** Yes.
4     **Q.** And that this was a homicide?
5     **A.** Yes.
6     **Q.** And you said at that time how the injury
7 occurred was ligature strangulation?
8     **A.** Yes.
9     **Q.** And you signed that on what day?
10     **A.** Looks like June 14, 2005.
11     **Q.** And then I'm going to ask you to turn to
12 page 18 of 96Z.
13     **A.** Okay.
14     **Q.** This appears to be the typed-up death
15 certificate of what you handwrote on page 20; is that
16 fair?
17     **A.** Yes.
18     **Q.** So this is the third and final death
19 certificate in this case?
20     **A.** Right. This would be the one that the
21 Medical Records Department would prepare.
22     **Q.** Okay. But it indicates that you were the
23 physician?
24     **A.** Yes.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 53

1    Q.   Prior to doing this final death certificate
2 in this case, you were never told by the members of
3 the police department that the elastic band from the
4 fitted bed sheet reached all the way from the top bunk
5 to the bottom bunk; is that fair to say?
6    A.   I don't recall being told that.
7    Q.   Okay.  Prior to doing this final death
8 certificate in Jaquari Dancy's case, you were never
9 told by any members of the Chicago Police Department
10 that Jaquari's father had seen him playing before with
11 that elastic string hanging from the bed?
12    A.   I don't recall hearing that.
13    Q.   Prior to doing that final death certificate,
14 you were never told by any members of the Chicago
15 Police Department that Jaquari's father had seen
16 Jaquari tie that elastic band from the sheet around
17 his neck before his death while he was in the bottom
18 bunk bed?
19    A.   No, I don't recall hearing that.
20    Q.   Prior to doing your final death certificate
21 in this case, the Chicago Police Department or members
22 of the Police Department never told you that Jaquari's
23 father had previously seen his boys, Jaquari and his
24 brother Diante, playing and that they let a little

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 54

1 girl wrap a rope around their necks?
2    A.   No.  That doesn't sound familiar either.
3    Q.   The fact that Jaquari had previously wrapped
4 this elastic band around his head, that was
5 significant information with respect to the
6 investigation into the manner of death in this case;
7 is that fair to say?  Strike that.  Sorry.  Let me
8 withdraw that.
9        The fact that Jaquari Dancy's father had
10 seen Jaquari wrap that elastic band from that sheet
11 around his neck prior to his death, that is
12 significant information with respect to the manner of
13 death in this case?
14    A.   Sure.  I'd want more information on that.
15 Yes.
16    Q.   Okay.  Well, okay.  You would say that --
17 you certainly would want to know that information in
18 terms of your determination as to the manner of death,
19 correct?
20    A.   Sure.  I wouldn't ignore it.  I think that
21 would be important for all the circumstances.
22    Q.   Okay.  So it was definitely one circumstance
23 that was important to consider in the manner of death
24 in this case?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 55

1    A.   I would say it's -- anything to do with his
2 neck would be important.
3    Q.   What other information would you want to
4 know?
5    A.   What happened?  When did he -- you know,
6 where, when, why, who.  Why is he wrapping things
7 around his neck all the time?  That's a question.
8    Q.   But in this case, the father, in fact,
9 testified that he had seen Jaquari wrap that elastic
10 band around his neck while they were living in that
11 apartment and Jaquari was on the bottom bunk; so it's
12 within the time period prior to his death.
13    A.   Okay.  I'd want to know more about that,
14 certainly.
15    Q.   And if you had known that information prior
16 to making your final determination as to the manner of
17 death, you would have taken that into consideration?
18    A.   Sure.  I would have brought that to the 2:00
19 meeting.  That's more information that the other
20 doctors should know too.
21    Q.   But that was something you would want to
22 know in making your own opinion?
23    A.   Sure.
24    Q.   Prior to your final determination as to the

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 56

1 cause and manner of death in this case, members of the
2 Chicago Police Department did not tell you that Diante
3 Dancy, Jaquari's brother, was a witness to his death,
4 correct?
5    A.   I don't recall the witness.  I believe he
6 was in the room, but I don't recall what he said or
7 what statements were given or anything like that.
8    Q.   Okay.  When were you told that the brother
9 was in the room?
10    A.   I believe the detectives told me that.  The
11 two of them -- the two of them were being punished in
12 their bedroom; so I believe I knew that, but I don't
13 remember what else was said or what statements were
14 made.
15    Q.   Okay.  And these detectives -- these were
16 the detectives that came to the autopsy that day?
17    A.   I mean, I would have to assume so.  I don't
18 like to assume, but I don't remember talking to any
19 other detectives except that day.
20    Q.   Okay.  Okay.  Were you ever -- Okay.  Prior
21 to making your final determination as to the cause and
22 manner of death in this case, no members of the
23 Chicago Police Department told you that Diante Dancy
24 was in the room when Jaquari died -- in the bedroom?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 57

```
1        A.   I don't think I was told one way or another.
2   I knew they were in the bedroom together for being
3   punished, but that's all I think I can recall.
4        Q.   Okay.  Prior to coming up with your final
5   determination of cause and manner of death in this
6   case, no members of the Chicago Police Department told
7   you that Diante Dancy, Jaquari's brother, was
8   interviewed on May 15, 2005, the same day that you
9   conducted the autopsy in this case?
10       A.   I don't think I knew that, no.
11       Q.   No members of the Chicago Police Department
12  told you that Detective Wo was present for that
13  interview of Diante Dancy on May 15, 2005?
14       A.   Yeah, I don't know that.
15       Q.   Okay.  No members of the Chicago Police
16  Department told you that during this interview with
17  Diante Dancy on May 15, 2005, he said that he knew
18  about his brother's death?
19            MR. KAMIONSKI:  Objection.  That assumes
20  facts not in evidence.  Foundation and form.  You can
21  answer.
22       A.   Again, I don't remember any conversations
23  about any interview with his brother.
24       Q.   Okay.  No members of the Chicago Police
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 58

```
1   Department told you that Diante Dancy said he knew
2   Jaquari was in the hospital?
3        A.   Again, any -- I don't remember any
4   conversations about what a brother would say or the
5   brother was interviewed.  I don't recall that.
6        Q.   Okay.  No members of the Chicago Police
7   Department told you that Diante Dancy said that he saw
8   Jaquari playing, and he wrapped the elastic string
9   around his neck from the blue sheet when they were
10  playing a Spider Man game and that Diante also said he
11  could not help Jaquari get out of that sheet?
12            MR. KAMIONSKI:  Objection.  That misstates
13  what he said.
14       A.   I don't remember hearing that information.
15       Q.   Okay.  No member of the Chicago Police
16  Department ever told you that Diante Dancy did not
17  report or did not say that his mother was ever in the
18  bedroom after he and his brother were sent there when
19  they were punished?
20       A.   Can you say that again?
21            MR. KAMIONSKI:  Objection.
22       Q.   Sure.  No member of the Chicago Police
23  Department ever told you that Diante in fact told --
24  said during this interview that his mother was not in
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 59

```
1   the room -- strike that.
2            No member of the Chicago Police Department
3   ever told you that Diante did not indicate that his
4   mother was ever in the bedroom with him and Jaquari
5   after they were punished?
6        A.   Sorry.  I'm having trouble following.  Did
7   not ever indicate is throwing me off.
8        Q.   Sure.  Right.  So no -- okay.  Okay.  No
9   member of the Chicago Police Department informed you
10  that Diante never said that his mother wrapped the
11  string around his neck or that the mother wrapped the
12  string around Jaquari's neck?
13       A.   If I understand, he said his mother -- he
14  never said his mother wrapped the string around the
15  neck?
16       Q.   Yes.
17       A.   Again, I don't -- I would say the same thing
18  I said before.  I don't remember any conversations or
19  any statements from the brother.
20       Q.   So I'm now going to show you what's
21  previously been marked Exhibit 12.  This is a General
22  Progress Report drafted by Detective Wo, one of the
23  defendants in this case, regarding the interview with
24  Diante Dancy on May 15, 2005.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 60

```
1        A.   Okay.
2        Q.   Prior to coming up with your final
3   determination of the cause and manner of death in this
4   case, you were never provided a copy of this report?
5        A.   Certainly it doesn't seem familiar to me; so
6   I don't believe so.
7        Q.   Okay.  And I'm going to ask you also to look
8   at 12A.  You never saw a version of this report with
9   the word "draft" on it, did you?
10       A.   Again, it doesn't seem familiar.  No.
11       Q.   Is it fair to say that Diante Dancy's
12  statements regarding what he saw Jaquari do and how
13  Jaquari died were significant?
14            MR. KAMIONSKI:  Objection.  Calls for
15  speculation.  Form.
16       A.   It's certainly worth considering.  So, I
17  mean, it would be significant in everything on both
18  sides, you know, trying to correlate these statements
19  with the autopsy.
20       Q.   Okay.  You would have taken Diante's
21  statements regarding what he saw Jaquari do with the
22  elastic string into consideration when determining the
23  cause of death in this case?
24       A.   Sure.  It would have been presented, and I
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 61

1  would have considered it.

2      Q.   And you would have taken Diante's statements

3  regarding what he saw Jaquari do with the elastic band

4  into consideration in determining the manner of death

5  in this case?

6      A.   Sure.

7      Q.   This is information you did not have before

8  you made this final determination?

9      A.   It certainly doesn't seem familiar to me.

10     Q.   Again, that was the final determination of

11 the cause and manner of death in Jaquari Dancy's

12 investigation?

13     A.   On the death certificate?

14     Q.   Yes.

15     A.   Yes.

16     Q.   No members of the Chicago Police Department

17 ever told you that Diante Dancy, Jaquari's brother,

18 was interviewed by Karen Wilson from the Department of

19 Children and Family Services on May 16, 2005?

20     A.   Again, I don't recall that.  I don't recall

21 hearing any of that.

22     Q.   No member of the Chicago Police Department

23 ever told you that Diante Dancy also told Karen Wilson

24 from the Department of Children and Family Services

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 62

1  that he saw Jaquari put the sheet around his neck and

2  that is why he's dead?

3          MR. KAMIONSKI:  Objection.  Assumes facts

4  and misstates what it says.  You can answer.

5      A.   Again, that doesn't sound familiar.

6      Q.   You were never told by any member of the

7  Chicago Police Department that Diante was asked by

8  Karen Wilson:  Did his mother or father put the sheet

9  around Jaquari's neck?  And he said, no, he did not

10 see either of them do that.

11     A.   Again, I don't recall any interviews with

12 the brother at all, by anyone.

13     Q.   At any time were you ever informed that

14 Diante Dancy, the brother, testified in a court

15 proceeding with respect to Nicole Harris's case?

16     A.   I'm sorry.  Can you say that again?

17     Q.   Sure.  In this case, have you ever been

18 informed that Diante Dancy testified in a court

19 proceeding with respect to Nicole Harris's case?

20     A.   I mean, I think that was one of the things I

21 read on the Internet, that he did not testify, that he

22 was not -- he was deemed not to testify or something

23 like that.  I don't know the legal system.

24     Q.   Well, in this case, he did testify in a

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 63

1  court proceeding.

2      A.   No, I don't know anything about that.

3      Q.   So you don't know that, in fact, he

4  testified that he saw Jaquari wrap the sheet around

5  his neck?

6      A.   I don't know anything about that.

7      Q.   Okay.  But you know that his testimony was

8  not presented to the jury in the case?

9      A.   I don't know if it -- I read it wasn't or

10 that the judge did not allow it.  That's what I

11 remember.

12     Q.   Do you remember when you read that?

13     A.   It was recent, I think within -- I read that

14 after -- several months ago, after it was brought up

15 in a trial here.

16     Q.   Okay.  Do you recall anything else about

17 what you read?

18     A.   Just what I mentioned before, Internet, the

19 Internet stuff, that she was released.  It was on TV.

20 There was a newspaper article that she was released

21 from prison.  It was on TV.  But not much else.

22     Q.   So let me ask you about your autopsy of

23 Jaquari Dancy in this case.  When was that autopsy

24 conducted?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 64

1      A.   It would have been May 15, 2005.

2      Q.   And where was that autopsy conducted?

3      A.   The Cook County Medical Examiner's Office in

4  Chicago.

5      Q.   And who was present for that autopsy?

6      A.   My autopsy assistant.  I would have to look.

7      Q.   Okay.

8      A.   Mark Neely was the autopsy assistant or the

9  autopsy tech, and I believe there were other doctors

10 in the room that were there also.

11     Q.   What other --

12     A.   Dr. Donoghue was there because he was the

13 Doctor the day that assigned me the case.

14     Q.   And was Dr. Donoghue present for the entire

15 autopsy?

16     A.   I mean, he would have been doing his own

17 work on a station catty-corner to where I was working.

18 So there's two autopsy rooms with four stations each,

19 and there were five doctors working every day.  So

20 each room either had two or three doctors, and I don't

21 remember anyone else besides Dr. Donoghue in the room

22 and my assistant.  The photographer would be there

23 taking pictures.

24     Q.   Do you know where Mark Neely works now?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 65

1      A.   He no longer works at Cook County; and yes,
2   he works part time for the two doctors in Joliet and
3   Kankakee as an autopsy assistant.
4      Q.   Okay.  So it's your testimony that when you
5   were doing the autopsy of Jaquari Dancy at the Cook
6   County Medical Examiner's Office, you were in a room
7   where Dr. Donoghue was also conducting autopsies on
8   another body or bodies?
9      A.   Right.  On that day, yes.
10      Q.   Prior to conducting the autopsy, did you
11   speak with anyone about the case?
12      A.   Prior to the autopsy?
13      Q.   Yes.
14      A.   I don't recall if I did.  Yes.  I'm sorry.
15   Well, I don't specifically recall talking to him, but
16   we had morning rounds every day at 8:30.  So we would
17   stand in a group five doctors, and we'd present the
18   cases to each other.  And we'd basically read the
19   investigator's report, and that was it.
20      Q.   Okay.  So as you sit here today, you don't
21   -- you can't tell us what was said during that
22   meeting?
23      A.   No.
24      Q.   And how did the cases get assigned to which

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 66

1   doctors?
2      A.   There was a doctor of the day.  So there was
3   -- one of the five doctors is on call.  So that doctor
4   of the day divides up the cases as equally as possible
5   among the five doctors.
6      Q.   Who was the doctor of the day?
7      A.   Since Dr. Donoghue was working, he would be
8   the doctor of the day.
9      Q.   And he was the Chief of the Medical
10   Examiner's Unit at that time?
11      A.   Yes.
12      Q.   And is it fair to say you can't recall
13   anything that was said about Jaquari Dancy's death
14   investigation on May 15, 2005, at 8:30 in the morning?
15      A.   I mean, the only thing I can recall is I
16   remember Dr. Donoghue mentioned to me, "Why are you
17   spending so much time on that case."
18      Q.   When did he mention that to you?
19      A.   That was when I was doing all this extensive
20   examination on his body.
21      Q.   Okay.  But prior to doing -- starting the
22   autopsy of Jaquari Dancy, you read the medical
23   examiner inspector's report with respect to this case?
24      A.   Right.  The investigator's report, yes.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 67

1      Q.   Okay.  So I'm going to ask you to turn to
2   pages 11 and 12 of Exhibit 96Z.
3      A.   Okay.
4      Q.   Is that the -- is that the inspector's
5   report with regard to the Jaquari Dancy investigation?
6      A.   That would be the investigator's report,
7   yes.  The medical examiner's investigator's reporter
8   yes.
9      Q.   And who was the investigator on this case
10   from the Medical Examiner's Office?
11      A.   Chester Garelli.
12      Q.   Did you speak with Chester Garelli before
13   you started the autopsy in this case?
14      A.   I don't remember doing so, no.
15      Q.   Did you ever speak with him afterwards?
16      A.   I don't remember.
17      Q.   Okay.  With respect to this report -- so you
18   had an opportunity to read the report?
19      A.   Yes.
20      Q.   And you learned from the report that Jaquari
21   Dancy was found by his father lying on the floor of
22   his bedroom with the elastic band wrapped from the bed
23   sheet around his neck?
24      A.   That's what it says here, yes.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 68

1      Q.   Okay.  Do you want to review it?
2      A.   Sure.
3           (Pause in proceedings.)
4      A.   Okay.
5      Q.   So that's the information you got from the
6   report, correct?
7      A.   Right.  This is the information I had prior
8   to the autopsy.
9      Q.   Right.  And it indicates that the inspector
10   from the Medical Examiner's Office, Chester Garelli,
11   got all of his information from the police officers
12   who were assigned to this investigation?
13      A.   Yes.
14      Q.   So in this case, you conducted both an
15   external examination and a full autopsy, right?
16      A.   Yes.  An internal examination, yes.
17      Q.   And so as part of that -- as part of your
18   examination, you looked at the outside of Jaquari
19   Dancy's body?
20      A.   Yes.
21      Q.   Okay.  And you also examined any clothes
22   that came with his body?
23      A.   Yes.
24      Q.   You also examined other items that were

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 69

```
 1   provided to you from the Police Department regarding
 2   this case?
 3        A.   Yes.
 4        Q.   And the Police Department provided you with
 5   both a phone cord and the sheet and the elastic band
 6   that were found in the apartment?
 7        A.   Yes.
 8        Q.   And photographs were taken of Jaquari
 9   Dancy's body as well as of the clothing?
10        A.   Yes.
11        Q.   Now, were those photographs you took?
12        A.   No.  They were taken at my direction by the
13   photographer that day.
14        Q.   I see.  So you would tell the photographer:
15   Take this shot; take that shot?
16        A.   Right.  The case identification number tag
17   would be held by me, by the holder, and then the
18   photographer would take that picture.
19        Q.   How long did this autopsy take?
20        A.   I'd be guessing.  I'd have to look and see
21   what other cases I had that day.  I have to look.  It
22   looks like I started at 9:00 a.m.  So I have to see
23   what other times I started other cases that day to
24   know for sure.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 70

```
 1        Q.   Okay.  When you reviewed this prior to your
 2   deposition, did you find any indication anywhere as to
 3   when this ended, what time the autopsy ended?
 4        A.   I mean, I saw my testimony.  I guessed -- I
 5   made a guess about two and a half hours with the
 6   autopsy length.
 7        Q.   Okay.  But there's nowhere in your autopsy
 8   report that would indicate how long it took?
 9        A.   No.
10        Q.   Was the autopsy recorded in any way?
11        A.   Just by the body diagram notes.
12        Q.   Okay.  And then the photographs?
13        A.   Yes.
14        Q.   But it wasn't videotaped?
15        A.   No.  That was not allowed.
16        Q.   And it wasn't audio -- you didn't do an
17   audio recording?
18        A.   I would dictate my findings for the report
19   off my body diagram notes at a later time.
20        Q.   Okay.  So you had a tape recorder there?
21        A.   Usually not there.  It was usually in my
22   office.
23        Q.   Oh, okay.
24        A.   So I'd go up to my office after all the
```

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 71

```
 1   cases were done and dictate the report from the notes.
 2        Q.   Oh, I see.  So you would take handwritten
 3   notes during the autopsy, and then later you would
 4   then dictate or speak into the audio recorder for that
 5   report to be typed up?
 6        A.   Yes.
 7        Q.   So beyond Dr. Donoghue, Mark Neely, and --
 8   strike that.
 9             Mark Neely was the person who took your
10   photographs, right?
11        A.   No.  He was my technician.  We had a
12   designated photographer.
13        Q.   Oh.  Who was the photographer?
14        A.   I don't remember.
15        Q.   Okay.  So beyond the photographer,
16   Dr. Donoghue, Mark Neely, was there anyone else
17   present for the autopsy?
18        A.   Not that I can recall, no.
19        Q.   At some point though, there were -- you met
20   with detectives from the Chicago Police Department?
21        A.   Right.  I think they showed up at the
22   examination after I was either completing it or ready
23   to move on.  And they showed up and said, you know --
24   and talked to me about this death.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 72

```
 1        Q.   And they came into the room where you were
 2   doing the examination?
 3        A.   Yes.
 4        Q.   And they had an opportunity to examine
 5   Jaquari Dancy's body?
 6        A.   I don't know if they did.  They probably did
 7   if his body was right there.
 8        Q.   Okay.  And they had an opportunity to look
 9   at the clothes that were there as well?
10        A.   They had the opportunity if the clothes were
11   out.  I don't know if they were out or not.
12        Q.   How many detectives came?
13        A.   I believe it was two.
14        Q.   Okay.  And do you know their names?
15        A.   No.
16        Q.   Their ages?
17        A.   I mean, I don't -- I didn't write it down
18   anywhere.
19        Q.   Okay.  Do you know what races they were?
20        A.   I don't recall.
21        Q.   And were they men or women?
22        A.   They were both men.
23        Q.   Now, during your examination of Jaquari
24   Dancy, you examined his clothes that came in?
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 73

1    A.    Yes.
2    Q.    Right.  And you documented that you found
3  pink vomit stains on his sweatshirt, right?
4    A.    Yes.
5    Q.    Now, if you had found any blood on his
6  clothes, you would have noted that in your report?
7    A.    Yes.
8    Q.    And reading your report, there's no
9  indication there was any blood found on any of his
10  clothes?
11    A.    Correct.
12    Q.    And there's no indication there was any
13  blood found anywhere on his body?
14    A.    Not that I saw, no.
15    Q.    And if there had been, you would have noted
16  that in your report?
17    A.    Yes.
18    Q.    And you noted during your autopsy that
19  Jaquari Dancy was well developed and a well-nourished
20  child?
21    A.    I believe so, yes.
22    Q.    And you determined there was no findings
23  that he was neglected in any way?
24    A.    I did not see any evidence of neglect.

SCOTT DENTON

Page 74

1    Q.    And you didn't see any evidence of being
2  malnourished?
3    A.    I did not.
4    Q.    And you did not find any signs that he had
5  been physically beaten?
6    A.    I don't believe so, no.  There were some --
7  I believe there was -- I wouldn't call them beatings.
8  There were other marks on his body, but I wouldn't
9  call them beating marks.
10    Q.    Right.  There was a scar on his right elbow,
11  correct?
12    A.    Right.  There were some scars, and then
13  there were some injuries away from his neck, like on
14  the chest, the upper shoulder, the left upper
15  shoulder; and within the right chest muscle, there was
16  an area of hemorrhage.  But I mean those -- I wouldn't
17  call those beating injuries.
18    Q.    Okay.  Were those injuries indicative of
19  anything?
20    A.    Just that he sustained some, I would say,
21  mild to moderate blunt trauma, probably mild.
22    Q.    Okay.  And could that have been blunt trauma
23  from the medical treatment that was being provided to
24  him?

SCOTT DENTON

Page 75

1        MR. KAMIONSKI:  Objection.  Calls for
2  speculation.
3    A.    I'd say usually not.  In those places, I've
4  never seen that before -- in those places
5    Q.    Okay.  Tell me exactly then where you saw
6  the area around his shoulder or -- oh, okay.
7    A.    I would say -- on the autopsy report, it's
8  on page 3.
9    Q.    Uh-huh.
10    A.    It says, "Within the right upper shoulder
11  over the humerus," which is the ball joint of the
12  shoulder, "there was an area of intramuscular
13  hemorrhage" or bruising to the muscle.  And that was 2
14  by 1 1/2 inches, and it was 7/10 of an inch thick.
15    Q.    Okay.
16    A.    So it just tells me that he sustained a
17  bruise to his shoulder that caused breeding in the
18  muscle.
19    Q.    I see.  So that was a bruise on the upper
20  right of his shoulder?
21    A.    Yes.
22    Q.    Okay.  But that did not indicate in any way
23  that he'd been physically abused?
24        MR. KAMIONSKI:  Objection.  Calls for

SCOTT DENTON

Page 76

1  speculation.
2    A.    No.  It just says that he sustained trauma
3  there.  I can't -- it doesn't -- I wouldn't call it
4  abuse.
5    Q.    Okay.  Were there any other -- okay.  Now,
6  you noted that there were marks around -- ligature
7  marks around his neck, correct?
8    A.    Yes.
9    Q.    And can you describe what those ligature --
10  where those ligature marks were?
11    A.    Sure.  The best way to see them is on page
12  10 of the notes.
13        It looks like it starts on the back of his
14  midline neck, about 6 1/2 inches from the top of the
15  head.  It was 2/10 of an inch wide and then goes
16  towards the left side of his neck, kind of
17  horizontally.
18        And then it -- if you go up to the right
19  upper corner, the left side of his neck, you can see
20  the ligature mark goes across his neck, slanting
21  slightly forwards.  And then I made a notation -- just
22  some notations about that.
23        It was 1/10 of an inch thick.  And then it
24  -- as it crosses the midline, it starts to fade; and

SCOTT DENTON

Page 77

1   you can see, like, a line of petechiae, which tells me
2   the ligature was there at one point, but it was light,
3   whether something was over it or it was light.  And
4   then it fades onto the back of the right side of the
5   neck.
6       Q.   I see.  Okay.  So the ligature marks were
7   more pronounced on the left side of the neck versus
8   the right side of the neck?
9       A.   Yes.
10      Q.   And there was a slight slant of the ligature
11  marks?
12      A.   Yes.
13      Q.   Okay.  And the slant was upward from the
14  front of his neck -- it was lower under his face, and
15  it slanted upwards towards the back?
16      A.   Right.  By about -- because it looks like,
17  in the midline back of the neck, it's 6 and 1/2
18  inches.  At the midline, you know, on his chin, it was
19  7 inches.  On the left side of the neck, it was 7 1/2
20  inches.  So it's slight.
21      Q.   Okay.  It was a slight vertical slant?
22      A.   Yes.
23      Q.   Which would indicate that the string was
24  somewhat -- wrapped around his neck was at somewhat of

SCOTT DENTON

Page 78

1   a slant around his neck?
2       A.   Right.  It was a slight slant, I would say,
3   towards the right side.
4       Q.   Meaning what?
5       A.   That it was -- on the back of his neck, it
6   was 6 1/2 inches.  I mean, all I can do is tell the
7   measurement.  Towards the right and left side -- on
8   the right side of his neck, it's 7 inches.
9       Q.   Seven inches from the top of his head?
10      A.   Yes.  And then on the left side, it's 7 1/2
11  inches; so you've got a 1/2 inch slant towards the
12  right side compared to the left side.
13      Q.   I see, okay.  Now, the members of the Police
14  Department, they brought these items to the autopsy,
15  the phone cord and the elastic band, correct?
16      A.   Yes.  It says "in two bags," yes.
17      Q.   And you removed the phone cord from the bag,
18  and you compared the phone cord to the ligature marks
19  found on Jaquari's neck?
20      A.   Yes.
21      Q.   And you determined that the phone cord --
22  the phone cord did not match the impressions on
23  Jaquari's neck?
24      A.   Right, specifically on the left side.  It

SCOTT DENTON

Page 79

1   did not match the impression marks on the left side of
2   the neck.
3       Q.   Okay.  You ruled out the phone cord as the
4   instrument of death in this case?
5       A.   Right.  I ruled it out because the elastic
6   cord matched better.
7       Q.   Okay.  Well, there's no evidence to indicate
8   that the phone cord had any role or was ever wrapped
9   around Jaquari's neck?
10      MR. KAMIONSKI:  Objection.  Calls for
11  speculation.
12      A.   I can't say that the phone cord caused those
13  ligature marks.  They're not as consistent as the
14  elastic cord.
15      Q.   Okay.  I'm going to ask:  Was there any
16  physical evidence to indicate the phone cord was ever
17  wrapped around his neck?
18      A.   Not that I know of, no.
19      Q.   Now, you also compared the elastic band from
20  the blue fitted sheet to the ligature marks on
21  Jaquari's neck?
22      A.   Yes.
23      Q.   And you determined that it was the elastic
24  band that was the instrument of death in this case?

SCOTT DENTON

Page 80

1       A.   Right.  The pattern injury on his neck
2   matched the pattern of elastic cord very, very well.
3       Q.   You in fact stretched out the band and
4   determined that, when you stretched it, the band had
5   these little loops; and those compared both with the
6   lines as well -- and you could see the little loops on
7   Jaquari's neck?
8       A.   Yes.
9       Q.   And you determined that the elastic band
10  from the sheet was 39 inches in length?  So let me be
11  clear.  Let me strike that.
12      A.   Yes.
13      Q.   You measured the loose part of the elastic
14  band, so the part of the elastic band that was not
15  attached to the sheet, and determined that was 39
16  inches in length?
17      A.   Yes.  As it was lax, laying there without
18  tension, it was 39 inches in length.
19      Q.   And you determined that loose elastic band
20  that was not attached to the sheet was 6 feet 8 inches
21  in length when it was stretched?
22      A.   Yes.
23      MR. KAMIONSKI:  I got a text they want to
24  mark two exhibits at the dep.  What should they mark

SCOTT DENTON

Page 81

1  them as?  How many more exhibits do you have?
2        THE WITNESS:  Can we take a break now?
3        MS. MOGUL:  Yeah.  Sure.
4              (Recess in proceedings
5              from 11:45 to 12:09 p.m.)
6        THE VIDEOGRAPHER:  This is the beginning of
7  recording number 2 of the videotaped deposition of
8  Dr. Scott Denton.  We're now going on the record.  The
9  time is approximately 12:09 p.m.
10        Q.  Okay.  So I'm going to direct your attention
11  back to Exhibit 96Z, your autopsy report in the
12  medical examiner's file in this case.
13              On pages 8, 9, and 10, you took notes
14  regarding your autopsy examination, correct?
15        A.  Yes.
16        Q.  And these notes you then used to dictate
17  your autopsy report?
18        A.  Right.  And the photographs usually too.
19        Q.  Okay.  And the photographs too.  And your
20  autopsy report is the typewritten report that's pages
21  1 through 6 of Exhibit 96Z, correct?
22        A.  Yes.
23        Q.  Okay.  And so prior to your conversations
24  with the detectives in this case who appeared at the

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 82

1  medical examiner's office, you had completed your
2  notes on pages 8, 9, and 10?
3        A.  I don't know.  I made notes that CPD brought
4  the two bags at the bottom; so I don't know exactly
5  when they showed up.
6        Q.  Okay.  Okay.  With respect to the physical
7  and pathological findings you made regarding Jaquari
8  Dancy's death, were those findings completed prior to
9  your conversations with the detectives?
10        A.  I would say most of them should have been.
11  The only thing I can think that would be extra I would
12  do would be, like, removing the spinal cord or doing
13  the incision on the back.
14        Q.  Okay.
15        A.  That might be extra afterwards, but I would
16  say it probably would have been done before that.
17        Q.  So prior to speaking with the detectives,
18  you had completed the entire autopsy?
19        A.  Pretty much.  Probably not the entire one;
20  or if I did, you know, then they showed up towards the
21  end.
22        Q.  Okay.  And so -- okay.  So but you had
23  completed your entire autopsy and your entire
24  examination prior to completing the first death

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 83

1  certificate in this case?
2        A.  Yes.
3        Q.  Okay.  And based on the results of your
4  autopsy, which included your examination of his
5  clothes, the exterior/interior of his body, and the
6  toxicological analysis in this case, you -- based on
7  those findings, you could not determine whether this
8  death was accidental, homicidal, or other?  Let me
9  strike -- accidental or homicidal?
10        A.  I would say, I mean, what I wrote on the
11  death certificate when I was done with the autopsy.
12  Just based on what I showed on the body and the
13  investigation report, I said it was hanging accident,
14  just based on the autopsy and the medical examiner's
15  investigation report.  So that's what I wrote first.
16        Q.  Okay.  So let me just ask this.  Based on
17  your findings of the body alone -- right? -- and the
18  clothes, there was no indication whether this was an
19  accident or a homicide, the cause of death -- or the
20  manner of death?
21              Strike that.  Let me ask it again.
22              Based on the physical findings of the body
23  and the clothes and the phone cord and the elastic
24  cord or elastic band, you could not determine whether

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 84

1  the manner of death was accidental or homicidal?
2        A.  Right.  I guess I would say the same thing.
3  I mean, just based on the body -- I mean, I went with
4  the investigation circumstances I was given.  The body
5  itself, just those findings, could be, right, like you
6  said, could be either one.
7        Q.  Right.  And if you were just determining the
8  -- if you just based the manner of death in this case
9  on the physical findings of the autopsy and your
10  external examination of the phone cord and the elastic
11  band and the clothes, the cause of death would be --
12  the manner of death would be undetermined?
13        A.  Can you say that again, what I would
14  consider?
15        Q.  Sure.  All right.  Well, let me ask this.
16  When you say that you've conducted an autopsy, what
17  does that include?
18        A.  The autopsy involves basically confirming
19  the person is the right person and then documenting
20  the findings externally and internally as objectively
21  as possible.
22        Q.  Right.  And what I guess I'm trying to get
23  is:  So that's the external examination of the
24  clothes, correct?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 85

1    **A.**    Yes.

2    **Q.**    And that is the external examination of the

3    body, correct?

4    **A.**    Yes.

5    **Q.**    That is an internal examination of the body?

6    **A.**    Right.

7    **Q.**    And that's a toxicology analysis, right?

8    **A.**    Yes.

9    **Q.**    Is there anything else included in just the

10   autopsy?

11   **A.**    You can do more, but usually that's about

12   it.

13   **Q.**    Right.  So based on the autopsy findings, if

14   you had to base it just on the autopsy findings alone,

15   would you say that the manner of death would be

16   undetermined?

17   **A.**    Right.  Like the body in a vacuum or the

18   body without any circumstances, --

19   **Q.**    Yes.

20   **A.**    -- I would say by default is undetermined.

21   **Q.**    Right.  Okay.  So there was no physical or

22   pathological evidence in this case that indicated this

23   was a homicide?

24       MR. KAMIONSKI:  Objection to the form of the

SCOTT DENTON

Page 86

1    question.

2    **A.**    I would say the only thing that could

3    indicate a homicide would be the nature of the

4    ligature that was horizontal because that's

5    inconsistent basically with hanging.  That's the only

6    thing, I would say.

7    **Q.**    Right.  But in this case, if a child had

8    wrapped the string around his neck and was unable to

9    get that loose, that could have caused his death?

10       MR. KAMIONSKI:  Objection.

11   **A.**    Yeah.  I mean, if a child could do that.  I

12   still have trouble believing that a 4-year-old could

13   do that.  But, I mean, if that happened, that could be

14   a possibility.

15   **Q.**    Okay.  Well, in that case, that would

16   indicate that -- there would be ligature marks that

17   were horizontal as opposed to vertical, correct?

18   **A.**    Yes.

19   **Q.**    Okay.  But other than the horizon-- but in

20   this case, the marks weren't totally -- the ligature

21   marks weren't totally horizontal, were they?

22   **A.**    Right.  They weren't completely flat or

23   horizontal, but they were -- they were almost, you

24   know, they were almost horizontal.

SCOTT DENTON

Page 87

1    **Q.**    There was a slight vertical part to it

2    though?

3    **A.**    There was, yes.

4    **Q.**    Which would indicate that the string was

5    slightly above one part of his head?

6    **A.**    Yes.

7    **Q.**    So it's possible, based on that ligature and

8    the vertical mark -- that ligature mark that there was

9    a slight hanging in this case or a slight pressure

10   from up to down?

11       MR. KAMIONSKI:  Objection to the form of the

12   question.

13   **A.**    I would say very slight; but yes, it could

14   be slight -- a slight angle.  Instead of being

15   completely 90 degrees, there could be a slight degree

16   deviation of it, yes.  There's traction that's not

17   completely perpendicular.  There's traction on the

18   cord that's slightly upwards, yes.

19   **Q.**    And that slight traction upwards could have

20   been a contributing factor to the death in this case?

21       MR. KAMIONSKI:  Objection to form.  Calls

22   for speculation.

23   **A.**    Right.  It just -- it indicates -- right.

24   It indicates traction at a slight angle.  It could be

SCOTT DENTON

Page 88

1    -- I mean, honestly, it could be from a fixed cord, or

2    it could be from someone pulling on a cord.  It could

3    be either one.

4    **Q.**    When you say "a fixed cord," what do you

5    mean by that?

6    **A.**    Like the opposite end of a bed sheet that's

7    stuck on -- a bed sheet that's stuck on a mattress.

8    **Q.**    Right.  So in this case, the sheet -- the

9    elastic band stuck on the sheet could have been at

10   such an angle that it caused that slight traction

11   upwards?

12       MR. KAMIONSKI:  Objection.  Calls for

13   speculation.

14   **A.**    If you could do, like, a scene

15   reconstruction and try to reconstruct that, I mean, I

16   would say it could be possible.

17   **Q.**    And that slight traction from the sheet

18   attached to the -- strike that.

19       That slight traction from the elastic band

20   from the sheet could have been a contributing factor

21   to Jaquari Dancy's death?

22   **A.**    Sure.  Because something is -- it's either

23   tightly wrapped around itself, or it's being pulled.

24   It's one of those two things.

SCOTT DENTON

Page 89

1    Q.    Right.  And I guess the pull -- what I'm

2  saying is the pull could have come from the bed sheet

3  attached to the top bunk of the bed?

4    A.    If it was fixed, sure.  If the bed sheet was

5  fixed on the bed to the mattress.

6    Q.    In this case, do you know whether the bed

7  sheet was fixed to the mattress at the time that

8  Jaquari Dancy died?

9    A.    I don't remember.

10    Q.    Did the police tell you that?

11    A.    I don't remember.  If it's in the -- if it's

12  in the police report, I mean, the typed one, then I

13  would have known that; but I don't remember reading

14  that.

15    Q.    Okay.  You don't remember being told that?

16    A.    I don't recall.

17    Q.    But based on the physical evidence in this

18  case regarding Jaquari Dancy's body and his clothes

19  and the toxicology report and the instruments, the

20  phone cord and the elastic band, you could not say

21  with any reasonable degree of medical certainty that

22  his death was a homicide?

23        MR. KAMIONSKI:  Objection to the form of the

24  question.

SCOTT DENTON

Page 90

1    A.    Just based on his body alone?

2    Q.    Yes.

3    A.    I would say that's fair.  Right.  You need

4  circumstances, investigation.

5    Q.    And in this case, you could not determine

6  the manner of death without that circumstantial

7  information?

8    A.    Well, I mean, honestly, I initially did

9  because I went with what the medical investigator --

10  medical examiner investigator said.

11    Q.    Right.

12    A.    And I just -- you know, I had his body, and

13  I had the circumstances that nothing was suspicious or

14  nothing was wrong; so I did --

15    Q.    Right.

16    A.    -- determine a cause of death.

17        And then I was asked -- then I was asked to

18  hold off because there might be more information.

19    Q.    Right.  The police asked -- the police

20  detectives who came to the autopsy asked you to hold

21  off?

22    A.    Yes.

23    Q.    And then that's when you struck out the

24  first death certificate where you found that the death

SCOTT DENTON

Page 91

1  was -- the manner was accidental?

2    A.    Right.  Then I -- we called it pulling the

3  death certificate, which happened quite frequently.

4  So I pulled the death certificate.

5    Q.    Okay.  Based on the police request, the

6  police detective's request?

7    A.    Yes.

8    Q.    Okay.  And the police detectives that

9  appeared at the autopsy on May 15, 2005?

10    A.    Yes.

11    Q.    Right.  And I guess what I want to be clear

12  about is there was no physical or pathological

13  evidence that indicated that Jaquari's death was not

14  accidental at the time that you completed this

15  autopsy?

16    A.    That's fair.

17    Q.    So then the detectives arrive.  And did you

18  tell them anything about the ligature marks on his

19  neck?

20    A.    I'm sure that I discussed it with them.  I

21  mean, I don't recall discussing it with them, but

22  that's usually what happens when they show up.

23    Q.    Okay.  All right.  Did they talk to you

24  about -- did they tell you there were bunk beds in the

SCOTT DENTON

Page 92

1  room where the child was found?

2    A.    I believe there -- I believe I knew there

3  were bunk beds early on, yes.

4    Q.    Okay.  And did they tell you that the sheet

5  with the elastic band came from the top bunk in the

6  room?

7    A.    I don't remember.

8    Q.    Did they ask you whether the phone cord was

9  the instrument of death in this case?

10    A.    Yes.

11    Q.    Okay.  And you then informed them that the

12  phone cord was not the instrument of death in this

13  case?

14    A.    That was my opinion, yes.

15    Q.    And if the phone cord had been the

16  instrument of death in this case, that would have

17  indicated it was a homicide, correct?

18    A.    Well, it would have been inconsistent with

19  the circumstances I was given.  So then there would --

20  you know, again, like I said before, one of them is

21  wrong.  Either the autopsy is wrong or the information

22  is wrong.  So it would be more likely -- if it was a

23  phone cord, it would more likely be a homicide.

24    Q.    And the fact that it wasn't a phone cord in

SCOTT DENTON

Page 93

1  no way indicated that it wasn't an accidental death?

2      A.  Can you say that again?

3      Q.  Sure.  I'll withdraw it, actually.

4          And did you in fact show the detectives how

5  the -- put the phone cord against Jaquari's neck and

6  show them that it in fact wasn't the instrument of

7  death?

8      A.  I don't know if I did, but that's something

9  I would -- I mean I would routinely do.

10     Q.  Okay.  And you would -- you did that as well

11 with the elastic band from the bed sheet?

12     A.  I would expect I would do the same with both

13 because I would show them what I see.

14     Q.  Okay.  And after you told them that the

15 phone cord wasn't the instrument of death, did you

16 tell them that the elastic band was the instrument of

17 death?

18     A.  I'm sure I did.  If that's what I thought, I

19 would certainly share that.

20     Q.   These detectives, they didn't tell you that

21 Nicole Harris had allegedly confessed to killing her

22 son with a phone cord when you met with them at the

23 autopsy?

24     A.  I don't think they told me there was any

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 94

1  confession at the autopsy.  I think they said they had

2  her in custody, but I don't remember saying there was

3  a confession.

4      Q.  Okay.  So they didn't tell you that she had

5  confessed in any way, correct?

6      A.  I don't think so, no.

7      Q.  And -- but they told you she was in custody?

8      A.  Yes.

9      Q.  And they said hold off on coming up with --

10 strike that.

11         Did you tell them that you had determined

12 that this death was accidental, and it was -- that it

13 was caused by hanging on an elastic cord?

14     A.  I'm sure I told them what I had done, what I

15 had filled out; and I believe that's why they asked me

16 to hold off.

17     Q.  So you had told them, "Look, I've completed

18 the death certificate, and these are my findings"?

19     A.  I said, "That's what I certified it as; and

20 if you have more information, you know, I need to see

21 it."

22     Q.  Okay.  So you had told them on May 15, 2005,

23 that you had certified that this death was caused by

24 hanging, that it was an accident, and specifically the

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 95

1  injury occurred by being hanged on the elastic cord?

2      A.  Based on what I had, yes.

3      Q.  And that was what you wrote in the first

4  death certificate?

5      A.  Yes.

6      Q.  And you told them you had certified that?

7      A.  Well, I submitted it.  It wasn't certified

8  yet.  It was still in the pending stages.

9      Q.  Okay.  So you informed them you had

10 submitted the first death certificate?

11     A.  Right.

12     Q.  And that's when they said, "Hold off.  We

13 have the mother in custody"?

14     A.  Right.  "And we have more information that

15 this is not an accident," basically.

16     Q.  What information did they tell you at that

17 time that this wasn't an accident?

18     A.  That the mother was in custody and that

19 there was more information coming.

20     Q.  Okay.  Did they tell you what information

21 that was?

22     A.  I don't remember.

23     Q.  Did they tell you anyone else was in

24 custody?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 96

1      A.  I don't think so.

2      Q.  Did they tell you they were talking to

3  anyone else?

4      A.  Again, I don't think so.

5      Q.  Did they tell you that they were

6  interviewing Diante Dancy, the brother?

7      A.  I don't recall any mention of interviews

8  with the brother.

9      Q.  So after they asked you to hold off on

10 certifying the death certificate and coming up with

11 your final opinion as to the cause and manner of

12 death, you did so; you pulled the death certificate?

13     A.  Right.

14     Q.  And as we testified earlier, you then filled

15 out the second death certificate where you noted

16 "pending police investigation"?

17     A.  Right.

18     Q.  Did the detectives, during your meeting with

19 them on May 15, 2005, tell you that Ms. Harris had any

20 anger issues?

21     A.  I think so, yes.

22     Q.  Did they also tell you at that time that

23 Ms. Harris had physically struck her children before

24 the death?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 97

1    **A.**   I think so because that's why I did the

2   incisions, the filleting or more incisions on the

3   back, because there was evidence of possible other

4   altercations or this punishment.  So that's why I was

5   looking for other bruises.

6    **Q.**   Okay.  So they -- did they tell you how

7   Ms. Harris allegedly struck her children?

8    **A.**   I don't think so.

9    **Q.**   They didn't tell you that she allegedly used

10  a belt?

11   **A.**   I think I read that somewhere, but I don't

12  remember when I knew that.

13   **Q.**   Okay.  Well, when you did this further

14  examination, did you find any indication of any

15  striking on the child?

16   **A.**   I didn't -- I don't think I saw any belt

17  marks.  That's for sure.

18        You know, the other bruises that were in the

19  muscles, I don't know what those are from.

20        And then there were some -- like on the

21  chest, there were three curvilinear marks.  I think,

22  you know, could be fingernail marks, I think; but

23  that's all I saw.

24   **Q.**   Right.  But you testified that there were

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 98

1   fingernail marks on the body that you assumed were

2   from someone holding Jaquari?

3    **A.**   Sure.  That could be possible, yes.

4    **Q.**   So the mark -- what I want to be very clear

5   about, there's no indications and there's no findings

6   that you had to indicate anything with any positive

7   certainty whatsoever that Nicole Harris had struck her

8   children?

9    **A.**   Right.  I didn't see any evidence of, you

10  know, pattern blunt trauma or anything like that.  I

11  didn't see any belt marks.  That's for sure.

12   **Q.**   How long was this conversation with the

13  detectives?

14   **A.**   Oh, I don't know.  Minutes, I would say.

15   **Q.**   Okay.

16   **A.**   But I don't know how many minutes.  It

17  wasn't an hour.  It wasn't a half hour.

18   **Q.**   It was less than a half hour?

19   **A.**   Sure.

20   **Q.**   And were either of them taking any notes?

21   **A.**   I don't remember.  I don't recall them

22  taking notes.

23   **Q.**   Okay.  Is there anything else they said to

24  you or anything else you said to them?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 99

1    **A.**   It was ten years ago.  I don't remember.

2    **Q.**   Okay.  Would anything refresh your memory?

3    **A.**   I mean, if someone did take notes, I would

4   look at that to see if that could refresh my memory.

5   But other than that, I don't remember.

6        MS. MOGUL:  Okay.  Well, okay, I'm going to

7   then point -- I'm going to ask you to review what's

8   been previously marked as -- give me one second.  I'm

9   going to ask you to review what's been previously

10  marked as Deposition Exhibit No. 30 -- or no, sorry,

11  46.  Strike that.  Let me start again.

12        I'm going to ask you to review what's been

13  previously marked as Harris Deposition Exhibit No. 30,

14  and it's Bates stamped City 0000408 and 409.

15           (Pause in proceedings.)

16        THE WITNESS:  Okay.

17   **Q.**   These are notes that Detective Kelly, one of

18  the defendants in the case, said that -- took

19  regarding meeting you with his partner Detective

20  Noradin on May 15, 2005?

21   **A.**   Okay.

22   **Q.**   You've had a chance to look through these

23  two pages?

24   **A.**   Yes.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 100

1    **Q.**   Does this refresh your memory as to anything

2   that was said between you and Detective Noradin and

3   Kelly on May 15, 2005?

4    **A.**   No.  But it sounds consistent with what I

5   remember or what I would do.

6    **Q.**   Okay.  This doesn't just -- this doesn't

7   refresh your memory as to anything they said or you

8   said during your conversation on May 15, 2005?

9    **A.**   No.

10   **Q.**   Now, after you met with the detectives on

11  May 15, 2005, you received a call from a Chicago

12  Police Department detective informing you that Nicole

13  Harris had confessed to killing Jaquari Dancy?

14   **A.**   I don't remember, but if it's written down

15  somewhere, I wouldn't dispute it.

16   **Q.**   Okay.  The call came in on Tuesday, May 17,

17  2005?

18   **A.**   Okay.  Sounds reasonable.

19   **Q.**   Okay.  You can't say one way or another?

20   **A.**   No.  You know, if I had the file there, I

21  would take a note on the inside of the file and write

22  down.  But otherwise, no, I usually wouldn't take

23  notes.

24   **Q.**   Well, in this case, do you recall testifying

AREA WIDE REPORTING & VIDEO CONFERENCING

1  that you first learned on the news that Nicole Harris
2  had confessed to killing Jaquari Dancy?
3      A.  I think that's true, yes.
4      Q.  Okay.  As you sit here today, do you
5  remember seeing that news story?
6      A.  No, but I know I testified to that; so it
7  was true at one point.
8      Q.  It was on TV?
9      A.  Yes, it was on TV.
10     Q.  Was her mug shot shown?
11     A.  I don't remember.
12     Q.  And so this detective called you to inform
13 you that Nicole Harris had confessed, and they wanted
14 -- this detective wanted you to have this information
15 in terms of -- so that you would write that the manner
16 of death was a homicide in this case?
17         MR. KAMIONSKI:  Objection to the form of the
18 question.
19     A.  I mean, they would say, you know, she
20 confessed, and then, you know, we have policies and
21 procedures on what we do next; so I would follow
22 those.  So if the evidence did support what he said,
23 you know, then I would follow those procedures in the
24 office.  You know, I would change it based -- if it

1  fit the autopsy.
2      Q.  Okay.  Well, okay.  In this case -- all
3  right.  So he called you saying, "Well, she's
4  confessed to killing her child."
5      A.  Okay.
6      Q.  Well, that's what you previously testified?
7      A.  Sure.
8      Q.  And the purpose of that call would be so
9  that that would influence your opinion and
10 determination as to the cause and manner of death,
11 correct?
12     A.  Sure.  It would require -- well, it would
13 require next steps.  It would require me to get that
14 information.  And then it would definitely be
15 information that needed to be considered.
16     Q.  Right.  Well, in this case, they wanted you
17 to hold off on making a cause and manner of death
18 determination in this case?
19     A.  On the day of the autopsy, yes.
20     Q.  Pending the police investigation?
21     A.  Yes.
22     Q.  So, therefore, they wanted the information
23 that they had obtained as a result of the police
24 investigation to influence these cause and manner of

1  death determinations; isn't that fair to say?
2          MR. KAMIONSKI:  Objection to the form of the
3  question.
4      A.  I mean, that's what usually happens.  You
5  know, if we pend it for police investigation, we
6  require those investigation reports before the case is
7  closed.
8      Q.  Okay.  I got that.  What I'm saying is they
9  wanted their investigation to impact your final
10 determinations?
11     A.  Sure.
12     Q.  Well, they certainly wanted you to consider
13 that information, that Nicole Harris confessed, in
14 terms of you making a final determination as to cause
15 and manner of death, right?
16     A.  Right.  That's -- that's standard procedure,
17 yes.
18     Q.  Right.  Because in this case, the detective,
19 when he called you, did he also tell you that they
20 were charging her with murder?
21     A.  I mean, I don't remember.  They might have.
22     Q.  Okay.  Is it a fair assumption that, once he
23 told you that Nicole Harris confessed to killing her
24 child, that she was being charged with murder for the

1  child?
2      A.  That's what usually happened, yes.
3      Q.  Okay.  And being a fair assumption that this
4  was a murder case, you knew that your determinations
5  as to cause and manner of death would be relevant in
6  the criminal prosecution of the case?
7      A.  Sure.  Yes.
8      Q.  Right.  And the detectives also knew that
9  your cause and manner of death determinations would be
10 relevant to the criminal prosecution, right?
11     A.  Yes.
12     Q.  So after you were informed of the -- that
13 Nicole Harris confessed, what did you do?
14     A.  After this conversation, what I would do is
15 follow the procedures and policy of the office.  So I
16 would require, you know, a statement of the
17 confession.  I would require any information that
18 basically supported, you know, their contention that
19 this was a homicide.
20         So I would ask them to provide it, you know,
21 as soon as they can or whenever they can because the
22 case wouldn't be finalized until I had that
23 information.
24     Q.  Okay.  So let me ask:  What were the

SCOTT DENTON

Page 105

1  policies and procedures of the Cook County Medical
2  Examiner's Office in May of 2005 when you were told
3  that there was a confession in the case?
4       A.   You need to -- well, for the pending police
5  investigation, you have to have the police
6  investigation report at the 2:00 meeting, and you have
7  to read it to the other doctors.  And you have to
8  state -- you know, describe the autopsy findings.  And
9  then there's a consensus opinion by the Quality
10 Assurance Committee of the other forensic
11 pathologists.
12      Q.   And who was part of the quality assurance?
13      A.   Well, Dr. Donoghue, you know, sat at the
14 head of the table, and he was there almost every day.
15 And then the other forensic pathologists would have to
16 attend.  And if you weren't there at 2:00, he would go
17 find you.
18      Q.   So whatever doctors were at the office that
19 day would be part of the quality assurance?
20      A.   Right.  If it wasn't -- half the staff
21 worked -- half the staff had off Sunday, Monday.  Half
22 the staff had off Friday, Saturday.
23           So if it was unpended Tuesday through
24 Thursday, it would be the entire staff.  If it was

SCOTT DENTON

Page 106

1  unpended on a Friday or a Monday, it would be, you
2  know, minus the doctors that were off that day.
3       Q.   Okay.  And prior to -- and prior to
4  determining the first cause and manner of death in
5  this case, you had consulted with other members of the
6  Medical Examiner's Office?
7       A.   On the first death certificate?
8       Q.   Yes.
9       A.   No.  That was just me filling that out.
10      Q.   Okay.  So what specifically did you request
11 from members of the Chicago Police Department with
12 respect to this case?
13      A.   You would have to have the final police
14 report.  You'd have to have any information that
15 supported, you know, any contention that this was a
16 homicide.  That would be -- that would be the most
17 important information.  And I would say anything else
18 that supported that.
19      Q.   Okay.  So what were you provided in this
20 case?
21      A.   I did recognize the typed report that you
22 provided me, the one from the Chicago Police
23 Department.  Case Supplementary Report, I would have
24 had that, and I would have read that to the doctors.

SCOTT DENTON

Page 107

1            MS. MOGUL:  Okay.  So I'm going to show you
2  for purposes of the record what was previously marked
3  as Deposition Exhibit No. 10.
4            THE WITNESS:  Okay.
5       Q.   So you would have gotten a copy from the
6  Police Department -- you got a copy from the Chicago
7  Police Department of this report?
8       A.   Yes.
9       Q.   Okay.  So this is the Clear and Closed
10 Supplemental Report with respect to the case?
11      A.   Yes.
12      Q.   Beyond this report, did you receive any
13 other information?
14      A.   Not that I can remember, no.
15      Q.   And -- okay.  You then read this report?
16      A.   Yes.
17      Q.   Right?  Did you -- okay.  And at that time,
18 after you read the report, what did you do?
19      A.   I don't remember what I did.  I know what I
20 did by the records because I took it to the quality
21 assurance meeting, to the other doctors -- and I went
22 to unpend it -- for their opinions too.
23      Q.   Okay.  And so you shared with the other
24 doctors at the Medical Examiner's Office what was

SCOTT DENTON

Page 108

1  contained in the Clear and Closed Report from the
2  police officers?
3       A.   Yes.  And I would have also described the
4  autopsy findings and everything else.
5       Q.   Okay.  And nowhere in that Clear and Closed
6  Report does it indicate what Diante Dancy said during
7  his interview on May 15, that he saw Jaquari wrap the
8  elastic band around his neck?
9            MR. KAMIONSKI:  Objection.  That
10 misrepresents what he said in report.
11           MS. MOGUL:  It absolutely doesn't.
12      A.   Yeah.  I don't recall seeing it if it does.
13      Q.   I'll direct your attention to Exhibit 10.
14      I'm going to ask you to look at the bottom
15 of page 13 and the top of page 14.
16      A.   You said bottom of page 13?
17      Q.   Page 13, yeah.
18      A.   Right.  I remember this part.  Playing with
19 the blue sheet, like playing Superman or something,
20 that would not cause the injuries.
21      Q.   Right.  But nowhere in this report does it
22 indicate that Jaquari (sic) Dancy said on May 15 that
23 he knew about Jaquari's death, knows Jaquari was at
24 the hospital, knows Jaquari was playing, wrapped

SCOTT DENTON

Page 109

1  elastic around neck from blue sheet?

2      A.  No.

3      Q.  Nowhere does it say that Diante couldn't

4  help Jaquari get out of a sheet, does it?

5      A.  No.

6      Q.  Nowhere does it say that Diante Dancy said

7  on May 15, 2005, "You can wrap it around arm, and

8  there's no bubbles.  You can wrap it around your neck,

9  and you go to the hospital."  Does it?

10     A.  No.

11     Q.  Nowhere does it say that Diante said that he

12  saw Jaquari wrap blue sheet around his neck, does it?

13     A.  I don't think so, no.

14     Q.  In fact, nowhere in that report does it even

15  indicate that Diante Dancy was a witness to Jaquari's

16  death in this case, does it?

17     A.  I don't recall reading that.

18     Q.  So then based on the Clear and Closed Report

19  that you were provided, you then went back to the

20  other doctors in the office, and you then changed your

21  determination as to the cause and manner of death?

22     A.  Right.  I presented the case, and the

23  consensus was the cause of death and manner of death

24  was strangulation, homicide.

SCOTT DENTON

Page 110

1     Q.  Okay.  And that change in the cause and

2  manner of death was based solely on Nicole Harris's

3  alleged confession?

4        MR. KAMIONSKI:  Objection to the form of the

5  question.

6        MS. MOGUL:  I'll strike that.

7     Q.  Okay.  Your change in the cause and manner

8  of death was based on information provided to you from

9  the Chicago Police Department that Nicole Harris had

10  confessed to killing her child?

11        MR. KAMIONSKI:  Objection to the form of the

12  question.

13     A.  Yes.  The confession fit the findings of his

14  body, yes.

15     Q.  Right.  But as we testified earlier, if

16  there was no confession, the finding would have been

17  undetermined or, in this case, accidental based on the

18  way the father said he found the child, correct?

19        MR. KAMIONSKI:  Objection to the form of the

20  question.  Misstates -- I'll leave it at that.

21     A.  I would say, if there was no confession, if

22  the detective had -- if the confession -- if the

23  detective had called me and said there's no

24  confession, it probably would have been undetermined.

SCOTT DENTON

Page 111

1     Q.  Okay.  If you were -- okay.  If the

2  detective -- if there was no evidence provided to you

3  or -- strike that.

4        If there's no information provided to you

5  that Nicole Harris had confessed, at that time you

6  would have determined that the manner of death was

7  undetermined?

8     A.  Right.  If the detective had called me back

9  and said there was no confession, I would say it would

10  probably be undetermined.  It would most likely be

11  undetermined as to manner.

12     Q.  Okay.

13     A.  Which means it's basically an open case.

14     Q.  What I'm getting at is the only additional

15  information that was provided to you after your

16  autopsy in May of 2005 -- the only additional

17  information to you provided from the Police Department

18  was that Nicole Harris had confessed?

19     A.  Yes.  And the report of that confession,

20  yes.

21     Q.  And also the transcript of Nicole Harris's

22  confession?

23     A.  Yes.  I believe I had that also.

24     Q.  But there was no information outside of the

SCOTT DENTON

Page 112

1  confession that influenced -- there was no additional

2  information beyond the autopsy and the confession that

3  influenced your final determination as to the cause

4  and manner of death?

5     A.  No.  I would say -- you know, the only thing

6  I would add was the opinions of the other doctors in

7  the office.  Besides that, no.

8     Q.  And the opinions of the doctors in the

9  office, were they in consensus?  Were there

10  disagreements?

11     A.  There was no disagreement that was told to

12  me.  And one of the doctors basically said I made a

13  mistake signing it out as accident -- you know,

14  accidental hanging initially.

15        So -- because she actually went on her own

16  and looked at the body, like, two days afterwards

17  because the body hadn't been picked up yet, that I

18  didn't know about.  And so there was actually strong

19  support for calling it a strangulation homicide.

20     Q.  Okay.  Who was this doctor?

21     A.  Dr. Nancy Jones.

22     Q.  Before you brought this to the quality

23  assurance meeting, did she come up to you and say that

24  you got this wrong?

SCOTT DENTON

Page 113

1    A.   Yes.

2    Q.   When did she do that?

3    A.   That was -- I don't know.  I would say

4    probably a couple days after.  So it was either -- I'd

5    say probably it was Tuesday because that would be the

6    next day she would be on, because she was off Sunday

7    Monday.

8    Q.   And what did you say in response to her?

9    A.   I was like, "Well, you know, clearly there

10   is more information.  The mother confessed" -- or

11   something to that -- you know, something like that.

12   Q.   Okay.  And I -- so -- all right.  You're

13   saying that on May 15, 20-- May 17, 2005, Dr. Jones

14   came up to you and said, "You got this wrong"?

15   A.   She said, you know, "The ligature mark was

16   horizontal.  There's no way that was hanging," you

17   know.  I mean, so yeah, she basically said, you know,

18   that that was a mistake.

19        And, you know, and then -- by that time, I

20   guess it was public knowledge that the mother had

21   confessed.  It was on the news.  So I was, like,

22   "Well, you know, clearly you were right, you know,

23   Dr. Jones."  And then I waited for the other

24   information to come in.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 114

1    Q.   Do you know whether she saw the news report

2    of Nicole Harris's --

3    A.   Don't know.  I mean, Dr. Jones -- Dr. Jones

4    liked telling me I was wrong multiple times during our

5    career together; so that was nothing that was unusual.

6    Dr. Jones and I did not have the best relationship.

7    Q.   So in this case, she said that the cause of

8    death, hanging, was wrong?

9    A.   Yes.

10   Q.   Did she say the manner of death was wrong as

11   well?

12   A.   I don't remember if she said that.  She said

13   that the ligature mark was horizontal; so it

14   definitely wasn't hanging.  And I'm not sure what

15   other comments she made.  It was, like, "Okay.  Thank

16   you."

17   Q.   Well, on -- so then on May 17, 2005, did you

18   go and do another death certificate in this case?

19   A.   No.  No, because I don't change things

20   because Dr. Jones comments, makes comments to me.

21   Q.   Okay.

22   A.   No.  You follow policies and procedures of

23   the office.

24   Q.   Turning back to -- okay.  So beyond

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 115

1    Dr. Jones' comments to you and the information you

2    were provided that Nicole Harris had confessed, there

3    was no additional information that made you change the

4    cause and manner of death in this case?

5    A.   I wouldn't even say Dr. Jones' comments

6    influenced me one way or another.

7        I mean, what caused me to change the cause

8    of death and the manner of death was the report and

9    the transcript of the confession that I presented to

10   the doctors that was consistent with the autopsy.

11   Q.   I see.  Okay.  And the report being the

12   Chicago Police Department's Clear and Closed Report?

13   A.   Yes.

14   Q.   And the transcript of Ms. Harris's

15   confession?

16   A.   Yes.  And, you know, any confession has to

17   fit the autopsy.  So are they consistent or not?  I

18   think I mentioned that before.  Are they consistent?

19   And they were -- they were all consistent.

20   Q.   Right.  So in this case, it's not -- the

21   autopsy report was consistent with Ms. Harris's

22   confession?

23   A.   Yes.

24   Q.   But it didn't -- the autopsy report didn't

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 116

1    prove that Ms. Harris's confession was accurate?

2        MR. KAMIONSKI:  Objection to the form of the

3    question.

4    A.   Right.  Confessions -- confessions have to

5    stand alone, you know.  And then you take that

6    confession and then compare it to the autopsy.

7        So, you know, confessions can support an

8    autopsy, but an autopsy can't -- doesn't always

9    support a confession.  They don't always go both ways.

10   Q.   Right.  I understand.  I guess what I want

11   to be clear about is the autopsy in this case was

12   consistent with Ms. Harris's confession?

13   A.   Yes.

14   Q.   But it didn't prove -- the autopsy in no way

15   proves in fact that Ms. Harris killed her child?

16   A.   No.  The autopsy is more supportive that

17   it's a horizontal ligature mark.  And so what's the

18   cause of that horizontal ligature mark?

19   Q.   Right.

20   A.   So it requires investigation.

21   Q.   Right.  Because, again, the physical and

22   pathological evidence cannot prove that one way or

23   another?

24   A.   Right.  It can either support or deny the

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 117

```
 1   circumstances.
 2        Q.   Okay.  So I want to turn your attention back
 3   to Exhibit 96Z, your autopsy report.
 4        A.   Uh-huh.  Okay.
 5        Q.   Pages 1 through 6.  Let me ask this.  Up and
 6   to the point where it says what your opinion is, would
 7   you say all of that report was completed on May 15,
 8   2005?
 9        A.   Yes.  Because those are objective autopsy
10   findings that do not change.
11        Q.   Okay.  All right.  And so -- okay.  So all
12   of the things on pages 1, 2, 3, 4, 5, and the summary
13   diagnosis on page 6 were the objective findings from
14   your autopsy on May 15, 2005?
15        A.   Yes.
16        Q.   Okay.  Now, this -- and below that it has
17   your opinion, right?
18        A.   Yes.
19        Q.   Okay.  And it states that you signed this
20   report and dated it July 8th, 2005?
21        A.   Yes.
22        Q.   And is that when you drafted what your
23   opinion was in terms of the circumstances of this
24   case?
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 118

```
 1        A.   That's when it would go on paper and I would
 2   sign it, but I would say that my opinion here would
 3   have to be when I did the second -- when I did the
 4   final death certificate on June -- whatever that would
 5   be.
 6        Q.   June 14, 2005.
 7        A.   Right.  Because I would have to agree that
 8   that's my opinion on the death certificate, filling
 9   that out.
10        Q.   I see.  So what was previous -- what is
11   Exhibit -- or page 18, June 14, 2005, that's when you
12   made the determination as to the date -- as to the
13   cause and manner of death?
14        A.   Yes.
15        Q.   When you made your final cause of death
16   determination and your final determination as to the
17   manner of death and prior to testifying at trial, you
18   were not told by members of the Chicago Police
19   Department of all of the circumstances of Nicole
20   Harris's interrogation?
21        A.   No.  I don't believe so, no.
22        Q.   And prior to your trial testimony, you
23   didn't have a chance to speak with Nicole Harris?
24        A.   No.  I never spoke with her.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 119

```
 1        Q.   And prior to your testimony at trial, you
 2   were never told by any member of the Chicago Police
 3   Department that Nicole Harris said she was pushed and
 4   poked during her interrogation?
 5        A.   I don't think I ever heard that, no.
 6        Q.   Prior to your trial testimony, you were
 7   not informed by any member of the Chicago Police
 8   Department that she was interrogated for over 27
 9   hours?
10        A.   I don't think I knew that.
11        Q.   And no member of the Chicago Police
12   Department ever told you that Nicole Harris was told
13   that she lied and failed the polygraph test after she
14   proclaimed her innocence in this case?
15        A.   I don't know any details of the
16   interrogation.
17        Q.   No one told you any of those?
18        A.   I don't think so, no.
19        Q.   No member of the Chicago Police Department
20   ever told you that, during her course of her
21   interrogation at Area 5 Police Headquarters, Diante
22   Dancy, her other son, was taken from her?
23        A.   No.  No, I wouldn't have known that nor
24   would I ever have been told details of interrogations,
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 120

```
 1   really.  That wasn't usually something I was made
 2   aware of ever.
 3        Q.   No member of the Chicago Police Department
 4   told you that Nicole Harris was called names, told she
 5   was a monster, said she crying false tears when she
 6   was crying during the interrogation when she was
 7   proclaiming her innocence?
 8        A.   No.
 9        Q.   No member of the Chicago Police Department
10   ever told you that, if she cooperated and confessed,
11   she could have been charged with a lesser degree of
12   murder, make bond, and fight her case from the outside
13   versus in jail?
14        A.   No.  Like I said, I would never have been
15   told any of that.
16        Q.   And you were never told by the Chicago
17   Police Department or any others that Ms. Harris claims
18   that the confession was fabricated by the members of
19   the -- the detectives in this case and that they
20   rehearsed it over and over with her again so that she
21   would recite it to the States Attorney's Office?
22        A.   No.  I don't think I was ever told that.
23        Q.   And in this case, without knowing all of the
24   circumstances of the interrogation, isn't it fair to
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 121

1  say that you can't determine whether Nicole Harris's
2  confession was coerced?
3       A.   I'm not an expert on coerced confessions.
4  I've had experience with them subsequent to this, but,
5  I mean, I'm not a good judge of coerced confessions.
6       Q.   So at the time you testified at her trial,
7  you weren't an expert about false confessions?
8       A.   No.  I have not studied coerced confessions.
9       Q.   You had not received any training on false
10  confessions?
11       A.   No.
12       Q.   So -- okay.  And at the time -- okay.
13  Without knowing all the circumstances of her
14  interrogation, you can't tell us whether the
15  detectives fabricated the confession or not?
16       A.   No.  I rely on the detectives that it's an
17  accurate confession.  I rely on others for that.
18       Q.   Right.  So in this case, you relied on the
19  detectives in determining that Nicole Harris's
20  confession was accurate, voluntary, and not coerced?
21       A.   Yes.
22       Q.   And it was only based on the detectives,
23  your trust in what the detectives had told you?
24       A.   Right.  And it -- right.  The facts that the

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 122

1  confession and the report, that they matched the
2  autopsy report and that they were accurate and
3  reliable.  I relied on that, yes.
4       Q.   Right.  So you relied on the detective
5  officers' representations that she voluntarily
6  confessed to killing her child?
7       A.   Yes.
8       Q.   But today, you're now aware that Ms. Harris
9  has alleged that she was coerced into giving a
10  fabricated and false statement?
11       A.   Yes.  I'm aware of that.
12       Q.   And you're aware that there's evidence that
13  indicates that Diante Dancy witnessed his brother wrap
14  the elastic band around his neck?
15            MR. KAMIONSKI:  Objection.  That assumes
16  facts.
17       A.   That's what he says in that report, yes.
18       Q.   And that he witnessed Jaquari kill himself?
19       A.   Yeah, I read that too.
20       Q.   Okay.  So in this case, at this point, in
21  terms of the statements you know from Nicole Harris
22  regarding her circumstances or her allegations
23  regarding the interrogation and Diante Dancy's
24  statements, you cannot say -- strike that.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 123

1            As you sit here today, you can't tell us
2  whether Ms. Harris's confession was coerced or not.
3  Is that fair to say?
4            MR. KAMIONSKI:  Objection.  Asked and
5  answered.
6       A.   Right.  I'm not an expert in coerced
7  confessions.
8       Q.   And you can't say whether it was fabricated
9  or not?
10            MR. KAMIONSKI:  Objection.  Asked and
11  answered.
12       A.   No.  I mean, the report seemed reliable.
13  That's what I have -- my basis of that.  And it
14  matched the autopsy report.
15       Q.   You're saying "the report," meaning the
16  police officer's report?
17       A.   Right.  Her statements and the police report
18  are consistent with the autopsy report or autopsy
19  findings.
20       Q.   And those are the autopsy findings that you
21  had shared with the detectives who you met with on May
22  15, 2005?
23       A.   Yes.
24       Q.   So her confession that was subsequently

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 124

1  given after the autopsy that you conducted are
2  consistent --
3            MR. KAMIONSKI:  Objection to the form of the
4  question.
5       Q.   -- with what you shared with the detectives?
6       A.   That would seem to be true, yes.
7       Q.   Now, in this case, was there any
8  pathological or physical findings that -- okay.  In
9  this case, you made a determination that Jaquari
10  Dancy, while he was being suffocated by the elastic
11  band, had vomited?
12       A.   That was most consistent with what was on
13  his sweatshirt, yes, vomit.
14       Q.   The pink vomit stains you found on his
15  sweatshirt?
16       A.   Yes.
17       Q.   And that was also consistent with the --
18  with his vein, the venous vein, being cut off?
19       A.   It's consistent with, like, asphyxia.  And
20  it's also -- there's a nerve that runs in there called
21  the vagus nerve; And if that gets compressed, that can
22  cause vomiting.
23            So there's actually three things that run on
24  each side.  The jugular vein, carotid artery, and

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 125

1  vagus nerve all run together.  So if they are

2  compressed, that can cause vomiting.

3      Q.   Okay.  So in this case, there was

4  indications that you made that you believed Jaquari

5  Dancy vomited while he was suffocating?

6      A.   Well, there's vomit on his sweatshirt that

7  accompanied his body that I believe he was wearing, so

8  yes.  That would be most consistent, yes.

9      Q.   Okay.  And there was no evidence in this

10 case to indicate that Jaquari Dancy bled from his nose

11 while he was being suffocated?

12     A.   I didn't see any blood in his nose.

13     Q.   And that's something you would have looked

14 for?

15     A.   Sure.

16     Q.   And if he had -- if you had found blood in

17 his nose, you would have noted that, correct?

18     A.   Yes.

19     Q.   And you didn't find any blood on his

20 sweatshirt or any other part of his clothes, correct?

21     A.   I don't believe so, no.

22     Q.   And you've already testified you would have

23 noted that in your report as well?

24     A.   Yes.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 126

1      Q.   So there's no evidence whatsoever to

2  indicate that Jaquari Dancy bled from his nose while

3  being suffocated?

4           MR. KAMINSKI:  Objection to the form of the

5  question.

6      A.   I didn't see any evidence of it.

7      Q.   In this case, is it possible that, while

8  Jaquari was in the bedroom, he wrapped the elastic

9  band around his neck and it caused him to lose oxygen,

10 causing him to pass out and fall to the ground and

11 die?  Is that a possible way he could have died in

12 this case?

13          MR. KAMINSKI:  Objection to the form of the

14 question.

15     A.   When you work with possibilities, I mean,

16 almost anything is possible.  I usually answer those

17 is it possible or likely or what degree of likeliness.

18 I never say anything is impossible.

19          I mean, is it possible?  Sure.  Is it

20 likely, probably -- like I said, I have trouble

21 believing a 4-year-old could wrap that around his neck

22 tight enough to do that.

23     Q.   Well, in this case though, you have evidence

24 that the father saw him do this on another occasion,

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 127

1  correct?

2      A.   The father stated that, yes.

3      Q.   And you have evidence that his brother saw

4  him do this?

5      A.   That's what his brother says, yes.

6      Q.   And there's evidence from the father that he

7  had to wrap the band from -- to get him away from the

8  neck several times?

9      A.   Yeah.  I would have to get more information

10 on that.  That just seems -- it seems unlikely to me,

11 just from my experience.  I mean, that's why I said it

12 could be possible.  It just seems difficult to believe

13 this child is wrapping things around his neck all the

14 time like that.

15          MS. MOGUL:  I want to take a break here for

16 a second.

17          THE VIDEOGRAPHER:  Now going off the record.

18 The time is approximately 1:07 p.m.

19               (Recess in proceedings

20                from 1:07 to 1:19 p.m.)

21          THE VIDEOGRAPHER:  Back on the record.  The

22 time is approximately 1:19 p.m.

23     Q.   On May 17, 2005, who were the members or the

24 doctors who were part of the quality assurance

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 128

1  discussion?

2      A.   I don't know.  There's no written record of

3  that.

4      Q.   There are no notes of the quality assurance

5  meetings?

6      A.   No.

7      Q.   Back in June of 2005, prior to coming up

8  with your final determination as to the manner --

9  cause and manner of death, would you have wanted

10 information regarding Nicole Harris's allegations

11 regarding her interrogation to determine the accuracy

12 of or the validity of that confession?

13     A.   In June 2005?  If I knew about her

14 allegations, I probably would want -- I would want

15 more information, I would say.  Yes.

16     Q.   But that's something you would want to have

17 taken into account in determining whether her -- the

18 confession would have influenced your change of the

19 cause and manner of death determinations?

20     A.   Right.  It's one of the things about -- it

21 would be one of the things I would take into

22 consideration.  Yes.

23     Q.   Based on the information -- okay.  Assuming

24 the following information is true, that the father had

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 129

1  seen Jaquari wrap the elastic band around his neck on

2  previous occasions, --

3      **A.**  Okay.

4      **Q.**  -- that he had seen the child put other

5  things or had other things around his neck, --

6      **A.**  Okay.

7      **Q.**  -- that Diante, his brother, saw him wrap

8  the elastic band from the sheet around his neck --

9      **A.**  Okay.

10     **Q.**  -- and he believes that that's what caused

11 his death, --

12     **A.**  Okay.

13     **Q.**  -- and that Nicole Harris said she did not

14 kill her child and that she was coerced and fabricated

15 into giving a confession, --

16     **A.**  Okay.

17     **Q.**  -- assuming all that is true, how would you

18 rule the manner and cause of death in this case?

19         MR. KAMIONSKI:  Objection.  Incomplete

20 hypothetical.

21     **A.**  That's a good question.  I would probably --

22 I would probably leave it strangulation, since the

23 ligature mark is horizontal.  And then I would

24 probably say undetermined, just because -- because

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 130

1  there's -- just because of the information.

2      **Q.**  Okay.  And so -- okay.

3      **A.**  Because of conflicting information, I would

4  say.  I'm assuming the police report would still be

5  there.

6      **Q.**  Meaning what?

7      **A.**  Like the police report the police gave me as

8  their report of the confession, I would have that; and

9  I would have the information you just said that was

10 true.

11        So I would -- if I have conflicting

12 information, I would say undetermined and leave it

13 open, or I wouldn't close it.  I would leave it open

14 indefinitely.

15     **Q.**  Okay.  But you would no longer rule it was a

16 homicide.  You would say it's undetermined?

17     **A.**  I would have to resolve the conflict between

18 those two stories before I could say anything, I would

19 say.

20        MS. MOGUL:  Okay.  I tender the witness.

21        MR. KAMIONSKI:  Okay.  Good afternoon,

22 Dr. Denton.

23        THE WITNESS:  Good afternoon.

24        MR. KAMIONSKI:  We've spoken before.  My

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 131

1  name is Avi Kamionski, and I represent the individual

2  officers.

3         THE WITNESS:  Okay.

4             CROSS EXAMINATION

5             BY MR. KAMIONSKI:

6      **Q.**  I want to go through a few points that

7  Ms. Mogul brought up and walk you through them.  Okay?

8      **A.**  Okay.

9      **Q.**  Let's go to page 10 of Exhibit 962.

10     **A.**  Okay.

11     **Q.**  That's the page in which you -- you talked

12 about before where you indicated the -- where you

13 marked the ligature marks around the neck, --

14     **A.**  Yes.

15     **Q.**  -- correct?

16        Am I correct you noted on the left side of

17 the neck only one ligature mark from the bed sheet?

18     **A.**  Yes.

19     **Q.**  And on the other side, you noted a fainter

20 type of ligature mark from presumably the bed sheet?

21     **A.**  Right.  There was a line of petechiae.  So

22 there was a clear demarcation that there was pressure

23 on the skin of the neck, but there was no abrasion or

24 scraping of the skin.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 132

1      **Q.**  And if you go lower down, you also noted

2  that there was a gap in the ligature mark that

3  surrounded the neck; is that correct?

4      **A.**  Yes.

5      **Q.**  I'm going to show you what's marked -- I'm

6  going to mark this, actually, as Exhibit 100.  It's

7  going to be the back packet of what you've got there.

8      **A.**  Okay.

9      **Q.**  Just the pictures -- because you didn't use

10 any pictures -- to make it easier.

11        Let me just -- let's separate the two

12 documents.  The top one is stapled; so it's a little

13 clearer.

14     **A.**  Okay.

15     **Q.**  Keep that one open to page 10.

16     **A.**  Okay.

17     **Q.**  And then --

18        MS. MOGUL:  So you're marking this -- okay.

19        MR. KAMIONSKI:  What I want to do is --

20        MS. MOGUL:  Do you have a copy of that for

21 me?

22        MR. KAMIONSKI:  Yeah.  You have it.

23        MS. MOGUL:  I -- not in the same order, and

24 it's going to be hard for me to find them because

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 133

```
 1   you're not using this.  You gave him a separate set of
 2   pictures, right?
 3            MR. KAMIONSKI:  No, no.  It's your pictures.
 4            MS. MOGUL:  Okay.
 5            MR. KAMIONSKI:  Your document was two
 6   stapled documents.  So I'm saying -- I thought, given
 7   the fact that you only -- you didn't use any of the
 8   pictures in your Exhibit 96Z, I'm just going to make
 9   your back part of the exhibit, Exhibit 100.
10            MS. MOGUL:  No.  It's a group exhibit, the
11   whole thing.
12            MR. KAMIONSKI:  We can keep it as 96Z.
13            MS. MOGUL:  No, no.  Okay, keep it at --
14   yeah.  I'm sorry.  I thought you were giving him a
15   whole different set of pictures.
16            MR. KAMIONSKI:  No.  It's the same pictures.
17   We're on the same page.  This is the back part of 96Z.
18            THE WITNESS:  Okay.
19        Q.  Can you find the pictures that show the gap
20   in the back of the neck?
21            I actually have a feeling it's not included
22   in here.
23        A.  Actually, I don't see a picture, a close-up
24   picture, of the back of the neck.
```

SCOTT DENTON

Page 134

```
 1        Q.  I'm going to find it.
 2            You would have taken a picture of the back
 3   of the neck, right?
 4        A.  Yes.
 5            I mean, 58 has a picture of his back and his
 6   head, but it's too dark to see anything.
 7        Q.  In your original file, do you have the
 8   pictures as well or just the Kodachromes, the small
 9   ones?
10        A.  I just have Kodachromes.
11            MR. KAMIONSKI:  I'm going to show you on my
12   computer, and we'll print it out and mark it
13   eventually as -- I'm going to mark a complete set as
14   my own Exhibit 100 of the photographs from the
15   autopsy.
16            MS. MOGUL:  Okay.  And I'm just going to
17   say, for the record, I attached everything I got.
18            So did you get a set of photographs that we
19   don't have?
20            MR. KAMIONSKI:  No.  It's Bates stamp number
21   City 1479.
22            MS. MOGUL:  Okay.
23            MR. KAMIONSKI:  I think you maybe -- I'm
24   marking something that was in the City production.  It
```

SCOTT DENTON

Page 135

```
 1   looks like you're using from the ME production.  I'm
 2   not saying this is not complete.  This is what we got.
 3   I'll show you later.  You got it also.
 4            MS. MOGUL:  Yeah, I think that that's this.
 5            MR. KAMIONSKI:  Is it the same thing?
 6            MS. MOGUL:  It's Bates numbered 25.
 7            MR. KAMIONSKI:  Oh, you know what?  It's my
 8   fault because I detached the documents.  They were in
 9   multiple staple.  It's actually stapled to this
10   packet.
11            THE WITNESS:  Oh, okay.
12            MR. KAMIONSKI:  The pictures aren't totally
13   separated.  Some of them are; some of them aren't.
14            THE WITNESS:  That makes more sense.
15            MR. KAMIONSKI:  Let's keep them all stapled
16   together.  So we're still on 96Z.
17            THE WITNESS:  Okay.  Now I see it, yes.
18        Q.  And there's a clear gap noted in the
19   picture; is that correct?
20        A.  Yes.
21        Q.  And am I correct that that indicates that
22   there was not -- the bed sheet was not wrapped tightly
23   around Jaquari's neck completely, throughout his
24   entire neck; is that correct?
```

SCOTT DENTON

Page 136

```
 1            MS. MOGUL:  Objection to form.  Foundation.
 2        A.  That would be most consistent.  It's either
 3   that, which is more likely, or that there's something
 4   between the ligature and the skin.  Either that -- but
 5   it's most consistent that there's no pressure on that
 6   area of the neck.
 7        Q.  And there is also less pressure indicated on
 8   the left side, correct?
 9            MS. MOGUL:  Objection to the --
10        Q.  On the right side -- I apologize -- which is
11   the other part of the --
12        A.  I believe that's -- yes.  The right side of
13   the neck also has less pressure, yes.
14        Q.  And, in fact, you would agree with me that
15   the -- your physical findings are not consistent with
16   a bed sheet -- with the cord being wrapped around
17   Jaquari's neck tightly multiple times?
18        A.  I would agree with that, yes.
19        Q.  You would agree with me that the bed sheet
20   cord -- strike that.
21            The gap which is behind Jaquari's neck is
22   most consistent with -- back up.  Let me strike that.
23            The bed sheet cord was not wrapped
24   completely around his neck based on your physical
```

SCOTT DENTON

Page 137

```
1   findings here, you agree with that, correct?
2       A.   That would be consistent with what I see,
3   yes, on his neck.
4       Q.   There's nothing in your physical findings
5   that show that it was wrapped around multiple times
6   around his neck, correct?
7       A.   There's nothing -- there's nothing that I
8   can -- okay.  Let me see if I understand.  There's
9   nothing that I see that shows it was wrapped around
10  multiple times his neck.
11      Q.   There's no medical findings that it was even
12  wrapped around completely tightly one time; is that
13  correct?
14      A.   That is correct.  There is no 360-degree
15  complete ligature abrasion.  There's a gap on the back
16  of the right side of his neck.
17      Q.   And medically, from a medical perspective,
18  it would be impossible for Diante (sic) to strangle
19  himself unless the cord was wrapped at least one time
20  around his neck?
21          MS. MOGUL:  Objection to the form and
22  foundation.
23      Q.   Is that correct?
24      A.   I would think strangling himself would
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 138

```
1   require him to wrap it around his neck tightly and it
2   not loosen up.
3       Q.   The other alternative is if there's an
4   opposing force on the cord; would that be correct?
5       A.   Yes.  I think I said that, yes.
6       Q.   You have a picture -- you also took
7   photographs of the actual -- let me back up.
8           So any stories that you've heard now about
9   the cord being wrapped around multiple times around
10  his neck, so witnesses seeing or Diante claiming that
11  he saw it wrapped multiple times around his neck, that
12  is not consistent with your medical findings; would
13  that be correct?
14          MS. MOGUL:  Objection to the form.  That
15  mischaracterizes Diante's statements, and it
16  mischaracterizes evidence in the record.
17      Q.   Let me make my question a little clearer.
18  The medical -- the evidence that you saw in the
19  photographs are inconsistent with a cord being wrapped
20  -- with the elastic cord being wrapped around Diante's
21  (sic) neck tight multiple times?
22      A.   That is correct.
23      Q.   The cord itself -- I'd direct your attention
24  to page -- 60 is the ME subpoena number 60.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 139

```
1       A.   Okay.
2       Q.   Am I correct that is a picture of the
3   elastic band that you took that was dangling out of
4   the sheet?
5       A.   Yes.  The free band is laying on the sheet,
6   yes.
7       Q.   When you say "free band," what you saw was
8   that one end of the elastic was not -- no longer
9   attached to the bed?
10      A.   Yes.
11      Q.   It wasn't in any sort of a loop form, where
12  it was attached at one side to the bed sheet and then
13  back at the other side to the bed sheet; is that
14  correct?
15      A.   I did not see that.
16      Q.   Maybe we can call it like a shoelace, like
17  the end of a shoelace.  Would that be a fair
18  representation?
19      A.   That's fair, yes.
20      Q.   Based on your experience, is it consistent
21  with what you saw that it is even physically possible
22  to wrap that cord around your neck one time by
23  accident without it just falling off?
24          MS. MOGUL:  Objection.  Form.  Confusing.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 140

```
1       Q.   Was there anything confusing about what I
2   just asked you?
3       A.   I think I understand.
4       Q.   Okay.  What's your understanding about what
5   I asked you?
6       A.   I don't think what you described is
7   possible.
8       Q.   What is not possible?
9       A.   That if you put a cord around your neck from
10  my fingers -- from here to here -- and then stop here
11  and then let it go and one end is free, that could not
12  cause strangulation.  That would just fall away unless
13  there was traction on the free end.
14      Q.   And traction -- in this case, you need
15  traction on potentially both ends or just the free
16  end?  That's right?
17      A.   (No response.)
18      Q.   Would you agree that the single-line cord
19  that is more pronounced on the left side versus the
20  right side is consistent with somebody applying
21  pressure by pulling on the cord around Jaquari's neck?
22          MS. MOGUL:  I'm going to object to the form
23  and mischaracterizes testimony.
24      A.   I would say that the darker abrasion on the
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 141

1  left side of the neck is consistent with greater force

2  being applied opposite the neck.  So the greater force

3  would be coming from the back of his right side of his

4  neck to cause that darker abrasion on the left side

5  front.

6      **Q.**   And you agree that the force is consistent

7  with it coming from someone or some person -- some

8  person pulling on it?  That's consistent with that?

9      **A.**   It is consistent with that, yes.

10     **Q.**   Did you see any -- did you learn of any

11  evidence in the room that was consistent with any sort

12  of object, as opposed to another human being, be able

13  to create this type of pressure?

14        MS. MOGUL:  Objection.  Form.  Foundation.

15     **A.**   No.

16     **Q.**   There was a discussion about how much -- how

17  angled was the ligature marks.  Do you recall that

18  discussion?

19     **A.**   Yes.

20     **Q.**   Would you call this an angled ligature mark?

21       MS. MOGUL:  Objection to the form and

22  mischaracterization of the prior testimony.

23     **A.**   No.

24     **Q.**   Is this -- is the ligature mark that -- have

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 142

1  you seen strangulation cases -- I mean hanging cases?

2  Strike that.

3        Have you reviewed autopsies of individuals

4  who have been hanged?

5     **A.**   Yes.

6     **Q.**   And do you have experience in seeing what a

7  common or typical hanging case looks like?

8     **A.**   Yes.

9     **Q.**   Is the ligature marks in this case

10  consistent with a typical hanging case?

11     **A.**   No.

12     **Q.**   And why not?

13     **A.**   I think I mentioned before, hanging deaths

14  usually require a suspension point of the ligature

15  that you can see on the neck.  Either it's on the

16  front side of the neck and it's an inverted V-shape,

17  or it's on the back of the neck.  And it's usually

18  either upwards and backwards slanting, or it's upwards

19  and forwards to the side slanting.  And you can see

20  the ligature mark on the skin or the neck -- on the

21  skin of the face or the neck.

22     **Q.**   And when you had indicated before there was

23  -- I think I called it slight angle or slight angle

24  based on the measurements of where the ligature marks

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 143

1  were.  Is that angle significant to indicate that this

2  is a hanging case?

3     **A.**   I would say it's inconsistent with what I

4  would call a hanging case.

5     **Q.**   Not to get into any of the personal disputes

6  you may have with Nancy Jones, with Dr. Jones, or get

7  into -- because you mentioned -- you made a comment

8  that you -- there were certain things you did not see

9  eye to eye on with Dr. Jones.  But you initially wrote

10  it as a hanging in your first death certificate.

11  Would you agree that that was a mistake?

12     **A.**   Yes.

13     **Q.**   Do you wish you didn't write that the first

14  time?

15     **A.**   I wish I had not.

16     **Q.**   It was only mentioned in the beginning.  We

17  had a discussion on the phone about petechiae.  Do you

18  recall that?

19     **A.**   You asked me about petechiae, yes.

20     **Q.**   Does the -- the petechiae is shown -- can

21  you pick a good photograph that demonstrates the

22  petechiae?

23     **A.**   Okay.  Just going through them, picture 26

24  shows petechiae within the inner lip, the mucosa of

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 144

1  the inner lip, those little red dots inside the

2  mucosa, between the lip and the gum, around the gum.

3  Those little red dots are a good example of petechiae.

4        On 29 at the upper left corner, there's lots

5  of petechiae.

6     **Q.**   I'm sorry.  Can you go back to page 26?

7     **A.**   Sure.

8     **Q.**   Can you just point to me which marks you are

9  saying is the petechiae?

10     **A.**   Sure.  Looking at this picture, inside, so

11  here's, like, the lower frenulum of the lip.  So the

12  lip is being pulled outward and downward, and these

13  little red dots are all petechiae.

14     **Q.**   Can I ask you a question?  What is this mark

15  over here?

16     **A.**   I describe that as, like, an abrasion or a

17  superficial tear of the mucosa.

18     **Q.**   Can you show me on your lip?  Where is the

19  mucosa?

20     **A.**   It's inside the lip.  So if I pulled my lip

21  down, it would be inside my lip.

22     **Q.**   Could that abrasion in the lip -- you would

23  call it an abrasion?

24     **A.**   Yes.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 145

1   Q.   Consistent with being pressure towards the
2   -- like from contact with the teeth?
3       A.   That's what it's consistent with, yes.
4       Q.   If Jaquari was lying flat on the floor with
5   his face down and there was pressure being pulled
6   behind him with the cord and his head was being pushed
7   down, could that abrasion have been caused -- could
8   that abrasion have occurred from his face being pushed
9   into the floor and his teeth pushing into his lips
10  there?
11      MS. MOGUL:   Objection.   Form.   Foundation.
12      A.   Yes.
13      Q.   The abrasion is fresh, correct?
14      A.   Yes.
15      Q.   I'm sorry.   I cut you off.
16      Where are the petechiae?
17      A.   I was just -- there's other pictures.
18      Q.   There was one -- can you find the one that
19  -- it's on the side of the head where all the dots
20  are.
21      A.   On the face is 53.   That shows the petechiae
22  on his forehead and his eyelids.   Also, his total
23  facial picture on 56 also shows petechiae on his face.
24      Q.   Do you find significance in -- would you

---

SCOTT DENTON

Page 146

1   call this a lot of petechiae in this case?
2       A.   Yes.
3       Q.   Do you find this much petechiae in a hanging
4   case?
5       A.   No.
6       Q.   Why not?
7       A.   Petechiae of this degree requires that the
8   jugular vein be compressed and that the carotid artery
9   is still patent.   So pressure is still flowing into
10  the head, but the blood cannot drain.
11      It shows what I would call a large amount of
12  differential pressure in the head.   The capillaries
13  are bursting from being unable to drain.
14      Q.   Would the -- why would the -- why could you
15  -- why in this type of scenario would the jugular vein
16  and the carotid not, for lack of a better term, go at
17  the same time?
18      A.   Because it requires more pressure to occlude
19  the carotid artery than it does the jugular vein.   So
20  the jugular vein will occlude and compress.   In my
21  experience, in strangulation cases, the jugular vein
22  usually stays compressed; and then, through movement
23  or struggle or the ligature coming off or on or the
24  forearm on the neck coming off or on, the carotid will

---

SCOTT DENTON

Page 147

1   put pressure up into the head while the jugular vein
2   cannot drain.   So you get this differential pressure,
3   and that's when you get the petechiae.
4       Q.   The case you talked about, the lanyard
5   death, --
6       A.   Yes.
7       Q.   -- the reason the kid accidentally -- that's
8   a hanging?   Do you recall that case?
9       A.   Yes.
10      Q.   In that case, there's opposing force of the
11  lanyard.   There's not just one loose --
12      A.   Right.   The lanyard was suspended and tight
13  above him; so it was an upwards and backwards slanting
14  ligature abrasion.
15      Q.   I want to direct you to page 11 of your
16  report; so we're going away from the pictures.
17      A.   Okay.   The investigator's report?
18      Q.   Yes.
19      A.   Okay.
20      Q.   This is the -- this is the information that
21  you are provided prior to doing the autopsy.   Would
22  that be fair?
23      A.   Yes, that's fair.
24      Q.   And you knew nothing else about the case

---

SCOTT DENTON

Page 148

1   prior to doing the autopsy other than what you read in
2   this report?
3       A.   That is correct.
4       Q.   So any conclusions that you're reaching
5   prior to speaking to the police officers is just based
6   on this report and your autopsy?
7       A.   Yes.
8       Q.   If you look at the third paragraph, --
9       A.   Okay.
10      Q.   -- am I correct that you were not informed
11  that Sta-Von had claimed that the bed sheet was even
12  wrapped around his neck once?
13      A.   It doesn't say that here; so I would not
14  have known that.
15      Q.   Right.   The word "wrap" does not appear on
16  this -- on the report, correct?
17      A.   Right.   The closest it says is "There's a
18  piece of elastic material from a blue sheet around his
19  neck."
20      Q.   So you don't know that there was a story --
21  there was an allegation that it was wrapped around
22  multiple times tight?
23      A.   At this time, the day of the autopsy, I did
24  not know that.

SCOTT DENTON

Page 149

1    Q.   If you had known that, that would be
2  inconsistent with your findings, correct?
3    A.   Yes.
4    Q.   So you don't -- so you don't really have a
5  lot to go on other than what's here when you're making
6  your initial determination?
7    A.   That's true.
8    Q.   And you talked about pulling the death
9  certificate happens frequently?
10   A.   Maybe not frequently, but it happens
11 commonly.
12   Q.   What do you mean by that?
13   A.   Like a death certificate will be filled out
14 -- the procedure was:  You would do the autopsy, then
15 handwrite out the death certificate, and then it would
16 be -- when I was there, it was just -- it was put on
17 your workstation, and then the intake attendant would
18 circulate around and pick them up during the day, the
19 autopsies.  And he would pick them up.
20        And if more information came through or, at
21 the 2:00 meeting, if there was a consensus that your
22 cause of death maybe wasn't accurate or it needed more
23 information, then they would say, "Okay, go pull that
24 death certificate and make it pending" or "Change it."

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 150

1    Q.   Which leads to my next question.  The fact
2  that there was a change here in the death certificate,
3  that wasn't some out-of-the-normal protocol that
4  happened at the Cook County Medical Examiner's Office?
5        MS. MOGUL:  Objection.  Form.  Foundation.
6    A.   No, not at all.
7    Q.   I want to go to your report, page 3 of the
8  report.
9    A.   Okay.
10   Q.   Could you walk through and describe to me on
11 the body the multiple abrasions that you found, I
12 guess starting --
13       MS. MOGUL:  Objection to the form.
14       MR. KAMIONSKI:  Let me finish my question,
15 and then you can make your objection.
16   Q.   You testified that you had found multiple
17 indications of blunt force trauma?
18       MS. MOGUL:  Objection.  Form and it
19 mischaracterizes his testimony.
20   Q.   Did you say that you found some blunt force
21 -- evidence of blunt force trauma when you were
22 answering questions from Ms. Mogul?
23   A.   Yes.
24   Q.   Am I mischaracterizing what you said?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 151

1    A.   I don't think so.
2    Q.   And you indicated that those were from
3  number 3 to number 7?
4    A.   I would say number 2 through number 7 are
5  evidence of other injury that's classified as blunt
6  trauma.
7    Q.   Can you walk through with me where --
8  describing each one of those injuries and where they
9  are located on the body?
10   A.   Sure.  Number 2 was what we saw on the
11 picture, on the inner lip, that abrasion that was in
12 the intraoral mucosa, that was 0.25 at one point --
13 I'm sorry -- 0.15 inch.
14       So those are superficial abraded impression
15 marks to the intraoral mucosa.  So there's two of
16 them.  One is a quarter of an inch and one is 0.15
17 inch.
18       And the next one, on the right lower back,
19 there's a red abrasion that's small.  It's 0.15 inch.
20       And then on the left side of the chest --
21   Q.   Can you -- I'm sorry.  Can we do it with the
22 pictures, like a show-and-tell?  As you're talking
23 about it, let me know which picture is going to
24 indicate and where on the picture it indicates what

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 152

1  you're saying.
2    A.   Okay.  I think whatever picture we looked at
3  before with the petechiae on the lip, that also showed
4  an abrasion.  That would be picture 26.  So that shows
5  the abrasion on the lower lip.  That looks like that's
6  about a quarter of an inch.
7        On the right lower back --
8    Q.   And there was a second one at 0.15 inches?
9    A.   There's another one, yes.  I'm not sure
10 which picture that would be in.  There might be
11 another picture of the lips and another picture of --
12 the upper and lower lips are usually photographed
13 separately.
14       I would say number 40 looks like the upper
15 lip frenulum.  Again, you can see the petechiae.  And
16 then, right between my fingers there's, like, a red
17 abrasion or red petechia.  Looks like an abrasion to
18 me.  It's focal.  That's probably the other one.
19   Q.   That's this dot over here?
20   A.   Yes.
21   Q.   Just for the record, that's above the --
22 what do you call the piece in the mouth?
23   A.   The frenulum?
24   Q.   Frenulum.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 153

```
1       A.   Frenulum, yes.
2       Q.   I think we're on to number 3.
3       A.   Number 3, on the right lower back, there's a
4  red abrasion.  I believe that is shown on picture --
5  it's hard to see.  It's red on red.  I believe it's
6  38.  Yes, picture 38.  That's the red abrasion that's
7  on the back.
8       Q.   Can you tell how far down that is on the
9  lower back?
10      A.   Not with this picture, no, because it's a
11 close-up view.
12           The next ones, 5 and 6, are over the right
13 and left upper shoulders.  That's after the body was
14 filleted and opened.  There's two areas of bruising
15 over the right and left shoulders.  That would be in a
16 picture that shows the muscle tissues of his upper
17 front body.
18           I believe 30 is one of them.  The picture is
19 -- the picture is kind of dark.  Where I'm indicating
20 with my pen, that would be in this area right here,
21 within this muscle over the humeral head.  Right here.
22      Q.   Right here?
23           MS. MOGUL:  Can you show that to the camera?
24      A.   So this is a picture -- again, this is
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 154

```
1  called "filleting."  It's when you look for deep
2  muscle tissue bruising.  And this looks like -- this
3  is his arm, and this is the shoulders, most likely the
4  left shoulder.  And this dark area would be the bruise
5  I described on his left shoulder.
6       Q.   Is this the front of him or the back of him?
7       A.   I don't know just from looking at this
8  picture because I don't know the orientation.  It's
9  hard to see.  They're all a little dark.
10      Q.   If you look at his ear, can you tell by his
11 ear in that picture?
12           MS. MOGUL:  Objection to the form.
13      Q.   Does his ear tell you anything?  Is that his
14 ear?
15      A.   I'm sorry.  Which picture was it again?  I
16 lost my place.
17      Q.   30.
18      A.   Yeah, that may be the back of his right ear.
19 But the way the tissue was cut, I can't honestly tell
20 from this picture.  It could be a flap of the tissue
21 from the filleting.  But it might be -- it might be
22 his back.  I can't tell from this picture.
23      Q.   Does the front of the body look like that if
24 you cut it open with the heart?
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 155

```
1       A.   No.  Actually, this is -- this is -- you are
2  right.  This is the back.  This is the back of his
3  right shoulder.  So that is the back of the right
4  shoulder over the humeral head; so you are correct.
5       Q.   Now, you noted in the report that you -- the
6  intramuscular hemorrhaging -- the hemorrhaging --
7  strike that.
8            Is the hemorrhaging only -- you can only
9  note the -- strike that.
10           You are only noting the hemorrhaging after
11 the fillet?  Before the fillet, you didn't see any
12 indication of bruising on the shoulder, only
13 afterwards?
14      A.   That's correct.
15      Q.   What is -- what does that indicate to you?
16      A.   It just indicates -- first of all, it
17 indicates the fact that not all trauma is seen
18 externally.  People bump themselves, and they get
19 bruises that are deep all the time, and you don't see
20 any external evidence.
21           So intramuscular hemorrhage just means that
22 the bruise was sustained to a part of that body and
23 that the tissue damage or the capillaries broke deeply
24 inside and not on the surface.  So there's no abrasion
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 156

```
1  or scraping, but there's just blunt direct trauma to
2  that area.
3       Q.   Can you tell how long -- how old the bruise
4  is?
5       A.   It looked recent to me.  There's no
6  scientific way to say exactly how old it is.  All I
7  can say is whether it appears recent or healing, and
8  it appears recent.
9       Q.   If Jaquari sustained a bruise while he was
10 being killed and he died -- is it possible that he
11 died before the bruise manifested itself on the skin?
12           MS. MOGUL:  Objection to the form of that
13 question and grossly unfair.
14      A.   Yes.  You can sustain a deep bruise that
15 doesn't come to the surface for sometimes days.
16      Q.   Would death prevent it from then coming to
17 the surface?
18      A.   Right.  Because when you die, all that
19 process stops.  So there's no -- there's no migrating
20 of the bruise or healing that goes on after death.
21      Q.   I think we're up to number 6.
22      A.   Number 6 is just, looks like, the opposite
23 side of the body.  I'm looking for a picture that
24 looks like that on the opposite side.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 157

1    I would say 23 is that picture.  So this is
2 the left shoulder area where the head of the humerus
3 would be because here's the -- actually, that's the
4 right.  That is the right -- no.  I'm sorry.  That's
5 the left back.  You are correct.
6    So that's the left, right here, and this is
7 the intramuscular hemorrhage that's darker.  So all
8 muscle is red-brown, and this area is the
9 hemorrhage.  I believe the left was smaller, which is
10 consistent with that.  And it is.  It's 1 inch.  So
11 it's a smaller hemorrhage in the left head of the
12 humerus.
13    Q.   Both number 5 and number 6, do they appear
14 to you to be parallel bruising injuries?
15    A.   Yes.  They're kind of symmetrical, I would
16 call them.
17    Q.   Symmetrical.  Do they -- based on your
18 review of the body, are they consistent with both
19 occurring at the same time?
20    A.   They look similar in age, yes.
21    Q.   And just like you described, the right one
22 could have bruised and not come to the surface before
23 death.  The left could also be in that -- the left is
24 also a potentially type of bruise that could have

SCOTT DENTON

Page 158

1 surfaced at one point, but death for sure would have
2 stopped it from ever surfacing?
3    MS. MOGUL:  Objection to the form.
4    A.   Right.  Death would prevent any movement or
5 healing or reaction to that bruise, further.
6    Q.   Okay.  Number 7.
7    Number 7 is the right trapezius muscle in
8 the upper back, and that's a small hemorrhage.  That's
9 3/10 of an inch.  So that would be a picture of the
10 right back after the filleting.  And the trapezius
11 muscle is kind of on the side.  It's one of the side
12 muscles on the back.
13    Okay.  64 is the picture number.  It's a
14 close-up photograph of that hemorrhage.  And right
15 below where my thumb and finger are, that dark area,
16 that's bruising of the muscle, of the trapezius.
17    Q.   Is that a different bruise?  Is number 7
18 different than number 3, or is it the same bruise?
19    I'm sorry.  Number 3 was something you
20 visualized on the outside, and number 7 is an internal
21 one; but they are both in the right -- oh, no.  That
22 one is in the right upper back.  I apologize.
23    A.   Yes.  So that's the trapezius muscle.
24    Q.   How close is the trapezius muscle to the

SCOTT DENTON

Page 159

1 humeral head?
2    A.   It's -- I mean, it's in the same region.
3 It's fairly close.  I mean, I'd have to -- honestly,
4 I'd have to look again at an anatomy book to refresh
5 my memory.  It's fairly close.
6    Q.   It's somewhere -- it's before the midline of
7 the back?
8    A.   Yes.
9    Q.   You were asked a lot of questions about
10 conversations you had with the police?
11    A.   Okay.  Yes.
12    Q.   As a medical examiner, is it common to have
13 conversations with the police?
14    A.   Yes.
15    Q.   There's nothing out of the ordinary of the
16 police coming to the autopsy?
17    A.   No.  It's actually -- in the Medical
18 Examiner's Office when I was there, there was a small
19 -- they call it Liaison Department of the Chicago
20 Police.  So the Chicago Police had officers stationed
21 in the Medical Examiner's Office.
22    Q.   When the police asked you to hold off for
23 the investigation, was that part of office policy to
24 do that?

SCOTT DENTON

Page 160

1    A.   Yes.
2    Q.   You weren't doing the police any special
3 favors?
4    A.   No.  Absolutely not.  I would do that for
5 anyone.  Even if a family member called and said to
6 hold off, we would hold off.  We would -- I would -- I
7 would do what I did.
8    Q.   Would you agree that, based on the marks on
9 Diante's (sic) neck, that his death is most consistent
10 with a homicide by another individual?
11    MS. MOGUL:  Object -- well, objection to the
12 form.  Foundation.
13    Q.   I'll rephrase that.
14    Would you agree that based on the injury on
15 his neck, the ligature mark on his neck, that the
16 injury he sustained to his neck -- strike that.
17    It's undisputed that he was strangled.
18 Would you agree with that?
19    A.   Right.  The findings are most consistent
20 with --
21    MS. MOGUL:  Objection.  I'm sorry, let me --
22 I'm going to object to the form and foundation on that
23 question.
24    Q.   You agree that the findings are most

SCOTT DENTON

Page 161

1 consistent with strangulation?

2     **A.** Yes.

3     **Q.** Irrespective of whether Nicole Harris

4 confessed or didn't confess to the crime, would you

5 agree that the findings are consistent with a

6 strangulation?

7     **A.** Yes. The findings are consistent with

8 strangulation.

9     **Q.** Not considering Nicole Harris's confession

10 at all, even if she never confessed, you would agree

11 that the findings are consistent with strangulation?

12     **A.** Yes.

13     **Q.** Now, not considering a confession by Nicole

14 Harris, would you also agree that the findings are

15 most consistent with a manual strangulation by someone

16 or something?

17     MS. MOGUL: Objection. Form. Foundation.

18     **Q.** I'll rephrase that.

19     Would you agree that, based on your review

20 of the body and the ligature marks on the neck, that

21 that is -- that strangulation is most consistent to be

22 caused by another person?

23     MS. MOGUL: Objection. Form. Foundation.

24     **Q.** Irrespective of the confession.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 162

1     **A.** I would say, just based on the ligature mark

2 on the neck and that gap and the elastic cord causing

3 that ligature mark, it's most consistent with another

4 person's help, yes.

5     **Q.** Have you ever in your career seen a case --

6 in your career, have you ever seen a case in which

7 there was a ligature mark consistent with this where

8 it was not caused by another individual?

9     MS. MOGUL: Objection to the form and

10 foundation.

11     **A.** With that gap, it's most consistent with the

12 cord being held away from the back of the neck almost

13 horizontally or slightly upwards. And that's -- and

14 I've never seen anything that wasn't caused by another

15 person causing that pattern.

16     **Q.** And you know that the cord is not -- is free

17 one end, correct?

18     **A.** That's what I was told, and that's what I

19 was shown, yes.

20     **Q.** You saw it? You photographed it?

21     **A.** Yes.

22     **Q.** You measured it?

23     **A.** I did.

24     **Q.** You touched it?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 163

1     **A.** Yes.

2     **Q.** The only way -- you'd agree the only way --

3 to a reasonable degree of scientific certainty, the

4 only way that cord could have caused the injuries on

5 that neck is if it was being held by another person?

6     MS. MOGUL: Objection. Form. Foundation.

7     **A.** I would say that that's most consistent.

8 That's the most consistent explanation for that

9 injury. Yes.

10     **Q.** Would you say that to a reasonable degree of

11 scientific certainty?

12     **A.** Based on the ligature mark and knowing what

13 caused it, I would say yes.

14     **Q.** Based on the ligature mark, based on the

15 gap, and based on the cord that you determined caused

16 the injury?

17     **A.** To a reasonable -- to a scientific -- to a

18 reasonable medical degree of certainty?

19     **Q.** Yeah.

20     MS. MOGUL: Objection. Form. Foundation.

21     **A.** I would say, to that degree of certainty,

22 that that injury pattern on the neck with that

23 ligature is most consistent with being fixed at both

24 ends, and that would require another person.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 164

1     **Q.** You'd also agree to a reasonable degree of

2 scientific certainty that the cord was not wrapped

3 around the neck tight multiple times?

4     **A.** I see no evidence of that; so I would have

5 to agree with that.

6     **Q.** Will you also state to a reasonable degree

7 of scientific certainty and medical certainty that

8 this case was strangulation and not a hanging?

9     **A.** Yes, it is a strangulation.

10     **Q.** Before we talked, you had talked about

11 getting -- being contacted by a student from

12 Northwestern?

13     **A.** Yes.

14     **Q.** We talked about that on the phone?

15     **A.** Yes. You asked me about emails, and I said,

16 "Well, there was -- I think there was an email, but

17 then they followed up by a phone call."

18     **Q.** You couldn't recall her name when you were

19 being asked questions, but does the name Anna Bisaro

20 refresh your recollection as the person that was

21 contacting you about this case?

22     **A.** What I did is I went back through my emails.

23 I just searched through the emails for Northwestern,

24 and that was -- there was one email that came up and

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 165

1   only one, and that was her name.  But I -- but I --
2   there's no email associated with that name.  It's just
3   in the list.  So that's -- so I did get an email from
4   an Anna Bisaro.
5       Q.   Does hearing the name Anna Bisaro -- does
6   that refresh your recollection as the person that both
7   emailed and called you about this case?
8       A.   I mean, it would be most consistent, but I
9   can't say for sure that it was her.  It could have
10  been another Northwestern journalism student.
11      Q.   And you were definitely called about the
12  Nicole Harris case?
13      A.   Well, I mean, the person said, you know, I
14  changed my opinion, and they were going to write an
15  article about it.  I was fairly certain, you know, it
16  was this case.  It's the only case I could remember
17  where that caused that kind of, you know, kind of
18  scrutiny.
19      Q.   And then you were shown Exhibit 95Z, which
20  was an email that was sent to you.  Do you recall
21  that?
22      A.   Yes.  I read it, yes.
23      Q.   You don't recall receiving the email?
24      A.   I don't.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 166

1       Q.   You're not saying you never received it?
2       A.   I don't know if I received it or not.  I
3   don't recall ever seeing it or reading it, and I don't
4   believe I responded to it.
5       Q.   Have you had other cases in which lawyers
6   have contacted you to try to get you to change your
7   opinion?
8       A.   Sure.
9            MS. MOGUL:  Objection to the form and
10  foundation.
11      Q.   Has that happened -- I'll withdraw that.
12           You agree -- I think you testified the
13  confession, Nicole Harris's confession that you read
14  -- did you actually read the transcript of the
15  confession or just the report by the police officers?
16      A.   I think there was a summary.  Like the last
17  part of her confession, I believe, was given to me, a
18  transcript of it.
19      Q.   And that -- what you read was consistent
20  with your findings?
21      A.   Right.  The police report that I was given
22  and I believe that transcript, it was consistent with
23  the autopsy.
24           MR. KAMIONSKI:  We can take a break.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 167

1            THE VIDEOGRAPHER:  We're now going off the
2   record.  The time is approximately 2:15 p.m.
3                 (Recess in proceedings
4                  from 2:15 to 2:29 p.m.)
5            THE VIDEOGRAPHER:  This is the beginning of
6   recording number 3 of the videotaped deposition of
7   Dr. Scott Denton.  We are now going on the record.
8   The time is approximately 2:29 p.m.
9   BY MR. KAMIONSKI:
10      Q.   Dr. Denton, I want to go back to the
11  discussion about Anna Bisaro, the Northwestern
12  student.
13      A.   Okay.
14      Q.   You indicated that she had contacted you by
15  phone?
16      A.   Right.  I believe -- it's most consistent
17  that it's her that contacted, but it was definitely a
18  Northwestern journalism student.
19      Q.   What I'm trying to get at is:  What was your
20  understanding of what she wanted you to do and what
21  she was trying to get you to do?  And what was your
22  impression about it?
23           MS. MOGUL:  Objection:  form, foundation,
24  speculation.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 168

1       A.   I mean, she wanted me to talk to her.  That
2   was her main thing.  And she was trying to, you know,
3   basically say, you know, there's unfavorable things
4   about you, and you changed your opinion on a case.  If
5   you don't talk to me, it's going to look really bad.
6   And I'm going to write an article; so you need to get
7   your side of the story out.
8       Q.   Did you feel like she was trying to
9   intimidate you?
10           MS. MOGUL:  Objection:  form, foundation,
11  speculation.
12      A.   I felt that way, yes.
13      Q.   Did you feel like she was threatening you?
14      A.   Well, you know, saying, "I'm going to write
15  an article, and it's going to be bad about you," that
16  seemed a little bit threatening to me.
17      Q.   Were you offended by it?
18      A.   I was more irritated.  Not really offended.
19  I've dealt with the Innocence Project Northwestern
20  students before.  So I wasn't offended.  I was more
21  irritated.
22           MR. KAMIONSKI:  I have no further questions.
23           MR. FLYNN:  I have just a couple of quick
24  questions, Joey.

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 169

1    CROSS-EXAMINATION
2    BY MR. FLYNN:
3        **Q.**  Going back to when you held off on
4    determining the cause of death because the officers
5    asked you to, approximately how many times have you
6    done that in total?  Let me rephrase.  I'm sorry.
7            Approximately how many times have you held
8    off on determining the cause of death for any reason
9    at all, not just police officers asking you to?
10       **A.**  Oh, it's extremely common.  It was almost
11   weekly.  Either pending police investigation or
12   pending further studies or just pending.
13       **Q.**  And a few minutes ago, you said that if a
14   family member were to call you and ask you to hold off
15   on determining the cause of death, you would do it for
16   that reason as well.  Do you remember saying that?
17       **A.**  Right.  If they had -- if it was reasonable.
18   If they said, you know, "We don't -- we don't think
19   this is really, you know -- we don't think this is
20   really a heart attack.  We think they were doing
21   drugs" or something or, you know, something that would
22   delay it for more information, I would do that, sure.
23       **Q.**  And what other reasons are there other than
24   the police asking you or a potential family member

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 170

1    calling you where you would hold off on determining
2    the cause of death?
3            MS. MOGUL:  Objection: form, foundation,
4    vague.
5            MR. FLYNN:  Let me rephrase.
6            THE WITNESS:  Sure.
7        **Q.**  What other reasons have you held off in
8    determining the cause of death?  What other reasons
9    have caused you to do that?
10       **A.**  If we need to do a scene investigation, like
11   if we need to go to the scene for a child death.
12   Toxicology studies are most common, waiting for
13   toxicology results.
14           MR. FLYNN:  Nothing further.
15               REDIRECT EXAMINATION
16               BY MS. MOGUL:
17       **Q.**  You were asked a series of questions by --
18   wait.  Strike that.
19           You said that, with respect to this
20   Northwestern Medill student, that you went through
21   your email.
22           And did you find the email?
23       **A.**  No.
24       **Q.**  So what exactly did you find?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 171

1        **A.**  I found a contact of Northwestern.  It was,
2    like, Northwestern.edu or something like that that was
3    -- that came up with her name.  But there was no
4    email; so I must have deleted it.
5        **Q.**  Okay.  And you have no idea as you sit here
6    today whether that was the person who contacted you
7    from the Medill School of Journalism about this case?
8        **A.**  No.  I can't say specifically who it was.
9    No.  It was just a young -- it was a young woman.
10       **Q.**  So when she asked you questions about this
11   case, she said, "I want to hear your side of the
12   story," right?
13       **A.**  Right.
14       **Q.**  Why didn't you respond?
15       **A.**  It was kind of her manner.  She basically
16   said, you know, "There's unfavorable things about you.
17   You changed your opinion.  I'm writing this story;
18   and, you know, you need to get your side of the story
19   out."
20           And that's -- that's immediately when I just
21   -- I was like, "No."  In my experience, that's a trap.
22   So I just say, "No comment.  No thank you."
23       **Q.**  Well, did it occur to you that maybe she was
24   young and inexperienced and didn't know how to ask the

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 172

1    question of you?
2        **A.**  I never assumed that with the Northwestern
3    Medill or Innocence Project students, that they were
4    young and inexperienced.
5        **Q.**  Well, when this person called you, you had
6    no idea they were asking you about the Nicole Harris
7    case, did you?
8        **A.**  No.  That's the only case -- that's true.
9    That's the only case I could think of where I changed
10   my opinion that caused, I guess, this kind of
11   scrutiny, I guess.
12       **Q.**  Okay.  So as you sit here today, you don't
13   even know if this person was calling you specifically
14   about the Nicole Harris case?
15       **A.**  Right.  She did not say Nicole Harris.  She
16   just said, you know, "the case that you changed your
17   opinion on, that was -- that made you look bad."
18       **Q.**  Okay.  Turning your attention back to
19   Exhibit 96, you were asked a series of questions
20   regarding what injuries you found on Jaquari Dancy's
21   body?
22       **A.**  Yes.
23       **Q.**  Okay.  With respect to those injuries that
24   you detailed on page 3 -- 2 through 7, right?

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 173

1    A.   Yes.

2    Q.   You cannot tell us when those injuries were

3 caused, right?

4    A.   Right.  I can't say exactly.  All I can say

5 is they're recent, but I cannot put a specific time on

6 them.

7    Q.   So "recent" could be within a week of his

8 death?

9    A.   Usually within a day, I would say.  That's

10 the max, maximum.

11    Q.   Okay.  But you don't know it was caused

12 during the course of his death?

13    A.   No, I don't.

14    Q.   It could have, and it could not have, right?

15    A.   Yes.

16    Q.   Okay.  You don't know how these injuries

17 were caused?

18    A.   No, I don't.

19    Q.   You don't know whether the injuries were

20 caused if he, let's say, bumped into a cabinet, right?

21    A.   I mean, it's possible that he could bump

22 into a cabinet.  It's probably not likely with those

23 injuries, but it's possible.

24    Q.   Okay.  What's more likely then for the cause

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 174

1 of the injuries to his chest or to his shoulders?

2    A.   Well, the injuries on his -- I mean, just

3 going through them, I mean 2 through 7, I mean,

4 possibly --

5    Q.   I guess my question is:  It's all

6 possibilities, right?

7    A.   Right.  What they are:  It's documenting

8 injuries, and then you need a context.  Is it

9 consistent or inconsistent?  So you could throw out

10 dozens of scenarios and say, "Is it consistent or

11 inconsistent?"

12    Q.   Right.  But as you sit here today, you can't

13 tell us whether one scenario is more possible than the

14 other?

15    A.   I can say what's more likely than another or

16 if it's consistent or inconsistent.  That's all I

17 can --

18    Q.   Well, could any of these injuries have been

19 caused from him falling?

20    A.   The one, I would say, on the back, on the

21 right lateral back, that abrasion could be from

22 falling on something, yes.  That could be from

23 falling.

24         The injuries on, like, the backs of his

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 175

1 shoulders, so the humeral heads, if he fell and hit

2 his shoulders on something hard, a floor or a wall,

3 that would be consistent with that.

4    Q.   Okay.  Now, you testified at Nicole Harris's

5 trial in this case, right?

6    A.   Yes.

7    Q.   And you were asked this question, and you

8 gave this answer.  "Do you know if there are any signs

9 of abuse or neglect present on his body when you were

10 performing your autopsy?

11         "Answer:  Except for the marks on the neck,

12 I did not see any."

13    A.   Okay.

14    Q.   You were asked that question; you gave that

15 answer?

16    A.   Yes.

17    Q.   Okay.  And you stick by that today?

18    A.   Sure.  Yes.

19    Q.   Now, I just want to get some terms clear

20 with respect to hanging versus strangulation.

21    A.   Sure.

22    Q.   Okay?  The term hanging describes -- let me

23 ask this:  Do you dispute that the term hanging

24 describes an asphyxia event resulting from the

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 176

1 constriction of the neck as a result of suspension in

2 such a manner that the weight of the body or part of

3 the body pulls on the ligature?

4    A.   That sounds fairly reasonable.  I agree with

5 that.

6    Q.   Do you dispute that the term strangulation

7 is used to refer to asphyxia caused by a ligature in

8 such a manner that the force acting upon it is exerted

9 only by the ligature and not by the full or partial

10 weight of the body?

11    A.   I've never heard that definition before.  It

12 seems reasonable.

13    Q.   Okay.  If that's reasonable, isn't it fair

14 to say that if someone dies of strangulation, that

15 doesn't mean that it was intentionally caused by a

16 human being?

17    A.   No.  Strangulation is usually -- the way I

18 define strangulation, it's a horizontal ligature mark

19 on the neck.  And, actually, the weight of the body

20 can be exerted upon a ligature.  Especially if a

21 person is kneeling or falling forward while they're

22 being strangled, their own body will exert; so it's

23 not just the ligature itself all the time.

24         So that's how I would define strangulation,

AREA WIDE REPORTING & VIDEO CONFERENCING

1  as a horizontal ligature mark around the neck.
2      Q.  Right.  And so it's about the way that the
3  neck is -- way that the ligature marks are made on
4  the neck, not by how it was caused?
5      A.  Right.  Hanging is a -- to me, hanging
6  implies both specific findings on the neck and also
7  how the body is found, you know, like I found them
8  hanging.  That is also -- that's -- it describes the
9  scene and also describes what you're going to see on
10  the neck.
11          If someone is strangled, usually, you know,
12  it's either manual strangulation or ligature
13  strangulation or compressional asphyxiation or a choke
14  hold or something of that nature.
15          So there's -- I guess that's how I would
16  define them.
17      Q.  Okay.  What do you mean when you say "manual
18  strangulation"?
19      A.  Hands around the neck or hands on the neck.
20      Q.  Well, okay.  Let's just say I want to --
21  let's just say, for example, someone is in a kneeling
22  position, and they have a rope around their neck --
23  right? -- and it's tied or fixed to something, and
24  they fall forward and they never get up.

AREA WIDE REPORTING & VIDEO CONFERENCING

1      A.  Yes.
2      Q.  That would be a strangulation?
3      A.  Yes.  If the ligature is around the neck and
4  it's horizontal, to me that would be a ligature
5  strangulation, yes.
6      Q.  And that would be not caused by anyone, but
7  by the position of the body in relation to the rope or
8  string or whatever it may be?
9      A.  Yes.
10      Q.  Do you dispute that the physical appearance
11  of victims of asphyxia can vary widely regardless of
12  whether the cause is accidental or intentional?
13      A.  Yes.
14      Q.  You dispute that?
15      A.  No.  I'm sorry.  I agree with that.
16      Q.  Okay.  Do you dispute that the course of the
17  ligature around the neck leaves markings, with the
18  usual appearance being a groove with the deepest point
19  opposite the neck, the so-called "inverted V"?
20      A.  In a hanging injury, I agree with that.
21      Q.  Okay.  But you're saying that couldn't
22  happen in strangulation?
23      A.  Usually the inverted V is, I would call, not
24  strangulation.  I would call that a hanging.

AREA WIDE REPORTING & VIDEO CONFERENCING

1      Q.  Do you dispute that it's not necessary for
2  the ligature to completely surround the neck in order
3  for someone to die of asphyxiation?
4      A.  I do not dispute that.  I agree with it.
5      Q.  Are you aware of instances where children
6  have been killed as a result of open-loop injuries?
7      A.  Yes.
8      Q.  Do you dispute that fatal pediatric
9  asphyxiation can occur when the ligature involved is
10  not a closed loop?
11      A.  I guess I would have to know a specific
12  example of that because I'm trying to imagine how that
13  could happen.
14      Q.  Okay.  Okay.  Well, there's an instance
15  where an 8-month-old male was wrapped in a lamp cord
16  in a motel room and was found on the floor not
17  breathing after the mother had fallen asleep with
18  possible alcohol intoxication.  The child died.
19      A.  An 8-month-old?
20      Q.  Yes.
21      A.  With a cord wrapped around its neck?
22      Q.  Well, no.  It was with a lamp cord.
23      A.  A lamp cord wrapped around its neck?
24      Q.  Not wrapped, but a lamp cord around his

AREA WIDE REPORTING & VIDEO CONFERENCING

1  neck.
2      A.  Okay.  I'd have to know more about that.
3  That seems -- an 8-month-old, that's unusual.  I
4  wouldn't -- I wouldn't assume that's an accident.
5      Q.  You wouldn't assume that was an accident?
6      A.  No.  I would want to know how an 8-month-old
7  could do that, I mean, if it's an open loop.  But
8  that's unusual.
9      Q.  Okay.  So in that case -- okay.  So in that
10  case, there was a full investigation, and the police
11  concluded the child died as a result of neglect and
12  lack of supervision.  Would you disagree with those
13  findings?
14      MR. KAMIONSKI:  Objection.  Incomplete
15  hypothetical.
16      A.  No.  I'd want to read that case report.  I
17  think that would be interesting to know.
18      Q.  Okay.  So there was a case where a
19  13-year-old male was found with a rope wrapped around
20  his neck.  One end of the rope was tied to a tree near
21  a trampoline.  The child had previously engaged in
22  play involving a rope and the trampoline.  The child
23  was found cold and not breathing with a neck abrasion.
24  The child -- a code was attempted, but the child died.

AREA WIDE REPORTING & VIDEO CONFERENCING

Page 181

1     A.   Okay.

2          MR. KAMIONSKI:  Objection.  Incomplete

3  hypothetical.

4     Q.   Do you believe that dispute -- do you

5  believe that could have been accidentally caused?

6     A.   Sure.  If the rope is wrapped around his

7  neck and then it cannot free itself, sure, that's

8  possible.

9     Q.   Have you read any studies regarding

10 pediatric asphyxiation?

11    A.   Not that I can recall.

12    Q.   Have you yourself conducted any studies

13 regarding pediatric asphyxiation?

14    A.   Other than that case report, I haven't

15 studied them or reviewed the literature, no.

16    Q.   When you say "that case report," that's the

17 one with the lanyard and the child who was hanging

18 from the ceiling fan?

19    A.   Right.  Yes.

20    Q.   So that's the only case you can recall that

21 you've ever worked on regarding any asphyxiation of a

22 child beyond the Jaquari Dancy case?

23    A.   That I can recall sitting here, yes, that's

24 true.

Page 182

1     Q.   Okay.  Turning your attention back to the

2  picture on page 26?

3     A.   Okay.

4     Q.   That's the injury you describe on page 3.2,

5  that there was a superficial abraded impression mark

6  on the upper intraoral mucosa?

7     A.   Let me see.  I would say it's one of them,

8  because there's two.  There's one that's a quarter of

9  an inch, and there's one that's 0.15 inch.  So I would

10 say, of the pictures, it shows two of those areas on

11 the lip.  So that -- that would be one of them.

12    Q.   Could those injuries have been caused if

13 Jaquari Dancy fell on the ground?

14    A.   Yes.

15    Q.   And that could have been if he accidentally

16 tripped and fell on the ground?

17    A.   Yes.

18    Q.   Now, it's your -- it's your testimony today

19 in response to Mr. Kamionski's questions that your

20 physical findings indicate that the elastic band was

21 not wrapped multiple times around Jaquari Dancy's

22 neck; is that correct?

23    A.   Right.  Based on the autopsy findings, I see

24 one line from his back -- going across the front of

Page 183

1  his neck and then kind of fading off on the back of

2  the right side.  So I only see one line.  I don't see

3  multiple wrapped lines.

4     Q.   Okay.  And you in fact -- is it your

5  testimony that you don't see the elastic band going --

6  doing a 360 around his entire neck?  That's what you

7  told Mr. Kamionski?

8     A.   That's true.  I don't see that either.  And

9  that's what the diagrams show, that it fades on the

10 back of the right side of the neck.

11    Q.   Okay.  So in this case -- I'm going to

12 direct your attention to what's been previously marked

13 as Exhibit No. 75?

14    A.   Okay.

15    Q.   That is the copy of the transcript of Nicole

16 Harris's confession that you were given by members of

17 the Chicago Police Department and you reviewed prior

18 to coming up with your final determination as to the

19 cause and manner of death.

20    A.   Okay.

21    Q.   That's correct, right?

22    A.   I believe so, yes.  I believe I got the

23 summary of her statement.

24    Q.   Well, when you say "summary," what does that

Page 184

1  mean?

2     A.   I mean I -- you know, purportedly there's 26

3  hours or 25 hours of -- I never received 26 hours of

4  transcripts of an interrogation.

5     Q.   Right.  Right.  You never -- Okay.  You just

6  read what's in this transcript, which was the final

7  confession in the case?

8     A.   Yes.  I believe the final confession is a

9  good way to put it.  Yes.

10    Q.   Right.  And so you read this exhibit,

11 Exhibit No. 75?

12    A.   Yes.  I believe I did, yes.

13    Q.   And I'm going to ask you to turn your

14 attention to page 15 of that exhibit.

15    A.   Okay.

16         MS. MOGUL:  I don't know if I've got another

17 copy of that.

18         MR. KAMIONSKI:  This one?  The confession?

19         MS. MOGUL:  Yeah.

20         MR. KAMIONSKI:  I've got it.

21    Q.   Did you have a chance to read page 15?

22    A.   Yes.

23    Q.   Okay.  So let me -- let me read it.  Here it

24 says that Ms. Harris was asked what kind of string it

SCOTT DENTON

Page 185

1    was.  Elastic.
2            She was asked what she did with it.  She
3    said she put it around his neck.
4            She was asked, "How many times did you do
5    that?"  And she said, "About four, maybe."
6            And she then indicated that after she
7    wrapped it around his neck four times, he wasn't
8    crying, and he wasn't moving," correct?
9        **A.**   That's what it says, yes.
10       **Q.**   And you read that, right?
11       **A.**   I believe so, yes.
12       **Q.**   So that -- her confession, in fact, is not
13   consistent with the physical findings you did in this
14   autopsy, is it?
15       **A.**   Right.  There's only one ligature mark on
16   her neck, yes.
17       **Q.**   So her -- the part of the confession that
18   says she wrapped it four times around his neck, that's
19   not consistent with your physical findings?
20       **A.**   That's true.
21       **Q.**   It also says that after she wrapped it
22   around his neck, that she noticed his nose was
23   bleeding, correct?
24       **A.**   Yes.

SCOTT DENTON

Page 186

1        **Q.**   And that also is not consistent with your
2    physical findings of this autopsy?
3        **A.**   Right.  I did not see any blood in his nose.
4        **Q.**   And you -- and you didn't have any evidence
5    that his nose bled?
6        **A.**   I had none.
7        **Q.**   Did you tell the Chicago Police Department
8    or any of the detectives that the confession in fact
9    was not consistent with your physical findings?
10       **A.**   No.
11       **Q.**   Did you tell anyone from the State's
12   Attorney's Office that?
13       **A.**   No.
14       **Q.**   So in this case, your actual autopsy
15   findings, in fact, contradict the confession in this
16   case?
17       **A.**   Not necessarily.  Because I -- just because
18   she wraps it around his neck multiple times doesn't
19   mean it stays wrapped around his neck multiple times.
20           So that's -- all I see is one ligature mark.
21   I don't know how many times it was wrapped around his
22   neck or if she wrapped it around four times or not.
23   But all I see is one ligature mark.  So if she wrapped
24   it around his neck multiple times, only one ligature

SCOTT DENTON

Page 187

1    mark made an impression.  That's all I can see.
2            And I don't know if the sweatshirt was also
3    caught up in that.  We haven't talked about that.  But
4    I don't know if the sweatshirt is in between.  She
5    could have wrapped it around his neck multiple times
6    and caught the sweatshirt and have one tight ligature
7    mark and have the sweatshirt there, and then actually
8    she's wrapping it around his sweatshirt.  That's
9    another possibility.
10       **Q.**   Okay.  So your testimony now is that it's
11   possible that the elastic string was wrapped around
12   his neck?
13       **A.**   No.  I'm saying I don't know whether it was
14   or not.
15       **Q.**   Okay.  I understand that.
16       **A.**   So I'm not saying possible or not.  I'm
17   saying I don't know.
18       **Q.**   Okay.  So let me ask this.  Reading the
19   confession though, does it indicate anywhere that she
20   unwrapped the string?
21       **A.**   No.
22       **Q.**   Did it indicate anywhere that the sweatshirt
23   was caught up in the elastic band?
24       **A.**   No.

SCOTT DENTON

Page 188

1        **Q.**   So there's no support for, now, this
2    possible theory that she may have wrapped it around
3    the neck four times, maybe not?
4        **A.**   I'm sorry.  I don't understand your
5    question.
6        **Q.**   Okay.  Let me withdraw that.
7            Well, certainly the fact that there was no
8    bleeding from the nose, that was not supported by your
9    physical findings?
10       **A.**   Right.  I saw no -- I mean, I can look at my
11   autopsy report again, but I described -- I should have
12   described his -- I mean, the only thing I say is "The
13   nares exudes serosanguinous fluid," which is red
14   fluid; but that's usually from the lungs.
15           So his -- so there is red fluid within his
16   nose in my autopsy report.
17       **Q.**   And that would be the mucosa?
18       **A.**   No.  That's from the lungs.  That's called
19   pulmonary edema fluid.  So that's fluid in the lungs
20   during asphyxia that comes up and out.
21           So when I see him -- and also it's caused by
22   resuscitation.  So what I'm seeing in his nose is
23   serosanguinous fluid, is red fluid that could be from
24   resuscitation, or it could be from the act of

SCOTT DENTON

Page 189

1 asphyxia, either one or both.

2     **Q.** Okay. But it didn't indicate that he bled

3 from his nose?

4     **A.** No. I can't say if he bled from his nose

5 one way or another. I mean, all I see is this red

6 fluid.

7     I didn't see any injury to his nose.

8 There's no broken capillaries. There's no direct

9 blood in his nose. There's just this serosanguinous

10 fluid.

11     **Q.** Okay. And when we spoke on December 12,

12 2015, I asked you about whether you found any signs

13 that he bled from his nose, correct?

14     **A.** Right. And I said I did not, just as I'm

15 saying now.

16     **Q.** Okay. Well, if there was blood in his

17 nose --

18     So is it your testimony today then that your

19 physical findings regarding the ligature marks on

20 Jaquari's neck do not contradict the confession given

21 by Ms. Harris?

22     **A.** You'll have to say that again.

23     **Q.** Well, okay. I want to be clear.

24     **A.** Okay.

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 190

1     **Q.** So your physical findings regarding the

2 ligature marks on Diante -- strike that.

3     Is it your testimony that the ligature marks

4 that you found on Jaquari's neck, those are not

5 inconsistent with Nicole Harris's confession?

6     **A.** "Not inconsistent." I have trouble with

7 "not inconsistent." I mean not inconsistent is

8 consistent.

9     So I mean, I can explain -- the ligature

10 marks are single. There's one single ligature mark

11 that I can see from the back, going across the front

12 to the side. Then it stops. That's not -- that is

13 inconsistent with four wraps of a ligature around his

14 neck, touching his skin.

15     So if that is the scenario and that's what

16 she's saying, that all four were around her neck on

17 the skin, that is inconsistent.

18     **Q.** When is the first time you told anyone that

19 you did not believe the ligature marks were fully

20 wrapped around Jaquari's neck?

21     **A.** When did I first what? I'm sorry.

22     **Q.** Tell anyone that you did not believe the

23 elastic band had been 360 degrees wrapped around

24 Jaquari's neck?

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 191

1     **A.** I don't know.

2     **Q.** Is it when you first spoke with

3 Mr. Kamionski?

4     **A.** I don't remember. I don't know.

5     **Q.** Is it possible that's the first time you

6 ever told anyone that?

7     **A.** It wasn't you? I mean, we sat here and I

8 told you there was a single ligature mark.

9     **Q.** You never told me that.

10     **A.** Well, that's what it is. I mean, it's

11 described in my autopsy report as a single ligature

12 mark. To me, it -- I mean, I can just read my report;

13 and it says, you know, there's a single ligature mark

14 that's one-tenth of an inch to two-tenths of an inch

15 wide. I never assumed that was an issue, I guess.

16     **Q.** I'm sorry. Can you just point to me so that

17 I can be clear -- where do you say that there was a

18 single ligature mark?

19     **A.** "Around the neck is a slightly upwards and

20 backward slanting ligature abrasion."

21     MR. KAMIONSKI: Can you just -- the page and

22 exactly where you're reading from.

23     **A.** Sure. The page is number 2 of my autopsy

24 report. It says singular -- it says, "Upwards and

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 192

1 backwards slanting ligature abrasion . . ." not

2 abrasions. It's a single abrasion. ". . . most

3 prominent on the left side of the neck, ranging from a

4 tenth of an inch to two-tenths of an inch wide."

5     And it shows -- "The ligature impression

6 shows weave pattern impression marks." That's those

7 vertical marks. The impression -- it's all impression

8 -- it's all one -- it's all one mark. I mean, I never

9 thought that was an issue.

10     **Q.** Okay. But just to be clear, you never used

11 the term "singular" here, did you?

12     **A.** I don't think I needed to do that.

13     **Q.** I understand. So just to be clear, you

14 didn't use the term "singular," correct?

15     **A.** Well, let me read -- I'd like to read it,

16 please.

17     **Q.** Okay.

18     **A.** No, I did not specifically use the term

19 "single" or "singular."

20     **Q.** Instead, you describe repeatedly the

21 ligature impression mark?

22     **A.** Right.

23     **Q.** And there's only one ligature in this case,

24 correct?

AREA WIDE REPORTING & VIDEO CONFERENCING

## Page 193

```
 1        A.   Yes.  The elastic cord is the ligature, in
 2   my opinion; and it's a single elastic ligature mark on
 3   his neck.
 4        Q.   Right.  Let me just be clear.  There's one
 5   ligature that we're talking about, and that would be
 6   the elastic band from the sheet?
 7        A.   That's -- in my opinion, yes.
 8        Q.   And you describe the ligature impression
 9   mark?
10        A.   Yes.
11        Q.   Now, Mr. Kamionski gave you a scenario where
12   he suggested that Jaquari was pushed down on the
13   ground with someone holding the elastic band behind
14   him.  Do you remember that question?
15        A.   Yes.
16        Q.   And you said that you believed that was --
17   that was a possibility?
18        A.   Yes.
19        Q.   If that were the case, wouldn't you expect
20   to see both -- ligature marks on both sides of the
21   neck of the same consistency and color?
22        A.   If it was coming from straight in the back
23   of the neck, I would.
24             If it's coming from -- because the deepest
```

## Page 194

```
 1   impression was on the left side of the neck.  So if
 2   the pull or the traction was coming from the back of
 3   the right side, that would be consistent with that and
 4   having that gap there and having the darkest area
 5   exactly opposite that gap.  So that would indicate the
 6   traction was coming from behind him.
 7        Q.   Okay.  But in this case -- okay.  But if
 8   someone was -- if someone was pushing him down and
 9   holding both sides of the string behind him, you would
10   expect to see symmetrical lines on his sides of his
11   neck?
12        A.   If it was just -- if they were just pulled
13   back, I would expect to see, actually, a larger gap.
14   I would expect to see it stop maybe right here and
15   then stop here.  So you would just see about half the
16   neck with the abrasion, what you just described.
17        Q.   Okay.  But if they were directly behind him,
18   holding this -- this person -- right? -- was directly
19   behind Jaquari?
20        A.   Behind and to the right would be most
21   consistent if that was -- if we're going to follow
22   that hypothetical.
23        Q.   I see.  So you're saying, based on the
24   ligature marks, the person would have to be to the
```

## Page 195

```
 1   right?
 2        A.   Right.  The force would have to be coming
 3   from the back of his right side of his neck to cause
 4   the deeper abrasion on the left and then that gap in
 5   that area.
 6        Q.   I see.  But if -- Okay.  What I'm asking you
 7   is a different hypothetical.
 8        A.   Okay.
 9        Q.   If someone was standing behind Jaquari and
10   was holding both sides of the string and pushing
11   Jaquari down?
12        A.   Okay.
13        Q.   You would expect to see -- I guess you would
14   then expect to see a ligature mark that had the same
15   color and have an arc around Jaquari's neck?
16        A.   Yes.
17        Q.   It wouldn't be fainter on one side and
18   darker on the other?
19        A.   No.  It should be symmetrical, and it should
20   be kind of like a U-shape on his neck.
21        Q.   Okay.  So it might be, like, 180 degrees,
22   but it would be -- and the center would be, what, his
23   Adams apple?
24        A.   Yes, or above the Adams apple is usual.
```

## Page 196

```
 1        Q.   In this case, do you know how Jaquari was
 2   found in the bedroom?
 3        A.   I don't recall.  No, I don't, unless it says
 4   that somewhere in the investigator's report.
 5        Q.   Did you ever ask anyone how he was found?
 6        A.   I don't think so.
 7        Q.   Did you ever look for any evidence to
 8   indicate how he was found?
 9        A.   No.  I looked at the lividity; so I looked
10   at evidence on his body.  I looked at the petechiae on
11   his face, which could be evidence -- which is most
12   indicative evidence of being face down.
13        Q.   Wait.  I'm sorry.  Say that again.  You
14   looked for --
15        A.   Well, the lividity or settling of blood in
16   his body.  So that would be evidence of his position.
17   His livor -- his livor mortis was posterior, in the
18   back.  That means the blood settled in his back after
19   death.
20             And then when you see florid petechiae of
21   that nature in his face, which was severe, usually
22   that's someone lying face down after death.
23        Q.   Okay.  So in that case then, the petechiae
24   up in his eyes and his lips that you described and are
```

SCOTT DENTON

Page 197

```
1   described, that could have been caused from him being
2   face down after he died?
3       A.   It makes it worse.  It doesn't cause that,
4   from being face down.  But if there are petechiae,
5   being face down makes the petechiae worse.  The
6   lividity and the gravity pressure makes those
7   petechiae look much worse.  It doesn't cause the
8   petechiae.
9       Q.   And so you're saying, based on the petechiae
10  and where you found the livor mortis, you believed he
11  was face down?
12      A.   No.  I'm saying that's -- it's a
13  possibility, but I don't know how he was found.
14      Q.   Okay.
15      A.   I would have to rely on other statements,
16  how he was found.  I saw no evidence that he was face
17  up or face down when he was found.
18      Q.   And the police never told you how he was
19  found.
20      A.   I'd have to look at their report again, but
21  I don't -- you know, what I read from their report.
22  But if it doesn't say in there, I don't know.
23      Q.   Did you ask them how he was found?
24      A.   I don't remember.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 198

```
1       MS. MOGUL:  I'm going to ask you to turn --
2   actually, I'd like to just take a moment to try to
3   figure out -- wrap up.  Okay?
4       THE WITNESS:  Okay.
5       THE VIDEOGRAPHER:  We're now going off the
6   record.  The time is approximately 3:09 p.m.
7            (Recess in proceedings
8             from 3:09 to 3:13 p.m.)
9       THE VIDEOGRAPHER:  We're now going back on
10  the record.  The time is approximately 3:13 p.m.
11  BY MS. MOGUL:
12      Q.   I'm turning your attention back to Exhibit
13  10 in this case, the Clear and Closed Report?
14      A.   Okay.
15      Q.   Turning your attention to page 9, --
16      A.   Okay.
17      Q.   -- I'm going to -- the third paragraph from
18  the bottom, it states, "Sta-Von stated adamantly that
19  he had to unwind four or five loops of the elastic
20  band from Jaquari's neck."
21      A.   Okay.
22      Q.   Sta-Von Dancy, as you know from reading this
23  report, is the father of Jaquari Dancy.
24      A.   Yes.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 199

```
1       Q.   And he's the one who found Jaquari Dancy in
2   the bedroom with the elastic band around his neck?
3       A.   Yes.
4       Q.   And he's the one who said he had to unwind
5   it four or five times?
6       A.   Yes.
7       Q.   Nowhere does it state that the -- his
8   sweatshirt was blocking that band, does it?
9       A.   It does not.
10      Q.   And nowhere in Nicole Harris's statement
11  does it say that his sweatshirt was blocking or in
12  between his skin and the elastic band?
13      A.   It does not.
14      Q.   In fact, there's just no evidence anywhere
15  that indicates that the sweatshirt was in some way in
16  between the elastic band and his neck?
17      A.   Right.  There's no mention of the hooded
18  sweatshirt caught up in the band.  That's true.
19      Q.   When you spoke with Mr. Kamionski, did you
20  discuss with him this possibility that the sweatshirt
21  was caught between the elastic band and the neck?
22      A.   No.
23      Q.   Is the first time you ever told anyone that
24  the elastic band may not appear to have gone around
```

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON

Page 200

```
1   Jaquari's neck 360 degrees because the sweatshirt may
2   have blocked it -- is that the first time you've ever
3   said that, today?
4       MR. KAMIONSKI:  Objection.  That
5   mischaracterizes his testimony.
6       A.   Yes.
7       Q.   So -- and just -- okay.  To be clear, the
8   first time you've ever told anyone the hypothesis that
9   there may not be a full ligature mark around the neck
10  of Jaquari Dancy because his sweatshirt may have been
11  between the elastic band and his neck was today?
12      A.   Right.  That's something that needs to be
13  looked at.  I don't know if it's true or not, but it
14  would -- you know, what I was trying to do is explain
15  this discrepancy of what's in here and what the
16  autopsy report shows.
17      Q.   And it's possible, though, that your autopsy
18  report just absolutely refutes the confession in this
19  case, correct?
20      A.   It's possible, yes.
21      Q.   So when you testified at Nicole Harris's
22  trial, were you asked this question, and did you give
23  this answer?
24       "Question:  So let's talk about the first
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 201

```
 1  opinion you rendered on May 15, 2005, at approximately
 2  9:00 a.m. in the morning.  What was that opinion?"
 3      Your answer:  "My opinion at that time was
 4  that this was a tragic accident, that this was a boy
 5  who was in his upper bunk bed, who had become
 6  entangled with an elastic band fitted sheet and had
 7  fallen to the ground from his upper bunk, and that
 8  this was just a tragic accident that occurred, and it
 9  was a hanging.  And I really had no other information
10  that it wasn't that.
11      So at that point, after consulting with the
12  other doctors who were doing autopsies, we agreed that
13  this was most likely just a tragedy, that this was an
14  accident, and it was due to a hanging from the elastic
15  cord."
16      Were you asked that question?  Did you give
17  that answer?
18      A.   Yes.
19      Q.   So what other doctors did you consult with
20  to make your first opinion in this case?
21      A.   It would have been probably Dr. Donoghue in
22  the autopsy room.
23      Q.   But it says "doctors."
24      A.   Yeah.  I don't know who those would be.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 202

```
 1  Whoever was on the schedule that day.
 2      Q.   So when you formed that first opinion, did
 3  Dr. Donoghue come over and look at the body as well?
 4      A.   I don't remember.
 5      Q.   But you certainly would have discussed it
 6  with him, and you would have told him what his
 7  findings were when you made that first opinion in this
 8  case?
 9      A.   Yes.
10      MS. MOGUL:  I have nothing else.
11      MR. KAMIONSKI:  Just to wrap up.
12         RECROSS-EXAMINATION
13         BY MR. KAMIONSKI:
14      Q.   Your findings in this case and the
15  examination and the photographs and the marks on
16  Jaquari's body are consistent with someone pulling on
17  the cord, on the elastic band, on both sides of the
18  band, towards the back right side of the neck; --
19      MS. MOGUL:  Objection:  form, foundation,
20  incomplete hypothetical.
21      Q.   -- is that correct?
22      A.   Right.  Based on the ligature mark and that
23  gap, that could be a possibility, and that's
24  consistent, yes.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 203

```
 1      Q.   And the gap is inconsistent with the cord
 2  being wrapped 360 around the neck tight to cause his
 3  death?
 4      A.   Right.  The gap there is inconsistent with
 5  the ligature cord being tight around that area of the
 6  neck.
 7      Q.   I want to show you -- this is number 25.
 8      A.   Okay.
 9      Q.   Do you see the ligature mark in picture
10  number 25?
11      A.   Yes.
12      Q.   Do you see that above the ligature mark it
13  appears to be abraded as well, like it's a wider
14  abrasion?  Would that be a correct --
15      A.   Yes.  Where it's fading away, yes.
16      Q.   Right.  Is that consistent with the cord
17  scratching up against the neck consistent with
18  potentially Jaquari struggling?
19      A.   It's consistent with movement of the cord;
20  so either the cord is moving or Jaquari is moving.  So
21  the cord being on the neck and then the cord moving
22  against the neck, skin of the neck.
23      Q.   And that's at the point of -- that's right
24  by the point of suspension, where there's a gap in the
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 204

```
 1  cord, correct?
 2      A.   Right.  Where it fades away and the cord
 3  would come off the skin or if something was on the
 4  skin with the cord, yes, that would be consistent with
 5  that.  Yes.
 6      Q.   It's possible that -- strike that.
 7      Your findings are consistent with the --
 8  some person strangling Jaquari with the cord, as we
 9  described, pulling on both ends of the cord, and then
10  taking the cord and wrapping it around afterwards to
11  make it look like an accident?
12      MS. MOGUL:  Objection:  form, foundation,
13  incomplete hypothetical.
14      A.   I would say that's a possibility.  That
15  would explain why I see one mark and then there's
16  multiple people that say it's wrapped four or five
17  times around the neck.  That's one explanation, yes.
18      Q.   You talked about "The nares exude" -- this
19  fluid that's coming out of the nose?
20      A.   Yes.
21      Q.   It's a red fluid?
22      A.   Yes.
23      Q.   It could look like blood?
24      A.   To someone who doesn't know any better, it
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 205

```
1   could, yes.
2          MS. MOGUL:  I'm going to just object to
3   incomplete hypo-- speculation.
4      Q.   It's red in color?
5      A.   Right.  That's the serous part.  The serous
6   part is the clear fluid, and then the sanguinous means
7   red.  So sanguine -- so it's a red clearish fluid.
8      Q.   And you found that in the -- in his nose?
9      A.   Right, the openings of the nostrils or the
10  nares.
11     Q.   Could that fluid have also come out of his
12  nose at the time that he was killed?
13     A.   Yes.
14     Q.   Have you -- in your experience in other
15  cases that you've either read about or have seen, have
16  you heard of fluid coming out -- sero--
17     A.   Serosanguinous.
18     Q.   -- serosanguinous fluid coming out of the
19  nose in asphyxia cases?
20     A.   Yes.
21     Q.   Does serosanguinous fluid have -- what is
22  it?  Does it have blood in it at all?  Is it any blood
23  characteristic?
24     A.   It has -- it has some red blood cells in it,
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 206

```
1   but it's mostly just -- it's mostly edema fluid from
2   the lungs that's mixed with some bloody fluid also in
3   the lungs.
4      Q.   Is it possible to -- this may be outside of
5   your purview.  If we had a sample of it today from
6   back in the day, could we test it to see if that's
7   what it was, versus blood?  Either you know or you
8   don't know.
9      A.   Yeah, I don't know.  I've never heard of
10  that one.
11     Q.   You were asked questions about whether or
12  not you indicated certain things in your report.  If
13  you go to page 2 of your report, where you talked
14  about the ligature mark abrasion, in paragraph marked
15  number 1, can you -- isn't it true that you noted that
16  the ligature mark was passing into the back right side
17  of the head and then completely fading behind the
18  right mastoid process?
19     A.   That's what it says, yes.
20     Q.   That's the gap that we're talking about,
21  correct?
22     A.   Yes.
23     Q.   You were asked some questions about a case
24  of a lamp cord and a case of a trampoline?
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 207

```
1      A.   Yes.
2      Q.   Do you have all the facts of those cases?
3      A.   No.
4      Q.   Do you know if the cord was wrapped around
5   the neck multiple times in those cases?
6      A.   I don't know anything other than what I've
7   heard here.
8      Q.   Would you agree, whether it's a lamp cord, a
9   trampoline rope coming out of a tree, or the cord of a
10  bed sheet, a single loop is not going to be able to
11  cause a strangulation unless it goes 360 -- unless it
12  goes 360 around the neck?
13         MS. MOGUL:  Objection.  I believe that
14  absolutely mischaracterizes his testimony.
15     A.   No.  It doesn't have to go 360.  It can just
16  be on the front of the neck.  So if -- I mean, you're
17  assuming both ends are fixed.
18     Q.   Let me rephrase that then.  You'd agree that
19  a single cord without an opposable end on the other
20  side --
21     A.   Okay.
22     Q.   It's just dangling like a shoelace.
23     A.   Yes.
24     Q.   -- is not going to be able to strangle
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 208

```
1   somebody unless it's wrapped around at least 360, if
2   not more?
3          MS. MOGUL:  Objection:  form, foundation,
4   incomplete hypothetical.
5      A.   I would say it has to be wrapped around 360
6   enough where it cannot free itself, so it's tight
7   enough not to free itself.
8      Q.   I wanted to mark Exhibit 97, just for
9   housekeeping, as your CV.
10     A.   Okay.  It's right here.  There is one right
11  there.
12     Q.   And that's your CV?  Let's establish that
13  for the record.
14     A.   It is.
15     Q.   And that's your most up-to-date CV?
16     A.   Yes.
17             (Harris Deposition Exhibit 97Z
18             marked for identification.)
19      MR. KAMIONSKI:  I have nothing further.
20         FURTHER REDIRECT EXAMINATION
21            BY MS. MOGUL:
22     Q.   I want to turn your attention back to
23  picture 25.
24     A.   Okay.
```

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON

Page 209

1    Q.   And I'll ask you to show it to the video
2  camera.
3       A.   Okay.
4       Q.   Is it your testimony that those two lines on
5  the left side of the back of Jaquari's neck, that
6  those don't indicate that the elastic band was wrapped
7  more than once around his neck?
8       A.   No.  Because what I just -- what I just
9  heard from my autopsy report -- the mastoid process is
10 right here at the back of the ear.  So right here at
11 the back of the ear is where the gap is.  The gap is
12 right here in this area of darkness.  So this is what
13 I described as it fading.
14           And if there's two little marks there, you
15 know, they may or may not be there.  It looks like
16 they are there in this picture.  But the gap I
17 describe is below the right side of the mastoid
18 process, which is this part, the bone right here.
19           So right here on his neck, you know, on my
20 diagrams, that's where I saw a gap.  So I would say
21 that, to me, shows a gap; and I don't know why there
22 is a gap there.
23      Q.   I'm going to ask you to turn your attention
24 to page 65.

SCOTT DENTON

Page 210

1       A.   Okay.
2       Q.   And this is the front of Jaquari Dancy's
3  neck?
4       A.   It looks like the right side of his neck
5  because that would be his chin and then the back of
6  his head and the front.
7       Q.   Okay.
8       A.   It looks like his head is turned towards the
9  side.
10      Q.   Okay.  So his head in this case is turned
11 towards the left shoulder, or his chin is turned
12 towards the left shoulder?
13      A.   Okay.  Let me see.  Chin, left shoulder,
14 yes.  So it's showing his right neck and then the skin
15 folds that would be in the front.
16      Q.   And I just -- so there appears to be one
17 line that's below his chin?
18      A.   Right.  There appears to be one red line
19 going across his neck.
20      Q.   And if you go up there -- if you go up from
21 that line, there's other red marks that are linear?
22      A.   Those are all the petechiae.
23      Q.   You don't -- okay.  So you're saying that
24 these aren't lines?  That could not -- are you saying

SCOTT DENTON

Page 211

1  that that would not be lines, other lines created by
2  the ligature in this case?
3       A.   I mean, they don't look like it to me.
4       Q.   Is it possible?
5       A.   I mean, it doesn't look like this to me; so
6  I would have to say -- I mean, honestly, I have to say
7  no.  It could be skin folds too, you know,
8  that have congestion.  I see that also in hanging and
9  neck injuries.
10      Q.   And petechiae may be caused in cases that
11 both involve strangulation and hanging, correct?
12      A.   Yes.
13      Q.   And the fact that there's petechiae does not
14 indicate that the cause of death is accidental or
15 homicidal, correct?
16      A.   That's true.  Petechiae does not indicate
17 manner of death.
18      Q.   I'm turning your attention to page 54.
19      A.   Okay.
20      Q.   This is a picture of the front of Jaquari
21 Dancy's neck?
22      A.   Looks like it, yes.
23      Q.   And it looks -- on the right side of the
24 neck, there's two lines on the right side of his neck

SCOTT DENTON

Page 212

1  below his chin.
2       A.   On the right side of this picture?
3       Q.   Yeah.  Not on the right side of the picture.
4  Left side of the picture, right side of his neck.
5           MR. KAMIONSKI:  Objection to the
6  characterization of the picture.
7       A.   So we're looking at his right or --
8       Q.   I'm going to point, which would be the right
9  side of his neck.
10      A.   I see the right side of his neck, yes.
11      Q.   Right.  And I'm going to ask you:  Does it
12 appear that there are two lines caused by the ligature
13 in this case?
14      A.   I mean, honestly, I just see the one
15 ligature line that goes into the other picture we just
16 looked at.
17      Q.   And what about this line below that?
18      A.   I mean, that's -- I mean, that's what you
19 see in impression marks.  Actually, it's called a
20 tram-track mark.  So actually you see an impression
21 mark, and the darker areas are above and below it.
22           So that's well known.  It's just a -- called
23 a tram-track mark.  It can look like two lines, but
24 it's just one.

SCOTT DENTON

Page 213

| | |
|---|---|
| 1 | Q. I'm going to turn your attention to page 55. |
| 2 | A. Okay. |
| 3 | Q. What was the purpose of this photo? |
| 4 | A. The purpose of this photo with the bed |
| 5 | sheet? |
| 6 | Q. Yeah. |
| 7 | A. It was basically how it matches. Because |
| 8 | the ligature abrasion is on the neck, and then what I |
| 9 | did is I just held it up so it matches. It shows it |
| 10 | matches. There's no other lines above or below this |
| 11 | ligature mark. |
| 12 | So it's actually -- it's completely covering |
| 13 | the ligature abrasion. There's no marks above it and |
| 14 | no marks below it. |
| 15 | And I think, in the Kodachromes, it actually |
| 16 | shows the little loops too, like, fairly clearly. You |
| 17 | can see the loops making little bump abrasions above |
| 18 | it. |
| 19 | Q. Okay. So you have copies of these |
| 20 | Kodachromes? |
| 21 | A. I have the originals. I mean, the |
| 22 | Kodachromes are shot on film; so I have the |
| 23 | Kodachromes, yes. |
| 24 | Q. Would you say those pictures are better in |

SCOTT DENTON

Page 214

| | |
|---|---|
| 1 | terms of the quality than these that we're showing you |
| 2 | today? |
| 3 | A. Oh, yeah. Absolutely. |
| 4 | Q. So if I subpoenaed you, you'd provide me |
| 5 | copies -- you'd provide me those Kodachromes? |
| 6 | A. I mean, if you send me a subpoena and the |
| 7 | judge says do it, I'd do it, sure. There's also a |
| 8 | copy of the Kodachromes at the ME office. |
| 9 | Q. Okay. Well, they provided us -- they |
| 10 | provided us these pictures. |
| 11 | A. What they did is they scanned them for you. |
| 12 | They scan Kodachromes by machine onto a disc for you, |
| 13 | which is not the best. |
| 14 | Q. Okay. So is it your testimony that unless |
| 15 | the judge orders that you produce those -- |
| 16 | A. No. I'm just saying, you know, if everybody |
| 17 | agrees -- if you send me a subpoena and there's no one |
| 18 | that says don't do this, then I'll do it. Sure. I |
| 19 | have no problem. |
| 20 | Q. Why do you have the Kodachrome pictures? |
| 21 | A. There's actually -- each doctor has their |
| 22 | own set of all their autopsy pictures. So each |
| 23 | picture that's taken at the Medical Examiner's Office |
| 24 | was shot twice. So there was a picture that -- so |

SCOTT DENTON

Page 215

| | |
|---|---|
| 1 | every picture is shot, like I said, twice. |
| 2 | So there's a finding. A picture is shot |
| 3 | that goes directly into the medical examiner's file, |
| 4 | case files, and then there's another picture that goes |
| 5 | to the doctor. So every doctor has their own set of |
| 6 | autopsy pictures. And that was done before digital |
| 7 | photography. |
| 8 | You know, most of us kept our Kodachromes. |
| 9 | Some threw them away. Some kept them. |
| 10 | Q. I'm going to turn your attention to page 56. |
| 11 | A. Okay. |
| 12 | Q. This is a picture of Jaquari Dancy's face |
| 13 | and his nose, right? |
| 14 | A. Right. It's called identification |
| 15 | photograph. |
| 16 | Q. Right. Okay. Well, is that the picture |
| 17 | that indicates there was the slight mucosa in his |
| 18 | nose? |
| 19 | A. No. That doesn't say anything about his |
| 20 | nose. This would be -- the identification photograph |
| 21 | would be cleaned up, and so there would be no fluid or |
| 22 | any excess, you know, debris at that picture at all. |
| 23 | Q. Okay. Well, in this case, there has been |
| 24 | evidence and testimony that Sta-Von Dancy, Jaquari |

SCOTT DENTON

Page 216

| | |
|---|---|
| 1 | Dancy's father, found him in the bedroom. |
| 2 | A. Okay. |
| 3 | Q. And that when he found him, he found him |
| 4 | with a bubble coming out of his nose. |
| 5 | A. Okay. |
| 6 | Q. That was most likely a mucosa bubble; is |
| 7 | that fair to say? |
| 8 | A. I don't know what a mucosa bubble is. I |
| 9 | mean, that would -- to me, that would be fluid that's, |
| 10 | you know, consistent with pulmonary edema fluid or |
| 11 | fluid that's in the nostril and it makes a bubble. It |
| 12 | could be any kind of fluid. |
| 13 | Q. Okay. |
| 14 | A. But there's some kind of fluid in his nose. |
| 15 | It could be, you know, mucus. It could be just mucus. |
| 16 | Q. Okay. I want to be clear. On December 21, |
| 17 | 2015, when I asked you about the picture of Jaquari's |
| 18 | face and I asked you about whether he would bleed from |
| 19 | the nose, are you telling me that you didn't say to me |
| 20 | and Mr. Clutter that you thought it could have been a |
| 21 | mucosa coming from his nose or a mucosa in his nose? |
| 22 | A. It could be mucus. I might have said mucus, |
| 23 | and you could think mucosal, that it could be mucus. |
| 24 | MS. MOGUL: I have nothing further. |

SCOTT DENTON
Page 217

MR. KAMIONSKI: I have nothing.

MR. KAMIONSKI: Doctor, you have the opportunity if you want to read the deposition, and that's called reserving signature and signing it; or you could trust that the court reporter took everything down. That's called waiving signature. The choice is yours.

THE WITNESS: I will waive it. I trust you.

THE VIDEOGRAPHER: This concludes the videotaped deposition of Dr. Scott Denton. We are now going off the record. The time is approximately 3:42 p.m.

(Deposition concluded at 3:42 p.m.; by agreement, signature waived.)

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON
Page 218

CERTIFICATE OF REPORTER

I, BRENDA L. ZEITLER, a Certified Shorthand Reporter and Registered Professional Reporter within and for the State of Illinois, do hereby certify that the witness, SCOTT DENTON, M.D, whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken on January 7, 2016, by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_________________________

Brenda L. Zeitler, CSR-RPR

Illinois License No. 084-004062

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON
Page 219

**A**
**a.m** 1:22 4:3 69:22 201:2
**ability** 218:10
**able** 13:10 141:12 207:10 207:24
**above-entitled** 1:17
**abraded** 151:14 182:5 203:13
**abrasion** 131:23 137:15 140:24 141:4 144:16 144:22,23 145:7,8,13 147:14 151:11 151:19 152:4,5 152:17,17 153:4,6 155:24 174:21 180:23 191:20 192:1,2 194:16 195:4 203:14 206:14 213:8,13
**abrasions** 150:11 192:2 213:17
**absolutely** 108:11 160:4 200:18 207:14 214:3
**abuse** 76:4 175:9
**abused** 75:23
**accept** 6:10
**accident** 29:19 47:19 48:15 50:10 83:13,19 94:24 95:15,17 112:13 139:23 180:4,5 201:4 201:8,14 204:11
**accidental** 34:6 34:16 39:17,21 40:5 44:11,18 44:24 45:3,15 47:24 49:5 83:8,9 84:1 91:1,14 93:1 94:12 110:17 112:14 178:12 211:14
**accidentally** 147:7 181:5 182:15
**accompanied** 125:7
**account** 128:17
**accuracy** 128:11
**accurate** 116:1 121:17,20 122:2 149:22
**acknowledge** 38:9
**act** 188:24
**acting** 176:8
**action** 218:13,17
**actual** 138:7 186:14
**adamantly** 198:18
**Adams** 195:23 195:24
**add** 20:21 112:6
**added** 28:19
**addition** 48:9
**additional** 32:7 111:14,16 112:1 115:3
**address** 24:19
**administered** 4:23
**adopt** 40:17
**adult** 29:12
**adults** 41:19
**afternoon** 130:21,23
**age** 39:23 157:20
**agencies** 38:2
**ages** 40:3,10 72:16
**ago** 7:6 9:1,22 10:9 14:8,20 15:7 17:12,14 19:7,20,20 22:4 29:7 63:14 99:1 169:13
**agree** 40:1 41:20 45:10 118:7 136:14,18,19 137:1 140:18 141:6 143:11 160:8,14,18,24 161:5,10,14,19 163:2 164:1,5 166:12 176:4 178:15,20 179:4 207:8,18
**agreed** 6:10 201:12
**agreement** 217:15
**agrees** 214:17
**airway** 43:17
**akamionski@...** 2:10
**al** 4:9
**alcohol** 179:18
**alert** 37:9
**Alison** 25:10
**alive** 13:13
**allegation** 148:21
**allegations** 122:22 128:10 128:14
**alleged** 110:3 122:9
**allegedly** 93:21 97:7,9
**allow** 63:10
**allowed** 70:15
**altercations** 97:4
**alternative** 138:3
**amended** 51:22
**amount** 40:23 41:17 47:11 146:11
**analysis** 83:6 85:7
**anatomic** 47:7
**anatomy** 159:4
**ANDREA** 1:10
**anger** 96:20
**angle** 12:16,18 87:14,24 88:10 142:23,23 143:1
**angled** 141:17 141:20
**Anna** 164:19 165:4,5 167:11
**answer** 6:4 36:23 57:21 62:4 126:16 175:8,11,15 200:23 201:3 201:17
**answered** 9:5 123:5,11
**answering** 6:5 6:15 150:22
**answers** 5:22
**ANTHONY** 1:9
**Anwar** 24:24
**anymore** 20:23
**apartment** 55:11 69:6
**apologize** 136:10 158:22
**Apparently** 25:18
**appear** 148:15 157:13 199:24 212:12
**appearance** 178:10,18
**APPEARAN...** 2:1
**appeared** 81:24 91:9
**appears** 52:14 156:7,8 203:13 210:16,18 218:8
**apple** 195:23,24
**applied** 41:15 141:2
**apply** 43:7
**applying** 140:20
**approximately** 4:3 81:9 127:18,22 167:2,8 169:5 169:7 198:6,10 201:1 217:11
**arc** 195:15
**area** 74:16 75:6 75:12 119:21 136:6 153:20 154:4 156:2 157:2,8 158:15 194:4 195:5 203:5 209:12
**areas** 153:14 182:10 212:21
**arm** 109:7 154:3
**arrive** 91:17
**arterial** 13:8,14
**arteries** 44:2
**artery** 13:16 47:9 124:24 146:8,19
**article** 63:20 165:15 168:6 168:15
**articles** 8:7
**asked** 15:22 37:19 38:14 39:11,12 50:16 50:17 62:7 90:17,17,19,20 94:15 96:9 123:4,10 140:2 140:5 143:19 159:9,22 164:15,19 169:5 170:17

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON
Page 220

171:10 172:19 175:7,14 184:24 185:2,4 189:12 200:22 201:16 206:11 206:23 216:17 216:18
**asking** 169:9,24 172:6 195:6
**asleep** 179:17
**aspect** 16:13
**asphyxia** 29:5 40:8 41:22 44:11 45:4,4 124:19 175:24 176:7 178:11 188:20 189:1 205:19
**asphyxiate** 40:24 41:7
**asphyxiated** 29:6 31:1
**asphyxiation** 29:2,3 30:5,6 30:13 44:18,19 44:24 45:1 177:13 179:3,9 181:10,13,21
**assigned** 64:13 65:24 68:12
**assistant** 1:10 64:6,8,22 65:3
**associated** 165:2
**assume** 6:4 56:17,18 180:4 180:5
**assumed** 98:1 172:2 191:15
**assumes** 57:19 62:3 122:15
**assuming** 128:23 129:17 130:4 207:17
**assumption** 103:22 104:3
**assurance** 38:24 105:10,12,19 107:21 112:23 127:24 128:4
**attached** 80:15 80:20 88:18 89:3 134:17 139:9,12
**attack** 169:20
**attempted** 180:24
**attend** 105:16
**attendant** 149:17
**attention** 49:24 81:10 108:13 117:2 138:23 172:18 182:1 183:12 184:14 198:12,15 208:22 209:23 211:18 213:1 215:10
**attorney** 2:8,13 8:19 21:23 22:13 218:15
**Attorney's** 120:21 186:12
**attorneys** 1:10 2:3 9:16,20 18:16,18,21 21:2,6,8
**audio** 70:16,17 71:4
**autopsies** 25:24 26:24 27:1,13 27:14,21 28:3 28:5,7,17,23 31:5,9 35:5,13 35:19 65:7 142:3 149:19 201:12
**autopsy** 6:20 7:5 7:10 10:12 11:1,5 13:24 21:19 28:12 31:16,19 32:18 33:9 34:13,14 34:15 36:4,18 36:19,20 37:1 37:7,17,24 50:5,20 51:14 56:16 57:9 60:19 63:22,23 64:2,5,6,8,9,15 64:18 65:3,5 65:10,12 66:22 67:13 68:8,15 69:19 70:3,6,7 70:10 71:3,17 73:18 75:7 78:14 81:11,14 81:17,20 82:18 82:23 83:4,11 83:14 84:9,16 84:18 85:10,13 85:14 90:20 91:9,15 92:21 93:23 94:1 102:1,19 105:8 108:4 111:16 112:2 115:10 115:17,21,24 116:6,8,8,11 116:14,16 117:3,9,14 122:2 123:14 123:18,18,20 124:1 134:15 147:21 148:1,6 148:23 149:14 159:16 166:23 175:10 182:23 185:14 186:2 186:14 188:11 188:16 191:11 191:23 200:16 200:17 201:22 209:9 214:22 215:6
**Avenue** 2:4
**average** 28:22
**Avi** 2:7 4:20 9:24 131:1
**aware** 6:16 12:14 120:2 122:8,11,12 179:5

**B**
**back** 11:15 12:14,17,21 30:10 46:1 76:13 77:4,15 77:17 78:5 81:11 82:13 97:3 109:19 111:8 114:24 117:2 127:21 128:7 132:7 133:9,17,20,24 134:2,5 136:22 137:15 138:7 139:13 141:3 142:17 144:6 151:18 152:7 153:3,7,9 154:6,18,22 155:2,2,3 157:5 158:8,10 158:12,22 159:7 162:12 164:22 167:10 169:3 172:18 174:20,21 182:1,24 183:1 183:10 190:11 193:22 194:2 194:13 195:3 196:18,18 198:9,12 202:18 206:6 206:16 208:22 209:5,10,11 210:5
**backs** 174:24
**backward** 191:20
**backwards** 142:18 147:13 192:1
**bad** 168:5,15 172:17
**badges** 29:11
**bag** 78:17
**bags** 78:16 82:4
**balanced** 20:11
**ball** 75:11
**Balodimas** 1:7 2:11
**band** 42:12,18 53:3,16 54:4 54:10 55:10 61:3 67:22 69:5 78:15 79:19,24 80:3 80:4,9,14,14 80:19 83:24 84:11 88:9,19 89:20 92:5 93:11,16 108:8 122:14 124:11 126:9 127:7 129:1,8 139:3 139:5,7 182:20 183:5 187:23 190:23 193:6 193:13 198:20 199:2,8,12,16 199:18,21,24 200:11 201:6 202:17,18 209:6
**Bartik** 1:7 2:10
**base** 85:14
**based** 32:18,19 37:18 83:3,6 83:12,14,16,22 84:3,8 85:13 87:7 89:17 90:1 91:5 95:2 101:24 109:18 110:2,8,17 121:22 128:23 136:24 139:20 142:24 148:5 157:17 160:8 160:14 161:19 162:1 163:12 163:14,14,15

AREA WIDE REPORTING & VIDEO CONFERENCING

SCOTT DENTON
Page 221

182:23 194:23
197:9 202:22
**basically** 7:24
10:10,11 14:16
14:23 19:23
20:12 26:21,22
31:10 33:7
37:19 65:18
84:18 86:5
95:15 104:18
111:13 112:12
113:17 168:3
171:15 213:7
**basis** 123:13
**Bates** 99:14
134:20 135:6
**beaten** 74:5
**beating** 74:9,17
**beatings** 74:7
**bed** 20:20 42:13
53:4,11,18
67:22 88:6,7
89:2,3,4,5,6
93:11 131:17
131:20 135:22
136:16,19,23
139:9,12,13
148:11 201:5
207:10 213:4
**bedroom** 56:12
56:24 57:2
58:18 59:4
106:2 199:2
216:1
**beds** 91:24 92:3
**beginning** 81:6
143:16 167:5
**behalf** 2:6,10,16
4:18,20
**believe** 8:9 9:12
13:16,23 14:14
17:10 21:22
25:12 29:24
31:16 34:21
38:17 42:14
56:5,10,12

60:6 64:9
72:13 73:21
74:6,7 92:2,2
94:15 111:23
118:21 125:7
126:12 126:13
132:16 152:4,5
153:18 157:9
166:4,17,22
167:16 181:4,5
183:22,22
184:8,12
185:11 190:19
190:22 207:13
**believed** 125:4
193:16 197:10
**believes** 129:10
**believing** 86:12
126:21
**belt** 97:10,16
98:11
**best** 21:18 27:24
47:17 76:11
114:6 214:13
218:10
**better** 79:6
146:16 204:24
213:24
**beyond** 30:5
32:8 71:7,15
**Bisaro** 164:19
165:4,5 167:11
**bit** 14:23 38:18
146:8
**blame** 23:9
**bled** 125:10
126:2 186:5
**bleed** 216:18
**bleeding** 47:10
185:23 188:8
**block** 22:18 41:8
**blocked** 47:9
200:2
**blocking** 41:9

199:8,11
**blood** 41:18 73:5
73:9,13 125:12
125:16,19
146:10 186:3
189:9,16
**Bloomington**
1:20 4:4
**blue** 58:9 79:20
108:19 109:1
109:12 148:18
**blunt** 74:21,22
98:10 150:17
150:20,21
151:5 156:1
**blurring** 17:21
**bodies** 65:8
**body** 6:22 12:5
12:10 28:11,12
33:7,7 35:24
74:8 83:5,12
86:20 68:19,22
69:9 70:11,19
72:5,7 73:13
74:8 83:5,12
83:17,22 84:3
84:4 85:3,5,17
85:18 89:18
90:1,12 98:1
110:14 112:16
112:17 125:7
**brother's** 57:18
**brought** 8:13,19
55:18 63:14
78:14 82:3
112:22 131:7
**bruise** 75:17,19
154:4 155:22
156:3,9,11,14
156:20 157:24
158:5,17,18
**bruised** 55:7,22
**bruises** 97:5,18
155:19
**bruising** 75:13
153:14 154:2
155:12 157:14
**bond** 120:12

**bone** 209:18
**book** 32:4,5
159:4
**books** 30:10
32:1,2
**bottom** 55:17
55:11 82:4
108:14,16
198:18
**Boulevard** 2:8
**boy** 201:4
**boys** 53:23
**brain** 47:10
**bursting** 146:13
**busy** 26:2
**breathing**
179:17 180:23
**breeding** 75:17
**Brenda** 1:18
4:23 218:4,21
**brief** 17:14
**broad** 29:4
**broke** 155:23
**broken** 189:8
**brother** 16:3
53:24 56:3,8
57:7,23 58:4,5
58:18 59:19
61:17 62:12,14
96:6,8 122:13
127:3,5 129:7

**158:16
bubble** 216:4,6
216:8,11
**bubbles** 109:8
**bump** 155:18
173:21 213:17
**bumped** 173:20
**bunk** 53:4,5,18
55:11 89:3
91:24 92:3,5
201:5,7
**burst** 13:11
**bursting** 146:13
**busy** 26:2

**___C___**

**cabinet** 173:20
173:22
**call** 15:24 18:24
19:6 26:24
27:16 28:15
66:3 74:7,9,17
76:3 100:11,16
102:8 139:16
141:20 143:4
144:23 146:1
146:11 152:22
157:16 159:19
164:17 169:14
178:23,24
**called** 1:16 5:3
9:5 14:13,15
19:3 91:2
101:12 102:3
103:19 111:20
**calling** 112:19
170:1 172:13
**Calls** 40:12
44:22 60:14
75:1,24 79:10

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON
Page 222

87:21 88:12
**camera** 153:23
209:2
**cancer** 25:24
**capillaries** 13:11
146:12 155:23
189:8
**car** 14:6 17:14
**career** 20:13
114:5 162:5,6
**carotid** 44:2
124:24 146:8
146:16,19,24
**case** 1:5 4:8 6:24
7:15,18,21
8:12,16,18,19
8:23 9:17 13:2
13:22 15:23
16:7,10,11,14
18:22 19:5
20:7 21:13,20
25:8,9 26:7
29:18 30:5,17
31:14 34:11
38:10,12 39:6
39:14 42:11
49:1,3 51:5
52:19 53:2,8
53:21 54:6,13
54:24 55:8
56:1,22 57:6,9
59:23 60:4,23
61:5 62:15,17
62:19,24 63:8
63:23 64:13
65:11 66:17,23
67:9,13 68:14
69:2,16 79:4
79:24 81:12,24
83:1,6 84:8
85:22 86:7,15
86:20 87:9,20
88:8 89:6,18
90:5 92:9,13
92:16 99:18
100:24 101:16
102:2,16,18

103:6,18 104:4
104:6,22 105:3
106:5,12,20,23
107:10 109:16
109:22 110:17
111:13 114:7
115:20 116:11
117:24 119:14
120:12,19,23
124:7,9 125:3
125:10 126:7
126:12,23
128:17 134:21
135:8,9,10,13
136:6,15,18
181:13 181:18
181:22,24
182:24 183:6
183:15,19
184:18 185:22
186:16 192:23
193:19 194:7
196:1,23
198:13 200:19
201:20 202:8
204:24 206:10
211:2 212:13
213:4 214:7,13
**cases** 29:1 30:7
30:12,13,20,24
31:11 34:8
35:23 36:12
37:2,5,14
41:23 42:6
48:22 65:18,24
66:4 69:21,23
71:1 142:1,1

146:21 166:5
205:15,19
207:2,5 211:10
170:10 199:16
209:22 211:18
213:14,17,17
173:21 213:17
**catty-corner**
64:17
**caught** 29:20
**cause** 1:17 13:22
13:23 14:17
31:10,15 32:17
32:18,22 33:2
33:4,6,8,11
34:20 35:16,21
147:10,24
162:5,6 164:8
164:21 165:7
165:12,16,16
168:4 171:7,11
172:7,8,9,14
**causes** 13:8,10
**causing** 43:4
**ceiling** 29:20
**central** 27:19
**certain** 143:8
**certainly** 38:5
40:11,4,12
54:17 55:14
60:5,16 61:9
93:19 103:12
188:7 202:5
**certainty** 89:21
98:7 163:3,11
165:15 206:12
**certainly** 38:5
141:4 149:22
**certificate** 34:7
46:6
**cert** 9:9
35:18,22 39:18

90:24 91:3,4
94:18 95:4,10
96:10,12,15
106:7 114:18
118:4,8 143:10
149:9,13,15,24
150:2 218:2
**certain** 6:19
94:23 95:6,7
218:4
**certify** 218:6
**certifying** 96:10
**chance** 24:15
**change** 99:24
110:1,7 114:19
115:3,7 117:10
128:18 149:24
150:2 166:6
**changed** 15:14
20:7 34:5,11
37:16,21 38:12
39:6 109:20
165:14 168:4
171:17 172:9
172:16
**changes** 35:6
**characteristic**
205:23
**characterizati...**
212:6
**charged** 103:24
120:11
**charging** 103:20
**Charles** 32:1
**chart** 74:14,15
97:21 151:20
174:1
**Chester** 67:11
67:12 68:10
**Chicago** 1:6,6
2:4,9,14,16 4:7
4:18,19 5:16
5:22 52:15,19
22:18 39:12
48:21,23 53:9
53:14,21 56:2

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON
Page 223

56:23 57:6,11
57:15,24 58:6
58:15,22 59:2
59:9 61:16,22
62:7 64:4
71:20 100:11
106:11,22
107:6 110:9
115:12 118:18
119:2,7,11,19
120:3,9,16
159:19,20
183:17 186:7
**chief** 39:2 66:9
**child** 28:20
29:12,13,21
30:15 40:24
45:22 73:20
86:7,11 92:1
97:15 102:4
103:24 104:1
110:10,18
116:15 122:6
127:13 129:4
129:14 170:11
179:18 180:11
180:21,22,24
181:17 181:22
**childhood** 44:12
**children** 28:18
30:7,21 31:1
39:21,24 40:3
40:10 41:10,13
41:18 42:1,4,8
43:16 61:19,24
96:23 97:7
98:8 179:5
**chin** 77:18 210:5
210:11,13,17
212:1
**choice** 217:7
**choke** 177:13
**Chris** 9:11
**circulate** 149:18
**circumferenti...**
12:23

**circumstance**
54:22
**circumstances**
14:2,2 15:4
33:13,22 36:5
54:21 84:4
85:18 90:4,13
92:19 117:1,13
118:19 120:24
216:20
**circumstantial**
90:6
**city** 1:6,20 2:16
4:9,18 18:19
48:22 99:14
134:21,24
**Civil** 1:18 6:9
**claimed** 148:11
**claiming** 138:10
**claims** 120:17
**classified** 151:5
**cleaned** 215:21
**clear** 3:14 80:11
91:11 98:4
107:9 108:1,5
109:18 115:12
116:11 131:22
135:18 175:19
189:23 191:17
192:10,13
193:4 198:13
200:7 205:6
216:16
**clearer** 132:13
**clearly** 113:9,22
213:16
**close** 130:13
158:24 159:3,5
**close-up** 133:23
133:1 158:14
**closed** 3:14
103:7 107:9
108:1,5 109:18
175:20 115:20
115:12 179:10
198:13

**closest** 148:17
**clothes** 68:21
72:9,10,24
73:6,10 83:5
83:18,23 84:11
84:24 89:18
125:20
**clothing** 69:9
**Clutter** 9:11
216:20
**code** 180:24
**coerced** 121:2,3
121:5,8
122:9 123:2,6
129:14
**cold** 180:23
**collapse** 41:14
**collected** 37:1
**color** 193:21
195:15 205:4
**come** 13:10 89:2
112:23 113:24
156:15 157:22
202:3 204:3
205:11
**comes** 188:20
**comfortable**
60:2 94:9
95:19 96:10
128:7 141:3,7
146:23,24
146:16
**coming** 57:4
60:2 94:9
95:19 96:10
128:7 141:3,7
146:23 146:20
216:16
**commencing**
1:22
**comment** 16:6
16:11 143:7
171:22
**comments** 16:6
115:16,20,20
115:1,5

**Committee**
105:10
**common** 211:9
44:12,15,16,19
45:1,4 142:7
149:1 170:12
170:12
**commonly**
149:11
**compare** 116:6
**compared** 78:12
78:18 79:19
80:5
**complete** 51:10
134:13 135:2
137:15
**completed** 50:3
51:5,17 82:1,8
82:18,23 91:14
94:17 117:7
**completely** 36:4
86:22 87:15,17
135:23 136:24
137:12 179:2
206:17 213:12
**completing**
71:22 82:24
**comprehension**
42:9
**compress** 44:1,3
146:20
**compressed**
124:21 125:2
146:8,22
**compressional**
177:13
**computer**
134:12
**conducted** 39:17
180:11 217:14
**concludes** 217:9
**conclusion**
47:23 49:3
**conclusions**
148:4
**conduct** 31:6
**conducted** 27:21

28:3 57:9
63:24 64:2
68:14 84:16
124:1 181:12
**conducting** 65:7
65:10
**confes** 161:4
**confessed** 93:21
94:5 100:13
101:2,13,20
102:4 103:13
103:23 104:13
110:10 111:5
111:18 113:10
113:21 115:2
120:10 122:8
122:13 123:2,6
129:14
**confession** 3:21
15:18,18 16:7
16:9,10,12
94:1,3 104:17
105:3 110:3,13
110:16,21,22
110:24 112:9
112:1,2 115:9
115:15,16,22
116:1,6,9,12
120:18 121:2
121:5,17,20
122:3 123:2,24
128:12,18
129:13 130:10
161:3 163:1,3
161:9,13 190:7
161:5 203:16
**confident** 36:16
**confirming**
84:18

AREA WIDE REPORTING & VIDEO CONFERENCING

---

SCOTT DENTON
Page 224

**conflict** 130:17
**conflicting**
130:3,11
**conflicts** 38:2
**confused** 47:5
**confusing**
139:24 140:1
**congestion**
211:8
**consciousness**
105:9 109:23
112:9 149:21
**consider** 30:12
40:14 54:23
84:14 103:12
**consideration**
55:17 60:22
61:4 128:22
**considered** 61:1
102:15
**considering**
48:10 60:16
161:9,13
**consistency**
193:21
**consistent** 10:20
11:1,19 42:14
79:13 100:4
115:10,17,18
115:19,21
116:12 123:18
124:2,12,17,19
125:8 136:2,5
136:15,22
137:2 138:12
139:20 140:20
141:1,6,8,9,11
142:10 145:1,3
145:16 146:14
147:11 148:20
157:10,18
160:9,19 161:1
161:5,7,11,15
174:10,16

175:3 185:13
185:19 186:1,9
190:8 194:3,21
202:16,24
203:16,17,19
204:4,7 216:10
**constriction**
13:15,16 176:1
**consult** 201:19
**consulted** 106:5
109:23 112:9
**consulting**
201:11
**contact** 145:12
171:1
**contacted**
164:11 166:6
167:14,17
171:6
**contacting**
120:10
**contained** 108:1
**contains** 49:18
**contention**
108:18 106:14
**context** 33:15,17
174:8
**contract** 26:20
**contradict**
79:16 80:2
82:12 83:23,24
84:10 87:18
88:1,2,4 89:20
92:8,12,15,23
93:3,6,8,12,14
93:22 94:1
95:1 136:16,20
138:4,17,21
141:2,6,23
142:14 143:1,3
143:6
**contradicted**
36:21
**contradictory**
137:2 138:12
139:20 140:20
141:1,6,8,9,11
142:10 145:1,3
145:16 146:14
147:11 148:20
**contribute**
41:22,24
**contributing**
87:20 88:20
**conversation**
10:6,9 13:19
14:5,7,20,21
15:7 16:4,17
18:8 19:4,21
98:12 100:9
104:14

**conversations**
14:9,11 17:15
17:20 18:2,9
18:15 57:22
204:4,7,16,17
204:10 206:24
207:4,8,9,19
2:11
**corner** 76:19
144:4
**coroner** 4:9
26:11,19 35:20
36:9 37:3,6,8
214:8
**coroner's** 26:10
**coroners** 26:22
36:10
**correct** 9:9
35:18,22 39:18
45:16 50:13
50:13,18 51:23
54:19 56:4
59:20 64:1
74:11 76:7
78:15 81:14,21
84:24 85:3
86:17 92:17
94:5 102:11
110:18 125:17
125:20 127:1,4
131:15,16
132:3 135:19
136:6 137:1,6
138:4,13,22
139:20 141:23
141:6,8,9,11
142:17 144:23
145:13 148:3,4
148:10,16
149:2 155:4,14
157:5 162:17
182:22 183:21

185:8,23
189:13 192:14
192:24 200:19
202:21 203:14
204:1,2,4,8,9
204:10,24,24
211:1,1,15
**correctly** 6:5,15
50:20
**correlate** 60:18
**counsel** 4:14
22:15,17
218:12,15
**Counselors** 4:11
**count** 27:22
**counties** 27:14
27:19
**county** 1:10,11
1:20 3:11 8:15
8:18 15:14
26:10,11 27:13
27:13 28:4,9
34:18,21 35:9
36:14,14 48:18
49:20 64:1
65:1,6 105:1
150:4
**couple** 5:15
28:21 13:4
28:23
**course** 119:20
173:12 178:16
**court** 1:1 4:23
5:20,21,24
62:14,18 63:1
128:23
**cousin** 119:20
**covering** 213:12
**CPD** 82:3
**crazy** 25:21,22
**create** 141:13
**created** 211:1
**crime** 161:4
**criminal** 21:3
149:2 155:4,14
157:5 162:17
182:22 183:21
**CROSS** 131:4

AREA WIDE REPORTING & VIDEO CONFERENCING

## Page 225

SCOTT DENTON

```
Cross-Examin...        50:3 53:8 54:9       168:19
  3:4,4 169:1          60:11 61:11          death 11:2,6,9
crosses 76:24          66:13 68:19          11:19,20 13:22
crying 120:3,6         69:9 72:5 82:8       13:23 14:1,3
  185:8                88:21 89:18          14:17,17 15:2
current 26:16          122:23 172:20        15:3,8,13,15
currently 15:12        182:21 210:2         15:16 29:1,17
  26:9,24 27:2         211:21 215:12        16:10,13,15
Curriculum             216:1                32:17,17,18,19
  3:13                 dangerous 42:9       32:22,23 33:2
curvilinear            dangling 139:3       33:2,4,6,8,11
  97:21                207:22               33:12,15,17,18
custody 94:2,7         dark 134:6           32:20,22 34:5,11
  95:13,18,24          153:19 154:4,9       34:20 35:5,17
cut 124:18             158:15               35:17,21,21
  145:15 154:19        darker 140:24        36:2,7,13 38:3
  154:24               141:4 157:7          38:4,4,6,12,15
CV 208:9,12,15         195:18 212:21        39:3,4,7,12,13
                       darkest 194:4        39:17,21 40:1
          D            darkness 209:12      40:4 41:23,24
                       date 4:2 9:4,9       42:12,20,24
D 3:1                  31:15 51:15          44:8 46:14,17
D-e-n-t-o-n 5:10       118:12               46:18 47:1,1,2
damage 155:2,3         dated 117:20         47:3,6,7,9,13
dates 14:14            47:15,17,21          17:3,8,12
Dancy 3:11,17         51:13               48:3,4,12,20
  6:21 11:18          day 1:8,21 2:11      49:2 50:2,3,8
  16:3 34:12           37:24 38:17         50:17 51:4,18
  49:20 56:3,23        50:20 51:16,17      51:23 52:14,18
  57:7,13,17           52:9 56:16,19       53:1,7,13,17
  58:1,7,16            57:8 64:13,19       53:20 54:6,11
  59:24 61:17,23       65:9,16 66:2,4      54:13,18,23
  62:14,18 63:23       66:6,8 69:13        55:12,17 56:1
  65:5 66:22           69:21,23            56:3,22 57:5
  67:5,21 72:24        102:19 105:14       57:18 60:3,23
  73:19 89:8           105:19 106:2        61:4,11,13
  96:6 100:13          113:6 148:23        66:13 71:24
  101:2 108:6,22       149:18 173:9        79:4,24 82:8
  109:6,15             202:1 206:6         82:24 83:8,11
  119:22 122:13        day 3 6:9,21        83:19,20 84:1
  124:10 125:5         10:9 14:8,20        84:8,11,12
  125:10 126:2         15:7 17:12,14       85:15 86:9
  181:22 182:13        112:16 113:4        87:20 88:21
  198:22,23            156:15               89:22 90:6,16
  199:1 200:10        dead 62:2            90:24,24 91:3
  215:24               dealt 31:17 31:12   91:4,13 92:9
Dancy's 16:3          dealt 30:24          92:12,16 93:1
```

```
93:7,15,17             defendants 1:12
94:12,18,23            2:10 59:23
95:4,10 96:10          99:18
96:12,12,15,24         defense 8:19
101:16 102:10          9:16,20 22:12
102:17 103:1           define 176:18,24
103:15 104:5,9         177:16
106:4,7 108:23         definitely 54:22
109:16,21,23           102:14 114:14
109:23 110:2,8         165:11 167:17
111:6 112:4            definition
114:8,10,18            176:11
114:8,8,15             degree 87:15
115:4,8,8              89:21 120:11
118:4,13,15            126:17 146:7
118:17 128:9           163:3,10,18,21
128:19 129:11          164:1,6
129:18 143:10          degrees 87:15
147:5 149:8,13         190:23 195:21
149:15,22,24           200:1
150:2 156:16           delay 38:17
156:20 157:23          168:10
158:1,4 160:9          deleted 20:24
169:4,8,15             171:4
170:2,8,11             demarcation
173:8,12               131:22
183:19 196:19          demonstrate
196:22 203:3           47:12
211:14,17              demonstrates
debris 25:20,21        143:21
29:4 31:2              DEMOSTHE...
36:14 38:22            1:7
40:9 142:13            Denton 1:15 3:3
deceased 31:14         4:10 5:2,8,10
December 9:8           8:1 8:10 130:22
17:18 189:11           16:7 30:10
216:16                 217:10 218:7
deemed 62:22           deny 116:24
deep 154:1             dep 22:24 80:24
155:19 156:14          department
deepest 178:18         6:24 7:2 48:22
193:24                 52:21 53:3,9
deeply 155:23          53:15,21,22
default 85:20          56:22 57:6
defendant 2:11         58:7,16,23
18:16                  59:2,9 61:16
```

SCOTT DENTON

## Page 226

```
61:18,22,24            describes            103:1,10 104:4     61:2 138:15,20     200:15
62:7 69:1,4            175:22,24           104:9 128:19       160:9              discuss 13:4
71:20 78:14            177:8,9             determine 15:2     Dickinson 12:1     199:20
78:16 110:1            describing          dietate 70:18      71:1,4 81:16       discussed 10:8
106:23 107:6,7         151:8               71:8,11 73:16      die 126:11         10:18 12:13
110:9 111:17           description 35:7    46:14 48:12,14     156:18 179:3       13:1,18 15:6,8
118:19 119:3,8         71:12               83:7,24 90:5       died 25:2 50:24     18:1 91:20
119:12,19              Designates 3:22     96:10 121:1        90:16 121:1        202:5
120:3,9,17             159:19 183:17       128:11             156:9              discussing 91:21
159:19 183:17          detached 135:8      determined         60:13 89:8         discussion 128:1
detail 15:1            detail 15:1         32:13 33:4,11      126:11 156:10      141:16,18
Department's           detailed 172:24     42:11 73:22        156:11 179:18      143:17 167:11
115:12                 details 119:15      78:21 79:20        180:11,24          dispute 39:20
depend 15:16           119:24              80:4,9,15,19       197:2              40:3,8,16,20
depended 15:16         detective 3:17      94:11 111:6        dies 11:9 46:22    40:22,23 41:13
depending 35:6         3:19 57:12          156:13             176:14             41:16,17,21
depends 14:1           59:22 99:17,19      determining        differences 38:7   42:4,7,10,20
32:14 41:6,9           100:12,14           35:16,20 38:15     38:8               42:24 43:15
deponent 4:9,22        103:18 110:22       46:17 47:1         different 12:18    44:10,11,18,24
deposition 1:15        110:23 111:2,8     60:22 61:4          12:11 30:19        45:5,9,10,12
3:8,9,12,14,16         detective's 91:6    84:7 106:4         34:23 36:21        45:15,20,21
3:18,20,23             detectives 39:13    121:19 128:17      37:7 38:2 47:2     100:15 175:23
5:11 6:8,18,19         56:10,15,16,19      169:4,8,15         133:15 158:17      176:6 178:10
9:15 10:11             49:9 70:2 81:17     171:20 190:16      158:18 195:7       178:14,16
22:21 23:16,19         71:20 72:12         171:24             174:18             179:1,4,8
49:9 70:2 81:17        81:24 82:9,17       diagnosis          differential       181:4
90:10,13 97:17         90:20 91:8,17       117:13             146:12 147:2       dispute 42:8
167:6 208:17           93:4,20 96:18       diagram 70:11      176:14             143:5
217:3,10,14            98:13 100:10        70:19              difficult 29:3     distance 12:23
218:8,14               104:8 120:19        diagrams 6:22      direct 3:3 5:6     distinction
depositions 1:13       121:15,16,19        183:9 209:20       81:10 108:13       46:24
115:2 116:19           121:22,23           Diante 3:17 16:3   138:23 147:15      DISTRICT 1:1
218:8,14               123:21 124:5        53:24 56:2,23      156:1 183:12       1:1
deps 23:2,3,4          186:8               57:7,13,17         189:8              divides 66:4
deputy 36:10,15        describe 27:4       58:1,7,10,16       direction 69:12    DIVISION 1:2
describe 27:4          30:6 76:9          59:24 60:11         218:11             doctor 64:13
describe 27:4          105:8 144:16        62:5 61:8,10       directly 11:21     66:2,3,6,8
105:8 144:16           150:10 182:4        56:21 57:5         194:17,18          112:20 214:21
150:10 182:4           192:20 199:8        59:24 60:1         215:3              215:5,5 217:2
199:8 207:17           207:17              61:17,23 62:7      disagree 180:12    discussion 55:20
deserted 30:6          deserted 30:6       62:14,18 96:6      disagreement       64:9,19,20
32:8 108:3             32:8 108:3          108:6,9 109:21     112:11             65:2,17 66:1,3
140:6 154:5            140:6 154:5         109:11,15          disagreements      66:5 105:7,18
150:10 182:4           157:21 188:11       118:16,16          112:10             106:2,24
188:12 191:11          188:12 191:11       124:9 128:8        disc 214:12        107:21,24
194:16 196:24          194:16 196:24       149:6 181:18       discrepancy        112:12 115:10
197:1 204:9            197:1 204:9         190:2              112:12             112:12 115:10
209:13                 209:13              Diante's 60:20
                       determinations      48:19 50:17
                       48:19 50:17
```

SCOTT DENTON

## Page 227

```
127:24 201:12          drain 146:10,13     80:19 83:23,24     entire 64:14       1:16 3:3,5,6
201:19,23              147:2               84:10 88:9,19     82:18,19,23,23     5:6 26:16
document 51:10         Drive 2:14          89:20 92:5        105:24 135:24      66:20 68:15,16
133:5                  driving 10:14,15    93:11,16 94:13     183:6              68:18 71:22
documented             drugs 169:21        95:1 108:8        entitled 4:8        72:2,23 81:14
73:2                   Drusen 25:5         109:1 122:14      equally 66:4        82:24 83:4
documenting            due 201:14          124:10 126:8      especially 40:7     84:10,23 85:2
84:19 174:7            duly 5:4 218:8      127:9,18 138:20    45:16,22           85:5 97:14
documents                                  139:3,8 148:18    176:20             131:4 170:15
84:19 132:12                    E          162:2 182:20      ESQ 2:2,3,7,13      202:15 208:20
133:6 135:8            E 3:1               183:5 185:1       Essentially 36:3   examinations
doing 22:22            e-trial 7:3         187:11,23        establish 208:12    28:6,8
25:24 35:13,19         ear 154:10,11,13    190:23 193:1,2    estimate 27:24     examine 72:4
53:1,7,13,20           154:14,18           194:24 197:4      et 4:9             examined 5:4
64:16 65:5             209:10,11           199:12,16,21     even 175:24         68:21,24 72:24
66:19,21 67:14         earlier 96:14       199:22 200:12    events 43:16        144:16 156:1
72:2 82:12             110:15              201:6,14          44:19,20 45:1      examiner's 3:10
147:21 148:1           early 92:3          202:17 209:6     45:2,5,7,12         21:11 33:1
160:2 169:20           easier 132:10       elected 26:22    eventually 44:13    34:15,19,22
183:6 201:12           easily 41:14        email 3:8 15:24   134:13             35:10 38:22
DO 152:19              EASTERN 1:2         20:23,23 21:1    everybody 214:16    39:1 46:3,5
dots 144:1,3,13        edema 188:19        23:21 24:2,8     evidence 57:20      80:11 81:5,6
145:19                 206:1 216:10        24:11,16,19      73:24 74:1          99:13,20 108:1
downward               either 11:14        25:14,17         79:7,16 85:22       127:3,18
144:12                 18:1,9 21:10        164:16,24        89:17 91:13        109:16,19,23
dozen 27:18            21:23 33:8          165:2,3,20,23    96:3 95:6           124:9 128:8,18
dozens 174:10          36:24 37:10,24      170:21,22        101:16 114:22      examiners 38:23
Dr 4:10 5:8,10         42:10 54:2          171:4            112:22 122:12      examining 34:18
26:17 39:2             62:10 64:20         emailed 20:22    125:9 126:1,6      excess 215:22
142:15,18              71:22 84:6          165:7            126:23 137:3,6     exert 176:22
66:7 66:7,16           88:3,22 92:21      emails 15:22,23   138:16,18          exerted 176:8,20
71:7,16 81:8           98:20 113:4         164:15,22,23     159:18,21          exhibit 3:8,9,12
105:13 112,21          169:11 177:12       employed         164:3,4 165:4      3:14,16,18,20
113:13,23              183:8 189:1         218:13,16        166:7,10,11,13     3:22 22:21
114:3,3,6,20           203:20 205:15      employee 26:18    196:7,16,17        23:16,18,19
115:1,5 130:22         207:17              218:15           199:14 215:24      24:2,8,11,16
143:6,9 167:7          eyes 67:5 78:15    ended 70:3,3      excess 138:13      24:19,19,20,24
167:10 201:21          79:5,14,19,23      employee 26:18    exert 176:22        207:1
202:3 217:7,10         80:9,9,13,14       enforcement       exerted 176:8,20   fit 102:1 110:13
draft 60:9             95:7 78:15          37:13            exhibit 3:8,9,12    115:17
drafted 3:16           59:22 117:22       engaged 180:21   3:14,16,18,20       fits 47:17
59:22 117:22                               entangled 201:6  3:22 22:21         fitted 42:12 53:4
                                                                               79:20 201:6
                                                           examination        five 10:7 47:21
                                                           5:5 72:3,7         64:19 65:17
                                                                             66:3,5 198:19
                                           examination     209:20
                                           67:2 81:11,21
```

SCOTT DENTON

## Page 228

```
99:10,13 107:3                   F         319:19 147:22     file 31:22 81:12     98:5 105:8
108:13 117:3           fabricated         147:23 176:13     100:20,21           108:4 110:13
118:11 131:9           120:18 121:15      216:7             134:7 215:3         117:10,13
132:6 133:8,9          122:10 123:8       fairly 159:3,5    files 215:14        123:19,20
133:9,10               129:14             165:15 176:4      filed 94:15         124:9 134:15
134:14 165:19          fair 77:14         213:16            96:14 149:13        137:1,4,11
172:19 183:13          142:21 145:5,8     fall 126:10       fillet 155:11,11    138:12 149:2
184:10,11,14           145:21,23          140:12 177:24     filleted 153:14     160:19,24
198:12 208:8           196:11,12,21       fallen 179:17     filleting 97:2      161:5,7,11,14
208:17                 197:5,11,16,17     family 139:23     154:1,2             166:20 177:6
exhibits 3:7           215:12 216:18      174:19,22,23      filling 106:9       182:13 183:13
22:23 80:24            81:1               194:13,14         159:1               185:19 186:2,9
81:1                   faithfully 7:3     195:13,14         film 7:9 23:22      188:19 189:9
expect 93:12           fact 34:10 54:3    expected 93:10    final 39:2 52:18    191:7 194:9
193:19 194:10          59:6,7 62:7        97:17             53:1,7,13,20        194:15 195:13
194:13,14              64:9 81:2 91:5     experience        55:16,24 56:21      197:2 199:2,3
195:13,14              92:24 93:4,6       37:14 121:4       57:4 60:2 61:8      199:23 200:2,8
expected 37:10         109:14 116:15      127:11 139:20     61:10 96:11         204:24 205:20
97:17                  133:7 136:14       142:6 146:21      180:11             202:2,7
experience             150:1 155:17       171:21 205:14     finger 158:15      fit 102:1 110:13
37:14 121:4            183:4 185:12       expert 121:3,7    fingernail 97:22    115:17
127:11 139:20          186:8,15 188:7     123:6             98:1               fits 47:17
142:6 146:21           187:1 204:9        explain 29:9     fingers 11:16      fitted 42:12 53:4
171:21 205:14          factor 87:20       47:4,7 190:9     140:10 152:16      79:20 201:6
expert 121:3,7         88:20              200:14 204:15    finish 150:14      five 10:7 47:21
123:6                  facts 57:20 62:3   explanation      finished 23:4      64:19 65:17
explain 29:9           121:24 122:16      163:8 204:17     50:5               66:3,5 198:19
47:4,7 190:9           207:2              207:2            Firm 22:11,18      209:20
200:14 204:15          fade 76:24         fade 76:24       first 5:4,11 7:3
explanation            faces 77:1 83:4    extensive 66:19  8:2 24 83:15
163:8 204:17           204:2              exterior/interi...83:24 87:18
207:2                  fading 183:1       83:5             74:4 97:14
exposure 66:11         203:15 206:17      external 28:8,15 105:17 125:19
extensive 66:19        fails 139:15       68:15 84:10,23  132:24 133:19
exterior/interi...     faint 6:4 41:1     85:2 155:20     140:10 152:15
83:5                   52:16 53:5         88:6 124:10     135:6 201:2,17
external 28:8,15       54:7,60:11        externally 84:20 190:21 191:2,5
68:15 84:10,23         56:12 90:3        extra 82:11,15   199:23 200:8,8
85:2 155:20            91:16 103:1,2     extremely 21:9   200:22 201:1
88:6 124:10            104:3 120:24       26:2 169:10     202:7,14 204:7
externally 84:20       123:3 139:17      exude 204:18     fit 102:1 110:13
extra 82:11,15         female 19:10,10    eye 143:9,9      115:17
extremely 21:9         fight 120:12       eyelids 145:22   fits 47:17
26:2 169:10            figure 5:24        eyes 196:24     fitted 42:12 53:4
exude 204:18           23:15 198:3                        79:20 201:6
eye 143:9,9                                               five 10:7 47:21
eyelids 145:22                                            64:19 65:17
eyes 196:24                                               66:3,5 198:19
                                                          209:20
```

SCOTT DENTON

AREA WIDE REPORTING & VIDEO CONFERENCING

## Page 229

89:5,7 163:23
177:23 207:17
**flap** 154:20
**flat** 86:22 145:4
**Flaum** 251:11
**floor** 2:4 67:21
145:4,9 175:2
179:16
**florid** 196:20
**flowing** 146:17
**fluid** 188:13,14
188:15,19,19
188:23,23
189:6,10
204:19,21
205:6,7,11,16
205:18,21
206:9,10,11,12
216:14
**Flynn** 2:13 3:4
4:18,18 168:23
169:2 170:5,14
**flynnk@gttlaw...**
2:15
**focal** 152:18
**folds** 210:15
211:7
**follow** 101:21,23
104:15 114:22
194:21
**followed** 164:17
**following** 59:6
128:24
**follows** 5:5
**force** 40:23
41:18 43:17,19
43:21 44:2
138:4 141:1,2
141:6 147:10
150:17,20,21
176:8 195:2
**forces** 41:11 14
**forearm** 146:24
**foregoing** 218:8
**forehead** 145:22
**forensic** 26:23

32:12,16,21
34:24 35:2,2,3
46:2,4,9,11
48:8 105:10,15
**forgive** 5:16
**form** 40:11
44:13,23 57:20
60:15 85:24
87:11,21 89:23
101:17 103:2
167:23 168:10
170:3 202:19
204:12 208:3
**foundation**
40:12 44:14,22
57:20 136:1
137:22 141:14
145:11 150:5
160:12,22
161:17,23
162:10 163:6
163:20 166:10
167:23 168:10
170:3 202:19
204:12 208:3
**four** 19:20 64:18
185:5,7,18
186:22 188:3
190:13,16
198:19 199:5
204:16
**fourth** 40:8
**fractures** 47:10
**frankly** 8:20
**free** 42:22 43:2
43:4,6,9 45:16
45:23 139:5,7
140:11,13,15
142:16 181:7
208:6,7
**freed** 43:13
**frenulum**
144:11 152:15
152:23,24
153:1
**frequently** 91:3
149:9,10
**fresh** 145:13
**Friday** 105:22
106:1
**front** 1:20 4:4
11:14 12:20
77:14 141:5
142:16 153:17
154:6,23
182:24 190:11
207:16 210:2,6
210:15 211:20
**full** 24:11 26:13

28:5 45:7
68:15 176:9
180:10 200:9
**fully** 190:19
**further** 3:6
97:13 158:5
167:10 170:11
206:13 207:15
210:20
218:14

**G**

**game** 58:10
**gap** 10:19 132:2
133:19 135:18
136:21 137:15
162:2,11
163:22 189:1
194:13 195:4
202:23 203:1,4
203:24 206:20
209:11,11,16
209:21,22
**Garelli** 67:11,12
68:10
**Garrett** 2:18 4:5
**General** 3:16
7:1 59:21
**generally** 32:11
34:1
**getting** 111:14
164:11
**girl** 54:1
**give** 27:6 99:8
200:22 201:16
**given** 15:19
36:17 56:7
84:4 92:19
124:1 133:6
156:17,21
**giving** 122:9
129:15 133:14
**good** 4:13 5:8
20:13,20 27:23
121:5 129:21
130:21,23
143:21 144:3
184:9

114:18 116:9
118:1 131:6,9
132:1 140:11
144:6 146:16
148:4,22,23
165:12 172:6
172:14,15
184:24 189:21
208:17
**help** 22:7 47:4
58:11 109:4
162:4
**hemorrhage**
74:16 75:13
155:21 157:7,9
157:11 158:8
158:14
**hemorrhaging**
155:6,6,8,10
**heroin** 47:12
**hit** 175:1
**hits** 8:1
**hold** 37:19 38:14
39:11,13 49:5
50:16,21 90:18
90:20 94:9,16
95:12 96:9
102:17 159:22
160:6,6 169:14
**holder** 69:17
**holding** 98:2
193:13 194:9
194:18 195:10
**holds** 29:10
**Hollis** 22:11
**homicidal** 44:19
45:1,4 83:8,9
84:1 211:15
**homicide** 8:18
15:12,13 47:18
47:24 48:15
52:4 83:19
85:23 89:22
90:1 100:1
101:1,13
103:13,23
104:13 110:9

## Page 230

**Googled** 7:24
**gotten** 107:5
**gravity** 197:6
**greater** 141:1,2
**GREENBERG**
2:12
**GROGAN** 1:11
**groove** 178:18
**grossly** 156:13
**ground** 5:17
126:10 182:13
182:16 193:13
201:7
**group** 39:23
65:17 133:10
**guess** 39:23
46:22 70:5
84:2,22 89:1
91:11 113:20
116:10 150:12
172:10,11
174:5 177:15
179:11 191:15
195:13
**guessed** 70:4
**guessing** 8:24
19:18 69:20
**gum** 144:2,2

**H**

**HALE** 2:2
**half** 16:20 70:5
98:17,18
105:20,21,21
144:15 146:10
**hand** 77:19,19
**handwriting**
149:15
**handwritten**
32:2 71:2
**handwrote**
52:15
**hanged** 50:13
95:1 142:4
**hanging** 11:2,9
12:1 29:6
30:12,16,20

34:6,16 39:18
40:20 42:21
43:1,15 45:5,7
45:12 50:8
53:11 83:13
86:5 87:9
94:13,24
112:14 113:16
114:8,14 142:1
142:7,10,13
146:3 147:8
164:8 175:20
175:22,23
178:20,24
181:17 201:9
201:14 211:11
211:13
**hanging-type**
11:2,6,19,20
**happen** 178:22
179:13
**happened** 8:14
33:8 37:2
42:15 55:5
86:13 91:3
104:2 150:4
76:15 78:9
**happens** 36:20
38:6 91:22
103:4 149:9,10
143:21 144:6,15
**hard** 30:9 43:3
132:24 153:5
154:9 175:2
**harder** 43:20
**Harris** 3:3 8:9
8:15:17 21:2
22:21 23:16,19
37:18 49:9,12
93:21 96:19,23
97:7 98:7
99:13 100:13
101:1,13
103:13,23
104:13 110:9

111:5,18 115:2
116:15 118:23
119:3,12 120:4
120:17 122:8
122:21 129:13
161:3,14
165:12 172:6
172:14,15
184:24 189:21
208:17
**help** 22:7 47:4
58:11 109:4
162:4
**Harris's** 3:20
94:13,24
**head** 5:23 11:10
11:11,22 112:2
121:23,23,24
122:21 129:13
134:1,11,13,16
140:22 143:23
147:16 151:23
151:24 165:24
167:1 208:1,24
211:11
**head's** 213:9
**held** 69:17
162:12 163:5
169:3,7 170:7
213:9
**help** 22:7 47:4
58:11 109:4
162:4
**heads** 175:1
**healing** 156:7,20
158:5
**health** 47:16
**hear** 171:11
**heard** 119:5
138:8 176:11
205:16 206:9
207:7 209:9

112:19 130:16
160:10
**honestly** 24:17
24:23 29:6
88:1 90:8
154:19 159:3
211:6 212:14
**hooded** 199:17
**horizon—** 86:19
**horizontal** 10:19
12:2 86:4,17
86:21,23,24
113:16 114:13
116:17,18
129:23 176:18
177:1 178:4
**horizontally**
76:17 162:13
196:16
**hospital** 58:2
108:24 109:9
**hour** 16:20
21:12 98:17,17
98:18
**hours** 70:5
159:19 184:3,3
184:3
**house** 19:3 27:7
**housekeeping**
200:8
**hub** 27:17
**hubs** 27:17
**human** 141:12
176:16
**humeral** 153:21
155:4 156:1
**humerus** 75:11
157:2,12
**hundred** 5:15
**hypo—** 205:3
**hypothesis**
200:8
**hypothetical**
129:20 180:15
181:3 194:22
195:7 200:20
204:13 208:4

## Page 231

**I**

**idea** 171:5 172:6
**identification**
23:17 29:11
49:10 69:16
208:18 215:14
215:20
**identify** 4:11
**ignore** 54:20
**Illinois** 1:1,21
2:4,9,14 4:4,7
26:21 27:15,20
47:23 218:6,22
**imagine** 179:12
**imagining** 43:3
**immediately**
171:20
**impact** 103:9
**implies** 177:6
**important** 15:19
15:20 54:21,23
55:2 106:17
**impossible**
126:18 137:18
**impression** 79:1
151:14 167:22
182:5 187:1
192:5,6,7,7,21
193:8 194:1
212:19,20
**impressions**
78:22
**inch** 75:14 76:15
76:23 78:11
151:13,16,17
151:19 152:6
157:10 158:9
182:9,9 191:14
**inches** 75:14
76:14 77:18,19
77:20 78:6,8,9
78:11 80:10,16
80:18,20 152:8
**incision** 82:13
**incisions** 97:2,2

**include** 23:13
40:7 84:17
**included** 30:12
83:4 85:9
133:21
**incomplete**
129:19 180:14
181:2 202:20
204:13 205:3
**inconsistent**
86:5 92:18
138:19 143:3
149:2 174:9,11
174:16 190:5,6
190:7,7,13,17
203:1,4
**indefinitely**
130:14
**indicate** 59:3,7
70:8 75:22
77:23 79:7,16
86:3,16 87:4
98:6 108:6,22
109:15 125:10
126:2 143:1
151:24 155:15
182:20 187:19
187:22 189:2
194:5 196:8
209:6 211:14
211:16
**indicated** 50:15
85:22 91:13
54:14,17 55:3
55:15,19 58:14
61:7 68:5,7,11
90:7,18 92:21
94:20 95:14,16
95:19,20
101:14 102:14
102:15,22
103:13 104:17
103:24 106:14
110:8 111:14,15
111:17,24
112:2 113:10

**indicating** 11:16
153:19
**indication** 70:2
73:9,12 83:18
97:14 155:12
**indications** 98:5
125:4 150:17
**indicative** 74:18
196:12
**individual** 4:21
131:1 160:10
162:8
**individuals**
142:3
**inexperienced**
171:24 172:4
**infant** 28:20
31:2
**infants** 29:5
40:7
**influence** 102:9
102:24
**influenced**
112:1,3 115:6
128:18
**inform** 101:12
**information**
20:8 31:12,18
32:7 33:16,21
33:24 34:14
36:24 37:14,19
38:11,13,20
48:21 54:5,12
67:1 68:5,7,11
90:7,18 92:21
94:20 95:14,16
95:19,20
**inside** 100:21
144:1,10,20,21
**inspector** 68:9
**inspector's**
66:23 67:4
**instance** 179:14
**instances** 179:5

**instrument**
42:12 79:4,24
92:9,12,16
93:6,15,16
**instruments**
89:19
**intake** 149:17
**intentional**
178:12
**intentionally**
176:15
**interested**
218:17
**interesting**
32:14 180:17
**internal** 68:16
85:5 158:20
**internally** 84:20
**Internet** 7:21
8:9 20:17
62:21 63:18,19
**interrogated**
119:8
**interrogation**
118:20 119:4
119:16,21
120:6,24
121:14 122:23
128:11 184:4
**interrogations**
119:24
**interview** 3:17
57:13,16,23
58:24 59:23
108:7
**interviewed**
57:8 58:5
61:18
**interviewing**
96:6
**interviews** 62:11
96:7
**intimidate** 168:9
**intoxication**
179:18
**intramuscular**
77:12 155:6,21

## Page 232

157:7
**intraoral** 151:12
151:15 182:6
**introduced**
19:22
**inverted** 11:13
142:16 178:19
178:23
**investigation**
3:11 31:19
32:19,19 33:5
33:13,14 34:7
34:9,15 35:5
36:6,9,11,16
36:17 37:20,23
38:6,11,16
39:7,8 48:11
49:21 50:4,18
51:8,12 54:6
61:12 66:14
67:5 68:12
83:13,15 84:4
90:4 96:16
103:5,6,9
105:5,6 116:20
159:23 160:11
170:10 180:10
**investigator**
67:9 90:9,10
**investigator's**
36:21 37:7,17
65:19 66:24
67:6,7 147:17
**investigators**
34:4
**involve** 211:11
**involved** 16:13
29:1,2 179:9
**involves** 84:18
**involving** 30:21
31:1 45:7
180:22
**irrespective**
161:3,24
**irritated** 168:18

168:21
**issue** 191:15
192:9
**issues** 6:13
96:20
**items** 68:24
78:14

**J**

**J** 1:8
**Jackson** 2:8
**jail** 8:2 120:13
120:24 136:17
136:21 140:21
189:20 190:24
190:20,24
195:15 198:20
200:1 202:16
200:5 216:17
**Jenner** 22:17
**job** 33:6 46:8
**Joey** 2:2 4:13
168:24
**joeymogul@a...**
2:5
**JOHN** 1:8
**joint** 75:11
**Joliet** 65:2
**Jones** 112:21
113:13,23
114:3,3,6,20
**Jones'** 115:1,5
**journalism** 19:1
19:14,16 20:13
165:10 167:18
171:7
**judge** 63:10
121:5 214:7,15
125:4,10 126:2
126:8 129:1
145:4 156:9
172:20 181:22
182:13,21
193:12 194:19
195:9,11 196:1
198:23 199:1
200:11,23
211:22 212:8

203:20 204:8
210:2 211:20
215:12,24
**Jaquari's** 53:10
53:15,22 56:3
57:7 59:12
61:17 62:9
78:19,23 79:9
79:21 80:7
91:13 93:5
108:23 109:15
135:23 136:17
136:21 140:21
189:20 190:24
191:22 192:6
202:5 216:17
**Jaquari** 3:11
6:21 11:17
16:3 34:12
49:20 50:3
53:8,16,23
54:3,9,10 55:9
56:18,20 57:1
61:18,23,24
63:1,7 64:21
87:2,20 88:12
88:21 89:8,18
98:2 100:13
101:12 108:7,22
108:23,24
109:4,12,19
121:17 126:13
126:8,15,20
142:5,8,11,12
146:21 147:1
**July** 26:1 117:20
**jumping** 29:19
**June** 51:20
61:8
**kept** 27:23 31:5
31:8,10,21,23
39:23 40:13

128:13
**jury** 63:8

**K**

**Kamionski** 2:7
3:4,5 4:20,20
10:1,1,2 12:13
13:19 14:8,12
14:22 17:5,9
17:19 18:2,12
18:13 23:2,9
26:6 40:11
44:13,21 57:19
58:12,21 60:14
62:3 75:1,24
78:10 85:20
85:24 86:10
87:11,21 88:12
89:23 101:17
103:2 108:9
110:4,14,19
116:2 122:15
123:4,10 124:3
124:8 129:19
129:19 130:21
130:24 131:1,5
132:19,22
133:3,5,12,18
134:11,20,23
135:5,7,12,15
150:14 166:24
167:9 168:19
180:14 181:2
183:7 184:18
184:20 191:3
191:21 193:11
193:12 194:6
198:19 200:4
202:11,13
208:19 212:5
217:1,2
**Kamionski's**
182:19
**Kankakee** 65:13
**Karen** 61:18,23
62:8
**keep** 27:23 31:5
31:8,10,21,23
39:23 40:13

32:7 132:15
133:12,13
135:15
**Kelly** 1:8 2:11
3:19 99:17
100:3
**Kenneth** 22:10
**kept** 215:8,9
**kid** 147:7
**kill** 122:18
129:14
**killed** 116:15
156:10 176:19
205:12
**killing** 93:21
100:13 101:2
102:4 103:23
110:10 122:6
**kind** 28:22 31:8
44:17 76:16
153:19 157:15
158:11 165:17
165:17 171:11
172:10 183:1
184:24 195:20
216:12,14
**kitchen** 19:3
**kneeling** 176:21
177:21
**knew** 56:12 57:2
57:10,17 58:1
92:2 97:13
104:4,8 108:23
119:10 128:13
**know** 6:3 8:14
8:22 11:1
12:22 13:7
15:14,15 16:12
17:22 19:2,8
19:12,17 20:10
20:14 21:20
22:22 23:18,19
26:21 27:18
30:1 33:7 37:9
39:23 40:13

44:16 45:3
54:17 55:4,5
55:13,20,22
57:14 60:18
62:23 63:2,3,6
63:7,9 64:24
69:24 71:23
72:6,11,14,19
77:18 79:18
82:3,4,20
86:24 89:6
90:12 92:20
93:8 94:20
97:18,19,22
98:10,14,16
100:20 101:6
101:19,20,23
101:24 103:5
104:16,18,20
105:8,13 106:2
106:15 107:19
112:5,13,18
113:3,9,11,15
113:17,17,19
113:22,22
114:1,3 115:16
116:5,7 119:15
122:21 128:2
135:7 148:20
148:24 151:23
154:7,8 162:16
165:13,15,17
166:2 168:12,3
168:14 169:18
169:19,21
171:16,18,24
172:13,16
173:11,16,19
175:8 177:7,11
177:9 180:2,6
180:17 184:2
184:16 186:21
187:2,4,13,17
191:1,4,13
196:1 197:13
197:21,22
198:22 200:13

200:14 201:24
204:24 206:7,8
206:15,19,21
211:7 214:16
215:8,22 216:8
216:10,15
**knowing** 120:23
121:13 163:12
**knowledge**
112:16
**knows** 55:15
89:13 119:23
148:14 149:1
212:22
**knows** 108:23
108:24
**Koda** 7:7
**Kodachrome**
7:11 214:20
**Kodachromes**
7:5,8 134:8,10
213:15,20,22
213:23 214:5,8
214:12 215:8
**Kyle** 2:13 4:18

**L**
**L** 1:18 2:2,13
218:4,21
**lack** 42:9 146:16
180:12
**lamp** 179:15,22
179:23,24
206:24 207:8
**Landando** 1:9
2:11
**lanyard** 29:6,8
30:15 147:4,11
147:12 181:17
**large** 146:11
**larger** 194:13
**larynx** 43:21
44:3
**LaSalle** 4:6
**lateral** 174:21
**law** 2:2,3,7,8,13

22:11,18 37:12
**LAWRENCE**
1:11
**lawyers** 166:5
**lay** 80:17
**laying** 80:17
139:5
**lead** 44:5,8
**leading** 39:20
40:1,4,9
**leads** 48:14
150:1
**learn** 34:1
141:10
**learned** 67:20
101:1
**leave** 110:20
129:22 130:12
130:13
**leaves** 178:17
**left** 8:15 74:14
76:16,19 77:7
77:19 78:7,10
78:12,24 79:1
131:16 136:8
140:19 141:1,4
144:4 151:20
153:13,15
154:4,5 157:2
157:5,6,9,11
157:22,23
176:3,7,9,18
176:20,23
177:1,3,12
178:3,4,17
179:2,9 185:15
186:20,23,24
187:6 189:19
190:2,3,9,10
190:13,19
191:8,11,13,18
191:20 192:1,5
192:21,23
193:1,2,5,8,20
194:6,16
**legal** 62:23
**length** 70:6
80:10,16,18,21
**lesser** 120:11
**let's** 5:22 131:9
132:11 135:15
173:20 177:20
177:21 200:24
208:12
**lethal** 45:6 47:11
**level** 43:19,21
43:23

**levels** 43:17
**Liaison** 159:19
**License** 1:19
218:22
**lied** 119:13
**ligature** 10:12
10:17,20,23
11:10,12,13
12:5,10,12,14
12:17,19 13:2
13:5,7,13
14:16 42:16,22
43:2,4,11 52:7
76:6,9,10,20
77:2,6,10
78:18 79:13,20
86:4,16,20
87:7,8 91:18
113:15 114:13
116:17,18
129:23 131:13
132:1 134:6
132:2 136:4
137:15 141:17
142:9,14,20,24
146:23 147:14
160:15 161:20
162:1,3,7
163:12,14,23
**lie** 143:24 144:1
144:2,11,12,18
144:20,20,21
144:22 151:11
152:3,5,15
182:11
**lips** 145:9
152:11,12
196:24
**list** 165:3
**literature**
162:1,3,7
**Litigation** 4:6
**little** 14:23
38:18 47:5
53:24 80:5,6
132:12 138:17
144:1,3,13
154:9 168:16
168:24 168:18
168:23 171:13
**lividity** 196:9,15
197:6
**living** 55:10
**livor** 196:17,17
197:10
**LLC** 2:7
**LLP** 2:12
**located** 27:5
151:9

**location** 4:3
26:12,13
**log** 30:10 31:11
31:12,21,23
32:1,2,4,5
**long** 10:6 16:17
16:19 18:4,5
19:21 23:21
38:19 69:19
70:8 98:12
**looser** 80:13,19
**loose** 80:13,19
86:9 147:11
**looger** 14:23
38:18 65:1
130:15 139:8
**look** 7:20,23 8:5
23:20 30:2,10
31:4 48:11
60:7 64:6
69:20,21 72:8
94:17 99:4,22
108:14 148:8
154:1,10,23
157:20 159:4
168:5 172:17
188:10 196:7
197:7,20 202:1
204:1,23
211:3,5 212:23
**looked** 7:4,5
8:11,13 28:11
68:18 112:16
125:13 152:2
156:5 196:9,9
196:10,14
200:13 212:16
**looking** 35:24
51:13,14 97:5
144:10 154:7
156:23 212:7
**looks** 23:1
51:13,15,20
52:10 60:22
76:13 77:16
135:1 142:7
152:5,14,17
154:2 156:2,9
156:24 209:15

210:4,8 211:22
211:23
**loop** 139:11
179:10 180:7
**loops** 80:5,6
198:19 213:16
**loose** 80:13,19
86:9 147:11
**loosen** 138:2
**lose** 126:9
**loss** 26:3
**lost** 154:16
**lot** 25:24 146:1
149:5 159:9
**lots** 144:4
**low** 40:24 41:1
43:16,19,21,23
45:13,22
**lower** 77:14
132:1 144:11
151:18 152:5,7
152:12 153:3,9
**luck** 20:13
**lungs** 188:14,18
189:19 202:23

**M**
**M** 1:8
**M.D** 1:15 3:3
5:2 218:7
**machine** 214:12
**main** 27:7 168:2
**making** 48:19
50:16 55:16,22
56:21 102:17
87:8,8 98:4
113:15 114:13
116:17,18
129:23 131:17
177:18 189:19
190:2,3,10,19
**male** 179:15
180:19
**malnourished**
74:2
**man** 29:5 58:10
**manifested**

156:11
**manner** 13:22
14:1,3,17 15:2
15:3,8,13,15
15:16 29:17
32:17,18,23
33:2,12 34:20
35:17,21 36:7
47:1,3,15,21
48:12,20 49:2
50:17 54:6,12
54:18,23 55:16
56:1,22 57:5
60:3 61:4,11
83:20 84:1,8
84:12 85:15
90:6 91:1
96:11 101:15
102:10,17,24
103:15 104:5,9
107:2 131:13
132:5 183:12
134:14 146:18
118:13,17
128:8,9,19
129:18,17,15
176:2,8 183:19
211:17
**manual** 161:15
177:12,17
**mark** 10:13,20
10:23 11:13
12:19 13:13
14:16 22:11
**mark** 27:7 168:2
77:1,9,16
76:20 80:24,24
87:8,8 98:4
113:15 114:13
116:17,18
129:23 131:17
177:18 189:19
190:2,3,10,19

162:7 163:12
163:14 176:18
177:1 182:5
185:15 186:20
186:23 187:6,7
190:10 191:8
191:12,13,18
192:1,5 193:21
193:9 195:14
200:9 202:22
203:4,23 204:6
206:16 208:8
211:22 213:2
213:10
**material** 148:18
**materials** 3:10
7:4,14,20,23
8:5 26:7 49:18
**matter** 2:2
**mattress** 88:7
89:5,7
**max** 24:4 173:10
**maximum** 41:3
173:10
**McCorkle** 4:6
**McLean** 1:21
8:17 26:10
27:13 35:9,14
36:8,13
**mean** 1:1 17:24
15:12 19:18
20:21 21:5,9
22:6,12 26:20
27:16 36:2
41:5 46:24
47:3,6 54:16
56:17 60:17
62:20 64:16
66:15 70:4
72:17 74:16
78:6 83:10
84:3,3 86:11
86:13 88:1,5
88:15 89:12
93:9 99:3
101:19 103:4
103:21 113:17
114:3 115:7
121:5 123:12
126:15,19

127:11 134:5
142:14 149:12
159:2,3 165:8
165:13 168:1
173:21 174:2,3
174:3 176:15
177:17 180:7
184:1,2 186:19
188:10,12
188:5 190:7,9
191:7,10,12
192:8 207:16
211:3,5,6,7
212:14,18,18
213:21 214:6
216:9
**meaning** 7:8
78:9 78:24
123:15 130:6
**means** 5:24
16:12 111:13
155:21 196:18
205:6
**meant** 16:15
**measured** 12:19
80:13 162:22
**measurement**
78:7
**measurements**
142:24
**mechanism** 13:8
**media** 8:8
**medical** 3:10
21:11 32:15,24
33:5 34:1,14
34:18,22 35:8
35:10 38:22,23
35:19 167:22
159:5
**men** 72:21,22
**mention** 16:2
66:18 96:7
99:17
**mentioned** 16:1
18:24 63:18
66:16 115:18
142:13 143:7
143:16

107:24 137:11
137:17 138:12
138:18 150:4
159:12,17,21
163:18 164:7
214:23 215:3
**medically**
137:17
**medications**
6:13
**medicine** 35:4
**Medill** 19:1,2,13
19:14 79:20
171:7 172:3
**meeting** 29:16
38:24 55:19
65:22 96:18
99:19 105:6
107:21 112:23
149:21
**meetings** 128:5
**member** 58:15
58:22 59:2,9
61:22 62:6
119:2,7,11,19
120:3,9 160:5
169:14,24
**members** 53:2,9
53:14,21 56:1
56:22 57:6,11
57:15,24 58:6
61:16 78:13
106:5,11
118:18 120:18
127:23 183:16
**memory** 22:5
99:2,4 100:17
159:5
**messed** 23:10
**met** 17:1,15
71:19 93:22
100:10 123:21
**MICHAEL** 1:9
**microscopic**
33:10
**midline** 76:14
76:24 77:17,18
159:6
**migrating**
156:19
**mild** 74:21,21
**millimeter** 7:9
**Milwaukee** 2:4
**minus** 106:2
**minute** 20:3
**minutes** 10:7
10:8 16:17
20:2 98:14,16
169:13
**miscellaneous**
141:22
**mischaracteri...**
138:15,16
140:23 150:19
200:5 207:14
**mischaracteri...**
150:24
**misrepresents**
108:10
**misstates** 58:12
62:4 110:20
**mistake** 112:13
**mixed** 206:2
**moderate** 74:21
**Mogul** 2:2 3:3,5
3:6 4:13,14 5:7
5:16,19 6:2,8
22:20 23:7,11
49:6,11 81:3
99:6 107:1
108:11 110:6
108:11 119:20
117:1 118:3
120:23 123:24
132:20,23

133:4,10,13
134:16,21
135:4,6 136:1
136:9 137:21
138:14 139:24
140:22 141:14
141:21 145:11
150:5,13,18,22
152:6 158:3
160:11,21
161:17,23
162:12 163:5
163:22 164:6
165:9 167:23
168:10 170:3
170:16 184:16
184:19 198:1
198:12 202:10
205:2 207:13
216:24
**moment** 198:2
**Monday** 105:21
106:1 113:7
**monster** 120:5
**month** 8:22
28:21 36:21
38:18,18
**months** 9:1
63:14
**morgue** 27:1,17
**morning** 4:13
5:8 65:16
64:14 201:2
**mortality** 44:12
**mortis** 196:17
197:10
**motel** 179:16
**mother** 58:17,24
59:4,10,11,13
59:14 62:8
95:13,18
113:10,20
179:17
**motor** 45:22
**mouth** 152:22

**move** 71:23
**movement**
146:22 158:4
203:19
**moving** 185:8
203:20,20,21
**mucosa** 143:24
144:2,17,19
148:12,19
160:9,15,15,16
161:20 162:2
161:17,23
216:21,21
**mucosal** 216:23
**mucus** 216:15
216:15,22,22
216:23
**murder** 103:20
103:24 104:4
120:12
**muscle** 74:15
75:13,18
153:16,21
154:2 157:8
158:7,11,16,23
158:24
**muscles** 97:19
158:12

**N**
**N** 3:1
**name** 4:4,13 5:9
9:13 19:8,11
20:20 25:7
27:9,10 31:14
39:4 131:1
**necks** 54:1
**need** 23:14 90:3

164:18,19
165:11,12
171:3
**names** 72:14
120:4
**Nancy** 112:21
143:6
**nares** 188:13
204:18 205:10
**natural** 47:17,24
48:15
**nature** 6:23
10:18 14:18
86:3 177:14
196:21
**near** 180:20
**necessarily**
186:17
**necessary** 179:1
**neck** 10:11,13
11:12,14,15
12:20,20 13:7
13:14 15:1
29:10 41:3
43:5,12 45:16
53:17 54:11
55:2,7,10 58:9
59:11,12,15
62:1,9 63:5
67:23 74:13
76:7,14,16,19
76:20 77:5,7,8
77:14,17,19,24
78:1,5,8,19,23
79:2,9,17,21
80:1,7 86:8
91:19 93:5
108:8 109:1,8
109:12 122:14
126:9,21 127:8
127:13 129:1,5
129:8 131:13
131:17,23
133:24 134:3
135:23,24
136:6,13,17,21

136:24 137:3,6
137:10,16,20
138:1,10,11,21
139:22 140:9
140:21 141:1,2
141:14 145:12
142:16,17,20
142:21 146:24
148:12,19
160:9,15,15,16
160:21 161:20
161:22 162:6,7
162:12 163:5
163:22 164:6
175:1 176:1
176:19 177:1,3
177:4,6,10,19
192:3 193:13
193:23 194:1
194:11,16
195:3,15,20
198:20 199:2
200:1,9,11
202:18 203:2,6
203:17,22,24
205:7,12,16
207:5,12,16
209:5,7,19
210:3,4,14,19
211:9,21,24,24
212:4,9,10
213:24 214:3,5
214:7 215:4,7
215:18 218:21
**necks** 54:1
**need** 23:14 90:3
118:19,23

94:20 105:4
140:14 168:6
170:10
171:18 174:8
**needed** 102:15
149:22 192:12
**needs** 36:24
71:7,9,16
200:12
**Neely** 64:8,24
71:7,9,16
**neglect** 73:24
175:9 180:11
**neglected** 73:23
**neither** 218:12
**nerve** 124:20,21
125:1
**never** 16:9 28:19
53:2,8,14,22
59:10,14 60:4
60:8 62:6 75:4
19:15 20:19
22:15 164:12
162:3 166:11
167:11,18
168:19 170:20
171:1 172:2
206:9
**news** 16:13
191:2,7,16,21
**newspaper** 8:7
63:20
**Nicole** 1:3 3:20
4:8,15,17 7:24
15:17 16:7
21:2 22:11
37:18 38:9
39:6,13 49:12
62:15,19 93:21
98:7 100:12
101:1,13
103:13,23
104:13 110:2,9
111:5,18,21
114:3 116:12
118:19,23

119:3,12 120:4
121:1,19
122:21 128:10
129:13 161:3,9
161:13 165:12
166:13 172:6
172:14,15
175:4 183:15
190:5 199:10
200:21
**night** 22:23 23:4
**nine** 28:6
**nod's** 5:23
**Noradin** 1:9
2:11 99:20
100:2
**NORTHERN**
1:1
**Northwestern**
8:4 15:24
19:15 20:19
22:15 164:12
162:3 166:11
167:11,18
168:19 170:20
171:1 172:2
203:7,10
206:15
**numbered** 135:6
**numerous** 28:20
65:24

**O**
**O'REILLY** 1:11
4:23 5:5
**object** 140:22
141:12 160:11
160:22 205:2
**objection** 40:11
44:13,21 57:19
62:22 66:10
62:3 75:1,24
79:10 85:24
86:10 87:11,21
88:12 89:23
101:17 103:2
108:9 110:4,11

73:15,18 76:6
96:15 125:17
125:23 131:16
131:19 132:1
133:18 135:5
135:8 148:5,9
206:5
**notes** 3:19 6:22
22:7 70:11,19
71:1,3 76:12
81:13,16 82:2
82:3 98:20,22
99:3,17 100:23
128:4
**niece** 28:6
**noticed** 185:22
**noting** 155:10
**November** 9:3
**number** 31:14
69:16 81:7
130:24 138:24
151:3,3,4,4,10
152:14 153:2,3
153:12,13
156:7,13,17
157:13,13
158:6,7,13,17
168:19 170:20
171:1 172:2
**nostril** 216:11
**nostrils** 205:9
**notation** 76:21
**notations** 76:22
**note** 12:16 13:13
31:18 100:21
155:9
**noted** 50:7 73:6

110:19 116:2
122:15 123:4
123:10 124:3
126:4,13
129:19 136:1,9
137:21 138:14
139:24 141:14
141:21 145:11
150:5,13,15,18
154:12 156:12
158:3 160:11
160:21 161:17
161:23 162:9
163:6,20 166:9
167:23 168:10
170:3 180:14
181:2 200:4
202:19 204:12
207:13 208:3
212:5
objective 117:9
117:13
objectively
84:20
obstruction
41:21 43:18,20
obtained 102:23
occasion 9:2
126:24
occasions 129:2
occlude 41:18
43:20 146:18
146:20
occluded 44:4
occur 42:21 43:1
43:16 45:6,13
171:23 179:9
occurred 15:17
38:5 50:12
52:7 95:1
145:8 201:8
occurring
157:19
occurs 40:21
44:15,17
offended 168:17
168:18,20

office 2:2 3:11
9:12 18:11
21:11 26:11,11
27:5,7 33:1
34:7,19 35:20
37:8 38:22
39:1 46:3,5,6
48:9,19 49:19
64:3 65:6
67:10 68:10
70:22,24 82:1
101:24 104:15
105:2,18 106:6
107:24 109:20
112:7,9 114:23
120:21 150:4
159:18,21,23
159:8,60:1,7
160:20 162:18
214:23
officer's 38:10
123:16
officers 1:7 4:21
18:16 68:11
108:2 131:2
148:5 159:20
116:15 169:4,9
officers' 122:5
offices 26:19
oh 70:23 71:2,13
75:6 98:14
135:7,11
158:21 169:10
214:3
okay 5:24 6:1
8:11,22 9:19
9:23 10:3,6,8
10:16 11:5
12:9,12 13:18
14:7,19 15:6
16:2 17:17,24
18:24 19:6,12
19:21 20:1,5
21:1,1,7,16
22:1,9,20 23:7
23:8,11,15,21
23:24 24:2,5
24:12,14,19

25:10 26:3,18
17:17,23
108:5 110:1,7
111:1,1,12
112:20 113:12
114:15,21,24
115:11 117:2,4
117:11,11,16
117:19 121:12
121:12 122:20
124:8 125:3,9
128:23 129:3,6
129:9,12,16
130:2,2,15,20
130:21 131:3,17
131:8,10 132:8
132:14,16,18
133:4,13,18
134:16,22
135:11,17
137:8 139:1
140:4 143:23
147:1,7,19
148:9 149:23
150:9 152:2
158:6,13
159:11 167:13
171:5 172:12
172:18,23
173:11,16,24
176:13 177:17
177:20 178:16
178:21 179:14
179:14 180:2,9
180:9,18 181:1
182:1,3 183:4
183:11,14,20
184:5,15,23
187:10,15,18
189:23 190:6
190:7,12 191:6
191:8,8 192:10
192:10,17
194:7,7,17
195:6,8,12,21
196:23 197:14
198:3,4,14,16
198:21 200:7

203:8 207:21
208:10,24
209:3 210:1,7
210:10,13,23
211:19 213:2
213:19 214:9
214:14 215:11
215:16,23
216:2,5,13,16
old 29:21,23
Older 29:23,24
once 103:22
148:12 209:7
one's 43:12 48:4
one-tenth
191:14
ones 47:18 134:9
153:12
open 28:12
111:13 130:13
130:13 132:15
154:24 180:7
open-loop 179:6
opened 153:14
openings 205:9
opinion 13:21
20:7 38:7,9
55:22 92:14
96:11 102:9
105:9 117:6,17
117:23 118:2,8
165:14 166:7
168:4 171:17
172:10,17
193:2,7 201:1
213:22 221:20
202:2,7
opinions 38:4
107:22 112:6,8
opportunity 9:7
9:16 24:6
117:12,21,24
152:1 153:4,6
153:10,16,18
153:19,24
154:8,11,15,20
154:21 156:23
157:1 158:9,13
opposable
207:19
opposed 86:17

141:12
opposing 138:4
147:10
opposite 88:6
141:2 156:22
156:24 178:19
194:5
options 46:16
order 40:19
132:23 179:2
orders 214:11
Ordinance
34:22
ordinary 159:15
organs 28:13,16
orientation
154:8
original 49:2
134:7
originally 39:16
originals 213:21
out-of-the-nor...
150:3
outcome 218:17
outside 28:9
68:18 111:24
120:12 158:20
206:4
overturned 144:12
overlaps 43:12
overlaying 29:4
31:3
oxygen 126:9

**P**

p.m 81:5,9
127:18,20,22
167:2,4,8
198:6,8,10
217:12,14
packet 132:7
135:10
page 3:1 49:24
50:23 51:3,3
52:12,15 75:8
76:11 108:15
108:15,16,17

117:13 118:11
131:9,11
132:15 133:17
138:24 144:6
147:15 150:7
177:24 182:2,4
184:14,21
191:21,23
198:15 206:13
209:24 211:18
213:1 215:10
pages 67:2 81:13
81:20 82:2
99:23 117:5,12
pancreatic
25:24
paper 118:1
paragraph
148:8 198:17
206:14
paralegal 9:12
part 19:13 26:12
65:2 68:17,17
80:13,14 87:1
87:5 105:12,19
108:18 125:20
127:24 133:9
155:22 159:23
166:17 176:2
187:17 205:5,6
218:10
parietal 45:6
176:9
parties 218:13
218:16
partner 21:24
21:24 25:23
26:1,4,14,16
99:19
pass 126:10
passing 206:16
patent 146:9
pathological
33:5 82:7
85:22 91:12

pathologist
32:12,16 34:24
138:24 144:6
147:15 150:7
177:24 182:24
184:14,21
191:21,23
198:5 201:14
213:7 215:10
pathologist's
32:21
pathologists
25:13 105:11
105:15
pathology 35:2
35:2
pattern 80:1,2
98:10 162:15
163:22 192:6
Pause 24:13
68:3 99:15
pediatric 179:8
181:10,13
pen 153:20
pend 103:5
pended 34:8
pending 34:6,8
38:16 51:8,11
95:8 96:16
102:20 105:4
149:24 169:11
169:12,12
people 33:21
155:18 204:16
PEOPLE'S 2:2
Peoria 10:15
26:11 27:6,13
35:20 36:14
perform 36:18
performing
175:10
period 55:12
perpendicular
12:8,11 87:17
person 9:8 10:3
11:11 16:21
19:8 20:14
47:13 71:9
84:19,19 141:7
141:8 161:22
162:15 163:5

163:24 164:20
165:6,13 171:6
172:5,13
176:21 194:18
194:24 204:8
person's 11:22
162:4
personal 143:15
perspective
137:17
petechia 152:17
petechiae 10:22
13:1,5,8 14:17
77:1 131:21
143:11,17,20
143:22,24
144:3,5,9,13
146:1,3,7
147:3 152:3,15
196:10,20,23
197:4,5,7,8,9
210:22 211:10
211:13,16
phone 9:3,5 10:4
10:5 14:4
15:24 16:21,22
17:2,15 18:8
18:13,24 19:4
19:6 69:5
phosphorus
75:4 75:23
96:23 139:21
physician 35:4
52:23
pick 143:21
149:18,19
picked 19:3
112:17
picture 69:18
121:23 123:24
134:2,5 135:3
138:5,18
189:5 204:21
205:4,7,7,24
210:18,21
215:8

211:20 212:2,3
212:4,6,15
214:23,24
215:1,2,4,12
215:16,22
216:17
pictures 7:6,8
7:11 21:18,18
64:23 132:9,10
133:23,23,24
133:16,19
134:8 135:12
145:17 147:16
151:22 182:10
213:23 214:10
214:20,22
216:4,6
piece 148:18
152:22
pink 73:3
124:14
place 154:16
places 75:3,4
Plaintiff 1:4,16
2:6 4:14 5:3
49:12
play 180:22
playing 53:10,24
58:8,10 108:18
108:19,24
please 4:11 5:9
6:3 192:16
plus 28:8
point 71:19 77:2
99:7 101:7
117:6 122:20
142:14 144:8
151:12 158:1
178:18 191:16
201:11 203:23
203:24 212:8
points 45:13
131:6
poked 119:4
police 1:6 6:24
7:2 34:2,3,6,8
38:10,11,16

39:7,12 48:22
50:16,18 51:8
51:11 53:3,9
53:15,21,22
56:2,23 57:6
57:11,15,24
58:6,15,22
59:2,9 61:16
61:22 62:7
68:11 69:1,4
71:20 78:13
89:10,12 90:19
90:19 91:5,6,8
96:16 100:12
102:20,23
103:5 105:4,5
106:11,13,22
107:6,7 108:2
110:9 111:17
119:2,7,11,19
119:21 120:3,9
120:17 123:16
123:17 130:4,7
130:7 148:5
150:19 151:16
159:20,20,22
160:2 161:6,9
161:14 169:11
180:10 183:17
186:7 197:18
policies 101:20
105:1 114:22
policy 34:8
104:15 159:23
polygraph
119:13
position 177:22
178:7 196:16
positive 98:6
possession 7:12
7:15
possibilities
126:15 174:6
possibility 86:14
187:9 193:17

197:13 199:20
202:23 204:14
possible 66:4
84:21 87:7
88:16 97:3
98:3 126:7,11
126:16,17,19
127:12 139:21
140:7,8 156:10
173:21,23
174:13 179:18
181:8 187:11
187:16 188:2
191:5 200:17
200:20 204:6
206:4 211:4
possibly 174:4
posterior 196:7
potential 169:24
potentially
140:15 157:24
203:18
pounds 41:2,2,4
41:7,8,11
practice 26:23
27:3,10
preparation
6:17,19
prepare 5:21
prepared 6:21
present 2:17
9:11 14:4
57:12 64:5,14
65:17 71:17
116:7
presented 29:16
39:1 60:24
63:8 109:22
112:9
pressure 13:7,9
13:9,14 41:2
87:9 131:22
136:5,7,13
140:21 141:13
141:15 143:19
145:1,5 146:9
147:1,2 197:6

presumably
131:20
Preteen 29:24
pretty 25:20
32:9 37:23
82:19
prevent 6:14
156:16 158:4
previous 157:1
118:10 129:2
previously 5:13
23:3 50:15
53:23 54:3
59:21 99:8,9
99:13 102:6
107:2 180:21
183:12
primarily 48:20
prime 34:3
print 134:12
prior 3:23 14:7
22:3,11 28:2,2
28:18 30:7,21
131:1,7,13,20
134:11 55:11
55:24 56:20
57:4 60:2
65:10,12 66:21
68:7 70:1
81:23 82:8,17
82:24 106:3,3
118:17,22
119:1,6 128:7
141:22 147:21
148:1,5 183:17
process 156:19
206:18 209:9
209:18
proclaimed
119:14
proclaiming
120:7
produce 214:15
production
134:24 135:1
Professional
218:5
Progress 3:16
7:1 59:22
Project 19:16
168:19 172:3
prominent
192:3
pronounced
187:3
77:20 140:19
properties 45:17
prosecution
104:6,10
protocol 21:10
38:21 150:3
prove 116:1,14
116:22

proves 116:15
provide 104:20
214:4,5
provided 38:11
38:14,20 48:21
60:4 69:1,4
74:23 106:19
106:22 109:19
110:8 111:2,4
111:6,17,17
115:2 147:21
214:9,10
proving 37:13
public 47:16
113:20
published 20:14
29:13,15
pull 89:1,2
149:23 194:2
pulled 83:23
91:4 96:12
101:18 103:3
110:5,12,20
116:3 124:4
126:5,14
129:21 138:17
144:14 150:1
160:23 172:1
174:5 175:7,14
188:5 193:14
200:22,24
201:16
punishment
97:4
purportedly
184:2
purpose 102:8
213:3,4
purposes 47:16
107:2
pursuant 1:17
3:10 6:9 49:18
purview 206:5
pushed 119:3
145:6,8 193:12
pushing 145:9

194:8 195:10
put 50:23,24
51:11 62:1,8
93:5 129:4
140:9 147:1
149:18 155:3
184:9 185:3
puts 11:11

**Q**

quality 38:24
105:9,12,19
107:20 112:22
127:24 128:4
214:1,10
quarter 151:16
152:6 182:8
question 6:2,4
27:23 32:14
49:7 78:5 96:1
97:11 105:7
106:24 107:15
107:18 122:19
148:1 165:22
166:13,14,19
180:16 181:9
184:6,10,21,23
185:10 191:12
192:15,15
197:21 205:15
217:3
quick 168:23
quickly 40:21
quite 28:19 29:7
91:3

**R**

races 72:19

radiology 33:10
RANDALL 1:10
ranging 192:3
ranked 40:19
ratio 44:20 45:2
45:3
reached 53:4
reaching 148:4
reaction 158:5
read 6:19,24 7:1
7:2,17 21:22
22:12 23:22
24:4,9 40:15
62:21 63:9,12
63:13,17 65:18
66:22 67:18
72:20 89:16
91:21 96:7
98:21 100:24
pulling 68:2
pulls 176:3
pulmonary
188:19 216:10
57:3 58:19
59:5
punished 56:11
175:16 197:16
200:22,24
201:16
punishment
97:4
really 16:11
120:1 149:4
168:5,18
169:19,20
reason 147:7
169:8,16
reasonable
89:21 100:18
163:3,10,17,18
164:1,6 169:17
176:4,12,13
reasons 169:23
170:7,8

recall 16:5,19
22:19 24:17,22
24:23 25:4,8
39:9 53:6,12
53:19 56:5,6
61:20,20 62:11
72:20 89:16
91:21 96:7
98:21 100:24
108:12 109:17
118:10 111:2
129:21 134:8,9
147:8 164:18
165:20,23
Recross-Exa...
3:5 202:12
recd 64:1,3,13
151:19 152:16
152:17 153:4,5
153:5,6 188:13
188:18,21
189:5 204:21
205:4,7,7,24
210:18,21
red-brown
157:8
Redirect 3:5,6
170:15 208:20
reduced 218:11
refer 176:7
referred 3:23
referring 14:10
refresh 22:15
99:2,4 100:1,7
159:14,24 162:1
162:24
refutes 200:18
regard 67:5
regarding 3:17
16:7 18:22
38:3 59:23
60:12,21 61:3
69:1 81:14
82:7 89:18
36:3 59:23
regardless
178:11
region 159:2
Registered
218:5

**rehearsed** 120:20
**related** 7:15
**relation** 178:7
**relationship** 114:6
**relative** 44:17 218:15
**released** 63:19 63:20
**relevant** 104:5 104:10
**reliable** 122:3 123:12
**relied** 48:20 121:18 122:3,4
**rely** 121:16,17 197:15
**remember** 8:20 9:4,4,9,10,13 10:10 11:4 13:20 14:14 15:5 16:8 17:7 18:3 19:11 21:4,14 22:4,9 22:13 29:7,22 30:9,23 38:19 39:10 50:19,19 56:13,18 57:22 58:3,14 59:18 63:11,12 64:21 66:16 67:14,16 71:14 89:9,11 89:13,15 92:7 94:2 95:22 97:12 98:21 99:1,5 100:5 100:14 101:5 101:11 103:21 107:14,19 108:18 114:12 165:16 169:16 191:4 193:14 197:24 202:4
**remove** 28:13,16 45:18

**removed** 78:17
**removing** 82:12
**rendered** 201:1
**repeat** 42:23 44:23
**repeatedly** 192:20
**rephrase** 160:13 161:18 169:6 170:5 207:18
**report** 3:15,16 6:21 7:1,1 31:17 34:15 36:6,20,22 37:6,17 47:11 58:17 59:22 60:4,8 65:19 66:23,24 67:5 67:6,17,18,20 68:6 70:8,18 71:1,5 73:6,8 73:16 75:7 81:11,17,20,20 83:13,15 89:12 89:19 105:6 106:14,21,23 107:7,10,12,15 107:18 108:1,6 108:12 109:14,18 109:22 117:20,22,22 122:17 123:12 123:14,15,16 123:17,18 125:23 130:4,7 130:18 147:16 147:17 148:2,6 148:16 150:7,8 155:5 166:15 166:21 180:16 181:14,16 188:11,16 191:11,12,24 196:4 197:20

197:21 198:13
198:23 200:16
200:18 206:12
206:13 209:9
**reporter** 4:23 5:20,22,24 6:7,17 218:2,5,5
**reports** 8:8 36:16,17 103:6
**represent** 21:19 24:10 131:1
**representation** 139:18
**representations** 122:5
**representing** 4:5 4:16 21:2
**request** 91:5,6 106:10
**requested** 27:12
**require** 43:22 102:12,13,13 103:6 104:16 104:17 138:1 142:14 163:24
**required** 40:24 41:18 44:3
**requires** 116:20 146:7,18
**reserving** 217:4
**residency** 46:10
**resolve** 130:17
**resolved** 38:1
**respect** 3:11 7:21 12:12 13:22 26:7 31:19,19 34:12 49:20 50:3 51:7 54:5,12 62:15,19 66:23 67:17 82:6 106:12 107:10 170:19 172:23 175:20
**respond** 20:22 24:2 25:16

171:14
**responded** 166:4
**response** 113:8 140:17 182:19
**result** 38:10 39:7 102:23 176:1 179:6 180:11
**resulted** 48:5
**resulting** 175:24
**results** 83:3 170:13
**resuscitation** 188:22,24
**review** 24:6,15 68:1 99:7,9,12 157:18 161:19
**reviewed** 6:20 70:1 142:3 181:15 183:17
**right** 7:9 8:9 9:3 9:9 11:8 12:18 23:8 33:6,19 34:13,21 35:1 38:8,13 39:19 40:18 42:2,13 43:13 44:5,8 54:18 55:2,3,3 56:18 57:4,4,6,21 58:8,22 59:15,22 61:8 61:16 69:17 72:7 73:2,3 74:10,10,12,15 75:10,20 76:18 77:4,8,16 78:2 78:3,7,8,12,24 79:5 80:1 81:18 83:17 84:2,5,7,15,19 84:22 85:6,7 85:13,17,21 86:7,22 87:23 87:23 88:8

89:1 90:3,11
90:15,19 91:2
91:11,23 95:11
95:14 96:13,17
97:24 98:9
102:3,16
103:15,16,18
104:8,10
105:20 107:17
108:18,21
109:12 110:15
111:8 113:12
113:22 115:20
116:4,10,19,21
117:14,17,21
121:18,24,24
122:4 123:6,17
128:20 131:21
133:2 134:3
136:10,12
137:16 140:16
140:20 141:3
141:7 145:18
152:7,16 153:3
153:12,15,20
154:18 155:2,2
159:6 160:14
167:16 169:17
171:10,13
172:15,24
173:3,4,14,20
174:6,7,12,21
175:5 177:2,5
177:23 181:19
182:23 183:2
183:16 188:10
189:14 192:22

193:4 194:3,14
194:18,20
195:1,2,3
199:17 200:12
202:18,22
203:4,16,23
204:2 205:5,9
206:16,18
208:10,10
209:10,10,12
209:17,18,19
210:4,14,18
211:23,24
212:2,3,4,7,8
212:10,11
215:13,14,16
**Robert** 1:7,8 25:3
**role** 32:12,13,16 32:21 33:1 34:19 37:6 46:13 79:8
**room** 50:21 55:6 56:9,24 59:1 64:10,20,21 65:6 72:1 92:1 92:6 141:11 179:16 201:22
**rooms** 27:6 64:18
**rope** 11:9 54:1 177:22 178:7 180:19,20,22 181:6 207:9
**rounds** 65:16
**routinely** 93:9
**rubric** 30:13
**rule** 129:18 130:15
**ruled** 79:3,5
**rules** 1:18 5:17 6:9
**run** 124:23 125:1
**runs** 124:20

**sake** 5:21
**sample** 206:5
**sanguine** 205:9
**sanguinous** 205:6
**sat** 105:13 191:7
**Saturday** 105:22
**saw** 58:7 60:8,12 60:21 61:3 62:1 63:4 70:4 73:14 75:5 97:16,23 108:7 109:12 114:1 126:24 127:3 129:7 138:11 138:18 139:7 139:21 146:2 146:21 156:5 163:3,11,17 164:2,7
**says** 34:6 62:4
**scan** 214:12
**scanned** 214:11

**scar** 74:10
**scars** 74:12
**scenario** 146:15 174:13 190:15 193:11
**scenarios** 174:10
**scene** 36:13,15 47:6,20 170:11 170:17 177:9 schedule 202:1
**school** 19:1,14 46:10 171:17 179:2
**scientific** 156:6 163:3,11,17 164:2,7
**Scott** 1:15 3:3 4:10 5:2,10 81:8 167:7 217:10 217:17 218:7
**scraping** 131:24 156:1
**scratching** 203:17
**scrutiny** 165:18 172:11
**sdentonmd@...** 24:20
**search** 20:17
**searched** 164:23
**second** 49:5 51:18,22 96:15 99:8 118:3 127:16 152:8 156:4
**secure** 43:8
**see** 5:19 12:7 20:18 26:3 27:2,8 38:14 36:6 40:18 46:21 51:7 62:10 69:14,20 69:22 71:2 73:24 74:1 75:19 76:11,19 77:1,6 78:13 94:20 98:9,11

99:4 115:11
118:10 125:12
126:6 133:23
134:6 135:17
137:2,8,9
139:15 141:10
142:15,19
143:8 152:15
153:5 154:9
155:11,19
159:6 161:1
164:6,21,24
166:1 168:14
169:16 178:21
187:13,16,17
189:15 190:16
190:17 192:10
210:24 214:16
215:17 216:7
217:6,9,11,12
**seeing** 24:22,23 101:5 108:12 130:10 162:4 166:3 188:22 200:8 201:19
**seen** 26:6 214:6
**segment** 135:13
**separately** 152:13

**sergeant** 23:4
**series** 170:17 172:19
**sero** 205:16
**serosanguinous** 188:13,23
**serous** 205:7
**service** 6:10
**Services** 4:6 61:19,24
**serving** 48:8
**set** 20:10 133:1 133:15 134:13 134:18 214:22 215:5
**settled** 196:18
**settling** 196:15
**Seven** 78:9
**share** 93:19
**shared** 107:23 123:21 124:5
**Shatat** 24:24 25:2
**sheet** 42:13 53:4 53:16 54:10 58:9,11 62:1,8 63:4 67:23 69:5 79:20 80:10,15,20 88:6,7,8,9,17 88:20 89:2,4,7 92:4 93:11 108:19 109:1,4 109:12 129:8 131:17,20 135:22 136:16 136:22 139:3,13 139:4,5,12,13 148:11,18 193:6 201:6 203:22 207:24 shoelace 139:16 139:17 207:22
**short** 10:14

19:22 20:1
**shorter** 18:7
**Shorthand** 218:4
**shot** 69:15,15 101:10 213:22 214:24 215:1,2
**shoulder** 74:14 74:15 75:6,10 75:12,17,20 154:4,5 155:3 155:4,12 157:2 210:11,12,13
**shoulders** 153:13,15 154:3 174:1 175:1,2
**show** 22:20 47:8 59:20 91:22 93:4,6,13 107:1 132:5 133:19 134:11 135:3 137:5 133:19 134:11 135:3 137:5 163:9 203:7 209:1
**show-and-tell** 151:22
**showed** 12:22 71:21,23 82:5 82:20 83:12 152:3
**showing** 23:18 210:14 214:1
**shown** 101:10 143:20 153:4 162:19 165:19
**shows** 47:11 137:9 143:24 145:21,23 146:11 152:4 153:16 182:10 192:5,6 200:16 209:21 213:9 213:16
**sic** 108:22 137:18 138:21

160:9
**side** 11:14 18:10 20:9,10 76:16 76:19 77:4,7,8 78:10,12,12,24 79:1 124:24 131:16,19 136:8,10,12 137:16 139:10 139:13 140:19 140:20 141:1,3 141:4 142:16 142:21 156:1 155:2 156:24 156:24 158:1 158:11 168:7 171:11,18 171:15 172:12 174:12
**sign** 118:2
**signature** 217:4 217:6,15
**signed** 34:16 51:15 52:9 117:19
**significance** 145:24
**significant** 42:5 54:5,12 60:13 71:9 71:22 78:2
**significantly** 41:19
**signing** 112:13 217:4
**signs** 74:4 175:8

189:12
**similar** 17:22 157:20
**simple** 36:23
**simultaneous** 22:23
**single** 190:10,10 191:8,11,13,18 192:2,19 193:2 207:10,19
**single-line** 140:18
**singular** 191:24 192:11,14,19
**sit** 19:12 22:1 25:13 65:20 101:4 123:1 171:5 172:12 174:12
**sitting** 39:10 181:5
**situations** 42:9
**skills** 45:22
**skin** 10:23 136:4 142:20 142:21 143:6,21 145:15 161:13 151:14 154:15 157:4 158:19 181:22 183:2
**skipped** 25:20
**slant** 77:10,13 77:21 78:1,2 78:11
**slanted** 77:15
**slanting** 11:13
**slight** 77:10,20 77:21 78:2
**slightly** 87:13,19 119:21 191:19

**slightly** 76:21 87:5,18 162:13 191:19
**small** 45:22 134:8 151:19 158:19 smaller 41:13 157:9,11
**so-called** 178:19
**solely** 110:2
**somebody** 140:20 208:1
**someone's** 41:6 47:9
**Somerville** 21:23
**somewhat** 77:24 77:24
**Sommer** 2:18 4:5
**son** 93:22
**sono** 104:21
**sorry** 26:3 45:11 45:21 54:7 59:6 62:16 65:14 99:10 153:1
**sound** 54:2 62:5
**sounds** 25:7 40:15 100:4,18 176:4
**source** 33:18 40:14
**sources** 32:20 33:16
**Spam** 26:19 215:17
**speak** 9:2,8,16

9:23 21:2
22:14,17 24:24
25:3,5,10
65:11 67:12,15
71:4 118:23
**speaking** 22:10 25:1,8 82:17 148:5
**special** 160:2
**Specialist** 2:18 4:5
**specialties** 35:4
**specialty** 35:3
**specific** 173:5 177:6 179:11
**specifically** 21:4 65:15 78:24 94:24 106:10 171:8 173:22 192:18
**speculation** 40:12 44:22 60:15 75:2 76:1 79:11 87:22 88:13 167:24 168:11 205:3
**spell** 5:9
**spending** 66:17
**Spider** 58:10
**spinal** 82:12
**spoke** 9:19 19:8 21:20 22:13 118:24 189:11 191:2 199:19
**spoken** 18:18,21 130:24
**Sta-Von** 148:11 198:18,22 215:24
**staff** 105:20,21 105:22,24
**stages** 95:8
**stains** 73:3
**stamp** 134:20
**stamped** 99:14

**stand** 8:20 65:17 116:5
**standard** 103:16
**standing** 195:9
**staple** 135:9
**stapled** 132:12 133:6 135:9,15
**start** 99:11
**started** 8:21 67:13 69:22,23
**starting** 66:21 150:12
**starts** 76:13,24 77:18 112:3 105:8 164:6 199:7 210:22
**State** 1:21 5:9 105:8 164:6 199:7 218:6
**stated** 127:2 198:18
**statement** 104:16 122:10 183:23 199:10
**statements** 15:17,20 16:2 19:23 20:5 56:7,13 59:19 60:12,18,21 61:2 122:21,24 123:17 138:15 197:15
**states** 11:3 39:21 40:4,10 51:8 117:19 120:21 198:18
**station** 64:17
**stationed** 159:20
**stations** 64:18
**Statute** 34:22
**Stauffer** 25:3
**stays** 146:22 186:19
**steps** 102:13
**Steve** 25:5
**stick** 175:17
**stood** 16:10
**stop** 140:10

194:14,15
**stopped** 158:2
**stops** 156:19
**store** 190:12
**stories** 130:18
**story** 20:6,9,19 101:5 148:20 178:7 171:12 171:17,18 172:7 177:18,22 199:18,19 199:22 201:18 201:22 207:24
**straight** 12:6 20:10 193:22
**strangle** 137:18 207:24
**strangled** 160:17 176:22 177:1
**strangulation** 137:24 204:8 strangulation-... 42:6
**stretched** 80:3,4 95:7,10
**strike** 40:2 44:44 51:21 54:7 59:1 71:8 80:11 83:9,21 88:18 94:10 91:11 110:6

111:3 122:24
136:20,22
142:2 155:7,9
160:16 170:18
190:2 204:6
**striking** 97:15
**string** 11:21 12:1,3 43:11 53:11 58:8 59:11,12,14 60:22 77:23 86:8 87:4 178:8 184:24 187:11,20 194:9 195:10 196:14 199:14 201:2 207:20 207:24 212:3
**strong** 112:18
**struck** 90:23 96:23 97:7 98:7
**structures** 41:9 41:14
**struggle** 146:23
**struggling** 203:18
**stuck** 88:7,7,9
**student** 15:24 19:16 164:11 165:10 167:12 167:18 170:20 students 168:20 172:3
**studied** 12:8 181:15
**studies** 169:12 170:12 181:9
**stuff** 63:19
**submitted** 31:17 95:7,10
**subpoena** 3:10 6:9,11,20 49:12,19 124:24 214:24 214:17
**subpoenaed** 214:4
**subsequent** 37:4 41:12

121:4
**subsequently** 123:24
**subspecialty** 35:3
**sudden** 113:15,15
**suffocated** 124:10 125:11 126:3
**suffocating** 125:5
**suggested** 193:12
**suggestion** 23:1
**suicide** 47:18,24 48:15
**Sunday** 105:21 113:6
**superficial** 116:16
**supposed** 48:11 146:9 192:18
**suppressed** 7:1 106:23
**support** 101:22 170:12 181:9 116:24 188:1
**supported** 116:19 166:18 168:8
**supportive** 116:16
**supposed** 48:11 146:9 192:18
**sure** 5:10,18,22 6:12 14:13 21:14,19,23 23:3 24:6 36:4 37:4 41:12

121:4
45:8,19 47:6
54:14,20 55:18
55:23 58:22
59:8 60:24
61:6 62:17
68:2 69:24
76:11 81:3
84:15 88:22
89:4 91:20
93:3,18 94:14
97:17 99:3,11
103:11 104:7
114:14 125:15
126:19 144:7
134:20 143:21
152:9 158:1
165:9 166:8
171:17 174:14
194:3 203:24
**surface** 155:24
156:1,15,17
157:22
**surfaced** 158:1
**surfacing** 158:2
**surround** 179:2
**surrounded** 132:3
**Susler** 2:3 4:16 4:16
**suspended** 11:10 147:12
**suspension** 11:3 11:9 45:6,7,13 142:14 176:1 203:24
**suspicious** 90:13
**sustain** 156:14
**sustained** 13:13 76:5 76:21,22 76:23 126:12
**sweatshirt** 73:3 124:1 124:6 125:6,20 187:2

187:4,6,7,8,22
199:8,11,15,18
199:20 200:1
200:10
sworn 5:1,4
218:8
symmetrical
157:15,17
194:10 195:19
system 26:21
32:14,15,22
34:1 35:1,7,8
35:10,12 37:22
38:6 46:13,13
62:23

**T**

T 2:7
table 105:14
tag 69:16
take 23:19 69:15
69:15,18,19
71:2 81:2 99:3
100:21,22
116:5 127:15
128:21 166:24
198:2
taken 1:18 6:8
55:17 60:20
61:2 69:8,12
119:22 128:17
134:2 214:23
218:9,14
talk 19:24 21:10
21:11 91:23
168:1,5 200:24
talked 9:5,10
10:22,24 14:15
15:22 17:1,16
21:5,8,24
71:24 131:11
147:4 149:8
164:10,10,14
187:3 204:18
206:13
talking 14:24
21:4 56:18

65:15 96:2
151:22 193:5
206:20
tag 70:20
tear 144:17
tears 120:5
tech 64:9
technician 71:11
teeth 145:2,9
tell 5:4 14:11,20
17:4,20 18:1
19:11 20:9,10
21:17 22:2
30:20 32:11
56:2 65:21
69:14 75:5
78:6 89:10
91:18,24 92:4
93:16,20 94:4
94:11 95:16,20
95:23 96:2,5
96:19,22 97:6
97:9 103:19
121:14 123:1
153:8 154:10
154:13,19,22
156:3 173:2
174:13 186:7
186:11 190:22
telling 8:21
114:4 216:19
tells 35:24 75:16
77:1
ten 18:7 22:4
99:1
tender 130:20
tension 80:18
tenth 192:4
term 29:4 41:1
44:17 146:16
175:22,23
176:6 192:11
192:14,18
terms 47:20
54:18 101:15
103:14 117:23
122:21 175:19

214:1
test 119:13
206:6
testified 5:5
15:19 21:6,8
21:12 49:1
55:9 62:14,18
63:4 96:14
97:24 101:6
102:6 110:15
121:6 125:22
150:16 166:12
175:4 200:21
testify 62:21,22
62:24 121:1
testifying
100:24 118:17
testimony 7:17
48:7 63:7 65:4
70:4 118:22
119:1,6 140:23
141:22 150:19
182:18 183:5
189:24 190:3
200:5 204:9
207:14 209:4
218:7,9
thank 20:12
26:5 114:15
171:22
theory 188:2
thereto 218:16
thick 75:14
76:23
thing 14:24
15:21 29:10
32:9 59:17
66:15 82:11
84:2 86:2,6
112:5 133:11
135:6 168:2
188:12
things 6:22 8:9

37:11 55:6
62:20 88:24
114:19 117:12
124:23 127:13
126:20,21
129:5,5 143:8
168:3 171:16
206:12
think 7:16 8:2,3
8:12 10:13,18
10:22,24 11:2
12:18 14:15
15:1,21,23
16:20 17:21
20:21 22:6
23:5 29:13
34:16 41:1
43:20 54:20
57:1,3,10
62:20 63:13
71:21 82:11
93:24 94:1,6
96:1,4,21 97:1
97:8,11,16,21
97:22 101:3
109:13 115:18
119:5,10,18
120:22 134:23
135:4 140:3,6
142:13,23
151:1 152:2
153:2 156:21
164:16 166:12
166:16 169:18
169:19,20
172:9 180:17
192:12 196:6
213:15 216:23
third 52:18
148:8 198:17
thought 93:18
133:6,14 192:9

168:13,16
three 17:13
19:20 40:13,18
64:20 97:21
124:23
threw 215:9
throw 174:9
throwing 99:7
thrown 16:9
thumb 158:15
Thursday
105:24
tie 53:16
tied 177:23
180:20
tight 13:15
126:22 138:21
147:12 148:22
164:3 187:6
203:2,5 208:6
tightly 43:9
tights 43:9
88:23 135:22
136:17 137:12
138:1
time 4:2 9:19,21
24:9 26:12,13
31:15 43:3
50:7,22 52:6
55:7,12 62:13
63:2 66:10,17
70:3,19 81:9
89:7 91:14
95:17 99:21
117:1,12,14
127:18,22
137:12,19
139:22 143:14
146:17 148:23
155:19 157:19
167:2,8 173:5

times 14:14 43:5
45:24 69:23
114:4 127:8
136:17 137:3
137:10 138:9
138:11,21
148:22 164:3
169:5,7 182:2
185:4,7,18
186:18,19,21
186:22,24
187:5 188:3
199:5 204:17
207:5
tissue 154:2,19
154:20 155:23
tissues 153:16
title 46:8
today 6:11,15,18
19:13 22:1,24
23:5 25:13
27:22 65:20
101:4 122:8
123:1 171:6
172:12 174:12
175:17 182:18
189:18 200:3
200:11 206:5
194:2,6
Today's 4:2 6:8
told 14:19 17:17
18:4 19:2 53:2
53:6,9,14,22
56:8,10,23
57:1,6,12,16
58:1,7,16,23
58:23 59:3
61:17,23,23
62:6 89:15
93:14,24 94:7
94:14,17,22
95:6 103:23
105:2 112:11
118:18 119:2
119:12,12,17
119:20,24
120:4,4,10,15

120:16,22
121:23 162:18
183:7 190:18
200:8 202:6
top 12:20,23
53:4 76:14
78:9 89:3 92:5
108:15 132:12
164:7 170:1
totally 86:20,21
135:12
touch 50:24
touched 162:24
touching 190:14
toxicological
63:6
toxicology 33:9
47:11 85:7
89:19 170:12
170:13
trachea 43:21
44:3
traction 87:16
87:17,19,24
88:10,17,19
140:13,14,15
194:2,6
tragedy 201:13
tragic 201:4,8
training 46:11
121:9
tram-track
212:20,23
trampoline
180:21,22
206:24 207:9
transcribed
82:12
transcript 3:20
7:3 21:22
111:21 115:9
115:14 166:14
166:18,22
183:15 184:6
transcripts

184:4
trap 171:21
trapezius 158:7
158:10,16,23
158:24
trauma 39:22
40:5 47:10
74:21,22 76:2
98:10 150:17
150:21 151:6
151:17 156:11
145:22 169:6
traumatic 74:23
tree 180:20
207:9
trial 7:2,3 8:13
21:11 22:3,11
22:14 63:15
118:17,22
119:1,6 121:16
175:5 200:22
tripped 182:16
trouble 37:15
59:6 86:12
126:20 190:6
true 40:6 101:3
101:7 124:6
128:24 129:17
130:10 149:17
133:1 135:15
135:24 181:18
181:22 199:4
199:18 200:13
206:15 211:16
trust 121:23
217:5,8
truth 5:4
try 88:15 166:6
198:2
trying 16:8,19
60:18 84:22
167:19,21
168:2,8 179:12
200:14
Tuesday 100:16
105:23 113:5
turn 49:23 51:2
52:11 67:1

117:2 184:13
198:1 208:22
209:23 213:1
215:10
turned 208:8,10
210:11
turning 114:24
172:18 182:1
198:12,15
211:18
TV 63:19,21
101:8,9
twice 14:14
214:24 215:1
two 8:6 9:21
10:9 14:8,20
15:17 17:10,11
17:11,12,14,15
17:23 18:23
19:19 20:3
27:1,18,19
32:6,10,11,11
64:18,20 65:2
70:5 72:13
78:16 80:24
82:4 88:24
99:23 112:16
130:18 132:11
133:15 135:15
153:14 180:21
182:10 209:4
209:14 211:24
212:2,22,23
two-tenths
191:14 192:4
Type 33:14
131:20 141:13
146:5 165:4
196:12
typed 71:15
188:21
typed-up 52:14
typewriting
218:11
typewritten
81:20
typical 1:1,2,6
1:2 142:7,10

**U**

U-shape 195:20
Uh-huh 75:9
117:4
unable 43:13
86:8 146:13
unattended
36:15
uncommon 38:5
unconscious_
41:23 44:5,7
unders~ 24:16
understand 6:3
14:19 38:8
39:5 46:23
47:20 59:13
116:10 137:8
138:3 187:15
188:4 192:13
understanding
6:14 24:11
140:4 167:20
understood 6:5
undetermined
38:1 47:19
48:1,16 84:12
85:16,20
110:17,24
117:7,21 118:1
129:24 130:12
130:16
undisputed
160:17
unexpected
37:11
unfair 156:13
unfavorable
20:8 168:3
171:16
unfortunately
41:14
unintentional
40:9
Unit 66:10
United 1:1 39:21
40:4,10

unnatural 47:18
47:18
unpend 107:22
unpended
105:23 106:1
unpending
38:21
unusual 114:5
180:3,8
unwind 198:19
199:4
unwrapped
187:20
up-to-date
208:15
upper 74:14,14
75:10,19 76:19
144:4 152:12
152:14 153:13
153:16 158:8
158:22 182:6
201:5,7
upside 11:17
upward 77:13
upwards 77:15
87:18,19 88:11
142:18,18
147:13 162:13
191:19,24
use 21:18 27:19
132:9 133:7
192:14,18
usual 178:18
195:24
usually 11:8,10
11:12,13,16
33:11 34:4
36:5,17 37:12
37:23,23 41:6
43:8 47:16
70:21,21 75:3
81:18 85:11
91:22 100:22
103:4 104:2
120:1 126:16
146:17 146:22 152:12

173:9 176:17
177:11 178:23
188:14 196:21

**V**

V 178:19,23
V-shape 11:14
11:17 142:16
vacuum 85:17
vague 170:4
vagus 124:21
125:1
validity 128:12
varies 27:18
vary 178:11
vein 13:17 41:22
44:4 124:18,18
124:24 146:8
146:15,19,20
146:21 147:1
veins 41:8 44:1
venous 13:9
43:17,19
124:18
verbal 5:23
version 60:8
versus 4:9 38:3
47:1,17 77:7
120:13 140:19
175:20 206:7
vertical 11:21
11:24 12:3,4,5
12:5,10 77:21
86:17 87:1,8
vessel 23:21 24:6
36:3 54:14,17
55:3,13,21
68:1 80:23
91:11 98:4
116:10 117:2
127:15 128:14
128:14,16
131:6 132:9
147:15 150:7
167:10 171:11
175:19 177:20
180:6,16
189:23 203:7

videotaped
70:14 81:7

167:6 217:10
view 153:11
visualized
158:20
Vitae 3:13
Void 50:24
voluntarily
122:5
voluntary
121:20
vomit 73:3
124:13,14
125:6
vomited 124:11
125:5
vomiting 124:22
125:2
vs 1:5

**W**

Wacker 2:14
wait 160:18
170:18 196:13
waited 113:23
waiting 170:12
waive 217:8
waiving 217:6
walk 131:7
150:10 151:7
wall 175:22
want 23:21 24:6
36:3 54:14,17
55:3,13,21
68:1 80:23
91:11 98:4
116:10 117:2
127:15 128:14
128:16 131:6
132:9 147:15
150:10 151:7
193:5 194:21
198:5,9 206:20
212:7 214:11
214:18
want 140:19
we've 23:18
130:24
wearing 162:5
weave 192:6

wanted 101:13
101:14 102:16
102:22 103:9
103:12 128:9
167:20 168:1
168:8
wasn't 16:13,19
19:24 63:9
70:14,16 92:24
93:1,6,15 95:7
95:17 98:17,17
105:20 114:14
124:12 139:21
149:22 150:3
162:14 168:20
185:7,8 191:17
201:10
way 30:19 33:11
47:6 49:13
53:4 57:1
70:10 73:23
75:22 76:11
93:1 94:5
100:19 110:18
113:16 115:6
116:14,22
126:11 154:19
163:4 168:12
176:17 177:2,3
184:9 189:5
199:15
ways 116:9
we'll 23:14
134:12
we're 23:12
26:14 81:8
133:17 135:16
147:16 153:2
156:21 167:1
193:5 194:21
198:5,9 206:20
212:7 214:11
214:18
we've 23:18
130:24
wearing 162:5
weave 192:6

week 8:6 16:24
173:7
weekly 169:11
weight 11:11
41:6 176:2,10
176:19
well-nourished
73:19
went 8:13 15:1
90:9 107:21
109:19 112:15
164:22 170:20
weren't 86:20
86:21,22
105:16 121:7
160:2
West 1:19 2:8
2:14 4:3
whatsoever 98:7
126:1
wide 76:15
191:15 192:4
widely 178:11
wider 203:13
Wilson 61:18,23
62:8
wish 143:13,15
withdraw 49:7
54:8 93:3
166:11 188:6
witness 1:16 3:2
5:1,3,18 6:1,7
6:12 24:14
56:3,5 61:2
69:6 76:10
189:18
witnessed 33:18
122:13,18
witnesses
130:18
Wo 1:10 2:11

3:17 57:12
59:22
woman 171:9
women 72:1
word 31:22
44:15 60:9
148:15
work 26:9,10,16
32:7,9,14,15
64:17 126:15
worked 19:13
28:23 30:7,21
31:23 34:18
37:3 105:21
181:21
working 26:14
46:12 48:18,22
64:17,19 66:7
works 64:24
65:1,2
workstation
149:17
worse 197:3,5,7
worth 60:16
wouldn't 54:20
74:7,8,16 76:3
100:15,22
104:22 115:5
119:23 130:13
180:4,4,5
193:19 195:17
wrap 54:1,10
55:9 63:4
108:7 109:7,8
109:12 122:13
126:21 127:6
129:1,7 138:1
139:22 148:15
wrapped 43:5,9
43:11 45:24
54:3 58:8
59:10,11,14
67:22 77:24
79:8,17 86:8
88:23 108:24
126:6 135:22

136:16,23
137:5,9,12,19
138:9,11,19,20
148:12,21
164:2 179:15
180:19 181:6
182:21 185:3
185:7,8,21
185:24 186:22
186:23 187:5
187:11 188:2
190:20,23
203:2 204:16
204:16 207:4,5
207:6 208:1,5
209:6
wrapping 45:15
55:6 127:13
wraps 186:18
190:13
Wright 22:10,10
write 72:17
100:21 101:15
143:13 165:14
168:6,14
writes 36:16
writing 20:6
171:17
written 2:7
26:20 100:14
128:2
wrong 36:21
37:1 90:14
91:2,12,22
112:24 113:14
114:4,8,10
wrote 52:2
83:10,15 95:3
114:9

**X**

X 3:1 50:23

**Y**

Y-o-u-n-a-n-s
26:17

yeah 40:2 57:14
81:3 86:11
108:12,17
113:17 122:19
126:9 132:22
133:14 135:4
134:18 145:14
184:19 201:24
206:9 212:3
213:6 214:3
year 8:22 19:17
22:4 25:21,22
28:5 30:1
years 19:7,20,20
28:7 29:23
99:1
Youmans 26:17
young 19:10
29:5,22 42:4
171:9,9,24
172:4
younger 29:3

**Z**

Z 23:13,14
Zeitler 1:19 4:24
218:4,21

**0**

0.15 151:13,16
151:19 152:8
182:9
0.25 151:12
00001 49:12
0000408 99:14
084-004062 1:19
218:22

**1**

1 40:10 75:14
81:21 117:5,12
157:10 206:15
1/10 76:23
1/2 75:14 76:14
77:17,19 78:6
78:10,11
1:07 127:18,20

1:19 127:20,22
10 3:14 76:12
81:13 82:2
107:3 108:13
131:9 132:15
198:13
10:1 44:20 45:2
10:10 1:22 4:3
100 132:6 133:9
134:14
104 1:19 4:3
107 3:14
11:17 212:14
1180 2:4
12 3:16 59:21
6:7 2 189:11
12:09 81:5,9
12A 60:8
13 108:15,16,17
13-year-old
180:8
131 3:4
14:10 210:10
108:15 118:6
118:11
14-cv- 1:5
14-CV-4391 4:8
1479 134:21
15 3:17 41:7
51:14 57:8,13
57:17 59:24
64:1 66:14
91:9 94:22
116:17 118:6
100:7,22 109:7
113:13 117:7
117:14 123:22
184:14,21
201:1
150 28:5
16 9:3 51:15
61:19
169 3:4
17 100:16
113:13 114:17

127:23
170 3:5
18 52:12 118:11
180 195:21
183 3:20
18A 51:17
19 49:24 50:23

**2**

2 75:13 81:7
117:12 151:4
151:10 172:24
174:3 191:23
206:13
2,500 28:7
2,700 28:7
210 76:15
2:00 38:23 55:18
105:6,16
149:21
215 167:2,4
2:29 167:4,8
2:30 216:20 51:3,3
52:15
20~ 113:13
200 4:6
2005 3:17 12:14
12:17 28:2,6
28:18 30:8,22
30:24 32:5
51:14,15 52:10
57:8,13 17
59:24 61:19
64:1 66:14
91:9 94:22
96:19 99:20
100:3,8,11,17
108:7,22 109:7
113:13 117:7
117:14 123:22
184:14,21
117:14,20
118:6,11
123:22 127:23
126:7,13 201:1
2011 25:20,22
26:1,1
2015 9:3,8 17:18

SCOTT DENTON

**189**:12 216:17
**2016** 1:22 4:2
  218:10
**202** 3:5
**20232** 1:10
**20417** 1:9
**20680** 1:8
**208** 3:6,12
**20926** 1:8
**21** 216:16
**21121** 1:9
**21204** 1:7
**21252** 1:9
**23** 3:8 157:1
**235-0070** 2:5
**25** 135:6 184:3
  203:7,10
  208:23
**26** 143:23 144:6
  152:4 182:2
  184:2,3
**27** 119:8
**29** 144:4
**2900** 4:7
**2nd** 9:8 17:18

**_____ 3 _____**

**3** 75:8 117:12
  150:7 151:3
  153:2,3 158:18
  158:19 167:6
  172:24
**3.2** 182:4
**3/10** 158:9
**3:09** 198:6,8
**3:13** 198:8,10
**3:42** 217:11,14
**30** 3:18 27:18
  99:10,13
  153:18 154:17
**300** 28:5
**3078** 1:7
**3100** 2:14
**312** 2:9,15
**330** 2:8
**341-9646** 2:9
**35** 7:9

**360** 183:6
  190:23 200:1
  203:2 207:11
  207:12,15
  208:1,5
**360-degree**
  137:14
**38** 153:6,6
**39** 80:10,15,18
**3rd** 2:4

**_____ 4 _____**

**4** 40:10 117:12
**4-year-old** 36:12
  126:21
**40** 152:14
**409** 99:14
**4391** 1:6
**46** 99:11
**476-5126** 2:15
**49** 3:9

**_____ 5 _____**

**5** 3:3 29:23,24
  39:24 40:3
  42:4,8 117:12
  119:21 153:12
  157:13
**53** 2:8 145:21
**54** 211:18
**55** 213:1
**56** 145:23
  215:10
**58** 134:5
**59** 3:16

**_____ 6 _____**

**6** 41:8 76:14
  77:17 78:6
  80:20 81:21
  117:5,13
  153:12 156:21
  156:22 157:13
**60** 138:24,24
**60601** 2:14 4:7
**60604** 2:9
**60642** 2:4

**64** 158:13
**65** 209:24
**66** 49:13

**_____ 7 _____**

**7** 4:2 41:8,11
  77:19,19 78:8
  78:10 151:3,4
  158:6,7,17,20
  172:24 174:3
  218:10
**7/10** 75:14
**75** 3:20 183:13
  184:11
**77** 2:14
**773** 2:5
**7th** 1:21

**_____ 8 _____**

**8** 80:20 81:13
  82:2
**8-month-old**
  179:15,19
  180:3,6
**8,500** 28:1
**8:30** 65:16 66:14
**8th** 117:20

**_____ 9 _____**

**9** 81:13 82:2
  198:15
**9,000** 28:1
**9:00** 69:22 201:2
**90** 87:15
**94** 23:5
**95** 23:5
**95Z** 3:8 23:12,16
  23:19 165:19
**96** 28:6 172:19
**96Z** 3:9 49:8,9
  50:24 51:3
  52:12 67:2
  81:11,21 117:3
  131:9 133:8,12
  133:17 135:16
**97** 208:8
**97Z** 3:12 208:17

**99** 3:18

AREA WIDE REPORTING & VIDEO CONFERENCING