# In the Matter of:

*Nicole Harris*

*vs.*

*City of Chicago, et al.*

_____

*Brian Peterson, M.D.*

*March 11, 2016*



**DTI** **Court Reporting Solutions**

311 South Wacker Drive, Suite 300, Chicago IL, 60606
312.386.2000 - Fax: 312.386.2275

Brian Peterson, M.D.   March 11, 2016

1

IN THE UNITED STATES DISTRICT COURT OF

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

* * * * * * * * * * * * * * *

NICOLE HARRIS,

                Plaintiff,

        vs.             Case No. 14-CV-4391

CITY OF CHICAGO, Chicago Police Officers ROBERT

BARTIK, DEMOSTHENES BALODIMAS, ROBERT CARDARO,

JOHN J. DAY, JAMES M. KELLY, MICHAEL LANDANDO,

ANTHONY NORADIN, and RANDALL WO, Assistant Cook

County State's Attorneys ANDREA GROGAN and

LAWRENCE O'REILLY, and the COUNTY OF COOK,


                Defendants.


        * * * * * * * * * * * * * * *



        VIDEOTAPED DEPOSITION OF BRIAN PETERSON, MD

TAKEN AT: Milwaukee County Medical Examiner's Office

        LOCATED AT: 933 West Highland Avenue

                Milwaukee, WI

                March 11, 2016

                9:02 a.m. to 1:28 p.m.


        REPORTED BY ANITA K. FOSS

        REGISTERED PROFESSIONAL REPORTER



        * * * * * * * * * * * * * * *

Brian Peterson, M.D.    March 11, 2016

**2**

1            A P P E A R A N C E S
2    PEOPLE'S LAW OFFICE, by
        Ms. Joey L. Mogul and
3    Ms. Jan Susler
        1180 North Milwaukee Avenue, 3rd Floor
4    Chicago, IL  60642
        773-235-0070
5    joeymogul@aol.com
        Appearing on behalf of the Plaintiff.
6
        HALE LAW, LLC, by
7    Mr. Avi T. Kamionski
        53 West Jackson Boulevard, Suite 330
8    Chicago, IL  60604
        312-341-9646
9    akamionski@ahalelaw.com
        Appearing on behalf of the Defendants.
10
        GREENBERG TRAURIG, by
11   Mr. Kyle L. Flynn
        77 West Wacker Drive, Suite 3100
12   Chicago, IL  60601
        312-476-5126
13   flynnk@gtlaw.com
        Appearing on behalf of the Defendants.
14
15            I N D E X
16   Examination by            Page
17   Ms. Mogul. . . . . . . . . . . . . . 4
18         E X H I B I T S
19   Exhibit No.  Description          Identified
20
        149     Responsive documents to subpoena. . 11
21
        150     List of trial testimony, report,
22              and curriculum vitae. . . . . . .143
23   151     Dr. Peterson's report. . . . . . 148
24   (Original exhibits retained by Ms. Mogul.)

**3**

1           TRANSCRIPT OF PROCEEDINGS
2           COURT REPORTER:  What type of transcript
3    would you like?
4           MS. MOGUL:  E-mail.
5           COURT REPORTER:  Just an e-mail, no hard
6    copy?
7           MS. MOGUL:  No.
8           MR. KAMIONSKI:  Same order.
9           MR. FLYNN:  No copy.
10          THE VIDEOGRAPHER:  My name is Steve
11   Peters, videographer.  Today I'm here on behalf of
12   DTI.  This is the beginning of the video deposition
13   of Brian L. Peterson, M.D., on March 11, 2016.  The
14   time, 9:02 a.m.  This is the case concerning Nicole
15   Harris, plaintiff, versus City of Chicago, et al.,
16   defendants, case number 14-CV-4391, pending in the
17   United States District Court for the Northern
18   District of Illinois, Eastern Division.
19          Will counsel now please state
20   their appearances, starting with the plaintiff.
21          MS. MOGUL:  Good morning.  My name is
22   Joey Mogul, and I am one of the counsel for the
23   plaintiff, Ms. Nicole Harris.
24          MS. SUSLER:  Jan Susler also for Nicole

**4**

1    Harris.
2           MR. KAMIONSKI:  Good morning.  Avi
3    Kamionski on behalf of the individual defendants.
4           MR. FLYNN:  Kyle Flynn on behalf of the
5    City of Chicago.
6           THE VIDEOGRAPHER:  The court reporter,
7    Anita Foss, will now swear in the witness.
8           BRIAN PETERSON, MD, called as a
9    witness herein, having been first duly sworn on
10   oath, was examined and testified as follows:
11         E X A M I N A T I O N
12   BY MS. MOGUL:
13      Q.  Can you just state your name for the
14   record, please?
15      A.  Brian L. Peterson.  B-R-I-A-N,
16   P-E-T-E-R-S-O-N.
17      Q.  And you're a doctor?
18      A.  I am.
19         MS. MOGUL:  So this is the deposition of
20   Dr. Peterson in the Nicole Harris civil litigation.
21   This deposition is taken pursuant to notice and the
22   Federal Rules of Civil Procedure, and subpoena as
23   well.
24   BY MS. MOGUL:

**5**

1       Q.  Doctor, this is not the first time you've
2    taken a deposition; am I correct?
3       A.  You're correct.
4       Q.  Yes.  How many depositions have you
5    taken?
6       A.  Dozens and dozens.
7       Q.  Dozens and dozens.  Okay.  So would you
8    say you've done more than a hundred depositions?
9       A.  I've certainly done more than a hundred
10   trials.  Depositions, probably under a hundred, but
11   it wouldn't be a lot under a hundred.
12      Q.  So we're saying more like somewhere
13   between 75 and 100?
14      A.  I think that's reasonable.
15      Q.  And in terms of the times you've
16   testified, how many times have you testified?
17      A.  At this point, over 600 times.
18      Q.  Okay.  So just to go over the ground
19   rules of a deposition.  As you can see,
20   everything's both being taken down by the court
21   reporter as well as the videographer, but I need
22   all your answers to be oral so that the court
23   reporter can get it down.  Nods of the head are
24   often less straightforward when it comes to the

2 (Pages 2 to 5)

Brian Peterson, M.D.    March 11, 2016

6

1  transcript, okay?
2      A.  We can skip that if you want to.  I know.
3      Q.  Okay.  Well, is there any -- okay, let me
4  say this.  It's going to take me a minute to spit
5  out my questions, so please let me do so and I'll
6  let you give your answers, okay?
7      A.  I understand.
8      Q.  And if there's a question I ask and you
9  answer it, we're going to assume that you
10 understood my question and you're answering it
11 correctly; is that fair?
12     A.  I understand that too.
13     Q.  Okay.  Is there any medication or medical
14 condition that you have that prevents you from
15 understanding and answering my questions correctly
16 today?
17     A.  No.
18     Q.  Okay.  What documents did you review to
19 prepare for your deposition today?
20     A.  In addition to reviewing the report that
21 I authored -- well, this morning I simply reviewed
22 the report that I authored, put it that way.
23     Q.  Okay.  Did you do anything else to
24 prepare for your deposition today?

7

1      A.  No.
2      Q.  And so the only time you spent getting
3  ready for this deposition was this morning in
4  reviewing your report?
5      A.  In terms of what I did today, that's all
6  I did this morning, was review my report.
7      Q.  What I'm asking is, what have you done to
8  prepare for this deposition, regardless of just
9  this morning?
10     A.  I had a conversation with Mr. Kamionski
11 yesterday morning.
12     Q.  Okay.  And was that conversation in
13 person or over the phone?
14     A.  Over the phone.
15     Q.  And how long was that conversation?
16     A.  I think 15 or 20 minutes.
17     Q.  Okay.  Other than speaking with
18 Mr. Kamionski for 15 to 20 minutes and reviewing
19 your report, have you done anything else to prepare
20 for your deposition today?
21     A.  No.
22     Q.  Since you issued your report, have you
23 reviewed any other documents --
24     A.  No.

8

1      Q.  -- related to this case?
2      A.  No.
3      Q.  You didn't read the report or the opinion
4  of Dr. Stevens?
5      A.  I had seen Dr. Stevens' report before I
6  issued this document, I think.  And you're correct,
7  I did read more of his material after.  I did.
8      Q.  Okay.  So those things weren't included
9  in your report?
10     A.  Correct.
11     Q.  But you had read Dr. Stevens' report
12 prior to drafting your report?
13     A.  Right.
14     Q.  So that was missing; correct?
15     A.  Yes.
16     Q.  So I'm going to -- have you reviewed
17 anything else?
18     A.  No.
19     Q.  What's your current title?
20     A.  Chief medical examiner for Milwaukee
21 County.
22     Q.  And how long have you held that position?
23     A.  I've been the chief for about five years
24 now.

9

1      Q.  And is it fair to say that you work with
2  the police on a daily basis?
3      A.  I wouldn't say daily.  Police oftentimes
4  attend autopsies for the various counties that we
5  serve, but we don't have those kind of autopsies
6  every day.
7      Q.  Okay.
8      A.  But on a regular basis.
9      Q.  Do you have them on a weekly basis?
10     A.  We probably do.
11     Q.  And is it fair to say probably on a more
12 than once a week basis?
13     A.  It's feast or famine.  It's kind of hard
14 to predict.  You know, on a day like Monday, when
15 we've had six homicides, we had police here all
16 day.  On a day like today, we have one officer here
17 from an outside county.  So it's variable.
18     Q.  But you work with police at least on a
19 weekly basis?
20     A.  I do.
21     Q.  In terms of Milwaukee county, what
22 counties -- or what areas do you serve?
23     A.  So our primary service area is Milwaukee
24 county.  And then in terms of outside counties,

3 (Pages 6 to 9)

Brian Peterson, M.D.    March 11, 2016

10

1  Ozaukee county, Kenosha county, Racine county,
2  Jefferson county.  We also do cases for the State
3  of Wisconsin; they have a state prion disease
4  monitor, so we do cases of Creutzfeldt-Jakob
5  disease, CJD, and some private autopsies as well.
6      **Q.  You say CDJ?**
7      A.  CJD.  Creutzfeldt-Jakob disease.
8      **Q.  Okay.  So what kind of autopsies do you**
9  **do for the State of Wisconsin?**
10     A.  Those cases, we're simply recovering the
11 brains and sending those to the National Prion
12 Disease Center in Cleveland, to Case Western.
13     **Q.  I see.  Okay.  And the cases you do for**
14 **Milwaukee county and the other counties you listed,**
15 **that was -- or, sorry, areas.  Other than Milwaukee**
16 **county, are there any other counties you serve?**
17     A.  Not on a regular basis.  We have
18 contracts with the ones that I mentioned.
19     **Q.  Okay.**
20     A.  In Milwaukee, in Milwaukee county, we
21 have a tertiary care hospital, Froedtert Hospital.
22 So they will receive cases sometimes, even from out
23 of state, northern Illinois, for example.  And if
24 those patients pass away, they'll often come to us

11

1  for autopsy.  But that's more sporadic.  The other
2  counties that I mentioned, we actually have
3  contracts with and do all their forensic autopsies.
4      **Q.  You said you also do private autopsies?**
5      A.  We do some here.  Occasionally there'll
6  be a case that perhaps doesn't fall within the
7  medical examiner's jurisdiction, but a family will
8  ask us to do that.  We will call that a private
9  case.
10     **Q.  Now, in response to a subpoena issued by**
11 **the plaintiff, you provided a series of materials**
12 **in response to that subpoena; correct?**
13     A.  I did.
14     **Q.  And one of those materials included part**
15 **of the consular notification process; does that**
16 **ring a bell?**
17     A.  You'd have to further define that for me.
18 I'm just a doctor.
19     **Q.  Okay.  Well, I guess we'll just mark**
20 **this.  What are we, 149?**
21     (Exhibit 149 marked for identification.)
22 **BY MS. MOGUL:**
23     **Q.  I'm going to show you what I'm marking as**
24 **Exhibit 149, which is all the responsive documents**

12

1  to the subpoena that we were given.
2      MS. MOGUL:  Sorry, guys, I don't have
3  full copies.  I'm assuming you brought your own.
4      MR. KAMIONSKI:  We're fine.
5  BY MS. MOGUL:
6      **Q.  I'm going to direct your attention to**
7  **page 39 of this.**
8      A.  We're looking at the Bates stamp 39?
9      **Q.  Yes.**
10     A.  Gotcha.  Okay.
11     **Q.  Okay.  So this is from the Department of**
12 **State, the consular notification and access manual.**
13     A.  That's what it looks like.
14     **Q.  Did you have anything to do with**
15 **authoring this manual?**
16     A.  Nope.
17     **Q.  Do you know why you included this in**
18 **response to the subpoenaed documents?**
19     A.  Nope.
20     **Q.  Have you read this manual before?**
21     A.  Never.
22     **Q.  Okay.  And is this the first time you've**
23 **seen it?**
24     A.  I believe this is part of our office

13

1  policy and procedure, because we occasionally get
2  foreign nationals here.  So we reference this in
3  our policy and procedure; we don't include this
4  whole thing, it's simply too much paper.  So I
5  believe if you look at our policy and procedures
6  online, it would be a hot link.
7      **Q.  Okay.  And so I'm going to just ask, have**
8  **you ever read this full document?**
9      A.  No, just portions.
10     **Q.  Okay.  Now you, at the beginning of your**
11 **deposition, referenced several times you've given**
12 **testimony in a case; right?**
13     A.  I have.
14     **Q.  And have you ever been given -- okay.**
15 **Strike that.  Every time you've provided testimony**
16 **in a case, has it always been as a medical**
17 **examiner?**
18     A.  I think I had to testify in a case one
19 time where I had some property stolen before I was
20 a medical examiner, so I was essentially a lay,
21 percipient witness at that point.  But
22 professionally, my title hasn't always been medical
23 examiner, but I've always testified as a forensic
24 pathologist.

4 (Pages 10 to 13)

Brian Peterson, M.D.    March 11, 2016

14

1    Q.  Okay.  Have you ever been the subject of
2  a Daubert or Frye motion to limit or preclude your
3  testimony at trial?
4    A.  I think if you look back at my testimony
5  record, I testified at a Daubert hearing in 2014.
6  But after that, I went ahead and testified at the
7  trial, so -- that was it.
8    Q.  That's in the case of State versus
9  Johnson?
10    A.  It is.
11    Q.  Okay.  And what kind of case was State
12  versus Johnson?
13    A.  I don't even remember.
14    Q.  You can't tell us whether it was a murder
15  case or what kind of crime was involved?
16    A.  Given what I do, it was most likely a
17  murder, but I don't recall the specific case.
18    Q.  You testified on behalf of the state in
19  that case?
20    A.  I did.
21    Q.  Okay.  And I guess what I -- so you're
22  telling me you can't tell me what was the nature of
23  the charges in that case?
24    A.  I simply don't remember.

15

1    Q.  Okay.  Is there a record here at the
2  office of the medical examiner that notes when
3  you've done an autopsy and when you provided
4  testimony in that case with respect to that
5  autopsy?
6    A.  Likely not.  If this involved -- and
7  again, I'd tell you if I could remember.  If this
8  involved an autopsy that we did at this office,
9  that would be on file.  But we don't reference, of
10  course, our autopsies by the name of a defendant,
11  we reference them by the name of the decedent, by
12  our patient.
13    Q.  So do you have any records here that
14  would indicate, in terms of you've just listed the
15  title of the case without giving us the case name,
16  first of all, or the case number.  Would the case
17  number be written down anywhere?
18    A.  When we get subpoenaed on cases by, say,
19  Milwaukee County, for example, they do have a case
20  number, a CF number for us on there.  And if we've
21  retained a copy of the subpoena, that number would
22  be on there.  And oftentimes in our case file we'll
23  have that.
24    Q.  But you have not cited the case number

16

1  for any of the cases you've testified in?
2    A.  No.
3    Q.  And what I'm trying to -- why is that?
4    A.  I've never seen the need for that.
5    Q.  Okay.  But there's no way anyone can --
6  okay.  Do you have any way to determine -- if you
7  did the autopsy, for example, in State versus
8  Johnson, do you have any way to determine what that
9  testimony was you provided in relation to the
10  autopsy you gave?
11    A.  Well, in terms of testimony, we don't
12  keep any files or records in this office with
13  respect to testimony.  That would be the court.
14    Q.  Uh-huh.
15    A.  So I would say no.
16    Q.  So in terms of that Daubert hearing, do
17  you know whether your trial testimony was limited
18  in any way?
19    A.  As I recall, it wasn't.  There was no
20  limitation at all.
21    Q.  But as you sit here today, do you
22  remember anything you testified to in that case?
23    A.  No.  That I did testify is in my record
24  here.  You see that same day there was a Daubert

17

1  hearing in the morning, and then trial testimony
2  was in the afternoon.
3    Q.  Right.
4    A.  And to me, it was just normal testimony.
5  But what the issues were -- I mean, I testify
6  probably 25 or 30 times a year.  I can't remember
7  one case.
8    Q.  In that case were you an expert called on
9  behalf of a witness or a party in that case, or
10  were you called on behalf of the -- as a medical
11  examiner as part of the state?
12    A.  Well, a medical examiner is an expert.
13    Q.  Sometimes.
14    A.  Are we arguing?
15    Q.  I'm trying to be a little clear.  There
16  are times you're called to provide testimony where
17  you're not qualified as an expert; is that --
18    A.  Never.
19    Q.  Never?
20    A.  No.  Only the time that I testified in
21  that personal theft case as a percipient witness.
22  But every time I've testified in my professional
23  capacity, it's been as an expert.
24    Q.  I see.  Okay.  Have you ever been deemed

5 (Pages 14 to 17)

Brian Peterson, M.D.    March 11, 2016

18

1    unqualified to give expert testimony in any case?
2        A.  No.
3        Q.  Have you ever testified in a case
4    involving pediatric asphyxiation?
5        A.  In a case where asphyxia of one type or
6    another has been the cause of death, sure.
7        Q.  Okay.  Well, I'm asking -- okay, let's
8    just get some terms straight.  What does the term
9    asphyxia mean to you?
10        A.  Asphyxia technically means lack of oxygen
11    by one mechanism or another.  It can be anything
12    from mechanical to chemical to other.
13        Q.  Okay.  And in terms of pediatric -- or
14    strike that.  In terms of asphyxia, that can
15    include cases that involve hanging; right?
16        A.  That would be a type of asphyxia.
17        Q.  That could include cases involving
18    strangulation; correct?
19        A.  That would be another type, either manual
20    or ligature.
21        Q.  And asphyxia could also include other
22    types of suffocation; right?
23        A.  Suffocation would be another type of
24    asphyxia, yes.

19

1        Q.  All right.  So let me ask this.  Have you
2    ever testified in a case involving a child who was
3    hung?
4        A.  That would be a child who was hanged.
5    No.  Typically, that would be suicide as to manner
6    of death, and there wouldn't be testimony required.
7        Q.  Have you ever testified in a case where a
8    child was strangled?
9        A.  I have.
10        Q.  How many times?
11        A.  Couldn't tell you.
12        Q.  When's the last time you testified in a
13    case involving a child that was strangled?
14        A.  Couldn't tell you that either, just that
15    I have done it, I'm certain.
16        Q.  How many times have you done it?
17        A.  I don't know.
18        Q.  When's the last time you testified in a
19    case involving a child strangled?
20        A.  I don't know.
21        Q.  Was the case a criminal case or a civil
22    case?
23        A.  I don't believe I've ever testified in a
24    strangulation case that's been civil.  They've all

20

1    been criminal.
2        Q.  And in those cases, do you know whether
3    you testified on behalf of the State or the
4    defense?
5        A.  Well, the way that I normally put it, I
6    testified on behalf of my patient.  I'm generally
7    called by the State, though.
8        Q.  Is there any research or investigation
9    you could do to determine the cases where you've
10    testified in a case involving a child who was
11    strangled?
12        A.  The reason that -- well, there are a
13    couple reasons why I would say no.  The first one
14    is that the only record I maintain of testifying is
15    what you see right here.  Person went to Federal
16    Rule 26.  The other reason is, is that in terms of
17    autopsies that I've done, I do not maintain the
18    case files; I'm not a custodian of record.  And
19    obviously, not every case that I do leads to trial.
20            So it would be an arduous process
21    to try to put that together, particularly now that
22    I've done something close to 9300 autopsies in my
23    career, at different places in the country.  I'm
24    not even sure if it would be possible in every

21

1    case.
2        Q.  Okay.  In terms of the autopsies you have
3    done here at this office, is there a copy of those
4    autopsies maintained in the office?
5        A.  The office does have those files, yes.
6        Q.  And is there a way that the office could
7    do an investigation to determine which cases
8    involved the hanging or strangulation of a child?
9        A.  I think so.  We maintain things on a
10    software database, and it might be possible to do a
11    custom search through that.  Again, that's not
12    something I would do.  Perhaps staff could do that.
13        Q.  Well, okay.  So you've done -- strike
14    that.  So you just told us that you've testified
15    hundreds of times; correct?
16        A.  I have.
17        Q.  And you've given depositions somewhere
18    between 75 and 100 times; right?
19        A.  I have.
20        Q.  Of the times that you've provided
21    testimony, either -- and it's fair to say you've
22    never done a deposition involving a child
23    strangulation; is that --
24        A.  I think that's true.  I don't think I

6 (Pages 18 to 21)

Brian Peterson, M.D.   March 11, 2016

22

1  have.
2    Q.  So of the times you've testified in a
3  case, what percentage of those had to do with a
4  child strangulation?
5    A.  I couldn't give you a percent or a
6  number.  I simply don't know.
7    Q.  Have you ever been disciplined as part of
8  your job?
9    A.  No.
10    Q.  Have you ever been disciplined as part of
11  any contractual agreement you've had?
12    A.  No.
13    Q.  Have you ever been named as a defendant
14  in a case?
15    A.  Yes.
16    Q.  How many times?
17    A.  Seven.
18    Q.  What did those cases involve?  I mean,
19  we're going to have to go through them, all seven.
20  So I'm going to ask --
21    A.  Sure.  The -- if I can remember, my very
22  first lawsuit was a wrongful death suit in which I
23  had done the autopsy.  After that, I know there was
24  one where the coroner's office and I were sued for

23

1  failure to notify the next of kin that an autopsy
2  was going to be done, although that wasn't my duty.
3          Another lawsuit involved clinical
4  laboratory testing in a woman that proved to have
5  antimouse antibodies in her system, and was
6  offended that the results of the lab tests were
7  different in a setting of mouse antibodies being
8  used in the lab test.  Let's see, another one
9  involved allegations that I was in a conspiratorial
10  relationship with Kaiser Hospital in California
11  based on an autopsy that I had done.
12          I don't remember.  I think there
13  were a couple others.  As I said, though, these
14  were all in California, and they all ended up being
15  dismissed with prejudice.
16    Q.  None of them settled?
17    A.  No.
18    Q.  Okay.  The one that had to do with
19  wrongful death in which you engaged -- in which you
20  conducted the autopsy in that case, who were the
21  other defendants named?
22    A.  If I recall, the coroner's office, and I
23  think the surgeon that performed the tonsillectomy
24  was also named.

24

1    Q.  Were there any other law enforcement
2  officials involved in that case beyond you?
3    A.  My group was working for the Contra Costa
4  coroner's office.  That's run in that county of
5  California by a sheriff coroner.  So in a sense,
6  they are law enforcement.  I mean, not law
7  enforcement like in a criminal case, but law
8  enforcement runs that office.
9    Q.  Okay.  And you as -- you were the chief
10  medical examiner of Milwaukee County; right?
11    A.  No, no.  This was --
12    Q.  I'm asking you now, though.  I've
13  switched.
14    A.  Right now, I'm -- not "were," am.  I am
15  the chief medical examiner.
16    Q.  Okay, sorry.  You are the chief medical
17  examiner.  And this isn't, you would consider, an
18  office that works -- is a law enforcement office?
19    A.  No.  We're actually a cabinet level
20  office for the county.  We're independent of law
21  enforcement.
22    Q.  Okay.  What does it mean to be a cabinet
23  level?
24    A.  In other words, our county executive has

25

1  regular cabinet meetings that I have to attend.
2    Q.  You provided a CV with your opinion;
3  correct?
4    A.  I did.
5    Q.  And is that up-to-date?
6    A.  It is.
7    Q.  Okay.  And you're a forensic pathologist;
8  right?
9    A.  I am.
10    Q.  Tell us what a forensic pathologist does.
11    A.  A forensic pathologist, in general, does
12  autopsies to determine cause and manner of death.
13  We can also provide consultation services,
14  courtroom testimony, etcetera.  But the main thing
15  the public thinks of, of course, is autopsies.
16    Q.  Have you received any training in how to
17  testify in court?
18    A.  I wish.  I'd like to -- I've offered that
19  kind of training.  Most programs don't have that.
20  We want to develop something here, but -- and I've
21  done that kind of teaching.  But having received
22  training, not so much.  And particularly because
23  the first part of my career was in the military,
24  and it didn't happen that often.

7 (Pages 22 to 25)

Brian Peterson, M.D.    March 11, 2016

26

1       Q.   But -- so you've provided training to
2    other people as to how to testify in court?
3       A.   I have.
4       Q.   And it's fair to say you feel really
5    familiar in courtroom settings?
6       A.   Pretty familiar.
7       Q.   And what kind of training do you provide
8    for people about how to testify in a court?
9       A.   A lot of it is really, you could call it
10   on-the-job.  So we have a forensic fellowship
11   program in the office here.  So we train a new
12   forensic pathologist every year.  So we take our
13   fellow with us when we testify so he or she can
14   watch us do that, talk about it afterwards.  We try
15   to give them the opportunity to testify, say in
16   preliminary hearings, and then do kind of an
17   after-action report.  And at various conferences
18   I've talked about it too.
19      Q.   And are there tips and tools of the trade
20   that you give to people about how they should
21   conduct themselves in a courtroom, how they should
22   interact with counsel or the judge or the jury?
23      A.   Well, I guess -- I guess the way you put
24   it, tips and tricks of the trade, I mean, if you

27

1    want to call answer questions fully and honestly a
2    trick of the trade, I guess that would be one of
3    them, but --
4       Q.   I didn't use the word "trick," did I?
5       A.   I think you said "tips and tricks of the
6    trade."
7       Q.   No, I didn't.  I said were there any tips
8    that you provide as to how you testify?
9       A.   That's bizarre.  Okay.  Well, I guess a
10   tip would be answer fully and honestly, make good
11   eye contact, you know, know where you're walking
12   into in the courtroom so you don't head to the
13   wrong seat, that kind of thing.
14      Q.   When you say "make good eye contact," eye
15   contact with the jury?
16      A.   Depends.  My usual thing is if it's a
17   short question, I'll be looking right at the
18   attorney.  If they want a longer answer, then I'll
19   look at the jury to make sure they're getting it.
20      Q.   Okay.  And so your work as a forensic
21   pathologist is part of this office of the Milwaukee
22   County -- Office of the Medical Examiner of the
23   Milwaukee County; right?
24      A.   It is.

28

1       Q.   Now, in this case you're providing expert
2    testimony in this civil rights case; right?
3       A.   Correct.
4       Q.   Is that under the auspices of the Office
5    of Medical Examiner of Milwaukee County?
6       A.   It is.
7       Q.   And you've been compensated for this, for
8    your opinion in this case; correct?
9       A.   No.
10      Q.   You haven't received any money?
11      A.   No.  I'd like to say the money goes to
12   our office, but it doesn't even do that.  It just
13   goes to Milwaukee County.
14      Q.   Okay.  But on behalf of the Milwaukee
15   County, then, you've received financial
16   compensation for the opinion you've provided in
17   this case?
18      A.   No.  I personally have received nothing.
19   The County has, I haven't.
20      Q.   I see.  But what I'm trying to get at is
21   the defendants have paid for your expert opinion in
22   this case?
23      A.   I'm not sure who's paid.  I think we've
24   invoiced Mr. Kamionski's office, and they've paid

29

1    the County.
2       Q.   Okay.
3       A.   But I'm trying to distinguish between
4    me --
5       Q.   I hear you.
6       A.   -- and my office, so --
7       Q.   No, I understand.  So let me just ask
8    this then.  In terms of the other times you've
9    served as a consultant or expert in a case that did
10   not have to do with the Office of the Medical
11   Examiner of Milwaukee County, do you receive any of
12   that financial compensation?
13      A.   It depends.  So we will do cases here
14   that perhaps involve the public defender elsewhere
15   in the state, not in our own service area, but
16   elsewhere in the state, and those work through the
17   office.  So just as in this case, the office gets
18   paid -- well, the County gets paid; we don't get
19   paid.  I do my own private consultation work that
20   has nothing to do with the county, generally, or
21   the state, say a firm back in California where I've
22   worked.  So I personally am compensated for those
23   kind of cases.
24      Q.   What percentage of those cases or what

8 (Pages 26 to 29)

Brian Peterson, M.D.   March 11, 2016

30

1  percentage of your income comes from those kinds of
2  cases?
3      A.  It varies a lot from year to year.  I'd
4  say anywhere between zero and a third, depending on
5  the year.
6      Q.  In terms of the consultation you do
7  privately, what kind of cases do those consist of?
8      A.  Some civil, some criminal.  I think at
9  this point I wouldn't say it's even half and half.
10  It's probably more criminal.
11      Q.  And are you -- okay.  Are you -- and who
12  are you testifying on behalf of in those cases?
13      A.  A lot of times they don't even lead to
14  testimony.  They'll simply be case review, that
15  sort of thing.  But it's been an entire mix.  It's
16  been anywhere from civil defense in cancer-related
17  cases, to criminal defense or criminal prosecution,
18  both sides, in the criminal cases.
19      Q.  And are those cases also listed on your
20  CV?
21      A.  They are.
22      Q.  And so in those cases you're -- out in
23  California, for example, you're also testifying on
24  behalf of the State at times?

31

1      A.  Occasionally.  Sometimes on behalf of the
2  State, sometimes on behalf of individual
3  defendants, say, in a criminal case or a civil
4  case.  Again, it just depends on the case.  It's
5  been a mix.
6      Q.  Do you have a particular specialty within
7  the forensic pathologist field?
8      A.  Forensic pathology, I mean, it's a
9  subspecialty.  So in general, in forensic
10  pathology, I have certain interests.  You know,
11  gunshot injuries are a specific interest of mine,
12  for example.  But that doesn't necessarily lead to
13  specific testimony.  In general what I'm asked to
14  look at is simply forensic pathology cases.
15      Q.  I understand.  For example, you say that
16  you have a particular specialty in gunshot
17  injuries.
18      A.  Well, I wouldn't call it a specialty in
19  the sense that there's no special training or
20  certification offered in that, in my world.  It's
21  just cases that I'm interested in.
22      Q.  What other cases are you interested in
23  then?
24      A.  Well, pretty much --

32

1      Q.  Or that you -- let me ask -- I mean,
2  people seek you out for your expert opinion;
3  correct?  And often experts are sought if they know
4  a particular area very well; right?
5      A.  That's true.  But the thing is, the
6  specific area really is forensic pathology, because
7  there are only maybe 400 of us, 500 of us in the
8  country, working actively in the field.  So what
9  I've seen as I've gone along in my career is it's
10  more a matter of being a forensic pathologist and
11  being experienced.  You know, there just aren't
12  that many of us.  So that's kind of led to more
13  consultation work as I've gotten older in the
14  field.  I certainly didn't do this amount of
15  consultation work when I was starting out.
16      Q.  Well, you said you've testified a lot in
17  civil defense cases involving cancer.
18      A.  I have.
19      Q.  Okay.
20      A.  Twice.
21      Q.  And you've testified with respect to
22  gunshot injuries?
23      A.  Oh, sure.
24      Q.  Well, in this case, you're doing --

33

1  you're providing this opinion under the auspices of
2  the office of the medical examiner of Milwaukee
3  County versus your own private practice; is that
4  right?
5      A.  That's correct.
6      Q.  Why is that?
7      A.  The case came to me at the office.
8  That's sort of part A.  Part B is that, frankly,
9  our county executive is a businessman and
10  appreciates his departments being entrepreneurial.
11  Part C is that any income that we as staff
12  pathologists can bring into the office helps offset
13  the tax levy that otherwise supports us.  And I'm
14  happy to say that between consultation work and
15  outside autopsies and so forth, we almost make half
16  of our budget by doing that kind of work.  So it's
17  a benefit to the county taxpayer and lets us see
18  cases that we wouldn't ordinarily see.
19      Q.  So was it your decision to have this be
20  under the Office of the Medical Examiner of
21  Milwaukee County versus under your own private
22  consultation?
23      A.  It was my decision.  But that would be
24  the general practice for this kind of case,

9 (Pages 30 to 33)

Brian Peterson, M.D.   March 11, 2016

34

1　particularly working with Mr. Kamionski's firm.
2　　　Q.　And why would it be the general practice
3　in this kind of case?
4　　　A.　That's just how we do it.  I mean, it's a
5　why question that's hard to answer.
6　　　Q.　Is it because this involves a city
7　municipality?
8　　　A.　No.
9　　　Q.　Is it because it involves law
10　enforcement?
11　　　A.　No.  It's more like Mr. Kamionski
12　contacted me at the office here.
13　　　Q.　Okay.  So because he contacted you at
14　your office, that's why this is then under the
15　auspices of the Office of the Medical Examiner of
16　Milwaukee County?
17　　　A.　Right.
18　　　Q.　Do you have a private website that you
19　have out there for your private consultation?
20　　　A.　No.
21　　　Q.　How would someone contact you outside of
22　your office to solicit your expert consultation?
23　　　A.　Personal e-mail or telephone.
24　　　Q.　And is that published anywhere?

35

1　　　A.　I don't know if cell phone numbers are.
2　Is there a directory for cell -- I don't know.  I
3　certainly -- I don't have a website, I don't
4　advertise, nothing like that.  Mostly, those kind
5　of cases are people that I've worked with in the
6　past.  And it could be a word of mouth thing, you
7　know, maybe they tell -- they tell an associate or
8　something.
9　　　Q.　Have you ever written an expert report
10　regarding a case involving a child who suffocated?
11　　　A.　Looking at the technical definition of
12　suffocation, I would say no.
13　　　Q.　Okay.  How about -- and so let me be
14　really clear, too, about this.  I understand that
15　you do autopsies, and in autopsies, you write an
16　autopsy report; right?
17　　　A.　Right.
18　　　Q.　But that's different than, let's say, for
19　example, the report you provided in this case;
20　correct?
21　　　A.　Correct.
22　　　Q.　And so what I'm asking is, have you ever
23　done a -- so you have never done a report in a
24　child suffocation case, an expert report like this?

36

1　　　A.　In terms of an expert report like this,
2　correct.
3　　　Q.　Have you ever done an expert report like
4　this in a case involving a child who hung?
5　　　A.　No.
6　　　Q.　Have you ever done an expert report in a
7　case where a child was strangled?
8　　　A.　No.
9　　　Q.　Have you ever done an expert report in
10　any case involving any type of asphyxiation of a
11　child?
12　　　A.　I don't believe I've done an expert
13　report in asphyxial death involving children or
14　adults.
15　　　Q.　So that in terms of asphyxial deaths too,
16　for adults, that would include hanging,
17　strangulation, or any sort of suffocation; right?
18　　　A.　Well, there are also other ways to get
19　into asphyxia.  But yeah, in general, that would
20　simply be the autopsy report, not a separate expert
21　report.
22　　　Q.　Okay.  Now, in terms of the testimony
23　you've provided in various cases, right, would you
24　say the vast majority of that testimony was

37

1　provided in criminal cases?
2　　　A.　Yes.
3　　　Q.　And would you say that the vast majority
4　of that testimony was provided when you were called
5　as a witness by the State?
6　　　A.　Yes.
7　　　Q.　And so let's -- in terms of the -- the
8　percentages, is it fair to say that 90 percent of
9　the times you've provided testimony they've been in
10　criminal cases?
11　　　A.　I would say either 90 percent, or maybe
12　even a little bit higher.
13　　　Q.　Sure, like 90 to 95 percent?
14　　　A.　Sure.
15　　　Q.　In those 90 to 95 percent of those cases,
16　you testify the, what, 90 to 95 percent of the time
17　when called as a witness by the State?
18　　　A.　Generally by the State.  I mean, there
19　certainly have been times, and not so much here in
20　Wisconsin, but more in California, where I would
21　end up getting subpoenas from the State and the
22　defense.  And of course here in Wisconsin, the
23　defense is also the State.  The public defender's
24　office is a state institution.

10  (Pages 34 to 37)

Brian Peterson, M.D.   March 11, 2016

38

1    Q.  Right.
2    A.  And occasionally I'll get subpoenas from
3  them separately for a case.  So it's variable.  But
4  I'd say mostly -- I mean, the bulk has been called
5  by the State on the prosecution side.
6    Q.  And again, it would be the vast bulk of
7  your testimony in criminal cases is when you were
8  called by the prosecutor?
9    A.  I think so.
10   Q.  And in terms of the civil cases you've
11 provided testimony in, is it fair to say that you
12 have provided that testimony the majority of time
13 on behalf of the defense in that case?
14   A.  I think that's been more -- more maybe
15 half and half.  That hasn't been a lot of
16 testimony.  It's been more case analysis than
17 testimony.  And for sure, looking at just the
18 analysis, I'd say that's probably more like half
19 and half.  But I suspect the times that I've
20 testified, that has been more for defense.  Because
21 in a criminal case, of course, the prosecution
22 would have whoever actually did the autopsy.
23   Q.  But just in terms -- so your civil case,
24 the times you've provided testimony, has been, you

39

1  know, we're talking like five percent of all the
2  case you've testified in?
3    A.  Right.
4    Q.  And of that five percent, it more often
5  is you testifying on behalf of the defense than you
6  are on the plaintiff?
7    A.  I think so.
8    Q.  Now, as a medical examiner, have you
9  received any training on how to determine a
10 person's credibility?
11   A.  You know, we talk about credibility in
12 terms of courtroom testimony and how to present one
13 self in a credible way.  But in terms of
14 determining someone's credibility, I would say
15 that's outside of my job description, again, since
16 mostly I'm involved with autopsy, and you wouldn't
17 -- really wouldn't say the deceased are credible or
18 not credible, they're just the deceased.
19   Q.  So you're not aware of any medical
20 examiner trainings or program about how medical
21 examiners can determine a person's credibility?
22   A.  Well, let me -- let me be specific with
23 respect to what I do.  If I have done an autopsy,
24 reviewed an autopsy, and I have certain autopsy

40

1  findings, then it's pretty typical to say that
2  those findings are either consistent with or not
3  consistent with somebody's history, somebody's
4  story, okay?  So I guess in a way you might say
5  that speaks to credibility.  But it's more based on
6  the physical findings of the office, which is my
7  expertise.
8    Q.  Right.  So beyond the physical findings,
9  you haven't had any -- I hear exactly what you're
10 saying.  You're saying the physical findings could
11 contradict someone's version of events?
12   A.  There you go.
13   Q.  And then sometimes the physical findings
14 could be consistent with someone's physical version
15 of the events?
16   A.  Right.
17   Q.  But beyond that, what your own education
18 and experience provides in terms of the
19 pathological and physical findings, you've received
20 no training on how to determine someone's
21 credibility?
22   A.  I'm not sure what you're asking, in the
23 sense that if it doesn't involve, say, the autopsy
24 findings and so forth, I'm not sure what would be

41

1  beyond that, so to speak.  In other words, I have
2  not been trained, say, in interview techniques, you
3  know, in the police sense.
4    Q.  Okay.
5    A.  Like talking to a witness and trying to
6  determine -- assess their demeanor, whatever.  I've
7  read about those things, but that's not part of
8  what I do.  That's not my training.
9    Q.  And you wouldn't say you're an expert in
10 that?
11   A.  No.
12   Q.  Have you ever received any training as a
13 medical examiner about coerced or false
14 confessions?
15   A.  That's part of our literature in the
16 sense that not so much cause of death, because
17 that's autopsy, but manner of death:  natural,
18 accident, suicide, homicide, other.  Those -- those
19 specifically relate to history and investigation.
20 And certainly we're aware, as forensic
21 pathologists, that the confession, a confession,
22 could be part of that, and it may or may not be
23 reliable.  I wouldn't call that specific training,
24 I would just say that's being aware of the

11  (Pages 38 to 41)

Brian Peterson, M.D.    March 11, 2016

42

1  literature.
2      Q.  So you're aware that there are false
3  confessions?
4      A.  Oh, sure.
5      Q.  Right.  But have you received any
6  training on how to identify whether a confession is
7  false?
8      A.  No.
9      Q.  Now, you're saying that's now a
10 possibility; right?  That's a reality that you
11 understand, that confessions can be false; right?
12     A.  Yes.
13     Q.  Would you say -- you know, you've been
14 practicing for what, 40 years now?
15     A.  Almost.
16     Q.  Okay.  When did you first -- was there a
17 change -- well, you know, strike that.  Forget it.
18 Have you ever received any training regarding
19 accidental pediatric deaths?
20     A.  Well, I would say that's part of --
21 that's part of general forensic pathology.  Every
22 manner of death is part of our training.  So you
23 talk about accidental death as a category, whether
24 the victim is months old, years old or decades old,

43

1  sure, that's part of our training, expertise, and
2  experience.
3      Q.  So I'm going to ask, what specific
4  training have you gotten regarding accidental
5  pediatric deaths?
6      A.  Well, when you start asking about
7  specific training, recall I've been doing this for
8  almost 40 years, so a lot of that is in the past,
9  and it gets hard to remember specific things.  But
10 that was part -- that kind of thing was part of my
11 pathology residency, anatomic and clinical, because
12 we had a staff forensic pathologist at the Naval
13 Hospital in San Diego.  It was certainly a part of
14 my fellowship training, the one year I spent at the
15 Armed Forces Institute of Pathology.
16         Accidental deaths as a group,
17 involving whichever age group, are often discussed
18 at forensic meetings, etcetera.  And I attend a lot
19 of meetings.  And I present at meetings and you,
20 know, teach at meetings and so forth, so -- and
21 even here in our office, morning rounds, you know,
22 we're talking about those kinds of deaths.  So it's
23 an ongoing thing.
24         But again, for forensic

44

1  pathologists, it's really a case by case thing,
2  too.  You know, one lament about our literature is
3  that it tends to be anecdotal, but it kind of has
4  to be, doesn't it?  I mean, it's one death at a
5  time.
6      Q.  I'm going to ask you, can you give me the
7  last time you received any training regarding
8  accidental pediatric deaths?
9      A.  I mean, the last paper I heard presented
10 on a type of pediatric accidental death would have
11 been in Charlotte last October.
12     Q.  Who presented that paper?
13     A.  I'd have to go back and look at the
14 program.  I don't remember the specific presenter.
15     Q.  And what kind of accidental pediatric
16 death were they talking about?
17     A.  We spend a lot of -- this was talking
18 about sleep setting.  You know, we spent a lot of
19 time looking at that.  So unsafe sleep, asphyxia,
20 you know, bed sharing, co-sleeping, that kind of
21 thing.
22     Q.  So this was what kind of conference in
23 Charlotte?
24     A.  This is the National Association of

45

1  Medical Examiners' annual conference.  We touched
2  on it again; we just had the interim meeting in Las
3  Vegas was three weeks ago or so, and the program
4  there was on unexpected death.  And again, part of
5  that time was spent talking about pediatric death
6  definition classification.
7      Q.  Okay.  Let me just -- so the National
8  Association of Medical Examiners was in Charlotte
9  last year?
10     A.  Right.
11     Q.  And then you're saying there was one in
12 Las Vegas?
13     A.  The American Academy of Forensic Sciences
14 has an annual meeting.  So one day during that
15 meeting is the National Association of Medical
16 Examiners' interim meeting.  So I was there for
17 some additional things, board meetings, so forth.
18 But the scientific session was part of that day.
19     Q.  And who taught that scientific session?
20     A.  It was a panel of people.
21     Q.  And -- okay.  And was that discussing
22 sudden infant death syndrome?
23     A.  That was part of it.  Sudden infant
24 death, sudden death in epilepsy, sudden death,

12 (Pages 42 to 45)

Brian Peterson, M.D.    March 11, 2016

46

1 sudden cardiac death.  Various types of sudden
2 unexpected death.
3      Q.  Was that cardiac in children or adults as
4 well?
5      A.  Yes, both.
6      Q.  So the training was both for children and
7 adults?
8      A.  Right.
9      Q.  It wasn't confined to just children?
10     A.  No.
11     Q.  Or young ones?
12     A.  No, it was the full age spectrum.
13     Q.  How long was the training in Las Vegas?
14     A.  That workshop was four-and-a-half or five
15 hours.  And the national meeting is about
16 four-and-a-half days or so.
17     Q.  Okay.  Well, did you go to any specific
18 trainings that just dealt with pediatric deaths?
19     A.  We generally don't have those.  I know
20 when I -- we hosted the national association here
21 in 2013, so we had a couple of our workshops on
22 sudden infant death and so forth.  But in general
23 you wouldn't look at a whole meeting devoted to it.
24 There's not enough interesting for forensic

47

1 pathologists there.  And given the way the cases
2 occur -- well, I can give you an example.
3           So if -- for Milwaukee County, we
4 do about a thousand autopsies a year, maybe 30
5 infant deaths a year.  So there's simply not enough
6 case volumes to make a whole meeting.  It just
7 wouldn't happen.
8      Q.  So I'm going to direct your attention to
9 another issue, another category of cases -- or
10 strike that.  I'm going to direct your attention to
11 another case you've worked on.  And that's the case
12 of Derek Williams.
13     A.  Uh-huh.
14     Q.  You're familiar with that case; correct?
15     A.  I am.
16     Q.  And you provided testimony in that case?
17     A.  I did.
18     Q.  Okay.  And that case involved his death
19 in police custody; correct?
20     A.  It did.
21     Q.  And in that case, you labeled his death
22 as a homicide; right?
23     A.  I did.
24     Q.  But you also said in that case that was

48

1 not -- that you had no evidence there was a crime;
2 is that right?
3      A.  Well, remember, we're stuck using the
4 same term as you attorneys are, but we mean
5 different things by it.  So homicide simply means
6 death at the hands of another.  That's my
7 determination to make as a medical examiner.
8 Whether there's a crime or not a crime is outside
9 of my purview.
10     Q.  Okay.  So let's go through all the
11 definitions then of what you could label someone's
12 death; right?  So there's homicide, which is death
13 at the hands of another.  Is there any other thing
14 you would add to that definition?
15     A.  Depends on the case and what I'm asked.
16 But technically that would be the shortest, easiest
17 definition.  Death at the hands of another due to
18 either action or inaction.
19     Q.  Okay, there's homicide.  Then there's
20 accident?
21     A.  There is.  An accident would be death as
22 the result of interaction with a hostile
23 environment.
24     Q.  Death due to interaction with a hostile

49

1 environment?
2      A.  Correct.
3      Q.  Okay.  Can you give me an example of what
4 would be an accidental death that you would -- what
5 death you would categorize as accidental?
6      A.  As long as we're on the asphyxia topic,
7 how about drowning?  Another large class that we
8 deal with these days would be drug overdose.  That
9 environment obviously is internal as opposed to
10 external, but still it fits the same definition.
11     Q.  A car accident?
12     A.  In general, yes.  And the funny thing
13 about that is that there are some exceptions.  So
14 if an automobile, say, strikes a pedestrian, we
15 will generally term that accident unless there was
16 evidence that it was intentional, and then we might
17 say that's a homicide.  That might be a
18 controversial call, but in general, that would be
19 an accident.
20     Q.  Has there been a case where you've had a
21 car hit a pedestrian that you've labeled as a
22 homicide?
23     A.  I'm sure I have.  Homicide -- I've
24 labeled them as suicides, occasionally.  You could

13 (Pages 46 to 49)

Brian Peterson, M.D.   March 11, 2016

50

1  have a pedestrian leap out in front of a car, for
2  example. And it's witnessed, you know, and you've
3  got that pretty well established, that could be a
4  suicide.
5      **Q. So a suicide would be --**
6      A. That's death at one's own hands.
7      **Q. Okay. And then there's two more**
8  **categories; correct?**
9      A. Well, the big one is natural.
10      **Q. Okay.**
11      A. And that's just death as the result of a
12  natural disease process.
13      **Q. And then there's -- finally, there's**
14  **undetermined?**
15      A. We also use pending, so -- and pending
16  would be a placeholder, so to speak. And that
17  would be the typical drug overdose, where the
18  testing has to be done. Undetermined, I've defined
19  that for my staff as a case where you're right in
20  between two other manners of death, and it's simply
21  not possible to discern, or perhaps there's simply
22  not enough material. The skeletonized remains, for
23  example.
24      **Q. But specifically with Derek Williams'**

51

1  **case, did you testify that you could not determine**
2  **whether that was a crime or not, his death?**
3      A. You know, I don't recall the specifics of
4  my testimony, but in general, I try to stay away
5  from issues of crime or not crime, because that's
6  not mine to determine.
7      **Q. Okay.**
8      A. Cause of death and manner of death, I'm
9  on pretty firm ground there. But in terms of a
10  crime, that's not what I do.
11      **Q. In that case, you said his death was**
12  **caused in part by the sickle cell anemia crisis;**
13  **correct?**
14      A. He had sickle trait. But sickle crisis,
15  yes, that was his cause of death.
16      **Q. Okay. And in that case, though, there**
17  **was -- you found that he had the trait for sickle**
18  **cell anemia?**
19      A. Right.
20      **Q. And had you -- before you made your**
21  **determination that his cause of death was due to**
22  **sickle cell anemia; right?**
23      A. No. His cause of death was sickle crisis
24  due to sickle trait.

52

1      **Q. So define that for me, please. I mean,**
2  **what does that mean to be sickle cell crisis due to**
3  **sickle cell trait?**
4      A. Oh, I gotcha. Okay. So sickle crisis,
5  in my world, is essentially a microscopic finding.
6  So aggregates of sickle cells, called sickle
7  thrombi in vessels throughout the body, liver,
8  brain, lung, etcetera. So that's the sickle crisis
9  part. Sickle trait, it involves a kind of
10  hemoglobin a person has. And if they have two
11  specific hemoglobin chains, that would be sickle
12  cell anemia. If they only have one and one normal,
13  that would be sickle trait. And Mr. Williams had
14  sickle trait.
15      **Q. Right. So -- and there are folks who**
16  **have the trait of sickle cell but they don't**
17  **have -- they don't suffer from symptoms of sickle**
18  **cell?**
19      A. Yes, that's correct.
20      **Q. Okay. And before you made your cause --**
21  **and so the cause of death analysis, let me just get**
22  **this one more time, was sickle crisis due to the**
23  **sickle cell anemia trait?**
24      A. Right. I wouldn't put the word "anemia"

53

1  in there, I would just call it sickle trait.
2      **Q. Okay. Sickle crisis due to sickle trait.**
3      A. Right.
4      **Q. Before you did that cause of death**
5  **analysis, did you speak with any of his family**
6  **members to determine if he had any symptoms of**
7  **sickle cell?**
8      A. I didn't have the opportunity to, in the
9  sense that it actually wasn't my autopsy. One of
10  my colleagues did the autopsy. And I heard about
11  it later. And it was at that point that I looked
12  into the case and changed the manner of death. But
13  changing the manner of death didn't require a
14  conversation with a next of kin. Whether or not he
15  had symptoms wouldn't have made any difference.
16      **Q. Okay. Why wouldn't it have made a**
17  **difference?**
18      A. Well, I mean, the anatomic cause of death
19  was what it was. And the story, if you will, of
20  his last 10 or 15 minutes of life was what it was.
21  So whether he had a history or no history of
22  symptoms earlier in life wouldn't have impinged at
23  all on how his life ended.
24      **Q. Okay. Well, there was -- in that case**

14 (Pages 50 to 53)

Brian Peterson, M.D.   March 11, 2016

54

1  there was another expert opinion provided with
2  respect to his cause of death; right?
3      A.  There were other -- there was other
4  testimony, but I think the other opinion was they
5  didn't know what the cause of death was.  If you
6  want to call that an opinion.
7      Q.  Okay.  That's not an opinion?
8      A.  Well, it's not particularly helpful, but
9  it is an opinion, I guess.  I mean, it's not a
10 cause of death, though.  I mean --
11     Q.  Right.  But they in fact disputed that
12 they did not believe there was evidence to say that
13 he died from sickle cell crisis due to sickle
14 trait.
15     A.  Correct.
16     Q.  And in fact, they did investigation to
17 determine that he had never suffered from any
18 symptoms of sickle cell; correct?
19     A.  I don't know what their investigation
20 involved, but I wouldn't have expected him to have
21 symptoms because he didn't have sickle cell anemia,
22 he had sickle cell trait.
23     Q.  Okay.  So it's fair to say that before
24 you determined that cause of death, you also didn't

55

1  look at any medical reports regarding Mr. Williams?
2      A.  I don't think we had medical reports.
3  The -- again, the cause of death had been
4  determined before I came to the case.  I changed
5  the manner of death.
6      Q.  Well, did Mr. Paulson check with you
7  before he made the cause of death finding?
8      A.  Dr. Poulos didn't.
9      Q.  Dr. Poulos.
10     A.  No.
11     Q.  And did he check with you before he made
12 the first manner of death?
13     A.  No.
14     Q.  And so the first manner of death was that
15 this was an accident; right?
16     A.  I thought he called it natural.
17     Q.  Okay.  So he called it natural, and
18 then -- and that was based on reports he had
19 received from police officers that said they
20 had no physical contact with him before his death?
21     A.  That was part of what he -- I mean, there
22 was a police report to review, and he had reviewed
23 that.
24     Q.  Okay.

56

1      A.  So whatever he derived from that police
2  report led him to conclude that the manner was
3  natural.
4      Q.  Okay.  And then you -- you -- Dr. Poulos
5  and you changed the manner of death in that case?
6      A.  Well, basically I did.  I mean, being the
7  chief, that was my option.
8      Q.  Okay.  And why did you change the manner
9  of death in that case?
10     A.  It was more of a technicality.  In my
11 view, had -- it's the but/for principle.  But for
12 police action, then I think Mr. Williams wouldn't
13 have passed away that day.  Clearly there were
14 other factors at play there too.  I mean,
15 committing armed robbery wearing a neoprene face
16 mask and then running wasn't helpful in terms of
17 physiologic stress.
18         But needless to say, there was a
19 police chase, and I think at some point there was
20 some hands-on with the police before he was put
21 into the squad car.  So in my view, that was a
22 physiologic stressor.  And because that was part of
23 it, that led to the manner of being homicide,
24 technically.

57

1      Q.  Because at that point you said one of the
2  contributing factors was that there was hands put
3  on him?
4      A.  And a struggle, right.
5      Q.  Okay.  And the changing of the manner of
6  death in that case, that caused some controversy?
7      A.  Oddly, it did.  I thought I was the good
8  guy, but I got a death threat out of it.
9      Q.  Okay.  Do you know who the death threat
10 was from?
11     A.  It was from his family.
12     Q.  Was anyone charged in that case?
13     A.  Nope.
14     Q.  Do you know who in the family gave you
15 that threat?
16     A.  I don't -- I saw this on television.  I
17 don't remember who was speaking.  I believe I was
18 threatened, as was the chief of police, as was the
19 mayor.  They got extra protection.  I got nothing.
20     Q.  What year was this?
21     A.  Oh, shoot, this would have been maybe six
22 years ago or so.  I don't recall specifically.
23     Q.  And was there controversy with respect to
24 Dr. Poulos' autopsy examination?

15 (Pages 54 to 57)

Brian Peterson, M.D.   March 11, 2016

58

1     A.  I don't think there was.  The controversy
2  revolved around the manner of death determination.
3  But -- and, again, there were other -- the other
4  opinion about the cause of death being
5  undetermined, if you want to call that controversy.
6  But otherwise, no.
7     Q.  Okay.  Well, in this case, Dr. Poulos
8  left the office after this case?
9     A.  He did.
10     Q.  And you in fact told him to leave?
11     A.  I didn't tell him to leave, I recommended
12  that he leave.
13     Q.  Okay.  And did you tell him that you
14  believed it was likely he would be fired from the
15  office?
16     A.  I told him that was a concern of mine.
17  Not fired by me, I should hasten to add, but there
18  was some political pressure there.
19     Q.  And who was the political pressure being
20  brought by?
21     A.  This would have been the common council
22  in Milwaukee.
23     Q.  And is that like -- tell me what the
24  common council is.

59

1     A.  It's -- so in Milwaukee, we have
2  Milwaukee county, Milwaukee city.  So the -- just
3  as the county has a board of supervisors and a
4  county executive, the City of Milwaukee has the
5  common council and the mayor.  Corresponding group
6  like that.
7     Q.  Okay.  So they're not -- they're not the
8  city council?
9     A.  I think maybe you could call it that.  I
10  mean, they happen to call them -- they have a
11  different term.  They're aldermen, that sort of
12  thing.
13     Q.  Okay, got it.  They're the elected --
14     A.  They're elected.
15     Q.  So there were aldermen who wanted
16  Dr. Poulos to be fired from the office?
17     A.  They used the term punished.
18     Q.  And one of those punishments would be
19  termination?
20     A.  Oh, I think so.
21     Q.  Okay.  And so you recommended he leave?
22     A.  I told him that in terms of ongoing
23  career, it would be better to resign and find
24  another job, which he did in about two days, as

60

1  opposed to being fired.
2     Q.  Right.  'Cause if he had been fired, that
3  could have prevented him from being hired again as
4  a medical examiner?
5     A.  You know, in our line of work, I don't
6  think it would necessarily prevent, because there
7  are so few of us, but it might make it more
8  difficult.  And he -- you know, he had done nothing
9  really wrong, so I thought that was a little bit
10  harsh.  And I thought he could do just fine getting
11  another job.
12     Q.  But you recommended that he quit before
13  he be terminated?
14     A.  I did.
15     Q.  And that was to help him in his career?
16     A.  It was.
17     Q.  And in some ways you were looking out for
18  him?
19     A.  Oh, I think so.
20     Q.  And in that case, Dr. Poulos originally
21  found that the manner of death was natural because
22  he believed that the police did not have -- there
23  was no struggle with the police before Mr. Williams
24  was put in the car; correct?

61

1     A.  You know, I'm not sure how much of the
2  police report Dr. Poulos saw before he assigned the
3  manner as being natural.  And as I recall, he was
4  focusing more on the specific mechanism being a
5  natural mechanism, and that led to his manner.
6     Q.  Right.  But then he later -- so my
7  understanding is that he initially just relied on
8  the police telling him various information, and
9  that's when he came up with the first manner of
10  death as natural.  He then learned later, from
11  various reports, that in fact the officers had put
12  a knee in Mr. Williams' back, and that there was --
13  there was other force used by the police, and
14  that's why he then changed the manner of death.  Or
15  that's why you and he changed the manner of death?
16     A.  Right.  I think -- I think you're right.
17  I think it was the issue of contact and struggle
18  versus no contact and a struggle.  And I simply
19  ended up with a fuller understanding of the
20  circumstances that changed the manner that perhaps
21  he didn't have when he decided that it was natural.
22     Q.  And so you testified at an inquest in
23  that case?
24     A.  I think there was an inquest and a trial,

16 (Pages 58 to 61)

Brian Peterson, M.D.    March 11, 2016

62

1   because we normally don't do inquests in Milwaukee.
2   Certainly it was in court with a judge, etcetera.
3   But what they exactly called that, I don't
4   remember.
5       Q.  Okay.  But you believe you also testified
6   in the trial on that case?
7       A.  There might have been.  I mean, it was at
8   one judicial proceeding.  I just don't remember
9   what they called that.
10      Q.  Okay.  So you've said you believe you've
11  now conducted about 9300 autopsies?
12      A.  Little bit over that, yes.
13      Q.  'Cause you said 9200.  So since your --
14      A.  Right.
15      Q.  -- opinion, you've done another --
16      A.  Done more cases.
17      Q.  You've done another hundred-plus cases?
18      A.  Ish.  Right.
19      Q.  How long does it take for you to conduct
20  an autopsy?
21      A.  Depends on the autopsy.  You know, I
22  would say anywhere from well under an hour for a
23  average natural death, to seven hours for maybe a
24  complicated case, complicated homicide, complicated

63

1   hospital death, that kind of thing.
2       Q.  And what percentage of the cases or the
3   autopsies that you've done dealt with children?
4       A.  All I could say is that hundreds of them
5   have.  Maybe even approached a thousand, but I
6   can't give you a specific number.  Just too many
7   years, too many cases.
8       Q.  But it's likely less than ten percent of
9   your cases?
10      A.  It could be as much as a thousand.  That
11  would be a little bit more than ten percent.  But
12  again, I couldn't give you a specific number.
13      Q.  Okay.  And of those cases, what
14  percentage of those child deaths were homicide?
15      A.  A good number of them have been.  All
16  told, again, I couldn't give you a specific
17  percentage or number.
18      Q.  What number of those were accidents?
19      A.  Again, a good number.  I mean, when you
20  think about children in general, you know, natural
21  death is a big chunk, accidents is a big chunk.
22  And both of those are probably bigger than
23  homicide.
24      Q.  But you can't tell me the number or

64

1   percentage for homicides versus natural?
2       A.  No.  I, like most forensic pathologists,
3   probably looking at all my -- all my cases, all
4   told, roughly ten percent homicide, ten percent
5   accident, ten percent suicide, and the rest
6   natural, with a few undetermined in there.  But
7   that's like average numbers for any forensic
8   pathologist with experience.
9       Q.  So you're saying that your percentage and
10  the number of cases you've worked on meets the
11  percentage or the types of cases other forensic
12  pathologists work on?
13      A.  Sure.  It's just the way the averages
14  work out with time.
15      Q.  What percentage of the cases that you
16  worked on involving children's death were left
17  undetermined?
18      A.  There have been some.  It's less common
19  with children than with adults.  You know, I've
20  seen more adults that have been undetermined due to
21  decomposition, skeletonization, mummification, that
22  kind of thing.  With the children, it's more a
23  matter of definition.  And there are some these
24  days that are looking at what I still -- I still

65

1   use the sudden infant death syndrome terminology.
2   Some forensic pathologists call those undetermined.
3       So if you want to group those
4   into undetermined, I've certainly done, you know, a
5   couple hundred or 300 SIDS cases all told.  And I
6   know in hospital practice, when I started out, I
7   had a lot of, say, intrauterine fetal demise-type
8   cases, and those are generally undetermined also.
9       Q.  As a medical examiner, is it fair to say
10  that you don't like to leave a case with an
11  undetermined manner of death?
12      A.  I would say that undetermined tends to be
13  the more frustrating ones.  There are times where
14  it's -- put it this way, there's undetermined and
15  there's undetermined.  Some undetermined cases are
16  because there's simply no historic way to determine
17  between the two manners, even though we know the
18  cause of death.
19       The really frustrating ones are
20  where both cause and manner are undetermined.
21  Where after a complete autopsy and complete
22  toxicology and everything else that we do, we don't
23  have a cause.  Yeah, I don't like those at all.
24  Those are the worst.

17 (Pages 62 to 65)

Brian Peterson, M.D.    March 11, 2016

66

1    Q.  Why is that?
2    A.  It's just frustrating, because the
3  thinking is maybe if we were smarter, if we had
4  better technology, if the timing had been better,
5  whatever, we'd actually find something.  But we
6  don't.  And those -- I mean, it's hard on us; it's
7  terrible for the next of kin.  We like to offer
8  them closure.  And if we don't have a cause of
9  death, we can't do it.
10        So I think the majority of those,
11  as we're looking at them now, they'll talk about
12  sudden unexpected death in adults even, certainly
13  sudden unexpected deaths in infants, may be cardiac
14  related, may be, in some cases, asphyxia related,
15  we just don't know.  But yeah, they're just
16  extremely frustrating.  We like to have answers,
17  and sometimes you just can't get to them.
18    Q.  Now, the issue with respect to the manner
19  of death being undetermined in Derek Williams' case
20  came up; right?  Or the possibility of it being
21  undetermined?
22    A.  Again, I'll use undetermined in a case
23  occasionally if we're stuck between two competing
24  manners and we don't have a way to decide between

67

1  those two.  That wasn't really the case for him.
2  The other option is if there's simply not enough
3  information due to -- due to whatever reason, to
4  come up with a manner.  And that really wasn't the
5  case either.  So I don't think undetermined would
6  have been particularly credible.  I don't think.
7        I guess -- your mileage may vary,
8  and of course whenever you have four forensic
9  pathologists in a room, you're probably going to
10  have five or six opinions about that.
11    Q.  Have you published any papers or
12  documents about deaths relating to asphyxia,
13  hanging, or strangulation?
14    A.  No.
15    Q.  Have you published any papers or
16  documents regarding death in children or deaths of
17  children?
18    A.  No.
19    Q.  Have you conducted any research into
20  cases involving pediatric asphyxia?
21    A.  They won't let us.
22    Q.  So that would be no?
23    A.  That would be no.
24    Q.  Have you conducted any test to evaluate

68

1  any conditions that lead to pediatric asphyxia?
2    A.  Hundreds of times.
3    Q.  What kind of tests have you done?
4    A.  The autopsy.
5    Q.  Okay.  But beyond the autopsy, have you
6  done any other types of tests?
7    A.  Sure.  I mean, drug and alcohol testing
8  impinges on a lot of those cases.  That'll tend to
9  complete our evaluation, though.  I mean, drug and
10  alcohol testing plus the autopsy.  Sometimes
11  microscopic examination.
12    Q.  But have you done any test to determine
13  the force that would be used to -- not -- force
14  necessary to cause pediatric asphyxiation?
15    A.  That would involve the living, and I
16  don't work with the living.
17    Q.  So you haven't published any papers or
18  documents on the deaths of children or on pediatric
19  asphyxiation; right?
20    A.  Correct.
21    Q.  Have you published any papers or
22  documents relating to the -- about conditions relating to
23  asphyxia in adults?
24    A.  Well, again, I'll take it from your

69

1  question that we're excepting the autopsy report?
2    Q.  No, I'm asking have you published any
3  reports or documents.
4    A.  Then published -- have I written autopsy
5  reports that have been printed and are on record,
6  sure.  Typically, though, I mean, if you're talking
7  about published as in a peer-reviewed publication,
8  no.
9    Q.  Exactly.  Okay.  And that's exactly what
10  I'm talking.  You haven't published any documents
11  or reports relating to the death of children that
12  have been peer reviewed?
13    A.  Correct.
14    Q.  And same with asphyxia?
15    A.  Correct.
16    Q.  Whether it's in adults or children?
17    A.  Right.
18    Q.  Have you ever given a presentation
19  regarding pediatric asphyxiation?
20    A.  Not pediatric asphyxiation specifically,
21  but asphyxial death in general, sure.
22    Q.  And asphyxial death -- all right.  So you
23  haven't given any trainings regarding anything
24  related with children strangulation or hanging?

18 (Pages 66 to 69)

Brian Peterson, M.D.   March 11, 2016

70

1      A.  Oh, in other words, that'll be part of a
2  talk on pediatric death that I've taught on; that
3  would be part of a talk on asphyxial death that
4  I've taught on.  But as I mentioned earlier,
5  pediatric asphyxial death would be such a small
6  subset, there wouldn't be enough to hold a group's
7  interest for a prolonged period.  The other ones
8  would.
9      Q.  Well, let me ask.  When was the last time
10  you gave a presentation about asphyxial death?
11     A.  I do it every year here for a fellow.
12  That would have been within the last several
13  months.
14     Q.  Do you have your own outline or syllabus
15  or --
16     A.  It's a PowerPoint.
17     Q.  You have a PowerPoint on that?
18     A.  On asphyxial death, sure.  And I have
19  another one on infant death.
20     Q.  And if I asked you for that PowerPoint on
21  the infant death, would you provide it to me?
22     A.  Sure.  Just don't use my pictures.
23     Q.  I won't.  I will -- I'll agree that I
24  won't use it in any case but this.  But I am going

71

1  to ask you to produce those PowerPoints.
2      A.  Sure.
3          MR. KAMIONSKI:  Can you just keep a list
4  of --
5          MS. MOGUL:  Yeah, I'll keep a list.
6          MR. KAMIONSKI:  I'm trying to take notes
7  also and --
8          MS. MOGUL:  I mean, I personally think I
9  should have gotten this response to subpoena, but
10  it's all right.  We'll take care of it.
11  BY MS. MOGUL:
12     Q.  Beyond these two PowerPoints on asphyxial
13  death and infant death, do you have any other
14  PowerPoints relating to hanging or strangulation in
15  children or adults?
16     A.  No.
17     Q.  Have you read any literature on pediatric
18  asphyxiation?
19     A.  There is no -- there's no specific
20  literature on that topic, that I'm aware.  But
21  those types of cases are part of our general
22  forensic pathology literature.  So in that sense,
23  yes.
24     Q.  Are you aware of any leading textbook or

72

1  treatise on pediatric asphyxiation?
2      A.  There's no such textbooks or treatise
3  that I know of.
4      Q.  I'm going to switch topics here, okay?
5  Do you dispute that the leading cause of death in
6  the United States is accidental trauma for
7  children?
8      A.  There's a lot in that definition that I
9  would have issues with, beginning with the very
10  thought that unless there's been an autopsy, the
11  cause of death is a moving target.  There are
12  plenty of death certificates that are issued
13  without autopsy, even in those kind of cases,
14  depending on jurisdiction.  So without an autopsy,
15  it's difficult to be sure.
16          So in that sense, yes, I think if
17  you look at an age subset where there have been
18  autopsies, then I could -- I could answer more
19  confidently true or false.  But in a general
20  statement like that, that would be my concern.
21     Q.  So you do dispute that the leading cause
22  of death in children in the United States is
23  accidental trauma?
24     A.  I would.

73

1      Q.  Do you dispute that asphyxia was the
2  fourth leading cause of unintentional death in the
3  United States for children between the ages of one
4  and four from 2000 through 2006?
5      A.  That's sounds like you've got a pretty
6  specific citation there.  I'd have to see that to
7  know, otherwise, I couldn't make an informed
8  evaluation.
9      Q.  Okay.  Do you check CDC studies regarding
10  pediatric deaths on an annual basis?
11     A.  I have no reason to do that.
12     Q.  So that would be, just for the record,
13  no?
14     A.  Yeah, no.  No, those aren't my cases.
15     Q.  Do you dispute that the amount of force
16  needed to occlude blood vessels in children is
17  significantly less than the amount of force needed
18  to do that in adults?
19     A.  It would depend on the blood vessels.
20  You'd have to be a little bit clearer there.
21     Q.  How much force is needed to occlude the
22  jugular vein in a child, a four-year-old child?
23     A.  I've never done that myself.  In adults,
24  we talk about five or six pounds.

19 (Pages 70 to 73)

Brian Peterson, M.D.   March 11, 2016

74

1    Q.  So adult would be five or six pounds, but
2 you can't say how much force or pounds would be
3 necessary for a child?
4    A.  Right.  Never tried.
5    Q.  How much force is needed to occlude the
6 carotid artery in a child?
7    A.  Again, it's not something that I would
8 do.  In adults, maybe double the force of occluding
9 a vein.
10    Q.  So that would be ten to twelve pounds?
11    A.  Right.  It depends on the adult, too, and
12 their state of vascular disease.
13    Q.  And you -- but you can't give me the
14 amount of force or pounds necessary for a child?
15    A.  No.  I have no reason to be interested in
16 that.
17    Q.  How much force is needed to occlude a
18 child's airway?
19    A.  Depends on how it's occluded.  It may be
20 no force at all in terms of aspiration, you know.
21 If we're talking about external compression, then
22 it would depend on the age of the child.  As they
23 get older, the cartilage develops more.  So it's
24 easier in an infant than it is in an older child.

75

1    Q.  So how much force would you say is needed
2 in a four-year-old?
3    A.  Again, I couldn't give you pounds for
4 that.  I have no idea.
5    Q.  How much in an adult?
6    A.  Maybe 20 pounds or so.  Again, depending
7 on the state of health.
8    Q.  I'm sorry if I just asked you this.  Do
9 you dispute that the amount of force needed to
10 occlude blood vessels in children is significantly
11 less than in adults?
12    A.  I think I said it depends on the blood
13 vessel, depends on how that is done.
14    Q.  I see.
15    A.  A lot of it depends there.
16    Q.  Okay.
17    A.  I think veins in children and veins in
18 adults are quite similar.  Arteries are different.
19    Q.  What makes you say that veins in children
20 are similar to adults?
21    A.  Microscopic study.  I mean, you look at
22 them, it's the same endothelium, the same
23 adventitia, it's the same structure.  What happens
24 as a person gets older, as an adult gets older

76

1 especially, there can be changes in the wall of
2 arteries that make it more resistant to
3 compression.  That doesn't -- those changes don't
4 particularly affect children.
5    Q.  Right.  So as an adult grows older -- I
6 see.  Okay.  As an adult grows older, their veins
7 become more resistant to compression?
8    A.  Arteries.
9    Q.  Their arteries do?
10    A.  Right.  Or can.  Again, depends on the
11 individual.
12    Q.  But so what you're saying is you believe
13 that in terms of the blood vessels, they could be
14 similar in nature for both children and adults, in
15 terms of compression?
16    A.  They could be, sure.  And that's just
17 speaking of the blood vessels, though.  Of course
18 there are other structures around there that can
19 affect that as well.
20    Q.  So it seems to me that you do then in
21 fact dispute the amount of force needed to occlude
22 blood vessels in children is significantly less
23 than in adults?
24    A.  I would rest on it depends.

77

1    Q.  And depends on what?
2    A.  Well, we were just over that.  It would
3 depend on the supporting structures around the
4 blood vessel, it would depend on what's going on in
5 the blood vessel wall, it would depend on how that
6 occlusion is done.  I guess there would be a lot of
7 variables.
8    Q.  Do you dispute that children have small
9 structures that collapse easily when force is
10 applied?
11    A.  That's a pretty generic statement.  Small
12 structures.
13    Q.  Well, smaller structures in their neck
14 that would collapse easily when force is applied.
15    A.  In general, the structures in a child's
16 neck are smaller than the structure in an adult's
17 neck.  Depending.  There's a range of normal there.
18 So depending on, let's say, the overall size of the
19 child, that's going to relate to the overall size
20 of the structures in their neck.  The size of the
21 structures of their neck may be more or less
22 resistant to compression depending on the specific
23 structures and that child.
24    Q.  Let me back up then.  Do you dispute that

20  (Pages 74 to 77)

Brian Peterson, M.D.    March 11, 2016

78

1  the amount of force needed to occlude blood vessels
2  in a four-year-old child is significantly less than
3  an adult?
4      A.  Depending on how the occlusion is done,
5  it may be exactly the same force.
6      Q.  Do you dispute that a four-year-old child
7  has smaller structures in his or her neck, and that
8  that -- those structures would collapse more easily
9  when force is applied than in an adult?
10     A.  So depending on the child and depending
11  on the adult to whom we're comparing those size --
12  those sizes may well be different.  Now, depending
13  on the specific structures, they may be more or
14  less resistant to compression.  Depends on the
15  structures, now.  And it depends on how the
16  compression is done.
17     Q.  Tell me the difference in -- what would
18  be -- well, first of all, which structures are --
19  would it depend on?
20     A.  Well, because you asked generically, I'm
21  giving you a generic answer.  So take, for example,
22  the hyoid bone, all right?  So as a person gets
23  older, the hyoid bone tends to calcify.  In a
24  child, it has actually a couple of joints.  In an

79

1  adult, those tend to calcify.  So the hyoid bone in
2  an adult may actually be more resistant to
3  compression just because of the calcification.  In
4  a younger person or a child, it may be less
5  resistant because those joints are still cartilage,
6  okay?  So that's just the hyoid bone.
7          If you look at structures
8  elsewhere in the neck, it'll depend.  The jugular
9  vein, for example, is kind of tucked in between the
10  carotid artery and the strap muscles of the neck.
11  So depending on the size of those muscles, it'll be
12  easier to get to, or less easier to get to.  And
13  that's going to vary from person to person too.  So
14  there's so many variables.  You're asking me a very
15  general question.
16     Q.  But I haven't heard you give me one
17  factor that would make it -- I haven't heard you
18  give me one factor that would make those structures
19  stronger and more resistant to force in a child
20  than in an adult.
21     A.  Again, it depends on the child and the
22  adult.  There can be adults that are significantly
23  less robust and children that could be more,
24  depending on a lot of both environmental and

80

1  hereditary factors.  It would depend on the
2  specific individual.
3      Q.  But in terms of let's say even the
4  muscles you've just given, wouldn't you say that a
5  four-year-old would have less muscles in their neck
6  than an adult?
7      A.  Well, you'd think so, but can there be
8  reasons to have atrophy in an adult?  Absolutely.
9  There's a condition, for example, called
10  torticollis that involves sternoclas --
11  cleidomastoid muscle.  Other issues that can affect
12  just how robust -- think of muscular dystrophy, as
13  an example.  So it depends on the individual.
14          And as a forensic pathology -- as
15  a forensic pathologist, I tend to look more at the
16  individual that's my patient, not so much a class.
17  Because a lot of times class findings don't apply
18  to that one individual upon whom I'm doing the
19  autopsy.
20     Q.  Okay.  So as a pathologist, you don't
21  look at class findings, you look at the individual?
22     A.  I have to look at the individual.  That's
23  my patient.
24     Q.  Do you dispute that children have

81

1  significant difficulties in freeing themselves from
2  events involving strangulation?
3      A.  That would involve behavior of the
4  living, and I don't observe that.
5      Q.  So you can't -- you don't have enough
6  information to dispute or not dispute that?
7      A.  I would have no opinion.
8      Q.  Do you dispute that children under five
9  lack comprehension of dangerous situations?
10     A.  Simply based on my own experience as a
11  parent, I think that's true.  That's anecdotal.
12     Q.  That's fine.  Do you dispute that you can
13  find petechiae in both accidental and homicidal
14  deaths?
15     A.  I would not dispute that.
16     Q.  Do you dispute that the accidental
17  wrapping of a free cord with elastic properties
18  around the neck of a child could be difficult for
19  that child to remove?
20     A.  I think, hypothetically, it could either
21  be difficult or easy.  Again, it would depend on
22  the situation and the circumstances.
23     Q.  Okay.  So you don't dispute or nondispute
24  that?

21 (Pages 78 to 81)

Brian Peterson, M.D.   March 11, 2016

82

1    A.  Right.
2    Q.  Do you dispute that marks on the neck of
3  a person who's been strangled or hung could be
4  missing or incomplete?
5    A.  I'm sorry?
6    Q.  Do you dispute that marks on a neck of a
7  person who's been strangled can be missing or
8  incomplete?
9    A.  So since there are different ways of
10  getting to strangulation, it would depend on how
11  it's done.
12    Q.  Okay.  Do you dispute that marks on a
13  neck of a person who's been hung can be missing or
14  incomplete?
15    A.  Hanged.
16    Q.  Hanged.
17    A.  Hanged.  And again, depending on how
18  that's done, they certainly could be.  It depends
19  on the specific circumstances.
20    Q.  Right.  Depending on the specific
21  circumstances, the ligature that was involved in
22  the hanging may not be -- may not make an
23  impression on the neck?
24    A.  That's correct.  Again, lot of things --

83

1  lot of it depends there.
2    Q.  What does it depend on?
3    A.  Oh, beginning with things like time, and
4  then going to the nature of the ligature and the
5  nature of the suspension, be it full or partial.
6    Q.  And if it was less suspension, you would
7  see maybe less of a ligature mark?
8    A.  No.  I mean, there can be a great
9  ligature mark even with hardly any suspension at
10  all, if the ligature is right.  And think about
11  say, for example, I don't know, think about an
12  extension cord versus a bed sheet.  And even with
13  full suspension, it would be not uncommon to see
14  not much of a mark with the bed sheet versus a nice
15  discrete mark with a cord.  And then time affects
16  that too.  So the longer the exposure, the more
17  likely to have a well-defined ligature mark.
18    Q.  Now, you previously told me you've done
19  an autopsy on a child who was asphyxiated; right?
20    A.  Lots of them.
21    Q.  But you can't tell me the number?
22    A.  No.
23    Q.  Can you give me any of the circumstances
24  in which you've conducted an autopsy on -- on a

84

1  child who has been asphyxiated?
2    A.  Well, sure.  I can give you classes, for
3  example.  So one type of asphyxia would be
4  drowning.
5    Q.  Okay.
6    A.  Another type of asphyxia would be
7  chemical, in the sense of inhalation of soot and
8  products of combustion, think carbon monoxide,
9  cyanide, soot, that sort of thing from a fire.
10  Another type of asphyxia would be mechanical or
11  traumatic or postural asphyxia.  Think now about an
12  infant wedged between, say, the mattress and the
13  side of the crib, okay?
14          Another type of asphyxia would be
15  from smothering.  Now, that would be an object
16  applied to the outside airway, duct tape around the
17  face, hands over the nose and mouth, that sort of
18  thing.  Another type of asphyxia would be, you
19  could call it ligature strangulation or
20  garrotement, okay?  Now we're talking about a cord
21  or object around the neck.
22          Another type of asphyxia would be
23  manual strangulation.  Now we're talking about
24  hands around the neck with strap muscle hemorrhage

85

1  as a diagnostic feature.  So any of those things
2  I've seen in children as well as adults.  I guess
3  one thing I haven't seen in kids would be chemical
4  asphyxia, say, from cyanide.  I've seen that in
5  adults, but not in children.
6      MS. MOGUL:  I'm sorry, I need to take a
7  bathroom break.
8      THE VIDEOGRAPHER:  We are going off the
9  record at 10:29 a.m.
10        (Break taken.)
11      THE VIDEOGRAPHER:  This is the beginning
12  of disc number two of the video deposition of Brian
13  L. Peterson, M.D., on March 11, 2016.  The time,
14  10:38 a.m.
15  BY MS. MOGUL:
16    Q.  Dr. Peterson, we just took a break.  Did
17  you have a chance to speak with Mr. Kamionski over
18  the break?
19    A.  No.
20    Q.  So before the break, you were describing
21  the various autopsies you've done on children
22  who've been asphyxiated; right?
23    A.  Different categories of asphyxial, sure.
24    Q.  It's a broad category?

22  (Pages 82 to 85)

Brian Peterson, M.D.   March 11, 2016

---

86

1    A. It is.
2    Q. Okay. And -- but so specifically within
3  that category you named -- or strike that.
4  Specifically within the category of asphyxia, you
5  identified a subset which you described as
6  ligature, strangulation, or garrotement; right?
7    A. Yes.
8    Q. Is it garrotted or garrotement?
9    A. I've always called it garrotement. I
10 think it's from the French.
11    Q. Okay, garrotement. Okay. How many
12 autopsies of children have you done that have
13 involved ligature, strangulation, or garrotement?
14    A. I couldn't give you a number. I've
15 certainly done them, though.
16    Q. Well, what percentage of the 9300
17 autopsies you've done have involved a child who
18 died due to ligature, strangulation, or
19 garrotement?
20    A. Same answer. I can't give you a number.
21 I don't know.
22    Q. Would you say it's a small amount?
23    A. Well, I guess "small." Is it less than a
24 hundred? Absolutely. You know, is it less than

---

87

1  50? Probably. But beyond that, I couldn't be any
2  more specific. I've certainly seen them.
3    Q. When's the last time you did an autopsy
4  on a child that involved ligature, strangulation,
5  or garrotement?
6    A. I don't remember.
7    Q. Could it be over ten years?
8    A. No. It's more recent than that.
9    Q. Well -- so you're saying you know that
10 you've done one in the last ten years?
11    A. I do.
12    Q. Have you done one in the last five years?
13    A. Couldn't tell you. I mean, no specific
14 case. I can close my eyes and think of cases that
15 I've done, but when or where those have happened,
16 it's hard to remember. I've just done too many.
17    Q. You mean you've done too many autopsies
18 overall?
19    A. Absolutely.
20    Q. So tell me the circumstances of the cases
21 of children who have died due to ligature,
22 strangulation, or garrotement.
23    A. Well, when you -- those specific terms,
24 when I use those terms, I'm talking about homicidal

---

88

1  death, okay? So you think about a young girl
2  walking home from a party being attacked,
3  strangled, and left to decompose, that kind of
4  thing. You know, a family annihilation is the term
5  that we use, kind of setting, where perhaps the
6  father kills his kids and his wife and himself, you
7  know, that kind of a multiple, would be another
8  setting for it that I can think of that I've done.
9    You know, child as defined say up
10 to age 18, the boyfriend-girl-upset-boyfriend kind
11 of thing using ligature to strangle, those would be
12 the typical settings.
13    Q. Okay. Have you ever done an autopsy
14 where you found a child died due to a ligature,
15 strangulation, or garrotement that was accidental?
16    A. I wouldn't use that same term for it.
17 Generally, if it's accidental, the term would be
18 hanging. And sure, that would be the child that
19 gets tangled up in the whatchamacallit, the mini
20 blind cord kind of a thing. Or, frankly, a child
21 hanging, say, under the age of four, where you
22 really don't want to talk about -- it's hard to
23 talk about intent in a kid that age, you know. And
24 they'll talk about, say, the hanging game, the

---

89

1  strangulation game, that kind of a thing, the urban
2  legend sort of deal.
3    But I think we've all had cases
4  where, you know, a child thought hanging by a belt
5  in a closet at a young age, five or six, and
6  there's controversy over how to manner that.
7  There's no doubt about the cause of the death and
8  the mechanism. The question is the manner.
9    Q. And what is the -- what is the
10 controversy over describing the manner of death in
11 those cases?
12    A. Yeah, it's just intent. You know, we try
13 to avoid intent as much as possible, but the
14 question is can a child that age really comprehend,
15 you know, the finality of death and the
16 ramifications of what they're doing. You know, the
17 fact that -- you know, again, I'm thinking of one
18 here, the belt around the neck from the clothes bar
19 in the closet, it would definitely take some steps
20 to get to that point. But did the child really
21 know that she was going to die thereby? I don't
22 know how you tell, you know.
23    And I'd always learned, even at
24 medical school, that children up until the age of

---

23 (Pages 86 to 89)

Brian Peterson, M.D.   March 11, 2016

90

1 six don't really understand the finality of death;
2 they don't really wrap their heads around that. So
3 under the age of six, I think in my community
4 there'd be some controversy, and those might be the
5 cases that a lot of us would tend to leave
6 undetermined as to manner.
7     Q.  So in the case of this girl who was found
8 hanging in a closet by a belt, did you do the
9 autopsy on that case?
10     A.  Yes.
11     Q.  How did you label that manner of death?
12     A.  That one I labeled undetermined.
13     Q.  When did you do that autopsy?
14     A.  That was within the last couple years.
15     Q.  Do you have -- do you know the name of
16 the victim?
17     A.  No.
18     Q.  Did you take pictures in that autopsy?
19     A.  We always do.  I mean, I don't
20 necessarily -- I didn't necessarily take them, but
21 probably the autopsy assistant did.
22     Q.  Okay.  Were there any ligature marks
23 found on her neck?
24     A.  I don't recall specifically if there were

91

1 in that case.  In those kind of situations, it
2 depends more on the exposure time, you know, the
3 hanging, how much time they were actually lying
4 there, hanging there.  It would depend on whether
5 you had a good ligature furrow.
6     Q.  But as you sit here today, you can't tell
7 us whether there was a ligature furrow at all?
8     A.  I don't remember.
9     Q.  In that case, did you rely on any
10 investigation that was done of the child's family
11 regarding her death?
12     A.  When you say "rely on," you know, I was
13 aware of what our -- we have our own medicolegal
14 death investigators, so they talk to the family.
15 We also have generally a police report when they
16 talk to the family.  In terms of relying, though,
17 not so much.  I mean, the -- the cause of death is
18 an autopsy finding, and that's really -- there's no
19 specific relationship between that and the
20 investigation.  The investigation more drives
21 manner of death.
22     Q.  Okay.
23     A.  And while I'm aware of those things,
24 sometimes that affects my determination of manner,

92

1 sometimes it doesn't.
2     Q.  When does it affect your manner of death
3 determination and when does it not?
4     A.  Well, it's going to sound trivial, but
5 when it's helpful, it affects the manner.
6 Sometimes it's not helpful, you know.
7     Q.  So in this case you determined her cause
8 of death was asphyxiation; right?
9     A.  I would call that asphyxia due to
10 hanging.
11     Q.  So you found the cause of the death?
12     A.  Yes.
13     Q.  But you left the manner of death
14 undetermined?
15     A.  Correct.
16     Q.  Why?
17     A.  That's because of the whole idea of
18 intent in a child that young.
19     Q.  Okay.
20     A.  And I think the circumstances in the
21 closet, the belt setup, the belt around the neck,
22 those all speak to steps, conscious steps, decisive
23 steps, on the part of the decedent.  But did she
24 really have the final outcome in mind?  That's the

93

1 hard part, you know, for a kid that young.  And
2 that's why I think I, and a lot of us, would call
3 that undetermined.
4     Q.  You wouldn't label it accidental?
5     A.  Well, there's an argument for that,
6 that's for sure.  But I would tend to think
7 accidental more in terms of if she didn't see it
8 coming.  You know, if she'd gotten entrapped in
9 something, you know, running into the room, caught
10 something around the neck, that kind of a thing.
11 But the fact is, as best anybody could tell, this
12 was all set up by her.  So it wasn't an accident in
13 that sense.
14         I mean, you might say it was a
15 hostile environment, but that's pushing that a bit
16 too far.  I mean, a bullet in the head is a hostile
17 environment too, but it depends how the bullet got
18 there.  So we don't get quite that fancy with it.
19     Q.  And so let me just be clear.  When you're
20 talking about something that's a hostile
21 environment, that's something you're talking about
22 that has, like, dangerous circumstances or
23 dangerous --
24     A.  Or at least potentially dangerous.  You

24 (Pages 90 to 93)

Brian Peterson, M.D.   March 11, 2016

94

1  know, think about something natural, like being hit
2  by lightning.  Think about being bit by a bug and
3  you have an allergy, you know.
4      **Q.  Sure.  Okay.**
5      A.  Or something in the environment, you
6  know, something toxic, that kind of a thing.
7      **Q.  Okay.  So let me be clear too, then.  It**
8  **seems to me, someone who is -- whose death is due**
9  **to strangulation, your use of the term**
10 **"strangulation" connotes homicide?**
11     A.  Well, again, I'm probably looking at
12 strangulation differently than you are.  In the
13 world of forensic pathology, that's used for a
14 specific mechanism, okay?  Again, there are lots of
15 ways to getting to asphyxia.  It depends on what,
16 exactly.  There has actually been an attempt in our
17 world to kind of codify that by a forensic
18 pathologist in Canada, and make those definitions
19 more specific.
20         But if you look on a death
21 certificate, that's generally where you'll find the
22 answer.  There's a block in there that asks
23 basically how did the circumstances arise that led
24 to death.  So I would, say, call a case asphyxia

95

1  due to hanging, and in that block I would say, you
2  know, decedent hanged self with extension cord from
3  rafter, or something like that.  So that's where
4  you kind of see it all fleshed out.  Because there
5  is some difference in terminology use.
6         But to get more to your point,
7  when I use the term strangulation, I'll tend to
8  give it a specific type.  So, for example, I'll
9  talk about manual strangulation, done with the
10 hands; you could talk about ligature strangulation,
11 if it's done by another person.  Again, I've used
12 garrotement for that as well.  You could talk about
13 ligature strangulation with respect to hanging.  I
14 don't tend to, you know.  I'll just call it
15 asphyxia due to hanging and leave it at that.
16         So there is some terminology
17 variation.  So that's why I'm trying to be very
18 specific about that strangulation part.  So
19 depending on who you're talking to, strangulation
20 wouldn't necessarily mean homicide, depending on
21 how that strangulation happens.
22     **Q.  Okay.  So in the case of this young**
23 **six-year-old girl, did you have pictures of how she**
24 **was found in the closet?**

96

1      A.  No.  But we hardly ever do, because when
2  somebody's discovered like that, their first
3  impulse is to take them down.  So I can't recall
4  the last time I saw an actual scene picture like
5  that, unless it's an adult found hanging.
6      **Q.  Do you know if she was suspended off the**
7  **ground?**
8      A.  I don't think she was fully suspended.
9  That would be distinctly unusual, though.
10     **Q.  Do you know if she was standing up or on**
11 **her knees?**
12     A.  I don't recall.  Kneeling, sitting, but
13 not fully suspended.
14     **Q.  Do you know whether the belt was above**
15 **her head, hanging on something, or behind her head?**
16     A.  In this case, it was above.  Like I said,
17 it was the -- that bar that you put the hangers on?
18 It was attached to that.
19     **Q.  And you're saying that bar was above her**
20 **head?**
21     A.  Right.
22     **Q.  And how did you know that?**
23     A.  Both from the description of the -- I
24 mean the description of the scene and a picture of

97

1  the closet.
2      **Q.  Did you know how many times the belt was**
3  **wrapped around her neck?**
4      A.  I think it was once, but I don't recall
5  specifically.
6      **Q.  Is there anything you could do to refresh**
7  **your memory as to whether there was a furrow or how**
8  **many times the belt was around her neck?**
9      A.  I'd have to find that case, which might
10 be distinctly time-consuming to do.
11     **Q.  So in that case you left it as**
12 **undetermined, the manner of death, because you**
13 **didn't know whether it was accidental, suicide, or**
14 **homicide?**
15     A.  You know, I would say this.  I'm not sure
16 if an under-the-age-of-six child can form the
17 intent to lead to suicide.
18     **Q.  Right, I understand that.  And so it's --**
19 **I mean, that's what I'm trying to get at, is you**
20 **often leave things undetermined because you say**
21 **it's in between various categories?**
22     A.  Yes.  No and yes.  I don't often use
23 undetermined.  When I do, generally it's because
24 something's between categories, or there's simply

25  (Pages 94 to 97)

Brian Peterson, M.D.   March 11, 2016

98

1  not enough information to make a good decision.
2    **Q.  What's another case where you found death**
3  **of a child due to strangulation?**
4    A.  Oh, the one that generally sticks out in
5  my mind is one that I did back in my California
6  years.  It involved a little girl coming home from
7  her 15th birthday party.  She was found partially
8  buried.  She had been strangled with a, I think it
9  was a lanyard.  I think she had like an ID lanyard,
10  that kind of a thing.  And that was a frustrating
11  one, because they never found out who was
12  responsible for it.
13    **Q.  Okay.  And so this was something you did,**
14  **again, back --**
15    A.  Back in the day.
16    **Q.  -- over 30 years ago?**
17    A.  No, I left California -- let me give you
18  the specific year here.  Too many numbers.  So I
19  left there in 2007.  So this would have been
20  somewhere between, say, 1992 and 2007.
21    **Q.  Okay.  You can't narrow it down between**
22  **those years?**
23    A.  No.  Too many cases.
24    **Q.  Okay.  Again, too many cases overall?**

99

1    A.  Right.
2    **Q.  Okay.  And in that case, you said she'd**
3  **been strangled with a lanyard?**
4    A.  Right.
5    **Q.  And you don't know who?**
6    A.  Nobody knows who, right.
7    **Q.  Okay.  And were there any ligature marks**
8  **on her neck?**
9    A.  She had a faint ligature mark that was
10  consistent with that lanyard.
11    **Q.  It was a faint ligature mark where on her**
12  **neck?**
13    A.  Whether it was high or low, I don't
14  remember.
15    **Q.  Did it fully encompass her entire neck?**
16    A.  It did for her.
17    **Q.  So in that case, it was a full**
18  **360 degrees around her neck?**
19    A.  I think it was.
20    **Q.  Was it -- was there more than one**
21  **ligature -- was there more than one furrow?**
22    A.  No.
23    **Q.  Do you have any pictures from this -- of**
24  **this ligature impression?**

100

1    A.  I don't think so.
2    **Q.  Was there petechiae in her head?**
3    A.  I don't remember.
4    **Q.  In the six-year-old's case, was there**
5  **petechiae?**
6    A.  I don't think so.
7    **Q.  What makes you say you don't think so?**
8    A.  Petechiae aren't particularly common.  So
9  when we see them, maybe it's easier to remember.
10    **Q.  And so petechiae aren't common in either**
11  **hanging or strangulation cases?**
12    A.  They're more common in strangulation.  I
13  would say that the times that I see petechiae in
14  hanging tend to be in those people that are more
15  suspended, and then you'll see them lower on the
16  body, like on the legs, feet and legs.  But
17  certainly if you're talking about manual
18  strangulation or ligature strangulation, homicidal,
19  in other words, it's more common then to see
20  petechiae face, eyes, mucosa, that sort of thing.
21    **Q.  So you've given me circumstances of two**
22  **cases involving children who were -- wait.  Strike**
23  **that.  Let me just ask.  With respect to the**
24  **six-year-old, I know you're telling me what the**

101

1  **common phenomena is petechiae, but as you sit here**
2  **today, is it fair to say you don't remember if**
3  **there was any petechiae?**
4    A.  No, I don't remember specifically in that
5  case.  What I'm saying is that in my case
6  experience, it's much more common to see petechiae
7  in that kind of a case from strangulation, in other
8  words, death at the hands of another, as opposed to
9  suicide by hanging.
10    **Q.  Right.  Okay.  So let's just talk about**
11  **petechiae for a second.  Petechiae is a phenomenon**
12  **that's caused when the jugular vein is occluded,**
13  **but the carotid artery may not be.  And so you have**
14  **blood that's rushing into the brain, and the**
15  **blood's not coming out of the brain, and that's why**
16  **you get those little red spots?**
17    A.  That's how I've always understood it.
18  It's a pressure phenomenon.
19    **Q.  Yes.  So often you may find petechiae in**
20  **strangulation cases versus hanging cases, because**
21  **in hanging cases, usually the death is more**
22  **instantaneous, in that the force is generally quick**
23  **enough that it shuts down the entire neck and**
24  **airway, so that -- that's why you see the lack of**

26  (Pages 98 to 101)

Brian Peterson, M.D.   March 11, 2016

102

1  petechiae in the face and head; is that fair to
2  say?
3      A.  Well, I think that's one factor, you
4  know.  I think there are a couple other potential
5  ones.  One of them is that I've always thought that
6  with -- the times that I've seen the most robust
7  petechiae have been manual strangulation.  And --
8      Q.  "Manual" being by hand?
9      A.  By the hands, sure.
10     Q.  And that's because it takes -- there's
11 struggle and there's pressure put on, that takes a
12 while to kind of shut down the entire airways,
13 carotid arteries, right?  So you see this pressure
14 going -- blood going into the brain but not coming
15 out?
16     A.  Back up a little bit.
17     Q.  Okay.
18     A.  Airway, no.  All right?  So it would be
19 distinctly uncommon, rare, for airway compromise to
20 be involved at all.  I mean, as you know, somebody
21 that has a stoma and a ligature above that from
22 hanging dies just fine.  So asphyxial death that
23 we're talking about here tends to be neurovascular.
24 I think that might be part of the petechiae

103

1  phenomenon in strangulation.  Perhaps with hanging,
2  there's more compromise of the carotid body, tends
3  to trigger a vagal response and slow the heart
4  down.  Maybe that brings death faster.
5          The other thing about
6  strangulation, I've always kind of thought that
7  it's probably hard work, and maybe during that
8  struggle there's kind of a catch-and-release
9  phenomenon, more pressure, less pressure.  And as
10 there's blood vessel damage, flow is damped down.
11 When that pressure is released, now you have flow
12 through damaged vessels.  Maybe that's why you get
13 more robust petechiae.
14          I mean, obviously it would be a
15 tough thing to study, you know.  But I think there
16 are probably two or three different factors at play
17 there.  What it ends up with for us is, doing these
18 cases, just that, you do tend to see the, I mean,
19 really robust petechiae in the manual strangulation
20 more.
21     Q.  And so in terms of the cause of that, I
22 guess I want to -- I understand that you've
23 enumerated various causes for why that might
24 happen.

104

1      A.  At least potential.
2      Q.  Potential.  But usually in a hanging case
3  it's quicker than in a manual strangulation case,
4  the death?
5      A.  That would be hard for me to say, you
6  know, because I'm not observing them.  But time
7  might be a factor.  You know, the way that the
8  pressure is applied to the neck might be a factor.
9  I mean, I can see other things going on there too.
10     Q.  So it's both time and pressure in terms
11 of what may produce petechiae in the head or not?
12     A.  May, right.
13     Q.  Okay.  So you've just given us two cases
14 involving hanging or strangulation of children, the
15 circumstances.  Give me another example.
16     A.  Well, I've only given you those two
17 because those are the ones that stand out in my
18 mind.  One because we discussed the manner of death
19 here with our staff, you know, as a teaching point;
20 the other because it was not solved, which was very
21 frustrating.  While I've done other ones, nothing
22 particularly stands out in my mind.  I mean, I know
23 I've done plenty of others.  But in terms of
24 specific circumstances, closing my eyes, seeing the

105

1  face, I can't do it.
2      Q.  Okay.  I guess you can't give me names,
3  clearly, or you can't give me the names of either
4  of these victims?
5      A.  No.
6      Q.  And you can't -- but you can't tell me
7  any other circumstances you've done an autopsy of a
8  child that died of -- either from hanging or
9  strangulation?
10     A.  Beyond what I started out with the family
11 annihilation kind of setting, you know, where the
12 guy kills the entire family, then himself.
13     Q.  So tell me what happened in that case.
14     A.  Just that.
15     Q.  How did he kill the children?
16     A.  Well, we're talking about strangulation.
17 Strangulation, you know.  I've seen that done
18 several different ways; strangulation is one of
19 them.
20     Q.  Well -- and that -- okay.  So give me the
21 example.  This father killed his wife and children?
22     A.  Right.
23     Q.  All right.  And you're saying he manually
24 strangled his children?

27 (Pages 102 to 105)

Brian Peterson, M.D.    March 11, 2016

---

106

1    A.  Right.
2    Q.  And so he used his hands?
3    A.  That's manual, right.
4    Q.  So when you're using the term "manual"
5    throughout this deposition, you've always meant
6    hands?
7    A.  Yeah.  I think that's the generally
8    accepted definition for manual strangulation.  It
9    doesn't specify angle, you know, from front or from
10   back, but it's hands.
11   Q.  Okay, I understand.  So in the case of
12   those children, how many children did he kill?
13   A.  I don't remember the number, but I
14   certainly remember the -- I mean, the defining
15   thing is the strap muscle hemorrhages.  And that's
16   what you remember seeing.
17   Q.  Can you tell me what that means, the
18   strap muscle?
19   A.  I'm sorry.  So turn your head to the
20   side.  That big muscle there is called the
21   sternocleidomastoid.  You've got about six pair of
22   muscles inside the neck.  And manual strangulation
23   is -- I mean, the circumstance is defined as seeing
24   bleeding in those muscles.  I mean, you can get it

---

107

1    from other reasons, but it's blunt force injury to
2    those muscles caused by fingers or thumbs.
3    Q.  So you didn't see that kind of strap --
4    what is it called?
5    A.  Strap muscle hemorrhage.
6    Q.  You didn't see that in the case of the
7    six-year old or the 15-year-old?
8    A.  No, in hangings you don't see it.  Well,
9    I take that back.  I have seen it, but it would be
10   the very unusual hanging, where somebody begins
11   suspended and then drops.  And in those kinds of
12   cases, you can see hemorrhage in those muscles.
13   Q.  Okay.  And how do you -- how do you find
14   that kind of hemorrhage in the muscles?
15   A.  It's a -- we do a layer-wise dissection.
16   So after you take out the chest and abdomen organs,
17   and after you take out the brain, then it's a
18   matter of taking the neck flap up higher, kind of
19   dividing the midline, and then you just follow
20   those groups side by side and bring them up like
21   so.  It looks kind of like a flower once you're
22   done.
23   Q.  What kind of examination is that called?
24   A.  I would call that a layer-wise neck

---

108

1    dissection.
2    Q.  Okay.
3    A.  My practice is always to take the neck
4    organs out, but we don't always need to do a
5    layer-wise neck dissection.
6    Q.  What are the neck organs you take out?
7    A.  Think about starting at the epiglottis
8    and going down.  Epiglottis, larynx, you know,
9    thyroid gland, etcetera.  The whole tube,
10   essentially.
11   Q.  Okay.  So let me -- in the case of this
12   man who killed his family, including his children,
13   he used his hands; right?
14   A.  Right.
15   Q.  Could you see his hands or fingerprint
16   marks on the children's neck?
17   A.  No.  But normally you don't.  I mean, the
18   very most you might see in a case like that would
19   be little curved abrasions.  We often call those
20   fingernail abrasions, with the thought that those
21   might even be from the victim trying to pull the
22   hands away.
23   Q.  So you see those curved abrasions on the
24   neck?

---

109

1    A.  Sometimes.  Less often you see nothing at
2    all.
3    Q.  Were there any curved abrasions on the
4    children in that case?
5    A.  No.  Mostly you see nothing exterior at
6    all.
7    Q.  But did you, in that case, do this
8    laryngeal neck -- say it for me again.
9    A.  Layer-wise neck dissection.  Yes.
10   Q.  So you did the layer-wise neck dissection
11   in each of those children?
12   A.  Right.
13   Q.  And then you could see -- tell me
14   again the --
15   A.  It's strap muscle hemorrhage.  And what
16   you're looking for, really, is full thickness
17   hemorrhage in a muscle.  Because blunt force neck
18   injury by itself -- say you get punched in the
19   neck.  You can have a little surface hemorrhage in
20   one of those muscles.  But to have robust, full
21   thickness hemorrhage, that's from manual
22   strangulation.
23   Q.  When was this case you're talking about
24   with the father and the children?  When did you do

---

28 (Pages 106 to 109)

Brian Peterson, M.D.    March 11, 2016

110

1  that autopsy?
2      A.  I can say that was in northern
3  California, but I can't give you a specific year.
4      Q.  So that was before -- 2007 or before?
5      A.  Or before, right.
6      Q.  Have you done a case like that since?
7      A.  We've had family annihilations here and
8  multiple kid deaths, but not by that kind of
9  strangulation.  Other kinds of asphyxia, sure, but
10 not from that.
11     Q.  Not from either hanging or ligature,
12 strangulation, or garrotement?
13     A.  As a family killing, no.
14     Q.  You've now given me three cases involving
15 some sort of hanging or strangulation of children.
16 Can you give me any other?
17     A.  Not specifically.  Again, done lots of
18 autopsies on those kind of cases, but those are the
19 ones that stick out because they're different.
20     Q.  I know, but -- these are three cases
21 involving children who've died by hanging or
22 strangulation?
23     A.  Right.
24     Q.  Right.  And you can't give us the

111

1  circumstances of any other cases involving children
2  due to hanging or strangulation?
3      A.  Well, specific circumstances, no.  I
4  mean, if you take the group of, say, suicidal
5  hanging that would be, say, over the age of six, up
6  to the age of 18, plenty of those.  But there's --
7  I mean, there's nothing particularly memorable or
8  interesting about those circumstances, generally.
9      Q.  So you're saying -- okay.  A child over
10 six.  Is six a cutoff for you in terms of suicide,
11 or not?
12     A.  Right.  Over six -- again, if the history
13 and circumstances are right, I'll tend to talk more
14 about suicide and less about undetermined.
15     Q.  Okay.  Well, when's the last time you did
16 an autopsy of a child from six to 18 who committed
17 suicide?
18     A.  Gosh, probably within the last few weeks.
19     Q.  Okay.  And when -- what kind of suicide?
20 Did they -- how did -- let me be clear.  I'm
21 talking about suicides that involve hanging or
22 strangulation.
23     A.  So that kind.
24     Q.  Is that the most common kind for

112

1  suicides?
2      A.  You know, I would say somewhere between
3  that and gunshot wounds.  With people under 18, it
4  would be more common to see hanging just because of
5  access.  But some of them get their hands on
6  firearms too.
7      Q.  Okay.  So in terms of the -- tell me the
8  last circumstance of a suicide autopsy you've done.
9      A.  I mean, the last suicide autopsy would
10 have been Mon -- no, Friday, last Friday.  Gunshot
11 wound to the head.
12     Q.  Give me the last case of a suicide
13 involving hanging or strangulation that you've
14 done.
15     A.  I think I've done a hanger within the
16 last -- I'm sorry, that's jargon.  I think I've
17 done a hanging suicide within the last couple of
18 weeks, just can't remember the age.  But we see
19 that not uncommonly.
20     Q.  And how did this person hang themself?
21     A.  Again, they just aren't memorable enough
22 to me.  I mean, just another hanging suicide to me.
23     Q.  Did they have ligature marks on their
24 neck?

113

1      A.  I don't remember.
2      Q.  Did they have petechiae?
3      A.  I couldn't tell you.
4      Q.  I understand.  But I'm going to have to
5  ask these questions.
6      A.  No, that's fine.  Just understand, I
7  mean, this is what I do day in and day out, several
8  hundred a year, so it just gets difficult to
9  remember one from another unless there's something
10 that really stands out about them.
11         You know, I can think of a
12 hanging suicide I did here, very tight, smooth,
13 quarter-inch electrical cord around the neck with
14 one knot beneath the right ear.  Why do I remember?
15 Because he had a tattoo on his arm of somebody
16 hanging from a tree.  Now, see that's -- that you
17 remember.  And that kind of brings the other
18 details to mind.  Otherwise, they just start kind
19 of blending in after awhile.
20         I'm not trying to be difficult,
21 it's just that I do so much of this stuff, unless
22 it's something really interesting, I'm not going to
23 remember specifically.
24     Q.  So just we're clear, you're saying you

29 (Pages 110 to 113)

Brian Peterson, M.D.    March 11, 2016

114

1  can't remember 'cause you just do so many autopsies
2  a year?
3      A.  Part of it is the volume of autopsies,
4  part of it is that you see so much of everything.
5  Gosh, you're asking me -- to ask me if one autopsy
6  months ago had petechiae is like asking did you
7  have grapefruit for breakfast seven months ago.
8  Can't tell you.  You know, I know I've had
9  grapefruit for breakfast, but whether that one case
10 had petechiae, I don't remember.
11     Q.  Okay.  So -- wait.  Let's get back to
12 this case of the person with the electrical cord
13 and the knot on the side.  Where was that case?
14 Where did you do that autopsy?
15     A.  Right downstairs.
16     Q.  When did that happen?
17     A.  That was about, I think, three years ago.
18     Q.  Okay.  And that was of an adult?
19     A.  Yes.
20     Q.  Okay.  And you're saying they had an
21 electrical cord?
22     A.  Right.
23     Q.  And so tell me the circumstances of that
24 death.

115

1      A.  What I can tell you is he had a great
2  tattoo, really well done, really well defined, nice
3  work, but it was a tree and a fella hanging with,
4  like, a hood over his head, from the tree.  That's
5  what I remember.
6      Q.  Okay.  But in terms of was the electrical
7  cord wrapped around his head multiple times?
8      A.  No, no.  I think it was a single loop
9  around the neck, again, with, like, a right
10 subaurale knot.
11     Q.  Okay.  Right subaurale --
12     A.  Under the ear.
13     Q.  Okay.
14     A.  Which is neither here nor there.  I mean,
15 that knot can be anywhere, and it still works just
16 fine.
17     Q.  What was the cause of death in that case?
18     A.  Asphyxia due to hanging.
19     Q.  How did you label the manner of death in
20 that case?
21     A.  Suicide.
22     Q.  Were there furrows on his neck?
23     A.  There was a furrow.
24     Q.  Was there petechiae?

116

1      A.  Don't remember.
2      Q.  Do you know how many times the cord was
3  wrapped around his neck?
4      A.  I think there was one loop.  So it would
5  be the usual --
6      Q.  Did he come in with the loop around his
7  neck?
8      A.  Yes.  We hope to get that.  I mean,
9  sometimes they cut that off at the scene.  But
10 particularly if there's been a longer hanging time
11 and they're overtly dead when whoever gets there,
12 gets there, then they'll leave them and bring in
13 the ligature with them, or even on them.
14     Q.  So in that case you had the benefit of
15 having the ligature around him when he came in?
16     A.  Right.  Still in place.
17     Q.  That's how you could determine it was one
18 loop?
19     A.  Right.  I mean, one loop, either -- you
20 can tell that because the ligature's still in
21 place.  Or if it's off, if there's just one furrow,
22 that tells us it's one loop for a hanging case.  Or
23 multiple.  You know, I've seen that too.
24     Q.  Multiple what?

117

1      A.  In other words, multiple loops around the
2  neck in a hanging case gives you a complex furrow
3  that may have multiple ridges, multiple loops.
4  Depends on the ligature, again, too.
5      Q.  Right.  Depends on what type of material
6  is wrapped around?
7      A.  Right.
8      Q.  Because some material will leave more
9  furrows, some material may not?
10     A.  Right.  That plus the time.  Even a nice,
11 discrete object may not leave much of a furrow if
12 there's a short hanging time.
13     Q.  Can you describe any other circumstances
14 of any other case you've done an autopsy of
15 involving hanging or strangulation, beyond the
16 three cases of the children you described and this
17 one adult with the tattoo?
18     A.  When you say circumstances, I mean, I can
19 remember different types of ligature, for example,
20 different material was used for ligature.  I can
21 remember circumstances where -- as I said, the --
22 even up to and including a hangman's fracture.  If
23 there's suspension and then release and they drop.
24 So those are the kind of things that, for a

30 (Pages 114 to 117)

Brian Peterson, M.D.    March 11, 2016

118

1  forensic pathologist, tend to stick out.  But other
2  circumstances, I'm not sure what you mean.
3  Somebody was depressed, you know.
4      Q.  So let me ask this.  Have you ever worked
5  on a case or done an autopsy of a case where
6  someone died due to hanging or strangulation due to
7  an elastic band from a bed sheet?
8      A.  I don't think so.  Yeah, I don't think
9  I've done one of those.
10      Q.  Have you ever done a hanging or
11  strangulation case involving some sort of ligature
12  that had elastic properties?
13      A.  Some of the ligatures I have taken off,
14  some belts, for example -- I mean, when you say
15  elastic properties, stretchy?  Sure.
16      Q.  So what kind of material was the belt?
17      A.  I mean, whatever it was, it was stretchy.
18  I mean, it looks like a web belt, you know what I
19  mean, like a military belt.  But it just happened
20  to be stretchable.
21      Q.  Okay.
22      A.  A bungee cord, I've seen that.  The --
23  what would you -- like a tow strap, you know what I
24  mean, like the -- it looks kind of like flat rubber

119

1  with a hook on each end, but it can stretch a
2  little bit.  I've seen that.
3      Q.  And in terms of your -- the autopsies
4  you've done, were they subjected to peer review in
5  any way?
6      A.  Depends on the case.  For example, this
7  office, if there's any death that involves police
8  action now, we have a thing we call difficult case
9  conference.  That's peer review.  We also do a
10  percent peer review every year where we look at
11  each other's cases.
12      Q.  But that's like an auditing function?
13      A.  It is, yeah.  I mean, but it's looking at
14  the entire case, including the autopsy report.  But
15  it's not specifically directed at a case, it's just
16  pulling examples of the different manner of death
17  and looking at those.  So, I mean, it's peer review
18  in that sense, but it's kind of a random case
19  selection.
20      Q.  But -- so the vast majority of autopsies
21  you've conducted have not been subjected to peer
22  review?
23      A.  Correct, yeah.  No office does that.  I
24  think the most -- the highest number I've seen has

120

1  been, say, ten percent some offices, if they're low
2  volume, can do.  And I think we're a little bit
3  unique in the sense that, for example, all the
4  police-involved ones we look at.  That's a county
5  statute now.
6      Q.  Right.  And that changed in light of the
7  Derek Williams case?
8      A.  Right.
9      Q.  But again, I just want to say it like the
10  vast, vast majority of autopsies you've done have
11  not been subjected to peer review?
12      A.  Correct.
13      Q.  And depending on the properties of the
14  ligature itself, like what material it's made of
15  and the amount of time, the less amount of time
16  that that ligature was around the neck, the less
17  likely you would see prominent furrows; is that
18  fair to say?
19      A.  Yeah.  I mean, as I said, it'll depend a
20  little bit on the nature of the ligature.  So you
21  could have something hard-edged; I remember a snap
22  tie sui -- snap the -- you know, you put the one
23  end into the other and -- like electricians use.
24  So this is like that.  And with something that

121

1  hard, even brief time, you'll see a furrow.
2          The other end of that is even
3  longer time with something that's kind of soft,
4  like a bed sheet, like you see in some prison
5  suicides, there tends to be nothing on the neck at
6  all.  And then anything in between.  And of course
7  I've done plenty of cases where there's clearly
8  been that kind of action, but now the body's
9  decomposed.  And with decomposition, that evidence
10  just goes away.
11      Q.  But I'm just saying generally, you're
12  saying -- 'cause you keep saying it depends on the
13  amount of time the ligature is.  The less time the
14  ligature is around the neck, the less likely you're
15  going to see a ligature impression?
16      A.  Right.  What I'm saying is as a rule of
17  thumb, that's true.  But like all rules of thumb,
18  there are exceptions.
19      Q.  Right.  So have you ever -- are you aware
20  of any cases where an adult or child was
21  asphyxiated by ligature where there was no marked
22  ligature impression?
23      A.  Oh, absolutely.
24      Q.  So -- and you've said that you've never

31 (Pages 118 to 121)

Brian Peterson, M.D.   March 11, 2016

122

1    done an autopsy involving a ligature of an elastic
2    band from a bed sheet; right?
3        A.  I don't think so.  I mean, I -- I guess I
4    could have done it and not known it.
5        Q.  Right.  Other than this case, are you
6    aware of any autopsies or studies of someone who
7    died due to a ligature involving an elastic band
8    from a bed sheet?
9        A.  There's no such study that I know of.  No
10   case group of experiences, no.
11       Q.  Okay.  And so you also -- you just
12   testified that you've seen cases where someone was
13   asphyxiated by a ligature and there was no marked
14   ligature impression.
15       A.  Correct.
16       Q.  And did those cases also involve
17   instances where the ligature was wrapped multiple
18   times around a person's neck?
19       A.  Both ways.
20       Q.  Okay.  It could be -- yeah.  So you're
21   saying you've seen cases where a ligature has been
22   wrapped multiple times around a person's neck and
23   there's no ligature mark?
24       A.  Right.

123

1        Q.  I'm switching topics again.  Have you
2    ever consulted or been asked to provide expert
3    opinions to anyone from the Hale Law Group beyond
4    this case?
5        A.  I've looked at other cases for them, yes.
6        Q.  How many other cases have you looked at
7    for the Hale Law Group?
8        A.  Gosh, two or three.
9        Q.  And have you provided expert opinion in
10   those cases?
11       A.  Yes.
12       Q.  And have you testified in those cases?
13       A.  One case, I did.
14       Q.  What was the name of that case?
15       A.  That was Robinson v. -- I think it's in
16   here.  Robinson v. City of Chicago.  It's on the
17   first page there.  Cook County, Illinois.  Right
18   there, about sixth from the top.
19       Q.  I see.  What kind of case was that?
20       A.  That was a gentleman that alleged that he
21   had been abused in police custody and claimed to
22   have injuries caused by the police.
23       Q.  And they were representing the police
24   officers in that case?

124

1        A.  Correct.
2        Q.  And what was the expert opinion you
3    provided in that case?
4        A.  My opinion was that the -- the trauma
5    that Mr. Robinson described was inconsistent with
6    the injuries that he had.  And in fact, the
7    injuries that he had would have been consistent
8    with self-infliction.  It would have been possible.
9        Q.  What kind of injuries did he have?
10       A.  The -- from the photographs that I looked
11   at, he had some scratches.  I mean, you could call
12   that a superficial abrasion, essentially.
13   Tangential kind of injury.  And that was it.  And
14   the -- substantially less than the trauma he
15   described, you know, having received.
16       Q.  Okay.  And that -- did you give a
17   deposition in that case?
18       A.  You know, I remember testifying.  I don't
19   remember if I was deposed on that one.  I was?
20   Okay, I'm getting a nod, so I think I was.
21       Q.  Who were the attorneys who deposed you in
22   that case?
23       A.  Oh, I don't remember.
24       Q.  And when you gave your expert opinion in

125

1    that case, was that in your private capacity or in
2    the office of the medical examiner?
3        A.  No, all of the Hale law firm cases I've
4    done have been as a Milwaukee county person for the
5    office.
6        Q.  Okay.  Do you know what happened as a
7    result of that trial?
8        A.  I don't know.  Don't care.
9        Q.  Okay.  So let me -- and in that -- okay.
10   Was that case in state court or federal court?
11       A.  State court.  I've got Cook County,
12   Illinois, here.
13           MS. MOGUL:  Who was plaintiff's counsel?
14           MR. KAMIONSKI:  Pardon?
15           MS. MOGUL:  Who was plaintiff's counsel?
16           MR. KAMIONSKI:  Do you know who Brian
17   Mocco is?
18           MS. MOGUL:  Yeah.
19   BY MS. MOGUL:
20       Q.  All right.  So that was one case you
21   worked on.  The next case on your CV is Redmond
22   versus Ziad.  That's a Cook County case.
23       A.  Oh, that was a -- that was -- that wasn't
24   with the same law firm, though.  That was a medical

32 (Pages 122 to 125)

Brian Peterson, M.D.   March 11, 2016

126

1  malpractice case.
2      Q.  I see.  Okay.  And were you on the
3  plaintiff's or defense side?
4      A.  I was on the defense side for that one.
5      Q.  And who was the law firm in that case?
6      A.  I don't remember.
7      Q.  Okay.  What was the medical malpractice
8  alleged?
9      A.  This one involved a -- it was a critical
10  care-type case, long, complicated hospitalization.
11  Just -- I mean, what you call a medical train wreck
12  kind of case.  And the doctor that was being sued
13  had put a chest tube in at the, you know, tube
14  thoracostomy at the end, and the allegation was
15  that the tube thoracostomy had caused injury to an
16  intercostal artery and then death by essentially
17  internal exsanguination due to that tube.  There
18  was an autopsy in that case, and the autopsy didn't
19  support that conclusion.  So that was my analysis
20  there.
21      Q.  Let me go back to the case Robinson
22  versus City of Chicago.  How much money were you
23  paid to provide your expert testimony in that case?
24      A.  I wasn't paid anything.

127

1      Q.  How much was the office of the Milwaukee
2  examiner --
3      A.  We were paid something.  I don't recall.
4      Q.  And did you work with Mr. Kamionski on
5  that case?
6      A.  I did.
7      Q.  What other cases have you worked with the
8  Hale Law Group on?
9      A.  I've not testified on anything else.  I
10  can think of at least one shooting case that I
11  looked at.  I think the issue there was a young guy
12  that got shot and, like, what position was he in
13  when he got shot.  I don't think that ever led to
14  anything more than just looking at the case,
15  though.
16      Q.  You didn't give an expert opinion in that
17  case?
18      A.  I gave an opinion, but I don't think it
19  actually led to deposition or trial.  Or at least
20  it hasn't.
21      Q.  Did you give an expert report in that
22  case?
23      A.  I don't remember if I wrote a report.  I
24  did?  Okay, I wrote a report.

128

1      Q.  Okay.  So Mr. Kamionski's head is nodding
2  yes --
3      A.  Yeah.  I'm glad for that, yeah.
4      Q.  Okay.  So the office of the medical
5  examiner of Milwaukee county was paid for the work
6  you did in that case as well?
7      A.  No, Milwaukee County.  And my office
8  doesn't actually see that money either.  Very
9  frustrating.
10      Q.  Okay.  What other cases have you worked
11  on with the Hale Law Group?  And again, so that
12  shooting case was, again, on behalf of the police
13  officers who were accused of excessive force?
14      A.  Right.
15      Q.  In the first case, Robinson versus City
16  of Chicago, was when the officers were accused of
17  excessive force?
18      A.  When you say "accused of excessive
19  force."  I mean, there was a lawsuit there.  The
20  specific thing that was laid out against the
21  police, they may have said excessive, I don't
22  remember.  I mean, that's not really what I'm
23  concerned with.
24      Q.  Okay.

129

1      A.  I'm concerned with whether or not the
2  injuries are consistent with, you know, with the
3  plaintiff's story, I guess.
4      Q.  Well, what was your opinion with respect
5  to the shooting case and the position of the body?
6      A.  As I recall, this involved a --
7  essentially a gunshot injury that had perforated an
8  arm and then went into the torso.  So the question
9  was, what would have been the position of the arms
10  to make that all line up, is really what it came
11  down to.  And, I mean, that was it, just how you
12  draw the line connecting A, B, C and D.
13      Q.  Okay.  And did you say that the injuries
14  were consistent or inconsistent with some version
15  of events?
16      A.  Yes.
17      Q.  And they were consistent with the cops'
18  version of events?
19      A.  I don't remember whose -- who that
20  supported.  But anatomically, it could only have
21  happened one way.
22      Q.  And what way was that?
23      A.  It seems to -- if I recall, he had to
24  have an arm up to make everything line up properly.

33 (Pages 126 to 129)

Brian Peterson, M.D.    March 11, 2016

130

1    Q.  I see.
2    A.  Yeah.  I mean, flexed at the elbow.
3    Q.  And so therefore it was supporting the
4  position that his arm was -- somehow looked like it
5  was holding something like a gun?
6    A.  Again, that's kind of beyond what I'd be
7  concerned with.  It's just that the arm would have
8  had to be in that position to make the gunshot
9  wound all line up.
10    Q.  So beyond the Robinson case you've
11  described, and this shooting case, what else have
12  you worked on with the Hale Law Group?
13    A.  You know, those are the ones that I can
14  recall off the top of my head.  I didn't know you
15  were going to ask me.  I won't look to him for the
16  answer here, but I think -- I know for sure those
17  are the ones that I can remember.
18    Q.  Okay.  So what's the name of the shooting
19  case?
20    A.  I don't recall.
21    Q.  Do you know if it was federal court or
22  state court?
23    A.  It's not on this list because I haven't
24  been deposed or been to trial for it.

131

1    Q.  Is it still pending?
2    A.  That's a law question.  I don't know.
3    Q.  Have you asked Mr. Kamionski what's going
4  on with that case?
5    A.  No.  He generally tells me if he needs me
6  to do something.
7    Q.  I see.
8      MS. MOGUL:  Is it sill pending?
9      MR. KAMIONSKI:  Yes.
10      THE WITNESS:  There you go.
11      MS. MOGUL:  What's the name of that case?
12      THE WITNESS:  Good shortcut.
13      MR. KAMIONSKI:  It's Chapman.
14      MS. MOGUL:  Oh, I thought so.  The one in
15  front of Gendelman right now.
16      MR. KAMIONSKI:  Yes.
17      THE WITNESS:  You're way ahead of me.
18      MR. KAMIONSKI:  She knows more about the
19  case than you do.
20      THE WITNESS:  Yeah, I guess so.
21  BY MS. MOGUL:
22    Q.  So have you worked with any other
23  attorneys who are working on behalf of the City of
24  Chicago?

132

1    A.  I don't think so.  I'm kind of looking
2  through my list here.  I don't think so.
3    Q.  How did it come to be that the Hale Law
4  Group first reached out to you to be an expert in a
5  case?
6    A.  Could have just been geographic
7  proximity.  You know, they're in Chicago and I'm in
8  Milwaukee.
9    Q.  Bu do you know as you sit here today?
10    A.  No.
11    Q.  Has anyone from the law firm of Greenberg
12  & Traurig reached out to you?
13    A.  I don't think so.
14    Q.  Have you ever testified on behalf of the
15  City of Chicago before, or the Chicago police
16  department?
17    A.  I don't think so either.
18    Q.  Have you ever consulted or testified on
19  behalf of the City of Milwaukee involving a law
20  enforcement misconduct case?
21    A.  I know I've been to federal court --
22  well, not -- put it this way.  It was a federal
23  court case that involved police action in
24  Milwaukee.  So I know I've done at least one.  And

133

1  that's probably still in here too.
2    Q.  And who called you to testify on that
3  case?
4    A.  This would have been a City of Milwaukee
5  attorney.  I think that's the -- on the last page
6  there, Boone versus City of Milwaukee.
7    Q.  That was a shooting case?
8    A.  Yes.
9    Q.  Okay.  And you had met with the city
10  attorney prior to testifying in that case?
11    A.  Yes.
12    Q.  Did you give a deposition in that case?
13    A.  I think I did.  For sure I was to trial a
14  couple different times.  And I think I wrote, you
15  know, your basic Rule 26 report, 'cause it was
16  federal court.  I don't recall if I was deposed.
17    Q.  In that case you didn't do the autopsy,
18  though, did you?
19    A.  No.
20    Q.  So beyond these two cases you've
21  mentioned that you've worked on with the Hale law
22  office, and the Boone case, are there any other
23  cases you've consulted on behalf of
24  for defense counsel in a law enforcement misconduct

34 (Pages 130 to 133)

Brian Peterson, M.D.   March 11, 2016

134

1   case?
2       A.  You know, I've testified on plenty of
3   these kind of cases, but not for -- not, say, for
4   one side or the other.  In northern California, in
5   Contra Costa county, they used to do inquests for
6   anything that involved police action.  So I'd be
7   subpoenaed to come to the inquest.  But of course,
8   like anything that I do, I'm there to talk about my
9   autopsy findings.  It's not really for one side or
10  the other.  So that wouldn't be called by the
11  defense specifically, but it would be talking about
12  a case that involved death at police hands.
13      Q.  Right, but that was -- okay, that was an
14  inquest in general into the case?
15      A.  Right.
16      Q.  Okay, I get that.  But so beyond that,
17  and the cases for Hale and the City of Milwaukee,
18  have you ever testified on behalf of defense
19  counsel, or the defendants, in a law enforcement
20  misconduct case?
21      A.  Yeah, off the top of my head, I don't
22  think so.
23      Q.  Have you ever testified on behalf of a
24  plaintiff in a civil rights case involving law

135

1   enforcement misconduct?
2       A.  I don't think so.  Might have.  Again,
3   too many cases under the bridge.
4       Q.  But you can't remember any as you sit
5   here today?
6       A.  No.
7       Q.  Now, you reviewed materials that were the
8   autopsy and the report and the testimony of
9   Dr. Scott Denton in this case?
10      A.  I did.
11      Q.  Have you met Dr. Denton?
12      A.  Yes.
13      Q.  When have you met with him?
14      A.  He's been a colleague of mine -- put it
15  this way.  I mentioned the National Association of
16  Medical Examiners?  So he's been the treasurer for
17  the last three years or so.  So he's a member of
18  the board.  I'm also on the board, so -- and one of
19  the forensic fellows that we trained here three or
20  four ago went and became a partner of his in his
21  office practice.
22      Q.  And what's his name?
23      A.  Her name.  I'll think of it in a minute.
24  It changed 'cause she got married.

136

1       Q.  Okay.  Junger?  Is her name Junger?
2       A.  I think it is now, yeah.
3       Q.  Okay.
4       A.  Yeah.  Junger or Youens, or something
5   like that.
6       Q.  So let me be clear.  You're on the board
7   of the National Association of Medical Examiners?
8       A.  Right.
9       Q.  And Dr. Denton is on the board as well?
10      A.  He's also on the board, correct.
11      Q.  And how long have you been on the board
12  of the National Association of Medical Examiners?
13      A.  I think I am in my fourth year now.
14      Q.  How long has Dr. Denton been on that
15  board?
16      A.  I couldn't tell you.  He was there before
17  I was.
18      Q.  And how often do you meet as a board?
19      A.  Twice a year.
20      Q.  So you see him at the board meetings
21  twice a year?
22      A.  If both of us are there.  That doesn't
23  always happen.
24      Q.  When did you first meet Dr. Denton?

137

1       A.  Probably at one of those meetings.  You
2   know, I'm thinking probably when I came to
3   Milwaukee.  'Cause when I came to Milwaukee is when
4   I started going to those meetings more, the main
5   meetings more.  So probably, at that point, several
6   years ago.
7       Q.  So in 2007?
8       A.  Right.  Or after.
9       Q.  So you've known Dr. Denton for close to
10  ten years?
11      A.  Something like that.
12      Q.  Would you say that you were friends?
13      A.  Oh, I mean, we've had dinner once.  We
14  know each other to say hi to.  We don't regular
15  associate.  There's not an opportunity for that.
16      Q.  Have you ever consulted with him on any
17  of his autopsies?
18      A.  Consulted with him?
19      Q.  Yeah.  Has he ever reached out to you to
20  talk to you about any of his autopsies?
21      A.  No.
22      Q.  Have you ever reached out to him to talk
23  to him about any of your autopsies?
24      A.  No.

35 (Pages 134 to 137)

Brian Peterson, M.D.    March 11, 2016

138

1    Q.  And both of you are still on the board of
2  the National Association of Medical Examiners?
3    A.  Yes.
4    Q.  Have you discussed this case with him?
5    A.  No.
6    Q.  Do you know any of the defendant officers
7  sued in this case?
8    A.  No.
9    Q.  So I'm going to -- do you know a Michael
10  Landando?
11    A.  No.
12    Q.  Anthony Noradin?
13    A.  No.
14    Q.  Robert Wells?
15    A.  Nope.
16    Q.  James Kelly?
17    A.  No.
18    Q.  James Day?
19    A.  No.
20    Q.  Demosthenes.  How do you pronounce that?
21      MR. FLYNN:  Demosthenes.
22  BY MS. MOGUL:
23    Q.  Demosthenes Balodimas?
24    A.  Nope.

139

1    Q.  Robert Cardaro?
2    A.  No.
3    Q.  Robert Bartik?
4    A.  Nope.
5    Q.  Okay.  You traveled back -- well, when
6  were you first contacted about this case?
7    A.  I'd have to go back and look at the
8  billing records on this case.  But I'm thinking it
9  would have been last year at some point.
10    Q.  Okay.  And where was that -- how was
11  that -- where did that meeting happen?
12    A.  It didn't start out as a meeting.  I
13  mean, Mr. Kamionski e-mailed me, and then a lot of
14  my review was based on large, large documents and
15  photographs and stuff that I looked at via Dropbox.
16    Q.  Okay.  And did you come up to Chicago to
17  speak about the case with Mr. Kamionski?
18    A.  I think I had planned on that one time
19  and it didn't happen.  We ended up conducting our
20  conference over the phone.  Much more convenient
21  than traveling down to Chicago.
22    Q.  You don't remember taking the train to
23  meet with him?
24    A.  I bought a train ticket and didn't use

140

1  it.  Yeah, that was the funny thing.
2    Q.  So in that instance, if it notes that
3  you -- that the consultation was for $1,000, does
4  that mean that the -- that you spoke over the phone
5  with him for two hours?
6    A.  Sometimes -- sometimes it'll be time on
7  the phone plus prep.  So I'm reading materials,
8  looking at materials, and so forth.  So it's all
9  kind of wrapped into one.
10    Q.  Do you know, as you sit here today, back
11  in July of 2015, how long you were on the phone
12  with him talking about the case?
13    A.  No.
14    Q.  Does anyone review, in Milwaukee County,
15  any of the expert reports you do on its behalf?
16    A.  I mean, if it's a report that would be on
17  one of our cases that I've autopsied, say, for
18  example, then sure, it would be the attorney here.
19  But for something like an extramural consultation
20  like this, no, not that I know of.  Sometimes I'll
21  show them to my colleagues just as a teaching
22  point.  But that's not really a review, it's more
23  look how you write a report kind of thing.
24    Q.  So at this point, according to the

141

1  billing records I've seen, you've been paid about
2  $9,000 for this case.  Does that sound about right?
3    A.  The County of Milwaukee has been paid
4  about that much.  That sounds right.
5    Q.  All right.
6      MS. MOGUL:  I'm going to take just
7  another quick break before we start into a new
8  area, okay?
9      THE VIDEOGRAPHER:  We are going off the
10  record at 11:36 a.m.
11        (Break taken.)
12      THE VIDEOGRAPHER:  We are back on the
13  record at 11:45 a.m.
14  BY MS. MOGUL:
15    Q.  So before the break we were talking about
16  that one of your fellows now works with Dr. Denton;
17  right?
18    A.  Right.
19    Q.  How long has that fellowship practice
20  been in place here, in your office?
21    A.  Oh, way before my time.  A decade and a
22  half, perhaps.
23    Q.  And this one -- this is one fellow per
24  year?

36 (Pages 138 to 141)

Brian Peterson, M.D.    March 11, 2016

142

1      A.  Right.
2      Q.  Okay.  And in your office, do you hire
3  outside pathologists to help conduct any of the
4  autopsies for your office?
5      A.  No.  I mean, we have permanent staff, and
6  some of them have not -- have come from other
7  places, as did I.  But in terms of, say, locum
8  tenens help or something, no.
9      Q.  Okay.  Well, some -- like, for example,
10  some counties, they don't have -- they contract
11  with pathologists.
12      A.  Right.
13      Q.  You don't contract with pathologists
14  here?
15      A.  No, but we provide that service.
16      Q.  Sure.
17      A.  So the other counties that we serve don't
18  have their own.
19      Q.  Right.  No, I understand.  Okay.  So in
20  this case, you provided an expert report, right, or
21  report of your opinions in this case; right?
22      A.  I did.
23      Q.  Okay.  So you are looking at that right
24  now?

143

1      A.  I have it right here.
2      Q.  Is that your copy of the report?
3      A.  This is a copy.  Looks like a photocopy.
4      Q.  Okay.
5      A.  It's a photocopy signature.
6      Q.  I'm going to label the one that -- a copy
7  of the one I got, okay?
8          MR. KAMIONSKI:  We'll use that one.
9          THE WITNESS:  Whatever you like.  You
10  want this one?
11          MS. MOGUL:  Well, I might.  Just leave it
12  here for one second, 'cause there's one thing I
13  want to check.  All right.  So this is 150.
14      (Exhibit 150 marked for identification.)
15  BY MS. MOGUL:
16      Q.  So I've labeled as Exhibit 150 the copy
17  of the report and the affidavit -- I mean, your
18  resumé, that you provided in this case.  Does that
19  look like the entirety of your report and your
20  resumé?
21      A.  Actually, it's three different things.
22  So it starts out with a list of trial testimony,
23  kind of like the Rule 26 list; the next section is
24  the report, then the final section is my curriculum

144

1  vitae.
2      Q.  Okay.  So let me just -- and so in its
3  entirety, this is ten pages long?
4      A.  Yes, it is.
5      Q.  Okay.  So -- and did you prepare this
6  entire curriculum vitae, report, and summary of
7  cases yourself?
8      A.  I did.
9      Q.  Okay.  Did you have any help in preparing
10  this report?
11      A.  No.  We don't have administrative help
12  here.  I'm on my own.
13      Q.  Okay.  So this report contains the
14  opinions you intend to offer at trial if you're
15  allowed to; right?
16      A.  Correct.
17      Q.  And all the facts and data you considered
18  in forming these opinions is listed in this report?
19      A.  Those would be under the materials
20  reviewed at the top of, I've got it as page 5 here.
21      Q.  Right.  Were any of those documents not
22  provided by defense counsel?
23      A.  No.
24      Q.  Did anyone else -- and I understand you

145

1  don't have administrative staff, but did anyone
2  else contribute to this report?
3      A.  I mean, I discussed the report with
4  Mr. Kamionski as I was crafting it, but nobody else
5  here at the office, no.
6      Q.  Did anyone conduct any research for this
7  report?
8      A.  No.
9      Q.  Did anyone help you review any materials?
10      A.  No.
11      Q.  Prepare summaries or abstracts?
12      A.  No.
13      Q.  Okay.  Did you ask for any materials to
14  help you in forming your opinions or drafting this
15  report that were not provided to you?
16      A.  No.
17      Q.  So let me -- so in this report, starting
18  on page 5 -- or strike that.  In this exhibit,
19  starting on page 5, that's the beginning of your
20  report with respect to this case?
21      A.  It is.
22      Q.  Okay.  And it starts out with materials
23  reviewed?
24      A.  Yes.

37 (Pages 142 to 145)

Brian Peterson, M.D.    March 11, 2016

146

1    **Q.  Right.  And so can you just go to the**
2    **bottom of the page?  The last sentence reads, "He**
3    **also described bleeding hemorrhage within the**
4    **muscles over both shoulders and the muscles of the**
5    **right upper back; these represent recent injuries,**
6    **not" -- and then it stops.**
7        A.  It sure does.  That's bizarre.  It looks
8    to me like that "not" doesn't need to be there.
9    "These represent recent injuries," period.
10    **Q.  Okay.**
11        A.  You can tell that I type this on my own.
12    **Q.  So now if you're editing it, you would**
13    **just put "these represent recent injuries," period?**
14        A.  Period, right.
15    **Q.  Okay.**
16        MR. KAMIONSKI:  It's weird, 'cause it
17    looks like there's a cutoff.  I'm looking at this
18    version, and there's another sentence and a half.
19        MS. MOGUL:  Which version is this?
20        MR. KAMIONSKI:  I'm looking at the report
21    he brought.
22        THE WITNESS:  Could have been when it
23    printed.  We've had printer server issues here, and
24    I had to print this at the office, obviously.

147

1        MS. MOGUL:  Well, does the version you
2    have have this full thing?  'Cause the one you
3    provided me did not.
4        MR. KAMIONSKI:  I'm assuming that I
5    provided you -- I provided you whatever he sent me
6    on the spot, you know.  So it could be that I do
7    have a version of that.  It looks like it's in
8    error.  I guess I should have reviewed that.
9        MS. MOGUL:  Well, this is substantially
10    more than -- well, I think we're going to have to
11    label this Exhibit 151.  I'm going to need a copy
12    before I leave.
13        MR. KAMIONSKI:  Can we make a copy now?
14    Take a break and make a copy real quick?
15        THE WITNESS:  Sure.
16        THE VIDEOGRAPHER:  You want me to go off?
17        MS. MOGUL:  I mean, it's a significant
18    addition that I didn't get on this.
19        MR. KAMIONSKI:  It's -- you know, it was
20    not done anything intentionally.  Like it wasn't --
21    you know, so --
22        MS. MOGUL:  Okay.
23        MR. KAMIONSKI:  We'll make you a copy
24    right now so you can talk about it.

148

1        MS. MOGUL:  All right.
2        THE WITNESS:  We're going to stop and
3    make a copy real quick?
4        MS. MOGUL:  I mean, we don't have to.  As
5    long as I can keep it in my hands, I'll just keep
6    going.
7        MR. KAMIONSKI:  Okay, that's fine with
8    me.
9        (Exhibit 151 marked for identification.)
10    BY MS. MOGUL:
11    **Q.  So on page 6 you define what's the**
12    **difference between cause and manner of death;**
13    **right?**
14        A.  Right.
15    **Q.  Cause of death is injury or disease that**
16    **sufficiently interrupts normal physiology so as to**
17    **be lethal; right?**
18        A.  Yes.
19    **Q.  You say that's best determined by an**
20    **autopsy examination.**
21        A.  Yes.
22    **Q.  What does an autopsy examination consist**
23    **of?**
24        A.  Depending on the case, but a complete

149

1    autopsy examination would be an external
2    examination of the body as received.  Next step
3    would be to remove clothing, property, evidence of
4    medical therapy.  Look at the nude body now,
5    perhaps followed by cleaning, if necessary, you
6    know, mud, dirt, that sort of thing.  Blood.
7        Once that's been done, the
8    photographs have been taken, then would come the
9    internal examination.  So we do make a Y-shaped
10    incision to open the torso, and then an incision
11    across the back of the head connecting the ears,
12    reflect the scalp, remove the top of the skull,
13    remove the brain.  I talked earlier about the neck
14    dissection.  That would be a specialized dissection
15    that's not always necessary, but might be.
16        So that's the internal exam.
17    During that process, collect samples of the major
18    organs for microscopic examination as needed.
19    Normally not needed, but we still collect.  Collect
20    specimens for chemical and toxicologic examination.
21    So the vitreous fluid in the eye, blood, liver,
22    urine, etcetera.  Describe internally evidence of
23    natural disease, congenital anomaly, injury, and so
24    forth.  Maybe an ancillary study, such as x-ray,

38 (Pages 146 to 149)

Brian Peterson, M.D.   March 11, 2016

150

1  you know, depending on the case. Once all those
2  things are done, create the report, collect the
3  results of the ancillary studies. And at that
4  point you can come up with a cause and manner of
5  death. Sometimes you can do that at the time of
6  the autopsy. Sometimes you have to wait for other
7  studies. But that's the basic process.
8     Q. Okay. But let me be clear. In terms of
9  just the cause of death, is that based solely on
10 the physical and pathological findings conducted
11 from the autopsy?
12    A. In general, it is. I mean, you have to
13 look at the specific case. But in general, that's
14 true.
15    Q. Right. And -- okay. You described the
16 neck dissection in cases involving manual
17 strangulation; right?
18    A. Right.
19    Q. There was no neck dissection done in this
20 case?
21    A. Not -- not this kind that I was talking
22 about, the layer-wise neck dissection.
23    Q. Yes.
24    A. Correct.

151

1     Q. Did you think the layer-wise neck
2  dissection should have been done in Jaqueri Dancy's
3  death investigation?
4     A. No.
5     Q. Why is that?
6     A. That would be for a case of manual
7  strangulation. But in a case like this that
8  actually had an external ligature furrow, I mean,
9  that's the answer in terms of asphyxia.
10    Q. So you don't think there was any reason
11 to believe there was any manual strangulation
12 involved in Jaqueri Dancy's death?
13    A. No.
14    Q. Or -- that would be correct?
15    A. I'm not sure what you just added.
16    Q. I don't -- I'm not going to lie, I'm not
17 the best at asking questions, but in this case you
18 don't believe there was any evidence to indicate
19 any form of manual strangulation in Jaqueri Dancy's
20 death?
21    A. Correct. Manual strangulation is defined
22 by strap muscle hemorrhage. So we often toy with
23 that question, could you have manual strangulation
24 without strap muscle hemorrhage. If that happens,

152

1  you wouldn't call it manual strangulation, 'cause
2  there's not strap muscle hemorrhage. So it's kind
3  of circular, in that sense. But there was no such
4  evidence here.
5     Q. Now, the manner of death describes how
6  the cause arose, and it's typically determined via
7  history and investigation; right?
8     A. Correct.
9     Q. And so that means it's usually determined
10 by things other than the autopsy?
11    A. That's correct.
12    Q. Okay. And what do you mean by history
13 and investigation?
14    A. Well, that would be the investigation
15 into the circumstances of somebody's death. You
16 know, I can give you analogies to help explain it,
17 but basically, one cause can arise lots of
18 different ways. So, for example, we talked about
19 homicide being death at the hands of another,
20 suicide being death at one's own hands. Sometimes
21 a gunshot wound is indeterminate; it could have
22 worked out either way.
23        So it would require looking into
24 the circumstances to try to discern which of those

153

1  is true. So there are times where the autopsy
2  pretty much speaks for itself; there's simply no
3  question about the manner of death. There are
4  other times where you need extra information that
5  doesn't come from the autopsy.
6     Q. And where do you get this extra
7  information with respect to history and
8  investigation?
9     A. Depends on where you work. At our office
10 here, we have our own medicolegal death
11 investigators on staff, so they're providing that
12 to us. In some cases, we're looking at what they
13 have to say, plus we're getting reports from, say,
14 a state fire marshal, or the police, or the
15 paramedics, EMTs, depending on who else has been
16 involved in the case. Sometimes medical records,
17 you know, hospital records, clinic records, that
18 kind of thing.
19    Q. But in terms of the investigation in
20 terms of what happened, what events happened before
21 someone's death, usually you get that from the
22 police, whether it's through your medical
23 investigators or directly from the police
24 themselves?

39 (Pages 150 to 153)

Brian Peterson, M.D.    March 11, 2016

154

1    A.  Lot of times the police aren't even so
2 much involved.  I mean, when 911 is activated in
3 Milwaukee, it's a police-fire response.  And then
4 after they come and determine there's a deceased
5 person there, my office goes.  Depending on the
6 kind of case, the police may have nothing further
7 to do except for perhaps controlling the scene, you
8 know.
9    Q.  Okay.
10    A.  Depends.
11    Q.  So -- okay.  And back to your definition
12 of homicide.  That just means death at the hands of
13 another?
14    A.  Right.
15    Q.  And as you said, it's out of your purview
16 to describe -- to determine whether there was a
17 crime committed or not?
18    A.  Right.  You attorneys think about murder,
19 we just think about homicide.
20    Q.  Right.  But just to be clear, there can
21 be -- you've had instances where you have defined
22 or labeled something as a death by -- that was a
23 homicide where in fact no crime was committed?
24    A.  Oh, sure.  I mean, it works both ways.

155

1 More often it's the other way.  Say, for example,
2 somebody has cardiovascular vulnerability due to
3 preexisting disease, and there's shooting going on
4 outside their house, and they die at that point.
5 We would typically call that a homicide, because
6 the stress of that event caused them to die of the
7 natural disease that they already had.
8        If you look at the way the FBI
9 defines homicide, they wouldn't include that.  So
10 that would be an example of where we're calling it
11 a homicide, but the system isn't.  Another type of
12 case might be, I don't know, somebody robs a
13 convenience store and shoots the clerk.  We would
14 call that a homicide.  That same robber now,
15 outside the convenience store, is confronted by the
16 police, tries to shoot the police, they shoot him;
17 we would also call that a homicide.  But clearly
18 one of those is unlawful, one of those is lawful.
19 So it can go in both directions, but we're just
20 stuck using the same term.
21    Q.  Okay.  Did you conduct any tests with
22 respect to Jaqueri Dancy's death?
23    A.  I only reviewed the written materials.
24 There was no test to conduct, that I'm aware of.

156

1    Q.  You never attempted to reconstruct how
2 this may have occurred?
3    A.  Well, I mean, physically, no.  Mentally,
4 yes.
5    Q.  Okay.  But you never did any tests with
6 any elastic bands?
7    A.  No.
8    Q.  I want to get back to the terminology.
9 In this case, you have said that you believe this
10 case is more consistent with it being a homicide
11 because it's a strangulation versus an accident and
12 a hanging; right?
13    A.  That's a little bit interesting
14 combination of terminology.  But yes, I believe
15 it's more consistent with somebody else being
16 involved as opposed to just this child being
17 involved.
18    Q.  So I just -- let me ask you to turn to
19 page 7 of your report.  It just says, if you look
20 at your chart, autopsy finding, accident, and then
21 you put parentheses, hanging; right?
22    A.  I do.
23    Q.  And then you say homicide, parentheses,
24 strangulation.

157

1    A.  Right.
2    Q.  I guess what I'm trying to get at, isn't
3 it possible to have a strangulation that is, in
4 fact, an accident?
5    A.  It's all a matter of definition, isn't
6 it?  Sure, if we think about strangulation as
7 involving specifically a ligature.  Could somebody,
8 say, run into a room and become entrapped in
9 something across the door, something on that order,
10 or, as I mentioned earlier, the unfortunate death
11 of an infant getting trapped in the cord of a mini
12 blind, would be an example.  I mean, it's hanging,
13 but I guess you could call that ligature
14 strangulation, sure.  That would be an accident.
15 So again, depending very much on case
16 circumstances, sure it would.
17    Q.  Right.  But in this case it seems like
18 you're saying hanging default means accident,
19 strangulation default means homicide.
20    A.  No, that's specifically within the
21 confines of this case.  I'm just trying to make it
22 clear how I'm making those two different groups,
23 the accident group versus the homicide group.  The
24 hanging group versus the strangulation group.  It's

40 (Pages 154 to 157)

Brian Peterson, M.D.    March 11, 2016

158

1   just for the purpose of clarification in this case.
2       Q.   But is it possible to have a
3   strangulation that is in fact not a homicide?
4       A.   Absolutely.
5       Q.   In this case, do you know what
6   allegations the plaintiff's making against the
7   defendants?
8       A.   My understanding was, was that initially
9   the plaintiff, that would be -- let me just make
10  sure I got this right here -- Ms. Harris, correct?
11      Q.   Yes.
12      A.   The plaintiff had confessed to murdering
13  her son, and then later took it back. So just that
14  much.
15      Q.   She took it back?
16      A.   Yeah, she said she didn't kill her son.
17      Q.   Okay. Were you told what the
18  circumstances of her confession were?
19      A.   I might have been, but it would mean
20  nothing to me. That's not my issue.
21      Q.   Okay. Why is it not your issue?
22      A.   Because my issue is my patient, in this
23  case her son, and his injuries. That I can speak
24  to professionally. In terms of what might have

159

1   happened to her and her confession, I can't.
2   That's beyond my expertise.
3       Q.   Were you told what she confessed to?
4       A.   Again, my understanding was she confessed
5   to strangling her son.
6       Q.   Right. Were you told how she confessed
7   to strangling her son?
8       A.   I think it was with this same piece of
9   elastic.
10      Q.   But besides using the piece of elastic,
11  were you described how?
12      A.   I don't think so.
13      Q.   So you say Jaqueri was -- well, your
14  opinion is that you believe -- well, how did
15  Jaqueri die?
16      A.   From asphyxia.
17      Q.   And how -- beyond that, how did he die?
18      A.   Sure. My opinion is that he had this
19  elastic band as a ligature around his neck, and
20  that a single loop caused the furrow. The furrow
21  was associated with pressure on his neck, and the
22  pressure on his neck caused asphyxia.
23      Q.   And in this case, you don't dispute that
24  the instrument of death in this case was the

160

1   elastic band?
2       A.   No, I think the -- as described by
3   Dr. Denton and as photographed, the edge of the
4   ligature furrow was quite consistent in pattern
5   with the notched edge on that elastic band.
6       Q.   What part of -- okay, so did -- is it
7   your opinion that the elastic band went around --
8   what part of the elastic band went around Jaqueri's
9   neck?
10      A.   I think based on there being a single
11  furrow there, that matches pattern on a single
12  band, a single throw, if you will, of ligature.
13  Could there have been other throws around the neck?
14  Sure, there could have. But the ligature pattern,
15  just a single, well-defined furrow that vanishes
16  behind the right ear, is consistent with pull being
17  put on a single band from behind and to the right.
18      Q.   Okay. But -- okay. But just to be
19  clear, you're not saying that the band wasn't
20  wrapped around his neck more than that? You're
21  just saying it's consistent with one?
22      A.   The pull being put on one. So, for
23  example, if there were multiple wraps around the
24  neck, and then just one of those pulled, that could

161

1   give you the pattern. If there were one around the
2   neck and that was pulled and then multiple were
3   put, either of those could work. I couldn't say,
4   based on the physical evidence, which could have
5   happened. Either could have happened.
6       Q.   You said two things there.
7       A.   Right, I did.
8       Q.   You said that it could have been wrapped
9   multiple times around his neck, and that there was
10  a single pull.
11      A.   Maybe to make it more clear, it could
12  have been wrapped several times around the neck
13  antemortem, and then traction could have been put
14  on one loop, and then that would have described
15  what his dad described, multiple loops around the
16  neck when he found him deceased.
17          Alternately, there could have
18  been one loop around the neck, traction placed on
19  that one loop, and then other loops put around his
20  neck after he was deceased. I would have no way at
21  autopsy, or reviewing these materials, to tell you
22  which one of those it must have been. Either one
23  of them would have been fine.
24      Q.   Let me be -- I want to go through the

41 (Pages 158 to 161)

Brian Peterson, M.D.   March 11, 2016

162

1    different scenarios.  You're saying that one could
2    be that it was wrapped 360 degrees around his neck
3    and it was pulled?
4        A.  By 360, if we're talking about one loop,
5    yes, pulled.
6        Q.  So when we're saying one loop, let's
7    always assume that's 360 degrees.
8        A.  Okay.
9        Q.  Okay?  'Cause that's what you're saying;
10   right?
11       A.  Well, yeah, with traction, one loop
12   pulled back here.  Now, that didn't necessarily --
13   that could have been a U shape around the neck, see
14   what I'm saying there?  So like a loose -- loose --
15   loose part on one end and the part that goes to the
16   bed in the other, and pulled U shape.  So that
17   wouldn't be 360, but that would also account for
18   the physical finding of the partial furrow.
19       Q.  Okay.  So you're saying one way you -- he
20   could have died was the U-shaped?
21       A.  Right.
22       Q.  That someone -- and that would be someone
23   holding both ends of the string?
24       A.  Yes.

163

1        Q.  You're saying another way he could have
2    died is that it was wrapped multiple times around
3    his neck, but only one of the --
4        A.  Loops.
5        Q.  -- loops from the string was pulled?
6        A.  Correct.
7        Q.  Okay.  And is there another option?
8        A.  I think the other option would be either
9    of the two that -- or the first one that we
10   discussed, just the U shape around the neck, now
11   death has occurred, now other loops are put around
12   the neck.
13       Q.  So the U shape and then it's multiple
14   times?
15       A.  Right.
16       Q.  Or it's multiple times and only one band
17   was wrapped?
18       A.  Right.  And just to be clear, what I'm
19   trying to put together here is the single discrete
20   furrow and the father's history that he found
21   multiple loops around the neck.  So how do you put
22   those two things in the same box?  And those are
23   the ways that I can think of doing it.
24       Q.  But as you sit here today, you can't tell

164

1    me whether he was killed by this U-shaped; right?
2        A.  Right.  I think that's not knowable.
3        Q.  And you can't tell me whether it was
4    multiple times around the neck with one band being
5    pulled?
6        A.  Right.  Between those two, either would
7    account for the physical findings and the father's
8    findings.  And they would both be consistent with
9    being fatal.
10       Q.  Is there any other evidence you have to
11   indicate how Jaqueri died in this case?
12       A.  Well, there were the soft findings,
13   again, the petechiae, the abrasions in the mouth,
14   the subcutaneous muscular hemorrhages on the back
15   that I think kind of add up to a scenario like you
16   see on my last page there.  But in terms of
17   you're talking about mechanism of death, I think
18   pretty much narrowed it down to that furrow around
19   the neck.
20       Q.  I'm sorry, can you repeat what you said
21   about the soft findings you had?
22       A.  So hard finding versus soft finding,
23   okay?
24       Q.  So tell me what a hard finding is.

165

1        A.  Sure.  So the hard finding is a ligature
2    furrow, all right?  That's pretty much
3    incontrovertible, and we know that's consistent
4    with the band.
5        Q.  Right.  Let me cut you off real quick so
6    we can be on the same page.  So what you're saying,
7    there's a hard finding that the ligature furrow
8    that's demonstrated on the body indicates basically
9    with -- that this was -- the death was caused by
10   the elastic band?
11       A.  By that ligature, sure.  In other words,
12   if we found him someplace else with no ligature at
13   all, that furrow would still speak for itself.
14       Q.  Okay.  So that's a hard finding, meaning
15   -- okay, you have --
16       A.  Right.  Maybe definitive is a better word
17   for that.
18       Q.  It's a definitive finding.  Okay.  And
19   you're saying now there's soft findings.  What do
20   you mean by that?
21       A.  Right.  So the abrasion inside the mouth,
22   the muscular hemorrhages under the skin of the back
23   in an active three-year-old could be explained
24   other ways, all right?  Could you get injuries to

42 (Pages 162 to 165)

Brian Peterson, M.D.    March 11, 2016

166

1    the inside of the mouth from any other mechanism
2    aside from, say, being pushed into the floor?
3    Sure. You know, could you bite the inside of your
4    mouth? You know, that childhood trauma kind of
5    stuff. So I would say those findings are
6    suggestive but not diagnostic, whereas the furrow
7    is diagnostic.
8        Q. Okay. So in this case, the findings you
9    made regarding the injuries in the back and
10   shoulder muscles and the mouth are not diagnostic?
11       A. They're not diagnostic. All they're
12   doing for me is they're additive, okay? So when
13   you take those in association with the furrow, in
14   association with the petechiae, that's how I'm
15   getting to homicide versus accident or suicide.
16       Q. Bu you would agree that those injuries in
17   the muscles could have been caused by accident?
18       A. Sure. If they had been there by
19   themselves, they probably wouldn't have even been
20   noticed.
21       Q. Okay. So in forming your opinions in
22   this case, you relied on Dr. Denton's autopsy
23   report and pictures; right?
24       A. I did.

167

1        Q. And you relied on copies of his
2    Kodachromes; right?
3        A. They were probably Ektachromes
4    specifically, but I did.
5        Q. Ektachromes?
6        A. It's a slide film.
7        Q. Got it. You also relied on Dr. Denton's
8    deposition testimony?
9        A. To a certain extent. I thought that
10   he -- you know, there are times where -- there's
11   only so much room in an autopsy report. So when
12   you're being questioned, you have a chance to
13   explain your opinion a little bit more fully. I
14   saw nothing there that was inconsistent with what
15   was in his autopsy report that was helpful in that
16   regard.
17       Q. Okay. Did you notice any times that his
18   testimony changed in his deposition?
19       A. You'd have to give me a specific example.
20   I'm not sure.
21       Q. Okay. Do you know whether he ever
22   changed any of his opinions or findings in this
23   case?
24       A. I think there was some discussion early

168

1    on about manner of death in this case. I think at
2    first he viewed it as an accident, and then changed
3    to homicide. That wasn't so much an autopsy
4    finding, though.
5        Q. Okay. Why wasn't that an autopsy
6    finding?
7        A. I mean, it's not an autopsy diagnosis
8    specifically. I mean, the cause of death didn't
9    change, but his view of the manner of death did.
10       Q. And would you agree that he based his
11   manner of death diagnosis solely on the confession
12   he read in this case?
13       A. I don't know. Yeah.
14       Q. You didn't read that in the deposition?
15       A. Well, again, I know what I read, but then
16   what was actually going on in his head, I don't
17   know.
18       Q. Okay. Well, what did he say about it in
19   his deposition?
20       A. Well, clearly, I mean, he talked about
21   having heard about the confession in his discussion
22   with the police and so forth. I get that. But --
23   and that absolutely informs our opinion, you know.
24   It's common knowledge in forensic pathology that

169

1    the autopsy is the autopsy, but other material can
2    be developed long after the autopsy.
3            So -- but what that process was
4    at the Cook County office and the staff that he
5    interacted with, you know, my impression was that
6    his impression and the staff's impression regarding
7    the manner was different at the outset. But again,
8    that's just how offices work too.
9        Q. If any of his findings changed as
10   regarding the physical or pathological evidence,
11   would that concern you in this case?
12       A. Depends. I mean, is it possible to miss
13   something the first time? I guess that would be
14   possible. And it may be that with my own trainees,
15   I'll see things that they won't see simply because
16   I have a lot more experience than they do. So it
17   wouldn't necessarily be a matter of concern. It
18   would depend specifically on what you're talking
19   about.
20       Q. Well, did you see any things in this case
21   that Dr. Denton didn't see?
22       A. Well, I didn't see this case in the sense
23   that I wasn't in the room. And my policy, when I'm
24   reviewing somebody else's autopsy, is that I'll

43 (Pages 166 to 169)

Brian Peterson, M.D.   March 11, 2016

170

1  take their description of the physical findings
2  pretty much at face value, because they were there
3  and I wasn't. I may interpret those findings
4  differently, but those findings are pretty much all
5  that I can really go on.
6      Q.  Are you aware that he testified in the
7  criminal proceeding in this case?
8      A.  I don't think I ever read criminal stuff
9  as I reviewed this case. All I had was his
10  deposition. So if there was criminal testimony, I
11  didn't have it.
12      Q.  Well, in this case he testified in
13  October of 2005, a few months after he did his
14  autopsy, regarding the findings he had in this
15  case. Would you think that that testimony was more
16  accurate because it was closer in time to the date
17  of the autopsy itself?
18      A.  You know --
19      MR. KAMIONSKI:  Objection, calls for
20  speculation.
21      THE WITNESS:  Yeah, I'd be speculating.
22  I can tell you my own practice. Closer temporally
23  is good, but by the same token, that's how we
24  create autopsy reports. As you've noticed today,

171

1  we've done a lot of cases; you can't bring
2  everything back to mind, especially when cases have
3  happened years ago. Reading one's own autopsy
4  report or somebody else's is very helpful for that
5  reason. So maybe, maybe not.
6      You know, could you misstate
7  something at testimony close to the autopsy? You
8  bet. You know, could I make a mistake? Sure I
9  have. Can you get it better later on after reading
10  through your report? Sure you could. So I could
11  see it happening either way.
12  BY MS. MOGUL:
13      Q.  But in this case, you don't think he read his report
14  prior to testifying in a criminal case?
15      A.  I can't speak --
16      MR. KAMIONSKI:  Objection, calls for
17  speculation, argumentative.
18      THE WITNESS:  Yeah, I can't speak for
19  him.
20  BY MS. MOGUL:
21      Q.  So let me ask you this. Before you
22  testify in a criminal case, do you read your
23  autopsy report?
24      A.  I do.

172

1      Q.  I mean, wouldn't you say that's pretty
2  standard for you to read your autopsy report before
3  you hit the stand in a criminal case?
4      A.  For me, it is.
5      Q.  So, you know, you provided some
6  speculation that ten years later you may be better
7  at testifying with respect to the accuracy of one's
8  autopsy examination versus closer in time. But
9  that's, again, speculation; right?
10      A.  Well, I mean, you asked me which way that
11  could go. And, you know, I have been -- I have
12  testified before where judges said you can't use
13  your autopsy report, you have to do it from memory
14  on the stand. Other times I've had my autopsy
15  report with me. So depending on the circumstances,
16  you can see how that would make a difference.
17      Q.  Sure. So let me -- well, in this case do
18  you have any interest in reading his testimony from
19  the trial?
20      A.  No, because I have his autopsy report,
21  and I'm basing my findings on his autopsy report,
22  and also on the father's history who found his son
23  deceased. So his trial testimony, I don't think,
24  would particularly be helpful.

173

1      Q.  Okay. But in this case, you in fact did
2  rely on Dr. Denton's testimony from his deposition
3  in formulating your opinion?
4      A.  I think my opinion would have been the
5  same thing just based on the autopsy report. As I
6  said, his deposition simply buttressed or
7  reinforced that. I didn't change anything after
8  reading his deposition.
9      Q.  So you read the deposition of Stefan
10  Dancy?
11      A.  I did.
12      Q.  And what specifically did you rely on
13  with respect to Stefan Dancy's testimony?
14      A.  He talked about the multiple loops around
15  the neck. And that stood out in my mind because
16  there was a single ligature furrow. So that was
17  something that I had to work through in my own head
18  in terms of explaining how this would have
19  happened.
20      Q.  Did you describe how that would happen in
21  your opinion?
22      A.  Oh, well, at the end there, I'm talking
23  about single versus a non-complex furrow.
24      Q.  Right.

44 (Pages 170 to 173)

Brian Peterson, M.D.   March 11, 2016

174

1    A.  And under point number two on page 6, I
2  go into some discussion about that.  But I can't be
3  specific.  And you know that because of the
4  questions that we just went through.  Could it have
5  been multiple loops at the beginning, one loop,
6  multiple loops after.  Any of those could have been
7  true.  So because I don't have a specific way that
8  it must have happened, I'd just as soon do like
9  this, you know, talk about it while being asked.
10    Q.  Okay.  But so you relied on the father's
11  testimony as to the circumstances in which he found
12  Jaqueri --
13    A.  Right.
14    Q.  -- with the multiple loops of the elastic
15  band around his neck?
16    A.  Correct.
17    Q.  And did you believe -- did you -- I mean,
18  do you believe that his testimony with respect to
19  the way he found Jaqueri was accurate?
20    A.  Well, he was certainly consistent in that
21  regard, so -- both at trial and in deposition, he
22  was consistent about the multiple loops, even down
23  to I couldn't get my finger beneath them.  And I
24  thought that would have been a funny thing to, I

175

1  don't know, probably make up is too strong a word,
2  to misremember.  So I thought that was -- that was
3  likely accurate.  I think, again, if you look at my
4  point number two, though, I think I can explain how
5  that's possible, physically possible.  And that
6  was -- that was basically my job.
7    Q.  Anything else in his testimony other than
8  how he found Jaqueri?
9    A.  No, just -- again, when you say how he
10  found, there were a couple issues there.  One is
11  multiple loops, the other is the tightness.
12    Q.  Okay.  Was the fact -- and you read his
13  trial testimony, and Mr. Dancy testified during the
14  trial that he had, prior to this incident, seen
15  Jaqueri play with the elastic band from the bed
16  sheet.
17    A.  Right.
18    Q.  And he had seen him put it in his mouth
19  and roll on the bed and have it roll -- wrapped
20  around his neck?
21    A.  I think he even talked about disciplining
22  him after that.
23    Q.  Right.  Did that in any way influence
24  your opinion in this case?

176

1    A.  I think it helped me to understand where
2  that elastic band came from.  Because when I first
3  looked at this case, I heard sheet, not elastic
4  band.  And it didn't quite make sense with the
5  single discrete furrow.  So having heard that
6  testimony, now I got it, where why is there even
7  elastic band around.  So that made sense.  But
8  that's about as far as it went.  I mean, ultimately
9  the physical finding was the physical finding.
10    Q.  Was it instructive to you that this child
11  had previously wrapped this elastic band around his
12  own neck before?
13    A.  No, because he didn't die before, did he?
14    Q.  But the fact that the child had
15  previously played with his elastic band before, and
16  wrapped it around his own neck, wouldn't that lead
17  to a possibility that he could have done this to
18  himself?
19    A.  Well, in other words, could this have
20  been a hanging accident.  That's, I think, what I
21  address with the rest of my report.  And for
22  reasons that we've pretty much gone through, I
23  think it's more consistent with death at the hands
24  of another.  You know, hypothetically, is that

177

1  possible?  I just can't make the physics work.
2  That's the problem.
3    Q.  And how can't you make the physics work?
4    A.  Well, think about it.  If it were just
5  the U shape around the neck, you couldn't put
6  enough traction by yourself.  If it were multiple
7  loops around the neck and you had enough traction,
8  you should have a complex furrow.  It just doesn't
9  work.  It just doesn't work by physics.
10    Q.  What did you rely on with respect to
11  Jaqueri Dancy's medical records from Our Lady of
12  Resurrection?
13    A.  Rely, not so much.  They did mention in
14  the emergency department record that it was a
15  partial furrow around the neck, and that was
16  consistent with what Dr. Denton had described.  So
17  again, it more buttressed my opinion there.  It
18  corroborated it.
19    Q.  Okay.  One of your opinions in this case
20  is that you believe that this is a homicide --
21  well, okay, in -- strike that.  You say that you
22  believe this is more consistent with a homicide,
23  meaning it was more at the hands of another, based
24  on various findings you made in your opinion;

45 (Pages 174 to 177)

Brian Peterson, M.D.    March 11, 2016

178

1  right?
2      A.  That's correct.
3      Q.  And I'll get to those findings.  But in
4  this case, who was -- who was the hand of the other
5  in this case?
6      A.  I have no way to tell you that from
7  autopsy.
8      Q.  Okay.  And can you tell us whether this
9  was a crime or not?
10     A.  Well, I mean, I don't have an expert
11 opinion there; I'm not an attorney.  But to say
12 that somebody else was involved in the
13 strangulation death of a young boy, that pretty
14 much sounds like a crime to a layperson with
15 respect to the law.
16     Q.  Okay.  If it was by another child, would
17 it be?
18     A.  Oh, sure.  I mean, there may not be
19 culpability there, but it's still death at the
20 hands of another.  Beyond that, it's not mine to
21 decide.
22     Q.  In this case, you have no idea who may
23 have -- if it was done by another, you have no idea
24 who would have done it?

179

1      A.  Well, let's just say, based on the whole
2  circumstances of the case, I have an idea.  But I
3  have no evidence from autopsy to tell me who must
4  have done this.
5      Q.  Okay.  And -- okay.  So you've described
6  how you believe the ligature was around Jaqueri's
7  neck, okay?
8      A.  I've explained how pressure was put on
9  the neck.
10     Q.  Right.
11     A.  And I've explained different ways it
12 could have been around the neck to end up the way
13 his father found it.  I'm not definitive on how it
14 must have been.
15     Q.  Right.  So in fact you can't tell us how
16 precisely Jaqueri died?
17     A.  How he died.  Well, I can in the sense
18 that he died as traction was being placed on a
19 single loop around his neck by another person.
20 What I can't tell you is, at that moment, were
21 there multiple loops around his neck or were those
22 put on later.  That I can't do.
23     Q.  What position was Jaqueri in when this
24 happened?

180

1      A.  What I can tell you for sure is that the
2  pull came from behind him, and I think slightly to
3  his right, based on where the gap was.  But whether
4  he was face down, which would account for the
5  mucosal abrasions and the back injuries, whether he
6  was against a wall, whether he was standing up,
7  that I can't say.  I think there's no physical
8  evidence one way or the other.
9      Q.  Can you tell us how long it took for
10 Jaqueri to die?
11     A.  No, I think that's variable and very
12 individual.  I think it was probably -- it wasn't
13 instant, in the sense that there were good
14 petechiae, and that takes some time to form.  But,
15 you know, how many minutes, say, I think it's not
16 knowable.
17     Q.  Isn't it fair to say that there's some
18 degree of speculation you are making in trying to
19 determine the actual way that he died?
20     A.  I wouldn't use the term speculation.  I
21 would say that there is reasonable uncertainty as
22 to some of the specifics, as we just talked about
23 position, for example.  I think that's probably
24 less important than the fact that I believe this

181

1  was done by somebody else.  So the exact position
2  probably isn't a big deal in that regard.
3          But I think some of those things
4  are not knowable.  I can tell you consistent with
5  or not consistent with.  In my world, I don't call
6  that speculation, though, it's just looking at the
7  same set of facts and saying this could be
8  possible, that could be possible.
9      Q.  Okay.  So one of the things you're saying
10 is that you believe that this is -- that Jaqueri's
11 death was consistent by another individual based on
12 the angle of the ligature impression found on
13 Jaqueri's neck?
14     A.  That is one factor, sure.
15     Q.  Okay.  And in doing that, you're relying
16 on a conclusion that Dr. Denton made in his
17 deposition where he said, "I would say the only
18 thing that could indicate a homicide would be the
19 nature of the ligature that was horizontal, because
20 that is inconsistent, basically, with a hanging";
21 right?
22     A.  No, I'm actually relying on the autopsy
23 report, where he gives specific measurements.  And
24 based on those specific measurements as a near

46 (Pages 178 to 181)

Brian Peterson, M.D.   March 11, 2016

182

1  horizontal furrow, he reaches a conclusion that he
2  states in his deposition.  But had I not even had
3  that deposition, I'd be reaching the same
4  conclusion based on his measurements.
5      **Q.  But to be clear in terms of your opinion,**
6  **you in fact quoted Dr. Denton with respect to that**
7  **finding?**
8      A.  Oh, sure, just to point out that we
9  agreed.
10     **Q.  Okay.  So in this case, is it your belief**
11 **that this -- this ligature impression was**
12 **horizontal?**
13     A.  It's not precisely.  It's near
14 horizontal.  It certainly isn't canted upward like
15 you see in a typical hanging.
16     **Q.  So -- all right.  So there is an angle to**
17 **the ligature impression?**
18     A.  Right.  It's a small one, though.  We've
19 got 7.5 inches below the top of the head of the
20 left ear, seven in the anterior midline, seven by
21 the right ear.  So generally with a hanging, with
22 any kind of -- any degree of suspension at all,
23 it's much more pronounced than that, and it's
24 uniform.

183

1      **Q.  Okay.  But there was a slight degree --**
2  **there was a slight angle to this impression?**
3      A.  There was.  Very slight.
4      **Q.  You know -- in terms of this case,**
5  **though, with respect to Jaqueri Dancy's death, you**
6  **also cannot tell us whether it was one person**
7  **involved or more than one person?**
8      A.  All I can describe is his injuries.  If
9  somebody were pulling the cord, and somebody else
10 was holding him down, there's no physical findings
11 to support that or to refute it.
12     **Q.  Okay.  So you can't say one way or**
13 **another whether it was one, two, or more people?**
14     A.  Right.  I think it's not sayable.  Not
15 from the autopsy, anyway.
16     **Q.  Let me be clear.  Dr. Denton, in his**
17 **deposition, made it clear that he did not believe**
18 **the physical or pathological evidence said with**
19 **certainty whether this was an accident or homicide.**
20 **Do you agree with that?**
21     A.  Well, again, if you look at what I quoted
22 here --
23     **Q.  Right, you quoted one sentence out of a**
24 **200-page deposition.**

184

1      A.  Sure.
2      **Q.  Did you also read in the deposition --**
3          MR. KAMIONSKI:  Let --
4  BY MS. MOGUL:
5      **Q.  Did you also read in the deposition where**
6  **Dr. Denton said that based on the autopsy findings**
7  **alone, he could not -- he would say the cause of**
8  **death was undetermined?**
9      A.  No, he -- you're misquoting.  He said the
10 manner of death.
11     **Q.  I'm sorry, you're right.  I agree.  So**
12 **you read in the deposition where Dr. Denton said**
13 **that the manner of death was undetermined based on**
14 **the autopsy findings alone?**
15     A.  Again, if you show me that specific line,
16 at that point I would say that we disagree.  Yeah,
17 I would say it's more consistent with homicide.  I
18 would not call it undetermined.
19     **Q.  Okay.**
20         MR. KAMIONSKI:  How much left on the
21 tape?
22         THE VIDEOGRAPHER:  I'm sorry?
23         MR. KAMIONSKI:  How much time left on the
24 tape?

185

1          THE VIDEOGRAPHER:  14 minutes on this
2  disc.
3          MR. KAMIONSKI:  Okay.  Just waiting for
4  the bathroom break time.
5          THE WITNESS:  Those $0.65 soft drinks.
6  You said it was going to happen.
7          MS. MOGUL:  Go ahead, take the break now.
8          MR. KAMIONSKI:  Thank you.
9          THE VIDEOGRAPHER:  This ends disc number
10 two of the video deposition of Brian L. Peterson,
11 M.D., on March 11, 2016.  The time, 12:34 p.m.
12          (Break taken.)
13          THE VIDEOGRAPHER:  This is the beginning
14 of disc number three of the video deposition of
15 Brian L. Peterson, M.D., on March 11, 2016.  The
16 time, 12:42 p.m.
17 BY MS. MOGUL:
18     **Q.  So Dr. Denton testified at his**
19 **deposition, he was asked this question: "And I**
20 **guess what I want to be clear about is there was no**
21 **physical or pathological evidence that indicated**
22 **that Jaqueri's death was not accidental at the time**
23 **you completed this autopsy?  ANSWER:  That's fair."**
24 **So in essence he's saying that he**

47 (Pages 182 to 185)

Brian Peterson, M.D.   March 11, 2016

186

1  doesn't believe the physical or pathological
2  findings indicate that this was a homicide over an
3  accident.  Are you saying you disagree with that,
4  with his conclusion in this case?
5      A.  I don't think that was his conclusion,
6  that was his answer to that question.  And we know
7  that later on, he pointed out a lot of factors that
8  would be consistent with homicide that I agree
9  with.  So --
10     Q.  What other factors -- so what factors did
11 he indicate?
12     A.  Well, I had them listed in my report.
13     Q.  Okay.  Please --
14     A.  So that being the case, I think it
15 depends on timing and when the question is asked
16 and the flow of things.  You know, if I were to ask
17 Dr. Denton, which I haven't, today, what he thinks
18 about this case, he might have something different
19 to say; he may not, you know.  My point is, is that
20 by looking at these different physical factors from
21 the autopsy, I think they point to homicide.
22         I think looking at the individual
23 factors, at least a couple of them, Dr. Denton
24 would agree with that.  We can go to point number

187

1  one, that would be the horizontal nature of the
2  furrow.  We could point to -- we could look at
3  point number two, the fact that it was consistent
4  with the single loop theory.  And we could look at
5  point number four there, the fact that there were
6  more petechiae.
7          Where that all adds up to in
8  Dr. Denton's head as of this day, I don't know.  I
9  can tell you where it is in mine, though, and
10 that's obviously homicide.
11     Q.  So in terms of the deposition, though,
12 you're saying that his answers changed depending on
13 the question that was asked?
14     A.  I don't know.  You're reading me one
15 excerpt from what you said was a couple
16 hundred-page deposition.  And I know how
17 depositions go, and it depends on the specific
18 question you're asked.  That one referred to at the
19 time of the autopsy.  Maybe if it had been said
20 well, once all was said and done, you considered
21 all the facts, would your opinion have changed.  I
22 don't know if he was ever even asked that.  So
23 depends.
24     Q.  But you don't recall him being asked

188

1  those questions during this -- this deposition?
2      A.  I don't -- I don't recall.
3      Q.  Okay.  So he was asked this question:
4  "QUESTION:  Right.  So based on the autopsy
5  findings, if you had to base it just on the autopsy
6  findings alone, would you say the manner of death
7  would be undetermined?  ANSWER:  Right.  Like the
8  body in a vacuum or the body without any
9  circumstances?  QUESTION:  Yes.  I would say by
10 default it's undetermined."  That's Dr. Denton's
11 testimony at his deposition.
12     A.  Dr. Denton -- yeah, I understand.
13     Q.  Okay.  You're saying you disagree with
14 his finding or his testimony in that instance?
15     A.  Again, yes, in the sense he's being asked
16 a very specific question there, and that really is,
17 is it possible to form an opinion based on an
18 autopsy in a vacuum.  I mentioned that very issue
19 to Mr. Kamionski when we started out this
20 consultation.  So that whole issue of trying to
21 perform an autopsy with no information at all is a
22 pressing issue in forensic science.
23         To his answer there, I think he's
24 answering that specific question.  So that's a

189

1  different question than what's your opinion of this
2  case overall.  And obviously we have to take things
3  like history into account.
4      Q.  Okay.  So, I'm sorry, you said you asked
5  Dr. Kam -- or strike that.  Not doctor.
6      A.  Congratulations.
7      Q.  You asked Mr. Kamionski at the outset of
8  this case about whether you could just look at the
9  body alone to make a determination as to manner of
10 death?
11     A.  What I was mentioning was, to him, that,
12 as I said in my report, cause of death generally
13 derives from the autopsy; manner of death relies a
14 lot on history and investigation.  My whole point
15 was the current issue of cognitive bias in forensic
16 science, and that you can't really apply that to
17 forensic pathology, because just as clinicians need
18 a physical and history, we need history in the
19 autopsy examination.  That's the point that I'm
20 making.
21     Q.  So what did you -- in making your
22 determinations that this was a homicide versus an
23 accident, what beyond the autopsy findings did you
24 use to making your determination?

48 (Pages 186 to 189)

Brian Peterson, M.D.    March 11, 2016

190

1      A.  Oh, as best I can tell from the history,
2   this child was found on the floor, with the
3   ligature still attached up to the bed.  That would
4   be consistent with a canted furrow, which he didn't
5   have.  And then we have the multiple loops that
6   we've already talked about.  So those are the
7   things from the history and the investigation that
8   I took into account.
9      **Q.  Okay.  So let me be clear.  Beyond the**
10  **picture of where Mr. Dancy believed that Jaqueri**
11  **was found in relation to the bed, right, is there**
12  **any other findings or any other evidence you relied**
13  **on in coming up with your opinions beyond the**
14  **autopsy and the pictures of the autopsy**
15  **examination?**
16     A.  Well, autopsy, autopsy pictures, and then
17  his description of how he found his son and where
18  that cord was attached to.
19     **Q.  Okay.  But how he found his son and how**
20  **his cord was attached to him, how does that -- how**
21  **did that influence your determination as to manner**
22  **of death?**
23     A.  Oh, just that if -- if it had been -- if
24  you accepted that at face value, then it should

191

1   have been a canted furrow.  And also, if you
2   accepted that at face value, you have a real issue
3   with there being a single furrow and not multiple.
4   That was simply inconsistent.  So the question is,
5   how do you explain those inconsistencies.  And I
6   believe the best explanation is, there are other
7   things in operation here.  Those other things are
8   somebody else who actually did the killing, see.
9      **Q.  You keep saying canted furrow.**
10     A.  Yeah.
11     **Q.  What does that mean?**
12     A.  Slanted.  Canted upwards.
13     **Q.  Okay, I got it.**
14     A.  So if we accept this all at face value,
15  the point of suspension was up there at the top of
16  the bunk bed, he's down below and a little bit of a
17  distance from the bunk bed.  So if that were all
18  true, and it was just an accidental death, that
19  furrow should have been angled upwards towards the
20  point of suspension, and it wasn't.
21     **Q.  But in this case, the cord was wrapped**
22  **around his neck in such a manner that it cut off**
23  **circulation and started to lead to him being -- it**
24  **could have led to him being unconscious before**

192

1   dying; right?
2      A.  That would be -- that would be like
3   asking can you strangle yourself.  You can't.
4   So -- you can't maintain pressure to the point of
5   death on yourself.  So physically, because that
6   thing, the cord, is only attached to one end, you
7   just can't do it.  I mean, if you were to maybe
8   wind around and around and around and then fall
9   down, you're still going to produce a canted furrow
10  and a complex furrow.  He didn't have either.  So
11  it just doesn't fit.
12     **Q.  But why in this case do you believe that**
13  **it would have to have multiple furrows?**
14     A.  Well, his father describes multiple loops
15  around the neck.
16     **Q.  But in this case, didn't he --**
17     A.  If those multiple loops had all been
18  under tension, there would have been a complex
19  furrow.  That's how it works, okay?  How do I know
20  that?  Because I've taken lots of complex ligatures
21  off the neck, so you have a complex furrow.  As I
22  pointed out, either pinch points in between loops
23  or multiple loops impressed on the skin.  He had a
24  single, well-defined furrow with a gap at the back.

193

1   That's simply not consistent with pressure being
2   applied to multiple loops.  Can't work.
3      **Q.  In this case, it's your -- is it your**
4   **belief that -- well, in this case, you can't tell**
5   **us whether the elastic band was wrapped multiple**
6   **times around Jaqueri's neck or only partially**
7   **around his neck, causing -- leading to his death?**
8      A.  Two separate questions.  Was it wrapped
9   multiple times around the neck?  I think it was,
10  based on his dad's testimony.
11     **Q.  Right.**
12     A.  There was no physical evidence of that,
13  in that there was only a single ligature furrow.
14  But that's what his father said a couple different
15  times, and in great detail.  So -- so that much I
16  get from -- from his testimony.  When you say
17  causing death, that gets us back to my original
18  point, tension on one loop must have caused death.
19  Whether there was more than one loop at that time,
20  or loops added later, I think it's not knowable
21  based on the physical evidence.
22     **Q.  In this case, do you believe that the**
23  **ligature made an impression on the right side of**
24  **Jaqueri's neck?**

49 (Pages 190 to 193)

Brian Peterson, M.D.   March 11, 2016

194

1    A.   Partially.  I mean, there was a gap, all
2  right?  So it was partially on the right side, up
3  to about the point of the external auditory meatus.
4  But once you got past that, there was a gap.
5    Q.   Where did the gap begin on the other
6  side?
7    A.   I think it was near the occiput.
8    Q.   Which is what?
9    A.   I'm sorry.  The back bone in the head
10  there.
11    Q.   Okay.  So there was a gap between the
12  right ear and the --
13    A.   And the posterior midline, put it that
14  way.  I think in the emergency room they said about
15  60 percent.  So maybe even a little more of a gap
16  across the back there.  And again, that would be
17  consistent with that U shape we talked about too.
18    Q.   You're aware of the testimony that the
19  father gave that when he found Jaqueri, the elastic
20  band was wrapped multiple times around his neck;
21  right?
22    A.   I am.
23    Q.   And that it was so many times and so
24  tight that he couldn't find a loose end of the

195

1  string?
2    A.   Right.
3    Q.   And that he had to completely unwrap it
4  in order to find the loose end of the string?
5    A.   Yes.
6    Q.   And you credit that testimony?
7    A.   I do.
8    Q.   Now, in this case you're also aware that
9  Dr. Denton said that the mark made -- so in this
10  case, to be clear, there was, on the left side of
11  his neck, a patterned dark furrow; right?
12    A.   There was a dark furrow that had one edge
13  that matched the pattern of the elastic band.
14    Q.   But on the right side of his neck there
15  wasn't the dark furrow, but there was a pale
16  impression that one could see.
17    A.   Exactly.
18    Q.   Right.  It wasn't in fact that furrow,
19  though, was it?
20    A.   Right.  But that's how we know that it
21  was pulled this way.  Because when you think about
22  it, if you've got that U shape, and you're pulling,
23  where's the biggest pressure -- where's the most
24  pressure in the pattern going to be?  Opposite to

196

1  it.  So that fits perfectly.
2    Q.   Agreed.  In this case, though, there was
3  in fact an indication that the elastic band was
4  wrapped around the right side of Jaqueri's neck
5  even though there was no marked furrow.
6    A.   Certainly the elastic band touched the
7  right -- when you said wrapped around, you can't
8  really wrap around one side.  There was certainly
9  contact.
10    Q.   There was contact on the right side of
11  the neck?
12    A.   Right.
13    Q.   And there was contact on the left side of
14  the neck?
15    A.   Right.
16    Q.   There's only a little gap of the lack of
17  a pale impression or a dark furrow on a little
18  portion behind the neck?
19    A.   Well, if you believe the emergency room,
20  40 percent.  If you believe Dr. Denton, he measured
21  a little bit.  But there was most certainly a gap.
22    Q.   Did the emergency room look for a pale
23  impression?
24    A.   Pale impression.  They just said they saw

197

1  something on about 60 percent of the neck.  I don't
2  think they used the term "pale impression."
3    Q.   But Dr. Denton in fact used the term
4  "pale impression."
5    A.   Sure.  He's a forensic pathologist.
6    Q.   Right.  And he said he found a pale
7  impression on the right side of the neck.
8    A.   Right.
9    Q.   And all I'm getting at is that indicated
10  that the ligature was touching the right side of
11  Jaqueri's neck, but it didn't have that patterned
12  furrow that the hospital noted that was 60 percent
13  around the neck.
14    A.   Well, the patterned -- the pattern was
15  something that Dr. Denton described and
16  photographed that was consistent with the edge on
17  that elastic.
18    Q.   Right.
19    A.   The way elastic is, I wouldn't
20  necessarily expect to see that uniformly around the
21  whole neck.  So the fact that there was a pale
22  furrow on the right and not that pattern, I'm fine
23  with that.  To me, all that indicates is that there
24  was contact on those portions of the neck.

50 (Pages 194 to 197)

Brian Peterson, M.D.    March 11, 2016

198

1       As I said, that would be quite
2   consistent with that U shape being pulled, or being
3   pulled. It would also be consistent with that
4   being pulled with other loops looser around the
5   neck. What I can say for sure is there was only
6   physical evidence on the neck of pressure on one
7   loop. If it had all been wrapped tight, it would
8   have been a complex, or multiple, furrow.
9       **Q.  Well -- okay.  I just want to get back to**
10  **this, though.  The dark furrow, right, or the**
11  **ligature mark, let's describe that --**
12      A. The whole thing's a ligature mark.
13      **Q.  You're right, the whole thing is a**
14  **ligature mark.  Okay.  There's just some part of**
15  **it, though, where you can see the actual line from**
16  **the ligature; right?**
17      A. Well, no. You can see the line from the
18  ligature everywhere you see ligature furrow.
19  There's only part where you can see that notching
20  pattern on the edge.
21      **Q.  Okay.  So are you saying that you see the**
22  **ligature furrow on the right side of Jaqueri's**
23  **neck?**
24      A. Oh, sure, except once you get to the gap.

199

1   Obviously underneath that gap -- I mean, a gap
2   means there's no furrow. But everywhere else you
3   see a mark, that would be called a ligature furrow.
4       **Q.  Do you have the medical examiner's report**
5   **with you?**
6       A. No.
7       **Q.  Okay.**
8       MR. KAMIONSKI: Do you have it?
9       MS. MOGUL: You don't have it?
10      MR. KAMIONSKI: Here, I can get it for
11  him.
12          (Pause in the proceedings.)
13      MS. MOGUL: Let's use this for a second.
14      MR. KAMIONSKI: I can pull up the
15  pictures on my computer also, probably. Make
16  things a little clearer.
17          (Pause in the proceedings.)
18      THE WITNESS: This is a copy.
19      MR. KAMIONSKI: Yeah, I know, I know.
20  BY MS. MOGUL:
21      **Q.  I'm going to ask you to turn to page 66,**
22  **the last picture.  This is Exhibit 96Z that we**
23  **previously marked in this case.**
24      A. I'm having a hard time -- wait a minute

200

1   here. Are we looking at the same picture? 'Cause
2   I can't really read the Bates stamp against the --
3       **Q.  Yeah, that's it.  Do you see the**
4   **impression made from the ligature in this picture?**
5       A. I do.
6       **Q.  Where is that?**
7       A. It's about two-and-a-half centimeters
8   above the edge of the scale.
9       **Q.  Can you point towards the camera and**
10  **point to it on the picture, please?**
11      A. Can you see that okay over there? Okay.
12  Right here.
13      **Q.  Now, is that the impression --**
14      MS. SUSLER: His hand's in the way of the
15  camera.
16      MS. MOGUL: Where your pinky is.
17      THE VIDEOGRAPHER: I can't see with the
18  hand there.
19      THE WITNESS: How's that? Right there.
20  BY MS. MOGUL:
21      **Q.  Yeah.  Now, are you pointing towards that**
22  **line you see on the picture?**
23      A. Yes, the ligature furrow.
24      **Q.  Is that the -- okay.  Are you -- okay.**

201

1   **Is that a TRAM mark there?**
2       A. A what?
3       **Q.  A TRAM mark.  TRAM.  Have you heard the**
4   **word TRAM?  TRAM.**
5       A. Not in this context. You mean like a
6   train?
7       **Q.  No, no, no.  It's a --**
8       A. What's a TRAM mark?
9       **Q.  You've never heard that?  Okay.  I've**
10  **heard other pathologists use the word TRAM mark.**
11  **Train.**
12      A. No, I understand, I just, I've never used
13  that with respect to a ligature furrow.
14      **Q.  Okay.  In this case, I mean, is that the**
15  **pale impression from the mark there from the**
16  **ligature?**
17      A. No, no. I was -- maybe you couldn't see
18  that I was pointing to this dark line.
19      **Q.  Yes.**
20      A. This is a lousy copy. This dark line,
21  and then continues onto the front of the neck, is
22  the ligature furrow.
23      **Q.  I see.  I just want to be clear.  Okay.**
24  **And -- okay.  So that -- that ligature furrow that**

51 (Pages 198 to 201)

Brian Peterson, M.D.   March 11, 2016

202

1  you're pointing to on the right side of the neck
2  there, right?
3      A.  Uh-huh.
4      Q.  That's thinner than the ligature furrow
5  on the left side of the neck?
6      A.  It is.
7      Q.  Okay.  Now, in this case, your belief
8  that this was -- this furrow was not complex,
9  composed of multiple lines around his neck, is
10  based on the idea that there were no pinch marks
11  found?
12     A.  That's one possibility that you can see
13  with multiple loops.  In other words, multiple
14  loops all with traction, there'll be uninjured skin
15  in between the loops.  That's the pinch marks.
16  Sometimes you'll see pale, red, pale, red, pale,
17  red.  The other possibility is that you'll just see
18  multiple furrows in the neck.  Depends on the
19  nature of the ligature and how close the loops are,
20  that sort of a thing.
21     Q.  Well, I'm going to ask you to look at
22  page 25 of this exhibit.
23     A.  All right.  Are we looking at the same
24  picture?

203

1      Q.  Yeah.
2      A.  Okay.
3      Q.  You see on the left side --
4          MR. KAMIONSKI:  I'm trying to pull it up
5  to follow you guys.
6  BY MS. MOGUL:
7      Q.  You see on the left side of that, of his
8  neck, there's two lines there, right, or two marks?
9  There's a line and another mark; right?
10     A.  I do.
11     Q.  You wouldn't say that the top line -- the
12  top mark there and the line below that's a pinch
13  mark?
14     A.  No.
15     Q.  Why not?
16     A.  You have to see a pinch mark to get it.
17  Pinch mark would be like pale, red, pale, and you
18  can see, not exactly petechial hemorrhage, but
19  certainly capillary-type hemorrhage in that
20  interval.  That's not what this is.
21     Q.  It looks pale, red, red, pale, red to me.
22     A.  Right, I get that.
23     Q.  But and --
24     A.  But that's not what it is.

204

1      Q.  And so what is that then?
2      A.  That's just -- that's just some red, some
3  pale.  But that's not what a pinch mark looks like.
4      Q.  How do you know that's not made from
5  multiple lines of the band being around his neck?
6      A.  Well, it'd have to be pretty much on top
7  of each other given the, how would you say it, one
8  end, all right?  So I guess if you place -- if you
9  had one loop around the neck and then precisely
10  place all the rest right on top of that, all right,
11  then that would look like a single furrow.  But
12  you'd have to have amazing precision to make that
13  happen.  I've never seen it.  For all the ligatures
14  I've taken off of necks, I've never seen that.
15     Q.  But it's possible that could have
16  happened in this case; correct?
17     A.  Well, you get to the point where if that
18  were so, then for that to work, the whole thing
19  would have to be canted, then, to make this
20  accident.  See what I'm saying?  So if you had
21  everything wrapped precisely, and now it's being
22  done by this little boy, the whole furrow would
23  have to be canted to account for the traction from
24  the bed.  It wasn't.  So it simply doesn't work.

205

1      Q.  But again, that's just based on your
2  conception that the only way this could have been
3  an accidental death if it was hanging.
4      A.  Well, to have enough traction for this to
5  be lethal, there'd have to be traction.
6      Q.  Okay.
7      A.  To have traction, you have to have pull.
8  And to have pull, you're talking about attached up
9  to the top of the bunk bed down to where he is.  I
10  go back to my analogy of trying to strangle
11  yourself to death.  You can't do it.
12     Q.  But in this case -- in this case, the
13  father said that when he found Jaqueri, the string
14  was wrapped multiple times around his neck, and it
15  was obviously wrapped several times around the
16  other layers because he could not find the free
17  end.
18     A.  Well, I'm not sure if that's so obvious.
19  What I know at the end of the day is there's a
20  single ligature furrow, okay?  So what that tells
21  me, if there were in fact multiple loops around the
22  neck, there couldn't have been traction on all of
23  them.  There would have had to have been extremely
24  precise placement to only cause one furrow.  And

Brian Peterson, M.D.   March 11, 2016

206

1  again, to have that happen, plus that point of
2  suspension, you'd have to have angling.  You don't.
3  It's just not consistent.
4      Q.  Well, I'm just saying -- back to this
5  picture.  How do you know the string wasn't, at
6  that point, around one part of his neck and then
7  another part of the string was around that part,
8  and it -- like there could be parts of the string
9  that overlapped a part -- and that spot on his
10  neck that didn't.
11      A.  Based on the pattern on the left side
12  with the jagged edge, that can't be, though.
13      Q.  Why?
14      A.  Because you have to eat your cake and
15  have it too.  What you'd be saying is, it's
16  precisely lined up geometrically on one part of the
17  neck, and yet it's splayed into multiple on another
18  part of the neck, and it's not canted.  You can't
19  have all those three things together.  It doesn't
20  work.
21      Q.  Well in this case, if the child had
22  wrapped it around his neck and -- a few times, and
23  then he -- and then it -- he fell or it pinched or
24  he stepped away and it pulled, that would cause him

207

1  to start losing consciousness; that could cause the
2  elastic to tighten; correct?
3      A.  Well, no, because you see, if he's
4  starting to lose consciousness, it's tight enough
5  already.  Now what you're saying is he loses
6  consciousness, then it falls and it tightens.  No,
7  it's already tight.  If it's already tight and he
8  falls, now it becomes canted.  And it wasn't.
9  That's the problem.
10      Q.  Okay.  So basically you're saying that --
11  I want to be clear.  In this instance, you're just
12  saying that you don't believe that that picture,
13  page 25, indicates that there were multiple loops
14  around the neck.  And if it -- and in your
15  testimony -- correct?  Let me just start there.
16  Right?
17      A.  Let me put it very clearly.  The best
18  portion of furrow that shows pattern on the left
19  side that has that sawtooth pattern on the top
20  indicates there was a single loop of tension
21  applied to it.
22      Q.  I understand that.  But you're saying
23  that you don't believe that there was -- okay.  You
24  don't believe -- I guess my thing is back to this

208

1  accident issue.  You don't believe it could be an
2  accident 'cause it's not decanted.  And maybe --
3      A.  Because it's essentially horizontal,
4  because it's not canted.
5      Q.  Okay.
6      A.  Because there are floored petechiae.  For
7  those three reasons, just with respect to the
8  injury on the neck, I don't believe it was an
9  accident.  Those three things together.
10      Q.  So just looking at that picture, to the
11  right of those two lines there that I'm going to
12  describe it as, do you see another bruise on the
13  neck there?
14      A.  No, I see skin fold.  But essentially, as
15  I said earlier, the posterior midline is where this
16  furrow disappears, and then we've got uninjured
17  skin.  And this is really kind of a lousy copy, but
18  Dr. Denton described the furrow as ending beneath
19  the right ear.  So that would be the gap.
20      Q.  Okay.  Would you say there was petechiae
21  or -- well, let me ask this.  Would you agree there
22  was redness found throughout the entire head?
23      A.  I am not even sure how to answer that.
24  Redness through the head?

209

1      Q.  Yeah, that his whole head, his whole head
2  and face was red.
3      A.  It was more brown.
4      Q.  Okay.  Was there petechiae found
5  throughout?
6      A.  Facial -- okay.  There were facial
7  petechiae that involved the entire face, sure.
8      Q.  Okay.  And I guess -- but just back to
9  this multiple lines issue.  I'm saying isn't it
10  possible that the string was wrapped multiple times
11  around his neck, and the reason we don't see the
12  multiple lines is because it folded over onto
13  itself?  And you're saying you don't think that's
14  possible?
15      A.  I believe there were multiple wraps
16  around the neck in accordance with his dad's
17  testimony.  I also believe that tension was only
18  applied to one loop, or U shape, to cause death.
19      Q.  Okay.  And I guess, do you believe that
20  the string overlapped on itself when it was wrapped
21  around his neck?
22      A.  I think the -- what we see on the left
23  side there is enough to say while there may have
24  been overlap, there's only tension applied to the

53 (Pages 206 to 209)

Brian Peterson, M.D.   March 11, 2016

210

1  one loop.
2      Q.  Okay.  So you're not in fact contesting
3  that this was wrapped multiple times around his
4  neck?
5      A.  I'm agreeing with the testimony, both at
6  deposition and at trial, based on how his father
7  found him, that there were multiple loops.  But
8  again, only tension on one caused death.
9      Q.  So in this case, the petechiae being
10  present, that indicates that his jugular vein, or
11  jugular veins, were cut off, but not the carotid
12  arteries; is that fair?
13      A.  I think that's the generally accepted
14  mechanism for petechiae, yes.
15      Q.  Now, you also made some soft findings
16  regarding the muscle hemorrhages in this case;
17  right?
18      A.  I did.
19      Q.  And those are based on him, Dr. Denton,
20  flailing the skin and seeing various injuries in
21  the upper shoulders and back; right?
22      A.  Correct.
23      Q.  Is it possible that those were injuries
24  were caused by the CPR in this case -- that was

211

1  done in this case?
2      A.  I've never seen that before.  I guess
3  theoretically.  But in a lot of flayed cases, I've
4  not seen those kind of hemorrhages before.
5      Q.  But it is possible that those could have
6  been caused by the CPR?
7      A.  I think theoretically, they could be.
8      Q.  And it's also possible that those
9  injuries could have been inflicted postmortem;
10  right?
11      A.  No.
12      Q.  No?
13      A.  No.  You don't get hemorrhages like that.
14  There's no more circulation.
15      Q.  Can injuries to a person be inflicted
16  postmortem?
17      A.  Well, every time we do an autopsy, we're
18  inflicting postmortem injury, but they aren't
19  hemorrhagic.  I've never seen one of our patients
20  bleed.
21      Q.  Okay.  So you're saying no bleeding
22  injuries could happen postmortem?
23      A.  Bleeding does not happen postmortem, no.
24      Q.  Okay.  Well, okay, hemorrhagic, what do

212

1  you mean by that?
2      A.  Bleeding.  I mean, blood flowing under
3  pressure.  There's no pressure.
4      Q.  You're saying there's no bleeding
5  injuries that could happen postmortem?
6      A.  I don't think I would use the term
7  "bleeding injury."  I'm fine with using that term,
8  but there's no blood pressure postmortem, so you
9  don't get focal hemorrhage like this.  You get
10  postmortem lividity as blood settles, but that's
11  not focal.
12      Q.  Can you get injuries -- any sort of
13  bruising injuries postmortem?
14      A.  Bruising.  I mean, again, bruising
15  implies antemortem.  Can you get blood drainage
16  postmortem?  Sure you can.  Can you get blood
17  drainage in an area like around the eyes if
18  somebody's positioned face down?  Sure you can.
19  Can you get spot hemorrhage like this?  No.
20      Q.  Okay.  You couldn't get the petechiae in
21  the head, you're saying, if he was face down?
22      A.  Right.
23      Q.  Okay.  Now, you also opined that -- you
24  also opined that the muscle hemorrhages in this

213

1  case could have been from the -- in his shoulders
2  and right upper back could be from someone holding
3  him down by the back and shoulders?
4      A.  Sure.  That would be consistent with
5  that.
6      Q.  How exactly would they be holding him
7  down?
8      A.  With pressure.
9      Q.  With what?  How would they exert that
10  pressure?
11      A.  Well, again, I've never actually seen
12  somebody killed, but I can imagine knee, knees,
13  elbow, wrists, fingers, hands, feet.
14      Q.  Would those kind of impressions made by
15  the knees or the hands leave some sort of marking
16  on the external body, on Jaqueri's body?
17      A.  Potentially, yes, but there were no such
18  markings.  So can you have something like that
19  happen with nothing on the skin?  Sure.
20      Q.  How much force -- in this case, how much
21  force was needed to occlude Jaqueri's airways and
22  kill him?
23      A.  His airway wasn't occluded, and that's
24  not what killed him.

54 (Pages 210 to 213)

Brian Peterson, M.D.   March 11, 2016

214

1    Q.  What did kill him in this case?
2    A.  It's a neurovascular death.  It's
3  pressure on the veins, mostly.  Also potentially
4  pressure on the carotid body that triggers a heart
5  slowdown.  And that's just a few pounds of
6  pressure.  Substantially less than airway
7  compression.
8    Q.  Okay.  I think we went over this.  In
9  this case, these are the soft findings you made
10  regarding these muscle hemorrhages; right?
11    A.  Yeah, soft in the sense that they aren't
12  diagnostic, right.
13    Q.  And those injuries could have been caused
14  by, let's say if he had fallen and tripped on the
15  ground?
16    A.  I think that's possible, sure.
17    Q.  Okay.  Or if he had banged into something
18  in the house?
19    A.  Or something banged into him, sure.
20    Q.  Right.  Okay.  But there's no way you can
21  tell how those injuries in either his mouth or
22  shoulders and back were caused?
23    A.  All I can say is that they're blunt force
24  injury.  Not for sure the injury in his mouth.  If

215

1  those had been caused by a fall, for example, I
2  would expect nose injury, since that's more
3  prominent.  So we have to look at more specific
4  types of injury there.  But they're not
5  specifically diagnostic, not like the furrow.
6    Q.  And how old were these injuries?
7    A.  I think they were fresh.
8    Q.  When you say "fresh," what does that
9  mean?
10    A.  That means just what I said, fresh.
11    Q.  Well --
12    A.  I mean, they're antemortem injuries, and
13  they're not days old.  But we don't have a
14  scientific way to be any more precise.
15    Q.  What is antemortem?
16    A.  Oh, before death.  A-N-T-E.
17    Q.  You're saying they're a day old?
18    A.  No.
19    Q.  They're within a day old?
20    A.  I think they're not older.  Yeah, they're
21  not days old.  But we don't have a scientific way
22  to be any more precise.
23    Q.  In this case, is it consistent or
24  inconsistent if someone wrapped the string multiple

216

1  times around Jaqueri's neck and then pulled that
2  string?
3    A.  There could have been multiple loops
4  wrapped around the neck with then pulling happening
5  to one loop.  That would be consistent.
6    Q.  Right.  But that one loop, what I'm
7  asking is -- let's say the string was wrapped
8  multiple times around his neck, and then the loose
9  part of the string that was from the bed sheet,
10  that part, or the -- if they pulled from the
11  string, would that -- is that -- would you say
12  that's consistent with the physical findings?
13    A.  I don't think so.  I think you have to
14  have essentially both ends anchored, if you will.
15  If you just pulled one, I could see that causing
16  injury right where that first touches the neck, but
17  not all the way around.  I don't think that would
18  work, no.
19    Q.  Okay.  So just to be clear, the two
20  scenarios you've provided is a U-shaped -- U-shaped
21  use of the elastic band where both ends are being
22  held?
23    A.  Right.
24    Q.  The other is multiple loops around his

217

1  neck, and then one of those loops being grabbed off
2  the neck and pulled?
3    A.  Right.
4    Q.  But it's not the pulling from the end of
5  the sheet that's attached to the bed?
6    A.  No, it has to be symmetrical.  If you
7  just pull one side, it's not going to do it.  It's
8  gotta be symmetrical.
9    Q.  So someone merely wrapping the string
10  around his neck and pulling that string, that would
11  not have caused the death?
12    A.  That wouldn't be symmetrical, and I think
13  you probably couldn't generate enough force that
14  way either.
15    Q.  Do you dispute Dr. Denton's testimony
16  that Jaqueri did not bleed from the nose when he
17  was strangled?
18    A.  I think the issue here is he described
19  fluid from the nose at autopsy.  Bleeding would be
20  a specific diagnosis.  And I think as a forensic
21  pathologist, he's trying to be precise.  One of the
22  findings with asphyxial death is pulmonary
23  congestion and edema.  That fluid would be properly
24  termed serosanguineous, so it's a mixture of serum

55 (Pages 214 to 217)

Brian Peterson, M.D.   March 11, 2016

218

1  and blood.  It's not blood per se.  So I would
2  agree he did not bleed from the nose; I think it
3  was serosanguineous fluid.  Different mechanism.
4      **Q.  So you agree with Dr. Denton's testimony**
5  **that he did not bleed from the nose when he was**
6  **strangled?**
7      A.  Right.
8      **Q.  Okay.  And in your report, though, you**
9  **said that you believe the serosanguineous blood**
10  **that was found -- or strike that.  It wasn't blood;**
11  **right?**
12      A.  Right.
13      **Q.  Let's -- strike that.  Okay.  Okay.  But**
14  **you added into your opinion that the serosanguinous**
15  **fluid could look like blood to the naked eye?**
16      A.  Right.
17      **Q.  But no one in fact described it as**
18  **looking like blood, did they?**
19      A.  Well, serosanguinous fluid does look like
20  blood, it's just thinner.  Serosanguinous fluid
21  would be an autopsy finding.  We talk about
22  serosanguinous out of the cavities, out of the
23  lung, whatever.  It seems to me that his dad may
24  have talked about blood coming from the nose.  That

219

1  would be a common lay observation.
2      **Q.  Oh, is that your belief, that Mr. Dancy**
3  **described it as blood?**
4      A.  Right.
5      **Q.  Can you tell me where Mr. Dancy described**
6  **it as blood?**
7      A.  I couldn't give you a page number.
8      **Q.  Is it possible you're wrong that he**
9  **described it as blood?**
10      A.  Sure.  I mean, I think we can all agree
11  on the serosanguinous fluid at autopsy.  I would
12  happily rest with that.
13      MS. MOGUL:  Okay.  I want a minute few
14  minutes to talk to my co-counsel.
15      THE VIDEOGRAPHER:  We are going off the
16  record at 1:19 p.m.
17      (Break taken.)
18      THE VIDEOGRAPHER:  We are back on the
19  record at 1:26 p.m.
20  BY MS. MOGUL:
21      **Q.  Turning back to your expert report in**
22  **this case, Exhibit 151, there's a lot of -- in your**
23  **descriptions where you describe progeny, angle**
24  **progeny?**

220

1      A.  Those are cancer cases.
2      **Q.  I see.  In State versus Rivera, you**
3  **testified at a post-conviction hearing.  Page 3 of**
4  **your --**
5      A.  Yeah, I see that.  That doesn't come up
6  really often, but occasionally we'll do an appeal
7  hearing, be asked to.
8      **Q.  What was the testimony you provided in**
9  **that case?**
10      A.  I don't remember.  That kind of a thing
11  here would be because we did have a previous chief
12  medical examiner that left the state; he's
13  practicing in a different state; we had one that
14  passed away.  So it might have been something like
15  that, where the person who did the autopsy wasn't
16  available and they needed somebody to talk about
17  it.
18      MS. MOGUL:  I don't have anything else.
19      MR. KAMIONSKI:  Reserve.
20      MR. FLYNN:  No questions.
21      MR. KAMIONSKI:  No questions.  Reserve.
22      THE VIDEOGRAPHER:  This ends the video
23  deposition of Brian L. Peterson, M.D., on March 11,
24  2016.  The time, 1:28 p.m.

221

1      STATE OF WISCONSIN  )
                           )  ss.
2  COUNTY OF MILWAUKEE  )
3      I, ANITA KORNBURGER-FOSS, Registered
4  Professional Reporter and Notary Public in and
5  for the State of Wisconsin, do hereby certify
6  that the preceding deposition was recorded by
7  me and reduced to writing under my personal
8  direction.
9      I further certify that said deposition was
10  taken at 933 West Highland Avenue, Milwaukee,
11  Wisconsin, on March 11, 2016, commencing at
12  9:02 a.m. and concluding at 1:28 p.m.
13      I further certify that I am not a relative
14  or employee or attorney or counsel of any of
15  the parties, or a relative or employee of such
16  attorney or counsel, or financially interested
17  directly or indirectly in this action.
18      In witness whereof, I have hereunto set my
19  hand and affixed my seal of office at
20  Milwaukee, Wisconsin, this 22nd day of March,
21  2016.
22  _____
   ANITA KORNBURGER-FOSS, RPR - Notary Public
23
   My commission expires May 13, 2017.
24

56 (Pages 218 to 221)

Brian Peterson, M.D.   March 11, 2016

222

1
2    STATE OF WISCONSIN  )
                ) SS.
3    COUNTY OF MILWAUKEE )
4
5        I, Brian Peterson, MD, do hereby certify
6    that I have read the foregoing transcript of
7    proceedings taken on the 11th day of March,
8    2016, at 933 West Highland Street, Milwaukee,
9    Wisconsin, and the same is true and correct
10   except for the list of corrections, if any,
11   noted on the annexed errata sheet.
12
13
14   Dated at           ,        , this
15          (city)      (state)
16
17        , of           , 2016.
18    (Day)      (Month)
19
20
21
22                Brian Peterson, MD
23
24

DTI Court Reporting Solutions - Chicago
800-868-0061                        www.deposition.com

Brian Peterson, M.D.   March 11, 2016

**A**

**abdomen**
107:16
**abrasion**
124:12 165:21
**abrasions**
108:19,20,23 109:3
164:13 180:5
**absolutely**
80:8 86:24 87:19
121:23 158:4 168:23
**abstracts**
145:11
**abused**
123:21
**Academy**
45:13
**accept**
191:14
**accepted**
106:8 190:24 191:2
210:13
**access**
12:12 112:5
**accident**
41:18 48:20,21 49:11
49:15,19 55:15 64:5
93:12 156:11,20
157:4,14,18,23
166:15,17 168:2
176:20 183:19 186:3
189:23 204:20 208:1
208:2,9
**accidental**
42:19,23 43:4,16 44:8
44:10,15 49:4,5 72:6
72:23 81:13,16 88:15
88:17 93:4,7 97:13
185:22 191:18 205:3
**accidents**
63:18,21
**account**
162:17 164:7 180:4
189:3 190:8 204:23
**accuracy**
172:7

**accurate**
170:16 174:19 175:3
**accused**
128:13,16,18
**action**
48:18 56:12 119:8
121:8 132:23 134:6
221:17
**activated**
154:2
**active**
165:23
**actively**
32:8
**actual**
96:4 180:19 198:15
**add**
48:14 58:17 164:15
**added**
151:15 193:20 218:14
**addition**
6:20 147:18
**additional**
45:17
**additive**
166:12
**address**
176:21
**adds**
187:7
**administrative**
144:11 145:1
**adult**
74:1,11 75:5,24 76:5,6
78:3,9,11 79:1,2,20
79:22 80:6,8 96:5
114:18 117:17
121:20
**adults**
36:14,16 46:3,7 64:19
64:20 66:12 68:23
69:16 71:15 73:18,23
74:8 75:11,18,20
76:14,23 79:22 85:2
85:5
**adult's**

77:16
**adventitia**
75:23
**advertise**
35:4
**affect**
76:4,19 80:11 92:2
**affidavit**
143:17
**affixed**
221:19
**afternoon**
17:2
**after-action**
26:17
**age**
43:17 46:12 72:17
74:22 88:10,21,23
89:5,14,24 90:3
111:5,6 112:18
**ages**
73:3
**aggregates**
52:6
**ago**
45:3 57:22 98:16
114:6,7,17 135:20
137:6 171:3
**agree**
70:23 166:16 168:10
183:20 184:11 186:8
186:24 208:21 218:2
218:4 219:10
**agreed**
182:9 196:2
**agreeing**
210:5
**agreement**
22:11
**ahead**
14:6 131:17 185:7
**airway**
74:18 84:16 101:24
102:18,19 213:23
214:6
**airways**

102:12 213:21
**akamionski@ahalel...**
2:9
**al**
3:15
**alcohol**
68:7,10
**aldermen**
59:11,15
**allegation**
126:14
**allegations**
23:9 158:6
**alleged**
123:20 126:8
**allergy**
94:3
**allowed**
144:15
**Alternately**
161:17
**amazing**
204:12
**American**
45:13
**amount**
32:14 73:15,17 74:14
75:9 76:21 78:1
86:22 120:15,15
121:13
**analogies**
152:16
**analogy**
205:10
**analysis**
38:16,18 52:21 53:5
126:19
**anatomic**
43:11 53:18
**anatomically**
129:20
**anchored**
216:14
**ancillary**
149:24 150:3
**ANDREA**

1:10
**anecdotal**
44:3 81:11
**anemia**
51:12,18,22 52:12,23
52:24 54:21
**angle**
106:9 181:12 182:16
183:2 219:23
**angled**
191:19
**angling**
206:2
**Anita**
1:19 4:7 221:3,22
**annexed**
222:11
**annihilation**
88:4 105:11
**annihilations**
110:7
**annual**
45:1,14 73:10
**anomaly**
149:23
**answer**
6:9 27:1,10,18 34:5
72:18 78:21 86:20
94:22 130:16 151:9
185:23 186:6 188:7
188:23 208:23
**answering**
6:10,15 188:24
**answers**
5:22 6:6 66:16 187:12
**antemortem**
161:13 212:15 215:12
215:15
**anterior**
182:20
**Anthony**
1:9 138:12
**antibodies**
23:5,7
**antimouse**
23:5

**anybody**
93:11
**anyway**
183:15
**appeal**
220:6
**appearances**
3:20
**Appearing**
2:5,9,13
**applied**
77:10,14 78:9 84:16
104:8 193:2 207:21
209:18,24
**apply**
80:17 189:16
**appreciates**
33:10
**approached**
63:5
**arduous**
20:20
**area**
9:23 29:15 32:4,6
141:8 212:17
**areas**
9:22 10:15
**arguing**
17:14
**argument**
93:5
**argumentative**
171:17
**arm**
113:15 129:8,24 130:4
130:7
**armed**
43:15 56:15
**arms**
129:9
**arose**
152:6
**arteries**
75:18 76:2,8,9 102:13
210:12
**artery**

74:6 79:10 101:13
126:16
**aside**
166:2
**asked**
31:13 48:15 70:20
75:8 78:20 123:2
131:3 172:10 174:9
185:19 186:15
187:13,18,22,24
188:3,15 189:4,7
220:7
**asking**
7:7 18:7 24:12 35:22
40:22 43:6 69:2
79:14 114:5,6 151:17
192:3 216:7
**asks**
94:22
**asphyxia**
18:5,9,10,14,16,21,24
36:19 44:19 49:6
66:14 67:12,20 68:1
68:23 69:14 73:1
84:3,6,10,11,14,18
84:22 85:4 86:4 92:9
94:15,24 95:15 110:9
115:18 151:9 159:16
159:22
**asphyxial**
36:13,15 69:21,22
70:3,5,10,18 71:12
85:23 102:22 217:22
**asphyxiated**
83:19 84:1 85:22
121:21 122:13
**asphyxiation**
18:4 36:10 68:14,19
69:19,20 71:18 72:1
92:8
**aspiration**
74:20
**assess**
41:6
**assigned**
61:2

**assistant**
1:9 90:21
**associate**
35:7 137:15
**associated**
159:21
**association**
44:24 45:8,15 46:20
135:15 136:7,12
138:2 166:13,14
**assume**
6:9 162:7
**assuming**
12:3 147:4
**atrophy**
80:8
**attached**
96:18 190:3,18,20
192:6 205:8 217:5
**attacked**
88:2
**attempt**
94:16
**attempted**
156:1
**attend**
9:4 25:1 43:18
**attention**
12:6 47:8,10
**attorney**
27:18 133:5,10 140:18
178:11 221:14,16
**attorneys**
1:10 48:4 124:21
131:23 154:18
**auditing**
119:12
**auditory**
194:3
**auspices**
28:4 33:1 34:15
**authored**
6:21,22
**authoring**
12:15
**automobile**

Brian Peterson, M.D.   March 11, 2016

3

49:14
**autopsied**
140:17
**autopsies**
9:4,5 10:5,8 11:3,4
15:10 20:17,22 21:2
21:4 25:12,15 33:15
35:15,15 47:4 62:11
63:3 72:18 85:21
86:12,17 87:17
110:18 114:1,3 119:3
119:20 120:10 122:6
137:17,20,23 142:4
**autopsy**
11:1 15:3,5,8 16:7,10
22:23 23:1,11,20
35:16 36:20 38:22
39:16,23,24,24 40:23
41:17 53:9,10 57:24
62:20,21 65:21 68:4
68:5,10 69:1,4 72:10
72:13,14 80:19 83:19
83:24 87:3 88:13
90:9,13,18,21 91:18
105:7 110:1 111:16
112:8,9 114:5,14
117:14 118:5 119:14
122:1 126:18,18
133:17 134:9 135:8
148:20,22 149:1
150:6,11 152:10
153:1,5 156:20
161:21 166:22
167:11,15 168:3,5,7
169:1,1,2,24 170:14
170:17,24 171:3,7,23
172:2,8,13,14,20,21
173:5 178:7 179:3
181:22 183:15 184:6
184:14 185:23
186:21 187:19 188:4
188:5,18,21 189:13
189:19,23 190:14,14
190:16,16 211:17
217:19 218:21
219:11 220:15

**available**
220:16
**Avenue**
1:16 2:3 221:10
**average**
62:23 64:7
**averages**
64:13
**Avi**
2:7 4:2
**avoid**
89:13
**aware**
39:19 41:20,24 42:2
71:20,24 91:13,23
121:19 122:6 155:24
170:6 194:18 195:8
**awhile**
113:19
**A-N-T-E**
215:16
**a.m**
1:18 3:14 85:9,14
141:10,13 221:12

------

**B**

**B**
2:18 33:8 129:12
**back**
14:4 29:21 44:13
61:12 77:24 98:5,14
98:15 102:16 106:10
107:9 114:11 126:21
139:5,7 140:10
141:12 146:5 149:11
154:11 156:8 158:13
158:15 162:12
164:14 165:22 166:9
171:2 180:5 192:24
193:17 194:9,16
198:9 205:10 206:4
207:24 209:8 210:21
213:2,3 214:22
219:18,21
**Balodimas**
1:8 138:23

**band**
118:7 122:2,7 159:19
160:1,5,7,8,12,17,19
163:16 164:4 165:4
165:10 174:15
175:15 176:2,4,7,11
176:15 193:5 194:20
195:13 196:3,6 204:5
216:21
**bands**
156:6
**banged**
214:17,19
**bar**
89:18 96:17,19
**Bartik**
1:8 139:3
**base**
188:5
**based**
23:11 40:5 55:18
81:10 139:14 150:9
160:10 161:4 168:10
173:5 177:23 179:1
180:3 181:11,24
182:4 184:6,13 188:4
188:17 193:10,21
202:10 205:1 206:11
210:6,19
**basic**
133:15 150:7
**basically**
56:6 94:23 152:17
165:8 175:6 181:20
207:10
**basing**
172:21
**basis**
9:2,8,9,12,19 10:17
73:10
**Bates**
12:8 200:2
**bathroom**
85:7 185:4
**bed**
44:20 83:12,14 118:7

121:4 122:2,8 162:16
175:15,19 190:3,11
191:16,17 204:24
205:9 216:9 217:5
**beginning**
3:12 13:10 72:9 83:3
85:11 145:19 174:5
185:13
**begins**
107:10
**behalf**
2:5,9,13 3:11 4:3,4
14:18 17:9,10 20:3,6
28:14 30:12,24 31:1
31:2 38:13 39:5
128:12 131:23
132:14,19 133:23
134:18,23 140:15
**behavior**
81:3
**belief**
182:10 193:4 202:7
219:2
**believe**
12:24 13:5 19:23
36:12 54:12 57:17
62:5,10 76:12 151:11
151:18 156:9,14
159:14 174:17,18
177:20,22 179:6
180:24 181:10
183:17 186:1 191:6
192:12 193:22
196:19,20 207:12,23
207:24 208:1,8
209:15,17,19 218:9
**believed**
58:14 60:22 190:10
**bell**
11:16
**belt**
89:4,18 90:8 92:21,21
96:14 97:2,8 118:16
118:18,19
**belts**
118:14

Brian Peterson, M.D.   March 11, 2016

4

**beneath**
113:14 174:23 208:18
**benefit**
33:17 116:14
**best**
93:11 148:19 151:17
190:1 191:6 207:17
**bet**
171:8
**better**
59:23 66:4,4 165:16
171:9 172:6
**beyond**
24:2 40:8,17 41:1 68:5
71:12 87:1 105:10
117:15 123:3 130:6
130:10 133:20
134:16 159:2,17
178:20 189:23 190:9
190:13
**bias**
189:15
**big**
50:9 63:21,21 106:20
181:2
**bigger**
63:22
**biggest**
195:23
**billing**
139:8 141:1
**birthday**
98:7
**bit**
37:12 60:9 62:12
63:11 73:20 93:15
94:2 102:16 119:2
120:2,20 156:13
167:13 191:16
196:21
**bite**
166:3
**bizarre**
27:9 146:7
**bleed**
211:20 217:16 218:2,5

**bleeding**
106:24 146:3 211:21
211:23 212:2,4,7
217:19
**blending**
113:19
**blind**
88:20 157:12
**block**
94:22 95:1
**blood**
73:16,19 75:10,12
76:13,17,22 77:4,5
78:1 101:14 102:14
103:10 149:6,21
212:2,8,10,15,16
218:1,1,9,10,15,18
218:20,24 219:3,6,9
**blood's**
101:15
**blunt**
107:1 109:17 214:23
**board**
45:17 59:3 135:18,18
136:6,9,10,11,15,18
136:20 138:1
**body**
52:7 100:16 103:2
129:5 149:2,4 165:8
188:8,8 189:9 213:16
213:16 214:4
**body's**
121:8
**bone**
78:22,23 79:1,6 194:9
**Boone**
133:6,22
**bottom**
146:2
**bought**
139:24
**Boulevard**
2:7
**box**
163:22
**boy**

178:13 204:22
**boyfriend-girl-upse...**
88:10
**brain**
52:8 101:14,15 102:14
107:17 149:13
**brains**
10:11
**break**
85:7,10,16,18,20
141:7,11,15 147:14
185:4,7,12 219:17
**breakfast**
114:7,9
**Brian**
1:15 3:13 4:8,15 85:12
125:16 185:10,15
220:23 222:5,22
**bridge**
135:3
**brief**
121:1
**bring**
33:12 107:20 116:12
171:1
**brings**
103:4 113:17
**broad**
85:24
**brought**
12:3 58:20 146:21
**brown**
209:3
**bruise**
208:12
**bruising**
212:13,14,14
**Bu**
132:9 166:16
**budget**
33:16
**bug**
94:2
**bulk**
38:4,6
**bullet**

93:16,17
**bungee**
118:22
**bunk**
191:16,17 205:9
**buried**
98:8
**businessman**
33:9
**buttressed**
173:6 177:17
**but/for**
56:11
**B-R-I-A-N**
4:15

**C**

**C**
2:1 33:11 129:12
**cabinet**
24:19,22 25:1
**cake**
206:14
**calcification**
79:3
**calcify**
78:23 79:1
**California**
23:10,14 24:5 29:21
30:23 37:20 98:5,17
110:3 134:4
**call**
11:8 26:9 27:1 31:18
41:23 49:18 53:1
54:6 58:5 59:9,10
65:2 84:19 92:9 93:2
94:24 95:14 107:24
108:19 119:8 124:11
126:11 152:1 155:5
155:14,17 157:13
181:5 184:18
**called**
4:8 17:8,10,16 20:7
37:4,17 38:4,8 52:6
55:16,17 62:3,9 80:9
86:9 106:20 107:4,23

Brian Peterson, M.D.   March 11, 2016

5

133:2 134:10 199:3
**calling**
155:10
**calls**
170:19 171:16
**camera**
200:9,15
**Canada**
94:18
**cancer**
32:17 220:1
**cancer-related**
30:16
**canted**
182:14 190:4 191:1,9
191:12 192:9 204:19
204:23 206:18 207:8
208:4
**capacity**
17:23 125:1
**capillary-type**
203:19
**car**
49:11,21 50:1 56:21
60:24
**carbon**
84:8
**Cardaro**
1:8 139:1
**cardiac**
46:1,3 66:13
**cardiovascular**
155:2
**care**
10:21 71:10 125:8
**career**
20:23 25:23 32:9
59:23 60:15
**care-type**
126:10
**carotid**
74:6 79:10 101:13
102:13 103:2 210:11
214:4
**cartilage**
74:23 79:5

**case**
1:7 3:14,16 8:1 10:12
11:6,9 13:12,16,18
14:8,11,15,17,19,23
15:4,15,15,16,16,19
15:22,24 16:22 17:7
17:8,9,21 18:1,3,5
19:2,7,13,19,21,21
19:22,24 20:10,18,19
21:1 22:3,14 23:20
24:2,7 28:1,2,8,17,22
29:9,17 30:14 31:3,4
31:4 32:24 33:7,24
34:3 35:10,19,24
36:4,7,10 38:3,13,16
38:21,23 39:2 44:1,1
47:6,11,11,14,16,18
47:21,24 48:15 49:20
50:19 51:1,11,16
53:12,24 55:4 56:5,9
57:6,12 58:7,8 60:20
61:23 62:6,24 65:10
66:19,22 67:1,5
70:24 87:14 90:7,9
91:1,9 92:7 94:24
95:22 96:16 97:9,11
98:2 99:2,17 100:4
101:5,5,7 104:2,3
105:13 106:11 107:6
108:11,18 109:4,7,23
110:6 112:12 114:9
114:12,13 115:17,20
116:14,22 117:2,14
118:5,5,11 119:6,8
119:14,15,18 120:7
122:5,10 123:4,13,14
123:19,24 124:3,17
124:22 125:1,10,20
125:21,22 126:1,5,10
126:12,18,21,23
127:5,10,14,17,22
128:6,12,15 129:5
130:10,11,19 131:4
131:11,19 132:5,20
132:23 133:3,7,10,12
133:17,22 134:1,12

134:14,20,24 135:9
138:4,7 139:6,8,17
140:12 141:2 142:20
142:21 143:18
145:20 148:24 150:1
150:13,20 151:6,7,17
153:16 154:6 155:12
156:9,10 157:15,17
157:21 158:1,5,23
159:23,24 164:11
166:8,22 167:23
168:1,12 169:11,20
169:22 170:7,9,12,15
171:14,22 172:3,17
173:1 175:24 176:3
177:19 178:4,5,22
179:2 182:10 183:4
186:4,14,18 189:2,8
191:21 192:12,16
193:3,4,22 195:8,10
196:2 199:23 201:14
202:7 204:16 205:12
205:12 206:21 210:9
210:16,24 211:1
213:1,20 214:1,9
215:23 219:22 220:9
**cases**
10:2,4,10,13,22 15:18
16:1 18:15,17 20:2,9
21:7 22:18 29:13,23
29:24 30:2,7,12,17
30:18,19,22 31:14,21
31:22 32:17 33:18
35:5 36:23 37:1,10
37:15 38:7,10 47:1,9
62:16,17 63:2,7,9,13
64:3,10,11,15 65:5,8
65:15 66:14 67:20
68:8 71:21 72:13
73:14 87:14,20 89:3
89:11 90:5 98:23,24
100:11,22 101:20,20
101:21 103:18
104:13 107:12
110:14,18,20 111:1
117:16 119:11 121:7

121:20 122:12,16,21
123:5,6,10,12 125:3
127:7 128:10 133:20
133:23 134:3,17
135:3 140:17 144:7
150:16 153:12 171:1
171:2 211:3 220:1
**catch-and-release**
103:8
**categories**
50:8 85:23 97:21,24
**categorize**
49:5
**category**
42:23 47:9 85:24 86:3
86:4
**caught**
93:9
**cause**
18:6 25:12 41:16 51:8
51:15,21,23 52:20,21
53:4,18 54:2,5,10,24
55:3,7 58:4 60:2
62:13 65:18,20,23
66:8 68:14 72:5,11
72:21 73:2 89:7
91:17 92:7,11 103:21
114:1 115:17 121:12
133:15 135:24 137:3
143:12 146:16 147:2
148:12,15 150:4,9
152:1,6,17 162:9
168:8 184:7 189:12
200:1 205:24 206:24
207:1 208:2 209:18
**caused**
51:12 57:6 101:12
107:2 123:22 126:15
155:6 159:20,22
165:9 166:17 193:18
210:8,24 211:6
214:13,22 215:1
217:11
**causes**
103:23
**causing**

193:7,17 216:15
**cavities**
218:22
**CDC**
73:9
**CDJ**
10:6
**cell**
35:1,2 51:12,18,22
    52:2,3,12,16,18,23
    53:7 54:13,18,21,22
**cells**
52:6
**Center**
10:12
**centimeters**
200:7
**certain**
19:15 31:10 39:24
    167:9
**certainly**
5:9 32:14 35:3 37:19
    41:20 43:13 62:2
    65:4 66:12 82:18
    86:15 87:2 100:17
    106:14 174:20
    182:14 196:6,8,21
    203:19
**certainty**
183:19
**certificate**
94:21
**certificates**
72:12
**certification**
31:20
**certify**
221:5,9,13 222:5
**CF**
15:20
**chains**
52:11
**chance**
85:17 167:12
**change**
42:17 56:8 168:9

173:7
**changed**
53:12 55:4 56:5 61:14
    61:15,20 120:6
    135:24 167:18,22
    168:2 169:9 187:12
    187:21
**changes**
76:1,3
**changing**
53:13 57:5
**Chapman**
131:13
**charged**
57:12
**charges**
14:23
**Charlotte**
44:11,23 45:8
**chart**
156:20
**chase**
56:19
**check**
55:6,11 73:9 143:13
**chemical**
18:12 84:7 85:3
    149:20
**chest**
107:16 126:13
**Chicago**
1:8,8 2:4,8,12 3:15 4:5
    123:16 126:22
    128:16 131:24 132:7
    132:15,15 139:16,21
**chief**
8:20,23 24:9,15,16
    56:7 57:18 220:11
**child**
19:2,4,8,13,19 20:10
    21:8,22 22:4 35:10
    35:24 36:4,7,11
    63:14 73:22,22 74:3
    74:6,14,22,24 77:19
    77:23 78:2,6,10,24
    79:4,19,21 81:18,19

83:19 84:1 86:17
    87:4 88:9,14,18,20
    89:4,14,20 92:18
    97:16 98:3 105:8
    111:9,16 121:20
    156:16 176:10,14
    178:16 190:2 206:21
**childhood**
166:4
**children**
36:13 46:3,6,9 63:3,20
    64:19,22 67:16,17
    68:18 69:11,16,24
    71:15 72:7,22 73:3
    73:16 75:10,17,19
    76:4,14,22 77:8
    79:23 80:24 81:8
    85:2,5,21 86:12
    87:21 89:24 100:22
    104:14 105:15,21,24
    106:12,12 108:12
    109:4,11,24 110:15
    110:21 111:1 117:16
**children's**
64:16 108:16
**child's**
74:18 77:15 91:10
**chunk**
63:21,21
**circular**
152:3
**circulation**
191:23 211:14
**circumstance**
106:23 112:8
**circumstances**
61:20 81:22 82:19,21
    83:23 87:20 92:20
    93:22 94:23 100:21
    104:15,24 105:7
    111:1,3,8,13 114:23
    117:13,18,21 118:2
    152:15,24 157:16
    158:18 172:15
    174:11 179:2 188:9
**citation**

73:6
**cited**
15:24
**city**
1:8 3:15 4:5 34:6 59:2
    59:4,8 123:16 126:22
    128:15 131:23
    132:15,19 133:4,6,9
    134:17 222:15
**civil**
4:20,22 19:21,24 28:2
    30:8,16 31:3 32:17
    38:10,23 134:24
**CJD**
10:5,7
**claimed**
123:21
**clarification**
158:1
**class**
49:7 80:16,17,21
**classes**
84:2
**classification**
45:6
**cleaning**
149:5
**clear**
17:15 35:14 93:19
    94:7 111:20 113:24
    136:6 150:8 154:20
    157:22 160:19
    161:11 163:18 182:5
    183:16,17 185:20
    190:9 195:10 201:23
    207:11 216:19
**clearer**
73:20 199:16
**clearly**
56:13 105:3 121:7
    155:17 168:20
    207:17
**cleidomastoid**
80:11
**clerk**
155:13

Brian Peterson, M.D.   March 11, 2016

7

Cleveland
10:12
clinic
153:17
clinical
23:3 43:11
clinicians
189:17
close
20:22 87:14 137:9
171:7 202:19
closer
170:16,22 172:8
closet
89:5,19 90:8 92:21
95:24 97:1
closing
104:24
closure
66:8
clothes
89:18
clothing
149:3
codify
94:17
coerced
41:13
cognitive
189:15
collapse
77:9,14 78:8
colleague
135:14
colleagues
53:10 140:21
collect
149:17,19,19 150:2
combination
156:14
combustion
84:8
come
10:24 67:4 116:6
132:3 134:7 139:16
142:6 149:8 150:4

153:5 154:4 220:5
comes
5:24 30:1
coming
93:8 98:6 101:15
102:14 190:13
218:24
commencing
221:11
commission
221:23
committed
111:16 154:17,23
committing
56:15
common
58:21,24 59:5 64:18
100:8,10,12,19 101:1
101:6 111:24 112:4
168:24 219:1
community
90:3
comparing
78:11
compensated
28:7 29:22
compensation
28:16 29:12
competing
66:23
complete
65:21,21 68:9 148:24
completed
185:23
completely
195:3
complex
117:2 177:8 192:10,18
192:20,21 198:8
202:8
complicated
62:24,24,24 126:10
composed
202:9
comprehend
89:14

comprehension
81:9
compression
74:21 76:3,7,15 77:22
78:14,16 79:3 214:7
compromise
102:19 103:2
computer
199:15
conception
205:2
concern
58:16 72:20 169:11,17
concerned
128:23 129:1 130:7
concerning
3:14
conclude
56:2
concluding
221:12
conclusion
126:19 181:16 182:1,4
186:4,5
condition
6:14 80:9
conditions
68:1,22
conduct
26:21 62:19 142:3
145:6 155:21,24
conducted
23:20 62:11 67:19,24
83:24 119:21 150:10
conducting
139:19
conference
44:22 45:1 119:9
139:20
conferences
26:17
confessed
158:12 159:3,4,6
confession
41:21,21 42:6 158:18
159:1 168:11,21

confessions
41:14 42:3,11
confidently
72:19
confined
46:9
confines
157:21
confronted
155:15
congenital
149:23
congestion
217:23
Congratulations
189:6
connecting
129:12 149:11
connotes
94:10
conscious
92:22
consciousness
207:1,4,6
consider
24:17
considered
144:17 187:20
consist
30:7 148:22
consistent
40:2,3,14 99:10 124:7
129:2,14,17 156:10
156:15 160:4,16,21
164:8 165:3 174:20
174:22 176:23
177:16,22 181:4,5,11
184:17 186:8 187:3
190:4 193:1 194:17
197:16 198:2,3 206:3
213:4 215:23 216:5
216:12
conspiratorial
23:9
consular
11:15 12:12

consultant
29:9
consultation
25:13 29:19 30:6
  32:13,15 33:14,22
  34:19,22 140:3,19
  188:20
consulted
123:2 132:18 133:23
  137:16,18
contact
27:11,14,15 34:21
  55:20 61:17,18 196:9
  196:10,13 197:24
contacted
34:12,13 139:6
contains
144:13
contesting
210:2
context
201:5
continues
201:21
Contra
24:3 134:5
contract
142:10,13
contracts
10:18 11:3
contractual
22:11
contradict
40:11
contribute
145:2
contributing
57:2
controlling
154:7
controversial
49:18
controversy
57:6,23 58:1,5 89:6,10
  90:4
convenience

155:13,15
convenient
139:20
conversation
7:10,12,15 53:14
Cook
1:9,10 123:17 125:11
  125:22 169:4
copies
12:3 167:1
cops
129:17
copy
3:6,9 15:21 21:3 143:2
  143:3,6,16 147:11,13
  147:14,23 148:3
  199:18 201:20
  208:17
cord
81:17 83:12,15 84:20
  88:20 95:2 113:13
  114:12,21 115:7
  116:2 118:22 157:11
  183:9 190:18,20
  191:12 192:6
coroner
24:5
coroner's
22:24 23:22 24:4
correct
5:2,3 8:6,10,14 11:12
  18:18 21:15 25:3
  28:3,8 32:3 33:5
  35:20,21 36:2 47:14
  47:19 49:2 50:8
  51:13 52:19 54:15,18
  60:24 68:20 69:13,15
  82:24 92:15 119:23
  120:12 122:15 124:1
  136:10 144:16
  150:24 151:14,21
  152:8,11 158:10
  163:6 174:16 178:2
  204:16 207:2,15
  210:22 222:9
corrections

222:10
correctly
6:11,15
Corresponding
59:5
corroborated
177:18
Costa
24:3 134:5
council
58:21,24 59:5,8
counsel
3:19,22 26:22 125:13
  125:15 133:24
  134:19 144:22
  221:14,16
counties
9:4,22,24 10:14,16
  11:2 142:10,17
country
20:23 32:8
county
1:10,10,16 8:21 9:17
  9:21,24 10:1,1,2,14
  10:16,20 15:19 24:4
  24:10,20,24 27:22,23
  28:5,13,15,19 29:1
  29:11,18,20 33:3,9
  33:17,21 34:16 47:3
  59:2,3,4 120:4
  123:17 125:4,11,22
  128:5,7 134:5 140:14
  141:3 169:4 221:2
  222:3
couple
20:13 23:13 46:21
  65:5 78:24 90:14
  102:4 112:17 133:14
  175:10 186:23
  187:15 193:14
course
15:10 25:15 37:22
  38:21 67:8 76:17
  121:6 134:7
court
1:1 3:2,5,17 4:6 5:20

5:22 16:13 25:17
  26:2,8 62:2 125:10
  125:10,11 130:21,22
  132:21,23 133:16
courtroom
25:14 26:5,21 27:12
  39:12
co-counsel
219:14
co-sleeping
44:20
CPR
210:24 211:6
crafting
145:4
create
150:2 170:24
credibility
39:10,11,14,21 40:5
  40:21
credible
39:13,17,18 67:6
credit
195:6
Creutzfeldt-Jakob
10:4,7
crib
84:13
crime
14:15 48:1,8,8 51:2,5
  51:5,10 154:17,23
  178:9,14
criminal
19:21 20:1 24:7 30:8
  30:10,17,17,18 31:3
  37:1,10 38:7,21
  170:7,8,10 171:14,22
  172:3
crisis
51:12,14,23 52:2,4,8
  52:22 53:2 54:13
critical
126:9
culpability
178:19
current

8:19 189:15
**curriculum**
2:22 143:24 144:6
**curved**
108:19,23 109:3
**custodian**
20:18
**custody**
47:19 123:21
**custom**
21:11
**cut**
116:9 165:5 191:22
   210:11
**cutoff**
111:10 146:17
**CV**
25:2 30:20 125:21
**cyanide**
84:9 85:4

**D**

**D**
2:15 129:12
**dad**
161:15 218:23
**dad's**
193:10 209:16
**daily**
9:2,3
**damage**
103:10
**damaged**
103:12
**damped**
103:10
**Dancy**
173:10 175:13 190:10
   219:2,5
**Dancy's**
151:2,12,19 155:22
   173:13 177:11 183:5
**dangerous**
81:9 93:22,23,24
**dark**
195:11,12,15 196:17

198:10 201:18,20
**data**
144:17
**database**
21:10
**date**
170:16
**Dated**
222:14
**Daubert**
14:2,5 16:16,24
**day**
1:9 9:6,14,16,16 16:24
   45:14,18 56:13 98:15
   113:7,7 138:18 187:8
   205:19 215:17,19
   221:20 222:7,18
**days**
46:16 49:8 59:24
   64:24 215:13,21
**dead**
116:11
**deal**
49:8 89:2 181:2
**dealt**
46:18 63:3
**death**
18:6 19:6 22:22 23:19
   25:12 36:13 41:16,17
   42:22,23 44:4,10,16
   45:4,5,22,24,24,24
   46:1,2,22 47:18,21
   48:6,12,12,17,21,24
   49:4,5 50:6,11,20
   51:2,8,8,11,15,21,23
   52:21 53:4,12,13,18
   54:2,5,10,24 55:3,5,7
   55:12,14,20 56:5,9
   57:6,8,9 58:2,4 60:21
   61:10,14,15 62:23
   63:1,21 64:16 65:1
   65:11,18 66:9,12,19
   67:16 69:11,21,22
   70:2,3,5,10,18,19,21
   71:13,13 72:5,11,12
   72:22 73:2 88:1 89:7

89:10,15 90:1,11
91:11,14,17,21 92:2
92:8,11,13 94:8,20
94:24 97:12 98:2
101:8,21 102:22
103:4 104:4,18
114:24 115:17,19
119:7,16 126:16
134:12 148:12,15
150:5,9 151:3,12,20
152:5,15,19,20 153:3
153:10,21 154:12,22
155:22 157:10
159:24 163:11
164:17 165:9 168:1,8
168:9,11 176:23
178:13,19 181:11
183:5 184:8,10,13
185:22 188:6 189:10
189:12,13 190:22
191:18 192:5 193:7
193:17,18 205:3,11
209:18 210:8 214:2
215:16 217:11,22
**deaths**
36:15 42:19 43:5,16
   43:22 44:8 46:18
   47:5 63:14 66:13
   67:12,16 68:18 73:10
   81:14 110:8
**decade**
141:21
**decades**
42:24
**decanted**
208:2
**deceased**
39:17,18 154:4 161:16
   161:20 172:23
**decedent**
15:11 92:23 95:2
**decide**
66:24 178:21
**decided**
61:21
**decision**

33:19,23 98:1
**decisive**
92:22
**decompose**
88:3
**decomposed**
121:9
**decomposition**
64:21 121:9
**deemed**
17:24
**default**
157:18,19 188:10
**defendant**
15:10 22:13 138:6
**defendants**
1:11 2:9,13 3:16 4:3
   23:21 28:21 31:3
   134:19 158:7
**defender**
29:14
**defender's**
37:23
**defense**
20:4 30:16,17 32:17
   37:22,23 38:13,20
   39:5 126:3,4 133:24
   134:11,18 144:22
**define**
11:17 52:1 148:11
**defined**
50:18 88:9 106:23
   115:2 151:21 154:21
**defines**
155:9
**defining**
106:14
**definitely**
89:19
**definition**
35:11 45:6 48:14,17
   49:10 64:23 72:8
   106:8 154:11 157:5
**definitions**
48:11 94:18
**definitive**

165:16,18 179:13
**degree**
180:18 182:22 183:1
**degrees**
99:18 162:2,7
**demeanor**
41:6
**demise-type**
65:7
**demonstrated**
165:8
**Demosthenes**
1:8 138:20,21,23
**Denton**
135:9,11 136:9,14,24
137:9 141:16 160:3
169:21 177:16
181:16 182:6 183:16
184:6,12 185:18
186:17,23 188:12
195:9 196:20 197:3
197:15 208:18
210:19
**Denton's**
166:22 167:7 173:2
187:8 188:10 217:15
218:4
**department**
12:11 132:16 177:14
**departments**
33:10
**depend**
73:19 74:22 77:3,4,5
78:19 79:8 80:1
81:21 82:10 83:2
91:4 120:19 169:18
**depending**
30:4 72:14 75:6 77:17
77:18,22 78:4,10,10
78:12 79:11,24 82:17
82:20 95:19,20
120:13 148:24 150:1
153:15 154:5 157:15
172:15 187:12
**depends**
27:16 29:13 31:4

48:15 62:21 74:11,19
75:12,13,15 76:10,24
77:1 78:14,15 79:21
80:13 82:18 83:1
91:2 93:17 94:15
117:4,5 119:6 121:12
153:9 154:10 169:12
186:15 187:17,23
202:18
**deposed**
124:19,21 130:24
133:16
**deposition**
1:15 3:12 4:19,21 5:2
5:19 6:19,24 7:3,8,20
13:11 21:22 85:12
106:5 124:17 127:19
133:12 167:8,18
168:14,19 170:10
173:2,6,8,9 174:21
181:17 182:2,3
183:17,24 184:2,5,12
185:10,14,19 187:11
187:16 188:1,11
210:6 220:23 221:6,9
**depositions**
5:4,8,10 21:17 187:17
**depressed**
118:3
**Derek**
47:12 50:24 66:19
120:7
**derived**
56:1
**derives**
189:13
**describe**
117:13 149:22 154:16
173:20 183:8 198:11
208:12 219:23
**described**
86:5 117:16 124:5,15
130:11 146:3 150:15
159:11 160:2 161:14
161:15 177:16 179:5
197:15 208:18

217:18 218:17 219:3
219:5,9
**describes**
152:5 192:14
**describing**
85:20 89:10
**description**
2:19 39:15 96:23,24
170:1 190:17
**descriptions**
219:23
**detail**
193:15
**details**
113:18
**determination**
48:7 51:21 58:2 91:24
92:3 189:9,24 190:21
**determinations**
189:22
**determine**
16:6,8 20:9 21:7 25:12
39:9,21 40:20 41:6
51:1,6 53:6 54:17
65:16 68:12 116:17
154:4,16 180:19
**determined**
54:24 55:4 92:7
148:19 152:6,9
**determining**
39:14
**develop**
25:20
**developed**
169:2
**develops**
74:23
**devoted**
46:23
**diagnosis**
168:7,11 217:20
**diagnostic**
85:1 166:6,7,10,11
214:12 215:5
**die**
89:21 155:4,6 159:15

159:17 176:13
180:10
**died**
54:13 86:18 87:21
88:14 105:8 110:21
118:6 122:7 162:20
163:2 164:11 179:16
179:17,18 180:19
**Diego**
43:13
**dies**
102:22
**difference**
53:15,17 78:17 95:5
148:12 172:16
**different**
20:23 23:7 35:18 48:5
59:11 75:18 78:12
82:9 85:23 103:16
105:18 110:19
117:19,20 119:16
133:14 143:21
152:18 157:22 162:1
169:7 179:11 186:18
186:20 189:1 193:14
218:3 220:13
**differently**
94:12 170:4
**difficult**
60:8 72:15 81:18,21
113:8,20 119:8
**difficulties**
81:1
**dinner**
137:13
**direct**
12:6 47:8,10
**directed**
119:15
**direction**
221:8
**directions**
155:19
**directly**
153:23 221:17
**directory**

35:2
**dirt**
149:6
**disagree**
184:16 186:3 188:13
**disappears**
208:16
**disc**
85:12 185:2,9,14
**discern**
50:21 152:24
**disciplined**
22:7,10
**disciplining**
175:21
**discovered**
96:2
**discrete**
83:15 117:11 163:19
176:5
**discussed**
43:17 104:18 138:4
145:3 163:10
**discussing**
45:21
**discussion**
167:24 168:21 174:2
**disease**
10:3,5,7,12 50:12
74:12 148:15 149:23
155:3,7
**dismissed**
23:15
**dispute**
72:5,21 73:1,15 75:9
76:21 77:8,24 78:6
80:24 81:6,6,8,12,15
81:16,23 82:2,6,12
159:23 217:15
**disputed**
54:11
**dissection**
107:15 108:1,5 109:9
109:10 149:14,14
150:16,19,22 151:2
**distance**

191:17
**distinctly**
96:9 97:10 102:19
**distinguish**
29:3
**District**
1:1,2 3:17,18
**dividing**
107:19
**Division**
1:3 3:18
**doctor**
4:17 5:1 11:18 126:12
189:5
**document**
8:6 13:8
**documents**
2:20 6:18 7:23 11:24
12:18 67:12,16 68:18
68:22 69:3,10 139:14
144:21
**doing**
32:24 33:16 43:7
80:18 89:16 103:17
163:23 166:12
181:15
**door**
157:9
**double**
74:8
**doubt**
89:7
**downstairs**
114:15
**dozens**
5:6,6,7,7
**Dr**
2:23 4:20 8:4,5,11
55:8,9 56:4 57:24
58:7 59:16 60:20
61:2 85:16 135:9,11
136:9,14,24 137:9
141:16 160:3 166:22
167:7 169:21 173:2
177:16 181:16 182:6
183:16 184:6,12

185:18 186:17,23
187:8 188:10,12
189:5 195:9 196:20
197:3,15 208:18
210:19 217:15 218:4
**drafting**
8:12 145:14
**drainage**
212:15,17
**draw**
129:12
**drinks**
185:5
**Drive**
2:11
**drives**
91:20
**drop**
117:23
**Dropbox**
139:15
**drops**
107:11
**drowning**
49:7 84:4
**drug**
49:8 50:17 68:7,9
**DTI**
3:12
**duct**
84:16
**due**
48:17,24 51:21,24
52:2,22 53:2 54:13
64:20 67:3,3 86:18
87:21 88:14 92:9
94:8 95:1,15 98:3
111:2 115:18 118:6,6
122:7 126:17 155:2
**duly**
4:9
**duty**
23:2
**dying**
192:1
**dystrophy**

80:12

_____
**E**
_____
**E**
2:1,1,15,18 4:11
**ear**
113:14 115:12 160:16
182:20,21 194:12
208:19
**earlier**
53:22 70:4 149:13
157:10 208:15
**early**
167:24
**ears**
149:11
**easier**
74:24 79:12,12 100:9
**easiest**
48:16
**easily**
77:9,14 78:8
**Eastern**
1:3 3:18
**easy**
81:21
**eat**
206:14
**edema**
217:23
**edge**
160:3,5 195:12 197:16
198:20 200:8 206:12
**editing**
146:12
**education**
40:17
**either**
18:19 19:14 21:21
37:11 40:2 48:18
67:5 81:20 100:10
105:3,8 110:11
116:19 128:8 132:17
152:22 161:3,5,22
163:8 164:6 171:11
192:10,22 214:21

Brian Peterson, M.D.   March 11, 2016

217:14
**Ektachromes**
167:3,5
**elastic**
81:17 118:7,12,15
122:1,7 156:6 159:9
159:10,19 160:1,5,7
160:8 165:10 174:14
175:15 176:2,3,7,11
176:15 193:5 194:19
195:13 196:3,6
197:17,19 207:2
216:21
**elbow**
130:2 213:13
**elected**
59:13,14
**electrical**
113:13 114:12,21
115:6
**electricians**
120:23
**else's**
169:24 171:4
**emergency**
177:14 194:14 196:19
196:22
**employee**
221:14,15
**EMTs**
153:15
**encompass**
99:15
**ended**
23:14 53:23 61:19
139:19
**endothelium**
75:22
**ends**
103:17 162:23 185:9
216:14,21 220:22
**enforcement**
24:1,6,7,8,18,21 34:10
132:20 133:24
134:19 135:1
**engaged**

23:19
**entire**
30:15 99:15 101:23
102:12 105:12
119:14 144:6 208:22
209:7
**entirety**
143:19 144:3
**entrapped**
93:8 157:8
**entrepreneurial**
33:10
**enumerated**
103:23
**environment**
48:23 49:1,9 93:15,17
93:21 94:5
**environmental**
79:24
**epiglottis**
108:7,8
**epilepsy**
45:24
**errata**
222:11
**error**
147:8
**especially**
76:1 171:2
**essence**
185:24
**essentially**
13:20 52:5 108:10
124:12 126:16 129:7
208:3,14 216:14
**established**
50:3
**et**
3:15
**etcetera**
25:14 43:18 52:8 62:2
108:9 149:22
**evaluate**
67:24
**evaluation**
68:9 73:8

**event**
155:6
**events**
40:11,15 81:2 129:15
129:18 153:20
**everything's**
5:20
**evidence**
48:1 49:16 54:12
121:9 149:3,22
151:18 152:4 161:4
164:10 169:10 179:3
180:8 183:18 185:21
190:12 193:12,21
198:6
**exact**
181:1
**exactly**
40:9 62:3 69:9,9 78:5
94:16 195:17 203:18
213:6
**exam**
149:16
**examination**
2:16 57:24 68:11
107:23 148:20,22
149:1,2,9,18,20
172:8 189:19 190:15
**examined**
4:10
**examiner**
8:20 13:17,20,23 15:2
17:11,12 24:10,15,17
27:22 28:5 29:11
33:2,20 34:15 39:8
39:20 41:13 48:7
60:4 65:9 125:2
127:2 128:5 220:12
**examiners**
39:21 45:1,8,16
135:16 136:7,12
138:2
**examiner's**
1:16 11:7 199:4
**example**
10:23 15:19 16:7

30:23 31:12,15 35:19
47:2 49:3 50:2,23
78:21 79:9 80:9,13
83:11 84:3 95:8
104:15 105:21
117:19 118:14 119:6
120:3 140:18 142:9
152:18 155:1,10
157:12 160:23
167:19 180:23 215:1
**examples**
119:16
**excepting**
69:1
**exceptions**
49:13 121:18
**excerpt**
187:15
**excessive**
128:13,17,18,21
**executive**
24:24 33:9 59:4
**exert**
213:9
**exhibit**
2:19 11:21,24 143:14
143:16 145:18
147:11 148:9 199:22
202:22 219:22
**exhibits**
2:24
**expect**
197:20 215:2
**expected**
54:20
**experience**
40:18 43:2 64:8 81:10
101:6 169:16
**experienced**
32:11
**experiences**
122:10
**expert**
17:8,12,17,23 18:1
28:1,21 29:9 32:2
34:22 35:9,24 36:1,3

Brian Peterson, M.D.   March 11, 2016

13

36:6,9,12,20 41:9
54:1 123:2,9 124:2
124:24 126:23
127:16,21 132:4
140:15 142:20
178:10 219:21
**expertise**
40:7 43:1 159:2
**experts**
32:3
**expires**
221:23
**explain**
152:16 167:13 175:4
191:5
**explained**
165:23 179:8,11
**explaining**
173:18
**explanation**
191:6
**exposure**
83:16 91:2
**exsanguination**
126:17
**extension**
83:12 95:2
**extent**
167:9
**exterior**
109:5
**external**
49:10 74:21 149:1
151:8 194:3 213:16
**extra**
57:19 153:4,6
**extramural**
140:19
**extremely**
66:16 205:23
**eye**
27:11,14,14 149:21
218:15
**eyes**
87:14 100:20 104:24
212:17

**e-mail**
3:4,5 34:23
**e-mailed**
139:13

--- **F** ---

**face**
56:15 84:17 100:20
102:1 105:1 170:2
180:4 190:24 191:2
191:14 209:2,7
212:18,21
**facial**
209:6,6
**fact**
54:11,16 58:10 61:11
76:21 89:17 93:11
124:6 154:23 157:4
158:3 173:1 175:12
176:14 179:15
180:24 182:6 187:3,5
195:18 196:3 197:3
197:21 205:21 210:2
218:17
**factor**
79:17,18 102:3 104:7
104:8 181:14
**factors**
56:14 57:2 80:1
103:16 186:7,10,10
186:20,23
**facts**
144:17 181:7 187:21
**failure**
23:1
**faint**
99:9,11
**fair**
6:11 9:1,11 21:21 26:4
37:8 38:11 54:23
65:9 101:2 102:1
120:18 180:17
185:23 210:12
**fall**
11:6 192:8 215:1
**fallen**

214:14
**falls**
207:6,8
**false**
41:13 42:2,7,11 72:19
**familiar**
26:5,6 47:14
**family**
11:7 53:5 57:11,14
88:4 91:10,14,16
105:10,12 108:12
110:7,13
**famine**
9:13
**fancy**
93:18
**far**
93:16 176:8
**faster**
103:4
**fatal**
164:9
**father**
88:6 105:21 109:24
179:13 192:14
193:14 194:19
205:13 210:6
**father's**
163:20 164:7 172:22
174:10
**FBI**
155:8
**feast**
9:13
**feature**
85:1
**federal**
4:22 20:15 125:10
130:21 132:21,22
133:16
**feel**
26:4
**feet**
100:16 213:13
**fell**
206:23

**fella**
115:3
**fellow**
26:13 70:11 141:23
**fellows**
135:19 141:16
**fellowship**
26:10 43:14 141:19
**fetal**
65:7
**field**
31:7 32:8,14
**file**
15:9,22
**files**
16:12 20:18 21:5
**film**
167:6
**final**
92:24 143:24
**finality**
89:15 90:1
**finally**
50:13
**financial**
28:15 29:12
**financially**
221:16
**find**
59:23 66:5 81:13
94:21 97:9 101:19
107:13 194:24 195:4
205:16
**finding**
52:5 55:7 91:18
156:20 162:18
164:22,22,24 165:1,7
165:14,18 168:4,6
176:9,9 182:7 188:14
218:21
**findings**
40:1,2,6,8,10,13,19,24
80:17,21 134:9
150:10 164:7,8,12,21
165:19 166:5,8
167:22 169:9 170:1,3

170:4,14 172:21
177:24 178:3 183:10
184:6,14 186:2 188:5
188:6 189:23 190:12
210:15 214:9 216:12
217:22
**fine**
12:4 60:10 81:12
102:22 113:6 115:16
148:7 161:23 197:22
212:7
**finger**
174:23
**fingernail**
108:20
**fingerprint**
108:15
**fingers**
107:2 213:13
**fire**
84:9 153:14
**firearms**
112:6
**fired**
58:14,17 59:16 60:1,2
**firm**
29:21 34:1 51:9 125:3
125:24 126:5 132:11
**first**
4:9 5:1 12:22 15:16
20:13 22:22 25:23
42:16 55:12,14 61:9
78:18 96:2 123:17
128:15 132:4 136:24
139:6 163:9 168:2
169:13 176:2 216:16
**fit**
192:11
**fits**
49:10 196:1
**five**
8:23 39:1,4 46:14
67:10 73:24 74:1
81:8 87:12 89:5
**flailing**
210:20

**flap**
107:18
**flat**
118:24
**flayed**
211:3
**fleshed**
95:4
**flexed**
130:2
**floor**
2:3 166:2 190:2
**floored**
208:6
**flow**
103:10,11 186:16
**flower**
107:21
**flowing**
212:2
**fluid**
149:21 217:19,23
218:3,15,19,20
219:11
**Flynn**
2:11 3:9 4:4,4 138:21
220:20
**flynnk@gtlaw.com**
2:13
**focal**
212:9,11
**focusing**
61:4
**fold**
208:14
**folded**
209:12
**folks**
52:15
**follow**
107:19 203:5
**followed**
149:5
**follows**
4:10
**force**

61:13 68:13,13 73:15
73:17,21 74:2,5,8,14
74:17,20 75:1,9
76:21 77:9,14 78:1,5
78:9 79:19 101:22
107:1 109:17 128:13
128:17,19 213:20,21
214:23 217:13
**Forces**
43:15
**foregoing**
222:6
**foreign**
13:2
**forensic**
11:3 13:23 25:7,10,11
26:10,12 27:20 31:7
31:8,9,14 32:6,10
41:20 42:21 43:12,18
43:24 45:13 46:24
64:2,7,11 65:2 67:8
71:22 80:14,15 94:13
94:17 118:1 135:19
168:24 188:22
189:15,17 197:5
217:20
**Forget**
42:17
**form**
97:16 151:19 180:14
188:17
**forming**
144:18 145:14 166:2
**formulating**
173:3
**forth**
33:15 40:24 43:20
45:17 46:22 140:8
149:24 168:22
**Foss**
1:19 4:7
**found**
51:17 60:21 88:14
90:7,23 92:11 95:24
96:5 98:2,7,11
161:16 163:20

165:12 172:22
174:11,19 175:8,10
179:13 181:12 190:2
190:11,17,19 194:19
197:6 202:11 205:13
208:22 209:4 210:7
218:10
**four**
67:8 73:4 88:21
135:20 187:5
**fourth**
73:2 136:13
**four-and-a-half**
46:14,16
**four-year-old**
73:22 75:2 78:2,6 80:5
**fracture**
117:22
**frankly**
33:8 88:20
**free**
81:17 205:16
**freeing**
81:1
**French**
86:10
**fresh**
215:7,8,10
**Friday**
112:10,10
**friends**
137:12
**Froedtert**
10:21
**front**
50:1 106:9 131:15
201:21
**frustrating**
65:13,19 66:2,16
98:10 104:21 128:9
**Frye**
14:2
**full**
12:3 13:8 46:12 83:5
83:13 99:17 109:16
109:20 147:2

Brian Peterson, M.D.   March 11, 2016

15

**fuller**
61:19
**fully**
27:1,10 96:8,13 99:15
167:13
**function**
119:12
**funny**
49:12 140:1 174:24
**furrow**
91:5,7 97:7 99:21
115:23 116:21 117:2
117:11 121:1 151:8
159:20,20 160:4,11
160:15 162:18
163:20 164:18 165:2
165:7,13 166:6,13
173:16,23 176:5
177:8,15 182:1 187:2
190:4 191:1,3,9,19
192:9,10,19,21,24
193:13 195:11,12,15
195:18 196:5,17
197:12,22 198:8,10
198:18,22 199:2,3
200:23 201:13,22,24
202:4,8 204:11,22
205:20,24 207:18
208:16,18 215:5
**furrows**
115:22 117:9 120:17
192:13 202:18
**further**
11:17 154:6 221:9,13

——————————
G
——————————
**game**
88:24 89:1
**gap**
180:3 192:24 194:1,4
194:5,11,15 196:16
196:21 198:24 199:1
199:1 208:19
**garrotement**
84:20 86:6,8,8,9,11,13
86:19 87:5,22 88:15

95:12 110:12
**Gendelman**
131:15
**general**
25:11 31:9,13 33:24
34:2 36:19 42:21
46:22 49:12,18 51:4
63:20 69:21 71:21
72:19 77:15 79:15
134:14 150:12,13
**generally**
20:6 29:20 37:18
46:19 49:15 65:8
88:17 91:15 94:21
97:23 98:4 101:22
106:7 111:8 121:11
131:5 182:21 189:12
210:13
**generate**
217:13
**generic**
77:11 78:21
**generically**
78:20
**gentleman**
123:20
**geographic**
132:6
**geometrically**
206:16
**getting**
7:2 27:19 37:21 60:10
82:10 94:15 124:20
153:13 157:11
166:15 197:9
**girl**
88:1 90:7 95:23 98:6
**give**
6:6 18:1 22:5 26:15,20
44:6 47:2 49:3 63:6
63:12,16 74:13 75:3
79:16,18 83:23 84:2
86:14,20 95:8 98:17
104:15 105:2,3,20
110:3,16,24 112:12
124:16 127:16,21

133:12 152:16 161:1
167:19 219:7
**given**
12:1 13:11,14 14:16
21:17 47:1 69:18,23
80:4 100:21 104:13
104:16 110:14 204:7
**gives**
117:2 181:23
**giving**
15:15 78:21
**glad**
128:3
**gland**
108:9
**go**
5:18 22:19 40:12
44:13 46:17 48:10
126:21 131:10 139:7
146:1 147:16 155:19
161:24 170:5 172:11
174:2 185:7 186:24
187:17 205:10
**goes**
28:11,13 121:10 154:5
162:15
**going**
6:4,9 8:16 11:23 12:6
13:7 22:19,20 23:2
43:3 44:6 47:8,10
67:9 70:24 72:4 77:4
77:19 79:13 83:4
85:8 89:21 92:4
102:14,14 104:9
108:8 113:4,22
121:15 130:15 131:3
137:4 138:9 141:6,9
143:6 147:10,11
148:2,6 151:16 155:3
168:16 185:6 192:9
195:24 199:21
202:21 208:11 217:7
219:15
**good**
3:21 4:2 27:10,14 57:7
63:15,19 91:5 98:1

131:12 170:23
180:13
**Gosh**
111:18 114:5 123:8
**gotcha**
12:10 52:4
**gotta**
217:8
**gotten**
32:13 43:4 71:9 93:8
**grabbed**
217:1
**grapefruit**
114:7,9
**great**
83:8 115:1 193:15
**Greenberg**
2:10 132:11
**GROGAN**
1:10
**ground**
5:18 51:9 96:7 214:15
**group**
24:3 43:16,17 59:5
65:3 111:4 122:10
123:3,7 127:8 128:11
130:12 132:4 157:23
157:23,24,24
**groups**
107:20 157:22
**group's**
70:6
**grows**
76:5,6
**guess**
11:19 14:21 26:23,23
27:2,9 40:4 54:9
67:7 77:6 85:2 86:23
103:22 105:2 122:3
129:3 131:20 147:8
157:2,13 169:13
185:20 204:8 207:24
209:8,19 211:2
**gun**
130:5
**gunshot**

31:11,16 32:22 112:3
112:10 129:7 130:8
152:21
**guy**
57:8 105:12 127:11
**guys**
12:2 203:5

## H

**H**
2:18
**Hale**
2:6 123:3,7 125:3
127:8 128:11 130:12
132:3 133:21 134:17
**half**
30:9,9 33:15 38:15,15
38:18,19 141:22
146:18
**hand**
102:8 178:4 200:18
221:19
**hands**
48:6,13,17 50:6 57:2
84:17,24 95:10 101:8
102:9 106:2,6,10
108:13,15,22 112:5
134:12 148:5 152:19
152:20 154:12
176:23 177:23
178:20 213:13,15
**hands-on**
56:20
**hand's**
200:14
**hang**
112:20
**hanged**
19:4 82:15,16,17 95:2
**hanger**
112:15
**hangers**
96:17
**hanging**
18:15 21:8 36:16
67:13 69:24 71:14

82:22 88:18,21,24
89:4 90:8 91:3,4
92:10 95:1,13,15
96:5,15 100:11,14
101:9,20,21 102:22
103:1 104:2,14 105:8
107:10 110:11,15,21
111:2,5,21 112:4,13
112:17,22 113:12,16
115:3,18 116:10,22
117:2,12,15 118:6,10
156:12,21 157:12,18
157:24 176:20
181:20 182:15,21
205:3
**hangings**
107:8
**hangman's**
117:22
**happen**
25:24 47:7 59:10
103:24 114:16
136:23 139:11,19
173:20 185:6 204:13
206:1 211:22,23
212:5 213:19
**happened**
87:15 105:13 118:19
125:6 129:21 153:20
153:20 159:1 161:5,5
171:3 173:19 174:8
179:24 204:16
**happening**
171:11 216:4
**happens**
75:23 95:21 151:24
**happily**
219:12
**happy**
33:14
**hard**
3:5 9:13 34:5 43:9
66:6 87:16 88:22
93:1 103:7 104:5
121:1 164:22,24
165:1,7,14 199:24

**hard-edged**
120:21
**Harris**
1:5 3:15,23 4:1,20
158:10
**harsh**
60:10
**hasten**
58:17
**head**
5:23 27:12 93:16
96:15,15,20 100:2
102:1 104:11 106:19
112:11 115:4,7 128:1
130:14 134:21
149:11 168:16
173:17 182:19 187:8
194:9 208:22,24
209:1,1 212:21
**heads**
90:2
**health**
75:7
**hear**
29:5 40:9
**heard**
44:9 53:10 79:16,17
168:21 176:3,5 201:3
201:9,10
**hearing**
14:5 16:16 17:1 220:3
220:7
**hearings**
26:16
**heart**
103:3 214:4
**held**
8:22 216:22
**help**
60:15 142:3,8 144:9
144:11 145:9,14
152:16
**helped**
176:1
**helpful**
54:8 56:16 92:5,6

167:15 171:4 172:24
**helps**
33:12
**hemoglobin**
52:10,11
**hemorrhage**
84:24 107:5,12,14
109:15,17,19,21
146:3 151:22,24
152:2 203:18,19
212:9,19
**hemorrhages**
106:15 164:14 165:22
210:16 211:4,13
212:24 214:10
**hemorrhagic**
211:19,24
**hereditary**
80:1
**hereunto**
221:18
**hi**
137:14
**high**
99:13
**higher**
37:12 107:18
**highest**
119:24
**Highland**
1:16 221:10 222:8
**hire**
142:2
**hired**
60:3
**historic**
65:16
**history**
40:3 41:19 53:21,21
111:12 152:7,12
153:7 163:20 172:22
189:3,14,18,18 190:1
190:7
**hit**
49:21 94:1 172:3
**hold**

70:6
**holding**
130:5 162:23 183:10
213:2,6
**home**
88:2 98:6
**homicidal**
81:13 87:24 100:18
**homicide**
41:18 47:22 48:5,12
48:19 49:17,22,23
56:23 62:24 63:14,23
64:4 94:10 95:20
97:14 152:19 154:12
154:19,23 155:5,9,11
155:14,17 156:10,23
157:19,23 158:3
166:15 168:3 177:20
177:22 181:18
183:19 184:17 186:2
186:8,21 187:10
189:22
**homicides**
9:15 64:1
**honestly**
27:1,10
**hood**
115:4
**hook**
119:1
**hope**
116:8
**horizontal**
181:19 182:1,12,14
187:1 208:3
**hospital**
10:21,21 23:10 43:13
63:1 65:6 153:17
197:12
**hospitalization**
126:10
**hosted**
46:20
**hostile**
48:22,24 93:15,16,20
**hot**

13:6
**hour**
62:22
**hours**
46:15 62:23 140:5
**house**
155:4 214:18
**How's**
200:19
**hundred**
5:8,9,10,11 65:5 86:24
113:8
**hundreds**
21:15 63:4 68:2
**hundred-page**
187:16
**hundred-plus**
62:17
**hung**
19:3 36:4 82:3,13
**hyoid**
78:22,23 79:1,6
**hypothetically**
81:20 176:24

───────────
**I**

**ID**
98:9
**idea**
75:4 92:17 178:22,23
179:2 202:10
**identification**
11:21 143:14 148:9
**identified**
2:19 86:5
**identify**
42:6
**IL**
2:4,8,12
**Illinois**
1:2 3:18 10:23 123:17
125:12
**imagine**
213:12
**impinged**
53:22

**impinges**
68:8
**implies**
212:15
**important**
180:24
**impressed**
192:23
**impression**
82:23 99:24 121:15,22
122:14 169:5,6,6
181:12 182:11,17
183:2 193:23 195:16
196:17,23,24 197:2,4
197:7 200:4,13
201:15
**impressions**
213:14
**impulse**
96:3
**inaction**
48:18
**inches**
182:19
**incident**
175:14
**incision**
149:10,10
**include**
13:3 18:15,17,21
36:16 155:9
**included**
8:8 11:14 12:17
**including**
108:12 117:22 119:14
**income**
30:1 33:11
**incomplete**
82:4,8,14
**inconsistencies**
191:5
**inconsistent**
124:5 129:14 167:14
181:20 191:4 215:24
**incontrovertible**
165:3

**independent**
24:20
**indeterminate**
152:21
**indicate**
15:14 151:18 164:11
181:18 186:2,11
**indicated**
185:21 197:9
**indicates**
165:8 197:23 207:13
207:20 210:10
**indication**
196:3
**indirectly**
221:17
**individual**
4:3 31:2 76:11 80:2,13
80:16,18,21,22
180:12 181:11
186:22
**infant**
45:22,23 46:22 47:5
65:1 70:19,21 71:13
74:24 84:12 157:11
**infants**
66:13
**inflicted**
211:9,15
**inflicting**
211:18
**influence**
175:23 190:21
**information**
61:8 67:3 81:6 98:1
153:4,7 188:21
**informed**
73:7
**informs**
168:23
**inhalation**
84:7
**initially**
61:7 158:8
**injuries**
31:11,17 32:22 123:22

124:6,7,9 129:2,13
146:5,9,13 158:23
165:24 166:9,16
180:5 183:8 210:20
210:23 211:9,15,22
212:5,12,13 214:13
214:21 215:6,12
**injury**
107:1 109:18 124:13
126:15 129:7 148:15
149:23 208:8 211:18
212:7 214:24,24
215:2,4 216:16
**inquest**
61:22,24 134:7,14
**inquests**
62:1 134:5
**inside**
106:22 165:21 166:1,3
**instance**
140:2 188:14 207:11
**instances**
122:17 154:21
**instant**
180:13
**instantaneous**
101:22
**Institute**
43:15
**institution**
37:24
**instructive**
176:10
**instrument**
159:24
**intend**
144:14
**intent**
88:23 89:12,13 92:18
97:17
**intentional**
49:16
**intentionally**
147:20
**interact**
26:22

**interacted**
169:5
**interaction**
48:22,24
**intercostal**
126:16
**interest**
31:11 70:7 172:18
**interested**
31:21,22 74:15 221:16
**interesting**
46:24 111:8 113:22
156:13
**interests**
31:10
**interim**
45:2,16
**internal**
49:9 126:17 149:9,16
**internally**
149:22
**interpret**
170:3
**interrupts**
148:16
**interval**
203:20
**interview**
41:2
**intrauterine**
65:7
**investigation**
20:8 21:7 41:19 54:16
54:19 91:10,20,20
151:3 152:7,13,14
153:8,19 189:14
190:7
**investigators**
91:14 153:11,23
**invoiced**
28:24
**involve**
18:15 22:18 29:14
40:23 68:15 81:3
111:21 122:16
**involved**

14:15 15:6,8 21:8 23:3
23:9 24:2 39:16
47:18 54:20 82:21
86:13,17 87:4 98:6
102:20 126:9 129:6
132:23 134:6,12
151:12 153:16 154:2
156:16,17 178:12
183:7 209:7
**involves**
34:6,9 52:9 80:10
119:7
**involving**
18:4,17 19:2,13,19
20:10 21:22 32:17
35:10 36:4,10,13
43:17 64:16 67:20
81:2 100:22 104:14
110:14,21 111:1
112:13 117:15
118:11 122:1,7
132:19 134:24
150:16 157:7
**Ish**
62:18
**issue**
47:9 61:17 66:18
127:11 158:20,21,22
188:18,20,22 189:15
191:2 208:1 209:9
217:18
**issued**
7:22 8:6 11:10 72:12
**issues**
17:5 51:5 72:9 80:11
146:23 175:10
**it'd**
204:6
**it'll**
79:8,11 120:19 140:6

_____ **J** _____

**J**
1:9
**Jackson**
2:7

**jagged**
206:12
**James**
1:9 138:16,18
**Jan**
2:3 3:24
**Jaqueri**
151:2,12,19 155:22
159:13,15 164:11
174:12,19 175:8,15
177:11 179:16,23
180:10 183:5 190:10
194:19 205:13
217:16
**Jaqueri's**
160:8 179:6 181:10,13
185:22 193:6,24
196:4 197:11 198:22
213:16,21 216:1
**jargon**
112:16
**Jefferson**
10:2
**job**
22:8 39:15 59:24
60:11 175:6
**Joey**
2:2 3:22
**joeymogul@aol.com**
2:5
**JOHN**
1:9
**Johnson**
14:9,12 16:8
**joints**
78:24 79:5
**judge**
26:22 62:2
**judges**
172:12
**judicial**
62:8
**jugular**
73:22 79:8 101:12
210:10,11
**July**

140:11
**Junger**
136:1,1,4
**jurisdiction**
11:7 72:14
**jury**
26:22 27:15,19

**K**

**K**
1:19
**Kaiser**
23:10
**Kam**
189:5
**Kamionski**
2:7 3:8 4:2,3 7:10,18
12:4 34:11 71:3,6
85:17 125:14,16
127:4 131:3,9,13,16
131:18 139:13,17
143:8 145:4 146:16
146:20 147:4,13,19
147:23 148:7 170:19
171:16 184:3,20,23
185:3,8 188:19 189:7
199:8,10,14,19 203:4
220:19,21
**Kamionski's**
28:24 34:1 128:1
**keep**
16:12 71:3,5 121:12
148:5,5 191:9
**Kelly**
1:9 138:16
**Kenosha**
10:1
**kid**
88:23 93:1 110:8
**kids**
85:3 88:6
**kill**
105:15 106:12 158:16
213:22 214:1
**killed**
105:21 108:12 164:1

213:12,24
**killing**
110:13 191:8
**kills**
88:6 105:12
**kin**
23:1 53:14 66:7
**kind**
9:5,13 10:8 14:11,15
25:19,21 26:7,16
27:13 29:23 30:7
32:12 33:16,24 34:3
35:4 43:10 44:3,15
44:20,22 52:9 63:1
64:22 68:3 72:13
79:9 88:3,5,7,10,20
89:1 91:1 93:10 94:6
94:17 95:4 98:10
101:7 102:12 103:6,8
105:11 107:3,14,18
107:21,23 110:8,18
111:19,23,24 113:17
113:18 117:24
118:16,24 119:18
121:3,8 123:19 124:9
124:13 126:12 130:6
132:1 134:3 140:9,23
143:23 150:21 152:2
153:18 154:6 164:15
166:4 182:22 208:17
211:4 213:14 220:10
**kinds**
30:1 43:22 107:11
110:9
**knee**
61:12 213:12
**Kneeling**
96:12
**knees**
96:11 213:12,15
**knot**
113:14 114:13 115:10
115:15
**know**
6:2 9:14 12:17 16:17
19:17,20 20:2 22:6

22:23 27:11,11 31:10
32:3,11 35:1,2,7 39:1
39:11 41:3 42:13,17
43:20,21 44:2,18,20
46:19 50:2 51:3 54:5
54:19 57:9,14 60:5,8
61:1 62:21 63:20
64:19 65:4,6,17
66:15 72:3 73:7
74:20 83:11 86:21,24
87:9 88:4,7,9,23 89:4
89:12,15,16,17,21,22
89:22 90:15 91:2,12
92:6 93:1,8,9 94:1,3
94:6 95:2,14 96:6,10
96:14,22 97:2,13,15
99:5 100:24 102:4,20
103:15 104:6,7,19,22
105:11,17 106:9
108:8 110:20 112:2
113:11 114:8,8 116:2
116:23 118:3,18,23
120:22 122:9 124:15
124:18 125:6,8,16
126:13 129:2 130:13
130:14,16,21 131:2
132:7,9,21,24 133:15
134:2 137:2,14 138:6
138:9 140:10,20
147:6,19,21 149:6
150:1 152:16 153:17
154:8 155:12 158:5
165:3 166:3,4 167:10
167:21 168:13,15,17
168:23 169:5 170:18
171:6,8 172:5,11
174:3,9 175:1 176:24
180:15 183:4 186:6
186:16,19 187:8,14
187:16,22 192:19
195:20 199:19,19
204:4 205:19 206:5
**knowable**
164:2 180:16 181:4
193:20
**knowledge**

168:24
**known**
122:4 137:9
**knows**
99:6 131:18
**Kodachromes**
167:2
**KORNBURGER-F...**
221:3,22
**Kyle**
2:11 4:4

**L**

**L**
2:2,11 3:13 4:15 85:13
185:10,15 220:23
**lab**
23:6,8
**label**
48:11 90:11 93:4
115:19 143:6 147:11
**labeled**
47:21 49:21,24 90:12
143:16 154:22
**laboratory**
23:4
**lack**
18:10 81:9 101:24
196:16
**Lady**
177:11
**laid**
128:20
**lament**
44:2
**Landando**
1:9 138:10
**lanyard**
98:9,9 99:3,10
**large**
49:7 139:14,14
**laryngeal**
109:8
**larynx**
108:8
**Las**

Brian Peterson, M.D.   March 11, 2016

20

45:2,12 46:13
**law**
2:2,6 24:1,6,6,7,18,20
34:9 123:3,7 125:3
125:24 126:5 127:8
128:11 130:12 131:2
132:3,11,19 133:21
133:24 134:19,24
178:15
**lawful**
155:18
**LAWRENCE**
1:10
**lawsuit**
22:22 23:3 128:19
**lay**
13:20 219:1
**layers**
205:16
**layer-wise**
107:15,24 108:5 109:9
109:10 150:22 151:1
**layperson**
178:14
**lead**
30:13 31:12 68:1
97:17 176:16 191:23
**leading**
71:24 72:5,21 73:2
193:7
**leads**
20:19
**leap**
50:1
**learned**
61:10 89:23
**leave**
58:10,11,12 59:21
65:10 90:5 95:15
97:20 116:12 117:8
117:11 143:11
147:12 213:15
**led**
32:12 56:2,23 61:5
94:23 127:13,19
191:24

**left**
58:8 64:16 88:3 92:13
97:11 98:17,19
182:20 184:20,23
195:10 196:13 202:5
203:3,7 206:11
207:18 209:22
220:12
**legend**
89:2
**legs**
100:16,16
**lethal**
148:17 205:5
**let's**
18:7 23:8 35:18 37:7
48:10 77:18 80:3
101:10 114:11 162:6
179:1 198:11 199:13
214:14 216:7 218:13
**level**
24:19,23
**levy**
33:13
**lie**
151:16
**life**
53:20,22,23
**ligature**
18:20 82:21 83:4,7,9
83:10,17 84:19 86:6
86:13,18 87:4,21
88:11,14 90:22 91:5
91:7 95:10,13 99:7,9
99:11,21,24 100:18
102:21 110:11
112:23 116:13,15
117:4,19,20 118:11
120:14,16,20 121:13
121:14,15,21,22
122:1,7,13,14,17,21
122:23 151:8 157:7
157:13 159:19 160:4
160:12,14 165:1,7,11
165:12 173:16 179:6
181:12,19 182:11,17

190:3 193:13,23
197:10 198:11,12,14
198:16,18,18,22
199:3 200:4,23
201:13,16,22,24
202:4,19 205:20
**ligatures**
118:13 192:20 204:13
**ligature's**
116:20
**light**
120:6
**lightning**
94:2
**limit**
14:2
**limitation**
16:20
**limited**
16:17
**line**
60:5 129:10,12,24
130:9 184:15 198:15
198:17 200:22
201:18,20 203:9,11
203:12
**lined**
206:16
**lines**
202:9 203:8 204:5
208:11 209:9,12
**link**
13:6
**list**
2:21 71:3,5 130:23
132:2 143:22,23
222:10
**listed**
10:14 15:14 30:19
144:18 186:12
**literature**
41:15 42:1 44:2 71:17
71:20,22
**litigation**
4:20
**little**

17:15 37:12 60:9
62:12 63:11 73:20
98:6 101:16 102:16
108:19 109:19 119:2
120:2,20 156:13
167:13 191:16
194:15 196:16,17,21
199:16 204:22
**liver**
52:7 149:21
**lividity**
212:10
**living**
68:15,16 81:4
**LLC**
2:6
**LOCATED**
1:16
**locum**
142:7
**long**
7:15 8:22 46:13 49:6
62:19 126:10 136:11
136:14 140:11
141:19 144:3 148:5
169:2 180:9
**longer**
27:18 83:16 116:10
121:3
**look**
13:5 14:4 27:19 31:14
44:13 46:23 55:1
72:17 75:21 79:7
80:15,21,21,22 94:20
119:10 120:4 130:15
139:7 140:23 143:19
149:4 150:13 155:8
156:19 175:3 183:21
187:2,4 189:8 196:22
202:21 204:11 215:3
218:15,19
**looked**
53:11 123:5,6 124:10
127:11 130:4 139:15
176:3
**looking**

Brian Peterson, M.D. March 11, 2016

21

12:8 27:17 35:11
38:17 44:19 60:17
64:3,24 66:11 94:11
109:16 119:13,17
127:14 132:1 140:8
142:23 146:17,20
152:23 153:12 181:6
186:20,22 200:1
202:23 208:10
218:18
**looks**
12:13 107:21 118:18
118:24 143:3 146:7
146:17 147:7 203:21
204:3
**loop**
115:8 116:4,6,18,19
116:22 159:20
161:14,18,19 162:4,6
162:11 174:5 179:19
187:4 193:18,19
198:7 204:9 207:20
209:18 210:1 216:5,6
**loops**
117:1,3 161:15,19
163:4,5,11,21 173:14
174:5,6,14,22 175:11
177:7 179:21 190:5
192:14,17,22,23
193:2,20 198:4
202:13,14,15,19
205:21 207:13 210:7
216:3,24 217:1
**loose**
162:14,14,15 194:24
195:4 216:8
**looser**
198:4
**lose**
207:4
**loses**
207:5
**losing**
207:1
**lot**
5:11 26:9 30:3,13

32:16 38:15 43:8,18
44:17,18 65:7 68:8
72:8 75:15 77:6
79:24 80:17 82:24
83:1 90:5 93:2
139:13 154:1 169:16
171:1 186:7 189:14
211:3 219:22
**lots**
83:20 94:14 110:17
152:17 192:20
**lousy**
201:20 208:17
**low**
99:13 120:1
**lower**
100:15
**lung**
52:8 218:23
**lying**
91:3

----

**M**

**M**
1:9 4:11
**main**
25:14 137:4
**maintain**
20:14,17 21:9 192:4
**maintained**
21:4
**major**
149:17
**majority**
36:24 37:3 38:12
66:10 119:20 120:10
**making**
157:22 158:6 180:18
189:20,21,24
**malpractice**
126:1,7
**man**
108:12
**manner**
19:5 25:12 41:17
42:22 51:8 53:12,13

55:5,12,14 56:2,5,8
56:23 57:5 58:2
60:21 61:3,5,9,14,15
61:20 65:11,20 66:18
67:4 89:6,8,10 90:6
90:11 91:21,24 92:2
92:5,13 97:12 104:18
115:19 119:16
148:12 150:4 152:5
153:3 168:1,9,11
169:7 184:10,13
188:6 189:9,13
190:21 191:22
**manners**
50:20 65:17 66:24
**manual**
12:12,15,20 18:19
84:23 95:9 100:17
102:7,8 103:19 104:3
106:3,4,8,22 109:21
150:16 151:6,11,19
151:21,23 152:1
**manually**
105:23
**March**
1:18 3:13 85:13
185:11,15 220:23
221:11,20 222:7
**mark**
11:19 83:7,9,14,15,17
99:9,11 122:23 195:9
198:11,12,14 199:3
201:1,3,8,10,15
203:9,12,13,16,17
204:3
**marked**
11:21 121:21 122:13
143:14 148:9 196:5
199:23
**marking**
11:23 213:15
**markings**
213:18
**marks**
82:2,6,12 90:22 99:7
108:16 112:23

202:10,15 203:8
**married**
135:24
**marshal**
153:14
**mask**
56:16
**matched**
195:13
**matches**
160:11
**material**
8:7 50:22 117:5,8,9,20
118:16 120:14 169:1
**materials**
11:11,14 135:7 140:7
140:8 144:19 145:9
145:13,22 155:23
161:21
**matter**
32:10 64:23 107:18
157:5 169:17
**mattress**
84:12
**mayor**
57:19 59:5
**MD**
1:15 4:8 222:5,22
**mean**
17:5 18:9 22:18 24:6
24:22 26:24 31:8
32:1 34:4 37:18 38:4
44:4,9 48:4 52:1,2
53:18 54:9,10 55:21
56:6,14 59:10 62:7
63:19 66:6 68:7,9
69:6 71:8 75:21 83:8
87:13,17 90:19 91:17
93:14,16 95:20 96:24
97:19 102:20 103:14
103:18 104:9,22
106:14,23,24 108:17
111:4,7 112:9,22
113:7 115:14 116:8
116:19 117:18 118:2
118:14,17,18,19,24

Brian Peterson, M.D.   March 11, 2016

22

119:13,17 120:19
122:3 124:11 126:11
128:19,22 129:11
130:2 137:13 139:13
140:4,16 142:5
143:17 145:3 147:17
148:4 150:12 151:8
152:12 154:2,24
156:3 157:12 158:19
165:20 168:7,8,20
169:12 172:1,10
174:17 176:8 178:10
178:18 191:11 192:7
194:1 199:1 201:5,14
212:1,2,14 215:9,12
219:10
**meaning**
165:14 177:23
**means**
18:10 48:5 106:17
152:9 154:12 157:18
157:19 199:2 215:10
**meant**
106:5
**measured**
196:20
**measurements**
181:23,24 182:4
**meatus**
194:3
**mechanical**
18:12 84:10
**mechanism**
18:11 61:4,5 89:8
94:14 164:17 166:1
210:14 218:3
**medical**
1:16 6:13 8:20 11:7
13:16,20,22 15:2
17:10,12 24:10,15,16
27:22 28:5 29:10
33:2,20 34:15 39:8
39:19,20 41:13 45:1
45:8,15 48:7 55:1,2
60:4 65:9 89:24
125:2,24 126:7,11

128:4 135:16 136:7
136:12 138:2 149:4
153:16,22 177:11
199:4 220:12
**medication**
6:13
**medicolegal**
91:13 153:10
**meet**
136:18,24 139:23
**meeting**
45:2,14,15,16 46:15
46:23 47:6 139:11,12
**meetings**
25:1 43:18,19,19,20
45:17 136:20 137:1,4
137:5
**meets**
64:10
**member**
135:17
**members**
53:6
**memorable**
111:7 112:21
**memory**
97:7 172:13
**Mentally**
156:3
**mention**
177:13
**mentioned**
10:18 11:2 70:4
133:21 135:15
157:10 188:18
**mentioning**
189:11
**merely**
217:9
**met**
133:9 135:11,13
**Michael**
1:9 138:9
**microscopic**
52:5 68:11 75:21
149:18

**midline**
107:19 182:20 194:13
208:15
**mileage**
67:7
**military**
25:23 118:19
**Milwaukee**
1:16,17 2:3 8:20 9:21
9:23 10:14,15,20,20
15:19 24:10 27:21,23
28:5,13,14 29:11
33:2,21 34:16 47:3
58:22 59:1,2,2,4 62:1
125:4 127:1 128:5,7
132:8,19,24 133:4,6
134:17 137:3,3
140:14 141:3 154:3
221:2,10,20 222:3,8
**mind**
92:24 98:5 104:18,22
113:18 171:2 173:15
**mine**
31:11 51:6 58:16
135:14 178:20 187:9
**mini**
88:19 157:11
**minute**
6:4 135:23 199:24
219:13
**minutes**
7:16,18 53:20 180:15
185:1 219:14
**misconduct**
132:20 133:24 134:20
135:1
**misquoting**
184:9
**misremember**
175:2
**missing**
8:14 82:4,7,13
**misstate**
171:6
**mistake**
171:8

**mix**
30:15 31:5
**mixture**
217:24
**Mocco**
125:17
**Mogul**
2:2,17,24 3:4,7,21,22
4:12,19,24 11:22
12:2,5 71:5,8,11 85:6
85:15 125:13,15,18
125:19 131:8,11,14
131:21 138:22 141:6
141:14 143:11,15
146:19 147:1,9,17,22
148:1,4,10 171:12,20
184:4 185:7,17 199:9
199:13,20 200:16,20
203:6 219:13,20
220:18
**moment**
179:20
**Mon**
112:10
**Monday**
9:14
**money**
28:10,11 126:22 128:8
**monitor**
10:4
**monoxide**
84:8
**Month**
222:18
**months**
42:24 70:13 114:6,7
170:13
**morning**
3:21 4:2 6:21 7:3,6,9
7:11 17:1 43:21
**motion**
14:2
**mouse**
23:7
**mouth**
35:6 84:17 164:13

165:21 166:1,4,10
175:18 214:21,24
**moving**
72:11
**mucosa**
100:20
**mucosal**
180:5
**mud**
149:6
**multiple**
88:7 110:8 115:7
116:23,24 117:1,3,3
122:17,22 160:23
161:2,9,15 163:2,13
163:16,21 164:4
173:14 174:5,6,14,22
175:11 177:6 179:21
190:5 191:3 192:13
192:14,17,23 193:2,5
193:9 194:20 198:8
202:9,13,13,18 204:5
205:14,21 206:17
207:13 209:9,10,12
209:15 210:3,7
215:24 216:3,8,24
**mummification**
64:21
**municipality**
34:7
**murder**
14:14,17 154:18
**murdering**
158:12
**muscle**
80:11 84:24 106:15,18
106:20 107:5 109:15
109:17 151:22,24
152:2 210:16 212:24
214:10
**muscles**
79:10,11 80:4,5
106:22,24 107:2,12
107:14 109:20 146:4
146:4 166:10,17
**muscular**

80:12 164:14 165:22
**M.D**
3:13 85:13 185:11,15
220:23

---

**N**

**N**
2:1,15 4:11,11
**naked**
218:15
**name**
3:10,21 4:13 15:10,11
15:15 90:15 123:14
130:18 131:11
135:22,23 136:1
**named**
22:13 23:21,24 86:3
**names**
105:2,3
**narrow**
98:21
**narrowed**
164:18
**national**
10:11 44:24 45:7,15
46:15,20 135:15
136:7,12 138:2
**nationals**
13:2
**natural**
41:17 50:9,12 55:16
55:17 56:3 60:21
61:3,5,10,21 62:23
63:20 64:1,6 94:1
149:23 155:7
**nature**
14:22 76:14 83:4,5
120:20 181:19 187:1
202:19
**Naval**
43:12
**near**
181:24 182:13 194:7
**necessarily**
31:12 60:6 90:20,20
95:20 162:12 169:17

197:20
**necessary**
68:14 74:3,14 149:5
149:15
**neck**
77:13,16,17,20,21
78:7 79:8,10 80:5
81:18 82:2,6,13,23
84:21,24 89:18 90:23
92:21 93:10 97:3,8
99:8,12,15,18 101:23
104:8 106:22 107:18
107:24 108:3,5,6,16
108:24 109:8,9,10,17
109:19 112:24
113:13 115:9,22
116:3,7 117:2 120:16
121:5,14 122:18,22
149:13 150:16,19,22
151:1 159:19,21,22
160:9,13,20,24 161:2
161:9,12,16,18,20
162:2,13 163:3,10,12
163:21 164:4,19
173:15 174:15
175:20 176:12,16
177:5,7,15 179:7,9
179:12,19,21 181:13
191:22 192:15,21
193:6,7,9,24 194:20
195:11,14 196:4,11
196:14,18 197:1,7,11
197:13,21,24 198:5,6
198:23 201:21 202:1
202:5,9,18 203:8
204:5,9 205:14,22
206:6,10,17,18,22
207:14 208:8,13
209:11,16,21 210:4
216:1,4,8,16 217:1,2
217:10
**necks**
204:14
**need**
5:21 16:4 85:6 108:4
146:8 147:11 153:4

189:17,18
**needed**
73:16,17,21 74:5,17
75:1,9 76:21 78:1
149:18,19 213:21
220:16
**needless**
56:18
**needs**
131:5
**neither**
115:14
**neoprene**
56:15
**neurovascular**
102:23 214:2
**never**
12:21 16:4 17:18,19
21:22 35:23 54:17
73:23 74:4 98:11
121:24 156:1,5 201:9
201:12 204:13,14
211:2,19 213:11
**new**
26:11 141:7
**nice**
83:14 115:2 117:10
**Nicole**
1:5 3:14,23,24 4:20
**nod**
124:20
**nodding**
128:1
**Nods**
5:23
**nondispute**
81:23
**non-complex**
173:23
**Nope**
12:16,19 57:13 138:15
138:24 139:4
**Noradin**
1:9 138:12
**normal**
17:4 52:12 77:17

Brian Peterson, M.D.   March 11, 2016

148:16
**normally**
20:5 62:1 108:17
149:19
**North**
2:3
**northern**
1:2 3:17 10:23 110:2
134:4
**nose**
84:17 215:2 217:16,19
218:2,5,24
**Notary**
221:4,22
**notched**
160:5
**notching**
198:19
**noted**
197:12 222:11
**notes**
15:2 71:6 140:2
**notice**
4:21 167:17
**noticed**
166:20 170:24
**notification**
11:15 12:12
**notify**
23:1
**nude**
149:4
**number**
3:16 15:16,17,20,20
15:21,24 22:6 63:6
63:12,15,17,18,19,24
64:10 83:21 85:12
86:14,20 106:13
119:24 174:1 175:4
185:9,14 186:24
187:3,5 219:7
**numbers**
35:1 64:7 98:18

— — — — — — — —
**O**
**O**

4:11
**oath**
4:10
**object**
84:15,21 117:11
**Objection**
170:19 171:16
**observation**
219:1
**observe**
81:4
**observing**
104:6
**obvious**
205:18
**obviously**
20:19 49:9 103:14
146:24 187:10 189:2
199:1 205:15
**occasionally**
11:5 13:1 31:1 38:2
49:24 66:23 220:6
**occiput**
194:7
**occlude**
73:16,21 74:5,17
75:10 76:21 78:1
213:21
**occluded**
74:19 101:12 213:23
**occluding**
74:8
**occlusion**
77:6 78:4
**occur**
47:2
**occurred**
156:2 163:11
**October**
44:11 170:13
**Oddly**
57:7
**offended**
23:6
**offer**
66:7 144:14

**offered**
25:18 31:20
**office**
1:16 2:2 12:24 15:2,8
16:12 21:3,4,5,6
22:24 23:22 24:4,8
24:18,18,20 26:11
27:21,22 28:4,12,24
29:6,10,17,17 33:2,7
33:12,20 34:12,14,15
34:22 37:24 40:6
43:21 58:8,15 59:16
119:7,23 125:2,5
127:1 128:4,7 133:22
135:21 141:20 142:2
142:4 145:5 146:24
153:9 154:5 169:4
221:19
**officer**
9:16
**officers**
1:8 55:19 61:11
123:24 128:13,16
138:6
**offices**
120:1 169:8
**officials**
24:2
**offset**
33:12
**oftentimes**
9:3 15:22
**Oh**
32:23 42:4 52:4 57:21
59:20 60:19 70:1
83:3 98:4 121:23
124:23 125:23
131:14 137:13
141:21 154:24
173:22 178:18 182:8
190:1,23 198:24
215:16 219:2
**okay**
5:7,18 6:1,3,3,6,13,18
6:23 7:12,17 8:8 9:7
10:8,13,19 11:19

12:10,11,22 13:7,10
13:14 14:1,11,21
15:1 16:5,6 17:24
18:7,7,13 21:2,13
23:18 24:9,16,22
25:7 27:9,20 28:14
29:2 30:11 32:19
34:13 35:13 36:22
40:4 41:4 42:16 45:7
45:21 46:17 47:18
48:10,19 49:3 50:7
50:10 51:7,16 52:4
52:20 53:2,16,24
54:7,23 55:17,24
56:4,8 57:5,9 58:7,13
59:7,13,21 62:5,10
63:13 68:5 69:9 72:4
73:9 75:16 76:6 79:6
80:20 81:23 82:12
84:5,13,20 86:2,11
86:11 88:1,13 90:22
91:22 92:19 94:4,7
94:14 95:22 98:13,21
98:24 99:2,7 101:10
102:17 104:13 105:2
105:20 106:11
107:13 108:2,11
111:9,15,19 112:7
114:11,18,20 115:6
115:11,13 118:21
122:11,20 124:16,20
125:6,9,9 126:2,7
127:24 128:1,4,10,24
129:13 130:18 133:9
134:13,16 136:1,3
139:5,10,16 141:8
142:2,9,19,23 143:4
143:7 144:2,5,9,13
145:13,22 146:10,15
147:22 148:7 150:8
150:15 152:12 154:9
154:11 155:21 156:5
158:17,21 160:6,18
160:18 162:8,9,19
163:7 164:23 165:14
165:15,18 166:8,12

166:21 167:17,21
168:5,18 173:1
174:10 175:12
177:19,21 178:8,16
179:5,5,7 181:9,15
182:10 183:1,12
184:19 185:3 186:13
188:3,13 189:4 190:9
190:19 191:13
192:19 194:11 198:9
198:14,21 199:7
200:11,11,24,24
201:9,14,23,24 202:7
203:2 205:6,20
207:10,23 208:5,20
209:4,6,8,19 210:2
211:21,24,24 212:20
212:23 214:8,17,20
216:19 218:8,13,13
219:13
**old**
42:24,24,24 107:7
215:6,13,17,19,21
**older**
32:13 74:23,24 75:24
75:24 76:5,6 78:23
215:20
**once**
9:12 97:4 107:21
137:13 149:7 150:1
187:20 194:4 198:24
**ones**
10:18 46:11 65:13,19
70:7 102:5 104:17,21
110:19 120:4 130:13
130:17
**one's**
50:6 152:20 171:3
172:7
**ongoing**
43:23 59:22
**online**
13:6
**on-the-job**
26:10
**open**

149:10
**operation**
191:7
**opined**
212:23,24
**opinion**
8:3 25:2 28:8,16,21
32:2 33:1 54:1,4,6,7
54:9 58:4 62:15 81:7
123:9 124:2,4,24
127:16,18 129:4
159:14,18 160:7
167:13 168:23 173:3
173:4,21 175:24
177:17,24 178:11
182:5 187:21 188:17
189:1 218:14
**opinions**
67:10 123:3 142:21
144:14,18 145:14
166:21 167:22
177:19 190:13
**opportunity**
26:15 53:8 137:15
**opposed**
49:9 60:1 101:8
156:16
**Opposite**
195:24
**option**
56:7 67:2 163:7,8
**oral**
5:22
**order**
3:8 157:9 195:4
**ordinarily**
33:18
**organs**
107:16 108:4,6 149:18
**original**
2:24 193:17
**originally**
60:20
**other's**
119:11
**outcome**

92:24
**outline**
70:14
**outset**
169:7 189:7
**outside**
9:17,24 33:15 34:21
39:15 48:8 84:16
142:3 155:4,15
**overall**
77:18,19 87:18 98:24
189:2
**overdose**
49:8 50:17
**overlap**
209:24
**overlapped**
206:9 209:20
**overtly**
116:11
**oxygen**
18:10
**Ozaukee**
10:1
**O'REILLY**
1:10

___

**P**

**P**
2:1,1
**page**
2:16,19 12:7 123:17
133:5 144:20 145:18
145:19 146:2 148:11
156:19 164:16 165:6
174:1 199:21 202:22
207:13 219:7 220:3
**pages**
144:3
**paid**
28:21,23,24 29:18,18
29:19 126:23,24
127:3 128:5 141:1,3
**pair**
106:21
**pale**

195:15 196:17,22,24
197:2,4,6,21 201:15
202:16,16,16 203:17
203:17,21,21 204:3
**panel**
45:20
**paper**
13:4 44:9,12
**papers**
67:11,15 68:17,21
**paramedics**
153:15
**Pardon**
125:14
**parent**
81:11
**parentheses**
156:21,23
**part**
11:14 12:24 17:11
22:7,10 25:23 27:21
33:8,8,11 41:7,15,22
42:20,21,22 43:1,10
43:10,13 45:4,18,23
51:12 52:9 55:21
56:22 70:1,3 71:21
92:23 93:1 95:18
102:24 114:3,4 160:6
160:8 162:15,15
198:14,19 206:6,7,7
206:9,16,18 216:9,10
**partial**
83:5 162:18 177:15
**partially**
98:7 193:6 194:1,2
**particular**
31:6,16 32:4
**particularly**
20:21 25:22 34:1 54:8
67:6 76:4 100:8
104:22 111:7 116:10
172:24
**parties**
221:15
**partner**
135:20

parts
206:8
party
17:9 88:2 98:7
pass
10:24
passed
56:13 220:14
pathological
40:19 150:10 169:10
   183:18 185:21 186:1
pathologist
13:24 25:7,10,11
   26:12 27:21 31:7
   32:10 43:12 64:8
   80:15,20 94:18 118:1
   197:5 217:21
pathologists
33:12 41:21 44:1 47:1
   64:2,12 65:2 67:9
   142:3,11,13 201:10
pathology
31:8,10,14 32:6 42:21
   43:11,15 71:22 80:14
   94:13 168:24 189:17
patient
15:12 20:6 80:16,23
   158:22
patients
10:24 211:19
pattern
160:4,11,14 161:1
   195:13,24 197:14,22
   198:20 206:11
   207:18,19
patterned
195:11 197:11,14
Paulson
55:6
Pause
199:12,17
pedestrian
49:14,21 50:1
pediatric
18:4,13 42:19 43:5
   44:8,10,15 45:5

46:18 67:20 68:1,14
   68:18 69:19,20 70:2
   70:5 71:17 72:1
   73:10
peer
69:12 119:4,9,10,17
   119:21 120:11
peer-reviewed
69:7
pending
3:16 50:15,15 131:1,8
people
26:2,8,20 32:2 35:5
   45:20 100:14 112:3
   183:13
PEOPLE'S
2:2
percent
22:5 37:8,11,13,15,16
   39:1,4 63:8,11 64:4,4
   64:5 119:10 120:1
   194:15 196:20 197:1
   197:12
percentage
22:3 29:24 30:1 63:2
   63:14,17 64:1,9,11
   64:15 86:16
percentages
37:8
percipient
13:21 17:21
perfectly
196:1
perforated
129:7
perform
188:21
performed
23:23
period
70:7 146:9,13,14
permanent
142:5
person
7:13 20:15 52:10
   75:24 78:22 79:4,13

79:13 82:3,7,13
   95:11 112:20 114:12
   125:4 154:5 179:19
   183:6,7 211:15
   220:15
personal
17:21 34:23 221:7
personally
28:18 29:22 71:8
person's
39:10,21 122:18,22
petechiae
81:13 100:2,5,8,10,13
   100:20 101:1,3,6,11
   101:11,19 102:1,7,24
   103:13,19 104:11
   113:2 114:6,10
   115:24 164:13
   166:14 180:14 187:6
   208:6,20 209:4,7
   210:9,14 212:20
petechial
203:18
Peters
3:11
Peterson
1:15 3:13 4:8,15,20
   85:13,16 185:10,15
   220:23 222:5,22
Peterson's
2:23
phenomena
101:1
phenomenon
101:11,18 103:1,9
phone
7:13,14 35:1 139:20
   140:4,7,11
photocopy
143:3,5
photographed
160:3 197:16
photographs
124:10 139:15 149:8
physical
40:6,8,10,13,14,19

55:20 150:10 161:4
   162:18 164:7 169:10
   170:1 176:9,9 180:7
   183:10,18 185:21
   186:1,20 189:18
   193:12,21 198:6
   216:12
physically
156:3 175:5 192:5
physics
177:1,3,9
physiologic
56:17,22
physiology
148:16
picture
96:4,24 190:10 199:22
   200:1,4,10,22 202:24
   206:5 207:12 208:10
pictures
70:22 90:18 95:23
   99:23 166:23 190:14
   190:16 199:15
piece
159:8,10
pinch
192:22 202:10,15
   203:12,16,17 204:3
pinched
206:23
pinky
200:16
place
116:16,21 141:20
   204:8,10
placed
161:18 179:18
placeholder
50:16
placement
205:24
places
20:23 142:7
plaintiff
1:6 2:5 3:15,20,23
   11:11 39:6 134:24

158:9,12
**plaintiff's**
125:13,15 126:3 129:3
158:6
**planned**
139:18
**play**
56:14 103:16 175:15
**played**
176:15
**please**
3:19 4:14 6:5 52:1
186:13 200:10
**plenty**
72:12 104:23 111:6
121:7 134:2
**plus**
68:10 117:10 140:7
153:13 206:1
**point**
5:17 13:21 30:9 53:11
56:19 57:1 89:20
95:6 104:19 137:5
139:9 140:22,24
150:4 155:4 174:1
175:4 182:8 184:16
186:19,21,24 187:2,3
187:5 189:14,19
191:15,20 192:4
193:18 194:3 200:9
200:10 204:17 206:1
206:6
**pointed**
186:7 192:22
**pointing**
200:21 201:18 202:1
**points**
192:22
**police**
1:8 9:2,3,15,18 41:3
47:19 55:19,22 56:1
56:12,19,20 57:18
60:22,23 61:2,8,13
91:15 119:7 123:15
123:22,23 128:12,21
132:15,23 134:6,12

153:14,22,23 154:1,6
155:16,16 168:22
**police-fire**
154:3
**police-involved**
120:4
**policy**
13:1,3,5 169:23
**political**
58:18,19
**portion**
196:18 207:18
**portions**
13:9 197:24
**position**
8:22 127:12 129:5,9
130:4,8 179:23
180:23 181:1
**positioned**
212:18
**possibility**
42:10 66:20 176:17
202:12,17
**possible**
20:24 21:10 50:21
89:13 124:8 157:3
158:2 169:12,14
175:5,5 177:1 181:8
181:8 188:17 204:15
209:10,14 210:23
211:5,8 214:16 219:8
**posterior**
194:13 208:15
**postmortem**
211:9,16,18,22,23
212:5,8,10,13,16
**postural**
84:11
**post-conviction**
220:3
**potential**
102:4 104:1,2
**potentially**
93:24 213:17 214:3
**Poulos**
55:8,9 56:4 57:24 58:7

59:16 60:20 61:2
**pounds**
73:24 74:1,2,10,14
75:3,6 214:5
**PowerPoint**
70:16,17,20
**PowerPoints**
71:1,12,14
**practice**
33:3,24 34:2 65:6
108:3 135:21 141:19
170:22
**practicing**
42:14 220:13
**preceding**
221:6
**precise**
205:24 215:14,22
217:21
**precisely**
179:16 182:13 204:9
204:21 206:16
**precision**
204:12
**preclude**
14:2
**predict**
9:14
**preexisting**
155:3
**prejudice**
23:15
**preliminary**
26:16
**prep**
140:7
**prepare**
6:19,24 7:8,19 144:5
145:11
**preparing**
144:9
**present**
39:12 43:19 210:10
**presentation**
69:18 70:10
**presented**

44:9,12
**presenter**
44:14
**pressing**
188:22
**pressure**
58:18,19 101:18
102:11,13 103:9,9,11
104:8,10 159:21,22
179:8 192:4 193:1
195:23,24 198:6
212:3,3,8 213:8,10
214:3,4,6
**pretty**
26:6 31:24 40:1 50:3
51:9 73:5 77:11
153:2 164:18 165:2
170:2,4 172:1 176:22
178:13 204:6
**prevent**
60:6
**prevented**
60:3
**prevents**
6:14
**previous**
220:11
**previously**
83:18 176:11,15
199:23
**primary**
9:23
**principle**
56:11
**print**
146:24
**printed**
69:5 146:23
**printer**
146:23
**prion**
10:3,11
**prior**
8:12 133:10 171:14
175:14
**prison**

121:4
**private**
10:5 11:4,8 29:19 33:3
33:21 34:18,19 125:1
**privately**
30:7
**probably**
5:10 9:10,11 17:6
30:10 38:18 63:22
64:3 67:9 87:1 90:21
94:11 103:7,16
111:18 133:1 137:1,2
137:5 166:19 167:3
175:1 180:12,23
181:2 199:15 217:13
**problem**
177:2 207:9
**procedure**
4:22 13:1,3
**procedures**
13:5
**proceeding**
62:8 170:7
**proceedings**
3:1 199:12,17 222:7
**process**
11:15 20:20 50:12
149:17 150:7 169:3
**produce**
71:1 104:11 192:9
**products**
84:8
**professional**
1:20 17:22 221:4
**professionally**
13:22 158:24
**progeny**
219:23,24
**program**
26:11 39:20 44:14
45:3
**programs**
25:19
**prolonged**
70:7
**prominent**

120:17 215:3
**pronounce**
138:20
**pronounced**
182:23
**properly**
129:24 217:23
**properties**
81:17 118:12,15
120:13
**property**
13:19 149:3
**prosecution**
30:17 38:5,21
**prosecutor**
38:8
**protection**
57:19
**proved**
23:4
**provide**
17:16 25:13 26:7 27:8
70:21 123:2 126:23
142:15
**provided**
11:11 13:15 15:3 16:9
21:20 25:2 26:1
28:16 35:19 36:23
37:1,4,9 38:11,12,24
47:16 54:1 123:9
124:3 142:20 143:18
144:22 145:15 147:3
147:5,5 172:5 216:20
220:8
**provides**
40:18
**providing**
28:1 33:1 153:11
**proximity**
132:7
**public**
25:15 29:14 37:23
221:4,22
**publication**
69:7
**published**

34:24 67:11,15 68:17
68:21 69:2,4,7,10
**pull**
108:21 160:16,22
161:10 180:2 199:14
203:4 205:7,8 217:7
**pulled**
160:24 161:2 162:3,5
162:12,16 163:5
164:5 195:21 198:2,3
198:4 206:24 216:1
216:10,15 217:2
**pulling**
119:16 183:9 195:22
216:4 217:4,10
**pulmonary**
217:22
**punched**
109:18
**punished**
59:17
**punishments**
59:18
**purpose**
158:1
**pursuant**
4:21
**purview**
48:9 154:15
**pushed**
166:2
**pushing**
93:15
**put**
6:22 20:5,21 26:23
52:24 56:20 57:2
60:24 61:11 65:14
96:17 102:11 120:22
126:13 132:22
135:14 146:13
156:21 160:17,22
161:3,13,19 163:11
163:19,21 175:18
177:5 179:8,22
194:13 207:17
**P-E-T-E-R-S-O-N**

4:16
**p.m**
1:18 185:11,16 219:16
219:19 220:24
221:12

**Q**

**qualified**
17:17
**quarter-inch**
113:13
**question**
6:8,10 27:17 34:5 69:1
79:15 89:8,14 129:8
131:2 151:23 153:3
185:19 186:6,15
187:13,18 188:3,4,9
188:16,24 189:1
191:4
**questioned**
167:12
**questions**
6:5,15 27:1 113:5
151:17 174:4 188:1
193:8 220:20,21
**quick**
101:22 141:7 147:14
148:3 165:5
**quicker**
104:3
**quit**
60:12
**quite**
75:18 93:18 160:4
176:4 198:1
**quoted**
182:6 183:21,23

**R**

**R**
2:1
**Racine**
10:1
**rafter**
95:3
**ramifications**

ramifications
89:16
RANDALL
1:9
random
119:18
range
77:17
rare
102:19
reached
132:4,12 137:19,22
reaches
182:1
reaching
182:3
read
8:3,7,11 12:20 13:8
41:7 71:17 168:12,14
168:15 170:8 171:13
171:22 172:2 173:9
175:12 184:2,5,12
200:2 222:6
reading
140:7 171:3,9 172:18
173:8 187:14
reads
146:2
ready
7:3
real
147:14 148:3 165:5
191:2
reality
42:10
really
26:4,9 32:6 35:14
39:17 44:1 60:9
65:19 67:1,4 88:22
89:14,20 90:1,2
91:18 92:24 103:19
109:16 113:10,22
115:2,2 128:22
129:10 134:9 140:22
170:5 188:16 189:16
196:8 200:2 208:17

220:6
reason
20:12,16 67:3 73:11
74:15 151:10 171:5
209:11
reasonable
5:14 180:21
reasons
20:13 80:8 107:1
176:22 208:7
recall
14:17 16:19 23:22
43:7 51:3 57:22 61:3
90:24 96:3,12 97:4
127:3 129:6,23
130:14,20 133:16
187:24 188:2
receive
10:22 29:11
received
25:16,21 28:10,15,18
39:9 40:19 41:12
42:5,18 44:7 55:19
124:15 149:2
recommended
58:11 59:21 60:12
reconstruct
156:1
record
4:14 14:5 15:1 16:23
20:14,18 69:5 73:12
85:9 141:10,13
177:14 219:16,19
recorded
221:6
records
15:13 16:12 139:8
141:1 153:16,17,17
177:11
recovering
10:10
red
101:16 202:16,16,17
203:17,21,21,21
204:2 209:2
Redmond

125:21
redness
208:22,24
reduced
221:7
reference
13:2 15:9,11
referenced
13:11
referred
187:18
reflect
149:12
refresh
97:6
refute
183:11
regard
167:16 174:21 181:2
regarding
35:10 42:18 43:4 44:7
55:1 67:16 69:19,23
73:9 91:11 166:9
169:6,10 170:14
210:16 214:10
regardless
7:8
Registered
1:20 221:3
regular
9:8 10:17 25:1 137:14
reinforced
173:7
relate
41:19 77:19
related
8:1 66:14,14 69:24
relating
67:12 68:22 69:11
71:14
relation
16:9 190:11
relationship
23:10 91:19
relative
221:13,15

release
117:23
released
103:11
reliable
41:23
relied
61:7 166:22 167:1,7
174:10 190:12
relies
189:13
rely
91:9,12 173:2,12
177:10,13
relying
91:16 181:15,22
remains
50:22
remember
14:13,24 15:7 16:22
17:6 22:21 23:12
43:9 44:14 48:3
57:17 62:4,8 87:6,16
91:8 99:14 100:3,9
101:2,4 106:13,14,16
112:18 113:1,9,14,17
113:23 114:1,10
115:5 116:1 117:19
117:21 120:21
124:18,19,23 126:6
127:23 128:22
129:19 130:17 135:4
139:22 220:10
remove
81:19 149:3,12,13
repeat
164:20
report
2:21,23 6:20,22 7:4,6
7:19,22 8:3,5,9,11,12
26:17 35:9,16,19,23
35:24 36:1,3,6,9,13
36:20,21 55:22 56:2
61:2 69:1 91:15
119:14 127:21,23,24
133:15 135:8 140:16

Brian Peterson, M.D.   March 11, 2016

30

140:23 142:20,21
143:2,17,19,24 144:6
144:10,13,18 145:2,3
145:7,15,17,20
146:20 150:2 156:19
166:23 167:11,15
171:4,10,13,23 172:2
172:13,15,20,21
173:5 176:21 181:23
186:12 189:12 199:4
218:8 219:21
**REPORTED**
1:19
**reporter**
1:20 3:2,5 4:6 5:21,23
221:4
**reports**
55:1,2,18 61:11 69:3,5
69:11 140:15 153:13
170:24
**represent**
146:5,9,13
**representing**
123:23
**require**
53:13 152:23
**required**
19:6
**research**
20:8 67:19 145:6
**Reserve**
220:19,21
**residency**
43:11
**resign**
59:23
**resistant**
76:2,7 77:22 78:14
79:2,5,19
**respect**
15:4 16:13 32:21
39:23 54:2 57:23
66:18 95:13 100:23
129:4 145:20 153:7
155:22 172:7 173:13
174:18 177:10

178:15 182:6 183:5
201:13 208:7
**response**
11:10,12 12:18 71:9
103:3 154:3
**responsible**
98:12
**responsive**
2:20 11:24
**rest**
64:5 76:24 176:21
204:10 219:12
**result**
48:22 50:11 125:7
**results**
23:6 150:3
**resumé**
143:18,20
**Resurrection**
177:12
**retained**
2:24 15:21
**review**
6:18 7:6 30:14 55:22
119:4,9,10,17,22
120:11 139:14
140:14,22 145:9
**reviewed**
6:21 7:23 8:16 39:24
55:22 69:12 135:7
144:20 145:23 147:8
155:23 170:9
**reviewing**
6:20 7:4,18 161:21
169:24
**revolved**
58:2
**ridges**
117:3
**right**
8:13 13:12 17:3 18:15
18:22 19:1 20:15
21:18 24:10,14 25:8
27:17,23 28:2 32:4
33:4 34:17 35:16,17
36:17,23 38:1 39:3

40:8,16 42:5,10,11
45:10 46:8 47:22
48:2,12 50:19 51:19
51:22 52:15,24 53:3
54:2,11 55:15 57:4
60:2 61:6,16,16
62:14,18 66:20 68:19
69:17,22 71:10 74:4
74:11 76:5,10 78:22
82:1,20 83:10,19
85:22 86:6 92:8
96:21 97:18 99:1,4,6
101:10 102:13,18
104:12 105:22,23
106:1,3 108:13,14
109:12 110:5,23,24
111:12,13 113:14
114:15,22 115:9,11
116:16,19 117:5,7,10
120:6,8 121:16,19
122:2,5,24 123:17
125:20 128:14
131:15 134:13,15
136:8 137:8 141:2,4
141:5,17,18 142:1,12
142:19,20,21,23
143:1,13 144:15,21
146:1,5,14 147:24
148:1,13,14,17
150:15,17,18 152:7
154:14,18,20 156:12
156:21 157:1,17
158:10 159:6 160:16
160:17 161:7 162:10
162:21 163:15,18
164:1,2,6 165:2,5,16
165:21,24 166:23
167:2 172:9 173:24
174:13 175:17,23
178:1 179:10,15
180:3 181:21 182:16
182:18,21 183:14,23
184:11 188:4,7
190:11 192:1 193:11
193:23 194:2,2,12,21
195:2,11,14,18,20

196:4,7,10,12,15
197:6,7,8,10,18,22
198:10,13,16,22
200:12,19 202:1,2,23
203:8,9,22 204:8,10
204:10 207:16
208:11,19 210:17,21
211:10 212:22 213:2
214:10,12,20 216:6
216:16,23 217:3
218:7,11,12,16 219:4
**rights**
28:2 134:24
**ring**
11:16
**Rivera**
220:2
**robber**
155:14
**robbery**
56:15
**Robert**
1:8,8 138:14 139:1,3
**Robinson**
123:15,16 124:5
126:21 128:15
130:10
**robs**
155:12
**robust**
79:23 80:12 102:6
103:13,19 109:20
**roll**
175:19,19
**room**
67:9 93:9 157:8
167:11 169:23
194:14 196:19,22
**roughly**
64:4
**rounds**
43:21
**RPR**
221:22
**rubber**
118:24

Brian Peterson, M.D.   March 11, 2016

31

**rule**
20:16 121:16 133:15
   143:23
**rules**
4:22 5:19 121:17
**run**
24:4 157:8
**running**
56:16 93:9
**runs**
24:8
**rushing**
101:14

---
**S**

**S**
2:1,18
**samples**
149:17
**San**
43:13
**saw**
57:16 61:2 96:4
   167:14 196:24
**sawtooth**
207:19
**sayable**
183:14
**saying**
5:12 40:10,10 42:9
   45:11 64:9 76:12
   87:9 96:19 101:5
   105:23 111:9 113:24
   114:20 121:11,12,12
   121:16 122:21
   157:18 160:19,21
   162:1,6,9,14,19
   163:1 165:6,19 181:7
   181:9 185:24 186:3
   187:12 188:13 191:9
   198:21 204:20 206:4
   206:15 207:5,10,12
   207:22 209:9,13
   211:21 212:4,21
   215:17
**says**

**156:19**
**scale**
200:8
**scalp**
149:12
**scenario**
164:15
**scenarios**
162:1 216:20
**scene**
96:4,24 116:9 154:7
**school**
89:24
**science**
188:22 189:16
**Sciences**
45:13
**scientific**
45:18,19 215:14,21
**Scott**
135:9
**scratches**
124:11
**se**
218:1
**seal**
221:19
**search**
21:11
**seat**
27:13
**second**
101:11 143:12 199:13
**section**
143:23,24
**see**
5:19 10:13 16:24
   17:24 20:15 23:8
   28:20 33:17,18 73:6
   75:14 76:6 83:7,13
   93:7 95:4 100:9,13
   100:15,19 101:6,24
   102:13 103:18 104:9
   107:3,6,8,12 108:15
   108:18,23 109:1,5,13
   112:4,18 113:16

**114:4 120:17 121:1,4**
121:15 123:19 126:2
128:8 130:1 131:7
136:20 162:13
164:16 169:15,15,20
169:21,22 171:11
172:16 182:15 191:8
195:16 197:20
198:15,17,18,19,21
199:3 200:3,11,17,22
201:17,23 202:12,16
202:17 203:3,7,16,18
204:20 207:3 208:12
208:14 209:11,22
216:15 220:2,5
**seeing**
104:24 106:16,23
   210:20
**seek**
32:2
**seen**
8:5 12:23 16:4 32:9
   64:20 85:2,3,4 87:2
   102:6 105:17 107:9
   116:23 118:22 119:2
   119:24 122:12,21
   141:1 175:14,18
   204:13,14 211:2,4,19
   213:11
**selection**
119:19
**self**
39:13 95:2
**self-infliction**
124:8
**sending**
10:11
**sense**
24:5 31:19 40:23 41:3
   41:16 53:9 71:22
   72:16 84:7 93:13
   119:18 120:3 152:3
   169:22 176:4,7
   179:17 180:13
   188:15 214:11
**sent**

**147:5**
**sentence**
146:2,18 183:23
**separate**
36:20 193:8
**separately**
38:3
**series**
11:11
**serosanguineous**
217:24 218:3,9
**serosanguinous**
218:14,19,20,22
   219:11
**serum**
217:24
**serve**
9:5,22 10:16 142:17
**served**
29:9
**server**
146:23
**service**
9:23 29:15 142:15
**services**
25:13
**session**
45:18,19
**set**
93:12 181:7 221:18
**setting**
23:7 44:18 88:5,8
   105:11
**settings**
26:5 88:12
**settled**
23:16
**settles**
212:10
**setup**
92:21
**seven**
22:17,19 62:23 114:7
   182:20,20
**shape**
162:13,16 163:10,13

177:5 194:17 195:22
198:2 209:18
**sharing**
44:20
**sheet**
83:12,14 118:7 121:4
122:2,8 175:16 176:3
216:9 217:5 222:11
**sheriff**
24:5
**she'd**
93:8 99:2
**shoot**
57:21 155:16,16
**shooting**
127:10 128:12 129:5
130:11,18 133:7
155:3
**shoots**
155:13
**short**
27:17 117:12
**shortcut**
131:12
**shortest**
48:16
**shot**
127:12,13
**shoulder**
166:10
**shoulders**
146:4 210:21 213:1,3
214:22
**show**
11:23 140:21 184:15
**shows**
207:18
**shut**
102:12
**shuts**
101:23
**sickle**
51:12,14,14,17,22,23
51:24 52:2,3,4,6,6,8
52:9,11,13,14,16,17
52:22,23 53:1,2,2,7

54:13,13,18,21,22
**side**
38:5 84:13 106:20
107:20,20 114:13
126:3,4 134:4,9
193:23 194:2,6
195:10,14 196:4,8,10
196:13 197:7,10
198:22 202:1,5 203:3
203:7 206:11 207:19
209:23 217:7
**sides**
30:18
**SIDS**
65:5
**signature**
143:5
**significant**
81:1 147:17
**significantly**
73:17 75:10 76:22
78:2 79:22
**sill**
131:8
**similar**
75:18,20 76:14
**simply**
6:21 10:10 13:4 14:24
22:6 30:14 31:14
36:20 47:5 48:5
50:20,21 61:18 65:16
67:2 81:10 97:24
153:2 169:15 173:6
191:4 193:1 204:24
**single**
115:8 159:20 160:10
160:11,12,15,17
161:10 163:19
173:16,23 176:5
179:19 187:4 191:3
192:24 193:13
204:11 205:20
207:20
**sit**
16:21 91:6 101:1
132:9 135:4 140:10

163:24
**sitting**
96:12
**situation**
81:22
**situations**
81:9 91:1
**six**
9:15 57:21 67:10
73:24 74:1 89:5 90:1
90:3 106:21 111:5,10
111:10,12,16
**sixth**
123:18
**six-year**
107:7
**six-year-old**
95:23 100:24
**six-year-old's**
100:4
**size**
77:18,19,20 78:11
79:11
**sizes**
78:12
**skeletonization**
64:21
**skeletonized**
50:22
**skin**
165:22 192:23 202:14
208:14,17 210:20
213:19
**skip**
6:2
**skull**
149:12
**Slanted**
191:12
**sleep**
44:18,19
**slide**
167:6
**slight**
183:1,2,3
**slightly**

180:2
**slow**
103:3
**slowdown**
214:5
**small**
70:5 77:8,11 86:22,23
182:18
**smaller**
77:13,16 78:7
**smarter**
66:3
**smooth**
113:12
**smothering**
84:15
**snap**
120:21,22
**soft**
121:3 164:12,21,22
165:19 185:5 210:15
214:9,11
**software**
21:10
**solely**
150:9 168:11
**solicit**
34:22
**solved**
104:20
**somebody**
102:20 107:10 113:15
118:3 155:2,12
156:15 157:7 169:24
171:4 178:12 181:1
183:9,9 191:8 213:12
220:16
**somebody's**
40:3,3 96:2 152:15
212:18
**someone's**
39:14 40:11,14,20
48:11 153:21
**someplace**
165:12
**something's**

97:24
**son**
158:13,16,23 159:5,7
172:22 190:17,19
**soon**
174:8
**soot**
84:7,9
**sorry**
10:15 12:2 24:16 75:8
82:5 85:6 106:19
112:16 164:20
184:11,22 189:4
194:9
**sort**
30:15 33:8 36:17
59:11 84:9,17 89:2
100:20 110:15
118:11 149:6 202:20
212:12 213:15
**sought**
32:3
**sound**
92:4 141:2
**sounds**
73:5 141:4 178:14
**speak**
41:1 50:16 53:5 85:17
92:22 139:17 158:23
165:13 171:15,18
**speaking**
7:17 57:17 76:17
**speaks**
40:5 153:2
**special**
31:19
**specialized**
149:14
**specialty**
31:6,16,18
**specific**
14:17 31:11,13 32:6
39:22 41:23 43:3,7,9
44:14 46:17 52:11
61:4 63:6,12,16
71:19 73:6 77:22

78:13 80:2 82:19,20
87:2,13,23 91:19
94:14,19 95:8,18
98:18 104:24 110:3
111:3 128:20 150:13
167:19 174:3,7
181:23,24 184:15
187:17 188:16,24
215:3 217:20
**specifically**
41:19 50:24 57:22
69:20 86:2,4 90:24
97:5 101:4 110:17
113:23 119:15
134:11 157:7,20
167:4 168:8 169:18
173:12 215:5
**specifics**
51:3 180:22
**specify**
106:9
**specimens**
149:20
**spectrum**
46:12
**speculating**
170:21
**speculation**
170:20 171:17 172:6,9
180:18,20 181:6
**spend**
44:17
**spent**
7:2 43:14 44:18 45:5
**spit**
6:4
**splayed**
206:17
**spoke**
140:4
**sporadic**
11:1
**spot**
147:6 206:9 212:19
**spots**
101:16

**squad**
56:21
**ss**
221:1 222:2
**staff**
21:12 33:11 43:12
50:19 104:19 142:5
145:1 153:11 169:4
**staff's**
169:6
**stamp**
12:8 200:2
**stand**
104:17 172:3,14
**standard**
172:2
**standing**
96:10 180:6
**stands**
104:22 113:10
**start**
43:6 113:18 139:12
141:7 207:1,15
**started**
65:6 105:10 137:4
188:19 191:23
**starting**
3:20 32:15 108:7
145:17,19 207:4
**starts**
143:22 145:22
**state**
3:19 4:13 10:2,3,9,23
12:12 14:8,11,18
16:7 17:11 20:3,7
29:15,16,21 30:24
31:2 37:5,17,18,21
37:23,24 38:5 74:12
75:7 125:10,11
130:22 153:14 220:2
220:12,13 221:1,5
222:2,15
**statement**
72:20 77:11
**states**
1:1 3:17 72:6,22 73:3

182:2
**State's**
1:10
**statute**
120:5
**stay**
51:4
**Stefan**
173:9,13
**step**
149:2
**stepped**
206:24
**steps**
89:19 92:22,22,23
**sternoclas**
80:10
**sternocleidomastoid**
106:21
**Steve**
3:10
**Stevens**
8:4,5,11
**stick**
110:19 118:1
**sticks**
98:4
**stolen**
13:19
**stoma**
102:21
**stood**
173:15
**stop**
148:2
**stops**
146:6
**store**
155:13,15
**story**
40:4 53:19 129:3
**straight**
18:8
**straightforward**
5:24
**strangle**

Brian Peterson, M.D.   March 11, 2016

88:11 192:3 205:10
**strangled**
19:8,13,19 20:11 36:7
82:3,7 88:3 98:8
99:3 105:24 217:17
218:6
**strangling**
159:5,7
**strangulation**
18:18 19:24 21:8,23
22:4 36:17 67:13
69:24 71:14 81:2
82:10 84:19,23 86:6
86:13,18 87:4,22
88:15 89:1 94:9,10
94:12 95:7,9,10,13
95:18,19,21 98:3
100:11,12,18,18
101:7,20 102:7 103:1
103:6,19 104:3,14
105:9,16,17,18 106:8
106:22 109:22 110:9
110:12,15,22 111:2
111:22 112:13
117:15 118:6,11
150:17 151:7,11,19
151:21,23 152:1
156:11,24 157:3,6,14
157:19,24 158:3
178:13
**strap**
79:10 84:24 106:15,18
107:3,5 109:15
118:23 151:22,24
152:2
**Street**
222:8
**stress**
56:17 155:6
**stressor**
56:22
**stretch**
119:1
**stretchable**
118:20
**stretchy**

118:15,17
**strike**
13:15 18:14 21:13
42:17 47:10 86:3
100:22 145:18
177:21 189:5 218:10
218:13
**strikes**
49:14
**string**
162:23 163:5 195:1,4
205:13 206:5,7,8
209:10,20 215:24
216:2,7,9,11 217:9
217:10
**strong**
175:1
**stronger**
79:19
**structure**
75:23 77:16
**structures**
76:18 77:3,9,12,13,15
77:20,21,23 78:7,8
78:13,15,18 79:7,18
**struggle**
57:4 60:23 61:17,18
102:11 103:8
**stuck**
48:3 66:23 155:20
**studies**
73:9 122:6 150:3,7
**study**
75:21 103:15 122:9
149:24
**stuff**
113:21 139:15 166:5
170:8
**subaurale**
115:10,11
**subcutaneous**
164:14
**subject**
14:1
**subjected**
119:4,21 120:11

**subpoena**
2:20 4:22 11:10,12
12:1 15:21 71:9
**subpoenaed**
12:18 15:18 134:7
**subpoenas**
37:21 38:2
**subset**
70:6 72:17 86:5
**subspecialty**
31:9
**substantially**
124:14 147:9 214:6
**sudden**
45:22,23,24,24 46:1,1
46:22 65:1 66:12,13
**sued**
22:24 126:12 138:7
**suffer**
52:17
**suffered**
54:17
**sufficiently**
148:16
**suffocated**
35:10
**suffocation**
18:22,23 35:12,24
36:17
**suggestive**
166:6
**sui**
120:22
**suicidal**
111:4
**suicide**
19:5 41:18 50:4,5 64:5
97:13,17 101:9
111:10,14,17,19
112:8,9,12,17,22
113:12 115:21
152:20 166:15
**suicides**
49:24 111:21 112:1
121:5
**suit**

22:22
**Suite**
2:7,11
**summaries**
145:11
**summary**
144:6
**superficial**
124:12
**supervisors**
59:3
**support**
126:19 183:11
**supported**
129:20
**supporting**
77:3 130:3
**supports**
33:13
**sure**
18:6 20:24 22:21
27:19 28:23 32:23
37:13,14 38:17 40:22
40:24 42:4 43:1
49:23 61:1 64:13
68:7 69:6,21 70:18
70:22 71:2 72:15
76:16 84:2 85:23
88:18 93:6 94:4
97:15 102:9 110:9
118:2,15 130:16
133:13 140:18
142:16 146:7 147:15
151:15 154:24 157:6
157:14,16 158:10
159:18 160:14 165:1
165:11 166:3,18
167:20 171:8,10
172:17 178:18 180:1
181:14 182:8 184:1
197:5 198:5,24
205:18 208:23 209:7
212:16,18 213:4,19
214:16,19,24 219:10
**surface**
109:19

surgeon
23:23
**Susler**
2:3 3:24,24 200:14
suspect
38:19
suspended
96:6,8,13 100:15
  107:11
suspension
83:5,6,9,13 117:23
  182:22 191:15,20
  206:2
swear
4:7
switch
72:4
switched
24:13
switching
123:1
sworn
4:9
syllabus
70:14
symmetrical
217:6,8,12
symptoms
52:17 53:6,15,22
  54:18,21
syndrome
45:22 65:1
system
23:5 155:11

_____
**T**
**T**
2:7,18 4:11
take
6:4 26:12 62:19 68:24
  71:6,10 78:21 85:6
  89:19 90:18,20 96:3
  107:9,16,17 108:3,6
  111:4 141:6 147:14
  166:13 170:1 185:7
  189:2

taken
1:16 4:21 5:2,5,20
  85:10 118:13 141:11
  149:8 185:12 192:20
  204:14 219:17
  221:10 222:7
takes
102:10,11 180:14
talk
26:14 39:11 42:23
  66:11 70:2,3 73:24
  88:22,23,24 91:14,16
  95:9,10,12 101:10
  111:13 134:8 137:20
  137:22 147:24 174:9
  218:21 219:14
  220:16
talked
26:18 149:13 152:18
  168:20 173:14
  175:21 180:22 190:6
  194:17 218:24
talking
39:1 41:5 43:22 44:16
  44:17 45:5 69:6,10
  74:21 84:20,23 87:24
  93:20,21 95:19
  100:17 102:23
  105:16 109:23
  111:21 134:11
  140:12 141:15
  150:21 162:4 164:17
  169:18 173:22 205:8
**Tangential**
124:13
tangled
88:19
tape
84:16 184:21,24
target
72:11
tattoo
113:15 115:2 117:17
taught
45:19 70:2,4
tax

33:13
taxpayer
33:17
teach
43:20
teaching
25:21 104:19 140:21
technical
35:11
technicality
56:10
technically
18:10 48:16 56:24
techniques
41:2
technology
66:4
telephone
34:23
television
57:16
tell
14:14,22 15:7 19:11
  19:14 25:10 35:7,7
  58:11,13,23 63:24
  78:17 83:21 87:13,20
  89:22 91:6 93:11
  105:6,13 106:17
  109:13 112:7 113:3
  114:8,23 115:1
  116:20 136:16
  146:11 161:21
  163:24 164:3,24
  170:22 178:6,8 179:3
  179:15,20 180:1,9
  181:4 183:6 187:9
  190:1 193:4 214:21
  219:5
telling
14:22 61:8 100:24
tells
116:22 131:5 205:20
temporally
170:22
ten
63:8,11 64:4,4,5 74:10

87:7,10 120:1 137:10
  144:3 172:6
tend
68:8 79:1 80:15 90:5
  93:6 95:7,14 100:14
  103:18 111:13 118:1
tends
44:3 65:12 78:23
  102:23 103:2 121:5
tenens
142:8
tension
192:18 193:18 207:20
  209:17,24 210:8
term
18:8 48:4 49:15 59:11
  59:17 88:4,16,17
  94:9 95:7 106:4
  155:20 180:20 197:2
  197:3 212:6,7
termed
217:24
terminated
60:13
termination
59:19
terminology
65:1 95:5,16 156:8,14
terms
5:15 7:5 9:21,24 15:14
  16:11,16 18:8,13,14
  20:16 21:2 29:8 30:6
  36:1,15,22 37:7
  38:10,23 39:12,13
  40:18 51:9 56:16
  59:22 74:20 76:13,15
  80:3 87:23,24 91:16
  93:7 103:21 104:10
  104:23 111:10 112:7
  115:6 119:3 142:7
  150:8 151:9 153:19
  153:20 158:24
  164:16 173:18 182:5
  183:4 187:11
terrible
66:7

tertiary
10:21
test
23:8 67:24 68:12
   155:24
testified
4:10 5:16,16 13:23
   14:5,6,18 16:1,22
   17:20,22 18:3 19:2,7
   19:12,18,23 20:3,6
   20:10 21:14 22:2
   32:16,21 38:20 39:2
   61:22 62:5 122:12
   123:12 127:9 132:14
   132:18 133:23 134:2
   134:18,23 170:6,12
   172:12 175:13
   185:18 220:3
testify
13:18 16:23 17:5
   25:17 26:2,8,13,15
   27:8 37:16 51:1
   133:2 171:22
testifying
20:14 30:12,23 39:5
   124:18 133:10
   171:14 172:7
testimony
2:21 13:12,15 14:3,4
   15:4 16:9,11,13,17
   17:1,4,16 18:1 19:6
   21:21 25:14 28:2
   30:14 31:13 36:22,24
   37:4,9 38:7,11,12,16
   38:17,24 39:12 47:16
   51:4 54:4 126:23
   135:8 143:22 167:8
   167:18 170:10,15
   171:7 172:18,23
   173:2,13 174:11,18
   175:7,13 176:6
   188:11,14 193:10,16
   194:18 195:6 207:15
   209:17 210:5 217:15
   218:4 220:8
testing

23:4 50:18 68:7,10
tests
23:6 68:3,6 155:21
   156:5
textbook
71:24
textbooks
72:2
Thank
185:8
theft
17:21
themself
112:20
theoretically
211:3,7
theory
187:4
therapy
149:4
thickness
109:16,21
thing
13:4 25:14 27:13,16
   30:15 32:5 35:6
   43:10,23 44:1,21
   48:13 49:12 59:12
   63:1 64:22 84:9,18
   85:3 88:4,11,20 89:1
   93:10 94:6 98:10
   100:20 103:5,15
   106:15 119:8 128:20
   140:1,23 143:12
   147:2 149:6 153:18
   173:5 174:24 181:18
   192:6 198:13 202:20
   204:18 207:24
   220:10
things
8:8 21:9 41:7 43:9
   45:17 48:5 82:24
   83:3 85:1 91:23
   97:20 104:9 117:24
   143:21 150:2 152:10
   161:6 163:22 169:15
   169:20 181:3,9

186:16 189:2 190:7
   191:7,7 199:16
   206:19 208:9
thing's
198:12
think
5:14 7:16 8:6 13:18
   14:4 21:9,24,24
   23:12,23 27:5 28:23
   30:8 38:9,14 39:7
   54:4 55:2 56:12,19
   58:1 59:9,20 60:6,19
   61:16,16,17,24 63:20
   66:10 67:5,6 71:8
   72:16 75:12,17 80:7
   80:12 81:11,20 83:10
   83:11 84:8,11 86:10
   87:14 88:1,8 89:3
   90:3 92:20 93:2,6
   94:1,2 96:8 97:4
   98:8,9 99:19 100:1,6
   100:7 102:3,4,24
   103:15 106:7 108:7
   112:15,16 113:11
   114:17 115:8 116:4
   118:8,8 119:24 120:2
   122:3 123:15 124:20
   127:10,11,13,18
   130:16 132:1,2,13,17
   133:5,13,14 134:22
   135:2,23 136:2,13
   139:18 147:10 151:1
   151:10 154:18,19
   157:6 159:8,12 160:2
   160:10 163:8,23
   164:2,15,17 167:24
   168:1 170:8,15
   171:13 172:23 173:4
   175:3,4,21 176:1,20
   176:23 177:4 180:2,7
   180:11,12,15,23
   181:3 183:14 186:5
   186:14,21,22 188:23
   193:9,20 194:7,14
   195:21 197:2 209:13
   209:22 210:13 211:7

212:6 214:8,16 215:7
   215:20 216:13,13,17
   217:12,18,20 218:2
   219:10
thinking
66:3 89:17 137:2
   139:8
thinks
25:15 186:17
thinner
202:4 218:20
third
30:4
thoracostomy
126:14,15
thought
55:16 57:7 60:9,10
   72:10 89:4 102:5
   103:6 108:20 131:14
   167:9 174:24 175:2
thousand
47:4 63:5,10
threat
57:8,9,15
threatened
57:18
three
45:3 103:16 110:14,20
   114:17 117:16 123:8
   135:17,19 143:21
   185:14 206:19 208:7
   208:9
three-year-old
165:23
thrombi
52:7
throw
160:12
throws
160:13
thumb
121:17,17
thumbs
107:2
thyroid
108:9

Brian Peterson, M.D.   March 11, 2016

37

ticket
139:24
tie
120:22
tight
113:12 194:24 198:7
207:4,7,7
tighten
207:2
tightens
207:6
tightness
175:11
time
3:14 5:1 7:2 12:22
13:15,19 17:20,22
19:12,18 37:16 38:12
44:5,7,19 45:5 52:22
64:14 70:9 83:3,15
85:13 87:3 91:2,3
96:4 104:6,10 111:15
116:10 117:10,12
120:15,15 121:1,3,13
121:13 139:18 140:6
141:21 150:5 169:13
170:16 172:8 180:14
184:23 185:4,11,16
185:22 187:19
193:19 199:24
211:17 220:24
times
5:15,16,17 13:11 17:6
17:16 19:10,16 21:15
21:18,20 22:2,16
29:8 30:13,24 37:9
37:19 38:19,24 65:13
68:2 80:17 97:2,8
100:13 102:6 115:7
116:2 122:18,22
133:14 153:1,4 154:1
161:9,12 163:2,14,16
164:4 167:10,17
172:14 193:6,9,15
194:20,23 205:14,15
206:22 209:10 210:3
216:1,8

time-consuming
97:10
timing
66:4 186:15
tip
27:10
tips
26:19,24 27:5,7
title
8:19 13:22 15:15
today
3:11 6:16,19,24 7:5,20
9:16 16:21 91:6
101:2 132:9 135:5
140:10 163:24
170:24 186:17
token
170:23
told
21:14 58:10,16 59:22
63:16 64:4 65:5
83:18 158:17 159:3,6
tonsillectomy
23:23
tools
26:19
top
123:18 130:14 134:21
144:20 149:12
182:19 191:15
203:11,12 204:6,10
205:9 207:19
topic
49:6 71:20
topics
72:4 123:1
torso
129:8 149:10
torticollis
80:10
touched
45:1 196:6
touches
216:16
touching
197:10

tough
103:15
tow
118:23
toxic
94:6
toxicologic
149:20
toxicology
65:22
toy
151:22
traction
161:13,18 162:11
177:6,7 179:18
202:14 204:23 205:4
205:5,7,22
trade
26:19,24 27:2,6
train
26:11 126:11 139:22
139:24 201:6,11
trained
41:2 135:19
trainees
169:14
training
25:16,19,22 26:1,7
31:19 39:9 40:20
41:8,12,23 42:6,18
42:22 43:1,4,7,14
44:7 46:6,13
trainings
39:20 46:18 69:23
trait
51:14,17,24 52:3,9,13
52:14,16,23 53:1,2
54:14,22
TRAM
201:1,3,3,4,4,8,10
transcript
3:1,2 6:1 222:6
trapped
157:11
trauma
72:6,23 124:4,14

166:4
traumatic
84:11
Traurig
2:10 132:12
traveled
139:5
traveling
139:21
treasurer
135:16
treatise
72:1,2
tree
113:16 115:3,4
trial
2:21 14:3,7 16:17 17:1
20:19 61:24 62:6
125:7 127:19 130:24
133:13 143:22
144:14 172:19,23
174:21 175:13,14
210:6
trials
5:10
trick
27:2,4
tricks
26:24 27:5
tried
74:4
tries
155:16
trigger
103:3
triggers
214:4
tripped
214:14
trivial
92:4
true
21:24 32:5 72:19
81:11 121:17 150:14
153:1 174:7 191:18
222:9

**try**
20:21 26:14 51:4
89:12 152:24
**trying**
16:3 17:15 28:20 29:3
41:5 71:6 95:17
97:19 108:21 113:20
157:2,21 163:19
180:18 188:20 203:4
205:10 217:21
**tube**
108:9 126:13,13,15,17
**tucked**
79:9
**turn**
106:19 156:18 199:21
**Turning**
219:21
**twelve**
74:10
**twice**
32:20 136:19,21
**two**
50:7,20 52:10 59:24
65:17 66:23 67:1
71:12 85:12 100:21
103:16 104:13,16
123:8 133:20 140:5
157:22 161:6 163:9
163:22 164:6 174:1
175:4 183:13 185:10
187:3 193:8 203:8,8
208:11 216:19
**two-and-a-half**
200:7
**type**
3:2 18:5,16,19,23
36:10 44:10 84:3,6
84:10,14,18,22 95:8
117:5 146:11 155:11
**types**
18:22 46:1 64:11 68:6
71:21 117:19 215:4
**typical**
40:1 50:17 88:12
182:15

**typically**
19:5 69:6 152:6 155:5

---

### U

**U**
162:13,16 163:10,13
177:5 194:17 195:22
198:2 209:18
**Uh-huh**
16:14 47:13 202:3
**ultimately**
176:8
**uncertainty**
180:21
**uncommon**
83:13 102:19
**uncommonly**
112:19
**unconscious**
191:24
**underneath**
199:1
**understand**
6:7,12 29:7 31:15
35:14 42:11 90:1
97:18 103:22 106:11
113:4,6 142:19
144:24 176:1 188:12
201:12 207:22
**understanding**
6:15 61:7,19 158:8
159:4
**understood**
6:10 101:17
**under-the-age-of-six**
97:16
**undetermined**
50:14,18 58:5 64:6,17
64:20 65:2,4,8,11,12
65:14,15,15,20 66:19
66:21,22 67:5 90:6
90:12 92:14 93:3
97:12,20,23 111:14
184:8,13,18 188:7,10
**unexpected**
45:4 46:2 66:12,13

**unfortunate**
157:10
**uniform**
182:24
**uniformly**
197:20
**uninjured**
202:14 208:16
**unintentional**
73:2
**unique**
120:3
**United**
1:1 3:17 72:6,22 73:3
**unlawful**
155:18
**unqualified**
18:1
**unsafe**
44:19
**unusual**
96:9 107:10
**unwrap**
195:3
**upper**
146:5 210:21 213:2
**upward**
182:14
**upwards**
191:12,19
**up-to-date**
25:5
**urban**
89:1
**urine**
149:22
**use**
27:4 50:15 65:1 66:22
70:22,24 87:24 88:5
88:16 94:9 95:5,7
97:22 120:23 139:24
143:8 172:12 180:20
189:24 199:13
201:10 212:6 216:21
**usual**
27:16 116:5

**usually**
101:21 104:2 152:9
153:21
**U-shaped**
162:20 164:1 216:20
216:20

---

### V

**v**
123:15,16
**vacuum**
188:8,18
**vagal**
103:3
**value**
170:2 190:24 191:2,14
**vanishes**
160:15
**variable**
9:17 38:3 180:11
**variables**
77:7 79:14
**variation**
95:17
**varies**
30:3
**various**
9:4 26:17 36:23 46:1
61:8,11 85:21 97:21
103:23 177:24
210:20
**vary**
67:7 79:13
**vascular**
74:12
**vast**
36:24 37:3 38:6
119:20 120:10,10
**Vegas**
45:3,12 46:13
**vein**
73:22 74:9 79:9
101:12 210:10
**veins**
75:17,17,19 76:6
210:11 214:3

**version**
40:11,14 129:14,18
  146:18,19 147:1,7
**versus**
3:15 14:8,12 16:7 33:3
  33:21 61:18 64:1
  83:12,14 101:20
  125:22 126:22
  128:15 133:6 156:11
  157:23,24 164:22
  166:15 172:8 173:23
  189:22 220:2
**vessel**
75:13 77:4,5 103:10
**vessels**
52:7 73:16,19 75:10
  76:13,17,22 78:1
  103:12
**victim**
42:24 90:16 108:21
**victims**
105:4
**video**
3:12 85:12 185:10,14
  220:22
**videographer**
3:10,11 4:6 5:21 85:8
  85:11 141:9,12
  147:16 184:22 185:1
  185:9,13 200:17
  219:15,18 220:22
**VIDEOTAPED**
1:15
**view**
56:11,21 168:9
**viewed**
168:2
**vitae**
2:22 144:1,6
**vitreous**
149:21
**volume**
114:3 120:2
**volumes**
47:6
**vs**

1:7
**vulnerability**
155:2

___

**W**
**Wacker**
2:11
**wait**
100:22 114:11 150:6
  199:24
**waiting**
185:3
**walking**
27:11 88:2
**wall**
76:1 77:5 180:6
**want**
6:2 25:20 27:1,18 54:6
  58:5 65:3 88:22
  103:22 120:9 143:10
  143:13 147:16 156:8
  161:24 185:20 198:9
  201:23 207:11
  219:13
**wanted**
59:15
**wasn't**
16:19 23:2 46:9 53:9
  56:16 67:1,4 93:12
  125:23 126:24
  147:20 160:19 168:3
  168:5 169:23 170:3
  180:12 191:20
  195:15,18 204:24
  206:5 207:8 213:23
  218:10 220:15
**watch**
26:14
**way**
6:22 16:5,6,8,18 20:5
  21:6 26:23 39:13
  40:4 47:1 64:13
  65:14,16 66:24 104:7
  119:5 129:21,22
  131:17 132:22
  135:15 141:21

152:22 155:1,8
  161:20 162:19 163:1
  171:11 172:10 174:7
  174:19 175:23 178:6
  179:12 180:8,19
  183:12 194:14
  195:21 197:19
  200:14 205:2 214:20
  215:14,21 216:17
  217:14
**ways**
36:18 60:17 82:9
  94:15 105:18 122:19
  152:18 154:24
  163:23 165:24
  179:11
**wearing**
56:15
**web**
118:18
**website**
34:18 35:3
**wedged**
84:12
**week**
9:12
**weekly**
9:9,19
**weeks**
45:3 111:18 112:18
**weird**
146:16
**Wells**
138:14
**well-defined**
83:17 160:15 192:24
**went**
14:6 20:15 129:8
  135:20 160:7,8 174:4
  176:8 214:8
**weren't**
8:8
**West**
1:16 2:7,11 221:10
  222:8
**Western**

10:12
**we'll**
11:19 15:22 71:10
  143:8 147:23 220:6
**we're**
5:12 6:9 10:10 12:4,8
  22:19 24:19,20 39:1
  41:20 43:22 48:3
  49:6 66:11,23 69:1
  74:21 78:11 84:20,23
  102:23 105:16
  113:24 120:2 147:10
  148:2 153:12,13
  155:10,19 162:4,6
  211:17
**we've**
9:15 15:20 28:23 89:3
  110:7 137:13 146:23
  171:1 176:22 182:18
  190:6 208:16
**whatchamacallit**
88:19
**when's**
19:12,18 87:3 111:15
**whereof**
221:18
**whichever**
43:17
**who've**
85:22 110:21
**WI**
1:17
**wife**
88:6 105:21
**Williams**
47:12 50:24 52:13
  55:1 56:12 60:23
  61:12 66:19 120:7
**wind**
192:8
**Wisconsin**
10:3,9 37:20,22 221:1
  221:5,11,20 222:2,9
**wish**
25:18
**witness**

4:7,9 13:21 17:9,21
37:5,17 41:5 131:10
131:12,17,20 143:9
146:22 147:15 148:2
170:21 171:18 185:5
199:18 200:19
221:18
**witnessed**
50:2
**WO**
1:9
**woman**
23:4
**word**
27:4 35:6 52:24
165:16 175:1 201:4
201:10
**words**
24:24 41:1 70:1
100:19 101:8 117:1
165:11 176:19
202:13
**work**
9:1,18 27:20 29:16,19
32:13,15 33:14,16
60:5 64:12,14 68:16
103:7 115:3 127:4
128:5 153:9 161:3
169:8 173:17 177:1,3
177:9,9 193:2 204:18
204:24 206:20
216:18
**worked**
29:22 35:5 47:11
64:10,16 118:4
125:21 127:7 128:10
130:12 131:22
133:21 152:22
**working**
24:3 32:8 34:1 131:23
**works**
24:18 115:15 141:16
154:24 192:19
**workshop**
46:14
**workshops**

46:21
**world**
31:20 52:5 94:13,17
181:5
**worst**
65:24
**wouldn't**
5:11 9:3 19:6 30:9
31:18 33:18 39:16,17
41:9,23 46:23 47:7
52:24 53:15,16,22
54:20 56:12 70:6
80:4 88:16 93:4
95:20 134:10 152:1
155:9 162:17 166:19
169:17 172:1 176:16
180:20 197:19
203:11 217:12
**wound**
112:11 130:9 152:21
**wounds**
112:3
**wrap**
90:2 196:8
**wrapped**
97:3 115:7 116:3
117:6 122:17,22
140:9 160:20 161:8
161:12 162:2 163:2
163:17 175:19
176:11,16 191:21
193:5,8 194:20 196:4
196:7 198:7 204:21
205:14,15 206:22
209:10,20 210:3
215:24 216:4,7
**wrapping**
81:17 217:9
**wraps**
160:23 209:15
**wreck**
126:11
**wrists**
213:13
**write**
35:15 140:23

**writing**
221:7
**written**
15:17 35:9 69:4
155:23
**wrong**
27:13 60:9 219:8
**wrongful**
22:22 23:19
**wrote**
127:23,24 133:14

---

**X**

**X**
2:15,18 4:11
**x-ray**
149:24

---

**Y**

**yeah**
36:19 65:23 66:15
71:5 73:14 89:12
106:7 118:8 119:13
119:23 120:19
122:20 125:18 128:3
128:3 130:2 131:20
134:21 136:2,4
137:19 140:1 158:16
162:11 168:13
170:21 171:18
184:16 188:12
191:10 199:19 200:3
200:21 203:1 209:1
214:11 215:20 220:5
**year**
17:6 26:12 30:3,3,5
43:14 45:9 47:4,5
57:20 70:11 98:18
110:3 113:8 114:2
119:10 136:13,19,21
139:9 141:24
**years**
8:23 42:14,24 43:8
57:22 63:7 87:7,10
87:12 90:14 98:6,16
98:22 114:17 135:17
137:6,10 171:3 172:6

**yesterday**
7:11
**Youens**
136:4
**young**
46:11 88:1 89:5 92:18
93:1 95:22 127:11
178:13
**younger**
79:4
**Y-shaped**
149:9

---

**Z**

**zero**
30:4
**Ziad**
125:22

---

**$**

**$0.65**
185:5
**$1,000**
140:3
**$9,000**
141:2

---

**1**

**1:19**
219:16
**1:26**
219:19
**1:28**
1:18 220:24 221:12
**10**
53:20
**10:29**
85:9
**10:38**
85:14
**100**
5:13 21:18
**11**
1:18 2:20 3:13 85:13
185:11,15 220:23
221:11
**11th**

222:7
**11:36**
141:10
**11:45**
141:13
**1180**
2:3
**12:34**
185:11
**12:42**
185:16
**13**
221:23
**14**
185:1
**14-CV-4391**
1:7 3:16
**143**
2:22
**148**
2:23
**149**
2:20 11:20,21,24
**15**
7:16,18 53:20
**15th**
98:7
**15-year-old**
107:7
**150**
2:21 143:13,14,16
**151**
2:23 147:11 148:9
219:22
**18**
88:10 111:6,16 112:3
**1992**
98:20

**2**

**20**
7:16,18 75:6
**200-page**
183:24
**2000**
73:4

**2005**
170:13
**2006**
73:4
**2007**
98:19,20 110:4 137:7
**2013**
46:21
**2014**
14:5
**2015**
140:11
**2016**
1:18 3:13 85:13
185:11,15 220:24
221:11,21 222:8,17
**2017**
221:23
**22nd**
221:20
**25**
17:6 202:22 207:13
**26**
20:16 133:15 143:23

**3**

**3**
220:3
**3rd**
2:3
**30**
17:6 47:4 98:16
**300**
65:5
**3100**
2:11
**312-341-9646**
2:8
**312-476-5126**
2:12
**330**
2:7
**360**
99:18 162:2,4,7,17
**39**
12:7,8

**4**

**4**
2:17
**40**
42:14 43:8 196:20
**400**
32:7

**5**

**5**
144:20 145:18,19
**50**
87:1
**500**
32:7
**53**
2:7

**6**

**6**
148:11 174:1
**60**
194:15 197:1,12
**600**
5:17
**60601**
2:12
**60604**
2:8
**60642**
2:4
**66**
199:21

**7**

**7**
156:19
**7.5**
182:19
**75**
5:13 21:18
**77**
2:11
**773-235-0070**
2:4

**9**

**9:02**
1:18 3:14 221:12
**90**
37:8,11,13,15,16
**911**
154:2
**9200**
62:13
**9300**
20:22 62:11 86:16
**933**
1:16 221:10 222:8
**95**
37:13,15,16
**96Z**
199:22