# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 4391 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 12, 2014, Plaintiff Nicole Harris filed the present civil rights lawsuit in which she alleges that a Circuit Court of Cook County jury convicted her of murdering her four-year-old son based in large part on a false and fabricated confession elicited during approximately 30 hours of intermittent interrogation by Chicago Police Officers. After discovery and motion practice, the Executive Committee for the Northern District of Illinois reassigned Harris' lawsuit to this Court on February 17, 2017. The Court has set a firm trial date of October 30, 2017.

On January 6, 2017, Defendant Chicago Police Officers Robert Bartik, John Day, Robert Cordaro, Demosthenes Balodimas, James Kelly, Michael Landando, Anthony Noradin, and Randall Wo ("Defendant Officers") moved to exclude the expert opinion testimony of Plaintiff's polygraph expert Dr. Charles Honts pursuant to the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and Federal Rule of Civil Procedure 26(a)(2)(B). The Court will discuss Plaintiff's motion in limine regarding Dr. Honts – which does not involve a *Daubert* analysis – in a separate order. For the

following reasons, the Court, in its discretion, grants in part and denies in part Defendants'
*Daubert* motion.

## BACKGROUND

### I.     Factual and Procedural Background[1]

During the relevant time period, Defendants John Day, Robert Cordaro, Demosthenes
Balodimas, James Kelly, Michael Landando, Anthony Noradin, and Randall Wo were Chicago
Police Department Officers assigned to the Detective Division of the Area 5 Violent Crimes
Unit.  Defendant Robert Bartik was a Chicago Police Department Officer assigned to the
polygraph unit.  Defendants Andrea Grogan and Lawrence O'Reilly were Assistant Cook County
State's Attorneys ("Defendant ASAs") during the relevant time period.

In May 2005, Harris lived with her two young sons, Diante and Jaquari, ages five and
four respectively, and the boys' father Sta-Von Dancy.  On May 14, 2005, Harris and Dancy
were at a laundromat close to their home while their children were in the boys' bedroom, which
contained a set of bunk beds.  Shortly thereafter, Dancy returned home from the laundromat, at
which time he took a nap.  When he awakened, Dancy went to check on the children and saw
that Jaquari was lying flat on his stomach on the floor, a bubble was coming out of his nose, and
his face was purple.

After calling 911, an ambulance took Jaquari to the hospital, and Harris, Dancy, and
Diante followed.  Upon arrival, hospital staff informed Harris and Dancy that Jaquari was dead.

---

[1] The Court bases the background facts on the parties' filings in this matter, including
Plaintiff's June 2014 Complaint, as well as the Seventh Circuit's decision granting Plaintiff's 28
U.S.C. 2254(d)(1) habeas petition.  *See Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012).
The Court recognizes that some of these facts are in dispute.

Less than an hour later, officers from the Chicago Police Department, including Defendants Wo and Day, approached Harris and Dancy asking them if they would go to the police station so that the detectives could ask them some questions. The officers then took Harris, Diante, and Dancy to Area 5 Police Headquarters.

In her Complaint, Plaintiff alleges that after Defendants Balodimas and Landando went to her apartment to gather evidence and returned to the police station, the officers claimed that she spontaneously confessed to killing Jaquari with a phone cord – a confession that she allegedly recanted. Thereafter, while interrogating her, Harris alleges that Defendants Noradin, Landando, and Balodimas accused her of lying, aggressively interrogated her, and told her that she was under arrest for murdering her son. According to Harris, she asked for an attorney on numerous occasions, but Defendants refused to comply.

At approximately 11:00 p.m. on May 14, 2005, Defendant Kelly contacted the Special Investigation Unit of the Children's Advocacy Center to arrange for a "Victim Sensitive Interview" of Diante, after which Alexander Levi questioned Diante. Defendant Wo observed Diante's interview. At the interview, Diante stated that he saw Jaquari wrap an elastic band from the sheet on the top bunk bed around his neck, but that he could not help Jaquari. Diante also stated that his parents were not present when Jaquari wrapped the elastic band around his neck.

In the meantime, Defendant Noradin and/or Kelly asked Harris to take a lie detector test and Harris agreed. Because lie detector testing was not available at that time, Harris remained in the interrogation room without being able to sleep and did not have anything to eat or drink for hours. Defendant Bartik then administered the polygraph test. According to Harris, Defendant

Bartik told her that the results of her polygraph test revealed that she was lying. On the other hand, Defendant Bartik testified that the polygraph examination yielded an inconclusive result.

After the polygraph examination, Defendants Noradin, Balodimas, and Cordaro continued to interrogate Plaintiff at Area 5. In her Complaint, Harris claims that Defendant Cordaro repeatedly told Harris a fabricated story and then told Harris to give this fabricated story to the Assistant State's Attorney. Harris also alleges that Defendant O'Reilly met with her in the presence of Defendants Noradin and Balomidas, at which time Harris recited this story. Area 5's Defendant Grogan also met with Harris and she repeated the confession. On May 15, 2005, shortly after 1:00 a.m., Harris gave a videotaped statement in which she confessed to killing her son Jaquari.

Dr. John Scott Denton, a Cook County Medical Examiner, conducted Jaquari's autopsy. Defendants Noradin and Kelly observed the autopsy. Dr. Denton concluded that the elastic band from the bed sheet was the cause of Jaquari's death. Although Dr. Denton originally concluded that Jaquari's death was accidental, after a Chicago Police Detective told Dr. Denton that Harris confessed to the murder, Dr. Denton revised his medical opinion concluding that Jaquari's death was a homicide.

The police charged Harris with murder and she later moved to suppress the alleged coerced confession. According to Harris, Defendants Bartik and Noradin falsely testified at her suppression hearing stating that she had spontaneously and voluntarily admitted to the murder of her son and that no one had physically or psychologically coerced her into giving a false or fabricated statement. The Circuit Court of Cook County judge denied Harris' motion to suppress. At her jury trial, Defendants Bartik, Cordaro, Landando, Noradin, Grogan, and

O'Reilly testified for the State.  The trial judge precluded Harris' son Diante from testifying.  On

October 26, 2005, the jury convicted Harris of murder and the Circuit Court judge later

sentenced her to thirty years in prison.

After exhausting her state court remedies, Harris brought a habeas petition pursuant to 28

U.S.C. § 2254(d)(1) in the United States District Court for the Northern District of Illinois.  After

the district court denied Harris' petition for a writ of habeas corpus, the United States Court of

Appeals for the Seventh Circuit reversed the district court's denial with instructions to grant the

writ on October 18, 2012.  *See Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012).  In

particular, the Seventh Circuit concluded that the state court's disqualification of Diante as a

witness violated Harris' Sixth Amendment right to present a complete defense and that counsel

at Diante's competency hearing provided ineffective assistance of counsel – also in violation of

the Sixth Amendment.  On February 25, 2013, the State released Harris from prison on bond.

On June 17, 2013, the Cook County's State's Attorney dismissed all charges against Harris, and

on January 25, 2014, the Circuit Court of Cook County found that Harris was innocent of the

charges for which she was convicted and granted her a Certificate of Innocence pursuant to 735

ILCS 5/1-702.

## II.     Dr. Honts' Qualifications

After earning bachelors and masters of science degrees in Psychology from Virginia

Polytechnic Institute, Dr. Honts received his Ph.D. in Experimental Psychology from the

University of Utah in 1986.  Thereafter, he joined the Boise State University Psychology faculty

in 1995 and is presently a Professor of Psychological Science and Department Chair.  Since

1982, Dr. Honts has offered instruction and continuing education in a number of venues in the

polygraph, law enforcement, psychological, and legal professions, including lectures and instruction with the United States Department of Defense Polygraph Institute (now known as the National Center for Credibility Assessment), the United States Secret Service, the Federal Bureau of Investigation ("FBI"), and the Canadian Police College. Furthermore, Dr. Honts has consistently maintained a practice as a polygraph examiner starting in 1976 when he trained at the Backster School of Lie Detection in San Diego, California.

Dr. Honts has published and/or presented more than 300 scientific papers on deception detection and was co-editor of the recently published book *Credibility Assessment, Scientific Research & Applications*, First Edition, Oxford, UK, Academic Press. Some of Dr. Honts' published articles include: Handler, M., Honts, C. R., & Goodson, W., *A Literature Review of Polygraph Countermeasures & the Comparison Question Technique,* The Police Polygraphist Digest, January, 22-32 (2016); Honts, C. R., & Reavy, R., *The Comparison Question Polygraph Test: A Contrast of Methods & Scoring*, Physiology & Behavior, 143, 15-26 (2015); Handler, M., Honts, C. R., & Nelson, R., *Information Gain of the Directed Lie Screening Test*, Polygraph, 42, 192-202 (2013); and Honts, C. R., & Schweinle, W., *Information Gain of Psychophysiological Detection of Deception in Forensic & Screening Settings*, Applied Psychophysiology & Biofeedback, 34, 161-172 (2009). In forming his opinions in this matter, Dr. Honts relied upon his many publications, especially Raskin, D. C., & Honts, C. R., *The Comparison Question Test*, in M. Kleiner (Ed.), Handbook of Polygraph Testing, London: Academic 1-49 (2002).

Also, Dr. Honts was the recipient of the 2014 Harry Detwiler Award for contributions to the polygraph profession in Latin America and the 2009 John E. Reid Memorial Award for

distinguished achievements in polygraph research, teaching, or writing. Dr. Honts is a Charter Member and Fellow of the Association for Psychological Science. His current research focuses on two areas: (1) improving the standardization and criterion validity of the comparison question test for psychophysiological deception detection, and (2) interrogation, confession and false confession phenomena in real world contexts. Moreover, Dr. Honts has served and testified as an expert witness regarding polygraph examinations in federal and state courts throughout the country. *See, e.g., Halsey v. Pfeiffer,* 750 F.3d 273, 281 (3d Cir. 2014); *Smock v. Nolan,* 361 F.3d 367 (7th Cir. 2004); *Livers v. Schenck,* No. 08 CV 107, 2013 WL 5676881 (D. Neb. Oct. 18, 2013); *Deskovic v. City of Peekskill,* 894 F. Supp. 2d 443 (S.D.N.Y. 2012); *State v. Cope,* 405 S.C. 317, 748 S.E.2d 194 (S.C. 2013); *People v. Kogut,* 10 Misc. 3d 245, 805 N.Y.S.2d 789 (N.Y. Sup. Ct. 2005); *Rivera v. Lake County, Illinois,* 12 C 8665 (N.D. Ill.); *Bell v. City of Chicago,* 02 L 9957 (Circuit Court of Cook County).

### III.    Dr. Honts' Expert Opinions

Dr. Honts provides a list of the materials that he relied upon in forming his expert opinions specific to this lawsuit. These materials include: (1) Defendant Bartik's testimony at Plaintiff's suppression hearing; (2) Defendant Bartik's testimony at Plaintiff's criminal trial; (3) Plaintiff's testimony at her criminal trial; (4) two May 17, 2005 CPD supplemental reports authored by Defendant Bartik; (5) Defendant Bartik's May 15, 2005 polygraph examiner's worksheets for Dancy and Plaintiff; (6) the CPD polygraph case review dated May 15, 2005; (7) Plaintiff's and Dancy's polygraph consent forms; (8) Defendant Bartik's complaint register histories; (9) CPD's Bureau of Technical Services, Forensic Services Division, Standard Operation Procedure for Polygraph Unit Operations; (10) CPD Bureau of Detectives, Forensic

Services Division, Standard Operation Procedure for Polygraph Unit Operations; (11) CPD General Order 93-3, Special Situations; (12) Case Supplementary Reports, Field Investigation Cleared Closed (Arrest and Prosecution) Report submitted on June 21, 2005 by Defendants Noradin, Kelly, Day and Wo; (13) Case Supplementary Reports, Field Investigation Progress-Violent (Scene) Report submitted on June 2, 2005 by Defendants Wo and Day; (14) reports submitted on May 14 and 15, 2005 regarding interviews of Diante and Plaintiff; (15) Plaintiff's May 15, 2005 arrest report; (16) Defendant Noradin's testimony at Plaintiff's suppression hearing; (17) Defendant Officers' testimony at Plaintiff's criminal trial; (18) Defendant Bartik's deposition and trial transcripts in other City of Chicago lawsuits; (19) polygraph documents in other City of Chicago cases; (20) Plaintiff's polygraph graph; (21) the videotape of Plaintiff's confession; (22) Defendant Bartik's deposition testimony in this lawsuit; (23) Defendant Bartik's training record, rating cards, and evaluations; (24) certain Illinois statutes; (25) Plaintiff's deposition transcript in this lawsuit; (26) the Seventh Circuit's decision in *Harris v. Thompson,* 698 F.3d 609 (7th Cir. 2012); and (27) certain CPD general orders and addenda to these general orders.

In his expert report, Dr. Honts explained that when he reviews polygraph examinations conducted by other examiners, it is his standard practice to evaluate the physiological data before reviewing other materials. Next, he stated that he tested Harris' polygraph examination by using a comparison question test with four relevant questions and two comparison questions. The questions were ordered in the format commonly referred to in the polygraph profession as the Mixed General Question Test ("MGQT") or the Reid Comparison Test – the same test that Defendant Bartik performed. Dr. Honts then evaluated the physiological recordings using the

numerical scoring system developed and scientifically validated at the University of Utah (the Utah Scoring System). After completing the analysis of the physiological data, Dr. Honts reviewed other materials from Harris' polygraph examination.

Based on his review and examination under the Utah Scoring System, Dr. Honts proffered certain opinions as represented in his expert report. Defendants challenge the following opinions:

- The Harris Examination conducted in 2005 used archaic and discredited testing and scoring techniques that were no longer accepted as valid best practices in the polygraph profession. Those archaic and discredited techniques resulted in a false confession[.]

- The false confession .... might well have been avoided had valid polygraph practices been followed. The most egregious failures to use valid polygraph practice were:

  - Ms. Harris, the potential polygraph subject, was an unsuitable subject for testing on May 15, 2005, because her son had died and the state had taken her surviving child less than 24 hours before the polygraph examination. Moreover, she had not had sufficient sleep the night before. The examiner, Mr. Bartik, unprofessionally and recklessly abdicated his duty to delay the examination to the alleged willingness of Ms. Harris to proceed.

  - The testing technique used in the 2005 Harris Examination was, at that time, notorious for its use in scientific studies that had produced the highest rates of false positive outcomes ever seen in the polygraph research literature. In 2005, any competently trained examiner should have known that the Reid MGQT was of very poor accuracy and was highly prone to a high rate of false positive errors (that is, failing the actually innocent) and inconclusive outcomes with the actually innocent.

  - An inferior and archaic scoring technique, global analysis, was used to evaluate the Harris Examination. Since the 1970s it had been well known in the professional and scientific literatures and communities that global analysis was significantly less accurate than numerical scoring analysis and that the difference between the two was large. In particular, it was known that global analysis was prone to very high rates of false positive error. In my opinion, the use of global analysis in 2005 showed either a

willful disregard or deliberate ignorance for the 30 years of scientific research and advances in professional practice that had gone before. Using global analysis in 2005 was a reckless professional practice.

- Despite the weakness with the testing technique used, and Ms. Harris' unsuitable condition on May 15, 2005, my scoring of the Harris Examination with the Utah Scoring System produced an outcome of Truthful with regard to the four relevant questions of the examination. It is my opinion that Mr. Harris was being truthful when she answered the relevant questions in the Harris Examination. Moreover, it is my opinion that in 2005 any properly trained examiner who used one of the valid numerical scoring systems available at that time would have reached the same conclusion.

- The supervisory and professional practices of the Chicago Police Department in place in 2005 condoned and encouraged an organizational climate where the use of the polygraph as a false evidence ploy was tolerated, passively encouraged, and possibly actively encouraged. The risk of false confessions following polygraph tests was generally known in 2005, and there is no apparent evidence that the Chicago Police Department took any measures to avoid such use.

(R. 215-2, 1/29/16 Honts' Expert Report, at 18-19.)

Defendants, however, do not take issue with the general premise that a qualified expert can assess the basis and foundation of another polygraph examiner's administration of a polygraph test and then compare it using a different scoring method to determine whether the individual answered the examiner's questions truthfully or deceptively. *See Halsey v. Pfeiffer*, 750 F.3d 273, 281 (3d Cir. 2014); *Smock v. Nolan*, 361 F.3d 367, 370 (7th Cir. 2004); *see also United States v. Scheffer,* 523 U.S. 303, 317 n.13 (1998); *see, e..g, United States v. Bryant*, No. 4:11CR00447, 2015 WL 847496, at *4 (E.D. Mo. Feb. 26, 2015); *United States v. Microtek Int'l Dev. Sys. Div., Inc.*, No. CIV. 99-298-KI, 2000 WL 274091, at *1 (D. Or. Mar. 10, 2000). In fact, Defendants' own polygraph rebuttal expert Dr. John Palmatier employed this method in examining Plaintiff's polygraph test that Defendant Bartik conducted on May 15, 2005. (R. 214-2, Palmatier Rep., at 2-9.)

10

# DAUBERT STANDARD

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one

and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood*, 807 F.3d at 834 (citation omitted). "[T]he proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence." *United States v. Saunders,* 826 F.3d 363, 368 (7th Cir. 2016).

## ANALYSIS

In their *Daubert* motion, Defendants first challenge Dr. Honts' qualifications arguing that although Dr. Honts has substantial experience with polygraph examinations in the academic and non-law enforcement settings, his experience is limited when it comes to active police investigations. In addition, Defendants move to bar Dr. Honts' opinions that Plaintiff was truthful in her polygraph examination administered by Defendant Bartik on May 15, 2005, Dr. Honts' opinion about Plaintiff's lack of suitability to take the polygraph test, and Dr. Honts' criticisms of Defendant Bartik's use of the Reid Comparison Question Test because Dr. Honts' expert report failed to provide a basis or explanation for these opinions as required by Federal Rule of Civil Procedure 26(a)(2)(B). Defendants also contend that Dr. Honts' opinion regarding Plaintiff's truthfulness is unfairly prejudicial. Last, Defendants seek to bar Dr. Honts' opinions regarding the CPD's use of the Reid Comparison Test/MGQT and that the CPD improperly trains and supervises polygraph examiners based on the Court's bifurcation of Plaintiff's *Monell* claim for trial.

# I.    Dr. Honts' Qualifications

Without any citation to legal authority, Defendants first argue that Dr. Honts is not qualified to render his proffered opinions because his experience does not include active police investigations, namely, that he is not a police officer, he has no training in investigating homicides, and that he has not administered a polygraph test in a homicide investigation.

An expert may be qualified "by knowledge, skill, experience, training or education." *See* Fed.R.Evid. 702; *see also T-Bill Option Club v. Brown & Co. Sec. Corp.,* 23 F.3d 410 (7th Cir. 1994) ("Rule 702 lists several ways in which a person can be qualified as an expert, and the rule lists those ways in the disjunctive.").  "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010) (internal quote and citation omitted).  "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).  In determining if an expert is qualified under this standard, the question is whether the expert's qualifications "provide a foundation for [him] to answer a specific question." *Gayton,* 593 F.3d at 617 (internal quotations omitted, alteration in original).

Before turning to Dr. Honts' academic qualifications and practical expertise, the Court examines Dr. Honts' experience in the administration of polygraph tests.  *See United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically

contemplates the admission of testimony by experts whose knowledge is based on experience.")

(internal quotation marks omitted). In his expert report, Dr. Honts states:

> I also maintain a practice as a polygraph examiner. In 1976 I was trained as a polygraph examiner at the Backster School of Lie Detection in San Diego, California. I practiced full time as a polygraph examiner between 1976 and 1980 when I went to graduate school to study Psychology. My polygraph practice continues to this day as a secondary professional pursuit to my career in Psychology. Currently I am licensed as a Polygraph Examiner in the state of New Mexico. My New Mexico license was originally issued in July of 1995. Other states where I have been licensed are listed in my Curriculum Vitae. In 2010 I completed an American Polygraph Association approved training course in Post-conviction Sex Offender Polygraph Testing.

(R. 215-2, 1/29/16 Honts' Expert Report, at 2.) In the context of working with law enforcement,

in his expert report Dr. Honts explains that he has worked with the United States Department of

Defense, the FBI, and the Secret Service in polygraph training of personnel. (*Id.*) At his

deposition, Dr. Honts testified that he has had polygraph experience working with federal

government agencies and the Canadian government, at which time he saw the workings of

quality control of polygraph examinations, and that "each of the various federal agencies has

detailed policy manuals for standard operating procedure of how polygraphs should be done and

how quality control should be conducted." (R. 328, 3/10/16 Honts Dep. at 164.)

As to Dr. Honts' academic and practical expertise, as discussed in detail above, he has a

Ph.D in Experimental Psychology, has an extensive forensic practice, has offered instruction and

continuing education in polygraph examinations for over three decades, has published peer-

reviewed scientific journals, book chapters, and training materials, and has been a polygraph

examination expert in federal and state courts. Examining the wide range of Dr. Honts'

experience, academic training, and practical expertise, he is qualified to render the opinions

proffered in his expert report based on his superior knowledge, skill, and expertise in polygraph

examinations.  *See Gayton,* 593 F.3d at 616-17; *see, e.g., Livers,* 2013 WL 5676881, at *5;

*Deskovic,* 894 F.Supp.2d at 459; *Kogut,* 805 N.Y.S.2d at 792.  To argue that Dr. Honts is not

qualified to offer his expert opinions regarding Harris' polygraph examination because he has

not engaged in active police investigations misunderstands Rule 702's and *Daubert's*

requirements.  The Court therefore denies this aspect of Defendants' *Daubert* motion.

## II.     Basis of Expert Opinions

Defendants further seek to bar Dr. Honts' opinion testimony that Plaintiff was truthful at

her May 15, 2005 polygraph examination and that Plaintiff lacked suitability to take the

polygraph test, as well as Dr. Honts' criticisms of Defendant Bartik's use of the Reid

Comparison Question Test, because Dr. Honts' expert report failed to provide a basis or

explanation for these opinions as required by Federal Rule of Civil Procedure 26(a)(2)(B)(i).

"Federal Rule of Civil Procedure 26(a)(2) requires parties to timely disclose their expert

witnesses in accordance with any deadlines set by the district court" and "further requires parties

to disclose a written report prepared and signed by the witness."  *Novak v. Board of Trs. of So.*

*Illinois Univ.,* 777 F.3d 966, 972 (7th Cir. 2015) (internal quotations omitted).  The particular

subsection of Rule 26(a)(2)(B) upon which Defendants rely requires that the expert report

include "a complete statement of all opinions the witness will express and the basis and reasons

for them."  *Id.* (quoting Fed.R.Civ.P. 26(a)(2)(B)(i).  "Failure to comply with the disclosure

requirements of Rule 26(a) results in automatic and mandatory exclusion of the proffered witness

'unless the failure was substantially justified or is harmless.'"  *Novak*, 777 F.3d at 972 (quoting

Fed.R.Civ.P. 37(c)(1)); *see also Hassebrock v. Bernhoft,* 815 F.3d 334, 341 (7th Cir. 2016) ("If a

party doesn't make a timely and complete expert-witness disclosure, the expert's testimony

ordinarily can't be presented at trial."). Nevertheless, barring an expert from testifying based on Rule 26(a)(2)(B) is considered a severe discovery sanction. *See Fidelity Nat'l Title Ins. v. Intercounty Nat'l Title Ins.,* 412 F.3d 745, 751-52 (7th Cir. 2005); *Only The First, Ltd. v. Seiko Epson Corp.,* 822 F. Supp. 2d 767, 778 (N.D. Ill. 2011).

"The purpose of [expert] reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion (along with the other background information required by Rule 26(a)(2)(B)) so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez,* 583 F.3d 990, 994 (7th Cir. 2009). In other words, disclosures in expert reports "allow attorneys, not experts in the fields at issue, to prepare intelligently for trial and to solicit the views of other experts." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010). Simply put, expert reports allow attorneys to prepare for the expert's deposition and trial testimony. *See Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734 (7th Cir. 2010) ("[t]he purpose of the report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response.").

## A.    Plaintiff's Suitability

Despite Defendants' argument to the contrary, Dr. Honts' expert report fulfills the requirements under Rule 26(a)(2)(B)(i) by providing complete statements of his opinions – as highlighted above – and his reasons for them. In particular, Dr. Honts gives a detailed explanation as to why Plaintiff lacked suitability to take the polygraph test in ¶ 15 and ¶ 22 of his expert report. (Honts' Report, at 5, 18.) These reasons included that: (1) Defendant Bartik administered the polygraph less than 24 hours after Jaquari died; (2) during the same time

period, Harris' other child was taken from her and she was separated from Dancy; and (3) Harris was held in custody for hours in a room without a bed.

Moreover, in his expert report, Dr. Honts indicated that he had reviewed the CPD's Standard Operation Procedures in place at the time of Plaintiff's polygraph test, which further support Dr. Honts' suitability opinion. More specifically, the CPD's examination guidelines state:

A.     Subject Suitability

Some subjects may not be suitable candidates for polygraph examinations at the time of request. The suitability of the subject will be left to the discretion of the examiner.

1.     Examples of subjects who may not be suitable for a polygraph examination at time of request:

a) sex crime victims

b) pregnant females

c) subjects with chronic medical/mental disorders

d) subjects who may be fatigued, impaired from the abuse of drugs/alcohol, impaired due to medical use/non-use of prescription medication, or otherwise physically impaired from taking the exam at time of request

e) relatives of homicide/death victims may not be suitable for a polygraph examination on the same day the incident occurred.

(R. 270-5, Ex. D, Bureau of Tech. Servs., Forensic Serv. Div., Standard Op. Proc.)

Based on these disclosures, Defendants' counsel asked Dr. Honts about Plaintiff's lack of suitability at Dr. Honts' deposition, after which Dr. Honts further clarified his opinion and how Plaintiff's lack of suitability affected the accuracy of her polygraph results, including the trauma involved with the death of her child. (Honts' Dep., at 160-62.) In particular, Dr. Honts testified:

> In her [Plaintiff's] situation, the worry is you could have a false positive outcome, because in – if she is truthful, then she's a victim because her child just died. And we know that testing victims is a bad idea, because they produce a lot of false positive errors. So when you ask her about the death of her child, even if she's completely truthful, completely uninvolved, asking about the death of a child is a traumatic question to ask someone. And just the traumatic nature of that question could cause her to respond to those relevant questions. So that's the concern.

(*Id.*) Dr. Honts also testified about his experience in analyzing the suitability of other polygraph subjects. (*See, e.g.,* at 25-28, 37-38.) In summary, not only were Dr. Honts' reasons pertaining to Plaintiff's suitability set forth in his expert report, these disclosures allowed counsel to ask Dr. Honts questions about Plaintiff's suitability at his deposition. Therefore, Defendants' Rule 26(a)(2)(B) argument regarding the basis of Dr. Honts' suitability opinion is without merit, and thus the Court denies Defendants' motion in this respect.

### B. Reid Comparison Question Test

Next, the Court addresses Defendants' argument that Dr. Honts failed to sufficiently explain in his expert report his criticisms of Defendant Bartik's use of the Reid Comparison Question Test. According to Dr. Honts' expert report, based on Defendant Bartik's deposition testimony in this matter and deposition testimony in another City of Chicago lawsuit in which the plaintiff alleged that Defendant Bartik framed him for murder, *McGee v. City of Chicago* (04 C 6352), Dr. Honts explains in his expert report why Defendant Bartik's self-training in the Reid Comparison method was sub-par. (Honts' Report ¶ 18, at 11-12.) Also, Dr. Honts opined that based on national standards for police polygraph professionals, Defendant Bartik was not in compliance with professional recommendations and standards. (*Id.*) In his report, Dr. Honts further describes the Reid Comparison Question Test in the context of Harris' polygraph examination and why the Reid Comparison Test was archaic and discredited at the time

18

Defendant Bartik administered Plaintiff's polygraph test in 2005. (*Id.* ¶¶ 10, 17.) In addition, Dr. Honts references the numerous peer-reviewed publications that he has authored on the subject of both the Reid Comparison Method and the Utah Numerical Scoring System, including Raskin, D. C., & Honts, C. R., *The Comparison Question Test*, in M. Kleiner (Ed.), Handbook of Polygraph Testing, London: Academic 1-49 (2002) and Honts, C. R., & Reavy, R., *The Comparison Question Polygraph Test: A Contrast of Methods & Scoring*, Physiology & Behavior, 143, 15-26 (2015). (Honts Report ¶¶ 7, 8, Honts C.V., at 3-14.)

Dr. Honts' explanations in his expert report gave defense counsel an opportunity to prepare and question Dr. Honts at his deposition about his background, experience, and criticisms of the Reid Comparison Test. Dr. Honts, for example, testified at his deposition about the reliability of the Reid Comparison Test, that he received Reid training on interrogation (although not in polygraph examination), and that he has published a case study on the Arthur technique, which is a variance of the Reed Comparison Test. (Honts Dep., at 34, 101.) Dr. Honts further testified that he has read John Reid's published works about the Reid Comparison Test and has also read a number of scientific papers and studies on the Reid technique. (*Id.* at 126, 190.) Thus, the disclosures in Dr. Honts' expert report satisfied the purposes of Rule 26(a)(2)(B).

Moreover, Dr. Honts' use of the Utah Scoring System and his criticisms of the Reid Comparison Question Test go to the weight, rather than the admissibility, of his expert testimony. *See Stollings*, 725 F.3d at 766 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."); *see, e.g., Livers,* 2013 WL 5676881, at *5.

As such, Defendants' argument that Dr. Honts' use of the Utah Scoring System was "not even a fair way to evaluate the exam" is misplaced, especially because Defendants' own polygraph rebuttal expert used a different scoring system from the test that Defendant Bartik used. (R. 214-2, Palmatier Rep. ¶ 4.) Likewise, Defendants' reliance on Dr. David Raskin's 1999 testimony in an Alaska criminal case concerning polygraph scoring goes to the weight of Dr. Honts' opinion testimony and not to the admissibility of his opinions. Defendants will have the opportunity to thoroughly cross-examine Dr. Honts regarding any such evidence at trial. *See Stollings,* 725 F.3d at 766; *see also Ortiz v. City of Chicago,* 656 F.3d 523, 536 (7th Cir. 2011) ("The admissibility determination is not intended to supplant the adversarial process."). The Court denies this aspect of Defendants' motion.

### C. Plaintiff's Polygraph Score

Defendants further argue that Dr. Honts does not provide a sufficient basis explaining how he arrived at Plaintiff's polygraph score in his expert report in violation of Rule 26(a)(2)(B)(i). Contrary to Defendants' argument, Dr. Honts first explains how he scored Plaintiff's polygraph examination as follows:

> I evaluated the physiological data before reviewing any of the other materials. The physiological data were provided as photocopies. The photocopies were on 8.5 X 11 inch sheets and were of only fair quality. I was able to piece them back together and determined that they were of sufficient quality to attempt a numerical scoring analysis.

(*Id.* ¶ 10.) Dr. Honts also clarified that the test Defendant Bartik administered took the form of a comparison question test and explained:

> The questions were repeated three times while physiological data were collected with an analog instrument. The standard three physiological measures were recorded, respiration (abdominal and thoracic), electrodermal activity (also known archaically as galvanic skin response), and relative blood pressure (often

referred to in the polygraph profession as cardio).  The physiological recordings were all relatively stable, but the sensitivity settings for abdominal respiration, electrodermal activity and the relative bloodpressure were below professional standards, although they were minimally sufficient for scoring.  The electrodermal activity appears to have been collected with the circuit in automatic centering mode.

Dr. Honts then applied the Utah Scoring System stating:

> In the Utah Scoring System, when evaluating an examination where the relevant questions address a single incident or issue, a total numerical score of +6 or greater indicates truthfulness.  A total numerical score of -6 or less indicates deception.  Total numerical scores between -6 and +6 are considered inconclusive outcomes.  In my opinion, the Harris Examination addressed a single incident and therefore only the total score is of interest.

(*Id.* ¶ 13; *see also id.* ¶ 11.)[2]  Furthermore, Dr. Honts explained:  "I initially scored the data from the first three repetitions of the test questions.  My scoring of the three repetitions of the Bartik Examination questions produced a total numerical score of +15.  In the Utah Scoring System that score indicates truthfulness to the relevant questions of the examination."  (*Id.* ¶ 14.)

Attached to his expert report, Dr. Honts listed the materials he reviewed in applying the Utah Scoring System, including Defendant Bartik's May 15, 2005 polygraph examiner's worksheets for Plaintiff, Plaintiff's polygraph graphs, Defendant Bartik's deposition testimony in this lawsuit, Defendant Bartik's May 17, 2005 CPD supplemental reports, the polygraph case review dated May 15, 2005, and Plaintiff's deposition transcript in this lawsuit, among other materials.  Further, Dr. Honts cited articles explaining the Utah Scoring System.  *See, e.g.,* Brian G. Bell, David C. Raskin, Charles R. Honts, & John C. Kircher, *The Utah Numerical Scoring*

---

[2]  The Seventh Circuit explained polygraph scoring as follows:  "Positive numbers tend to show truthful responses whereas, negative numbers tend to show deception.  If a resulting score is close to zero, –1 or +2 for instance, the result is deemed inconclusive."  *Smock v. Nolan,* 361 F.3d 367, 370 n.1 (7th Cir. 2004).

*System,* 28 Polygraph 1 (1999).

These expert disclosures fulfill the requirements under Rule 26(a)(2)(B)(i) because they state a detailed basis for Dr. Honts' scoring of Plaintiff's 2005 polygraph data. *See Stollings*, 725 F.3d at 765 n.3 (Rule 26(a)(2)(B)'s "requirement ensures that the opposing party has an adequate basis to examine the expert."); *Walsh*, 583 F.3d at 994 (purpose of expert report is "to convey the substance of the expert's opinion."). In other words, Dr. Honts' expert report provided defense counsel with notice of the substance of the his expert opinions and gave defense counsel sufficient information to prepare for his testimony. *See Meyers,* 619 F.3d at 734.

Despite these sufficient disclosures, Defendants' counsel chose not to explore more details about Dr. Honts' calculation of Plaintiff's polygraph score at Dr. Honts' deposition. That counsel did not ask Dr. Honts' specific questions about his scoring of the physiological data concerning Defendant Bartik's polygraph examination of Plaintiff is not a basis to exclude Dr. Honts' polygraph testimony under Rule 26(a)(2)(B) or *Daubert*, especially because Defendants do not cite legal authority supporting any such argument. Therefore, Defendants can explore the details concerning Plaintiff's polygraph score at trial. *See Metavante Corp.*, 619 F.3d at 762 (expert reports "allow attorneys, not experts in the fields at issue, to prepare intelligently for trial and to solicit the views of other experts.").

## III.    Unfair Prejudice

### A.    Illinois Case Law

Further, Defendants argue that the Court should exclude Dr. Honts' opinion that Harris was honest at her polygraph examination as unfairly prejudicial. In particular, Defendants rely

on a 1984 Supreme Court of Illinois case holding that polygraph tests are inadmissible in Illinois to prove either guilt or innocence in the context of criminal proceedings. *See People v. Taylor*, 101 Ill. 2d 377, 391-92, 78 Ill.Dec. 359, 462 N.E.2d 478 (1984). In *Taylor*, the Supreme Court of Illinois reasoned that polygraph tests are inadmissible in criminal cases because "the results of polygraph examinations are not sufficiently reliable to be used to prove guilt or innocence." *Id.* at 391. The Illinois court also explained that "[t]he possibilities for prejudice are obvious; jurors will assume that the polygraph is reliable" and that "the danger is too great that jurors will not understand the disclaimers, will be unprepared to evaluate the conflicting testimony of experts, will not be able to heed the admonitions of the trial judge, and will, in the end, overemphasize the polygraph results." *Id.* at 392.

The Supreme Court of Illinois' decision in *Taylor* is not persuasive for many reasons. First, although Illinois has a "blanket prohibition" on polygraph evidence, "there is no similar ban in federal court." *United States v. Ross*, 412 F.3d 771, 773 (7th Cir. 2005). As such, the proper way to analyze the admission of polygraph examinations is under Rule 403 and *Daubert*. *See id.*; *United States v. Lea,* 249 F.3d 632, 638 (7th Cir. 2001) ("In this Circuit, the admissibility of polygraph evidence is a matter within the discretion of the district court."); *United States v. Robbins,* 197 F.3d 829, 844 (7th Cir. 1999) ("[i]n determining whether to admit polygraph evidence, the district court must take as its guide Rule 403 of the Federal Rules of Evidence.").

Second, although the Supreme Court of Illinois' concerns in 1984 were based on the unreliability of polygraph examinations, during that same time period, federal courts relied upon the "proponent of polygraph evidence" to "lay a foundation establishing that the particular

evidence offered contains sufficient indicia of reliability to warrant admission." *United States v. Dorfman,* 532 F. Supp. 1118, 1135 (N.D. Ill. 1981) (collecting cases). Since the United States Supreme Court's *Daubert* decision in 1993, federal courts look to the *Daubert* factors to gauge the reliability of proffered polygraph evidence. *See Lea,* 249 F.3d at 640. Further underscoring the *Taylor* decision's lack of persuasiveness, when considering the admissibility of expert testimony, "Illinois follows the *Frye* test, under which scientific evidence is not admissible unless technique has gained acceptance within relevant scientific community." *Ellison v. Acevedo,* 593 F.3d 625, 635 (7th Cir. 2010); *see also People v. Schuit,* 67 N.E.3d 890, 910 (1st Dist. 2016).

Third, unlike the *Taylor* court's assessment that jurors will not understand the trial court's disclaimers nor heed the admonitions of the trial judge, federal courts presume that jurors follow the court's instructions. *See Rodriguez v. Gossett,* 842 F.3d 531, 539 (7th Cir. 2016) (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). In sum, the *Taylor* decision is not persuasive in the context of Defendants' *Daubert* motion.

The Court thus turns to whether Dr. Honts' expert polygraph testimony is unfairly prejudicial under Rule 403. *See United States v. Schiro,* 679 F.3d 521, 529 (7th Cir. 2012) ("a trial judge has a responsibility to screen expert evidence for reliability and to determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury").

## B.     Rule 403

"The trial court enjoys broad discretion in determining whether to admit or exclude evidence[.]" *Jackson v. Willis,* 844 F.3d 696, 701 (7th Cir. 2016). Under Federal Rule of

Evidence 403, "the district court is allowed to exclude evidence whose probative value is substantially outweighed by a danger of unfair prejudice." *Davies v. Benbenek*, 836 F.3d 887, 890 (7th Cir. 2016). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago,* 822 F.3d 317, 339 (7th Cir. 2016) (citation omitted). As the Seventh Circuit recognizes, "all evidence is prejudicial." *Common v. City of Chicago,* 661 F.3d 940, 947 (7th Cir. 2011); *Davis v. Duran,* 276 F.R.D. 227, 233 (N.D. Ill. 2011) ("It is not enough to say that evidence is prejudicial" because "[a]ll evidence is prejudicial; that is why it is used.). Accordingly, "[t]o be excludable under Rule 403, the evidence must be *unfairly* prejudicial and its probative significance must be *substantially* outweighed by the danger of that prejudice." *Davis,* 276 F.R.D. at 233 (emphasis in original).

Here, except for their reliance on *Taylor*, Defendants do not explain how Dr. Honts' opinion testimony is unfairly prejudicial or why its probative value is substantially outweighed by the danger of unfair prejudice. Indeed, Dr. Honts' testimony is highly probative because how Defendant Bartik administered, reviewed, and informed Harris about the polygraph examination and its results is one of the central issues of this lawsuit. Under these circumstances, this probative evidence is not substantially outweighed by unfair prejudice. The Court therefore denies this aspect of Defendants' *Daubert* motion.

## IV.     Opinions Related to CPD's Polygraph Policy

Last, Defendants assert that Dr. Honts' opinion about the CPD's use of the Reid Comparison Question Test/MGQT and his opinion about the training of the CPD's polygraph unit are not relevant because the Court has bifurcated Plaintiff's *Monell* claim for trial. In

particular, Dr. Honts' opines:

> The supervisory and professional practices of the Chicago Police Department in place in 2005 condoned and encouraged an organizational climate where the use of the polygraph as a false evidence ploy was tolerated, passively encouraged, and possibly actively encouraged. The risk of false confessions following polygraph tests was generally known in 2005, and there is no apparent evidence that the Chicago Police Department took any measures to avoid such use.

(Honts' Report, at 19.) The Court agrees that Dr. Honts' opinions about the CPD's use of the Reid Comparison Test and the CPD's training of its polygraph unit speak to Plaintiff's bifurcated *Monell* claims against the City, and thus the Court excludes these opinions at this time. *See Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.").

That being said, as discussed, Dr. Honts' opinion testimony concerning Defendant Bartik's application of the Reid Comparison Test is relevant and will assist the trier of fact. *See Daubert,* 509 U.S. at 591 (Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" which "goes primarily to relevance.") (citation omitted); *see also Stuhlmacher*, 774 F.3d at 409 ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case."). To clarify, Defendant Bartik testified at his deposition that he decided to use the Reid Comparison Test and that not all Chicago Police Department polygraph examiners use the Reid Comparison Test. (R. 270-6, Bartik Dep., at 77, 91.) Dr. Honts' opinions as to Defendant Bartik's choice of the Reid Comparison Test, along with Defendant Bartik's application of this test, including the questions Defendant Bartik asked Plaintiff and opinions about Defendant

Bartik's experience and professional development, would assist the trier of fact "to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *see also Jimenez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013) ("In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful.").  On the other hand, Dr. Honts' comments about Defendant Bartik's lack of curiosity and cavalier attitude go to Defendant Bartik's credibility, and thus are not admissible. *See United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses.").

On a final note, any testimony that Defendant Bartik did not videotape the polygraph examination would only confuse the jury, especially because the CPD's General Order 05-01 on digital recordings for interrogations did not take effect until after Plaintiff's polygraph examination. *See United States v. Alayeto,* 628 F.3d 917, 922 (7th Cir. 2010) (evidence is confusing if it distracts jurors from central issue of case).

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part Defendants' *Daubert* motion to exclude Dr. Honts' opinion testimony.

**Dated:**  May 31, 2017

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

27