**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 4391 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

On June 12, 2014, Plaintiff Nicole Harris filed the present civil rights lawsuit in which she alleges that a Circuit Court of Cook County jury convicted her of murdering her four-year-old son based in large part on a false and fabricated confession elicited during approximately 30 hours of intermittent interrogation by Chicago Police Officers. After discovery and motion practice, the Executive Committee for the Northern District of Illinois reassigned Harris' lawsuit to this Court on February 17, 2017. The Court has set a firm trial date of October 30, 2017.

Before the Court is Defendant Officers' motion to exclude the expert testimony of Plaintiff Nicole Harris' false confession/coercive interrogation expert Dr. Richard A. Leo pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Similarly, Plaintiff has moved to admit Dr. Leo's expert testimony also pursuant to the Federal Rules of Evidence and *Daubert*. On May 23, 2017, the Court held a *Daubert* hearing at which time Dr. Leo testified. For the following reasons, the Court, in its discretion, grants in part and denies in part Defendants' *Daubert* motion, and grants in part and denies in part Plaintiff's *Daubert* motion. The Court will consider

the parties' arguments regarding Defendants' false confession expert Professor Paul Cassell in a separate order.

## BACKGROUND

### I.    Factual and Procedural Background[1]

During the relevant time period, Defendants John Day, Robert Cordaro, Demosthenes Balodimas, James Kelly, Michael Landando, Anthony Noradin, and Randall Wo were Chicago Police Department Officers assigned to the Detective Division of the Area 5 Violent Crimes Unit.  Defendant Robert Bartik was a Chicago Police Department Officer assigned to the polygraph unit.  Defendants Andrea Grogan and Lawrence O'Reilly were Assistant Cook County State's Attorneys ("Defendant ASAs") during the relevant time period.

In May 2005, Harris lived with her two young sons, Diante and Jaquari, ages five and four respectively, and the boys' father, Sta-Von Dancy.  On May 14, 2005, Harris and Dancy were at a laundromat close to their home while their children were in the boys' bedroom, which contained a set of bunk beds.  Shortly thereafter, Dancy returned home from the laundromat, at which time he took a nap.  When he awakened, Dancy went to check on the children and saw that Jaquari was lying flat on his stomach on the floor, a bubble was coming out of his nose, and his face was purple.

After calling 911, an ambulance took Jaquari to the hospital, and Harris, Dancy, and Diante followed.  Upon arrival, hospital staff informed Harris and Dancy that Jaquari was dead.

---

[1] The Court bases the background facts on the parties' filings in this matter, including Plaintiff's June 2014 Complaint, as well as the Seventh Circuit's decision granting Plaintiff's 28 U.S.C. 2254(d)(1) habeas petition.  *See Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012).  The Court recognizes that some of these facts are in dispute.

Less than an hour later, officers from the Chicago Police Department, including Defendants Wo and Day, approached Harris and Dancy asking them if they would go to the police station so that the detectives could ask them some questions. The officers then took Harris, Diante, and Dancy to Area 5 Police Headquarters.

In her Complaint, Plaintiff alleges that after Defendants Balodimas and Landando went to her apartment to gather evidence and returned to the police station, the officers claimed that she spontaneously confessed to killing Jaquari with a phone cord – a confession that she later denied and recanted. Thereafter, while interrogating her, Harris alleges that Defendants Noradin, Landando, and Balodimas accused her of lying, aggressively interrogated her, and told her that she was under arrest for murdering her son. According to Harris, she asked for an attorney on numerous occasions, but Defendants refused to comply.

At approximately 11:00 p.m. on May 14, 2005, Defendant Kelly contacted the Special Investigation Unit of the Children's Advocacy Center to arrange for a "Victim Sensitive Interview" of Diante, after which Alexander Levi questioned Diante. Defendant Wo observed Diante's interview. At the interview, Diante stated that he saw Jaquari wrap an elastic band from the sheet on the top bunk bed around his neck, but that he could not help Jaquari. Diante also stated that his parents were not present when Jaquari wrapped the elastic band around his neck.

After administering a polygraph test to Harris, police transported Harris back to Area 5 and Defendants Noradin, Balodimas, and Cordaro continued to interrogate her. In her Complaint, Harris claims that Defendant Cordaro repeatedly told Harris a fabricated story and then told Harris to give this fabricated story to the Assistant State's Attorney. Harris also alleges that Defendant ASA Lawrence O'Reilly met with her in the presence of Defendants Noradin and

Balomidas, at which time Harris recited this story. Area 5's Defendant Grogan also met with Harris and she repeated the confession. On May 15, 2005, shortly after 1:00 a.m., Harris gave a videotaped statement in which she confessed to killing her son Jaquari.

Dr. John Scott Denton, a Cook County Medical Examiner, conducted Jaquari's autopsy. Defendants Noradin and Kelly observed the autopsy. Dr. Denton concluded that the elastic band from the bed sheet was the cause of Jaquari's death. Although Dr. Denton originally concluded that Jaquari's death was accidental, after a Chicago Police Detective told Dr. Denton that Harris confessed to the murder, Dr. Denton revised his medical opinion concluding that Jaquari's death was a homicide.

The police charged Harris with murder and she later moved to suppress the alleged coerced confession. According to Harris, Defendants Bartik and Noradin falsely testified at her suppression hearing stating that she had spontaneously and voluntarily admitted to the murder and that no one had physically or psychologically coerced her into giving a false and fabricated statement. The Circuit Court of Cook County judge denied Harris' motion to suppress. At her jury trial, Defendants Bartik, Cordaro, Landando, Noradin, Grogan, and O'Reilly testified for the State. The trial judge precluded Harris' son Diante from testifying. On October 26, 2005, the jury convicted Harris of murder and the Circuit Court later sentenced her to thirty years in prison.          After exhausting her state court remedies, Harris brought a habeas petition pursuant to 28 U.S.C. § 2254(d)(1) in the United States District Court for the Northern District of Illinois. After the district court denied Harris' petition for a writ of habeas corpus, the United States Court of Appeals for the Seventh Circuit reversed the district court's denial with instructions to grant the writ on October 18, 2012. *See Harris v. Thompson,* 698 F.3d 609 (7th

Cir. 2012).  In particular, the Seventh Circuit concluded that the state court's disqualification of Diante as a witness violated Harris' Sixth Amendment right to present a complete defense and that counsel at Diante's competency hearing provided ineffective assistance of counsel – also in violation of the Sixth Amendment.  On February 25, 2013, the State released Harris from prison on bond.  On June 17, 2013, the Cook County's State's Attorney dismissed all charges against Harris, and on January 25, 2014, the Circuit Court of Cook County found that Harris was innocent of the charges for which she was convicted and granted her a Certificate of Innocence pursuant to 735 ILCS 5/1-702.

## II.     Dr.  Leo's Qualifications

Dr. Richard Leo is a Professor of Law and Psychology at the University of San Francisco, and was formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine.  In addition, Dr. Leo is a Fellow in the Institute for Legal Research at the University of California, Berkeley, Boalt Hall School of Law. Dr. Leo received his bachelors degree from the University of California, Berkeley, his master's degree from the University of Chicago, his juris doctorate from Boalt Hall School of Law, and his Ph.D. from the University of California, Berkeley.  His areas of research, training, and specialization include social psychology, criminology, sociology, and law.  Dr. Leo's areas of academic specialization including Criminal Law, Criminal Justice, Psychology and Law, Law and Social Science, and Police Organization and Behavior.  For more than two decades, Dr. Leo has conducted empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions.  In doing so, Dr. Leo spent nine months in the field with the Oakland,

California Police Department, which included observing 122 felony interrogations in 1992. In 1993, he observed 60 videotaped interrogations in the Vallejo and Hayward Police Departments.

Dr. Leo has analyzed thousands of cases involving interrogations and confessions and has researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals – often collaborating with Richard Ofshe, an internationally recognized expert on false confessions. These publications include: Richard A. Leo, *Why Interrogation Contamination Occurs*, The Ohio State Journal of Criminal Law (2013); Richard A. Leo & Deborah Davis, *Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation & the Decision to Confess*, Psychology, Public Policy & Law (2012); and Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice & Irrational Action,* 74 Denv. U. L. Rev. 979, 1117 (1997). Dr. Leo has written several books, including *Police Interrogation & American Justice* (Harvard University Press 2008) and *Confessions of Guilt: From Torture to Miranda & Beyond* (Oxford University Press 2012). Federal and state courts have cited and relied upon Dr. Leo's published works. *See, e.g., Corley v. United States,* 556 U.S. 303, 321, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) ("'[C]ustodial police interrogation, by its very nature, isolates and pressures the individual,' and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed, see, *e.g.,* Drizin & Leo, *The Problem of False Confessions in the Post–DNA World,* 82 N.C.L.Rev. 891, 906-907 (2004).") (internal citation omitted); *United States v. Preston*, 751 F.3d 1008, 1027 (9th Cir. 2014) ("Under interrogation, [arrestees] are not likely to understand that the police detective who appears to be friendly is really their adversary or to comprehend the long-term consequences of making an incriminating

statement.  Jon B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions After a Century of Research,* 100 J.Crim. L. & Criminology 825, 847 n.119 (2010).”); *Harris v. Thompson*, 698 F.3d 609, 632 n.12 (7th Cir. 2012) (“*See generally* Richard A. Leo, *False Confessions: Causes, Consequences, & Implications,* 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) (“Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect’s postadmission narrative.”)).

Dr. Leo has given numerous lectures and presentations to judges, defense attorneys, prosecutors, and other criminal justice professionals and has taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.  He has received numerous awards, including the Lifetime Achievement Award (2014) from the Society for the Study of Social Problems, Crime and Juvenile Delinquency Division; the Paul Tappan Lifetime Achievement Award (2014), from the Western Society of Criminology; and a Fellowship from the Center for the Advanced Study in the Behavioral Sciences (2014-15) at Stanford University, among others.  To date, Dr. Leo has consulted with criminal and civil attorneys on approximately 1,800 cases involving disputed interrogations and/or confessions, and has been an expert witness over 300 times in state, federal, and military courts, including cases in the Northern District of Illinois.  *See, e.g., Caine v. Burge,* No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013); *Livers v. Schenck,* No. 08 CV 0107, 2013 WL 5676881 (D. Neb. Oct. 18, 2013); *United States v. Deuman,* 892 F.Supp.2d 881 (W.D. Mich. 2012).

## III.    Dr. Leo's Expert Opinions

Dr. Leo provides a list of the materials upon which he relied in forming his expert opinions. These materials include: Chicago Police reports, event history records, crime scene reports, property inventories, general progress reports, polygraph materials, Harris' videotaped confession, Dancy's and Harris' criminal records, Dancy's statement, supplementary reports of Jaquari's death and polygraph tests, Harris' criminal trial transcript, the Illinois Appellate Court decision in *People v. Harris*, the Seventh Circuit's opinion in *Harris v. Thompson,* filings in the present lawsuit, Defendant Officers' deposition transcripts, Harris' deposition transcript, and Alexander Levi's deposition transcript.

In his expert report, Dr. Leo explains the study of police interrogations and false confessions and proffers the following opinions in relation to this lawsuit:

> (1) It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;
>
> (2) Nicole Harris's account of her multiple interrogations during her more than 30 hours at Area 5 on May 14-16, 2005 is consistent with the social science empirical research literature on the types of interrogation techniques and investigative practices that are associated with, increase the risk of, and are known to cause innocent individuals to falsely confess;
>
> (3) The accounts of the various Chicago police investigators who interrogated Nicole Harris for between 28 and 30 hours on May 14-16, 2005, are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;
>
> (4) In her account of what occurred during her police custody and/or interrogations on May 14-16, 20[0]5, Nicole Harris describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven. Nicole Harris describes interrogation procedures whose goal was not to find the truth but to break down her denials of guilt and elicit from her

a confession to killing her son Jaquari Dancy;

(5) Before interrogating her, the investigators misclassified Nicole Harris as guilty when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about;

(6) The initial spontaneous "confession" attributed to Nicole Harris, which she denies, is inconsistent with empirical social science research on police interrogation and confessions, as well as with logic and the physical evidence in this case;

(7) The multiple interrogations described by Nicole Harris were both physically and psychologically coercive: Nicole Harris's account of what occurred during her multiple interrogations contains interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

(8) Nicole Harris's account of what occurred during her multiple interrogations contains numerous interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent. These included false evidence ploys, minimization, implied and explicit threats, and implied and explicit promises;

(9) Nicole Harris was also at a heightened risk during her interrogations of making and/or agreeing to a false and unreliable confession because of her personality traits (i.e., *personal* risk factors), specifically her submissiveness and high suggestibility, as well as specific personality traits she had at that time (her overwhelming grief over the loss of her son);

(10) The interrogations described by Nicole Harris involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Nicole Harris' confession statement would, misleadingly, appear to be detailed and self-corroborating; and

(11) The confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

(R. 274-1, 2/8/16 Leo Expert Report, at 2-4.)

## DAUBERT STANDARD

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert,* 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one

and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood,* 807 F.3d at 834 (citation omitted); *see also Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 410 (7th Cir. 2014) ("It is not the trial judge's job to determine whether the expert's opinion is correct."). "[T]he proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence." *United States v. Saunders,* 826 F.3d 363, 368 (7th Cir. 2016).

## ANALYSIS

In their *Daubert* motion, Defendant Officers argue that the Court should exclude Dr. Leo's opinion testimony on police interrogations and false confessions based on issues of reliability and relevance. *See Daubert,* 509 U.S. at 597 (district court must ensure that expert evidence "both rests on a reliable foundation and is relevant to the task at hand."). In particular, Defendants maintain that Dr. Leo's opinions are unreliable because they are not based on reliable science or a specialized area of knowledge, while other opinions do not reliably apply his special knowledge to the facts of this case. Furthermore, Defendants assert that Dr. Leo's testimony – at its core – goes to witness credibility, which is the province of the jury, and that some of his opinions proffer legal conclusions. Last, Defendants argue that Dr. Leo's opinion testimony would not be helpful to the jury because the phenomenon of false confessions is a general proposition that is not disputed. The Court addresses each argument in turn.

# I. Reliability

## A. Reliable Science/Specialized Area of Knowledge

Defendant Officers first assert that the Court should bar Dr. Leo's expert opinions because they are not based upon reliable science or any specialized knowledge. *See United States v. Smith*, 811 F.3d 907, 909 (7th Cir. 2016) (expert opinion must be based on "scientific, technical, or other specialized knowledge") (quoting Fed.R.Evid. 702). "To gauge reliability, the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Higgins,* 794 F.3d at 704. "When determining the reliability of a qualified expert's testimony under *Daubert*, courts are to consider, among other things: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.,* 845 F.3d 838, 844 (7th Cir. 2017); *see also Daubert,* 509 U.S. at 593-94. "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire,* 526 U.S. at 141; *see also Wood*, 807 F.3d at 835 ("this list is neither exhaustive nor mandatory."). In other words, these four factors "may be applied in differing degrees when it comes to non-Newtonian science or 'other specialized knowledge.'" *Indianapolis Minority Contractions Ass'n, Inc. v. Wiley,* No. 94 C 1175, 1998 WL 1988826, at *12 (S.D. Ind. May 13, 1998) (Tinder, J.) (quoting *United States v. Hall,* 974 F. Supp. 1198, 1202 (C.D. Ill. 1997)). The "district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins,* 794 F.3d at 704 (citation omitted); *see also Kumho Tire,* 526 F.3d at 142 ("the law

grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.") (emphasis in original).

In his expert report, Dr. Leo explains that there is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subject of police interrogation practices, psychological coercion, and false confessions dating back to 1908. He asserts that this research has been the subject of extensive publication, has been submitted to peer review and testing, and is based on recognized scientific principles and methods. Also, Dr. Leo contends that this research is generally accepted in the social scientific community, and that courts have applied this type of expert testimony in both criminal and civil rights litigation. *See Caine,* 2013 WL 1966381, at *3 ("the field of police interrogation practices, psychological coercion, and false confessions is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702."); *see also Kluppelberg v. Burge,* No. 13 C 3963, 2016 WL 6821138, at *4 (N.D. Ill. Sept. 16, 2016) ("Applying the *Daubert* factors to Ofshe's methodology, this court, like other courts in this circuit, has little trouble concluding that Ofshe's methodology is reliable."); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying *Daubert* motion to bar testimony of plaintiff's false confession expert Richard Ofshe). As the district court in *Hall* explained:

> The Court [] finds that the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702. While Dr. Ofshe and his peers utilize observational, as opposed to experimental techniques, this is wholly acceptable in the established field of social psychology.

*Hall,* 974 F. Supp. at 1205. Also, not only has the United States Supreme Court cited Dr. Leo's work with approval, *see Corley v. United States,* 556 U.S. 303, 321 (2009), the Seventh Circuit

cited Dr. Leo's work when granting Harris' habeas petition. *See Harris,* 698 F.3d at 632 n.12

(quoting Richard A. Leo, *False Confessions: Causes, Consequences, & Implications,* 37 J. Am.

Acad. Psychiatry & L. 332, 337 (2009)).

Despite numerous federal courts concluding that the science of psychology in relation to

police coercion in interrogations is sufficiently developed to constitute a reliable body of

specialized knowledge, Defendants argue that Dr. Leo's conclusions are based upon

unacceptable rates of error and unacceptably small sample sizes, and that these problems are

compounded by the fact that Dr. Leo did not randomly select the case studies he used – in

contradiction of the third *Daubert* factor highlighted above. *See Daubert,* 509 U.S. at 594 ("in

the case of a particular scientific technique, the court ordinarily should consider the known or

potential rate of error."). Keeping in mind that the *Daubert* list of reliability factors is neither

exhaustive nor mandatory, *see Kumho Tire,* 526 U.S. at 141, Defendant Officers also argue that

the scientific research conducted on this subject is not sufficiently developed to allow for reliable

conclusions as to causation.

Over twenty years ago, the Seventh Circuit explained that "[s]ocial science in general,

and psychological evidence in particular, have posed both analytical and practical difficulties for

courts attempting to apply Rule 702 and *Daubert*." *United States v. Hall,* 93 F.3d 1337, 1342

(7th Cir. 1996). "Notwithstanding these difficulties, however, social science testimony is an

integral part of many cases." *Id.*[2] As the district court in *Hall* explained on remand, "[m]any

---

[2] Defendant Officers attempt to distinguish *Hall* and its progeny by arguing that the
Seventh Circuit "properly applied the *Daubert* test for admissibility" in *United States v. Mamah*,
332 F.3d 475, 478 (7th Cir. 2003). In *Mamah*, the Seventh Circuit concluded that there was no
link between Dr. Ofshe's research and his opinions. *See id.* at 478. Below, the district court
found that Dr. Ofshe employed "mere conclusory statements in his report about tactics used

social scientists rely primarily on real-world experience rather than experimentation to arrive at their conclusions," and the "primary method for analyzing and comparing real-world experiences is systematic observation and analysis." *Hall*, 974 F. Supp. at 1202-03. The *Hall* district court further elucidated that "social scientists testify from a practical standpoint about the human behavior they observe" and "write scholarly articles about their observations which are subjected to peer review by others in their profession." *Id.* at 1203. "This process of sharing one's findings with peers and having it critiqued by them may eventually lead to a common body of knowledge worthy of being called a 'science,' albeit not a 'hard' science such as physics." *Id.*

Nevertheless, Defendants take issue with the fact that Dr. Leo only identified 450 to 500 proven false confessions since the 1970's, although Dr. Leo acknowledges in his report that "this is surely an underestimate and thus the tip of a much larger iceberg for several reasons." (Leo Expert Report, at 5.) In his report, Dr. Leo clarifies, "false confessions are difficult for researchers to discover because neither the state nor any organization keeps records of the interrogations producing them," and "even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of proving the confessor's *absolute* innocence." (*Id.* at 5.) (emphasis in original). Dr. Leo further explained in his report:

> [O]nly a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of proven false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that

without specifics or elaboration." *United States v. Mamah*, No. 00 CR 396, 2002 WL 34358182, at *2 (N.D. Ill. Feb. 4, 2002). As with all *Daubert* motions, the facts of the case and the particular expert report and testimony drive the *Daubert* analysis, as *Mamah* highlights.

police have elicited in the United States in recent decades. There have almost
certainly been thousands (if not tens or hundreds of thousands) more police-
induced false confessions than researchers have been able to discover and classify
as proven false. Indeed, in a survey of police that my colleagues and I published
in 2007, police investigators themselves estimated that they elicited false
confessions in 4.78% of their interrogations.

(*Id*. at 6.) Also, Drs. Leo and Ofshe have acknowledged these limitations in their publications

stating, "we have repeatedly pointed out that the methodological problems inherent in arriving at

a sound estimate are formidable and unsolved, and we have concluded that no well-founded

estimate has yet been published." Richard A. Leo & Richard J. Ofshe, *Using the Innocent to*

*Scapegoat Miranda: Another Reply to Paul Cassell*, 88 J. Crim. L. & Criminology 557, 560

(1998).

Defendant Officers also argue that the low sample size is compounded by the fact that

Dr. Leo did not randomly select his case studies. At his deposition, when asked about why he

did not use a random sample in his studies, Dr. Leo explained:

In the real world it's impossible to do a random sample like that because there's
no database from which to randomly sample, and in addition to that, strictly
speaking, you can't parse out causation in the real world even if you had a
random sample. You can talk about statistical associations, but you can't parse
out causation. So we have done that, and we've done it in the laboratory, and
we've done it one step better than your question asks by not only asking what –
what techniques cause false confessions, but what techniques that sometimes
cause false confessions – at what ratio do they cause false to true confessions
because the same techniques can cause both false and true confessions, right.
You can physically coerce true confessions. What we want to know is what's the
greater risk when you use psychological coercion, threats, promises, et cetera.

(R. 325-1, 3/21/16 Leo Dep., at 136-37.) Simply put, Dr. Leo testified that there is no random

selection mechanism or database from which to draw random samples. (*Id.* at 136.)

At the *Daubert* hearing, Dr. Leo further clarified that in laboratory studies, social

scientists can induce true and false confessions to study the ratio of certain techniques that lead

to false or true confessions. He also stated that in laboratory experiments, he can isolate

variables and causation, but in the real world, social scientists cannot control the environment to

isolate variables. As such, Dr. Leo testified that there are inherent limitations in gathering

random samples for his studies.

Recently, Defendant City of Chicago raised similar arguments in relation to the expert

opinion of Dr. Ofshe, namely, that his sample size was not random and that the lack of reliable

data prevented him from developing a reliable scientific methodology. (13 C 3963, R. 309, 310

*Daubert* Mot. & Mem. ) In rejecting these arguments, the district court concluded:

> Defendants' specific arguments – that since Ofshe did not include non-coerced
> confessions in his study he cannot opine on the rate of coerced confessions or that
> there is a causal link between certain police tactics and false confessions – merely
> identify limitations of Ofshe's methodology, not that it is unreliable. Other than
> citations to state-court cases in which Ofshe has not been permitted to testify,
> defendants have not offered a reason why Ofshe's opinion is rendered unreliable
> by his inability to identify the rate at which coerced confessions occur. *Allstate
> Ins. Co. v. Maytag Corp.*, No. 98 C 1462, 1999 WL 203349, at *4 (N.D. Ill. Mar.
> 30, 1999) ("Moreover, a party who seeks to exclude expert testimony on the
> ground of failure to conduct testing has the burden of explaining what tests should
> have been run, and what would have been accomplished by that testing. 'A
> litigant that wants a court of appeals to set aside a district judge's decision to
> admit expert testimony has to do more than appeal to a lawyer's sense of how
> science should be done.'") (quoting *DePaepe v. General Motors Corp.*, 141 F.3d
> 715, 720 (7th Cir. 1998)). This is particularly true given that academic literature
> posits that there are limitations that prevent scholars from identifying a coercion
> rate. (*See* dkt. 318-3, APA Article, at 3 ("There are several reasons why an
> incidence rate cannot be determined.").)

*Kluppelberg v. Burge,* No. 13 C 3963, 2016 WL 6821138, at *4 (N.D. Ill. Sept. 16, 2016).

Similarly, in *Caine v. Burge*, the district court concluded:

> [M]any of Defendants' objections to Dr. Leo's testimony can be explored and
> challenged during cross-examination. For example, Defendants argue that Dr.
> Leo's methodology is not scientifically reliable because Dr. Leo relies mostly on
> his own research, did not use random data sets, and his research requires a
> subjective determination as to the truth or falsity of the confessions studied based

on incomplete case information. The Court concludes that these alleged shortcomings do not provide a basis for barring Dr. Leo's testimony, but obviously provide ample areas for cross-examination.

*Caine*, 2013 WL 1966381, at *2.

Under these circumstances, Defendants have not established that Dr. Leo's methodology is unreliable from the perspective of social science, especially because Defendants do not develop their arguments concerning the frequency of coerced confessions and the need for randomized samples with sufficient legal or scientific authority in the context of social science. *See DePaepe v. General Motors Corp.,* 141 F.3d 715, 720 (7th Cir. 1998) ("A litigant that wants a court of appeals to set aside a district judge's decision to admit expert testimony has to do more than appeal to a lawyer's sense of how science should be done."); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005) (lawyers "may fail to appreciate the difficulties that bona fide experts encounter," therefore, "[s]cientific decisions must be made by scientific rather than rhetorical means.").[3] The Court therefore denies this aspect of Defendants' *Daubert* motion because Dr. Leo's opinions are based on a sound, accepted, and reliable methodology. Defendants are free to cross-examine Dr. Leo on these issues.

### B.     Application of Reliable Method

Next, Defendant Officers argue that Dr. Leo did not apply his own research or specialized knowledge to the facts of this case. *See General Elec. Co. v. Joiner,* 522 U.S. 136,

---

[3] Defendant Officers' reliance on *Chavez v. Illinois,* 251 F.3d 612 (7th Cir. 2001), is misplaced. In *Chavez,* the plaintiffs attempted to prove discriminatory effect in the context of an equal protection claim through the use of statistics. *See id*. at 637-39. The Seventh Circuit considered the validity and value of the proffered statistical evidence drawn from available Illinois State Police databases, as well as field reports, in concluding that these "statistics may not be the sole proof of a constitutional violation." *Id.* at 647-48.

146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Under *Daubert*, a "critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' that is properly excluded under Rule 702." *Manpower, Inc. v. Ins. Co. of Penn.,* 732 F.3d 796, 806 (7th Cir. 2013) (quotation omitted). Moreover, expert testimony cannot "be based on subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010); *see also Brown v. Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on "facts or data," as opposed to subjective impressions."). On the other hand, "reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology – the framework – of the expert's analysis." *Manpower,* 732 F.3d at 808.

1.      **Dr. Leo's Opinion: Plaintiff's Confession was Illogical and Incomplete**

Defendants argue that Dr. Leo's opinion no. 11 – "[t]he confession statement of Nicole Harris contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions" – is not linked to his area of expertise. *See Wood*, 807 F.3d at 832 (expert must "connect the dots between the scientific studies that he analyzed and the opinions that he offered."). Before addressing this argument, the Court turns to Dr. Leo's expert report for background.

In his report, Dr. Leo discussed how scientific researchers evaluate the likely reliability and unreliability of an incriminating statement, admission, or full confession. In particular, he

stated that "scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.)." (Leo Expert Report, at 13-14.) He further elucidated:

> The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that is full of gross errors and disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination, the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

(*Id*. at 14.) Dr. Leo also stated in his report that "[t]he well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement." (*Id*.) Moreover, at the May 2017 *Daubert* hearing, Dr. Leo reiterated that in forming his opinion about indicia of reliability, he applied an approach common in his field in which he compared indicia of reliability and unreliability to Plaintiff's confession. He further testified that he is not opining that Harris gave a false confession, but that her confession contained indicia of unreliability.

Turning to Defendants' argument about the logical errors in Plaintiff's confession as referenced in opinion no. 11, Dr. Leo stated in his report:

According to Nicole Harris, she never made the first confession that police have attributed to her – that she killed Jaquari by placing a phone cord around his neck and then the cord sheet to make his murder appear to be an accident. However, everyone agrees that if Ms. Harris had made this confession, it was a false confession, since Jaquari did not die from the strangulation by a telephone cord. This first false confession (again attributed to Ms. Harris by police but denied by her) reflected the investigators' mistaken theory at the time (the evening of May 14) of how Jaquari had died. It did not fit with the death scene facts or evidence. The investigators only found out the following morning, after Dr. Denton performed an autopsy, that Jaquari had not died from strangulation by a telephone cord (but that the ligature marks around his neck had most likely come from the elastic from Jaquari's bedsheet), and the investigators thereafter pressured Ms. Harris to agree to a different version of how she alleged killed Jaquari.

The second confession that the police investigators attributed to Ms. Harris – that Ms. Harris put Jaquari on the upper most level of the bunk bed and wrapped the loose end of an elastic band from a fitted sheet around his neck before leaving the apartment – also did not match the death scene evidence. Jaquari slept on the bottom bunk, not the top one, and he was found on the ground. He could not have rolled off the top bunk, where Ms. Harris' second confession places him, because of the guard rail on the top bunk. This error is corrected in Ms. Harris' third and final confession which has Ms. Harris leaving Jaquari on the ground after strangling him with the dangling elastic band from the top bunk approximately four times. But even that confession contains an error that does not match any other evidence or testimony – that the cord had been wrapped around Jaquari's neck approximately 10 times.

Assuming Ms. Harris' account, her multiple false confessions to strangling Jaquari not only contain the kinds of factual errors that social science research has shown are associated with false and unreliable confessions, but they also make little logical sense, another indicia of an unreliable confession. It makes no sense that Ms. Harris would violently strangle her son Jaquari to death merely because he had been playing outside after she had asked him to stay inside. Ms. Harris' confession statements are not only contradicted by extrinsic evidence, but also by logic and plausibility.

(*Id*. at 31.)

When questioned about the basis of his opinion as to logical errors at his deposition, Dr. Leo focused on the State's theory of Harris' motive for killing her son, namely, that "parents don't usually kill children for something as trivial as playing outside when asked to stay inside,

that doesn't logically fit – the anger associated with something that trivial is incommensurate with a violent strangling to death, and so that just doesn't make logical sense." (Leo Dep., at 75-76.) He further stated that "when people kill, they kill for motives that are commensurate with the activity, not for something this trivial. And what you often see in false confession cases is bogus motives created in the minds of interrogators that they pressure suspects to accept or to make up." (*Id*. at 76.) When asked what methodology he used to come to this conclusion, Dr. Leo answered that his conclusion was based on "[m]y experience studying criminal cases for many years. So obviously this is – this is an inference, conclusion based on that experience." (*Id*. at 77.) Dr. Leo then testified about his qualifications and expertise in linking motives to a particular crime. He first explained that "the issue of motive comes up in interrogations because interrogation is largely about ascribing a motive to somebody, getting them to confess and then getting them to fill in the reason why they confessed." (*Id*. at 83.) Dr. Leo followed up with his qualifications by testifying as follows:

> I've been studying this for 20 years after getting a Ph.D. that specialized in this. I have reviewed, analyzed, written about hundreds, thousands of interrogations, confessions, and, of course, my testimony is based on not just my own contributions to a broader field of knowledge, but those of other social scientists as well. So I'm drawing on that research, knowledge, experience when I arrive at the conclusions[.]

(*Id*. at 83-84.)

In their *Daubert* motion, Defendants take issue with Dr. Leo's conclusions regarding the logical errors in Plaintiff's confessions because "there is ample evidence that Plaintiff's anger and frustration with Jaquari gradually escalated from hitting him with a belt to wrapping a cord around his neck." (R. 221, Defs.' *Daubert* Brief, at 13.) Defendant Officers point to other evidence in the record arguing that these "facts certainly make the confession more logical and

corroborate the confession," including that Plaintiff yelled at her sons earlier that day. (*Id*. at 13-14.) Likewise, at the *Daubert* hearing, Defendants further highlighted certain factual disparities in Dr. Leo's opinion, including whether Plaintiff confessed to wrapping the cord around her son's neck four times or ten times. In pointing to these factual disputes, Defendants argue that Dr. Leo improperly relied upon Plaintiff's version of the facts.[4]

It is well-settled that experts can base their opinions on disputed facts because the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.,* 782 F.3d 353, 360 (7th Cir. 2015) (citation omitted). Indeed, the Advisory Committee's Notes to Rule 702 envisioned factual disputes in the context of expert opinions as follows:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed.R.Evid. 702, advisory committee's note (2000 amends.). "The Advisory Committee stressed that 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system' or to allow the district court to preempt the jury by evaluating the correctness of the facts on which the expert relied." *Richman v. Sheahan,* 415 F. Supp. 2d 929, 943 (N.D. Ill. 2006) (citation omitted). "Moreover, although an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions." *Sanders v. City of Chicago Heights,* No. 13 C 0221, 2016 WL 1730608,

---

[4] In his report, Dr. Leo also proffered opinions crediting Defendants' accounts, concluding that several risk factors for a false confession remained. (Leo Report, at 33.)

at *6 (N.D. Ill. May 2, 2016) (citing *Cage v. City of Chicago,* 979 F. Supp. 2d 787, 810 (N.D. Ill.

2013).  As the Seventh Circuit explained in *Hall*, "[t]he fact that there was a dispute between

Hall and the interrogating officers about the nature of the questioning itself provides no reason to

exclude the expert testimony; it is a rare case where everything is agreed except the subject

matter for which the expert is presented."  *Hall*, 93 F.3d at 1345; *see also Scott v. City of

Chicago,* 724 F. Supp. 2d 917, 923 (N.D. Ill. 2010) ("It is of course permissible for an opinion

witness, in arriving at his or her conclusions, to premise that result on one side's view of

contested events.").  Moreover, Dr. Leo is not vouching for Plaintiff's version of the facts.  It

will be up to the jury to determine if it believes Plaintiff's version of the facts upon which Dr.

Leo relied in rendering his opinions.

 In addition, Defendants fail to cite legal authority that an expert witness cannot consider

his client's version of the contested facts – or must consider both sides' versions of the contested

facts – when forming expert opinions and the Court could find none.  This is because "[e]xperts

routinely base their opinions on assumptions that are necessarily at odds with their adversary's

view of the evidence."  *Richman*, 415 F. Supp. 2d at 942; *see, e.g., Kluppelberg,* 2016 WL

6821138, at *6.  Indeed, it is well-established that Defendants can present trial evidence

contradicting the facts underlying Dr. Leo's expert opinion, *see, e.g., Indianapolis Airport Auth.*

*v. Travelers Prop. Cas. Co.,* 849 F.3d 355, 371 (7th Cir. 2017), and that juries resolve any such

factual conflicts.  *See Jimenez v. City of Chicago,* 732 F.3d 710, 722 (7th Cir. 2013).  "In

*Daubert* the Supreme Court expressly envisioned th[e]... role for the jury when it reminded all

that '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on

the burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence.'" *Stollings*, 725 F.3d at 766 (quoting *Daubert*, 509 U.S. at 596).  Accordingly, the proper way for Defendants to challenge Dr. Leo's factual assumptions is through cross-examination showing that these assumptions are in error and through the presentation of their own witnesses.  The Court therefore denies this aspect of Defendants' *Daubert* motion.

In the same vein, Defendants contend Dr. Leo's opinion that Plaintiff's confession was incomplete, namely, that she did not provide a fully developed confession, was not a legitimate basis for him to conclude that Harris' confession had the "hallmarks of a false confession."  In making this argument, Defendants rely on an article published by Professor Paul Cassell for the proposition that an incomplete confession is neither the hallmark of a false or true confession. *See* Paul G. Cassell & Bret S. Hayman, *Police Interrogation in the 1990s: An Empirical Study of the Effects of Miranda*, 42 UCLA L. REV. 839, 869 tbl. 4 (1996).   Defendants' arguments goes to the weight – rather than the admissibility of – Dr. Leo's expert testimony.  *See Stollings*, 725 F.3d at 766 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt.  It is the role of the jury to weigh these sources of doubt.").  Defendants will have ample opportunity to cross-examine Dr. Leo about these issues at trial.

### 2.      Plaintiff's Psychological or Personality Traits

Highlighting opinion no. 9, Defendants assert that Dr. Leo is not qualified to discuss Plaintiff's psychological or personality traits.  Put differently, Defendants maintain that Dr. Leo's opinion about Plaintiff's psychological and personality traits is outside of Dr. Leo's expertise.  Opinion no. 9 reads in its entirety:

> Nicole Harris was also at a heightened risk during her interrogations of making
> and/or agreeing to a false and unreliable confession because of her personality

traits (i.e., *personal* risk factors), specifically her submissiveness and high suggestibility, as well as specific personality traits she had at that time (her overwhelming grief over the loss of her son).

At his deposition, Dr. Leo testified that he was not a clinical practicing or licensed psychologist, but instead a research social psychologist, therefore, he is not qualified make clinical diagnoses. (Leo Dep., at 10.) Also, Dr. Leo testified that although he never interviewed Harris, he based his assessment of Harris' personality traits on the Gudjonsson Suggestibility Scales administered by a clinical psychologist named Dr. Bruce Frumkin and that he was very familiar with this testing and how it is scored. (*Id.* at 11.) In his expert report, Dr. Leo relied upon Dr. Frumkin's test scores as follows:

> [A]s Dr. Frumkin indicated in his 2006 assessment, Nicole Harris was in 2005, extremely suggestible, testing in the 99th percentile. This means, as he states, that she has an extreme tendency to succumb to the demands of authority figures, especially when placed under pressure, and to give in to leading questions in response to negative feedback to placate them. She is more likely to be easily led and manipulated. As a result of the personality traits identified by Dr. Frumkin, Nicole Harris was at that time highly vulnerable to making and/or agreeing to a false and/or unreliable confession in order to please her interrogators, especially the longer and/or more intense the interrogation(s) last. Dr. Frumkin notes that Nicole "loses her ability to make rational use of information when she is under stress." Ms. Harris's high level of interrogative suggestibility appears to be explained by the personality traits identified by Dr. Frumkin. In short, Ms. Harris is highly suggestible, compliant and conflict averse, personality traits that clinical psychological research has, for decades, shown to increase the risk that individuals will yield to the pressures of interrogation and shift their answers to satisfy their interrogators.

(Leo Expert Rep., at 29.) Based on his background in psychology and familiarity with the Gudjonsson Suggestibility Scales test and how it is scored, Dr. Leo's reliance on Dr. Frumkin's calculation of Plaintiff's tests scores complies with Rule 702, which allows experts to rely on sufficient facts or data. Meanwhile, as the Court ruled earlier in granting Plaintiff's motion to exclude Defendants' rebuttal expert Dr. Orest Wasyliw, Dr. Leo cannot testify as to any of Dr.

Frumkin's opinions when rendering his own opinions.

## II.    Relevancy/Assist Trier of Fact

Defendant Officers' arguments concerning credibility determinations, legal conclusions, and helpfulness concern relevancy.  *See Jimenez v. City of Chicago,* 732 F.3d 710, 722 (7th Cir. 2013).  Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" which "goes primarily to relevance."  *Daubert,* 509 U.S. at 591 (citation omitted); *see also Stuhlmacher*, 774 F.3d at 409 ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case.").

### A.    Credibility

Defendant Officers contend that many of Dr. Leo's expert opinions touch on witness credibility and that it is the exclusive province of the jury to determine the weight and credibility of witness testimony.  *See Stollings*, 725 F.3d at 765 ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."); *Goodwin v. MTD Prod., Inc.,* 232 F.3d 600, 609 (7th Cir. 2000) ("credibility questions are within the province of the trier of fact"); *United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury – determining the credibility of witnesses."). Again, Defendants argue that Dr. Leo's opinions vouch for one version of the disputed facts underlying this lawsuit and that his factual basis is "incorrect."  Defendants' argument echoes their earlier assertion that Dr. Leo's opinion testimony is inadmissible because he relied upon Plaintiff's version of the facts.  *See Sanders*, 2016 WL 1730608, at *6 ("although an expert

cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions.").

In any event, Defendant Officers specifically argue that in his opinion no. 5, Dr. Leo relies on the fact that Jaquari died accidently and that this factual basis "completely ignores the fact that the only forensic pathologists disclosed in this case have uniformly concluded that Jaquari's death was the result of homicidal strangulation." (Defs.' *Daubert* Brief, at 10.) Thus, Defendants argue Dr. Leo's opinion that – "none of the death scene evidence suggests that Jaquari was killed intentionally or that a crime occurred" – has no basis in fact. (*See id.*; Leo Expert Report, at 32.)

Attached to his expert report, Dr. Leo lists the materials he relied upon when forming his opinions. (R. 326, Appendix C.) Although Dr. Leo did not review the forensic pathologists' reports or deposition transcripts, he did review other "death scene evidence" that police gathered on May 14, 2005 prior to Plaintiff's confessions. In particular, the list of materials indicates that Dr. Leo reviewed physical evidence concerning the crime scene, including ambulance records, reports describing the physical evidence, and reports about the photos taken at the crime scene. Dr. Leo also reviewed records concerning the 911 call, the CPD initial report, and other CPD reports and event histories submitted on May 14, 2005 before Plaintiff gave her confession. At the May 2017 *Daubert* hearing, Dr. Leo clarified his opinion no. 5 explaining that at the time of Plaintiff's interrogation – which took place before the medical examiner's autopsy – "there was no evidence indicating that she had killed her child. There had been – there had not been a conclusion by a medical examiner or coroner or any independent evidence suggesting she was responsible for this death."

When questioned at the *Daubert* hearing, Dr. Leo admitted that he did not review some of the other physical evidence that police gathered on the day of Jaquari's death, such as Jaquari's emergency room records. Nonetheless, Dr. Leo's opinion concerns what Defendant Officers knew at the time of Plaintiff's interrogation and confession – not what Defendant Officers learned after the medical examiner performed Jaquari's autopsy on May 15, 2015. To further muddy the waters, at Plaintiff's criminal trial, Dr. Denton, the Cook County Medical Examiner who conducted Jaquari's autopsy, testified that he had originally concluded that Jaquari's death was accidental in his May 15, 2005 report, but changed his report later after a police detective informed him of Plaintiff's confession. *See People v. Harris*, 389 Ill. App.3d 107, 114 (1st Dist. 2009). In fact the post mortem report Defendants moved into evidence at the *Daubert* hearing indicates that Dr. Denton signed his revised post mortem examination report on July 8, 2005. (R. 340-1, Denton Report, at 6.) Thus, the physical evidence known at the time of Plaintiff's interrogation and confession did not include the autopsy report concluding that Jaquari's death was a homicide. Therefore, there is a factual basis for Dr. Leo's conclusions in relation to opinion no. 5.

Although there is a factual premise for Dr. Leo's opinion no. 5, Dr. Leo is not qualified to proffer his opinions that "none of the death scene evidence suggests that Jaquari was killed intentionally or that a crime occurred" and there was "no evidence whatsoever to indicate that Jaquari Dancy's death was anything other than accidental nor that Nicole Harris had any role in bringing it about" because he is not a police practices expert. To clarify, Dr. Leo does not have the requisite "knowledge, skill, experience, training or education" to opine that Jaquari's death was accidental. *See* Fed.R.Evid. 702. Although Dr. Leo's experience includes observing

confessions and interrogations, he does not have sufficient law enforcement or forensic evidence experience or training to connect the dots to his conclusion that Jaquari's death was accidental. *See Wood,* 807 F.3d at 837. Without any such expertise, Dr. Leo's opinions are subjective and speculative. *See Manpower, Inc.*, 732 F.3d at 806 ("The critical inquiry is whether there is a connection between the data employed and the opinion offered."); *see also Metavante Corp.,* 619 F.3d at 761. Further, Dr. Leo's conclusions would not be helpful to the trier of fact. *See Matter of the Complaint of Ingram Barge Co.*, No. 13 C 3453, 2016 WL 3763450, at *10 (N.D. Ill. July 14, 2016) ("Expert testimony does not assist the trier of fact when [it] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony."). Accordingly, the Court bars Dr. Leo from testifying as to opinion no. 5.

### B. Legal Conclusions

Defendant Officers also seek to exclude certain opinions arguing that they are legal conclusions. As a general rule, an expert cannot offer legal opinions or conclusions. *See Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) ("Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *Client Funding Solutions Corp. v. Crim,* 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact."). Put differently, although Rule 704(a) "states that '[a]n opinion is not objectionable just because it embraces an ultimate issue,'" Rules 702 and 704, "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. N.L.R.B.,* 674 F.3d 638, 648 (7th Cir. 2012); *see also King v. Kramer*, 763 F.3d 635, 646 (7th Cir. 2014).

Here, Defendants argue that Dr. Leo's opinions nos. 2, 3, 4, and 8 essentially state that "all modern interrogations are coercive" and that this statement is contrary to law. (Defs.' *Daubert* Brief, at 15.) Further, Defendant Officers contend that Dr. Leo opined that "legally acceptable interrogation techniques are psychologically coercive." (*Id.*) In making this argument, Defendants assert that police officers "are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." *United States v. Rutledge,* 900 F.2d 1127, 1130 (7th Cir. 1990); *see also Green v. City of Wenatchee,* No. CS-01-072, 2003 WL 26089744, at *4 (E.D. Wash. Mar. 14, 2003) ("there is no clearly-established constitutional right to be free from an environment that would elicit a false confession, absent coercion.").

First, at no point in his expert report or during his testimony did Dr. Leo opine that "all modern interrogations are coercive" or that "legally acceptable interrogation techniques are psychologically coercive." Second, Defendants' reliance on *Rutledge* and *Green* is misplaced because Plaintiff is arguing that Defendant Officers' interrogation *was* coercive and that Defendants' conduct resulted in her irrational confession in violation of her due process rights. *See Chavez v. Martinez,* 538 U.S. 760, 774, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). As such, Defendants' argument that Dr. Leo's opinions include legal conclusions fails.

C.     **Helpfulness**

Last, Defendants argue that Dr. Leo's expert opinions are not helpful. More specifically, Defendants argue that they "do not quibble with the idea mentioned in opinion no. 1 that it is possible for someone to falsely confess to a crime", and that "this concept does not require

expert testimony because it will be admitted on cross-examination of Defendant Officers."

(Defs.' *Daubert* Brief, at 5.)  Defendant Officers' attempt to exclude Dr. Leo's testimony

pursuant to *Daubert's* helpfulness requirement is based on a faulty and restrictive premise.  To

clarify, in *Hall*, the Seventh Circuit explained that in the context of jurors having beliefs about

false confessions "the question is whether those beliefs were correct," and that "[p]roperly

conducted social science research often shows commonly held beliefs are in error."  *Hall,* 93

F.3d at 1345; *see also Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996) ("Social

scientists in particular may be able to show that commonly accepted explanations for behavior

are, when studied more closely, inaccurate.  These results sometimes fly in the face of

conventional wisdom.").  Also in *Hall*, the Seventh Circuit further reasoned that expert

testimony would "let the jury know that a phenomenon known as false confessions exists, how to

recognize it, and how to decide whether it fits the facts of the case being tried."  *Id*. at 1345; *see*

*also United States v. West,* 813 F.3d 619, 624 (7th Cir. 2015) ("Evidence bearing on the

trustworthiness of a confession is generally relevant and admissible absent some specific reason

to exclude it, such as unfair prejudice or juror confusion.").  In summary, Dr. Leo's expert

testimony regarding false confessions will be helpful to explain why false confessions happen

and how to recognize false confessions, thus allowing the jury to use this framework to apply to

the facts of this case.  Finally, in her response brief, Plaintiff acknowledges that Dr. Leo cannot

testify that her interrogation was coercive or that she gave a false confession because these are

questions for the jury.  (Resp. Brief, at 13.)  The Court therefore denies this aspect of

Defendants' *Daubert* motion.

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part and denies in part

Defendants' *Daubert* motion and grants in part and denies in part Plaintiff's *Daubert* motion

concerning Plaintiff's expert witness Dr. Leo.

**Dated:** June 5, 2017

ENTERED

_____

**AMY J. ST. EVE**
**United States District Court Judge**