# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NICOLE HARRIS, | ) |
| Plaintiff, | ) |
| | ) No. 14-CV-4391 |
| v. | ) |
| | ) Hon. Amy J. St. Eve |
| CITY OF CHICAGO, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Robert Bartik, Demosthenes Balodimas, Robert Cordaro, James Kelly, Michael Landando, Anthony Noradin, and Randall Wo (collectively, "Defendants") have moved to bar certain testimony of Plaintiff Nicole Harris's proposed expert, Dr. Robert Galatzer-Levy, pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). For the following reasons, the Court, in its discretion, grants in part and denies in part Defendants' motion.

## BACKGROUND

### I.  Factual Background

This is a wrongful conviction case against eight Chicago Police Officers. Plaintiff alleges that, on October 26, 2005, a jury in the Circuit Court of Cook County convicted her of murdering her four-year-old son, Jaquari Dancy, based in large part on a false and fabricated confession elicited during 27 hours of intermittent interrogation by Chicago Police Officers. Plaintiff alleges that Defendants fabricated a police report, subjected Plaintiff to sustained and aggressive questioning, held her overnight in a cell, and ultimately elicited the false and fabricated

confession, which the Defendants captured on videotape, that Plaintiff killed her son. *See Harris v. Thompson*, 698 F.3d 609, 612 (7th Cir. 2012). The day after Jaquari's death, Alexandra Levy, an investigator with the Chicago Children's Advocacy Center ("CAC"), interviewed Jaquari's brother Diante. *Id.* at 616. The CAC is a non-profit organization that facilitates interviews of children needed by law enforcement agencies by providing the agencies with age appropriate interview facilities and interviewers who specialize in child forensic interviews. The CAC did not videotape or audiotape any of its interviews at that time, including Diante's. Instead, CPD Detective Randall Woo took notes as he observed the interview through a one-way mirror.

Six months after the trial, Dr. Galatzer-Levy performed a "thorough competency assessment" of Diante. *Id.* at 618. As part of this assessment, Dr. Galatzer-Levy conducted two interviews of Diante on April 11 and April 15, 2006. (R. 227-6, Galatzer-Levy Expert Report, at p. 2.) In October 2012, the Seventh Circuit overturned Plaintiff's conviction based in part on Dr. Galatzer-Levy's opinions. *Harris*, 698 F.3d at 650. Dr. Galatzer-Levy "had concluded that Diante was 'neither incapable of expressing himself concerning the events surrounding his brother's death, nor incapable of understanding the duty of a witness to tell the truth.'" *Id.* at 621. On June 17, 2013, the Cook County State's Attorney dismissed all charges against Plaintiff. Plaintiff was thereafter granted a Certificate of Innocence, pursuant to 735 Ill. Comp. Stat. 5/2-702.

## II. Dr. Galatzer-Levy's Background

Dr. Galatzer-Levy is a psychiatrist who holds an appointment as a Clinical Professor of Psychiatry and Behavioral Neurosciences at the University of Chicago and as a faculty member at the Chicago Institute for Psychoanalysis. (R. 227-6, at p. 1.) He graduated from the Washington University School of Medicine in 1971. (*Id.*, at 15.) Dr. Galatzer-Levy was a

Resident in Psychiatry and a fellow in Child Psychiatry at the University of Chicago. (*Id.*) He graduated from the Chicago Institute for Psychoanalysis in 1982. (*Id.*) In 1983, he received a certification in adult, child, and adolescent psychoanalysis from the American Psychoanalytic Association. (*Id.*) Dr. Galatzer-Levy primarily treats patients and has co-authored five books and over one-hundred professional book chapters and articles. (*Id.*, at 1, 15-22.) Additionally, Dr. Galatzer-Levy has been qualified as an expert witness by courts in Cook, Lake, DuPage, and McHenry Counties and in the Northern District of Illinois. (*Id.*, at 2.)

### III. Dr. Galatzer-Levy's Opinions

Plaintiff hired Dr. Galatzer-Levy to "provide information about the mental status and competency to testify of Diante Dancy and to recount and convey his observations at and around the time of his brother's death." (*Id.*, 1.) Dr. Galatzer-Levy conducted two interviews of Diante on April 11 and April 15, 2006. (*Id*, 2.) Dr. Galatzer-Levy also reviewed "case law and statutes regarding Illinois' current witness competency requirements; police reports of an interview of Diante conducted on May 15, 2005; DCFS reports in the matter and transcripts of portions of Ms. Harris's trial including a transcript of the court's hearing and ruling regarding Diante's competency, as well as transcripts of portions of the testimony of Nicole Harris, Sta-Von Dancy, Wanda Harris and Audrey Harris" and "pertinent psychological and psychiatric research literature concerning children's competency to testify and the techniques appropriate to the psychiatric and forensic interviewing of children." (*Id.*)

Dr. Galatzer-Levy's report begins with a review of his interactions with Diante and techniques for conducting forensic interviews with children. (*Id.*, at 2-6.) He notes that his first evaluation was designed to determine whether Diante could express himself concerning how his brother died and whether he was capable of understanding the duty to tell the truth as a witness.

3

(*Id.*, at 2.) Dr. Galatzer-Levy videotaped the interviews, consistent with best practices in the field. (*Id.*, at 3.) He notes that his interviews focused on specific capacities related to Diante's competency to testify as a witness and were not intended to assess other capacities or features of Diante's personality. (*Id.*, at 4.) Dr. Galatzer-Levy also determined that no one had coached or otherwise influenced Diante. (*Id.*) The report also discusses Diante's ability to express himself concerning the events surrounding his brother's death, Diante's capability to understand the duty to tell the truth as a witness, and Diante's competency to testify in court. (*Id.*, 6-13.)

>Dr. Galatzer-Levy offers the following opinions in this case:
>
>(1) Diante Dancy was, "in the days following his brother's death, at the time of his mother's trial, and at the time of his interviews with me, capable of expressing himself concerning the events surrounding his brother's death, and capable of understanding the duty to tell the truth about what he witnessed."
>
>(2) His own opinions "appear consistent with the findings of the Child Advocacy Center forensic interviewer who interviewed Diante the day after his brother's death, as memorialized in the police reports in this case."
>
>(3) The CAC interviewers "failed to follow procedures for forensic interviewing of children that were widely recognized as appropriate at the time of those interviews" because the only record of the interview are Detective Wo's notes.
>
>(4) "Diante's inability to describe the specific times at which events he observed occurred and the time intervals involved, his inability to determine the time or indications of his brother's death, and his having become confused about the sequence of events when questioned in a confusing manner all indicate only that he was functioning as a normal child of his age. They indicate neither that he was unable to accurately recount what he saw with respect to his brother's death, nor that he failed to possess the capacity to tell the truth and to appreciate the importance of being honest in the context of the investigation and the legal proceedings and they do not undermine his observations that he witnessed his brother wrap the elastic band around his neck causing his own death."

(*Id.*, 13-14.)

**LEGAL STANDARD**

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in [*Daubert*]." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). "The rubric for evaluating the admissibility of expert evidence considers whether the expert [is] qualified, whether his methodology [is] scientifically reliable, and whether the testimony would . . . assist[] the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* . . . de novo*," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States*, 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) ("The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible."). Once the Court determines that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's

5

analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000))). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Hartman*, 758 F.3d at 818. "[T]he key to the gate is not the ultimate correctness of the expert's conclusions," rather, "it is the soundness and care with which the expert arrived at her opinion[.]" *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015) (second alteration in original) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## ANALYSIS

Defendants seek to exclude three of Dr. Galatzer-Levy's opinions: (1) professional standards of forensic interviews involving children required Diante's CAC interview to be recorded, (2) Detective Wo's notes for the unrecorded interview were "woefully deficient", and (3) Diante expressed "that he witnessed [Jaquari] wrap the elastic band around his neck causing his own death."

I. **Failure to Videotape the Chicago Advocacy Center Interview**

Alexandra Levi interviewed Diante Dancy at the CAC in Chicago on May 15, 2005. (R. 355-1, Alexandra Levi Dep., at 30:19-31:8.) At the time, Levi did not videotape the interview nor did the CAC have the capacity to videotape or audiotape interviews in 2005. (R. 355-1, at 86:10-19). Dr. Galatzer-Levy intends to testify that the CAC's failure to videotape the interview

6

was not consistent with the best practices at the time, which, according to Dr. Galatzer-Levy, held child forensic interviews should be videotaped.

Defendants argue that the CAC's failure to record Diante's interview is not relevant to whether Defendants committed any wrongdoing. The Court agrees. The CAC is not a Defendant in this case. Plaintiff has not alleged that the CAC participated in the alleged false and fabricated confession. As such, whether it followed "best practices" is not relevant to the issues in this case. While Plaintiff argues that the CAC is, in practical terms, an arm of the Chicago Police Department and Cook County State's Attorney's Office, she has provided no evidence supporting this assertion. She likewise has not provided any evidence that Defendants controlled the CAC. Moreover, Plaintiff has failed to present any evidence that any Defendant instructed Levi to not tape the interview. In addition, while Plaintiff implies a conscious decision on the CAC's part not to videotape the interview, she does not dispute the CAC's lack of capacity to do so at the time. Accordingly, Dr. Galatzer-Levy may not testify that the CAC interviewers failed to follow appropriate procedures by not videotaping the interview of Diante.

Plaintiff may elicit testimony that a recording of the interview does not exist and Detective Wo's notes are the only documentation of the interview. The parties are also free to raise the fact that the CAC did not have the capability to videotape the interview at the time. These facts are relevant to Plaintiff's challenge to Detective Wo's notes.

## II.  Detective Wo's Notes

At one point in his report, Dr. Galatzer-Levy describes Detective Wo's notes of Diante's interview, contained in a general progress report, as "woefully deficient." (R.227-6, at 13.) Defendants argue that Dr. Galatzer-Levy should not be allowed to opine on the quality of the notes from Diante's interview because he is not qualified to comment on police note-taking.

Plaintiff concedes that Dr. Galatzer-Levy will not comment on the adequacy of Detective Wo's notes in the context of police procedures. As such, this aspect of Defendants' motion is denied as moot.

Plaintiff argues the report "states only that because there is no video of the CAC's interview with Diante, the only record of that interview is Defendant Wo's notes, and that this record reflects that the interview was not in conformity with the contemporaneous standards for forensic interviewing." (R. 271, at p. 5.) As discussed above, the fact that Detective Wo's notes are the interview's sole documentation and may present an incomplete or misleading record of the interview is relevant. To that extent, Defendants' motion is denied. Whether the CAC followed contemporaneous standards for forensic interviewing, however, is not relevant.

### III.  Jaquari's Interview Statements

Defendants also seek to exclude Dr. Galatzer-Levy's opinion that "Diante witnessed his brother wrap the elastic band around his neck causing his own death." Dr. Galatzer-Levy's full opinion is that

> Diante's inability to describe the specific times at which events he observed occurred and the time intervals involved, his inability to determine the time or indications of his brother's death, and his having become confused about the sequence of events when questioned in a confusing manner all indicate only that he was functioning as a normal child of his age. They indicate neither that he was unable to accurately recount what he saw with respect to his brother's death, nor that he failed to possess the capacity to tell the truth and to appreciate the importance of being honest in the context of the investigation and the legal proceedings and they do not undermine his observations that he witnessed his brother wrap the elastic band around his neck causing his own death.

(R. 227-6, at 14.) Defendants argue Dr. Galatzer-Levy conceded in his deposition that he has no scientific opinion on how to interpret Diante's statements. Dr. Galatzer-Levy stated in his deposition that he did not have an expert opinion on what actually happened to cause Jaquari's death. (R.355-2, at 100:16-18) ("I do not have an expert opinion on what the events were. So all

8

I know is – what he said and my understanding of what he said."). His opinion is that based on his experience and examination of Diante, Diante could accurately express that he saw Jaquari wrap the elastic band around his neck, causing his own death.

Defendants argue that the jury should be able to come to its own conclusions regarding what Diante said in the interviews. The Court agrees. One purpose of expert witness testimony, however, is to "assist[] the trier of fact in understanding the evidence . . . ." *Hartman*, 758 F.3d at 817. Dr. Galatzer-Levy's testimony would clearly assist the trier of fact in understanding Diante's capacity as a child and ability to understand and make such statements.[1] Defendants also argue that Dr. Galatzer-Levy's opinion on what Diante expressed has no scientific basis, but "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data . . . ." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Indeed, Defendants do not argue that Dr. Galatzer-Levy's opinions are unreliable due to lack of experience.

Further, Defendants' argument that Dr. Galatzer-Levy failed to exclude the possibility Diante was coached is unavailing. Dr. Galatzer-Levy stated that it was possible that Diante's memories could have been contaminated by ongoing contact with family members. (R. 355-2, at 78:10-80:8.) In his report, Dr. Galatzer-Levy stated he explored whether Diante had been coached or otherwise influenced and determined that had not occurred. (R. 227-6, at 4.) Defendants are free to cross examine Dr. Galatzer-Levy regarding this opinion. Indeed, the accuracy of the opinion should be "tested before the jury with the familiar tools of 'vigorous

---

[1] Defendants do not challenge Dr. Galatzer-Levy's opinions on a six-year old child's cognitive capacity, understanding of language, or developmental state including: the inability to think in abstractions, sometimes confusing a sequence of events, the ability to distinguish between real and imaginary events, and the ability to distinguish truth from non-truth, among others. (R. 227-6, at 5-10.)

9

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805.

In sum, Dr. Galatzer-Levy can testify that Dainte had the capacity and ability to accurately recount what he saw regarding his brother's death. He may further testify that his age and capacity do not undermine his observations that he witnessed his brother wrap the elastic band around his neck causing his own death. Dr. Galatzer-Levy may not, however, testify to what Diante actually told the CAC interviewer because Dr. Galatzer-Levy was not present for that interview and has no scientific foundation to opine on what he said to the CAC. In addition, he may not testify to what Diante in fact observed when his brother died for the same reasons.

Finally, Defendants contend that Dr. Galatzer-Levy has no basis to give an expert opinion that Jaquari's death was accidental. As Dr. Galatzer-Levy stated in his deposition, he does not have an expert opinion on what actually happened to cause Jaquari's death. (R.355-2, at 100:16-18). Nor does Dr. Galatzer-Levy have any qualifications to determine the cause of death. As such, he may not testify regarding the nature of Jaquari's death.

## CONCLUSION

For the foregoing reasons, the Court, in its discretion, grants in part and denies in part Defendants' motion.

**DATED:** July 6, 2017                              **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge