**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NICOLE HARRIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14 C 4391 |
| v. ) | |
| ) | |
| CITY OF CHICAGO, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Nicole Harris has moved to bar the testimony of Defendants' false confession/coercive interrogation rebuttal expert witness Professor Paul G. Cassell pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). On June 5, 2017, the Court granted in part and denied in part Defendants' *Daubert* motion to exclude Plaintiff's false confession/coercive interrogation expert Dr. Richard Leo. The Court presumes familiarity with that ruling. For the following reasons, the Court, in its discretion, grants in part, denies in part, and denies in part as moot Plaintiff's motion.[1]

**BACKGROUND**

**I.    Factual Background**

This is a wrongful conviction case involving several Chicago Police Department ("CPD") Officers, namely, Defendants Robert Bartik, Demosthenes Balodimas, Robert Cordaro, James

---

[1] Because the Court granted Defendants' *Daubert* motion in respect to Dr. Leo's opinion concerning the death scene evidence, namely, opinion no. 5, Professor Cassell's rebuttal testimony on this topic is moot. (R. 356, 6/12/17 Status Report.)

Kelly, Michael Landando, Anthony Noradin, and Randall Wo. In her Complaint, Plaintiff alleges that on October 26, 2005, a jury in the Circuit Court of Cook County convicted her of murdering her four-year-old son, Jaquari Dancy, based in large part on a false and fabricated confession elicited during approximately 30 hours of intermittent interrogation by Chicago Police Officers. After the jury convicted her of murder, the Circuit Court of Cook County judge sentenced Plaintiff to 30 years in prison.

After exhausting her state court remedies, Plaintiff brought a habeas petition pursuant to 28 U.S.C. § 2254(d)(1) in the United States District Court for the Northern District of Illinois. After the district court denied her petition for a writ of habeas corpus, the United States Court of Appeals for the Seventh Circuit reversed the district court's denial with instructions to grant the writ on October 18, 2012. *See Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012). On February 25, 2013, the State released Harris from prison on bond. On June 17, 2013, the Cook County's State's Attorney dismissed all charges against Plaintiff, and on January 25, 2014, the Circuit Court of Cook County found that Plaintiff was innocent of the charges for which she was convicted and granted her a Certificate of Innocence pursuant to 735 ILCS 5/1-702. Plaintiff filed the present lawsuit on June 12, 2014.

## II.     Professor Paul Cassell's Qualifications

In 1981, Professor Cassell graduated from Stanford University with a B.A. in Economics and in 1984, he graduated from Stanford Law School with a J.D. After law school, Professor Cassell served as a judicial law clerk to Judge Antonin Scalia of the United States Court of Appeals for the D.C. Circuit and then to Justice Warren E. Burger of the United States Supreme Court. Starting in 1986, Professor Cassell served as an Associate Deputy Attorney General at the United States Department of Justice, followed by three-and-a-half years as a federal

prosecutor in the United States District Court for the Eastern District of Virginia. As a federal prosecutor, Professor Cassell handled criminal prosecutions involving police questioning of suspects and legal issues pertaining to the admissibility of confessions.

In 1992, Professor Cassell began teaching at the University of Utah, College of Law, in the areas of criminal procedure, criminal law, crime victims' rights, and related courses. In 2001, President George W. Bush nominated Professor Cassell to serve as a federal district court judge for the District of Utah. As a federal judge, Professor Cassell presided over criminal cases, including cases involving confession issues. Chief Justice William Rehnquist also appointed Professor Cassell to serve as the Chair of the Judicial Conference's Criminal Law Committee. In 2007, he resigned from the bench and returned to the University of Utah.

In 2008, Professor Cassell became the Ronald N. Boyce Presidential Professor of Criminal Law at the University of Utah, College of Law. As a law school professor, he has published numerous scholarly law review articles relating to the American criminal justice system. Further, Professor Cassell has participated in academic symposia on innocence issues, including a September 2015 symposium at Northeastern University School of Law and a 2011 symposium on innocence issues held at New York University School of Law. The paper he presented at the Northeastern University Law School symposium was published as a chapter in a book, namely, Paul G. Cassell, *Can We Protect the Innocent Without Freeing the Guilty? Thoughts on Innocence Reforms that Avoid Harmful Tradeoffs*, WRONGFUL CONVICTIONS AND THE DNA REVOLUTION: REFLECTIONS ON TWENTY-FIVE YEARS OF FREEING THE INNOCENT (2016). Similarly, the New York University Law Review published the paper Professor Cassell presented at the New York University School of Law. *See* Paul G. Cassell,

*Freeing the Guilty Without Protecting the Innocence: Some Skeptical Observations on Proposed New "Innocence" Procedures*, 56 N.Y.L. Sch. L. Rev. 1063 (2012).

In addition, Professor Cassell has authored other law review articles concerning a wide variety of legal topics, including Paul G. Cassell & Thomas E Goodwin, *Protecting Taxpayers & Crime Victims: The Case for Restricting Utah's Preliminary Hearings to Felony Offenses*, 2001 Utah. L. Rev. 4 (2001); Paul G. Cassell & Edna Erez, *Victim Impact Statements & Ancillary Harm: The American Perspective*, 15 Canadian Crim. L. Rev. 149 (2011); Paul G. Cassell, *Too Severe? A Defense of the Federal Sentencing Guidelines*, 56 Stan. L. Rev. 1017 (2004); Paul G. Cassell, *The Paths Not Taken: A Critique of the Supreme Court's Decision in Dickerson,* 99 Mich. L. Rev. 898 (2001); Paul G. Cassell, *Barbarians at the Gates: A Reply to the Critics of the Victims' Rights Amendment,* 1999 Utah L. Rev. 479 (1999); and Paul G. Cassell, *Miranda's' Negligible Effect on Law Enforcement: Some Skeptical Observations*, 20 Harv. J. L. & Pub. Pol'y 327 (1997).

Professor Cassell has served as an expert rebuttal witness in several state and federal courts on the subject of false confessions. *See, e.g.*, *United States v. Robel Phillipos*, No. 1:13-cr-10238-DPW (D. Mass. 2014) (expert testimony via affidavit in a Boston Marathon bombing-related case); *State v. Morales*, No. 31-342 (First Jud. Dist., WY 2013) (admissibility hearing testimony in relation to false confession expert Richard Ofshe); *People v. Thomas*, No. 08-1074 (Superior Court County of Rensselaer, NY) (admissibility hearing testimony in relation to Richard Ofshe); *State v. Maughan*, No. 051100355 (1st Dist. Court, UT 2009) (provided expert report and testified in relation to false confession expert Richard Leo). Although no court has excluded Professor Cassell's expert opinions, "Professor Cassell has never had the occasion to

testify before a jury on these issues." (R. 248, Defs.' Resp., at 9; *see also* R. 230-5, Cassell Dep., at 90.)

**III.  Professor Cassell's Opinions**

In his expert report, Professor Cassell rebuts Plaintiff's false confession/coercive interrogation expert Dr. Richard A. Leo. Professor Cassell lists the materials he reviewed before forming his opinions in this matter, including (1) Plaintiff's Complaint; (2) a May 14, 2005 initial police report; (3) two crime scene processing reports dated May 14, 2005; (4) four CPD event queries dated May 14, 2005; (5) CPD event histories and reports regarding Jaquari's death; (6) Defendant Officer Wo's general progress reports; (7) Defendant Officer Kelly's general progress reports; (8) CPD property inventory reports; (9) Plaintiff's and her fiancé's criminal history records; (9) a general progress report from Edwardsville, Illinois police; (10) Defendant Officer Landando's general progress reports; (11) Defendant Noradin's general progress reports; (12) crime scene progress report regarding items sent to the pathologist; (12) Chicago Children's Advocacy Center Investigative Intake; (13) general progress reports regarding Plaintiff's surviving son Diante Dancy; (14) various polygraph reports; (15) arrest reports; (16) a Circuit Court of Cook County's adult probation department investigative report; (17) a post mortem examination; (18) a grand jury transcript; (19) criminal trial proceedings; (20) *People v. Harris*, 389 Ill.App.3d 107 (1st Dist. 2009); (21) *Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012); (22) deposition transcripts in this lawsuit; and (23) other expert reports in this matter.

Based on these materials, Professor Cassell opines that Dr. Leo's "proposed expert testimony is unreliable because he has not reliably reviewed the record in this case." (R. 230-2, Cassell Report, at 7.) He further posits that Dr. Leo's opinion about Plaintiff's confession and its "fit" is based on a faulty assumption because "even true confessions frequently diverge from

5

crime scene facts." (*Id*. at 12-21.) Professor Cassell additionally asserts that Dr. Leo cannot reliably offer an opinion about whether the psychological techniques used during the police questioning of Plaintiff increased the risk of extracting a false confession, including techniques such as guilt presumptive questioning, lengthy interrogation and sleep deprivation, false evidence ploys, minimization and maximization techniques, promises and threats, psychological coercion, and personality traits. (*Id*. at 21-35.) Last, Professor Cassell contends that Dr. Leo's opinion is not based on reliable science.

## LEGAL STANDARD

"In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to serve in a gatekeeping role and make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Haley v. Kolbe & Kolbe Millwork Co.*, ___ F.3d ___, 2017 WL 2953042, at *8 (7th Cir. July 11, 2017) (quoting *Daubert,* 509 U.S. at 592-93). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015) (citation omitted). "[T]he proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence." *United States v. Saunders,* 826 F.3d 363, 368 (7th Cir. 2016).

## ANALYSIS

In her *Daubert* motion, Plaintiff argues that although Professor Cassell's legal credentials are "impeccable," he is not qualified to rebut Dr. Leo's opinions on false confessions and coercive interrogations based on the science of social psychology. An expert may be qualified "by knowledge, skill, experience, training or education." *See* Fed.R.Evid. 702; *see also T-Bill Option Club v. Brown & Co. Sec. Corp.,* 23 F.3d 410 (7th Cir. 1994) ("Rule 702 lists several ways in which a person can be qualified as an expert, and the rule lists those ways in the

7

disjunctive."). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010) (internal quote and citation omitted). In making this determination, a "court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

In response, Defendants argue that Professor Cassell has spent three decades serving in, studying, and teaching in the criminal justice system, and that through this experience, he is qualified to rebut Dr. Leo's opinions regarding coercive techniques and false confessions. *See Cage v. City of Chicago*, 979 F. Supp. 2d 787, 824 (N.D. Ill. 2013) ("the fact that an expert's conclusions are based only on his observations and extensive specialized experience does not render them inadmissible"); *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 964 (N.D. Ill. 2001) ("An expert witness may form opinions by studying or observing the work of others rather than through first hand participation."). Although Professor Cassell's work experience establishes that he has knowledge of false confessions and coercive interrogations in the context of the criminal justice system, there is no indication in the record that Professor Cassell has researched the specialized area of coercive interrogations and false confessions drawing on the principles of rational decision making, perception, and interpersonal influence, or that he has systematically analyzed documented factors that correlate with false confessions.[2] Further, Professor Cassell has not trained as a social scientist nor contributed to the study of coercive

---

[2] For a thorough discussion detailing the study of false confessions and coercive interrogations within the field of social psychology, *see United States v. Hall*, 974 F. Supp. 1198, 1203–04 (C.D. Ill. 1997), *aff'd,* 165 F.3d 1095 (7th Cir. 1999).

interrogation and false confessions that would allow him to rebut Dr. Leo's testimony based on the science of social psychology. Indeed, Professor Cassell admits that he does not have formal training in psychology, sociology, or social psychology and that he has never conducted scientific experiments in relation to false confessions. (Cassell Dep., at 53, 72.)

Nonetheless, Defendants contend that Professor Cassell has published several law review articles that speak to Dr. Leo's experts opinions, including *The Guilty and the 'Innocent': An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 HARV. J.L. & PUBLIC POL'Y 523 (1999). Defendants further assert that Professor Cassell is qualified to offer his expert opinions because he conducted a study of his own that was published in a UCLA Law Review Article, namely, *Police Interrogation in the 1990s: An Empirical Study of the Effects of Miranda*, 42 UCLA L. REV. 839 (1996).

Furthermore, although Professor Cassell and Dr. Leo have engaged in legal debates about false confessions at various law schools, Defendants' argument that "Professors Cassell and Leo are clearly within the same academic community" may apply to their legal expertise, but this premise does not hold true in comparison to Dr. Leo's extensive background, training, education, and experience in the social science of false confessions and coerced interrogations. Simply put, although Dr. Leo also has a law degree, he has also conducted extensive laboratory and "real world" research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions for well over two decades. Furthermore, Dr. Leo has taught interrogation training courses to police departments throughout the United States, published numerous articles in peer-reviewed scientific journals (in addition to law review articles), and has observed well over 100 felony interrogations as part of his research. In this context, Professor Cassell is not Dr. Leo's peer in

9

the field of social science as it relates to false confessions and coercive interrogations. Instead, Professor Cassell's specialize area of knowledge is based on his extensive legal experience as a prosecutor, federal judge, and law professor. As he explains in his expert report, for example, part of his experience as a federal prosecutor involved the "legal issues pertaining to the admissibility of confessions." (Cassell Report, at 2.) Accordingly, Professor Cassell's opinions about the psychological techniques used during Plaintiff's interrogations are beyond his expertise. The Court therefore grants this aspect of Plaintiff's *Daubert* motion.

Professor Cassell also takes issue with Dr. Leo's factual assumptions based on Plaintiff's version of the events. As the Court clarified in its *Daubert* ruling regarding Dr. Leo, "[i]t is of course permissible for an opinion witness, in arriving at his or her conclusions, to premise that result on one side's view of contested events." *Scott v. City of Chicago,* 724 F. Supp. 2d 917, 923 (N.D. Ill. 2010); *see also Richman v. Sheahan,* 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence."). As such, Professor Cassell's opinions about the underlying evidence upon which Dr. Leo relied are of no moment because it is well-settled that experts can rely on their client's version of the facts because once the Court determines that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596). Accordingly, the Court grants Plaintiff's motion in this respect. Defendants, of course, are free to cross-examine Dr. Leo regarding these issues.

Likewise, Professor Cassell's opinion concerning the science upon which Dr. Leo relied is not only a legal conclusion for the Court's resolution pursuant to *Daubert* and Rule 702, but the Court soundly rejected Defendant Officers' argument that Dr. Leo's opinion was not based on reliable science in the Court's June 5, 2017 ruling, as have other courts in this district. *See Kluppelberg v. Burge,* No. 13 C 3963, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016); *Caine v. Burge,* No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010); *see also United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir. 1996); *United States v. Hall,* 974 F.Supp. 1198, 1202 (C.D. 1997).

That leaves Professor Cassell's opinions based on his extensive legal experience and distinguished career as a prosecutor, federal judge, and law professor, namely, his rebuttal opinions about Dr. Leo's assessment concerning the "fit" of Plaintiff's confession. Included in this opinion is Professor Cassell's assessment that "[e]ven true confessions frequently diverge from the crime scene facts." (Cassell Report, at 13-15.) Because Professor Cassell is qualified to proffer these opinions based on his own experience and observations, as well as his review of scientific studies, the Court denies this aspect of Plaintiff's motion to bar. That being said, numerous opinions and explanations in Professor Cassell's expert report concern legal doctrines and standards, and it is well-established that experts cannot offer legal opinions or conclusions. *See Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) ("Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *Client Funding Solutions Corp. v. Crim,* 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact.").

**CONCLUSION**

For these reasons, the Court, in its discretion, grants in part, denies in part, and denies in part as moot Plaintiff's motion to bar Defendants' expert witness Professor Cassell brought pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**DATED:** July 25, 2017

ENTERED

_____
**AMY J. STEVE**
**United States District Court Judge**