```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
      NICOLE HARRIS,                ) Docket No. 14 C 4391
 4                                  )
                     Plaintiff, )
 5                                  )
                vs.                 )
 6                                  )
      CITY OF CHICAGO, et al.,      ) Chicago, Illinois
 7                                  ) May 23, 2017
                     Defendants.) 9:40 o'clock a.m.
 8

 9            TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
                 BEFORE THE HONORABLE AMY J. ST. EVE
10

11    APPEARANCES:

12
      For the Plaintiff:        PEOPLE'S LAW OFFICE
13                              BY:  MS. JOEY L. MOGUL
                                1180 North Milwaukee Avenue
14                              Chicago, Illinois  60622

15                              VALOREM LAW GROUP
                                BY:  MS. NICOLE N. AUERBACH
16                              218 N. Jefferson St., Suite 300
                                Chicago, Illinois  60661
17

18    For Deft. City of        GREENBERG TRAURIG
      Chicago:                  BY:  MS. TIFFANY S. FORDYCE
19                              77 West Wacker Drive, Suite 3100
                                Chicago, Illinois  60601
20

21    For the Individual       NATHAN & KAMIONSKI, LLP
      Defendants:               BY:  MR. AVI T. KAMIONSKI
22                                   MR. SCHNEUR Z. NATHAN
                                140 S. Dearborn St., Suite 1510
23                              Chicago, Illinois  60603

24                              HALE LAW, LLC
                                BY:  MS. JENNIFER BITOY
25                              53 W. Jackson Blvd., Suite 330
                                Chicago, Illinois  60604
```

1   APPEARANCES (Cont'd):

2
    Court Reporter:              MR. JOSEPH RICKHOFF
3                                Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
4                                Chicago, Illinois  60604
                                 (312) 435-5562
5

6                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

7                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
8                  TRANSCRIPT PRODUCED BY COMPUTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  14 C 4391, Harris vs. City of Chicago.
 2              THE COURT:  Good morning.
 3              MS. MOGUL:  Good morning, your Honor, Joey Mogul here
 4  on behalf of the plaintiff, Ms. Harris.
 5              MS. AUERBACH:  Nicole Auerbach also here on behalf of
 6  the plaintiff.
 7              MR. NATHAN:  Good morning, your Honor, Shneur Nathan
 8  on behalf of the defendant officers.
 9              MR. KAMIONSKI:  Good morning, your Honor, Avi
10  Kamionski on behalf of the defendant officers.
11              MS. BITOY:  Good morning, your Honor, Jennifer Bitoy
12  on behalf of the defendant officers.
13              THE COURT:  Say your name again, please.
14              MS. BITOY:  B-i-t-o-y.
15              THE COURT:  I just did not hear you.
16              MS. FORDYCE:  Good morning, your Honor, Tiffany
17  Fordyce on behalf of the City of Chicago.
18              THE COURT:  Good morning.
19              You are here for a Daubert hearing as to Dr. Leo this
20  morning.
21              A couple of things before we get started.
22              And I assume Dr. Leo is here?
23              MS. AUERBACH:  He is, your Honor.
24              THE COURT:  A couple of things before we get started.
25              I have read through everything.  And I know this case
```

1    was not mine at the time these briefs were filed, but I do not

2    like the tone at all in the briefing.  Not just in this, but

3    we are not going to go forward with that for many reasons.

4    One, it is not professional and you are highly skilled lawyers

5    who are much more professional than that; and, two, to figure

6    out what your arguments are, I have to dig through your

7    insults at each other.  And if I am doing that, there is a

8    chance I am not getting what your arguments are because I am

9    digging through the hurled insults going back and forth.  And

10    that is not productive, and that does not advance your case.

11          So, again, I know I was not the judge on this case

12    when these briefs were filed, but I certainly do not expect

13    that tone today and I will not be happy if I get that tone

14    today.

15          MS. AUERBACH:  You will not.

16          THE COURT:  And I am looking at all of you.  I do not

17    know who wrote the briefs; but, you are the ones standing

18    before me, so you are the ones who get to take it.

19          We are not going to do that tone today, and we are

20    not going to do that tone going forward.  So, please, drop it

21    at the door.  It is not productive.  Let's get to the merits.

22    You can raise your meritorious arguments.  But I do not expect

23    insults to be hurled at each other.

24          Second, the focus of the hearing today, you do not

25    need to focus on whether or not the science of using coercion

1    or coercive techniques in interrogations is accepted in the

2    field of social psychology.  I find that it is, and my opinion

3    will address that.

4          So, I want you to focus on Dr. Leo's opinions rather

5    than on that foundation and that general "is it accepted."

6    The Seventh Circuit has all but said it is, and my opinion

7    will address that today.

8          But do not waste your time on the science of

9    coercion.  Focus on the individual opinions of Dr. Leo's.  So,

10    that hopefully will give you more of a focus.

11          MR. NATHAN:  Judge, may I just ask a clarification

12    question?

13          THE COURT:  Of course.

14          MR. NATHAN:  Do you mean that you're asking us to

15    focus on the application of -- the way that Dr. Leo applied

16    the science to the facts of our case?  Is that what you're

17    saying?

18          THE COURT:  Yes.

19          In your briefs, digging through, you are challenging

20    the underlying science and whether or not that methodology is

21    acceptable and whether or not the science is reliable.  I find

22    that it is.  So, I do not want you to spend time focusing on

23    challenging whether or not the science itself is reliable.

24          But there are 11 opinions set forth by Dr. Leo.  And

25    some, of course, address that science, but they go beyond

1    that.  And, so, I want you to focus on the opinions and your

2    challenges to those individual opinions, whether it is a

3    question of their applicability to Ms. Harris in this case or

4    whether it is something -- does it go beyond the science?  I

5    will leave that to you to argue.

6            MR. NATHAN:  There are times when I might envision

7    the issues to overlap a little bit, but --

8            THE COURT:  Okay.  We will take it --

9            MR. NATHAN:  Remind me to move on if they overlap too

10   much.

11           MS. MOGUL:  Do you mind -- we don't want to delay or

12   inconvenience anyone, but can you give us just a few moments

13   to kind of jettison and get rid of material that we were

14   planning to go over?

15           THE COURT:  Yes.

16           And you can certainly do some general introductory

17   background.  I do not care if you take ten minutes on the

18   general background.  But I do not need you to go through all

19   the studies that have been issued in this area and the other

20   experts in this area and his writings in this area.

21           As I said, the Seventh Circuit has essentially

22   recognized this as acceptable science and my opinion ruling on

23   Dr. Leo will give you more detail, but we do not need to waste

24   our time on that today.

25           MS. MOGUL:  Okay.

Leo - direct

7

```
 1              MS. AUERBACH:  Okay.  If we could just take a few

 2     minutes, your Honor?

 3              THE COURT:  Sure.  Let me know when you are ready.

 4              MR. NATHAN:  One second.

 5              MS. AUERBACH:  Oh, sorry.

 6              MR. NATHAN:  There are times when there might be a

 7     question about the implications of that science, and that

 8     would be fair game in your --

 9              THE COURT:  And you can ask your questions.  Let's

10     see what the direct looks like.  You can ask your questions

11     and if I think -- if there is an objection and I think you are

12     focused too much on what I have already addressed, I will

13     sustain it.

14              MR. NATHAN:  Okay.  Thank you.

15              MS. AUERBACH:  Thank you, your Honor.

16          (Brief pause.)

17              THE COURT:  Please call Dr. Leo when you are ready.

18              MS. AUERBACH:  We are ready.

19              THE COURT:  Please come forward.

20               RICHARD LEO, PLAINTIFF'S WITNESS, SWORN

21                        DIRECT EXAMINATION

22     BY MS. AUERBACH:

23     Q.  Good morning, Dr. Leo.

24     A.  Good morning.

25     Q.  Could you state and just spell your name for the record,
```

1    please.

2    A.   Sure.  Richard Leo.  Last name is spelled L-e-o.

3    Q.   Where are you currently employed?

4    A.   I'm currently employed at the University of San Francisco

5    School of Law.

6    Q.   And in what position?

7    A.   I have a endowed chair as a professor of law and

8    psychology.

9    Q.   What degrees do you hold?

10   A.   I have a Bachelor's Degree in Sociology from UC Berkeley,

11   a Master's Degree in Sociology from the University of Chicago,

12   a Ph.D. from UC Berkeley, and a J.D. from UC Berkeley.

13   Q.   Have you been retained to give an expert opinion in this

14   case?

15   A.   Yes.

16   Q.   And could you briefly summarize the topics without going

17   into the specific details of your opinions?  But could you

18   briefly summarize first for the Court your opinions?

19   A.   Sure.

20        Well, the topics would be the psychology of police

21   interrogation, false confessions, indicia of false

22   confessions, risk factors for false confessions, effects of

23   false confessions.  There's the general opinion, so to speak,

24   that an educational witness would give, and then there's the

25   application to facts in this case.

Leo - direct

9

1    Q.  So, are the topics that you just testified, are those

2    topics that you have testified in the past as an expert?

3    A.  Yes.

4    Q.  Okay.

5           We'll go through your specific opinions in a moment,

6    but how would you describe your area of expertise?

7    A.  I would describe it as the social scientific study of

8    influence and decision making in the particular applied

9    context of police interrogations and how and why that leads to

10   false and/or unreliable statements, admissions or confessions.

11          So, the applied study of influence and decision

12   making in the context of police interrogations and the

13   products they produce.  So, this is really broadly about the

14   field of social psychology and sociology and criminology and

15   the applied study in a particular context.

16   Q.  And how long have you worked in that area?

17   A.  Since 1990.  So, more than a quarter century.

18   Q.  You've put together a curriculum vitae in this case,

19   correct?

20   A.  I have a curriculum vitae, yes.

21   Q.  And was that attached to the report that you submitted?

22   A.  I believe so.

23   Q.  Okay.

24          I would like to --

25          MS. AUERBACH:  Your Honor, do you want me to enter

Leo - direct

10

1    exhibits?  Do you want me to do it that way or just -- okay.

2                THE COURT:  You should enter exhibits --

3                MS. AUERBACH:  Okay.

4                THE COURT:  -- if you want them in the record.  I

5    have the binder you gave to me.

6                MS. AUERBACH:  Perfect.

7                So, I'd like to hand you and hand actually Dr. Leo a

8    binder of what we marked as Group Exhibit No. 1.  So, if I can

9    have permission to approach, your Honor?

10               THE COURT:  You may.

11        (Document tendered.)

12   BY MS. AUERBACH:

13   Q.  Dr. Leo, is that a copy of the report that you submitted

14   in this case, along with the attachments?

15   A.  Yes.

16   Q.  And is Appendix A to that group exhibit your CV?

17   A.  Through February of 2016, correct.

18   Q.  Okay.

19               And, to your knowledge, was that CV current as of

20   February, 2016, when you submitted it?

21   A.  Yes.

22   Q.  And are there any, I'll just say, material or major

23   changes that have been made since February, 2016, that we

24   should know about?

25   A.  Nothing major, no.

Leo - direct

11

1   Q.   Okay.

2           MS. AUERBACH:   Your Honor, I don't know how much you

3   need us to go through his qualifications.  I'm happy to walk

4   through it, and I was prepared to do that.

5           THE COURT:  I think you can truncate them.

6           MS. AUERBACH:   Perfect.

7           THE COURT:  Again, I have read everything.

8           MS. AUERBACH:  Okay.

9           THE COURT:  I think you can truncate the

10  qualifications.

11          MS. AUERBACH:  Okay.

12  BY MS. AUERBACH:

13  Q.   So, Dr. Leo, I'd like to just talk a little bit about what

14  type of research that you have done that relates to the

15  opinions that you're giving in very broad strokes.  I don't

16  need you to go through the articles themselves.

17          But if you could just talk generally about the

18  research and the area that you've conducted?

19  A.   Before you do any research, you have to master a body of

20  literature.  And, of course, the research in this field, I'm

21  just one contributor.  I've done this for many years, but

22  there's a context here.  So, this is not about me.  This is

23  about a field of research.

24          The research that I've done, I think of it in terms

25  of the different methods and the different research questions.

Leo - direct

12

1    So, I have done field research by which I mean observational

2    research.  I've done research where I've sat in police

3    stations and watched live interrogations; done qualitative

4    analysis, as well as quantitative analysis, of what I've

5    observed.

6            I've done research where I've interviewed police

7    officers, interrogators, trainers, suspects, prosecutors,

8    district attorneys, and other criminal justice officials.

9            I've done research that's been archival.  Historical

10   research going into actual archives.  I've done the modern

11   equivalent of that, which is analyzing case documents, case

12   files, trial transcripts, police reports, and, of course, most

13   commonly, electronically recorded interrogations and

14   transcripts.

15           I've done surveys.  Surveys of police officers,

16   surveys of potential jurors, surveys of real jurors, surveys

17   of mock jurors.

18           I've participated in studies that have involved

19   experiments, though not many.

20           So, there's a wide -- so, I've done a great deal of

21   research using different methods, addressing different

22   research questions.  There are many research questions in this

23   field.  The primary one, I think, that's on everyone's mind

24   is:  How and why do false confessions sometimes occur, and

25   what is it about the process of police interrogation that

Leo - direct

13

1    counterintuitively leads people who are innocent or partially

2    innocent to make statements that are wholly or partially false

3    or unreliable?

4            But there's a myriad of other questions that are

5    related to that.  Subsidiary or associated questions.

6            So, again, I think of it in terms of methods and the

7    research questions and my contribution to the field.  But it's

8    a big field and I'm just one person in this big field.

9    Q.  One of the areas that you touched upon was jurors'

10   understanding of the phenomenon of false confessions.  And I

11   wanted to ask you a little bit about that aspect and the

12   relevancy of your opinions in this case to that particular

13   issue.

14           What research have you done personally -- I'll start

15   with that.  What research have you done personally that

16   suggests to you one way or the other whether jurors are

17   familiar with the phenomenons that you would like to testify

18   about?

19   A.  So, between the years of 2008 and 2011, there were five

20   published surveys.  Two of those surveys I was a co-author on.

21   One involved surveying real jurors in the Santa Ana

22   courthouse.  Another involved surveying undergraduate

23   students.  But there were, again, three other studies that

24   involved adults -- real adults.

25           So, what these -- these studies have common findings,

Leo - direct

14

1  these surveys.  And one thing they show is that average

2  citizens are not that familiar with the phenomena of false

3  confessions.  They tend to be highly skeptical that they

4  occur --

5            MR. NATHAN:  Objection, your Honor.  This -- if this

6  is a new opinion, it's not one that was disclosed.

7            THE COURT:  Was this disclosed, or are you just

8  trying to get at the relevance or why his opinions are

9  relevant during a jury trial?

10            MS. AUERBACH:  It's the latter, your Honor.  It's the

11  relevance as to why his opinions as a whole, not the specific

12  ones that he set out.

13            THE COURT:  Okay.

14            Overruled.

15  BY THE WITNESS:

16  A.  So, succinctly, the survey studies, including the ones

17  that I co-authored, show that people are highly skeptical that

18  false confessions occur; that they tend to assume that most

19  confessions are true; that they reason that they would never

20  be made to falsely confess.

21            They don't understand why somebody would falsely

22  confess.  It's self-destructive, irrational, against one's

23  self-interest.

24            That they understand that police interrogation can be

25  psychologically coercive and they understand the link between

Leo - direct

15

1   that and true confessions, but not so much between that and

2   false confessions.

3          So, the upshot is that the surveys show this is

4   outside of common knowledge, common experience for most

5   people.  They haven't gone through police training.  They

6   haven't read the social science literature.  They don't know

7   people who falsely confessed.

8   BY MS. AUERBACH:

9   Q.  So, before getting into your specific opinions, the last

10  question that I'll ask you just as a foundation for the basis

11  for your opinion is:  Other than your own research, what else

12  have you relied on or looked to in the field in order to

13  establish your opinions in this case?

14  A.  Well, again, it would be the body -- the larger body of

15  research.  There are hundreds of articles in this field --

16  peer-review articles.  There are dozens of books.  It's not

17  that I rely on one specific source or another.  Some are more

18  salient or comprehensive or recent.

19         But on the entire body of research in this area,

20  there are some that perhaps would be the best exemplars of

21  what I rely on that I could discuss, if that's helpful.

22  Q.  Give us just a small snippet, if you will, of the

23  exemplars that you're talking about.

24  A.  Well, my mind naturally goes to what is referred to as the

25  White Paper, which is an article that was published in 2010

Leo - direct

16

1    that was commissioned by the American Psychology-Law Society,

2    which is Division 41 of the American Psychological

3    Association.

4            That article reflects the general acceptance of

5    various findings and opinions and principles and methodologies

6    in the relevant scientific community because Division 41 of

7    the American Psychological Association, named the American

8    Psychological Law Society, are those psychologists who study

9    the legal system and applied -- apply the science of

10   psychology to legal issues.

11           And, so, a number of distinguished scholars were

12   chosen to write this review essay.  It was vetted through the

13   whole society.  Every member of that society got to comment on

14   it before submitted for publication, to make sure it

15   represented the consensus views; and, then, it went through a

16   rigorous peer-review process.

17           It's perhaps the most comprehensive recent review of

18   the field.  So, it's 35 dense pages.

19           So, much of what I say, since you asked about

20   reliance, could be cross-referenced back to some section of

21   that review article, that thoroughly reviews the field at

22   least up to 2010 and reflects the consensus views of the

23   scientific community that studies the application of

24   psychology to the study of interrogation and confessions.

25   Q.  And, Dr. Leo, what you referred to as the White Paper was

Leo - direct

17

 1   one of the articles that were submitted as exhibits for this

 2   hearing, correct?

 3   A.  Yes.

 4           MS. AUERBACH:  So, your Honor, if I could approach?

 5           THE COURT:  You may.

 6           You do not have to ask --

 7           MS. AUERBACH:  Okay.

 8           THE COURT:  -- anymore to approach.  That is fine.

 9   BY MS. AUERBACH:

10   Q.  I'm going to show you, Dr. Leo, what we marked as Group

11   Exhibit No. 2 --

12       (Document tendered.)

13   BY MS. AUERBACH:

14   Q.  -- and just ask you to identify -- and, actually, to make

15   it easier, I'm actually also going to hand you the joint

16   report that we filed with the Court in advance of this hearing

17   that listed all of the articles that were contained in Group

18   Exhibit No. 2, and I'll ask you to point out which one is the

19   White Paper that you're referring to.

20       (Document tendered.)

21   BY THE WITNESS:

22   A.  So, it's the first article listed under 2.B.i., "Police-

23   Induced Confessions:  Risk Factors and Recommendations."

24   There are six authors, but the first one is Saul Kassin,

25   K-a-s-s-i-n.

Leo - direct

18

1      MS. AUERBACH:  Your Honor, I'd like to move into

2 evidence Group Exhibit No. 2.  Just in the sake of brevity,

3 I'm not going to have him go through any of the other

4 articles.

5      THE COURT:  Any objection?

6      MR. NATHAN:  No, your Honor.

7      THE COURT:  It is admitted.

8    (Group Exhibit No. 2 received in evidence.)

9      MS. AUERBACH:  And while I'm at it, I will also move

10 to admit Group Exhibit No. 1, which is his report and the

11 attachments to that.

12      THE COURT:  Any objection?

13      MR. NATHAN:  No objection.

14      THE COURT:  It is admitted.

15    (Group Exhibit No. 1 received in evidence.)

16 BY MS. AUERBACH:

17 Q.  And, Dr. Leo, you, in fact, were one of the authors of the

18 White Paper, correct?

19 A.  Yes.

20 Q.  I'd like to turn your attention now to the report that you

21 submitted and, in particular, the opinions that are listed

22 there.  And that is in the notebook, Group Exhibit No. 1.

23 A.  Correct.  Thank you.

24 Q.  So, Dr. Leo, you set forth a number of opinions on Pages 2

25 and 3 of Group Exhibit No. 1 and, in particular, your report;

Leo - direct

1    and, I'd like to go through those, if you would.

2         Let me, as a background, ask you, did you memorialize

3    what case materials you relied upon before doing this report?

4    A.   Yes.  And I believe it's in Appendix B to the report,

5    which is also included in the materials that I have in front

6    of me.  So, it's a six-page list of materials that I reviewed

7    prior to preparing this report.

8    Q.   And, I'm sorry, could you direct us to where that is?

9    A.   So, it's Appendix B.

10   Q.   Appendix B?

11   A.   Appendix B to the report.  And it's separately paginated,

12   so there's six full pages.

13   Q.   Okay.

14   A.   Actually, you know, I think I made a mistake.  I don't

15   think it is Appendix B.  It's Appendix C.  I'm sorry.  I was

16   referring to something else.

17        Appendix C is not -- is not -- paginated, but it

18   looks to be about eight to ten pages.

19   Q.   Okay.

20        MS. AUERBACH:  And Appendix C is part and parcel of

21   Group Exhibit No. 1, your Honor.

22        THE COURT:  Okay.

23        For the record, it starts at 333-2.

24   BY MS. AUERBACH:

25   Q.   Dr. Leo, going to the specific opinions that are set forth

Leo - direct

20

1    on Page 2 of your report, I'd like you to actually go through

2    each opinion and then I'll ask you some questions.  We'll do

3    it separately.

4          So, let's focus on Opinion No. 1:  "It has been well-

5    documented in the empirical social science research literature

6    that hundreds of innocent suspects have confessed during

7    police interrogations to crimes (often very serious crimes

8    such as murder and rape) that it was later objectively proven

9    that they did not commit."

10         So, could you explain what that opinion means and

11   then also the basis for it?

12   A.  Sure.

13         So, there are multiple sources that document this

14   opinion that there have been hundreds of proven false

15   confessions, and that there is no dispute that false

16   confessions do occur.  One source would be the scholarly

17   literature.  Some of us have studied what we call proven false

18   confessions.  So, we've collected cases where we can show to a

19   near or absolute certainty that a confession is false.

20         We have argued that you can only do that four ways.

21   One is if you could show that no crime occurred; two is if you

22   could show that it was physically impossible that the person

23   who confessed to the crime actually committed the crime; three

24   is if you had dispositive scientific or exculpatory evidence

25   that proved that the confession was false; and, then, four

Leo - direct

1    would be if the true perpetrator is apprehended and that's the

2    person who it's established committed the crime, not the

3    confessor.

4            So, we have studies of these proven false

5    confessions.  There are several hundred in the published

6    literature.  There's more in papers to be published.  There's

7    no dispute that -- that -- these are proven, documented false

8    confessions.

9            In addition to that, there is, of course, the

10   database of DNA exonerations going back to 1989.  I believe

11   there are 350 DNA exonerations.  And we know that consistently

12   somewhere between 15 and 20 percent of those DNA exonerations

13   where an innocent person was shown to have been wrongly

14   convicted and released from prison, about 15 to 20 percent of

15   the time, false confessions -- they involve false confessions

16   by the exoneree.

17           And, then, there is more recently what is known as

18   the National Registry of Exonerations, which began as a

19   project between Michigan -- University of Michigan and

20   Northwestern University and has recently been relocated to the

21   University of California Irvine, which has tried to document

22   exonerations going back to 1989.  This involves both DNA, as

23   well as non-DNA exonerations.  They have different criteria

24   than the innocence project since they're non-DNA cases; but,

25   again, they have mostly consistent findings.  Around 15

Leo - direct

1    percent of the exonerations involve false confessions.

2          So, when I refer to the documentation that it's well-

3    documented, I have those various sources in mind, particularly

4    the scholarly literature on proven false confessions that I

5    mentioned first.

6          25, 30 years ago, we didn't have this.  And there was

7    a dispute about whether false confessions occurred and what

8    the role of police interrogation techniques were.  But we've

9    moved far past that moment.  So much so that even the police

10    interrogation training manuals themselves have chapters on

11    false confessions and acknowledge it's a problem that occurs

12    and has been well-documented.

13    Q.  Moving on to the second opinion that's listed here:

14    "Nicole Harris' account of her multiple interrogations during

15    her over 30 hours at Area 5 on May 14 through 16, 2005, is

16    consistent with the social science empirical research

17    literature on the types of interrogation techniques and

18    investigative practices that are associated with the increased

19    -- " I'm sorry, "with increase the risk of and are known to

20    cause innocent individuals to falsely confess."

21          Can you describe or give us a little bit of an

22    explanation of what that opinion relates to?

23    A.  Yes.

24          So, I'm going to start with the second half of the

25    sentence and work back to the first.  So, of course, as I

Leo - direct

1    mentioned earlier, we're interested in, among other things,

2    why sometimes innocent people falsely confess.  And we have

3    multiple lines of research to get at that.  We talk about risk

4    factors because certain techniques, certain practices have

5    been shown to increase the risk that an innocent person would

6    make or agree to a false or unreliable confession.

7            Now, in the laboratory studies, we can induce true

8    and false confessions; and, we can analyze whether certain

9    techniques led to those true or false confessions; and, we can

10   study the ratio of a certain technique leading to false, as

11   opposed to true, confessions.  A technique might lead to both,

12   but it might lead to false confessions ten times more or ten

13   times less than it leads to true confessions.

14           So, in the experiments, we can do randomization.  We

15   can isolate variables.  We can parse out causation.  But we

16   can't generate the phenomena identically to how it occurs in

17   the real world.  That's the inherent limitation.  In the real

18   world, we can study the phenomenon as it really occurs, but we

19   can't control our environment to isolate out causation in the

20   way we can in a laboratory.

21           So, when we put these and other lines of research

22   together, what we look for is what we call convergent

23   validity.  Do the findings from one line of research that has

24   inherent limitations converge on, support the findings from

25   another line of research that has different inherent

1    limitations?  And if they do, we have greater confidence in

2    our analysis of risk factors and real or potential causes.

3              So, there is this body of literature that has the

4    field studies -- the documentary studies, the real-world

5    studies -- and then the experimental studies that has

6    identified risk factors and potential causes.  And, then,

7    there is a particular case.

8              And in this case, we don't have a record of what

9    occurred during her interrogation.  I don't know what occurred

10   during her interrogation.  I'm not a fact witness.  And, so, I

11   have two different accounts.  I have the account that

12   Ms. Harris gave based on the materials that I reviewed, and

13   then I have the accounts that people who participated in the

14   interrogation and the custody and the polygraph over the 28 to

15   30 hours that they gave.

16             And what I'm saying here in this opinion is that her

17   description is consistent with much of what we know from the

18   research literature about what increases the risk of and is

19   known to cause false and unreliable confessions.

20   Q.   In order to reach this opinion, Doctor, is it necessary

21   for you or will you credit Ms. Harris' account over the

22   defendants' account?

23   A.   No, because, as I said, I'm not a fact witness and I can't

24   testify to whose account is more accurate or inaccurate.  So,

25   I can merely say if we credit her account or if we take her

Leo - direct

25

1    description, here's what the social science tells us.  If we

2    credit their account, one or more of the participants -- other

3    participants -- present in her 28 to 30 hours, here's what the

4    social science tells us.

5         But I'm not here to make credibility judgments.  And,

6    so, I can't credit anybody's account.

7    Q.  So, it's an assumption that you're making in order to

8    reach the opinion that you've reached in No. 2?  You're

9    assuming that her -- if you took into account her description

10   of the events, then you reach that opinion; is that correct?

11   A.  Correct.  I might phrase it a little bit differently; but,

12   yes, if we take her description, then the social science is

13   consistent with that description.  If we take their

14   description, then that's going to be a different opinion.

15   Q.  Okay.

16        Moving on to Opinion No. 3:  "The accounts of the

17   various Chicago police investigators who detained and/or

18   interrogated Nicole Harris during her over 30 hours at Area 5

19   are not consistent with the empirical findings of the social

20   science research literature on the factors associated with and

21   known to increase the risk of and/or cause false and

22   unreliable confessions."

23        Could you tell us in a little bit more detail what

24   that opinion means?

25   A.  So, again, there's this body of research, which is

Leo - direct

1    described in the body of the report; and, then, we have the

2    descriptions of what did and did not occur, according to the

3    officers.  And this opinion is merely saying that their

4    description of what they did and said to her does not comport

5    with or fit with, it's not consistent with the research on the

6    risk factors and causes of false and unreliable confessions.

7    Q.  Can you give us a little bit more detail as to why they

8    don't fit?

9    A.  Well, their account doesn't really contain much of a

10   description of what they did over this period of time.  There

11   is some description of confronting her with inconsistencies,

12   but there really isn't much of a description of what occurred.

13   As far as I can tell, there's a large gap.  And when you get

14   false confessions, they usually don't come easy.  They usually

15   take a lot of effort, a lot of work.

16          Interrogation is a very structured, goal-directed

17   process that involves pressure and persuasion to move somebody

18   from their denial to the goal of eliciting a statement.  And

19   here I just don't see that -- in their descriptions, in their

20   depositions, in their recollections a description of any of

21   those techniques that we know are associated with and

22   sometimes cause or increase the risk of false and unreliable

23   confessions.

24          So, it struck me as a pretty bare-bones account and

25   not containing, other than the amount of time that occurred,

Leo - direct

1   the risk factors or a description of the techniques that

2   increase the risk of false confessions.

3   Q.  So, in order to reach this opinion or discuss this topic

4   in your testimony, is it necessary for you to discredit what

5   the defendants' account is?

6   A.  Well, I'm not trying to discredit their account because

7   I'm just saying if you take their account as given, it doesn't

8   contain these techniques or factors -- risk factors.  So, I'm

9   not trying to discredit them in the sense of saying whether

10   it's accurate or it's inaccurate.  Again, I don't know.

11   Q.  And if, in fact, you did credit or you assumed that their

12   account is accurate, then your opinion is that the

13   interrogation techniques did not contain factors that increase

14   the risk of a false confession, correct?

15   A.  Correct.

16   Q.  Okay.

17        Moving on to Opinion No. 4:  "In her account of what

18   occurred during her police custody and/or interrogation on May

19   14th through 16, 2015 -- " I think that that's a typo, because

20   that's not the date.

21   A.  Correct.

22   Q.  But in any event, "Nicole Harris describes the use of

23   interrogation techniques and practices that were

24   guilt-presumptive, accusatory and theory-driven.  Nicole

25   Harris describes interrogation procedures whose goal was not

Leo - direct

28

```
 1   to find the truth, but to break down her denials of guilt and

 2   elicit from her a confession to killing her son Jaquari

 3   Dancy."

 4          So, first -- it caught me for the first time -- May

 5   14th through 16, 2015, is it your understanding that that year

 6   is incorrect?

 7   A.  Correct.  I think it was 2005.  So, I think it might be a

 8   typo on the "1."  The "1" was supposed to be a "0."

 9   Q.  Okay.

10          Could you explain in more detail what you mean by

11   this opinion?

12   A.  Okay.  So, guilt-presumptive.  So, police are trained that

13   you've interrogated when you've concluded that somebody

14   committed a crime, you presume their guilt, and you try to

15   move them from denial to admission.

16          She describes an account of being accused of having

17   killed her child.  Repeatedly accused.  So, her description of

18   her account is not one of an interview, open-ended questions,

19   let's find out what happened here.  It's more one of

20   accusation and trying to pressure and persuade her to confess.

21          So, that's what I mean when I say she describes an

22   account that is guilt-presumptive.  In her description, the

23   goal is to get her to confess, not to figure out whether she

24   did this or did not do this.

25          And in her description, it's accusatory; in that, she
```

Leo - direct

29

1   is being repeatedly accused of having done something that she

2   then repeatedly denies doing.  It's not open-ended questions.

3   This is what distinguishes interviews from interrogations most

4   fundamentally.  So, she's being accused not only of killing

5   her child but, when she denies it, of lying.

6         And when I say "theory-driven" here, this in a way is

7   another way of saying guilt-presumptive; that they presume her

8   guilt in her description and their goal is to prove her guilt,

9   to prove their theory that she is the one who committed this

10  crime.

11        So, then the second sentence in that opinion:  "She

12  describes procedures whose goal was not to find the truth."

13        As she described it, that was my opinion of what she

14  was describing.  These were guilt-presumptive, accusatory

15  procedures designed to get a confession because the officers

16  already knew the truth, as she described it, but to break down

17  her denials of guilt and elicit from her a confession.

18  Q.  And can you explain a little bit the background or the

19  research that you're relying on to come to these conclusions

20  or to come to this opinion with respect to guilt-presumptive

21  and these type of techniques?

22  A.  A number of researchers, including myself, have sat in on

23  and participated in police interrogation training courses all

24  across the country.  We've studied, read, written about police

25  interrogation training manuals going back to the 1940s.  We've

Leo - direct

30

1    done observational studies, studies inside police departments,

2    but more commonly of electronically recorded interrogations.

3    We've interviewed police officers, done surveys of police

4    officers.  This is how police are taught.  This is how

5    interrogation is observed.

6              There's no secret that interrogation is

7    guilt-presumptive.  It is a process that is not supposed to be

8    exploratory.  It's not supposed to be at the beginning of an

9    investigation, but only when the officers have concluded --

10   presumably, after a reasonable investigation and the evidence

11   supports that -- that somebody committed a crime.  And, then,

12   they are directed, essentially, to get a confession, to get

13   the evidence of the person's presumed guilt.

14             So, again, I rely on the body of research which has

15   multiple methodologies -- some observational, some based on

16   analysis of documents, some based on surveys -- in order to

17   reach those opinions.

18   Q.  And, again, for purposes of this opinion, is it necessary

19   for you to credit the account that Nicole Harris has given?

20   A.  I don't believe it is, no.

21   Q.  Turning to Opinion No. 5:  "Before interrogating her, the

22   investigators misclassified Nicole Harris as guilty when, in

23   fact, they had no evidence whatsoever to indicate that Jaquari

24   Dancy's death was anything other than accidental nor that

25   Nicole Harris had any role in bringing it about."

Leo - direct

31

1        Can you go into a little bit more detail about what

2    you mean by that opinion, please?

3    A.  My understanding was at the time of the interrogation,

4    there was no evidence indicating that she had killed her

5    child.  There had been -- there had not been a conclusion by a

6    medical examiner or coroner or any independent evidence

7    suggesting she was responsible for this death.  And, so, she's

8    describing, again, a highly guilt-presumptive interrogation.

9        And, again, police are trained and have been observed

10   in the studies to interrogate people when they've concluded

11   that the person is guilty of the crime and when their goal is

12   then to get a confession or incriminating statement.

13       And when we are studying false confessions, we're

14   interested in a series of errors that lead to that false

15   confession.  And the first one we call the misclassification

16   error, since police interrogation is designed for guilty

17   suspects -- to get true confessions from guilty suspects.

18   And, so, I think that's why I used the word "misclassified,"

19   that they had put her in the category of a guilty person, even

20   though there was no basis to do so at that time based on any

21   evidence.

22   Q.  Dr. Leo, let me stop you there.

23       Are you making the determination that they did that

24   in the interrogation room, or are you basing that on Nicole

25   Harris' account?

Leo - direct

1    A.  Well, it's -- my understanding from the materials I

2    reviewed is that they did not have any evidence at the time of

3    her interrogation indicating that she had committed a crime,

4    that she was responsible for the death.  However, when I say

5    guilt-presumptive, I'm -- which really is referencing the

6    prior opinion -- yes, that's relying on her description and

7    not crediting anybody's account, but relying on her

8    description.

9    Q.  Okay.

10          To the extent that there is evidence that's set forth

11    in this case or that --

12          MS. AUERBACH:  Strike that.

13    BY MS. AUERBACH:

14    Q.  To the extent that it is a disputed issue as to what the

15    evidence shows ultimately occurred, are you excluding the

16    possibility that the evidence would show one thing or another?

17    A.  I don't think it's my role to determine facts in dispute.

18    So, no.

19    Q.  Turning to No. 6:  "The initial spontaneous confession

20    attributed to Nicole Harris, which she denies, is inconsistent

21    with empirical social science research on police interrogation

22    and confessions, as well as with logic and the physical

23    evidence in this case."

24          Could you describe in more detail what you mean by

25    that opinion, please?

Leo - direct

33

1   A.  So, I mentioned a moment ago that false confessions

2   usually don't come easy.  They're usually the product -- I

3   mean, not always, but usually the product -- of some prolonged

4   pressure and interrogation.  So, it's rare that you get

5   spontaneous false confessions.

6           And, so, the idea that somebody would just

7   spontaneously confess to a murder, especially after being --

8   or as being in an interrogation room for 28 to 30 hours or

9   longer, is just not consistent with the research.  It usually

10  takes a lot of time and/or a lot of interrogation techniques

11  and/or a lot of personality vulnerabilities to those

12  interrogation techniques.  So, it's just inconsistent with

13  what one of the fundamental findings or general tendencies in

14  the study -- empirical study -- of false confessions.

15          I think when I say it's not consistent with logic, as

16  a kind of a theoretical matter, it doesn't make sense either

17  because to admit to killing your child or to admit to any

18  serious crime if you didn't do it is against self-interest,

19  and it just doesn't make sense that somebody would

20  spontaneously admit to that.

21  Q.  In order to make that opinion, are you substituting your

22  credibility determination for the jury's?

23  A.  Well, I don't think so, because I'm making this opinion as

24  a general statement.  So, it's possible that she spontaneously

25  confessed.  I don't know.  I'm just saying that account, that

1    somebody would spontaneously confess to a crime like this --

2    it could be Nicole Harris; it could be anybody, any case -- is

3    just not consistent with the social science research that

4    confessions that are the product of police interrogations from

5    people who are not mentally ill are almost never spontaneous.

6    Again, they're usually the product of extensive or prolonged

7    police interrogation, pressure and persuasion.

8              So, I don't think that to make this statement I am

9    necessarily crediting her account.  And the reference to logic

10   is really more of a theoretical statement that as a logical

11   matter, theoretical matter, we wouldn't expect spontaneous

12   false confessions.

13   Q.  And when you say "we wouldn't expect," what do you mean by

14   that?

15   A.  Well, I guess we in the research committee.  We --

16   community.  We who study false confessions.  You know, we have

17   hypotheses.  We have theories.  We try to gather data.  We try

18   to falsify or advance, extend.  And, so, just as a hypothesis

19   that somebody would make a spontaneous confession to a crime

20   this serious in a police interrogation room, especially if

21   they had been in that room that long, it just -- it just

22   doesn't fit.

23   Q.  Okay.

24             Turning to Opinion No. 7:  "The multiple

25   interrogations described by Nicole Harris were both physically

1  and psychologically coercive:  Nicole Harris' account of what

2  occurred during her multiple interrogations contain

3  interrogation techniques that are known to cause a suspect to

4  perceive that he or she has no choice but to comply with their

5  demands and/or requests, and that are known to increase the

6  risk of eliciting involuntary statements, admissions and/or

7  confessions."

8          Can you give a little bit more explanation as to what

9  that opinion means?

10  A.  Okay.  So, again, I'm not crediting an account.  This is

11  her description.  So, if we take her description, she

12  describes being shoved in a room.  I think she describes later

13  being pushed or tapped on the chest.  So, there is some

14  physical force being used on her.  And I think that's the

15  reference to "physically" -- some physical pushing or

16  touching.

17          The psychological coercion would really have to do

18  with when interrogation techniques cause someone to perceive

19  that they have no choice but to comply when they are broken to

20  the point of hopelessness or helplessness and they feel like

21  the only way they can escape the stress or the pressure is to

22  say what the officers are demanding or requesting.  And

23  certainly that is her account.

24          Her account is that she resisted for a long time;

25  that she repeatedly denied the accusations; but, when she was

Leo - direct

1   pushed and threatened and told that there was evidence that

2   established her guilt, at some point she was broken.  She

3   couldn't take it any longer and she agreed to make those

4   statements.

5         And the techniques, which I think are really referred

6   to in the following opinion, No. 8, are techniques that can

7   cause somebody to perceive they have no choice; that can cause

8   somebody to feel coerced, especially over a lengthy period of

9   time.  And that's essentially what she's describing.

10        What she is describing fits with cases that we've

11  studied, cases that others have studied where they describe

12  the step-by-step process where they are broken down and end up

13  agreeing to a statement that is later proven objectively to be

14  false.

15  Q.  And, so, the cases that you're referring to, were those

16  known confessions?

17  A.  Correct.  Proven false confessions.

18  Q.  And what other research is it that you rely upon in

19  determining that those factors -- some of the factors that you

20  described, the physical touching or psychological

21  techniques -- that those are risk factors for false

22  confessions?

23  A.  Well, on the physical, we obviously can't physically abuse

24  people in university laboratories.  So, I'm not relying on

25  that.  There's a lot of historical research on physical abuse

Leo - direct

1    and physical coercion during interrogation.  There's research

2    that contains interviews by people who have been physically

3    abused.  But there's no dispute about that.

4            The psychological piece is not just the proven false

5    confessions, but there's also historical research.  And, then,

6    you could say the experimental research, as well, because

7    sometimes the experimental research involves debriefing

8    subjects who falsely confess and asking them why they falsely

9    confessed.  So, I would add that.

10   Q.  Okay.

11           Moving on to Opinion No. 8:  "Nicole Harris' account

12   of what occurred during her multiple interrogations contained

13   numerous interrogation techniques, methods and strategies that

14   have been shown by social science research to increase the

15   risks of eliciting false and unreliable statements, admissions

16   and/or confessions (i.e., situational risk factors) when

17   misapplied to the innocent.  These included false evidence

18   ploys, minimization, implied and explicit threats, and implied

19   and explicit promises."

20           Can you explain in more detail what that opinion

21   means?

22   A.  Well, I think this is the heart of the report really.  I

23   think this is the centerpiece of the opinions at least insofar

24   as in the report, I describe in detail -- more detail -- this

25   opinion.  And, of course, this is drawing on the entire body

Leo - direct

1    of research, especially the experimental research.

2            So, there are certain techniques that are known to

3    increase the risk of false confessions, and we see them

4    present disproportionately in the proven false confessions;

5    but, in the laboratory, where we can induce true and false

6    confessions, we see that they're more common in the false

7    confessions than in the true confessions.  There is a greater

8    risk under controlled laboratory studies that certain

9    techniques -- like false evidence ploys, minimization -- I'll

10   talk about in a moment are more likely to lead to false than

11   true confessions.

12           So, in the report, I have a section essentially on

13   each of these techniques that are referenced in this opinion.

14   So, false evidence ploys means lying to suspects.  Police

15   sometimes will call these ruses.  They're obviously legal.  We

16   call them false evidence ploys.  They're really just lies

17   about evidence.  We have your fingerprints or your DNA or the

18   computer, video surveillance caught you doing something, when,

19   in fact, there is no such evidence.

20           And there's a rich body of literature in psychology

21   on what's called misinformation effects or when you lie to

22   people and how you can manipulate them to believe things that

23   are false to be true and say things that are false believing

24   them to be true.

25           So, in Nicole Harris' account -- and this is applied

Leo - direct

1    to her account -- again, I'm not a fact witness -- she

2    describes that she was repeatedly told that the police

3    investigators had irrefutable evidence establishing that she

4    had murdered her son.  They told her that her boyfriend

5    Sta-Von and the father of her two children believed she had

6    killed her son; and, they told her, according to her, that she

7    had failed a polygraph exam and that had also proved to a

8    scientific certainty she had killed her child.

9           My understanding of the materials that I reviewed is

10   that there really was no evidence.  The polygraph, from a

11   scientific point of view, is not really evidence of anything.

12   But, apparently, it was inconclusive, though she was told that

13   she had failed it; and, that her boyfriend had not said that

14   she had killed the son, and that there wasn't general

15   irrefutable evidence establishing this.

16          Again, at the time of the interrogation there was no

17   evidence.  They didn't know.  It was just their theory.  And

18   her description is that they were trying to get her to agree

19   to that theory.

20          So, that's the basis for that opinion:  That there's

21   a science that shows this increases the risk of false

22   confession.  This technique was present here.  The

23   minimization technique is a well-known technique where police

24   try to minimize the suspect's culpability, the suspect's

25   blameworthiness and/or the consequences that will follow if

Leo - direct

1   the suspect agrees to the accusation, admits to the crime.

2          And the converse of that -- which we call

3   maximization -- is the implication or explicit statement that

4   the suspect will be worse off, that they will be more

5   blameworthy or more culpable or face worse consequences if

6   they fail to confess.  And those techniques can shade into

7   implied or indirect promises or threats.

8          And, so, in the report, there is a discussion of that

9   for a couple pages, Pages 26 and 27, under the heading of

10  "Minimization and Maximization."

11         And what I was thinking of here, the -- I mean, the

12  science is solid establishing the risk that this increases the

13  risk of leading to false confessions -- but that she had been

14  told repeatedly by investigators that if she confessed, she

15  could go home; that she would only be charged with the lesser

16  crime of manslaughter; that she would receive a lower bond,

17  that she could fight the crime from the outside; but, that if

18  she continued to deny, she would be turned over to the state;

19  they would slam her; she would likely be charged with and

20  convicted of first degree murder and might even be considered

21  for capital punishment or spend the rest of her life in prison

22  and, perhaps most significantly, not see her other child,

23  Diante, again.

24         So, you can see how this technique, if we just take

25  her description, becomes or shades into the next category,

Leo - direct

1   implied and explicit threats and implied and explicit

2   promises.

3          From a social psychological point of view, what is

4   important is the message that's being communicated and how the

5   suspect understands that message.  And, clearly, from her

6   description, she understands an implied promise:  Voluntary

7   manslaughter; you can fight it from the outside; you'll be

8   able to see your child again if you confess.  As against you

9   could you face life in prison; possibly capital punishment;

10  never see your child again if you don't.

11         So, her description is of a technique that I think

12  developed into a promise or promises and threats and that kind

13  of finishes out Opinion No. 8.

14         So, again, there's the social science that

15  establishes these risk factors; that documents them being

16  present in real-world cases; that has frameworks and models to

17  understand how and why they lead to false and unreliable

18  confessions.

19         And, then, there is the application in this case.

20  Again, since we don't have an objective record, there's her

21  account and they are present in her account.

22  Q.  Moving on to Opinion No. 9:  "Nicole Harris was also at a

23  heightened risk during her interrogations of making and

24  agreeing to a false and unreliable confession because of her

25  general personality traits; i.e., personal risk factors.

Leo - direct

1   Specifically, her submissiveness and high suggestibility, as

2   well as specific personality traits she had at the time (her

3   overwhelming grief over the loss of her son)."

4           So, I'm going to ask you to describe that opinion in

5   a little bit of detail, but I also want to ask you if you're

6   aware of the Court's ruling with respect to Dr. Frumkin's

7   report or his findings?

8   A.  I am, yes.

9           THE COURT:  Just so you know, I was not ruling in any

10  way on the admissibility of this particular opinion in ruling

11  on Dr. Frumkin.

12          MS. AUERBACH:  Okay.  You did note that there are

13  some limitations upon which --

14          THE COURT:  What he can rely on.

15          MS. AUERBACH:  Exactly.

16          THE COURT:  It was unclear if he had actually relied

17  on that, and there was a dispute in the briefing.

18          MS. AUERBACH:  Okay.  Thank you.

19          THE COURT:  So, you can clarify that.

20          MS. AUERBACH:  Okay.  Thank you, your Honor.

21  BY MS. AUERBACH:

22  Q.  So, in order -- first off, I'll just ask you hand in hand,

23  can you explain in more detail this opinion but, in

24  particular, what you rely upon with respect to Dr. Frumkin's

25  report or anything else to arrive at it?

Leo - direct

43

1   A.  Yes.  So, I want to be very succinct, but I just need to

2   make a general statement first.

3           So, this body of literature involves, as I mentioned

4   earlier, social psychologists like me who study social

5   behavior and focus on interrogation techniques and methods and

6   the interrogation environment.  It also involves clinical

7   psychologists who study personality and how that's related to

8   involuntary or unreliable statements or confessions, as well

9   as criminologists, sociologists and others.

10          So, I am not a clinical psychologist.  I don't do

11  tests.  I am very familiar with the tests that are done.  I'm

12  very familiar with the research on which those tests are

13  based.  And, so, I'm familiar with the kinds of things that

14  Dr. Frumkin wrote about and described.

15          But for purposes of this opinion, I'm relying on two

16  things here.  One is what is called the Gudjonsson

17  suggestibility scales -- "Gudjonsson" is spelled

18  G-u-d-j-o-n-s-s-o-n -- and on her grief-stricken state at the

19  time of the interrogation, which followed her learning of the

20  death of her younger child.

21          The Gudjonsson suggestibility scales is the state-of-

22  the-art testing for, in clinical psychology, whether or not

23  somebody is more prone to or vulnerable to making a false

24  confession than somebody else.  So, it requires an

25  understanding of what clinical psychologists call

Leo - direct

44

1  suggestibility.  The personality trait where people will yield

2  to the pressure of others and shift their responses sometimes

3  in response to misleading information.

4        So, like many things in life, this personality trait

5  is believed to be sort of a bell curve.  And there's some

6  people who are not very suggestible, and there are some people

7  who are highly suggestible; and, the purpose of the test is to

8  determine how suggestible a particular individual is.

9        And, so, if somebody is likely to yield to the

10  pressure of others and to shift their answers and responses in

11  response to misleading information, they would be highly

12  suggestible and it would, in theory, take less interrogation

13  pressure, less interrogation coercion to move them from a true

14  denial to a false admission.

15        Dr. Frumkin's test results, I believe, were that she

16  scored in the 99th percentile of suggestibility.  That would

17  be somebody who is highly suggestible.  And, of course,

18  somebody who is in a grieving state, somebody who just learned

19  that day that their child died, would also be in a suggestible

20  state.

21        So, this opinion today would be based on those two

22  things in light of the Court's ruling.

23  Q.  Okay.

24        THE COURT:  In reaching Opinion No. 9, did you rely

25  on any of Dr. Frumkin's assessments of the plaintiff?

Leo - direct

45

 1          It is clear you relied on his test results in the

 2    99th percentile, but he had some assessments of her.  Did you

 3    rely on those assessments in reaching Opinion No. 9?

 4          THE WITNESS:  You know, I don't recall if I did at

 5    the time or if I just relied on his report -- I mean, on his

 6    tests.  I think I want to just look at what I wrote to refresh

 7    my recollection.

 8          THE COURT:  It is not a hundred percent.  It did not

 9    appear that you were relying on them, but it was not crystal

10    clear.

11          MS. AUERBACH:  Page 28, 29.

12          THE WITNESS:  It looks like it's Page 29, yes.

13      (Brief pause.)

14          THE WITNESS:  I think I was relying on both.  I think

15    I was relying both on his tests or primarily on the Gudjonsson

16    suggestibility scales, but also to a lesser extent on his

17    assessment.  Because I quote something that he says on 29.

18    So, at the time that I wrote the report, yes, I was relying --

19          THE COURT:  Because that is what I have excluded --

20    Dr. Frumkin's assessment.  He cannot rely on that.

21    BY MS. AUERBACH:

22    Q.  Are you able to form this opinion or is this opinion

23    challenged in any way by simply a reliance on the scores as

24    opposed to the notes that Dr. Frumkin made or his own

25    assessments?

Leo - direct

1   A.  So, the opinion that I expressed in the courtroom is based

2   just on the suggestibility scales.  I would say most, but not

3   all, of the opinion in the report where I discuss this is

4   based on the suggestibility scales.  But the part where I

5   quote Dr. Frumkin, I think, is excluded by your Honor's

6   opinion.

7           So, there's a sentence here where I'm quoting him,

8   saying that she loses her ability to make rational use of

9   information when she's under stress.  And I would not express

10  that opinion, given the Court's ruling.  And that is

11  independent of the suggestibility scales.

12          But what I have said prior to the follow-up is based

13  exclusively on two things:  The suggestibility scales and the

14  grief-stricken state.  So, I would not express the full

15  opinion in this report if allowed to testify about this

16  opinion.

17  Q.  Moving on to Opinion No. 10:  "The interrogations

18  described by Nicole Harris involve documented instances of

19  police interrogation contamination, i.e., leaking and

20  disclosing non-public case facts, and scripting that

21  contravene universally accepted police interrogation training

22  standards and best practices, and which increased the risk

23  that Nicole Harris' confession statement would misleadingly

24  appear to be detailed and self-corroborating."

25          Could you give us some more detail as to what that

Leo - direct

1    opinion means?

2    A.  I'm sorry.  Give me just a moment here.

3        (Brief pause.)

4    BY THE WITNESS:

5    A.  Okay.  So, first of all, the word "contamination" in this

6    context means leaking or disclosing non-public details of a

7    crime.  And oftentimes when you have a disputed confession

8    that is the product of a not-recorded interrogation -- I

9    understand we've got a 23-minute tape at the end of this, but

10   we have 28 to 30 hours of custody and interrogation that

11   precede that, that was not recorded -- you often get a dispute

12   about where the details came from.  The interrogators saying

13   they did not supply the details; the suspect saying, "They

14   told me the details."

15        So, again, since there's no objective record -- I'm

16   not a fact witness -- I don't know what occurred.  But

17   according to Ms. Harris, she was repeatedly supplied with

18   details of the death scene and repeatedly coached through her

19   confession prior to going on camera.  And this involved

20   telling her the manner in which her son was killed and details

21   about that, such as that initially he was strangled with a

22   telephone cord; that she had wrapped a bed sheet around his

23   neck; that she had left him on the top bunk.  And, then, this

24   account changes since she made several confessions where -- or

25   agreed to them where -- she was told different details at

Leo - direct

1    different times as the interrogator's account changed.

2             So, the report goes through the specifics, but the

3    significance of contamination -- remember I said earlier there

4    were a sequence of errors that lead to false confessions.

5    It's really a sequence of errors that lead to false

6    confessions that appear to be true.  And the first one I

7    talked about was misclassification.  The second one was what

8    we call coercive -- the coercion error.  We talked about that.

9    The third and final one we talk about is contamination.

10            If there is feeding of details and scripting of the

11   narrative suggesting not only the details, but why the suspect

12   would have committed the act, that doesn't increase the risk

13   that somebody would make a false confession.  It increases the

14   risk that the confession appears to be corroborated, appears

15   to be detailed, appears to be persuasive, and thus can lead to

16   a wrongful conviction of an innocent person.

17            So, this opinion is essentially describing that -- if

18   we credit her account, she is describing contamination.  She's

19   describing scripting.  And it's also saying that that

20   increases the risk that it would appear detailed and

21   self-corroborated.

22            But this is one area where there is no dispute

23   between the police interrogation training industry and the

24   manuals and the academic research committee -- community.  In

25   their training, they always say don't feed suspect the

Leo - direct

 1   details; get them to volunteer those details.  Because then if

 2   it demonstrates personal knowledge and it corroborates the

 3   admission, we have greater confidence in the accuracy of the

 4   statement.

 5   Q.  Turning to the last opinion --

 6            THE COURT:  Before you turn --

 7            MS. AUERBACH:  I'm sorry.  Sure.

 8            THE COURT:  -- forward --

 9            When you say in Opinion No. 10 the interrogations

10   described by Nicole Harris involved documented instances of

11   police interrogation contamination, what are you referring to

12   when you say "documented instances"?  Are you referring to the

13   social science research and that these are documented there,

14   or are you referring to information being documented in the

15   interrogation of this case?

16            THE WITNESS:  Yeah, I need to review what I've

17   written.  Sorry.  I just need a moment to review.

18            THE COURT:  Because it appeared to be the latter to

19   me, that you were talking about documented instances --

20            THE WITNESS:  Right.

21            THE COURT:  -- in this case; and, if so, what are

22   those documented instances?

23       (Brief pause.)

24            THE WITNESS:  What I think that I was referring to

25   when I wrote this report is that the police had a theory

Leo - direct

1    initially of what occurred, that he was strangled with a

2    telephone cord -- Jaquari was strangled by a telephone cord.

3    And if I'm remembering correctly, there was documentation in

4    the record that they thought that that was the manner of death

5    and then they realized it wasn't, subsequent to her saying

6    that.

7            And, so, they had -- I think my opinion was that they

8    had -- the way she would have got that false fact would have

9    been through them, and that was the documented instance of

10   contamination that's described at the bottom of Page 29 and

11   the top of Page 30.

12           THE COURT:  Where was it documented?

13           THE WITNESS:  I don't recall as I sit here today.

14   BY MS. AUERBACH:

15   Q.  Do you recall, Dr. Leo, any of the medical examiner

16   reports -- reviewing any of those?

17   A.  I did review them.  I didn't review them in preparation

18   for today.

19   Q.  As you sit here today, do you recall the cause of death,

20   reviewing any of the documentation of that?

21   A.  I thought the cause of death was strangulation, but that

22   he was found to have not a telephone cord around his neck.  It

23   was a fitted bed sheet, I believe.

24   Q.  Okay.

25           MS. AUERBACH:  I'll move on, your Honor, unless you

Leo - direct

1    have other questions in that regard.

2            THE COURT:  No.  Go ahead.

3    BY MS. AUERBACH:

4    Q.  Turning to Opinion No. 11:  "The confession statement of

5    Nicole Harris contains factual and logical errors,

6    inconsistencies and other indicia of unreliability that are

7    hallmarks of false or unreliable confessions."

8            Can you explain this opinion in more detail, please?

9    A.  Well, we do see patterns and characteristics in false

10   confession cases, and what we see are right and wrong answers.

11   And where there's a recording, usually the right answers are

12   either the product of guessing or if the person has some

13   pre-existing knowledge or of contamination or feeding.

14           But oftentimes there are wrong answers, as well.

15   Answers that don't fit the facts of the crime because the

16   person doesn't have personal knowledge and is guessing or

17   making up a false answer.

18   Q.  In order to come to this opinion, are you making a

19   determination that the confession in this case was false?

20   A.  Well, that's not really for me to make, right?  So, this

21   is -- this opinion is really about evidence that is consistent

22   with or inconsistent with and is about applying an approach

23   that we use in our field when we're evaluating whether there's

24   indicia of reliability or indicia of unreliability.

25           Indicia are not absolute.  They're just indicia,

Leo - direct

52

1  right?  So, if I were allowed to express this opinion, I would

2  not say that the confession is false.  I would merely say

3  there are some indicia of unreliability; here's our

4  methodology for looking at indicia of reliability and

5  unreliability; and, here's my analysis of why I think there's

6  some indicia of unreliability.

7  Q.  So, to summarize, Dr. Leo, at the end of the day, do you

8  intend to opine on whether or not Nicole Harris gave a false

9  confession in this case or not?

10  A.  No, of course I would not opine on that.  The opinion that

11  I would give, Opinion No. 11, is really laid out in the

12  report; and, that would be the opinion that I would give, if

13  allowed.

14  Q.  So, with respect to all of the opinions that you've given,

15  when you describe the topics, you broke it into two

16  categories.  One was the phenomenon of false confessions, and

17  the other was the application of the facts to false

18  confessions.

19       First of all, in your experience testifying, have you

20  been allowed to testify as to both aspects?

21  A.  Yes, but this requires some qualification.  So, I've

22  testified at this point in my career over 300 times.  And much

23  of the time the testimony is purely general.  And it could

24  depend on a lot of factors.  The strategy of the attorney who

25  retains me, as well as the judge's decision, or even, you

Leo - direct

1      know, at what point in the trial the testimony occurs.

2             So, oftentimes it's just purely general educational

3      testimony to educate the trier of fact about a phenomena

4      that's counterintuitive, but highly impactful; that there's

5      been scientific study on; that provides a framework and

6      findings for understanding how and why something could have

7      happened.  And, then, the trier of fact puts whatever weight

8      they want on that.

9             There are other times when I'm allowed to opine about

10     facts in the case.  And when that occurs, the typical -- and I

11     should say most of the cases that I have testified in have

12     been criminal cases, not civil cases, and state cases, not

13     federal cases.

14            So, in those cases, usually there's an interrogation

15     recording with a corresponding interrogation transcript.  And

16     usually what my opinions are focused on is going through the

17     interrogation transcript and identifying particular techniques

18     and discussing what the research shows about those techniques

19     specifically and what my concerns would be about the possible

20     effects of those techniques.

21            When allowed to testify specifically, I never testify

22     about whether or not I think a confession is false because

23     usually it's not allowed and it's also outside the scope of

24     what I had been retained for.  Now, there might be some

25     exception to that, like, you know, a post-conviction habeas

Leo - direct

54

1    hearing where the judge wants me to say do I think this is

2    false and why do I think this is false.  But that would be

3    extremely rare.

4         MS. AUERBACH:  Just one moment, your Honor, please.

5       (Brief pause.)

6    BY MS. AUERBACH:

7    Q.  The last question, Dr. Leo:  Do you know how many articles

8    that you have authored or co-authored about confessions and

9    interrogation methods that have been peer reviewed?

10   A.  I don't know the exact number.  I would estimate 60 or 70

11   or 80 percent.  I am trained both as a social scientist and as

12   a lawyer, even though I've never practiced law.  And for the

13   first half of my career, I was a professor in psychology and

14   criminology; and, the second half of the career, I moved to a

15   law school for personal reasons.  And, so, I am often invited

16   to write law review articles.  And, so, some of the

17   publications that I've done have not gone through the

18   traditional peer review, but most of them have.

19        And, then, within the law review, sometimes they have

20   a hybrid peer review.  You know, sometimes there is an

21   editorial board of students and they run it -- they contact

22   national experts.  Sometimes I'm contacted for others.  But

23   it's not the traditional social science peer review.  So, 60,

24   70, 80 percent of the articles would be my estimate.  I

25   haven't counted.

Leo - direct

1      And, then, the university books are -- go through a

2  peer review.  Usually, initially a proposal that's sent out to

3  authors -- I mean, to peer reviewers, experts in my field;

4  and, then, when the manuscript is complete, it's usually peer

5  reviewed again.

6  Q.  And the articles that you have authored or co-authored and

7  the books that you have written are reflected in your CV,

8  correct?

9  A.  Correct.

10      MS. AUERBACH:  I don't have anything further at this

11  time, your Honor.

12      THE COURT:  One more question, and then we will take

13  a break.

14      Have you ever testified, as you are seeking to do

15  here, drawing conclusions and opinions with respect to someone

16  who was interrogated based solely on her interpretation of

17  what happened as opposed to a transcript or a videotape?

18      THE WITNESS:  Yes.

19      THE COURT:  Let's take about a ten-minute break, and

20  then we will pick up with cross-examination.

21      MS. AUERBACH:  Thank you, your Honor.

22      (Brief recess.)

23      THE COURT:  Mr. Nathan, cross-examination whenever

24  you are ready.

25      (Brief pause.)

```
 1                        CROSS-EXAMINATION

 2   BY MR. NATHAN:

 3   Q.  Good morning.  I think it's still morning, right?

 4   A.  Good morning.

 5   Q.  Professor, you do agree that there's an agreement in your

 6   field that the majority of -- or overwhelming majority of --

 7   confessions are true or at least partially true?

 8   A.  I agree that that is the conventional wisdom, yes.

 9   Q.  You assert in your report at Page 5, you say that you've

10   identified 450 to 500 proven false confessions since the

11   1970s, correct?

12   A.  Correct.

13   Q.  And you don't estimate the total number of confessions

14   that occur in the United States per year, correct?

15   A.  Correct.  I don't estimate that.

16   Q.  Did you ever try to make that estimate?

17   A.  No.

18   Q.  Do you -- are you aware of anyone that did make that

19   estimate?

20   A.  Not reliably, no.

21   Q.  You're talking about the defense expert, Professor

22   Cassell, that made such an estimate, right?

23   A.  Correct, yes.

24   Q.  And at least according to Professor Cassell -- and you

25   dispute it -- he says that he approximates there were at least
```

Leo - cross

1  42 million confessions in the United States since the 1970s?

2  A.  I don't recall off the top of my head where that 42

3  million figure comes from, but if he said that, that wouldn't

4  surprise me.

5  Q.  And it wouldn't surprise you that there are many, many

6  more confessions in the United States than just 500?

7  A.  Correct.

8  Q.  So, you do agree with the conventional wisdom, then, that

9  the vast majority of those confessions are either true or at

10  least partially true?

11  A.  Well, we don't know, but it seems like a reasonable

12  hypothesis.

13  Q.  Let me just jump right to something you left off with at

14  the end of your direct testimony.  You testified at the end of

15  direct that you have been able to testify before just based on

16  assuming the plaintiff's version or your client's version of

17  the events, correct?

18  A.  Well, I testified before in cases where there hasn't been

19  recorded interrogation, where there's been two disputed

20  accounts.  And, so, I testified about those disputed accounts

21  without endorsing which one is factually accurate or not.

22  Q.  So, I mean, Judge St. Eve asked you the question near the

23  end, and I think the question was:  Have you testified -- or

24  something close to this.  Have you testified based on just one

25  person's version of events?  Testified to a jury.

Leo - cross

1          THE COURT:  Where it was not documented through a

2    video or transcript.

3          THE WITNESS:  Right.

4    BY THE WITNESS:

5    A.  My recollection of the question -- obviously, it's in the

6    record -- is that it was about a case where there is

7    unrecorded interrogations.  That doesn't necessarily mean that

8    it was based on just one person's.  Because there might have

9    been a dispute between the police officers and the defendant

10   in a criminal case about -- about -- what exactly occurred.

11   BY MR. NATHAN:

12   Q.  How many times did you testify in those types of

13   circumstances in front of a jury?

14   A.  So, I don't -- I don't -- I haven't tracked the number of

15   cases I've testified in front of a jury where there was a

16   recorded versus an unrecorded interrogation.  So, I don't have

17   that specific number.

18   Q.  Are you able to name one case where you testified to such

19   a -- in such a circumstance?

20   A.  Oh, I'm sure I could.  I mean, I just have to look through

21   the cases that I've testified in.

22          Off the top of my head, no, I mean, at this moment.

23   But if I had a moment to look through a list of cases, I'm

24   sure I could come up with one or more.

25   Q.  Now, if I understood you correctly, you were saying that

Leo - cross

1   your research has demonstrated or at least documented that

2   false confessions do occur within the larger body of

3   confessions, correct?

4   A.   Right.   The field has documented that, among other things.

5   Q.   Okay.

6           But you -- and what your research does is you look at

7   -- at least with respect to real-world confessions and not lab

8   research, what you do is you look at a false confession that

9   you -- something that you decided to be a proven false

10  confession and you look backwards and say, well, what might

11  have caused that, correct?

12  A.   That would be one thing that we could do, sure.   What

13  factors were present here that appear to be associated with

14  false confessions -- because they're disproportionately

15  present -- or what patterns or characteristics are present in

16  these group of proven false confession cases.

17          There are other research questions that we also would

18  use that data to get at.

19  Q.   And you described that here as risk factors for false

20  confessions, right?

21  A.   Right.   But the idea of risk factors really originates in

22  the experimental research.   The case research is kind of con-

23  -- it provides evidence that's consistent with that.

24          But, yes, if there are factors that increase the risk

25  of leading to a false confession, just like factors that

Leo - cross

60

1   increase the risk of lung cancer or heart disease, we would

2   call those risk factors.

3   Q.  But you don't go the other way, meaning you don't say,

4   "I'm looking at this confession; I'm taking -- applying these

5   risk factors; and, then, I'm determining whether or not it is

6   a false confession"?

7   A.  The risk factors can't tell you whether or not it's a

8   false confession.  They can just tell you whether somebody

9   subjected to those interrogation techniques or somebody with

10  those personality characteristics is at greater risk for

11  making a false confession.

12  Q.  So, putting that another way, you cannot take those risk

13  factors and predict whether someone will give a false

14  confession, correct?

15  A.  It depends on what you mean by "predict."  I mean --

16  Q.  I mean tell the future.

17  A.  Well, I think -- I think in the precise sense in which you

18  mean it, if I understand what you mean, no.  If you say, you

19  know, if you have a false evidence ploy, a lie about evidence,

20  you know, can you say what percentage of interrogation -- or

21  confessions are going to be false when you use that technique?

22  No.  In that precise quantitative sense, no.

23          But if you knew that certain techniques were used,

24  you could say that they increase the risk and, so, they

25  predict a higher likelihood.  But in a qualitative sense, not

Leo - cross

61

 1   in a precise quantitative sense, unless you're doing

 2   particular statistic -- laboratory studies where you think and

 3   have precise statistics.

 4   Q.  So, really, the starting point for your analysis of risk

 5   factors and a false confession is first identifying a false

 6   confession, correct?

 7   A.  I don't think so.  I mean, when you say the starting

 8   point, I want to know what you mean.  Because there's a lot of

 9   starting points, depending on what the research question is,

10   what the data we're looking at is.

11   Q.  Well, at Page 4 of your report, you talk about -- well,

12   and then 6 -- you talk about these four ways to establish that

13   there's a proven false confession, right?

14   A.  Correct, yes.

15   Q.  Okay.

16        Now, I'm on Page 6 of your report where it

17   identifies -- and that's Exhibit 1 -- Plaintiff's Exhibit 1 --

18   where it identifies these four different ways, correct?

19   A.  Yes.

20   Q.  Now, the first way to identify a proven false confession,

21   as you described, is -- well, let me skip 1 and just address

22   2, 3 and 4 first.

23        2:  "When it can be objectively established that it

24   would have been physically impossible for the confessor to

25   have committed the crime?"

Leo - cross

1       That's not relevant here, correct?

2   A.  Correct.

3   Q.  No. 3:  "When the true perpetrator is identified and his

4   guilt is objectively established."

5       That's also not relevant here, correct?

6   A.  Correct.

7   Q.  No. 4:  "When scientific evidence dispositively

8   establishes the confessor's innocence."

9       That would be like DNA exonerations, right?

10  A.  Correct.

11  Q.  That's also not relevant here, right?

12  A.  To my understanding, yes.

13  Q.  So, let's go back to No. 1:  "When it can be objectively

14  established that the suspect confessed to a crime that did not

15  happen."

16      Is that the criterion that you used here to identify

17  as your starting point?

18  A.  No.

19  Q.  So, No. 1 is not present either?

20  A.  That's not what I said, no.  I'm not making a judgment

21  about whether this is a proven false confession.  These are a

22  category -- this comes from the research.  And, so, the cases

23  that we have in our research where we say there's been a

24  proven false confession fall into one of these four

25  categories.

Leo - cross

1          I didn't understand it as my mission in this case to

2    categorize this as a proven false confession.  And as the

3    direct questioning repeatedly established, I'm not here to say

4    this is a false confession.  That's not my judgment.  That's

5    not my role.

6    Q.  So, what's the point in your mind of this Paragraph No. 1?

7    What are you trying to do with that?

8    A.  Well, what -- you're talking about on No. 1.  It's not

9    really a paragraph.

10   Q.  On Page 6.

11   A.  Yeah.

12          Well, first of all, it's part of the section called

13   "Scientific Study of Police Interrogation and False

14   Confessions."  And the point is just to lay out that this is

15   an area that goes back many years, that it's accepted in the

16   scientific community; that this is a phenomena that's real;

17   it's been documented; and, here's how we know it occurs.

18          So, you know, this is one point that's made in those

19   two or three pages which were abbreviated.  It's really just

20   to create some context for what follows in the report.

21   Q.  I mean, we went through the fact that your field and the

22   research you rely upon can't take certain -- can't take a

23   certain confession, apply the risk factors and predict whether

24   it was false going -- prospectively, correct?

25   A.  So, if I understand your question, yeah, if we say three

1    risk factors were present, for example, or two or five, in a

2    particular case, now can we say whether this is true or false?

3    No.

4    Q.  Right.

5          And what you do is you take the -- something that you

6    decide was a false confession based on these four bullet

7    points here identified on Page 6, and then you study what you

8    describe to be a false confession, right?

9    A.  Again, it depends on the study.  I mean, most of these

10   studies are aggregated case studies.  So, it's not just one

11   case.  We take a number of cases.  And, then, we ask questions

12   about -- we then try to gather data on all these cases that

13   are proven false confessions.  And, then, we ask a series of

14   questions about the patterns and characteristics.

15   Q.  I mean, numerous times in this report you -- you're

16   referring to -- let me just jump to it.

17       (Brief pause.)

18          MR. NATHAN:  I seem to be missing Page 31.

19          Do you have Page 31?

20          THE COURT:  It is in my report.

21       (Brief pause.)

22   BY MR. NATHAN:

23   Q.  I'm actually at -- let me ask you a different question.

24          You did say in this report that the most significant

25   piece in your professional opinion was that none of the death

Leo - cross

1   scene evidence suggests that Jaquari was killed intentionally

2   or that a crime occurred, correct?

3   A.  I don't think I said that.

4   Q.  Okay.

5          So, did --

6   A.  So, when I testified on direct and we were going through

7   my individual opinions, when I got to No. 8, I said I thought

8   this was the heart of the report.

9   Q.  Let me just direct you to the top of Page 32:  Finally and

10  most significantly, in my professional opinion, none of the

11  death scene evidence suggests that Jaquari was killed

12  intentionally or that a crime occurred.

13         Do you see that, the very first sentence on 32?

14  A.  Yes, yes, but the "significantly" in that sentence doesn't

15  refer to the whole report.  It refers to the section, right?

16  So, it refers to what I think was the final opinion.  I think

17  Opinion No. 11.

18  Q.  I'm going to address that in a second.

19         Now, on Page 13 of your report, you say that truthful

20  confessions and statements are typically corroborated by solid

21  physical evidence and independent knowledge of underlying case

22  facts that have not been suggested to the suspect.

23         Do you still agree with that?

24  A.  So, if -- yes, I do.  But it would be helpful to me if you

25  could just pause for a second so I can go to that page in the

Leo - cross

1    report.  Then if you could tell me what part of the report

2    you're referring to so when you read the statement, I can

3    follow along with you.

4    Q.  Well, Page 13 -- I'm just asking you -- it's the very

5    first paragraph.  I think it's the last sentence of that first

6    paragraph on 13.  And I'm asking you if you still agree with

7    that.

8    A.  Yes.

9    Q.  Okay.

10          So, truthful confessions and statements are typically

11   corroborated by solid physical evidence and independent

12   knowledge of the underlying case facts that have not been

13   suggested to the suspect, right?

14   A.  Yes.

15   Q.  Now, if that statement means anything, then if some -- if

16   a confession is corroborated by physical evidence, then it

17   does have indicia of reliability or it is likely true, in your

18   nomenclature, correct?

19   A.  Correct.  We may disagree about whether it's corroborated;

20   but, yeah, if we agree for sake of argument abstractly that

21   there's corroboration, yes.

22   Q.  So, if there's physical evidence corroborating the

23   confession, then it's more likely true, correct?

24   A.  Yeah, all other things being equal, correct.

25   Q.  Now, I think that we started to jump to Opinion 11.  I

1    think that's probably the crux of your opinion here.  So,

2    let's start with that one.

3          You're not opining that Nicole Harris' confession is

4    true or false.  We went through that, correct?

5    A.  Correct.

6    Q.  But you are attempting to opine that the confession was

7    either likely reliable or likely unreliable, right?

8    A.  Well, has indicia of unreliability.  So, I think if I were

9    to say it's likely reliable or unreliable, then that might be

10    like saying I think it's likely false or likely true.

11    Q.  Okay.

12          So, you're not saying it's likely true or likely

13    false.  That's what you just said?

14    A.  Correct, yeah.  That's a judgment for the jury, not for

15    me.

16    Q.  Okay.

17          You're just saying it has indicia of reliability or

18    it does not have indicia of reliability?

19    A.  Correct.

20    Q.  What is the difference between the two?

21    A.  Well, you -- I guess the difference would be that if

22    something has indicia of something, then you simply say --

23    it's like saying these symptoms are present, but I'm not

24    making the diagnosis.  The diagnosis is for you.  Whereas, if

25    I say it's likely X or likely Y, then I am making the

Leo - cross

1    diagnosis or at least it sounds like I'm making the diagnosis.

2    So, that's how I would distinguish it.

3         And I would also say that, you know, my thinking on

4    this is that we have a social science methodology here for

5    looking at indicia of reliability and unreliability, and this

6    is merely an application of that.  It's not a conclusion

7    about, one way or the other, whether it is reliable or

8    unreliable.

9    Q.  So, you can't say, well, it's -- you can't assign a

10   percentage to how reliable it is -- the confession is -- or

11   how unreliable it is, correct?

12   A.  Correct.

13   Q.  And we already said you can't establish that any

14   particular interrogation technique caused or didn't cause a

15   false confession, right?

16   A.  When you're saying "caused or didn't cause," do you mean

17   in this particular case?  Do you mean just in general?

18   Q.  I'm talking about if you're looking at an interrogation

19   technique without already knowing whether it is a false

20   confession or a true confession, you can't look at that

21   technique and then make a prediction as to whether it's a

22   false confession?

23   A.  It's not going to tell you, correct, whether or not the

24   confession's true or false.

25   Q.  That's impossible for you to do, right?

Leo - cross

1   A.  Well, I don't know if it's impossible, but it's not

2   something that we do.

3   Q.  That would not be a reliable thing for you to testify

4   about?

5   A.  Other than in extreme circumstances, presumably, yes, if I

6   understand your question.  We don't -- we don't -- infer from

7   techniques that the confession is true or false.

8   Q.  When you evaluate the reliability of a confession, you do

9   place more value on physical evidence rather than testimonial

10  evidence, correct?

11  A.  Assuming -- assuming it's reliable physical evidence, yes.

12  Q.  Because the physical evidence is objective, right?

13  A.  Right.  But some physical evidence is more objective than

14  other physical evidence.  So, if you're talking about hairs

15  versus DNA, right.  There are classes of physical evidence.

16          But, yes, I think good physical evidence trumps good

17  testimonial evidence if that's all we know.  That physical

18  evidence, as long as it's been collected properly and

19  interpreted reasonably, is more likely to be accurate than

20  much testimonial evidence.

21  Q.  Okay.

22          So, let's go back to Page 32 of your report, that

23  first paragraph where you say, "Finally and most

24  significantly, in my professional opinion, none of the death

25  scene evidence suggests that Jaquari was killed intentionally

Leo - cross

1    or that a crime occurred."

2    A.   Okay.

3    Q.   You see that, right?

4    A.   Yes.

5    Q.   The very first sentence on the page?

6    A.   Correct.  Thanks.  Yeah.

7    Q.   Now, at your deposition, I asked you about the statement,

8    that you said "most significantly."  And you said you would

9    actually describe it as foundational, correct?

10   A.   Well, I think -- but I would have to refresh my

11   recollection -- is I think that I said a better word to have

12   used in the report would have been "foundationally" rather

13   than "significantly."

14   Q.   Let me try to refresh your recollection then.

15        (Brief pause.)

16   BY MR. NATHAN:

17   Q.   So, just -- I'm reading from Page 52 of your deposition.

18   And we're talking about that same sentence.

19           In 52, Line 8, you say, "So, maybe if I had written

20   the sentence today, instead of using the word 'significantly,'

21   although I'm not withdrawing that, I would have perhaps used

22   the word 'foundationally.'  I think 'foundational' really

23   captures what I'm getting at here."

24           Do you remember -- does that refresh your memory?

25   A.   In part, yes.

Leo - cross

71

 1    Q.  I mean, you don't dispute saying that, right?  We agree to

 2    that?

 3    A.  Correct.

 4    Q.  And you stood by that foundational concept at your

 5    deposition?

 6    A.  I believe I did, but I would have to review the deposition

 7    to recall what specifically I said there.

 8    Q.  Now, you actually described -- if you remember this

 9    exercise during the deposition, I asked you to go through your

10    various opinions and identify which opinion -- to which

11    opinions this foundational sentence or most significant

12    reference applied to.

13            Do you remember that?

14    A.  No.

15    Q.  Okay.

16            Isn't it true that you described at your deposition

17    that -- this sentence about none of the death scene evidence

18    suggesting that Jaquari was intentionally killed or that a

19    crime occurred was foundational to Opinions 5, 6, 10, and 11?

20    A.  You know, I'd need you to show me my deposition to refresh

21    my recollection.

22    Q.  Okay.

23            I mean, why don't you look through -- well, I'm going

24    to do that.  I'm going to find the deposition citation.  Can

25    you look at your report for Opinions 5, 6, 10, and 11, and

Leo - cross

1  confirm for me that that sentence applies to those opinions

2  that I just mentioned.

3  A.  Just a clarification question.  So, are you saying that

4  the sentence on the top of Page 32 does or does not apply to

5  5, 6, 10, and 11?

6  Q.  Let me go about it another way.

7        Can I refresh your memory that at your deposition, I

8  asked you:  "Well, why don't we just do it this way.  You take

9  the time and tell me for which opinions, 1 through 11, there

10  is a foundation that's important to under- -- where you're

11  saying it's a foundational principle that no crime even

12  occurred."

13        "Answer:  Okay.  So, I think related to Opinions 5,

14  6, 10, and 11.  So, I don't know if you want to go through

15  those opinions."

16        MS. AUERBACH:  Shneur, I'm sorry, could you say what

17  page and line number?

18        MR. NATHAN:  Sorry.  I was reading from Page 106,

19  Lines 2 through 11.

20        THE COURT:  Is the question, did he say that?

21        MR. NATHAN:  Yeah.

22  BY MR. NATHAN:

23  Q.  Do you remember saying that?

24  A.  No.  No.  All I remember is the word "foundational" I said

25  was a better word than "significant."  But I don't remember

Leo - cross

1  the rest of it going through -- going through 5, 6, 10, and

2  11, or 1 through 11.  That's what I'm trying to jog my memory

3  on.

4  Q.  Right.

5       So, I read to you a question and answer from your

6  deposition where you said that this sentence that we're

7  talking about at the top of Page 32 of your report --

8  A.  Right.

9  Q.  -- applies to Opinions 5, 6, 10, and 11.  And I asked you

10  did that refresh your memory?

11  A.  And it did not, no.  I would like to see the context in

12  the deposition and to try to better understand what you're

13  getting at here.  Because I think what you're saying is that I

14  said it did apply to 5, 6, 10, and 11.  I think that's what

15  you're saying.

16  Q.  It did apply, correct?

17  A.  I don't know.  That's why I'm trying to understand what

18  you're asking.

19  Q.  Can we agree that that sentence does apply to Opinions 5,

20  6, 10, and 11?

21  A.  No.  I'm not going to just agree to this.  I have to

22  understand it first.

23  Q.  Okay.  Look -- if you can please look at those opinions,

24  5, 6, 10, and 11, and tell me if now you are withdrawing your

25  testimony from your deposition that this sentence applies to

 1    them.

 2              MS. AUERBACH:  Your Honor, I would just ask that he

 3    be given the time to review those opinions.

 4              THE COURT:  He certainly can.

 5              And you may want to show him his deposition --

 6              MR. NATHAN:  May I just --

 7              THE COURT:  -- just based on the form of your last

 8    question.

 9              Yes.

10    BY MR. NATHAN:

11    Q.  I'm handing you Page 106.

12        (Document tendered.)

13              THE COURT:  What I think you are trying to say is he

14    said at his deposition that this paragraph did apply to

15    Opinions 5, 6, 10, and 11, and you are trying to get him to

16    reconfirm that.  Is that --

17              MR. NATHAN:  That's exactly right.

18              THE COURT:  Okay.

19    BY THE WITNESS:

20    A.  So, it appears that what I'm saying on Page 106 is that

21    it's related to Opinions 5, 6, 10, and 11, but that's, if I

22    understand you, different than what you're asking.  And the

23    problem I have with what you're asking is you're not

24    establishing a foundation for me to understand the connection.

25    You should be showing me more of the deposition.  And by

Leo - cross

1   asking me about four opinions all at once, you're asking me a

2   compound question.

3           So, if you want to go through the opinions

4   individually, I'd be happy to do that, but I need to see more

5   of the deposition.  My saying in that deposition that it's

6   related is ambiguous.

7   BY MR. NATHAN:

8   Q.  At your deposition, did I ask you the question and did you

9   give that answer:

10          "Question:  Well, why don't we just do it this way.

11  You take time to tell me for which Opinions 1 through 11 is --

12  is there a foundation that's important to under- -- what

13  you're saying it's a foundational principle that no crime even

14  occurred."

15          "Okay."

16          The transcript says "pause."

17          "So, I think it's related to Opinions 5, 6, 10, and

18  11.  So, I don't know if you want to go through those

19  opinions."

20          Were you asked that question and did you give that

21  answer?

22  A.  Yes, but "related to" doesn't tell me very much.  Yes, I

23  said "related to."  I don't recall specifically how we went

24  through its relationship to without being shown more of the

25  deposition.

Leo - cross

1   Q.  And you --

2          MS. AUERBACH:  Your Honor, I'll just belatedly

3   object.  It's not impeaching.

4          THE COURT:  I will let your objection stand and take

5   it up in the context of ruling.

6   BY MR. NATHAN:

7   Q.  I mean, you do agree that you wrote at the top of Page 32

8   that, "Finally and most significantly, in my professional

9   opinion, none of the death scene evidence suggests that

10  Jaquari was killed intentionally or that a crime occurred,"

11  correct?

12  A.  Yes.  Yeah.

13  Q.  And we went through the four factors at the beginning of

14  this examination where you're able to -- when you're studying

15  false confessions, you find these four different factors; and,

16  the only one that applied was whether or not a crime occurred,

17  right?

18          MS. AUERBACH:  Object to the form of the question and

19  mischaracterizes his testimony.

20          THE COURT:  Overruled.

21          You may answer, if you can.

22  BY THE WITNESS:

23  A.  If we were trying to categorize her confession as a proven

24  false confession, that would be the relevant criteria -- No.

25  1; not 2, 3 or 4 -- yes.

Leo - cross

1    BY MR. NATHAN:

2    Q.  And that's why --

3           MR. NATHAN:  Well, strike that.

4    BY MR. NATHAN:

5    Q.  Isn't it true that the Cook County medical examiner in

6    this case concluded that the death of the 4-year-old child

7    Jaquari was due to strangulation?

8    A.  My understanding is after the confession, yes.

9    Q.  Isn't it true that the Cook County medical examiner

10   concluded that the manner of death was homicide?

11   A.  My understanding is after the confession.  After being

12   told that there was a confession, yes.

13   Q.  Right.

14          And you're being careful to clarify that point

15   because we already talked about how if physical evidence

16   independently corroborates the confession, that's an indicia

17   of reliability, correct?

18          MS. AUERBACH:  Object to the form.

19          THE COURT:  Sustained.

20          Rephrase.

21          MR. NATHAN:  If we've been through it before, maybe I

22   don't even have to rehash it.

23          THE COURT:  I leave that to you.

24          MR. NATHAN:  Okay.

25          THE COURT:  The form was -- well, I will leave that

Leo - cross

1    to you.

2            MR. NATHAN:  Let me give it another shot.

3    BY MR. NATHAN:

4    Q.  We covered before that the physical evidence in a case is

5    paramount because that's objective, right?

6    A.  Yes, the physical evidence.  Interpretation of the

7    physical evidence may be different; but, yes.

8    Q.  And we went through the fact that if the physical evidence

9    corroborates the confession, that is indicia of the

10   confession's reliability, right?

11   A.  Correct.  I did qualify it with the quality of the

12   physical evidence and the consensus about the physical

13   evidence; but, yes.

14   Q.  Now, are you aware that the medical examiner from Cook

15   County that actually did that medical examiner's report was

16   Dr. Denton?

17   A.  Yes.

18   Q.  All right.

19           You did not review his deposition before forming your

20   opinions in this case, correct?

21   A.  I don't recall if I did or not.

22   Q.  It is not listed in Appendix C; is that correct?

23   A.  If it's not listed, then I would not have reviewed it

24   prior to forming the opinions, correct.

25   Q.  You did not review the expert report of Dr. Brian Peterson

1   before coming to your conclusions in this case, correct?

2   A.  If it's not listed in the materials reviewed for the

3   report, then correct.

4   Q.  And that is not listed on Appendix C, correct?

5   A.  I believe it is not --

6        MS. AUERBACH:  We'll stipulate.

7   BY THE WITNESS:

8   A.  -- listed in Appendix C.

9        THE COURT:  Okay.

10  BY MR. NATHAN:

11  Q.  And you did not review Dr. Brian Peterson's deposition

12  testimony before coming to your opinions and conclusions in

13  this case; is that correct?

14  A.  I believe so, based on -- based on Appendix C.

15  Q.  Meaning Dr. Peterson's deposition is not in your list of

16  materials reviewed?

17  A.  Correct.

18  Q.  Isn't it true that Dr. Denton testified that the injuries

19  to Jaquari's neck were, quote, consistent with the force

20  coming from some person -- well, from some person pulling on

21  whatever was Jaquari's neck.

22        I take back -- I'm not directly quoting the

23  deposition testimony.

24        MS. AUERBACH:  I'll object, your Honor.  It's unclear

25  whether he is quoting something from the underlying criminal

 1   case and asking whether it's true or something from the

 2   deposition that he's already testified.

 3            THE COURT:  Sustained.

 4            Clarify what you are quoting from -- or maybe not

 5   quoting from.

 6            MR. NATHAN:  If I just may have a moment, your Honor?

 7            THE COURT:  You may.

 8       (Brief pause.)

 9   BY MR. NATHAN:

10   Q.  Isn't it true that Dr. Denton testified at his deposition

11   in this case -- and I'm quoting from Page 161, Line 19 --

12   "Would you agree that based on your review of the body and the

13   ligature marks on the neck, that that is -- that strangulation

14   is most consistent to be caused by another person?

15            "Objection.  Form.  Foundation.

16            "Question:  Irrespective of the confession.

17            "Answer:  I would say just based on the ligature mark

18   on the neck and that gap and the elastic cord causing that

19   ligature mark, it's most consistent with another person's

20   help, yes."

21            MS. AUERBACH:  So, your Honor, I'm going to object

22   because he's already established that he did not review and is

23   not aware.  I don't think it's an appropriate question.  And I

24   also think it's not relevant to what's being asked because

25   he's relying on what was available at the time of the

Leo - cross

1    interrogation.

2          THE COURT:  Address the first part.  The second, the

3    relevancy, I will overrule.

4          The first part, you are asking him isn't it true that

5    Dr. Denton testified to something at his deposition when Dr.

6    Leo has testified he did not read the deposition.

7          MR. NATHAN:  So, what I would like to do is bring

8    certain testimony to Dr. Leo's attention, and then I can ask

9    him if that undermines his opinion.

10          THE COURT:  Well, I think you need to phrase it

11    differently because by asking him isn't it true that he

12    testified to this, there is an assumption there that he is

13    aware and can clarify that.

14          You can ask him if it would impact his opinion

15    knowing that Dr. Denton testified to something.  That is fine

16    for cross and testing his opinions.  But the way you are

17    phrasing it is not proper.

18          MR. NATHAN:  I'll rephrase.

19    BY MR. NATHAN:

20    Q.  Did you just hear the cited deposition testimony?

21    A.  I did, but I was a little bit confused by the form of the

22    question.  So, if you could read it again or provide me a copy

23    of it, I'll be able to comment on it.

24    Q.  I'm going to read the quote again and I'm going to just

25    ask you to put that in your bank of knowledge for a moment and

Leo - cross

1   I'm going to move on, and then I'll come back to it and ask

2   you ultimately if that undermines your statement from the top

3   of Page 32 of your report.  Okay?

4   A.  Okay.

5   Q.  So, again, I'm reading from Page 161, Line 19, through

6   Page 162, Line 4, of Dr. Denton's deposition.

7           "Question:  Would you agree that based on your review

8   of the body and the ligature marks on the neck, that is --

9   that strangulation is most consistent to be caused by another

10  person -- "

11          There's an objection.

12          And the question is continued:  " -- irrespective of

13  the confession?"

14          So, we're discounting the confession.

15          And now the answer is:  I would say just based on the

16  ligature mark on the neck and that gap and the elastic cord

17  causing that ligature mark, it's most consistent with another

18  person's help, yes.

19          Okay?  I want you to be aware that he testified to

20  that, okay?

21  A.  Okay.

22  Q.  And from that question and answer, just so we're clear,

23  the question was whether the physical findings were consistent

24  with homicidal strangulation even if you discount the

25  confession, meaning he's not taking into consideration the

 1    fact that Nicole Harris provided a confession, right?

 2    A.   That's what he says, yes.

 3    Q.   Okay.

 4         And you would agree that Dr. Denton possesses the

 5    expertise to be able to determine whether physical evidence is

 6    consistent with a homicide, right?

 7              MS. AUERBACH:  Objection, your Honor.  Foundation.

 8              MR. NATHAN:  I'll rephrase.

 9              THE COURT:  Sustained on foundation.

10              MR. NATHAN:  Sorry.

11    BY MR. NATHAN:

12    Q.   You have no qualifications to opine as to cause of death

13    and manner of death, correct?

14    A.   Correct.

15    Q.   And you have no qualifications that would allow you to

16    disagree with a medical examiner, a forensic pathologist, as

17    to findings on cause and manner of death; is that correct?

18              MS. AUERBACH:  Your Honor, I'm going to object simply

19    because, to some extent, this goes to the admissibility of his

20    opinion as opposed to Daubert.  I mean, we're not prepared to

21    present our disputed evidence --

22              THE COURT:  You mean weight of the --

23              MS. AUERBACH:  The weight, exactly, as opposed to

24    admissibility.

25              MR. NATHAN:  May I respond?

1          THE COURT:  Yes.

2          MR. NATHAN:  It goes to the core of the reliability

3    of his opinions because he's stating that the most significant

4    or foundational aspect of Opinions 5, 6, 10, and 11 are

5    whether or not any of the death scene evidence suggests that

6    Jaquari was killed intentionally.  So, he's relying on that

7    factual understanding.

8          THE COURT:  I am going to sustain the form to the

9    last question.

10          If you want to ask him, again, if some of what you

11    are, I think, trying to bring out -- physical evidence -- if

12    that would impact his opinions at all, you can do that.  But

13    the last question, I am sustaining the form.

14    BY MR. NATHAN:

15    Q.  I think you already said you have no qualifications in the

16    field of forensic pathology, right?

17    A.  Correct.

18    Q.  Now, we talked about how Dr. Brian Peterson also is not

19    part of Appendix C, correct?

20    A.  Yes.

21    Q.  His report was not in there and -- correct?

22    A.  Yes.

23    Q.  And his deposition was not in your database, correct?

24    A.  Correct.

25    Q.  I'm going to ask you to put another piece of information

1    into your database, okay?  I'm referring to Dr. Brian

2    Peterson's report, Page 6.  And it says, "In the case at hand,

3    multiple autopsy findings are consistent with the ligature

4    having been placed by another individual."

5              Okay?

6    A.  Okay.

7    Q.  In that report, he lists various reasons why the physical

8    findings are consistent with the ligature having been placed

9    by another individual.  One is the ligature mark being

10   horizontal, okay?

11   A.  Okay.

12   Q.  Two is based on the ligature furrow.  Three is the fact

13   that the ligature furrow disappears behind the neck.  Four

14   involves his review of the petechiae in the child's eyes.  And

15   five relies on muscle hemorrhaging in the child's shoulder

16   area.

17             Would you agree that none of those bases involve

18   understanding whether or not Nicole Harris confessed?

19             MS. AUERBACH:  I'll object to the form of the

20   question.

21             THE COURT:  Sustained.

22   BY MR. NATHAN:

23   Q.  Would you agree that from -- based on what I've read to

24   you -- Dr. Peterson opining that in this case, multiple

25   autopsy findings are consistent with the ligature having been

Leo - cross

1    placed on another individual -- all of the categories of

2    reasons why that finding is correct relies on physical

3    evidence, correct?

4            MS. AUERBACH:  Objection.  Foundation.

5            THE COURT:  Overruled.

6            You may answer that, if you can.

7    BY THE WITNESS:

8    A.  Well, I have no idea whether it's correct, but what you're

9    reading does not mention a confession if that's what you're

10   asking.

11   BY MR. NATHAN:

12   Q.  And we covered you're not a forensic pathologist, right?

13   A.  Yes.

14   Q.  And you have no basis to dispute medical and forensic

15   pathological findings, correct?

16   A.  Not from the field of medical pathology; but, if I were

17   reviewing multiple reports and they were inconsistent, that

18   would be something that people in my field would look at in

19   arriving at our opinions, if we had particular opinions.

20   Q.  Okay.

21           Now, going back to that sentence at the top of Page

22   32, you're referring to the most significant -- or at your

23   deposition, you say the foundational -- part of your

24   professional opinion.  You say none of the death scene

25   evidence suggests that Jaquari was killed intentionally or

Leo - cross

1    that a crime occurred.

2         Do you see that?

3    A.  Yes.

4    Q.  Now, taking the deposition testimony I just read from

5    Dr. Denton and the report of Dr. Peterson, do you agree with

6    me that that -- that information is inconsistent with that

7    sentence that you put at the top of Page 32?

8    A.  Inconsistent in the sense that their interpretation of the

9    physical evidence is that it's consistent or more

10    consistent -- what you've read me -- with the ligature being

11    placed by another individual.

12         Now, you could have a ligature placed with another

13    individual that still wasn't an intentional killing or still

14    wasn't a crime, right?  And, again, I have to say that this

15    "most significantly" or "most foundationally," this refers to

16    Opinion 10 -- or No. 10 on Page 30.  It doesn't refer to the

17    earlier parts of the report that you're talking about.  We may

18    have discussed that in the deposition, but I think you're

19    taking this and you're making a statement that's broader than

20    what -- the statement that I was intending in this report.

21    Q.  You testified at your deposition that this statement

22    applies to 5, 6, 10, and 11, right?

23         MS. AUERBACH:  Objection, your Honor.  I believe that

24    mischaracterizes his testimony here.

25         THE COURT:  Sustained.

1          You are going to have to show him his deposition if

2     you want to do that, because he was not clear on that earlier.

3          MR. NATHAN:  Let me rephrase first.

4     BY MR. NATHAN:

5     Q.  You testified at your deposition that this statement, the

6     "most significant" or "foundational" statement, is at least

7     related to Opinions 5, 6, 10, and 11, right?

8     A.  That's my best interpretation of Page 106, yes.

9     Q.  Isn't it true that this "most significant" and

10    "foundational" aspect of your opinion is simply incorrect?

11    You're saying that none of the death scene evidence suggests

12    that Jaquari was killed intentionally or that a crime

13    occurred.

14          Let me rephrase that.

15          Given the testimony from Dr. Denton and the report of

16    Dr. Peterson, isn't it true that this "most significant" and

17    "foundational" statement of, quote, none of the death scene

18    evidence suggests that Jaquari was killed intentionally or

19    that a crime occurred, is simply wrong?

20    A.  I don't see it that way.  I think that there's more

21    ambiguity than that.  It's an interpretation of evidence.

22    There are contrary interpretations.  And, as I just mentioned,

23    even if -- even if -- they are opining that it's consistent

24    with somebody placing the ligature there, that doesn't speak

25    to whether it was an intentional killing or whether it was a

Leo - cross

1    crime.

2    Q.   If the physical evidence here -- discounting the

3    confession, just completely excluding it -- still is

4    consistent with it being a homicide, that at least, can we

5    agree, does undermine this most significant and foundational

6    aspect of your opinion?

7    A.   If that is true as a hypothetical matter, then, yes,

8    the -- it undermines that that is the most significant aspect

9    of the opinion that this is a hallmark of a false confession.

10   There may have been other hallmarks here, and that may not be

11   related to earlier opinions.

12        (Brief pause.)

13            MR. NATHAN:   Sorry, your Honor.   One moment.

14        (Brief pause.)

15   BY MR. NATHAN:

16   Q.   Now, you talk about one of the indicia of unreliability

17   being factual errors, correct?

18   A.   Yes.

19   Q.   Factual errors in the confession, right?

20   A.   Yes.

21   Q.   Now, at least with respect to the final confession, the

22   videotaped and later transcribed confession, you identified

23   only one factual error, correct?

24   A.   Can you refresh my recollection?

25   Q.   So, I'm looking at Page 31.   I'm in the middle paragraph.

Leo - cross

90

1    Well, let's call it the second paragraph.  It starts with,

2    "The second confession."  That's this first sentence.

3            And, then, I want you to go to the sentence that

4    says, "This error is corrected in Ms. Harris' third and final

5    confession, which has Ms. Harris leaving Jaquari on the ground

6    after strangling him with a dangling elastic band from the top

7    bunk approximately four times."

8            Do you see that sentence?

9    A.  Yes.

10   Q.  So, now we're talking about the third and final

11   confession, right?

12   A.  Okay.

13   Q.  Am I right?

14   A.  I believe so, yes.

15   Q.  And you wrote this report and that's what you're talking

16   about, the third and final confession now, right?

17   A.  That's my understanding, yes.

18   Q.  It continues:  "But even that confession contains an error

19   that does not match any other evidence or testimony that the

20   cord had been wrapped around Jaquari's neck approximately ten

21   times."

22           Do you see that?

23   A.  Yes.

24   Q.  So, one of the things you're relying upon to determine

25   that this confession, at least the third -- the ultimately

Leo - cross

```
 1   videotaped statement has indicia of unreliability is that it

 2   has this factual error, correct?

 3   A.  In the report, yes.

 4   Q.  If it didn't contain this factual error, that would -- or

 5   any other factual error, that would -- be more of an indicia

 6   of reliability, correct?

 7   A.  Well, not necessarily, because we don't know -- we don't

 8   know what was told to her prior to the tape being turned on.

 9   So, she could get facts right that she is merely repeating

10   back what they told her.  And that isn't an independent

11   indicia of reliability because we don't have a full record of

12   how that fact came into existence in her third and final

13   confession.

14   Q.  Other than this one supposed factual error, are you able

15   to identify any other factual errors in the videotaped

16   confession?

17   A.  In the third and final one, no.  Not as I sit here at

18   least, no.

19   Q.  Isn't it true that you actually have no factual errors

20   identified from that final confession because she never said

21   ten in that final confession, correct?

22   A.  I guess it's a two-part question.  So, you're saying I

23   have -- the first part is I have no factual errors identified

24   from the third and final confession?  Is that the first part

25   of the question?
```

Leo - cross

1  Q.  Let's back up.

2          The only factual error you identified in this final

3  confession is she supposedly said the cord was wrapped around

4  the neck ten times, right?

5  A.  In this section of the report, correct.  Yes, in the

6  report.

7  Q.  I'm reading from the transcript of the plaintiff's

8  confession, Page -- it's Page 15 of 24.

9          MS. AUERBACH:  I'm sorry, Shneur, what are you

10  reading from?

11          MR. NATHAN:  The transcript of the confession.

12          MS. AUERBACH:  Of the confession.  Thank you.

13  BY MR. NATHAN:

14  Q.  And isn't it true that the confession actually says:

15          "Question:  What kind of string was it?

16          "Answer:  Elastic.

17          "Question:  And what did you do with it?

18          "Answer:  I put it around his neck.

19          "Question:  Could you please speak up?

20          "Answer:  I put it around his neck.

21          "Question:  And how many times did you do that?

22          "Answer:  About four maybe."

23          Isn't it true that she actually testified -- she

24  actually said -- in the transcribed and videotaped confession

25  it was wrapped four times, not ten times?

Leo - cross

1    A.  I'm not disputing that.  If it's true, it's true.  Usually

2    lawyers will hand me documents that they want me to say -- so,

3    I mean, I'm not doubting that you're reading accurately.  But

4    it's sort of an odd -- it's an odd exchange for you to ask me

5    whether something is true that's not in front of me.  I don't

6    have a photographic memory.  It's been a long time since I

7    reviewed that transcript.

8    Q.  Okay.

9         So, being that this error -- this factual error --

10   that is contained in the videotaped confession is the only

11   factual error you've identified -- is that she supposedly said

12   wrapped ten times but, in fact, the evidence shows it was

13   wrapped four times, according to other evidence you

14   reviewed -- being that that was the only factual error you

15   identified and now I've showed you that's not actually, in

16   fact, an error, do you withdraw this statement from your

17   report?

18   A.  No.  I would have to review the transcript that you're

19   referring to, to see whether or not she refers to it ten

20   times.  You know, it was a 23- or 24-minute confession --

21   taped confession -- statement.

22        So, no, I'm not going to withdraw it unless you

23   provide me the proper foundation to review what's in that

24   document to see if I made a mistake by saying ten times.

25   Q.  Well, I'm happy to bring this to you.

Leo - cross

1          MR. NATHAN:  If I may?

2          THE COURT:  You may.

3     (Document tendered.)

4  BY MR. NATHAN:

5  Q.  I'm referring you to Page 15 of 24 of the confession, Line

6  8:  "Question:  And how many times -- " well, let me back up.

7          "Question:  And did you -- what did you do with it?"

8          I'm starting with Line 4.

9          "Answer:  I put it around his neck.

10          "Question:  Put it -- could you -- could you speak

11  up?

12          "Answer:  I put it around his neck.

13          "Question:  And how many times did you do that?

14          "Answer:  About four maybe."

15  A.  Okay.  So, I'm not disputing that that's what it says.

16          I think you're misunderstanding my prior comment;

17  which is:  There may be another portion in that 24-minute

18  taped confession where she says ten times.  It may be before

19  that; it may be after that.  Without being provided the full

20  document to review it and try to figure out why I say ten

21  times, I'm not going to agree that this is an error.

22  Sometimes people say one thing and then they say another, in

23  an interrogation or confession.

24          So, I don't know the source of this ten.  And your

25  reading one page from the entire transcript suggests that's

Leo - cross

1    the only thing she says.  And I don't recall whether that's

2    the only thing she says.

3    Q.  Let me just go on and ask you the next question.

4           The very next question, the person asking the

5    question says:  "After you wrapped the string around -- the

6    elastic around his neck four times, what did he do?

7           "Answer:  Nothing."

8           Do you see that?

9    A.  Yes.

10   Q.  That's another instance where she says it was four times,

11   correct?

12   A.  She doesn't say it, but the question says it.

13   Q.  And nothing about that next question makes you believe

14   that she didn't say in the confession four times, right?

15          MS. AUERBACH:  Object to the form.

16          THE COURT:  Sustained.

17   BY MR. NATHAN:

18   Q.  According to you, there was no corroboration for Nicole

19   Harris' confession, correct?

20   A.  Can you point to me specifically in the report where

21   you're referring to?

22   Q.  Sure.

23          I mean, I'll refresh your memory with Page 98 of your

24   deposition, Line 17.

25          "Question:  Is there any circumstance that you would

Leo - cross

96

1   be willing to concede corroborates the confession?

2           "Answer:  I did not find, as I described in the

3   report, any corroboration for the confession.  And, you know,

4   I think this -- subsequent to writing this report, as

5   mentioned earlier, I read Mr. McCrary's report.  He is the

6   crime scene expert.  And I think that adds additional

7   information about lack of corroboration for her confession

8   statement."

9           Does that refresh your memory that you've

10  testified you didn't find any corroboration here?

11  A.  Yes.

12  Q.  And the reason you talk about corroboration in your report

13  is because lack of corroboration, in your view, is indicia of

14  unreliability?

15  A.  Correct.

16  Q.  Wouldn't you agree, then, that the converse of that -- the

17  existence of corroboration -- is indicia of reliability?

18  A.  It can be, yes.

19  Q.  Do you remember that Nicole Harris stated in her

20  confession that she hit the children with a belt?

21  A.  Yes.

22  Q.  Would you agree, then, that if there's evidence that

23  Nicole Harris did hit the children with a belt, that would

24  tend to corroborate the confession, right?

25  A.  I would need more specific information.  I'd have to

Leo - cross

1    recall whether or not the confession involved killing the

2    child through hitting it with a belt and what exactly you're

3    saying is corroboration of hitting the belt, when hit with the

4    belt.  So, the question is pitched more generally than I feel

5    comfortable answering.

6    Q.  Okay.

7         At least you can answer it the same way you answered

8    the previous question.  It could corroborate it, correct?

9    A.  It could, but I'd need to know more, yes.  Or it could be

10   an indicia of corroboration.

11   Q.  Well, if in the confession, like you just said -- and we

12   agree that the confession says that day she hit the children

13   with a belt, right?

14   A.  Yes.

15   Q.  Would you agree that if there was other evidence

16   corroborating that fact, it would be indicia of reliability?

17   A.  Yes, but you and I may think of corroboration differently.

18        And, so, you know, if there was evidence

19   indicating -- physical evidence -- that she hit the child with

20   a belt that day as opposed to somebody across the way saying

21   they think they saw her hit the kid with a belt, you know, at

22   a different time, we may be using the word "corroborate" very

23   differently.

24        So, the problem I'm having with your question is the

25   lack of specificity of what you mean by "corroboration."  So,

Leo - cross

1    you're trying to get me to agree to something that's vaguer

2    than I feel comfortable agreeing with.

3    Q.   Okay.

4            So, that's because you can't assign a percentage as

5    to how much corroboration it would provide, right?

6    A.   No.

7    Q.   That's impossible, right?

8    A.   No to the first question.

9            And to the second question, I'm not sure I really

10   understand when you say "a percentage."  Yes, we're not

11   talking about mathematical formulas, if that's what you're

12   asking.

13   Q.   Right.  You're saying, yeah, it tends to corroborate her

14   or might corroborate it, but you can't give a percentage to

15   how much corroboration it gives, right?

16           MS. AUERBACH:  Object to the form.

17           THE COURT:  Sustained.

18   BY MR. NATHAN:

19   Q.   Taking a fact in the confession that is consistent with

20   some extraneous fact tends to corroborate the confession a

21   little bit.  We went through that, right?

22   A.   Again, it might; it might not.  Yes.

23   Q.   But we can't assign a percentage, right?

24           MS. AUERBACH:  Object to the form.

25           THE COURT:  Overruled.

Leo - cross

1          You may answer that, if you can.

2     BY THE WITNESS:

3     A.  Correct.  We can't assign mathematical percentages.

4     BY MR. NATHAN:

5     Q.  And that's the same -- that also applies to the flip side,

6     right?  We can't assign how unreliable it would be if there

7     was no corroboration, right?

8     A.  When you say "assign," you want a percentage?  32 percent

9     unreliable, 83 percent unreliable, correct, we don't do that.

10    Q.  We're just talking -- or you're just talking in general

11    terms there's indicia of unreliability or indicia of

12    reliability, right?

13    A.  I wouldn't say general.  I'd say qualitative terms.

14    Q.  Well, when you say "qualitative terms," you mean it's not

15    quantitative, right?

16    A.  Correct.  So, you could say there's a little indicia,

17    there's a lot, it's substantial, more, less; but, not

18    percentages, which is what you seem to be asking.

19    Q.  You can't give quantitative data or information about how

20    much a fact will corroborate a confession, right?

21    A.  I don't think anybody can, yes.

22    Q.  And you can't give quantitative data about the absence of

23    corroboration and how that might provide indicia of

24    unreliability, right?

25    A.  Your use of the word "data" is the wrong word.  You can't

Leo - cross

1  give a quantitative percentage.  We're not talking about data

2  here.  You're asking can I assign a percentage.  No, I can't

3  assign a percentage.  No one can.

4  Q.  Now, in Opinion No. 9 -- I'm not going to get to Opinion

5  No. 9.  I'm not there yet.  But when you talked about Opinion

6  No. 9 in your direct, you talked about Dr. Frumkin, right?

7  A.  Correct.

8  Q.  And Dr. Frumkin was --

9       MR. NATHAN:  Strike that.

10  BY MR. NATHAN:

11  Q.  Did you understand that Dr. Frumkin was a psychologist --

12  a clinical psychologist -- that interviewed Nicole Harris when

13  she was at Cook County jail in 2006 after she had been

14  convicted, but before she had gone to the sentencing process?

15  A.  Yes.

16  Q.  Now, Dr. Frumkin's deposition is not one of the things

17  that's in your database, correct?

18  A.  Correct.

19  Q.  It's not in Appendix C, correct?

20  A.  Correct, yes.

21  Q.  If Dr. Frumkin -- I'm just asking you hypothetically, if

22  Dr. Frumkin testified at his deposition that when he

23  interviewed Nicole Harris at Cook County jail in 2006 at the

24  request of her attorneys, she told him that she did hit the

25  children with a belt that day, would that tend to corroborate

 1     the confession?

 2          (Brief pause.)

 3               THE COURT:  Can you answer?

 4               THE WITNESS:  I thought there was going to be an

 5     objection.  That's why I haven't answered.

 6               MS. AUERBACH:  I'm sorry.  That's my fault.  I was

 7     trying to formulate.

 8               There's a disputed issue of fact.  I'm not sure that

 9     I can challenge that particular question.

10               THE COURT:  Because he used it as a hypothetical.  I

11     assume that is what is disputed, the first part about what he

12     testified to in his deposition.  And he phrased that as a

13     hypothetical.

14               MS. AUERBACH:  Okay.  Thanks.

15               THE COURT:  So, can you answer the question?

16               THE WITNESS:  Yes.

17     BY THE WITNESS:

18     A.  So, I would say, as a hypothetical matter, if she said she

19     hit him with a belt that day, it would tend to corroborate

20     that fact in the confession.  You're asking me whether it

21     corroborates the confession, and the confession, of course, is

22     more than merely that fact.

23     BY MR. NATHAN:

24     Q.  Okay.

25               So, hypothetically, if Nicole Harris told Dr. Frumkin

Leo - cross

1    that she hit the children with a belt that day, it would tend

2    to corroborate at least that fact of the confession?

3    A.   That fact in the confession, correct.

4    Q.   I'm going to represent to you that Dr. Frumkin, at his

5    deposition, was presented with his own handwritten notes of an

6    interview that he had with Nicole Harris.  And with that

7    context, I'm going to read to you and present to you

8    Dr. Frumkin's testimony about those notes, okay?

9    A.   Okay.

10   Q.   This is -- I'm at Page 45 of Dr. Frumkin's deposition.

11   And this is him -- the question is, "Continue," because he's

12   reading.

13          The answer is, quote:  "I said, 'Get in.  Get in.

14   You know better.  You shouldn't have been inside.'  So, I

15   spanked him.  I had a little belt, tapped him on the legs, hit

16   each of them three or four times.  They both cried.  I told

17   them go lay down.  That's when Sta-Von went to the couch

18   sleeping."

19          So, I want you to assume and rely -- put into your

20   database -- because you didn't rely on Dr. Frumkin's

21   deposition -- that he testified consistent with what I just

22   read, that Nicole Harris told him that during his interview

23   with Nicole in 2006.  Okay?

24          With that in mind, does that fact corroborate at

25   least this portion of the confession about hitting the

Leo - cross

1   children with a belt?

2   A.  Yes.  I mean, it could -- would corroborate that specific

3   statement, not necessarily other things in the confession.

4   Q.  And the physical findings of Dr. Denton would also

5   corroborate the confession, right?

6           MS. AUERBACH:  Object to the form.  Foundation.

7           THE COURT:  Sustained.

8   BY MR. NATHAN:

9   Q.  We covered the fact that Dr. Peterson has opined in this

10  case that the physical findings here are consistent with a

11  homicide, right?

12  A.  Correct.

13          I mean, I think you said consistent with somebody

14  placing -- somebody else placing a ligature mark, right?  And,

15  then, I said that may or may not be a homicide.  So --

16  Q.  Okay.

17  A.  -- I just want to be really clear.

18  Q.  Right.

19          As long as we're being really clear, at Page 32 of

20  your report, the fact you found most significant or

21  foundational in your professional opinion were that none of

22  the death scene evidence suggests that Jaquari was killed

23  intentionally or that a crime occurred, right?

24  A.  Correct.

25  Q.  Let's talk -- I think we can talk about Opinions No. 2, 3,

1    4, and 8 together.

2           So, in Opinion 2, you talk about Nicole -- according

3    to Nicole's account of 30-hour interrogation, it's associated

4    with increased risk -- associated with increased risk of and

5    are known to cause innocent individuals to confess -- to

6    falsely confess, right?

7    A.  Yes.

8    Q.  And, then, No. 3 talks about how the accounts of the

9    police officers are supposedly not consistent with your

10   research, right?

11   A.  With the empirical social science research on the factors

12   associated with a known increase, false confessions, yes.

13   Q.  And No. 4 and 5 -- actually, let me just stick with 4.

14          In No. 4, you're talking about guilt-presumptive

15   interrogation, right?

16   A.  Correct.

17   Q.  And you talk about how that's the interrogation method

18   that was used here, right?

19   A.  I say it's guilt-presumptive, accusatory and theory-driven

20   in her description of what occurred, yes.

21   Q.  And in No. 8, you talk about various techniques like false

22   evidence ploys, minimization, implied threats, or implied

23   promises, right?

24   A.  Correct, yes.

25   Q.  And those techniques are really part and parcel of a

Leo - cross

1    guilt-presumptive interrogation; is that true?

2    A.  Yes.

3    Q.  Okay.

4         So, I'm just trying to put it in context if we're

5    talking about these opinions together.

6         You cannot say that a particular technique -- let's

7    take false evidence ploy from Opinion 8 -- causes a false

8    confession, right?

9    A.  Well, we can say that in experimental studies, it

10   increases the risk.  And, so, there is an association that's

11   not an association by chance and that it's more likely to lead

12   to false rather than true confessions.

13   Q.  And --

14   A.  But when you say "cause," I think it depends on what you

15   mean by the word "cause."  If you have this absolute notion of

16   causation or this singular notion of causation, then no.

17   Q.  I mean it in this sense:  You can't tell whether a

18   particular interrogation technique, like minimization or a

19   false evidence ploy, would cause a true confession versus a

20   false confession, right?

21   A.  So, if I understand your question -- you can correct me if

22   I don't -- is I think you're saying if you know that this

23   technique is present, whether it's a false evidence ploy, you

24   can't infer from the fact that that technique was used whether

25   the confession is true or false.  That's how I'm interpreting

1    your question.

2    Q.   Yeah, that's what I'm -- that's I was asking.

3    A.   Right.  So, that gets back to the earlier testimony.

4    Looking at the interrogation techniques does not tell you

5    whether a confession is true or false.  It answers -- or

6    provides the answer -- to a different question.

7    Q.   Now, you're critical in Opinion 4 of this whole idea of

8    engaging in guilt-presumptive interrogation, right?

9    A.   Well, you have to tell me more about what you mean about

10   "critical of."

11   Q.   Do you advocate for this type of interrogation to be used

12   widely across the United States?

13   A.   I don't really advocate for a type of interrogation to be

14   used, right?  I'm not a police trainer.  I'm not trying to

15   say -- although I have done some police training, but not on

16   the traditional type of stuff they receive.

17          So, there are problems with guilt-presumptive

18   interrogation that are discussed in the literature and some of

19   my writings, but I'm not advocating a particular method.

20   Q.   You would agree with me that guilt-presumptive

21   interrogation constitutes the vast majority of interrogation

22   in the United States today, correct?

23   A.   Correct.

24   Q.   In fact, you've referred to this guilt-presumptive

25   interrogation technique as the American style of interviewing,

Leo - cross

1    right?

2    A.  Well, I think I've referred to the Reed method as the

3    American style; and, the Reid method is, among other things,

4    guilt-presumptive.

5    Q.  Okay.

6             This American style or guilt-presumptive style of

7    interrogation is used by the FBI, right?

8    A.  Yes.

9    Q.  And putting aside any research that the federal government

10   may be doing or funding, just in practice you're not aware of

11   any branch of the federal government that has moved away from

12   guilt-presumptive interviewing, correct?

13   A.  Well, you really should be saying guilt-presumptive

14   interrogation because you know there's a distinction between

15   interviewing and interrogation, and interviewing is not guilt-

16   presumptive.  So, with that qualification, yes.

17   Q.  You don't know any branch of the federal government that

18   is not using guilt-presumptive interrogation, right?

19   A.  Correct.

20   Q.  So, would you agree with me the fact that the officers in

21   this case may have been using guilt-presumptive interrogation,

22   that mere fact --

23             MR. NATHAN:  Strike that.

24   BY MR. NATHAN:

25   Q.  Would you agree with me that you can't criticize the

Leo - cross

1    officers in this case for using guilt-presumptive

2    interrogation in general?  I'm not talking about when it was

3    used or not used, but just in general that they used that

4    style of interrogation.

5    A.   I would disagree; in that, the Reid people most

6    prominently say you have to thoroughly investigate before you

7    essentially use guilt-presumptive interrogation.  So, if they

8    had no evidence to support their guilt-presumptive

9    interrogation, then I would criticize it.

10            It's not just that guilt- presumptive interrogation

11   is okay.  It's that guilt-presumptive interrogation rests on a

12   foundation of a certain amount of evidence before you launch

13   into it.  So --

14   Q.   So, I think that's what you're talking about in Opinion

15   No. 5 about -- where you talk about Nicole Harris being

16   misclassified as guilty and then being subjected to this type

17   of guilt-presumptive interrogation, right?

18   A.   Correct.  Because at that time, they had no evidence

19   indicating that this was a homicide or that she had committed

20   this homicide.  And, so, the guilt presumptive interrogation

21   was not based on any solid investigative work.

22   Q.   So, right now I'm not talking about that opinion.  We're

23   going to talk about that in a minute.  I'm talking about

24   just -- I believe it's contained in Opinion No. 4, but even if

25   it's not, just the general concept of officers using

Leo - cross

1    guilt-presumptive interrogation in general is not misconduct,

2    right?  It's not wrong for them to use just in general?

3    A.  No, it's not -- it's certainly not considered misconduct,

4    no.

5    Q.  Now, it's not unlawful to accuse a suspect of a crime,

6    right?

7    A.  Correct.

8    Q.  It's not unlawful to undermine a suspect's assertion of an

9    alibi, right?

10   A.  Correct.

11   Q.  It's not unlawful to point out inconsistencies in a

12   suspect's various statements?

13   A.  Correct.

14   Q.  Even I think you refer to something called exuding an

15   unwavering confidence in guilt, right?

16   A.  Yes.

17   Q.  That's part of this guilt-presumptive interrogation

18   technique, right?

19   A.  It's an interrogation technique, yes.

20   Q.  And we already said that that -- the use of that technique

21   by itself is not unlawful, right?

22   A.  Correct, yes.

23   Q.  Even the use of false evidence ploys is not unlawful,

24   right?

25   A.  For the most part, yes, courts have not found it to be

Leo - cross

1   unlawful.

2   Q.  I mean, we can agree that in certain circumstances, you

3   can come up with a false evidence ploy that is just so

4   outrageous it might overbear a suspect's will, right?

5   A.  Correct.  Or otherwise violate due process, yes.

6   Q.  But in general, the use of a false evidence ploy by an

7   interrogator just by itself is not unlawful?

8   A.  Correct.

9   Q.  Offering a suspect moral reasons why they might want to

10  just be truthful is not unlawful, right?

11  A.  Correct.

12  Q.  And while we're on that topic, some guilty people do

13  confess for -- just to get it off their chest, right?

14  A.  They do confess; and, yes, sometimes that's what they say.

15  Q.  You've encountered situations like that in your research,

16  right?

17  A.  Correct, yes.

18  Q.  What kinds of things do people -- have you encountered in

19  your research where people were just trying to get them off

20  their chest -- get the crime off their chest?  Can you give us

21  a couple examples?

22  A.  I mean, I've seen confessions where people are expressing

23  remorse independently of a pressure to do so; where they are

24  expressing guilt over having done an act or participated in an

25  act that they express guilt or shame about.

Leo - cross

1          So, you know, if I had a list of cases that were on

2     my mind, I could talk more specifically.  But I have seen

3     that, to answer your question.

4     Q.  And sometimes people want to get it off their chest right

5     away, as soon as they get arrested, right?

6     A.  Well, sometimes, yes, you'll have confessions that are --

7     that occur shortly after arrest or shortly after

8     interrogation, yes.

9     Q.  Or just shortly after interacting with the police, right?

10    A.  That can happen, yes, of course.

11    Q.  Not even in the context of an interrogation.  Sometimes

12    people do just confess, right?

13    A.  Correct, yes.

14    Q.  And that happens sometimes when people are guilty, right?

15    A.  Correct.

16    Q.  Because they just have a feeling inside them that they

17    need to release this information, right?

18    A.  Presumably, yeah, although it may have something to do

19    with the interaction, as well.

20    Q.  But you've encountered many situations where suspects that

21    have confessed have reported that type of a feeling and

22    phenomenon?

23    A.  Some, yes.

24    Q.  It is not unlawful for a law enforcement interrogator to

25    tell a suspect, "If you cooperate, we'll let the prosecutors

Leo - cross

1    know that"; is that true?

2          MS. AUERBACH:  Objection.  Foundation.

3          THE COURT:  Sustained.

4          You are asking him a lot of questions about what is

5    unlawful, and I am not sure for purposes of here why you are

6    doing that.

7          First of all, I know these techniques are not

8    unlawful in and of themselves, and he has not opined that the

9    techniques are unlawful.

10         MR. NATHAN:  So, he's opined --

11         THE COURT:  For purposes of the Daubert hearing, I am

12    not sure what you are doing with this.

13         MR. NATHAN:  Well, I can wrap it up.  But I'm trying

14    to establish -- he has opinions that various techniques are --

15    increase the risk of --

16         THE COURT:  That is different than unlawful.

17         MR. NATHAN:  Right.  So, what I'm trying to establish

18    is exactly that point, that what he's saying about increasing

19    the risk of is different from unlawful.  That's all I'm

20    saying.

21         THE COURT:  But then we should move on because that

22    is not relevant to the Daubert.  And I certainly know that.

23    It might be different if there is a jury here, and we can take

24    that up later on; but, he has not opined, at least in anything

25    I have seen, that these techniques, in and of themselves, are

 1    unlawful and that because of some unlawfulness she gave a

 2    false confession or there was indicia that she did.

 3              So, I do not see the relevance of it for Daubert.

 4              MR. NATHAN:  With that in mind, I've made my point.

 5    I'll move on.

 6              THE COURT:  Do you have a sense of how much longer

 7    you have, ballpark?

 8              MR. NATHAN:  I mean, I'm not wrapping up, like, right

 9    now, but I would say --

10              THE COURT:  I am trying to figure out if we are going

11    to be able to finish it before lunch or if we should break for

12    lunch and come back.

13              MR. NATHAN:  I would try to do it -- to get it done

14    before lunch, but I can't -- I'm not sure.

15              THE COURT:  Do you think you will wrap up in a half

16    hour?

17              MR. NATHAN:  I'm really not sure.

18              THE COURT:  Let's go a little longer.

19              By the way, if they start going down routes --

20    especially 20 minutes of a route -- that are not relevant to

21    the Daubert, feel free to object.  I do not like to --

22              MS. AUERBACH:  Thanks, your Honor.

23              THE COURT:  -- jump in --

24              MS. AUERBACH:  And I don't like to --

25              THE COURT:  -- to interrupt lawyers.  But at some

Leo - cross

1    point, feel free to object.

2              MS. AUERBACH:  Okay.  I will.

3              THE COURT:  And I appreciate that neither side is

4    trying to object too much.

5              MS. AUERBACH:  Right.  Okay.

6              THE COURT:  But feel free to.

7    BY MR. NATHAN:

8    Q.  Now, I promised you I would get back to Opinion No. 5

9    about misclassification.  You're saying that Nicole Harris was

10   misclassified as guilty when no evidence whatsoever indicated

11   that this was anything other than an accident?

12   A.  At the time of the interrogation, yes.

13   Q.  Okay.

14             Now, isn't it true that the officer account is that

15   she wasn't interrogated until she spontaneously confessed,

16   right?

17   A.  Yes.

18   Q.  And you're not claiming to be able to make credibility

19   determinations, right?

20   A.  Correct.

21   Q.  So, what methodology did you rely upon to come to this

22   conclusion that Nicole Harris was misclassified before she was

23   interrogated -- misclassified as guilty before she was

24   interrogated?

25             MS. AUERBACH:  Object to the form.

1          THE COURT:  Sustained on form.

2          Rephrase it.

3   BY MR. NATHAN:

4   Q.  How did you come to this conclusion in No. 5 that before

5   interrogating her, the investigators misclassified Nicole

6   Harris as guilty when, in fact, they had no evidence

7   whatsoever to indicate that Jaquari Dancy's death was anything

8   other than accidental nor that Nicole Harris had any role in

9   bringing it about?

10  A.  When you ask about methodology, I'm really not sure how to

11  answer your question because these are professional opinions,

12  right?  These are based on my knowledge and my study of the

13  case and my application.

14          Maybe what you mean to ask -- I don't know, you can

15  correct me --

16  Q.  I didn't ask about methodology.  It was a different

17  question.

18  A.  Oh, I'm sorry.  I thought you asked methodology.  Maybe I

19  misheard the question.

20          THE WITNESS:  I mean, I just have to interject, I

21  would like to go to lunch at some point, you know, so -- I'm

22  getting a little light-headed.

23          THE COURT:  Let's answer the last question.

24          The question was:  How did you come to this

25  conclusion in No. 5?

1          I am not going to reread No. 5.

2     BY THE WITNESS:

3     A.   Okay.  So, because it's such a general question, I would

4     say applying my knowledge to the facts.  I mean, you got to be

5     more specific, how did I come to this conclusion.  Or maybe

6     I'm just not understanding it -- your question.

7     BY MR. NATHAN:

8     Q.   This conclusion is merely taking Nicole Harris' version of

9     events over the detectives' version of events, correct?

10    A.   If you take -- yes.  If you assume her version of events,

11    then, yes, they had no evidence whatsoever.

12         And I guess what I think you're saying is that if you

13    assume their version of events, they had evidence because she

14    spontaneously confessed before being interrogated.

15         Is that correct?

16    Q.   Yes.

17         MR. NATHAN:  I think -- if we can keep going to No.

18    6, because it's closely related.

19         THE COURT:  Sure.

20    BY MR. NATHAN:

21    Q.   Now, in Opinion No. 6, you talk about initial spontaneous

22    confession attributed to Nicole Harris, which she denies, is

23    inconsistent with empirical evidence -- empirical social

24    science research on police interrogation and confession, as

25    well as with logic and the physical evidence in this case,

1   right?

2   A.  Yes.

3   Q.  Now, let's just start with the physical evidence in this

4   case.

5        You made this conclusion prior to even reviewing the

6   deposition testimony of Dr. Denton, correct?

7   A.  We've established that, yes.

8   Q.  All right.

9        And you made that conclusion about the physical

10  evidence in the case being --

11       MR. NATHAN:  Strike that.

12  BY MR. NATHAN:

13  Q.  And you made this conclusion in No. 6 without reviewing

14  the report of another medical examiner, Dr. Peterson, correct?

15  A.  Correct.  You asked that earlier.

16  Q.  And we already went through you didn't review Dr.

17  Peterson's deposition, right?

18  A.  Correct.  You asked that earlier, as well.

19  Q.  Now, you're claiming that this spontaneous confession is

20  inconsistent with logic, right?  That's what you say in No. 6?

21  A.  Yes.

22  Q.  Isn't it true we just went through your research where you

23  say you've come across situations like this on numerous

24  occasions where someone does spontaneously confess?

25       MS. AUERBACH:  Object to the form.

Leo - cross

1    THE COURT:  Overruled.

2    You may answer, if you can.

3    BY THE WITNESS:

4    A.  No, no, not situations like this, no.  Situations like

5    this where she was in the police station for some period of

6    time before she, quote-unquote, spontaneously confessed, no.

7    You asked earlier about situations where people confess

8    shortly after being interrogated.

9    BY MR. NATHAN:

10   Q.  And shortly after their initial interaction with the

11   police, is what you said, right?

12   A.  Yeah.  I mean, I've seen shortly after their initial

13   interaction with the police, but it's rare that you get a

14   spontaneous confession without any police elicitation or any

15   police interaction.

16   Q.  Okay.

17   Now, going back to whether or not this is logical,

18   this confession, when is it logical to murder a child?

19   A.  Okay.  You asked me this in my deposition, and it's a

20   weird question.  So, obviously, people do murder children;

21   and, maybe in their own mind it may be logical.  And I think I

22   said in my deposition it's never logical to murder a child.

23   Okay?  But there's something just inherently weird about the

24   question.

25   And the reason why I say it doesn't really work with

Leo - cross

1  logic here is because the scenario -- and I think I go through

2  this in the report, and I think we discussed it in the

3  deposition -- the scenario that somebody -- a parent -- would

4  be upset because the kid's playing outside and they're not

5  listening to the parent and then they go through this violent

6  rage and murder the child just didn't make sense to me as I

7  was going through this.

8          Police are trained when they get confessions to spin

9  scenarios, to make up scenarios that suspects will agree to.

10  And this one just didn't seem to me to, on its face, be very

11  logical.  That's what I was getting at both in the deposition

12  and in the report -- that if we studied child murders by

13  parents, I doubt there would be very many where a kid was

14  killed because they didn't listen to the parents in the

15  situation like -- that was described here.

16  Q.  What is the methodology or basis for the statement you

17  just made that you doubt this type of thing would happen?

18  A.  It doesn't pass the laugh test.  Social scientists talk

19  about face -- there's no methodology.  That's what I was

20  referring to in the prior question.  So, I was making a

21  judgment, which I stated in this report.

22          We talked about it in the deposition that this

23  account, which, of course, is disputed because there's no

24  record -- there's no objective record -- of how it came about,

25  doesn't strike me as plausible.

Leo - cross

1  Q.  Did you see the police report in your review of the

2  materials in Appendix B that documented the police's account

3  that Sta-Von Dancy told them he was only with Nicole Harris

4  because he was scared she would injure the children?

5  A.  I know that when I prepared the report, I reviewed a lot

6  of police reports.  I don't -- as I sit here, I don't

7  specifically recall that police report if that was described

8  in a police report or the context in which that would have

9  been described.

10  Q.  If that was in a police report, would that make it more

11  logical for Nicole Harris to kill her children?

12         MS. AUERBACH:  Objection, your Honor.

13         THE COURT:  Sustained.

14  BY MR. NATHAN:

15  Q.  Would you agree that it's not logical for a parent to hit

16  a child with a belt just because they went to the backyard?

17         MS. AUERBACH:  Same objection.

18         THE COURT:  I think you are going beyond any

19  expertise of his at the moment.

20         MR. NATHAN:  I'd like to just move on, except the

21  opinion says that the confession is not consistent with logic.

22  So, I'm not trying to be, as the witness is saying, weird.

23         THE COURT:  But your question was about is it logical

24  for a parent to hit a child with a belt just because they went

25  to the backyard.  That is several steps removed from the logic

Leo - cross

1   about the confession.

2            The objection is sustained.

3   BY MR. NATHAN:

4   Q.  Isn't it true that the ultimate recorded confession

5   includes the fact that Nicole Harris hit the children with a

6   belt that day?

7   A.  It includes that statement, yes.

8   Q.  Okay.

9            And is that illogical?

10           MS. AUERBACH:  Objection, your Honor.

11           THE COURT:  Is what illogical?

12           MR. NATHAN:  That --

13  BY MR. NATHAN:

14  Q.  Is it illogical for Nicole Harris' confession to include

15  that statement?

16           MS. AUERBACH:  I'll object to that.  Lacks

17  foundation.

18           THE COURT:  Sustained.

19  BY MR. NATHAN:

20  Q.  Is it logical for Nicole Harris to actually hit the child

21  with a belt, consistent with what she said in the confession?

22           MS. AUERBACH:  Both form and foundation.

23           THE COURT:  Sustained.

24  BY MR. NATHAN:

25  Q.  I mean, are you attempting to provide testimony to the

Leo - cross

122

1  jury about what's logical and not logical?

2  A.  No.  I say on Page 31 in the report it makes no sense that

3  Ms. Harris would violently strangle her son Jaquari to death

4  merely because he had been playing outside after she had asked

5  him to stay inside.  Ms. Harris' confession statements are not

6  only contradicted by extrinsic evidence, but also by logic and

7  plausibility.  That's the opinion, right there.

8  Q.  Now, very briefly with Opinion No. 7, you talked --

9         MS. AUERBACH:  I'm sorry, your Honor, I believe the

10  witness wants a break.  Is it possible for us to break now?

11        THE COURT:  Well, we can break because I am ready for

12  a break, and I will see you at 1:45.

13        MS. AUERBACH:  Thank you.

14     (Recess taken at 12:32 o'clock p.m., until 1:45 o'clock

15  p.m., of the same afternoon.)

16                          *    *    *    *    *

17

18  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
19

20
    /s/ Joseph Rickhoff                      October 14, 2017
21  Official Court Reporter

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
    NICOLE HARRIS,                    ) Docket No. 14 C 4391
 4                                    )
                        Plaintiff, )
 5                                    )
                   vs.                )
 6                                    )
    CITY OF CHICAGO, et al.,          ) Chicago, Illinois
 7                                    ) May 23, 2017
                    Defendants.) 1:50 o'clock p.m.
 8

 9            TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
                BEFORE THE HONORABLE AMY J. ST. EVE
10

11   APPEARANCES:

12
    For the Plaintiff:          PEOPLE'S LAW OFFICE
13                              BY:  MS. JOEY L. MOGUL
                                1180 North Milwaukee Avenue
14                              Chicago, Illinois  60622

15                              VALOREM LAW GROUP
                                BY:  MS. NICOLE N. AUERBACH
16                              218 N. Jefferson St., Suite 300
                                Chicago, Illinois  60661
17

18   For Deft. City of          GREENBERG TRAURIG
    Chicago:                    BY:  MS. TIFFANY S. FORDYCE
19                              77 West Wacker Drive, Suite 3100
                                Chicago, Illinois  60601
20

21   For the Individual         NATHAN & KAMIONSKI, LLP
    Defendants:                 BY:  MR. AVI T. KAMIONSKI
22                                   MR. SCHNEUR Z. NATHAN
                                140 S. Dearborn St., Suite 1510
23                              Chicago, Illinois  60603

24                              HALE LAW, LLC
                                BY:  MS. JENNIFER BITOY
25                              53 W. Jackson Blvd., Suite 330
                                Chicago, Illinois  60604
```

1   APPEARANCES (Cont'd):

2
    Court Reporter:                 MR. JOSEPH RICKHOFF
3                                   Official Court Reporter
                                    219 S. Dearborn St., Suite 1232
4                                   Chicago, Illinois  60604
                                    (312) 435-5562
5

6                * * * * * * * * * * * * * * * *

7                        PROCEEDINGS RECORDED BY
                         MECHANICAL STENOGRAPHY
8                  TRANSCRIPT PRODUCED BY COMPUTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings had in open court:)

2               THE COURT:  Whenever you are ready, go ahead.

3               MR. NATHAN:  Thank you, Judge.

4          RICHARD LEO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

5                    CROSS-EXAMINATION (Resumed)

6     BY MR. NATHAN:

7     Q.  Moving straight to Opinion No. 7, you're talking about how

8     the multiple interrogations described by the plaintiff were

9     psychologically and physically coerced, right?

10    A.  Correct, yes.

11    Q.  That essentially boils down to -- well, let me back up.

12          The defendant officers denied pushing Nicole Harris,

13    right?

14    A.  Correct.

15    Q.  And they deny poking her, right?

16    A.  Correct.

17    Q.  If you believe the defendant officers' version, then there

18    was no physical coercion, certainly, right?

19    A.  Correct.  Correct.

20    Q.  And the defendant officers also deny psychologically

21    coercing her, correct?

22    A.  Correct.

23    Q.  So, if you believe the defendant officers' version, then

24    there was no psychological coercion, right?

25    A.  Correct.

Leo - cross

1   Q.  We talked, I think, already about Opinion No. 8, where you

2   talk about the various techniques that you say increase the

3   risk of eliciting unreliable statements?

4   A.  Correct.

5   Q.  And I mean, you're not saying that you can predict how

6   frequent it would be where someone is exposed to a various --

7   a specific technique --

8           MR. NATHAN:  Strike that.

9   BY MR. NATHAN:

10  Q.  You can't predict how frequently someone will falsely

11  confess when they are exposed to a specific interrogation

12  technique, right?

13  A.  Correct.

14          MS. AUERBACH:  Objection, your Honor.  Asked and

15  answered.

16          THE COURT:  Sustained.

17  BY MR. NATHAN:

18  Q.  Here, again, the defendant officers deny making any kind

19  of explicit promises, right?

20  A.  Correct.

21  Q.  And they deny any kind of explicit threats, right?

22  A.  Correct.

23  Q.  Let's move on to No. 9.  In this opinion, you say that

24  Nicole Harris was at a heightened risk for making or agreeing

25  to unreliable confession because of her personality traits,

Leo - cross

127

1   right?

2   A.  Correct.

3   Q.  You're not a clinical psychologist, right?

4   A.  Correct.

5   Q.  That means you don't make diagnoses as to mental health

6   disorders, right?

7   A.  Correct.

8   Q.  And you don't make diagnoses as to how suggestible someone

9   might be?

10  A.  Correct.

11  Q.  And you don't make diagnoses as to IQ?

12  A.  Correct.

13  Q.  You never did a psychiatric or psychological examination

14  of the plaintiff in this case, right?

15  A.  Correct.  I'm not a psychiatrist.

16  Q.  Now, nowhere in Appendix C, the database of materials that

17  you reviewed, does it list Dr. Frumkin's psychological testing

18  data; is that correct?

19  A.  Correct.

20  Q.  That's because you didn't even have possession of that

21  underlying data, right?

22  A.  Correct.

23  Q.  So, you were not able to make any independent conclusions

24  as to what that -- as to interpreting that data, correct?

25          MS. AUERBACH:  Objection.  Foundation.

Leo - cross

1           THE COURT:  Overruled.

2           You may answer that, if you can.

3    BY THE WITNESS:

4    A.  Correct.  I relied on Dr. Frumkin's description of his

5    giving the test.  I'm familiar with the test and how to

6    interpret it, but his description of the results.

7    BY MR. NATHAN:

8    Q.  Now, in the field of psychology, that testing data is not

9    just given to anyone, right?

10   A.  That's my understanding, yes.

11   Q.  Psychologists are very protective over that data because

12   it can easily be misconstrued and misinterpreted, right?

13   A.  Well, I'm not sure why they're so protective, but they

14   are.

15   Q.  Do you know whether depression at the time of

16   psychological testing can impact the validity of the

17   psychological testing results?

18   A.  Are you talking about the suggestibility -- the Gudjonsson

19   suggestibility scales?

20   Q.  That would be one such example of psychological testing,

21   correct?

22   A.  I am not aware of any study that shows that.

23   Q.  You don't know if there is or there isn't such a study,

24   right?

25   A.  It's possible that there is, but I've read some studies on

1  that.  I haven't encountered it.

2  Q.  You are not diagnosing Nicole Harris here as being in

3  shock at the time of her interrogation, correct?

4  A.  Correct.  I'm not making any diagnosis.

5  Q.  And you would agree with me there's no evidence in the

6  records you reviewed that indicates that any Chicago police

7  officer that interacted with Nicole Harris at the time of her

8  interviews or interrogation would be able to discern just by

9  looking at her or talking to her that she was predisposed to

10  falsely confessing, correct?

11          MS. AUERBACH:  Object to the form.

12          THE COURT:  Sustained on form.

13          Rephrase it.

14  BY MR. NATHAN:

15  Q.  There's no evidence in the records you reviewed that

16  indicates that a officer interacting with the plaintiff in

17  this case would be able to discern that she was

18  psychologically predisposed to falsely confessing, correct?

19  A.  Yes.

20  Q.  On direct examination -- and this is relevant to Opinion

21  No. 10 -- you talked about this issue of contamination.  Do

22  you remember that?

23  A.  Yes.

24  Q.  And you described contamination as the leaking of

25  non-public details of the crime, right?

Leo - cross

1   A.   Correct.

2   Q.   And I think it was Judge St. Eve that asked you this

3   question about are you able to refer to any documented

4   instances of contamination.

5        Do you remember that?

6   A.   Yes, but I don't remember what the specific question was.

7   Q.   And you said you were able to identify one such instance

8   of documented contamination, and you said that related to the

9   phone cord being at the scene.

10       Do you remember that?

11  A.   Yes.  Well, I think the phone cord being used to strangle

12  the child.

13  Q.   Okay.

14       Now, that was the only instance that you identified

15  where there was documented instance of contamination, correct?

16  A.   In the question, yes.  In response to the question, yes.

17  Q.   Now, the officers deny that they contaminated --

18       MR. NATHAN:  Strike that.

19  BY MR. NATHAN:

20  Q.   The officers deny that they gave Nicole Harris that

21  information about the phone cord, right?

22  A.   I believe so, yes.

23  Q.   And Harris herself denies that she ever even said anything

24  about the phone cord confession, right?

25  A.   I believe so.

1    Q.  She denies even making that spontaneous statement, right?

2    A.  I believe so, yes.

3    Q.  So, isn't it true that you have zero instances of

4    documented contamination?

5            MS. AUERBACH:  Object to the form.

6            THE COURT:  Overruled.

7            You may answer, if you can.

8    BY THE WITNESS:

9    A.  Well, if the first confession is fabricated, if she didn't

10   make it, then it's contamination of a different sort, right?

11   It's like forced contamination, right?  It's not giving her a

12   fact and then pressuring her to feed it back.  It would be

13   making up the fact that's consistent with their theory, which

14   she's denying.

15           So, obviously, there's two possibilities.  She made

16   the statement; she didn't make the statement.  But either way,

17   it seems to me it's coming from the police because it was

18   their theory at the time, until they learned the next day that

19   that's not how the child died.

20   BY MR. NATHAN:

21   Q.  Right.

22           But you said that the only instance of documented

23   contamination that you've identified related to this phone

24   cord, right?

25   A.  I think that's how I answered the Judge's question

Leo - cross

1    earlier, yes.

2    Q.  And you talked about contamination being the leaking of

3    non-public details of the crime, right?

4    A.  Yes.

5    Q.  And we just went through the fact that according to

6    Nicole, nothing was contaminated relating to the phone cord

7    because she never made the statement, right?

8    A.  Well, I mean, I think I would just be tempted to give the

9    same answer as I gave before.  In the traditional sense, when

10   you tell somebody a fact and they feed it back, not in that

11   sense, but it's still coming from them.

12          The whole idea about contamination is that the police

13   are really the one who are authoring the confession in the

14   sense that they're constructing it.  And if they -- if she

15   didn't make it but there's a report saying that she did and it

16   came from them, then, like I said, it's contamination of a

17   different sort.

18   Q.  Now, I want to next talk about this issue called

19   scripting, that you identify in Opinion 10.

20   A.  Yeah.

21   Q.  Well, let me just ask this question:  You would agree with

22   me that there are times when someone may confess to portions

23   of a crime but not the entire crime, right?

24   A.  Correct.

25   Q.  You've encountered that in your research?

Leo - cross

1    A.  Yes.

2    Q.  For example, someone might confess to a murder aspect of a

3    crime, but not a rape aspect of a crime, right?

4    A.  Correct.

5    Q.  You've encountered that in a case you referenced at your

6    deposition, the Richard Allen case, right?

7    A.  Yeah.  I think he -- yeah.  You might have asked me about

8    that.  It's a case that I wrote about.  It's not a case that I

9    worked on.

10   Q.  Okay.

11        It's a case that you reviewed and you documented that

12   it was a partially true confession, right?

13   A.  I think it was a true confession.  I think it was an

14   incomplete confession.

15   Q.  Okay.

16        And you would also agree with me that it's not

17   uncommon for statements of guilty suspects to evolve or change

18   over the course of an interrogation, correct?

19   A.  Well, we don't know how common, but certainly that can

20   happen, yes.

21   Q.  Well, I'm specifically saying it's not uncommon, correct?

22        MS. AUERBACH:  Your Honor, I'm going to make a

23   relevance objection here.  I'm not sure that it goes to the

24   issues for Daubert.

25        THE COURT:  I am not sure where you are going with

 1   this, Mr. Nathan.

 2           MR. NATHAN:  I'm going to leave it after this

 3   question.

 4           THE COURT:  Okay.  Ask one more, and then let's move

 5   on.

 6           MR. NATHAN:  If --

 7           THE COURT:  Again, it is just the Daubert part.  It

 8   is not --

 9           MR. NATHAN:  If he could just answer that question,

10   I'll move on.

11           THE COURT:  If you can.

12           Do you need the question repeated, Doctor?

13           THE WITNESS:  Sure.

14       (Record read by the Court.)

15   BY THE WITNESS:

16   A.  It's not uncommon.  I think the prior question was for a

17   true confession to evolve.

18   BY MR. NATHAN:

19   Q.  Right.

20   A.  Okay.  It depends on what we mean by "evolve"; but, yes,

21   that's not uncommon.

22           MR. NATHAN:  One moment.

23       (Brief pause.)

24   BY MR. NATHAN:

25   Q.  Now, if you credit the plaintiff's version of the

1   interrogation and interview process, then she falsely

2   confessed, right?

3   A.  Correct.

4   Q.  Now, that conclusion would be true regardless of what your

5   research has to say, correct?

6         MS. AUERBACH:  Object to the form.  I'm not sure

7   which conclusion he's --

8         THE COURT:  Do you want to rephrase?  I think --

9         MR. NATHAN:  I'll try.

10        THE COURT:  -- I understand, but --

11  BY MR. NATHAN:

12  Q.  So, we established that if one were to credit Nicole

13  Harris' version of the whole interrogation process where she's

14  saying she didn't commit the crime and she just merely falsely

15  confessed, then she indeed falsely confessed, right?

16  A.  She provides an explanation for why she would have falsely

17  confessed; and, she said she falsely confessed, yes.

18  Q.  Okay.

19        And that conclusion, if you believe what she has to

20  say, would be correct whether or not you provide any

21  assistance here, correct?

22        MS. AUERBACH:  I'm going to object to the form.

23        THE COURT:  Sustained.

24  BY MR. NATHAN:

25  Q.  Assuming plaintiff's version is true -- she falsely

Leo - cross

1    confessed.  That was my preliminary question, right?

2           I'm merely asking you now, wouldn't that conclusion

3    hold true if you make that same assumption regardless of any

4    studies that talk about indicia of reliability or indicia of

5    unreliability of statements and confessions?

6           MS. AUERBACH:  I will object to the form and also,

7    again, the relevance because I'm not sure that that goes to

8    Daubert.

9           MR. NATHAN:  It goes to the helpfulness aspect of

10   Rule 702.

11          THE COURT:  You are going to have to rephrase it.

12   BY MR. NATHAN:

13   Q.  You would agree that a jury can make its own determination

14   after evaluating her testimony about whether or not she

15   falsely confessed about whether or not she's telling the

16   truth, correct?

17   A.  The jury's going to have to make that determination if

18   this goes to trial, yes.

19   Q.  In your report, you don't -- let me back up.

20          If you remember the exchange that we had where you

21   had identified in your report that in the ultimate videotaped

22   confession, you were saying that she said the cord was wrapped

23   ten times and I cited a transcript where she said four times;

24   and, that was the factual inaccuracy that you were able to

25   identify from the ultimate confession -- or supposed factual

Leo - cross

1    inaccuracy you were able to identify from the ultimate

2    confession.

3              Do you remember that?

4    A.  Yes.

5    Q.  Okay.

6              So, putting that aside -- the Court's going to be

7    able to determine whether Nicole Harris actually said four

8    wrappings or ten wrappings; and, the transcript of the

9    confession, the transcript says four.

10              So, leaving that aside, in your report, you don't

11   opine that the video confession itself contains any indicia of

12   unreliability, correct?

13   A.  The third taped one, correct.

14   Q.  Now, as to whatever's not on the video, you are assuming

15   or taking as true that the plaintiff's version of events is

16   correct, true?

17   A.  No, because I say repeatedly in here that I'm not a fact

18   witness and if we credit one account or we take one

19   description, here's what follows; if we take another

20   description, here's what follows.

21              So, no, I'm not assuming her account is correct.

22   Q.  You're saying assuming the plaintiff's version is correct,

23   here's what follows and --

24   A.  Correct.

25              MR. NATHAN:  That's all I have.

1          THE COURT:  Redirect.

2          MS. AUERBACH:  Thank you, your Honor.

3          So, your Honor, I have one question that I would like

4   to ask, and then I have a whole series of questions that would

5   go to establish that there are hotly disputed issues that

6   touch upon a lot of the issues that Mr. Nathan raised.

7          It's our opinion that that goes to the weight of this

8   witness' testimony and not to the admissibility.  If you need

9   me, I mean -- and I'll just state further that in order to do

10  that, I need to read into the record other statements in the

11  same depositions that Mr. Nathan read that Dr. Leo did not

12  review, simply to get them out there on the record that there

13  are hotly disputed issues.  And I don't know if that serves

14  the interests of the Court in this hearing.

15         THE COURT:  I am not sure that it does, because I

16  think one of the arguments will come down to Dr. Leo, in

17  rendering his opinions, has relied on the plaintiff's version

18  only.  He is not saying it is an accurate version.  He is

19  saying if the jury believes the plaintiff's version, here are

20  my opinions.  I think he has admitted that he did not consider

21  the defendants' versions in rendering those opinions.

22         MS. AUERBACH:  I would say that he has admitted that

23  to some extent where he has noted that if we credit the

24  plaintiff's opinion, there is an opinion where he says if we

25  credit the defendants' version of events, then that is not --

1    there are no indicia of --

2           THE COURT:  There may be one or two.  There may be a

3    few instances.

4           MS. AUERBACH:  Okay.

5           THE COURT:  But I think for the most part, he has

6    testified that he is just crediting -- he is not crediting,

7    but he is taking the plaintiff's version as is --

8           MS. AUERBACH:  Correct.

9           THE COURT:  -- and it will be up to the jury whether

10   or not to credit that.

11          MS. AUERBACH:  Correct.

12          THE COURT:  So, I think for that aspect and that

13   argument, the legal question is:  Is that sufficient or does

14   he somehow have to consider the defendant?

15          So, if you are -- I realize from everything I have

16   read in this case so far that there are many of these facts

17   that are disputed.  So, for my purposes you do not need to go

18   into it, because I do not think whether they are disputed or

19   not is going to impact anything he has to say because he did

20   not -- he took the plaintiff's version.

21          MS. AUERBACH:  Okay.

22          THE COURT:  Unless you are trying to tell me

23   something else that I am not understanding.

24          MS. AUERBACH:  No, no, your Honor.  I just wanted to

25   know if there's -- you know, is there a benefit to us sort of

1    establishing for the record or for your Honor that many of

2    the -- in particular, with respect to the pathology here, that

3    what he indicated that Dr. Denton said, that there's other

4    parts of the deposition that the doctor went another way.

5              At the end of the day --

6              THE COURT:  I am not sure it will even matter,

7    because he has not read the deposition.

8              MS. AUERBACH:  I agree.  I agree.

9              So, I think we'll just -- in the interest of that,

10   we'll leave it at that.  I do have one question on the

11   pathology that I would like to just ask, and that will be all

12   I have for redirect.

13             THE COURT:  If there is something you feel like you

14   need to get in the record, I am not suggesting you should not.

15   But --

16             MS. AUERBACH:  No, I appreciate that.

17             THE COURT:  -- I think --

18             MS. AUERBACH:  It would be for --

19             THE COURT:  From what I understand the arguments to

20   be -- and I do not think the fact that there is a different

21   version of events -- which I know there is on many of these

22   things, from everything that I have read over the past few

23   months; but, I do not think that will change any of his

24   opinions.

25                         REDIRECT EXAMINATION

Leo - redirect/recross

141

1   BY MS. AUERBACH:

2   Q. So, the question I would like to ask, then, Dr. Leo, is:

3   Are you aware of any evidence in the record that at the time

4   that Nicole Harris gave her videotaped confession, that the

5   police had any pathological evidence establishing that a

6   murder had occurred?

7   A. No.

8         MS. AUERBACH: I don't have anything else, your

9   Honor.

10        THE COURT: Recross.

11                  RECROSS EXAMINATION

12   BY MR. NATHAN:

13   Q. In your database of materials, were you provided the

14   emergency room record from the treatment of Jaquari Dancy?

15   A. I would have to review this to see.

16        MR. NATHAN: Can we stipulate that he wasn't provided

17   the emergency room record?

18        MS. AUERBACH: Sure. I'm happy to do that, as long

19   as you are representing that it's not in here. Because I have

20   to look back at the list myself.

21        MR. NATHAN: I'm looking at my notes that says it

22   wasn't.

23        MS. AUERBACH: With that representation, I'll accept

24   your representation and stipulate.

25   BY THE WITNESS:

Leo - recross

142

1    A.  I don't see it.

2    BY MR. NATHAN:

3    Q.  I'm sorry?

4    A.  Yeah, I didn't see any emergency -- anything labeled

5    emergency room records in Appendix C.

6    Q.  Okay.

7            And you would agree that it is unusual for a

8    four-year-old child to asphyxiate and die, correct?

9            MS. AUERBACH:  Objection.  Foundation.

10           THE COURT:  Sustained on foundation.

11           I think you are confusing that with a different

12   expert.

13           MR. NATHAN:  I'm sorry?

14           THE COURT:  I think you are confusing that question

15   for a different expert.

16           MR. NATHAN:  Okay.

17           Your Honor, I just wanted to move a few exhibits into

18   evidence, and then I will be finished.

19           THE COURT:  Sure.

20           MR. NATHAN:  We would seek to move the transcript of

21   the plaintiff's confession; the deposition of -- well, let me

22   say the Cook County medical examiner report; the deposition of

23   Dr. Denton; the report of Brian Peterson and the deposition of

24   Brian Peterson -- and those were identified in the joint

25   status report as to this witness under Paragraph 3 and then

Leo -

1   identified -- they were by letter.  So, it's Exhibits 3-E, -J,

2   -K, -L, and -M.

3           THE COURT:  You have just confused me --

4           MR. NATHAN:  I'm sorry.

5           THE COURT:  -- by what -- where are they identified

6   as exhibits in the record?  In the --

7           MR. NATHAN:  It's at Docket No. 333, which is the

8   joint status report.

9           THE COURT:  Yes, I have that.

10          MR. NATHAN:  And, then, on --

11          THE COURT:  333-3, is that the right one?  Or 333 --

12          MR. NATHAN:  It's just 333.

13          THE COURT:  -- -4?

14          So, 333, just the joint report.  Okay.

15          MR. NATHAN:  Correct.

16          THE COURT:  I am with you now.

17          MR. NATHAN:  Now, in Paragraph 3, it says,

18  "Defendants intend to use the following exhibits."

19          THE COURT:  Yes.

20          MR. NATHAN:  And, then, under that has --

21          THE COURT:  Okay.  I am following you now.

22          Is there any objection?

23          MS. AUERBACH:  Your Honor, I'll simply note that they

24  were supposed to be filed with the Court, and that they were

25  supposed to be tendered to us.  They were not.  I just lodge

1    that objection.  I'll leave it at that.

2              MR. NATHAN:  Well, I thought they were filed with the

3    Court.  You're saying currently --

4              THE COURT:  I have not received these.

5              MR. NATHAN:  I would ask for leave to just file those

6    specific exhibits.  They were all -- it's not like any of

7    these are a surprise.  I thought they were filed.

8              THE COURT:  Maybe not to you, but --

9              MR. NATHAN:  Right.

10             THE COURT:  -- I have not seen these before.  But I

11   will let you -- if there is no objection, I will admit them

12   for purposes of today for whatever they are worth.

13             MS. MOGUL:  If you don't mind, I just -- you know,

14   your Honor, we would object to the admission of the deposition

15   of Scott Denton, report of Brian Peterson, deposition of

16   Dr. Brian Peterson.  These came long after the fact of his --

17   of the interrogation itself.  This is about his opinions with

18   respect to the interrogation.  We just don't think these are

19   relevant.

20             THE COURT:  I will admit them for whatever relevance

21   they are worth.  I understand your argument.

22             MS. MOGUL:  Okay.

23             THE COURT:  I understand your argument.

24             MR. NATHAN:  We'll file those with the Court.

25             THE COURT:  File those today.

 1          MR. NATHAN:  Yes.

 2          THE COURT:  Do they need to be under seal for any

 3   reason?

 4          MS. MOGUL:  Well, I think that -- potentially.

 5          THE COURT:  Okay.

 6          MS. MOGUL:  So, I don't know if under seal, but

 7   they're certainly -- with respect to the autopsy, there is

 8   redactions pursuant to the Federal Rules and potentially under

 9   seal with respect to some private information.

10          THE COURT:  Why don't you drop off a copy with the

11   Court, if you can, by tomorrow morning, and then file them by

12   the end of the week.

13          MR. NATHAN:  Okay.

14          THE COURT:  So, what you drop off with me does not

15   have to have the redactions, but make sure that you file

16   consistent with your obligations.

17          MR. NATHAN:  Thank you.

18          THE COURT:  Thank you, Doctor.  You may step down.

19      (Witness excused.)

20          THE COURT:  I will take this -- it really covers two

21   motions.  I will take it under advisement and give you a

22   written opinion on it.

23          You are back here for another Daubert on June 6th, I

24   believe --

25          MS. MOGUL:  Yes.

1          THE COURT:  -- is the next date.

2          One additional thing that I need from you.  And I

3     know when you filed your joint final pretrial order, the case

4     was not before this Court.  I need you to refile your jury

5     instructions, please, consistent with my standing order on

6     jury instructions.  Ideally, when you do that, you will agree

7     on a few more of them; but, if not, you need to identify --

8     and please look at my standing order for final pretrial

9     orders.  You need to identify your objections to specific

10    instructions and give your basis for your objections.

11         I lay it out pretty clearly in my final pretrial

12    order standing order on my Web site.  So, look at that,

13    please.  And if you could refile those by June 12th.  That

14    will give you a couple weeks to do that.

15         MS. MOGUL:  Your Honor, could I ask -- and I

16    apologize for this, but I'm going to be out of town June 4th

17    to June 22nd.  Can we just have -- and I was responsible for

18    doing most of those jury instructions.  So, would you indulge

19    me in allowing me to have just an extra week so we could file

20    by June 30th?  Is that too late for you?

21         THE COURT:  That will work.  As long as you promise

22    me you are going to try to agree on a few more, I will give

23    you a little more time.

24         MS. MOGUL:  I will say that Mr. Kamionski and I did

25    work a lot.  We'll take another pass at it.

1       THE COURT:  Okay.

2       MR. KAMIONSKI:  I mean, I can think of one off the

3   top of my head we can probably agree on based on your --

4       MS. MOGUL:  Right.

5       MR. KAMIONSKI:  -- on one of the rulings you came

6   down that we can --

7       THE COURT:  Excellent.

8       MS. MOGUL:  Right.

9       MR. KAMIONSKI:  We'll get there.

10      THE COURT:  So, file your revised jury instructions

11  consistent with the Court's standing order for final pretrial

12  orders --

13      MS. MOGUL:  Okay.

14      THE COURT:  -- by June 30th.

15      MS. MOGUL:  Great.

16      And, so, just so you know, your Honor, you're going

17  to get two new lawyers -- or maybe "new to you" lawyers -- on

18  June 6th because I'll be out of town.  So, we will relay to

19  our counsel your instructions, which we heard loud and clear

20  today.

21      THE COURT:  I will tell them, as well.

22      MS. MOGUL:  Okay.

23      THE COURT:  Who are the two -- I am not sure that

24  this was the audience that needed to hear what I had to say.

25      MS. AUERBACH:  Perhaps the audience is a little bit

1    further back.

2           THE COURT:  That did not go unnoticed.  But you are

3    all a team, so you all --

4           MS. MOGUL:  We are a team.  So --

5           THE COURT:  I will reiterate.

6           MS. MOGUL:  So, you are going to hear from Ms. Susler

7    and Ms. Hoft on June 6th.  That's who will be representing the

8    plaintiffs, because we divvied up the experts.  So, I will not

9    be here.  Not out of disrespect, but I will be out of town.

10          THE COURT:  I do not take it as any sign of

11   disrespect.

12          I will repeat it, to the extent I need to.  I hope I

13   do not need to; but, to the extent I need to, I will.

14          MR. KAMIONSKI:  As for the hearing on June 6th, I

15   know the June 6 team is not here for the plaintiff, but is

16   there more any more direction -- like the Court, like,

17   redirected the focus of the examination today?

18          THE COURT:  Part of the problem and why, I had to dig

19   through all of your junk --

20          MR. KAMIONSKI:  Okay.

21          THE COURT:  -- and all of your hurling of insults.

22   When I have to dig through that and peel back all those

23   layers, it takes me longer to get to things.  So, you do not

24   get rulings as quickly as I would like to give them.

25          So, if I have further direction and I am able to

1   provide it in advance, I certainly will.

2           MR. KAMIONSKI:  Thank you, your Honor.

3           MS. MOGUL:  Thank you, your Honor.

4           THE COURT:  Do we have a final pretrial conference?

5           MS. MOGUL:  We do not, your Honor.

6           MS. AUERBACH:  We don't.  We do have the trial date

7   on October 30th.

8           THE COURT:  Yes, October 30th is your firm trial

9   date.

10          MS. MOGUL:  Wonderful.  We're thrilled.

11          THE COURT:  I will repeat that to you every time you

12  come in if you want.  Unless a felony comes in that has to

13  trump it under the Speedy Trial Act, I do not plan on moving

14  that.

15          So, I do not have Katie in here.  I need her for the

16  final pretrial conference.  It will be sometime in September.

17  I will have to have her get dates to you.

18          MS. AUERBACH:  Okay.

19          THE COURT:  She has my calendar.

20          But it will be sometime in September.  And I will

21  probably do it earlier in September and, then, do a follow-up

22  a little closer to the trial.  But earlier so we can take care

23  of some of the big issues, a final pretrial conference and

24  jury instruction conference.

25          But Katie can reach out to you.

1          MS. MOGUL:  Thank you, your Honor.

2          Well, just -- okay, one last note then.  And maybe

3  I'm -- you have not been provided a copy of all the exhibits

4  that we've cited in this case by either party.

5          THE COURT:  Cited in, what?

6          MS. MOGUL:  In the pretrial order.

7          And you --

8          THE COURT:  I have asked for some as I have been

9  going through them.

10         MS. MOGUL:  Exactly.  And what I'm asking you is

11  would you like us to supply you with those exhibits now or

12  just as you're going through it?

13         THE COURT:  To the extent you think it would be

14  helpful in ruling on your omnibus motion in limine, yes.

15         If there are exhibits that are objected to for the

16  admissibility of trial, I do not need those yet.

17         MS. MOGUL:  Okay.

18         MS. AUERBACH:  We'll take a look at that motion again

19  --

20         THE COURT:  But if there is something else --

21         MS. AUERBACH:  -- and submit anything --

22         THE COURT:  I am going through that and ruling on

23  things on a rolling basis.

24         MR. KAMIONSKI:  Yes.

25         THE COURT:  If there is something else that you think

```
 1      -- I do not remember any other photograph objections or --

 2              MS. MOGUL:  You did the bond photograph, which we

 3      understood, and you had the autopsy photos.

 4              THE COURT:  Yes.

 5              MS. MOGUL:  So, we, you know -- but I'll look back

 6      and see.

 7              Okay.  Thank you.

 8              THE COURT:  The other -- I may need full depositions

 9      from you on some of the other remaining Dauberts, to the

10      extent they were not filed, because it is helpful for me to

11      see everything in context rather than just the snippets.  So,

12      if you have not filed full deposition transcripts from the

13      remaining Dauberts, if you could do that, that would be

14      helpful.

15              MS. MOGUL:  Okay.

16              THE COURT:  Otherwise, I will ask for them.  But if

17      you could do that, that would be helpful.

18              MS. AUERBACH:  We will do that, your Honor.

19              THE COURT:  All right.

20              I will see some of you in early June.

21              MR. NATHAN:  Thank you.

22              MS. AUERBACH:  Thank you.

23                              *    *    *    *    *

24

25
```

152

1    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
2

3
     /s/ Joseph Rickhoff                    October 14, 2017
4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25