1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
      NICOLE HARRIS,              ) Docket No. 14 C 4391
 4                               )
                     Plaintiff, )
 5                               )
               vs.               )
 6                               )
      CITY OF CHICAGO, et al.,    ) Chicago, Illinois
 7                               ) October 18, 2017
                     Defendants.) 2:00 o'clock p.m.
 8

 9                 TRANSCRIPT OF PROCEEDINGS - STATUS
                 BEFORE THE HONORABLE AMY J. ST. EVE
10

11    APPEARANCES:

12
      For the Plaintiff:       PEOPLE'S LAW OFFICE
13                             BY:  MS. JOEY L. MOGUL
                                    MS. JANINE L.HOFT
14                             1180 North Milwaukee Avenue
                               Chicago, Illinois  60622
15
                               VALOREM LAW GROUP
16                             BY:  MS. NICOLE N. AUERBACH
                                    MR. STUART J. CHANEN
17                             218 N. Jefferson St., Suite 300
                               Chicago, Illinois  60661
18

19    For Deft. City of        GREENBERG TRAURIG
      Chicago:                 BY:  MR. KYLE L. FLYNN
20                             77 West Wacker Drive, Suite 3100
                               Chicago, Illinois  60601
21

22    For the Individual       HALE LAW, LLC
                               BY:  MR. ANDREW M. HALE
23                                  MR. SCOTT J. JEBSON
                                    MS. JENNIFER BITOY
24                             53 W. Jackson Blvd., Suite 330
                               Chicago, IL 60604
25
```

1   APPEARANCES (Cont'd):

2
    Court Reporter:                MR. JOSEPH RICKHOFF
3                                  Official Court Reporter
                                   219 S. Dearborn St., Suite 1232
4                                  Chicago, Illinois  60604
                                   (312) 435-5562
5

6                 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

7                        PROCEEDINGS RECORDED BY
                         MECHANICAL STENOGRAPHY
8                  TRANSCRIPT PRODUCED BY COMPUTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  14 C 4391, Harris vs. City of Chicago.
 2              MS. MOGUL:  Good morning, your Honor.
 3              THE COURT:  Good afternoon.  It is afternoon.
 4              MS. MOGUL:  You're so right.  I'm a little bit on
 5    autopilot.  I apologize.
 6              Joey Mogul, M-o-g-u-l, here on behalf of Ms. Harris,
 7    the plaintiff.
 8              MS. HOFT:  Janine Hoft also on behalf of Ms. Harris.
 9              MS. AUERBACH:  Nicole Auerbach on behalf of
10    Ms. Harris.
11              MR. HALE:  Good afternoon, your Honor, Andy Hale on
12    behalf of the police officer defendants.
13              MS. BITOY:  Jennifer Bitoy on behalf of the
14    individual defendants.
15              MR. JEBSON:  Good afternoon, Judge, Scott Jebson for
16    the officers.
17              THE COURT:  Good afternoon.
18              You are here for a status before trial starting next
19    week.
20              Thank you.  You just provided me with a courtesy copy
21    of the deposition designations that we had talked about last
22    week.
23              And I assume nothing has changed with him, that --
24              MS. AUERBACH:  No, your Honor.
25              THE COURT:  Okay.
```

1           So, I will get you a ruling on Diante Dancy's

2    deposition designations soon.

3           I received the plaintiff's motion with respect to the

4    police officer reports.  Your response is due to that on, I

5    believe, the 19th.  So, I will rule on that.

6           MS. MOGUL:  Your Honor, I think we've reached an

7    agreement on that.

8           THE COURT:  That is even better.

9           MS. MOGUL:  So, we filed the motion on Monday and

10   yesterday or two -- yes, yesterday we learned that they

11   weren't objecting to the majority of the reports that were

12   specified.  They were objecting to just three.  They've asked

13   now that we agree to admit a few additional reports.  We've

14   agreed to do so.  So, now all of those reports are coming in.

15          THE COURT:  So, are all of the reports attached to

16   your October 16th motion?

17          MS. MOGUL:  No, your Honor.

18          THE COURT:  No.

19          MS. MOGUL:  Because they're asking for, I believe,

20   five additional reports.

21          THE COURT:  Okay.  I was just going to say all of

22   these reports -- there are 14 reports you have identified.

23   Those plus the five additional ones?

24          MS. MOGUL:  Yes.

25          Just let me -- there's more than 14 in that pack.  I

1   think there's 17, because three they had previously agreed to;

2   we sought an additional 14; now there's an additional five.

3           Does that make sense?

4           THE COURT:  Do you want to put on the record exactly

5   which ones?

6           MS. MOGUL:  Okay.  I'm going to do my --

7           THE COURT:  I am asking you.  If you are fine not

8   doing that -- in Paragraph 8 at Page 3, you have 14 reports

9   listed.

10          MS. MOGUL:  Yes, your Honor.

11          THE COURT:  So, you are not objecting, Mr. Jebson, to

12  the admission of those 14 reports, correct?

13          MR. HALE:  With the exception of one.  It's a

14  duplicate.  It says "draft" on it.

15          THE COURT:  Which one is that?

16          MS. MOGUL:  It's Exhibit 3, your Honor.  It should be

17  the second exhibit that you're looking at.

18          THE COURT:  Okay.

19          And that's --

20          MS. MOGUL:  It's the same exhibit as Exhibit 2.  It

21  just has handwriting on it that says "draft."

22          THE COURT:  And are you seeking the admission of

23  both?

24          MS. MOGUL:  Yes.

25          MS. AUERBACH:  Yes.

```
 1              THE COURT:  Okay.  So, let me figure out what we have

 2   to address and I will address it, if I can, today.

 3              So, other than -- and that is not even -- the

 4   Exhibits 2 and 3 are not identified in the 14 reports at

 5   Paragraph 18.  They are Exhibits 4 --

 6              Well, do you have the motion before you --

 7              MS. MOGUL:  I do, your Honor.

 8              THE COURT:  -- Mr. Jebson?

 9              MS. MOGUL:  I can go through the exhibits.  And --

10   yes.  This was a little bit influx based on what was going on.

11              THE COURT:  Well, let me just get a confirmation from

12   Mr. Jebson.

13              Paragraph 8 that lists 14 reports, are you objecting

14   to the admission of any of those 14 reports?

15              MR. JEBSON:  No.

16              THE COURT:  Okay.

17              And, then, there is also Exhibit 2 and Exhibit 3.

18   You are not objecting to the admission of Exhibit 2 to this

19   motion, but you are objecting to the admission of Exhibit 3?

20              MR. JEBSON:  Yes.

21              THE COURT:  And what are the other police reports in

22   here?  It looks like I am missing, according to what you said

23   earlier, one more.

24              MS. MOGUL:  Yes, your Honor.  There's Exhibit 112

25   that's attached is not listed in Paragraph 8.  That's the
```

1   criminal complaint charging Ms. Harris with murder.  They've

2   agreed to the admission of that.

3          THE COURT:  I do not see that as a police report, but

4   is that correct?  You are agreeing to the admission of that?

5          MR. JEBSON:  Yes.

6          THE COURT:  Okay.

7          MS. MOGUL:  This is two police documents that I did

8   not attach, but that both parties have agreed are the consents

9   for the polygraph examination.

10         THE COURT:  Okay.

11         And you are in agreement with that?

12         MR. JEBSON:  Yes.

13         THE COURT:  There are two separate consents to

14  polygraph?

15         MS. MOGUL:  One for Ms. Harris and one for Mr. Dancy.

16         THE COURT:  Do you want to identify those by an

17  exhibit number.

18         MS. MOGUL:  Sure.  Plaintiff's Exhibits 96 and 97.

19         THE COURT:  Okay.

20         MS. MOGUL:  And, then, there's just one other exhibit

21  that -- your Honor, this is not a police report or police

22  document, but the defendants have also agreed to the admission

23  of Plaintiff's Exhibit 4, which is a report from DCFS, which

24  is also attached to this motion.

25         THE COURT:  Is that correct, Mr. Jebson?

1     MR. JEBSON:  It is.  I mean, I would like to object,

2  but we originally did not.  So -- but that is correct.

3     THE COURT:  Okay.

4     So, we will turn to Exhibit 3 in a moment.

5     What are the five exhibits that you have, in your

6  compromising, agreed to the admission of?

7     MR. JEBSON:  It might -- so, this is -- these are old

8  exhibit numbers.  So, that can make it more confusing.  I can

9  identify what they are and then we can --

10     THE COURT:  Identify what they are.

11     MR. JEBSON:  Okay.

12     So, the first one is Detective Kelly's GPR, general

13  progress report.

14     THE COURT:  Okay.

15     MR. JEBSON:  And it was our defendants' old Exhibit

16  15.

17     THE COURT:  Okay.

18     MR. JEBSON:  The second one is a general progress

19  report by Detectives Noradin and Kelly, and it was identified

20  as defendants' old Exhibit 13.

21     THE COURT:  Okay.

22     MR. JEBSON:  The next one is Detective Wo, W-o,

23  general progress report; and, that is defendants' old Exhibit

24  No. 20.

25     THE COURT:  Okay.

1    MR. JEBSON:  The next one is also another general

2  progress report, Detective Wo; and, that was defendants' old

3  Exhibit 19.

4    THE COURT:  Okay.

5    MR. JEBSON:  The next one is Sergeant Bartik's

6  polygraph case review worksheet, and that was defendants' old

7  Exhibit No. 34.

8    THE COURT:  Okay.

9    And you are not -- I am sorry, were there any

10  additional ones?

11    MR. JEBSON:  I don't think so.

12    Just to kind of give a background -- so, the reason

13  why we're coming to this agreement is they wanted the CLEAR

14  and CLOSED supplemental report.  So, we wanted to make sure if

15  they're going to get the following report, they're going to

16  get all the GPRs.  And I went through that, and those are the

17  five that I believe would encompass all five.  If for some

18  reason I missed one, I will certainly bring it up.  I think

19  that's all of them.

20    THE COURT:  Okay.

21    And you are not objecting to the admission of those

22  documents Mr. Jebson just identified, correct?

23    MS. MOGUL:  No, your Honor.

24    THE COURT:  Okay.

25    So, a large portion of your motion is denied as moot

1    in light of your agreement.  The only issue is Exhibit 2

2    versus Exhibit 3.  Is Exhibit 3 identical to Exhibit 2 with

3    the exception of "draft" handwritten on both pages?

4             MR. JEBSON:  Almost.  The other difference is that it

5    is not signed as being approved.

6             And I can explain why I believe it has the word

7    "draft" on it.  I don't know if you want to get into that now,

8    but --

9             THE COURT:  It is not signed -- it is signed by the

10   reporting officer Wo, it looks like, but not by the

11   supervisor.

12            MR. JEBSON:  Right.

13            THE COURT:  Okay.

14            MR. JEBSON:  So, do you want me to explain why I

15   believe --

16            THE COURT:  Yes.

17            MR. JEBSON:  Okay.

18            So, what happened in this case is Detective Wo, he

19   brought the younger brother to be interviewed by the

20   Chicago --

21            THE COURT:  The older brother.

22            MS. AUERBACH:  Right.

23            MR. JEBSON:  I'm sorry, the older brother.

24            -- to be interviewed by the Chicago Children's

25   Advocacy Center --

```
 1              THE COURT:  Yes.
 2              MR. JEBSON:  -- by Ally Levy.
 3              THE COURT:  Yes.
 4              MR. JEBSON:  So, he gives his interview; he takes
 5     down his notes in the GPR; and, at the end, he hands out
 6     copies of his GPR to Ally Levy.
 7              THE COURT:  And is this the GPR that he -- of Wo's
 8     notes from the interview?
 9              MR. JEBSON:  Yes.
10              THE COURT:  Okay.
11              MR. JEBSON:  So, we believe what happened is that
12     someone from the child advocacy center wrote "draft" on there.
13     And this is how we believe that this happened.
14              And if I can hand up Exhibit 14.
15          (Document tendered to the Court.)
16              MR. JEBSON:  So, if you look at the first page,
17     that's from the Children's Advocacy Center; and, you can see
18     the word "draft" on there.
19              THE COURT:  It looks like the same writing.
20              MR. JEBSON:  Exactly.
21              So, what we think happened is that whoever got the
22     copy from Detective Wo wrote "draft" on it, which is
23     consistent with writing "draft" on their own sheet.
24              And I should also add a couple days ago -- maybe it
25     was yesterday -- the parties went down and looked at the
```

1    original general progress report at police headquarters, and

2    it does not have the word "draft" on there.

3              THE COURT:  So, what is your objection?

4              MR. JEBSON:  That there's no foundation, and it will

5    be misleading to the jury because I think that the plaintiff

6    wants to argue that the word "draft" was written by the

7    detective or someone from the police department when I think

8    that clearly shows it was not.

9              THE COURT:  Ms. Mogul?

10             MS. AUERBACH:  It's actually going to be me.

11             I'm sorry, I didn't see what was handed up.

12             THE COURT:  It is Plaintiff's 14.  I will hand it

13   back to you.

14             MS. AUERBACH:  Okay.  If you don't mind.

15             THE COURT:  It looks like it is Exhibit --

16             MR. HALE:  I have another copy here.

17             THE COURT:  Great.  Thank you.

18             MR. JEBSON:  I think it's Defendants' 14, Judge.

19             MS. MOGUL:  It's Bates stamped --

20             THE COURT:  You are right.  It is defendants'.  It is

21   Bates stamped with a plaintiff's Bates stamp.

22             MS. AUERBACH:  So, your Honor, Ms. Levy testified

23   that they don't keep any notes.  They don't keep any

24   documents.  In fact, they are essentially -- they come in to

25   do the interview and they don't keep a file --

1          THE COURT:  They do not take their own notes?

2          MS. AUERBACH:  They don't not only take their own

3    notes, they don't keep any documents.  They don't have a file.

4    This was an emergency interview.  It was done on a Sunday.

5    She did it herself.  There was no staff, et cetera, et cetera.

6          And, so, the idea that Ms. -- I believe that

7    Ms. Levy -- I showed her this in her deposition.  She

8    testified that she did not keep a copy of this GPR and she did

9    not know who wrote "draft" or why it has "draft" on it, but it

10   would not be in her habit to retain any of the GPRs.  She

11   makes copies to the extent that there's anybody there other

12   than the officer who is taking the notes, and she gives the

13   original back to the officer.  So --

14         THE COURT:  Did you -- the first page of defendants'

15   Exhibit 14 looks like it is a document from the Chicago

16   Children's Advocacy Center, not --

17         MS. AUERBACH:  That's correct.

18         THE COURT:  So --

19         MS. AUERBACH:  It does look like that.

20         THE COURT:  -- is this from Ms. Levy's files?

21         MS. AUERBACH:  I don't believe so.  I mean, the

22   underlying document is.

23         THE COURT:  "This" being the first page.  Is that

24   from her files?

25         MS. AUERBACH:  The underlying document without the

 1   word "draft" is, but it's got a Bates stamp with Nicole

 2   Harris, which probably means that it was produced at some

 3   point by somebody to Nicole's underlying attorneys and that's

 4   how it was given.  To the extent that it was from CAC directly

 5   in this litigation, it wouldn't have been Bates labeled

 6   plaintiff Nicole Harris.  It would have the moniker of

 7   whatever entity was producing it.

 8          THE COURT:  Has anybody been able to identify whose

 9   writing this is -- "draft" -- on the front?

10          MS. AUERBACH:  No.

11          THE COURT:  I think I am going to have to wait until

12   trial and see what kind of foundation you can lay for this, if

13   you can identify --

14          MS. AUERBACH:  So, just --

15          THE COURT:  -- whose writing that is.

16          MS. AUERBACH:  Just to be honest, your Honor, the

17   reason why -- okay.  I get it.  That's fine.

18          THE COURT:  And the reason why -- go ahead.  Why is

19   it you are seeking to admit this, your Plaintiff's 3 -- or

20   maybe it's Defendants' 3, but Exhibit 3 to your motion -- in

21   addition to Exhibit 2?

22          Exhibit 2 is coming in, which is --

23          MS. AUERBACH:  Right.

24          THE COURT:  -- the final report.

25          MS. AUERBACH:  I need to double-check before I make a

1    representation as to whether or not a version of this report

2    from Exhibit 2 was produced with "draft" from the City.  My

3    recollection was that it was.  And to the extent that it was

4    produced by the City, that means that it was in police or

5    City's possession at some point.

6           And it's our theory that when this report came back

7    to Area 5 in the course of this investigation, it was after

8    the polygraph exam and after Nicole Harris had capitulated and

9    said she would confess; and, then, Detective Wo came back and

10   said this is what the brother said and they believed that it

11   was quite damning to now a confession, and that somebody wrote

12   "draft" over it in order to, I don't know, make it seem

13   someone came across this, that it's not -- you know, it's not

14   final or to sort of draw attention away from it.

15          THE COURT:  Looking at Exhibit 2, when was Exhibit 2

16   finalized in connection with the question --

17          MS. AUERBACH:  So, the testimony from Detective Wo is

18   that he wrote Exhibit 2 while he was at CAC and he signed it.

19          THE COURT:  Right.

20          MS. AUERBACH:  And, then, at some later date, which

21   is dated May 23rd, a supervisor put the supervisor's

22   signature.

23          THE COURT:  And remind me, is that around a week

24   later?  Where is that in connection --

25          MS. AUERBACH:  May 14 -- this interview with Diante

1    Dancy was May 15th, the day after the death of his brother.

2              THE COURT:  Okay.

3              MS. AUERBACH:  So, May 15th to May 23rd it's in

4    police custody.

5              THE COURT:  But there is no difference.  And I have

6    not compared them, but if Exhibit 2 is identical to Exhibit

7    3 -- so, if the final version of Exhibit 2, which you say is

8    damning to the theory that she did this, if the final version

9    is damning --

10             MS. AUERBACH:  Why would they even have submitted

11   that ever?

12             THE COURT:  Or why -- what is the weight of what you

13   are trying to argue?

14             MS. AUERBACH:  It goes hand in hand with what was

15   done with respect to this report in the CLEAR and CLOSED, for

16   example, and at a later date.

17             So, I agree that there is a submission of the final

18   report without "draft" across it.  But Detective Wo said it

19   was his report.  Nobody asked him.  It's unclear why anybody

20   ever would have put "draft" across this if it was final, as

21   Detective Wo wrote.  If it's final, then why is anyone writing

22   "draft" anyway?  Nobody consulted him.  He said that nobody

23   came and told him he was doing this.

24             So, it's just odd that somebody would write "draft"

25   across a final report regardless.

```
 1              THE COURT:  Okay.  Well, I will have to wait and
 2   hear --
 3              MS. AUERBACH:  Okay.
 4              THE COURT:  -- what the testimony is and if you can
 5   lay a foundation.  And you might be in a different position if
 6   it came from the City's files.  Certainly let them know and
 7   maybe you can track down exactly who it came from.
 8              I am not sure your theory -- based on what you have
 9   just told me, I am not sure it really matters if the draft
10   comes in or not if Exhibit 2, the final report, is identical
11   to draft.  It is about a week later.  It was in the City's
12   files.  And if it is damning to their theory that the
13   plaintiff committed the murder and it is there and final, I am
14   not sure --
15              MS. AUERBACH:  It's not all --
16              THE COURT:  If Exhibit 3 does not come in, I do not
17   know that -- I think you have the same argument, but --
18              MS. AUERBACH:  I understand.  It's not all clean and
19   it's not all tidied up as we'd like.  So, I understand what
20   you're saying.
21              THE COURT:  I will see if you can lay the foundation
22   at trial.
23              MS. AUERBACH:  Okay.
24              THE COURT:  So, I will keep that under advisement
25   until we hear what the foundation is, and the remainder is
```

1    denied as moot in light of your agreement.

2           Your demonstratives, did you get together and talk

3    about those and reach agreement on those?  I had directed you

4    last time you were here to meet, since you had not discussed

5    those yet.

6           MR. JEBSON:  We have an objection to the elastic band

7    that their expert wants to use.  So, this is -- their expert,

8    Dr. Stevens, he's going to testify regarding strangulation and

9    hanging, stuff like that.  So, apparently, he has an elastic

10   band he's going to wrap around his wrist and say that, look

11   it, after wrapping around my wrist, it's not showing multiple

12   ligature marks; so, that means you can wrap an elastic around

13   someone's neck and not show any ligature marks.

14          THE COURT:  Is that accurate?

15          MS. MOGUL:  Well, I wouldn't say that he's going to

16   wrap it around his wrist, but he did bring this elastic band

17   to his deposition.  The defendants had notice of it.  They

18   were allowed to question him at his deposition.  He described

19   the properties of the elastic band.  He described the -- you

20   know, the print -- both its clinging nature and the way it

21   wraps.  And, so, they had an opportunity to question and an

22   opportunity to examine it themselves and ask him to do

23   whatever they wanted with it.

24          He is going to bring this elastic band and describe

25   its properties and be able to show the jury.  Whether it's

1    going to be on his wrist, I don't know, your Honor.  I'm

2    not -- I'm going to be honest with you.  I haven't fully

3    prepared him to testify yet.  But it is -- in this case, you

4    know, there is a big issue with regards to whether there were

5    multiple indentations or lines across Jaquari's neck.  And

6    whether the -- the type of material that that elastic band is

7    made of is absolutely relevant to what kind of marks would be

8    made.

9            THE COURT:  In reaching his opinions, is this

10   something that he used and wrapped around his wrist in --

11           MS. MOGUL:  I believe he --

12           THE COURT:  -- reaching his opinions?

13           MS. MOGUL:  I don't know if he wrapped it around his

14   wrist, but he certainly used it and considered it and assessed

15   it in making his opinions.

16           THE COURT:  If he used it and assessed it in making

17   his opinions -- that is one thing -- and you had the

18   opportunity to question him about it, then he can use it

19   during his testimony.  But I am not sure wrapping it around

20   his wrist as a demonstrative in front of the jury is proper if

21   that is not something he did during his preparation.

22           As a demonstrative when we are talking about the neck

23   and the wrist, which the skin is different, I do not know that

24   we are comparing apples to oranges.

25           So, he can certainly bring it.  He can certainly use

1    it.  He can talk about how he used it in reaching his

2    opinions.  But if he is going to wrap it around a body part to

3    demonstrate something, you will have the opportunity to object

4    and we can talk about it during the course of his testimony.

5           Sitting here today, without hearing the doctor -- but

6    I have read enough of these reports during the Dauberts in

7    advance -- I do not know that demonstrating how it impacts the

8    skin by wrapping around the neck would be comparing apples

9    to -- by wrapping around the wrist would be comparing apples

10   to oranges with the neck.

11          MS. MOGUL:  Okay.

12          MR. JEBSON:  Your Honor, I may be wrong about this,

13   but I do not think that he mentioned this elastic band in his

14   report.  I think he just brought it to the deposition.

15          THE COURT:  I do not have that before me, so I am

16   accepting your representation that it is something he used in

17   reaching his opinions, which I would assume would be somehow

18   disclosed either at the deposition or in the report.

19          MS. MOGUL:  I mean, that's -- I mean, what I can say,

20   your Honor, is he did bring it to the deposition.  He

21   described it.  It was there for them to examine.  It was there

22   for them to ask him to make any demonstrations with it.  You

23   know --

24          THE COURT:  If he just brought it to the deposition

25   and it is not something he relied on in reaching his opinions,

```
1    that is a different issue.  But I am accepting your

2    representation that he relied on it and used it in reaching

3    his opinions.

4              MS. MOGUL:  And that's my under- --

5              THE COURT:  If not, then there is a different issue.

6              MR. JEBSON:  So, we will just bring this up before he

7    testifies if we --

8              THE COURT:  You should talk.  You should go back.  If

9    it is not in the report, if you do not think it is in the

10   report or you do not think it is something disclosed, you

11   should go back and raise it with Ms. Mogul.

12             And if it is in there, point to him where it is.

13             MS. MOGUL:  Okay.

14             THE COURT:  Or if it was disclosed during his

15   deposition as something that he used and relied on, since you

16   had the opportunity to question him about it, that is fair

17   game, as well.  If he just shows up with something that has

18   never been disclosed or revealed as something he has relied on

19   or intends to rely on, that is a different issue.

20             MR. JEBSON:  And I don't think he did mention it in

21   the report.  But let's say that he did and he comes to the

22   deposition.  I still think that we have a basis to keep it --

23   to bar it because just because he says he's basing it -- he's

24   based his opinions on something that has no scientific basis

25   to base his opinion on --
```

1    THE COURT:  You cannot start raising Daubert-type

2 questions now when I have ruled on 12 Daubert motions.

3 Dauberts were due a long time ago.  So, I am hearing a Daubert

4 issue now if you are saying there is a scientific basis, which

5 is something different than you said before -- surprise

6 demonstrative, not something he relied on.  Those are two

7 different issues.

8        You cannot raise a Daubert scientific on the eve of

9 trial when there was a time for thorough briefing of Daubert

10 motions.

11    MR. JEBSON:  And I won't do that, Judge.  I won't

12 make any arguments that could have been made before.

13    THE COURT:  But if it is a "this is not a proper

14 demonstrative because he did not rely on it in his opinions,"

15 that is a separate issue that you may bring.

16        What about other demonstratives?  Did you --

17    MS. MOGUL:  I mean, well, there's this -- you know,

18 we have a continual argument with respect to the autopsy

19 photos.

20    THE COURT:  Well, if they are not -- I see those as

21 exhibits, not as demonstratives.  I have ruled on so far what

22 is admissible.  There were some that were under advisement

23 that I needed to hear the testimony on.  If you have more to

24 offer now on the testimony -- you cannot use them in opening.

25    MS. MOGUL:  We agree.  We agree with that.  And we

1    understand your ruling, and that is fine with us.

2         MR. JEBSON:  And I was going to bring this up.  It

3    sounds like you don't want any argument.  Because this is

4    going to be a big part of our case, the ligature.  And we

5    wanted to bring it up in the opening.  And Dr. Stevens is

6    going to be, I think, their second witness.  So, I don't --

7         THE COURT:  I am not saying you cannot argue it, but

8    if the exhibits are not admitted or not objected to, you

9    cannot use them in openings.  I am not saying I am not going

10   to admit them during the course.

11        I believe what I said with respect to the neck when I

12   ruled on this in your motion in limine was I needed to hear

13   more testimony to make a determination as to their

14   admissibility.

15        But if you want to educate me more, Mr. Jebson, about

16   the issue so that I can make those --

17        MR. JEBSON:  Sure.

18        THE COURT:  -- in the context, go ahead.

19        MR. JEBSON:  Yeah.  The reason why I think it might

20   be better to bring it up now is because it's going to come up

21   in the cross-examination of their expert.

22        THE COURT:  Okay.

23        MR. JEBSON:  So, it won't be on the witness that

24   we're putting forward.

25        So, I know you know the main issues in this case,

1    that we're obviously claiming it was a homicide and they're

2    claiming it was an accident.  So, we have two forensic

3    pathologists who are going to testify:  The ME and the person

4    that we hired.  And they are both going to testify that,

5    because of the ligature, it was a homicide and, because of the

6    ligature, it could not have been an accident.  And because of

7    the lig- --

8              THE COURT:  And how are they going to define "the

9    ligature"?

10             MR. JEBSON:  So, can I hand up --

11             MR. HALE:  Actually, Judge, I have a copy of all of

12   our exhibits.  Can I just give the whole thing?

13             THE COURT:  For me?

14             MR. HALE:  Yeah.  I have a hard copy and also have

15   them on a disc for you.

16             Can I just take back the 14 we gave you?  And there's

17   a 14 in this folder.

18         (Document tendered to the Court.)

19             THE COURT:  There you go.  There is your 14 back.

20             MR. HALE:  What Scott's going to be referring to is

21   Exhibit 1.  I think it's 1-1, 1-2 and 1-3.

22             THE COURT:  Okay.

23             MR. JEBSON:  So, if you look at Defendants' 1-1,

24   please.

25             THE COURT:  And I believe these are ones I took under

1    advisement.

2            MS. MOGUL:  Yes.

3            THE COURT:  I do not remember the exact exhibit

4    numbers, but I believe these are ones that I said I could not

5    rule on without more.

6            MR. JEBSON:  Sure.

7            THE COURT:  So, I have 1-1.  Go ahead.

8            MR. JEBSON:  So, the ME and our expert is going to

9    say that it could not have been an accident.  In other words,

10   we believe that they're going to argue that the child wrapped

11   it around his neck multiple times and either strangled --

12           THE COURT:  The bed sheet.

13           MR. JEBSON:  The elastic from the bed sheet.

14           THE COURT:  Yes.

15           MR. JEBSON:  And either hung himself or strangled

16   himself to death.

17           So, the ME and our expert is going to say that if

18   that elastic band was wrapped around multiple times, the

19   ligature would go around.  You would see multiple loops.

20           THE COURT:  Define "ligature" for me in the sense

21   that you are using it.

22           MR. JEBSON:  A ligature mark is the mark on the neck.

23   The ligature is the elastic band.

24           THE COURT:  Okay.

25           MR. JEBSON:  So, it's the instrument.

1           THE COURT:  So, it is not the mark.  The ligature --

2           MR. JEBSON:  The ligature mark is the mark, and the

3 ligature is the instrument that causes the mark.

4           THE COURT:  Okay.

5           MR. JEBSON:  So, both forensic pathologists --

6           THE COURT:  You may want to make that clear to the

7 jury.

8           MR. JEBSON:  I know.  It's confusing.

9           THE COURT:  That there is a difference between the --

10 and in some of the submissions, if I remember, I thought the

11 ligature was referencing the mark itself.

12           MR. JEBSON:  Right.

13           THE COURT:  Just you all may want to make that clear

14 to the jury.

15           MR. JEBSON:  It's also called -- will be referred to

16 as a furrow, also.  The furrow is the mark.

17           THE COURT:  The furrow is the mark?

18           MR. JEBSON:  Yes.  So, ligature mark and furrow are

19 the same thing.  Ligature is the elastic.

20           So, our expert and the ME is going to say that if the

21 elastic was wrapped around multiple times to cause either

22 strangulation or to cause a hanging, which would -- they're

23 going to say was an accidental death, the ligature mark would

24 be all the way around.  And no question about it, they're

25 going to say.

```
 1              So, if you look at Exhibit D-1 and --
 2              THE COURT:  1-1?
 3              MR. JEBSON:  I'm sorry, yes, 1-1.
 4              So, that shows that there's a ligature mark on the
 5    left side of his neck, but it shows a gap.  So, in other
 6    words, it's showing it does not go all the way around.  So, if
 7    you look at Exhibit 1-2, that is now a close-up of the
 8    ligature mark on the left-hand side, and you can see that it
 9    is more prominent on that left-hand side.
10              And what our expert is going to say, what that is
11    consistent with is someone from behind on the right using
12    force pulling the elastic which would cause that ligature
13    mark.  And he will say that, again, if it was wrapped around,
14    the ligature mark would look nothing like this.  It would look
15    like this all the way around.
16              THE COURT:  Ms. Mogul, remind me for these two
17    photos, 1-1 and 1-2, was your objection relevance or 403?
18              MS. MOGUL:  403.
19              THE COURT:  Okay.
20              MS. MOGUL:  I mean, your Honor --
21              THE COURT:  Let me -- I will come back to you.  Let
22    Mr. Jebson finish.  I just wanted to get an understanding.
23              MR. JEBSON:  So, these are obviously close-up
24    pictures of the ligature mark, 1 and 2.  And the other
25    important part about the ligature mark, as you can see, this
```

1    is a horizontal mark; and, what the experts are going to say

2    is that a horizontal mark is consistent with a strangulation

3    and inconsistent with a hanging.  If it was a hanging, the

4    ligature mark would be going -- they call it canted.  It would

5    be upwards.  It would not be horizontal.

6           So, that's why the pictures are very important.

7    Because by just conceding that there is a partial ligature

8    mark on the neck does not get into the details regarding if

9    it's horizontal; if there's more of an indentation on the left

10   side, which shows that there was force applied to it from

11   behind.  The coloration is important.

12          If you look at 1-3, the reason why this is important

13   -- and this is not a good copy, but we have digital copies --

14   this really shows the gap between the ligature mark and bare

15   skin on the right side.  Again, the experts will say that if

16   this was an accidental death, the ligature mark would go all

17   the way around and would be as pronounced all the way around.

18          THE COURT:  What about the 403 aspect of 1-3?  You

19   are really showing the --

20          MR. JEBSON:  In terms of the third picture?

21          THE COURT:  The third picture.

22          MR. JEBSON:  Well --

23          THE COURT:  You are showing a lot more of the body

24   here.

25          MR. JEBSON:  That's true.  I mean, it's not -- I

1    mean, any time that you show a child that has died is going to

2    be -- you know, it's not a great thing to show the jury.  But,

3    unfortunately, it's -- I mean, thankfully you haven't seen the

4    other autopsy pictures, which are --

5              THE COURT:  No, I did, because they were submitted.

6              MR. JEBSON:  Oh, okay.

7              THE COURT:  Your prior counsel were seeking to admit

8    all of them, and I made some rulings on many of them.

9              MR. JEBSON:  Well, we're not seeking those.

10             THE COURT:  I have already ruled.

11             MR. JEBSON:  So, I mean, I agree that no one wants to

12   see this.  But, unfortunately, to prove our case, we have to

13   show this because this picture is different than the close-ups

14   because this picture gives the angle of showing the gap.

15             Now, if there's a way that we can somehow zoom in

16   closer, we're happy to try to do that.  I mean, we would

17   prefer to do that.  But if we can't do it, we can't do it.

18   So, in terms of 1-4, there's a issue regarding the petechia.

19   And petechia -- I don't know how much you know about this --

20             THE COURT:  Okay.  Before we go to that, let me just

21   ask Ms. Mogul about the ligature.

22             Do you agree -- and I think you do -- that the

23   ligature is going to be an issue?

24             MS. MOGUL:  Yes, your Honor.

25             THE COURT:  And do you agree with what Mr. Jebson

 1     just represented their expert is going to testify about?

 2             MS. MOGUL:  Yes.

 3             THE COURT:  Okay.

 4             MS. MOGUL:  But I will also say, your Honor, that

 5     the -- that our expert and their expert don't disagree with

 6     what Denton's findings are regarding where the ligature was

 7     marked or noted or the ligature mark is on the neck.  Okay?

 8     So, that's not in dispute.  Our expert's not going to come in

 9     and say, oh, I see it all the way around the neck.  That's, in

10     fact -- so, what this is, is showing pictures to them that are

11     about marks that are not in dispute.  And instead, what we are

12     now doing is showing very graphic disturbing photos of a young

13     four-year-old who is deceased lying on a metal slab.  Okay?

14             So, you know, these are very upsetting photos for

15     people to look at.  And it is already involved -- this case is

16     a very upsetting case because we are talking about the tragic

17     loss of a four-year-old.  So, I'll say this:  We find this

18     particularly inflammatory to be shown in opening.

19             THE COURT:  I am not going to let them show it in

20     opening.  I have already -- the question was admissibility.

21             MS. MOGUL:  Okay.

22             With respect to the ligature marks, your Honor, as to

23     coming in with certain experts, we were willing to concede

24     that the ones that just showed the neck we could see being

25     shown for demonstrative purposes.  But, for example, the one

1   he just showed of the back, I think, is highly -- is not -- is

2   not necessary --

3           THE COURT:  So, are you not objecting or are you

4   withdrawing your objection to 1-1 and 1-2?

5           MS. MOGUL:  I guess to 1-1 and 1-2, yes, your Honor,

6   we would.

7           MS. AUERBACH:  To be shown with the experts.

8           MS. MOGUL:  To be shown with the experts.

9           THE COURT:  Are you seeking these for demonstrative

10  only --

11          MR. JEBSON:  No.

12          THE COURT:  -- or for admission?

13          MR. JEBSON:  We are seeking to admit them, yes.

14          THE COURT:  I think 1-1 and 1-2 will likely come in.

15  I will have to hear it.  I do not see those as overly

16  prejudicial and, given what I am hearing, there certainly is a

17  probative value to them.

18          1-1 is the back of the head.  I certainly cannot even

19  tell this is a child.  I know there will be testimony about

20  that.  But it is probative -- the probative value of each of

21  these is certainly not substantially outweighed by undue

22  prejudice, given the angle of these autopsy photos.

23          And as I have said, given the representation -- and

24  there is no objection -- that this is a relevant issue, those

25  two will likely come in.

1    I am not going to let you use these in opening.  You

2 can talk about the issue, but I am not going to let you use

3 these in openings.

4    1-3 is a closer call.  If I let you -- if I let 1-3

5 in at all, I am not going to let the bottom half in.  And if

6 it is digital, you should be able to work with that.

7    MR. JEBSON:  Okay.

8    THE COURT:  But I will keep 1-3 under advisement.

9    MR. JEBSON:  And could we show you the digital

10 version of 1-3 so you can get -- because it's hard to make my

11 argument with this bad a picture.

12   THE COURT:  Yes.

13   Do you have it with you?

14   MR. JEBSON:  I don't.  I'm sorry, Judge.  But I will

15 bring it next time.

16   MS. AUERBACH:  Could I just ask a question to

17 counsel?

18   THE COURT:  Yes.

19   MS. AUERBACH:  Are you only using it for purposes of

20 the neck or is there some other purpose that you're

21 attempting --

22   MR. JEBSON:  That's it.

23   MS. AUERBACH:  -- something else you're attempting to

24 show?

25   MR. JEBSON:  No, just the neck.

```
 1                THE COURT:  Okay.
 2                So, then 1-4 -- by the way, I only have until 3:00.
 3    I have a 3:00 o'clock.  I am happy to spend the time on this.
 4    Are there other issues for me outside of these autopsy photos?
 5                MS. MOGUL:  I mean, there's a lot of autopsy photos
 6    at issue here, and I'm not sure it's worthy to fight this out
 7    right now.
 8                THE COURT:  Okay.
 9                Are there other issues besides the autopsy photos
10    that we need to get to this afternoon?
11                MR. JEBSON:  Just one clarification --
12                THE COURT:  Yes.
13                MR. JEBSON:  -- and I should know the answer to this;
14    I will preface my question -- about jury selection.  I know
15    you've explained it many times.  I just want to make sure.
16                THE COURT:  And you have done it before me.
17                MR. JEBSON:  I know.
18                THE COURT:  I have not changed.
19                MR. JEBSON:  I know.  Well, because when we went
20    back, when Andy told me the way it was, I said I don't think
21    that's the way it is.
22                I know you ask everyone, the whole venire, questions.
23                THE COURT:  Yes.
24                MR. JEBSON:  And, then, do you put 16 in the box?
25                THE COURT:  I put 16 in the box and ask them the
```

1   questions, and then I will excuse those 16; and, then, I put

2   another 16 in the box and ask them the same questions; and, we

3   go through that until I have questioned the entire venire.

4           MR. JEBSON:  And, then, when you --

5           THE COURT:  And we do not exercise strikes until I

6   have questioned everybody.

7           MR. JEBSON:  And, then, when you put the 16 -- then

8   you put 16 back into the box.

9           THE COURT:  Once I have questioned them, I am done.

10  The 16 -- the second round of 16 will be ones I have not

11  questioned yet.  So, I will put 16 in.  I will ask them

12  individual questions based on my letter.  I will do follow-up

13  that is not in the letter.  I will do that with all 16.  Then

14  I will ask them some group questions.  And, then, if we need

15  to do follow-up with anybody at sidebar, I will have them come

16  down and we will do follow-up at sidebar.  And I will ask you

17  at that point, "Do you have any further questions?"

18          Once we are done with that whole process, I will

19  excuse those 16 and tell them to come back in two hours and I

20  will put the next 16 in, and we will go through the same

21  process.  I do not take your strikes until we have questioned

22  the entire panel.

23          MR. JEBSON:  And, then, when you pick the jury, what

24  are the first 16 that we pick from?

25          THE COURT:  Well, we will not have 16.  We are going

1    to have 10, possibly 12, depending on the panel.  But we are

2    going to have 10.  The first 10 that have not been struck for

3    cause or peremptories will be our jury.

4             MR. JEBSON:  In the order you originally called them?

5             THE COURT:  In the order I originally called them.

6             So, if No. 5 is not struck --

7             MS. AUERBACH:  That's your first --

8             THE COURT:  -- and the first four have been struck,

9    No. 5 will end up being our first juror.

10            MR. JEBSON:  Okay.  Thank you.

11            THE COURT:  Does that make --

12            MR. JEBSON:  Yes.

13            THE COURT:  Okay.

14            Other than that, are there any other issues besides

15   the autopsy photos that you need me to address today?

16            MS. AUERBACH:  Any other issues relating to anything?

17            THE COURT:  To the trial.

18            MS. AUERBACH:  Yes.

19            Your Honor, we have an issue with some witnesses,

20   particularly one witness who was removed from the witness list

21   and then put back on just yesterday.  And the exhibits related

22   to this witness were removed in the last iteration of the

23   revised exhibit list.

24            THE COURT:  Who is that witness?

25            MS. AUERBACH:  That is Dr. Frumkin.  Dr. Frumkin --

1          THE COURT:  He is on the "May Call" list.

2          MS. AUERBACH:  He's on the "May Call."

3          THE COURT:  Okay.

4          MS. AUERBACH:  And the reason why we're concerned

5   about that is, you know, it's a week before trial.  We relied

6   on the representation that they wouldn't be calling him

7   earlier.  He's out of state.  There are a number of potential

8   hearsay issues or other issues with any testimony of his that

9   would come in.

10          Technically, he's unavailable.  I don't know if

11  they've been in contact with him and they're planning to have

12  him come live, but --

13          THE COURT:  Who is he?

14          MS. AUERBACH:  Do you want to describe your witness?

15          MR. JEBSON:  Well, it's their expert that they

16  dropped, that the defendants had listed all along as a "may

17  call."

18          THE COURT:  What type of expert?  Because you have

19  him listed here as a fact witness.

20          MR. JEBSON:  Right.  So, the plaintiff made

21  admissions to this person and --

22          THE COURT:  What type of expert is he?

23          MR. HALE:  He was -- your Honor, he was a

24  psychologist or psychiatrist at the Cook County jail.  I'm

25  sorry, no.

 1              MS. AUERBACH:  No.

 2              MR. HALE:  You guys -- let me preface.  Back in 2006,

 3     when Nicole Harris was going through her post-conviction

 4     proceedings, he was retained by her legal team and then he

 5     gave a report.  He interviewed her for eight hours at the Cook

 6     County jail.  They disclosed him as an expert in this case.

 7              MR. CHANEN:  No, no, not this case.

 8              MR. HALE:  In that case.

 9              THE COURT:  Mr. Chanen, do not come up here and start

10     causing trouble.  I am not kidding.  I will give you the

11     opportunity to address it.  Let him finish.

12              MR. HALE:  I'm going to turn it back to them in one

13     second.  The point was he interviewed Nicole Harris for eight

14     hours at the Cook County jail, and notes were produced in this

15     case of those interviews.  He was on our original pretrial

16     order as a "may call."  Both sides have gone back and forth on

17     that, you know, and we've got a final version.  But he was on

18     the original pretrial order.

19              We simply list him as a fact witness for potential

20     impeachment.  And what I would propose doing if it's -- if it

21     turns out this way, if I say to Nicole Harris, "Did you tell

22     Dr. Frum- " -- "you met with Dr. Frumkin on this date.  Did

23     you tell him -- " I'm just making this up " -- did you tell

24     him that Jaquari fell off the top bunk?"  If she says "No," I

25     would designate the deposition.  That's impeachment.

1          THE COURT:  To perfect your impeachment?

2          MR. HALE:  To perfect the impeachment.

3          And I would simply call him through deposition

4   designations to perfect the impeachment.  And that's why we

5   list him as fact only.

6          THE COURT:  So, is your only purpose in calling him

7   to perfect impeachment if Ms. Harris denies that she told him

8   something?

9          MR. HALE:  Correct.

10         THE COURT:  You do not plan to call him, then, to

11  testify about --

12         MR. HALE:  No.

13         THE COURT:  -- what she said if her testimony is

14  consistent or if it is on something that is inconsequential?

15         MR. HALE:  Right.  If I ask her -- so, I intend to

16  ask her, did you tell Dr. Frumkin A, B, C?  If she testifies

17  consistently with what's in his notes, that's it.

18         THE COURT:  Okay.  Then I think I will have to hear

19  her testimony --

20         MR. HALE:  Okay.

21         THE COURT:  -- and see.

22         That is different than what I think you thought he

23  was going to be called for.  I think I will have to hear her

24  testimony.

25         MR. HALE:  Okay.  Fair enough.

```
 1              THE COURT:  Mr. Chanen, you are sitting back down.
 2    Do you have nothing to say now?
 3              MR. CHANEN:  Thank you, your Honor.
 4              Stuart Chanen.  I'm also on behalf of the plaintiff.
 5              Judge, you dealt with this a little bit in the
 6    Wasyliw opinion because -- I just want to remind the Court
 7    that Mr. Drizin and Ms. Flaum, while they represented
 8    Ms. Harris in federal habeas procedure, hired Dr. Frumkin.
 9    From the very start of this case, we never -- he was never our
10    witness.  And what they tried to do was say because Frumkin
11    was hired in the federal habeas case, we're entitled to bring
12    in Dr. Wasyliw now.
13              THE COURT:  Right.  I ruled on that.  Right.
14              MR. CHANEN:  Right.
15              And, so, I just want it to be clear that to suggest
16    that we had made Dr. Frumkin or his conclusions or his
17    interview or his notes or his report any part of this case, we
18    had never done that.  And they both took Dr. Frumkin off their
19    list orally and they took Dr. Frumkin off their list
20    physically, and then he reappeared yesterday.  And that's the
21    problem we're having.
22              THE COURT:  And now I understand that it is for a
23    limited -- potentially perfecting of impeachment --
24              MR. HALE:  Right.
25              THE COURT:  -- not to call him just to testify about
```

1    her statements to him.

2           MR. HALE:  Right.

3           And just one little final footnote.  For instance,

4    when the plaintiff filed their revised witness list yesterday,

5    they added Karen Wilson.

6           MS. MOGUL:  And we're happy --

7           MR. HALE:  So, I mean, you know, that's not really an

8    issue.

9           THE COURT:  We are not going to get in a tit-for-tat.

10           Now I understand.  I will have to hear Ms. Harris' --

11           MR. HALE:  Okay.

12           THE COURT:  -- testimony.

13           MS. MOGUL:  At this point, your Honor, the only

14    reason Ms. Wilson was added back on is because they were

15    objecting to one of the exhibits that they previously agreed

16    to.  Now that they've agreed to her, we don't have to lay the

17    foundation.  We're happy to remove her.

18           MR. HALE:  Well, she's on our list, too.  So --

19           MS. AUERBACH:  Now.  You added her back.

20           THE COURT:  Are there any other issues that you need

21    me to address this afternoon before -- I'll go back to the

22    autopsy for just a little bit.  But any other issues that you

23    need addressed before trial?

24           MS. MOGUL:  Well, just so you know, your Honor, I

25    mean, both parties all along were listing both substantive and

1   impeachment exhibits as pre-identified.  And we understand you

2   only want the substantive exhibits to be produced to you on

3   Friday.  We are intending to do so.

4          We have always -- you know, we have withdrawn some

5   exhibits.  But we have listed things for identification

6   purposes.

7          They have now listed -- their exhibit list is only

8   the substantive exhibits.  It's no longer any of the

9   impeachment exhibits.

10          THE COURT:  I think that is what I asked for.  I

11   wanted an exhibit list to keep track of and to go through what

12   you are seeking to admit as substantive evidence.

13          MS. MOGUL:  Okay.

14          THE COURT:  But that was what I asked for.  And

15   especially in light of you -- you submitted your original list

16   before the Court ruled on all the motions, and you have been

17   back and forth and changing minds on things.  So, I wanted

18   those substantive documents that are going to be used or

19   sought to be admitted in trial so I have those in advance.

20          MS. MOGUL:  Okay.  Your Honor, then I apologize.  I

21   was a little unclear.

22          So, I'm going to provide you our substantive exhibits

23   and I'm going to provide you the full list that we filed, as

24   well as just the list of the substantive exhibits.  It's not

25   going to be in order because it's not.

```
 1              THE COURT:  Do you have a separate list of the
 2    exhibits that you are going to seek to admit at trial?
 3              MS. MOGUL:  No.  It's just all one list.
 4    Everything's been premarked.  To be honest with you, your
 5    Honor, this was done last August when we were preparing.
 6    We're a small office.  I can't -- it's taken a long time to
 7    prepare.
 8              I'm happy to just provide you the substantive and
 9    create the table that just lists the substantive exhibits for
10    you.
11              THE COURT:  Are the -- is the exhibit list -- are
12    your exhibits 1, 2, 3, 4, 5?  Okay.  Then I can follow it.
13              MS. MOGUL:  Well, no, let me be clear.  No, they're
14    not listed substantive 1 through 25.  They're interspersed.
15              THE COURT:  But you are identifying your exhibits by
16    number?
17              MS. MOGUL:  Exactly.
18              THE COURT:  Okay.  Then that is fine.
19              MS. MOGUL:  Okay.
20              MR. JEBSON:  Judge, the five additional police
21    reports that we added, do you want for the defendants to add
22    those to their exhibit list or do you want that to be
23    plaintiff's exhibits?
24              THE COURT:  Who is going to seek to admit them?  I do
25    not care.
```

1          MR. JEBSON:  It doesn't make a difference.

2          MS. AUERBACH:  Do you want to, Scott?

3          MR. JEBSON:  All right.  Then we'll add them.

4          THE COURT:  Okay.

5          MR. HALE:  And, your Honor, I just wanted to note for

6   the record I tendered to the Court -- I'm tendering to

7   plaintiffs on a disc -- our Exhibits 1 through 14, which

8   encompasses anything we intend to submit as substantive

9   evidence.

10          THE COURT:  Okay.

11          Any other issues?

12          MS. MOGUL:  No.

13          THE COURT:  Let's go back to the issue that you were

14  about to explain.  Because this was another one I took under

15  advisement in 1-4 and the significance -- Defendants' 1-4, the

16  significance of this photo.

17          MR. JEBSON:  Actually, there's other photos with the

18  ligature or lack of ligature marks.  Do you want me to put

19  those two aside for now?

20          THE COURT:  Put those aside.  In light of -- see if

21  you can revisit it with each other and agree on any of these

22  in light of the Court's rulings.

23          MR. JEBSON:  So, the other issue with the petechia:

24  The medical examiner and our expert is going to say that

25  because of the amount of petechia, that's more consistent with

1  a strangulation.

2          THE COURT:  That is on the eyes?

3          MR. JEBSON:  Exactly.  It's in the eyes.  It's also

4  in the mouth.  So, Exhibit 1-4 is showing it on the eyes.

5          So, their opinion is that because of the amount of

6  petechia, that's more consistent with a strangulation than a

7  hanging.

8          There's also petechia on the face, as well.  So, I'll

9  just identify some of those pictures.

10         1-9.

11         1-12, that's petechia in the mouth.

12         MS. MOGUL:  No.

13         MR. JEBSON:  1-13.

14         1-14 shows an abrasion inside the mouth that our

15  expert has disclosed an opinion that that is consistent with

16  being pushed down against a hard object while being strangled.

17         1-15 shows petechia.

18         1-16 is a -- shows petechia on the eyes.

19         I can --

20         THE COURT:  I am not going to let 1-16 in.  1-4

21  covers that, and 1-16 shows the whole face.  I am not going to

22  let 1-16 in under 403.

23         MR. JEBSON:  Okay.  So, that's it for the petechia

24  pictures.

25         THE COURT:  Okay.

1          MS. MOGUL:  Your Honor, I just -- I want to be frank

2     with you because I don't want to, let's say, have my one shot

3     and miss it.  Because I haven't had -- I have had an

4     opportunity to go through Dr. Denton's testimony.

5          At trial, he testified in the criminal case that the

6     physical markings on --

7          THE COURT:  Dr. Denton is?

8          MS. MOGUL:  Was the Cook County medical examiner.

9          THE COURT:  Okay.

10         MS. MOGUL:  Okay.  Who testified.

11         And he testified that the markings and the physical

12    evidence on the body did not indicate whether it was an

13    accident or homicide.  And the reality is whether it's a

14    strangulation or hanging, it could still be an accident or a

15    homicide.

16         In this case, the fact that there was petechiae

17    doesn't indicate one way or another.  Everyone agrees where

18    there was petechiae in the eyes, you know -- and you could see

19    that Jaquari's face, his head was entirely red because he had

20    suffocated.  When you asphyxiate, that is a common sign that

21    you have those red dots in your eyes.

22         Again, I just don't think that this is in dispute as

23    to the fact that there was petechiae.  Our expert doesn't

24    dispute it.  Dr. Denton didn't say that it was pertinent one

25    way or another.

1              I will be honest, your Honor.  I haven't read

2    Dr. Peterson yet to make this argument to you.  So, I guess

3    I'd ask, can you reserve ruling on this?

4              THE COURT:  I am not going to rule right now.

5              MS. MOGUL:  Okay.

6              THE COURT:  No.  I am going to wait until I hear

7    more.

8              MS. MOGUL:  All right.  I appreciate that, your

9    Honor.

10             THE COURT:  The neck, I have heard enough that that

11   is going to be disputed, the markings and on all versus half.

12   1 and 2 will come in.

13             Are you objecting to the clothes?

14             MS. MOGUL:  No, not with respect to the medical

15   examiner's photographs we are not.  And, in fact, just so you.

16             THE COURT:  I am sorry.  Just so I am clear and so

17   the record is clear, Defendants' Exhibits 1-17 through 1-23,

18   you are not objecting to?

19             MS. MOGUL:  No, your Honor.  You ruled on this

20   already, and we're following your ruling.  With respect to the

21   medical examiner's photos that were taken the day after

22   Jaquari died, we are not.

23             THE COURT:  Okay.

24             MS. MOGUL:  There is an issue with respect to photos

25   that were taken over ten years later of the clothes that we

```
 1    are objecting to.  But those aren't the medical examiner's

 2    photos.

 3              THE COURT:  Okay.

 4              Are the clothes still in existence?

 5              MS. MOGUL:  They are.

 6              THE COURT:  And are you going to seek to admit those?

 7              MS. MOGUL:  No.

 8              THE COURT:  Are you?

 9              MR. JEBSON:  No.  We're going to use pictures

10    instead.

11              THE COURT:  Okay.

12              MR. JEBSON:  And just, the pictures that we want to

13    use are -- show it more clear because it's a brighter flash.

14              THE COURT:  Are they in here?

15              MR. JEBSON:  Yes, they are.

16              THE COURT:  Okay.  I will take a look at them, then.

17              MS. AUERBACH:  Your Honor, just to give you an idea,

18    this is what they're talking about comparatively.  And we've

19    objected for a number of reasons, including -- you know, I

20    don't know if the sweatshirt was treated with anything, but

21    the appearance in these photos with the brighter flash, I

22    think, is inconsistent with the appearance from the medical

23    examiner photos the day after the death.  And I think --

24              THE COURT:  I will look at them.  I cannot tell

25    from --
```

1           MS. AUERBACH:  Yeah, okay.

2           THE COURT:  -- the way you are showing it.

3           MS. AUERBACH:  Sure.

4           THE COURT:  But I have them now, so I will look at

5    them.

6           MR. JEBSON:  And, your Honor, in terms of the medical

7    examiner pictures of the sweatshirt, those are ones you really

8    have to see the digital ones -- and we'll bring those to you

9    -- because a photocopy, you really can't see the vomit on

10   there.

11          MS. MOGUL:  Well, just -- I'll say this --

12          Are the digital ones on the new set of exhibits you

13   provided.

14          MR. JEBSON:  Yes.

15          MS. MOGUL:  Because we haven't had --

16          THE COURT:  This is ten years later.  You are not

17   going to be able to see the vomit on it.

18          MR. JEBSON:  I'm sorry?

19          THE COURT:  If it is about vomit on a sweatshirt, ten

20   years later when you take the photos, you can still see the

21   vomit?

22          MR. JEBSON:  Well --

23          MS. HOFT:  He used more flash.

24          MR. JEBSON:  When we took the picture, there was a

25   better flash.  You can see it a lot better.

```
 1              MS. AUERBACH:  Ten years later, though.  That's the
 2    problem.
 3              THE COURT:  Okay.  I understand.  I will take a look
 4    at them.
 5              We are running out of time.  Is there anything else?
 6              MR. HALE:  We were going to do the Elmo thing today,
 7    but if you'd rather we come back for that, we can come back.
 8              THE COURT:  My 3:00 o'clock is back in chambers, so
 9    you can stay and do it today.
10              So, you are back here for jury selection next
11    Thursday, the 26th.  So, please make sure that you -- why
12    don't you get here by 8:45 and we will take up any last-minute
13    issues that have to be taken up, and then we will get started
14    with jury selection.
15              I will see you next week.
16              MR. HALE:  Thank you, your Honor.
17              MS. AUERBACH:  Thank you, your Honor.
18              MS. MOGUL:  Thank you.
19                         *     *     *     *     *
20
21    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
22
23
      /s/ Joseph Rickhoff                    October 23, 2017
24    Official Court Reporter
25
```