**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 4391 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

After a three-week jury trial, at which over 20 witnesses testified, including seven experts, a jury returned a verdict in favor of Chicago Police Department ("CPD") Officer Defendants Anthony Noradin, Demosthenes Balodimas, Robert Bartik, Michael Landando, Randall Wo, John Day, John Kelly, and Robert Cordero and against Plaintiff Nicole Harris on all counts.[1] Before the Court is Harris' motion for a new trial brought pursuant to Federal Rule of Civil Procedure 59(a). For the following reasons, the Court denies Harris' Rule 59(a) motion.

## BACKGROUND

In her Complaint, Harris alleged that on October 26, 2005, a jury in the Circuit Court of Cook County convicted her of murdering her four-year-old son, Jaquari Dancy, based in part on a false and fabricated confession elicited during hours of intermittent interrogation by Chicago Police Officers, including a videotaped confession played to the jury. After the jury convicted her of murder, the Circuit Court of Cook County judge sentenced Harris to 30 years in prison.

---

[1] On February 17, 2017, the Northern District of Illinois Executive Committee reassigned this lawsuit to the Court. Prior to reassignment, on June 14, 2016, the Honorable John Darrah granted Defendant City of Chicago's motion to bifurcate and stay Harris' claim based on *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), pursuant to Federal Rule of Civil Procedure 42(b).

On March 13, 2009, the Illinois Appellate Court affirmed Harris' conviction, and thereafter, the Supreme Court of Illinois denied her petition for leave to appeal on September 30, 2009.

After exhausting her state court post-conviction remedies under the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.,* Harris brought a habeas petition pursuant to 28 U.S.C. § 2254(d)(1) in the United States District Court for the Northern District of Illinois. After the district court denied her petition for a writ of habeas corpus, on October 18, 2012, the United States Court of Appeals for the Seventh Circuit reversed the district court's denial with instructions to grant the writ unless the State elected to retry Harris within 120 days after issuance of the mandate. *See Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012). The mandate issued on December 3, 2012, and on February 25, 2013, the State released Harris from prison on bond. On June 17, 2013, the Cook County's State's Attorney dismissed all charges against Harris, and on January 25, 2014, the Circuit Court of Cook County granted Harris a Certificate of Innocence pursuant to 735 ILCS 5/2-702. Harris filed the present lawsuit on June 12, 2014.

Once the Executive Committee reassigned this matter on February 17, 2017, and prior to the jury trial, the Court ruled on over 30 written motions in limine, most of which involved detailed analyses that the Court issued via written orders. The Court also issued written orders concerning numerous expert motions brought pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and conducted an evidentiary hearing in relation to Harris' false confession expert, Dr. Richard Leo. In addition, the Court considered oral evidentiary motions before and during trial.[2] The Court also conducted pre-trial and jury instruction conferences on September 12, 2017 and October 11, 2017, during which the Court carefully considered the parties' proposed jury instructions and made rulings on many of

---

[2] The Court incorporates its prior rulings to the extent relevant to the issues presently before the Court.

the instructions. The Court held the final jury instruction conferences during the last days of trial after the parties had proffered the majority of the trial testimony and documentary evidence. The jury instruction process was an ongoing, collaborative effort starting at the end of June 2017 and ending in mid-November 2017 when the Court instructed the jury. The Court instructed the jury on the following claims: (1) a Fourteenth Amendment due process fabricated evidence claim; (2) a Fourteenth Amendment due process coerced confession claim; (3) a constitutional failure to intervene claim; (4) a constitutional conspiracy claim; (5) a state law malicious prosecution claim; (6) a state law intentional infliction of emotional distress claim; and (7) a state law conspiracy claim. The jury found for Defendants on each of these claims.

## LEGAL STANDARD

Under Rule 59(a), a "new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (citation omitted); *see also Prime Choice Servs., Inc. v. Schneider Logistics Transloading & Distrib., Inc.*, 861 F.3d 633, 635 (7th Cir. 2017). "The district court has the discretion to 'grant a new trial on all or some of the issues – and to any party,' and a new trial should be granted if a prejudicial error occurred[.]" *Hillmann v. City of Chicago,* 834 F.3d 787, 793 (7th Cir. 2016) (internal citation omitted). The Seventh Circuit reviews the denial of Rule 59(a) motions for an abuse of discretion. *Haze v. Kubicek,* 880 F.3d 946, 950 (7th Cir. 2018). In general, a district court abuses its discretion when no reasonable person would agree with its rulings. *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018).

The Seventh Circuit considers "a district court's jury instructions with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the

jury." *Doornbos v. City of Chicago*, 868 F.3d 572, 580 (7th Cir. 2017); *see also Sanchez v. City of Chicago*, 880 F.3d 349, 355 (7th Cir. 2018) ("We review *de novo* whether a challenged jury instruction fairly and accurately summarized the law, but the trial court's decision to give a particular instruction is reviewed for an abuse of discretion.") (citation omitted). "If an instruction is legally deficient, a new trial is required only if the flawed instruction could have confused or misled the jury causing prejudice to the complaining party." *Doornbos,* 868 F.3d at 589; *see also Armstrong v. BNSF Ry. Co.,* 880 F.3d 377, 381 (7th Cir. 2018).

Courts consider evidence unfairly prejudicial if it induces jurors to decide a case on an improper basis, such as an emotional one. *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 634 (7th Cir. 2018). To obtain a new trial, where a party "is complaining that the district court committed an evidentiary error, he must establish not only that the court's decision was unreasonable but that the error in admitting or excluding the evidence in question affected his substantial rights." *United States v. Whiteagle*, 759 F.3d 734, 756 (7th Cir. 2014). Put differently, "to warrant a new trial, an evidentiary error must affect the losing party's substantial rights – that is, there must be a significant chance that the flawed ruling affected the outcome of the trial." *Thorncreek Apartments III*, 886 F.3d at 634.

## ANALYSIS

In her Rule 59(a) motion for a new trial, Harris makes the following arguments: (1) a confluence of errors resulted in negating her Certificate of Innocence and rendered her trial unfair; (2) the Court erred in its rulings in relation to her son Diante Dancy's competency hearing and deposition testimony; (3) the Court erred in its Federal Rule of Evidence 404(b) ruling in relation to Defendant Bartik; and (4) the Court erred in restricting the testimony of three of Harris' expert witnesses. The Court addresses each argument in turn.

## I.      Certificate of Innocence and Related Rulings

In her motion for a new trial, Harris first argues that the Court's rulings concerning her

Certificate of Innocence ("COI"), along with other related rulings, rendered her trial unfair.  To

give context, in January 2014, the Chief Criminal Judge of the Cook County Circuit Court

granted Harris a COI pursuant to 735 ILCS 5/2-702.  Specifically, in September 2008, the

Illinois legislature enacted 735 ILCS 5/2-702, which "permits a person who served time in prison

on a conviction that is later set aside to seek a 'certificate of innocence' from the court that had

convicted him."  *Rodriguez v. Cook Cnty., Ill.,* 664 F.3d 627, 629 (7th Cir. 2011).  To obtain a

Certificate of Innocence under Section 2-702, the petitioner must prove by a preponderance of

evidence that:

> (1) [she] was convicted of one or more felonies by the State of Illinois and
> subsequently sentenced to a term of imprisonment, and has served all or any part
> of the sentence;
>
> (2)(A) the judgment of conviction was reversed or vacated, and the indictment or
> information dismissed or, if a new trial was ordered, either [she] was found not
> guilty at the new trial or [she] was not retried and the indictment or information
> dismissed; … ;
>
> (3) [she] is innocent of the offenses charged in the indictment or information or
> his or her acts or omissions charged in the indictment or information did not
> constitute a felony or misdemeanor against the State; and
>
> (4) [she] did not by his or her own conduct voluntarily cause or bring about his or
> her conviction.

735 ILCS 5/2–702(g); *People v. Fields,* 959 N.E.2d 1162, 1165 (1st Dist. 2011).  In *Fields*, the

Illinois Appellate Court stated "that the plain language of section 2–702 shows the legislature's

intent to distinguish between a finding of not guilty at retrial and actual innocence of the charged

offenses."  *Fields*, 959 N.E.2d at 1166; *see also Rudy v. People*, 984 N.E.2d 540, 543 (1st Dist.

2013).  The *Fields* decision further instructed "that in determining whether defendant showed by

a preponderance of evidence that he is innocent of the murders, the court was required to consider the materials attached to defendant's petition in support of his innocence claim … in relation to the evidence presented against him at both trials." *Fields*, 959 N.E.2d at 1166.

Harris' COI is a boilerplate form citing the language in Section 2-702(g) on which the Chief Criminal Judge checked the following boxes:

> After September 22, 2008, the Defendant/Petitioner's indictment or information was dismissed or s/he was acquitted, and Petitioner was filed within 2 years of the dismissal of the indictment or information or acquittal;

> The Defendant/Petitioner is innocent of the offenses charged in the indictment or information, or his/her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State[.]

(Pl.'s Trial Ex. #1.) The remainder of Section 2-702(g)'s language is stated on Harris' COI form.

In January 2017, Defendant Officers filed a motion in limine seeking to bar any reference to Harris' COI. In Harris' legal brief in response to the motion to bar, she argued that "the jury's primary focus should be on whether the Police Defendants fabricated incriminating evidence, Ms. Harris's confession, coerced her into reciting this false statement, and whether the Police Defendants conspired against her to maliciously prosecute and wrongfully inflicted emotion distress upon her." (R. 263, Resp. Brief, at 7.) The Court agreed in large part and denied Defendant Officers' motion to bar reference to Harris' COI in a written order on March 29, 2017. In that ruling, the Court stated:

> Plaintiff's certificate is relevant and admissible to demonstrate that Plaintiff's underlying criminal proceedings were terminated in her favor in relation to her malicious prosecution claim, *see Swick v. Liautaud,* 169 Ill.2d 504, 512 (Ill. 1996), as well as to her damages if Defendants argue that Plaintiff committed the crime. *See Kluppelberg,* 84 F.Supp.3d [741,] 746 [(N.D. Ill. 2015)](citing *Parish v. City of Elkhart, Ind.*, 702 F.3d 997, 1003 (7th Cir. 2012). Also, Plaintiff's Certificate of Innocence "may bear on the due process claim insofar as it is

needed to keep the jury's focus on the materiality issue as opposed to [plaintiff's] actual guilt or innocence." *Kluppelberg*, 84 F. Supp. 3d at 747.

….

Furthermore, the Court rejects Defendants' argument that the risk of unfair prejudice would substantially outweigh the highly probative Certificate of Innocence, especially because the Certificate of Innocence does not make any findings regarding the CPD Officer Defendants[.] *See Kluppelberg*, 84 F.Supp.3d at 747; *see also Common v. City of Chicago*, 661 F.3d 940, 947 (7th Cir. 2011) ("Evidence is 'unfairly prejudicial in the context of Rule 403 if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented.'") (citation omitted).

(R. 313, 3/29/17 Order, at 3-4.)

Despite this favorable ruling, Harris now argues that the Court's other rulings and "improper" COI jury instruction, along with Defendants' arguments, negated the weight of the COI in such a way that it caused her substantial prejudice. In particular, Harris maintains that the Court erred by:

- Providing an instruction about the COI with the effect of telling the jury that the COI had no bearing on the case, that the state court that issued the COI considered none of the same issues in granting the COI, that the jury should ignore the COI by focusing on evidence adduced in this case alone, and failing to instruct that the jury could properly consider the COI;

- Allowing the Defendants to question Ms. Harris about the basis for the Seventh Circuit opinion, *i.e.*, that Ms. Harris' then 5-year old son, Diante, should have been allowed to testify and that she had ineffective assistance of counsel, but not allowing Plaintiff to question her about other aspects of the opinion, such as that the Seventh Circuit strongly questioned the voluntary nature of her confession;

- Requiring Plaintiff to stipulate to or face a jury instruction regarding the two bases for the Seventh Circuit's habeas opinion; and

- Allowing Defendants to examine Ms. Harris about a response to a Request to Admit stating that no court had ever found her confession was coerced and allowing that response to be admitted into evidence.

(R. 457, Pl.'s Opening Brief, at 3.) The Court turns to each argument, as well as whether a "confluence of errors" rendered Harris' trial unfair.

## A.    COI Jury Instruction

In the last days of trial after the parties had presented the majority of their trial testimony and documentary evidence, the Court conducted final jury instruction conferences. Throughout the pre-trial process, the parties had submitted proposed jury instructions and made arguments in relation to the COI instruction. At the November 13, 2017 final jury instruction conference, the Court discussed the COI instruction with the parties, especially in light of conforming the instruction to the trial evidence. In doing so, the Court clarified:

> I do think it is important to tell the jury – given all of the testimony that we have heard and, quite frankly, given the title of the Certificate of Innocence that she has received, I do think it is important to tell the jury, given the focus that you have had on this during the trial, that the fact that she got this does not mean that the plaintiff has proven her case, essentially. It does not mean that – the Certificate of Innocence does not establish that the defendants here violated her constitutional rights or her state rights or that her confession was fabricated. Those are issues for the jury.

(11/13/17, JI Conf. Tr., at 10-11.) After considering the parties' arguments about the COI jury instruction, the Court carefully crafted the COI jury instruction as follows:

> You have heard evidence that Plaintiff Harris was awarded a Certificate of Innocence in the State court. The State court's decision to issue a Certificate of Innocence is not binding on you in this case.
>
> The State court decided different issues than those before you when issuing the Certificate of Innocence. The State court was not asked nor did it decide the issue of whether Plaintiff's constitutional rights were violated or whether the Defendants engaged in any misconduct under state or federal law. The State court was not asked nor did it decide the issue of whether Plaintiff's confession was false, fabricated or coerced. These are issues for you alone to decide. You have listened to and heard all the evidence in this case and are to decide this case based on the evidence you heard in this case and this case alone.

(R. 443, Final JI, at 31.)

In her new trial motion, Harris does not argue that this jury instruction, alone, is legally deficient. *Ernst v. City of Chicago,* 837 F.3d 788, 794 (7th Cir. 2016) ("District courts have

substantial discretion in how to precisely word jury instructions, provided that the final result, read as a whole, is a complete and correct statement of the law.").  Indeed, the Court based the COI jury instruction on Illinois statutes and case law, along with the Seventh Circuit Civil Pattern Jury Instructions.  More specifically, the second sentence of the jury instruction is consistent with Illinois statutory law, namely, "[t]he decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings."  735 ILCS 5/2-702(j).  The first three sentences of the second paragraph are also accurate legal statements under Illinois law because the Circuit Court judge who granted Harris' petition for a Certificate of Innocence was required to consider Harris' petition in relation to the evidence presented at her 2005 criminal trial for first-degree murder.  *See Fields*, 959 N.E.2d at 1166.  Thus, although the prosecution and defense counsel offered evidence about Harris' confession at her 2005 criminal trial, including certain Defendant Officers' conduct in relation to her interrogation, the parties did not present evidence on the issues of accidental strangulation or false confessions and the judge instructed the jury as to the first-degree murder charge, not that Defendant Officers fabricated evidence or coerced Harris' confession.  *See People v. Harris*, 904 N.E.2d 1077, 1092-95, 1098 (1st Dist. 2009).  Moreover, at the January 23, 2014 hearing for Harris' Certificate of Innocence – at which the State took no position – Circuit Court Judge Paul Biebel stated that he had read the petition for a Certificate of Innocence and that he was familiar with the claims and general history of the case before granting the petition.  (R. 219-3, 1/23/14 Hr'g Tr., at 3.)  Finally, the Court based the last two sentences of the COI jury instruction on Seventh Circuit Civil Pattern Instruction 1.01, Functions of the Court and the Jury.  These sentences are also consistent with other jury

instructions explaining that the jury must consider all the evidence in this case.  (R. 443, Final JI ## 3, 7, 10.)

Although the COI instruction accurately states the law, for the sake of completeness, the Court turns to Harris' argument that it misled the jury and was confusing.  *See Doornbos,* 868 F.3d at 580 ("If an instruction is legally deficient, a new trial is required only if the flawed instruction could have confused or misled the jury causing prejudice.").  In particular, Harris contends that the COI instruction was flawed because "[i]t failed to properly balance the COI's admissibility and the jury's obligation to consider it as proper evidence with Defendants' desire to abrogate its meaning."  (Opening Brief, at 10-11).  Simply put, Harris is arguing that the jury instruction did not mention that the COI could be considered as evidence.  That the instruction did not tell the jury that Harris' COI was evidence to be considered is a non-starter because not only was the COI admitted into evidence in front of the jury, there was no indication from the Court nor the parties that it was not evidence to be considered.  Rather, defense counsel spent a considerable amount of time and energy attacking this evidence.  Moreover, Harris' counsel discussed the COI in both opening statements and closing arguments.  At closing, for example, Harris' counsel stated:

> Now, when I first spoke to you during opening statements, I told you that three steps had to occur for Nicole Harris to begin – to begin – to awake from the nightmare that these defendants have created in her life.  Step No. 1 was the appellate court telling the trial court to release her or retry her; and, Step No. 2, the Cook County State's Attorney's Office, who had prosecuted her, dismisses all charges against her and her conviction is vacated.  Step No. 3 occurs when the chief judge of all the criminal courts of Cook County issues Nicole a Certificate of Innocence.
>
> I'm going to say the whole word:  Certificate of Innocence.  Because the defendants only want to say a certificate.  They don't like the full word.  It's a Certificate of Innocence.  And she was granted it without objection from the Cook County State's Attorney's Office and without opposition.  And they had every right to oppose it, and they did not.

(11/16/17 p.m. Trial Tr., at 136-37.)

As the parties acknowledge, district courts are not required to give an "idealized set of perfect jury instructions." *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.,* 677 F.3d 781, 791 (7th Cir. 2012) (citation omitted). Before and during trial, the Court and the parties worked closely together to fashion the jury instructions, including the COI instruction. The COI instruction fairly and accurately summarized the law. "[E]xamining the instructions as a whole, in a common sense manner," *Saathoff v. Davis,* 826 F.3d 925, 932 (7th Cir. 2016), Harris has not shown that the Court abused its discretion in instructing the jury as such. *Karahodzic v. JBS Carriers, Inc.,* 881 F.3d 1009, 1016 (7th Cir. 2018) ("The trial court's decision to give a particular instruction is reviewed for an abuse of discretion.").

## B.    Habeas Decision

Next, Harris contends that the Court's erroneous rulings in relation to the Seventh Circuit's decision resulting in the grant of Harris' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1), further muddied the waters in relation to her COI. *See Harris v. Thompson,* 698 F.3d 609, 613 (7th Cir. 2012). In general, federal habeas corpus proceedings are civil matters that are brought separately from the underlying criminal case after the petitioner has exhausted his or her state court remedies. *United States v. Wilkozek,* 822 F.3d 364, 368 (7th Cir. 2016) (citing *United States v. Morgan,* 346 U.S. 502, 506 n.4 (1954)); 28 U.S.C. § 2254(b)(1). It is well-established that in "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68 (1991). With these standards in mind, the Seventh Circuit addressed Harris' constitutional arguments that the trial court's exclusion of her then 5-year-old son Diante Dancy's testimony from her criminal trial violated her Sixth Amendment right to present

witnesses in her own defense and that she received constitutionally ineffective assistance of counsel at Diante's competency hearing. The Seventh Circuit reversed the district court's denial of Harris' habeas petition with instructions to grant the writ stating:

> A court's exclusion of defense evidence violates the Compulsory Process Clause of the Sixth Amendment where the evidence is material to the outcome of trial and the application of the evidentiary exclusion is arbitrary or disproportionate to the state's legitimate interests promoted by the rule. Although Diante and his testimony posed challenges, the complete exclusion of this critical exculpatory evidence in this case was arbitrary and disproportionate to the truth-seeking and reliability concerns advanced by witness competency restrictions. We review this issue *de novo* because it was not addressed by the Illinois courts.[3] The disqualification of Diante as a witness violated Harris's Sixth Amendment right to present a complete defense.
>
> We also conclude that trial counsel's serious errors in the competency hearing deprived Harris of the right to effective counsel. As the only eyewitness to Jaquari's death, Diante's testimony was essential to Harris's defense. His competency hearing was crucial, but Harris's counsel was not ready for it: he did not interview Diante, he did not secure the presence of a witness who would have shown that Diante's recollections of what happened were consistent and credible, and he did not correct the trial court's misapplication of the burden of proof. Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny, each of these mistakes—lack of investigation, failure to secure a key witness, and ignorance of applicable law—amounted to constitutionally deficient performance of defense counsel. If counsel had taken simple and obvious steps to prepare for the hearing, it is reasonably likely that Diante would have been deemed competent. And if the jury had heard his testimony, there is a reasonable probability that the outcome of the trial would have been different. In concluding that Harris was not prejudiced by her counsel's errors at the competency hearing, the state appellate court unreasonably applied *Strickland*.

*Harris*, 698 F.3d at 613.

## 1. Trial Questions

Harris asserts that the Court erred by allowing Defendants' counsel to question Harris at trial about the basis of the Seventh Circuit's habeas decision, namely, that Harris' son Diante

---

[3] When no state court has squarely addressed an exhausted habeas claim, federal habeas courts review the claim pursuant to 28 U.S.C. § 2243 instead of the more deferential standard of review set forth in 28 U.S.C. § 2254(d). *See Adorno v. Melvin*, 876 F.3d 917, 921 (7th Cir. 2017); *Carrion v. Butler*, 835 F.3d 764, 772 (7th Cir. 2016).

should have been allowed to testify at her criminal trial and that her attorney rendered constitutionally ineffective assistance of counsel, but not allowing questions about the Seventh Circuit's discussion in relation to the voluntary nature of her confession. She further argues that these questions, and the omissions of others, left the jury with the impression that neither the Cook County States' Attorney's later dismissal of the charges against her nor the issuance of her COI were based on her innocence or how her confession was obtained. Rather, Harris contends that this evidence suggested that that the only reason Harris was released from custody was because of mere technicalities.

At trial, Harris' counsel did not object to Defendants' question about the Seventh Circuit's opinion in relation to the exclusion of Diante's testimony at her criminal trial. Although counsel objected to the question concerning trial counsel's constitutionally ineffective assistance of counsel – an objection the Court overruled based on relevancy and completeness – when asked about this reason, Harris testified that she could not remember. On re-direct examination, Harris' counsel then asked Harris about the habeas decision stating "do you remember if that court made any statements about the reliability about your confession in this case?" (R. 479, Ex. A, at 470.) Defense counsel objected, and the Court sustained the objection based on juror confusion under Federal Rule of Evidence 403, and that it was not proper rebuttal evidence.

The language in the decision at issue relates to the State of Illinois' argument that the exclusion of Diante's testimony was merely harmless error, which ignores the constitutional inquiry of "whether the exclusion of the evidence had a reasonable probability of affecting the outcome of trial[.]" *Harris*, 698 F.3d at 630. In this context, the Seventh Circuit reasoned:

> Here, we do not ask whether Diante's testimony would have overwhelmed the
> probative value of Harris's videotaped confession, nor even whether the jury

would more probably than not have credited Diante's eyewitness account over the confession. An appellate court does not engage in such apples-to-oranges evidentiary comparisons. Our task is simply to ask whether, if Diante had testified, there is a reasonable probability the jury would have returned a different verdict.

We are confident that the answer is yes. The videotaped confession was powerful evidence, but the jury had reasons to question its reliability, too—reasons in line with leading research on false confessions. The jury knew the confession was the product of interrogation stretching over 27 hours at the police station. Cf. Saul M. Kassin et al., Police–Induced Confessions: Risk Factors and Recommendations, 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to ... extract confessions"). The jury knew Harris did not have an attorney present during this questioning and that, as a mother who had just lost her son, she was under stress and stricken with grief. Cf. Gisli H. Gudjonsson et al., Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth, 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police). The jury knew that Harris's initial, unwarned confession was inconsistent with the physical evidence—she said she had used the telephone cord. Only in later confessions (and after many more hours of interrogation) did she correct this curious discrepancy. See Brandon L. Garrett, The Substance of False Confessions, 62 Stan. L.Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation."). The jury also heard Harris testify that she had spent a sleepless night handcuffed in the interrogation room and that the police had threatened her, pushed her, called her names, and deprived her of food, water, and access to the bathroom, though she had said otherwise in the recorded confession.

These warning signals were not enough to overcome the videotaped confession at trial. But they might well have been enough if the jury had considered them along with Diante's testimony, which would have changed the entire tenor of the defense case. The theory of accidental death would have been buttressed by an actual eyewitness—the only person, according to the defense, who was present when Jaquari died. Such testimony "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." In this light, the circumstances of Harris's interrogation and the possibility of a false confession may well have given the jury greater pause. In sum, Diante's testimony was significant enough to be reasonably likely to have changed the outcome of the trial. Diante's testimony would have been material and favorable to Harris's defense.

*Harris,* 698 F.3d at 631-32 (internal citations and footnote omitted).

In summary, the Seventh Circuit addressed the reliability of Harris' confession by interpreting the facts presented at her criminal trial – in light of § 2254(e)(1)'s presumption that the Illinois Appellate Court's factual determinations were correct. The Seventh Circuit then applied the facts to the Sixth Amendment inquiry and concluded that the "warning signals" were not enough to overcome her videotaped confession at trial, but that Diante's testimony would have changed the "tenor" of the theory of the case, namely, that Jaquari's death was accidental.

The danger of potential juror confusion in admitting the Seventh Circuit's discussion about false confessions substantially outweighed Harris' counsel probing into this complicated constitutional analysis made on federal habeas review. *White v. Hefel,* 875 F.3d 350, 355 (7th Cir. 2017) (Rule 403 "permits exclusion of relevant evidence if its probative value is substantially outweighed by the danger of confusing the issues."). The Court's ruling based on juror confusion is further underscored by Harris' argument in her motion in limine to bar Defendants from calling her post-conviction attorneys from testifying at trial, in which she stated that her habeas petition involved "an entirely different civil proceeding with entirely different claims and defenses," and thus, "[a]rguments in the habeas case are likely to confuse and distract the jury." (R. 218, Pl.'s MIL #6, at 23.) Equally important, at trial, Harris' counsel presented evidence that her confession was coerced, along with a false confession expert, and it was the jury's role to decide whether the Defendant Officers coerced Harris' confession – not the federal habeas court's role. Accordingly, Harris has not met her burden of establishing that the Court abused its discretion in excluding this evidence, let alone that any such error affected Harris' substantial rights. *See Davies v. Benbenek*, 836 F.3d 887, 889 (7th Cir. 2016) ("We review the district court's evidentiary rulings for abuse of discretion and will reverse only if 'no reasonable person could take the view adopted by the trial court.'") (citation omitted); *Sanchez*, 880 F.3d at

359 ("An error is serious enough only 'if there is a significant chance that [it] affected the outcome of the trial.'") (citation omitted).

## 2. Stipulation

In a similar vein, Harris argues that the Court required her to stipulate to or face a jury instruction regarding the two bases for the Seventh Circuit's habeas opinion. To give background, during trial, on November 1, 2017, before the presentation of evidence, defense counsel requested that the Court give a jury instruction about the Seventh Circuit's holding that the state trial court's exclusion of Diante's testimony from Harris' criminal trial violated her Sixth Amendment right to present witnesses in her own defense and that she received constitutionally ineffective assistance of counsel in violation of the Sixth Amendment. This request was made in response to Harris' earlier testimony that she could not recall the Seventh Circuit's second ruling about ineffective assistance of counsel. Thereafter, Harris' counsel asked to see if "we could come up with a compromise on this" because "I understand that it has to come in somehow." (R. 481, 11/1/17 Trial Tr., at 2.) The Court then suggested "[m]aybe you can stipulate to it because the opinion is the opinion." (*Id.*) On November 14, 2017, the parties informed the Court that they had attempted to agree to a stipulation, and defense counsel stated that "if there's not an agreement to a stipulation, then we're going to offer a jury instruction on this." (R. 479, 11/14/17 Trial Tr., at 38-39.) Two days later, Harris' counsel confirmed that they had agreed to a stipulation regarding the Seventh Circuit's habeas decision. (R. 479, 11/16/17 Trial Tr., at 4.)

Based on these interactions with counsel, the Court would be hard-pressed to conclude that Harris was forced to stipulate to the Seventh Circuit's holding in her habeas case, especially because counsel acknowledged that "it has to come in somehow." In addition, the stipulation

was necessary and warranted based on Harris' testimony concerning the habeas ruling, as well as her counsel's comments about the habeas ruling in her opening statements and closing arguments. As such, Harris has not established that the Court erred in relation to the stipulation, to which Harris agreed.

### 3. Request to Admit

Harris also takes issue with the Court's ruling in relation to an admission she had made during discovery. In particular, during discovery, Defendants served Harris with a set of Requests to Admit, including No. 7, which stated: "No court has ever found that plaintiff's confession to murdering her son was coerced." (Defs.' Trial Ex. # 13.) Harris response was: "Admit." (*Id.*) In relation to testimony concerning Harris' COI and Harris' testimony about the Seventh Circuit's habeas decision, defense counsel sought to present this admission when Harris was on the stand. At first, the Court denied counsel's request, but after hearing more of Harris' testimony, counsel raised the issue the following day. Harris' counsel objected arguing that the jury would give it undue weight and it would cause juror confusion. (R. 479, Ex. A., at 28-29.) The Court overruled Harris' objection because it was admissible as an admission by a party-opponent under Federal Rule of Evidence 801(d)(2), relevant in light of other evidence presented at trial, and not confusing.

Here, Harris argues that by allowing her admission into evidence "after Defendants were able to repeatedly and incorrectly inform the jury that there were 'only two reasons' why the Seventh Circuit vacated [her] conviction, also contributed to the prejudicial and cumulative errors to warrant a new trial." (R. 481, Reply Brief, at 10.) Harris, however, does not sufficiently explain how the Court abused its discretion by allowing Harris' own statement into evidence, namely, that the Court "based its decision on an erroneous view of the law or a clearly

erroneous evaluation of evidence." *Watkins v. Trans Union, LLC*, 869 F.3d 514, 518 (7th Cir. 2017). Moreover, the Court properly informed the jury that they had to determine what weight, if any, to give the evidence. Without more, Harris has not shown that the Court abused its discretion in this respect, let alone that any such error had a substantial effect on the jury's verdict. *See Thorncreek Apartments III*, 886 F.3d at 634.

### 4. Closing Arguments

Harris further contends that during closing arguments, Defendants' counsel reiterated to the jury that the only basis for the Seventh Circuit's opinion was that Diante was not allowed to testify, which further exacerbated the Court's erroneous rulings in relation to the Seventh Circuit's habeas decision. In particular, defense counsel argued:

> She got the gift of her life when her conviction got vacated simply because the Seventh Circuit said Diante should test— could be allowed to testify. Great. Let him testify. She got the gift of her life when the State's Attorney's Office decided not to retry her.

(11/16/17, Trial Tr., at 46.) First, Harris' counsel did not object to this argument. *Hamdan v. Indiana Univ. Health N. Hosp., Inc.,* 880 F.3d 416, 422 (7th Cir. 2018) (failure to object to statement made in closing argument waives challenge). Second, even if counsel had objected to this argument, the Court clearly instructed the jurors that statements made in closing arguments are not evidence for them to consider, *see id.*, and it is well-established that courts presume juries follow jury instructions. *See Thorncreek Apartments III,* 886 F.3d at 635; *Wilson v. City of Chicago*, 758 F.3d 875, 884 (7th Cir. 2014). Harris' argument based on Defendants' closing argument is misplaced.

### C. Confluence of Errors

Based on the Court's rulings in relation to the COI jury instruction and Seventh Circuit's decision in her habeas matter, Harris argues that this "confluence of errors" resulted in negating

her COI and rendered her trial unfair. *See Sanchez,* 880 F.3d at 355 (a new trial is appropriate "if the verdict stands against the weight of the evidence or if, for other reasons, the trial was not fair to the losing party."). Specifically, Harris argues:

> Repeatedly telling the jury (1) that the basis for the vacation of Ms. Harris' criminal conviction was ***solely*** Diante's testimony and ineffective assistance of counsel; (2) that "no court has found Ms. Harris' confession was coerced;" and then instructing that the state court did ***not*** address (and by implication, did not consider) any of the same issues when granting the COI; that the COI is not binding on the jury and only the evidence from this case is to be considered; and then (4) omitting any instruction that the jury legally ***could*** consider the COI in determining the claims, substantially and unfairly prejudiced Ms. Harris.

(Opening Brief, at 13) (emphasis in original).

To show that the jury verdict stands against the manifest weight of the evidence, Harris must establish that "no rational jury" could have rendered the verdict. *See Flournoy v. City of Chicago*, 829 F.3d 869, 874 (7th Cir. 2016); *Saathoff*, 826 F.3d at 932. Harris has not made any such arguments, but instead asserts that the Court's erroneous rulings rendered her trial unfair. Although "errors that are harmless in isolation may, in the aggregate, become harmful," to establish "harm, a party must show that 'the multiple errors so infected the jury's deliberation that they denied the [party] a fundamentally fair trial.'" *Sanchez,* 880 F.3d at 361 (internal citation and citation omitted). The Seventh Circuit teaches that when determining if otherwise harmless errors deprived a litigant of a fundamentally fair trial, "we examine the error in light of the entire record, and a new trial will be granted only if we are unable to say with fair assurance that the error did not substantially sway the jury." *Barber v. City of Chicago*, 725 F.3d 702, 715 (7th Cir. 2013).

As discussed, Harris has not shown that the Court committed any errors, let alone harmless errors. *See Smego v. Payne,* 854 F.3d 387, 391 (7th Cir. 2017); Fed.R.Civ.P. 61. Therefore, looking at the record as a whole, Harris' argument that the cumulative errors denied

her a fundamentally fair trial is unsupported. *See Baugh v. Cuprum S.A. de C.V.,* 845 F.3d 838, 848 (7th Cir. 2017). Last, Harris points to certain arguments or rulings to which she did not object at trial, but any such strategic decisions cannot be a basis for a new trial. *See Sanchez*, 880 F.3d at 360. Accordingly, the Court denies this aspect of Harris' Rule 59(a) motion for a new trial because she has failed to establish that the Court's alleged errors in relation to her COI and the Seventh Circuit's habeas decision rendered her trial unfair.

## II.    Diante's Testimony

As mentioned, Harris' son Diante was present at the time of his brother Jaquari's death. Diante was 5 years old at the time. Diante is now attending an out-of-state college. Instead of calling her son as a live witness at trial, Harris made the strategic decision to deem him unavailable and offer his testimony via deposition designations pursuant to Federal Rule of Evidence 804(b)(1). In advance of trial, the Court ruled on the parties' deposition designations.

### A.    Competency Hearing Testimony

As discussed above, the state court judge held a competency hearing in the underlying criminal case to determine whether Diante could testify at Harris' criminal trial. In her motion for a new trial, Harris argues that the Court erred by not allowing Diante's competency hearing testimony into evidence. More specifically, before presenting her expert witness – who would testify about Diante's competency – Harris sought admission of Diante's competency hearing testimony as "prior consistent" testimony under Federal Rule of Evidence 801(d)(1)(B)(i). (11/09/17 a.m. Trial Tr., at 4-5; 11/09/17 p.m. Trial Tr., at 7-8.) Under Rule 801(d)(1)(B)(i), "[p]rior consistent statements that are offered to rebut a charge of recent fabrication or improper influence or motive are not hearsay." *Miller v. Greenleaf Orthopedic Assocs., S.C.*, 827 F.3d 569, 574 (7th Cir. 2016) (citation omitted); *see.,e.g., Whitlock v. Brueggemann,* 682 F.3d 567,

575 (7th Cir. 2012). More specifically, "[a] prior statement does not fall within Rule 801(d)(1)(B), even if it is consistent with the witness's in-court testimony, unless it has some potential to rebut the alleged link between the in-court testimony and the witness's recent improper motive." *Miller*, 827 F.3d at 574. Rule 801(d)(1)(B) is not designed to permit impermissible bolstering of a witness' testimony. Instead, prior consistent statements are only admissible to rehabilitate a witness after an assertion of recent fabrication or improper influence or motive.

In addressing Harris' argument about Diante's competency hearing testimony under Rule 801(d)(1)(B)(i), the Court explained:

> It is a witness and it is a prior consistent statement, but the problem is I do not see you meeting (d)(1)(B)(i). You cannot just bring in any prior consistent statements. It has to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying.
>
> And I have not heard questioning suggesting that the defendants are arguing that Diante recently fabricated or acted from a recent improper influence or motive.

(11/09/17 p.m. Trial Tr., at 8.) The Court based its ruling on the fact that in questioning Diante, defense counsel did not challenge Diante's testimony as fabricated or that he acted with a recent improper motive. In short, Rule 801(d)(1)(B)(i) was not implicated by Diante's testimony presented at trial.

In her present motion, Harris contends that the Court should have admitted Diante's competency hearing testimony because it "was the most cogent and detailed explanation of what he observed[.]" (Opening Brief, at 15.) Rule 801(d)(1)(B)(i) is not that broad. *See Tome v. United States*, 513 U.S. 150, 157 (1995) ("The Rules do not accord this weighty, nonhearsay status to all prior consistent statements."). Harris further argues that Diante's prior consistent statements were admissible as rebuttal because Defendants raised the issue that Diante's

recollection and testimony may have been influenced by "lawyers, or psychologists or psychiatrists or interviewers" since Jaquari's death. (R. 423, Diante Dep., at 42.) Not only did Harris fail to make this argument at trial, but this line of questioning was part of Harris' own initial deposition designations. Also, Harris' counsel does not link this question to the exact deposition testimony that Diante's earlier competency hearing testimony would have rebutted.

Moreover, Harris' expert Dr. Galatzer-Levy testified about his reliance on Diante's competency hearing testimony, which was admissible because experts may rely on hearsay in forming their opinions. *See* Fed.R.Evid. 703; *Tilstra v. BouMatic LLC,* 791 F.3d 749, 753 (7th Cir. 2015) ("an expert witness is not required to verify all the facts on which he relies; he can rely on hearsay … provided[ that such reliance is an accepted practice in his profession[.]"). In fact, Dr. Galatzer-Levy testified about Diante's competency hearing testimony in detail, including specific testimony Diante gave, such as "Jaquari was playing with that string and wrapping it around his neck." (11/09/17 p.m. Trial Tr., at 42-56.)

Harris also argues that the Court erred by not admitting Diante's competency hearing testimony into evidence under Federal Rule of Evidence 804(b)(1). Harris, however, does not point to the record where she raised this argument and the Court's resultant ruling.[4] Nonetheless, at trial, on November 9, 2017, after the Court ruled on Harris' Rule 801(d)(1)(B)(i) argument, Harris' counsel questioned why the competency hearing testimony could not come into evidence because Diante was unavailable. The Court responded "[t]hat is a different issue – you have never raised that with me." (R. 11/09/17 p.m. Trial Tr., at 10.) The Court further clarified:

> His unavailability, you have put on his testimony already through his deposition. That is why I let you put on the deposition testimony. This would be a second –

---

[4] The Court notes that on appeal, any failure to provide transcripts or documents reflecting the Court's decisions as required under Federal Rule of Appellate Procedure 10(b)(2) may result in forfeiture of that argument. *See Hall v. Jaeho Jung,* 819 F.3d 378, 382-83 (7th Cir. 2016).

more testimony, a second bite. I do not think the rule calls for that. And I have not heard that argument. The argument I got was prior consistent statement.

(*Id*.) After this explanation, Harris' counsel stated "Okay." (*Id*.)

Assuming Harris' statement made in open court constitutes an objection, and thus, is not waived, *see Walker v. Groot*, 867 F.3d 799, 805 (7th Cir. 2017), Harris does not explain how the Court abused its discretion, namely, that no reasonable person would agree with the Court's ruling. *See Dunn*, 880 F.3d at 905. Also, under Rule 804(b)(1), former testimony is admissible when a witness is unavailable and if the testimony is offered against a party who had both an opportunity and a similar motive to develop that witness' testimony on direct or cross-examination. *See United States v. Salerno*, 505 U.S. 317, 322 (1992); *Kubsch v. Neal*, 838 F.3d 845, 874 (7th Cir. 2016) (dissent). In her opening legal memorandum, Harris' counsel argues that Diante was unavailable because he was at an out-of-state college during trial, but failed to argue in any detail how Defendants (or their predecessor-in-interest) had an opportunity and similar motive to develop Diante's competency hearing testimony until her reply brief. *See Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 768 (7th Cir. 2018) ("Arguments raised for the first time in a reply brief are waived."). Moreover, in her reply brief, Harris did not specifically address the factors courts consider when determining whether Defendants or their predecessor-in-interest had a similar motive to develop Diante's prior testimony. *See Volland-Golden v. City of Chicago*, 89 F. Supp. 3d 983, 988 (N.D. Ill. 2015) (citing *United States v. Feldman,* 761 F.2d 380 (7th Cir. 1985)). As such, Harris' perfunctory and undeveloped arguments are waived. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 718 (7th Cir. 2017).

Further, the Court admitted Diante's deposition testimony from this case because Harris elected not to call her son as a live witness at trial. Because Diante attends an out-of-state college that is beyond the 100 mile radius provided by Federal Rule of Civil Procedure

45(c)(1)(A), he was beyond the Court's subpoena power. The Court admitted Diante's deposition testimony after addressing the parties' deposition designations and objections. As such, Harris does not get to submit cumulative testimony from Diante's competency hearing.

In addition, Harris does not argue that the Court's evidentiary ruling affected her substantial rights, namely, that there was "a significant chance that the flawed ruling affected the outcome of the trial," *Thorncreek Apartments III*, 886 F.3d at 634, especially in light of Dr. Galatzer-Levy expert testimony discussing certain aspects of Diante's competency hearing testimony. Without more, Harris has not met her burden of showing that the Court's evidentiary ruling concerning Diante's competency hearing testimony was flawed, and thus warranted a new trial. *See Thorncreek Apartments III*, 886 F.3d at 634.

## B. Deposition Testimony Admitted At Trial

As noted above, Harris presented Diante's January 18, 2016 video deposition at trial because Diante was unavailable to testify. *See* Fed.R.Evid. 804(a), (b)(1). In the present motion for a new trial, Harris asserts that the Court erred in admitting portions of Diante's deposition testimony because the testimony lacked foundation and was speculative. Specifically, Harris maintains that during Diante's videotaped deposition, Defendants asked him if he recalled his interviews with Alexandra Levy at the Children Advocacy Center and with Dr. Galatzer-Levy, to which Diante answered no. (R. 423, 1/18/16, Diante Dep., at 58, 123, 134.) Nonetheless, Defendants also questioned Diante about notes concerning his 2005 interview with Alexandra Levy and his 2006 interviews with Dr. Galatzer-Levy.

In relation to Diante's interview with Alexandra Levy, defense counsel asked Diante "you have no reason to dispute that you told Alexandra Levy at the Children's Advocacy Center that your mom whooped Jaquari, correct?" to which Diante replied "yes." (1/18/16, Diante Dep.,

at 135.)  In response to Defendants' deposition designations, Harris argued that Diante's testimony about his mother spanking Jaquari lacked a proper foundation not only because Diante did not remember his interview with Alexandra Levy, but also because counsel asked Diante this question in a "vacuum."  Defense counsel, however, set forth the following foundation before asking Diante this question:

> Q: Sure, Is it fair to say that you also do not remember telling – if you told Ali Levy that you saw your mom spanking Jaquari with a belt?
>
> A: Yes.
>
> Harris' counsel:  I'm just not clear how that came out.  For the transcript purposes, would you mind reading that?  (Record read as requested)
>
> Harris' counsel: Thank you.
>
> Defense counsel: But you have no reason to doubt that you said that, correct?
>
> A: Correct.
>
> Q: And you actually remember being struck with a belt, correct?
>
> A: Yes.
>
> Q: And you have no reason to dispute that you told Alexandra Levy at the Chicago Children's Advocacy Center that your mom whooped Jaquari, right?
>
> A: Yes.
>
> Q: And that was a word that you would use?
>
> A: Yes

(Diante Dep., at 135: 1-22.)  Under these circumstances, counsel set forth a proper foundation when asking Diante this question, including whether Diante remembered his mother hitting him, despite Diante not remembering his interview with Alexandra Levy.

Harris also challenges defense counsel's questions to Diante regarding his interviews with Dr. Galatzer-Levy.  To give context, Diante reviewed the transcripts of his 2006 interviews

with Dr. Galatzer-Levy in preparation for his January 2016 deposition.  At his January 2016 deposition, Diante was reading the transcript of an interview when counsel asked:  "So you read that – you told Dr. [Galatzer] Levy that you guys got in trouble after he put the sheet around his neck" to which Diante answered "yes."  (*Id*. at 67: 4-6, 10.)  Counsel then asked "[a]nd you told Dr. [Galatzer] Levy that after the sheet was around Jaquari's neck, that's when you went outside," and Diante answered "yes."  (*Id*. at 67: 11-13, 17.)  Further, defense counsel asked Diante:  "And after you went outside is when your mom hit you with – hit you with a belt," and Diante answered "yes."  (*Id.* at 67: 18-20.)

At the deposition, Harris' counsel objected to this line of questioning by stating "[t]he exhibit speaks for itself."  (*Id*. at 67: 7-8, 15, 21-22.)  In Harris' objections to the deposition designations, she also objected based on foundation because Diante did not remember the interviews with Dr. Galatzer-Levy and because the testimony was cumulative.  First, "[a]s a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless."  *Jordan v. Binns*, 712 F.3d 1123, 1138 (7th Cir. 2013).  Second, at his deposition, Diante was reading the transcript of his interview with Dr. Galatzer-Levy and confirmed what the transcript stated, and therefore, Harris' objection based on foundation is without merit.

Once again, Harris does not adequately explain how the Court abused its discretion in allowing this testimony into evidence nor how any such error had a substantial effect on the jury's verdict.  *See United States v. Brown,* 871 F.3d 532, 536 (7th Cir. 2017) ("District judges have wide discretion over decisions to admit or exclude evidence; we will reverse only if no reasonable person could take the judge's view of the matter.").  Instead, Harris argues that this line of questioning left the jury with the impression that Diante was reaffirming the statements

Defendants attributed to him, when in fact, he had no memory of them.  Therefore, the Court's evidentiary rulings in relation to Diante's deposition testimony do not warrant a new trial.  *See Viramontes v. City of Chicago*, 840 F.3d 423, 430 (7th Cir. 2016) ("An error affects substantial rights only if there is a 'significant chance' that the ruling affected the trial's outcome.").

## III.     Defendant Bartik's Prior Bad Acts

Next, Harris argues that the Court erred in granting in part Defendants' motion in limine to bar prior bad acts evidence in relation to Defendant Officer Bartik pursuant to Federal Rule of Evidence 404(b).  Defendant Bartik administered Harris' polygraph examination on May 15, 2005, and the parties hotly disputed Defendant Bartik's alleged misconduct in administering and reviewing Harris' polygraph examination, along with his interactions with the other Defendant Officers.  In their motion in limine, Defendants moved to exclude Harris' proposed Rule 404(b) witnesses.  Harris proffered these witnesses to testify about Defendant Bartik's involvement in their own criminal cases in relation to allegations of coerced and fabricated confessions.

In the August 16, 2017 written ruling granting Defendant Officers' motion in part, the Court recognized that "Rule 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts for the purpose of proving a person's character or propensity to behave in a certain way, but permits the use of this evidence for other purposes . . . such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014) (en banc) (citing Fed. R. Evid. 404(b)).  In short, "[s]uch evidence is not admissible to prove character, or propensity to act in a certain way[.]"  *United States v. Urena*, 844 F.3d 681, 684 (7th Cir. 2016).  On the other hand, other-act evidence is admissible if "the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed," and is sufficiently similar and recent in light of the

"specific purpose for which the other-act evidence is offered." *Gomez,* 763 F.3d at 853-55. As the Seventh Circuit instructs, "the district court should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the evidence is relevant to that purpose – or more specifically, how the evidence is relevant without relying on a propensity inference." *Id*. at 856. Moreover, "[i]f the proponent satisfies the initial burden, the District Court must then undertake an analysis under Rule 403 of the Federal Rules of Evidence to determine whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice, taking into account the extent to which the non-propensity purpose is actually at issue in the case." *Urena*, 844 F.3d at 684.

In response to Defendant Officers' Rule 404(b) motion, Harris asserted that evidence about Defendant Bartik's prior conduct in allegedly coercing confessions and fabricating evidence was not propensity evidence, but went to her theory of the case that she did not voluntarily confess to killing her son. Specifically, she argued that Defendant Bartik – and other Defendant Officers – coerced and fabricated her confession, which included Defendant Bartik's use of the polygraph examination and its results. Harris then asserted that these other instances of Defendant Bartik's misconduct went to his plan, opportunity, motive, modus operandi, or state of mind. Harris specifically argued that Defendant Bartik knew he could operate with impunity when conducting polygraph tests because he administered these tests without supervision and that he would receive high performance evaluations for the number of confessions he elicited. She also pointed to Defendant Bartik's testimony that the CPD had never disciplined him after juries found criminal defendants not guilty despite their confessions to him to support her "other purposes" argument.

In rejecting Harris' arguments, the Court stated that "[a]lthough Defendant Bartik's testimony and evaluations possibly point to 'another purpose,' Plaintiff has failed to explain how she will present the Rule 404(b) witnesses' testimony to support her theory of the case without relying on a propensity inference."  (R. 382, 8/16/17, Order, at 4.)  The Court further concluded that Harris did not connect evidence of Defendant Bartik's plan, opportunity, motive, modus operandi, or state of mind to the Rule 404(b) witnesses' testimony without the propensity inference that Defendant Bartik's alleged misconduct in the past shows that he coerced and fabricated Harris' confession in this lawsuit.  *United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) ("Rule 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts for the purpose of proving a person's character or propensity to behave in a certain way.").  In addition, the Court noted that Harris did not address whether the other act evidence she sought to present "is sufficient for *the jury* to find by a preponderance of the evidence that the other act was committed."  *Gomez,* 763 F.3d at 854 (emphasis in original).  The Court then weighed the evidence under Rule 403 as follows:

> [W]hatever probative value it may have is substantially outweighed by the "risk that the jury will draw the forbidden propensity inference rather than an allowable one." *United States v. Lawson*, 776 F.3d 519, 521 (7th Cir. 2015). Moreover, evidence about these other lawsuits "has a significant potential to mislead the jury into attempting to decide those cases" and "could lead to distracting and time consuming mini-trials regarding the merits of these other allegations."  *Patterson v. City of Chicago*, No. 15 C 4139, 2017 WL 770991, at *4 (N.D. Ill. Feb. 28, 2017).

(R. 382, 8/16/17 Order, at 5.)

In the present new trial motion, Harris argues that the Court erred when it determined that she had "failed to explain how she will present the Rule 404(b) witnesses' testimony to support her theory of the case without relying on a propensity inference."  Instead of articulating why the Court's ruling was legally incorrect or how the Court abused its discretion,

Harris makes many of the same arguments she made in response to Defendant Officers' Rule 404(b) motion in limine, therefore, Harris has not met her burden for establishing the need for a new trial based on these repeated Rule 404(b) arguments. *See, e.g., Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2013 WL 4506004, at *24 (N.D. Ill. Aug. 23, 2013).

Harris, however, also contends that Defendants opened the door to allowing such evidence by repeatedly down-playing any role Defendant Bartik may have had in the alleged constitutional deprivations because he was "just" the polygraph examiner.[5] In doing so, Harris now argues that the average juror would find it difficult to understand why the polygraph examiner had anything to do with eliciting a false confession rather than simply administering the polygraph examination. Thus, Harris argues, allowing other act evidence of Defendant Bartik engaging in interrogations and eliciting false confessions would demonstrate "motive, opportunity, intent, preparation, and plan" – which Harris asserts is all propensity-free evidence. Specifically, Harris contends that testimony about the number of confessions that Defendant Bartik obtained and providing evidence of other times Defendant Bartik took it upon himself to do more than simply administer a routine polygraph exam would have demonstrated to the jury that the polygraph examiner could join in a conspiracy to violate her constitutional rights. The proffered Rule 404(b) witnesses, however, were not necessary to testify about these factors. *See, e.g., United States v. Novak*, No. 13 CR 312, 2015 WL 881000, at *3 (N.D. Ill. Jan. 23, 2015). Equally important, Harris fails to elucidate how her Rule 404(b) witnesses – who assert that they were victims of Defendant Bartik's misconduct – would have testified without invoking any propensity inference.

As to the Court's Rule 403 balancing analysis, Harris argues that because defense counsel repeatedly asserted that Defendant Bartik was a mere polygraph examiner, the other

---

[5] Harris did not object or front this issue with the Court during trial.

acts evidence was highly probative and outweighed any potential prejudice. In making this argument, Harris relies on the Court's Rule 404(b) in limine ruling in *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3840336 (N.D. Ill. Aug. 30, 2011). Not only did the Court decide the *Hill* motions in limine three years before the Seventh Circuit issued the *Gomez* decision – which shifted the Rule 404(b) paradigm – but Harris does not describe how the Court abused its discretion in weighing the present Rule 404(b) evidence as such. *See United States v. Carson,* 870 F.3d 584, 598 (7th Cir. 2017) ("we give great deference to the district court's assessment of whether to admit evidence in light of Rule 404(b), and reverse only for an abuse of discretion").

Finally, Harris contends that a limiting instruction would have cured any such prejudice. "Although jury instructions may help reduce the risk of unfair prejudice from other-act evidence," if the party cannot explain how the other act evidence relates to a permissible use under Rule 404(b) "without resorting to a propensity inference, it would be unfair to expect the jury to do so based only on [a limiting] instruction." *United States v. Stacy*, 769 F.3d 969, 975 (7th Cir. 2014) (citation omitted). Because Harris did not sufficiently explain how the proffered evidence was relevant through a "chain of reasoning that does not rely on the forbidden [propensity] inference," *see Gomez,* 763 F.3d at 860, a curative limiting instruction does not come into play. Therefore, the Court, in its discretion, denies Harris' new trial motion based on the Court's Rule 404(b) ruling in relation to Defendant Bartik.

IV. **Expert Opinion Testimony**

Last, Harris argues that the Court committed certain prejudicial errors by unfairly restricting the testimony of her expert witnesses Dr. Richard Leo, Agent Gregg McCrary, and Dr. Ryan Stevens.

## A.    False Confession/Coercive Interrogation Expert Dr. Richard Leo

On May 23, 2017, the Court held an evidentiary hearing in relation to Defendants'

motion to exclude the expert testimony of Harris' false confession/coercive interrogation expert

Dr. Richard Leo pursuant to the Federal Rules of Evidence and *Daubert*.  Harris also moved to

admit Dr. Leo's testimony under *Daubert*.  On June 5, 2017, the Court issued a 33-page

Memorandum Opinion and Order granting in part and denying in part Harris' *Daubert* motion

and granting in part and denying in large part Defendants' *Daubert* motion.

In the present motion, Harris takes issue with the Court's ruling to exclude the following

opinion Dr. Leo proffered in his February 8, 2016 expert report:

> Before interrogating her, the investigators misclassified Nicole Harris as guilty
> when, in fact, they had no evidence whatsoever to indicate that Jaquari Dancy's
> death was anything other than accidental nor that Nicole Harris had any role in
> bringing it about.

(R. 274-1, 2/08/16 Leo Report, at 3.)  Defendants also challenged Dr. Leo's opinion that "none

of the death scene evidence suggests that Jaquari was killed intentionally or that a crime

occurred."  The Court excluded this opinion testimony because Dr. Leo did not have the requisite

"knowledge, skill, experience, training or education" to proffer these police practices opinions in

which he interpreted the nature of the crime scene evidence.  The Court also clarified:

> Although Dr. Leo's experience includes observing confessions and interrogations,
> he does not have sufficient law enforcement or forensic evidence experience or
> training to connect the dots to his conclusion that Jaquari's death was accidental.
> Without any such expertise, Dr. Leo's opinions are subjective and speculative.

(R. 349, 6/5/17 Mem. Op. & Order, at 29-30.)  Dr. Leo simply did not have the expertise to offer

this specific opinion.

Here, Harris argues that because false confessions and police practices overlap, it was

improper to segregate and limit Dr. Leo's testimony.  Specifically, Harris asserts that Dr. Leo

was not attempting to give an opinion that Jaquari's death was in fact accidental, but that at the time of Harris' interrogation, Defendants had no evidence it was not accidental. The Court, however, did address this issue when concluding that Dr. Leo did not have the requisite expertise to interpret the nature of the crime scene evidence. Nonetheless, the crux of Harris' motion is that the excluded testimony was crucial in explaining that Defendant Officers' improper interrogation was connected to their jump to judgment that she was guilty. To clarify, Harris asserts that she sought to adduce testimony from Dr. Leo regarding the significance of police officers having or not having certain information or when police jump to a conclusion that a suspect is guilty without any factual foundation. Dr. Leo, however, testified about this specific topic at trial:

> Q. Did you see – you talked a little bit earlier about presumption of guilt. Did your opinion focus in any way on that being present in this case?
>
> A. So, yes. One of – one of – the factors that we see in these false confessions is the – a kind of guilt-presumptive bias; that there is a rush to judgment early on that somebody committed a crime and, then, the attempt to build the case around that theory rather than go where the evidence leads. A kind of tunnel vision sets in where the focus is only building the case around an individual rather than objectively gathering evidence to test the hypothesis of whether somebody did or did not do it.
>
> And in this case, yes, I – I – I concluded, based on a number of materials, that there was what we call a guilt-presumptive or, in the literature, behavioral confirmation bias that increased the risk that there would be a false confession.
>
> When police investigators essentially rush to judgment and build a theory early on without thorough investigation and then try to build their case around that theory, they often see the person they're interrogating, everything about the case, they only see guilt.

(R. 479, Ex. A, 11/3/17 Tr., at 58.)

Because Dr. Leo offered opinion testimony on guilt-presumptive bias and police officers rushing to judgment, any err the Court may have made in excluding Dr. Leo's opinion was

harmless.  *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) ("Even if an expert's testimony was erroneously admitted or excluded, reversal is not warranted unless the error has affected a party's 'substantial rights.'"); Fed. R. Civ. P. 61.  The Court therefore denies Harris' Rule 59(a) motion in this respect.

### B.    Police Practices Expert FBI Agent Gregg McCrary

In their *Daubert* motion, Defendant Officers did not challenge former FBI Agent Gregg McCrary's expert opinions concerning police practices, the professional standards in relation to police practices, and the problems with the investigation into Jaquari's death.  Instead, Defendant Officers successfully moved to exclude Agent McCrary's opinion testimony about false confessions based on his lack of specialized training, education, or experience in the false confession field of social science.  Harris now challenges the Court's ruling arguing that not only was Agent McCrary qualified to testify about false confessions, but that it was important for the jury to understand that false confessions can be a by-product of improper police practices.

In the July 27, 2017 *Daubert* ruling granting Defendants' motion in part, the Court relied on its earlier *Daubert* ruling in relation to Dr. Leo and his expertise in the complex social science of false confessions and coercive interrogations.  The Court contrasted this expertise to Agent McCrary's background and experience in the field as an FBI agent and his involvement in an Arizona investigation where certain police officers had obtained false confessions concluding that Agent McCrary is not a social scientist and has not contributed to the study of coercive interrogations and false confessions.  Instead, Agent McCrary's police practices expertise includes crime scene analysis, criminal behavior, and violent crime.

Setting aside Harris' argument that Agent McCrary was qualified to opine about false confessions, the jury heard expert opinion testimony from Dr. Leo in which he explained the

decision points in a police investigation that can lead to a false confession. (11/3/17 Trial Tr., at 45.) In doing so, he commented on how police officers are trained to interrogate suspects and how certain deviations from this training can lead to a false confession. (*Id.* at 45-48.) Dr. Leo's testimony thus established a causal connection between inadequate or improper police training and false confessions. In other words, Dr. Leo testified that false confessions can be a by-product of improper police practices.

Moreover, in closing, Harris' counsel tied together Dr. Leo's and Agent McCrary's testimony. Specifically, counsel described Dr. Leo's expert opinions about the manipulative tactics that police officers employ in obtaining false confessions. (11/16/17, Trial Tr., at 10, 15, 17-18.) Counsel further elucidated how Agent McCrary's testimony underscored the theory that Defendant Officers jumped to a conclusion that Jaquari's death was a homicide, as well as highlighting how Defendant Officers in this lawsuit did not follow proper police practices according to Agent McCrary's expert opinion. (*Id.* at 21, 27-28.)

Under the circumstances, the Court's exclusion of Agent McCrary's false confession opinion testimony did not affect Harris' substantial rights, especially in light of Dr. Leo's trial testimony highlighted above. *See Sanchez,* 880 F.3d at 359 (An evidentiary "error is serious enough only 'if there is a significant chance that [it] affected the outcome of the trial"); *Hall,* 840 F.3d at 926 (party's substantial rights affected when erroneous ruling had a "substantial influence over the jury, and the result reached was inconsistent with substantial justice") (citation omitted). The Court denies this aspect of Harris' post-trial motion.

### C. Pediatric Asphyxiation Expert Dr. Ryan Stevens

Harris also contends that the Court erred in concluding that her pediatric asphyxiation expert Dr. Ryan Stevens was not qualified to testify that Jaquari's death was accidental. More

specifically, based on his research and experience, the Court concluded that Dr. Stevens was qualified to testify about asphyxiation events involving children generally and what kind of force is required for a child to asphyxiate as compared to an adult, but that his expertise did not qualify him to opine about the manner of death, namely, whether Jaquari's death was an accident or a homicide. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.") (internal quote and citation omitted).

Here, Harris maintains that Seventh Circuit authority rejects the notion that Dr. Stevens had to be a forensic pathologist to opine that Jaquari's death was accidental. In the Court's May 15, 2017 *Daubert* ruling, however, the Court did not exclude Dr. Stevens' testimony because he was not a forensic pathologist. Rather, the Court considered his background, training, and experience when concluding that Dr. Stevens did not have the requisite background to determine the "manner of death," namely, that Jaquari's death was an accident. To clarify, Dr. Stevens specializes in Otolaryngology and Ear, Nose, and Throat surgery. He is abundantly qualified through experience, education, and training to give expert opinions on child asphyxiation, which is the undisputed cause of Jaquari's death. Nevertheless, while he has worked with living patients with neck injuries arising from hanging, Dr. Stevens has no similar experience with deceased individuals. Moreover, at his March 2016 deposition, Dr. Stevens testified that he had never worked as a forensic pathologist, had never conducted an autopsy, and had only observed one autopsy. (R. 330, 3/8/16, Stevens' Dep., at 41.) Also important, when asked about the specific factors used to determine the manner of death, Dr. Stevens replied that he did not know. (*Id*. at 148.) In addition, Dr. Stevens stated that he has never testified in court as to cause of

death and admitted that he had never had to determine cause of death in a case where an individual was strangled.  (*Id*. at 109-10, 112.)  His vitae and materials attached to his expert report, along with his deposition testimony, further indicate that Dr. Stevens does not have experience in homicidal asphyxiation.

Turning to Harris' argument, she asserts that Seventh Circuit authority allows physicians to testify as experts even if they do not have a certain specialty, such as pathology.  In *Hall*, for example, the Seventh Circuit reiterated that "courts impose no requirement that an expert be a specialist in a given field."  *Id*. at 929 (quoting *Gayton*, 593 F.3d at 618).  In short, "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats."  *Gayton,* 593 F.3d at 617.  The *Gayton* decision nonetheless acknowledged that "simply because a doctor has a medical degree does not make him qualified to opine on all medical subjects."  *Id.*  Indeed, the question courts ask "is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'"  *Id*. (citation omitted).

Here, the Court did not exclude Dr. Stevens' opinion because he was not a forensic pathologist, but rather because he had no experience, skill, or training in pathology, determining the manner of death, or homicidal asphyxiation.  Therefore, Dr. Stevens was not qualified to answer the specific question of whether Jaquari's manner of death was accidental.  Thus, unlike the expert in *Gayton*, Dr. Stevens' proffered expert testimony was not based on knowledge that any competent physician would generally possess.  Harris' argument that the Court's ruling was a material error in light of the two forensic pathologists who testified at trial that Jaquari's death was a homicide does not alter this analysis because the Court did not prohibit Harris from presenting opinion testimony – via a qualified expert – that the manner of Jaquari's death was

accidental.  Rather, the Court, in its discretion, excluded Dr. Stevens from proffering this expert opinion because he was not qualified to do so.

In addition, Harris argues that the Court erred in prohibiting Dr. Stevens from using an elastic band to demonstrate Jaquari's strangulation.  The Court barred Dr. Stevens' use of the elastic band because he did not disclose that he used an elastic band when reaching the opinions in his expert report, and that allowing Dr. Stevens to use the elastic band at trial was unfair to Defendant Officers.  *See* Fed.R.Civ.P. 26(a)(2)(B); *see, e.g., Cripe v. Henkel Corp.,* 858 F.3d 1110, 1112 (7th Cir. 2017).  Harris nevertheless asserts that she was not required to supplement Dr. Stevens' Rule 26 disclosures because Defendants were aware that Dr. Stevens use of the elastic band at his deposition.  That being said, although Harris posits that this ruling affected her substantial rights, assuming the Court's ruling was "flawed," the Court would be hard-pressed to conclude that the lack of Dr. Stevens' use of the elastic band affected the outcome of Harris' three-week trial.  *See Thorncreek Apartments III,* 886 F.3d at 634; *Hall*, 840 F.3d at 926-27.

On a final note, Harris argues that the Court erred in excluding Dr. Stevens' expert conclusions that bunk beds are common sites of accidental childhood asphyxiation and that the presence of a sibling (or other child) witness at the time of the event does not ensure survival.  In the May 15, 2017 *Daubert* ruling, the Court explained that the basis of these two opinions was unclear.  *Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 781 (7th Cir. 2017) ("Rule 702 explicitly requires that expert testimony be 'based on sufficient facts or data.'").  First, although Dr. Stevens testified at his deposition that he used CDC data as the basis for his bunk bed opinion, he could not recall what the data was or how specific it was.  (Stevens Dep., at 132-33.) Second, as to his opinion about the presence of a sibling or child witness, Dr. Stevens testified that he based this statement on his studies and information from an individual at the United

States Consumer Product Safety Commission named Renae Rauschwalbe, whose cases were published in the Journal of the American Medical Association ("JAMA"). (*Id*. at 133-34.) Again, at his deposition, Dr. Stevens could not provide any specific details of his own or Rauschwalbe's studies. (*Id*. at 134.) Due to Dr. Stevens' inability to provide any details in relation to the underlying data upon which he relied, the Court concluded that he did not base his opinions on sufficiently reliable facts or data as required by Rule 702.

Harris does not contend that the Court abused its discretion in excluding these opinions or that any such evidentiary errors could have affected the outcome of her trial. Rather, she maintains that Dr. Stevens' reliance on a study in JAMA and the Consumer Products Safety Commission, along with his own research, provided a sufficient basis for his opinions. As discussed, without any details, the Court could not determine if this data was qualitatively adequate. *See Gopalratnam,* 877 F.3d at 781. Moreover, even if the Court had abused its discretion in excluding these opinions, the exclusion amounts to harmless error because any such error did not affect the outcome of the trial. *See Sanchez*, 880 F.3d at 359. The Court denies Harris' Rule 59(a) motion based on the Court's evidentiary rulings in relation to Dr. Stevens.

## CONCLUSION

For these reasons, the Court, in its discretion, denies Harris' Rule 59(a) motion for a new trial.

**DATED:** May 11, 2018                    **ENTERED:**

**AMY J. ST. EVE**
**United States District Court Judge**

39