```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   NICOLE HARRIS,               ) Docket No. 14 C 4391
                                  )
 4                   Plaintiff, )
                                  )
 5             vs.                )
                                  )
 6   ROBERT BARTIK, et al.,       ) Chicago, Illinois
                                  ) November 14, 2017
 7                   Defendants.) 1:32 o'clock p.m.

 8                    EXCERPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
 9
     APPEARANCES:
10
     For the Plaintiff:       PEOPLE'S LAW OFFICE
11                            BY:  MS. JOEY L. MOGUL
                                   MS. JANINE L. HOFT
12                                 MS. JANIS M. SUSLER
                              1180 North Milwaukee Avenue
13                            Chicago, Illinois  60622

14                            VALOREM LAW GROUP
                              BY:  MS. NICOLE N. AUERBACH
15                                 MR. STUART J. CHANEN
                              218 N. Jefferson St., Suite 300
16                            Chicago, Illinois  60661

17   For the Defendants:      HALE LAW, LLC
                              BY:  MR. ANDREW M. HALE
18                                 MR. SCOTT J. JEBSON
                                   MS. JENNIFER BITOY
19                            53 W. Jackson Blvd., Suite 330
                              Chicago, Illinois  60604
20
     Court Reporter:          MR. JOSEPH RICKHOFF
21                            Official Court Reporter
                              219 S. Dearborn St., Suite 2128
22                            Chicago, Illinois  60604
                              (312) 435-5562
23
                 * * * * * * * * * * * * * * * * *
24                    PROCEEDINGS RECORDED BY
                      MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED BY COMPUTER
```

McCrary - direct

2

```
 1          THE CLERK:  14 C 4391, Harris vs. City of Chicago.

 2                    *    *    *    *    *

 3      MS. HOFT:  Your Honor, plaintiff calls Gregg McCrary.

 4          GREGG McCRARY, PLAINTIFF'S WITNESS, SWORN

 5          MS. HOFT:  You might want to pull that microphone in

 6  a spot where we can hear you.  Great.

 7          John is going to help you.

 8          THE WITNESS:  Thank you, sir.

 9                    DIRECT EXAMINATION

10  BY MS. HOFT:

11  Q.  Good afternoon, sir.

12  A.  Good afternoon.

13  Q.  Can you tell the jury your name.

14  A.  Yes.  My name is Gregg -- that's G-r-e-g-g -- McCrary,

15  M-c-C-r-a-r-y.

16  Q.  And have you been retained as an expert in this case?

17  A.  Yes, I have.

18  Q.  What is your area of expertise?

19  A.  It is police practices or investigating crimes, especially

20  violent crimes.

21  Q.  And do you recall -- let me first show you what we've

22  marked as Plaintiff's 188, 189 and 190.

23          MS. HOFT:  For identification, your Honor,

24  Mr. McCrary's CV, Mr. McCrary's report and Mr. McCrary's file.

25          THE COURT:  Okay.
```

McCrary - direct

3

```
 1          MS. HOFT:  May I approach?

 2          THE COURT:  Yes, you may.

 3       (Documents tendered.)

 4  BY THE WITNESS:

 5  A.  Thank you.

 6  BY MS. HOFT:

 7  Q.  And, Mr. McCrary, those are the documents that you had

 8  prepared relative to this case, correct?

 9  A.  Yes.

10  Q.  And if at any time during my examination or the

11  examination by the defendants' lawyer you need to refresh your

12  recollection, please let us know.

13  A.  Thank you.  I will.

14  Q.  And do you recall what you were asked to assess in this

15  case?

16  A.  Yes.  Basically, the propriety of the investigation into

17  the case; the reasonableness of the police investigation into

18  the death of the child.

19  Q.  And were you also requested to discuss the propriety of

20  the interview and interrogations of Nicole Harris?

21  A.  Yes.  That would be part of the investigation.  Yeah, that

22  certainly was part of it, yes.

23  Q.  And could you, for the jury, briefly summarize your

24  conclusions?

25  A.  Yes.  First of all, there was a rush to judgment about the
```

McCrary - direct

4

1    death that -- concluding it was a homicide rather than

2    anything else prior to any real investigation, until any real

3    evidence had come in.

4           And, then, subsequent to that, with tunnel vision on

5    Ms. Harris as -- once the rush to judgment had been made it

6    was a homicide, then they had to look for a suspect.  And,

7    then, tunnel vision -- they got focused on Ms. Harris as the

8    potential perpetrator of the crime.

9           And, then, following that was a coercive environment

10   in which she was held and interviewed for about 26 hours, you

11   know, at that time.

12          Then there is some disputed testimony as to what she

13   said happened versus what the police officers say happened,

14   say, regarding a spontaneous confession where she allegedly

15   confessed to wrapping a telephone cord around the child's neck

16   and then recanting the testimony.  She said that never

17   happened.  The police say it did.  Again -- and she talked

18   about different things that went on, different abuses that she

19   alleged occurred -- physical abuses, verbal berating of her,

20   and so forth -- which the police had denied.

21          But if any of that is true, if any of that

22   occurred -- she was physically abused, verbally abused,

23   submitted to coercive techniques like that -- then that

24   violates fundamental, basic police practices and standards;

25   and, it would show to me a willful and deliberate violation of

McCrary - direct

5

1  basic police practices and a disregard for finding the truth,

2  which is what an investigation should be.

3  Q.  And let's go back for a minute to talk about you.

4         Can you tell the jury what your educational

5  experience is.

6  A.  Yes.  Formal education, I have a bachelor's degree from

7  Ithaca College, Ithaca, New York.  I did graduate studies in

8  criminal justice at Long Island University.  I have a Master's

9  Degree in Psychological Services from Marymount University.

10  And I did some additional graduate work at the University of

11  Virginia.

12         That's my formal education.

13  Q.  And do you have any law enforcement experience?

14  A.  Yes.

15  Q.  Tell us about your law enforcement experience.

16  A.  I was an FBI agent for a little over 25 years.

17  Q.  And when did you first enter the FBI?

18  A.  Way back in 1969.  I EOD'd or entered on duty, December

19  1st, 1969, as a new agent.

20  Q.  And as a new agent, what were your duties and

21  responsibilities?

22  A.  Well, the first is to complete the training -- new agent

23  training -- at Quantico -- at the FBI Academy at Quantico.

24  And that's a structured environment where we're educated there

25  about a number of things.  Obviously, investigative

McCrary - direct

6

1   techniques, policy, law.  Those sort of things.  And, then,

2   there's tactical aspects, as well.  Firearms training,

3   defensive tactics training, arrest techniques, and all of

4   this.  So, it's a bunch of that stuff that's all rolled in

5   together in new agent training.

6           And, then, you're -- at that point we were

7   transferred -- I was transferred out -- completed --

8   successfully completed the training and was sent to the

9   Detroit field office as an agent to conduct investigations

10  there.  That really is considered kind of an extension of the

11  training because now you're out in the real world and actually

12  doing interviews and interrogations and making arrests and

13  presenting evidence in court and those things that you can't

14  really replicate -- only to a limited degree -- in training.

15  Q.  Mr. McCrary, you might want to slow down just a tad.

16  A.  Okay.  I'm sorry.

17  Q.  Joe hasn't complained yet, but let's just make sure that

18  you keep your voice --

19  A.  I'll be more measured.

20  Q.  Measured.

21  A.  Yes.

22  Q.  Sounds good.

23  A.  Thank you.

24  Q.  So, as a field agent at the FBI, where were you assigned?

25  A.  The first office was Detroit, Michigan, for about a year.

McCrary - direct

7

1    And there I did criminal investigations -- I called

2    disorganized crime -- regarding bank robberies, kidnappings,

3    extortions, those sorts of federal crimes.  Then after that, I

4    was transferred to New York City.  And I worked there for

5    several years in violent crime -- basically, in violent crime

6    investigations.

7    Q.  In New York, did you have any involvement with the New

8    York City Police Department?

9    A.  Yes.  Yes, I did.

10   Q.  Tell us about that.

11   A.  There was a group called -- that identified themselves as

12   the Black Liberation Army, and they were assassinating police

13   officers in New York City at the time.  They were also doing

14   armored car robberies, committing violations that were both

15   federal and local.  And I worked jointly with -- we had a task

16   force -- the FBI had a task force -- which I was part of, with

17   the New York City PD.  And I worked with that task force.  As

18   a matter of fact, I was the liaison with the NYPD.  I actually

19   had a desk in a precinct in Lower Manhattan in the New York

20   City precinct where I worked during the course of that

21   investigation.

22   Q.  In what division of the New York Police Department were

23   you physically housed?

24   A.  Well, that was in a precinct, but the task force was with

25   the -- under the homicide investigation due to the murder of

McCrary - direct

8

1    several police officers.

2    Q.   And how long were you a field agent with the FBI?

3    A.   Total of 17 years in the field.

4    Q.   And during that 17-year time period, could you describe

5    your involvement in investigating crimes?

6    A.   Yes.

7            As a field agent, that's basically what we do.  We're

8    the front lines in the investigation.  We do interviews,

9    interrogations, do crime scene searches, collect evidence,

10   present the facts of the case in court.  So, just doing that

11   is our daily -- our daily -- routine in the field,

12   investigating crimes.  Primarily, obviously, crimes over which

13   the FBI has primary jurisdiction, although we work in

14   conjunction many times with local or state law enforcement

15   when there is concurrent jurisdiction, such as, for example, a

16   bank robbery.  That violates state law, federal law, so forth.

17   So, we work jointly very closely many times with local law

18   enforcement.

19   Q.   And after your time as a field agent, what was your next

20   assignment at the FBI?

21   A.   I was promoted and transferred down to the FBI Academy on

22   the staff then at that point.  And that was under the sort of

23   larger umbrella of what was known as the National Center For

24   the Analysis of Violent Crime.  That was founded in 1985 at

25   the direction of President Reagan.  We had a uptick -- quite

McCrary - direct

9

1    an upswing -- in violent crime in the late '80s into the early

2    '90s, and he wanted a center formed that would address that

3    specific issue of violent crime and violent crime

4    investigations.  The FBI was tasked with that responsibility.

5    And that center was housed in the Behavioral Science Unit at

6    the FBI Academy.

7           So, I was promoted from the field agent to a

8    supervisory agent and transferred down to the FBI Academy,

9    where I finished my about last eight years with the Bureau

10   there in that assignment.

11   Q.  And have you ever been involved in investigating a

12   homicide?

13   A.  Yes.  Yes.

14   Q.  Approximately how many times?

15   A.  Easily over a thousand homicide cases over the years.

16   Q.  And were you lead investigator in each of those cases?

17   A.  No, no.  I would be sometimes a lead investigator for the

18   Bureau in our involvement in a given case, but I certainly

19   wasn't the lead investigator in every homicide case, no.

20   Q.  And have you ever done any teaching or training about

21   either crime investigation or interview interrogation

22   techniques?

23   A.  Yes.

24   Q.  Tell us about that.

25   A.  We had -- when I was at the FBI Academy, we had -- in the

McCrary - direct

10

1   national center, we have three programs:  Research, training

2   and operational support.  I was in the operational wing, which

3   meant my primary responsibility was involved in investigating

4   cases.  However, training was part of that.  And I trained.  I

5   taught at the FBI Academy.  I taught police officers there.

6           And my assignment geographically while assigned at

7   the FBI Academy was the east coast of the United States and

8   Europe.  And, so, I did training, actually, throughout the

9   United States to law enforcement agencies, and I trained and

10  worked cases at Europe.  I've trained at the National Police

11  Academy of Spain, in Portugal, the French National Police.  I

12  did a stint with Budapest Homicide in Hungary, taught the

13  Hungarian National Police; the Carabinieri in Italy; worked

14  with Scotland Yard and trained them, as well.

15          So, that's a quick overview.

16  Q.  Have you ever -- have you written or authored any books or

17  articles in the areas of police practices?

18  A.  In police practices -- well, actually, yes, I wrote a

19  chapter in a book on investigative failures dealing with a

20  specific case example.  That's part of the training that I've

21  done and continue to do on how cases go bad and they fail.

22  And that could either be an unsolved case or a wrongful

23  conviction.  Those sorts of things.  So, I've done that.

24          I've also written a book about a number of the cases

25  that I've been involved in, which include a couple of

McCrary - direct

11

1  instances where there was police malpractice or there were

2  problems with the case.  As well, I've authored a journal

3  article on stalking.  Those sorts of things.

4  Q.  And have you ever been asked to speak or give

5  presentations in the area of crime investigation?

6  A.  Oh, yes.  Yes.  Yeah, a lot.

7         Throughout the United States, like I say, with the

8  Bureau and overseas.  And I've done this -- I've continued to

9  do this since I've retired.  I've done law enforce- --

10 conferences for law enforcement, again, both nationally and

11 internationally.  I did a presentation a while ago in

12 Tennessee from police officers -- about 300 police officers

13 from 14 states.  Last October I was invited to Sweden, to

14 Stockholm, to do training for the Swedish National Police.

15        Last month, September, I did a presentation that was

16 sponsored by the FBI and another government agency, the

17 National Institutes of Standard in Training on error

18 management in forensics in cases.

19        And just a few weeks ago I did a presentation for the

20 Pennsylvania State Coroners Association on equivocal death and

21 investigative failures, basically.

22 Q.  Okay.

23        And we might be here all day if we hear all of your

24 presentations, but I want to focus on the last issue that you

25 talked about.

1          Can you tell the jury what an equivocal death

2    investigation is?

3    A.   Yes.  An equivocal death investigation is done to

4    determine the manner of death.

5          And there are only four manners of death.  And a

6    quick way to remember this is the acronym NASH -- N-A-S-H:

7    Natural, accident, suicide, or homicide.  That's it.  That's

8    all there are.

9    Q.   And what did you present to the Pennsylvania Coroners

10   Association about equivocal deaths?

11   A.   Well, they know that, obviously.  They know the four --

12   but how cases go wrong, how investigative failures can impact

13   an equivocal death investigation, and how to spot those

14   dangers and hopefully avoid them or at least minimize the

15   chance of getting it wrong.

16   Q.   And what is your current employment?

17   A.   I'm self-employed.  I run my own consulting business

18   called Behavioral Criminology International.

19   Q.   And do you currently work on any active homicide

20   investigations?

21   A.   Sometimes.  I'll be -- next month I'll be in Hawaii on a

22   cold case homicide, one back from 1996.  I'll be going over to

23   work with the police in Hawaii to see if we can move this

24   case -- move it forward.  So, I do sometimes, yeah.

25   Q.   Have you ever been qualified by any court as an expert in

McCrary - direct

13

1   police practices?

2   A.  Yes.

3   Q.  Do you recall what courts?

4   A.  Well, there have been several.  Certainly, done it here in

5   Illinois and Chicago.  Testified in Alaska, in Georgia.  That

6   just comes to mind, but there have been other places, as well.

7   Q.  And have you ever testified before any senate committees?

8   A.  Yes.  Those are state senate committees in Boston and New

9   York on violence.  Those dealt more with sexual violence, but

10  they're violent crimes that I provided expert testimony as an

11  FBI agent at that time.

12          MS. HOFT:  Your Honor, at this time, we would tender

13  Mr. McCrary as an expert in police practices and criminal

14  investigation.

15          THE COURT:  I will accept him as such, consistent

16  with the Court's prior rulings.

17  BY MS. HOFT:

18  Q.  Now, Mr. McCrary, are you being paid for your time to come

19  here today?

20  A.  Yes.

21  Q.  And what is your rate?

22  A.  I work at $500 an hour.

23  Q.  And when you -- how do you decide what expert consultation

24  work to engage?

25  A.  Are you talking about litigation cases?

McCrary - direct

14

1  Q.  Yes.

2  A.  Court cases?

3  Q.  Things like this one.

4  A.  It goes to the merit of the case.  If I think the case has

5  merit, if there's something I can add to the case, I will take

6  it; if not, I won't.

7  Q.  And could you generally describe in your expert experience

8  the procedure for criminal investigations?

9  A.  Yes.  There are different phases, there are different ways

10  to think about it.  But the first phase -- and this goes

11  perhaps to the equivocal death issue -- is to determine

12  whether or not a crime has been committed.  That's the very

13  first stage.

14          Sometimes that's easy.  Sometimes there's no doubt a

15  crime has been committed.  But other times it's ambiguous,

16  it's far less clear.  And, so, the first stage is to determine

17  whether or not a crime has occurred.

18          You might -- a quick example, you might remember the

19  -- years ago the TWA Flight 800 took off from Kennedy and blew

20  up in midair.  Took a year of investigation -- over a year --

21  by the FBI and the National Transportation Safety Board to

22  determine that it was an accident.  It was a spark in the fuel

23  tank.

24          So, it had been investigated by the FBI for over a

25  year with the consideration it could be a crime, it could be

McCrary - direct

1   terrorist attack or whatever; but, ultimately, it was ruled an

2   accident.

3           So, that's the first stage.  And, obviously, a very

4   important stage that we get that right at the very beginning.

5   Q.  And after there's been a determination that a crime has

6   occurred, what happens next, generally, in a criminal

7   investigation?

8   A.  Well, we want to make sure that we understand what crime

9   it is because sometimes the crime reported or the crime we

10  think we're investigating isn't what actually has occurred.

11  You may remember an example, a case Susan Smith years ago came

12  to the South Carolina State Police and said that an individual

13  had hijacked her car with her two kids in it.  Had a crime

14  occurred?  Yes.  Was that it?  No.  It turned out that she had

15  actually murdered her children.

16          So, you have to be careful to make sure the crime

17  you're investigating, to understand it and know exactly what

18  it is you're investigating before you move too far forward.

19  You want to make sure you're moving in the right direction.

20  Q.  And what's the ultimate purpose of any criminal

21  investigation?

22  A.  Well, obviously, it's to determine the truth, to find out

23  what happened.  And it needs to be an evidence-driven

24  investigation that will lead you to a conclusion, either at

25  the beginning, whether or not a crime has occurred; and, if

McCrary - direct

16

1    so, what crime is it; and, then, who did it; and, then,

2    present the evidence in court.

3    Q.  And can you talk to us for a bit about the general

4    procedure for interviewing or interrogating an individual and

5    what, if any, differences there are?

6    A.  Well, they are -- those are different things.  An

7    interview is simply to gather information from an individual.

8    And that could be a witness.  It could be a living victim,

9    assuming we're not dealing with a homicide.  So, someone who

10   has information -- potential information -- about the crime.

11   That's the purpose of the interview, is to search their mind,

12   if you will, and be very careful with that that you don't

13   contaminate the mind or the memory of the person.

14          We know when we search a physical crime scene we're

15   very careful.  You see guys with their Tyvek suits on and

16   boots and hats.  We don't want to leave our DNA, our

17   fingerprint, our hair at that scene.  And when we do an

18   interview, you have to think of the mind of the person you're

19   interviewing as a crime scene, and you want to search that

20   very carefully without contaminating that, as well, with any

21   ideas I might have or any suggestion I might have.  I have to

22   avoid all that and should avoid all that.

23          So, that's the purpose of an interview.

24          An interrogation is different.  That typically is

25   suspect oriented and it's -- it can be a little more

McCrary - direct

1   accusatorial.  Ideally, at that point, you have evidence that

2   would support the idea that this person committed the crime,

3   is the suspect.  And you can't really interrogate before you

4   investigate.  You have to have evidence on which to

5   interrogate the person.  Otherwise, it's -- you know, there's

6   no -- it's just wrong.  You don't have anything to interrogate

7   anyone about.

8           So, that tends to be a bit more accusatorial in

9   nature.  But it's based on the evidence that you had that

10  would support the opinion that the person has, in fact,

11  committed the crime.  So, they're similar but different.

12  Q.  And with regard to interviewing individuals, what is the

13  importance, if any, of advising the individual that they may

14  be free to leave?

15  A.  Well, yes.  Certainly, anyone -- that assumes they're in a

16  police environment or the FBI office or something, yeah.

17          That can be very intimidating.  You understand people

18  come into a police department to be interviewed or the FBI

19  office, it could be a little bit intimidating.  And you let

20  them know that they're there -- they're free to go, they don't

21  have to talk to you.  Obviously, if it's a witness, we'd

22  appreciate them talking to us about what they observed.

23          But, no, actually, no one has to talk to the police

24  or has to talk to the FBI at all.  So, they certainly need to

25  be made aware of that fact and made aware that they're free to

McCrary - direct

1    leave.  But, of course, you hope that they will cooperate with

2    you and talk to you about whatever the issue is.

3    Q.  And what is the importance, if any, of documenting conduct

4    of the police officers as they conduct their investigation?

5              MR. HALE:  Objection to leading.

6              THE COURT:  Overruled.

7              You may answer, if you can.

8              THE WITNESS:  Yes.

9    BY THE WITNESS:

10   A.  It's important to document everything all of the time.  We

11   can't remember everything that every witness or every victim

12   tells us.  So, taking -- say in an interview or an

13   interrogation scenario, you need to take copious notes to talk

14   about the quantity and the quality of information that the

15   person has provided and document all of that stuff.  Because

16   especially in a case that begins to have more witnesses and

17   more things, you just can't remember everything.

18             So, you have to document everything very thoroughly

19   as you go along because something that might not seem

20   important early in the investigation can become very important

21   later on, depending on which way the investigation goes.  And

22   if you haven't documented that, you'll never -- you'll never

23   -- find it.

24             Like I say, we in law enforcement are the gatekeepers

25   of the criminal justice system.  If we don't do it, it doesn't

McCrary - direct

19

 1    get done.  If that person isn't interviewed, we'll never know

 2    what they had to say.  If that piece of evidence isn't picked

 3    up, it'll never get to the lab and never be examined.  So,

 4    we've got to document all of that stuff very, very carefully.

 5    BY MS. HOFT:

 6    Q.  Now, drawing your attention to the case at hand here of

 7    the investigation of the death of Jaquari Dancy, do you recall

 8    what you reviewed in order to reach your conclusions?

 9    A.  I reviewed a lot of stuff.  I'd have to -- there's, like,

10    12 pages I wrote of materials I've reviewed.  So, very

11    voluminous.  Literally -- well, not literally a ton, but a lot

12    of material, yeah.

13    Q.  Do you recall whether or not you read each of the eight

14    defendants' depositions in this case?

15    A.  Yes, I did.

16    Q.  And do you recall whether or not you reviewed the video

17    and the transcript of that video of Ms. Harris' alleged

18    confession?

19    A.  Yes, with the assistant state attorney Ms. Grogan that --

20    yes, I -- yes.

21    Q.  And did you review police reports?

22    A.  Yes.

23    Q.  And did you review DCFS records?

24    A.  Yes, I did.

25    Q.  And did you review the entire transcript of the criminal

McCrary - direct

20

1   trial of Ms. Harris?

2   A.  Yes, I did.

3   Q.  And did you also review Ms. Harris' deposition?

4   A.  Yes.

5   Q.  And did you also review the M.E. Dr. Denton's deposition?

6   A.  Yes.

7   Q.  And do you recall reviewing the depositions of Melvin and

8   Dinaja Arnold?

9   A.  Yes.

10  Q.  And I want to move back, again, to your conclusions that

11  you summarized for us at the beginning of your testimony.

12          And let's talk first about this idea that in this

13  case, the defendants rushed to judgment that the equivocal

14  death was a homicide rather than an accident.

15          Can you tell the jury more about that?

16  A.  Yes.

17          I think it -- according to the testimony of some of

18  the defendants, they were suspicious right away that this was

19  a homicide.  And when they -- even before they talked or even

20  when they first talked to Ms. Harris, they were viewing this

21  thing as a homicide.  They found her demeanor suspicious.

22  They felt that her -- what appeared to be stoicism or lack of

23  emotion was suspicious to them.  They went -- two officers

24  went back to the scene about 10:30 that night and saw a

25  telephone cord that they thought could possibly be a murder

McCrary - direct

21

1  weapon.

2           So, the whole investigation early on was sort of a

3  rush to judgment about this case being a homicide.  And this

4  was before the autopsy was even completed.  They're way ahead

5  of the game, moving prematurely to the idea that this was a

6  homicide and not anything else.

7  Q.  And why is that a problem?

8  A.  Well, it's a huge problem because, like I say, the first

9  stage is to determine whether or not a crime has been

10  committed.  And that has to be based on evidence, not hunches,

11  not gut feelings.

12           Again, if you look at demeanor of people, there's no

13  one demeanor, no one reaction -- especially to the death of

14  one's child -- that would be indicative of deception or being

15  a murderer or being inappropriate.  Some people are very

16  stoic.  Some people just don't show emotion.  Other people are

17  very emotional.  So, you can't read into that.  It's wrong to

18  read into any given demeanor as being indicative of deception

19  or guilt or being a murderer.

20  Q.  You also mentioned that you had concluded that the

21  defendants had tunnel vision that Nicole was the perpetrator

22  of this crime that they now have considered a homicide.  What

23  is tunnel vision?

24  A.  Tunnel vision is a narrow focus.  And it can be on a

25  suspect -- it can be an individual who they think -- we think

McCrary - direct

22

1   is a suspect -- that unduly narrows the range of alternatives

2   and it limits our thinking -- limits an investigator's

3   thinking -- about either the type of crime that occurred or if

4   a crime occurred or who the suspect may be.

5           And my experience, I think any experienced

6   investigator would tell you, I had focused on the wrong

7   suspect early on, thinking this guy really looks good, he

8   probably did it, only to wash him out through investigation

9   and he didn't do it.  Then you have to move on to someone

10  else.

11          But it's wrong to get too tightly focused and not

12  keep an open mind about everything, including whether or not a

13  given individual is the suspect.  And that's been proven to be

14  a constant factor in investigative failures, where the tunnel

15  vision is on the wrong suspect.

16  Q.  And did you find any -- and I'm sorry if you mentioned

17  this, but tunnel vision, does it also include ignoring some

18  evidence that doesn't fit your theory and only accepting

19  evidence that does fit your theory?

20          MR. HALE:  Objection.  Leading.

21          THE COURT:  Sustained.

22  BY MS. HOFT:

23  Q.  What, if any, examples of tunnel vision did you find in

24  the defendants' conduct here?

25  A.  Well, the things I've just mentioned, which was a focus on

McCrary - direct

23

1    Ms. Harris at the very beginning.

2            Now, what happens is also confirmation bias, which it

3    closely related to tunnel vision, which is a situation where

4    one seeks out and gives more weight to the evidence that

5    supports a theory that you have while ignoring or

6    under-weighing or refusing to search for contradicting

7    evidence.

8            So, once you have an idea this is what happened and

9    this is who did it, there's a danger that investigators begin

10   to accept only that information that supports their theory

11   while filtering out disconfirming evidence or undervaluing it

12   or not even -- not even -- looking for it.

13           So, that's another problem in the mindset of

14   investigators that has been documented to lead to wrongful

15   convictions.

16   Q.  And did you find any examples of what you're terming

17   confirmation bias in the conduct of the defendants here?

18   A.  Yes, yes, I believe, you know, that we did, that it's

19   there.  For example -- and it exists even to -- it could even

20   exist up to today.

21           For example, the theory was initially the police

22   thought that the telephone cord could have been the instrument

23   of death used to kill her -- or kill the child.  Then when the

24   M.E. did the autopsy and ruled that out -- that the telephone

25   cord was not used; it was the bed sheet instead -- for

McCrary - direct

24

1   example, in Detective Noradin's deposition, he indicated that

2   he felt that the cord was used, even despite the evidence from

3   the medical examiner that it wasn't used.  And his belief in

4   that, he stated, was because Ms. Harris had said that's what

5   was used.

6          And that's an example, I think, of confirmation bias,

7   where you're filtering out disconfirming evidence, such as a

8   ruling from the medical examiner, and just believing something

9   sort of because you want to believe it or because allegedly

10  Ms. Harris had told him that was what she used.

11  Q.  Since you're mentioning the phone cord confession, I'm

12  going to show you what's been marked and admitted into

13  evidence, I believe, Plaintiff's Exhibit 13.

14         I'm going to try to bring it out so you can see the

15  whole document.

16         You mentioned Detective Noradin.  Do you -- is this

17  one of the police report documents you relied on in giving

18  your conclusions?

19  A.  Yes.

20  Q.  It might be a little easier to see.

21         And with regard to what you've talked to the jury

22  about in terms of this alleged phone cord confession, do you

23  see what's put in quotations in the middle of that report?

24  A.  Yes.

25  Q.  And can you tell us what you made of that statement

McCrary - direct

1  included in that report?

2  A.  Well, it is -- it's problematic in a way because we know

3  that this occurred prior to the autopsy, prior to the finding

4  the cord wasn't used.  But we also know it was allegedly made

5  after the investigators suspected that the phone cord was the

6  instrument of death.  They seized it.  They had the evidence

7  technician come and log it in and photograph it, and so forth.

8  So, that was their theory at this time in the investigation.

9  A few hours into the investigation that was the theory.

10       And the idea that Ms. Harris would spontaneously

11  confess to the theory the police had without any either

12  contamination on their part was -- would be just an incredible

13  coincidence in my mind that she would confess to what they

14  thought was the theory and of course -- what their theory was.

15  Only, of course, we find out later that the cord wasn't used

16  at all.

17       So, either they contaminated the interview or -- she

18  alleged that she never did say this.  So, again, that's not

19  for me to determine, but it's in that arena that's

20  problematic.

21  Q.  And let me ask you this:  After that quotation, there's --

22  on the next line, it says, "Stopped."

23       What was your understanding of what that referred to

24  in reading the depositions of the defendants and reviewing the

25  police reports?

McCrary - direct

1   A.  That they stopped the -- whatever interview or

2   interrogation, they stopped her from speaking at that point.

3   And they indicated they advised her of her Miranda rights,

4   that she didn't have to speak, and so forth.

5   Q.  And what did you make of that claim?

6   A.  Well, it's unusual -- it's not unusual to advise someone

7   of their Miranda rights if they are making, we call, a

8   statement against self-interest where they're involving

9   themself in a crime.  You want to advise them they don't have

10  to do this.

11         But, on the other hand, as an investigator, if

12  someone is telling you that they committed a crime and they

13  want to confess spontaneously, we certainly don't want to get

14  in the way of that.  We'd like to hear what it is they have to

15  say.

16         So, it's unusual to stop unless the person just shut

17  down suddenly.  It's okay to advise them of the Miranda

18  rights; probably should -- you should at that point -- but

19  then to stay with them and say, you don't have to talk to me,

20  but I'd really like to understand what happened and please,

21  please continue, tell me more about this if you want to, if

22  you want to help me understand.

23         So, it's unusual that it just stopped cold.

24              THE COURT:  Mr. Hale?

25              MR. HALE:  A belated objection to the last two

McCrary - direct

1   questions and answers where I think the witness is making

2   credibility determinations, as opposed to just talking about

3   practices.

4           THE COURT:  I am not sure if he was.

5           But I will certainly instruct the jury that the jury

6   is the one that makes the credibility determinations in this

7   case, nobody else.  That is your job.

8           MS. HOFT:  Thank you, your Honor.

9   BY MS. HOFT:

10  Q.  And you mentioned that if someone shuts down suddenly --

11  would someone being upset after spontaneously confessing,

12  would that require you to not -- or even counsel you to just

13  stop speaking to the person?

14          MR. HALE:  Objection to form and leading.

15          THE COURT:  Sustained on form.

16          Rephrase it.

17  BY MS. HOFT:

18  Q.  You mentioned that it was unusual to stop someone who has

19  spontaneously confessed.  What, if any, effect does it have on

20  your conclusions for an individual to be upset and crying

21  after spontaneously confessing?

22          MR. HALE:  Object on form.  And even the first part,

23  I think, goes to the credibility issue I talked about, the way

24  it's phrased.  So, object on form.

25          THE COURT:  I am going to sustain on form.

McCrary - direct

1          Rephrase it.

2          MS. HOFT:  Okay.

3    BY MS. HOFT:

4    Q.  What, if any, effect on an officer's interviewing or

5    interrogating of a suspect would there be if an individual

6    became upset and crying after spontaneously confessing?

7    A.  As far as police practices, it's not unusual for people

8    who have emotionally unloaded that they've committed a crime,

9    a violent crime that they feel bad about, they might be

10   emotional.  It doesn't mean you necessarily stop the

11   interview.  It means you may show them some compassion, some

12   understanding; tell them, as I said, they don't have to talk

13   to you but you would love to understand what happened, and

14   allow them to explain to you, you know, what had occurred.

15          So, it wouldn't necessarily stop an investiga- --

16   stop an interview.

17   Q.  And let me show you what has been marked and admitted into

18   evidence as Plaintiff's 139.

19          Do you recognize that document as one of the police

20   reports that you relied upon?

21   A.  Yes.

22   Q.  And this report, again, was written by Detective Noradin

23   indicating that Ms. Harris had recanted this spontaneous

24   confession.  What, if any, import did this document have on

25   your conclusions?

McCrary - direct

29

A.  Well, it goes to a couple things.  One is the lack of the
thoroughness of documentation.  In other words, the flat
statement that she recants it -- in other words, she would --
if she made that statement and then, you know, did she say, I
recant?  I don't think so.

My experience is people change their mind and explain
things differently:  Well, that's not exactly what happened;
what happened was this; I didn't mean that; I meant this.

But there's no further documentation here other than
just she -- the statement that she recanted, which is unusual
and, you know, I would think there would be -- well, there
should be -- basic police practices would be to ask her why
she is recanting the statement:  What actually happened?  Why
was that wrong?  Why did you say that?  Now you're saying
something different.

You need to understand that to flesh that out.  So,
that's basically -- that's basic police practices what would
normally follow.

MR. HALE:  I object.  He characterized it as unusual.
It's going to credibility issues as opposed to just practices.

THE COURT:  Again, I have instructed the jury that it
is their determination as to the credibility of each witness
here, not for anybody else to tell you that.

BY MS. HOFT:

Q.  Let's switch, Mr. McCrary, to speaking about -- focusing

McCrary - direct

1   on, again, on the interviewing and interrogation of Nicole

2   Harris.

3           What, if anything, did you conclude about what

4   factors that existed with regard to Ms. Harris that the

5   defendants ignored or did not consider?

6   A.   Well, I think the overall about 26-hour period was --

7   was -- rather coercive.  She was in a police facility for the

8   majority of that time.  And her child had just been pronounced

9   dead.  There's the whole grieving issue that can get in the

10  way of getting to the truth of situations.  The emotionality

11  of the whole situation.

12          She was isolated.  She was alone.  She wasn't with

13  any -- her other child had been taken away from her.  She had

14  nobody else around and was isolated in a police setting and

15  just surrounded by police officers.

16          And, then, there would be the lack of sleep.  There's

17  some indication she may have dozed off, but for that time

18  period, very little sleep.  No food until at least 24 hours or

19  so after she had been in the police facility.

20          So, all of those things:  A lack of sleep, the lack

21  of food, the death of a child, having another child taken

22  away, being isolated.  And then, certainly, you know, a point

23  after this alleged false -- or this alleged confession that

24  she recanted, then she was locked -- she was already in

25  custody at that point, locked in a interview room from that

McCrary - direct

31

1    point on.

2              So, all of that is quite coercive.

3    Q.  And what effect, if any, is there on the fact of multiple

4    detectives coming in and out of an interview or interrogation

5    room?

6    A.  Again, that could be intimidating.  Again, it's -- you

7    think of it as an away game for her, a home game for the

8    police.  It's their facility.  They're in charge.  She's not

9    in charge.  She has to ask permission to go to the bathroom.

10   She has to ask permission to get water.  It's that sort of

11   relinquishing of your basic freedom to even go to the bathroom

12   without their permission, and so forth.

13             So, it -- and, then, just seeing only detectives

14   there rather than family members or anyone supportive.  Again,

15   that goes to the overall coercive nature of the situation.

16   Q.  And did you reach a conclusion based on the totality of

17   these factors within a reasonable degree of professional

18   certainty whether or not the interview and interrogation of

19   Nicole Harris was coercive?

20   A.  I believe it was, yes.

21   Q.  And did you arrive -- what, if any, conclusions did you

22   arrive at about how the interview and interrogation of Nicole

23   Harris was designed or not to discover any provable facts?

24   A.  It didn't appear -- it appeared as though they were trying

25   to confirm their theory as to what happened.  They were trying

McCrary - direct

1  to validate their theory that the phone cord was used -- that

2  it was a homicide and that the phone cord was used to strangle

3  the -- to strangle the -- child.  It didn't seem to be

4  designed to get at the truth as to:  One, whether or not a

5  crime has occurred; and, two, if so, who might have done it;

6  or, if not, if it was an accident.

7          So, it seemed to be targeted in that direction of

8  simply trying to validate the theory that they had developed

9  that it was a homicide, the phone cord was used and she did

10  it.

11  Q.  And let me ask you this:  In the context of police

12  practices, once a confession is obtained, what's the next step

13  in any investigation?

14  A.  Is to do your very best to corroborate -- to get as much

15  detail about that situation and then do everything you can to

16  corroborate that confession independently.

17          In other words, a confession is not the end of an

18  investigation.  It's the beginning of the next phase of an

19  investigation, where you need to go out and corroborate as

20  best you can everything that was said in that confession.

21  Q.  And why?

22  A.  Well, to -- for a couple of reasons.  One, to assess the

23  truthfulness of the confession that that is exactly what

24  happened.  And that makes a very -- you know, a much tighter

25  case.  Assuming a person has confessed truthfully and they're

McCrary - direct

1  telling you, you know, what they've done, you want to go out

2  and corroborate that independently so it isn't just -- if that

3  person were later to recant, say, no, that never happened, if

4  you have any independent facts, the more independent facts you

5  can have in place to substantiate that confession, the better

6  off you are.  Or if you can't, maybe you have to consider the

7  fact that there's a problem with that particular confession.

8  Q.  And when you use the word "corroborate," what do you mean?

9  A.  To independently validate what they're telling you

10  happened to the best of your ability, that there are any

11  independent facts out there that you could go out and

12  investigate to determine that that confession is true, is

13  factual.

14  Q.  And in your review of this case, what, if any, other

15  evidence could you identify with regard to Nicole Harris being

16  the perpetrator of a murder other than her incriminating

17  statements?

18  A.  None that I could see.

19  Q.  And did you identify any corroboration of Ms. Harris'

20  incriminating statements?

21  A.  Well, which ones?  I mean, if we go with the alleged phone

22  cord thing, I think that is not corroborated.  And, then, the

23  other one seems to fit the pattern that -- as far as the -- at

24  least the mechanics of the death is that the elastic around

25  the bed sheet was the instrument of death.  But beyond that,

McCrary - direct

1    there was nothing that I saw that went any further than that.

2    Q.   And what about the video confession that you reviewed?

3    A.   Well, the video confession, to me, was another kind of a

4    problematic thing because the -- Detective Noradin and the

5    state attorney, I think Ms. Grogan was her name, were there

6    and the state attorney said, before -- this is what you told

7    me, and she went in and laid out the whole scenario and

8    then -- in effect, telling Ms. Harris what happened or what

9    they believed happened rather than let her tell them.

10         Any time you're doing an interview and interrogation,

11   the purpose isn't it to tell that person what you think

12   happened.  It's to find out what they know.  And that's just

13   the opposite of how that should have been conducted.

14   Q.   And why is that the purpose of interviewing?

15   A.   Because otherwise, you are contaminating the interview or

16   the interrogation by telling them what you think happened.

17         As an investigator, what I think happened doesn't

18   matter at all.  What matters are the facts and what that

19   person is going to tell me happened.  I'm not telling them

20   what I think happened.  That's not our job.  Our job isn't to

21   believe or disbelieve anybody.  It's to find facts.  And what

22   I believe is of no consequence.  It's the facts that are

23   important.

24         So, to sit down and tell somebody what you think

25   happened and just to have them repeat that back doesn't really

1   move us very far forward in the direction of getting to the

2   truth.

3   Q.  And in your opinion, is it ever justified for a police

4   officer to fabricate evidence?

5   A.  Obviously not, no.  No.  No.  That's really -- no.  I

6   mean -- no.

7   Q.  And if you or if the jury were to accept plaintiff's

8   statements that she was -- and defendants' admissions -- that

9   she was not free to leave the police station and that --

10          MR. HALE:  Objection.

11          THE COURT:  Sustained on form.

12          Rephrase it.

13  BY MS. HOFT:

14  Q.  In your opinion, did you conclude -- or what was your

15  ultimate conclusion with regard to the defendants' conduct in

16  this case if you consider Ms. Harris' assertions of physical

17  and psychological abuse, promises to go home if she confessed?

18          MR. HALE:  This has been asked and answered.

19          THE COURT:  Overruled.

20          You may answer, if you can.

21  BY THE WITNESS:

22  A.  Yes, if we assume -- if I were to assume what Ms. Harris

23  has alleged to have happened -- I'm talking about the physical

24  abuse, pushing, shoving; verbal abuse, the berating of her,

25  all of those things, handcuffing her -- the totality of those

McCrary - cross

1    things, then that certainly is a willful and a deliberate

2    departure from police standards.  It's a horrible violation.

3    Even if any one of those things is true, that violates basic

4    police conduct.  Then it would be -- and also showing sort of

5    an utter disregard for the truth, if that's what happened.

6              MS. HOFT:  If I could just have a moment, your Honor?

7              THE COURT:  You may.

8         (Brief pause.)

9              MS. HOFT:  I have no further questions.

10             THE COURT:  Cross-examination.

11                         CROSS-EXAMINATION

12   BY MR. HALE:

13   Q.  Good afternoon.

14   A.  Good afternoon, Mr. Hale.  How are you, sir?

15   Q.  I'm wonderful.  How are you?

16   A.  Good.  Thank you.

17   Q.  What kind -- well, first of all, you said you reviewed a

18   lot of materials, right?

19   A.  Yes, sir.

20   Q.  You submitted a list of 12 pages of materials you

21   reviewed, right?

22   A.  Yes, sir.

23   Q.  And you knew you were going to testify today?

24   A.  Yes.

25   Q.  You knew you needed to be familiar with the materials,

McCrary - cross

37

1   correct?

2   A.   Yes.

3   Q.   And you wanted to be accurate today?

4   A.   Yes.

5   Q.   And thorough?

6   A.   Yes.

7   Q.   Okay.

8            What is your understanding of the first time the

9   police talked to Nicole Harris at the police station?

10  A.   At the police station, she was transported from the

11  hospital to the police station around -- I'd have to go back.

12  I think around 7:00 or 8:00 o'clock that evening, the evening

13  of the 14th.

14  Q.   My question, what's the first time they actually

15  interviewed her at the police station?

16           MS. HOFT:  Objection to form.

17  BY THE WITNESS:

18  A.   I'd have to look at the -- I've got a timeline.  It was

19  later.  I don't recall off the top of my head.

20  BY MR. HALE:

21  Q.   So, I just want to ask you questions --

22           THE COURT:  I am sorry, was there an objection?  I

23  heard you barely.

24           MS. HOFT:  Oh, sorry, Judge.  Yes, there was an

25  objection to form, and asked and answered.

McCrary - cross

```
 1           THE COURT:  Overruled.  It can stand.
 2   BY MR. HALE:
 3   Q.  So, I just want to ask you just without looking at
 4   anything, you came in here; you knew you were going to
 5   testify, right?
 6   A.  Yes.
 7   Q.  You were prepared to testify, right?
 8   A.  Yes.
 9   Q.  You've had as much time as you wanted to get ready to
10   testify today, right?
11   A.  Well, there's a lot of other things going on in my life,
12   but I think I'm prepared to testify today.  But I can't -- I
13   don't have a memory of every single minute of every issue that
14   occurred during this investigation.  I have notes I'm happy to
15   look at that would refresh my recollection, that I could nail
16   this down and be a little more specific.
17   Q.  Is there anything that prevented you from preparing as
18   much as you wanted to testify today?
19   A.  No.  I am prepared --
20   Q.  Okay.  So, let's just go --
21   A.  -- to testify.
22   Q.  Let's just go through what you know first, okay?
23           What time did the police first interview Nicole
24   Harris at the police station?
25   A.  It was the evening of May 14th.  She was transported there
```

McCrary - cross

1  around 8:00.  I don't recall the exact time that the -- I have

2  a timeline I'd be happy to look at.  If you're just doing a

3  memory quiz, I don't -- I don't -- recall off the top of my

4  head.

5  Q.  Do you think me asking you the time the police first

6  interviewed Nicole Harris at the police station is an unfair

7  question?

8  A.  No, it's not unfair.  I don't know that it goes to my

9  overall opinion in any way as to the things I just testified

10 to as to what time a given thing occurred.

11 Q.  Is that a question you didn't think you would be asked?

12 A.  I -- again, I prepared notes and I have a timeline I would

13 be happy to refer to, as I've done in many other cases,

14 because I cannot remember every single fact.

15 Q.  And I'm not going to ask you to remember every single

16 fact.  I'm going to ask you to tell me certain facts that I

17 think are important.  Okay?

18        MS. HOFT:  Objection, your Honor.

19 BY THE WITNESS:

20 A.  That's fine.

21        THE COURT:  Sustained on form.

22        MR. HALE:  All right.

23 BY MR. HALE:

24 Q.  So, you don't know exactly what time the police first

25 interviewed Nicole Harris at the police station, correct?

McCrary - cross

1  A.  It's the evening of the 14th, maybe around 9:00 o'clock or

2  so to my best recollection.  I don't recall exactly.

3  Q.  And what's the next time the police had an interaction

4  with Nicole Harris at the police station?

5  A.  It would be --

6        MS. HOFT:  Objection to form, your Honor.

7  Interaction.

8        THE COURT:  Sustained.

9        Rephrase it.

10  BY MR. HALE:

11  Q.  What's the next time the police talked to Nicole Harris at

12  the police station?

13  A.  In the -- I believe, the small hours of the morning.

14  Q.  What time?

15  A.  Maybe after midnight, 1:00 o'clock.  Something like that,

16  I think.

17  Q.  What's the next time the police interview Nicole Harris?

18  A.  2:25 they ask her if she would take a polygraph, as I

19  recall.

20  Q.  And what's your understanding the next time the police

21  interview Nicole Harris?

22  A.  Would be the following -- on the 15th.  I don't -- it

23  would be around the time that she was taken for the polygraph,

24  which was scheduled for noon on the 15th, as I recall.  They

25  might have had contact, they might have talked to her early in

McCrary - cross

41

 1   the morning.  I don't really recall.

 2           But around noon was the next time I recall.  That's

 3   when the polygraph was scheduled and occurred.  So, that

 4   certainly was a time they were talking to her.

 5   Q.  Do you think there might have been some contact in the

 6   morning?

 7   A.  It's possible there was contact.  I mean, she had to be

 8   transported or taken from the holding cell or the interview

 9   room, wherever she had been held, to the polygraph.  So, there

10   might have been some interaction.

11   Q.  Was there any kind of police interview in the morning with

12   Nicole Harris?

13   A.  I don't recall.

14   Q.  And you talked about noon.  What's the next time -- what's

15   your understanding of the next interview the police do with

16   Nicole Harris?

17   A.  I don't really recall exactly --

18   Q.  If there is a next time even.

19   A.  Well, there was ultimately the -- there were a couple of

20   interviews by state attorneys, Mr. O'Reilly and then

21   Ms. Grogan.  And, obviously, as I just testified to, there was

22   a interview with her prior to the videotape of Ms. Grogan.

23   So, all that would have occurred, as well.

24   Q.  Is there anything else you want to add to what you just

25   told us?

McCrary - cross

42

1   A.   No.

2   Q.   About interviews with the police and Nicole Harris?

3   A.   That's what I recall.

4          MS. HOFT:   Object to form, your Honor.

5          THE COURT:   Sustained on form.

6          MR. HALE:   Okay.

7   BY MR. HALE:

8   Q.   Let's walk through it a little bit.  The first interview

9   that the police have at the police station, that is an

10  interview, correct?

11  A.   Yes.

12  Q.   Right.

13         Meaning -- your distinction was, between an interview

14  and an interrogation, an interview is not accusatory, correct?

15  A.   Correct.

16  Q.   So, what's your understanding of what happened during the

17  first interview at the police station?

18  A.   I'm not sure.  But I'll look at my notes.  They had spoken

19  to her.  I just don't recall offhand.

20  Q.   Do you remember anything that she said to the police in

21  the first interview?

22  A.   I don't offhand.  There was very little documentation on

23  the interviews and interrogations, as I recall.

24  Q.   Little documentation?

25  A.   Little.

McCrary - cross

1    Q.  You don't remember seeing three pages of handwritten notes

2    about that first interview?

3    A.  I recall --

4              MS. HOFT:  Objection to form.

5    BY THE WITNESS:

6    A.  -- seeing some notes about that --

7              THE COURT:  Sir, if there is an objection, just let

8    me rule first, please.

9              THE WITNESS:  Oh, I'm sorry.

10             THE COURT:  Objection?

11             MS. HOFT:  To form, your Honor.

12             THE COURT:  Sustained.

13             Rephrase.

14   BY MR. HALE:

15   Q.  Did you see, sir, three pages of handwritten notes of an

16   initial interview of Nicole Harris?  Do you remember seeing

17   it?

18   A.  I'm sure -- I'm sure I did.

19   Q.  But as you sit here, you don't remember it, do you?

20   A.  I don't remember it specifically, no.  If you'd like to

21   show it to me, I'd be happy to review it.

22   Q.  When is the last time you looked at any of the police

23   reports?

24   A.  Over the last few days.  But there are thousands of pages,

25   sir.

McCrary - cross

```
 1   Q.   Thousands of pages?

 2   A.   Trial transcripts, police reports, depositions.  There are

 3   hundreds of pages each deposition.  That's all the material

 4   that I had reviewed before preparing a report and prior to

 5   showing up here today.

 6   Q.   My question was:  When is the last time you reviewed the

 7   police reports?

 8             MS. HOFT:  Objection.  Argumentative.

 9             THE COURT:  Overruled.

10             You may answer, if you can, sir.

11   BY THE WITNESS:

12   A.   It would have been part of what I reviewed in preparation

13   for testimony today.

14   BY MR. HALE:

15   Q.   And there weren't thousands of pages of police reports,

16   right?

17   A.   Not of themselves, no.

18   Q.   And, in fact, your opinion is there is not enough

19   information in the reports, right, is your criticism?

20   A.   Some of it is lacking, yes, for sure.

21   Q.   But you don't remember as you sit here today reading three

22   pages of handwritten notes of an interview of Nicole Harris?

23   A.   No, I did.  I don't recall it off the top of my head.

24   Q.   Can we agree that the first interview at the police

25   station between Nicole Harris and the detectives was
```

McCrary - cross

1   non-accusatory?

2   A.  Probably, yes.

3   Q.  Are you guessing?

4   A.  I think it was an interview.  At what stage they began to

5   formulate -- I know it was early they began to formulate this

6   idea that there's something suspicious about her and her

7   behavior when they first contacted her.  So, while it might

8   not have been accusatorial per se, the idea that they were

9   judging her potential guilt on her demeanor would indicate

10  that this was perhaps something more than just a benign

11  interview of a witness, because they were harboring these

12  suspicions, according to their own testimony, when they first

13  saw her and when they observed her.

14  Q.  Do you have any understanding of whether the detectives

15  involved in the first interview at the police station with

16  Nicole Harris were the same ones or different ones who saw her

17  at the hospital?

18  A.  I think they were different.

19  Q.  Okay.

20          Do you have any recollection of anybody who

21  interviewed Nicole Harris at the police station at the initial

22  interview making any initial comments about her demeanor prior

23  to that?

24  A.  I don't recall off the top of my head.

25  Q.  Who first interviewed Nicole Harris at the police station?

 1   A.  I don't recall right now.

 2   Q.  Well, you're making comments about the police officers

 3   jumping to conclusions --

 4   A.  Yes.

 5   Q.  -- right?

 6   A.  Yes, sir.

 7   Q.  So, what I want to know is the police officers -- you

 8   don't know who interviewed her at the police station, right?

 9   A.  Not off the top of my head.

10   Q.  So, you can't even tell the jury whether those officers

11   did or did not previously make observations about Nicole

12   Harris, right?

13   A.  Only based on their own testimony.

14   Q.  Right.  You don't know what that testimony is?

15   A.  I do.  It's stuff I've testified to already, that the

16   officers had thought that she was suspicious based on -- let

17   me look at my report here, if I may.

18   Q.  You want to look at your report?

19   A.  Yes.  May I?

20   Q.  Go ahead, yeah.

21   A.  Thank you.

22        They thought it was -- let's see.

23   Q.  You keep saying "they."  Can you be more specific?

24   A.  Yes, I will.

25        (Brief pause.)

McCrary - cross

 1   BY THE WITNESS:

 2   A.  Well, I know that Detective -- here again, I have notes

 3   that you don't want me to look at, I guess.  Detective Wo --

 4   Q.  I know you've got notes.

 5   A.  Yes.

 6   Q.  You just looked at your report.  Did your report help?

 7   A.  A little, not a lot.  I have notes on another copy of my

 8   report that has more detail.

 9   Q.  And just to be clear, in your report, you were free to

10   write that with as much detail as you wanted supporting who

11   you thought made observations about Nicole Harris, correct?

12   A.  Yes.

13   Q.  Okay.

14           And can you give me a name?

15           MS. HOFT:  Object to form, your Honor.

16   BY THE WITNESS:

17   A.  Hang on one second, if I might.

18           THE COURT:  Overruled.

19           You may answer, if you can.

20   BY THE WITNESS:

21   A.  Detective Wo indicated that Ms. Harris was very stoic.  He

22   further testified that he never saw her cry during the time

23   she was at Area 5 Detectives, that she did not appear

24   distraught.  He further testified that he had never witnessed

25   any parent go into a state of shock over the loss of a loved

McCrary - cross

1   one.

2         And that was Detective Wo's deposition transcript,

3   Page 28, Lines 9 through 18; Page 29; and, Pages 55 to 56.

4   BY MR. HALE:

5   Q.  Was Detective Wo involved in the initial interview of

6   Nicole Harris at the police station?

7   A.  I don't recall at this point, but he was seeing her.  He

8   was observing her there.  And this was his impression, as well

9   as the impressions of other officers.

10   Q.  Right.

11         My question was -- and I'll say it again because I

12   don't think you answered it -- was Detective Wo involved in

13   the first interview of Nicole Harris at the police station?

14   A.  I don't recall.

15   Q.  Was Detective Wo involved in the second interview of

16   Nicole Harris at the police station?

17   A.  I don't recall.

18   Q.  Was Detective Wo involved in the third interview of Nicole

19   Harris at the police station?

20   A.  I don't recall.

21   Q.  Was Detective Wo involved in any interview of Nicole

22   Harris?

23   A.  I don't recall.

24   Q.  Is that something you think you would have liked to have

25   known?

McCrary - cross

1    A.   I think I knew, and it's in my notes and I could tell you.

2    I just don't recall off the top of my head.

3    Q.   And when is the last time you looked at your notes?

4    A.   Well, the last time I looked at my notes -- they're

5    voluminous because the documents are voluminous.  So, it would

6    be earlier today.

7    Q.   How many pages are your notes, about?

8    A.   All my notes?

9    Q.   Your notes and when you -- whatever you read, you took

10   notes of, yeah.

11   A.   How many?

12   Q.   How many pages?  About how many pages?

13   A.   Lord, I don't know.  Hundreds.  Hundred or more probably

14   all together with the deposition transcripts and the

15   interviews and the trial transcripts and all of that.

16   Q.   Did you read your notes today?

17   A.   Some of them.

18   Q.   Did you read your notes last night?

19   A.   Some of them.

20   Q.   Okay.

21        There's nothing wrong, is there, when there's a death

22   of a child, with a detective making an observation that, hmm,

23   this parent doesn't seem to be exhibiting the kind of behavior

24   I would think they'd exhibit if they lost a child?  Is there

25   anything wrong with them making that mental note?

McCrary - cross

1   A.   Yes.

2   Q.   They should be robots and they should not even assess what

3   the person's demeanor is like?

4   A.   They can.  But they shouldn't base judgment on that.  You

5   could say they appear stoic, they appear emotional.

6   Q.   Right.

7           My question was --

8   A.   It doesn't go to guilt.

9   Q.   My question was about basing judgment.

10          There's nothing wrong, is there, in making a personal

11  observation about a parent's reaction who's lost a child,

12  correct?

13          MS. HOFT:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

15          You may answer, if you can.

16  BY THE WITNESS:

17  A.   There's nothing wrong with making an observation.  It's

18  wrong when you --

19  BY MR. HALE:

20  Q.   That's my question.

21  A.   -- interpret it --

22  Q.   That's my question.

23          There's nothing wrong with making an observation,

24  correct?

25  A.   In isolation, correct.

McCrary - cross

1    Q.   Okay.

2              When is your understanding of when Nicole Harris

3    first confessed?

4    A.   In the early morning hours of the 15th, around midnight --

5    after midnight sometime.

6    Q.   And what is your understanding of how much time had

7    elapsed between the first confession and the first interview?

8    A.   Would be a few hours.

9    Q.   A few hours?

10   A.   Yes.

11   Q.   Okay.

12             And when Nicole Harris first confessed, it was during

13   an interview setting, wasn't it?

14   A.   Well, that's what the detectives say, yes.

15   Q.   Right.

16             You read nothing where the officers were making

17   accusations in that meeting accusing Nicole Harris of

18   murdering her son, correct?

19   A.   There's no document on the police file that go to that.

20   There's no indication of what they were doing or saying.

21   That's part of the issue.  We don't have any documentation as

22   to what occurred other than this alleged confession, which is

23   obviously disputed.

24   Q.   Well, what did the officers -- what's the detectives'

25   version about what they say happened?

McCrary - cross

1   A.  That she spontaneously confessed.

2   Q.  Right.

3          And what do they say happened before she

4   spontaneously confessed?

5   A.  I don't recall.

6   Q.  Do you recall there being any discussion about anything --

7   from the officers' standpoint, do you recall there being a

8   discussion about anything before they said Nicole Harris

9   confessed?

10  A.  I don't recall.

11  Q.  You read all the depositions, and I think you said you

12  read them very closely, right?

13  A.  I read each deposition, yes, and took notes.  And I have

14  all those notes with me and --

15  Q.  Right.

16          And the depositions -- let's look at -- you read the

17  depositions very carefully, right?

18  A.  I read them as carefully as I could, sir.

19          MR. HALE:  Your Honor, if I can approach?  I just

20  want to refresh recollection, if I could.

21          THE COURT:  You may.

22  BY MR. HALE:

23  Q.  I'm going to show you your deposition, Page 98, Lines 18

24  through 19.

25          MS. HOFT:  If you could just give me a minute,

McCrary - cross

53

1   counsel?

2           MR. HALE:  Yep.

3           MS. AUERBACH:  What are you refreshing?

4           MR. HALE:  What I just asked him.

5           MS. HOFT:  Okay.

6           MR. HALE:  98, 18 through 19.

7           MS. HOFT:  Okay.

8       (Document tendered.)

9           MR. HALE:  Underline there, right here (indicating).

10  BY MR. HALE:

11  Q.  Did you read it?

12  A.  Yes.

13  Q.  Does that refresh your recollection that the depositions

14  you read very carefully?

15  A.  Yes.

16  Q.  So, as you sit here today, you don't recall any testimony

17  in anything you read or prepared from that these detectives --

18  some of these detectives -- were asking Nicole Harris about

19  hitting her kids with a belt?

20  A.  That they were asking her about that?

21  Q.  Yes.

22  A.  That certainly had come up in interviews with witnesses

23  who alleged that they had seen that.

24  Q.  Right.  It came up in interviews with witnesses that had

25  seen that, right?  And, then, it came up when they went to

McCrary - cross

 1    talk to Nicole Harris at 12:45 in the morning, right?

 2              MS. HOFT:  Objection to form.

 3              THE COURT:  Sustained on form.

 4              Rephrase it.

 5    BY MR. HALE:

 6    Q.   The officers -- wasn't the whole -- from the officers'

 7    standpoint, wasn't the whole point of the 12:45 interview to

 8    ask her about what they had learned from a witness about her

 9    hitting the boys with a belt?

10    A.   That's -- that's what they indicated, yes.

11    Q.   You're remembering that now?

12    A.   Yes, I am.

13    Q.   Do you remember the witness' name who told the police

14    that?

15    A.   That was a Ms. Arnold.  Daneeji (phonetic) or something.

16    I forget the --

17    Q.   Dinaja Arnold --

18    A.   Dinaja Arnold.

19    Q.   -- right?

20    A.   There you go.

21    Q.   And the police version is during that interview, Nicole

22    Harris confessed, right?

23    A.   That's what they say.

24    Q.   Right.

25              And you're not pick- -- let's be clear.  You're not

McCrary - cross

1   picking sides here today, right?

2   A.  That's correct.

3   Q.  You're not here to say, I believe the police or I believe

4   Nicole Harris, correct?

5   A.  That's correct.

6   Q.  As the Judge has instructed, the jury makes the

7   credibility determinations, right?

8   A.  Totally.

9   Q.  Okay.

10          And both sides agree -- when I say "both sides,"

11  Ms. Harris and the detectives agree -- that at that 12:45

12  meeting, she was placed under arrest, correct?

13  A.  Yes.

14  Q.  And she was moved to an interview room, correct?

15  A.  Yes.

16          MS. HOFT:  Objection, your Honor, to the

17  characterization.

18          THE COURT:  That she was moved to an interview --

19          MS. HOFT:  To an interview room and that we agreed at

20  that time.

21          THE COURT:  I did not -- the agreement was not

22  attached to the last question.  It was attached to the time of

23  arrest.

24          Are you disputing -- the question about being moved

25  to the interview room was not linked to an agreement.

1      MS. HOFT:  But our objection, your Honor, was the

2  characterization of that she was then moved to an interview

3  room, when we all agree that it was an interrogation room and

4  she was locked inside.

5           THE COURT:  Mr. Hale?

6           MR. HALE:  We've called it an interview room.

7           THE COURT:  Why don't you rephrase it.

8           MR. HALE:  All right.

9  BY MR. HALE:

10 Q.  Let me ask you this:  What's your understanding of where

11 Ms. Harris was when she -- when the police officers say that

12 she confessed?

13 A.  I think they referred to it as a butterfly room.  And,

14 then, once she had allegedly confessed, they took her to

15 another either interview or interrogation room where she was

16 locked inside.  Locked from the outside.  She was locked in.

17 Q.  And at that point, she's placed under arrest, right?

18 A.  Yes, sir.

19 Q.  And at that point, when you talked about she's -- she is

20 now in a police station under arrest, right?

21 A.  Yes.

22 Q.  She's no longer in the living room of her house, right?

23 A.  Correct.

24 Q.  You said she's isolated, right?

25 A.  Yes.

McCrary - cross

1  Q.  Because she's at a police station under arrest, correct?

2  A.  Yes.

3  Q.  And, in fact, when the police have a suspect -- Chicago

4  police -- they can keep somebody in one of those interview

5  rooms up to 48 hours before taking them to a judge, right?

6  A.  I believe that's correct.

7  Q.  And you said home game, away game.  She's under arrest at

8  a police station and that's where she's at, right?

9  A.  I agree.

10          MS. HOFT:  Object to the form.

11          THE COURT:  Overruled.  That can stand.

12  BY MR. HALE:

13  Q.  I've got a lot to cover, but I'm going to try to cut to

14  the chase.  You say that, you know, a case has to be based on

15  evidence.  A confession is evidence, correct?

16  A.  If it's a valid confession.

17  Q.  If it's a valid confession, it's evidence, right?

18  A.  Yes.

19  Q.  Okay.

20          When you were at the FBI, you interrogated suspects

21  for up to four to five hours straight, right?

22  A.  I don't believe so.  We -- we -- I can't -- I can't recall

23  any going more than two to three hours.  And four to five

24  hour, that'd be unusual.

25  Q.  Well, let me look at your deposition.  It was given on

McCrary - cross

1    April 6th, 2016, Line -- Page 218, Line 16 through 24.

2         You were under oath at the time, right?

3    A.  Yes, sir.

4    Q.  "Question:  What's the longest period of time you believe

5    the FBI has kept a suspect in an interrogation room?

6         "The longest time?  I wouldn't know for sure.  I

7    mean, we typically don't interview -- "

8              THE COURT REPORTER:  Mr. Hale --

9              MR. HALE:  I'm sorry.

10   BY MR. HALE:

11   Q.  "What's the longest -- "

12             MS. HOFT:  Objection.

13   BY MR. HALE:

14   Q.  " -- period of time you believe the FBI has kept a suspect

15   in an interrogation room?

16         "Answer:  The longest time, I wouldn't know for sure.

17   I mean, we typically don't interview for more than four hours,

18   five hours max.  Four or five hours.  I can't imagine anything

19   going longer than that without taking a break."

20         Were you asked those questions, did you give those

21   answers?

22   A.  Yes.

23   Q.  Okay.

24         Sir, when you were at the FBI for 25 years --

25   A.  Yes.

McCrary - cross

1  Q.  -- the FBI never recorded suspect interviews, correct?

2  A.  Rarely.  It was not the policy, that's correct.

3  Q.  And you can think of many cases where an individual

4  confesses but then recants shortly thereafter, right?

5  A.  There are those cases, yes.

6  Q.  And on your CV, one of the things you list under "Other

7  Training" is the Reid School of Interviewing and

8  Interrogation, correct?

9  A.  Yes.

10  Q.  And, in fact, it's probably the most prevalent

11  interrogation technique in law enforcement, right?

12  A.  Yes.

13  Q.  You would agree that interviews can change from

14  preliminary interviews to an interrogation quickly, correct?

15  A.  Possibly, yes.

16  Q.  And one of the things that causes -- that can cause an

17  interview to change quickly to an interrogation is the person

18  being interviewed can suddenly start confessing or making

19  inculpatory statements, right?

20  A.  Yes.

21  Q.  In your experience with individuals confessing, you've

22  seen them confess where they were truly guilty but got certain

23  facts wrong in the confession, right?

24       MS. HOFT:  I'm going to object, your Honor, based on

25  the motion in limine that the defendants brought and what it

1    seems like they're opening the door now to, an area that they

2    sought to be precluded.

3              THE COURT:  I am not sure which ruling you are

4    referring to.  Why don't you just briefly tell Mr. Hale and

5    see if he rephrases it.  If not --

6         (Counsel conferring.)

7              MR. HALE:  I don't think I agree with what she's

8    saying.

9              MS. HOFT:  I'd ask for a sidebar, your Honor.

10             THE COURT:  Ask your next question.  We will see if

11   we need one.

12   BY MR. HALE:

13   Q.  You have seen confessions where the person was ultimately

14   guilty in your mind, but withheld certain information, right?

15   A.  Yes.

16   Q.  You've been involved in cases where the medical examiner

17   or medical examiner equivalent changed their opinion on the

18   cause of death, right?

19   A.  Yes.

20             MR. HALE:  Can I have one moment, your Honor?

21             THE COURT:  Yes.

22        (Brief pause.)

23   BY MR. HALE:

24   Q.  Just a couple things, sir, and I'm going to wrap it up.

25             One of the things you relied on, sir, was, if you

McCrary - cross

61

1    look in your notes, Karen -- there was certain parts of the

2    criminal trial you relied upon, correct?

3    A.  Yes, I reviewed the criminal trial, yes.

4    Q.  And one of the portions you list in your report as having

5    relied upon was the criminal trial testimony of Karen Wilson

6    from the Department of Child and Family Services?

7            MS. HOFT:  Objection.  Mischaracterizes the

8    testimony.

9    BY MR. HALE:

10   Q.  One of the things -- you can look at your report at Page

11   12.  I think it's Page 12.  Actually, it's not Page 12.  I'll

12   tell you what page it is.

13           It's Page 1 of what you relied upon.

14   A.  Page 1 of what I relied upon?

15   Q.  You've got a document called, "Material Provided to Police

16   Practices -- "

17   A.  Correct.

18   Q.  " -- Expert Gregg McCrary"?

19   A.  Yes.

20   Q.  Okay.

21           You see there's testimony of criminal trial listed on

22   that page?

23   A.  Yes.

24   Q.  And, then, for the date 10-24-05, you list the second

25   person down, Karen Wilson?

1   A.  Yes.

2   Q.  And do you recall that Karen Wilson testified that Diante

3   Dancy said he was asleep when his brother got hurt?

4   A.  Among other things, yes, she testified to that.

5   Q.  You also relied upon, if you go to Page 12 of your list of

6   things you relied upon, at the bottom it says, "Chicago Fire

7   Department Ambulance Records."

8           Do you see that?

9   A.  Yes.

10          MR. HALE:  If I could have the Elmo, please.

11  BY MR. HALE:

12  Q.  I'm going to show it to you first.  Just so you

13  understand, you see it has the Bates numbers?  You list CCFAO

14  272 to 275.

15          Do you see that?

16  A.  That's correct.

17  Q.  I'm going to show you 273, '74 and '75.

18      (Documents tendered.)

19  BY MR. HALE:

20  Q.  See that?

21  A.  Yes.

22  Q.  Okay.

23  A.  And, again, I haven't memorized this.  I mean, there are a

24  number of things there but --

25  Q.  But your lawyers gave you this as something they wanted

 1  you to look at, right?

 2  A.  Yes.

 3  Q.  Okay.

 4          And Page 273 is the Pre-Hospital Care Unit report.

 5  I'm going to show you the second page of this report.

 6      So, your lawyers gave you this document that said --

 7          MS. HOFT:  I'm going to object, your Honor.  Could

 8  he --

 9          MR. HALE:  It said --

10          Mr. Hale, could you identify the --

11          MR. HALE:  Yeah.

12          MS. HOFT:  -- CCFAO number?

13          MR. HALE:  Right.  It's CC -- this is CCFAO 274.

14  BY MR. HALE:

15  Q.  And what I've highlighted says, "Patient had broken blood

16  vessel all about the face.  Patient eyes were bulging out.

17  Patient had finger marks on his chest.  Patient had round mark

18  on his buttock."

19          Do you see that?

20  A.  Yes.

21  Q.  This is a report your lawyers gave to you?

22  A.  That's correct.

23  Q.  You read Nicole Harris' trial testimony, right?

24  A.  Yes.

25  Q.  And at one point Nicole Harris testified that after they

McCrary - cross

64

 1   got in trouble, Jaquari was crying, but Diante was not crying,

 2   right?

 3   A.  Yes.

 4   Q.  And you had said that you read all the depositions.  If

 5   you look at Pages -- Page 1 of your -- Page 11 and 12 of the

 6   depositions --

 7   A.  Of the material reviewed, you mean?

 8   Q.  Yeah.  Page 11 at the bottom, it says, "Deposition

 9   Transcripts"?

10   A.  Okay.  Yes.

11   Q.  All right.

12         You don't list defendant Kelly, correct?

13   A.  I don't see it.

14   Q.  Are you aware there is a defendant Kelly?

15   A.  Yes.

16   Q.  Okay.

17         You don't list -- you weren't given the deposition of

18   Sta-Von Dancy, correct?

19   A.  No, I don't recall that.

20   Q.  And you weren't given the deposition of Diante Dancy,

21   correct?

22   A.  Correct.

23         MR. HALE:  One moment, your Honor.

24      (Brief pause.)

25         MR. HALE:  I don't have any further questions.

McCrary - redirect

65

 1              THE COURT:  Redirect, Ms. Hoft?

 2              MS. HOFT:  Yes.  Just briefly, your Honor.

 3                      REDIRECT EXAMINATION

 4   BY MS. HOFT:

 5   Q.  First of all, Mr. McCrary, do you remember whether or not

 6   the ambulance report that Mr. Hale just showed you was the

 7   complete and final ambulance report in this case?

 8   A.  I don't know.

 9   Q.  Do you know if there was another version of the ambulance

10   report that you were not provided early on in this case?

11   A.  If I wasn't provided it, I don't know about it.

12   Q.  Okay.

13              And if we were to allow you to go back and look at

14   all your notes, would you be able to come up with the times

15   that the defendants claim each of these interviews happened by

16   reviewing the reports?

17   A.  Yes.

18              MS. HOFT:  If I could just have a moment, your Honor?

19              THE COURT:  You may.

20   BY MS. HOFT:

21   Q.  Mr. Hale asked you a number of questions about true

22   confessions.  Do you recall those questions?

23   A.  Yes.

24              MS. HOFT:  And, Judge, I believe that the door has

25   been opened for me to ask about false confessions.

McCrary - redirect

66

1         THE COURT:  Overruled.  With the Court's prior

2  ruling, the door was not opened to that and I have already

3  ruled --

4         MS. HOFT:  To the existence?

5         THE COURT:  I have already ruled that he's not

6  qualified to testify on those.

7         MS. HOFT:  I understand, but Mr. Hale went into true

8  confessions.  I think I should be able to --

9         THE COURT:  I do not know what you are going to ask

10 him, but I have already ruled he is not qualified to opine on

11 that here.  So --

12        MS. HOFT:  Right, right.

13 BY MS. HOFT:

14 Q.  Let me just ask you this, Mr. McCrary:  Are you aware of

15 the phenomenon of false confession?

16        MR. HALE:  Objection.  Not proper subject.

17        THE COURT:  Sustained on form.

18        MR. HALE:  And beyond the scope of what I asked.

19        THE COURT:  Sustained on form.

20 BY MS. HOFT:

21 Q.  Mr. McCrary, do you have any awareness of whether or not

22 there are also false confessions documented?

23 A.  Yes.  There are numerous --

24        MR. HALE:  Objection.

25 BY THE WITNESS:

McCrary - redirect

67

1    A.   -- thoroughly documented.

2          MR. HALE:  I think it's an improper topic, and I

3    think it's beyond the scope.

4          THE COURT:  Overruled.  That answer can stand.

5          MS. HOFT:  I have nothing further.

6          THE COURT:  Any recross?

7          MR. HALE:  No.

8          THE COURT:  Thank you, Mr. McCrary.  You may step

9    down.

10         THE WITNESS:  Thank you, your Honor.  Appreciate it.

11      (Witness excused.)

12                        *     *     *     *     *

13

14   I certify that the foregoing is a correct excerpt from the
     record of proceedings in the above-entitled matter.

15

16
     /s/ Joseph Rickhoff                     May 29, 2020
17   Official Court Reporter

18

19

20

21

22

23

24

25